*71595*

CAUSE NUMBER 71,595

IN THE
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS

---

**RICK ALLAN  RHODES**

**VS**

**THE STATE OF TEXAS**

---

On Direct Appeal From The
179th Judicial District Court
of Harris County, Texas
Cause No. 612408

---

**APPELLANT'S BRIEF ON APPEAL**

---

COUNSEL FOR APPELLANT:
JAMES STAFFORD
1512 Alabama
Houston, Texas 77004-3936
State Bar No. 18996900
(713) 521-3600 (Telephone)
(713) 528-3933 (Facsimile)

x

FILED IN
COURT OF CRIMINAL APPEALS

SEP 7  1993

Thomas Lowe, Clerk

CAUSE NUMBER 71,595

IN THE
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS

---

**RICK ALLAN  RHODES**

**VS**

**THE STATE OF TEXAS**

---

On Direct Appeal From The
179th Judicial District Court
of Harris County, Texas
Cause No. 612408

---

**APPELLANT'S BRIEF ON APPEAL**

---

COUNSEL FOR APPELLANT:
JAMES STAFFORD
1512 Alabama
Houston, Texas 77004-3936
State Bar No. 18996900
(713) 521-3600 (Telephone)
(713) 528-3933 (Facsimile)

X

## LIST OF PARTIES

The Appellant in this cause is RICK ALLAN RHODES.

Appellate counsel is JAMES STAFFORD, 1512 Alabama, Houston, Texas 77004-3936.

Appellant's trial attorneys were JAMES STAFFORD and DEBORAH KAISER, 1512 Alabama, Houston, Texas 77004-3936.

Appellate counsel for the State is CALVIN HARTMAN, District Attorney's Building, 201 Fannin, Houston, Texas 77002.

The trial attorney for the State was CAROL DAVIES, District Attorney's Building, 201 Fannin, Houston, Texas 77002.

The trial judge was the HONORABLE J. MICHAEL WILKINSON, 179th District Court, Harris County, Texas.

x

# TABLE OF CONTENTS

**PAGE**

List of Parties..............................................i

Table of Contents..........................................ii

Table of Citations.......................................viii

Preliminary Statement.......................................1

Point of Error One..........................................3

> THE TRIAL COURT ERRED IN GRANTING THE STATE'S
> MOTION IN LIMINE WHICH PROHIBITED APPELLANT
> FROM OPENLY DISCUSSING WITH PROSPECTIVE
> JURORS THE STATUTORILY ESTABLISHED MINIMUM
> TIME WHICH MUST BE SERVED BY AN INDIVIDUAL
> SENTENCED TO LIFE IMPRISONMENT.  SUCH A
> PROHIBITION RESTRICTED APPELLANT'S ABILITY TO
> ADEQUATELY VOIR DIRE THE PANEL AND LIMITED
> THE EFFECTIVE EXERCISE OF PEREMPTORY
> CHALLENGES.

Summary of Argument.....................................4
Statement of Facts......................................6
  Motion in Limine......................................6
  Voir Dire Discussions.................................7
  Argument and Authorities.............................15


Point of Error Two..........................................3

> THE TRIAL COURT'S DECISION TO GRANT THE
> STATE'S MOTION IN LIMINE AND LIMIT
> APPELLANT'S ABILITY TO BASE HIS PEREMPTORY
> CHALLENGES UPON A FULL DISCUSSION OF
> PUNISHMENT ISSUES DENIED APPELLANT EFFECTIVE
> ASSISTANCE OF COUNSEL DURING THE JURY
> SELECTION PROCESS.

Summary of Argument.....................................4
Statement of Facts......................................6
  Motion in Limine......................................6
  Voir Dire Discussions.................................7
  Argument and Authorities.............................15

Point of Error Three.....................................3

       THE TRIAL COURT ERRED DURING THE JURY
       SELECTION PROCESS BY PROVIDING FALSE AND
       MISLEADING INFORMATION REGARDING PAROLE
       ELIGIBILITY TO PROSPECTIVE JURORS IN HIS
       ATTEMPT TO ADHERE TO WHAT HE BELIEVED WAS
       THIS COURT'S MANDATE NOT TO INFORM THEM OF
       THE STATUTORY PROVISIONS OF ARTICLE 42.18,
       SECTION 8(B) OF THE <u>TEXAS CODE OF CRIMINAL</u>
       <u>PROCEDURE</u>.

Summary of Argument......................................4
Statement of Facts.......................................6
  Motion in Limine.......................................6
  <u>Voir Dire</u> Discussions................................7
  Argument and Authorities..............................15


Point of Error Four......................................3

       IF SECTION 37.07 OF THE <u>TEXAS CODE OF</u>
       <u>CRIMINAL PROCEDURE</u> WAS PROPERLY INTERPRETED
       AS PREVENTING THE TRIAL COURT FROM FULLY
       INFORMING THE JURY OF THE STATUTORY
       SENTENCING PROVISIONS FOR CAPITAL MURDER, THE
       SECTION VIOLATED THE DUE PROCESS RIGHTS
       AFFORDED BY THE FOURTEENTH AMENDMENT TO THE
       UNITED STATES CONSTITUTION AND ARTICLE 1,
       SECTIONS 13 AND 19 OF THE TEXAS CONSTITUTION.

Summary of Argument......................................4
Statement of Facts.......................................6
  Motion in Limine.......................................6
  <u>Voir Dire</u> Discussions................................7
  Argument and Authorities..............................15


Point of Error Five.....................................25

       THE TRIAL COURT ERRED IN ADMITTING EVIDENCE
       OVER APPELLANT'S OBJECTION DURING THE
       PUNISHMENT PHASE OF THE TRIAL THAT APPELLANT
       WOULD BE ELIGIBLE FOR UNACCOMPANIED EMERGENCY
       FURLOUGH FROM PRISON IF HE WERE ASSESSED A
       LIFE SENTENCE FOR THE OFFENSE OF CAPITAL
       MURDER. (R. 35: 1036-1038).

Statement of Facts......................................25
Argument and Authorities................................28

Point of Error Six.....................................25

        THE TRIAL COURT ERRED IN OVERRULING
        APPELLANT'S MOTION FOR NEW TRIAL BASED UPON
        THE ADMISSION OF EVIDENCE REGARDING
        UNESCORTED FURLOUGH.  SUCH EVIDENCE WAS SHOWN
        TO BE MISLEADING AND, IN CONCERT WITH THE
        COURT'S RULING REGARDING THE PROVISIONS OF
        ARTICLE 42.18 OF THE <u>TEXAS CODE OF CRIMINAL
        PROCEDURE</u>, CONSTITUTED A DEPRIVATION OF
        APPELLANT'S RIGHT TO DUE PROCESS OF LAW.

    Statement of Facts................................25
    Argument and Authorities.........................28


Point of Error Seven...................................30

        THE TRIAL COURT ERRED IN OVERRULING
        APPELLANT'S REQUESTED INSTRUCTION IN THE
        COURT'S CHARGE ON PUNISHMENT THAT THE JURY
        WAS NOT TO CONSIDER THE POSSIBILITY OF
        FURLOUGH DURING PUNISHMENT DELIBERATIONS.
        (R. 39: 4-5).

    Statement of Facts................................30
    Argument and Authorities.........................30


Point of Error Eight...................................30

        THE TRIAL COURT ERRED IN OVERRULING
        APPELLANT'S REQUESTED INSTRUCTION IN THE JURY
        CHARGE REGARDING THE MINIMUM TIME SERVED FOR
        A LIFE SENTENCE ASSESSED FOR THE OFFENSE OF
        CAPITAL MURDER. (R. 39: 4-5).

    Statement of Facts................................30
    Argument and Authorities.........................30

x

Point of Error Nine.....................................33

THE TRIAL COURT ERRED IN OVERRULING
APPELLANT'S OBJECTION TO THE STATE'S
EXERCISE OF PEREMPTORY CHALLENGE AGAINST
THE PROSPECTIVE JUROR BERNIECE HOLIDAY FOR
THE REASON THAT THE CHALLENGE WAS RACIALLY
MOTIVATED IN VIOLATION OF THE UNITED STATES
SUPREME COURT'S RULING IN BATSON V. KENTUCKY,
476 U.S. 79 (1986).

Statement of Facts....................................33
Argument and Authorities.............................40

Point of Error Ten....................................33

THE TRIAL COURT ERRED IN OVERRULING
APPELLANT'S OBJECTION TO THE STATE'S
EXERCISE OF PEREMPTORY CHALLENGE AGAINST
THE PROSPECTIVE JUROR GREGORY C. RANDLE FOR
THE REASON THAT THE CHALLENGE WAS RACIALLY
MOTIVATED IN VIOLATION OF THE UNITED STATES
SUPREME COURT'S RULING IN BATSON V. KENTUCKY,
476 U.S. 79 (1986).

Statement of Facts....................................33
Argument and Authorities.............................40

Point of Error Eleven.................................44

ARTICLE 37.071 OF THE TEXAS CODE OF CRIMINAL
PROCEDURE UNDER WHICH APPELLANT WAS SENTENCED
IS FUNDAMENTALLY UNCONSTITUTIONAL, VIOLATING
THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION
AND ARTICLE 1, SECTIONS 10 AND 19 OF THE
TEXAS CONSTITUTION. THE CONSTITUTIONAL
INFIRMITY RESTS IN THE FACT THAT TWO
DIFFERENT VERSIONS OF ARTICLE 37.071 WERE
ENACTED INTO LAW BY THE TEXAS LEGISLATURE AND
WERE IN EFFECT AT THE TIME OF APPELLANT'S
TRIAL.

Argument and Authorities.............................44

Point of Error Twelve.................................47

ARTICLE 37.071 (B) OF THE TEXAS CODE OF
CRIMINAL PROCEDURE IS UNCONSTITUTIONAL IN

x

VIOLATION OF THE EIGHTH AND FOURTEENTH
AMENDMENTS OF THE UNITED STATES CONSTITUTION
BECAUSE IT REQUIRES AN UNTRAINED JURY TO
PREDICT OR FIND THAT A DEFENDANT WILL COMMIT
FUTURE ACTS OF VIOLENCE THAT CONSTITUTE A
CONTINUING THREAT TO SOCIETY.  (R. 1: 167).

Statement of Facts
Argument and Authorities...........................47


Point of Error Number Thirteen.........................50

ARTICLE 37.071 OF THE TEXAS CODE OF
CRIMINAL PROCEDURE LIMITS AND INHIBITS THE
JURY'S CONSIDERATION OF MITIGATING EVIDENCE
IN VIOLATION OF THE EIGHTH AND FOURTEENTH
AMENDMENTS OF THE UNITED STATES CONSTITUTION
BECAUSE OF THE STATUTE'S FAILURE TO PLACE THE
BURDEN OF PROOF UPON THE STATE IN THE SECOND
SPECIAL ISSUE REGARDING MITIGATING
CIRCUMSTANCES.

Statement of Facts
Argument and Authorities...........................50


Point of Error Fourteen................................50

THE TRIAL COURT ERRED IN OVERRULING
APPELLANT'S OBJECTION TO THE PUNISHMENT
CHARGE BASED UPON THE FAILURE OF THE SECOND
SPECIAL ISSUE TO ACCURATELY PLACE THE BURDEN
OF PROOF UPON THE STATE.

Statement of Facts
Argument and Authorities...........................50

Point of Error Fifteen................................52

ARTICLE 37.071 OF THE TEXAS CODE OF CRIMINAL
PROCEDURE VIOLATES THE EIGHTH AND FOURTEENTH
AMENDMENTS OF THE UNITED STATES CONSTITUTION
BECAUSE IT FAILS TO DIRECT OR INFORM THE JURY
OF THE NATURE OF THE AGGRAVATING OR MITI-
GATING EVIDENCE THAT WOULD CALL FOR OR
AGAINST THE IMPOSITION OF THE DEATH PENALTY.
THIS DEFECT IN THE STATUTE ESSENTIALLY
ALLOWED THE JURY UNBRIDLED DISCRETION IN
IMPOSING THE DEATH PENALTY AS PROHIBITED BY
THE FOURTEENTH AMENDMENT.

Statement of Facts
Argument and Authorities.........................52

Point of Error Sixteen................................52

THE TRIAL COURT ERRED IN OVERRULING
APPELLANT'S OBJECTION TO THE PUNISHMENT
CHARGE THAT IT FAILED TO IDENTIFY AND DEFINE
THE FACTORS PRESENTED BY THE EVIDENCE WHICH
COULD BE CONSIDERED MITIGATING FACTORS.  (R.
39: 3).

Statement of Facts
Argument and Authorities.........................52

Point of Error Seventeen.............................52

THE TRIAL COURT RESTRICTED APPELLANT'S
ABILITY TO CONDUCT AN ADEQUATE VOIR DIRE
EXAMINATION AND INTELLIGENTLY EXERCISE HIS
PEREMPTORY STRIKES IN VIOLATION OF HIS SIXTH
AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF
COUNSEL BY NOT ALLOWING HIM TO SPECIFICALLY
DETERMINE WHAT THE PROSPECTIVE JURORS MIGHT
CONSIDER TO BE A MITIGATING CIRCUMSTANCE.

Statement of Facts
Argument and Authorities.........................52

Point of Error Eighteen................................57

THE TRIAL COURT ERRED IN REFUSING TO ADMIT
FOR THE JURY'S CONSIDERATION, PHOTOGRAPHS
WHICH DEPICTED APPELLANT IN EARLY CHILDHOOD
TO CORROBORATE HIS PARENT'S VERBAL DESCRIP-
TION OF HIS CHILDHOOD.  THE EVIDENCE WAS
ADMISSIBLE AND PROBATIVE ON THE ISSUE OF
MITIGATING CIRCUMSTANCES.

Statement of Facts................................57
Argument and Authorities..........................57

Conclusion............................................58

Certificate of Service................................59

x

cert. denied 446 U.S.988, 100 S.Ct 2975, 64 L.Ed.2d 846
(1980)
.................................................15, 16, 17

Penry v. Lynaugh, 492 U.S. 302 (1989)
.................................................55

Robinson v. State, 844 S.W.2d 925 (Tex.App.--Houston,
[1st Dist.] 1992, no pet.)
.................................................58

Rose v. State, 752 S.W.2d 529 (Tex.Crim.App. 1987)
.................................................17, 19

Sanders v. State, 580 S.W.2d 349 (Tex.Crim.App. 1978)
.................................................18

Skipper v. South Carolina, 476 U.S. 1 (1986)
.................................................55

Sneed v. State, 670 S.W.2d 262 (Tex.Crim.App. 1984)
.................................................18

Steward v. State, 830 S.W.2d 771 (Tex.App.--Houston
[1st Dist.] 1992, pet. ref'd)
.................................................46

Stoker v. State, 788 S.W.2d 1 (Tex.Crim.App. 1989)
cert. denied 111 S.Ct. 371 (1990)
.................................................17

Stone v. State, 574 S.W.2d 85 (Tex.Crim.App. 1978)
.................................................58

Trevino v. State, 815 S.W.2d 331 (Tex.Crim.App. 1987)
.................................................55

White v. State, 629 S.W.2d 701, 708 (Tex.Crim.App. 1981),
cert. denied, 456 U.S. 938, 102 S.Ct. 1995, 72 L.Ed.2d 457
(1982)
.................................................15, 16

White v. State, 779 S.W.2d 809 (Tex.Crim.App. 1989)
.................................................55

Young v. State, 848 S.W.2d 203 (Tex. App.--Dallas, 1992,
pet. ref'd)
.................................................43

Zant v. Stephens, 462 U.S. 862 (1983)
.................................................55

**UNITED STATES CONSTITUTION**

U.S. Const. Amend. 5
................................................44

U.S. Const. Amend. 6
...............................................3, 44

U.S. Const. Amend. 8
......................................44, 47, 50, 52

U.S. Const. Amend 14
................................4, 22, 44, 47, 50, 52

**TEXAS CONSTITUTION**

Tex. Const. Art. 1, Sec. 10
................................................44

Tex. Const. Art. 1, Sec. 13
..............................................4, 22

Tex. Const. Art. 1, Sec. 19
...........................................4, 22, 44

Tex. Const. Art. 2, Sec. 1
................................................19

Tex. Const. Art. 4, Sec. 11
.............................................19, 22

**TEXAS RULES AND CODES**

Tex. Code Crim. Pro., Art. 36.14
.............................................31, 32

Tex. Code Crim. Pro., Art. 37.07
...................4, 7, 15, 17, 18, 19, 20, 21, 22

Tex. Code Crim. Pro., Art. 37.071
...................44, 45, 46, 47, 49, 50, 52, 56

Tex. Code Crim. Pro., Art. 42.12
................................................20

Tex. Code Crim. Pro., Art. 42.18
...........................3, 5, 23, 25, 28, 30

Texas Penal Code, Sec. 2.03(d)

............................................................51

Texas Rules of Criminal Evidence, Rule 401
............................................................58

## PRELIMINARY STATEMENT

Appellant Rick Allan Rhodes was charged by indictment with capital murder.  The indictment alleged that on or about September 13, 1991, Appellant intentionally caused the death of Bradley Dean Allen by stabbing him with a knife and that during the same criminal transaction Appellant intentionally caused the death of Charles Allen by stabbing him with a knife and striking him with a bar. (R. 1: 14).

Jury selection began on July 27, 1992, and was completed on September 10, 1992. (R. 27 through 30). The first phase of the trial began on September 28, 1992 and was completed on October 1, 1992.  (R. 27 through 30).  The jury found Appellant guilty of capital murder as charged in the indictment. (R. 1-A: 281).

The punishment phase of the trial began on October 2, 1992, and was completed on October 7, 1992.  (R. 31 through 35).  The following issues were presented to the jury:

SPECIAL ISSUE NO. 1

> Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant, Rick Allan Rhodes, would commit criminal acts of violence that would constitute a continuing threat to society?

SPECIAL ISSUE NO. 2

> Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, Rick Allan Rhodes, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of

1

life imprisonment rather than a death
sentence be imposed?

The jury unamimously answered the first issue affirmatively and
the second in the negative.  (R. 1-A: 294-295).  The trial court
therefore sentenced Appellant to death.

Judgment of conviction was imposed on July 27, 1992).
(R. 1-A: 297). A written notice of appeal was filed. (R. 1-A:
300). Review of Appellant's death sentence by this Court is
automatic under Article 37.071, Section 2(h) of the <u>Texas Code of
Criminal Procedure</u>.  A Motion for New Trial was filed on November
3, 1992. (R. 1-A: 306).  This motion was overruled on December
11, 1992).  (R. 1-A: 310).

### POINT OF ERROR NUMBER ONE

THE TRIAL COURT ERRED IN GRANTING THE STATE'S MOTION IN LIMINE WHICH PROHIBITED APPELLANT FROM OPENLY DISCUSSING WITH PROSPECTIVE JURORS THE STATUTORILY ESTABLISHED MINIMUM TIME WHICH MUST BE SERVED BY AN INDIVIDUAL SENTENCED TO LIFE IMPRISONMENT. SUCH A PROHIBITION RESTRICTED APPELLANT'S ABILITY TO ADEQUATELY VOIR DIRE THE PANEL AND LIMITED THE EFFECTIVE EXERCISE OF PEREMPTORY CHALLENGES.

### POINT OF ERROR NUMBER TWO

THE TRIAL COURT'S DECISION TO GRANT THE STATE'S MOTION IN LIMINE AND LIMIT APPELLANT'S ABILITY TO BASE HIS PEREMPTORY CHALLENGES UPON A FULL DISCUSSION OF PUNISHMENT ISSUES DENIED APPELLANT EFFECTIVE ASSISTANCE OF COUNSEL DURING THE JURY SELECTION PROCESS.

### POINT OF ERROR NUMBER THREE

THE TRIAL COURT ERRED DURING THE JURY SELECTION PROCESS BY PROVIDING FALSE AND MISLEADING INFORMATION REGARDING PAROLE ELIGIBILITY TO PROSPECTIVE JURORS IN HIS ATTEMPT TO ADHERE TO WHAT HE BELIEVED WAS THIS COURT'S MANDATE NOT TO INFORM THEM OF THE STATUTORY PROVISIONS OF ARTICLE 42.18, SECTION 8(B) OF THE TEXAS CODE OF CRIMINAL PROCEDURE.

3

## POINT OF ERROR NUMBER FOUR

IF SECTION 37.07 OF THE TEXAS CODE OF CRIMINAL PROCEDURE WAS PROPERLY INTERPRETED AS PREVENTING THE TRIAL COURT FROM FULLY INFORMING THE JURY OF THE STATUTORY SENTENCING PROVISIONS FOR CAPITAL MURDER, THE SECTION VIOLATED THE DUE PROCESS RIGHTS AFFORDED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTIONS 13 AND 19 OF THE TEXAS CONSTITUTION.

### SUMMARY OF ARGUMENT

Recently, capital murder defendants have made repeated requests to present expert testimony regarding the amount of prison time the particular offender would likely serve if he were sentenced to life imprisonment.  The modern climate of early prison release and the general public concern about criminal offenses committed by parolees arguably make such information essential to a full and fair consideration of the punishment options the jury must consider.  Based upon a long standing tradition of separation of governmental powers, Texas courts have consistently ruled that evidence regarding parole and the functioning of the Board of Pardons and Paroles was not a proper consideration for jury deliberation in a capital case.  Jones v. State, 843 S.W.2d 487 (Tex. Crim. App. 1992); Ellason v. State, 815 S.W.2d 656 (Tex. Crim. App. 1991).

Recognizing these decisions, Appellant in the case now before the Court sought to conform to the existing law while

4

asserting his Due Process right to a full and fair consideration of whether he should be sentenced to death or to life imprisonment.  Appellant requested only that the jury be informed of the statutory provisions of Article 42.18, Section 8(b) of the <u>Texas Code of Criminal Procedure</u>, which require that he serve a minimum of thirty-five years before he would be eligible for consideration of parole if sentenced to life imprisonment.  Unlike the defendants in the cases previously presented to this Court, Appellant did not seek to offer any speculative testimony regarding the procedures or policies of the Board of Pardons and Paroles in deciding whether or when Appellant might be paroled after he had served thirty-five years. He asked only that the jury be fully informed of the statutory provisions of the Code.

The trial court refused to allow the jury to know the statutory minimum sentence based upon the decision of this Court in <u>Jones</u>, <u>supra</u>.  Yet there is a significant difference between presenting testimony regarding the procedures and policies of the Board of Pardons and Paroles and informing the jury of the provisions of the Code of Criminal Procedure.

There is no Constitutional prohibition against providing the jury with such information.  Indeed, the people of Texas amended the Constitution to authorize legislation making this kind of information available to jurors.  There is no statutory prohibition or requirement that a jury be so instructed in a capital murder case, although statutes now require similar instructions in all other felony prosecutions.

5

To deny this information to a jury in a capital murder prosecution violates the defendant's right to due process and equal protection under the law.  It restricts the defendant's right to effective assistance of counsel in the jury selection process.  It was within the discretion of the trial court to allow the jury the information it required and often requested, yet Appellant's repeated requests were denied. The harm suffered by Appellant because of the trial court's decision is apparent in the record of the <u>voir dire</u> examination, when juror after juror expressed great concern about early prison release and specifically requested the information intrinsically relevant to the jury's decision regarding punishment.

## STATEMENT OF FACTS
## MOTION IN LIMINE

The State filed a motion in limine requesting that the defendant, his attorneys and witnesses be ordered not to refer to the length of time a defendant sentenced to life imprisonment for capital murder must be imprisoned before becoming eligible for parole.   During argument on the motion, Appellant's counsel stated that he did not intend to offer evidence regarding parole or to <u>voir dire</u> on the mechanics and workings of the parole board.  (R. 3:  40).  Rather counsel stated that from his experience, he anticipated that prospective jurors might be more likely to assess life imprisonment as a punishment if they knew that the defendant wouldn't be released in a few years.

6

Given the option of the death penalty or release to the streets within a few years, the prospective juror might choose the death penalty.  To make full and effective use of his peremptory challenges, counsel needed to have this kind of honest conversation with the jurors. Counsel asked only to be allowed to let such a potential juror know that under the Code of Criminal Procedure the defendant would not be eligible for parole before serving thirty-five years.  The request was based upon the defendant's Sixth Amendment right to effective assistance of counsel in the exercise of peremptory challenges.  Counsel also argued that the mandatory minimum sentence constituted a mitigating circumstance which the jury was entitled to take into consideration.  (R. 3: 40-41).  Further, if Article 37.07 of the Texas Code of Criminal Procedure were interpreted to impede these rights it must be considered an unconstitutional abridgement of Due Process. (R. 3: 45-46).

The trial court granted the State's motion in limine based solely upon the recent Court of Criminal Appeals opinion in Jones v. State, 843 S.W.2d 487 (Tex. Crim. App. 1992) cert. denied 113 S.Ct. 1858 (1993).  (R. 3: 47-48).  The State's motion contains the judges notation that it was granted on June 23, 1992. (R. 1: 146).

### Voir Dire Discussions

As the court began addressing the very first panel of prospective jurors regarding the punishment issues, he was asked by a prospective juror:

7

THE JUROR:    Life is life: correct?
It's not what we hear on TV?

THE COURT:   We really had a pool going
as to how long it was going to take...
(R. 4: 35, l. 16-19).

The court then advised the panel that he would instruct them

not to consider the issue of parole in making their decision.  He

further instructed that they specifically could not consider how

long a person would serve on any sentence imposed.  Counsel for

appellant objected:

MR. STAFFORD:  Based on the question of juror
number sixteen in reference to life being
life, I again request that the court overrule
the State's motion in limine and inform them
that thirty-five years is mandatory because
again it's apparent that this is a troubling
issue for these jurors and they need to be
informed that this is a man's life is at
stake, and justice and fairness dictate that
jurors be able to consider the true facts as
they are, including the law.

THE COURT:  Denied.
(R. 4: 36, l. 18 - 37, l. 4).

During her individual _voir dire_ examination juror number six-

teen's concern remained.  She stated that the court's instruc-

tions made the issue mysterious to her.  (R. 6. 453).

During the State's individual _voir dire_ of the first juror

on the first panel:

Q.  Does anything pop into your mind
that is important, or I mean why that must
be, why we need the death penalty, if we do?

A.  I just -- there is so much about
people that are turned loose after serving
such a short period of time in a prison for
minor crimes and then go out and commit
murder, and it's just really scary to hear
things like that, that they are put away for

8

not so serious crime and then turn around and
do much worse crimes after being just
sentenced for such a short period, or not
sentenced but allowed to serve such a short
period of time, and if people like that can
do -- go to that point, people that have
already committed horrendous crimes, it just
seems a little scary that they might do the
same thing again, or be a hazard to society.
(R. 5: 123, l. 13 - 124, l. 4).

Eva Curry, another member of the first panel stated that she

was concerned about early release and heard about it in the news

everyday. (R. 6: 339).  Walter Mallard, also on the first panel

believed that early release was such a problem that he believed

the time served should be controlled by the sentencer rather than

later by parole. (R. 6: 375).

Mark Glanowski was questioned by defense counsel regarding

the jury questionnaire:

> Q.  The way the question reads: Do you
> agree or disagree that life imprisonment is
> more effective than capital punishment?  And
> you disagreed with that statement.
>
> A.  That is correct.
>
> Q.  Could you share with me why?
>
> A.  I guess the reason I answered it in
> that response was that basically we know that
> even though they get life imprisonment they
> are up for parole within ten or twenty years
> and that life imprisonment doesn't mean life
> imprisonment. Basically the words don't mean
> anything.
> (R. 7: 551, l. 15-25; 552, l. 1-2).

At that point Appellant's counsel repeated his objection to the

State's motion in limine and the court repeated its ruling.

(R. 7: 552).

On the second panel, Neal Priddy was the first prospective jury to voice his concern that a "... person is put in prison and he is released within just a few months for a crime that he should be in there for a number of years."
(R. 9: 900, l. 16-19).

James Patrick Gaffney was questioned by the judge regarding a statement he has made during the examination of the entire panel. In response to a question from the prosecutor, the juror had volunteered that he had been annoyed by things that occurred while serving as a juror on an aggravated robbery case several years before. (R. 8: 676-677). The court explored this feeling further during individual <u>voir dire</u>. The juror related that the trial had been lengthy and the jury had experienced difficulty in reaching a verdict on guilt or innocence. After the finding of guilt, information of prior offenses was introduced during punishment and the jury, after what he termed a "mind boggling" deliberation, assessed a seventy-seven year sentence. (R. 9: 906, l. 10). After the verdict was delivered the jury was speaking with the judge and this juror wanted to know with all the problems of jail overcrowding the minimum the defendant would serve. The judge had told him it could be as little as five or six years. The court in the present case tried to intimate to Mr. Gaffney that the previous judge had been incorrect in his answer. (R. 9: 905-910).

When another member of this panel expressed concern about

early release, the trial judge responded:

> Q.  Question relating to leniency
> within the penal institution or criminal
> laws, and you mentioned early release.
> Almost everybody does.  That is one of the
> most popular answers...
> (R. 10: 979, l. 21-24).

Early in the questioning of the fourth panel, a prospective

juror interrupted:

> THE PROSPECTIVE JUROR:  Can I ask a
> question?
>
> MS. DAVIES:  You are Mr. Marks?
>
> THE PROSPECTIVE JUROR: Yes.  What does
> life mean?  Can they get out in three years
> or four years with life?
>
> MS. DAVIES:  Well we always wonder how
> early on this question is going to come
> because it comes up every day, and I noticed
> from looking over the questionnaires that you
> filled out several of you expressed
> interested concern about that.
> (R. 16: 1978, l. 3-14.).

In apparent frustration, Ms. Davies and the Court then

undertook, to explain to the juror that what he was asking was

not something he could properly consider during the punishment

phase of the trial.  At the end of the explanation:

> THE PROSPECTIVE JUROR:  I don't think I
> really got an answer.
>
> THE COURT:  You didn't get a correct
> answer because I can't tell you.  All I can
> tell you is you can't consider it.
> (R. 16: 1980, l. 16-20).

Ms. Janice McGehee was asked if she could follow the judge's

instructions in spite of the feelings about early release that

she had noted on the questionnaire:

11

> A.   Yes, I can.  Not that I think it's
> right or not; but, yes, I can.
> (R. 18: 2302, l.15-16).

By the time the court had called the fifth panel, it appeared that all concerned had grown tired with the process of refusing this information to the jurors.  During the individual questioning of Ms. Regina Polk, the court noted her concern about early release on the questionnaire and moved on, inviting no further response.  (R. 21: 2662).  But when asked about the potential for a person being a continuing threat to society, Mr. Luvan Garcia volunteered:

> A.   Most of them do.  Most of them -- I
> watch the news every night.  Early parolees
> and everything, they get out of jail and they
> commit another crime the next day.
> (R. 22: 3011, l. 21-24).

In response to the court's last question regarding anything which might prevent or substantially impair her performance as a juror, Ms. Eileen Adams volunteered that she had a "real struggle" with a person convicted of a crime released "all of a sudden" to commit another crime. (R. 23: 3064, l. 1-9).  She asked if this was possible in a capital murder case.  The court responded:

> Q.   Well I think it is obvious if
> somebody is assessed the death penalty you
> don't get paroled on a death penalty.
>
> A.   That doesn't seem to be what is
> happening, though.  Or are we not knowing the
> full story when we hear things?
>
> Q.   You probably don't know the full
> story, but you aren't paroled on a death
> penalty.  I think that is obvious.  I don't

12

think anybody is going to object at this
point to my telling you that, which leaves
you with the other option, a life sentence.

A.  And that's the one that you are
eligible for parole at some stage perhaps?

Q.  Yes.

MR. STAFFORD: Your Honor, I would
request that you overrule the State's motion
and inform her fully as to the full
ramifications of it.

THE COURT:  No.
(R. 23: 3066, l. 1-19).


The issue of early release pervaded the remainder of this

prospective juror's questioning.  During the State's questioning,

when informed that she would be instructed not to consider parole

she responded:

A.  See I think that is wrong.  I think
that if -- I think that if the sentence I am
going to -- if the way I vote on this affects
whether he is going to be out in two years
versus thirty years, then I think I should
really have the right to know that up front
because I think that changes can occur and
sometimes changes don't occur, and if they
get back out again and they repeat the
offense then I am real angry about that.
(R. 23: 3068, l. 1-10).

Counsel re-urged his objection. (R. 23: 3068).

At one point Ms. Adams made reference to something in the

current news about a convicted murderer released on early parole

who committed another murder although she could not recall the

name. (R. 23: 3121).  Following this juror's questioning,

Appellant re-urged his original objection to the State's motion

13

in limine and introduced into evidence articles from that day's Houston Chronicle and from the current issue of the Texas Monthly Magazine.  These articles related to the notorious McDuff murder case to which counsel believed Ms. Adams had been referring.  He requested that the jurors who had been previously selected be recalled to the court and informed of the thirty-five year minimum and asked if they had read similar articles.  Counsel suggested that the news articles had tainted the eleven selected jurors and that the only effective way to cure that taint would be to inform them of the thirty-five year minimum. This request was denied. (R. 23: 3133-3134).

During the questioning of the sixth general panel, a prospective juror asked the District Attorney what the term life imprisonment meant.  Appellant's counsel requested that the court answer the juror's question truthfully. (R. 24: 3239).  Rather, the court explained that this was something she would be instructed not to consider. The juror then specifically asked if a person sentenced to life could be paroled and the judge answered affirmatively.  (R.24: 3241). Then the following colloquy:

> THE JUROR: Yes. When will they be eligible for parole?
>
> THE COURT: I can't answer that.
>
> MR. STAFFORD:  I ask the court to answer it.
>
> THE COURT:  I am not going to answer it. It's within the exclusive jurisdiction of the Board of Pardons and Paroles and the

governor of the State of Texas.
(R. 24: 3241, l. 15-23).

In further conversation the juror indicated that the possibility of parole would weigh heavily on her decision regarding punishment.  When counseled again that she would be instructed not to consider it, she stated: "I don't think I can disregard that fact.  I think it would influence my judgment." (R. 24: 3244, l. 21-23).  This juror was eventually dismissed by agreement based upon the difficulty she would experience in assessing the death penalty. (R. 25: 3585).

## ARGUMENT AND AUTHORITIES

This case was tried in a community climate of tremendous concern about crime and the early release of convicted criminals. The portions of the record set out above clearly reflect this concern and the jurors' desire for the simple instruction afforded juries in all other felony cases: the minimum sentence imposed by statute and an admonition not to consider the manner in which the parole law might be applied thereafter to this particular defendant.  See Article 37.07, Section 4 of the Texas Code of Criminal Procedure.  The trial court, while acknowledging the reality of this fact, felt constrained by this Court's opinion in Jones, supra, and denied appellant the relief he sought and the jury the information it lacked.

Yet this Court's opinion in Jones did not require the trial court to take the action which it did. The request made by the Appellant in Jones was to call an expert witness to testify about

15

the process of granting or denying parole used by the Board after a prisoner became eligible.  The offer of proof was made in an attempt to show the jury that it was extremely unlikely that Jones would ever be paroled.  In response to the request made in Jones, this Court reasoned:

> "The matter of parole is not a proper consideration for jury deliberation on punishment in a capital murder trial."  n11 Ellason v. State, 815 S.W.2d 656, 665, n. 5 (Tex.Cr.App. 1991). See also Felder v. State, 758 S.W.2d 760, 762 (Tex.Cr.App. 1988); White v. State, 629 S.W.2d 701, 708 (Tex.Cr.App. 1981), cert. denied, 456 U.S. 938, 102 S.Ct. 1995, 72 L.Ed.2d 457 (1982); O'Bryan v. State, 591 S.W.2d 464, 478 (Tex.Cr.App.
>
> 1979), cert. denied 446 U.S.988, 100 S.Ct 2975, 64 L.Ed.2d 846 (1980). Jones at p. 495.

This Court specifically held:

> Thus the trial court did not abuse its discretion by refusing to admit evidence regarding the functioning of the Board of Pardons and Paroles and the correctional consultant's opinion as to how long appellant would remain incarcerated."  Id.

The Appellant in Jones specifically argued that expert evidence that he would never be paroled would be helpful to the jury on the issue of continuing threat to society.  This court noted its prior holdings that the question of continuing threat applied to prison society as well as society in general and determined:

> "Therefore, the length of time appellant remains incarcerated is not relevant to the issue of whether he will be a continuing threat to society. Id.

16

With this additional holding the court overruled appellant's point of error in Jones.

The decision in Jones is not dispositive of the issue raised by Appellant in this case.  In support of its holding in Jones that matters of parole are not proper considerations for punishment deliberation in a capital murder trial, this Court cited four of its previous opinions, Ellason, Felder, White and O'Bryan.  Yet in Ellason and Felder, the court considered whether jurors who had expressed disagreement with the implementation of the parole system, should have been dismissed from the panel for cause.  In White, the Appellant argued that Section 12.31(a) of the Texas Penal Code denied due process by failing to provide a reasonable alternative to the death penalty: life imprisonment without the possibility of parole.  In O'Bryan, Appellant contended that the trial court should have instructed the jury on the parole process and function of the Board of Pardons and Paroles and then instructed not to consider in their deliberations whether or not the defendant might or might not be paroled at some future date. No statutory instruction was apparently requested. The Court also relied upon its decision in Stoker v. State, 788 S.W.2d 1 (Tex. Crim. App. 1989), cert. denied 111 S.Ct. 371 (1990), which specifically resolved the issue of expert testimony regarding the parole process.

Neither Jones nor the cases on which it was based addressed the specific request made by Appellant in the case at bar. Indeed, in a footnote in Jones the Court referred to the issue it

17

was not addressing:

> Interestingly, at the time of Appellant's trial, Article 37.07, section 4, V.A.C.P.P. allowed the jury to consider, in felony cases, how long someone would serve is assessed a life sentence. Here, the trial court vacillated on whether this applied to capital felonies as well. Ultimately, the trial court did not allow it. Four months after this case was tried, this Court held that it was unconstitutional for a jury to be instructed on parole laws. Rose v. State, 752 S.W.2d 529 (Tex.Cr.App. 1987)._
> Jones, note 11.

Jones specifically considered the admissibility of expert testimony which would explain and predict the procedures of the Board of Pardons and Paroles after Jones had reached the point of eligibility.  The Jones holding presumably rested upon the traditional principle that the

> "decision to parole, if and when made, is beyond the province of the courts...and therefore of the jury, and is exclusively a matter within the province of the executive branch of the government under proper regulation by the legislative branch. Article IV, Section 11, Texas Constitution."
> Heredia v. State, 528 S.W.2d 847, 853 (Tex. Crim. App. 1975).

The doctrine of separation of powers has served as the "constitutional basis for the established rule that discussion of the parole law is always jury misconduct." Sanders v. State, 580 S.W.2d 349, 352 (Tex. Crim. App. 1978).

Interestingly, the test presently used to determine reversible error when such misconduct occurs requires a showing that there was a misstatement of law made during deliberations which was asserted as a fact by someone professing to know the

18

law.  <u>Buentello v. State</u>, 826 S.W.2d 610 (Tex. Crim. App. 1992); <u>Sneed v. State</u>, 670 S.W.2d 262 (Tex. Crim. App. 1984).  Misinformation and misstatements of law by individual jurors could be eliminated if the court were permitted to accurately instruct the jury about the law.  This was apparently the position of the Texas legislature in 1985 when it first amended Article 37.07, Section 4, of the <u>Texas Code of Criminal Procedure</u>.  The amendment authorized the court in non-capital felonies to inform the jury that it could consider that a defendant would have to serve one-third of his sentence before being eligible for parole consideration if convicted of an "aggravated" crime or found to have used a deadly weapon during the commission of the offense.  It also required an additional instruction that the jury was not to consider the manner in which the parole board's procedures might be applied to the particular defendant being sentenced.  Two years later, this Court, consistent with its previous opinions, declared the amendment to Article 37.07 unconstitutional because it violated the separation of powers provision of Article 2, Sec. 1 of the Texas Constitution.  <u>Rose v. State</u>, 752 S.W.2d 529, 552 (Tex. Crim. App. 1987).

Then the people of Texas spoke.  Article 4, Section 11 was amended to give the Legislature the authority to enact laws which require or permit courts to inform juries about the effect of good conduct time and parole eligibility on the period of incarceration served by a defendant convicted of a criminal offense.  In response, the Legislature enacted the present

19

amendment to Article 37.07, Section 4.  The amendment was upheld by this Court which determined that the constitutional amendment cured the due process and separation of powers problems addressed in Rose.  Oakley v. State, 830 S.W.2d 107 (Tex. Crim. App. 1992); Marks v. State, 830 S.W.2d 113 (Tex. Crim. App. 1992).

With the express permission of the citizens of this state, trial courts are now permitted to inform juries in non-capital cases of the statutory minimum sentence which must be served before parole eligibility.  Whether courts are permitted to do so in a capital case has not been directly addressed by this Court. This was the specific request made by Appellant in the case at bar.  The trial court seriously considered the request, but felt constrained to grant it because of his interpretation of the opinion in Jones.  In viewing the difficulty the judge encountered in having to refuse such information to so many jurors who vigorously requested it, it is apparent that the judge might have ruled otherwise if he had felt unhampered by the ruling of this Court.  There was no constitutional or judicial impediment to the trial court's ability to provide the potential jurors with the statutory information Appellant requested and the jurors desired.

The State argued that Article 37.07 Section 4(a):

> "explicitly excludes instructing the jury regarding parole law in capital murder cases. They changed the law. They could have changed this.  It tells you you don't instruct the jury."
> (R. 3: 43, l. 7-12).

The prosecutor argued that if the jury should not be instructed

under this Article, then it should not be told in any other way.

The prosecutor's argument is without merit. Article 37.07, Section 4(a) provides:

> In the penalty phase of the trial of a felony case in which the punishment is to be assessed by the jury rather than the court, if the offense of which the jury has found the defendant guilty is listed in Section 3g(a)(1), Article 42.12, of this code or if the judgment contains an affirmative finding under Section 3g(a)(2), Article 42.12, of this code, unless the defendant has been convicted of a capital felony the court shall charge the jury as follows:

The article then specifically sets forth the instruction which should be given the jury regarding "aggravated" offenses and crimes in which a deadly weapon is used or exhibited, in accordance with the specific sections of Article 42.18. The district attorney apparently focused upon the words "unless the defendant has been convicted of a capital felony" as the basis for his belief that this section intentionally and specifically excepted capital murder juries from the information which would assist them in reaching a fair and informed sentencing verdict. But that is not the necessary reading of these words. If capital murder were not specifically excepted in this section, it would make no sense. The section relates to the requirement that persons convicted of specific "aggravated" offenses or who are found to have used a deadly weapon must serve one-third of their sentence before becoming eligible for parole. If capital murder were not excepted, the jury would be receiving inapplicable instructions in a capital case. The instruction to be included

21

in a capital case would appear elsewhere in the Code of Criminal
Procedure.   Contrary to the prosecutor's position, the wording of
Article 37.07, Section 4(a) does not specifically prohibit an
instruction in a capital case.   Rather, it required an
appropriate instruction in a non-capital case.  The Code of
Criminal Procedure neither expressly prohibits nor expressly
requires the trial court to include the thirty-five year minimum
in jury instructions or in response to questions arising during
the voir dire examination of potential jurors.   Jury instructions
have traditionally been placed within the sound discretion of the
judiciary.   Many instructions are properly given without a
statutory mandate.   The trial court in the case at bar believed
he had no discretion under the law to give the information
Appellant and the jurors requested.   This belief was erroneous.

   This Court has power and discretion to expressly authorize
the lower courts to inform juries of the provisions of the
existing law of minimum sentence which must be served and to
further caution the jury not to speculate when and if the
particular defendant might actually be paroled thereafter.   The
Texas Constitution does not limit this Court's power to do so.
Neither has the legislature limited this Court's authority to do
so.   What then is the logic or wisdom of knowingly allowing
jurors to remain ignorant of a law relevant to assessing appro-
priate punishment in this the most serious kind of case they
could ever be called upon to judge?  To decide to do otherwise
deprives the capital defendant of a fundamental right now

22

afforded to all other felony defendants.  Yet the consequences of the range of punishment that a capital jury actually considers are so much greater.  If Article 37.07, Sec. 4 of the Code of Criminal Procedure is interpreted to preclude this Court from exercising such discretion, the statute violates Article I, Sections 13 and 19 of the Texas Constitution.  If Article 4, Section 11 of the Texas Constitution, as amended, is interpreted to preclude the exercise of such discretion, the amendment violates the Equal Protection provisions of Fourteenth Amendment of the United States Constitution.

The public concern over early release was reaching a fever pitch at the time this case was tried.  So many of the jurors interviewed expressed this concern that the frustration of the trial court became obvious when he repeatedly told them that he could not answer their questions regarding parole eligibility in a capital case.  Actually toward the end of the selection process, the judge was indeed giving some of the requested  information and refusing others. When the juror on the last panel asked the specific question if a person sentenced to life imprisonment could be paroled, the judge answered affirmatively. But when asked when he would be eligible for parole, the judge refused to respond, stating that that was exclusively within the jurisdiction of the parole board. In reality, the time of eligibility was not within the jurisdiction of the parole board, but of the legislature as enacted in Article 42.18 of the Texas Code of Criminal Procedure. This prospective juror was actually

23

given the misinformation that the date of parole was soley within the discretion of the current board, when such discretion could not be exercised for thirty-five years. (R. 24: 3241). During the trial court's conversation with Eileen Adams the judge actually informed the juror of the substance of Article 42.18, Section (b)(1) when he told her that a person sentenced to death was not eligible for parole, but refused to tell her the substance of Section (b)(2), that a prisoner serving a life sentence for capital murder would not be eligible for parole for thirty-five years. (R. 23: 3066, l. 1-19). Although counsel asked the trial court to answer this juror's questions, the court refused. (R. 23: 3066).

The record clearly establishes the problems caused by the unequal application of the provisions of Article 42.18 of the Code of Criminal Procedure to capital and non-capital defendants. In attempting to implement such an unconstitutional distinction the trial court mislead and frustrated the jurors and in reality violated his own decision by partially informing the jurors of the statutory provisions.

Jurors called for a capital case are asked by our society to perform its most onerous civic duty. Yet in the case at bar, these citizens were deprived of basic statutory information to assist them in exercising this most troubling responsibility. This severe impediment was not required by the constitution or statutes of Texas and is unfounded in reason. The decision of the trial court to grant the State's motion in limine constituted

24

an abuse of discretion that deprived Appellant of his Constitutional right to Due Process and Equal Protection of the laws of this state and of the United States.

## POINT OF ERROR NUMBER FIVE

THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OVER APPELLANT'S OBJECTION DURING THE PUNISHMENT PHASE OF THE TRIAL THAT APPELLANT WOULD BE ELIGIBLE FOR UNACCOMPANIED EMERGENCY FURLOUGH FROM PRISON IF HE WERE ASSESSED A LIFE SENTENCE FOR THE OFFENSE OF CAPITAL MURDER. (R. 35: 1036-1038).

## POINT OF ERROR NUMBER SIX

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION FOR NEW TRIAL BASED UPON THE ADMISSION OF EVIDENCE REGARDING UNESCORTED FURLOUGH.  SUCH EVIDENCE WAS SHOWN TO BE MISLEADING AND, IN CONCERT WITH THE COURT'S RULING REGARDING THE PROVISIONS OF ARTICLE 42.18 OF THE TEXAS CODE OF CRIMINAL PROCEDURE, CONSTITUTED A DEPRIVATION OF APPELLANT'S RIGHT TO DUE PROCESS OF LAW.

## STATEMENT OF FACTS

Roy Smithy was employed as an investigator with the special prosecution unit operating in the Huntsville prison.  He was called by the State to testify regarding violent crime within the prison system.  (R. 35: 1024).  During his testimony the following exchange took place:

> Q. If an inmate is in prison and behaves himself for a certain period of time, even if he has been convicted of capital murder, and, of course, is there on just a life sentence, is there an opportunity for him to get furloughed?

25

A. If he obtains SAT status, state approved trustee 3 status, then he is eligible for furloughs.

Q. Just exactly what does furlough mean?

A. You have different types.  You have emergency furloughs.  You have other--

Q. Your Honor, could I have a running objection to all of this?

THE COURT: Just a moment. Approach the bench, please.

(Counsel went to the bench for an off-the-record conference; then the reporter was called to the bench, and the following proceedings were had:)

MR. STAFFORD: Judge, to allow her to go into this stuff and not let me allude to -- let the jury know he is going to stay locked up for thirty-five years is a gross miscarriage of justice.

THE COURT:  I don't know where your objection is in there.  I understand what your previous objection was.  She has been admonished.

MR. STAFFORD:  I object to any further questions along this line.

THE COURT;  I am going to allow her to complete her line of questioning.  That is all I am going to say.

(Before the jury)

BY MS. DAVIES:

Q. I am not even sure I remember what the last question was.

MR. STAFFORD:  Talking about furlough.

Q. I think I had asked you what is a furlough?

26

A.   A furlough is when an inmate is allowed to leave the prison unit unescorted to attend whatever reason it is that he has requested to leave the unit, things such as funeral, family emergency and things of that sort where he, in essence, signs a piece of paper that says he is going to be released a certain time and that he will go to wherever this emergency is and that he promises that he will be back and turn himself back into the unit.

Q. Like just for the weekend or something or for a day or so?

A. Yes, ma'am.  It may not be just a weekend. It could very well be for a three day period in the middle of the week.

Q. Depending on the circumstances?

A. Yes, ma'am. (R. 35: 1036, l. 16 - 1038, l. 24).

At a hearing on Appellant's motion for new trial, Appellant introduced into evidence a portion of the Texas Department of Criminal Justice Institutional Division Departmental Policy and Operational Manual covering temporary furloughs.  (R. 39 MNT: 17).  Eligibility for such a furlough required that the inmate be within 12 months of parole eligibility, must not have been incarcerated on two or more previous convictions if either the current or prior records include the offense of capital murder, and must not have a current or prior conviction for homicide. (MNT Def. Ex. 1).

The prosecutor pointed out that emergency provisions are set out in another section of the guidelines and do not include the restrictions set out above for "appropriate reason" furloughs. Emergency furloughs, unlike the other type, may be "escorted" if

27

the department deems it necessary.  The State's attorney pointed out that Mr. Smithy had been testifying about emergency furlough's only.  The trial court accepted the distinction argued by the State and overruled Appellant's motion for new trial. (R. 39 MNT: 26-27).

Appellant argued at the hearing that the furlough testimony was inherently misleading and in the current political climate was highly prejudicial.  Counsel also reiterated the inequity of being refused permission to inform the jury of the statutory minimum sentence while the state was allowed to offer misleading testimony regarding the ability of a convicted capital murderer serving a life sentence to in essence sign himself out of prison for three days.  The harm was specifically related to the facts of this case where Appellant was charged with committing the instant crime shortly after his release on parole from a previous offense. R. 39 MNT: 6).

### ARGUMENT AND AUTHORITIES

The error and the harm of the trial court's decision not to accurately inform the jury of the statutory provisions of Article 42.18 of the <u>Texas Code of Criminal Procedure</u> is made manifest by the decision to allow the jury to hear that this particular defendant could be eligible for unescorted emergency furlough if, in the words of the prosecutor, he was "there on just a life sentence."  The impression left by this testimony on any listener would be as Appellant's counsel characterized it: "the ability of

a convicted capital murderer serving a life sentence to in essence sign himself out of prison for three days." Yet the requirements for an emergency furlough are stringent, requiring certification of serious illness or death, a vote of the State Classification Committee, the recommendation of the unit warden, notification of local law enforcement, and the final provision:

> Inmates approved for emergency furlough who are considered security risks must be escorted by at least two full-time, certified law enforcement officers...
> (MNT Def. Ex. 1, p. 5).

The testimony offered by the State was not only signifi-cantly misleading and prejudicial, it was incompatible with the State's position that it was improper for the jury to consider future action of other governmental agencies which might result in the release of Appellant from prison if the death penalty were not assessed.  See Jones, supra, and authorities cited in the foregoing Argument. In essence the trial court held that a statutory instruction regarding the impossibility of parole for thirty-five years could not be considered by the jury, but they could be led to believe that unescorted furlough was a real possibility at any time during Appellant's incarceration.  Can such conflicting holdings be said to foster a fair consideration of the dire punishment consequences faced by Appellant in a capital murder prosecution?  The trial of any criminal case is adversarial, but it is the responsibility of the trial court to insure that the trial is fundamentally fair and that all aspects of Due Process are afforded the accused.  Here, well aware that

an atmosphere of genuine concern existed in the minds of the public and the jury about prison release, the trial court considered it improper to instruct on the law of minimum sentence service but allowed the inflammatory notion of unescorted prison furlough to be presented to the jury.  In a capital prosecution, strict adherence to principles of fundamental fairness must exist.  The trial court's decision to admit this testimony violated Appellant's right to receive a fair trial of the issues relevant to the imposition of the death penalty.

### POINT OF ERROR NUMBER SEVEN

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S REQUESTED INSTRUCTION IN THE COURT'S CHARGE ON PUNISHMENT THAT THE JURY WAS NOT TO CONSIDER THE POSSIBILITY OF FURLOUGH DURING PUNISHMENT DELIBERATIONS. (R. 39: 4-5).

### POINT OF ERROR NUMBER EIGHT

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S REQUESTED INSTRUCTION IN THE JURY CHARGE REGARDING THE MINIMUM TIME SERVED FOR A LIFE SENTENCE ASSESSED FOR THE OFFENSE OF CAPITAL MURDER. (R. 39: 4-5).

### STATEMENT OF FACTS

Prior to submission of the court's charge on punishment, Appellant requested that the jury be instructed that they should not consider the evidence wrongfully admitted on the issue of

30

furlough and further that it be instructed regarding the statutory
provisions of Article 42.18, Section 8(b) of the *Texas Code of
Criminal Procedure*.  Both requests were denied.
(R. 39: 4-5).

## ARGUMENT AND AUTHORITIES

Prior to the submission of the charge, the trial court was

given one last opportunity to diminish the effect of the erro-

neous decision to refuse statutory information regarding minimum

parole eligibility and to allow opinion evidence regarding the

possibility of furlough.  See Article 36.14, *Texas Code of

Criminal Procedure*.  Yet the trial court elected to keep the jury

uninformed regarding the law and misinformed regarding the

furlough procedures of the Texas Department of Criminal Justice.

The effect of this decision is apparent.  Although the jury must

answer specific special issues during the punishment phase of a

capital trial, it is fully informed regarding the consequences of

its responses.  There are only two choices given to these citi-

zens called to pass the most stringent judgment of our society:

death or life imprisonment.  The legislature, recognizing the

societal problems caused by early prison release and the ever

growing societal condemnation of these problems, increased the

minimum time a convicted capital murdered must serve to be

eligible for parole.  At the insistence of the State which sought

the death penalty in this case, Appellant's jury was not informed

of this provision of the law.  Again at the insistence of the

State, the jury was allowed to hear that if not sentenced to

death, Appellant could at any time leave the prison unescorted.

31

The law regarding the propriety of a jury deliberating on the possibility of release from prison before the complete service of the sentence assessed is intricate, tangled, and based upon constitutional issues of separation of powers.  It is not difficult to see, however, that the decisions made by the trial court in this area are conflicting and calculated to deprive Appellant of a fair and informed jury decision on the issue of appropriate punishment.

The trial court erred in allowing the jury to consider testimony regarding the procedures applicable to discretionary prison release.  This is the type of evidence which courts have consistently ruled inadmissible and which the legislature would still keep from jury deliberation.  *Jones*, *supra*; Points of Error One through Four, *infra*. Appellant abided by this authority and never offered speculative evidence regarding the possibility of prison release.  Yet the trial court allowed the State to offer evidence which authorized the jury to consider the possibility of unescorted furlough from prison.  The instructions requested by Appellant were thus raised by the evidence of the case and constituted the last opportunity for the trial court to prevent the State from having it both ways.  Article 36.14, *Texas Code of Criminal Procedure*.  If the jury cannot consider the legal requirement of mandatory imprisonment, how can it justifiably consider the speculative evidence of unescorted furlough from prison?   The trial court erred in failing to instruct the jury in accordance with Appellant's request.

32

### POINT OF ERROR NUMBER NINE

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE STATE'S EXERCISE OF PEREMPTORY CHALLENGE AGAINST THE PRO-SPECTIVE JUROR BERNIECE HOLIDAY FOR THE REASON THAT THE CHALLENGE WAS RACIALLY MOTIVATED IN VIOLATION OF THE UNITED STATES SUPREME COURT'S RULING IN *BATSON V. KENTUCKY*, 476 U.S. 79 (1986).

### POINT OF ERROR NUMBER TEN

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE STATE'S EXERCISE OF PEREMPTORY CHALLENGE AGAINST THE PRO-SPECTIVE JUROR GREGORY C. RANDLE FOR THE REASON THAT THE CHALLENGE WAS RACIALLY MOTIVATED IN VIOLATION OF THE UNITED STATES SUPREME COURT'S RULING IN *BATSON V. KENTUCKY*, 476 U.S. 79 (1986).

### STATEMENT OF FACTS

After the jury was selected and before it was sworn, Appellant filed and presented a motion to prohibit the impaneling of the jury. (R. 1-A: 201). (R. 27: 3). Appellant based his motion upon the trial court's denial of *Batson* challenges to two jurors. He argued that evidence established that the State's challenges were racially based and that the State failed to articulate sufficiently race neutral reasons for the exercise of

33

its strikes.   These prospective jurors were Berniece Holiday and
Gregory C. Randle.

      After these individual challenges had been overruled and
before Appellant presented his formal motion, the prosecutor
made the following statement for the record:

> MS. DAVIES:  I want to be sure that the
> record reflects that at this point the State
> has used a total of fourteen strikes.
> Thirteen of those were during the original
> proceedings of selecting twelve jurors.  The
> fourteenth strike was on an alternate.  And
> of those total of fourteen strikes, twelve of
> them, the twelve individuals who the State
> struck were white.

> THE COURT:  That is correct.

> MS. DAVIES:  I don't think the record
> reflected that.  I wanted it to reflect that.
> (R. 25: 3576, l. 16 – 3577, l. 1).

### BERNIECE HOLLIDAY

      Berniece Holiday was the thirteenth juror called from panel
four.  She was a second grade school teacher.  (R. 18: 2332).
During questioning by the Court she stated that she had
previously served on a burglary jury and that the jury had set
the defendant free.  (R. 18: 2335).  She also related that she
had a first cousin who had been sent to prison but that she did
not know for what reason or for how long because they were not
close and never had contact.  (R. 18: 2336).  As the Judge
continued to review her questionnaire and the answers thereon,
this juror indicated that she was strongly in favor of the death
penalty but that the decision would have to depend upon the facts
and the circumstances of the individual case.  (R. 18: 2337).  As

34

the Court further explained the procedures of the case, Ms.
Holiday exhibited a clear understanding of the law and stated
that nothing in her view would prevent or impair her performance
as a juror.  (R. 18: 2337-2348).

Ms. Holiday was then questioned by the District Attorney.
The very first inquiry related to what emotional reaction this
juror might have felt when she realized that this was a capital
case.  The juror responded that she had none.  (R. 18: 2349-
2350).  The District Attorney then inquired whether she had given
any thought in the past several days to her beliefs about the
death penalty.  Ms. Holiday responded

A.  Well, my belief is what I said on
the questionnaire.  (R. 18: 2350, l. 17-18).

The District Attorney then spoke about the difficulty jurors must
have in answering such a questionnaire before the law was ex-
plained to them, and asked if the juror would like to change any
of her answers.  Ms. Holiday responded that she would not change
any.  (R. 18: 2350).  Ms. Holiday continued to express her
belief in the death penalty while the District Attorney continued
to determine with certainty that she was not overlooking some
reservation regarding capital punishment.  She was concerned
whether Ms. Holiday's grown children and husband believed in the
death penalty, wondering specifically if it was something that
some of them might disagree with her about.  Ms. Holiday really
couldn't say.  (R. 18: 2352).  Then the District Attorney turned
her attention toward Ms. Holiday's church and wondered whether
any of its teachings would prevent the juror from imposing the

35

death penalty.  Again the answer was no.  (R. 18: 2356).

The District Attorney also questioned this juror extensively about whether working with school counselors would affect her attitude toward the testimony of psychiatrists or psychologists. She said it would not.  (R. 18: 2353-2355).  Throughout the rest of her examination Ms. Holiday reflected a clear understanding of the law and unequivocal statements that she would follow it. (R. 18: 2358-2366).  Specifically when asked about examples of mitigating circumstances that immediately came to her mind, Ms. Holiday thought of mental illness and no others came immediately to mind.  (R. 18: 2366).  The defense then began its questioning and almost immediately was interrupted by the District Attorney exercising a peremptory strike.

Appellant challenged the action of the District Attorney, arguing that Ms. Holiday had been dismissed because of her race. (R. 18: 2368).  The State responded that the defense had not established a *prima facie* case of discrimination.  To support its *prima facie* case, Appellant responded that Ms. Holiday was the first and only black venireperson on this particular panel, that her responses were very succinct and State oriented.  The Appellant had only been allowed to speak with her for less than two minutes when the State interrupted and exercised the challenge.  Appellant argued that the State's actions were quite unusual when compared to the manner in which she handled other jurors.  (R. 18: 2368-2371).

The Court then ordered the District Attorney to state

36

reasons for the challenge into the record.  Over objection Ms. Davies stated that this was approximately the sixty-fourth person questioned and that this was the first peremptory challenge that the State had used against any black individual.  She stated that her strike was based on a number of things: that the juror had dozed off during voir dire of the entire panel; her answers were too succinct leaving the prosecutor unimpressed with her candor; she worked with young children and was aware of the effect of broken homes on difficult childhoods; that in regard to her prior jury service she had used the words "we set him free" with a real tone of pride; that her daughter worked for Texas Human Resources and that she had a first cousin in prison.  (R. 18: 2372-2376).

Appellant's counsel responded that although she had personally not observed Ms. Holiday nodding off, that there were numerous people on the panel that she had seen nodding off at various times during Ms. Davies general *voir dire*.  Although she did have one daughter employed by Texas Human Resources, she also had two sons in college and college students are very typically state orientated people.  Although she had a cousin in prison she didn't even know him.  Several people already seated on the jury had indicated that problems in early childhood might prove an explanation for later behavior, but in fact, Ms. Holiday could only think of mental illness as a possible explanation when directly asked.  (R. 18: 2376-2378).  Appellant argued that Ms. Holiday's responses were typical of what the State would want in seating a juror and re-urged his objection.  The Court, noting

37

that he had also seen Ms. Holiday napping along with several others, denied the motion and entered a finding that the reasons were racially neutral.  (R. 18: 2378-2379; 2381).


### GREGORY C. RANDLE

Gregory C. Randle was the first juror on the sixth panel. (R. 24: 3284).  In response to the Court's questions regarding his brother:

    Q.  Your brother was arrested for an offense.  What was that?

    A.  To tell you the truth, I don't know.

    Q.  Was he arrested more than one time?

    A.  I am not sure.  See, my brother ran away from home at an early age.

    Q.  Are you younger or older?

    A.  Older.

    Q.  How much older?

    A.  Five years.

    Q.  You think he is in the penitentiary now?

    A.  I know he is.  I have heard from my brother, my older brother, that he was.

    Q.  Have you visited your younger brother while he has been in the penitentiary?

    A.  Once.

    Q.  Where was he?  What unit?

    A.  Tennessee Colony.

    Q.  What is he doing time for?

38

A.  I don't know.

Q.  You don't know what kind of case?

A.  No.  I didn't even know about the case until my brother told me he was already in prison.

Q.  How long ago was it that you visited him?

A.  This summer, this past summer, a couple of months.

Q.  Do you know how much time he got?

A.  I don't know.

Q.  Do you know if he has ever been in the penitentiary before?

A.  Yes, he was in Sugar Land once.

Q.  I take it that you are not close to this brother?

A.  No, he left home and he distanced himself from the rest of us.
(R. 24:  3286, l. 1 - 3287, l. 13).

During the Court's questioning of this prospective juror:

Q.  Can you see that number one could sometimes be answered yes, sometimes be answered no, depending on the circumstances you had before you?

A.  Yes, I could, depending on the person's history.

Q.  Sometimes you have a defendant's prior history in front of you and sometimes you don't.  And I believe I covered this briefly this morning.  Sometimes when you don't have all that additional information, all you have to go on is what he did in that one case on trial.

A.  Right.

Q.  If it is so horrible -- you make up you own example -- I could sit here and make

39

up some real ghastly hypothetical situations,
but do you see how there are some offenses
that are so horrendous, that based upon the
manner in which somebody went about
committing that one particular crime, that
you as a juror could find that there would be
a probability that that person would commit
criminal acts of violence constituting a
continuing threat to society?

    A.  Sure, I could.
(R. 24: 3294, l.3 - 3295, l. 1).

Ms. Davies asked if the juror could convict of capital

murder and answer the special issues based upon the facts of a

single capital murder case.   The juror responded:

    A.  Yes, I could.  it depends on how
terrible the crime was for me to make that
decision.  A person would have to do
something that almost seemed inhuman, you
know.

    Q.  I guess I am trying to understand.
Can you help me out a little bit, when you
say inhuman?

    A.  Well, you read about different
crimes where people have dismembered,
disfigured.  To me, that is, you know, that
is hard to take, you know, to dismember a
human body, it's like in the Jeffrey Dahmer
case where all that went on.

    Q.  That gets to everybody.

    A.  Right.  That is morbid.  It's
scary.

    Q.  Is that the only kind of case that
you can see that would ever be serious
enough?

    MR. STAFFORD:  I object to her trying
to get him to commit to a certain fact
situation.

    THE COURT:  Sustained.

40

BY MS. DAVIES:

    Q.  Might there be other cases other than a Jeffrey Dahmer kind of case that that alone would be enough to convince you?

    A.  Well, could be, possibly.  I would just have to know the facts.  (R. 24: 3310, l. 20 - 3311, l. 21).

## ARGUMENT AND AUTHORITIES

The testimony of Berneice Holliday  during the *voir dire* examination was clear, succinct and straightforward.  On both her questionnaire and during questioning, she offered no opposition whatsoever to the death penalty.  Yet in an uncharacteristic manner of questioning, the prosecutor prodded and probed to find a hidden difficulty or conscientious reservation.  When it became clear that Ms. Holiday would offer no opposition to the death penalty, the State's attorney began questioning about her family's feelings and whether they might differ from hers and cause some problem.  Again no problem was revealed, so the prosecutor asked about the prospective juror's church's position regarding the death penalty.  When no problem surfaced here either, the prosecutor exercised her peremptory strike before Appellant even had two minutes to question Ms. Holliday.  The extreme difference between this pattern of questioning and the manner in which the prosecutor generally approached the prospective jurors makes her exercise of the strike suspect.  The trial court correctly required the State to articulate racially neutral reasons for the strike.  The reasons

41

given, however, do not rise to the level of Constitutional acceptability.  Too many of the reasons offered by the prosecutor are not supported by the record.  The discrepancies pointed out by Appellant were valid.    Although she did have one daughter employed by Texas Human Resources, she also had two sons in college. Although she believed she had a cousin in prison, she didn't even know him.  She was involved in early childhood education, but several people already seated on the jury had indicated that problems in early childhood might prove an explanation for later behavior, while in fact, Ms. Holiday could only think of mental illness as a possible mitigating factor.

As the State conceded:  Mr. Randle's answers reflected that he was a very intelligent man with a clear understanding of the issues involved and that this was ordinarily valued highly by the District Attorney in a juror.  (R. 24: 3339).  The State defended the use of the strike on the basis that Mr. Randle had a brother in prison and upon his need for evidence of prior violent activity before finding the first punishment issue affirmatively. (R. 24: 3339-3341).  In reference to the first reason expressed, it was the Prosecutor's belief that Mr. Randle was not being truthful with her.  Appellant vigorously opposed such an interpretation.  (R. 24: 3343).

Appellant responded to the second reason given by pointing out that on two or three occasions Mr. Randle had told the Prosecutor that he could answer the first question based solely on the facts of the capital murder case itself.  He did not need

42

any more evidence.   Then the District Attorney couched her
question specifically in terms of prior acts of violence, in an
apparent attempt to disqualify his answer by committing to a
particular situation.   But Mr. Randle always told her that the
answer would depend upon the facts of the case.   Appellant
concluded by arguing that both articulated reasons had been shown
not to be race neutral under the record and reurged his motion.
The Court found the reasons expressed to be racially neutral and
denied the motion.   (R. 24: 3342-3344).

The State attempted to justify its exercise of the strike
upon the juror's stated need for additional evidence to
affirmatively answer the first special issue.   This, however, was
never what he said.   He did indicate that the crime for which the
defendant had been convicted would need to be terrible or
inhuman.   But issues of how horrendous the crime must be were
placed in the mind of this juror by the Court in describing
situations where one murder would be enough.   The prosecutor
fostered this kind of thinking by bringing up the case of Jeffrey
Dahmer (R. 24: 3299).   Again the prospective juror had been led
by the prosecutor into giving the testimony which was used to
justify the strike.   Mr. Randle followed the prosecutor's lead a
bit better than Ms. Holliday, but he never expressed the opinion
that the prosecutor used to justify her strike.

The exercise of even one peremptory strike for racial
reasons invalidates the entire jury selection process and
mandates a new trial.   *Linscomb v. State*, 829 S.W.2d 164 (Tex.

43

Crim. App. 1992); *Young v. State*, 848 S.W.2d 203 (Tex. App.--Dallas, 1992, pet. ref'd). The trial court erred in refusing to grant Appellant's motion to invalidate the jury selected to hear this case.


### POINT OF ERROR NUMBER ELEVEN

ARTICLE 37.071 OF THE *TEXAS CODE OF CRIMINAL PROCEDURE* UNDER WHICH APPELLANT WAS SENTENCED IS FUNDAMENTALLY UNCONSTITUTIONAL, VIOLATING THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTIONS 10 AND 19 OF THE TEXAS CONSTITUTION. THE CONSTITUTIONAL INFIRMITY RESTS IN THE FACT THAT TWO DIFFERENT VERSIONS OF ARTICLE 37.071 WERE ENACTED INTO LAW BY THE TEXAS LEGISLATURE AND WERE IN EFFECT AT THE TIME OF APPELLANT'S TRIAL.


### ARGUMENT AND AUTHORITIES

Article 37.071 of the *Texas Code of Criminal Procedure* establishes the procedure governing the punishment phase of a capital murder trial.  This Article is constitutionally defective because there is an irreconcilable conflict between the two legislative enactments amending Article 37.071, both enrolled on June 16, 1991 with the Secretary of State of Texas to be effective on September 1, 1991.  The two conflicting legislative amendments to the article are Senate Bill 880 and House Bill 9.

Senate Bill 880 passed the Senate on May 3, 1991. The House passed Senate Bill 880 with amendments on May 14, 1991.  On May

17, 1991, the Senate concurred in the House Senate Bill 880.
Because of the absence of an express veto, Senate Bill 880 became
law, effective September 1, 1991.

House Bill 9 passed the House on May 7, 1991. On May 24,
1991, the Senate passed House Bill 9 with amendments. The House,
however, refused to agree to the Senate amendments and requested
the appointment of a conference committee to consider the
differences in the House and Senate versions of House Bill 9. On
May 27, 1991, the Senate and the House adopted the conference
committee report on House Bill 9. On June 16, 1991, the Governor
signed house Bill 9, to be effective September 1, 1991.

Senate Bill 880 amended Article 37.071 of the *Texas Code of
Criminal Procedure* by omitting the first and third questions
propounded to capital murder jurors during the punishment phase
of the trial as they existed before the amendment. It preserved
the second question regarding a continuing threat to society and
implemented additional inquiries in a case where a defendant was
found guilty of capital murder as a party to the offense. Senate
Bill 880 also expressly provided for consideration of mitigating
circumstances.

House Bill 9 amended Article 37.071 by providing for a life
sentence for a defendant found guilty of capital murder where the
State did not seek the death penalty and by providing procedures
in such cases for the trial court to determine whether the
defendant would be sentenced to death or life imprisonment. It
provided questions to be propounded to the jury on issues of

45

(1) deliberateness of the defendant's conduct, (2) the defendant's future dangerousness, and (3) issues of provocation, when raised by the evidence.

The irreconcilable conflict between Senate Bill 880 and House Bill 9 violated Appellant's rights secured him under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article 1, Sections 10 and 19 of the Texas Constitution.  Appellant was denied effective assistance of counsel at critical stages of the trial because he could not know what law and procedure would be applied to his case.  He was also unable to effectively prepare and conduct the *voir dire* examination of potential jurors when the law was uncertain regarding which questions they would be called upon to answer. The conflicts raised by two separate legislative enactments are of such a serious nature that they destroy the validity of Article 37.071.  Such an irreconcilable conflict denied Appellant the fundamental right to a fair trial, due process and equal protection under the law of Texas and the United States of America.

A defect so egregious that it deprives a defendant of a fair and impartial trial is considered by this court to be fundamental and subject to review whether or not it was presented to the trial court.  *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1984).  The sentencing portion of the capital trial demands the utmost scrutiny.  The present statutory scheme of submitting special issues rather than seeking a general verdict has been

46

required by the United States Supreme Court to protect the constitutional rights of a capital defendant to due process and equal protection under the law.   To face trial when the statutory basis of the special issues to be submitted is unclear violates these rights.   A sentence based upon Article 37.071 special issues as they were enacted at the time of Appellant's trial is void as a matter of law and subject to fundamental error review.   See *Steward v. State*, 830 S.W.2d 771 (Tex. App.--Houston [1st Dist.] 1992, pet. ref'd).   Application of a law which violates the defendant's right to due course of law constitutes fundamental error.   *Hensarling v. State*, 829 S.W.2d 168 (Tex. Crim. App. 1992).


## POINT OF ERROR NUMBER TWELVE

ARTICLE 37.071 (B) OF THE *TEXAS CODE OF CRIMINAL PROCEDURE* IS UNCONSTITUTIONAL IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BECAUSE IT REQUIRES AN UNTRAINED JURY TO PREDICT OR FIND THAT A DEFENDANT WILL COMMIT FUTURE ACTS OF VIOLENCE THAT CONSTITUTE A CONTINUING THREAT TO SOCIETY.   (R. 1: 167).


## STATEMENT OF FACTS
## ARGUMENT AND AUTHORITIES

Appellant filed a pre-trial motion asserting the unconsti-tutionality of Article 37.071 of the *Texas Code of Criminal Procedure*.   (R. 1: 165).   This motion was denied by the trial

47

court by attached order dated September 11, 1992.  (R. 1: 171).
As part of the motion Appellant asserted that Section b of
Article 37.071 violated the Eighth and Fourteenth Amendments of
the United States Constitution in that it required an untrained
jury to predict or to find that a defendant would commit future
criminal acts of violence that constitute a continuing threat to
society.  It was Appellant's position that the American Medical
Association and the American Psychological Association had made
findings that even trained psychiatric or scientific experts
could not predict with any accuracy the probability that a person
will commit future acts of violence.  The scientific literature
revealed that the opinion of experts that predictions of future
dangerousness were wrong more often than they were right.
Appellant argued that if experts could not accurately predict
future acts of violence, it was impossible for a jury to answer
such a special issue with consistency and fairness in the capital
murder sentencing process without the same being capricious and
arbitrary. (R. 1: 167).

In support of his motion, Appellant offered the testimony of
Windel L. Dickerson who held his doctorate degree in psychology
from the University of Texas.  (R. 26: 19).  To amplify the
motion testimony of Dr. Dickerson, Appellant introduced for this
Court's consideration journal articles which addressed the issue
of predicting dangerous behavior.  (R. 26: 16-18).  (Def. M. Ex.
A through J).  In reviewing the studies represented by these
articles and based upon studies in which he had participated, Dr.

48

Dickerson testified that a thoroughly conscientious psychologist "will not be able to tell you what an individual is going to do with a degree of accuracy exceeding fifty percent." (R. 26: 38, l. 14-17). The balance of Dr. Dickerson's testimony and the substance of the scientific journal articles offered into evidence supported Appellant's contention that members of the psychological community "don't predict very accurately at all" whether an individual will commit future acts of violence. (R. 26: 43, l. 15-16).

Appellant demonstrated through the evidence introduced at the motion hearing the constitutional infirmity of the first special issue required under Article 37.071 of the Texas Code of Criminal Procedure. The issue was designed to cure the fundamental issues addressed by the United States Supreme Court in *Furman v. Georgia*, 408 U.S. 238 (1972). Juries were to be given specific instructions regarding their consideration of whether or not to impose the death penalty. The Texas statutory scheme, however, asks the jury to consider and reach a conclusion that even qualified experts cannot make. Juries are left to speculate upon matters that trained experts cannot accurately reach conclusions. The statutory attempt of Article 37.071 to meet the constitutional requirement that the death penalty not be arbitrarily or capriciously rendered fails to achieve its purpose.

The Appellant request that this Court not approve a statutory scheme that allows common every day people to act as

49

soot sayers in predicating whether some will be a future danger. Due process has to be violated when your taking a persons life based on a prediction and that prediction two out of three times will be wrong. (R. 26: 34, 38). Simply put if the experts cannot do it how can the law allow untrained jurors to predict future acts of violence.

## POINT OF ERROR NUMBER THIRTEEN

ARTICLE 37.071 OF THE *TEXAS CODE OF CRIMINAL PROCEDURE* LIMITS AND INHIBITS THE JURY'S CONSIDERATION OF MITIGATING EVIDENCE IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BECAUSE OF THE STATUTE'S FAILURE TO PLACE THE BURDEN OF PROOF UPON THE STATE IN THE SECOND SPECIAL ISSUE REGARDING MITIGATING CIRCUMSTANCES.

## POINT OF ERROR NUMBER FOURTEEN

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE PUNISHMENT CHARGE BASED UPON THE FAILURE OF THE SECOND SPECIAL ISSUE TO ACCURATELY PLACE THE BURDEN OF PROOF UPON THE STATE.

### STATEMENT OF FACTS
### ARGUMENT AND AUTHORITIES

The second special issue was submitted to the jury during the punishment phase of Appellant's trial in the form mandated by Article 37.071 of the *Texas Code of Criminal Procedure*:

SPECIAL ISSUE NO. 2

50

>           Do you find from the evidence, taking
> into consideration all of the evidence,
> including the circumstances of the offense,
> the Defendant's character and background, and
> the personal moral culpability of the
> Defendant, Rick Allan Rhodes, that there is a
> sufficient mitigating circumstance or
> circumstances to warrant that a sentence of
> life imprisonment rather than a death
> sentence be imposed?

Appellant objected to the submission of the issue pointing out its failure to place the burden of proof upon the State. (R. 39: 3). Appellant also challenged the constitutionality of Article 37.071 which mandated the submission of this issue without appropriately assigning the burden of proof. (R. 1: 166). The motion to declare the statute unconstitutional on this basis was presented to the court which overruled Appellant's assertion. (R. 3: 36; 26: 14; 1: 171).

It is axiomatic that the burden of proof of all issues in a criminal prosecution rests upon the State beyond a reasonable doubt. Defenses raised by the evidence from any source must be disproved by the State beyond a reasonable doubt and juries must be so instructed. See Section 2.03(d) of the *Texas Penal Code*; *Gribble v. State*, 808 S.W.2d 65 (Tex. Crim. App. 1990). The second special issue mandated by Article 37.071 and placed in the jury charge in this case fails to define the burden of proof and to appropriately place that burden upon the State. The trial court erred in instructing the jury in accordance with this procedurally and constitutionally invalid special issue.

### POINT OF ERROR NUMBER FIFTEEN

ARTICLE 37.071 OF THE *TEXAS CODE OF CRIMINAL PROCEDURE* VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BECAUSE IT FAILS TO DIRECT OR INFORM THE JURY OF THE NATURE OF THE AGGRAVATING OR MITIGATING EVIDENCE THAT WOULD CALL FOR OR AGAINST THE IMPOSITION OF THE DEATH PENALTY. THIS DEFECT IN THE STATUTE ESSENTIALLY ALLOWED THE JURY UNBRIDLED DISCRETION IN IMPOSING THE DEATH PENALTY AS PROHIBITED BY THE FOURTEENTH AMENDMENT.

### POINT OF ERROR NUMBER SIXTEEN

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE PUNISHMENT CHARGE THAT IT FAILED TO IDENTIFY AND DEFINE THE FACTORS PRESENTED BY THE EVIDENCE WHICH COULD BE CONSIDERED MITIGATING FACTORS.  (R. 39: 3).

### POINT OF ERROR NUMBER SEVENTEEN

THE TRIAL COURT RESTRICTED APPELLANT'S ABILITY TO CONDUCT AN ADEQUATE *VOIR DIRE* EXAMINATION AND INTELLIGENTLY EXERCISE HIS PEREMPTORY STRIKES IN VIOLATION OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BY NOT ALLOWING HIM TO SPECIFI-CALLY DETERMINE WHAT THE PROSPECTIVE JURORS MIGHT CONSIDER TO BE A MITIGATING CIRCUMSTANCE.

## STATEMENT OF FACTS
## ARGUMENT AND AUTHORITIES

Appellant also challenged the Constitutionality of Article 37.071 for its failure to define what might be considered by the jury to be a mitigating factor.  He argued that without the direction of the statute or of the court to define what is a mitigating or aggravating factor, the jury could not distinguish the two and was essentially given unbridled discretion in its decision to impose the death penalty.  The trial court overruled Appellant's objection to the charge and upheld the constitutionality of the statute.  (R. 3: 36; 26: 14; 1: 171).

The lack of definition in Article 37.071 and the trial court's refusal to define mitigating and aggravating circum-stances for the jury caused much difficulty during the jury selection process.  In the general questioning of each panel the court gave essentially the same description of the second issue to the potential jurors:

> We are talking about mitigating circumstance or circumstances.  Mitigating evidence basically is anything which might serve as a basis for a sentence less than death.  I don't know what that might be in this case or in any other case we might be trying.  It can mean different things; it's going to depend on the case, in a proper case.  You may have certain kinds of mitigating circumstances; they may be mitigating as to one offense, one trial, not be mitigating in another, I don't know; but or [sic] statutes don't help a whole lot. The statutes don't identify or limit the aspects of the defendant's character or reputation or record, the record of circumstances that may be mitigating.  And

53

the law doesn't impose any special formula
for determining how much weight a mitigating
circumstance deserves.  The jury is the sole
judge of just exactly what is mitigating
circumstance, whether it exists, and if it
does exist, exactly how much weight to give
it.  We know that mitigating circumstances
are things like mental retardation and mental
illness.  They could be youth, a defendant's
age, that kind of thing. In a proper case,
mitigating evidence might include good
behavior in prison or in jail; it might
include an exceptionally unhappy or unstable
childhood.  It might include childhood drug
abuse or economic deprivation; might include
voluntary intoxication, drug dependency,
illiteracy, opinion testimony of lay
witnesses or psychiatric opinion testimony
that the defendant would not be a danger in
the future. (R. 11: 1131).

The court then explained that neither party had the responsi-

bility to produce such evidence and that as he interpreted the

law, it was a way for the jury to decide that the death penalty

was not appropriate even if it had found that a defendant would

be a continuing threat to society.  (R. 11: 1131).  The potential

jurors were consistently instructed by the court that it was

within their sole discretion to determine what might be  miti-

gating circumstances and how much weight to give such circum-

stances.  (R. 11: 1201).  Appellant repeatedly objected to this

instruction arguing that there were some factors which had been

determined in prior decisions to be mitigating and that the jury

was entitled to know what these factors were and then to be told

to give the factors whatever weight the jury deemed appropriate.

(R. 11: 1201).

Following this type of general discussion, Appellant's

counsel would try to develop an understanding of what individual jurors might consider a mitigating circumstance and attempted to discuss with them the factors which appellate courts had previously held to be mitigating.  The trial court frequently ruled that such questioning was an impermissible attempt to have the juror commit to what factors he would consider mitigating. (R. 11: 1170-1171).  (R. 11: 1246-1247). (R. 9: 865).  Indeed one potential juror had indicated that he might consider drug use an aggravating factor, but Appellant was not allowed to ask if he could consider drug use mitigating in a certain case.  (R. 13: 1574).  See also (R. 21: 2755).  Appellant was forced to exercise peremptory strikes on otherwise potentially acceptable jurors because he was not allowed to identify mitigating factors that under the law must be considered and determine if the jury could properly consider such evidence. (R. 10: 1119).

Appellate cases have clearly defined factors which must be considered as mitigating against the imposition of the death penalty. *Penry v. Lynaugh*, 492 U.S. 302 (1989) [mental retardation]; *Zant v. Stephens*, 462 U.S. 862 (1983) [mental illness or brain disorder]; *Eddings v. Oklahoma*, 455 U.S. 104 (1982) [troubled or abusive background]; *Skipper v. South Carolina*, 476 U.S. 1 (1986) [good behavior in jail or prison].  That these factors constitute mitigating circumstances is a legal concept upon which Appellant was entitled to rely.  If a juror were to state that he was unable to consider these factors as mitigating against the death penalty he would be subject to disquali-

fication.  See *White v. State*, 779 S.W.2d 809 (Tex. Crim. App. 1989).  This Court has expressly stated that the proper procedure is to inform prospective jurors that the law requires that they consider these established factors and to inquire about their ability to do so.  *Trevino v. State*, 815 S.W.2d 331, 346 (Tex. Crim. App. 1987).  This is precisely what Appellant was not permitted to do during jury selection in this case.  The record reflects that this fact seriously impaired his ability to determine the prospective juror's ability to fairly judge the facts of the case and at the very least impaired his ability effectively exercise peremptory challenges.  The trial court prevented Appellant's counsel to questions prospective jurors in order to exercise intelligent peremptory challenges. Art. 1., Sec. 10, Texas Constitution, Powell v. State, 631 S.W.2d 169 (Tex.Crim.App.1982)

The trial court erred in limiting Appellant's counsel during the jury selection process and again in failing to define in the jury charge that certain factors must be considered to be mitigating whatever weight the jury might assign to those factors.  The Article 37.071 special issue violates the consti-tutional rights of capital murder defendants because it provides no definition or guidance to the jury regarding factors which the Supreme Court has held to be mitigating as a matter of law. *Eddings*, *supra*.  The trial court informed all of the jurors that certain evidence maybe mitigating to one person but aggravating to another.  The trial courts failure to identify the mitigating

56

factors as offered by the appellant allowed his jury to consider that evidence as aggravating.  The harm caused by the court's failure to instruct can never be measured or determined.


### POINT OF ERROR NUMBER EIGHTEEN

THE TRIAL COURT ERRED IN REFUSING TO ADMIT FOR THE JURY'S CONSIDERATION, PHOTOGRAPHS WHICH DEPICTED APPELLANT IN EARLY CHILDHOOD TO CORROBORATE HIS PARENT'S VERBAL DESCRIPTION OF HIS CHILDHOOD.  THE EVIDENCE WAS ADMISSIBLE AND PROBATIVE ON THE ISSUE OF MITIGATING CIRCUMSTANCES.


### STATEMENT OF FACTS

During the punishment phase of the trial Appellant offered into evidence several photographs of Appellant taken during his early childhood.  (R. 34: 735; Def. Ex. Nos. 6-16). Appellant argued that the pictures were relevant to the testimony of Appellant's parents regarding his early childhood and corroborated his family's verbal description of that time of his life.  The State objected to their admission on the basis of relevancy. (R. 34: 739).  The trial court denied their admission on that basis and the photographs were included in the appellate record.  (R. 34: 739).

### ARGUMENT AND AUTHORITIES

Many photographs were admitted during the trial of this case.  Of particular note was the State's introduction of photographs of the victims of the offense and family portraits in

57

which they appeared.  These pictures were not relevant to the crime itself, but were offered to humanize the victims for the jury.  Yet the trial court refused to admit pictures of the Appellant which depicted his appearance during the childhood that his parent's described.  The relevance of the proffer is tied to this testimony, all of which went to the issue of mitigation.

Relevancy is defined as that evidence which has a tendency to make a fact that is of consequence to the determination of the action more probable than it would be without the evidence.  Rule 401 of the *Texas Rules of Criminal Evidence*; *Stone v. State*, 574 S.W.2d 85 (Tex. Crim. App. 1978); *Robinson v. State*, 844 S.W.2d 925 (Tex. App.--Houston, [1st Dist.] 1992, no pet.).  The photographs proffered by Appellant were highly relevant to the issue of mitigating circumstances.  Childhood factors have been held to constitute mitigating circumstances.  It was error for the trial court to deny admission of evidence which would have been probative on this issue.  The harm of this decision is demonstrated by the court's decision to allow the jury to consider similar evidence offered by the State.  The jury was not allowed to see evidence which tended to place the defendant in the context of his life, while it saw photographic examples of the lives of the victims of this offense.  The trial court's error mandates reversal of the judgment and sentence imposed in this case.

### CONCLUSION

For all the reasons set out herein, Appellant prays that the

58

judgment of conviction and sentence of death imposed in this case be reversed and a judgment of acquittal substituted or a new trial ordered.

Respectfully submitted,

JAMES STAFFORD
Attorney for Appellant
RICK ALLAN RHODES

## CERTIFICATE OF SERVICE

I hereby certify that on the ___ day of September, 1993, a true and correct copy of the foregoing Appellant's Brief was forwarded by United States Mail, postage prepaid, to Calvin Hartman, Assistant District Attorney, 201 Fannin, Suite 200, Houston, Texas 77002 and to Robert Huttash, State Prosecuting Attorney, Supreme Court Building, P.O. Box 12405, Austin, Texas 78711.

JAMES STAFFORD