APPELLATE COURT NO. 71595

IN THE COURT OF CRIMINAL APPEALS

OF THE STATE OF TEXAS

AT AUSTIN

RICK ALLAN RHOADES,

                    Appellant

VS.

THE STATE OF TEXAS,

                    Appellee.

APPEAL FROM 179TH DISTRICT COURT OF HARRIS COUNTY,

TEXAS

Judge J. Michael Wilkinson  Presiding

STATEMENT OF FACTS

VOLUME_____IX_____  OF 40  VOLUMES

Marlene Swope
Official Court Reporter
301 San Jacinto
Houston, Texas  77002

FILED IN
COURT OF CRIMINAL APPEALS

MAR 5  1993

Thomas Lowe, Clerk

717

1
2
3
4

INDEX

VOLUME IX

VOIR DIRE EXAMINATION OF PROSPECTIVE JURORS

<u>Page</u>

5  MARION DALE HARVILLE
       By the Court                       719
6      By the State                       732
       By the Defense                     753
7      Sworn as a Juror                   774

8  JENNIFER MILSAPS
       By the Court                       777
9      By the State                       789
       By the Defense                     816
10     Excused by the State               820

11 ELAINE C. JONES
       By the Court                       821
12     By the State                       833
       By the Defense                     857
13     Excused by the Defense             876

14 NEAL PRIDDY
       By the Court                       876
15     By the State                       890
       Excused by agreement               903

16
   JAMES PATRICK GAFFNEY
17     By the Court                       904
       By the State                       922
18     By the Defense                     948
       Excused by the State               976

19
20
21
22
23
24
25

1                   ALPHABETICAL INDEX

2                     VOLUME IX

3      VOIR DIRE EXAMINATION OF PROSPECTIVE JURORS

|  |  | Page |
|---|---|---|
| **GAFFNEY, JAMES PATRICK** | | |
| By the Court | | 904 |
| By the State | | 922 |
| By the Defense | | 948 |
| Excused by the State | | 976 |
| **HARVILL, MARION DALE** | | |
| By the Court | | 719 |
| By the State | | 732 |
| By the Defense | | 753 |
| Sworn as a Juror | | 774 |
| **JONES, ELAINE C.** | | |
| By the Court | | 821 |
| By the State | | 833 |
| By the Defense | | 857 |
| Excused by the defense | | 876 |
| **MILSAPS, JENNIFER** | | |
| By the Court | | 777 |
| By the State | | 789 |
| By the Defense | | 816 |
| Excused by the State | | 820 |
| **PRIDDY, NEAL** | | |
| By the Court | | 876 |
| By the State | | 890 |
| Excused by agreement | | 903 |

1                    CAUSE NO. 612408

2   STATE OF TEXAS        IN THE 179TH DISTRICT COURT

3   VS.                          OF

4   RICK ALLAN RHOADES     HARRIS COUNTY, T E X A S

5

6   A P P E A R A N C E S:

7   For the State:       Ms. Carol Davies
                          Assistant District Attorney
8                         Harris County, Texas

9   For the Defendant:   Mr. James Stafford
                          Ms. Deborah Kaiser
10                        Attorneys at Law
                          Houston, Texas

11

12

13            BE IT REMEMBERED that upon this the

14   4th day of August A.D. 1992, the above entitled

15   and numbered cause came on for continued voir

16   dire examination of prospective jurors before

17   the Honorable J. Michael Wilkinson, Judge of the

18   179th District Court of Harris County, Texas;

19   and the State appearing by counsel and the

20   Defendant appearing in person and by counsel,

21   the following proceedings were had, viz:

22

23

24

25

                                                    718

1                    MARION DALE HARVILL,

2    called as a prospective juror, was examined as

3    follows:

4                    EXAMINATION BY THE COURT.

5         Q.    This is prospective juror number four

6    on panel number two, Mr. Marion Dale Harvill.

7    Is that the correct pronunciation?

8         A.    Yes, sir.

9         Q.    I am going to ask you a few questions

10   before we get started.  You were asked if you

11   were a lawyer/rancher, and you said you were a

12   rancher/lawyer.  I noticed you had worked with a

13   couple of major firms in Houston.  I believe it

14   was Kronzer, Abraham and Baker Botts?

15        A.    Yes.

16        Q.    Can you give us the time frames when

17   you worked there?

18        A.    I came directly out of law school in

19   1964 to Baker Botts Shepherd and Coates.  I was

20   with Baker Botts Shepherd and Coats until July 6

21   of 1966.  And I was with the Brown Kronzer firm

22   from that time until May 1st of 1973.

23        Q.    May 1, '73, you left that firm and?

24        A.    Went out on my own and formed my own

25   law firm after that.

719

1   Q. What kind of law did you practice?

2   A. Okay, from 1973 until October first,

3 1975, I was a solo practitioner.  I practiced

4 personal injury, plaintiffs personal injury law,

5 which was ninety some odd percent of the cases I

6 was a litigator.  In October first, 1975, G. P.

7 Hardy, III came over from Vinson, Elkins, and we

8 formed the firm.

9   Q. You are that Harvill and Hardy.

10   A. That's right.  Judge Scirs used to

11 call us Laurel and Hardy.

12   Q. You were Harvill and Hardy until when?

13   A. I withdrew from the firm on May 1st of

14 1985, and I set up shop out in the FM 1960 area

15 where I lived, and I have been out there ever

16 since.

17   Q. I know there were a couple of former

18 DA's at one time or another who went through

19 there as associates.  Did you have various

20 associates over the years with Harvill and Hardy?

21   A. Yes.

22   Q. I can't recall any names right now.

23   A. There is one in particular that I know

24 of.  If you need his name.  Pat McKennah.

25   Q. Oh, yeah.  I forgot where he went

1    after that.  So, plaintiffs personal injury.

2    Plaintiffs who have personal injury cases often

3    pick up criminal cases on the side while theirs

4    is pending.  Where did you refer those out to?

5         A.   I didn't have that many because I just

6    didn't.  Most of the cases that I had were

7    referred from other lawyers, to start with.  And

8    any that came up would have -- there was not any

9    particular one person that they went to.  I

10   know, I don't recall if I ever referred one

11   period.

12        Q.   Did you ever appear in criminal court

13   with any of those people?

14        A.   No, I did not.

15        Q.   You still keep a law office open?

16        A.   I have a law office open, and I have

17   one case that is pending in the Texas Supreme

18   Court that will be argued October 20th that I

19   keep.  I get calls.  A young lawyer that was

20   with me downtown named Scot Saines gets those

21   cases.  I just tell the people I don't do them

22   day to day anymore and suggest, if they want a

23   good lawyer, they call Scott Saines.

24        Q.   Your cattle ranching activity, what

25   county?

1      A.    I have ranching operations in North

2   Texas in Montague County, Texas, which is my

3   home county.  I have some in Grimes County.  I

4   have some in Hardin County.  And I have some in

5   Harris County.

6      Q.    Where was your wife a legal secretary?

7      A.    She worked for a lawyer named Graham

8   Moore, who is now deceased.  He became deceased

9   at about age thirty-seven.  He was primarily a

10  divorce lawyer.  I think that is all he did

11  except he may have gotten a few plaintiffs

12  personal injury cases.

13     Q.    Five children.  They are scattered

14  everywhere.

15     A.    Yes, sir.

16     Q.    One is with a law firm in Los Angeles?

17     A.    Yes, sir.

18     Q.    One is in Maryland.

19     A.    Yes, sir.

20     Q.    Where is Belmont?

21     A.    Belmont is in Nashville, Tennessee.

22  That is my musician.

23     Q.    Previously on one criminal jury?

24     A.    Yes, sir.

25     Q.    Seven or eight years ago.  A burglary

1    case.  Do you recall what court that was in?

2          A.    It was Frank Price, visiting judge was

3    the judge, but I cannot recall which.

4          Q.    I am amazed that you remember Frank.

5    Did you know Frank from before or something?

6          A.    Yes.  He ruled against me one time in

7    a civil case and we reversed him on appeal.

8                MR. STAFFORD:  He has never forgiven

9    you.

10         A.    Fulbright and Jaworski and I did

11   against a Dallas lawyer.

12         Q.    You actually completed a Michner book.

13         A.    Yes.  It was a struggle, but I did.

14         Q.    High school friend went to prison for

15   what offense, do you recall?

16         A.    You know, I do not know.  That is just

17   hearsay.  I have never spoken to him about it,

18   but it seems like it was some kind of an

19   oilfield theft of some kind.

20         Q.    Pages eight and nine of this

21   questionnaire list statements and either have

22   you check the one which best summarizes your

23   views about capital punishment and the death

24   penalty or has you check whether you agree or

25   disagree with the statement they write.  In

1    summarizing these two pages, it appears that you

2    wish capital punishment weren't necessary, but

3    you feel it is necessary for some offenses.  Is

4    that correct?

5         A.    That is correct.

6         Q.    At any rate, your decision on whether

7    or not the death penalty should be assessed

8    would depend solely on the facts and

9    circumstances of the individual case?

10        A.    Yes, sir, absolutely.

11        Q.    You are very familiar with the general

12   principles we had talked about, presumption of

13   innocence, burden of proof on the State to prove

14   the case beyond a reasonable doubt?

15        A.    Yes, sir.

16        Q.    Defendant's failure to testify is not

17   to be considered as any evidence against him,

18   all those things?

19        A.    Yes, sir.

20        Q.    Of course you went through that in

21   1984, 1985 case where you sat on the jury?

22        A.    Yes, sir.

23        Q.    You probably were more aware than most

24   folks we get in here, aware of the statutory

25   scheme we have in Texas on capital murder

724

1    offenses, exactly what kind of offenses can be

2    elevated from murder to capital murder?

3        A.    My knowledge of that was just very

4    general, just about like any other citizen would

5    have knowledge just from what I read or hear,

6    but I did not have any legal knowledge about

7    that.

8        Q.    I read off those six different

9    categories where intentional taking of a life

10   plus an aggravating factor makes the offense of

11   capital murder, police officer murdered, the

12   murder for hire, the murder while in the course

13   of committing another felony, murder of an

14   employee of a penal institution while

15   incarcerated, murder while escaping and the

16   killing of two or more people, murdering two or

17   more people in the same criminal transaction.

18   Are all those kinds of offense that you think

19   should be capital murder offenses?

20       A.    In the right circumstances, the right

21   facts, I would say yes.

22       Q.    And everything we ask you is going to

23   hinge, of course, on individual circumstances

24   that you hear in a case on trial.  When these

25   people are talking to you, by the way, they are

1    not going to be referring to this case

2    specifically, they are going to be talking in

3    hypothetical terms.  You did understand that if

4    anybody is convicted of the offense of capital

5    murder there are only two possible punishments,

6    death penalty or life imprisonment?

7         A.    Yes, sir.

8         Q.    We had talked about the possibility of

9    lesser included offenses may arise, depending on

10   the testimony from the witness stand.   Do you

11   recall whether or not ya'll had an option

12   electing among lesser included offenses in that

13   case you tried seven or eight years ago?

14        A.    If we did, I don't recall that we did.

15        Q.    I believe both sides touched on lesser

16   includeds which could be anything from murder to

17   voluntary manslaughter, involuntary

18   manslaughter, negligent homicide, coming down

19   the line from capital murder, first, second and

20   third degree felonies, class A misdemeanor, all

21   the way down?

22        A.    Right.

23        Q.    If the jury finds the defendant guilty

24   of capital murder, as I said before, it's

25   mandatory life or death.  Were you familiar with

1    the scheme that we have in punishment on a

2    capital murder case, not the jury voting on life

3    or death but on answering certain questions put

4    to them, special issues?

5              I am going to remind you to speak up.

6         A.   Yes.

7         Q.   She has to take it down.

8         A.   I was impressed with the kindness of

9    that statute.

10        Q.   How do you mean the kindness of the

11   statute?

12        A.   It means that you have to.

13        Q.   Oh, the insulation of the jury?

14        A.   The insulation of the jury.

15        Q.   It works both ways because the judge

16   is kind of isolated also.

17        A.   Exactly.

18        Q.   Let's refer over here.  We have them

19   on the board.  I don't know if you could see

20   those yesterday when we were talking about

21   them.  This only comes into play in that second

22   stage of trial after you have heard evidence in

23   the second stage if the jury has found someone

24   guilty of capital murder.  First one asks you:

25   Do you find from the evidence beyond a

1    reasonable doubt that there is a probability the

2    defendant would commit criminal acts of violence

3    that would constitute a continuing threat to

4    society.  This is the estimation of future

5    dangerousness of a defendant.  By probability we

6    mean more likely to occur than not.  The jury

7    would have in front of them all kinds of

8    information by that time.  I would instruct the

9    jury that they should consider all the evidence

10    admitted at the guilt or innocence stage and at

11    the punishment stage, including evidence of a

12    defendant's background or character or the

13    circumstances of the offense that militate for

14    or mitigate against the imposition of the death

15    penalty when they are deciding that issue.  It

16    takes all twelve jurors agreeing unanimously

17    that the answer should be yes.  It takes ten or

18    more jurors agreeing to have a no answer.  If

19    the jury answers that no, there is no

20    probability, that is the end of it, I assess

21    life imprisonment.  If they answer yes, there is

22    a probability, then you continue on to number

23    two.  Number two is asking whether or not,

24    taking into consideration all the evidence,

25    including the circumstances of the offense, the

1    defendant's character and background, personal
2    moral culpability of the defendant, whether or
3    not there is a sufficient mitigating
4    circumstance or circumstances to warrant that a
5    sentence of life imprisonment rather than a
6    death penalty be imposed.  You are considering
7    everything you have heard, all the way through,
8    including whatever mitigating evidence there
9    might have been.  Our courts haven't told us
10   exactly what is per se mitigating circumstances
11   except for mental retardation, but we know that
12   a lot of other things can be mitigating.  And
13   not to give you a complete laundry list because
14   I don't know what all they might be, but we know
15   they can include such things as child abuse, a
16   defendant's previous good behavior while in
17   prison or jail, an exceptionally unhappy
18   childhood, economic deprivation, childhood drug
19   abuse, age, voluntary intoxication, drug
20   dependency, illiteracy, lay opinion testimony or
21   psychiatric opinion testimony that a defendant
22   on trial would not be a danger in the future.
23   All those kind of things may be mitigating kinds
24   of circumstances.  We can't ask you exactly what
25   you think is mitigating circumstances or isn't

729

1    and exactly what kind of value.  We don't know

2    what is going to come into effect in the trial.

3         A.    Right.

4              MR. STAFFORD:   I object again.  We

5    could not ask him what is mitigating to him and

6    what effect he would give it.

7    BY THE COURT:

8         Q.    We can't commit you to exactly -- let

9    me rephrase it.  We can't commit you to exactly

10   what all these kinds of things out there.  I

11   don't know, there could be thousands of

12   different kinds of mitigating circumstances, I

13   don't know.  And we can't commit you as to

14   exactly how much weight you would give any

15   particular mitigating circumstance.  We want to

16   make sure that we have jurors who will look at

17   all the evidence and, based on everything they

18   have, decide whether or not there is enough

19   there to warrant a life imprisonment sentence

20   rather than death even if the jury has found

21   there is a probability in number one that the

22   defendant would commit criminal acts of violence

23   that would constitute a continuing threat to

24   society.  You understand where we are coming

25   from?

1      A.   Yes, sir.

2      Q.   It takes all twelve jurors unanimously

3  agreeing the answer should be no.  It takes ten

4  or more to return a yes answer.  So if they have

5  already answered number one yes and answered

6  number two yes, I impose a life sentence.   If

7  it's unanimous as to number one with a yes

8  answer, unanimous number two a no answer, there

9  is nothing mitigating here that would warrant a

10  life imprisonment rather than death, then I

11  impose the death penalty.

12      A.   Yes, sir.

13      Q.   Simple and confusing all at the same

14  time, but you get to know in advance exactly

15  what I am going to do if you answer those

16  questions in a certain way.

17      A.   Yes, sir.

18      Q.   One of the things that we are trying

19  to assure ourselves during this process is

20  someone doesn't automatically answer those one

21  way or the other.  Want to make sure that a

22  potential juror is not predisposed to always

23  answer a certain way to insure either that a

24  death penalty results or that life imprisonment

25  results.

.731

1          Is there anything about your views

2     regarding the death penalty and capital

3     punishment which would prevent or substantially

4     impair the performance of your duties as a juror

5     in accordance with the instructions I would give

6     you and your oath as a juror?

7          A.    No, sir.

8          Q.    Can you see that how under some

9     certain circumstances question number one could

10    be answered yes and sometimes no?

11         A.    Yes, I do.

12         Q.    And the same as to number two?

13         A.    Yes, sir, I do.

14              THE COURT:   Ms. Davies.

15              EXAMINATION BY THE STATE

16    BY MS. DAVIES:

17         Q.    This is kind of an interesting, unique

18    situation for us, Mr. Harvill, because we rarely

19    have somebody sitting where you are who has had

20    as much experience in the legal system.

21         A.    Yes.

22         Q.    At the same time, I suspect it's just

23    as unique for you because not many people --

24    even given your experience -- have the occasion

25    to actually confront the possibility of being

732

 1   involved in a death penalty.

 2        A.    That is true.

 3        Q.    How do you feel about that?

 4        A.    I feel like it's a very heavy burden,

 5   that the people that actually serve are going to

 6   have to take the job very seriously and they are

 7   going to have to look at all the facts and the

 8   circumstances and not make any decision

 9   lightly.  They are going to have to do it based

10   upon evidence and based upon facts and

11   circumstances, and then they are going to have

12   to live with whatever decision they make.

13        Q.    I would agree with you.  I don't think

14   either party in this case would want anybody on

15   the jury who didn't take this seriously.  I will

16   be asking for the death penalty, so we are, as

17   we talk about it today -- I guess what I would

18   really like to know is if I had met you three

19   days ago in just a casual social situation and

20   we had been engaged in a conversation about the

21   situation, crime in the community and death

22   penalty, how would you have described your

23   attitude toward the death penalty, its necessity

24   or lack of necessity?

25        A.    If friend or neighbor had asked me or

1    an acquaintance had asked me, I would have

2    simply said that I feel it's unfortunate that it

3    is necessary, but I feel that it is necessary

4    and that our society is such that at this point

5    in time I believe that it should be in an

6    appropriate case available for law enforcement.

7         Q.   Are there any types of cases to your

8    way of thinking that are the first ones that

9    come to your mind that are the appropriate types

10   of cases for the death penalty?

11        A.   I guess my attitude is one -- I don't

12   know why, but I am basically a person who tends

13   to agree more than disagree with where we are

14   with respect to things, and I can't think of

15   anything that has been mentioned to me as being

16   a capital murder situation that could not be

17   appropriate for a death penalty.  And whether it

18   is appropriate or not would depend on the facts

19   and individual personalized circumstances in a

20   particular case.

21        Q.   That is exactly what the law would

22   anticipate should be the appropriate kind of

23   measure.  We talk about these things in the

24   abstract.  As you said, if a friend or neighbor

25   had asked you about it.  Now your're confronted

734

1   with the reality, and I assume you gave it a

2   little thought last night.  Do you feel

3   differently at all knowing that, hey, I am going

4   to have to deal with this myself as opposed to

5   just talk about it?

6       A.   No, I don't feel differently because

7   in just talking about things I am not the type

8   person that will go out on these little, you

9   know, community discussions that everybody gets

10  on one bandwagon or another, that sort of

11  thing.  I have never been a bandwagon sort of

12  person.  And I attribute that probably to the

13  way I grew up.  As a migrant farm worker, I was

14  a person that wasn't very well thought of as a

15  migrant farm worker, and then I became a lawyer

16  and so forth, and all of a sudden I was Mr.

17  Cool, you see.  And, so, I know that facts and

18  circumstances make a difference, and I have not

19  changed my view, because I have had the same

20  view for quite awhile.

21      Q.   I noticed you have got a family.  You

22  have got -- your son in L.A., what type of law

23  does he practice?  That is Patrick?

24      A.   That's Patrick.  I don't know for sure

25  except I know it will have to do probably with

735

1       anti-trust and corporate litigation sort of
2       practice that he himself personally is doing as
3       probably two or three other lawyers mold at this
4       point.   He has only been out of law school for a
5       little over a year.
6              Q.    Your daughter Teresa is at the
7       University of Maryland?
8              A.    Yes.  She's my career student.   She's
9       twenty-nine years old.
10             Q.    I know the feeling.
11             A.    She just graduated with a major in
12      English with a minor in history.
13             Q.    Did I hear you say that Heather in
14      Belmont University, that she is a musician
15      studying music?
16             A.    Yes.  Her name is Heather Edwards.
17      It's not Heather Harvill.  She's my
18      stepdaughter.  But as far as she and I are
19      concerned, she's my daughter, and she's studying
20      music business.
21             Q.    Music business?
22             A.    Yes.  And that school is known at
23      least in that area for music business.  It used
24      to be called Belmont Baptist.  It's now Belmont
25      University.

736

1      Q.   Given the size of your family, both

2  children and stepchildren, did you manage to get

3  through, so far, at least, without having any

4  difficulty with any of your children having

5  problems with the law?

6      A.   I have been extremely fortunate.  I

7  feel that my children are better than me because

8  they have never had the least bit of trouble

9  with the law of any kind.

10      Q.   That is amazing today for a parent to

11  be able to say that.

12           Do you know whether your wife or your

13  children, any of your family members, hold

14  different views about the death penalty from

15  yours?

16      A.   If any of them do, they have never

17  told me, because we generally, for instance, the

18  children, I never have discussed it with them.

19  I don't know how they would feel about it.  I

20  know my wife would feel about it the same way I

21  feel about it basically.

22      Q.   My concern as a rule is to always know

23  whether there are people who are close to you,

24  people who matter to you who would disapprove if

25  you were on a jury that gave a death penalty

1    verdict.

2         A.    I don't know of any.  If there are

3    any, I don't know it, okay.

4         Q.    Would you feel any pressure in that

5    regard?

6         A.    Absolutely not.

7         Q.    The insulation is there for the jury

8    and for the judge.  One of our previous jurors

9    we talked to about it commented that he saw it

10   more as insulation for the judge as opposed to

11   insulation for the jury, which is interesting.

12   I had never thought of it that way.  But,

13   obviously, the twelve jurors are going to know

14   very clearly what the result of their answers to

15   those two questions are.  So if someone is

16   inclined to try to manipulate their answers to

17   avoid the death penalty or to be sure it was

18   imposed, it's a very simple thing to do.  Do you

19   feel like you would be predisposed to try to get

20   the result you want going in even without

21   hearing evidence?  Would you be a person who

22   would want to avoid the death penalty?

23        A.    No.   In fact, I was impressed

24   favorably by the way that charge and the fact

25   that jurors do know what is going on because I

738

1  lived for many, many years on the civil side
2  with the jury kind of blindfolded about the
3  results of their answers to issues and that sort
4  of thing; so I was favorably impressed by the
5  way that scheme is set up and the fact that we
6  as potential jurors don't have blindfolds.
7      Q.   I want to be sure I am not just
8  hearing what I want to hear, so I will ask you
9  again -- I think sometimes we fall into that
10 trap.  I think I am hearing you say that if you
11 are on the jury and you thought the evidence
12 indicated that the answers to those questions
13 should be answered in such a way that the death
14 penalty would result that you could actually do
15 that.
16     A.   I have no doubt that I could.
17     Q.   At the same time, I am not getting the
18 impression that you are a person who would
19 always answer those questions one way or the
20 other.
21     A.   That is absolutely true.   I would not
22 go into it with any agenda whatsoever because I
23 feel it's too important for prejudice.
24     Q.   You in your law practice, you were
25 primarily a litigator?

739

1        A.    Correct.

2        Q.    I feel like it's pretty safe to assume

3    you have had a lot of dealings with using expert

4    witnesses?

5        A.    Yes.

6        Q.    I have no idea what evidence there

7    might be from the defense.  Over here on this

8    side of the street, on the criminal side,

9    discovery is not a two-way street like it is in

10   the civil cases.  The defense has a right to

11   discovery from me, but I have no right to know

12   anything about what they might do.  I can only

13   assume, given the type of case, that it would

14   not be at all unusual for us to hear experts in

15   this type of case, psychologists,

16   psychiatrists.  Having relied on expert

17   testimony in your professional experience, I am

18   concerned to know what your attitude is toward

19   that field, especially of psychology.  Do you

20   feel like that is a precise enough science that

21   you would feel like you really should always

22   rely on that type of testimony?

23       A.    Not always; I wouldn't say always

24   rely; but I personally have relied on it in some

25   of my cases; and, yes, I do believe in the field

                                           740

1  of psychology; and I do believe that it can be

2  helpful.  It's like anything else, you have to

3  judge what you hear and what you see and whether

4  or not it rings true; but I am not one that

5  bashes psychologists or is in love with

6  psychologists.  I am simply objective in my

7  attitude.  In other words, my mind and heart

8  position is to be objective about that sort of

9  thing without prejudging it.

10     Q.    When we are talking about that type of

11 thing, people's information about how someone

12 might conduct themselves in the future, do you

13 feel like just laymen opinion can also be

14 valuable?

15     A.    Absolutely.

16     Q.    Perhaps, is there ever a chance that

17 that might weigh heavier with you in some cases

18 than a psychologist, given the circumstances?

19     A.    Given set of circumstances, possible

20 that I might feel better about some lay

21 testimony than I would about a psychologist in a

22 given situation.  On the other hand, it could be

23 the other way, too.  I have seen it both ways in

24 civil cases.

25     Q.    In some instances, I can ask or might

741

1    ask for the death penalty based just on the

2    evidence of the capital murder offense itself.

3    In other words, there certainly is a possibility

4    of your getting additional evidence at the

5    punishment stage about the defendant's

6    background, but in some cases there is no

7    additional, there may be no past criminal

8    history, and maybe there is no psychiatric or

9    other testimony, you just would be looking at

10   the crime itself.  Can you see in your mind any

11   situation where that alone could suffice to

12   convince you that those questions should be

13   answered--?

14           MR. STAFFORD:  My only qualification

15   to that if he was convinced beyond a reasonable

16   doubt.

17           THE COURT:  Would you rephrase it,

18   please?

19   BY MS. DAVIES:

20       Q.   Perhaps I left that phrase out.    Can

21   you see there ever being a situation where just

22   the crime itself, if you were convinced beyond a

23   reasonable doubt that the issue should be

24   answered in such a way that it resulted in the

25   death penalty, can you see evidence of the crime

1    itself being enough?

2        A.   If under the court's instructions if

3    it were appropriate to do so, I can see there

4    are situations that I would think those facts

5    alone would be strong enough that would be

6    favorable to the death penalty.  If it would be

7    appropriate for a jury to do so and the facts

8    were horrible enough, yes, I could do that.

9        Q.   You said Judge Price presided over the

10   burglary case you were on the jury.  Do you

11   remember who the prosecutor was or the defense

12   attorney, by any chance?

13       A.   I do not.  I know some of them when I

14   see them other than Price, but I don't recall

15   the names.  One of the two defense counsel was a

16   big, old guy, great big guy.  Name is on the tip

17   of my tongue but I can not call it down.

18       Q.   I was concerned -- I know that you

19   heard some of the comments yesterday by one of

20   the members of the venire about having been on

21   jury duty and being offended by the appearance

22   the State was hiding evidence, things that were

23   developed by the defense.  I didn't like the way

24   that sounded.  I don't like for anybody to come

25   away from a trial feeling that way, but I am

1    wondering what your impression was when you went

2    through that process.

3         A.    I understand your concern by those

4    comments because, you know, in every civil case

5    you always have a concern that somebody is going

6    to think that you are trying to hide something,

7    and that doesn't play well with the jury, but my

8    only personal experience in the criminal case

9    was a very favorable one as far as the way both

10   sides conducted themselves and, indeed, the way

11   the court who had ruled against me conducted

12   himself.    I thought he did good.

13        Q.    I guess that speaks very well.    You

14   don't have any built-in concerns in that regard

15   then?

16        A.    No, because also I understand there

17   are tactics going on, and I have used the same

18   tactics, so I know what you are talking about.

19   And I know how it plays both ways for each side,

20   you see.

21        Q.    Again, you know, everything is not a

22   two-way street over here.    After I went home

23   last night I thought, you know, I didn't explain

24   to that person if I leave out part of the

25   statement the defense has the right to put the

744

1   balance in, but if the defense doesn't want

2   something in and the court rules with them I

3   don't have the reciprocal right to offer in the

4   balance.  That is why I wanted to delve into

5   that a little more and see how you felt about

6   that.

7        A.   Yes.

8        Q.   We deal with -- the burden is always

9   on me.  I know you understand that.  The

10  standard of proof is beyond a reasonable doubt.

11       A.   Yes.

12       Q.   Lengthy instruction will be given to

13  the jury on that.  It's a high standard.  I

14  would not suggest otherwise.

15       A.   Right.

16       Q.   However, the instruction the judge

17  gives makes very clear that it's not beyond all

18  doubt.  We are talking about the death penalty.

19  And some people, frankly, come in here and they

20  tell me when it's the death penalty I have to

21  have all doubt removed.  Do you have any

22  feelings along that line?

23       A.   I really don't.  I think that the

24  Court's Charge tells us what standard to go by,

25  and I don't have any doubt that I can go by that

1   standard.

2        Q.   Let's talk about these two issues.   In

3   our two stage trial, obviously, we don't even

4   deal with those until we get to the second

5   stage, the punishment stage.   And if you are on

6   a jury that was dealing with those you would

7   have already found someone guilty of capital

8   murder, in a case such as this, the murder of

9   two people.   The intentional murder.   Let me

10  back up a second because I do want to talk about

11  intentional a little bit.   I think I touched on

12  this yesterday.   My suggestion that the intent

13  to kill can be formed very quickly.   Does it

14  seem less serious to you, less egregious if

15  someone kills intentionally but somewhat

16  spontaneously as opposed to someone who planned

17  the murder ahead of time?

18       A.   Just on the face of it, without other

19  facts and circumstances involved and so forth,

20  no, I don't think that I would distinguish --

21  there could be, I can see where there could be

22  distinctions, but with that statement alone, I

23  don't see any distinction.

24       Q.   Do you have any disagreement with that

25  notion that one can act intentionally but form

746

1    that intent very quickly?

2        A.   Not at all.

3        Q.   And as I say, you would have found one

4    guilty, a defendant guilty of intentionally

5    killing two people, guilty of capital murder,

6    before you get to these two issues.  In that

7    first issue, let's focus on that for a moment,

8    to answer it yes, and twelve people would have

9    to agree, the twelve jurors would have to agree

10   to answer it yes, you would have to be convinced

11   beyond a reasonable doubt that there is a

12   probability, not a certainty but a probability

13   that the defendant would commit criminal acts of

14   violence that would constitute a continuing

15   threat to society.  It's crystal ball gazing

16   some people would say, predicting the future,

17   not to a certainty but to a probability.  Do you

18   feel like you could take evidence and ever be

19   able to answer that question yes?

20       A.   I certainly feel like I could answer

21   it yes under the right fact situation.

22       Q.   What kinds of things would you want to

23   hear about to help you to answer that?

24       A.   Well, do you want me to just start

25   talking?

1      Q.   Yeah.   What do you think would help

2  you?

3      A.   I think that the background of the

4  particular individual, other acts of violence,

5  his mental makeup, his psychology, his

6  proclivity being convicted for criminal acts,

7  that sort of thing.   In other words, if he had a

8  lifestyle over a period of time, I would say a

9  substantial period of time that showed that he

10  had done dastardly deeds, so to speak, that

11  would be important to me as to what the future

12  might hold for that person.

13      Q.   Would a pattern, so to speak, of maybe

14  escalating seriousness be significant?

15      A.   Could be significant, yes.

16      Q.   And in some instances, again, there

17  may be that would not have the benefit of all,

18  that just the crime itself.

19      A.   That's right.

20      Q.   Do you feel like that could be enough?

21      A.   A particular crime could be enough, yes.

22      Q.   It talks about committing criminal

23  acts of violence.   To your way of thinking,

24  would you have to be convinced that this person

25  was going to kill again, or are there other

1    criminal acts that you would consider sufficient

2    to be a continuing threat to society?

3        A.   Based on that charge, it would not

4    require -- wouldn't require a killing, the way I

5    read that charge.  It speaks in terms of

6    criminal acts of violence.  So there are acts

7    of violence that are not murder, are not

8    killing; and, so, I would feel that those would,

9    you know, they would count.

10       Q.   For some people, even criminal acts

11   such as robbery or burglary, because they have

12   such potential for violence, that that would be

13   the kind of thing that would also be a threat to

14   society that would fit that question.

15       A.   I would not exclude it in my mind at

16   all.

17       Q.   Basically the way I understand the

18   charge and read those questions, you are going

19   to look at all the evidence.  By the time you

20   get to considering those questions, you have got

21   the evidence from the guilt stage surrounding

22   the offense, and if additional evidence

23   concerning background, any personal data,

24   character of the defendant, and you are going to

25   look at all of it in considering each of those

```
 1    questions.  Assuming that you are on a jury
 2    where twelve people have agreed that, yes, this
 3    person is a continuing threat to society and
 4    issue number one is answered yes, you are one
 5    step closer to the death penalty.  You look at
 6    issue number two.  Basically, to paraphrase
 7    rather liberally, it's telling you:  Okay, look
 8    at it again now, be sure that you didn't
 9    overlook any mitigating information that was
10    there, weigh it, weigh what mitigating evidence
11    may be there against the fact of continuing
12    threat to society and decide whether you think
13    he should get a life sentence instead of the
14    death sentence.
15         A.   Yes.
16         Q.   Like I say, that may be a rather
17    liberal interpretation, but basically I think
18    that is what it comes down to.  There may be
19    mitigating evidence; there may be information,
20    from whatever source; but in some instances I
21    would suggest you could weigh that, and it's not
22    enough, it's not enough to offset the danger to
23    society, and the acts that this person did, and
24    that the jury should answer that question no,
25    the result being that, yes, the death penalty is
```

1    appropriate despite some mitigating evidence.

2    Can you see that that would be a real possibility?

3         A.    That could be, yes, I think so.  Under

4    that charge, I sure do.

5         Q.    I know under the charge, and certainly

6    you are schooled in following the court's

7    instructions; but, you know, I am more concerned

8    with the citizen as opposed to the lawyer as to

9    what your feeling is.

10        A.    My personal feeling is that, yes, in a

11   circumstance there can be mitigating

12   circumstances that do not relieve the dastardly

13   deed, so to speak, and the proclivity for doing

14   dastardly deeds.   And, on the other hand, there

15   are some mitigating circumstances that I think

16   would potentially call for a different answer to

17   that question.

18        Q.    I know that the judge will make clear

19   to the jury that the burden is always on the

20   State.  And I think sometimes we assume that

21   mitigating evidence is going to come from the

22   defense.   That is not always the case.   They

23   have no burden to produce any evidence.   There

24   is always that possibility that evidence that is

25   potentially mitigating, just, you know, it goes

751

1    back to this we don't hide anything.  Youth.

2    Some people would consider if you have got a

3    particularly young defendant, well, he is

4    sitting here, would be sitting before the jury,

5    and his age would be obvious, and the State

6    during the presentation of their case might very

7    well just, you know, some facts, the witness

8    could testify about the way the person, the

9    defendant spoke and handled himself to where it

10   might be apparent that he was mentally retarded

11   or young or whatever.

12        A.    Uh-huh.

13        Q.    So sometimes that mitigating evidence

14   comes from an unexpected source.

15        A.    Right.

16        Q.    And you would weigh that in.

17        A.    Yes.

18        Q.    I guess the reason I mention that is

19   to be sure--

20        A.    If it's evidence from the case, it

21   could be counted for any purpose, I assume.

22        Q.    Right.  You weigh it?

23        A.    Right.

24        Q.    In accordance with those issues and

25   the instructions.

1    Do you have any questions of me?

2  A. No, ma'am, I don't.

3   MS. DAVIES:  Thank you.

4  A. Thank you, ma'am.

5   EXAMINATION BY THE DEFENSE

6 BY MR. STAFFORD:

7  Q. Sir, I am James Stafford, again.

8  A. Yes, sir.

9  Q. I don't mean to try to make you feel

10 like I am auditioning you for your job, but I

11 feel somewhat inadequate to talk to you because

12 I know of your reputation and your firm's

13 reputation.  I haven't been a lawyer as long as

14 you have, but I feel like it's kind of like a

15 baby surgeon talking to DeBakey or something,

16 feel like what can I say to you because I feel

17 like you know everything.

18  A. Well, I hate to burst that bubble.

19  Q. I am flattered to have a distinguished

20 lawyer to share some ideas.  And I think you

21 gathered from me yesterday, and I assume you had

22 the same experience when you were on voir dire,

23 you like jurors to be honest with you.

24  A. Absolutely.

25  Q. I hope I can be equally honest with

753

1    you.   We had one juror come up yesterday and I

2    made a slip of the tongue by saying when the

3    prospective juror ten spoke out about something

4    happened in the jury room we didn't want him to

5    blurt out because we didn't know what he was

6    going to say.  My comment was I didn't want him

7    to prejudice the rest of the jury.  He came up

8    and said, "You called me prejudiced."  "No, I

9    didn't.  Time out."

10        A.    You always love to hear those things.

11        Q.    And, unfortunately, our law is

12    written, talk about prejudices and biases, and

13    of course, as we know, as lawyers what we are

14    really talking about is likes and dislikes

15    because basically likes and dislikes are

16    prejudices and biases, just a matter of what

17    label you put on them.

18        A.    I agree.

19        Q.    And I think probably -- how many

20    juries do you think you selected through your

21    career?

22        A.    I don't know.   I used to go to

23    Brazoria County and pick one in the morning and

24    Fort Bend County and pick one in the afternoon

25    and try to have somebody bring my files so I

1  could look at them later.   So.

2     Q.   Sounds like an assistant D.A.  One of

3  my favorite jokes about the old days was the

4  D. A.'s had so many files they would put the

5  witnesses on the stand without talking to them.

6  Beautiful thing about being a prosecutor, you

7  can say what happened next and develop your

8  case.   And sometime they would go, "You are

9  kidding me!"

10     A.   I have had a number.  For about, I

11  would say, probably, well, actually I started

12  slowing it down in 1988.  And from '64 until

13  '88  I had quite an active jury picking season.

14     Q.   You will agree with me that probably

15  one of the things we lawyers do -- we may be too

16  guilty of, we stereotype people, and for some

17  reason we go by the bottom of our britches.  I

18  am going to be guilty and be candid with you.  I

19  am stereotyping you also.

20     A.   Sure.

21     Q.   Because mostly plaintiffs lawyers are

22  State's jurors, by and large.

23     A.   That is news to me.  But whatever.

24     Q.   That is what I want to talk to you

25  about.   If I called Crown or Mr. Kronzer -- and

755

1    I used to spend a lot of time with Mr. Kronzer

2    and loved to sit and listen to him talk, and he

3    used to share with me stories about when he was

4    a young lawyer practicing criminal law how he

5    had to give it up because it was just eating him

6    alive to do capital cases.

7         A.   Did he claim to have ever tried a

8    case?

9         Q.   But I wonder if I went to the Crown

10   today and said what could you tell me about Mr.

11   Harvill, what do you think he would tell me

12   about you?

13        A.   I don't have the faintest idea.  I

14   really don't.  You know, we have our thoughts,

15   and I think that he would probably tell you that

16   I am too much for Montague County or something

17   like that, too country, you know.  No, I

18   suspect that he would be favorable.  I mean,

19   the truth is I think he would give you a

20   favorable picture for either side.  I think he

21   would.  Because he has not ever heard anything

22   from me that would cause him not to.

23        Q.   Okay.  Let me explore another area of

24   concern.  The reason is we had some jurors that

25   have told us this.  There are -- and I put

756

1     myself in the same category as you.  You made a

2     comment I believe it was that when you were

3     talking to Ms. Davies, that you came from a

4     troubled childhood.  You probably came from a

5     poor family.

6          A.    It wasn't as troubled as it was poor.

7          Q.    Yeah.  I came from a poor family.  And

8     you have made it.  You have somehow had the,

9     whether it's the strong hand of your mom or

10    religion, something has helped you get where you

11    are.  So you can -- and there is a lot of us who

12    have made it who said I have come from a bad

13    background, but then, once some jurors, when

14    they start judging someone who had maybe the

15    same opportunity but they took a different path

16    for some reason, they may have had a troubled

17    childhood through being adopted, because of the

18    dark hole there, or suppressive parents or

19    something that they didn't have the ability to

20    pull themselves up by the boot straps and make

21    something of themselves.  So those type of

22    jurors often, who have risen above the cream,

23    are harder on those folks because they judge I

24    am sure just like your mom and dad and I have

25    heard the story, too, I walked four miles in the

757

 1  snow and I had a bucket with my sandwich in it

 2  and you want a ride to school?

 3      A.    Yeah, my kids' eyes glaze over.

 4      Q.    Everytime they hear that story?

 5      A.    Yeah.  I think I understand where you

 6  are coming from.

 7      Q.    Do you think you would be harder on a

 8  prospective defendant who--

 9      A.    No, I don't think that I would be.

10  And I say that because somebody that grew up

11  like I did, from like age twelve I was

12  essentially on my own, migrating around West

13  Texas, pulling cotton, associating with all

14  sorts of people.  A person with that sort of

15  background tends to either harden the views, for

16  instance, in the area of race because I had a

17  lot of folks that I pulled cotton with who were

18  of a different race than I was.  And people tend

19  to go one of two ways.  They either harden their

20  views or they develop a situation where they

21  say, well, I am now not a migrant farm worker so

22  I either lambast migrant farm workers or I have

23  a point of connection with migrant farm

24  workers.  And my attitude has always been that

25  not to forget where I came from.  And, so, you

1    know.

2        Q.    I appreciate that.

3        A.    I don't have -- I don't think that

4    anybody that came from that has the privilege of

5    doing something that somebody that didn't come

6    from that has that privilege to do. But on the

7    other hand, I don't think because I am not now a

8    migrant farm worker I should look down my snoot

9    at migrant farm workers, basically. That is my

10    attitude.

11        Q.    As a trial lawyer, if I may, listening

12    to you talk about capital murder cases, anybody

13    found guilty of capital murder, using your

14    terminology, basically has done a dastardly

15    deed. That is a horrible crime.

16        A.    That is true. They have done one,

17    anyway.

18        Q.    Just the fact of that. But then,

19    maybe this is a poor analogy, but I guess it's

20    like any type of personal injury suit. You can

21    have a case where liability is not at issue,

22    it's just a matter of whether it's worth a

23    million dollars or whether it's worth five

24    thousand dollars. It's still personal injury,

25    still could be a bad injury, just putting a

1    dollar amount on it.    My analogy I guess is the

2    fact that do you feel just because somebody is

3    found guilty of capital murder that he

4    automatically deserves to die because he has

5    been found guilty of a dastardly deed?

6         A.    No, I don't automatically, no way.

7         Q.    Do you think there are certain

8    situations, factors, justify life in prison,

9    depending on each individual case?

10        A.    Yes, I think there are certain

11   situations that would mean that there should be

12   life rather than death.

13        Q.    Theoretically mitigation, to me, if

14   you can transfer it on the civil side, is almost

15   like damages.    The more damages you have, the

16   more likely you are going to get the death

17   penalty.    The lesser damages or the more

18   mitigation you have, basically lessens the

19   punishment.    So it's not much difference in a

20   way except naturally, unfortunately, our present

21   state law, which I filed a motion to attack the

22   constitutionality of on special issue number

23   two, the judge ain't going to tell you the

24   burden of proof is on the State to prove to you

25   beyond a reasonable doubt that that question

760

should be answered no.  I think it should be
that way.  To convince you to take someone's
life, you should be convinced beyond a
reasonable doubt.  But you are not going to get
that instruction.  They are just going to say
basically if you think it should be answered
yes, which means life imprisonment, you can.  If
you think he has nice blue eyes or blonde hair.
They don't tell you what mitigation is.  It's
totally up to you.  We have had some jurors say
I could consider it but I would never give it
any effect.  There are certain things as far as,
once I found.  I am probably playing
intellectual game with you, but basically in
answering issue number one you have weighed all
the mitigation factors and basically not given
them any justifiable weight, especially if you
answer yes, that he will be a continuing threat
to society.  Then you have to re-examine it as
to issue number two.  So I am wondering
intellectually how, if you have rejected it as
to issue number one, how could you give it any
meaningful weight and answer question number two
in such a way that life imprisonment would be
imposed?  Do you think it would be difficult, or

1    do you think it's possible?

2         A.   Well, let me say this.  I would

3    hate -- from my experience, I always hate a

4    closed mind juror.  You know, that is something

5    we don't like to see.  And the end result is I

6    can see where there can be both a yes on issue

7    number one and yes on issue number two.  I can

8    see that.  But, you know, I don't know how long

9    it would take me to explain it to you.

10        Q.   Well, in your past years of

11   experience, have you found that jurors often

12   disregard the jury instructions and go back, and

13   you just go how in the world did they come up

14   with that decision, or do you think they

15   normally follow the court's instruction?  What

16   is your gut reaction?

17        A.   Okay.   Back to my favorable

18   attitude.  In the twenty-five years that I did

19   heavy civil trial work I would say that there

20   were very, very few, maybe two or three at the

21   most -- and I count that being really the fault

22   of me as the lawyer that I lost early cases,

23   but, you know, like first two or three years of

24   practice, but generally I think jurors do what

25   is right.   And I know from my past experience

1    with a jury that they do take their job

2    seriously, and they do try to do a good job.

3    Now, what happens sometimes is that jurors hear

4    what the judge says but they don't -- it doesn't

5    soak in to the point where they want to get off

6    base sometimes like here yesterday I had two or

7    three people try to talk to me about things the

8    judge said don't talk about. And, so, I just

9    don't talk, you know. But it doesn't really

10   soak in to them sometimes not to do that. And,

11   so, I just have to walk away or, else, just

12   stand there and say nothing.

13        Q.   If you are on this jury, more likely

14   than not you are going to be the foreman, I

15   would gather. And, also, with your twenty-five

16   years persuasion and intellect, you are

17   probably, once you are back in that jury room,

18   the jurors are going to look to you for a lot of

19   guidance.

20        A.   Let me say on the other jury, we went

21   back there and they wanted me to be the foreman

22   and I refused to be the foreman because I didn't

23   think that would be right basically because I

24   wasn't there to be some kind of a power broker

25   or because I had had legal education to control

1     things as such.  Now, for whatever good that is
2     to either one of you, the bottom line is I
3     wouldn't count on that.
4          Q.   I am not asking this question to
5     insult you.  If you get mad at me, don't hold it
6     against my guy.
7          A.   No, I am very hard to insult.
8          Q.   But my fear is, because I don't know
9     you that well, but my feeling about -- I was
10    talking to Racehorse Haynes the other day, we
11    trial lawyers, including Ms. Davies and you, we
12    are rare species.
13         A.   We think.
14         Q.   I know that.  But we have egoes.
15         A.   Yes, indeed we do.
16         Q.   We are kind of prima donnas.  We are
17    kind of like the surgeons.   We are prima
18    donnas, or I don't think we would be trial
19    lawyers.  There is something about we love or
20    something that feeds us, but we are that way.  I
21    am not trying to commit you.  If you are back in
22    the jury room and for some reason you honestly
23    feel in your heart and your soul that the death
24    penalty is just in this case and you should
25    answer those questions one and two in such a way

1    that the death penalty would be imposed, but the

2    ten other jurors, eleven other jurors believe

3    one of the questions should be answered in such

4    a way life imprisonment should be imposed, do

5    you think that you would be offended, or do you

6    think you would go forward to try to convince

7    them over to your side in such a way to whip

8    them around as an ego thing?  You understand

9    what I am trying to come from?

10        A.   Yes.

11        Q.   I am sure the State would like to know

12    the same thing, if you felt like life.

13        A.   Let me tell you my attitude about it,

14    for whatever it's worth to either one of you.

15    My attitude about it would be what I believed to

16    be right I will defend and I won't give up

17    easy.  But, you know, everybody has their own

18    view, and if it came to a situation, it boils

19    down to, I will not be a person that just kind

20    of flies with the wind.

21        Q.   I understand that.

22        A.   I will be a person if I hold a view

23    back in the jury room, you know, whichever way

24    it is, I am not one that is easy to give that

25    view up.

1      Q.    Do you think you are going to be like

2   Gregory Peck in that movie where he convinced

3   all the eleven jurors to whip over to his side?

4      A.    Let me tell you a story about that if

5   I might.    The last case I tried the foreman of

6   the jury came to me after the trial and

7   mentioned this movie.   I have never seen that

8   movie.   I don't know what Gregory Peck did or

9   didn't do, but he came to me after that, and he

10  said that jury followed that movie -- it was

11  just like a carbon copy of that movie, and I

12  don't know even know what the movie is about

13  because I have never seen it.    I almost refuse

14  to watch legal movies.   So, the end result is,

15  if what you are talking about is he brought

16  everybody over to his side, I have heard those

17  ego stories like that, but that is not me.    I

18  can't imagine myself letting false pride get to

19  the point where I would want to either acquit,

20  convict or do anything else to another person

21  based upon whether Dale Harvill thought he was a

22  big wheel or not, you see.   I don't think I

23  would go that way.

24     Q.    Let me ask you this.    Criminal cases,

25  again, very similar to the civil cases, I am

766

1    sure you have tried a lot of civil cases where

2    liability is not at issue, it's really being

3    tried for damages.

4         A.    It seemed rare.

5         Q.    But occasionally?

6         A.    Occasionally.

7         Q.    You have those.  Often in criminal

8    cases the same way, case is tried for punishment

9    not so much as to guilt and innocence.

10        A.    Yes.

11        Q.    I need to ask you if for some reason

12   you were on a jury like that and a person pled

13   not guilty where maybe at the conclusion it's

14   obvious he is guilty beyond all sin, would you

15   hold that against him because he didn't plead

16   guilty and fess up to the jury, that there are

17   certain legal things that we have got to do?

18        A.    No, I wouldn't.  You mean if somebody

19   pleads not guilty would I hold that against

20   him?

21        Q.    And make the State prove it when at

22   the conclusion it's substantially overwhelming

23   that he is guilty, for example.  May have

24   confession, may have eyewitnesses, but he still

25   has a right to plead not guilty.  Some jurors

767

1   are offended by that.

2      A.   I can understand that could be, but it

3   wouldn't be me, either.

4      Q.   Okay.  And as Ms. Davies said, civil

5   and criminal trials are different.  I have often

6   described them on our side as trial by ambush

7   from the standpoint that, true, we may at times

8   get to see her file, but if you ever try to get

9   to go out and talk to the witnesses, like police

10   officers, they don't talk to you until they get

11   on the stand.  So often we do not know what

12   they are going to say.  And I hope you don't

13   hold it against either side if it looks like we

14   have a look of amazement on our face at times.

15      A.   I am really going as a juror to try to

16   look at the facts and not too much at the

17   lawyers, basically because I know we all as

18   lawyers we think that we control things, and we

19   do to a large extent, but I will purposely not

20   be trying to judge the lawyers in this case.  I

21   will be trying to judge the facts in the case.

22      Q.   Let me tell you one thing.  If there

23   is a positive side about trying capital murder

24   cases is that basically everything in the world

25   eventually that is good or bad can come out

1    against an accused.  The State can introduce

2    offenses where he has never been charged with

3    them, never been indicted.   There is a

4    provision in the law that says anything that is

5    relevant, according to the judge, that goes to

6    the answering of this issue, the adjudicated,

7    unadjudicated, everything including the barnyard

8    if the judge thinks it can come into you.

9    Unlike any other case, they can kind of lay

10   everything in front of you to help you, if it

11   does, to answer these special issues.  That is

12   not a question, I guess it's more of a comment

13   to you.

14           But let me ask you one other thing.

15   Through your many years of experience, have you

16   ever known anybody that has adopted any

17   children?

18        A.   Yes.

19        Q.   Have you ever known anybody that has

20   adopted children say after they already reached

21   say four, five, six, seven years old?

22        A.   Yes.

23        Q.   In your opinion, what are the

24   formative years for a child, for example, that

25   could possibly affect them as they grow older as

769

1   to their conduct and their personalities if you

2   had to peg a number?

3       A.   I am, you know, really not,

4   technically I would not know exactly what that

5   would be; but, to me, with mine, I felt that all

6   their years were very important, you know, that

7   I was with them as their parent.   I thought

8   that was very important from day one

9   basically.

10      Q.   If we brought you expert testimony in

11  that regard, I gather from your responses to the

12  State, you can listen to it and give it whatever

13  weight you deemed appropriate?

14      A.   Yes, whatever -- I know there are

15  certain things that psychologists and

16  psychiatrists say, but I don't know what they

17  are.   So, as a parent I just have to kind of

18  glome over it and say I tried to do my best all

19  the time with them.

20      Q.   How important -- I gather from reading

21  your information sheet you are fairly active in

22  the church?

23      A.   My wife is more active than I am, but

24  I am active, yes.   I am on a faith for the

25  future committee of the church.   And I have been

770

1    a member of that church for about a year and a

2    half.  Before that, I was a Methodist.  I

3    switched over to the church I am now a member

4    of.

5        Q.  Trying to figure out how to word this

6    without -- I guess what I am trying to say are

7    you a teetotaler?  Are you totally on one side

8    of the religious spectrum now or kind of look

9    down on people who do not?  I am just being

10    blunt to you.  If I hurt your feelings, I

11    apologize.

12        A.  You are not hurting my feelings.  No,

13    unfortunately, I can't live, you know, I

14    personally have not been able to be a

15    teetotaler.  And one of the reservations I had

16    in switching was when a long time ago they

17    required a teetotalling oath, you see.  And,

18    so, I told my wife, before we switched, I said

19    if they are going to require me to sign that

20    oath, I am not going to do it because I am going

21    to have, you know, I am not going to get out and

22    get drunk, but if I want to have a drink I am

23    going to have it.  And if that is a sin, I will

24    ask forgiveness, but I know myself well enough

25    to know that I can't live as a teetotaler.

771

1    And, in fact, in years past, when I was a

2    downtown lawyer, sometimes I didn't teetotal

3    enough.

4         Q.    Especially if you are around

5    (unintelligible).

6         A.    I could tell you a few stories about

7    him, but I won't.

8         Q.    I could probably share some with you,

9    too.  Maybe someday somebody will write a book

10   about him.  The publisher would be the problem.

11        A.    Probably.

12        Q.    The Graham Hill that your wife worked

13   for, was that John Hill's son?

14        A.    No, that is Graham Moore.

15        Q.    Graham Moore.

16        A.    No, Graham Moore was a divorce lawyer

17   around town.

18        Q.    How many years ago was that?  Do you

19   recall?

20        A.    My wife and I have been married now

21   almost fifteen years.  And that was before we

22   married.  So sixteen or seventeen years ago.

23   Graham died as a young lawyer basically in his,

24   well, mid 30's, and she had just quit when he

25   died.  So it was fifteen or sixteen years ago.

1    Q.    One last question.  If you were the

2    defense lawyer in this case would you put a

3    juror of your thinking, of your nature, knowing

4    that I want to save my client's life on my

5    jury?

6    A.    Let me say this to both sides.  Here's

7    what I am going to say is I don't want to be on

8    this jury.  I just soon not to be, okay.  But I

9    will say this to you:  If I was being charged, I

10   would want somebody that had my attitude on the

11   jury basically because I might go one way but I

12   might go the other, too.  I have no agenda going

13   in.  I have no preconceived notions going in.

14   And that is all I can say about it.  Maybe both

15   of you will see fit that you don't want me,

16   so.

17   Q.    This may sound real pretentious.  It

18   seems at times when a juror of intellectuals, as

19   I call them, college educated jurors, often can

20   assess punishment a lot quicker than lay people

21   who are uneducated.  What I call the common

22   folks.  They get more passionate and more

23   merciful.  Sometimes I think we get in ivory

24   towers and it's easy to mete out harsh

25   punishment.  That troubles me about you.  I am

773

1   not trying to be cute or funny.   Anyway, thank

2   you for your candor.

3        A.    You are very welcome.

4        THE COURT:   Would you stand outside,

5   please.

6        (The prospective juror leaves the

7   courtroom).

8        MS. DAVIES:   The State will accept Mr.

9   Harvill.

10       MR. STAFFORD:   Let me visit with

11   counsel and the defendant.

12       (Pause).

13       MR. STAFFORD:   I accept the juror,

14   Your Honor.

15       THE COURT:   Okay.  Ask him to come in,

16   please.

17       THE COURT:   Mr. Harvill, come up

18   here.   You have been selected to serve on this

19   jury.

20       THE JUROR:   You are kidding.

21       THE COURT:   If you would first turn to

22   this gentleman, he is going to swear you in.

23       (Juror Sworn)

24       THE COURT:   In a minute he is going to

25   go over the information on your sheet there to

774

1    make sure we have appropriate phone numbers,
2    that kind of thing.  We are going to start
3    testimony in this case, unless you get further
4    notice of some change, on Monday, September
5    28th.  Ask that you return at ten a.m.  On the
6    week of Monday, September 21, we will be calling
7    you.  If we haven't called you by Tuesday, give
8    us a call.  Both on that slip and on the back of
9    the badge are phone numbers.   The attorneys are
10   being instructed not to engage you in
11   conversation.  If we run into you, we may nod
12   recognition.  If anybody attempts to talk to you
13   about the case, bring it to our attention
14   immediately, give us a call, talk to the bailiff
15   or the process server, me.   Our courtroom is up
16   on the eighth floor.  That is where we will be
17   trying the case.  Same building, eighth floor.
18   We will give you full instructions and give you
19   a call as to the exact time.   I am going to
20   anticipate 10:00 a.m. on Monday, September
21   28th.  Don't make any kind of independent
22   investigation.  Don't attempt to find out
23   exactly which case it is we are going to be
24   trying.   Don't go read any law on capital
25   murder in textbooks or that kind of thing, try

1    to figure out what we are doing because the law

2    does change and has changed in this case.   In

3    fact, I believe I might have told this panel

4    this is the first case we are trying under the

5    new capital murder statute.

6              THE COURT:   Mr. Stafford, do you have

7    any requested admonitions?

8              MR. STAFFORD:   No.

9              THE COURT:   Ms. Davies.

10             MS. DAVIES:   I believe you have

11   covered everything.

12             THE COURT:   Do you have any questions

13   of me?

14             THE JUROR:   No, sir.   I will just try

15   to be here unless I hear otherwise.

16             THE COURT:   Wear your badge at all

17   times when you are in and around the

18   courthouse.   It identifies you as a juror so we

19   are not talking about cases in front of you.

20

21

22

23

24

25

1              JENNIFER MILSAPS,

2    called as a prospective juror, was examined as

3    follows:

4              EXAMINATION BY THE COURT:

5         Q.    This is prospective juror number six

6    on panel number two, Ms. Jennifer Milsaps.

7              Let me run over some of the things on

8    your questionnaire.  We have to talk over this

9    din that is going on out here.  I am not sure

10   what we are missing.  You have two very young

11   children.  You have a month old child?

12        A.    Yes.

13        Q.    Are you back at work?

14        A.    Yes, I am.

15        Q.    How long have you been back at work?

16        A.    About three weeks.

17        Q.    You weren't out very long; were you?

18        A.    No.  My daughter was in the hospital

19   for a month after birth, so I had to go back and

20   take maternity leave later.

21        Q.    She's only a month old now?

22        A.    Yes.

23        Q.    When did she get out of the hospital?

24        A.    About three weeks ago, also.

25        Q.    Your husband is a security officer?

1          A.    Yes, he is.

2          Q.    How long has he been doing that kind

3     of work?

4          A.    About three years.

5          Q.    Does he transfer from job site to job

6     site, or he is only at one location?

7          A.    Usually he transfers a few months.

8     He has been at this location for a few months

9     now.

10          Q.    The other jobs he has had, pizza

11     deliverer, painter and daddy?

12          A.    He was a painter for twenty something

13     years, and I made him go and get another job.

14     He worked for his father.

15          Q.    He started young, if he is only

16     twenty-six now.

17          A.    Yeah, he started very young.

18          Q.    Did you meet your husband at Blinn?

19          A.    No, I met him through a mutual friend

20     in high school.

21          Q.    Pages eight and nine of this

22     questionnaire list statements and have you

23     either check the one which best summarizes your

24     views about capital punishment and the death

25     penalty or ask you to either agree or disagree

1    with the statement.  And in an attempt to

2    summarize, you believe capital punishment is

3    basically wrong but necessary for some offenses;

4    is that correct?

5         A.   It depends on the person who is on

6    trial.  It just depends.

7         Q.   At any rate, you said your decision on

8    whether the death penalty should be assessed

9    would depend solely on the facts and

10   circumstances of the individual case; is that

11   true?

12        A.   Yes.

13        Q.   You had checked that agreed with the

14   statement which said capital punishment should

15   be available as punishment for more crimes than

16   it is now.  I know that you filled out this

17   questionnaire before we had the opportunity to

18   talk to you.  Were you aware when you came in

19   here yesterday that capital punishment was

20   available for so many different kinds of

21   offenses?  I listed about six.

22        A.   No, I really didn't know what it was

23   available for.

24        Q.   You understand murder is when somebody

25   intentionally and knowingly causes the death of

779

1    another person.  Capital murder is intentional

2    killing plus some kind of aggravating factor.

3    We have in Texas six different ways in which the

4    offense of capital murder can occur, including

5    murder of a peace officer or fireman in the

6    lawful discharge of an official duty, murder for

7    hire, murder for remuneration schemes,

8    committing murder while escaping or attempting

9    to escape from a penal institution, being

10    incarcerated and murdering somebody who is

11    employed by the penal institution.   When

12    somebody commits the offense of murder while in

13    the course of committing another felony offense

14    like robbery or burglary, aggravated sexual

15    assault, kidnapping, arson, they kidnap, rape,

16    murder, those cases are capital murder

17    offenses.  Robbing a store clerk and killing him

18    in the course of that robbery, that would be

19    capital murder.   And then the last category is

20    the one that we are talking about in this case,

21    where somebody murders two or more people in the

22    same criminal transaction.   It could be as few

23    as two people up to however many people.  The

24    multiple murder situations.  Are all those the

25    kinds of offenses that you think should be

1    capital murder offenses?

2         A.   --.

3         Q.   By capital murder offense I am saying

4    if somebody is convicted of a capital murder

5    offense it's mandatory that the punishment

6    either be life or death.   Do you think those

7    different categories that I just listed are what

8    should be capital murder offenses?

9         A.   It's a hard question.   I believe they

10   should be.

11        Q.   Can you think of any others offhand?

12   Have you given much thought to it at all?

13        A.   No, I haven't given much thought to

14   anything like that.

15        Q.   Have you ever been called for jury

16   service and not taken?

17        A.   No, never.   This is my first time.

18        Q.   First time down here and you get the

19   long form questionnaire?

20        A.   Right.

21        Q.   We talked about a number of general

22   concepts of law.   Presumption of innocence.   Any

23   defendant in a criminal case is not a little bit

24   guilty.   He is presumed innocent as he sits in

25   court.   Do you agree with that?

1      A.    Yes.

2      Q.    The indictment in a criminal case is

3 no evidence of guilt whatsoever. That can't be

4 considered. Do you agree with that?

5      A.    Yes.

6      Q.    The burden of proof in a criminal case

7 is always on the State. They have to prove a

8 defendant's guilt beyond a reasonable doubt.

9 Not beyond all doubt, not beyond a shadow of a

10 doubt. Do you agree that should be the burden

11 on the State?

12      A.    Yes.

13      Q.    If a defendant does not take the stand

14 and testify in his own behalf, I will instruct

15 the jurors that they are not to consider that as

16 any evidence of guilt whatsoever. Would you

17 agree with that?

18      A.    Yes.

19      Q.    Did you know before you came in here

20 yesterday that if a jury found someone guilty of

21 the offense of capital murder that in the second

22 stage of trial the jury does not go back and

23 vote for life or death; they, instead, answer

24 certain questions I submit to them; and

25 depending on how the jury answers those

1    questions, I assess either life or death?  Did
2    you know that is how it worked?
3         A.   No.
4         Q.   Does it make a little bit of sense,
5    now that we explained to you yesterday, that it
6    worked that way?
7         A.   Yes.
8         Q.   See how we are insulating the jury in
9    some fashion and the judge in some fashion.
10   It's a two stage trial.  The first stage is
11   where you hear all the evidence in the case in
12   chief.  I have no idea what kind of evidence you
13   are going to hear in the case because I will
14   hear it for the first time as you do.  But after
15   both sides rest and the charge is read to you,
16   you go back and deliberate the issue of guilt.
17   Has the State proven the defendant guilty of
18   capital murder beyond a reasonable doubt.  If
19   raised by the evidence, there may be charges on
20   what we refer to as lesser included offenses.
21   When these folks are talking to you about the
22   offense such as voluntary manslaughter,
23   involuntary manslaughter, negligent homicide,
24   those may be in certain cases lesser included
25   offenses of the offense of capital murder.  If a

                                                    783

1   jury returns a verdict of guilty of capital

2   murder, there is a second stage of trial.

3   Additional evidence may be presented. The jury

4   may have evidence of a defendant's background,

5   his character, his reputation, other

6   circumstances. They may have evidence of a

7   defendant's previous criminal record. I don't

8   know what all might be included in a given

9   case. But at the close of that second phase,

10   the jury goes back after finding a defendant

11   guilty of capital murder and is asked to answer

12   the questions or special issues that determine

13   whether or not the death penalty is assessed. I

14   am going to refer over here to the board.

15   Issue number one asks you: Do you find from the

16   evidence beyond a reasonable doubt that there is

17   a probability that the defendant would commit

18   criminal acts of violence that would constitute

19   a continuing threat to society. That is asking

20   the jury to make a determination basically of a

21   defendant's future dangerousness. By

22   probability we are asking is it more likely to

23   occur than not that a defendant would commit

24   criminal acts of violence constituting a

25   continuing threat to society. You would be

1    instructed, when you're answering issue number

2    one, that the jury is to consider all the

3    evidence admitted at the guilt or innocence

4    stage of the trial, the first stage of trial and

5    the punishment stage, the second stage of the

6    the trial, including evidence of a defendant's

7    background or character or the circumstances of

8    the offense that militate for or mitigate

9    against the imposition of the death penalty.  So

10    you have all this evidence in the record and you

11    look at all of it and you make that

12    determination is there a probability this

13    defendant whom you have already convicted of

14    capital murder would commit criminal acts of

15    violence constituting a continuing threat to

16    society.  It takes all twelve jurors to agree

17    that the answer should be yes.  It takes ten or

18    more to agree that the answer should be no, a no

19    answer to be returned in open court.  If the

20    jury answers no, ten or more people say no, that

21    there is not a probability he is going to commit

22    criminal acts of violence constituting a

23    continuing threat to society, then I assess life

24    in prison.  If the jury says yes, there is such

25    a probability, then you move on to issue number

1   two.   Issue number two asks whether taking into
2   consideration all the evidence, including the
3   circumstances of the offense, the defendant's
4   character and background and the personal moral
5   culpability of the defendant, there is a
6   sufficient mitigating circumstance or
7   circumstances to warrant that a sentence of life
8   imprisonment rather than a death sentence be
9   imposed.   I would instruct the jury that the
10  jury is to consider mitigating evidence to be
11  evidence that a juror might regard as reducing a
12  defendant's moral blameworthiness.   So even if
13  the jury decides that there is a probability
14  that defendant on trial would commit criminal
15  acts of violence constituting a continuing
16  threat to society, you then look at everything
17  left, and you ask whether or not there is
18  something here which says a life imprisonment
19  sentence is warranted rather than a death
20  sentence.   It takes all twelve jurors agreeing
21  the answer should be no.   It takes ten or more
22  to say yes.   If the jury says yes there are
23  circumstances here which warrant a sentence of
24  life imprisonment be imposed even though they
25  answered yes to number one also, I will impose a

786

1    life sentence.  If the jury answers no to that
2    question, after having first answered yes to
3    number one, it comes back to me and I assess the
4    death penalty.  So the jury doesn't vote for
5    life or death; you answer these two questions;
6    but you know full well if you answer number one
7    yes and number two no I am going to assess the
8    death penalty.  Do you understand?
9         A.    Yes.
10         Q.    When we are talking about mitigating
11    evidence, we are talking about any evidence that
12    is relevant to a defendant's character, his
13    record or circumstances of the offense, anything
14    which might serve as a basis for a sentence less
15    than death.  We know it includes such things as
16    mental retardation, mental illness.  It could
17    include such things as age.  I don't know how
18    long the list might be, what all different kinds
19    of things might be included when that jury
20    starts to looking at mitigating evidence or when
21    mitigating evidence is presented from either
22    side.  It may come from either side.  We don't
23    depend on either side to bring you mitigating
24    evidence.  You can't ask that one side or the
25    other bring it in.  It might include a

1    defendant's good behavior while in prison or
2    jail.   Might include an exceptionally unhappy
3    childhood, economic deprivation.   It could
4    include drug abuse, childhood abuse, age,
5    voluntary intoxication, drug dependency,
6    illiteracy, opinion testimony of lay witnesses
7    or psychiatric opinion testimony that a
8    defendant is not a danger in the future, would
9    not be a danger in the future.   It could include
10   all those different things.   I don't know what
11   you might receive in any given case.   I don't
12   know what you might have before you to
13   consider.   But you consider all those things
14   before you when you answer these questions,
15   special issues.   I want to make sure that
16   jurors don't automatically answer one way or the
17   other, answer a yes or answer a no so that they
18   are assured either a death penalty would be
19   imposed or a life sentence would be imposed,
20   that they answer these questions honestly,
21   depending on the circumstances you have before
22   you.   Do you think you could do that?
23        A.   Yes.
24        Q.   Is there anything regarding your views
25   on capital punishment and the death penalty

1  which you think would prevent or substantially

2  impair the performance of your duties as a juror

3  in accordance with the instructions you will be

4  given and your oath as a juror?

5       A.   No.

6            THE COURT:  Ms. Davies.

7

8            EXAMINATION BY THE STATE

9  BY MS. DAVIES:

10      Q.   Hello, Ms. Milsaps.

11      A.   Hello.

12      Q.   I want you to know right up front that

13  there are no right or wrong answers and we are

14  not wanting you to answer to agree with anybody

15  or to answer the way you think we want.  We

16  really want to know what you feel, what you

17  believe and what you think about some of these

18  things.  Fair enough?

19      A.   Fair enough.

20      Q.   You haven't taken an oath yet to serve

21  on the jury.  Those people who are on the jury

22  will take an oath to follow the law.  And, so,

23  this is your chance to tell us how you really

24  feel, whether you can take an oath to follow the

25  law as it exists because we don't want anybody

789

1    to be in a moral bind and force them to take an

2    oath that they disagree with something.

3           Your baby is a baby girl?

4    A.   Yes.

5    Q.   What do you call her?

6    A.   Elizabeth Renee is my youngest.

7    Q.   Are you calling her the whole thing?

8    A.   Pretty much.

9    Q.   A big name for a little baby, but she

10   will grow into it.

11   A.   Yes, she will.

12   Q.   How is she doing?

13   A.   She's fine.  She's gaining weight.

14   Q.   You said she was in the hospital for

15   several weeks?

16   A.   She was five weeks early.

17   Q.   Okay.  How old is she now?

18   A.   She will be two months on the 14th.

19   Q.   I hear other friends talk about how

20   difficult it is to get such a young child into

21   day care.

22   A.   She could have gone to the day care as

23   soon as she came out of the hospital.  It was no

24   problem with them.

25   Q.   That's good.

790

1      A.    She's in day care now.

2      Q.    Okay.  Well, one reason I wanted to

3  ask that, on the very last page where it asks

4  about things that might affect your service as a

5  juror you mentioned her, and, so, I want to be

6  sure whether health problems, special demands on

7  you.

8      A.    If she gets sick, that would be the

9  only reason.  If she had to go back to the

10 hospital, I would want to be there with her.

11     Q.    You don't have any reason to

12 anticipate that?

13     A.    No, nothing.

14     Q.    I just wanted to be sure what serious

15 demands might be put on you.  Sounds like

16 you're busy, working and two young children.

17           Your husband is a security guard?

18     A.    Yes, ma'am.

19     Q.    That is a pretty recent change of jobs

20 for him?

21     A.    No, it has been about three years.  He

22 just got on day shift now.

23     Q.    Does he like that?

24     A.    Yes, he seems to like it.

25     Q.    When he comes home, do you discuss any

791

1   of the experiences he has in his job?

2       A.   He fuels trucks for UPS.   There is

3   nothing really exciting there.

4       Q.   He hasn't had any exciting stories

5   about criminal offenses?

6       A.   No, no, he doesn't do anything like

7   that, no.

8       Q.   How did you feel -- you know, it's

9   easy for all of us to talk about whether we

10  believe in the death penalty or don't believe

11  when we are just talking about what we read in

12  the newspaper.   Tell me in your own words how

13  you feel about whether the death penalty is

14  necessary and appropriate.

15      A.   It's necessary, but you don't know who

16  it's necessary for unless you hear both sides,

17  hear the whole story, you don't know.   I

18  couldn't tell you really.   It just depends on

19  each situation.

20      Q.   Do you hear about certain cases, types

21  of cases that you agree when you read about, oh,

22  this person got the death penalty, you think,

23  yeah, that is right, or disagree and think, oh,

24  no, that shouldn't be?

25      A.   I really don't know.   Like I said, it

792

1    depends.   I wasn't there to hear both sides of

2    the story.  And they may, if they got the death

3    penalty and somebody might say, oh, he deserved

4    it, but I think to myself I don't know that.   I

5    don't know if they deserved it.

6         Q.   Have you always believed in the death

7    penalty, that it was necessary, or at some point

8    in your life have you had a different opinion?

9         A.   I guess I kind of grew into it.   I

10   couldn't tell you.   It's just something I guess

11   I just kind of grew into.   It's necessary, you

12   know, once in awhile.   I don't know.

13        Q.   How does your husband feel about it?

14        A.   I really haven't discussed that with

15   him.  He has his own beliefs on issues like

16   that.  We kind of don't talk about it because we

17   will end up, I don't want to spoil his views and

18   I don't want him influencing me, end up arguing

19   about it.

20        Q.   Okay.  Have you ever gotten into an

21   argument or discussion with anybody on the

22   subject of whether the death penalty should be

23   available?

24        A.   No, I try to stay away from things

25   like that.

1       Q.   Do you have other family here in the

2  Houston area?

3       A.   Yes.

4       Q.   What?

5       A.   My mother and father.  My brothers,

6  one of my brothers is near Houston.   My

7  in-laws.

8       Q.   Do you feel, if you should be on a

9  jury and you were a jury that gave the death

10  penalty, do you feel like anybody in your family

11  or close friends would disapprove of that?

12       A.   I really wouldn't care what they

13  thought.   I don't care whether they would

14  disapprove or approve.  It's just the jurors'

15  choice, and it's really none of their business.

16       Q.   I noticed -- well, the judge had asked

17  you this, and I guess I want to try to be sure

18  that I understand your attitude toward what

19  kinds of cases should be capital murder.   When

20  we say capital murder, we are talking about

21  where the death penalty is a possibility.  You

22  know that this particular case is the murder of

23  more than one person in the same criminal

24  transaction.   If you were going to write the law

25  that said, well, death penalty would be

1    available for only certain cases, do you feel

2    like you would include that, killing more than

3    one person?

4         A.    Yes.   It would be kind of hard to

5    decide.   At least, I haven't thought about it

6    except for the past two days about what I would

7    include in it.   There is a lot more things I

8    need to consider before I sit down and include

9    all these different crimes.

10        Q.    Having thought about it for a couple

11   of days, do you think killing more than one

12   person intentionally is the kind of thing that

13   should be included in that statute?

14        A.    It should be.

15        Q.    What was your first reaction when you

16   came in for jury duty and at what point did you

17   realize you were going to be questioned

18   regarding a case that might involve the death

19   penalty?

20        A.    When I came in this room.

21        Q.    Okay.   What about when you were going

22   over that questionnaire, what did you think?

23        A.    I really didn't know, oh, I wonder if

24   this is a criminal.   I just wanted to answer the

25   questions.   I didn't know what kind of case.   I

 1    have never done anything like this before.

 2         Q.   You figured maybe they do this on

 3    every case every time somebody comes down for

 4    jury duty?

 5         A.   I didn't know.

 6         Q.   What was your gut reaction when you

 7    got in here and you realized this case may

 8    involve the death penalty?

 9         A.   I really didn't have a reaction.  Just

10    kind of:  Okay, how do I deal with this.  And

11    stay open-minded if I was picked, to stay as

12    open-minded as I could and view everything and

13    then tell them how I felt about it, what I

14    thought, or if I had to choose the death penalty

15    or if I was asked the question, just to answer

16    them as honestly as I could.

17         Q.   We kind of do this purposely.   Maybe

18    it isn't quite fair that you are given this

19    questionnaire before you have gotten over here

20    and found out anything so we get your answer,

21    you know, before you have been conditioned in

22    any way by anything that you have heard here.   A

23    lot of times I think people wish they would have

24    a chance to go over the questionnaire again

25    after they have thought about it for two days.

                                              796

1    How do you feel about that?  Would you change

2    any of your answers?  Would you like to have a

3    chance to look at it again?

4         A.    Well, I think I am pretty much doing

5    that today, answering y'all's questions about

6    it.

7         Q.    Was there anything that was in your

8    mind before we even started talking, though,

9    that as you thought for a couple of days -- or I

10   guess that just was yesterday -- it seems like a

11   long time ago.

12        A.    It does.

13        Q.    Overnight as you thought about it, did

14   anything come to your mind?

15        A.    Not really.  I don't really remember

16   too many of the questions on there.  Once I

17   answered them, I filed them away.  It's not

18   coming back too much.

19        Q.    There was one thing I was going to ask

20   you about and now I can't find the page.  I was

21   very interested in this question that I can't

22   find right now.  Here it is.  One of the things

23   that we had asked you about and you had written

24   an answer about whether you think certain people

25   are more likely to commit crimes.   And you had

1    written out an answer talking about that

2    sometimes people from great families commit

3    crimes, but you think a person from a bad

4    background might act out their frustration the

5    wrong way.  So it's interesting.  You are

6    talking about bad background.   What did you

7    have in mind?  What were you thinking?

8         A.   Okay, physical abuse, sexual abuse,

9    mental, verbal, maybe a very poor background,

10   could be very rich and not, you know, been

11   schooled to death, something like that.  A great

12   background to me would be somebody that has a

13   good family, closeness, they may not be rich,

14   may not be poor.  That is a good background to

15   me.

16        Q.   Okay.  So you are thinking it's more

17   likely that a person with a bad background?

18        A.   They could.  They may not have a way

19   to funnel their frustration.   May not have been

20   taught the right way of how to vent their anger.

21        Q.   Do you feel like if somebody has come

22   from a bad family background, you mentioned

23   several things there, abuse and deprivation of

24   various types, do you feel like that they would

25   be -- you shouldn't hold them to blame the same

1   way as you would somebody who had a good family
2   background?
3         A.    You still have to hold them
4   accountable for what they have done, but you can
5   take it into consideration about what kind of
6   punishment, you know, what to do, how to take
7   care of the situation.
8         Q.    Do you feel like someone, if things
9   happen to them when they are very young, that
10  that would mean that they should not be punished
11  the same way as somebody who had a good
12  background?
13        A.    It depends on the person.  Somebody
14  that may have been abused by men and they may go
15  and hurt every single man they see, they should
16  be punished different than just somebody that
17  didn't have a background like that.  I don't
18  know really.  It just depends on the person.
19        Q.    Okay, I am not sure that I am
20  understanding.  I don't want to misread what you
21  are saying here.  You said if somebody who was
22  abused, that then they--
23        A.    If they go ahead and start being
24  violent to somebody else, no, they should be
25  punished for that; but it just depends on their

799

1    mental status then and how they feel about it

2    then, you know, as opposed to somebody that did

3    something violent and was not abused.

4         Q.   Okay.

5         A.   It's hard to.

6         Q.   Would it matter how violent their acts

7    were, what kind of things they were doing?

8    Would that make a difference?  Or do you feel

9    like their bad background would tend to excuse

10   their blame?

11        A.   It wouldn't excuse it, no; it just

12   would depend -- I don't know how to describe

13   it -- it would just depend on the different

14   person, their character and things.  They may

15   need more help than somebody who came from a

16   good background and just did it intentionally

17   and meant to hurt the person and they are not

18   sorry about it or something, and they need to be

19   punished.  Just depends.  They may need some

20   help on that.

21        Q.   Do you feel like -- it's so easy for

22   us to sit here and talk in the abstract about

23   whether the death penalty is necessary.  If it

24   came right down to it, do you think that you

25   could actually be on a jury that gave a verdict

800

1     that resulted in the death penalty?  Could you

2     actually do that yourself?

3          A.   Yes, if it was necessary.

4          Q.   I'm sorry?

5          A.   If it was necessary, yes.

6          Q.   When you say if it was necessary,

7     what?

8          A.   Okay.

9          Q.   What are you thinking?  Just try to

10    tell me.  I know it's hard to express.  I have

11    a hard time asking the questions.  We just

12    really want to know how you feel.

13         A.   I mean, if a person is going to do it,

14    they are going to be violent, there is nothing

15    they can do to help them then, yes, they should

16    have the death penalty.  But if there is some

17    way to help them, if they are trying to improve

18    their life, and go to the second question and

19    whatever we answer, you know, have a life

20    sentence, then it would be all right.  But if

21    they are not going to change or if the

22    circumstances would not be in their favor or

23    benefit to where they need the death penalty,

24    then I would have to answer the questions the

25    way that would be a death penalty.  It just

1    depends.

2         Q.   Do you feel like you are always going

3    to answer those questions one way or the other?

4    Mind you, you don't get to those questions until

5    after you have found somebody guilty of capital

6    murder, so you know that you are dealing with

7    somebody who has done a capital murder, let's

8    assume, because we know this is the case,

9    intentionally killing two people.  So you have

10   already decided they are guilty of that type of

11   violent offense.

12        A.   No.  I don't -- one more time what was

13   the question?

14        Q.   That is what I wanted to be sure.  Do

15   you feel like you would always be inclined to

16   answer those questions one way or another?

17        A.   Not always.

18        Q.   Are you inclined -- are you the kind

19   of person who is, if there was any way to spare

20   somebody's life, in other words, avoid the death

21   penalty, do you feel like that would be your

22   first inclination?

23        A.   It's so general, I don't know.  You

24   just can't -- I don't know, I would need to hear

25   everything.  I don't know what would be my first

                                                   802

1    reaction.    I don't know.

2         Q.    Let's go back to the first stage of

3    trial.  I would have to prove that a defendant

4    had intentionally killed two people, not

5    premeditated.  I think there was one question in

6    here about premeditation.  I think we have made

7    it pretty clear that premeditation is not

8    required.  But I am concerned to know how you

9    feel about that word intentionally.  My

10   suggestion is somebody can decide to act

11   intentionally very quickly.  How do you feel

12   about that?

13        A.    You can, on the spur of the moment you

14   can act intentionally if you do it in anger or

15   even just you can automatically do it right

16   away.  Or you can plan and plot and

17   intentionally kill somebody.

18        Q.    To your way of thinking, is the murder

19   less serious if it was intentional but

20   spontaneous, something that was done on the spur

21   of the moment as opposed to something that was

22   planned and thought out ahead of time?

23        A.    One more time on that.

24        Q.    Does it seem less serious to you, a

25   spur of the moment intentional killing being

1   less serious?

2       A.   No, they are both serious.  It just

3   depends on that person.  I really couldn't

4   answer it yes or no.

5       Q.   When you get -- a jury first hears

6   evidence in the first stage of trial, first

7   hears evidence on the issue of guilt.  That is

8   all you hear evidence about then.  And as they

9   consider that evidence, hear the arguments, the

10  instructions from the judge, deliberate, and

11  when I say deliberate, nobody ever contemplates

12  that, you know, quickly reach a decision or just

13  immediately all unanimously agree, the

14  suggestion is that you are suppose to go back

15  there and really sift through the evidence, talk

16  to one another and decide.  Once a jury has

17  found somebody guilty, that means they have been

18  convinced beyond a reasonable doubt that the

19  person is guilty.  We have thrown that phrase

20  out -- beyond a reasonable doubt, but we haven't

21  really talked about it.  There is a long

22  definition.  A part of the instruction will make

23  clear that it does not mean beyond all doubt.

24  It's a heavy burden, but it's not beyond all

25  doubt.  I want to be sure how you feel.  There

804

1 are a lot of people who feel like capital

2 murder, you are talking about life or death. I

3 would have to have all doubt removed from my

4 mind.  How do you feel about that?

5   A. .  It depends on how much doubt.  I

6 mean, if there is a little bit, if you know that

7 person did it.  If you believe it and there

8 is -- I don't know how to explain it.  You know

9 the person did it.  You are sure on that.  And

10 you know the person -- are we talking about the

11 first stage or second?

12   Q.   The same burden of proof applies at

13 both stages of trial.

14   A.   Okay.

15   Q.   And, so, that is my concern.  Both

16 when you decide somebody is guilty and then when

17 you are deciding what the answers to the

18 questions should be.  So basically, in effect,

19 you're determining whether the judge is going to

20 give a life or death sentence.   The burden of

21 proof is the same -- beyond a reasonable doubt.

22 Is that enough for you, or would you have to

23 have beyond all doubt?

24   A.   Reasonable doubt.

25   Q.   I'm sorry?

805

1       A.    A reasonable doubt.   I probably would

2   that with just a reasonable doubt.  Beyond a

3   reasonable doubt.

4       Q.    Okay.  Kind of compare it to a jigsaw

5   puzzle.  You can have one of these big jigsaw

6   puzzles -- have you ever worked those?  They

7   have hundreds and hundreds of pieces.  Even

8   though there may be one or two pieces missing,

9   you can see still see the picture.  I compare

10   that to reasonable doubt.  There could be some

11   doubt but you still see the picture and that

12   would be enough for you.  Do you feel?

13       A.    Explaining it that way, yes.

14       Q.    Let's go talk about those two issues,

15   the second stage of trial.  You are considering

16   those after you have found somebody guilty of

17   capital murder.  And at that second stage of

18   trial there may or may not be additional

19   evidence.  First let's talk about the situation

20   where there is no additional evidence.  You may

21   be asked to answer those questions based just on

22   the facts of the crime that you have heard about

23   at the first stage of trial.  In other words, I

24   might very well be asking a jury to answer those

25   questions in such a way as to result in the

806

1    death penalty based just on the facts of the

2    person committing one particular capital

3    murder.  Can you see that in some instances that

4    would be enough, that you could be convinced

5    beyond a reasonable doubt that the death penalty

6    should result just based on the facts of that

7    capital murder crime alone?  Or would you always

8    have to have more?

9         A.   It's hard.  Based on both, if that is

10   all the facts I have got and that is all I am

11   going to get, would have to then I would base it

12   on that.

13        Q.   Well, and that is all the evidence,

14   and that is the evidence that you would have to

15   use.  What I am trying to find out is do you

16   believe that there could be a capital murder

17   offense that was so brutal that that alone would

18   be enough to convince you beyond a reasonable

19   doubt that that first question should be

20   answered yes, that this person is probably going

21   to be a continuing threat to society?

22        A.   I don't know.  If that is all that I

23   am allowed to work with, then I would have to

24   say yes.  It just depends on, you know,

25   everything that was done in the trial.

807

1    Q.   Well, you are saying you have to say

2    yes.  You don't have to say yes.  You know,

3    that is, I want to know how you feel about it.

4    A.   I won't know until I cross that

5    bridge.  I mean, it just depends on the person.

6    I don't know what evidence is going to be

7    there.  If it's so brutal and all this other

8    stuff, I don't know how I am going to react

9    right then and there.  It's different in here

10   than it is over there.  I don't know.

11   Q.   And that is why all we can do is ask

12   you to look in your heart and your mind and you

13   know yourself and tell us how you feel.

14        Have you heard of any crimes, any

15   capital murders that you think that alone would

16   indicate that somebody deserved the death

17   penalty?

18   A.   No, not really.  I have never -- even

19   if -- I still didn't know all the evidence.  I

20   would want to keep an open mind.  If I was

21   there hearing all of it, then maybe that would

22   be my decision, but I don't know.

23   Q.   The law says that that would be, that

24   would be sufficient, if the jury is convinced

25   beyond a reasonable doubt.  If I brought you

808

1    evidence of a really brutal capital murder, can

2    you see yourself ever being able to answer that

3    first question yes based on the facts of just

4    one -- when I say just, we are talking about a

5    capital murder.

6         A.   Uh-huh.

7         Q.   Can you see yourself ever being able

8    to do that?

9         A.   I might be able to.  I don't know.  I

10   don't know.  I might.  I might not.  I am

11   trying to answer as honestly as I can.

12        Q.   I understand that.  I understand, too,

13   it's like, you know, I might.  I am looking for,

14   yes, I can or, no, I can't because that is the

15   kind of thing that both sides are wanting to

16   know, get to know you a little bit better.

17             Look at that first issue and just read

18   it over to yourself so we can focus on that.  It

19   talks about probability, not a certainty

20   basically.  Some people say that is crystal ball

21   gazing.  It's trying to predict the future.  And

22   when it comes to how people are going to act,

23   you can't ever do that.  What do you think?

24        A.   One more time.

25        Q.   Do you think you can ever be sure

1    beyond a reasonable doubt what somebody is

2    probably going to do in the future?

3         A.    Depends on the person.  If the

4    evidence came up to where it would be, yes, a

5    person dah, dah, dah, they are going to do it

6    again, or look at what they did, it might be

7    probable.

8         Q.    What kind of things do you think would

9    help you to answer that question?

10        A.    I guess character and background, what

11    the crime was about, things like that that might

12    help me more than just examples.

13        Q.    Would it make a difference if a person

14    had been convicted of crimes in the past?

15        A.    That would weigh on it, yes.

16        Q.    Even if they were not violent crimes,

17    if there had been a history of repeated criminal

18    convictions?

19        A.    Like what?  For example?

20        Q.    Auto theft, forgery, burglary, just a

21    pattern of repeated criminal behavior.

22        A.    It would weigh some, yes.

23        Q.    Do you feel like you would have to be

24    convinced that a person certainly was going to

25    commit criminal acts of violence in the future,

810

1    or would probably be enough for you?

2         A.   Probably would be enough.

3         Q.   Where does probably fall for you?   Say

4    if a mere possibility was -- if we had a scale

5    of one to ten, mere possibility was a one and an

6    absolute certainty was ten, where would

7    probability fall for you?

8         A.   Five or six.

9         Q.   For me to persuade you to answer that

10   first question yes, would you have to be

11   convinced that a person was going to kill again,

12   or would other criminal acts of violence be

13   enough for you to consider them continuing to be

14   a threat to society?

15        A.   I wouldn't know.   Probably threatening

16   society, burglary and things like that, that is

17   serious.

18        Q.   I'm sorry?

19        A.   Burglary and things like that are

20   serious, but the killing is a lot more serious.

21   I wouldn't know how to, what I would react to

22   that or how I would answer that.

23        Q.   Could you answer that question yes if

24   you were convinced by the evidence?

25        A.   If I was convinced, yes, I could

811

1    answer it yes.

2         Q.    Even though you knew that that is one

3    step on the way to the death penalty being

4    imposed?

5         A.    Yes.

6         Q.    Talking about issue number two.  By

7    the time you get to that you have decided

8    somebody is guilty of capital murder and you

9    have decided that, yes, they are a threat to

10   society in the future.  And basically this tells

11   you to look at all the evidence again and decide

12   whether you think a life sentence should be

13   imposed instead of the death penalty.  If there

14   was any mitigating evidence at all, in other

15   words, and you mentioned a couple of things

16   earlier, bad childhood, bad background, can you

17   see yourself ever answering that question no

18   despite some mitigating evidence?  And no would

19   mean that there should be the death penalty.

20   Can you see yourself ever doing that?

21        A.    Yeah, I could see myself.  It's

22   hard.   I don't know.   But I could -- I don't

23   know how to explain it.   It just depends on --

24   I don't know if I could do it if that was the

25   way I felt.

                                              812

1       Q.  I guess, you know, when the jury goes

2   back there, they know what the result of their

3   answers are going to be.  So, obviously, you

4   know it's like it's easy for them to manipulate

5   and get the results they want.  Do you feel like

6   that there is a result that you would want to

7   reach if you were on a jury?  Would you be

8   wanting to avoid the death penalty for

9   somebody?

10      A.  Not unless I feel that that is the

11   best for them.  I really wouldn't know how the

12   other jurors would feel.  I would just tell them

13   my answer and let them see my point of view and

14   then I would look at their point of view.

15      Q.  Okay, fair enough.  I guess my concern

16   is to know that anybody who is on that jury is

17   capable of answering those questions in such a

18   way that is going to result in the death penalty

19   if that is what the evidence called for.  And

20   some people come in here and they tell us I know

21   I couldn't do that or I feel so shaky about it I

22   don't think I could live with myself if I did.

23   Do you think you would have any trouble sleeping

24   at night if you did?

25      A.  No.

1      Q.   If you in that second stage of trial,

2   on that second issue, I know from not from this

3   case because I have no idea what the evidence

4   would be in this case, but I know from past

5   experience it would not be unusual at all for

6   there to be psychiatrists or psychologists to

7   testify, come in and give their opinion about

8   whether this person is going to be dangerous or

9   their opinion about why they act the way they

10  do.   Have you had any exposure to that field,

11  know people who are psychologists or

12  psychiatrists?

13      A.   No.

14      Q.   What is your impression, do you feel

15  like that that kind of expert would be somebody

16  really important to listen to, that their

17  opinion?

18      A.   It's going to be important in

19  determining, it's going to be just like you

20  said, another part of the puzzle in

21  determining.   It's just another view.

22      Q.   Okay.   When we are talking about that

23  kind of thing, they are talking about their

24  opinion about human behavior, do you think they

25  are always going to be right?

1      A.    Nobody is ever right, I mean, not all

2   the time.  It just -- I don't know -- I guess

3   credibility.  I don't know how if they would be

4   right on other times.  I don't think they would

5   be right all the time.

6      Q.    That kind of information, do you think

7   sometimes just common sense, a lay person and

8   good common sense would be as helpful in

9   answering those questions as psychiatrists or

10  psychologists would be?

11     A.    You are asking me about a lay person,

12  if they can answer the question as well as the

13  psychologist?

14     Q.    Yeah, just common sense.

15     A.    I believe they could.

16     Q.    Like the people on the jury, their

17  common sense.  If they came up with a different

18  opinion than the psychiatrist, do you think that

19  is possible?

20     A.    Might be.

21     Q.    Are there things that we have talked

22  about either yesterday or today that you have

23  any questions about?

24     A.    Not really.

25     Q.    Thank you.

1          MS. DAVIES:  Pass the juror.

2

3          EXAMINATION BY THE DEFENSE

4    BY MS. KAISER:

5          Q.   Good afternoon.  How are you?  Not to

6    harp on your daughter and her age or her health,

7    but I want to be clear in my mind.  You say your

8    husband is now working day shift?

9          A.   Right.

10          Q.   And, so, if for some reason we got

11    into a trial and we either ended up having to

12    stay here late or when the jury was deliberating

13    you weren't able to go home, would there be

14    someone there to take care of your daughter?

15          A.   My husband would just take her over to

16    the sister's house.  That is what he does.  He

17    will stay there with them and take care of the

18    older while they take care of the younger.  He

19    switches roles with both children.

20          Q.   If you had a little bit of advance

21    notice?

22          A.   No.   At my work once a year I have to

23    do that for two weeks, work over night.

24          Q.   I see.  Right now her health is such

25    that you don't anticipate problems?  Of course,

816

1    you never know.

2        A.    No.

3        Q.    But she's gaining weight and

4    everything.    How much did she weigh when she

5    was born?

6        A.    Three pounds five and a half ounces.

7        Q.    Was she at Texas Children's for

8    awhile?

9        A.    No, they didn't transfer her out.

10   She stayed at Parkway.

11       Q.    My nephew was a premie.  He is like

12   this big.  And now, as an eleven year old, he's

13   the biggest one on his little league team.

14       A.    This is my second premie, so I am used

15   to it.

16       Q.    You obviously take your role as a

17   mother and it appears your husband takes his

18   role as a daddy fairly seriously just by your

19   answers here on the questions.  You are the only

20   panelist that I have seen that actually listed

21   mommy and daddy as their other jobs.

22       A.    It is a job.

23       Q.    I am sure it is.

24             Do you have an opinion, or at what

25   age, or do you think there is an age of a

1    child's life that is more important than other

2    ages as far as developing their character,

3    setting their personality, things that might

4    have just kind of molded them for how they might

5    be later in life?

6        A.   It would be from the time before they

7    are born all the way up to thirteen, fourteen.

8    It could even go as high as that.  It just

9    depends.

10       Q.   You are even looking at prenatal?

11       A.   Right.

12       Q.   Depending on the type of prenatal care

13    the mother received and what she may or may not

14    have received?

15       A.   Right.  My older, I was away from her

16    for four days.  My baby stopped moving.   They

17    develope character I believe from the time they

18    are in the womb.

19       Q.   So if you were to hear testimony in a

20    case about something, some type of deprivation

21    or abuse or something like that that that child

22    received at very early age, is this a factor for

23    whatever weight you might give it, is this a

24    factor that you could take into consideration

25    when it came time to decide punishment?

1      A.   Yes, it would be.

2      Q.   Do you think that there are people

3    that for whatever reason -- it might be

4    upbringing or whatever -- just live better and

5    react better living in the structured

6    environment of a prison as opposed to being out

7    in free society where there are a lot of choices

8    that confront them on a daily basis?  Do you

9    think there are people that get along better

10   with that structure?

11     A.   There might be.

12     Q.   In looking at issue number one where

13   it talks about where you have to decide beyond a

14   reasonable doubt that there is a probability, we

15   have a couple of little hurdles.   Beyond a

16   reasonable doubt that there is a probability

17   that this person is going to commit criminal

18   acts of violence that would be a continuing

19   threat to society.  Our courts have told us in

20   the past that society includes not only the free

21   society, and that is normally what springs to

22   everybody's mind because that is where we all

23   live, but the word society also includes the

24   prison society.  I am sure you probably haven't

25   ever thought about it in that regard, but could

1    you understand how that might be the case?

2       A.   Yes.

3       Q.   In looking at that question, as a

4    juror, would you be able to, whatever the

5    evidence you might receive in both stages of the

6    trial, be able to plug into that question and

7    before you answered that question yes be

8    convinced beyond a reasonable doubt that there

9    is a probability that this person is going to

10   commit continuing criminal acts of violence that

11   is going to be a danger to prison society as

12   well as free society; or in lieu of free

13   society, you would look at both areas of society

14   there in answering that question.  Could you do

15   that?

16      A.   Yes.

17       THE COURT:  Hold up just a second.

18   Could I ask you to step outside this door just a

19   moment.  I need to take something up.

20       THE JUROR:  Kicking me out.

21       THE COURT:  Just briefly.

22       (The prospective juror is removed from

23   the courtroom).

24       MS. DAVIES:  The State will use a

25   peremptory challenge.

820

1          THE COURT:   That is a peremptory
2    challenge as to prospective juror number six,
3    panel two, Ms. Milsaps.
4          ELAINE C. JONES,
5    called as a prospective juror, was examined as
6    follows:
7          EXAMINATION BY THE COURT
8          Q.    This is prospective juror number seven
9    on panel number two, Ms. Elaine C. Jones.
10          How long have you been doing work at
11    M.D. Anderson as a research RN?
12          A.    Three and a half years.
13          Q.    You were in the operating room before
14    that?
15          A.    Yes.
16          Q.    Two children.   Youngest one is at UT
17    studying what?
18          A.    She's in government.   She's hoping to
19    go to law school.   She finished her freshman
20    year, getting ready to start her sophomore year.
21          Q.    New Canaan High School.   I guess
22    Connecticut.
23          A.    Yes, sir.   My dad was transferred to
24    New York.   We lived in Connecticut at that time.
25          Q.    You began as premed?

821

1     A.   Yes, sir.

2     Q.   And then you transferred to Baylor?

3     A.   I got married.  When I got divorced, I

4 went back to school.

5     Q.   Last movie "Dying Soon"?

6     A.   "Dying Young".

7     Q.   On pages eight and nine of your long

8 form questionnaire they ask you to check a

9 statement which best summarized your views about

10 capital punishment and the death penalty or ask

11 you to either agree or disagree with certain

12 statements they wrote.  And it appears, in

13 summary, you wish capital punishment weren't

14 necessary but believe it is necessary for some

15 offenses?

16     A.   Exactly.

17     Q.   And, at any rate, your decision on

18 whether or not the death penalty should be

19 assessed would depend on the facts and

20 circumstances of the individual case.  You have

21 never served on a criminal jury in the past.

22 Had you ever been called for jury service and

23 not selected?

24     A.   I am shocked.  I have been registered

25 to vote for twenty years, and I have never been

822

1    called.  This is my first time.

2         Q.   First time called and you get the long

3    form questionnaire?

4         A.   Exactly.

5         Q.   Do you understand in general terms

6    about these principles I talked to you about

7    yesterday, the presumption of innocence, a

8    defendant is presumed innocent, the burden of

9    proof is on the State.  It's always on the State

10   to prove a defendant's guilt beyond a reasonable

11   doubt.  Do you agree with that?

12        A.   Yes.

13        Q.   If a defendant does not take the stand

14   and testify in his own behalf, that can't be

15   used as evidence against him.   You can't

16   speculate on things you haven't heard.  You have

17   to base your verdict on what you have heard in

18   the courtroom.  Do you agree?

19        A.   Yes.

20        Q.   You didn't know anything about this

21   case.

22        A.   No.  Actually last night I was

23   thinking, because I remember a neighbor of mine

24   saying that her maid has some friends that were

25   killed, but that was months ago.  Nobody said

1   any names.  Nobody said anything about the

2   circumstances.  I don't even know if it's

3   related, but that is the only thing.  I didn't

4   read about this in the paper.

5        Q.   Do you know what area that was in?

6        A.   No.  She didn't know names; she didn't

7   know anything.

8        Q.   You have no preconceived notion as to

9   the defendant's guilt?

10       A.   No, absolutely not.

11       Q.   Before you came in here yesterday, did

12  you understand in general terms what the

13  difference was between murder and capital

14  murder?

15       A.   Probably not really, not in definitions.

16       Q.   In Texas, we have capital murder

17  offenses and then we have first, second and

18  third degree felony offenses.  We did talk, I

19  believe both sides spoke briefly about the

20  possibility of lesser included offenses may be

21  in the Court's Charge, that is, if there was any

22  evidence of any other offenses other than

23  capital murder jurors might look to, that would

24  be in the Court's Charge.  The jury may at some

25  point have the opportunity to decide whether or

824

1    not the defendant is guilty of the offense of

2    capital murder.   And if they don't believe that

3    beyond a reasonable doubt, then they might look

4    at some lesser included offenses like murder or

5    down the line voluntary manslaughter or

6    involuntary manslaughter, sort of stair-stepping

7    down the schedule of felony offenses all the way

8    to misdemeanor offenses.   By murder we are

9    talking about when someone intentionally or

10   knowingly causes the death of another

11   individual.   When we are talking about capital

12   murder, we are talking about that intentional

13   taking of a life plus some other aggravating

14   factor, something that elevates it from a first

15   degree felony offense to capital murder.   And in

16   Texas our scheme is that we have six different

17   categories.   One is where a person murders a

18   peace officer or a fireman acting in the lawful

19   discharge of an official duty.   One is the case

20   where somebody commits a murder for hire.   One

21   is where someone murders a person while escaping

22   or attempting to escape from a penal

23   institution.   One category is when someone

24   murders an employee of a penal institution while

25   he is incarcerated in the penal institution.

825

1  The most common type of capital murder offense
2  we see and is covered by the media is where a
3  defendant murders someone while he is in the
4  course of committing another felony like
5  kidnapping, burglary, robbery, aggravated sexual
6  assault or arson. And I believe the examples I
7  gave yesterday were where a lady was kidnapped
8  on a parking lot, raped and murdered. That is
9  capital murder. It's the intentional taking of
10  a life with the aggravating factor. Convenient
11  store robberies in which the clerk is killed
12  during the course of committing robbery. That
13  is a capital murder offense. The sixth category
14  we have is where someone murders more than one
15  person in the same criminal transaction. Could
16  be as few as two people. And we know by
17  reading the indictment to you, you know at this
18  point that that is the allegation in this case,
19  that two people are killed in the same criminal
20  transaction. I believe I told you yesterday
21  that you would receive an instruction that the
22  indictment is no evidence of guilt whatsoever.
23  That just means that we arrive here in court.
24  Do you agree with that?
25      A.   Yes.

1      Q.    So now you know the type of capital

2  murder scheme we are talking about and the

3  different ways in which the offense of murder

4  can be elevated to capital murder.  Are all

5  those the kinds of things that you think should

6  be capital offenses?

7      A.    Yes.

8      Q.    Do you understand that if someone is

9  convicted of the offense of capital murder there

10  are only two possible punishments, it's

11  mandatory that that person be either sentenced

12  to life imprisonment or the death penalty?

13      A.    Yes.

14      Q.    Did you understand before you came in

15  here yesterday that after someone is convicted

16  of capital murder the jury does not then retire

17  and decide whether to assess life or death, vote

18  for life or death, we, instead, insulate the

19  jury a bit and insulate the judge a bit by

20  giving you special issues, these questions.  Did

21  you know that before you came in here?

22      A.    No.

23      Q.    Most people don't unless they are

24  lawyers.

25              You will recall that the trial is in

827

1    two stages.  The first stage is what we will

2    call the guilt stage.  Evidence is presented,

3    the jury goes back to deliberate, comes back

4    either guilty or not guilty of an offense.  If a

5    jury returns a verdict of guilty, there is a

6    second stage of trial, the penalty stage.  Each

7    side may present additional evidence.  They

8    don't have to but they may present additional

9    evidence.  If they don't present anything in

10   addition you may examine everything you saw in

11   the case in chief and go back and determine

12   punishment.  If the jury returns a verdict of

13   guilty of capital murder, I submit these two

14   special issues.  Number one asks:  Do you find

15   from the evidence beyond a reasonable doubt that

16   there is a probability that the defendant would

17   commit criminal acts of violence that would

18   constitute a continuing threat to society.

19   That is where we are asking the jury to make a

20   determination of the defendant's future

21   dangerousness.  We focus on that word

22   probability, in common usage meaning more likely

23   to occur than not.  Is it more likely to occur

24   than not that the defendant would commit

25   criminal acts of violence constituting a

1    continuing threat to society.  I would instruct

2    the jury that they should consider all the

3    evidence admitted at the guilt or innocence

4    stage and the punishment stage including

5    evidence of the defendant's background or his

6    character or the circumstances of the offense

7    that militates for or mitigates against the

8    imposition of the death penalty.  So everything

9    you had heard in both stages of trial you can

10   take into consideration when you are making the

11   determination as to issue number one.  It takes

12   all twelve jurors agreeing to answer yes.  Ten

13   or more can agree and answer that no.  If a no

14   answer is returned, you come back in, and I

15   assess the death penalty.  I was looking at him

16   and my mouth was running.  If a no answer is

17   returned, I assess life imprisonment.  If yes is

18   answered, then the jury looks at number two.

19   You don't even move to issue number two unless

20   that yes answer comes on number one.  First of

21   all, as to number one, can you see how under

22   some circumstances if you have found a defendant

23   guilty of capital murder you could vote yes and

24   sometimes no, depending on the evidence you had

25   before you as to future probability of dangerous

829

1     acts?

2         A.   Yes.

3         Q.   On number two, that is asking

4     something a little bit different.   It asks

5     whether taking into consideration all the

6     evidence, including the circumstances of the

7     offense, the defendant's character and

8     background and the personal moral culpability of

9     the defendant there is a sufficient mitigating

10    circumstance or circumstances to warrant that a

11    sentence of life imprisonment rather than a

12    death sentence be imposed.   There is not

13    another stage of trial between your answering

14    issue number one and issue number two.   If you

15    find someone guilty of capital murder and there

16    is a second stage, you go back and answer these

17    two questions while you are out deliberating.

18    If you answer number one yes, you look at number

19    two and you answer that.   There is no burden of

20    proof assigned to issue number two.   That is

21    saying you can reconsider everything before you,

22    anything that is mitigating in your mind you may

23    look at, and even though you have decided there

24    is a probability that the defendant on trial

25    would commit criminal acts of violence

1    constituting a continuing threat to society, you

2    can determine whether or not there is something

3    else, there is something else, sufficient

4    mitigating circumstance or circumstances that

5    would warrant you in saying that life

6    imprisonment should be imposed rather than

7    death.   It's another way for the jury to say we

8    think life should be imposed in this case.   Do

9    you see how under some circumstances that could

10   be answered yes and under some circumstances no

11   even though you had previously answered number

12   one yes?

13          A.   Yes.

14          Q.   If the jury answers yes to number two,

15   I assess life imprisonment.   If they answer no,

16   after having previously answered number one yes,

17   I assess the death penalty.   You get to know

18   that in advance.   What is important is that you

19   see that these aren't automatic answers yes or

20   no to either one of these issues and that you

21   are not predisposed to always answer one of

22   these issues a certain way so as to insure that

23   either the death penalty would be imposed or

24   that a life sentence would be imposed.   Do you

25   understand and agree?

1          A.    Yes.

2          Q.    When we are talking about mitigating

3     evidence, we are talking about in general terms

4     evidence that is relevant to a defendant's

5     character, record, any circumstances of the

6     offense, anything which might serve as a basis

7     for the sentence less than death.  I can't give

8     you an all inclusive list of what are mitigating

9     evidence, mitigating circumstances.  We know

10    that mental retardation, mental illness can be

11    mitigating evidence.  Other things might include

12    child abuse, a defendant's good behavior in

13    prison or in jail, whether or not a defendant

14    had an exceptionally unhappy or unstable

15    childhood, child and drug abuse, economic

16    deprivation, voluntary intoxication, drug

17    dependency, illiteracy, opinion testimony of lay

18    witnesses or psychiatric opinion testimony that

19    a defendant would not be a danger in the

20    future.  All those things can be mitigating

21    evidence.  We just don't have, in plain words,

22    the things identified that are mitigating

23    evidence for the jurors.  And there is no

24    formula that is imposed on the jurors as to

25    determine the weight that they may assess on

832

1    each one of these mitigating factors if they

2    determine that each one of these circumstances

3    is a mitigating circumstance.   That is up to the

4    jury to decide.

5           Do you have any questions about

6    anything I have said so far?

7           A.   No.

8           Q.   Is there anything regarding your views

9    on capital punishment or the death penalty which

10   would either prevent or substantially impair the

11   performance of your duties as a juror in

12   accordance with the instructions I would give

13   you and your oath as a juror?

14          A.   No.

15          THE COURT:   Ms. Davies

16          EXAMINATION BY THE STATE

17   BY MS. DAVIES:

18          Q.   Ms. Jones, what was your first

19   reaction when you realized that here your first

20   time to come down for jury duty and you are

21   being called over on a case that may very well

22   involve the death penalty?   How did you feel?

23          A.   Uncomfortable.   It's a very serious

24   situation, and I take it very seriously.

25          Q.   I would hope so.   I think most people

1    do.  When did it hit you, when you were filling

2    out the questionnaire?

3         A.   Oh, it was fairly obvious.

4         Q.   Not too subtle?

5         A.   Not too subtle.

6         Q.   You said it made you feel

7    uncomfortable?

8         A.   Well, it's not -- I have very strong

9    views about it, so it's not that.  I have

10   just -- I expected to be on some little civil

11   something or another when I was called right at

12   the beginning.  I was a little bit surprised but

13   not uncomfortable to the point that I don't want

14   to do it.   I wouldn't or would feel

15   uncomfortable making a decision about, for

16   instance, these questions, et cetera.   Just the

17   seriousness of it more than anything.

18        Q.   You say you have strong views on the

19   subject.  We asked you at least twenty different

20   ways, probably more than that, but just in your

21   words can you tell us what your attitude is

22   toward the necessity for the death penalty?

23        A.   As he summarized, I feel, I wish that

24   it would not be necessary.  I do feel that there

25   are some circumstances in which a person would

834

1    have to pay with his life for taking someone

2    else's life.  There are also extenuating

3    circumstances that it would not be necessary,

4    that life imprisonment would be possible, too.

5    I mean, I would have to know the facts before I

6    would make any type of decision, but I would be

7    able to go either way.

8         Q.   For many people who can have very

9    strong beliefs in terms of an abstract

10   discussion and, yet, for them, when they are

11   confronted with a situation where they would be

12   personally involved in a case that resulted in

13   the death penalty, they have to say, well, I

14   have come face to face with this and I realize

15    -- I think it's necessary, I think it needs to

16   be part of society, other people, you know, I

17   want it to continue, but I can't be a part of

18   this.  Did you have any thoughts of that?

19        A.   No.

20        Q.   I assume you gave this some thought

21   last night after you left here?

22        A.   Oh, absolutely.  I deal, I mean, my

23   job is a very serious job as well, and I deal

24   with a lot of cancer patients, and most of my

25   patients die because of the type of cancer I

835

1    take care of.  And, believe me, I know the
2    seriousness of it.  And, yes, I did give it
3    thought.
4         Q.    Given that time to sit back and think,
5    do you feel like -- was there anything that
6    after twenty-four hours of consideration that
7    you would want to change about the way you would
8    have answered these questions yesterday?
9         A.    I don't think so.
10        Q.    One of the things that I noticed, we
11   ask the question about what the objective of
12   punishment, primary objective should be, you
13   mentioned, hopefully, rehabilitation as well as
14   you mentioned prevention, that you made a point
15   to mention that you hoped for rehabilitation.
16   How optimistic a person are you I guess is what
17   I want to know.   What are your expectations of
18   rehabilitation?
19        A.    To be honest, I know very little about
20   in the prison system what type of rehabilitation
21   is offered.   I really honestly don't know.   I
22   do believe that some people can possibly
23   become -- this is a different case, but some
24   people could possibly become, you know, decent
25   citizens with help.  I am not real optimistic.

1    I know reality.  And there are times that it
2    would not be possible.
3        Q.   Obviously the death penalty is pretty
4    final.  Obviously, if that death penalty is
5    imposed, the jury has given up on
6    rehabilitation.  I guess that is what I am
7    trying to find out from you.  Are you one of
8    those people who think anyone at any point
9    deserves a second chance?
10       A.   No.   It depends on the
11   circumstances.  But, no, I am not -- I see
12   reality, and what reality is in life, and it's
13   not possible sometimes.  It's just not.
14       Q.   At this point, you certainly don't
15   strike me as a person who is looking to answer
16   those questions one way or the other every
17   time.  Am I?
18       A.   No, I am not looking to answer
19   anything.  I wouldn't know what to answer, to be
20   honest.   I am just, you know, going to be
21   honest with you about how I feel.
22       Q.   We have described these issues as a
23   way of insulating the jury.  It's a pretty thin
24   insulation, to my way of thinking.  True, if you
25   are on the jury you are not called upon to write

1   death in red letters across the verdict page,

2   but you know what the result of your yes or no

3   answer is.  So, clearly, anyone is capable of

4   manipulating those answers to accomplish the

5   purpose that you might have.  In your line of

6   work, I would think your whole approach is

7   reverence and attempt to save life, so that

8   makes me wonder, you know, would you be doing

9   violation to your--

10       A.    No.    I was thinking about that as

11  well as religious beliefs last night and this

12  morning.  I am comfortable with it.  I am very

13  comfortable with it.   I am a Christian as well,

14  but I just truly feel that there are some

15  circumstances that it is necessary, and I would

16  not have a problem with doing it.   I wouldn't

17  jump at it.  I don't think that every person

18  that has murdered someone necessarily needs to

19  die.  I think there are extenuating

20  circumstances.  I am sure there has been in the

21  past.  But I would not have a problem answering

22  yes.

23       Q.    Well, clearly, we want to be sure --

24  the judge has already told you anybody who sits

25  on this jury is the kind of person who could

1    answer those questions either way, and then it

2    also would be just as obvious as I talk to you

3    and Mr. Stafford we are on opposite sides of

4    this.  I am going to be asking for the death

5    penalty.  So, I want to know that there is

6    somebody -- that the people on the jury can live

7    with themselves if they do that, if they put

8    their name on a verdict that would result in the

9    death penalty.

10       A.    I understand.

11       Q.    So, you feel like you could?

12       A.    Yes, absolutely.

13       Q.    If the evidence was there that

14   convinced you beyond a reasonable doubt?

15       A.    Yes.

16       Q.    What about your children?  You have

17   got children of an age that they tend to have

18   opinions about things like this, and you have a

19   daughter who is studying government, pre-law.  I

20   suspect she's the kind of young woman who has

21   her own opinions on things.  Have you ever

22   discussed, do you know what her attitude would

23   be toward the death penalty?

24       A.    No.  She wasn't at home last night or

25   she would have asked.

839

1      Q.    Is there anybody in your life, family,
2    friends, anyone who you think would disapprove
3    of your decision if you were on a jury that gave
4    the death penalty?
5      A.    No.  I talked to my parents last
6    night, and they know that if I was chosen for
7    this jury that that is what I would be doing.
8    Nothing was said.  We all have our own opinions
9    and we basically respect each other's opinion.
10      Q.    There is nobody who you would feel
11    pressured or inhibited in making your decision?
12      A.    No.
13      Q.    I noticed, apparently, someone in your
14    family, perhaps yourself, had seen -- there is a
15    question here:  Have you or a member of your
16    family consulted a psychiatrist or psychologist.
17      A.    I did after divorce, during the
18    divorce went to a counselor.
19      Q.    Do you have any dealings through your
20    training or even professionally with any
21    psychologists or psychiatrists?
22      A.    No.  We consult and, you know, if we
23    feel that need in our patient we consult with
24    them, send them for consultation, but, no.  I
25    have had training, obviously.  I mean,

840

1    somewhat.  I took a lot of that in college

2    because of the degree I was getting, but.

3         Q.   I guess in this kind of case -- I

4    don't know what the evidence will be.  In

5    criminal cases, the discovery is not

6    reciprocal.  You hear in civil cases how it goes

7    back and forth.  I have no right to discover

8    what the defense case will be.  They have

9    certain rights, things I have to turn over to

10   them so that they know what the State's case is,

11   but it's not a two-way street.  So I have no way

12   of knowing what the evidence will be in this

13   case, but from experience I can know in this

14   type of case it would not be uncommon at all for

15   there to be some psychiatric testimony, a

16   psychologist, some kind of expert coming in and

17   talking about the person's background, something

18   that might try to explain why they are the way

19   they are.  So I am interested to know what your

20   feeling would be about that type -- say if a

21   psychiatrist or an expert of that type came in,

22   do you feel like that is a particularly exact

23   kind of science to make a decision on?

24        A.   No.  It's another facet of

25   information.  I don't believe that a

841

1    psychiatrist or, say, a psychologist that was

2    there would be one hundred percent on the

3    money.  I don't necessarily believe that.  I

4    think it can be taken into consideration, but

5    definitely not, I mean, they are people as well,

6    and there is bias in everyone's decision even

7    with the examinations they give, et cetera.  I

8    think it would just be a portion of

9    information.  Certainly not every bit of

10   information.

11        Q.   Do you feel like in some instances

12   just a commonsense approach could be, in terms

13   of evaluating human conduct, could be as valuable?

14        A.   Not necessarily as valuable.  It could

15   be as valuable, but I just -- I would not I

16   think put total credence in something that a

17   psychiatrist or psychologist inferred about

18   someone else.

19        Q.   But it's something that you would

20   consider?

21        A.   I would consider it.

22        Q.   If that was part of the evidence.

23             We went over so many things

24   yesterday.  Did any of them -- anything you gave

25   thought to that you had a question or?

1        A.    No, not really.

2        Q.    Or wanted to explore.  We talked about

3   the burden of proof.  We kept using that term

4   beyond a reasonable doubt, beyond a reasonable

5   doubt, convinced beyond a reasonable doubt, we

6   would throw it out, but I don't think we really

7   talked about it in any depth.  The legal

8   standard says it's beyond a reasonable doubt.

9   To find the defendant guilty of capital murder

10   -- in fact, that is the same standard on any

11   criminal case from, you know, misdemeanor

12   offenses on through capital murder.  It's all

13   the same, beyond a reasonable doubt.  There is a

14   lengthy definition.  I won't go into the whole

15   lengthy one.  It's a high standard, no question

16   about that, but the instruction the judge will

17   give you makes clear that it's not beyond all

18   doubt.

19        A.    Right.

20        Q.    Now, at this point our main concern is

21   to know how you feel about things.  Some people

22   will come in here and tell us that they don't

23   care what the legal standard is, lady, if you

24   are going to be asking me to give the death

25   penalty you are going to have to remove all

843

1    doubt from my mind.  That is practically an

2    impossible standard.  I need to know how you

3    feel about that.

4          A.   I think that is impossible.  The only

5    way it would be possible is if I was there.

6          Q.   True.

7          A.   So, it would have to be reasonable.

8          Q.   So, do you feel like the legal

9    standard is an appropriate one?

10         A.   Yes.

11         Q.   We touched on this yesterday, the

12   issue of intent, because I have to prove that

13   two people, the defendant killed two people

14   intentionally during the same criminal

15   transaction.  We are not talking about

16   premeditated but just intentional.  My

17   suggestion is that you can form the intent,

18   anyone can, the intent to act very quickly.  I

19   don't have to decide before I leave the house

20   this morning that I am going to run a red light

21   for it to be intentional.  As I'm approaching

22   the corner and I see the light change and just

23   say, oh, heck, I am going on.  The thought

24   process there, I have reached my decision, I am

25   acting intentionally, but it was a very

1    spontaneous spur of the moment decision.  How do

2    you feel about that?  I am saying the same kind

3    of thinking would apply to the decision to

4    commit murder.

5        A.   I agree with that.   It doesn't have

6    to be something you planned for a month or two

7    weeks or ten minutes ago.  The red light

8    example, if I look up a five second moment and

9    make the decision to run that red light, I have

10   intent to do it.  So.

11       Q.   If you apply that kind of definition

12   of intent to a murder situation, would it seem

13   less serious a murder to you if someone decided

14   on the spur of the moment to kill as opposed to

15   one that they planned ahead?

16       A.   No.  Murder is murder.

17       Q.   One of the things I didn't touch on

18   yesterday is the issue of self-defense.  Anytime

19   you are talking murder of any kind that is an

20   issue that can come up.  Someone starts talking

21   about self-defense, most of us feel strongly

22   that a person, we all have the right to defend

23   ourselves.  Do you agree?

24       A.   Absolutely.

25       Q.   And the law does, too.   The law

1   certainly includes the right of self-defense or
2   even the defense of another person.  If you were
3   at work and someone came in and was robbing, you
4   would have the right to protect yourself or a
5   third person if you were being victimized.  I
6   want to mention that because certainly the law
7   does include the right to self-defense.  The
8   right of self-defense applies to a person who is
9   acting lawfully, not to the wrongdoer.  In other
10  words, if a defendant went into the convenient
11  store to rob the clerk and then, you know, said
12  give me all your money, the clerk reaches under
13  the counter and pulls a gun to defend himself
14  and the robber then shoots the clerk, he would
15  not have a legal right to come into court and
16  say, hey, I had to defend myself, he pulled a
17  gun on me, because he was breaking the law to
18  begin with and the clerk would be acting within
19  the law in trying to defend himself.  Does that
20  make sense to you?
21       A.   Yes.
22       Q.   Okay.   Let's talk about these issues
23  a little bit.  Since you haven't been on a jury
24  -- I don't want to belabor this, but since you
25  haven't been through the process like some

846

1    people have.    You understand it's a two stage
2    trial.  At the first stage of trial, that is the
3    guilt stage, the only evidence that is going to
4    be admissible is evidence that relates to this
5    particular capital murder.
6         A.    To that issue only.
7         Q.    That issue only, just a very limited
8    did he do this crime.  Is he guilty of the
9    capital murder.  So that is why you probably
10   hear people talk about:  Oh, I was on a jury,
11   they didn't let us know anything about this
12   guy.  Well, it's not relevant.  The idea is at
13   that first stage of trial the person should be
14   tried only for this act, not for what they may
15   have done in the past.  So that is why the jury
16   doesn't get to hear that kind of thing.   After
17   they hear all the evidence, the judge gives the
18   instruction, the attorneys for both sides argue,
19   then the jury goes back into the jury room to
20   decide that issue of guilt.  There is never any
21   expectation that a jury makes an instantaneous,
22   unanimous decision, you know, the expectation is
23   that is what is called deliberating.  You are
24   going to sift through the evidence.  You are
25   going to discuss it with the other jurors before

847

1   you reach your decision, and it has to be a

2   unanimous verdict for there ever to be a guilty

3   verdict.   At that point then the jury would come

4   back into the courtroom, deliver their verdict.

5   It's only after you have gotten a verdict of

6   guilty of capital murder that we ever get to

7   this second stage of trial.   Now, at the second

8   stage of trial there is the potential for

9   additional evidence.   Not always.   There will be

10  times, can be times where I might be asking a

11  jury to give the death penalty or answer these

12  questions where it would result in the death

13  penalty just based on the facts of that capital

14  murder alone, that they are so brutal that

15  should be enough to convince you that this

16  answer should be yes or no.   Can you see that

17  there might be some instance where, without any

18  other background information, any other criminal

19  history, that just the facts of that particular

20  capital murder alone would justify the death

21  penalty?

22       A.   Yes.

23       Q.   In other instances you will get more

24  information.   And that kind of additional

25  background information would come in at that

1    second stage, the punishment stage of trial.

2         A.   I think it would take a lot, but, yes,

3    I do think there are some circumstances that it

4    could be done.

5         Q.   You would like to have additional

6    information, I am sure.

7         A.   I am sure, but if you don't.

8         Q.   Of course you would.   My concern is

9    to know would you always require?

10        A.   No.

11        Q.   Okay.

12        A.   Not always.   I would prefer it but not

13   always.

14        Q.   At this second stage of trial -- I was

15   drawing this up here when I was talking to

16   somebody else.   This is this big ball of

17   evidence.   And, so, at this second stage you are

18   going to consider all of it, the whole ball of

19   wax.   It's going to include the evidence you

20   have heard about the offense, the capital

21   murder, and if there was additional evidence

22   brought to you about the defendant's background,

23   good or bad.   I mean, there is always the

24   potential for, if there have been other criminal

25   acts, convictions, or maybe it's good stuff, he

```
 1    was a deacon in the church, an honor student,
 2    whatever the evidence may be, background,
 3    character, any personal data.   Some of the
 4    things that may be characterized as mitigating
 5    evidence may be brought in by the defense.   They
 6    never have any obligation to bring in anything
 7    at any stage of trial.   So those things may
 8    become apparent during the State's case, you
 9    know.   The description and the appearance of
10    the defendant would indicate perhaps he would be
11    particularly young or perhaps during the course
12    of the offense, I mean, you might have a witness
13    describe what happened, and say in a capital
14    murder situation maybe one person was killed,
15    another witness survived that described some of
16    the things that the defendant said during the
17    offense that, you know, he might, say, if it's a
18    murder during the course of a rape, tell this
19    woman, as he is torturing her and raping her,
20    hey, you know, does that hurt, sure, it does.
21    I am going to treat you like my mother always
22    treated me.   You could come up with information
23    that would suggest that he was abused as a child
24    or whatever.   Or had a low IQ because of the
25    way he talked.   But at any rate the point of
```

1     that is you don't ever look to the defense to

2     put on evidence, but wherever the evidence came

3     from you consider all of it when you are

4     addressing these two questions.  Same evidence

5     but different focus as you are addressing the

6     question.

7                Let's take that first one.  Talks

8     about probability of future dangerousness.  Not

9     a certainty but a probability.  It's kind of

10    predicting the future, how somebody is going to

11    behave in the future.  Is that too much like

12    gazing in a crystal ball, or do you think you

13    can be convinced to answer that question yes

14    based on the evidence?

15         A.   I could answer it yes.

16         Q.   It talks about criminal acts of

17    violence.  It doesn't say he is probably going

18    to kill again.  It talks about criminal acts of

19    violence that would constitute a continuing

20    threat to society.  To your way of thinking,

21    are there other criminal acts that would be a

22    continuing threat short of murder?

23         A.   Yes, there could be.

24         Q.   Okay.  If you answer that question

25    yes, if you were convinced by the evidence

851

1   beyond a reasonable doubt that it should be,

2   could you do that, knowing that that is one step

3   closer to the death penalty?

4        A.    Yes, I could.

5        Q.    If the jury has answered that yes

6   unanimously, then they move to that second

7   question.  And I may be taking too many

8   liberties in paraphrasing it, but basically, as

9   I read that, it sounds like what it's saying

10  is:  Okay, you have decided he is a continuing

11  threat to society, now look at this evidence

12  again, be sure you don't overlook the mitigating

13  stuff that is in there, if there is anything.

14  In some cases there may not be other things.  In

15  other cases there may be a lot.  But be sure you

16  consider that, but you also still consider the

17  circumstances of the offense, in effect,

18  re-weigh it.  Do you think there is enough

19  mitigating evidence in there to warrant backing

20  off the death penalty and giving him a life

21  sentence.  And if your answer is yes, he should

22  get a life sentence.   If ten agree on it, that

23  is what the judge does.  If your answer is no,

24  all twelve have to agree, the death sentence

25  results.

852

1            Do you see -- I am concerned about

2     this because I noticed on your questionnaire you

3     talked about, in answering one question, about

4     people who are likely to commit crimes and their

5     background, a reference to disadvantaged

6     childhood, that kind of thing.  Can you ever see

7     yourself, when there is some mitigating

8     evidence, thinking that, yes, there is a sad

9     story here and sad background but it's not

10    enough?

11         A.   Yes.  For me, I am a researcher, I

12    think very analytically.   I am very in order.

13    I think there would be a line for me, and I

14    don't know where it would be.  That there would

15    be a time I could say yes to that.  And there

16    would be a time to say no.  I think -- I know I

17    could do either; I just do not know where that

18    line is.  I would know for me.

19         Q.   There is all kinds of things that can

20    be mitigating.  We know some things that the

21    courts have said in the past are properly

22    considered to be mitigating.   I mean, what is

23    mitigating to one juror may not be to another.

24    For example, drug usage.  You know, some people

25    think that might be aggravating, another person

                                              853

1    mitigating.  And they are going to give it
2    different weight.  We are not going to ask you
3    what weight you would give to any one factor.
4         A.    It would be a combination for me, I
5    would imagine.  A combination of factors.
6         Q.    And perhaps hearing it in the
7    context.  I mean, one factor may be heavier in
8    one case than in another, depending on the
9    context.  Someone who has had a very tragic
10   childhood at a young age, certainly I think we
11   would all feel sympathy and consider that to be
12   mitigating.  Do you think that that would
13   diminish or that negates personal
14   responsibility?
15        A.    Certainly not.
16        Q.    Entirely?
17        A.    Certainly not, but.
18             MR. STAFFORD:  Making reference to
19   guilt or innocence or punishment?  I think that
20   is misleading the juror as to what she means.
21   Is she talking about punishment or guilt or
22   innocence?
23             THE COURT:  Rephrase the question.
24   BY MS. DAVIES:
25        Q.    Well, our discussion was in the

854

1    framework of punishment.

2         A.   Well, a bad childhood, I mean, my

3    goodness, everyone at some point has a

4    dysfunctional family, I think, but a bad

5    childhood alone probably not.  I don't know what

6    combination or what one thing would make me

7    answer that yes.  I can't tell you that.

8         Q.   Well, and I am not asking you to tell

9    me that.  I think it would be inappropriate for

10   me to ask or expect you to be able to come up

11   with an answer as to what weight you would give

12   any factor.  Our concern would be to be sure

13   that you would consider anything mitigating.  I

14   mean, there may be a really sad story about a

15   tragic childhood.  Whether in the context of

16   the case you are hearing it would be enough for

17   you to come up with a yes or no answer is

18   another thing.

19        A.   Right.

20        Q.   Would you be able to consider any and

21   all of the evidence, the mitigating evidence,

22   aggravating evidence, all of it, in order to

23   reach a decision?

24        A.   Absolutely.  That is what you have to

25   do.

1      Q.   Without prejudging what weight you
2  would give to any aspect?
3      A.   Oh, no.   I would have to have all the
4  information.
5      Q.   I think I am understanding you to tell
6  me that you would answer either one of those
7  questions yes or no just depending on the
8  evidence.   You are not going into this--
9      A.   No, I don't feel that every person
10 that commits murder needs to be sentenced to
11 death.   I think it is a possibility -- I think
12 it in some cases should be done and in some
13 cases it should not be done.
14     Q.   And you would be able to consider all
15 of that background evidence?
16     A.   Absolutely.
17     Q.   As well as the evidence of the offense
18 in making your decision?
19     A.   Yes.
20     Q.   Has anything else come to your mind
21 that you want to share with us or ask about?
22     A.   No.   You did a very good summary
23 yesterday.   Answered all my questions, anyway.
24     Q.   Thank you.   I pass.
25

1                EXAMINATION BY THE DEFENSE

2       BY MR. STAFFORD:

3            Q.    Were you raised in the New Canaan area

4       as a kid?

5            A.    No, I was born in Tyler.    We moved to

6       Houston.

7            Q.    How old were you when you came to

8       Houston?

9            A.    Four.

10           Q.    You are basically a Houstonian?

11           A.    Right.    We moved to New Orleans, back

12      to Houston, New York, Overseas and back here.

13           Q.    Your father was with the military?

14           A.    No, with Exxon.

15           Q.    What did he do?

16           A.    He just retired a few years ago.    He

17      was the manager of all the international

18      drilling and exploration for Exxon.

19           Q.    Did he stay in the office or was he

20      out in the field?

21           A.    Office.    Traveling a lot to other

22      countries.

23           Q.    But would he actually go out in the

24      oilfields to see what was going on?

25           A.    No.    He did when he started with

857

1    Exxon, I believe.

2         Q.    What is his educational background?

3         A.    He graduated from Duke University.

4         Q.    Okay.  Was he originally from the

5    South?

6         A.    South Carolina.  Grew up on a farm.

7         Q.    How about your mom?

8         A.    Texas.  She's from Wichita Falls.

9         Q.    Close to Olney, Texas?

10        A.    Yes.

11        Q.    My hometown where I was born.    Any

12   memory about Tyler at all?

13        A.    No.

14        Q.    Where were your grandparents?  Are

15   they in Wichita Falls?

16        A.    Right, and South Carolina.

17        Q.    Spend very much time in Wichita Falls?

18        A.    Very little.  We would go visit once

19   or so a year maybe.  They would come to our

20   house a lot.

21        Q.    And where did you go to junior high

22   school?  In New Orleans?

23        A.    New Orleans and Houston.    High school

24   started in Houston and then finished in

25   Connecticut.

858

1      Q.    How did you pick SMU to go to school?

2      A.    My mom had gone there.    And I had

3  five other friends, we all were from New Canaan,

4  Connecticut, came down to SMU.    It was

5  amazing.    They were shocked.    They had never

6  heard of New Canaan, Connecticut, and six of us

7  went down there.    I wanted to move back to

8  Texas.

9      Q.    You graduated SMU?

10     A.    I didn't graduate from SMU.

11     Q.    You had it in here what year you

12  left.

13     A.    '72.    And I went back to school in '78

14  to Baylor in Dallas the last two and a half

15  years of bachelor's degree for nursing.

16     Q.    So what I am gathering your premed was

17  interrupted by marriage and children?

18     A.    Right.

19     Q.    Any regrets?

20     A.    Yes, sometimes.    More than anything,

21  I will be honest, financially because I have

22  been a single parent.    It's not easy.

23     Q.    How long have you been a single

24  parent?

25     A.    I remarried and divorced, and I have

859

1    been single since '85. '84 or '85.

2         Q.   I gather from your paper you had the

3    smarts, this other intervening circumstance that

4    happened that prevented you from becoming a

5    doctor.   How did you choose the cancer research

6    and the cancer nursing?

7         A.   Actually my neighbor and friend was in

8    research nursing.  I was getting very burned out

9    in the operating room as well as just getting

10   too old for it.   I mean, we had to take call,

11   and you would be up all night, plus have to be

12   back at work at 6:40 in the morning.   I just

13   couldn't do it anymore.

14        Q.   Was the emergency room?

15        A.   Operating room.   It was St. Johns.

16   I live in Clear Lake.

17        Q.   Basically any type and all types of

18   surgery?

19        A.   Oh, yes.   I trained at Baylor.  I did

20   a year's internship in Dallas in surgery.   All

21   areas.   And then went into open heart for

22   awhile.   Did that until I moved down here.

23        Q.   It may appear that I am playing mind

24   games with you, and I may be.  How do you

25   explain the work that you do in the cancer

860

1     patient trying to save lives and then your views

2     on capital punishment of taking a life?  I see a

3     conflict there.

4          A.   I don't see it.  I don't see a

5     conflict.  I mean, as I said, I think there are

6     circumstances in which it is inappropriate to

7     vote for whatever, for death sentence.  But I

8     think if certain situations and certain

9     circumstances it is possible or plausible more

10    than anything.  I know it seems -- it seems that

11    way.  As I said, even my Christian views, you

12    know, I am comfortable with it.

13         Q.   Because I see some sort of cancer, for

14    example, that I have no control over, something

15    happens that we are still trying to figure out

16    the answer of why is cancer.   I am sure there

17    are other types of cancer, that you can trace my

18    eating habits and the way I took care of myself

19    that contributed to that I personally had

20    control over.   I can see a difference.   End

21    result is still going to be the same.   Same way

22    with an individual trying to determine whether

23    someone dies or lives.  You could have an

24    individual that we could bring you testimony

25    that he did what he did because of something

1    that happened to him in his childhood.   It's

2    almost you could predict where he was going.

3    He had no control of his destiny almost.

4    Certain factors that control him versus an

5    individual who sat around and plotted for ages

6    of how to kill his wife and collect the

7    insurance, for example.  I mean, he went through

8    great schemes.  To me, you had to look at the

9    two to determine whether one lives or dies.

10   Both did horrible deeds; wouldn't you agree?

11        A.    Yes.

12        Q.    One of them did it out of hunger for

13   money and one was reacting because of something

14   that his parents or something that happened in

15   his childhood.  Do you see any difference?

16        A.    Oh, yes.  The mitigating

17   circumstances.   There can be.

18        Q.    Same way with Ms. Davies' hypo about

19   the Utotem or the Seven-Eleven.  Seven-Eleven is

20   the days of our past.  But you could have a

21   situation where the shop owner was out in the

22   driveway sweeping and he could be having words

23   with somebody, and the guy pursues him to find

24   out why they were fussing and they get into

25   fisticuffs and he takes the guy's life.   He

1    didn't go in there with the intent to rob him.

2    He didn't go in there with the intent to commit

3    any other type of felony, it's just they have

4    words and they get in a fight and you believe he

5    unjustifiably took his life.  And in the course

6    someone could walk out of the back room, for

7    example, and surprises him, and you could see in

8    that situation where maybe he did act in

9    self-defense and he kills him.

10          A.    Uh-huh.

11          Q.    You end up with two dead bodies.    One

12   could be unjustified, one could be

13   self-defense.  See what I am saying?

14          A.    Yes.

15          Q.    And this is where Our Honor spent time

16   with you for lessers and self-defense and things

17   of that nature.  You may get into a situation in

18   a jury trial, for example, where the court will

19   give you a charge before you can find someone

20   guilty of capital murder you have to believe

21   that he intentionally killed both of them.    That

22   basically you are ruling against me on

23   self-defense.  Okay?

24          A.    Uh-huh.

25          Q.    Intentionally on both of them.    But

1    then you may be in a situation -- also we talked

2    about lesser included offenses where you could

3    go to murder, aggravated assault, et cetera, et

4    cetera.   But you also could be put in a

5    situation where there is no lesser included.

6    That is our hypothet.   There is no lesser

7    included, there is going to be either not guilty

8    of capital murder or not guilty, the guy goes

9    home.   It may be a situation where you think he

10   intentionally took one life, he acted in

11   self-defense on the other.   If you followed your

12   oath in that situation, you would have to find

13   him not guilty of capital murder and let him

14   go.   Some jurors' strong beliefs are such I

15   couldn't do that in that situation.   He killed

16   one body intentionally, I know he did, it's no

17   doubt in my mind he did it, he needs to be

18   punished, and I ain't going to let him go.   Do

19   you think you could follow your oath in that

20   ridiculous situation?

21        A.    Yes.

22        Q.    Okay.

23        A.    We touched on that yesterday.   Yes.

24   It may be unpalatable, but, yes.

25        Q.    What is mitigation to you?   What are

864

1   certain mitigating factors that you would take

2   into consideration?

3        A.   Oh, goodness.

4        Q.   What would be mitigating at the time

5   of punishment?  You kind of ruled out bad

6   childhood in a way.

7        A.   Oh, no, I mean, there could be a

8   combination of things.

9        MS. DAVIES:  Your Honor, I have to

10  object to trying to commit Ms. Jones as to

11  exactly what she would consider as mitigating.

12  As long as she would consider any mitigating

13  evidence.

14        THE COURT:  I understand.  I don't

15  understand the question to be trying to commit

16  her.  And certainly the statutes neither

17  identify nor limit the aspects of a defendant's

18  character or record or circumstances that are

19  mitigating.  So if you just want to talk about

20  in general terms.

21        A.   I honestly don't know.  That is

22  difficult.

23        Q.   Let me preface this and then I will

24  pin you down.  As our statutes didn't tell you

25  and the court will not tell you what is

865

1    mitigating.

2         A.    It's going to be different for each

3    juror, I am sure.

4         Q.    Right.  So, can you think of anything

5    that is mitigating to you or what is aggravating

6    to you?  I mean, you've heard Our Honor throw

7    out certain terms that he suggested were

8    mitigating.   Are any of those you would

9    disagree with him?

10        A.    No.   Maybe a combination of a few of

11   them that I would consider mitigating to be able

12   to say yes to that.

13        Q.    Do you think you would have to have

14   more than one?

15        A.    No.

16        Q.    Because the way the statute was

17   written it says circumstance or circumstances.

18        A.    No, I don't.   It depends on the

19   circumstances.   I am not saying I would have to

20   have more than one, okay?  There may be one that

21   I would say yes to.

22        Q.    But as far as being able to identify

23   to me what is aggravating and what is mitigating

24   that would be somewhat difficult for you to do?

25        A.    Of course it's difficult.   You know,

                                                    866

1 the childhood, parents that, you know, taught

2 violence in the home.  I don't know.  I would

3 have to draw that line for myself when I saw the

4 circumstances.

5   Q. So basically that would be something

6 that you would have to draw from within

7 yourself?

8   A. Yes.

9   Q. As to what is mitigating without any

10 help from the court.  Do you think that is fair

11 to you at all, to have to come up?

12   A. No, not without help from the court.

13 The evidence has to be presented.  What do you

14 mean?

15   Q. I am saying the court won't tell you

16 what is mitigating and what is aggravating.  Do

17 you think that is fair?  Do you think you should

18 be left to unbridled discretion to what is

19 mitigating and what is aggravating?

20   A. It may not be fair, but if that is the

21 way we have to do it, it's the way we have to do

22 it.

23   Q. As you look at question number two

24 right now, would you expect me to convince you

25 that there are mitigating factors, or would you

867

1    expect the State to convince you?

2        A.   Well, I would expect you to, to

3    provide information that would have me answer

4    that yes.  I mean, I would expect that.

5        Q.   As the prosecutor has told you, there

6    may be certain factors that are naturally

7    surrounding the offense itself that she may

8    present you that could possibly be mitigating,

9    such as certain people believe kind in the area

10   that we talked about premeditation, for example,

11   as far as mitigation.   They can see a

12   difference a person who sits around and thinks

13   about it a long time, goes through great pains

14   of disguise or weaponry or whatever versus

15   someone who does something out of anger or out

16   of uncontrollable impulse.   Someone who didn't

17   show up at the scene with a weapon versus

18   someone who did show up with a weapon.  Those

19   little factors could play a part that would

20   naturally come out in the offense itself.  More

21   likely than not, as the prosecutor accurately

22   told you, she is not going to go out and talk to

23   the parents and find out what happened to him in

24   the past.  They normally don't do that.  That

25   is, basically, my job.   But I need to know are

1   you placing a burden on me to convince you that

2   these questions should be answered yes or expect

3   me to do that as you sit here now?

4        A.   No.   As I said, I expect you to

5   provide information.   I feel that I would have

6   to be real convinced again beyond the reasonable

7   doubt for both of these, you know, for that to

8   be yes or for that to be no.   What each of us

9   finds as mitigating is, again, going to be

10  different for each juror.   And since I was

11  unable to give you a perfect example of what I

12  would consider mitigating--

13       Q.   Well, in all fairness, I don't know if

14  there is a perfect example.   Maybe I am being

15  unfair to you.   I don't mean to.   Would the

16  fact that you are having to pass judgment on

17  somebody where there is two deceased bodies

18  affect you as you approach question number two?

19  Would that make you more inclined to answer it

20  yes because there is in fact two dead bodies?

21       A.   You mean to answer it no?

22       Q.   Pardon me.   Question number one.

23       A.   No.

24       Q.   What is your initial reaction about

25  hearing that there are two deceased individuals?

869

1      A.   A murder is a murder, whether it's one

2   or more.  Of course it's worse.  There are two

3   people that are gone.  But it would not preclude

4   me to automatically say yes to issue number one.

5      Q.   I noticed you subscribe to a couple of

6   cooking magazines.

7      A.   Yes, several.

8      Q.   I see "Food and Wine".   I hope it's

9   the latter that you are interested in, the wine

10  and not the food.

11     A.   I like to cook.

12     Q.   You are a cook?

13     A.   Yes.

14     Q.   You have always been a Republican?

15     A.   I guess so.   I am more middle of the

16  road, but I would probably tend toward.

17     Q.   Your boating activity, tell me

18  something about that.

19     A.   I have several friends.

20     Q.   Water skiing?

21     A.   Sailing and boating.  That is why I

22  live down there and drive this awful drive every

23  day.

24     Q.   I have one last question.  On a scale

25  of zero to ten, zero being cases after someone

1    is found guilty of capital murder you would in

2    very few cases vote for the death penalty, ten

3    being the top end of the scale, that more likely

4    than not you would vote or answer these

5    questions in a way that death would be imposed.

6    If we could put you on a scale of zero to ten,

7    where do you think you would fall?  Your own

8    personal beliefs.  Forget about the law for a

9    minute.   Just your own personal beliefs about

10   the death penalty.

11           MS. DAVIES:  Your Honor, I object to

12   asking Ms. Jones how often she's going to vote

13   for the death penalty.  She's being asked to

14   commit how often she's going to give the death

15   penalty without knowing what the facts are.

16           THE COURT:  Sustained.   You may

17   rephrase the question if you would like.

18   BY MR. STAFFORD:

19       Q.   From a zero to ten on your strong

20   attitudes for the death penalty, let's forget

21   about the special issues.

22       A.   I can answer it.   I would have to

23   probably say I would probably be a five.   I

24   mean, I hate to be trite, but that is probably

25   where I am.

871

1        Q.   I have to be real honest with you, the

2    problem I am having with you is that every

3    question or response is that I have to wait and

4    hear the evidence.    I still don't know anything

5    about you other than I know you are going to

6    wait and hear the evidence.    I am trying to get

7    into my mind -- I guess I am like a frustrated

8    psychiatrist trying to figure out how you are

9    going to weigh something and what you are going

10   to do because of what you believe, because on

11   paper it appears that you are a strong believer

12   in capital punishment, so I don't know whether

13   in most cases you favor the death penalty, in

14   most cases you favor life.

15       A.   I don't think so.

16       Q.   I don't know how to gauge you.    See

17   what I am saying?

18       A.   I see what you are saying.    The only

19   answer I can give again is just because someone

20   has murdered one person or five people does not

21   mean that they need to die.    I would at certain

22   times again be able to say yes and no; but I can

23   see myself as well, whether someone has killed

24   one person or five persons, find that there are

25   circumstances that the person should not die.    I

1    don't know how else to answer that.

2         Q.    Do you have any close friends who have

3    adopted children?

4         A.    Adopted children?  My cousin adopted

5    her children.

6         Q.    How old are they now, the children?

7         A.    About my children's age.   I haven't

8    seen them in years.

9         Q.    You don't know whether they are

10   adjusting or having problems with them?

11        A.    No.   I think they have pretty well

12   adjusted.

13        Q.    How is Clear Lake High School for the

14   kids?

15        A.    Excellent.

16             MR. STAFFORD:  I have no other

17   questions.

18             THE COURT:  If you would, just stand

19   outside this door for a few minutes.   We will

20   be back with you.

21             (The prospective juror leaves the

22   courtroom).

23             MR. STAFFORD:  I challenge for cause

24   basically on the ground of the motion which I

25   have on file attacking the constitutionality of

                                              873

the statute.  This prospective juror was unable
to articulate to aid me to decide whether to
exercise a peremptory challenge.  Because of the
defect in the statute, this juror can not think
of any mitigating factors other than she has no
disagreement with the one you had.  She
expressly said, in essence, what I am saying
that jurors are going to be there unbridled to
use their discretion in any way of what they
want to determine mitigating factors.  And as
our great court here just last week stated, the
Texas Court of Criminal Appeals stated that if
discretion in the assessment of punishment under
the statutes be shown to be reasonable to
control rather than conspicuous and
discriminatory then the test of Furman is met.
I think from what this prospective juror has
said on the record everything is going to be
left up to her to determine what is reasonable,
and nothing is controlled and nothing will guide
the prospective jurors as to what is mitigating
and what is aggravating.  And based upon that, I
would challenge this prospective juror for cause
because of her inability to aid me and to
exercise my sixth amendment right to effective

874

1   assistance of counsel to make effective

2   peremptory challenges whether or not to accept

3   her or to reject her.

4            THE COURT:  I don't know what to say

5   other than our statutes still do not identify or

6   limit the aspects of the defendant's character

7   and record and the circumstances of the crime

8   that are mitigating, and the law does not impose

9   a formula how much weight a mitigating

10  circumstance deserves and that each juror is the

11  sole judge of whether mitigating circumstances

12  exist and if they do exist how much they

13  deserve.  Your challenge is denied.

14            MR. STAFFORD:  I would like to add to

15  that motion also, she would expect me to

16  convince her that there was sufficient

17  mitigating evidence.  Based upon that

18  combination, judge, is my challenge.

19            THE COURT:  What says the State as to

20  prospective juror number seven on panel two, Ms.

21  Jones?

22            MS. DAVIES:  You are asking me?

23            THE COURT:  Do you accept her?

24            MS. DAVIES:  I accept Ms. Jones.

25            MR. STAFFORD:  Based upon my

875

1 challenge, I exercise a strike, Your Honor.

2 Without waiving my right to my challenge.

3    THE COURT:  Defense strike number one

4 is Ms. Jones, prospective juror number seven on

5 panel two.

6    MR. STAFFORD:  Because the system or

7 statute will not assure the sentence of death

8 will not be wantonly over-imposed.

9    THE COURT:  Is there your Furman

10 objection?

11    MR. STAFFORD:  Therefore, it violates

12 the constitution.

13    MS. DAVIES:  Untimely objection.

14      NEAL PRIDDY,

15 called as a prospective juror, was examined as

16 follows:

17    EXAMINATION BY THE COURT.

18   Q. This is prospective juror number nine

19 on panel number two, Mr. Neal Priddy.

20    Mr. Priddy, I am going to go through

21 this questionnaire for a minute or two.

22   A. Okay.

23   Q. Your work address is in Corpus?

24   A. We also have a yard here.

25   Q. So you live here?

1      A.   I am leased on to a company that is
2  out of Corpus, yes, sir.
3      Q.   About fifteen years ago, you did serve
4  on a jury here in Harris County?
5      A.   Fifteen or a little bit longer.  I
6  served for a couple of days.
7      Q.   That was here in Houston?
8      A.   Yes, sir.  It was a correctional
9  facility incident.  It happened in a
10 correctional facility.
11     Q.   Pages eight and nine of this long form
12 questionnaire list statements and either have
13 you check the statement which best summarizes
14 your general views about capital punishment and
15 the death penalty or asks you to either agree or
16 disagree with the statement, and in summary it
17 appears you wish capital punishment weren't
18 necessary but believe it is necessary for some
19 offenses; is that correct?
20     A.   That is correct.
21     Q.   At any rate, any decision on whether
22 to assess the death penalty would depend on the
23 facts and circumstances of the individual case?
24     A.   That is correct.
25     Q.   You did agree, when you filled this

1    out on Monday morning, that capital punishment

2    is justified only for premeditated murder.  Of

3    course, you filled this out long before we ever

4    talked to you and gave you some guidelines as to

5    the general principles that were going to be

6    applied in this case.  You understand now that

7    premeditation doesn't have anything to do with

8    this?

9         A.   Yes.

10        Q.   Having served on a jury in the past,

11   some of the information we spoke of on Monday

12   you had heard before, but I am going to go back

13   through a few things.  You are familiar with the

14   presumption of innocence.  A defendant is

15   presumed innocent in a criminal case.  Do you

16   agree with that presumption?

17        A.   Yes, sir.

18        Q.   The burden of proof is always on the

19   State, and their burden is to prove a

20   defendant's guilt beyond a reasonable doubt.

21        A.   Correct.

22        Q.   Do you agree with that?

23        A.   Yes.

24        Q.   If a defendant should not take the

25   stand in his own behalf, you cannot use that as

878

1    any evidence whatsoever.

2         A.    That's right.

3         Q.    And the indictment in a criminal case

4    is no evidence of guilt either.  Do you agree?

5         A.    Yes.

6         Q.    Before you came in here on Monday, did

7    you realize the distinction between murder and

8    capital murder?

9         A.    I knew what capital murder was.

10        Q.    In terms of what the penalty was?

11        A.    Right.

12        Q.    You understand that when somebody

13   commits the offense of murder, a first degree

14   felony, we are talking about someone who

15   intentionally or knowingly causes the death of

16   another individual.   When we are talking about

17   capital murder we are talking about someone

18   intentionally taking the life plus there is some

19   other aggravating factor.  It's murder plus to

20   make it a capital murder offense.   I discussed

21   with you briefly the six different statutory

22   schemes in Texas under which we have the capital

23   murder offense.  One, of course, is where

24   someone murders a peace officer or fireman

25   acting in the lawful discharge of an official

1    duty.  One is where someone commits a murder for
2    hire.   One is where somebody commits murder
3    while escaping or attempting to escape from a
4    penal institution.  One is where somebody
5    murders an employee of a penal institution while
6    incarcerated.  The most common kind of capital
7    murder offense we see is where someone is in the
8    course of committing another felony offense and
9    commits a murder such as kidnapping, burglary,
10   robbery, aggravated sexual assault, arson.  The
11   examples I gave this panel of a woman would be
12   kidnapped from a parking lot, raped, murdered.
13   That is a capital murder offense.   If a
14   convenient store is robbed and the robber, the
15   gunman, shoots and kills the clerk in the course
16   of committing robbery, that is a capital murder
17   situation.  The category, however, that we are
18   talking about in this case is where somebody is
19   alleged to have committed murder of more than
20   one person in the same criminal transaction.  It
21   could be a number of people.  It could be as few
22   as two people.  Having read the indictment to
23   you yesterday, the allegation in this case is
24   that two people were killed in the same criminal
25   transaction.  Two people were murdered in the

880

1    same criminal transaction.  I had spoken to you
2    briefly about the possibility that you might
3    receive a charge on what we refer to as lesser
4    included offenses.  If raised by the evidence, I
5    would perhaps give you a choice of different
6    kinds of offenses that a defendant might have
7    committed.  If you cannot reach an agreement on
8    the capital murder offense, for example, you
9    might next consider the offense committed was
10   one of those lessers.  We know that lesser
11   included offenses of capital murder might
12   include everything from first degree felony
13   murder to voluntary manslaughter to involuntary
14   manslaughter, negligent homicide, stair-stepping
15   down the scale of felonies and misdemeanors.   I
16   don't know in advance of trial exactly what kind
17   of evidence you are going to hear.  If a jury
18   finds a defendant guilty of the offense of
19   capital murder, it's mandatory that he either
20   receive a death penalty sentence or life
21   sentence.   Did you understand that, sir?
22        A.   Yes, sir.
23        Q.   Did you also understand that the jury
24   does not go back and vote life or death; they
25   answer certain questions or what we refer to as

                                             881

1    special issues, and that determines what penalty

2    I am going to assess?

3        A.   Right.

4        Q.   We insulate the jury, and in some

5    respects we insulate the judge by having the

6    jury answer those questions.  The jury getting

7    to know full well what result is going to occur

8    if they answer those questions a certain way.

9             I had talked to you about the two

10   stages of trial.  I don't recall in the other

11   case in which you sat did you decide punishment

12   in that case also?

13       A.   No, there wasn't enough evidence that

14   come up against him.  It happened inside a

15   correction facility, the people that was already

16   in there, and it was a sex act, but they didn't

17   have enough evidence to charge the man anything

18   extra.

19       Q.   Did you have other inmates testify?

20       A.   They did.

21       Q.   So you were able to judge the

22   credibility of the other witnesses who were

23   called to testify?

24       A.   Right.  And they didn't -- they more

25   or less what I call ride the middle of the

882

1    road.   It didn't go.

2         Q.    They didn't prove to your satisfaction

3    beyond a reasonable doubt that the defendant

4    committed the offense.

5         A.    We all twelve agreed that it wasn't

6    enough evidence.

7         Q.    So you have been through that process

8    before.   What you haven't seen occur is the

9    second stage of trial.   If a jury finds a

10   defendant guilty of an offense, there is a

11   second stage in which additional testimony may

12   be presented.   Neither side has to present any

13   witnesses or present any evidence, but they may,

14   they have the opportunity to present additional

15   evidence.   That may be the stage of trial where

16   you would get evidence of a defendant's

17   background or his reputation or other bad acts

18   or previous convictions of a defendant, that

19   kind of thing.   And generally when jurors are

20   deciding what the appropriate penalty is they

21   need that kind of information even though they

22   have already found somebody guilty of an

23   offense.

24             Number one of these two issues if you

25   find somebody guilty of capital murder and after

883

1    that second stage of trial, the first question
2    asks:  Do you find from the evidence beyond a
3    reasonable doubt that there is a probability
4    that the defendant would commit criminal acts of
5    violence that would constitute a continuing
6    threat to society.  That is asking the jury
7    basically to make a determination of a
8    defendant's future dangerousness.  Focusing on
9    that word probability, which in common usage
10   would mean more likely to occur than not.  Is
11   it more likely to occur than not, based on what
12   you have heard so far, that the defendant would
13   commit criminal acts of violence that would
14   constitute a continuing threat to society.  I
15   would give the jury an additional instruction
16   that they are to consider all evidence admitted
17   at the guilt or innocence stage and at the
18   punishment stage including evidence of the
19   defendant's background or character and the
20   circumstances of the offense that militate for
21   or mitigate against the imposition of the death
22   penalty.  And we ask the jury to answer that
23   question yes or no.  It takes all twelve jurors
24   agreeing before they can return a yes answer.
25   It takes at least ten jurors agreeing to return

884

1    a no answer to that question.  If the jury

2    answers no, saying there is no probability, that

3    is the end of it, I assess life imprisonment.

4    If the jury answers yes that there is a

5    probability that defendant would commit criminal

6    acts of violence constituting a continuing

7    threat to society, then the jury moves onto

8    issue number two.  Both of these talk about

9    mitigating evidence.  And number two asks

10   whether, taking into consideration all the

11   evidence, including the circumstances of the

12   offense, the defendant's character and

13   background and the personal moral culpability of

14   the defendant, there is sufficient mitigating

15   circumstance or circumstances to warrant a

16   sentence of life imprisonment rather than a

17   death sentence be imposed.  I would instruct the

18   jurors that they are to consider mitigating

19   evidence to be evidence that a juror might

20   regard as reducing a defendant's moral

21   blameworthiness.  Now, there you take into

22   consideration everything you had heard, once

23   again, even though you had already found there

24   was a probability that the defendant would

25   commit criminal acts of violence that would

885

1    constitute a continuing threat to society, based
2    on everything you have heard and looking at
3    those mitigating circumstances, we are asking
4    whether or not you think life imprisonment
5    should be the punishment rather than a death
6    sentence.  It takes all twelve jurors agreeing
7    to return a no answer.  It takes at least ten
8    agreeing for a yes answer to be returned.  So if
9    the jury had returned a yes to number one and
10   yes to number two, I assess life imprisonment.
11   Only if the jury answers number one yes and
12   number two no do I assess the death penalty.
13   You get to know that in advance.  A yes to one
14   and no to number two is the only way in which a
15   death penalty sentence is assessed by me.  When
16   we are talking about mitigating evidence, we are
17   talking about any evidence that is relevant to
18   the defendant's character or record or the
19   circumstances of the offense which might serve
20   as a basis for a sentence less than death.  We
21   know that mitigating evidence can be certain
22   kinds of things.  We know that mental
23   retardation and mental illness can be mitigating
24   evidence.  Other evidence a jury might consider
25   would include such things as child abuse, a

1   defendant's good behavior in prison or in jail,

2   an exceptionally unhappy or unstable childhood,

3   childhood drug abuse, economic deprivation, a

4   defendant's youth, his age, voluntary

5   intoxication, drug dependency, illiteracy,

6   opinion testimony of lay witnesses or

7   psychiatric opinion testimony that a defendant

8   would not be a danger in the future.  Those are

9   all things that might be included.  You might

10   have a laundry list that is ten miles long of

11   what might be mitigating evidence in the case.

12   Our statutes do not set out, do not identify or

13   limit the aspects of the defendant's character

14   and record or the circumstancess of the crime

15   that are mitigating.  And, in addition, the law

16   does not impose a formula for determining how

17   much weight a mitigating circumstance deserves.

18   Each juror judges that.  The jury is the sole

19   judge of whether mitigating circumstances exist

20   and if they do exist how much weight they

21   deserve.  It's for the jury to decide.  And I

22   can't even begin to tell you how many different

23   things might be considered by a jury.  What is

24   important, among other things, is you may get

25   these from a number of different sources.  You

1    might determine certain things are mitigating

2    which come in the State's case in chief.  You

3    might find that the defense would present

4    certain aspects of mitigation.  You might

5    anticipate such things, but you cannot require

6    either side to present that kind of evidence.

7    You will note that number two doesn't place a

8    burden.   There is no burden on the defense or

9    on the State to produce mitigating evidence,

10   mitigating circumstances.  There is no burden

11   placed on the defense or State as to proof

12   beyond a reasonable doubt or anything like

13   that.  Number one does have that proof beyond a

14   reasonable doubt.   And when you're answering

15   the question of guilt, that is also proof beyond

16   a reasonable doubt.  Number two, it seems to me,

17   is basically asking you, once you have found a

18   defendant guilty of capital murder and once you

19   have found that there is a probability that he

20   is going to commit criminal acts of violence

21   that would constitute a continuing threat to

22   society, is there still something there in all

23   that you have heard that says to you that life

24   imprisonment sentence would be warranted.

25   Gives the jury another way to let me know that

888

1    life rather than death is the appropriate

2    punishment.

3          A.    Uh-huh.

4          Q.    Do you have any questions about those?

5          A.    No, sir.  I believe I understand them.

6          Q.    Do you see how the answer to number

7    one can be yes under some circumstances and no

8    under some circumstances depending on what you

9    had before you even though you found someone

10   guilty of the offense of capital murder?

11         A.    Yes, sir.

12         Q.    And if you had found somebody guilty

13   of capital murder and answered number one yes,

14   do you also see that number two could sometimes

15   be yes and sometimes could be no?

16         A.    Yes, sir.

17         Q.    I am basically asking you to agree

18   that the answers aren't automatically yes or no.

19         A.    Correct.

20         Q.    We want to make sure you are not

21   predisposed to always answer a certain way so as

22   to insure that a death penalty results or to

23   assure that a life sentence results.  Do you

24   understand?

25         A.    Yes.

                                                889

1        Q.   Is there anything about your views

2    regarding capital punishment and the death

3    penalty which would prevent or substantially

4    impair the performance of your duties as a juror

5    in accordance with the instructions I would give

6    you and your oath as a juror?

7        A.   No, sir.   I would try to do it the

8    best of my ability, to take in all the

9    considerations.

10                THE COURT:   Ms. Davies.

11

12                EXAMINATION BY THE STATE

13    BY MS. DAVIES:

14        Q.   Hello, Mr. Priddy.   We talked a lot on

15    Monday when you were in here, and I didn't

16    really get a chance to hear much from you about

17    how you feel about things, so that is the main

18    thing we are interested in today is not trying

19    to get you to -- we don't want you to answer

20    just the way you think we want you to.

21        A.   Correct.

22        Q.   But to tell us how you feel and what

23    you believe.   I am interested to know what your

24    initial gut reaction was when you realized that

25    this jury service was going to involve a case

1     that might have the death penalty?

2          A.    Well, when they first give us those

3     forms and we started filling it out and it asked

4     about capital punishment and stuff, I realized

5     at that point that we must be involved in

6     something, you know, besides just regular jury

7     duty.

8          Q.    The questionnaire was pretty much a

9     give away; wasn't it?

10         A.    Yes.

11         Q.    What was your feeling?

12         A.    Well, I know when you take on this

13    type of responsibility that, you know, it's a

14    great responsibility for us to hear all the

15    evidence and everything because it doesn't go

16    any higher, you know, capital punishment is the

17    highest.  And we have to take this very

18    conscientiously.

19         Q.    Did you give it some thought after you

20    left here yesterday?

21         A.    Oh, I am sure, yes, definitely, it

22    weighed heavy on your mind because of capital

23    punishment, the importance of it.

24         Q.    You know, in a way it may not seem

25    quite fair.  We give you the questionnaire to

1    fill out before you have heard anything about

2    the case.  The reason is we want to get those

3    first reactions.

4         A.    Correct.

5         Q.    Sometimes I think what we ought to do

6    is let you fill it out over there, then, when

7    you come back today fill it out again and see,

8    after you have had some twenty-four hours to

9    give it some thought, if you would answer

10    anything any differently.

11         A.    Differently, yeah.

12         Q.    As you were thinking about it, since

13    you first came down here, can you share with us

14    a little bit what your thoughts have been about

15    that?  Maybe whether you think you really

16    believe as strongly in the death penalty as you

17    first indicated you do?

18         A.    I don't believe that I have changed

19    any opinion the way that I feel about the death

20    penalty.  It's just like any time that you talk

21    about the death penalty, anything, the

22    importance of it.  But as far as changing from

23    yesterday from my views, you know, when I filled

24    out the questionnaire, I don't have any kind of

25    change in my answers.

1       Q.   Do you believe the death penalty is

2   necessary in some cases?

3       A.   I do believe it's necessary.  I wish

4   it wasn't.  I believe I stated that in part of

5   mine, but I believe it is necessary.

6       Q.   Have you always held that view, or

7   have you changed over time?

8       A.   I am sure I have changed over time.

9   Probably when I was younger I questioned it

10   quite a bit.

11       Q.   When you say you questioned it quite a

12   bit, do you remember--

13       A.   I mean, I just, when I was younger, I

14   really thought it was probably a cruel way, you

15   know.  I know if a person is taken to get the

16   capital punishment they have done terrible

17   because they have taken a person's life or

18   whatever it is, but if our system didn't take

19   care of this I believe the world would get out

20   of balance.  In other words, if they was no

21   capital punishment for anyone, then I think we

22   or society would  -- I don't know the word I

23   want to use -- it would run wild wouldn't

24   necessarily be the proper word to use.  It would

25   get out of hand I think, our society.

1      Q.   The judge has already gone over the

2   kinds of offenses that are included as capital

3   murder offenses.   If you were going to write the

4   law, if you were going to make a list of those

5   cases that you think the death penalty should be

6   available for, would you include murder during

7   the course of a robbery or murder during the

8   course of a burglary?

9      A.   Another thing -- well, another thing

10   that I would add to like capital murder is also

11   like infants or children or anything of that

12   nature that they take their lives, a child

13   doesn't have any way to protect their self or

14   anything, and I think this is a capital offense.

15      Q.   A lot of people would agree with you

16   on that.   What about some of the ones like

17   murder during the course of a robbery, murder

18   during the course of a burglary, would you also

19   include that?

20      A.   Well, I think it depends upon how

21   cruel or how it was done, you know.   I am sure

22   a lot of times when a robbery takes place there

23   is no intent to kill, but then it happens.   And

24   I am wondering if, say, for instance, if they

25   kidnap say the person they was robbing and they

1  tortured this person to a great extent or how

2  they mutilated that person or something, I

3  believe it would be a capital murder.  I do.

4       Q.   What about if they just go in to rob a

5  store?  Typical thing you read about in the

6  newspaper, the convenient store robbery.

7       A.   Yes.

8       Q.   They go in to rob and blow the clerk

9  away.  Is that the kind of offense that you

10  think should be -- I am not saying would that

11  person always get the death penalty, but is that

12  the kind of case that in some instances should?

13       A.   I think it would.   I really do.   If

14  they went in there, I am sure it depends on the

15  individual person, too, you know, and how they

16  acted toward it or what provoked them or

17  something.

18       Q.   Well, let's talk about that a little

19  bit because, any time you are talking about any

20  kind of murder, self-defense is something that

21  might come up.  Do you feel like people have the

22  right to defend themselves?

23       A.   Definitely.

24       Q.   The law does include the right to

25  self-defense.  A person has the right to defend

895

1    themselves.   They have the right to defend

2    someone else against the threat.   For instance,

3    we were talking about a convenient store robbery

4    that resulted in a murder.   You know, if

5    somebody goes into a convenient store to rob

6    somebody, goes into the clerk, maybe has a gun,

7    says give me your money.   He doesn't intend to

8    kill anybody when he walked in, but he has a gun

9    to show the clerk.   Says give me your money.

10   The clerk pulls a gun from under the counter and

11   says:   No, drop your gun.   And then the robber

12   shoots the clerk, then comes into court and

13   says:   Well, I had to defend myself, the clerk

14   pulled a gun.

15          A.    Yeah, but he went in there with a

16   gun.   The intent to rob, he may not have gone in

17   there with the intent to kill, but the

18   circumstances come up that he did kill.

19          Q.    Okay.   Well, the point is the right of

20   self-defense would not be the robber's; it would

21   be the clerk's.

22          A.    That's right.

23          Q.    Okay.

24          A.    Has to defend himself.

25          Q.    So you feel people do have the right

                                                    896

1    to defend themselves in their homes or their

2    stores or wherever?

3         A.    Definitely, I do.

4         Q.    You mentioned something about intent.

5    You said you he didn't go in there with the

6    intent to kill.  I think we touched on this

7    yesterday.  The law does not say that it has to

8    be premeditated murder but just an intentional

9    murder.

10         A.    Uh-huh.

11         Q.    I suggest that that intent can be

12    formed very quickly.  You can make the decision

13    that you are going to do something in a split

14    second, even if it's a decision to kill.  Do you

15    disagree with that or agree?

16         A.    No, I agree with that.  He may have

17    gone in there with the intention of just robbing

18    but he went in there no matter what it took

19    maybe he was going to get the money.

20         Q.    Uh-huh.  Does a murder seem less

21    serious to you if it's intentional but kind of a

22    spur of the moment decision as opposed to one

23    that was planned ahead?

24         A.    Right, because premeditated I think

25    carries a greater weight.

897

1      Q.   Okay.  You would count the spur of the

2    moment intentional killing as a little less

3    serious somehow?

4      A.   Yes, unless it got completely, you

5    know, out of hand or.

6      Q.   I am not sure what you mean when you

7    say out of hand?

8      A.   Say if the person was going to defend

9    hisself and this other guy, the one that come in

10   to rob, say he started to shooting, just, you

11   know, it may be more than one person in the

12   store.  He is determined he is going to get the

13   money no matter what it takes.  And I think you

14   have to consider this evidence towards whether

15   it was capital murder or not.

16      Q.   Whether it was more brutal?

17      A.   Right.  And then another case in that,

18   say, for instance, some stores, you know, you

19   have a detective and things, and there has been

20   times where a person will go in and they will

21   shoot the detective and never say anything to

22   him that it's going to be a holdup.  They see

23   that it's something going to stand between them

24   and the money.  And they will shoot the person

25   that is a guard in the store or whatever.  This

1   has happened a number of times.  I think this

2   warrants capital murder.

3       Q.   The kind of person who is just bent on

4   violence even if it's not necessary?

5       A.   Right.   Then, too, then when you get

6   down into the case on that, it may be the guy

7   may be mentally off or something.  But, I mean,

8   I am talking about if the person is not, you

9   know, we don't have other evidence to bring up

10  against this.   I am talking about a person that

11  should be of sound mind that does this.

12      Q.   What about the situation where two

13  people are killed in the course of the same

14  criminal transaction, is that the kind of case

15  that you think should be included for the death

16  penalty in some instances?

17      A.   Yes, in some instances, yes.

18      Q.   I didn't mean to cut you off.   I

19  thought maybe you were starting to say

20  something.

21      A.   No.

22      Q.   I know that you mentioned on your

23  questionnaire that one of the primary objectives

24  of punishment should be rehabilitation.   Do you

25  feel like everybody can be rehabilitated?

1      A.    I don't believe they can, but I think

2    we ought to give it our best effort and try to.

3      Q.    What about, I mean, would it make a

4    difference to you in deciding on the death

5    penalty whether someone had been to the

6    penitentiary before?  In other words, do you

7    have any feelings about whether everybody should

8    get a second chance or third chance or that kind

9    of thing?

10      A.    If someone has been in prison and they

11    was out, I think that you have to weigh this,

12    what kind of murder taking place and everything,

13    you know, what did they do.  Did they try to

14    rehabilite the person who was in prison before

15    they released it, or is it like some of the acts

16    we hear now, it's just a revolving door, a

17    person is put in prison and he is released

18    within just a few months for a crime that he

19    should be in there for a number of years.  I do

20    have a problem with that.

21      Q.    I think we mentioned that on Monday

22    also.  The judge is going to tell you, that even

23    though you may not like what you read and hear

24    about that, he is going to instruct you that you

25    cannot consider parole.

1     A.   Right.

2     Q.   In reaching a verdict.  Do you feel

3 like you would be able to follow that

4 instruction?

5     A.   Yes, I do.  I am sure that like when

6 a case comes up you have to consider the case

7 that is in front of you at the time.  Where the

8 other evidence will come in is where the judge

9 is giving the sentence to the person that

10 committed this.  If we find the person guilty,

11 then this other will come into the act, you

12 know, probably how severe the punishment will

13 be.

14     Q.   You have been in your present business

15 for how long?

16     A.   If you want to back up a little bit.

17 I worked for Weingarten's for twenty-nine and a

18 half years.  If you noticed on the application,

19 I show two months for a company.  And then I

20 worked Weingarten's until they went out of

21 business in '84.  I was accountant with them.

22 Prior to that, I worked in the stores.  Then in

23 '85, I went in business, you can really say I

24 went in business for myself.  I am leased to a

25 company.  And that company went down the tubes

901

1    this past, well, this past March, and I joined

2    this other company because our salesmen moved

3    over to this company I am with now.  I have only

4    been leased to them for two months.

5         Q.   Well--

6         A.   But I have never quit a job.  Jobs

7    have run out.

8         Q.   I understand.  That is happening to a

9    lot of people these days.

10        A.   Right.  I thought mine was secure at

11   Weingarten's until the holding company put us

12   under.  I only had twenty-nine and a half total

13   years.

14        Q.   So, then, this company that went under

15   a couple of months ago, what were you doing for

16   them?

17        A.   I was same thing that I am doing now

18   because we still have our same salesmen, they

19   just moved over.  It's oilfield related

20   equipment.  I hotshot oilfield equipment.  I've

21   been to thirty-one states, but mostly we run

22   Texas, Louisiana, and Oklahoma, but I have been

23   to thirty-one states, and I have been doing it

24   since '85.

25        Q.   You have been living here in Harris

1      County for a good while?

2          A.   I have lived here since '65 other than

3      two years I lived up at New Caney in Montgomery

4      County.   Which I showed I lived here thirteen

5      years, but I have really lived here other than

6       '65 other than two years in New Caney.

7               MS. DAVIES:   Your Honor, could we have

8      just one moment to address the court?

9               THE COURT:   Could you step out this

10     door right here?

11              THE JUROR:   Sure.

12              (The prospective juror leaves the

13     courtroom).

14              MS. DAVIES:   It is my understanding we

15     have an agreement.

16              THE COURT:   It's my understanding that

17     by agreement of all parties prospective juror

18     number nine on panel two, Mr. Neal Priddy, is

19     being excused.

20              Is this your agreement, Ms. Davies?

21              MS. DAVIES:   It is.

22              THE COURT:   Yours, Mr. Stafford?

23              MR. STAFFORD:   Yes, sir.

24              THE COURT:   Yours, Mr. Rhoades?

25              THE DEFENDANT:   Yes.

1                    JAMES PATRICK GAFFNEY,

2    called as a prospective juror, was examined as

3    follows:

4                    EXAMINATION BY THE COURT.

5         Q.   This is prospective juror number nine

6    on panel number two.

7                    MS. DAVIES:   I believe it's number

8    ten.

9                    THE COURT:   I'm sorry.   Have a seat.

10   Prospective juror number ten on panel number

11   two, Mr. James P. Gaffney.

12        A.   Right.

13        Q.   Broker sales in what?

14        A.   Insurance.

15        Q.   Okay.   Where did you go to college?

16        A.   University of North Carolina, Chapel

17   Hill, North Carolina.

18        Q.   Your daughter who is a therapist, is

19   she here in Houston?

20        A.   No, San Antonio.

21        Q.   What kind of therapist?

22        A.   Cancer treatment.   She works between

23   the terminally ill cancer people and the

24   families.

25        Q.   What does your son do at Chevron?

                                                    904

1      A.   He works in the accounts payable

2  department.

3      Q.   Two years ago you were on a criminal

4  jury.  I don't remember.  Did you tell me what

5  court you were in?  Do you remember what court?

6      A.   It was the judge right around the

7  corner here on the seventh floor.  McSpadden.

8      Q.   You did reach a verdict and you did

9  participate in the punishment phase?

10      A.   That is correct.

11      MR. STAFFORD:  He is the prospective

12  juror that we visited with we asked him not to

13  divulge what problems he was having back in the

14  jury room.  Could you explore that with him

15  where something occurred.

16      THE COURT:  I don't remember you being

17  that person because on your questionnaire on

18  page five asked whether there was anything in

19  your prior jury experience that either upset or

20  agitated you.  You answered no.

21      A.   Well, agitation or upset wouldn't be

22  the word.

23      Q.   Tell me what you were.

24      A.   The judge called us back into his

25  chambers and thanked us.

1      Q.    Somebody gave you some additional

2  information you wish you had known?

3      A.    Well, it wasn't so much I wish I had

4  known.    It was just the times that we have here

5  in Houston, we're constantly reading in the

6  paper about the overcrowding of the jails and

7  the length of time that is being served and that

8  type of thing.  And we were curious.   We wound

9  up with a 77 year sentence is what we got.   How

10  we arrived at that number was mind boggling.

11  One of the questions we had of the judge, when

12  we got back there, he said feel free to ask

13  anything, the case is now over and everything.

14  And I said I am curious what would be the

15  minimum amount of time somebody getting 77 years

16  could serve in this state with all the problems

17  we are having now, with overcrowding jails and

18  everything else, and he said to me:  Well, you

19  know, he says tough question, but good behavior,

20  he could get out in a very short period of time

21  with the situation we have here in the state.   I

22  said, "Like four or five, six years?"  He said

23  that would be possible.  I remember thinking

24  that, you know.

25      Q.    Wait a minute.  I want to catch a

906

1    couple of things here.  The person was tried for
2    aggravated robbery?
3         A.    That is correct.
4         Q.    Was this a holdup with a gun?
5         A.    Yeah, it was a jewelry store.
6         Q.    So there was a deadly weapon involved?
7         A.    Yes.
8         Q.    Was it a fairly recent case, like one
9    that happened within the last year or two of the
10   time that you tried the case?
11        A.    I believe so.  I believe the incident
12   took place probably in less time than a year
13   time.
14        Q.    I'm not saying that judge gave you
15   some incorrect information, but it doesn't sound
16   right from what you have told us.
17        A.    Well, I remember the feeling I had
18   because when the sentencing part came, you are
19   then, of course, made aware of any past
20   experiences that the defendant had.
21        Q.    He had previous felony convictions?
22        A.    A sheet a mile long.
23        Q.    And, so, y'all were assessing
24   punishment between 25 years or 99 years or life?
25        A.    Right.

907

1      Q.    Something doesn't sound exactly right

2    if there was a deadly weapon involved.

3      A.    It has been sometime ago.  I can't

4    quote exactly everything that happened.  I just

5    remember the feeling that I had of:  Gosh, we

6    did an awful lot of work here, it wound up

7    taking a lot longer than I thought.  It was

8    about five days.  I thought when we first went

9    in there it would be a real quick case.  It was

10   eyewitnesses.   They had like five people in the

11   store that ID'd the individual.  It's like:  The

12   person here, yes, that is him, that type of

13   thing.   I remember in the beginning of the

14   trial I thought this is probably going to be,

15   you know, fairly quick because of eyewitnesses.

16   Turned out to be about five days.  A big problem,

17   I wound up in the jury situation, we had, I

18   think we had twelve people, and eleven were for

19   conviction and one was against.  The judge said

20   we are not going to -- we are not going to let

21   you go until you reach a verdict here.

22   Basically we had to keep at it.

23     Q.    You understand the case that we are

24   trying is capital murder offense and a term of

25   years doesn't apply if somebody is convicted of

1    capital murder, it's either life or death?

2         A.    You made that pretty clear yesterday.

3         Q.    If somebody is convicted of a lesser

4    offense, the State doesn't prove the defendant's

5    guilt beyond a reasonable doubt of the offense

6    of capital murder, they might prove something

7    else, at which time there would be a second

8    stage where the jury determines what the

9    appropriate punishment would be.  At that point

10   you would be charged, as I'm sure you were in

11   the case a couple of years ago, that you are not

12   to discuss among yourselves how long the accused

13   would be required to serve any sentence

14   imposed.  We can't ask the jurors to flush from

15   their mind the information they have when they

16   come into the courtroom and hear a case and go

17   back to deliberate a case.  We are also well

18   aware that jurors often have a lot of

19   misinformation.  Which you may or may not have

20   some misinformation.  I am not sure.  At any

21   rate, you would be instructed that you are not

22   to discuss how long somebody would actually have

23   to serve because, as we have already said, those

24   matters come within the exclusive jurisdiction

25   of the board of pardons and paroles and the

909

1   governor and are not to be considered by the

2   jury.

3           The only person you've ever known who

4   has been to prison is the guy that was convicted

5   at your last trial; right?

6       A.    Pretty much that is correct.

7       Q.    Pages eight and nine of the

8   questionnaire either ask you to check the

9   statement which best summarizes your views about

10  capital punishment or the death penalty and ask

11  you to agree or disagree with the statement.

12  There was one little conflict.  On one page you

13  had checked that you were in favor of capital

14  punishment except in a few cases where it may

15  not be appropriate.  And by in favor of capital

16  punishment I am never sure if that question

17  means when somebody is convicted of capital

18  murder offense you are in favor of it either

19  being life or death or if that is referring only

20  to the death penalty because the next page you

21  said, in summary, it looks like you don't

22  necessarily believe in capital punishment, you

23  wish it weren't necessary but you believe it is

24  necessary for certain kinds of offenses.

25      A.    I think that is exactly how I feel.

1      Q.   At any rate, you had checked that your

2  decision on whether or not the death penalty

3  should be assessed would depend on the facts and

4  circumstances of the individual case; correct?

5      A.   Correct.

6      Q.   One of these statements which you

7  answered, which, of course, was answered before

8  you heard us talk about the offense of capital

9  murder, says capital punishment is justified

10  only for premeditated murder.   You understand

11  now that premeditation is not a requirement?

12      A.   Right.

13      Q.   You may hear that intent can be formed

14  in an instant, which it can.

15      A.   Yesterday was a learning process.

16      Q.   Then we are doing it right.   Sometimes

17  we wonder.   Since you were on a jury just a

18  couple of years ago, you are familiar with these

19  general principles:   Presumption of innocence,

20  burden of proof, if a defendant does not take

21  the stand and testify in his own behalf it can't

22  be held against him; the indictment is no

23  evidence of guilt whatsoever.   Do you agree

24  with all that?

25      A.   I do.

911

1          Q.    Before you came in yesterday, did you

2     understand the distinction between murder and

3     capital murder that we were making?

4          A.    No.

5          Q.    When we are talking about murder we

6     are talking about somebody intentionally or

7     knowingly causing the death of another

8     individual.  To elevate that first degree felony

9     offense to capital murder, we are talking about

10    the intentional taking of a life plus some

11    aggravating factor.   We have those six

12    statutory schemes in Texas in which the offense

13    of murder is elevated to capital murder.  One in

14    brief general terms is where somebody murders a

15    peace officer or fireman in the lawful discharge

16    of an official duty.  Murder for hire kind of

17    murder.  Somebody murdering someone while

18    escaping from a penitentiary or attempting to

19    escape.  Someone who murders an employee in the

20    operation of the penal institution while that

21    person is incarcerated in the penal

22    institution.  The most common kind of capital

23    murder situation is where somebody commits a

24    murder in the course of committing or attempting

25    to commit another felony, as kidnapping,

1    burglary, robbery, aggravated sexual assault,
2    arson.   The examples I had given were one where
3    a woman is kidnapped from a parking lot, taken
4    somewhere, raped and murdered, capital murder.
5    Another would be where a person is in the
6    process of committing robbery of a convenient
7    store and murders the clerk, that is capital
8    murder.   Murder plus the aggravating factor.
9    And the final kind of statutory scheme we have
10   is where someone murders more than one person in
11   the same criminal transaction, multi murders.
12   Could be a number of murders; could be as few as
13   two.   Having read the indictment to you
14   yesterday, you know that the allegation in this
15   case is two people having been killed, that
16   somebody murdered two people during the same
17   criminal transaction.
18          Do you agree that those kinds of
19   different schemes of having an intentional
20   killing with the aggravating factor are the
21   kinds of offenses which should warrant
22   punishments of either life or death on
23   conviction?
24        A.   Well, you brought up a term yesterday,
25   mitigating.

913

1    Q.   Okay.

2    A.   I think that would bear weight.

3    Q.   But, I mean, bear with me just a

4 second.  There are just two possible

5 punishments, life or death.

6    A.   I understand.

7    Q.   Would you agree these are the kinds of

8 offenses that should be capital offenses?

9    A.   Yes, sir.

10    Q.   You understand it.  You have been

11 through that process with the two separate

12 stages of trial.  In the case in which you were

13 involved in, once the jury returned a verdict of

14 guilty, was additional evidence presented in

15 addition to the prior convictions of the

16 defendant?

17    A.   No, pretty much the prior

18 convictions.  That I remember being the main

19 thrust of the additional.

20    Q.   Pretty much one sided, from the state

21 in that case?

22    A.   From the state side, yeah, the state

23 presented his record, basically.

24    Q.   You understand neither side is

25 compelled to present anything?  Either side may

914

1    have the opportunity to present additional
2    evidence but they are not compelled to do it.
3    In that second stage, that is where you get to
4    hear about the defendant's reputation, his
5    background and prior criminal record, just as
6    you heard, and you can't speculate on what that
7    might or might not be.  Have to go basically on
8    what you have got in the courtroom.
9         A.    Right.
10        Q.    Only after hearing whatever evidence
11   there is in that regard, after having convicted
12   somebody of capital murder, do we send the jury
13   back to answer these special issues.  They don't
14   vote life or death.   They answer these special
15   issues.  Were you familiar with these special
16   issues?
17        A.    Not really.
18        Q.    That is how we do it with capital
19   murder offense, insulating both the jury and the
20   court.  That first one asks:  Do you find from
21   the evidence beyond a reasonable doubt that
22   there is a probability that the defendant would
23   commit criminal acts of violence that would
24   constitute a continuing threat to society.  That
25   is the estimation of future dangerousness

1  question.  Is it more likely to occur than not
2  that the defendant on trial would commit
3  criminal acts of violence constituting a
4  continuing threat to society.  That is the
5  question which takes a unanimous vote of all
6  twelve to answer it yes.  Takes at least ten
7  people agreeing to answer that question no.  If
8  that question is answered no, that is the end of
9  it.  I assess life in prison.  If that question
10 is answered yes there is indeed a probability
11 that the defendant on trial would commit
12 criminal acts of violence constituting a
13 continuing threat to society, then we ask the
14 jury to proceed to issue number two.  You have
15 talked about the mitigating evidence.
16 Basically let me tell you something else about
17 number one.  When you are determining this
18 probability question, this question of future
19 dangerousness, I would instruct the jury that
20 the jury is to consider all the evidence
21 admitted at the guilt or innocence stage and the
22 punishment stage including evidence of a
23 defendant's background or character or the
24 circumstances of the offense that militates for
25 or mitigates against the imposition of the death

1   penalty.  Consider all that when you're
2   answering that probability question.  Then at
3   issue number two you see where mitigating
4   circumstances are directly referred to in issue
5   number two.   You would only consider number two
6   if you answer number one yes.  Issue number two
7   is asking whether, taking into consideration all
8   the evidence, including the circumstances of the
9   offense, the defendant's character and
10  background, personal moral culpability of the
11  defendant, there is a sufficient mitigating
12  circumstance or circumstances to warrant that a
13  sentence of life imprisonment rather than a
14  death penalty can be imposed.  You get to
15  consider everything you have heard so far in
16  trial.  First stage of trial, second stage of
17  trial.   You get this so-called mitigating
18  evidence, mitigating circumstances that you may
19  have before you.   What are those?  Those are
20  just about anything that is relevant to a jury
21  and serve as some kind of basis for a sentence
22  less than death.  Evidence relative to the
23  defendant's character, his record, the
24  circumstances of the offense, anything which
25  would serve for a life sentence rather than the

917

1    death penalty.   You cannot require either of
2    these parties to present evidence of mitigating
3    circumstances.   You may well get mitigating
4    evidence from either side or both sides.   May
5    come in the State's case; the defense may call
6    certain witnesses to the stand to present what
7    they would request that you take into
8    consideration as mitigating evidence.   You might
9    anticipate certain kinds of things, but you
10   can't require it from either side.   Our statutes
11   do not identify or limit the aspects of the
12   defendant's character and record or the
13   circumstances of the crime that are mitigating.
14   And the law doesn't put any formula out there so
15   you can determine how much weight any particular
16   mitigating circumstance deserves.   The jurors
17   are the sole judges of whether mitigating
18   circumstances exist, and if they do exist how
19   much weight they deserve is up to the jury.   We
20   know that certain things are included as
21   mitigating evidence.   We know that mental
22   retardation, mental illness, for example, can be
23   mitigating circumstances.   There is not an all
24   inclusive list.   Your list may have a million
25   things listed on it, I don't know.   Might

918

1    include such things as child abuse, good
2    behavior while a defendant was in jail, an
3    exceptionally unhappy and unstable childhood.
4    It might include childhood drug abuse or
5    economic deprivation, youth, the age of the
6    defendant.  It might include voluntary
7    intoxication.  It might include drug
8    dependency.   It might include illiteracy,
9    opinion testimony of lay witnesses or
10   psychiatric testimony that a defendant would not
11   be a danger in the future.  All those things
12   could be included as mitigating evidence.  I
13   have no idea if any of those or none of those or
14   some brand new ones might be brought into this
15   case.  But those are the kind of things you
16   might have in front of you.  And number two is
17   asking you specifically, even though you find a
18   defendant guilty of capital murder, and even
19   though based on what you've heard so far you
20   believe there is a probability this defendant
21   would commit criminal acts of violence that
22   would constitute a continuing threat to society,
23   if there are still some things there for you as
24   an individual juror to say I still think life
25   imprisonment rather than the death penalty is

1    the proper punishment.   Okay?   Understand?

2        A.    Yes.

3        Q.    There is no burden of proof written in

4    issue number two.

5        A.    Right.

6        Q.    That kind of turns everything in the

7    jurors' laps, lets you sift through it and make

8    a determination.   It requires all twelve people

9    to agree that that answer should be no; requires

10   ten or more to agree the answer should be yes.

11   If that issue is answered yes, I assess life in

12   prison.   Only if number one is a unanimous yes

13   and number two is unanimous no do I assess the

14   death penalty.   You as a prospective member of

15   the jury get to know that in advance.   Going

16   in, you know exactly what I am going to do

17   .depending on how you answer those question.

18   Having said that, we are trying to assure that a

19   juror would not always automatically answer the

20   questions one way or the other.   Can you see

21   that number one could sometimes be answered yes

22   as to probability, sometimes no, depending on

23   the facts and circumstances you had before you?

24       A.    Yes, sir.

25       Q.    Even if you answered number one yes,

920

1    do you see how number two could sometimes be

2    yes, sometimes be no, depending on what you had

3    before you?

4         A.    Yes.

5         Q.    We want to make sure you are not

6    predisposed to always answer a certain way to

7    insure either a death penalty or life

8    sentence.    Okay.

9              Is there anything about your views on

10   the death penalty or capital punishment which

11   would either prevent you or substantially impair

12   your performance or the performance of your

13   duties as a juror in accordance with the

14   instructions I would give you or your oath as a

15   juror?

16        A.    No.

17             THE COURT:   Ms. Davies.

18             MS. DAVIES:   Thank you.

19

20

21

22

23

24

25

1        VOIR DIRE EXAMINATION BY THE STATE

2   BY MS. DAVIES:

3        Q.   We get to talk again, Mr. Gaffney.

4   This time we want to hear more from you although

5   you did liven things up for us yesterday.   You

6   did.  Often we have people come in and they sit

7   back and don't have anything to say, so it's

8   always refreshing when someone is candid about

9   telling us how they feel about things.   That is

10  what we want today, too.

11            Did you think about this last night?

12       A.   Sure did.

13       Q.   Do you mind sharing your thoughts a

14  little bit with us?

15       A.   Well, I went home, I had some

16  dinner.   I have a study in the house that is

17  kind of my room.   I went in there, and I

18  thought about it.  I have never been involved in

19  anything like this, you know, somebody's life

20  that is at stake.   It's an awesome

21  responsibility.  I thought about that a lot.   I

22  mean, I could sit on a jury and the outcome of

23  whether somebody lived or died would be in my

24  hands.   I have just never gone through anything

25  like that.   Pretty well the main theme of my

1    thinking.

2        Q.   You know, sometimes it seems

3    practically unfair.  We pass these

4    questionnaires out to get your impression before

5    you have been informed and before you have gone

6    through that so-called educational process.

7    Sometimes I think we should give the same

8    questionnaire to you when you come back

9    twenty-four hours later and you have had a

10   chance to think on it a little bit to see if

11   there would be a difference in your answer.    Do

12   you think there would be in yours?

13       A.   No.  I know trying to refresh my

14   memory on the questions about them, I think the

15   judge even brought it up, I seemed to, you know,

16   have different sides on it.  But I feel like

17   that is me, that is who I am.  I don't think I

18   am -- I don't think it's set in concrete in my

19   mind this crime calls for this, or I think every

20   crime of any nature has, everything has to be

21   considered, everything.

22       Q.   Can you tell me -- I think from the

23   questionnaire I get that you think the death

24   penalty is necessary in some cases?

25       A.   In some cases, yes.

923

1      Q.    And I know we ask them a hundred

2  different ways on the questionnaire, so I am

3  going to ask you another way.  Can you just tell

4  me why you think so?

5      A.    Why I think the death penalty is

6  necessary in some cases?

7      Q.    Right.

8      A.    I would say that when a person has

9  shown total disregard for human life and has a

10 history of violence and crime on society, I

11 think in my mind would probably be a

12 justification for the death penalty.

13     Q.    When you say they have had a history,

14 would a history of criminal offenses short of

15 murder, you know, just a history of law

16 violations over time, would that be significant,

17 or would it have to be that they have killed

18 before or done particularly violent crimes?

19     A.    For me, that has a lot of gray in it.

20 It really does.   I don't necessarily think that

21 I could say yes to that question, if they had a

22 history of crimes other than murder would

23 definitely make me vote for the death penalty.

24 And I couldn't say that, you know, the other

25 side of that argument.  I think it would just be

1    something that would have to be weighed strictly

2    on that case, period.  I don't think I could go

3    -- I don't think I could be specific on your

4    question.   I really don't.

5        Q.    Please understand I am not asking

6    whether you would give the death penalty in this

7    case or any specific case.

8        A.    I understand that.

9        Q.    We can't tell you the facts, you

10   know.   I certainly wouldn't ask you that kind

11   of question.   In some instances we ask for the

12   death penalty based on the facts of that

13   particular case.  Now, as the judge has

14   described to you, sometimes you get additional

15   information about a person's background.  That

16   is not always the case.  I want to focus on the

17   kind of situation where you come into court,

18   say, look, the facts of this capital murder are

19   so brutal that that alone suffices, I would

20   argue to you, to answer the questions in such a

21   way that the death penalty would result.  Do you

22   think that that would be appropriate in some

23   cases, that the facts of just the capital

24   murder, no past offenses, nothing else about the

25   defendant, just the facts of the case alone

1 could be enough to convince you beyond a

2 reasonable doubt that those questions should be

3 answered, the result--

4    A. Just the facts of the cases and no

5 other information?

6    Q. Just the capital murder?

7    A. That would be enough for me to vote

8 for the death sentence?

9    Q. That is what I am asking you.

10    A. No, I don't think so.

11    Q. No matter how brutal?

12    A. Murder is brutal.   There is no

13 question about that.   But, in other words, if I

14 hear your question, if you came to court and

15 basically got up and said this individual

16 murdered two people brutally, you know, and that

17 is it.

18    Q. You would hear the evidence from the

19 witness stand about the details of that

20 particular capital murder, whether it was the

21 murder of two people or of twenty people.

22    A. Or whatever.

23    Q. Or whatever.

24    A. I mean, you know, again I think it

25 would be something that I would have to be there

1    and go through, you know, to answer your

2    question.   I just, you know, when you first

3    paraphrased it, it sounded like just the fact

4    that the individual had murdered two people, you

5    know, they were brutal, is that sufficient to

6    warrant the death penalty.  I don't think at

7    this point I could answer that question yes or

8    no for you.

9        Q.   That is what I am trying to make

10   clear.   You know, it's a matter -- there are a

11   lot of different kind of capital murders.

12       A.   I feel right now that there would have

13   to be more for me than just that.   That is my

14   first feeling.  There would have to be more than

15   just that.

16       Q.   Can you tell me could there be a

17   situation -- I am sure both of us, you found out

18   the other day when we use examples we come up

19   with extreme examples, but like I say, it could

20   be the murder of twenty people.   It could be a

21   torture murder.   Who knows.  Just imagine the

22   worst one you have read about.   My concern is to

23   know whether I can rely on that aspect of the

24   law that says at times, yes, that is enough, if

25   the jury is convinced that is enough, but I am

927

1     not, right now I am not so concerned about what

2     the law is but how you feel.

3          A.   I understand.

4          Q.   So I just need to know whether you

5     would always have to have more or whether there

6     may be some really horrible capital murder out

7     there that for you would be enough.

8          A.   Again, I think my answer would be

9     sometimes I might have to have more and

10    sometimes I might not.

11         Q.   Okay.  I think that answers me.  If

12    sometimes that would be enough?

13         A.   It might be.

14         Q.   Okay.  You understand you are going

15    to find out as we talk the "might be's" always

16    makes us very nervous.  I certainly am.  A yes

17    or no.

18         A.   I think, when it comes to taking

19    another person's life, I think I am going to

20    have to be a "might be".  I don't think it's set

21    in concrete for me.  I really don't.  I think

22    as the judge said, made a point yesterday,

23    something like this, I mean, those issues right

24    there alone are -- that is not concrete at all

25    there, especially the numbers that have to go

                                              928

1   yes, no.   I think I could vote, but it would

2   depend on the case, the circumstances, the

3   evidence.

4         Q.   And we have thrown out references to

5   the phrase beyond a reasonable doubt.  We have

6   used repeatedly but we really haven't talked

7   about it much yet.   And the standard of proof

8   is beyond a reasonable doubt.  That burden of

9   proof is always on me.   Defense doesn't have to

10  bring any evidence whatsoever either stage of

11  trial.

12        A.   Right.

13        Q.   They are under no obligation to bring

14  in any mitigating evidence.   There may or may

15  not be mitigating evidence.  If there is some,

16  it may very well come from the state.

17  Inadvertently, perhaps.   But if there is

18  something mitigating or not, regardless, the

19  burden is always on me, the standard of proof

20  for me to prove it is beyond a reasonable

21  doubt.   There is a lengthy definition of that.

22  An instruction from the court.   The instruction

23  makes clear that it does not mean beyond all

24  doubt.  Now, of course, I know you have been on

25  a jury before so you have had that, although I

 1    don't think there was a definition given to

 2    you.   The laws are always changing on us.   Now

 3    there is a definition.   But we are talking about

 4    a different kind of case.   We are talking about

 5    the death penalty.   So my concern is to know do

 6    you feel that where the death penalty is

 7    involved you would have to have all doubt

 8    removed as opposed to--

 9         A.   No, I don't think I would have to have

10    all.

11         Q.   You feel like the beyond a reasonable

12    doubt would be an appropriate standard for you?

13         A.   I do.

14         Q.   I am not trying to minimize the

15    standard; it's a high one.

16         A.   Yes, it is, as it should be.

17         Q.   Yes, it should be.   But I also want

18    to be sure I won't be held to an impossible

19    one.   And some jurors would feel that way.

20              I was very concerned Monday you made

21    come comment about the prosecution.   What I was

22    hearing was prosecutor was hiding evidence in

23    that case.

24         A.   No, I didn't feel that way.   I just

25    thought -- I will be honest with you -- in that

930

1   particular case, knowing some details, number

2   one, that the attorney was court-appointed.  You

3   know, the defendant came from obviously very low

4   socioeconomic background.   I admired the

5   defense attorney who was appointed.   I thought

6   for a case that to me was so open and shut in my

7   mind when I first heard the evidence, that, you

8   know, the attorney did an admirable job with

9   what I thought was a very difficult case to

10   him.   I was amazed at how he constantly would

11    -- the point that you brought up about leaving,

12   maybe omitting certain parts of testimony, if it

13   benefited his client he would always make sure

14   that it did get admitted into the court

15   record.   That is really where I was going with

16   that.

17       Q.   You know, I was being sensitive and

18   perhaps I misunderstood what you were saying,

19   but, you know, I would hate to think that anyone

20   came from jury duty thinking that the prosecutor

21   was acting improperly.

22       A.   No, I didn't see that.   The thing

23   that struck me in the whole case was the fact

24   that I just put myself in the attorney's shoes

25   and said, my gosh, what must it be like for an

931

1    attorney to be assigned these types of cases and

2    to really get himself pumped up and do a good

3    job, you know.   What the process is like that

4    to go through.   Because this particular

5    attorney I thought did just a really good job.

6         Q.   Do you remember who the defense

7    attorney or the prosecutor was?

8         A.   You know, Judge McSpadden, I went to a

9    funeral about a year later, and he gave a eulogy

10   for a relative of my wife's that worked down

11   here.  And that attorney was there.  I remember

12   going up to him at the time.  I can't think of

13   his name right now, but I remember going up to

14   him, here it was a year later, I said, "I served

15   on a jury and you were the court-appointed

16   attorney and I was struck by the job that you

17   did."  He probably didn't even remember the

18   case.  He said: "Well, thank you."

19        Q.   You know, as we talked yesterday about

20   the business of leaving out parts of a statement

21   and the defense having the right to put things

22   in, you know, in criminal cases it's not always

23   a two-way street.   If I leave something out,

24   they have the right to put it in.  But if the

25   judge, if they want something in or the judge

                                              932

1    rules that something should stay out, I don't

2    have the reciprocal right to be sure it comes

3    in.

4              MR. STAFFORD:  Your Honor, I think

5    that is misleading.  If the law does not allow

6    it in, it does not allow it in.  And for her to

7    indicate to this juror that she has been picked

8    on or the State has been picked on, I object.

9              THE COURT:  You may reword it.

10   BY MS. DAVIES:

11        Q.   That was poorly worded.  I think my

12   point is like discovery.  We are all here --

13   well, I am not expressing this very well.  But,

14   for instance, I am sure through your business

15   you are familiar with in civil cases the

16   discovery process, where both sides reveal

17   everything.  In the criminal courthouse, it

18   doesn't work quite the same way.  I am obligated

19   to reveal things to the defense about the case,

20   they do not, there is not a reciprocal right of

21   discovery on my side.  As far as things being

22   left out of a statement, I guess I wanted to

23   make clear that if there are times that things

24   may be omitted for reasons other than that the

25   statement was omitted.  It may be that the

1    defense objected to particular things being

2    admitted in front of the jury.  The judge agreed

3    and said this part is going to be left out, the

4    jury is not going to hear this at the defense

5    request.  And I just, because we got into that

6    so much yesterday, I don't want to always take

7    the hicky, hey, we are not hearing this because

8    she doesn't want us to.  You understand there

9    could be different reasons for that?

10         A.    Sure.

11         Q.    You mentioned -- one of the things on

12   this questionnaire is about you had answered one

13   of these that agreed that capital punishment was

14   justified only for premeditated murder.  Now

15   that we have talked about the fact that

16   premeditation is not involved, do you still feel

17   that way, or is the intentional murder

18   sufficient in your mind?

19         A.    Well, by definition, Your Honor, if I

20   understood your talk to us yesterday, the State

21   of Texas basically came up with the term of

22   capital.  This isn't a nation wide?

23         THE COURT:  This is the legislative

24   scheme.

25         A.    Exactly.  I mean, are there states in

934

1   the union, I don't know, where premeditated is

2   still a crime punishable by death?

3          THE COURT:   I believe there are some

4   states that use the term, but I don't know about

5   punishable by death.   Anybody want to jump in

6   here?

7          MS. DAVIES:   I am not certain which

8   states.

9     A.   If your question is do I understand

10  the difference today in the State of Texas

11  between premeditated murder and capital, I think

12  so.   I think that came across pretty good.

13        THE COURT:   Premeditation is not a

14  part of our statutes whatsoever.

15     A.   Right.

16        THE COURT:   The distinction we had

17  basically been talking about is between murder

18  and capital murder and what such words as intent

19  or intentionally mean as opposed to premeditation.

20  BY MS. DAVIES:

21     Q.   I had suggested that one can form the

22  intent to kill very quickly.   Do you agree with

23  that?

24     A.   I think you made a good point with

25  that.   I did.

1        Q.    In your mind, would it be more

2    serious, a worse killing, worse murder if it was

3    planned ahead as opposed to one that was carried

4    out intentionally but somewhat a spur of the

5    moment decision?

6        A.    It might be.

7        Q.    What is your thinking there?

8        A.    Again, I think it would have to depend

9    on the circumstances of the case.  It could

10    be.  It could be -- in my mind it could be just

11    premeditation as a layman, that is pretty

12    heinous crime to me, you know, to think about,

13    contemplate and execute a plan to take

14    somebody's life.  Prior to coming in here

15    yesterday, I mean, to me that was the top of the

16    list.

17        Q.    And even for you, though,

18    premeditation -- I would suggest that you could

19    have premeditation in a relatively short period

20    of time, too.

21        A.    I am saying that you made me aware of

22    that yesterday.  Prior to yesterday, I have

23    always been one that thought premeditated murder

24    was, you know, at the top of the list, to

25    actually think about, plan and execute your plan

1    and take someone's life.   That has always been

2    in my mind the number one.   But some light was

3    shed on that yesterday for me.

4         Q.   You mentioned earlier -- and I can't

5    remember what the judge was talking about that

6    you said something about that mitigating

7    evidence would be important.   And, obviously, as

8    you are reading over those questions at the

9    punishment stage it's something we would expect

10   all jurors to consider, whatever evidence there

11   might be.   Tell me, if you can, what it was you

12   had in mind in terms of what you think of as

13   mitigating.   What would -- if things come to

14   your mind as being particularly important in

15   downgrading a defendant's blameworthiness?

16        A.   Downgrading his blameworthiness.   I

17   think probably his family background, how he was

18   raised, whether he was abused.   I think those

19   things would be information that I would want to

20   hear, I mean, if, you know.

21        Q.   And if you heard that kind of

22   information, certainly it's clear that you would

23   be expected to consider that.   We are not going

24   to ask you how you would weigh any particular

25   aspect because I would hope you would need to

937

1    hear it in context to make that decision.  Do

2    you feel like mitigation of that type, if there

3    was any evidence at all that would mitigate such

4    as you described, in your mind would that always

5    indicate that someone of that type should not

6    get the death penalty?

7         A.   You used the word always.  No.   My

8    answer would be no.  I think I would try to just

9    keep an own mind about that and form that

10   opinion based on that information at that time.

11   Always, I don't think, so.

12        Q.   If I bring you the evidence that

13   convinces you beyond a reasonable doubt, would

14   you be able to put your name on a verdict that

15   was going to result in the death penalty?

16        A.   I think so, yes.

17        Q.   Thank you.  Did we talk about

18   self-defense?

19        A.   No.

20        Q.   I don't remember.  We have talked to

21   so many people, I am losing track of what I have

22   talked to different ones about.   Anytime we are

23   talking about a murder case; self-defense is one

24   that comes to most people's mind as a

25   possibility.  Do you feel like we each have the

1    right to defend ourselves?

2        A.   Yes.

3        Q.   Or to defend another?  Whether it's in

4    your store or your home or out in the parking

5    lot.  The law certainly does agree with you,

6    with us, that self-defense is appropriate as

7    long as it is used in an appropriate manner

8    within the limits of the appropriate degree of

9    force and immediately necessary.  Sometimes the

10   notion of self-defense gets a little garbled,

11   though, and that is why I want to bring it up.

12   For example, someone goes into the convenient

13   store to rob someone, to rob the clerk.  They go

14   in with no intent to kill.  They go to commit a

15   robbery.  They go in with a gun, and the clerk

16   pulls a gun from under the counter, refuses to

17   turn over the money and says drop your gun.

18   Instead, the robber shoots the clerk and then

19   tries to claim self-defense, saying I had to

20   shoot him, he pulled a gun on me.  What is your

21   reaction to that?

22       A.   My gut feeling is the assailant got

23   what he deserved.  In other words, he pulled, he

24   had a gun, the clerk pulled a gun, a shooting

25   took place, and the assailant was killed.  Was

1    that self-defense?  I don't think so.

2         Q.    The clerk.  Let me be sure we are

3    talking about the same.

4         A.    The clerk pulled a gun and shot the

5    assailant that had a gun.  Was that

6    self-defense?  In my mind, no, I don't think

7    so.

8         Q.    You don't think the clerk would have

9    the right to defend himself?

10        A.    Yes.   I don't think the -- if the

11   clerk were shot and the other person were taken

12   to trial the other person could plead

13   self-defense, no, I wouldn't buy that at all.

14        Q.    And that is because he was acting

15   unlawfully to begin with?

16        A.    Exactly.   And the clerk was defending

17   his property and his day's take or whatever.

18        Q.    The law would agree with you

19   completely.  You have to be acting lawfully to

20   claim self-defense.   The clerk would have the

21   right to protect himself, or the manager who was

22   in the back room would have the right to come

23   out and protect the clerk.

24        A.    With a gun, yeah.

25        Q.    The procedure on this -- you did

                                        940

1    punishment in your other trial, so you are
2    familiar with that first stage of trial. You
3    only hear evidence that relates to the
4    particular offense that is on trial.   For good
5    reason.   All the things about the background
6    really are not relevant.   A person shouldn't be
7    convicted for what they have done before but for
8    whether we can bring the evidence to convince
9    you that he is guilty of the capital murder that
10   is on trial.   You hear that evidence, the
11   judge's instruction, the attorneys' argument, go
12   back and deliberate.   And usually I explain to
13   people that we never expect an instantaneous
14   verdict.   And given your experience, I think
15   you can certainly understand that.   It's called
16   deliberation because you do go back there and go
17   through all that evidence and have to try to
18   reach a consensus, a unanimous verdict.   It's
19   only after you have come back with a verdict of
20   guilty of capital murder that you even get to
21   this second stage of trial and those two
22   questions.   Now, I think we have touched on the
23   fact that sometimes there may not be any
24   additional evidence.   And I might very well be
25   asking you to answer those questions just based

941

1  on those facts.  Other times there can be more
2  evidence.  It can be from the state or from the
3  defense if they choose to bring in evidence, but
4  you really can not ever require them to do so.
5  Background, past convictions, character, good or
6  bad, you know, if they chose to do so they could
7  bring in information he was a deacon of the
8  church, an honor student and good employee, you
9  know, either way, you would consider all the
10 evidence at the punishment stage, you would
11 consider both the evidence you had heard about
12 the offense that had been committed, the capital
13 murder, and the information that you hear about
14 this person's background.  You take that same
15 evidence and you examine it two different
16 times.  Say you look at it twice because you are
17 going to have a different measure.  You are
18 going to re-weigh it, depending on the focus of
19 the question.  That first question focuses on
20 probability of future dangerousness.  Some
21 people come in here and say that is crystal ball
22 gazing.  When you are talking about human
23 conduct you can't ever answer that question, how
24 can you ever be convinced beyond a reasonable
25 doubt as to what somebody is going to do in the

1    future.   How do you feel about that?

2        A.   Well, I will just go back to the case

3    I sat on.   The person's background had a lot of

4    weight for me.   The person was habitual in the

5    commission of the crime, going back to age

6    thirteen, fourteen years old, where he had a

7    history of it.   Been in and out of jail.   I

8    think he was in his twenties at the time of this

9    case.   It impacted me.   This is somebody,

10   obviously, that, you know, had not been

11   rehabilitated at all and shouldn't be on the

12   streets, and it impacted me as far as the

13   sentencing phase of it.   No question about it.

14       Q.   Am I hearing you correctly, then, to

15   say that kind of information would assist you in

16   answering that question?

17       A.   Absolutely.   Absolutely.   The other

18   side of the coin is your extreme or maybe

19   non-extreme, if the person were a deacon in the

20   church, Boy Scout leader, National Honor Society

21   in school, that would also influence me, too,

22   sure would.

23       Q.   Given evidence, do you feel like you

24   could be convinced, having enough information to

25   answer that question?

943

1      A.   Yes.

2      Q.   It talks about probability that a

3  defendant would commit criminal acts of

4  violence.   Acts of violence that would

5  constitute a continuing threat to society.

6  Doesn't say are you convinced this person is

7  probably going to kill again.

8      A.   No, it didn't.

9      Q.   And that is what I want to know about

10  what your feeling on that is.   To your way of

11  thinking, are there criminal acts that are a

12  continuing threat to society?

13      A.   No question.

14      Q.   Other than murder?

15      A.   Absolutely.

16      Q.   For some people, offenses like

17  burglary, or robbery.

18          MR. STAFFORD:   I object to her trying

19  to commit him to burglary.   Burglary by

20  definition is not a violent act unless a violent

21  act is committed in the process of burglary.

22  The act of committing burglary is not a violent

23  act.   I object to her trying to suggest to this

24  juror that it is.

25          THE COURT:   I don't think she has

944

1    suggested yet.  I am listening for it, though.

2    BY MS. DAVIES:

3        Q.   I think that what I said that for some

4    people, because certain offenses such as robbery

5    or burglary, because they have the potential for

6    violence, in their mind they would include them

7    as crimes of violence that would be a continuing

8    threat.

9        A.   I would say yes.  I would agree with

10   that could be as you put it.

11       Q.   Not always?

12       A.   Not always.  Could be.  Burglary to

13   me, I mean, there is a lot of violence could

14   take place in a burglary.  You just cited a case

15   or an example where somebody walked in and put a

16   gun on somebody and asked for their money and

17   they came from behind the counter with a gun and

18   shots were fired and somebody was killed.  It's

19   pretty violent.  Yes, it could.

20       Q.   But, obviously, there are other times

21   that it wouldn't be.  If you answered -- of

22   course, obviously, twelve jurors would have to

23   unanimously agree that question number one

24   should be answered yes before you would ever

25   even get to the second question.  Would you --

1    well, let me paraphrase that second question.   I
2    don't want to take too many liberties with it.
3    I am paraphrasing it.  I read it as basically
4    it's saying look at the evidence again now, be
5    sure you haven't forgotten to look at all the
6    mitigating evidence that is there.  And also it
7    says including the circumstances of the
8    offense.  Basically you are going to weigh the
9    mitigating circumstances against what may be
10   aggravating circumstances and decide whether
11   there is enough mitigating evidence there that
12   you think the guy should get a life sentence
13   instead of the death penalty.
14        A.    That is the way I read it.
15        Q.    That may be entirely too commonsense
16   an interpretation because it doesn't have all
17   the -- but that is what it looks like.
18        A.    I think you zeroed in on it, yes.
19        Q.    But it talks about if you are asked is
20   there sufficient mitigating circumstances.  So I
21   am wanting to know could there be a case that
22   there is some mitigating evidence that you might
23   weigh that and think, yeah, that is mitigating,
24   there is some sad stuff here, and I am going to
25   consider it, but I don't weigh that enough, I

946

1    don't think it offsets his moral culpability for

2    this offense. I am going to answer this

3    question no because I think he should still get

4    the death penalty despite the sad childhood, the

5    deprived background, whatever. Can you see

6    that ever happening?

7         MR. STAFFORD: I think she is trying

8    to get him committed to a certain fact situation

9    as she has objected to me previously, and I so

10   object.

11        THE COURT: Sustained. Rephrase your

12   question.

13   BY MS. DAVIES:

14        Q. If there is some mitigating evidence,

15   are you always going to answer that question

16   yes?

17        A. No. If there is some mitigating

18   circumstances, it would have to depend on what

19   they are. What are they. As it relates to

20   what has happened, you know in this incident.

21        Q. Sometimes you would answer, even in

22   the light of some mitigating evidence, you can

23   see yourself sometimes answering that question

24   yes and sometimes no?

25        A. I sure can.

1    Q.   Even though if you answered it no you
2    would know the death penalty was going to
3    result?
4    A.   That's correct.
5    Q.   You could live with that if you had
6    been convinced of that?
7    A.   Yes.   Yes, I could.
8    Q.   Thank you.   I think I have kept you
9    long enough.   I will pass you unless you have
10   some questions of me.   Was there anything you
11   wanted to ask me?
12   A.   I can't think of anything.
13                EXAMINATION BY THE DEFENSE
14   BY MR. STAFFORD:
15   Q.   My turn.   What kind of broker sales?
16   A.   Insurance.
17   Q.   Oh, insurance.   What is the name of
18   the company?
19   A.   I work for myself.   I am it.
20   Q.   Tell me how that works.   I mean, you
21   go out, you have a bunch of companies you
22   represent?
23   A.   Right.
24   Q.   You get the cheapest rates, the best
25   rates?

1       A.   I don't go around and get the cheapest

2   rates.  I try to find the best companies I can

3   to represent my client base I have.  I get

4   appointed with these companies.

5       Q.   What is your client base basically?

6       A.   Personal line, life insurance,

7   annuities.

8       Q.   Do individuals like us come to you, or

9   are you usually dealing with bigger companies?

10       A.   No, most of my business is client

11   based individuals.

12       Q.   So citizens on the street can come to

13   you as an independent broker and say I need

14   annuity or life insurance?

15       A.   Absolutely.

16       Q.   Do you get into car insurance as well?

17       A.   No.

18       Q.   Just basically life and annuities.

19   No hospital?

20       A.   Yes.  Personal line.  That would be

21   hospitalization, Medicare supplement insurance

22   for older people, life, all types of life

23   products, term, whole life, annuities.

24       Q.   How did you get from the printing

25   company into insurance?  I notice you were the

949

1    owner of a printing company before this.

2         A.   I had a small printing company in

3    Austin, Texas.   We were commercial shop doing

4    the normal business card, letterhead, you know,

5    type of business.   Small.   Realizing that that

6    was extremely competitive, I mean, everybody

7    that opens up a print shop.   These franchizes

8    that you have, that is what they start out

9    doing.   I tried to take a little different

10   direction with the company.   I wanted to find a

11   specialty item that we could manufacture, and it

12   became index tabs.   I bought index tabing

13   equipment and became a jobber printer.   In

14   other words, we wound up becoming a print shop

15   for other print shops.   We manufactured index

16   tabs, and if a printer had a program for the

17   University of Texas, for instance, that needed

18   index tabs put into a bindery he would come to

19   me, I would make them for him.   Then a big

20   company in town came to me and said we like very

21   much what you are doing, we would like to either

22   buy you out or go into competition with you.

23        Q.   Sounded good to you at the time?

24        A.   I sold the company.

25        Q.   Okay.   What did you do before that?

950

1       A.   Prior to that, I was a manufacture's

2  representative in oilfield products, steam

3  turbines and all types of pumps and valves back

4  during the good times in Houston.

5       Q.   The boom area?

6       A.   Yeah.

7       Q.   How did you get from Australia to

8  North Carolina, South Carolina, yeah, to North

9  Carolina?

10      A.   My father was a career serviceman.

11      Q.   Oh, was he?

12      A.   Yes.

13      Q.   What branch?

14      A.   The old Army Air Corps and then

15  regular Air Force.

16      Q.   You got to travel throughout the

17  world, I guess, as a kid, pretty much?

18      A.   A lot.

19      Q.   Which was your least favorite place to

20  live?

21      A.   Fort Bragg, North Carolina.

22      Q.   I was at Fort Jackson, South Carolina.

23  That was bad enough.

24          How would you describe your

25  relationship with your father?

1    A.    My father and I didn't have -- we
2  didn't have the best relationship.    I mean, my
3  father was not there for me a lot when I was
4  growing up.
5    Q.    Do you think that affected you later
6  in life, or do you see how?
7    A.    I think it had a very positive effect
8  on me later in life.
9    Q.    Can you see in other situations with
10  with other individuals that could be negative?
11    A.    Absolutely.    Mine was negative when I
12  was young.    It was very negative.    My father
13  and mother divorced.    That was very
14  unpleasant.    There were four of us in a
15  stepladder.
16    Q.    Where did you fall?
17    A.    The oldest.    I had two sisters that
18  were born in Australia after me, and then I had
19  a brother that was born in the States.
20    Q.    How old were you when your father and
21  mother divorced?
22    A.    I was nine years old.
23    Q.    Were you ever adopted or anything
24  later on in life?
25    A.    No.

952

1     Q.   Ever known any kids that were adopted?

2     A.   Absolutely.

3     Q.   Do you think sometimes -- have you

4 ever noticed that sometimes adopted kids have

5 worst times of adjusting to certain situations

6 than kids who are raised in what we call--

7     A.   I think in certain cases they do.

8     Q.   What basic religion were you raised in

9 as a child?

10    A.   Catholic.

11    Q.   Are you still fairly an active

12 Catholic, or how would you describe your

13 participation now in religion?

14    A.   On a personal basis, I would say I am

15 fairly active.

16    Q.   Since the church has taken a public

17 stand against the death penalty, how do you

18 reconcile that?  I assume that you feel like

19 it's a personal attitude with you.

20    A.   I do.

21    Q.   Same way you think abortion, death

22 penalty, all that should be an individual basis,

23 the church stay out of it?

24    A.   When I went off to college as a young

25 man, my mind got opened up to a lot.

1  Catholicism issues, I don't know if anybody in
2  here -- I was raised in the Catholic faith.  I
3  was raised very staunch Catholic, I was an alter
4  boy, I went to mass every day when I was growing
5  up as a young man.  I wanted to be a priest.  I
6  went through all that.  And I went off to
7  college, and my mind was expanded, and all of a
8  sudden a lot of the dogma of the church didn't
9  sit well with me.
10       Q.   You and I are about the same age, so
11  we were in the sixties when things were
12  turbulent.
13       A.   Absolutely.
14       Q.   We saw a lot of changes.
15       A.   Tremendous amount of change.   I faded
16  away from the church during the sixties.
17       Q.   Seems like the circle is kind of
18  coming back around to a degree?
19       A.   Right.
20       Q.   Sixties were the years of anti-death
21  penalty.   And now it's coming back.
22       A.   Right.
23       Q.   I know you gave it some thought last
24  night, but do you ever read a paper ever now and
25  then about someone doing a dastardly deed and

954

1    say what in the world are we going to do with

2    these people?  If you were king for the day, do

3    you think you could come up with some formula or

4    some law or some formula for these horrible

5    people who do horrible things, or have you ever

6    thought along those lines?

7         A.    I don't think I could come up with

8    anything.

9         Q.    You made an interesting point about

10   your job, that you are in control of your own

11   destiny.  One of the things that you like about

12   it.  Expand on that a little bit for me.

13        A.    I thought when I put it down it was

14   pretty self-explanatory.   I work when I want to

15   work.  I work as hard as I want to work.  I work

16   as late as I want to work.   If I want to take a

17   day off and go fishing, I can.   I am at a point

18   in life now, you mentioned we are about the same

19   age, I assume you are heading into the big 50.

20        Q.    Getting real close.

21        A.    My daughter got married last

22   weekend.   My son got married a year and a half

23   ago.  It's my wife and dog and myself.  And my

24   wife has fifteen years with a large

25   corporation.  She will be retiring in five more

1    years.  We have both worked hard.  I can control

2    my own destiny doing what I am doing right now.

3    If I want to take a few days off and go to the

4    wedding in San Antonio that my daughter was

5    involved in and make a little vacation out of

6    it, I can.

7         Q.    What is your handicap?

8         A.    About six.

9         Q.    Ain't bad.

10        A.    Not too bad.

11        Q.    Who was the lady that worked here that

12   passed away?

13        A.    Her husband passed away.

14        Q.    What were their names?  Do you recall?

15        A.    Bruce and Cynthia.

16             THE COURT:  Burns.

17        A.    Right.   Bruce is the sibling on my

18   mother-in-law's side of the family.

19        Q.    He was here for years.  He was a nice

20   guy.

21             THE COURT:  I don't know if you

22   attended that funeral.  McSpadden gave the

23   eulogy for Sherman Ross.

24        Q.    He was with Sherman for years and

25   years.

1      A.   That is him.   I mentioned to you

2   Judge McSpadden did the eulogy, and the lawyer

3   that represented the young man was there.

4            THE COURT:  Everybody was there.

5      A.   The first time I had seen him.   I

6   remember walking up to him and just, you know,

7   saying I thought you did an admirable job for a

8   pretty open and shut case, I thought.

9      Q.   We kind of briefly talked about that

10   yesterday, that you might be on a capital murder

11   jury where the guilt and innocence is rather

12   open and closed, rather a foregone conclusion,

13   that the case may be tried for punishment,

14   punishment only.  And we have had jurors who

15   have been kind of upset that we entered a plea

16   of not guilty to what they thought was such a

17   whale, should have went ahead and bellied up to

18   the bar, admitted your guilt and let's get on

19   down to brass tacks.   Do you think if that

20   happened you would hold it against us if we

21   entered a plea of not guilty and made the state

22   prove it to you beyond a reasonable doubt?   Do

23   you have any intellectual problems with that at

24   all?

25      A.   Intellectual problems?  I guess the

957

1    way you tabled that question, I would almost

2    feel like you wouldn't be doing your job unless

3    you did that, especially in a situation like

4    this.

5         Q.   Often what I call the real crux of the

6    case or the -- not that the guilt and innocence

7    stage is not an important part, it is, but the

8    punishment stage is where the difficulty not

9    only for you to make these important decisions

10   but for what kind of evidence we bring you and

11   how you weigh it.  You can appreciate that?

12        A.   Absolutely.

13        Q.   As far as issue number two is

14   concerned, I mean, number one, I'm sorry.  Let

15   me suggest to you, that since you were on a

16   trial, they have come out with a definition now

17   of what they call reasonable doubt.  Now, there

18   will be some other charges that, of course, says

19   that the State doesn't have to prove its case

20   beyond all doubt.  It's based upon a reasonable

21   doubt.  But now the legislature has come up with

22   basically a reasonable doubt is a doubt based

23   upon reason and common sense after careful and

24   impartial consideration of all the evidence in

25   the case.  It's the kind of doubt that would

1  make a reasonable person hesitate to act in the

2  most important of his own affairs.  Proof beyond

3  a reasonable doubt, therefore, must be proof of

4  such convincing character that you would be

5  willing to rely and act upon it without

6  hesitation in the most important of your own

7  affairs.  And you will be able to take that

8  back.  And it's going to be applicable to this

9  issue number one as far as predicting what you

10  consider the probability that a person would

11  commit future acts of violence in the future

12  that would be a continuing threat to society.

13          Let me ask you this:  Do you think

14  society includes prison society?

15          A.    --.

16          Q.    That is in context with that.

17          A.    Do I think society includes prison

18  society in context with that?

19          Q.    Issue number one.  Or do you think

20  they are worried about whether he is going to

21  commit future acts of violence to us in the free

22  society?

23          A.    Do I think society is worried?

24          Q.    When you read that, when you approach

25  the answer to that, answering that, would you be

959

1    concerned about whether he is going to be

2    violent in prison or whether he would commit

3    future acts of violence to be a threat to what I

4    call free society, us?

5         A.    Sounds like several questions in

6    there.   I mean, the one I hear would it be

7    important to me whether he could continue to be

8    a threat to society, would that be important to

9    me?  Is that the question?

10        Q.    No, my question is keyed on the word

11   society.  When you read that, what is your first

12   impression?  You are thinking about prison

13   society or free society?

14        A.    Which do you want me to think of?

15   Prison or?

16        Q.    No, I totally have everybody confused,

17   including myself.  When you read that question,

18   what does society mean to you?

19        A.    Society means you and I and the rest

20   of the people in the room.

21        Q.    Would it include prison when you are

22   approaching answering that question?

23        A.    I think prison is part of our society.

24        Q.    That is where I guess I should have

25   asked and made things a lot simplier.  I guess

960

1    what I am trying to find out from you, because

2    you made a comment to the judge and the

3    prosecutor, that one of the things that kind of

4    bothered you from the other case is that the

5    person was not going to serve very long period

6    of time.

7        A.   I don't remember my exact question to

8    the judge at the time, but my concern was, you

9    know, I remember he was from Oklahoma, and he

10    had Oklahoma memorabilia all over the place, and

11    we talked a little about that, and I think he

12    had practiced up there some before coming down

13    here, I remember making the comment to him that

14    something to the effect that I bet people in New

15    Hampshire wound up doing a lot more time than

16    people in Texas do, and he pretty well agreed

17    with that, you know, that their situation up

18    there was quite a bit different than ours.

19    Smaller populated state and crime was nowhere

20    near the problem.  We were at the height of it

21    then.   It was constantly in the papers all the

22    time, early release and prisons full, Harris

23    County not being paid enough funds, you know, by

24    the rest of the states.   And my concern was,

25    because when we got into the sentencing portion

1  of this thing, the numbers that were thrown

2  around in there, we could give anything from 25

3  years to a hundred years, and people were

4  wanting to give twenty-six.  I never went

5  through a process like that.  It was

6  unbelievable, all these different numbers that

7  they were coming up with.  We arrived at

8  seventy-seven.  Again, that was -- it was one of

9  those things, like I said to the judge when we

10  went into the chambers after it was over with,

11  we came up with seventy-seven, "Have you ever

12  had a jury come up with that odd number?"  He

13  said, "No, I can't remember."  I was serious.  I

14  said, "What amount of time could this individual

15  serve on a sentence of seventy-seven years?"

16      Q.   Let me -- the reason I am trying to

17  get into this area of discussion with you is I

18  have had individuals tell me:  Well, you know,

19  the death penalty, he is never going to die

20  anyway, and if he gets life he is going to get

21  out too quick, so I am just going to vote for

22  the death penalty just because I know he ain't

23  going to die.  Now, Our Honor, as you know, is

24  going to tell you if you are on this jury that

25  you are not supposed to take into consideration

962

1    what the parole board is going to do.

2        A.    Could I make a comment on what you

3    just said there?   Could I comment on something

4    you just said?

5        Q.    Yes.

6        A.    I could never vote for the death

7    penalty simply because I know he is not going to

8    get it anyway.

9        Q.    You know that he wouldn't die?

10       A.    I couldn't vote for the death penalty

11   simply because I know he won't die.   I couldn't

12   do that.   There is no way I could do that.

13       Q.    Let me ask you this.   How about you

14   are in a situation, and you are bothering me

15   because it appears to be a concern of yours

16   about early release.   Do you think approaching

17   life imprisonment, considering the court's

18   instruction, when you were considering life

19   imprisonment, and if you thought life

20   imprisonment was the proper sentence based upon

21   the evidence, how would the fact of what you

22   have been telling me affect the way you would

23   answer these questions?

24       A.    I wouldn't consider, if I voted for

25   life imprisonment, I wouldn't consider the fact

963

1     that there is a possibility that the individual

2     might be released early.  If I found out at a

3     later time that the individual, it might bother

4     me at that time, but it wouldn't bother me in

5     making my decision for a life sentence versus

6     death.

7         Q.   That is what I need to know.

8         A.   I think any layman living in this

9     society that we live in right here has a concern

10    for early release.  I think if you don't, I

11    think something would be wrong with you.   But I

12    would never convict somebody--

13        Q.   Or sentence them to death?

14        A.   Absolutely.  Not simply because I know

15    that they are not going to get the penalty

16    anyway.  And the same on the other side of the

17    coin.  I would not have a concern that at the

18    time I would be making this monumental decision

19    that how much time the party would actually wind

20    up having to do with a life sentence.

21        Q.   So you could follow the court's

22    instruction and not let that play a factor in

23    your decision?

24        A.   Absolutely.

25        Q.   Okay.   That is fair to me.   That is

964

1    what I want to hear.

2         A.    But I might be upset later on.

3         Q.    I understand.

4         A.    I would reserve that.

5         Q.    On issue number one, as far as

6    probabilities are concerned, you made an

7    interesting comment.   I think, for example,

8    this may be a poor excuse, I mean, a poor

9    analogy, but I guess if you went to the race

10   tracks a lot or dog track a lot, or even if you

11   followed golf a lot.

12        A.    I do that.

13        Q.    You know who the guys are and you can

14   pretty well, based on how they have been

15   shooting, what possibilities or probabilities

16   they are going to do in the next tournament or

17   what the horse is going to do based upon their

18   track record.   I guess where I am going:   Do

19   you think, for example, just because someone has

20   committed five or six auto thefts with no

21   violence involved, is that an indication to you

22   that he is going to go out and commit future

23   acts of violence?  Or do you think just because

24   someone commits a non-violent crime there is a

25   probability he is going to commit future acts of

965

1    violence that would be a continuing threat to

2    society?  Or can you differentiate between

3    non-criminal conduct and violent criminal

4    conduct?

5         A.   I think I can differentiate.  I would

6    also think that in the case of somebody

7    continually committing non-violent crimes, I

8    think if you want to talk about odds and going

9    to the horses and what have you, I think

10   probably for me somebody that enjoys competition

11   and understands odds, I think the odds would be

12   heavily in favor that violence sooner or later

13   in this person's life is going to take place if

14   they continually keep committing non-violent

15   crimes.  I would say the odds are pretty good

16   that violence at some point in the future is

17   going to take place for that person.  Keep

18   stealing automobiles, sooner or later you are

19   going to steal somebody's car that happens to be

20   near by and has a gun and maybe shoots you.  You

21   know.  Keep stealing cars and you might be

22   involved in a high speed chase that gets you

23   shot.  You know.  I think constant, somebody

24   committing constant non-violent crimes I think

25   eventually the odds are going to be in their

966

1  favor that violence will take place.

2  Q.  Will occur?

3  A.  Yes.  But I don't necessarily think

4  that people committing non-violent crimes are

5  going to wake up tomorrow morning and commit

6  violent ones either, just decide let's graduate

7  from cars now to murder, no.

8  Q.  Do you think his prior criminal record

9  as far as his conduct in prison, if you are

10  sitting there evaluating:  Okay, life in prison

11  means life in prison, I am concerned about how

12  he is going to conduct himself in prison,

13  whether he is going to be a threat to the

14  guards, to other inmates, would his prior record

15  from prison aid you as to his conduct in prison

16  if it showed that he had never been in trouble

17  much or no violence?  Would that have any weight

18  on you at all, or would you consider it or not

19  consider it?

20  A.  I could consider it, yes.

21  Q.  We may bring you psychologists to

22  testify on the issue of probability, not

23  particularly much as he is concerned but about

24  people in general.  They have conducted studies

25  and written articles, experts have, and you may

967

1    hear about all these articles and these studies

2    as to what the medical profession thinks about

3    predicting future dangerousness.  Do you think

4    you would automatically disregard what that

5    testimony is, or do you think you could give it

6    whatever weight you feel like it's worth?

7         A.   I think I could give it whatever

8    weight I feel like it's worth.

9         Q.   What do you feel about psychologists

10   who come in and testify on behalf of a

11   defendant?  Leave a bad taste in your mouth?

12        A.   No.

13        Q.   Do you think they are the hired guns

14   of the defendant, that we are just getting them

15   to come down here to say what we want them to

16   say, or do you think they have their own code of

17   ethics?

18        A.   Absolutely.

19        Q.   Would it offend you?

20        A.   I think they are as professional as

21   attorneys.

22        Q.   We won't get into that.  We all

23   appreciate that.  I don't mean to make fun.  I

24   gather also you would not be offended if you

25   determined that he got paid for coming down here

968

1   to testify?

2        A.   I would hope so.

3        Q.   Like police officers get paid for

4   coming to be on duty.  If they are not on the

5   job, they get extra pay.

6        A.   Jurors.

7        Q.   You don't get much.  You only get six

8   dollars.

9        A.   $12.50 the second day; isn't it?

10       Q.   Once you get on, you may even get a

11  free lunch.

12       A.   We got fed the last one.

13       Q.   Did you?

14       A.   Yeah.

15       Q.   We've made a big heyday out of this

16  confession or statement.  There has been

17  editorials both by the court and by the

18  prosecutor as to how the function that it works,

19  procedurally works.  I can only state that if

20  for some reason Our Honor believes that a

21  certain portion of a statement is not admissible

22  you are not going to know about that anyway.  It

23  will be done outside your presence if for some

24  reason based upon the law he doesn't think it

25  should be before you, has no bearing on this

1   case, probably will never be a factor that you

2   will never know.    Also in the old days we used

3   to have what we call the voucher rule, that is

4   anything the State introduced they had to stand

5   by it and say that is what I believe.    That rule

6   no longer applies.    They can introduce the

7   whole statement and never get caught in that

8   trap.    They just introduce the whole thing, and

9   then at the closing argument or whatever they

10  can say I don't believe this, the evidence

11  doesn't support it.

12          MS. DAVIES:    I have to object to

13  that.    If I said such a thing Mr. Stafford would

14  certainly be objecting.

15          THE COURT:    Go ahead.    Proceed.

16  BY MR. STAFFORD:

17      Q.    What I am saying it's no longer the

18  voucher rule.    I am not saying this prosecutor

19  is going to do that, I am just giving you a

20  general over view of the law.    They don't have

21  to vouch for what they introduce.    They can

22  introduce the whole statement.

23      A.    When you say they don't have to vouch.

24      Q.    Back in the old days they had what is

25  called the voucher rule.    Basically if there

970

1   was a statement that raised the issue of

2   self-defense or some other factor that may show

3   that he is not guilty of it, if the state

4   introduced that showing that there was a defense

5   to it they had to live by it.

6          A.    If a statement was introduced that

7   someone had pleaded self-defense?

8          Q.    Right.

9          A.    In the old days.

10         Q.    If the state introduced it.

11         A.    They would have to stand by it?

12         Q.    Right.   And then the legislature and

13  the courts finally realized that's kind of

14  ridiculous to hold them to that strict burden.

15  So now they did away with that rule.

16         A.    Now what are they able to do?

17         Q.    They can introduce the whole thing and

18  they are not bound by the voucher rule anymore.

19  They don't have to live by the issue of

20  self-defense.   They have the right to come in

21  and say that ain't true, we don't believe that's

22  true.

23         A.    They can introduce the statement

24  today?

25                MS. DAVIES:   That is my objection.   I

1    don't have the right to come in and say I don't
2    believe that is true.

3            THE COURT:   Sustained.

4    BY MR. STAFFORD:

5        Q.    They can introduce evidence to show
6    it's not true.

7        A.    That a statement is not true?

8        Q.    Whatever in the statement is not
9    true.  I guess the bottom line is maybe the
10   voucher rule is no longer in.  We will leave it
11   at that.  But I do not believe, in all candor,
12   that there is going to be any trickery or hiding
13   in this case.  I don't think either side of us
14   play that way.  You are going to hear everything
15   that is relevant and it's going to be laid out
16   on the table for you.  There are not going to
17   be any dark corners or secrets in this trial.  I
18   hope you would understand that on both sides and
19   not hold it against either one of us.  I am
20   sure, as you know from your previous trial, we
21   make objections.  I assume they did at the
22   other trial; did they not?

23       A.    Absolutely.

24       Q.    I am probably going to be making
25   objections, and so shall she.  Am I hearing that

                                            972

1    you will assure me and my client that you are

2    not going to hold that against me if I make

3    objections?

4         A.   Of course not.   Again, I would feel

5    you would be rather remiss in your duty if you

6    went through the whole case without objecting to

7    something.

8         Q.   The fact of -- you kind of briefly

9    talked to the prosecutor about this -- would the

10   fact that there are two dead bodies or two

11   deceased people, what is your -- am I starting

12   off behind the eight ball with you on that

13   factor as far as your opinions towards capital

14   murder are concerned, or do you think it would

15   be I am starting off the same level with you

16   whether there was one or two deceased people?

17   You know in this case there are at least two

18   from the pleadings.

19        A.   The fact that there are two people

20   deceased, is that in my mind does that put you?

21        Q.   Does that put me kind of behind the

22   starting gate somewhere, or am I still even if

23   you are on this jury?

24        A.   I think right now today you are even.

25   Sure do.

973

1     Q.   Does it bring out any -- I hate to use

2    the word bias with you, but the fact that there

3    are two deceased people bring out anything in

4    you that you can share with me or explain or

5    cause any ill feelings in you or any anger or

6    anything of that nature, just the fact that

7    there are two deceased people, individuals?

8     A.   First thought that comes to my mind is

9    that I feel sorry for their families.  That is

10    the first thought I have.  Feel compassion for

11    the families of the people.

12     Q.   As far as the mitigation issue is

13    concerned, unfortunately the law is written that

14    the State does not have any burden of proof on

15    that issue.  The court will tell you that

16    neither one of us has the burden.  But if I do

17    bring you evidence, will you listen to it and

18    will you give it whatever weight you think is

19    necessary?

20     A.   Absolutely.

21     Q.   Do you realize that just because you

22    have answered this issue yes does not

23    necessarily mean that you have got to answer

24    this question no, they each stand on their own

25    ground.  Do you understand that?

1      A.    I do.

2      Q.    Just because you find that he is a

3 future danger does not necessarily mean that

4 there may not be some factor in his background

5 that reduces it?  You can see the difference

6 between the two?

7      A.    Absolutely.

8      Q.    Are you of the opinion that future

9 dangerousness can be diagnosed like cancer or

10 broken bone by doctors or by psychiatrists?  Or

11 do you think this is just a combination of

12 things?

13      A.    Repeat that.

14      Q.    Some individuals believe that future

15 dangerousness is something that you can just

16 diagnose, like you have got cancer, it's that

17 easy.  Or do you think predicting future

18 dangerousness is a little bit more complex and

19 difficult?

20      A.    I think it would be a little more

21 complex than cancer, but I also feel like that

22 psychologists and psychiatrists that are trained

23 in that area I think can make, with a certain

24 amount of certainty, future predictions about

25 patterns within human beings.

975

1          MR. STAFFORD:   No further questions.

2          THE COURT:   Step outside for just a

3     moment, please.

4          (The prospective juror leaves the

5     courtroom).

6          MS. DAVIES:   The State will excuse Mr.

7     Gaffney.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

976