APPELLATE COURT NO. *71595*

IN THE COURT OF CRIMINAL APPEALS

OF THE STATE OF TEXAS

AT AUSTIN

RICK ALLAN RHOADES,

                    Appellant

VS.

THE STATE OF TEXAS,

                    Appellee.

APPEAL FROM 179TH DISTRICT COURT OF HARRIS COUNTY,

TEXAS

Judge J. Michael Wilkinson   Presiding

STATEMENT OF FACTS

VOLUME *16* OF *40* VOLUMES

Marlene Swope
Official Court Reporter
301 San Jacinto
Houston, Texas  77002

FILED IN
COURT OF CRIMINAL APPEALS

MAR 5  1993

Thomas Lowe, Clerk

1923

1
2                           INDEX

3                        VOLUME XVI

4       GENERAL VOIR DIRE EXAMINATION OF PROSPECTIVE JURORS

5       BY THE COURT                          Page
                                              1925

6       BY THE STATE                          1969

7       BY THE DEFENSE                        2019

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

i.

1                    CAUSE NO. 612408

2     STATE OF TEXAS          IN THE 179TH DISTRICT COURT

3     VS.                              OF

4     RICK ALLAN RHOADES       HARRIS COUNTY, T E X A S

5

6     A P P E A R A N C E S:

7     For the State:        Ms. Carol Davies
                            Assistant District Attorney
8                           Harris County, Texas

9     For the Defendant:    Mr. James Stafford
                            Ms. Deborah Kaiser
10                          Attorneys at Law
                            Houston, Texas

11

12

13           BE IT REMEMBERED that upon this the

14    17th day of August A.D. 1992, the above entitled

15    and numbered cause came on for continued voir

16    dire of prospective jurors before the Honorable

17    J. Michael Wilkinson, Judge of the 179th

18    District Court of Harris County, Texas; and the

19    State appearing by counsel and the Defendant

20    appearing in person and by counsel, the

21    following proceedings were had, viz:

22

23

24

25

                                                        1924

1          (A panel of prospective jurors is

2     seated in the courtroom).

3          THE COURT:  All right, welcome back,

4     ladies and gentlemen.  This is an annex court

5     for the 179th.  As I briefly told you before we

6     recessed for lunch, we are in the process of

7     selecting a jury in a capital murder case.  By

8     way of introduction of the principals, the

9     defendant in this case is Mr. Rick Allan

10    Rhoades.

11         Would you, please, stand up?

12         He is represented by Mr. James

13    Stafford and Ms. Deborah Kaiser.   State is

14    represented by Assistant District Attorney Ms.

15    Carol Davies.

16         Is there anybody on this panel who

17    recognizes any of these participants?  Anybody

18    not been able to see?

19         Mr. Rhoades, could you kind of stand

20    around?

21         Now is there anybody who recognizes

22    any of these participants?  It's not a

23    disqualification.  The other side is simply

24    entitled to know if you know any of these people

25    from your employment, neighborhood or anything

1925

1    like that.

2              As I said earlier, this is a capital

3    murder case.  We go about selecting a jury in a

4    different manner for those of you who have been

5    down here on criminal jury selection.  The

6    defense is entitled to individual voir dire of

7    the prospective jurors.  Each one of you can be

8    talked to individually.  We do a little bit of

9    hybrid in this court when we are in the process

10   of selecting a jury in a capital case because we

11   give general voir dire.  I am going to give a

12   general introduction as to what we are doing,

13   then let each side speak to you.   It may be a

14   little bit lengthy from your standpoint, sitting

15   out here in those chairs.  I will try to give

16   you a break in a little while.  At the end of

17   that time, as I said earlier, we are going to

18   excuse you from the room, these folks are going

19   to get together, and a decision will be made on

20   who is going to be brought back and who is going

21   to be released.  During the last hour, hour and

22   a half, they have had an opportunity to glance

23   over those long form questionnaires as well as

24   the short forms, and they will be able to see,

25   during the course of what we are doing this

afternoon, your general reaction, your thoughts,
your questions about some of the things we are
going to be putting to you.  At the end of the
day, some of you will be released, some of you
will be given a morning or afternoon session
later this week to come back in here for
individual questions.  At that time, we actually
put you on the witness stand, I speak to you,
then each side gets to talk to you for a little
while.   Sometimes it's a very little while, ten
or fifteen minutes; sometimes it's up to two
hours, depending on how interested usually they
are in and what kind of answers you are making
to their questions.  Please do not answer
anything except absolutely honestly.  There is
no right or wrong answers to what we are putting
to you.  The correct response is the honest
response.  Don't attempt to mislead us.  Don't
attempt to tell us what you think we want to
hear.  Don't attempt to answer questions in such
a way that you think you will be excluded from
serving on this jury.  Don't answer in a way
such as you think would be a manner in which you
would be included on this jury.   Just answer us
as honestly as you possibly can.   We will take

1  care of the rest of it.

2           I know that you have all been

3  qualified technically when you were across the

4  street.  I now have a question for all of you.

5  I am going to be asking in a moment if there is

6  any reason why any of you could not sit as a

7  juror in this case.  I am not talking about any

8  questions that may have been on this

9  questionnaire.  What I am talking about is at

10  the time this case is scheduled and for the

11  length of time it's scheduled.  We are going to

12  begin testimony in this case on September 28th,

13  a Monday.  We should have a jury selected well

14  before that date, but for scheduling of

15  witnesses and that kind of thing we have to go

16  ahead and get a date we are going to start

17  testimony in the case.  We know full well it's

18  going to take us quite some time to get a jury.

19  We have been at this for over three weeks now.

20  On Monday, the 28th, we'll begin about ten a.m.

21  While I might think that this is going to take

22  about a week to try, from experience I know that

23  I should not limit it to that, and I am going to

24  ask each of you who is selected to serve on this

25  jury to go ahead and tell your employers about

1928

1    it, that kind of thing and mark out as much as
2    two weeks, block out as much as two weeks
3    beginning September 28th for service on this
4    jury.  Having heard that, I am now asking if
5    there is anybody who has a problem, any kind of
6    thing that is specific that you need to bring to
7    my attention why you could not sit as a juror
8    for as much as two weeks beginning September
9    28th.  I am not asking if you are
10   self-employed.  I am not asking if being down
11   here is a financial hardship.  I am asking the
12   following kind of things.  Are you on dialysis?
13   Do you have surgery scheduled on Friday, before
14   the 28th of September?  You have a son or
15   daughter getting married in California on
16   September 29th and you would like to be
17   present?  Have you got pre-paid, nonrefundable
18   plane tickets for that once in a lifetime trip
19   for Paris that leaves on September 28th, that
20   morning?  Those are the kinds of things I am
21   asking.  Is there any reason like that why you
22   could not sit as a juror beginning September
23   28th?  By a show of hands, anyone?  I was about
24   to assume by your silence that nobody had any
25   problem.  Show of hands is for number seven and

1929

1    number fifteen.    All right.    Sir, could you

2    come up, please?

3              This is juror number seven, Mr. Paul

4    Byrd.

5              What is it that you need to tell us?

6              THE PROSPECTIVE JUROR:   As of that

7    time, I will be enrolled at the University of

8    Houston school.

9              THE COURT:   Starting what date?

10             THE PROSPECTIVE JUROR:   This will be

11   starting August 24th.

12             THE COURT:   Have you been enrolled?

13             THE PROSPECTIVE JUROR:   Yes.

14             THE COURT:   What is your

15   classification?

16             THE PROSPECTIVE JUROR:   I am a

17   junior.

18             THE COURT:   What are you studying?

19             THE PROSPECTIVE JUROR:   Computer

20   science.

21             THE COURT:   Are you registered?

22             THE PROSPECTIVE JUROR:   Yes, sir.   I

23   registered in the spring of this year.

24             THE COURT:   How many hours are you

25   taking?

1930

```
 1              THE PROSPECTIVE JUROR:  I am taking
 2    six.  I am not full time.
 3              THE COURT:  You are taking six hours.
 4    When do  classes being?
 5              THE PROSPECTIVE JUROR:  They are
 6    scheduled for eleven until around one o'clock.
 7              THE COURT:  Okay.  Y'all have any
 8    questions?
 9              MR. STAFFORD:  No.
10              THE COURT:  Just have a seat.
11              THE COURT:  Ms. Allen.
12              This is number fifteen, Ms. Leanear,
13    last name Allen.  What did you need?
14              THE PROSPECTIVE JUROR:  I take
15    medication and I have blood thinner.  I can't
16    sit still for a period of time.  Too, my sister
17    is coming down from Dallas.  She's an M. D.
18    Anderson patient, and she lives with me when
19    she's here, and I take her back and forth.
20              THE COURT:  She comes down for
21    treatment?
22              THE PROSPECTIVE JUROR:  Yes.
23              THE COURT:  And when is she coming
24    down?
25              THE PROSPECTIVE JUROR:  Well, she's
```

1931

1    scheduled the first of September, but usually

2    when she comes, when I say first, it may be

3    first or second week and, she's here for six

4    months.

5              THE COURT:  How often does she come?

6              THE PROSPECTIVE JUROR:  She just went

7    back home.  She's coming now for four months.

8              THE COURT:  Is it daily?

9              THE PROSPECTIVE JUROR:  Yeah, when she

10   comes down, she goes every day.

11             THE COURT:  Is this radiation?

12             THE PROSPECTIVE JUROR:  This is

13   radiation.  Chemo.

14             THE COURT:  Do you want to ask any

15   questions?

16             MR. STAFFORD:  No.

17             MS. DAVIES:  No.

18             THE COURT:  We will ask you some

19   questions later on.  Just have a seat.

20             THE COURT:  This is number one, Ms.

21   Rebecca David.

22             THE PROSPECTIVE JUROR:  I have a trip

23   coming up on October 21.

24             THE COURT:  No problem.

25             Anybody else?  Just as we did during

1932

1  that question, a lot of times I am going to have
2  to assume by your silence what your answers
3  are.  If you need to speak up, you need to
4  respond, don't understand something, you want us
5  to clarify something, raise your hand.  Same
6  goes when these people are talking to you.  Now,
7  occasionally they may ask you a question --
8  usually doesn't happen when you are on the
9  panel, but on the individual questioning
10 sometimes they will ask a question that you
11 think the answer to which is embarrassing or is
12 simply too personal to share with other people,
13 especially twenty-one other strangers.  If that
14 occurs while they are talking to you, raise your
15 hands, and we will attempt to talk about it
16 outside the presence of everybody else like we
17 did with these last two or three questions
18 here.
19         By a show of hands, how many have ever
20 served on a criminal jury in the past?
21 Remarkable.  Only two.  Has anybody here ever
22 served on a Grand Jury before?  No one.  How
23 many people have been called and gone through
24 the jury selection process in a criminal case
25 and not served?  Not very many.   So a lot of

1933

1    what we are going to be talking about is going

2    to be new to you.

3              The general procedure we are going to

4    go through, once we give you the days and times

5    you come back in here, as I said before, we each

6    talk to you for quite sometime, and before you

7    leave at that session we will tell you whether

8    or not you have been selected to serve.   If you

9    are selected to serve on the jury, we go ahead

10   and swear you in at that time and give you some

11   additional instructions and tell you exactly

12   when to be back here on the 28th and where to

13   report to.

14             When you come back in here on

15   September 28th, if you are selected to serve on

16   this jury, the defendant will be arraigned in

17   your presence, the indictment having been read

18   to you, and we will begin testimony in the

19   case.   The State goes first.   The State will go

20   first when they are talking to you in this jury

21   selection process; they will go first when they

22   are presenting witnesses; they will go first and

23   last when they argue the case to you because

24   they have the burden of proof in a criminal

25   case.   State calls witnesses to the stand.    At

                                                   1934

1    some point, the State rests.  Once the State

2    rests, the defense has the opportunity to go

3    forward.  They don't have to go forward if they

4    don't want to.  They don't have to call any

5    witnesses to the stand.  They don't have to call

6    the defendant to the stand.  The State can not

7    call the defendant to the witness stand.  Why do

8    they do that?  For a number of reasons.  They

9    may feel, by the time the State has rested,

10    after discussing the case among themselves, the

11    State hasn't met their burden of proof.  They

12    may feel the State has not proved the

13    defendant's guilt beyond a reasonable doubt and

14    rest right behind the State.  They may well be

15    able to put forward whatever kind of defense

16    they want to simply by cross examining the

17    witnesses already called by the State.  You

18    can't speculate on why they are doing that kind

19    of thing.  If the defendant does not take the

20    stand and testify in his own behalf, you cannot

21    use that as any evidence of guilt whatsoever.

22    I know full well that many of you would say if

23    you were ever charged with a criminal offense

24    you would want to get on the stand and tell

25    everything you knew.  Maybe you would and maybe

1    you wouldn't.  There are many legitimate reasons

2    why individuals who are charged with offenses

3    don't get on the stand and testify in their own

4    behalf.  It's a fifth amendment privilege

5    accorded all of us.  We have many defendants

6    these days who have severe accents and don't

7    take the stand.  We have many defendants who

8    because of the stress of the situation appear

9    for all the world like they are telling a lie

10   when in fact they are telling the truth.  You

11   can't speculate on that kind of information.

12   The burden of proof is on this side of the

13   table.  Their burden is to prove the defendant's

14   guilt beyond a reasonable doubt.  It's up to

15   them to prove it.  Nobody else.  This side

16   doesn't have to go forward.  At some point, the

17   defense will rest, either having called

18   witnesses or not having called any witnesses.

19   At that point, there may be rebuttal testimony

20   from either side.  Usually doesn't take very

21   long.  After that, both sides rest and close and

22   I prepare the Court's Charge.  That is a

23   multi-page, typewritten instrument which is

24   going to contain all the law and all the

25   definitions you need in this case when you go

1936

1   back to deliberate the case.  Both sides will

2   argue the case to you.  The State being able to

3   go first and last.  You go back to deliberate.

4   The jury returns a verdict in open court, guilty

5   or not guilty.  We are going to call that the

6   guilt phase of the trial, whether or not you

7   find a defendant guilty of an offense.  If a

8   defendant is found guilty, there is a second

9   stage of trial.  We call it a bifurcated trial.

10  Two stages.  The first stage, guilt stage, if

11  the defendant is found guilty, you go to the

12  second stage.  That is the penalty stage.  At

13  that time you may hear additional evidence.

14  Each side has the opportunity to call witnesses

15  and to produce additional evidence.  That is

16  normally the stage where you hear evidence of a

17  defendant's background, his reputation, of prior

18  bad acts, if any, of a previous record of

19  criminal convictions, if any exist, that kind of

20  thing.  The case is argued to you, after I

21  prepare another charge, you go back and

22  deliberate in this second stage of the trial.

23  That information you receive in the second stage

24  of trial is usually the kind of information most

25  jurors would like to have available when they

1    are making a determination as to what the
2    appropriate punishment should be in any criminal
3    case, capital case or otherwise.   Jury returns a
4    verdict in open court.   That is basically the
5    way we are going to proceed in the trial.
6           Let's talk about witnesses.   I have no
7    idea exactly what is going to go on in this
8    trial.   We are not going to permit anybody in
9    here to tell you what they anticipate the facts
10   are going to be.
11          I am going to read to you from the
12   indictment in this case.   The indictment, by the
13   way, is no evidence of guilt whatever in a
14   criminal trial.   No one here has ever appeared
15   on a Grand Jury, but the Grand Jury has a very
16   different function from that of a jury who will
17   be sworn in to hear this case.   The Grand Jury
18   is not determining issues of guilt.   The Grand
19   Jury is only deciding that some reason exists
20   for a fact finder, either a court or a jury, to
21   make a determination as to guilt.   Usually in a
22   Grand Jury setting, one person appears before
23   the Grand Jury.   That is usually a prosecutor
24   who gives a shorthand rendition of what that
25   person thinks the facts are in the case.   Based

1938

1    on hearing that from usually only one source,

2    the jury either true bills or no bills the

3    case.  Only takes nine people to true bill a

4    case.  Basically they are only determining that

5    there is some reason to believe that a jury or a

6    judge should decide the issue of guilt.  There

7    is no finding of guilt whatsoever.  I would give

8    you an instruction to the effect that the

9    indictment in a case is no evidence of guilt.

10           The indictment alleges that in Harris

11   County, Texas, on or about September 13, 1991,

12   the defendant, Rick Allen Rhoades, did

13   unlawfully intentionally and knowingly cause the

14   death of Bradley Dean Allen by stabbing him with

15   a deadly weapon, namely, a knife, and during the

16   same criminal transaction the defendant did then

17   and there unlawfully intentionally and knowingly

18   cause the death of Charles Allen by stabbing

19   Charles Allen with a deadly weapon, namely, a

20   knife, and by striking Charles Allen with a

21   deadly weapon, namely, a bar.

22           Now, I have given you a couple more

23   items of information.  You now know the alleged

24   date of the offense, September 13, 1991.  You

25   have the names of two victims, Bradley Dean

1939

1    Allen and Charles Allen.   I am going to give
2    you a little bit more information.   It's my
3    understanding that the alleged offense occurred
4    September 13, 1991, on Keith Street, K-e-i-t-h,
5    in Pasadena.   And the two Allen gentlemen are
6    brothers.
7              Is there anybody here on this panel
8    who lives in Pasadena?  Anybody who lives in
9    South Houston?  Where do you live?
10             THE PROSPECTIVE JUROR:   Clear Lake
11   City.
12             THE COURT:   That is way south
13   Houston.
14             Are you Clear Lake City proper?
15             THE PROSPECTIVE JUROR:   Right.
16             THE COURT:   You, sir?
17             THE PROSPECTIVE JUROR:   Ship channel.
18   Southeast.
19             THE COURT:   All right.   Nobody
20   actually lives in South Houston or Pasadena.
21             Having heard that limited amount of
22   information, is there anybody on this panel who
23   believes you know something about this case?
24   Don't ask me any questions.   I want to see a
25   show of hands.   Anybody else who thinks you

                                                    1940

1    might know anything about this case?

2              Could you please come up?

3              THE COURT:  This is prospective juror

4    number twelve, Ms. Janis McGehee.  What do you

5    think you know?

6              THE PROSPECTIVE JUROR:  I remember

7    reading about it in the paper.

8              THE COURT:  Can you tell us anything

9    that you remember?

10             THE PROSPECTIVE JUROR:  I remember two

11   guys.  They were found in a house at the end of

12   the street.  And they were white, in their

13   thirties.  And that was about it.

14             THE COURT:  See, I know even less than

15   you do if that happens to be the offense.    I

16   don't know whether or not any of the information

17   you are giving me is close to the case we have

18   here.

19             Did the names ring a bell?  Did you

20   recognize the names?

21             THE PROSPECTIVE JUROR:  Yeah, I did.

22             THE COURT:  What about what I told you

23   caused you to think that you remember, which

24   part?

25             THE PROSPECTIVE JUROR:  Two guys in

1   that area of town that were murdered.

2            THE COURT:  Do you remember, by the

3   way, where you might have heard any information

4   or gotten any of the information, if you read

5   it?

6            THE PROSPECTIVE JUROR:  I got it in

7   the newspaper and TV.

8            THE COURT:  By the way, do you know

9   about when it was that you heard the

10  information?

11           THE PROSPECTIVE JUROR:  Right after it

12  happened.  If it was September, I don't--

13           THE COURT:  Do you remember ever

14  hearing anything else about it?

15           THE PROSPECTIVE JUROR:  Yeah, when

16  they, I think when they picked the guy up that

17  they suspected or whatever.

18           THE COURT:  Can you tell me anything

19  else?

20           THE PROSPECTIVE JUROR:  No.

21           THE COURT:  Okay.  Based on whatever

22  information it might have been that you heard,

23  do you have any conclusion as to guilt or

24  innocence of the defendant charged in this

25  case?

1942

```
 1                    THE PROSPECTIVE JUROR:   No.
 2                    THE COURT:   Do you know any of the
 3       participants in this case?
 4                    THE PROSPECTIVE JUROR:   No.
 5                    THE COURT:   You did not recognize the
 6       defendant when he stood up?
 7                    THE PROSPECTIVE JUROR:   No.
 8                    THE COURT:   From any source?
 9                    THE PROSPECTIVE JUROR:   No.
10                    THE COURT:   Do you recall ever having
11       heard this case discussed in the interim?
12                    THE PROSPECTIVE JUROR:   No, just what
13       I read and saw on TV.
14                    THE COURT:   You haven't reached any
15       conclusion about this case, in either fashion,
16       guilt or innocence?
17                    THE PROSPECTIVE JUROR:   No.
18                    THE COURT:   There is nothing about
19       that that would influence your verdict?
20                    THE PROSPECTIVE JUROR:   I don't think
21       so, no.
22                    THE COURT:   Do you believe that you
23       will be able to render an impartial verdict on
24       the law and evidence in this case?
25                    THE PROSPECTIVE JUROR:   I could.
```

1943

1      THE COURT:  Do you have any
2   questions?
3      MS. DAVIES:  Nothing.
4      MS. KAISER:  Do you remember anything
5   about why they picked this fellow up?
6      THE PROSPECTIVE JUROR:  He was a
7   friend of theirs.  That is what I remember.
8      MS. KAISER:  Okay.
9      THE COURT:  You see, I don't know
10  whether or not you are remembering this case or
11  another case.
12     THE PROSPECTIVE JUROR:  That's right.
13  I don't either.
14     THE COURT:  That is why they all have
15  the advantage of both of us.
16     THE PROSPECTIVE JUROR:  I do not know
17  if it's the same one.
18     THE COURT:  Have a seat.
19     (Before the panel).
20     THE COURT:  Let's go back into the
21  general fashion in which the trial is going to
22  take place.  I believe I started talking to you
23  about witnesses before I read some of those
24  names.  By the way, while I may have subpoena
25  lists of witnesses filed by either or both

                                    1944

1   sides, that doesn't mean that those are all the
2   people that are going to be called.   Frequently
3   the subpoena lists in criminal cases are
4   identical.   The State's list is often time
5   identical to the defense witness list, and that
6   is why many times, since the State goes first
7   and gets the first crack at the witnesses, so to
8   speak, a defense can effectively present what
9   they need to by simply cross examining the same
10  people they would have called who were already
11  called first by the State.   Every witness who
12  testifies will have been sworn to tell the
13  truth.   That doesn't mean that every witness is
14  telling the truth.   You get to determine who is
15  the truth teller in the case.   You are the fact
16  finders.   You determine the credibility of every
17  witness who testifies, including the defendant
18  should he testify in a case.   Every witness you
19  see will have been sworn.   They will take that
20  oath when they raise their right hand at some
21  point during the trial.   Sometimes it takes
22  place in your presence.   Sometimes it does not.
23  Sometimes we swear witnesses in when you are out
24  on break, you're at lunch, before you come in in
25  the morning, after you leave in the evening,

1945

1  that kind of thing.  I will try to remind you
2  with each witness who takes the stand that that
3  witness has been sworn to tell the truth.  But,
4  again, you determine the credibility of a
5  witness.   You may believe everything a witness
6  tells you.  You may disregard everything a
7  witness tells you.  You may choose to believe
8  part of what a witness tells you and disregard
9  the rest of it.  That is up to you.   You make
10 that determination.  But you don't make that
11 determination as to credibility before you have
12 heard the witness testify, which is to say you
13 don't decide that you are going to
14 automatically, for example, believe everything a
15 priest tells you and you are going to
16 automatically disbelieve everything a wrecker
17 driver tells you.  You wait until you have heard
18 the testimony and then you make that
19 determination.  A frequently asked question in
20 criminal cases is would you believe the
21 testimony of a police officer over that of any
22 other witness simply because he was a police
23 officer and for no other reason.   That is
24 asking you to prejudge a person's testimony
25 based on his job or class or whatever it might

1946

1   be. After you have heard a witness testify,

2   based on that witness' background, training,

3   expertise, what that witness was able to observe

4   in the case on trial then you may be able to

5   give that witness greater credibility; but

6   before you have already heard him testify, you

7   don't say I am automatically going to believe

8   what somebody wearing a clerical collar tells me

9   and I am going to automatically disbelieve or

10  believe everything somebody wearing a blue

11  uniform tells me. You wait for the testimony.

12  We want you to keep open minds on every element

13  when you come in here. Just listen to what is

14  going on in the courtroom and make up your own

15  mind as to credibility and everything else.

16          Any questions so far?

17          THE PROSPECTIVE JUROR: If you are on

18  the jury, can you take notes?

19          THE COURT: I am not going to be

20  allowing the jury to take notes. I know there

21  are a couple of courts in this courthouse where

22  they allow that, but we have only one official

23  notetaker in this court, and that is going to be

24  the court reporter. When you go back to

25  deliberate, I will give you instructions that if

1    there is a legitimate question as to some topic
2    that you don't agree on, like six of you on the
3    jury may say I heard that witness say this about
4    that subject, and the other says:  No, you
5    didn't hear it right, you can ask for that
6    specific testimony, and we will read that back
7    to you.  But I want it verbatim, I don't want an
8    unofficial court reporter, or two or three or
9    however many it is in the jury box writing notes
10   down.  Sometimes people write things down
11   incorrectly.  I have seen that happen.  There is
12   only one official notetaker.  If you need
13   testimony, we will give that back to you.
14        Let's talk about some general
15   principles of law.  Most of you have to be
16   re-educated because you have seen far too much
17   television in your lifetime, too much television
18   in the form of Perry Mason and Petrochelli and
19   L. A. Law and all the rest of them.  Some of the
20   things you are familiar with.  Presumption of
21   innocence.  A defendant in a criminal case is
22   presumed innocent.  As this defendant or any
23   defendant in a criminal case sits in court
24   awaiting trial, he is not a little bit guilty.
25   He is presumed innocent.   That is a legal

1   presumption.  It can be overcome with legally
2   competent evidence.  That is what the State is
3   doing or attempting to do when they put the
4   witnesses on the stand.  They are attempting to
5   chip away at that presumption of innocence with
6   every witness they call to the stand so that,
7   hopefully, by the time the State rests, in their
8   view, they will have proven the defendant's
9   guilt beyond a reasonable doubt.  That is their
10   burden of proof.  Contrary to television, it's
11   not proof beyond all doubt, not proof beyond a
12   shadow of a doubt.  For most jurors to have a
13   case proved to their satisfaction beyond all
14   doubt, that juror would have had to have been
15   present and witness the offense occur.  If that
16   happened, you would be a witness and you
17   couldn't sit as a juror.  We do have some few
18   cases where video cameras are rolling, bank
19   robberies, the occasional convenient store
20   robbery, that kind of thing.  Usually the
21   evidence in those cases is so overwhelming, a
22   tape running of a robbery in progress, that
23   those cases never go to trial.  So what we are
24   left with are all the rest of the cases, all
25   those in which you listen to witnesses come in

1    and tell you what happened second and third

2    hand.  That is the reason the burden of proof on

3    the State is to prove a defendant's guilt beyond

4    a reasonable doubt.  For over a hundred years,

5    we existed perfectly well without a definition

6    of what beyond a reasonable doubt means.  A few

7    months ago our Court of Criminal Appeals, in

8    their infinite wisdom, gave us a definition, and

9    if either side chooses to read that to you they

10   may do so.

11           Any questions about the presumption of

12   innocence, burden of proof?

13           We have already touched on this

14   failure to testify aspect.  A defendant does not

15   have to testify in his own behalf.  If he

16   chooses not to testify in his own behalf, you

17   cannot use that as any evidence of guilt

18   whatsoever.  He is presumed innocent.  The

19   burden of proof is on the State.

20           Let me give you a couple of

21   hypotheticals and make sure y'all understand

22   what we are talking about.  Let's assume a

23   defendant is arraigned in the jury's presence.

24   The indictment having been read in open court.

25   The defendant enters a plea of not guilty.  The

1    State immediately rests without ever having
2    called any witnesses.  The defense rests right
3    behind them.  You have heard nothing.  You go
4    back to deliberate.  Defendant is presumed
5    innocent.  State has the burden of proof.  All
6    that exists is an indictment, and that is no
7    evidence.  You would have to return a verdict of
8    not guilty.  Any questions?
9         Second hypothetical.  A defendant is
10   arraigned, enters a plea of not guilty, State
11   goes forward by calling witnesses to the stand.
12   At some point, the State rests.  Defense rests
13   right behind the State without ever having
14   called any witnesses whatsoever.  Charge is read
15   to you, case is argued.  You go back to
16   deliberate.  In this case, you as an individual
17   juror believe the State had proved the
18   defendant's guilt beyond a reasonable doubt.  He
19   didn't testify.  The defense called no
20   witnesses.  But based on what the State
21   produced, you believed the defendant's guilt had
22   been proved beyond a reasonable doubt.  Is there
23   anybody here who could not participate under
24   those circumstances in a verdict of guilty?
25   Sounds like a silly question, but I am asking

1951

1    that for a couple of reasons, and one is because

2    occasionally we will have a prospective juror

3    who believes he or she could sit there and

4    listen to the evidence, go back and deliberate

5    but would never, never be able to vote guilty

6    for personal reasons, philosophical reasons,

7    religious reasons, whatever it might be, even if

8    that juror believed the State had proved the

9    defendant's guilt beyond a reasonable doubt.  Is

10   there anybody on this panel of that mind?  I am

11   going to assume by your silence that no one is.

12          Third hypothetical.  Defendant is

13   arraigned, enters a plea of not guilty, State

14   goes forward, calls witnesses, at some point the

15   State rests.  The defense rests right behind the

16   State without ever having called any witnesses.

17   Charge is read to you, case is argued, you go

18   back to deliberate.  This time you as an

19   individual, independent juror believe the State

20   had not proved the defendant's guilt beyond a

21   reasonable doubt.  He didn't testify.  But you

22   don't believe based on what you heard in the

23   courtroom the State had proven his guilt beyond

24   a reasonable doubt.  The proper verdict in that

25   case for the individual juror is not guilty.

1    Anybody have any problem with that?  Any

2    questions so far?  You are all mostly still

3    awake, and occasionally somebody even nods.

4    They are going to make you speak up.   I am not

5    going to make you do that because it goes faster

6    this way.  They are going to demand to hear your

7    voices after awhile.

8           We have what are called lesser

9    included offenses.  If the evidence coming from

10    that witness stand shows that another offense

11    may have been committed, if there is any

12    evidence in the record whatsoever, I put it in

13    the Court's Charge.  I basically give the jury

14    options because I am forced to do that.  That is

15    what I have to do.  If it's in the record, there

16    is testimony on this subject, there is evidence

17    of it, it goes in the Court's Charge.   It is

18    not a comment by myself on what I think is the

19    appropriate verdict in a case.  The defendant in

20    this case is charged with the offense of capital

21    murder.  We know that the lesser included

22    offenses of capital murder under the proper

23    circumstances may include murder, a first degree

24    felony, what we sometimes refer to as simple

25    murder or straight murder.  We know that a

1    lesser included offense could be voluntary

2    manslaughter, a second degree felony offense.

3    Third degree felony offense, involuntary

4    manslaughter.  Class A misdemeanor offense,

5    negligent homicide, and so on.  Just

6    stair-stepping down from the greatest offense

7    down to the lessers -- capital murder, murder,

8    voluntary manslaughter, involuntary

9    manslaughter, negligent homicide.  You may well

10   get a charge which says if you don't believe

11   beyond a reasonable doubt that the defendant

12   committed the offense of, for example, capital

13   murder, you are next to consider a lesser

14   included offense, which does, in a fashion, give

15   the jury an option.  If you can't agree on one

16   offense, you might be asked to consider the

17   lesser offense.  It works the same in all kinds

18   of cases.  Aggravated robbery, down to robbery.

19   Perhaps theft or aggravated assault is a lesser

20   included offenses.  If you should see a charge

21   on lesser included offenses in this case, you

22   are not to assume that I have made any

23   determination as to what the proper verdict

24   would be.  That is still up to the jury.  You

25   should anticipate in this case -- I am not

1    telling you anything I don't think these people
2    would tell you -- that at some point in this
3    trial the State is going to be asking you to
4    find the defendant in this case guilty of the
5    offense of capital murder.  You should
6    anticipate that at some point in this trial the
7    defense is going to be asking you to either not
8    find the defendant guilty of capital murder and
9    probably consider a lesser included offense or
10   to find him not guilty of any offense
11   whatsoever.  You should anticipate that.  That
12   is what we are here for.  It's a jury trial.  If
13   the defendant is found guilty of the offense of
14   capital murder, you should anticipate that at
15   some point the State is going to be asking you
16   to answer questions in a certain way so that the
17   death penalty is assessed.  If the defendant is
18   found guilty of the offense of capital murder,
19   you should anticipate that at some point in this
20   trial the defense will be asking you to answer
21   certain questions put to you in such a way that
22   a death penalty does not result.  That shouldn't
23   really come as news to you.  But the process we
24   go through probably is not going to be very
25   familiar to you.  When someone is found guilty

1955

1    of the offense of capital murder, we don't send

2    the jury back to vote for life or death.  We

3    have the jury answer certain special issues, two

4    questions that I put to the jury.  Based on the

5    answers to those questions, I will either assess

6    life imprisonment or the death penalty as the

7    appropriate punishment in the case.

8            Let's talk about the offenses in

9    general.  In terms of murder, when we are

10   talking about that first degree felony offense,

11   I am talking about somebody who intentionally or

12   knowingly causes the death of another

13   individual.  When we are talking about capital

14   murder, we are talking about something in

15   addition.  We are talking about somebody who

16   intentionally takes another life plus some other

17   aggravating factor.  In Texas, we have six

18   categories of offense in which the offense of

19   capital murder can be charged, six murder

20   situations which can be elevated to capital

21   murder status.  And when I am talking about a

22   capital murder offense, I am talking about one

23   for which the only possible punishment on

24   conviction is either life or death, not a term

25   of years.  By example, some of those lesser

1956

1    included offenses I was talking about,

2    involuntary manslaughter is two to ten year

3    offense.  Voluntary manslaughter, two to

4    twenty.  Murder, first degree murder, five to 99

5    or life.  Very wide -- what did I say?  Five to

6    99 or life.  In addition a fine not to exceed

7    ten thousand dollars may be assessed.  Very wide

8    ranges of punishment.  When you get to capital

9    murder, there is only two choices, life or

10   death.    Those six ways we have that are set out

11   by statute include when somebody murders a peace

12   officer or a fireman in the lawful discharge of

13   an official duty.  You probably heard about

14   those kinds of offenses.  It includes the kind

15   where somebody is in a murder for hire scheme,

16   murder for remuneration.  Some of those were in

17   the news last year, famous ones locally.  When

18   somebody is incarcerated in a penal institution

19   and in fleeing from that institution or

20   attempting to escape, he kills somebody.  That

21   can be capital murder.  If somebody kills an

22   employee of an institution, penal institution,

23   while he is incarcerated, that is capital

24   murder.  The kind of offense that you are most

25   familiar with, the kind you read in the

1957

1    newspaper and you see on television many
2    evenings is where somebody is in the process of
3    committing another felony offense and commits
4    murder.   There are five different categories of
5    felonies where that can occur.   Kidnapping,
6    robbery, arson, aggravated sexual assault and
7    burglary.   Examples, a lady is kidnapped from a
8    parking lot, taken somewhere, raped and
9    murdered.   That is a capital murder.   The
10   aggravating factor on top of the murder.   If a
11   convenient store clerk is killed while somebody
12   is in the process of robbing him, that is a
13   capital murder.   The sixth category is the one
14   that we have here.   The sixth category is where
15   someone murders more than one person in the same
16   criminal transaction.   It can be a number of
17   people -- the Jeffrey Dahmer case in Wisconsin
18   comes to mind.   It can be as few as two people.
19   You know from my having read the indictment to
20   you the allegation in this case is that two
21   people were murdered in the same criminal
22   transaction.   All those various ways get us to a
23   capital murder offense.   And if somebody is
24   convicted of capital murder, only two possible
25   punishments, it's mandatory, either life

1958

1    sentence or the death penalty.

2                Now, I talked about those wide ranges

3    of punishment on the lesser included offenses.

4    Usually it's very easy for people to think of a

5    situation where they would be able to consider

6    the upper end of the range of punishment in the

7    the appropriate set of facts and circumstances.

8    It's often difficult for people to think up a

9    hypothetical situation where the lesser range

10   might be the appropriate penalty.  When these

11   folks are talking to you, they are not going to

12   be able to commit you to a set of facts, commit

13   you to what you would do in a certain kind of

14   fact situation, but just one example.  Murder

15   case.  Somebody commits an act clearly dangerous

16   to human life which results in the death of

17   someone.  A situation you may never have thought

18   about is the euthansia case.  Husband and wife

19   married fifty years, one spouse is dying some

20   kind of incurable ailment, that spouse is on

21   life-support.  Spouse has hours to live.  The

22   doctors have been in and said your wife will be

23   dead within twenty-four hours.  She knows it.

24   She is in excruciating pain.  Because of

25   whatever life-support equipment she is on, she

1   can't have appropriate kind of medication to
2   relieve pain.  Doctors leave the room.   She
3   pleads with husband to, in effect, pull the
4   plug.  He does that.  She dies.  She may have
5   died ten hours later of natural causes, but what
6   he did caused her death.  He committed an act
7   clearly dangerous to human life which resulted
8   in her death.  That is the kind of offense in
9   which somebody can be charged with first degree
10  murder.

11          MR. STAFFORD:  With all due respect,
12  Your Honor, I do not believe that is murder, for
13  purposes of the record.

14          THE COURT:  I understand.  And I
15  believe that you are wrong.

16          At any rate, somebody could be charged
17  with that offense, arrested for that offense,
18  indicted for that offense, tried for that
19  offense, convicted of that offense; and if
20  convicted of an offense like that, then the
21  second stage of trial, the penalty stage is
22  where the jury decides the appropriate
23  punishment.  And that might be the kind of case
24  where somebody could consider as little as five
25  years in the appropriate case.  All I am saying

1960

1    is there are thousands and thousands of

2    different ways in which each one of these

3    offenses can be committed, and that is why it

4    has to be a wide range of punishment and why you

5    have to keep an open mind as to the punishment

6    scheme on these lesser included offenses when we

7    talk about them.

8                Capital murder.  Let's suppose the

9    jury returns a verdict of guilty to the offense

10   of capital murder.  We don't ask the jury to go

11   back there and vote life or death.  First you

12   sit through the penalty stage, which is a

13   shorter version of the trial.  Each side has the

14   opportunity to call additional witnesses.  You

15   may hear evidence of a defendant's background,

16   character, reputation, prior bad acts, prior

17   criminal convictions, if any.  You may hear

18   evidence of mitigating circumstances.  Jury goes

19   back to deliberate, but this time they are

20   looking at two questions, two special issues.

21   They are written over here on the board, and

22   these will be turned around to you when you are

23   up here individually.  But the first one asks:

24   Do you find from the evidence beyond a

25   reasonable doubt that there is a probability

1961

1   that the defendant would commit criminal acts of

2   violence that would constitute a continuing

3   threat to society.  That is asking the jury to

4   make a determination of a defendant's future

5   dangerousness.  You have all that information

6   available to you from the first and second stage

7   of trial.  I would give you an instruction to

8   the effect that you are to consider the evidence

9   admitted at the guilt or innocence stage as well

10   as all the evidence admitted at the punishment

11   stage, including evidence of a defendant's

12   background or character or the circumstances of

13   the offense that militate for or mitigate

14   against the imposition of the death penalty.

15        We are focusing on the word

16   probability.  By probability, in common usage,

17   meaning more likely to occur than not.  Do you

18   find from the evidence beyond a reasonable doubt

19   that there is a probability that the defendant

20   would commit criminal acts of violence that

21   would constitute a continuing threat to

22   society.

23        Now, by that term society, that term

24   is undefined.  You won't get a definition of the

25   term society in the Court's Charge.  It does

1    include the society within the penitentiary.  It

2    may include something more than what you have

3    ever considered.  We know that many of these

4    concepts you have never considered before.   In

5    answering that special issue number one, society

6    includes the society within what we call the

7    Institutional Division of the Texas Department

8    of Criminal Justice, what we use to call TDC or

9    Texas Department of Corrections.  So, is there

10    that probability the defendant you have already

11    found guilty of capital murder would commit

12    criminal acts of violence constituting a

13    continuing threat to society.  You answer that

14    yes or no.  It takes all twelve jurors agreeing

15    unanimously to return a yes answer.  Ten or more

16    can agree on a no answer.  If number one as to

17    probability is answered no, that is the end of

18    it as far as the jury is concerned, I assess

19    life imprisonment.  If number one is answered

20    yes, then we ask the jury to consider issue

21    number two.  Special issue number two asks

22    whether, taking into consideration all the

23    evidence, including the circumstances of the

24    offense, the defendant's character and

25    background and the personal moral culpability of

1   the defendant, there is a sufficient mitigating

2   circumstance or circumstances to warrant that a

3   sentence of life imprisonment rather than a

4   death penalty be imposed.   I would instruct you

5   that mitigating evidence is evidence that a

6   juror might regard as reducing a defendant's

7   moral blameworthiness.   So special issue two is

8   specifically about a mitigating circumstance or

9   mitigating circumstances.   Some people would say

10   that special issue number two permits the jury a

11   discretionary grant of mercy basically to say no

12   to the death penalty even though you have

13   already found somebody guilty of capital murder

14   and even though you have already found that

15   person had a probability of committing criminal

16   acts of violence constituting a continuing

17   threat to society.   It's important to realize

18   that the answers to these questions can

19   sometimes be yes, sometimes be no, depending on

20   the circumstances you have before you.   Every

21   case is different.   The circumstances of the

22   offense are different.   The kinds of evidence

23   you receive in the punishment stage of trial are

24   going to be different.

25          When I am saying mitigating

1    circumstances, exactly what do I mean?  Well,
2    it's not all that clear because, once again, our
3    statutes don't set out for us, they don't
4    identify or limit the aspects of the defendant's
5    character, of his record or the circumstances of
6    the offense that are mitigating.  In addition,
7    the law doesn't impose a formula for you to
8    determine how much weight to give a mitigating
9    factor.  So you may hear mitigating evidence or
10   you may hear evidence that you decide is not
11   mitigating in that case but in another case
12   might be mitigating.  And if you find that the
13   evidence is mitigating, you get to decide how
14   much weight to give to it.  So just because
15   there is some mitigating evidence introduced
16   doesn't mean that you have to answer that in
17   such a way that a life sentence is imposed.   We
18   know that certain things can be mitigating
19   evidence, like mental retardation, mental
20   illness.  We also know that in the proper
21   circumstances and proper case mitigating
22   evidence can include such things as a
23   defendant's good behavior in prison or in jail,
24   can include an exceptionally unhappy or unstable
25   childhood, can include childhood drug abuse,

1965

1   economic deprivation, youth, a defendant's age,

2   illiteracy, drug dependency, voluntary

3   intoxication, opinion testimony of lay witnesses

4   or psychiatric opinion testimony that a

5   defendant would not be a danger in the future.

6   All those kind of things in the proper case

7   might be mitigating evidence.  It's up to you to

8   decide, based on what you have heard, whether it

9   is mitigating and how much weight you would give

10  that.  You cannot require either side to bring

11  you mitigating evidence.  Mitigating evidence

12  may come in in the State's case in chief, it may

13  come in in the form of witnesses called by the

14  defense at that second stage of trial telling

15  you, for example, about some kind of terrible

16  childhood trauma, that kind of thing.  I never

17  know until we get into the trial.

18  Unfortunately, you and I are both a little bit

19  in the dark here.  We get to hear this evidence

20  for the first time together when testimony

21  begins in this case on September 28th, which is

22  as it should be.  The important thing is these

23  answers aren't automatically yes or

24  automatically no.  They are going to depend on

25  each case, each set of circumstances and vary

1966

1    from case to case.  We certainly don't want

2    anybody who is predisposed to always answer a

3    certain way to insure that a death penalty

4    results or who is predisposed to always answer

5    these questions in such a way that a life

6    sentence results.

7            On that number two issue, all twelve

8    jurors have to agree that the answer is no to

9    return a no answer.  Ten or more can agree to a

10   yes answer.  If that issue is answered yes, I

11   assess life imprisonment.  If all twelve jurors

12   say no, saying basically there is not sufficient

13   mitigating circumstances to warrant a sentence

14   of life imprisonment rather than a death

15   sentence after unanimously agreeing that there

16   is a probability the defendant would commit

17   criminal acts of violence that would constitute

18   a continuing threat to society, I assess the

19   death penalty.  Yes/no results in the death

20   penalty.  That is the only way it happens.

21   You get to know that in advance.  We don't keep

22   you in the dark about that.  You are going to

23   know from the outset what I am going to do

24   depending on how you answer those question.

25            Anybody have any questions so far?

1967

1                  Ms. Davies.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1              VOIR DIRE EXAMINATION BY THE STATE
 2    BY MS. DAVIES:
 3              I suspect the one thing I could get
 4    all twenty-two of you to agree on right now
 5    would be this would be a great time to leave
 6    here and go and take a nap.   I can tell by the
 7    glazed looks.   You have been over here all
 8    morning and you have had a lot of things thrown
 9    at you that you really didn't want to have to
10    hear about anyway.   So bear with us.
11              I will introduce myself again.   My
12    name is Carol Davies.   I am an assistant
13    district attorney.   You have probably all heard
14    of your elected district attorney, Johnny
15    Holmes.   He has close to two hundred attorneys.
16    It's a big law firm.   And all of us are his
17    assistants, and we are assigned to different
18    courts with responsibility for different types
19    of cases, depending on our assignments and our
20    experience.   That is why I am here.   The judge
21    has already made several references to the State
22    must do this, the State must do that, and as the
23    trial progresses you will continue to hear that
24    phrase.   They are talking about me when they
25    talk about the State.   I am here with the
```

1969

1   responsibility to see that the laws of our state

2   are enforced, hopefully to see that justice is

3   done, that appropriate sentences are handed out

4   in these courtrooms, and all these references

5   the State having the burden of proof and so

6   forth are references to me.  Rather impersonal,

7   but that is exactly what it means.  I always

8   like to mention that because I think it's not

9   nearly as obvious.  It's easy to tell who the

10  judge is.  Sometimes he is wearing a robe, but

11  at least he's sitting up there and making the

12  rulings as to the law.  The court reporter is

13  taking notes, and it's easy to see that the

14  defense attorneys are sitting next to their

15  client, the defendant on trial.  And I am over

16  here.  Who the heck is she.  So, that is why I

17  am here.

18          Some of this is going to be

19  repetitious, I know.  Most of you have not had

20  many opportunities, we have very few people who

21  had actually served on juries in this group.

22  And it's a serious case.  We are talking about a

23  capital murder.  So at the risk of boring you or

24  being repetitious in some respects, it's really

25  important that everybody understands what is

1    going on here.  So bear with me and try to
2    answer out, you know, whether you yell out,
3    speak up, raise your hand, stomp your feet, I
4    don't care, just try to let me know whether you
5    agree or disagree.  I would appreciate that.
6              This is kind of like an orientation
7    session I guess you would say.  What we are
8    trying to do is, I know it doesn't seem like we
9    are saving any time, but that is what we are
10   trying to accomplish because for many of you we
11   are going to talk to you individually, and if we
12   can go over some of these things that are common
13   to all lawsuits, all criminal cases, if we can
14   go over some of them as a group, in the long run
15   it saves some time, we think.  For that reason,
16   I am going to save most of my comments and
17   questions of you that relate to the death
18   penalty, that relate to answering those two
19   questions, as the judge has mentioned, at the
20   punishment stage, I am going to save that for
21   when I talk to you individually.  So, for the
22   most part, I just want to go over some of the
23   things that are common to many criminal cases
24   and certainly to any murder cases that may be
25   tried as well as capital murder cases.

1971

1    How many of you had the idea when you
2  came down here today that the death penalty was
3  a possible punishment for murder cases in
4  general, for any type of murder case?
5    THE PROSPECTIVE JUROR:  I think I
6  did.
7    MS. DAVIES:  I see quite a few hands
8  going up.  That is pretty typical.  You read
9  about things in the newspaper.  Half of the time
10  what they tell you is wrong.  Any newspaper
11  reporters here?  And I apologize if so.   It
12  will be part of the information.  And it just
13  doesn't give you the whole story.  As you know
14  now, that is not the case.  The death penalty is
15  only available for one sub group of murder
16  cases.  Those are what we refer to as capital
17  murder cases.  It has to be an intentional
18  murder plus an aggravating factor.   Judge has
19  already mentioned some of them for you.   It's
20  the intentional murder committed during the
21  course of a robbery, a burglary, a kidnapping,
22  something of that type, or the intentional
23  murder of a police officer, the murder for hire
24  situation, and it also includes the intentional
25  murder of more than one person during the same

1   criminal transaction.  So, for it to be capital
2   murder and for the death penalty to be one of
3   the possible punishments, you've got to have
4   murder plus.  That is the highest form of
5   homicide or murder in our legal system here in
6   Texas.  The judge has gone over them, and I want
7   to go over that hierarchy again with you
8   quickly.  We will start at the top of the
9   ladder, capital murder.   That is the
10  intentional murder plus the aggravating factor.
11  Only possible punishments are life or death.
12  That is it.   That is when you deal with those
13  two questions.  But below that capital murder on
14  the ladder, the list of murder or homicide
15  offenses are a number of other what we refer to
16  as lesser included offenses.  Say lesser
17  included offenses, it's kind of like peeling the
18  layers off of an onion, you know, the lesser is
19  always in there.  And you keep layering on a
20  little more, a little more to get to the more
21  serious one.  Makes me think of those nesting
22  dolls that the kids play with, you know, they
23  are all alike except it gets bigger and bigger.
24  From the murder scheme, it gets a little more
25  serious when you get to the top of the ladder.

1    So, below capital murder is your first degree

2    murder.  That is the intentional or knowing

3    taking of a life.   Intend to kill somebody but

4    not the additional aggravating factor.   First

5    degree, range of punishment, five to 99 years or

6    life.  And, by the way, all of these include an

7    optional fine.   We know that is the case, but

8    let's focus on the number of years because I

9    think that is the most significant aspect of the

10   punishment.   Below that, below that first

11   degree murder is voluntary manslaughter.   This

12   is a second degree felony.   Punishable by two to

13   twenty years.   Voluntary manslaughter is also

14   an intentional or knowing murder, but it is

15   committed under unique circumstances.   When

16   someone intentionally kills but they were acting

17   under the influence of sudden passion resulting

18   from an adequate cause.  And that language would

19   be explained to a jury by the judge to mean

20   that, in other words, a person is acting under

21   circumstances where they are in such a rage,

22   such an emotional state and they have not had

23   time to coolly reflect to control themselves,

24   and that rage has been caused by the person they

25   kill doing something that a reasonable person

1974

1   would consider an adequate cause.   Let me give
2   you an example.   You are going to find we talk
3   in terms of hypotheticals in here, and usually
4   they are extreme examples because that is the
5   best way to illustrate something.   But an
6   example of voluntary manslaughter would be, say,
7   you come home from work, your twelve-year-old
8   daughter had been home alone, you go in the
9   door, and there she is, she's bleeding,
10  battered, sobbing, she has been cut up, she has
11  been raped, and she sobs to you that Joe who
12  lives down on the corner did this to me.   Well,
13  self-defense is not an issue here or defense of
14  your child.   It's too late.   It has been done.
15  He is gone.   You don't have anybody to defend.
16  However, it is easy for most people to see in
17  that example that someone might be so enraged,
18  that instead of reaching for the phone and
19  calling the police, they reach for their gun
20  because they know who it is.   He is two doors
21  down at the corner and go shoot him
22  intentionally.   It's murder, but the legislature
23  has seen fit that when someone, when a jury
24  believes that they are acting, a person is
25  acting under the influence of sudden passion

1975

1    from an adequate cause in those reasonable

2    circumstances that offense is downgraded to a

3    second degree murder, punishable by two to

4    twenty.

5            You go on down to the next lower rung

6    on the homicide scheme, we have involuntary

7    manslaughter.  That is a third degree felony.

8    Third degree felony is punishable by two to ten

9    years.  That is the reckless taking of someone's

10    life.  Recklessly means you knew there was a

11    risk, you knew you were doing something that

12    might very well cause, endanger someone's life,

13    might result in serious bodily injury or death,

14    didn't intend to kill them, but you knew that

15    the act you were committing was a dangerous

16    one.  You disregarded the risk and do it

17    anyway.  Example, the kind of thing you read

18    about in the newspapers.  This is certainly not

19    the only way that you can have an involuntary

20    manslaughter.  But I think it's a typical

21    example is D.W.I. Somebody is driving while

22    intoxicated, they kill somebody.  Then, at the

23    very bottom of the ladder is negligent homicide,

24    which isn't even a felony offense.  That is a

25    misdemeanor where you should have known there

1976

1    was a risk in the acts you were committing but
2    the person on trial didn't even understand that
3    there was a -- that it was a risk, that they
4    were endangering somebody's life; however, the
5    result of their conduct was someone's death.
6    Okay?  So there is an incredibly wide range of
7    punishment there.   And all of those lesser
8    offenses are encompassed in that greater offense
9    of capital murder.   They just don't have those
10   extra aggravating elements added on.
11           Let's just focus on the felony
12   offenses and set aside capital murder and your
13   death penalty case for the moment.  Our concern
14   is to know whether any of you, if you were on a
15   jury in any type of murder case other than
16   capital murder now, and you were confronted with
17   deciding punishment, could you keep an open mind
18   and consider the entire range of punishment?
19   Let's start at the top.  Say if you were on a
20   jury considering the first degree murder, five
21   to 99 years or life, is there anyone here who
22   feels like they could never consider sentencing
23   someone to life imprisonment?  Anybody here who
24   feels that way?  We have people who come in here
25   who feel they shouldn't sit in judgment on

1977

1  somebody and they could never be responsible for
2  that.  Yes, sir?
3           THE PROSPECTIVE JUROR:  Can I ask a
4  question?
5           MS. DAVIES:  You are Mr. Marks?
6           THE PROSPECTIVE JUROR:  Yes.  What
7  does life mean?  Can they get out in three years
8  or four years with life?
9           MS. DAVIES:  Well, we always wonder
10 how early on this question is going to come
11 because it comes up every day, and I noticed
12 from looking over the questionnaires that you
13 filled out several of you expressed interested
14 concern about that.
15          Your Honor, would you like to explain
16 that or shall I?
17          THE COURT:  I keep hoping that you
18 will just do it without ever talking to me every
19 time.
20          I think we will both do it.  I will
21 suffer a little bit, and then I will let you
22 talk to them.
23          You are not to consider how long
24 somebody would have to serve on a sentence
25 imposed.  I know full well when you come in here

 1    twenty-two different people have twenty-two

 2    different ideas exactly how much somebody is

 3    going to serve on any sentence imposed.  Some of

 4    you have better information than others do.

 5    Some of you are walking around with a lot of

 6    misinformation.   Some of you may even have a

 7    pretty good idea in certain kinds of cases how

 8    quickly somebody can be out.   If you are

 9    getting your information from most of the news

10    media, it is probably incorrect.   At any rate,

11    if you were called upon to assess a term of

12    years in the penitentiary in any case, I would

13    give you an instruction in every criminal case

14    in the punishment stage that you are not to

15    consider parole, you are not to consider how

16    long somebody would actually serve.   We know

17    you come in with that information, we know that

18    it's there, but you can't be expected to flush

19    your mind of this information.  When you go back

20    to deliberate, however, you are not to consider

21    that in deciding what the appropriate punishment

22    should be.   I remind the jurors that parole is

23    within the exclusive jurisdiction of the Board

24    of Pardons and Paroles and the governor of the

25    State of Texas.   I don't have any control over

                                                 1979

1    it; you don't have any control over it.  I would
2    also instruct the jurors that if any other juror
3    starts to mention exactly how long somebody
4    would serve on a sentence imposed it's the duty
5    of the other jurors to stop him at once.
6              Ms. Davies, you can say anything you
7    want to.
8              MS. DAVIES:  There is not much to add
9    to that other than, unfortunately, I always like
10   to ask the judge because I hate it when somebody
11   asks me a question and I can't give them a
12   straight out answer.  The reason is the judge is
13   going to instruct you that you must not consider
14   that in determining a sentence in this case or
15   in any criminal case.
16             THE PROSPECTIVE JUROR:  I don't think
17   I really got an answer.
18             THE COURT:  You didn't get a correct
19   answer because I can't tell you.  All I can
20   tell you is you can't consider it.
21             THE PROSPECTIVE JUROR:  You can't tell
22   me if there is any difference between 99 years
23   and life?
24             THE COURT:  I can tell you that.
25   That is usually the second question we get.

                                              1980

1    It's just a matter of how long it takes us to

2    get there. It has to do with when somebody can

3    discharge parole.  It's my understanding that

4    you don't ever technically discharge a parole on

5    a life sentence.

6           MS. DAVIES:   That's my

7    understanding.   There is no distinction in

8    terms of when one becomes eligible for parole.

9    There is only a difference in how long, what

10   portion of one's life you remain on parole after

11   you get out of prison.

12          Now that this has been brought up, the

13   issue of parole, I would like to have

14   everybody's assurance that even though you may

15   disagree with what the Board of Pardons and

16   Paroles is doing at the present time and have

17   concerns about the system, that you recognize

18   that that is something that is not within the

19   jury's or the court's control and that you could

20   follow the judge's instructions and set aside

21   your concern, not let that influence your

22   sentencing in this case if you should be on the

23   jury.  Can you do that?  Thank you for raising

24   your hand.   Okay.

25          Because that is one of the

1981

1    instructions that the judge will give you.  It's
2    just something that, you know, if you are
3    wanting to see changes made in that regard, it
4    needs to be through the legislative process or
5    some other process other than through your
6    service as a juror.
7              I think what we were talking about was
8    the range of punishment.  Each of your --.
9              THE PROSPECTIVE JUROR:  Where does
10   premeditated come in?  Is that only first
11   degree?
12             MS. DAVIES:  Premeditated doesn't come
13   in at all.  We will talk about that a little bit
14   more here in just a few minutes.  But, no, we
15   are talking about intentional murder.
16   Premeditated is a term you hear on TV, and it
17   used to be a part of the law but is no longer.
18             So let's go back to the range of
19   punishment for a minute here.  My concern is to
20   know whether each of you can keep an open mind
21   as to the full range of punishment.  Remember we
22   are not talking about capital murder here right
23   now.  We are talking about first degree murder.
24   Five to life.  Is there anyone who could never
25   consider sentencing an individual to life

                                              1982

1    imprisonment regardless of the facts?  Anyone

2    who feels that way, that they shouldn't sit in

3    judgment of that type?  Okay.

4              And then the other end of the spectrum

5    is the low end, as little as five.  I heard the

6    judge give you an example about euthanasia, a

7    mercy killing.  And, again, usually we use

8    extreme examples to illustrate the point.

9    Murder comes in all kinds of situations.  You

10   could have a first degree murder, an intentional

11   murder that was a domestic, an ongoing family

12   feud that finally erupted into violence.   It

13   could be a barroom disturbance, stranger meets

14   somebody for the first time.  It could be a

15   sniper who kills just one person.  Or it can be

16   this other extreme example of someone who is

17   acting, to use the judge's euthanasia or mercy

18   killing example, is acting out of love and

19   doesn't want to see someone suffer, a defendant

20   perhaps who is very elderly and has never been

21   in trouble in his life, that for most people

22   they can see.  There is such a difference in the

23   type of fact pattern, that is why we need such a

24   wide range of punishment.  So whether we are

25   talking about the minimum range of five years in

                                                    1983

1    a first degree murder or the minimum range of

2    two on your second or third degree murder, I

3    just want to be sure that each of you would be

4    able to keep an open mind, wait and hear the

5    facts and decide what punishment was

6    appropriate, whether it's the minimum, maximum

7    or something in between, based on the facts in

8    the case you have heard.  Can you do that?

9              Thanks.   That makes it so much

10   easier.   I appreciate that.

11             You know from the indictment that the

12   judge read to you that this capital murder

13   involves the killing of two individuals.   And

14   what I have to prove in proving up this

15   particular capital murder is that there was the

16   intentional, not premeditated but intentional

17   killing of two men, Charles and Bradley Dean

18   Allen.   Premeditated, Ms. Holden asked me about

19   premeditated.   That was one of the things that I

20   wanted to talk to you about.   That is simply not

21   a part of the scheme.   Years ago, it was.   At

22   this point in our law, I have to prove that it

23   was intentional, that someone intended to kill,

24   but it doesn't matter whether it was planned two

25   days, two minutes or two seconds ahead of time.

1984

1    Does anybody have any disagreement with that?
2    Does that not seem right to you?  Mr.
3    Washington?
4              THE PROSPECTIVE JUROR:  I have no
5    disagreement with that.
6              MS. DAVIES:  Let's talk about that
7    intentional killing.  I have to prove that
8    someone intentionally killed and, yet, you
9    already know that this defendant and any
10   defendant in any criminal case has the right to
11   remain silent.  He certainly does not have to
12   testify.  And I think you have all already
13   indicated that you could respect that
14   constitutional right that we all have to remain
15   silent.  Human nature may be that in most
16   situations you are always dying to hear both
17   sides of the story, but this is one place where
18   we have to set aside our natural inclinations
19   and be willing to respect that basic
20   constitutional right of the individual who is on
21   trial.  So, can y'all assure me that you can do
22   that?  Then we get to, from there, okay, nobody
23   can force this person to testify, and I am
24   supposed to prove what he intended to do.  How
25   do I do that?

1985

1          THE PROSPECTIVE JUROR:  Evidence.

2          MS. DAVIES:  Yeah, evidence, right.

3     From the circumstances.  The evidence hopefully

4     that would show -- sometimes you have an

5     eyewitness.  We will get into that in a little

6     bit.  Sometimes you don't, when you are talking

7     about murder.  Sometimes the only person who was

8     there is dead.  But you have to look at the

9     circumstances and at the conduct of the

10    individual to decide what they intended to do.

11    Is there anyone who feels like they would have a

12    problem doing that?

13         THE PROSPECTIVE JUROR:  I have a

14    question.

15         MS. DAVIES:  Mr. Hensley?

16         THE PROSPECTIVE JUROR:  Yes.   When

17    you are talking about intentional murder, this

18    is something that was planned, you said it could

19    have been planned two weeks, two days or two

20    minutes beforehand.

21         MS. DAVIES:  I think I even said two

22    seconds.

23         THE PROSPECTIVE JUROR:  But we are not

24    talking about self-defense at all?

25         MS. DAVIES:  Not right now, we are

                                        1986

1     not.     Self-defense is a concept that I think

2     naturally comes to mind any time you are talking

3     about different types of murder.   But, no.

4                   THE PROSPECTIVE JUROR:   But not in

5     this case?

6                   MS. DAVIES:   I can't tell you what the

7     evidence will be in this case.   We will talk

8     about self-defense here in just a minute.   But

9     let's finish up.   And remind me if I forget, Mr.

10    Hensley, because I do want to touch on that.

11                  To prove intent, I think what I was

12    saying was, even if the defendant gave up his

13    right to remain silent and testified, he might

14    not be totally candid.   Like any witness, you

15    might not -- you can believe all, part or none

16    of what somebody says.   When somebody has a lot

17    at stake in terms of proving intent, they might

18    not be candid with you.   But if somebody does

19    testify, looking at the circumstances and

20    conduct, actually what they did might tell you

21    more about what somebody meant to do.   You know,

22    if I push my paper over here and this cup fell

23    off the table, you might not be all that sure

24    that I intended to knock the cup off the table.

25    Hey, you know, she just hit it and it fell

1    off.   On the other hand, if you saw me pick up
2    the cup, pull my arm back and hurl it against
3    the wall, you could probably conclude from
4    looking at what I did and how I went about doing
5    it that I intentionally threw the cup against
6    the wall.   That would be without my saying
7    anything.   You know, if there was a law against
8    breaking this cup that belonged to somebody else
9    or whatever, say, I would have the right to
10   remain silent, I wouldn't have to tell you what
11   I intended to do, but you can look at what I did
12   and how I did it to decide what you believe my
13   intent to be.   Does that make sense?
14            THE PROSPECTIVE JUROR:   Yeah.
15            MS. DAVIES:   As far as how quickly
16   intent can be formed, I think I didn't see
17   anybody disagree with the notion that it could
18   be formed quickly, but let's talk about that for
19   a little bit.   Because I do have to prove that
20   there was the intent to kill.   And just to try
21   to highlight the fact that it would not have to
22   be premeditated or planned ahead, let's say --
23   anybody drive the freeways in Houston?   Make you
24   nervous now and then?   Some of the things you
25   read make you wonder whether you should.   But,

1988

1    for example, it might be that in Houston, Texas,

2    this kind of hypothetical could occur.  You are

3    driving along and certainly without any --

4    nobody knew it was going to happen ahead of

5    time.   You cut in front of somebody.   It makes

6    them mad.  They edge you over to the side of the

7    road, pull a gun and shoot you or your passenger

8    or something.   I mean, clearly intended to kill

9    somebody.  Pulled a gun, took aim, fired.

10   Intentional murder.  But certainly it would be

11   something that was decided on very quickly.

12   They didn't know each other.  He didn't know you

13   were going to cut in front of them, and

14   certainly the shooter didn't either.  But can

15   you see, that as quickly as that happened, that

16   that could be an intentional murder?  Anybody

17   disagree with that?  Think to qualify as first

18   degree murder it would have to be something

19   planned out with more thought or planning?

20   Anyone?  Okay.

21              THE COURT:  Ms. Davies, we are going

22   to take a break.

23              (Recess; after which, the following

24   proceedings were had:)

25              MS. DAVIES:  I think we had just about

1    wound up with one area.  I wanted to talk to you
2    a little bit about the kinds of witnesses and
3    witnesses in general.  I think, when people
4    think about what kind of evidence we have in
5    trials, so often they think of the evidence as
6    physical evidence, bullets, fingerprints,
7    weapons, things you can touch and feel.
8    Evidence also includes testimony.  And that is
9    the most typical kind of evidence.  Normally we
10   have people come in here, citizens like you and
11   me, who come in and tell under oath what they
12   saw or heard or know about a case.  And a part
13   of the jury's job, in fact it is the main part
14   of a jury's job is to decide who is worthy of
15   belief, who is credible, who is not, is part of
16   what they are saying true and maybe part isn't.
17   For example, if during the break you had gone
18   out in front of the building and there was an
19   automobile accident at the intersection and
20   there had been four witnesses, one person
21   standing on each corner seeing that accident
22   from different directions and different
23   perspectives, would it surprise anybody to think
24   that if they came right up here to the courtroom
25   to tell us about it that there might be some

1990

1    discrepancies in the versions that they gave?

2    Would that surprise anybody to think there might

3    be differences in the way they report what they

4    saw?  Anybody who would be surprised by that?

5    Several of you are speaking up you certainly

6    wouldn't be surprised.  Is there any particular

7    reason why you think there might be

8    differences?

9              THE PROSPECTIVE JUROR:  Different

10   angles of vision.

11             MS. DAVIES:  Ms. Holden said different

12   angles of vision.  Somebody might have had

13   something blocking their view that another

14   person didn't have, or blinked, looked away when

15   the other didn't or had better eyesight.  Of

16   course, there can be other differences, too.

17   Some people have better memories or some people

18   are just more articulate, they are better able

19   to come up here and describe for you what they

20   saw.  And those are all examples of situations

21   where none of those people would be lying.

22   They might come and tell you as accurately as

23   they are able what they saw.  But you as the

24   jury would have to resolve the conflicts, decide

25   which was more accurate.  And you could compare

1       what they tell you they saw with the physical

2       evidence of how the cars were, point of impact

3       and so forth to decide which one was the more

4       reliable.  Of course, sometimes some people do

5       fabricate or exaggerate or maybe diminish what

6       they saw.  And, so, there is other things

7       involved.  Did someone have something at stake?

8       I mean, if one of the witnesses happened to be

9       the mother of one of the drivers in that

10      accident, you might say:  Well, you know, she

11      might not be quite as reliable.  She might have

12      a little bit of a bias.  Maybe, maybe not,

13      depending on how she presents herself.  That is

14      a part of the jury's job is to resolve the

15      conflicts and decide who is the most

16      believable.  Anybody who feels like you could

17      not do that?  Anyone at all?

18              Ms. David, is it David or David?

19              THE PROSPECTIVE JUROR:  Depends on

20      what language.  David.  Yeah, I think so.  If

21      they all saw the same thing, somehow it would

22      all tie up, so I would say if one person was

23      driving and ran over another person, yes, there

24      might be different angles, but they all have to

25      tie up somehow.

1992

1           MS. DAVIES:  You are right.  Do you

2     feel like you could resolve the discrepancies?

3           THE PROSPECTIVE JUROR:  I don't know.

4     It depends.  Some might be lying.  But I can't

5     see a problem with everybody not agreeing on

6     certain things but they all have to tie up that

7     they saw the same thing at the same time.

8           MS. DAVIES:  One may be lying.  That

9     would be a part of the jury's job is to decide

10    which one of those people is worthy of belief

11    and which isn't.  So could you look at that type

12    of evidence and make that kind of decision?

13          THE PROSPECTIVE JUROR:  I think so.

14          MS. DAVIES:  Okay.  Sometimes we don't

15    have that kind of problem because there is only

16    one witness.  And we can have a situation

17    where -- and you still have to decide whether

18    that witness is reliable and credible, worthy of

19    belief.  But the law would permit me to ask a

20    jury to find someone guilty based on the

21    testimony of just one witness, assuming, of

22    course, you would have to believe that witness

23    beyond a reasonable doubt and they would have

24    the information to substantiate guilt.  We are

25    talking about capital murder.  We are talking

1993

1    about the possibility of a death penalty.   Is
2    there anyone who has the reaction to that notion
3    of basing a conviction on just one witness that,
4    no way, you would have to have more than that?
5    Anyone who feels that they could not or would
6    not want to convict based on the testimony of
7    just one witness?   Anyone?
8                THE PROSPECTIVE JUROR:   I don't
9    know.   What if you have doubts about that
10   witness?
11               MS. DAVIES:   Well, she's asking what
12   if you have doubts about that witness.   In my
13   question, I assume, I mean, you are going to
14   have to decide that witness is worthy of
15   belief.   You have to be convinced beyond a
16   reasonable doubt that that witness is a
17   truth-teller.   That certainly you are not going
18   to convict somebody based on one witness you
19   don't believe.   But say if there is one
20   witness.   Some people feel like that one witness
21   isn't enough.   I want to know if anybody feels
22   that way.   We are talking about a witness you
23   believe beyond a reasonable doubt.   Could you
24   base a conviction for capital murder based on
25   the testimony of just one witness assuming you

1994

1    believe that witness beyond a reasonable doubt?

2              THE PROSPECTIVE JUROR:   If I believe

3    the witness.

4              MS. DAVIES:   Anybody have a problem

5    with that?  Okay.

6              The judge has already touched on that

7    notion of different statuses of witnesses.   You

8    know, would you automatically believe a police

9    officer, you know, anybody feel like I am always

10   going to believe everything a police officer

11   says, or the flip, I am never going to believe

12   anything a police officer says?  Anybody feels

13   either way?  Anybody?  Or who is always going to

14   believe what a plumber says or never going to

15   believe what a plumber says, or a doctor?  The

16   point is can you keep an open mind and listen to

17   a witness and certainly any, if they bring

18   special background or training that is related

19   to what they are testifying about, it's

20   appropriate to consider that in deciding whether

21   to believe their testimony, but the point is we

22   want to think everybody starts out the same at

23   the same point in the race.  They start out

24   equal, you wait and hear about their

25   credentials, hear about what they have to say

1    before you decide whether to believe them or

2    not.  Fair enough?  Can everybody do that?

3             THE PROSPECTIVE JUROR:  Yeah.

4             MS. DAVIES:  We are nearly getting

5    through here.  A couple of things I want to

6    touch on.  Another type of evidence that is

7    possibly a part of any criminal case is a

8    situation where a defendant may not testify.  He

9    may exercise his right to remain silent, but

10    there may a statement that he gave to the

11    police.  There are several rules of evidence

12    that apply to that that I want to touch on.  And

13    if a defendant has given a statement to the

14    police, the rules of evidence say, well, the

15    judge first will make some rulings.  There are

16    circumstances when sometime the judge may rule

17    most of that statement comes in but some of it

18    doesn't because maybe it's irrelevant, it's too

19    prejudicial, there is something about some

20    aspect of it that the judge would say the jury

21    can't hear, that that is something only the

22    judge can rule on.  In other instances I may,

23    according to the rules of evidence, offer a

24    defendant's statement that he has given to the

25    police, but there may be some parts of it I

1    choose not to offer.  May be words, it may be

2    sentences, paragraphs, and the jury would know

3    this.  It's not that it would be done without

4    your knowledge.   It would be clear from the

5    testimony that certain portions have been left

6    out.   Anybody highly offended at the motion I

7    may use that rule of evidence and do such a

8    thing, offer parts but not all of a statement?

9              THE PROSPECTIVE JUROR:  I would.

10             MS. DAVIES:  Ms. David.  Ms. Holden.

11   Anybody else?  Ms. Henderson.  Anybody else?

12   That bothers you.

13             THE PROSPECTIVE JUROR:  Yeah.

14             MS. DAVIES:  I think that is a natural

15   reaction, why is she leaving that out, I want to

16   hear all of it.

17             THE PROSPECTIVE JUROR:  It wouldn't

18   bother me.  If you used part of the statement, I

19   would imagine that the defense attorney would

20   bring it up and offer the entire statement.

21             MS. DAVIES:  Well, Mr. Washington has

22   touched on the other part of that same rule of

23   evidence.

24             THE PROSPECTIVE JUROR:  I figure how

25   can I judge something if I don't have all the

1    information?

2              MS. DAVIES:  This is why I touched on

3    this because I don't know what the defense will

4    decide to do, but I like to be sure people who

5    are sitting on juries understand what is going

6    on.  That same rule of evidence that would

7    permit me to offer part of the statement, the

8    second part of that same rule is, if I do that,

9    the defense has the right immediately to offer

10   the rest of it.  That is like what is fair is

11   fair.  She doesn't have to offer all of it.  For

12   whatever her trial strategy is.  If the defense

13   wants the rest of it in -- and that is a big _if_

14    -- if they want the rest of it in, they

15   immediately have the right to offer it.  So, the

16   result is nothing is ever hidden from the jury.

17   Now, does it make a difference to you, Ms.

18   Holden, knowing that, I mean, if I would do

19   that, we all know going in the defense gets to

20   show it to you if they want to.

21             THE PROSPECTIVE JUROR:  I would be

22   against you because you didn't show it to me?

23             MS. DAVIES:  Right.

24             THE PROSPECTIVE JUROR:  No, I would

25   weigh everything else along the line.

1998

1           MS. DAVIES:  I think for most people
2      it makes a difference.
3           THE PROSPECTIVE JUROR:  But I wouldn't
4      like it.
5           MS. DAVIES:  If I do that, I know, the
6      defense knows, everybody knows:  Hey, it's not
7      like she can hide anything from us.  She is not
8      trying to do that.  It's just a matter of trial
9      strategy, that, hey, if the defense wants that
10     part of the statement in, let them do that, and
11     the law permits them to do so.
12          Ms. David, how about you?  Would you
13     hold it against me if I utilize that?
14          THE PROSPECTIVE JUROR:  I would just
15     say if you left something out I would feel like
16     I was tricked and not told the whole truth from
17     either side.
18          MS. DAVIES:  You would feel like you
19     were tricked even though you know--
20          MS. DAVID:  Half a truth is like a lie
21     to me.  It's either I am told everything or I am
22     told nothing.
23          MS. DAVIES:  Even knowing that that
24     rule of evidence--
25          THE PROSPECTIVE JUROR:  It doesn't

                                              1999

1    matter.

2              MS. DAVIES: -- provides that -- you

3    are not going to hear half of it.

4              THE PROSPECTIVE JUROR:  They may not

5    offer the other half, I don't know.   Is it a

6    sure thing?  If it is, then why won't you say it

7    if they are going to come up and say right

8    away?  You say it's a strategy.  Strategy of

9    what?

10             MS. DAVIES:  There are so many

11   different kinds of fact situations.

12             MS. DAVID:  I would have a problem.  I

13   would have a problem.

14             MS. DAVIES:  There can be a situation,

15   to give you an example of strategy, say if there

16   is something in that statement that, I mean, I

17   just think if they want that in let them put it

18   in.   For instance, this is an absurd example,

19   but we can't talk about the facts of this case

20   or what might be the case.  But say I have got

21   witnesses that say:  Oh, I heard the shot at

22   twelve noon, called the police, the police say I

23   arrived at ten minutes after twelve and there

24   was the body, you know, took us ten minutes to

25   get there.  And in a defendant's statement he

2000

1    says:  Well, I shot this person at midnight.  It

2    didn't happen at midnight.  It happened at

3    noon.   Why would I offer that part of his

4    statement that, you know, it's clearly wrong

5    based on the rest of the evidence.

6            THE PROSPECTIVE JUROR:  What

7    difference would it make?

8            THE PROSPECTIVE JUROR:  She's

9    interested in pointing to the fact that the

10   person did admit that they committed the crime,

11   they shot the person, regardless of whether it

12   was at twelve noon or twelve midnight.

13           THE PROSPECTIVE JUROR:  What

14   difference would it make?  Why would she not say

15   whether it was noon?

16           MS. DAVIES:  I would be offering

17   evidence of what time it was.  You know, I would

18   have, in this hypothetical, all of the evidence

19   points to this happened at a certain time of

20   day.  I mean, this is an absurd example.  Who

21   knows why it might be important?  But we all

22   know that if the defense thinks it's important

23   that he said it happened at midnight, you hear

24   it.   Nothing is hidden from you.   It's not

25   secret.   I mean, I have to tell them

                                              2001

1    everything.  They know it.   You would know

2    it.   It's just like these are the way the rules

3    of evidence work.  She does A, they can do B.

4    So, my concern is just to know would you hold it

5    against me if I did that?

6            THE PROSPECTIVE JUROR:   No, but I

7    wouldn't like it.

8            MS. DAVIES:   Okay.

9            And, Ms. David, you are telling me

10   that you would hold it against me?

11           THE PROSPECTIVE JUROR:   Against you or

12   against them.   I am going to say whoever is

13   better hiding is the one who is going to get the

14   defendant guilty or not guilty.   I mean, it's a

15   matter of convincing.  So if you are better in

16   doing your own thing than they are, then we know

17   the result and vice versa.

18           MS. DAVIES:   Okay.   We will talk

19   about it some more.

20           There was another hand back there.

21   Who else was it that raised their hand?   Ms.

22   Henderson?

23           THE PROSPECTIVE JUROR:   If you left

24   something out, I would feel like you were trying

25   to sway us your way.

                                             2002

1          MS. DAVIES:  Oh, sure, I am.  That is

2     what this is all about.  In terms of the

3     presentation of the case, I mean, of course, I

4     am going to be trying to persuade you, just as

5     the defense is going to be trying to persuade

6     you.  We are on different sides here, you will

7     find out.   I mean, we are friendly between

8     breaks, we work together.  Hey, during this

9     trial we are on different sides.  We are going

10    for different things here.  Absolutely.  But the

11    point of all this, and because we are, we have

12    to each of us have a strategy on how to develop

13    the evidence.  The rules of evidence are going

14    to make sure nothing is hidden from you.   You

15    are going to get to hear it all.  That is the

16    point of this.  I like to be sure jurors

17    understand that because if they don't know how

18    that rule of evidence works they might think I

19    could hide something from them under those

20    circumstances.  And that is not the case.  That

21    is not the case.  Would you hold it against me,

22    Ms. Henderson, if I used that rule?

23          THE PROSPECTIVE JUROR:  I just know

24    now that if I were a juror I wouldn't know you

25    wouldn't be telling anything that you didn't

2003

1    want me to hear.  You wouldn't be presenting

2    anything.

3              MS. DAVIES:  Well, see, discovery in

4    criminal cases requires that -- it's not like on

5    the civil side, where everybody has to tell

6    everything they know.  If any of you have ever

7    been involved in civil litigation, the discovery

8    goes on and on.  It's not the same way over

9    here.  Over here, it's just a one-way street.  I

10   have to tell them everything I have.

11             MR. STAFFORD:  That's not true, Judge.

12   She only has to tell what the Supreme Court has

13   told her to tell.  That doesn't mean

14   everything.

15             MS. DAVIES:  I apologize.  Let me

16   reword that.  I don't have to tell them

17   everything, but I do, I am under professional

18   and ethical requirements as well as rulings of

19   the court to reveal.  And certainly -- this

20   example -- any statement a defendant has made,

21   they know all about it.  Anything that points to

22   his innocence or mitigation, if I have

23   information of that kind, I must tell them about

24   it.   Y'all don't want to sit here all afternoon

25   to go over every detail of types of evidence I

2004

1    must tell them about, but I assure you this is
2    not something that, you know, they don't have to
3    tell me anything about their case.  Nothing.
4    But the law does require and certainly anything
5    that would point to innocence or mitigation, if
6    I am in possession of that kind of information,
7    I must tell them.  And this would be an
8    example.  Any statement they give.  It's not
9    like I have a secret and I get to hide it from
10   the defense or from the jury.  Okay.
11          Let's go onto something else.  We will
12   come back to that later.  Another type of legal
13   issue that is related to a defendant's statement
14   is the issue of whether a statement was given
15   voluntarily.  It's kind of a legal question.
16   For the most part, the judge decides legal
17   questions and the jury decides questions of
18   fact, like who is believable, what happened
19   there.  But this is kind of a unique situation.
20   Anytime a defendant has given a statement and
21   it's offered into evidence, it is quite common
22   that the judge will tell the jury, when they are
23   reaching their verdict, that they have the
24   responsibility, each of them individually, of
25   deciding in their own mind whether that was a

1    voluntary statement.  And the judge will tell

2    you that if you are not convinced that it was

3    voluntarily given you must disregard the

4    evidence.  Are you hearing what that means?  You

5    hear the evidence; you read it; you hear it; you

6    have heard a statement that a defendant gives;

7    and, yet, you would be given the opportunity to

8    decide whether it was voluntary.  And if you

9    were not convinced it was voluntary, you must

10   consciously disregard that statement.  You can't

11   forget it.  Nobody has an erase button on their

12   brain.  It's like unringing the bell.  You are

13   not going to forget it, but you would go through

14   the mental exercise of disregarding it.  In

15   other words, don't consider it as evidence.

16   Just look to the other evidence.

17              Now, on the issue of whether the

18   statement is voluntary, you know, what is the

19   reason for this?  I mean, it is another one of

20   those protections for the defendant to be sure

21   that he is not browbeaten, coerced into giving a

22   statement.  So one issue of voluntariness would

23   be a pretty obvious, more physical thing.  You

24   know, if you heard testimony from a police

25   officer -- and again this is a bizarre, extreme

2006

1     example -- but he described how he starved and

2     tortured a prisoner for days before he got the

3     statement, probably pretty good bet you would

4     decide that was not voluntary.  On the other

5     hand, voluntariness, also, the judge would give

6     you a list of certain requirements that the

7     police officers must follow.  These are required

8     by the constitution and specifically required by

9     our Texas statute.  Anybody heard of the term

10    Miranda warnings?  You have seen this on TV.

11    Whether you heard Miranda warnings or not, it's

12    the warnings the police have got to give.  You

13    have the right to an attorney.   You have the

14    right to remain silent, et cetera.   There is a

15    list of those warnings set out in our law now

16    that very specifically police officers know they

17    must do that.  And, so, if you have a statement

18    and it's clear from the evidence that they

19    didn't do what the law requires, one of those

20    warnings was left out, the judge will tell you

21    then you disregard that statement because it's

22    not voluntary.  As I said, you are not going to

23    forget it, but it's a matter of mental

24    self-discipline, a mental exercise of deciding I

25    will not consider that as evidence because I am

1      not convinced it's voluntary.  And you would

2      have to throw it out and look at the other

3      evidence, the remaining evidence to  determine

4      whether you are convinced that beyond a

5      reasonable doubt that the person is guilty of

6      the crime.  Can each of you assure me that you

7      would follow that instruction from the judge as

8      difficult as it may be?  I mean, difficult, just

9      the concept of, you know you can't forget it but

10     you know you are going to have to set it aside.

11           THE PROSPECTIVE JUROR:  You have to

12     un-remember.

13           MS. DAVIES:  Good.  Un-remember.   And

14     you can't do that, I mean, you can't forget, you

15     are going to know, so you are going to know

16     exactly what you are doing, but it's a matter of

17     tossing out the evidence, just like in other

18     circumstances you have read about where a judge

19     throws out evidence, decides it's not

20     admissible.  This would be each individual juror

21     making that decision because one juror could

22     hear that evidence and think it was voluntary

23     and consider it, another juror would say:  Well,

24     I don't think it was voluntary, I am not going

25     to consider that, but based on the other

1   evidence I am still convinced beyond a
2   reasonable doubt he is guilty.   See?   Okay.
3   Now here comes the hard part, the next step is
4   the really tough one.   When you are confronted
5   with that situation where you have heard that
6   statement, it's a confession.   I usually call it
7   a statement because a statement doesn't always
8   admit guilt.   Sometimes it does; sometimes it
9   doesn't.   But you have heard that statement and
10  you are convinced it was not voluntary for
11  whatever reason.   For purposes of our
12  hypothetical, let's just assume the police
13  forgot to give one of those warnings the law
14  requires.   It's obvious that they didn't give
15  the warnings.   You would have to conclude it's
16  not voluntary, so you follow the judge's
17  instructions, you disregard the statement, throw
18  out that evidence, and now you look at the
19  remaining evidence.   There is nothing there.
20  Sure not enough to base a conviction on.   So
21  you are left with this very difficult situation
22  of not having evidence to convince you of guilt
23  after you have decided you must disregard
24  something that admits guilt.   Not easy.   This is
25  a matter of self-discipline and being able to go

2009

1  through that mental exercise and live with

2  that.  The judge will instruct you exactly what

3  you have to do if you are confronted with that

4  kind of situation where you are convinced, and

5  it would be your individual decision, if you are

6  convinced that was, or I should put it the other

7  way, if you are not convinced it was a voluntary

8  statement.  Can each of you do that?

9           THE PROSPECTIVE JUROR:  Just because

10  they weren't read that, we have to assume it was

11  involuntary?

12           MS. DAVIES:  Well, that can be one

13  way.  You know, it could be any kind of

14  situation; but, yes, in that particular setting,

15  yes, the law requires these warnings must be

16  given.  And there is a list of them.  The judge

17  will tell you that in the instruction.  And if

18  those instructions aren't given.

19           THE PROSPECTIVE JUROR:  How do you

20  know if they were given or not?

21           MS. DAVIES:  By the evidence you would

22  have heard.

23           THE PROSPECTIVE JUROR:  The police is

24  going to say I said it and he is going to say he

25  didn't state my rights.

1          MS. DAVIES:  Well, given your example,

2     if a police officer said I did do it and a

3     defendant said he didn't?

4          THE PROSPECTIVE JUROR:  Uh-huh.

5          MS. DAVIES:  The jury is the one who

6     decides who to believe.  If you thought the

7     police officer was telling the truth and the

8     defendant wasn't, then it would not be a problem

9     in terms of whether it's voluntary.  Or it could

10    go the other way, depending on who you believe,

11    the credibility of the witnesses.  Or it could

12    be a situation where a rookie officer comes in

13    and tells you:  God, you know, I didn't have

14    that list with me and I couldn't remember it.

15    I left that fifth one out.  You know, whatever

16    the fact situation is.  Because we can't know

17    what the facts are in any case.  We can't

18    predict, any one of us, what we are going to do

19    in a particular fact situation.  That is not

20    what we are trying to pin you down to.  We just

21    want the general concepts.  Can you see that

22    situations exist out there that under those

23    instructions a jury might be required to do

24    that?

25          THE PROSPECTIVE JUROR:  I would have a

2011

1    problem.

2              MS. DAVIES:  It would be difficult to

3    do.

4              THE PROSPECTIVE JUROR:  To me, yes.

5              THE PROSPECTIVE JUROR:  If they

6    admitted they were guilty but they weren't read

7    their rights and there wasn't enough evidence to

8    prove they are guilty even though you feel they

9    are guilty because they said they were, you

10   would have to say that they weren't if there

11   wasn't the evidence.

12             MS. DAVIES:  If you were convinced

13   that the statement was not voluntary.

14             THE PROSPECTIVE JUROR:  It could have

15   been voluntary, but if they weren't given the

16   rights, then you can't consider it; right?

17             MS. DAVIES:  The judge is going to

18   tell you that for a statement to be voluntary,

19   these rights, the defendant must have been

20   advised of these rights.  The law requires

21   that.

22             THE PROSPECTIVE JUROR:  So even though

23   you felt they were guilty, that they admitted

24   it, but they weren't read, legally you would

25   have to say that they weren't guilty?

                                              2012

1      MS. DAVIES:  You would have to be able

2   to follow the judge's instruction, look at the

3   rest of the evidence, and if there was not

4   enough evidence to prove guilt, you would be in

5   the position of having to find somebody not

6   guilty.  It's not an easy concept, no.  But that

7   is one aspect of the law that the judge would

8   instruct you on.  I just want to be sure that

9   each of you would be able to follow  that.  I

10  mean, it's just like the constitutional right to

11  remain silent.  That is not easy for some

12  people, either.  But those are the protections

13  that make up our judicial system that we all

14  have to respect because they are rights that

15  each of has.

16      THE PROSPECTIVE JUROR:  Everybody

17  knows their rights now; don't they?

18      MS. DAVIES:  Well, for the most part,

19  but you might not know the exact list.  I mean,

20  Ms. Holden is saying everybody knows their

21  rights.  All you have to do is go to a couple of

22  movies or watch TV and you know police officers

23  give those rights.  You know, again, I am using

24  an extreme example to illustrate a point because

25  we need to be sure that you can follow the law.

2013

1    And that is the way the judge will explain the

2    law to you.  He will probably do a much clearer

3    job of doing it than I have as we are talking

4    about it, but that is the point, to be sure that

5    you can follow that law, as difficult as it may

6    be, if you were confronted with that situation.

7    Okay?

8            One of the other basic constitutional

9    rights is that presumption of innocence.  You

10   know, it's like a protective bubble that

11   surrounds the defendant as he sits here right

12   now.  Doesn't mean he didn't do it.  It means he

13   must be presumed innocent at this point.  Only

14   after I have brought that evidence to the

15   courtroom that is sufficient to convince you

16   beyond a reasonable doubt of guilt, then that

17   bubble bursts.  But if right now if we ask for a

18   vote, guilty or not guilty, you would have to

19   say not guilty.  I mean, that is not going to

20   happen because that is not the way the trial

21   will proceed, but the point is that you would

22   have to say not guilty now because he has that

23   protective bubble of the presumption of

24   innocence surrounding him as he sits here

25   today.  Fair enough?

1          Did I hear somebody try to ask a

2    question?

3          Mr. Hensley asked me to talk about

4    self-defense.  I probably would have saved that

5    for individual, but I will touch on it since you

6    brought it up.  Anything that popped into

7    anybody else's mind that they wanted to ask me

8    questions about?

9          Let's touch on self-defense briefly.

10   I assume that everybody here feels like you have

11   the right to protect yourself, to defend

12   yourself, or even to defend family members or

13   friends or whatever.  Am I right?  And the law

14   certainly contemplates that, too.   You know,

15   self-defense is a concept where you might find

16   that, yes, someone is guilty of murder.  I think

17   this is why you asked me, Mr. Hensley.  Yes, it

18   was an intentional murder, but they were acting

19   under circumstances that they had the right to

20   defend themselves.  And if that is the case,

21   they would be found not guilty.  It's like a

22   justification, a defense that would excuse the

23   conduct.  But there are firm limitations, legal

24   limitations on that right to defend yourself.

25   You only are entitled to defend yourself when

2015

1   you are acting lawfully, when you are responding

2   to an unlawful use of deadly force.  You are

3   limited to use that degree of force that is

4   immediately necessary.  In other words, somebody

5   comes after you with a fly swatter, you know, a

6   Uzi is probably excessive force.  So the degree

7   of force, is it immediately necessary?  Would a

8   reasonable person in the circumstances have

9   retreated instead of using force?  So, it

10  probably would make a difference if you were in

11  your own home it would be rare to think that a

12  reasonable person would retreat.  You have the

13  right to be there as opposed to if you had gone

14  to your neighbor's house and accosted them,

15  maybe you are the one who should retreat.  So

16  the right is there to defend yourself and even

17  to defend another, but under certain

18  limitations.  Does that answer your question?

19  Did you have anything more specific in mind?

20          THE PROSPECTIVE JUROR:  No.

21          MS. DAVIES:  Anybody else have any

22  questions?  Mr. Marks, when am I going to sit

23  down and be quiet?

24          THE PROSPECTIVE JUROR:  No.

25          MS. DAVIES:  It would have been a fair

2016

1    question.

2              THE PROSPECTIVE JUROR:   Can

3    circumstantial evidence be in a capital case?

4              MS. DAVIES:   I am so glad you asked

5    about that.   I forgot to talk about that.   We

6    have physical evidence.    We have testimonial

7    evidence.   We don't always have eyewitnesses,

8    and especially when we are talking about a

9    murder case.   Yes, circumstantial evidence can

10   be used in any criminal case.   I don't like to

11   call it circumstantial evidence because I think

12   that is a dirty word for a lot of people.    I

13   like to call it indirect evidence because it's

14   not an eye-witness thing, what happened, but

15   it's proving the case based on the

16   circumstances.   You asked that question.   Is it

17   because you were concerned that you feel like

18   circumstantial evidence would be inappropriate

19   or?

20             THE PROSPECTIVE JUROR:   No, just a lot

21   of people have trouble with that, I mean, if

22   someone blindfolded six people and shoots one of

23   them, nobody saw him do it, that is

24   circumstantial evidence.   At least, that is what

25   I would understand it.

2017

1              MS. DAVIES:  You sure don't have an

2      eyewitness.  Well, you might have -- to use your

3      hypothetical of circumstantial evidence, say if

4      everybody who was there were blindfolded and

5      they hear a shot,  you know, it may be that one

6      of those people would be able to testify that,

7      well, right before the blindfold was put over my

8      eyes I saw one gun in the room.  It was a .38.

9      Looked like a .38 to me.  And that man, that

10     defendant, had it in his hand.  And then they

11     blindfolded me, I didn't see what happened, but

12     I heard one shot.  Okay.  And then say there is

13     somebody across the street outside -- and I am

14     going to change your hypothetical.  This is a

15     building.  This happened in a place with no

16     windows and only one door.   In other words, no

17     other way to get out.  And somebody across the

18     street says I saw this defendant, I heard a

19     shot, I didn't see what happened in there, but I

20     heard a shot, I saw this person run out the one

21     and only opening in that building immediately

22     after the shot was fired, and I called the

23     police.   Nobody else went in or out of that

24     building until the police arrived.  And the

25     police get there, and there is only evidence of

1    one shot being fired.  Maybe they do a test and
2    this man has residue of gunpowder on his hand or
3    whatever.   It's all circumstantial.   Nobody
4    saw what happened.  But, you know, as we are
5    talking here, pretty strong circumstantial case
6    as to who was the shooter.  Okay.   Indirect
7    evidence.
8              Is there anybody who feels like they
9    could not convict anyone based on circumstantial
10   evidence?  Anybody who feels like that that is
11   just out of the question for them?  Anyone at
12   all?  Just tell me.  I mean, fair enough.  You
13   are free to feel how you feel about anything.
14   Thanks.  I will be quiet now.
15              THE COURT:  Mr. Stafford.
16
17        VOIR DIRE EXAMINATION BY THE DEFENSE
18   BY MR. STAFFORD:
19              You mean it's my turn?  All right.   I
20   am so glad to see so many Democrats here.  I
21   know if there were any Republicans you would be
22   at the Astrodome.  All right.  We thank you for
23   coming.  I am not going to talk very long, but
24   there's a few things I want to talk to you about
25   because actually I guess Ms. Davies has kind of

2019

```
 1    told you her role.  And it's true.  She and I
 2    have been friends.  We have been what I call the
 3    gladiators in the courtrooms for a couple of
 4    years or several years.  And I, as she said her
 5    role is to see justice is done and the
 6    appropriate sentence is handed out, there is no
 7    doubt in my mind that the line in the sand in
 8    this case has been drawn.  She's just a breath
 9    away, if you are on this jury, to ask you to
10    give my client the death penalty.  I am going
11    to be up front with you as I stand here right
12    now.  And I have been doing it for twenty
13    years.  I am here trying to save my client's
14    life.  And it seems like at times maybe there
15    is no bad intent on anybody's part, is that we
16    have been in trial now or jury selection for the
17    fourth week.  What does that mean?  That means
18    the people we have talked to for four weeks have
19    a whole group of ideas and thoughts, biases and
20    prejudices.  When we talk about bias and
21    prejudice, everybody's defensive mechanisms
22    automatically go up.  Because if I probably
23    would ask each one of you do you have any bias
24    or prejudice uniformly probably would say no I
25    do not.  But at no time in their history right
```

2020

1    now as we are in Houston, Texas, does the true

2    issue of bias and prejudice come out because

3    right now we can't pick up a newspaper, we can't

4    see the television without the protesters or

5    what is going on now during the convention.

6    What is that?  That is bias and prejudices.

7    Doesn't mean in a negative form.  That means you

8    believe so strongly in something that you are

9    willing to get out on the street and carry a

10   thing.  So it's basically the same way.  We are

11   here trying to select a jury that can be what I

12   consider fair to my side.   I want a jury who is

13   going to consider all the facts, all the

14   mitigating evidence before they determine to put

15   my client to death because once you take that

16   oath you are saying something to the court and

17   to the jury is that I can vote for the death

18   penalty.  You are certified to take someone's

19   life based upon the law and the evidence.

20          MS. DAVIES:  I object to that

21   characterization.

22          THE COURT:  Sustained.

23          MR. STAFFORD:  On the defense

24   standpoint, the defense is not entitled to a

25   juror who says I could never vote for the death

2021

1   penalty.  Under any fact situation, I can't vote

2   for the death penalty.  Because basically that

3   person can not consider the full range of

4   punishment.  Okay?  There are some people who

5   feel so strongly about the death penalty because

6   of their own personal beliefs, maybe based upon

7   what has happened to them, maybe based upon

8   their house being burglarized so many times or

9   their car being taken so many times, that they

10  feel like anybody who has been to prison or does

11  anything else and goes out and commits murder in

12  the process of robbery there is only one just

13  punishment.  They may be fair at the guilt or

14  innocence stage, but come punishment time they

15  think there is only one appropriate punishment.

16  It's almost like you as a child being a victim

17  of sexual molestation.  You have been a victim

18  for years.  How fair of a juror would you be

19  come punishment time if you had to sit on

20  judgment for punishment?  My point is those are

21  the kind of feelings, when we bring you back and

22  talk to you, that we want you to tell us about.

23  I think another thing that scares jurors -- and

24  this is where I want to talk to you.   We keep

25  saying we want to know whether you can put it

2022

1   out of your mind and follow the law.  Can you
2   put it out of your mind and follow the law?  I
3   don't want you to believe or think that if you
4   disagree with a particular point of law that you
5   are breaking the law, that you are a bad citizen
6   because you don't agree.  Again, we know we have
7   the right to disagree.  There have already been
8   several people arrested at the abortion clinics
9   for their various beliefs.  So you have the
10  right to agree or disagree.  That is my whole
11  point.
12          Now, there are certain things that I
13  think are what we call hot topics.  We have
14  already kind of touched on them.  Our Honor
15  again will tell you that you cannot consider
16  parole because come punishment time it may be a
17  situation where it's life or death.  It will
18  be.  That is the only choice you have got.  But
19  when we bring you back, if you have strong
20  feelings about early parole, if it would affect
21  your decision and you can't put it aside, we
22  need to know that.  Only you know that.  I don't
23  know that.  I can't look into your mind.  I get
24  fifteen strikes.  In other words, I can
25  eliminate fifteen people.  I imagine y'all wish

2023

1  y'all had a few strikes and you would eliminate
2  the lawyers right now.  It's a process of
3  elimination.  The State has fifteen.  I have
4  fifteen.  So basically we don't know.  We have
5  got ten or fifteen minutes with you to make a
6  decision.  But I know all of us have strong,
7  strong feelings and beliefs and philosophies
8  about certain things.  And if you believe in
9  your heart and your soul, and only you know,
10 that it would affect the way you would approach
11 something, then please tell us, whether it's for
12 me, against me or whatever.
13         Now, another area I would like to talk
14 to you about is similar to what Ms. Davies
15 talked to you about on the confession issue.
16 And there is basically what we call some people
17 believe there are technicalities in the law.  We
18 lawyers don't talk in technicalities.  We
19 believe the law is the law and there is no such
20 thing as legal technicalities, but we know the
21 citizens believe in technicalities.  And that
22 the technicality that she touched on
23 basically--.
24         MS. DAVIES:  I object to
25 characterizing any aspect of our state's laws as

                                              2024

1      a technicality.

2               THE COURT:  Be more specific please,

3      sir.

4               MR. STAFFORD:  What some citizens

5      would believe I don't believe is a

6      technicality.  As you can gather, Ms. Davies

7      doesn't believe it's a technicality, neither do

8      I, but some citizens believe that the fact that

9      a police officer fails to warn a citizen that he

10     has the right to have a lawyer is what they

11     would consider a legal technicality.  In fact,

12     it is not, but some people feel that way.  We

13     are talking about legal rights versus what y'all

14     consider in laymen's terms technicalities;

15     okay?  Because voluntariness to a lot of lay

16     people means did they abuse it.  Did they take

17     an electric prod and prod him and shock him to

18     make him confess.  Did they cigarette burn him?

19     They look in those terms.  Have been cases where

20     they have taken Coca-Cola, shake it up and

21     sprayed it up your nose.  It's remarkable how

22     truthful you get when you have Coca-Cola going

23     up your nose.  Those are the areas, when we

24     talk to you individually about, is that once --

25     Our Honor will tell you that if you believe, you

                                              2025

1    may believe in your heart beyond a reasonable
2    doubt that he went in and raped and robbed and
3    killed that lady.  You believe it beyond a
4    reasonable doubt.  But the only reason you can't
5    consider the confession is because a rookie
6    police officer forgot to give the warning.  And
7    if you throw that statement out, that means
8    there is nothing there to convict him, and you
9    know in your heart that he did it.  Those are
10   the things you have the right to disagree with
11   if you do.  If you don't, if you can follow the
12   law, then you can follow the law.  Some people
13   can't.  We need to know it.
14         Another thing I want to talk to you
15   about.  I think she brought it up about the
16   readings of the warnings, for example.  This may
17   be an area that I would like to know more
18   about.  You may be in a situation where it's
19   the police officer's testimony versus the
20   defendant's testimony.  Police officer says:
21   Yes, I read him the warnings.  The defendant
22   says:  No, he didn't read me the warning.  Some
23   people believe, just because that person is a
24   police officer, I am going to believe his
25   testimony every time.  If he said he read the

1   warning, I am going to believe him over the
2   defendant every time in every situation.
3   Basically what you are telling me in that
4   situation I could never convince you that the
5   police officer didn't do what he said.   I mean,
6   you have already blocked me out.   Nothing wrong
7   with you feeling that way.   Some people believe
8   that police officers would not shed the truth or
9   shade the truth I think is the term I am looking
10  for.   Some people believe a police officer is
11  just like everybody else.   A lot of us have run
12  yellow lights and gotten a ticket for running a
13  red light when you know in your heart it was
14  yellow or almost green.   But that is okay.
15  And, so, those are the things that we need to
16  know and we need to talk about.
17           And the confession, as far as
18  introducing things into evidence and not
19  introducing things into evidence, it's I guess
20  what we can say about confessions is basically,
21  or statements, is there are certain things that
22  Our Honor has a right to rule on that you will
23  never know about.   There are certain legal
24  things.   There are certain things in statements
25  that if they are not relevant, for example, you

2027

1    probably will not hear about them because
2    basically the only reason you are here is to
3    know about the facts of this case, not about
4    what happened two years ago in his early
5    childhood.  If he makes some reference to that
6    in his statement, it has no bearing on this case
7    at all.  I may feel like it shouldn't be there,
8    or she may feel it shouldn't be there, and the
9    judge would rule on it appropriately, and you
10   would not get that.  But also there a rule
11   basically that the statement can be introduced
12   in total.  And whatever trial strategy is, I
13   guess the bottom line is you are not supposed to
14   concern yourself about what the State's trial
15   strategy is and what mine is other than we are
16   adversaries and we are definitely trying to
17   prove two different things.
18              Anybody have any questions of me?
19   None.  That's great.
20              One other little thing.  There was
21   some comment because it always kind of ruffles
22   my feathers about not being a two-way street in
23   discovery.  There are certain rules, for
24   example, that if I am raising the defense of
25   insanity I have to give the state notice.  There

2028

1    is also the discovery that the State gives the

2    defense is basically what our Supreme Court has

3    stated because if any of y'all are historians of

4    history you realize that one of the first things

5    our founding fathers did was that to keep the

6    government from taking citizens out of their

7    home and throwing them into prison, et cetera,

8    et cetera, that they came up with certain rules

9    and regulations.  And one of them is that when

10   the government or the State of Texas points the

11   finger at you and says you committed a crime

12   then the burden of proof is on them to prove

13   that you did what they said you did.  They don't

14   require us to produce any evidence.  The burden

15   is on them.  As a practical matter, I will

16   agree with Ms. Davies, it's not like on the

17   civil said.  On the civil side, you have the

18   right to give notice to the police officers, for

19   example, if it's a civil case, you have a right

20   to take their deposition.  Defendants do not

21   have the right to depose the police officers.

22   We don't have the right to bring them in before

23   trial under deposition and ask them what they

24   know about the case.  We have the right sometime

25   to read their offense report, but if it's only a

2029

1  paragraph long you don't know that much.  It's
2  not always what she painted it to be.  It's not
3  a two-way street.  But there are certain things
4  that the constitution requires.  I ask you not
5  to hold that against us.
6          How many of ya'll, as you sit here
7  looking at my client sitting over there, think
8  he is a little bit guilty or he wouldn't be
9  here?  Anybody feel that way?  Okay.  Would you
10  raise your hands again?  I won't remember the
11  numbers.  Okay.  That is something else I want
12  to talk to you about when we talk to you
13  individually.  Do you think he is a little bit
14  guilty, how it would affect you later down the
15  road.  Can you really and truly presume him to
16  be innocent?  And, again, you have the right to
17  believe or not believe anything you want to
18  believe.
19          How many of you wish you hadn't showed
20  up this morning?  How many of y'all want to go
21  home?  Okay.
22          Talked about early parole.
23          Another thing that concerns me that I
24  want you to also think about because I think we
25  have certain factors in our life that may

2030

1  control us.   There are two or three people in

2  here that have had either fathers or friends or

3  actively involved with law enforcement.   I think

4  maybe some of the most difficult case of that

5  would be being put on a capital murder trial and

6  coming back with a verdict, for example, on

7  punishment, of life.   Do you think that would

8  cause some undue pressure by your family members

9  or loved ones or friends by saying how in the

10 world could you do that?   Because often people

11 come to me and say:   Stafford, how in the world

12 could you defend these horrible people charged

13 with horrible crimes?   Like Ms. Davies has

14 commented, they are presumed to be innocent.

15 And often some of the greatest work that can be

16 done is to make the State of Texas prove they

17 did what they said they did, or in this

18 situation trying to convince you through

19 mitigating evidence that my client doesn't

20 deserve to die for what they say he did.   Come

21 to the punishment phase of the trial, for

22 example, we won't talk about this individually

23 now, but there is going to be -- you haven't

24 been able to read the number two special issue

25 that basically talks about mitigating evidence,

2031

1   as to whether there are certain factors that

2   would warrant a life imprisonment based upon the

3   evidence rather than death.   There are certain

4   people believe that there are no mitigating

5   factors, for example, they could not consider

6   this, this and this to warrant life.   If you

7   took a life, it's eye for eye, tooth for tooth,

8   and that is the only proper punishment.   If you

9   feel that way, there is nothing wrong with it.

10  We just need to know about it.

11          I thank you for your time.

12          THE COURT:   Ladies and gentlemen, we

13  ask you to step outside the room for a few

14  minutes.   Just remain in the hallway when you

15  come back.   Do not come back into the room

16  here.

17          (Prospective jurors leave the

18  courtroom)

19          THE COURT:   It's my understanding that

20  by agreement of all parties the following

21  prospective jurors on panel number four are

22  being excused:   Number one, Ms. Rebecca Lask

23  David; number two, Mr. Valentine Guzman; number

24  three, Mr. Victor James Marks; number four, Mr.

25  Tony Alonzo Washington; number six, Ms. Floria

2032

```
1    Henderson; number seven, Mr. Paul Anthony Byrd;
2    number 14, Ms. Dale Porter Miller; number
3    fifteen, Ms. Leanear Allen; number 22, Mr.
4    Christopher E. Heinrich.
5              THE COURT:  Is that your agreement,
6    Ms. Davies?
7              MS. DAVIES:  Yes, sir.
8              THE COURT:  Yours, Mr. Stafford?
9              MR. STAFFORD:  Yes.
10             THE COURT:  Yours, Mr. Rhoades?
11             THE DEFENDANT:  Yes, Your Honor.
12             MR. STAFFORD:  Before you bring them
13   in, could I put something on the record?  I make
14   a motion to quash the whole panel because of the
15   ineffective -- not ineffective, the wrong
16   hypothet that you gave on pulling the plug.  I
17   don't think that is murder.  I think it tainted
18   the whole jury panel.  I would ask the whole
19   panel be quashed.
20             THE COURT:  Certainly depends on the
21   facts as flushed out in a case.
22             MR. STAFFORD:  I make a motion to
23   quash the whole panel based on the court giving
24   a bad analogy.
25             THE COURT:  Denied.
```

1          (Panel returns to the courtroom)

2          THE COURT:  All right, I am going to

3     call the numbers and names of those folks who

4     are going to be excused for all purposes.  This

5     gentleman has the slips you can take with you to

6     your employer or whoever needs to look at them.

7     You do not have to go back to the jury assembly

8     room.   You may leave as I call out your name.

9          Number one, Ms. David; number two, Mr.

10    Guzman; number three, Mr. Marks; number four,

11    Mr. Washington; number six, Ms. Henderson;

12    number seven, Mr. Byrd; number fourteen, Ms.

13    Miller; number fifteen, Ms. Allen; number 22,

14    Mr. Heinrich.

15         For those of you left in the pool, we

16    are now going to give you the times and days

17    that you are going to return here.  Don't leave.

18    We are just going to pass these out for right

19    here.   Ms. Holden will be coming back and Mr.

20    Roberts also at 9:30 tomorrow morning, Tuesday.

21    Tomorrow afternoon at 1:00, Mr. Englund and Ms.

22    Crutch.  At two p.m., Ms. Gracey.  At 9:30 a.m.

23    on Wednesday Ms. McGehee and Ms. Holiday.  At

24    1:00 p.m. on Wednesday, Mr. Hensley and Ms.

25    Quintanilla.  At 9:30 a.m. on Thursday, Ms.

                                                    2034

1    Alvarado and Mr. Rodriguez.  At 1:00 p.m. on

2    Thursday, Ms. Parton and Ms. Wing.

3             Now that you have been given those

4    slips, is there any discrepancy in the day and

5    time I called out and what is written on your

6    slip?

7             All right.  You are not to discuss

8    anything we have talked about or anything on the

9    questionnaire with anyone, not spouses, not

10   employers, not with each other.  You are going

11   to have to necessarily tell your employer the

12   reason that you have to come back one day this

13   week is because you are a prospective juror on a

14   capital murder case; but, again, don't sit there

15   and listen to anything they want to tell you.

16   Just say it's capital murder case; when I get

17   struck from the case, I will talk to you.  If I

18   get put on the jury, I will talk to you about it

19   when it's all over.  Don't make any kind of

20   independent investigation, which is to say don't

21   attempt to read any law that you think might

22   apply in the case or in the questioning you

23   might get from the parties involved.  Don't

24   attempt to find out which capital murder case

25   are discussing.  The attorneys are being advised

2035

1    not to engage you in conversation.  If they see

2    you in the hallway or on the elevator, they may

3    nod that they recognize you but they are not

4    going to engage you in conversation.  If anybody

5    attempts to talk to you about the case, bring it

6    to our attention as soon as you see us the next

7    time, me or the bailiff who has you in charge.

8              Do you have any questions?

9              THE PROSPECTIVE JUROR:  We are only

10   here for one day?

11             THE COURT:  Either the morning or

12   afternoon session, one day.  When we complete

13   the examination of you, we are going to tell you

14   right then whether or not you are going to be on

15   the jury coming back September 28th.

16             Any other questions?  None?  If there

17   is nothing else, you are excused until your

18   appointed times.  Tomorrow morning it's Mr.

19   Roberts and Ms. Holden at 9:30.

20

21

22

23

24

25

2036