APPELLATE COURT NO. *71595*

IN THE COURT OF CRIMINAL APPEALS

OF THE STATE OF TEXAS

AT AUSTIN

_____

RICK ALLAN RHOADES,

                              Appellant

VS.

THE STATE OF TEXAS,

                              Appellee.

_____

APPEAL FROM 179TH DISTRICT COURT OF HARRIS COUNTY,

TEXAS

Judge J. Michael Wilkinson  Presiding

_____


STATEMENT OF FACTS

VOLUME____XX___ OF *40*,___ VOLUMES




Marlene Swope
Official Court Reporter
301 San Jacinto
Houston, Texas  77002


FILED IN
COURT OF CRIMINAL APPEALS

MAR 5  1993

Thomas Lowe, Clerk

2560

```
 1                        INDEX

 2                      VOLUME XX

 3       VOIR DIRE EXAMINATION OF PROSPECTIVE JURORS

 4       GENERAL VOIR DIRE EXAMINATION OF THE PANEL

 5                                              Page

 6   BY THE COURT                              2562

 7   BY THE STATE                              2614

 8   BY THE DEFENSE                            2644

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

i.

1                      CAUSE NO. 612408

2      STATE OF TEXAS        IN THE 179TH DISTRICT COURT

3      VS.                          OF

4      RICK ALLAN RHOADES   HARRIS COUNTY, T E X A S

5

6      A P P E A R A N C E S:

7      For the State:       Ms. Carol Davies
                            Assistant District Attorney
8                            Harris County, Texas

9      For the Defendant:   Mr. James Stafford
                            Ms. Deborah Kaiser
10                           Attorneys at Law
                            Houston, Texas

11

12

13              BE IT REMEMBERED that upon this the

14      24th day of August A.D. 1992, the above entitled

15      and numbered cause came on for continued voir

16      dire examination of prospective jurors before

17      the Honorable J. Michael Wilkinson, Judge of the

18      179th District Court of Harris County, Texas;

19      and the State appearing by counsel and the

20      Defendant appearing in person and by counsel,

21      the following proceedings were had, viz:

22

23

24

25

                                                    2561

1              (Panel of prospective jurors seated in

2      the courtroom)

3              VOIR DIRE EXAMINATION BY THE COURT.

4                   Welcome back, ladies and gentlemen.

5      We are going to get started in the selection

6      process this afternoon.   I am going to be

7      speaking to you for about forty minutes or so,

8      maybe less, if you are lucky.   Once I get

9      through, we will turn it over first to the state

10     and then to defense counsel.   For the most part,

11     we are doing this on automatic pilot about now.

12     I told you this is our fifth week going through

13     this process of bringing prospective jurors over

14     here in panels, talking to you, assessing your

15     qualifications, re-scheduling you, bringing you

16     back for individual selection.   This is a

17     capital murder case; so, therefore, we are

18     entitled to have individual voir dire,

19     individual questioning of the jurors.   We won't

20     be questioning you on an individual basis as

21     long as there is an entire panel here; we bring

22     you back one at a time.   Sometimes that process

23     takes ten or fifteen minutes, sometimes it takes

24     two hours that one of you is on the witness

25     stand while we ask you questions, checking your

1    qualifications.

2         I know that you have all been

3    technically qualified to serve as jurors across

4    the street.    I need to ask now whether or not

5    there is anybody who can't sit on this jury for

6    any particular reason.    I am going to tell you

7    what I mean by that.    We know exactly when we

8    are supposed to start testimony in this case.

9    As I said before lunch, it's Monday, September

10   28th, probably about ten, 10:15 a.m. on that

11   day.    We have other things scheduled in the

12   interim.    I have a visiting judge in my

13   courtroom trying cases on a regular basis.    We

14   have other matters than just this capital murder

15   case we are involved in right now, so we gave

16   ourselves plenty of lead time to get a jury in

17   this case and handle our motions in this case

18   prior to September 28th, but that is our

19   anticipated starting date.    Right now, I don't

20   see anything that could change that at all.

21   When we start trial, while I might anticipate

22   this case is going to be tried in a week, I am

23   asking everybody to block out two weeks because

24   I never know what is going to happen once we get

25   started.    I don't know how long it's going to

1    take a jury to deliberate a case once they get

2    it and go back to the jury room and begin their

3    deliberations, so we are asking everybody to

4    block out a maximum of two weeks beginning

5    Monday, September 28th. Having heard that, I am

6    going to be asking you in a couple of moments if

7    there is any reason you need to bring anything

8    to our attention as to why you could not sit as

9    a juror beginning September 28th. I am not

10    asking if you are self-employed. I am not

11    asking if it's a financial hardship for you to

12    be on jury service. It is for most people. I

13    am asking such things as: Are you on dialysis?

14    Do you have surgery scheduled on September

15    25th? Is your son or daughter getting married

16    in California on September 29th and you would

17    like to be there? Do you have prepaid,

18    nonrefundable plane tickets for that

19    once-in-a-lifetime trip to Paris leaving on

20    Monday morning, September 28th? Those are the

21    kinds of things I am asking about.

22           Having heard that, is there anybody on

23    this panel who has any particular reason, any

24    special reason you need to bring to my attention

25    why you could not sit as a juror in this case?

2564

1    One hand, two hands. I am not going to give you

2    much more time to think about it. On the third

3    row, that is number thirteen and fourteen.

4    Could you come up, sir?

5                    (Prospective juror James A. Y'Barbo

6    approached the bench, and the following

7    proceedings were had:)

8                    THE COURT: This is prospective juror

9    number 13 on panel number 5, Mr. James Allen

10   Y'Barbo.

11                   What did you need to tell us?

12                   THE PROSPECTIVE JUROR: I am the

13   corporate controller for Apple Tree Markets. We

14   have a backruptcy hearing scheduled on the 29th;

15   and during that next week we have a confirmation

16   date of probably the 12th.

17                   THE COURT: Where is it being heard?

18                   THE PROSPECTIVE JUROR: Here in

19   Houston. I am not sure I am going to be in

20   that, but I am heavily involved in preparing all

21   the schedules and kind of on standby to be there.

22                   THE COURT: Have you been subpoenaed?

23                   THE PROSPECTIVE JUROR: No, I have not.

24                   THE COURT: You are preparing

25   documentation; is that what you are doing?

2565

1          THE PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Have you been through this

3     before?

4          THE PROSPECTIVE JUROR:  I have

5     testified early on in some preliminary hearings.

6          THE COURT:   Just in your capacity as

7     controller?

8          THE PROSPECTIVE JUROR:   Yes.

9          THE COURT:  Any questions at this

10    point?

11         MR. STAFFORD:  Would they issue a

12    subpoena for you if they knew you were--

13         THE PROSPECTIVE JUROR:  No, they don't

14    issue subpoenaes in bankruptcy court.  Usually

15    you are there and available.

16         MR. STAFFORD:  What would happen if

17    you didn't show up?

18         THE PROSPECTIVE JUROR:  Well, the

19    judge has said--

20         MR. STAFFORD:  Issue a warrant for me?

21         THE PROSPECTIVE JUROR:  That is a

22    thought.

23         THE COURT:  Have a seat.  We may ask

24    you some questions later on.

25              (Prospective juror Charles H. Vervalin

2566

```
 1    approached the bench, and the following
 2    proceedings were had:)
 3                THE COURT:   This is prospective juror
 4    Charles H. Vervalin.
 5                THE PROSPECTIVE JUROR:   I have
 6    nonrefundable airline tickets to Colorado
 7    leaving the 21st.
 8                THE COURT:   Returning when?
 9                THE PROSPECTIVE JUROR:   A week later,
10    about eight days.
11                THE COURT:   Do you know for sure when
12    it returns?
13                THE PROSPECTIVE JUROR:   The eighth
14    day.
15                THE COURT:   On our next break, is
16    there someone you can call to verify?
17                THE PROSPECTIVE JUROR:   Yes.
18                THE COURT:   Is it with Continental?
19                THE PROSPECTIVE JUROR:   Yes, sir.
20                THE COURT:   How many people are going?
21                THE PROSPECTIVE JUROR:   Just my wife
22    and I.
23                THE COURT:   And y'all have vacation?
24                THE PROSPECTIVE JUROR:   That's right.
25                THE COURT:   Any questions?
```

2567

1          MR. STAFFORD:  No, sir.

2          THE COURT:  We may ask you questions

3     later on.

4               (Before the panel)

5          THE COURT:  If at any time during the

6     course of this proceeding, you suddenly realize

7     you do need to bring something to our attention,

8     please raise your hand and let us know at that

9     time.  It would be appropriate at anytime while

10    I am talking to you or either of the parties in

11    this case.  Don't just sit there silently on

12    some information because we do need to know some

13    of these things.  It's helpful, particularly

14    later on today when we are going through the

15    list and asking ourselves who we want to have

16    brought back later on in the week.

17          After I get through talking to you,

18    each side is going to be asking you some

19    questions.  They are, for the most part, going

20    to be asking questions of the entire array.

21    Sometimes they will have to assume by your

22    silence what your answers, so you do need to

23    speak up so they don't assume by your silence

24    incorrectly.  Sometimes they will ask the

25    entire panel, sometimes row by row.  Generally,

1    at this stage, we aren't going to be asking
2    individual questions.  That will come later.
3    Once both sides have talked to you -- and we
4    will take a break, in case you are wondering, in
5    about an hour and fifteen minutes or so -- we
6    will send you out of the room, we will get
7    together, the parties will talk to each other
8    and make a determination of exactly which ones
9    and how many are going to be brought back for
10   individually questioning.  When you come back
11   for individual questioning, we usually bring in
12   a couple of people in the morning and perhaps
13   three people in the afternoon and you do sit
14   here for a while, or sit in the anteroom for a
15   while, so you need to bring reading material
16   with you at that time because, as I said
17   earlier, sometimes it takes ten or fifteen
18   minutes and sometimes it's a couple of hours
19   when we are talking to an individual.
20           I am getting weather bulletins up
21   here.  If you have your weather charts out
22   there, it's latitude 25 north, longitude  82
23   west at  one p.m.  West/northwest.  So that is
24   more of that north stuff.  Not expected to come
25   to Houston; however, we are expecting five to

2569

1    eight inches of rain.   Is that today?

2              THE CLERK:  No, Wednesday.

3              THE COURT:  I don't know how can they

4    can tell that two or three days in advance, but

5    we will keep you posted, as they say.

6              Okay.  Once we schedule you, we will

7    bring you up here and give you little slips and

8    tell you exactly where to go and what time to

9    return.   Some of you will be released for all

10   purposes; some of you will be asked to come

11   back.   On whatever date that you come back in

12   here and we question you individually, when you

13   get off that stand we will let you know at that

14   time whether or not you are selected to serve on

15   the jury.  If not, you go about your business.

16   If you are selected to serve, we will give you

17   some additional instructions, some admonitions,

18   some more paperwork and tell you exactly when to

19   be back here and where to report on September

20   28th for jury service.   We have already selected

21   nine jurors in this case.   We are only looking

22   for three more good men and women and one

23   alternate, as they say.

24             When we start testimony on September

25   28th, State will go first.   The defendant will

1    be arraigned in your presence, a plea will be
2    entered.    State goes first because they have
3    the burden of proof.  They will go first in the
4    jury selection process.  They will go first in
5    calling witnesses to the stand.  They will go
6    first and last in arguing the case to you.  At
7    some point, the State will rest.  The defense
8    has the opportunity, they don't have to go
9    forward at that time, but they have the
10   opportunity to go forward.  They may call
11   witnesses to the stand.  If they do not choose
12   to do so, they don't have to.  They don't have
13   to call the defendant to the stand.  The State
14   can not call the defendant to the witness
15   stand.  At some point, the defense will rest.
16   Both sides will have the opportunity to have
17   rebuttal.  They will rest and close.  At that
18   point, I will prepare the Court's Charge.  That
19   is a multi-page, typewritten instrument which I
20   will read to you.  It's going to contain all the
21   law and all the definitions you need to know
22   when you go back to deliberate this case.  The
23   case will be argued to you by both sides.  You
24   go back and deliberate.  You return a verdict of
25   guilty or not guilty.  In any criminal case, if

1    a jury returns a guilty verdict, there is a

2    second stage of trial.  We will call that the

3    penalty stage or the punishment stage.  That is

4    the stage where you most often hear testimony

5    regarding a defendant's background, character,

6    reputation, prior bad acts, previous criminal

7    convictions, if any exist, that kind of thing,

8    the kind of information most jurors find helpful

9    when they are determining what the appropriate

10   punishment should be.  I prepare another charge;

11   it's argued to you; you go back and you

12   deliberate in the second stage of trial.  That

13   is basically what happens in any criminal case.

14          I need to see if there is anybody here

15   who knows anything about the case that we are

16   going to be hearing.  Now, I don't know very

17   much about the facts of this case.  I am not

18   going to allow either side to tell you what they

19   anticipate the facts are going to be.  You get

20   to hear what happened in this case at the same

21   time that I do, and that is when you are seated

22   in the jury box with eleven other jurors.

23          Is there anybody on this panel who

24   lives in Pasadena?  I can't see all of you.

25   Anybody here who lives in South Houston?  That

2572

1  is fairly consistent with the other panels we

2  have had.  It is my understanding that the

3  offense in this case occurred on or about

4  September 13, 1991, on Keith Street, K-e-i-t-h,

5  in Pasadena.  The complainants deceased both are

6  Charles Allen and Bradley Dean Allen.  It's my

7  understanding that those two people are

8  brothers.

9        Having heard that information, is

10 there anyone here who thinks you recognize the

11 case that I am talking about?  One hand.  Any

12 other hands?  I will get back to you in just a

13 moment.

14        Let me introduce the principals

15 involved in this case.  The defendant is Mr.

16 Rick Allan Rhoades.

17        Would you, please, stand up, sir?  You

18 might have to move to the other side of this

19 post.

20        He is represented by Mr. Jim Stafford

21 and Ms. Deborah Kaiser.

22        The State of Texas is represented by

23 an assistant district attorney, Ms. Carol

24 Davies.

25        Is there anyone on the panel who

```
 1    recognizes any of these participants?  On the
 2    back row?  Who do you think you recognize?
 3              THE PROSPECTIVE JUROR:  (Indicates)
 4              THE COURT:  Ms. Davies?
 5              THE PROSPECTIVE JUROR:  Yes.
 6              THE COURT:  Can you tell me where you
 7    think you recognize her from?
 8              THE PROSPECTIVE JUROR:  A young man
 9    that I more or less adopted has been in your
10    court.
11              THE COURT:  Could you come up, please?
12              (Prospective juror Eileen Pfau Adams
13    approached the bench, and the following
14    proceedings were had:)
15              THE COURT:  This is prospective juror
16    number 21 on panel number 5, Ms. Eileen Adams.
17              Who was it?
18              THE PROSPECTIVE JUROR:  Mark Walzer
19    has been in your court.
20              THE COURT:  The name is vaguely
21    familiar.
22              THE PROSPECTIVE JUROR:  He should be.
23              THE COURT:  Tell me why.
24              THE PROSPECTIVE JUROR:  Well, you put
25    him in boot camp, and he is just about ready to
```

2574

```
 1    get out, which is good.
 2              THE COURT:  Did he have a
 3    co-defendant?
 4              THE PROSPECTIVE JUROR:  No.
 5              THE COURT:  What was he charged with?
 6              THE PROSPECTIVE JUROR:  Theft was the
 7    last one.  It goes back many years.  He had
 8    theft and then he had, of an automobile, and
 9    probably about -- I can't remember now.
10              THE COURT:  Did you come to court with
11    him?
12              THE PROSPECTIVE JUROR:  Oh, yeah.
13              THE COURT:  Was he on bond or in
14    custody?
15              THE PROSPECTIVE JUROR:  He is in
16    custody.
17              THE COURT:  Was he, when you came to
18    court with him, in custody?
19              THE PROSPECTIVE JUROR:  In custody.
20              THE COURT:  Who represented him?
21              THE PROSPECTIVE JUROR:  Elaine Shaw.
22              THE COURT:  How long ago was this?
23    Must have been three or four--
24              THE PROSPECTIVE JUROR:  Yeah, because
25    he graduates Wednesday.
```

2575

1              THE COURT:   Did he live with you prior
2      to the time?
3              THE PROSPECTIVE JUROR:   For a short
4      period of time, yes.
5              THE COURT:   Do you recognize Ms.
6      Davies from the courtroom?
7              THE PROSPECTIVE JUROR:   Yes.  Both of
8      you from the courtroom.
9              THE COURT:   You were there the day the
10     plea was entered?
11             THE PROSPECTIVE JUROR:   Yes, sir.
12             THE COURT:   You realize there are
13     dozens and dozens, so I can't remember.
14             THE PROSPECTIVE JUROR:   Yes.
15             THE COURT:   Is there anything about
16     that experience regarding Mr. Walzer that would
17     cause you to be biased or prejudiced one way or
18     the other?
19             THE PROSPECTIVE JUROR:    No.
20             THE COURT:   When he gets out of boot
21     camp and is on probation, is he going to be
22     living with you?
23             THE PROSPECTIVE JUROR:  Yes.
24             THE COURT:   Has he been in contact
25     with you?

```
 1              THE PROSPECTIVE JUROR:  Yes, sir.
 2              THE COURT:  Are you making
 3    visitations?
 4              THE PROSPECTIVE JUROR:  Yes.
 5              THE COURT:  He is not legally formally
 6    adopted?
 7              THE PROSPECTIVE JUROR:  No.  He  is a
 8    kid that needed help that I took in.
 9              THE COURT:  Do you have a child about
10    his own age?
11              THE PROSPECTIVE JUROR:  Yes.
12              THE COURT:  From high school?
13              THE PROSPECTIVE JUROR:  Yes.
14              THE COURT:  Which high school?
15              THE PROSPECTIVE JUROR:  Clear Lake.
16              THE COURT:  Do you have any questions
17    of her at this time?
18              MS. DAVIES:  Did you and I ever talk
19    about the case directly?
20              THE PROSPECTIVE JUROR:  No.
21              THE COURT:   And I have not talked
22    directly?
23              THE PROSPECTIVE JUROR:  No.  I always
24    just sat in the back and watched.
25              THE COURT:  Just have a seat.
```

2577

1             (Before the panel)

2             THE COURT:  Was there anybody else who

3    recognized any of the participants?

4             An indictment, of course, was returned

5    in this case, it being a felony case.  How many

6    people have ever sat on criminal juries in the

7    past?  Four or five.  Is there anybody here who

8    has ever served on a Grand Jury?  No hands.  A

9    Grand Jury has a very different function than

10   that of a jury which will be sitting in this

11   case.  The Grand Jury is not deciding issues of

12   guilt.  A Grand Jury is determining whether or

13   not some reason exists that a finder of fact,

14   either a jury or a judge, should determine a

15   defendant's guilt.  They are only saying there

16   is some reason here that we think somebody else

17   should make the determination.  Guilt doesn't

18   enter into it when they are voting to true bill

19   or no bill a case.  Takes at least nine jurors

20   in a Grand Jury to true bill a case.  Generally

21   what happens is a representative of the district

22   attorney's office goes in for a few minutes and

23   gives a Grand Jury a shorthand rendition of how

24   that person viewed the case or what that person

25   determined from certain reports, that kind of

                                              2578

1   thing, and the Grand Jury makes a decision.

2   There are dozen and dozens of cases which are

3   true billed everyday in front of grand juries.

4   In fact, here in Harris County we keep five

5   sitting in the state courts at all times meeting

6   twice a week, each one of those five grand juries.

7          The Grand Jury indictment is no

8   evidence of guilt whatsoever.  The indictment is

9   merely a legal pleading.  We have to have an

10  indictment before we can proceed to trial.  We

11  either have to have an indictment or a waiver of

12  indictment.  So it's the means whereby we are

13  here today.  It lets the defense know exactly

14  what the defendant is charged with; it sets out

15  for the State exactly what they have to prove,

16  what we refer to as the material elements of the

17  offense.  I will give you an instruction in

18  this, as in every criminal case, later on when a

19  jury is charged that the Grand Jury indictment

20  is no evidence of guilt whatsoever and is not to

21  be considered by you as any evidence.

22         The Grand Jury indictment alleges that

23  in Harris County, Texas, on or about September

24  thirteen, 1991, the defendant, Rick Allan

25  Rhoades, did unlawfully intentionally and

2579

1    knowingly cause the death of Bradley Dean Allen
2    by stabbing Bradley Dean Allen with a deadly
3    weapon, namely, a knife, and during the same
4    criminal transaction the defendant did then and
5    there unlawfully intentionally and knowingly
6    cause the death of Charles Allen by stabbing
7    Charles Allen with a deadly weapon, namely, a
8    knife, and by striking Charles Allen with a
9    deadly weapon, namely, a bar.
10          So I have read to you information from
11   the indictment giving you some other
12   information, which is basically the nature in
13   which the offense is alleged to have occurred,
14   the date, September 13, 1991, the names of the
15   two complainants, Charles Allen and Bradley Dean
16   Allen, and a general location, Keith Street in
17   Pasadena, Texas.
18          Now, having heard all of that, is
19   there anyone other than the lady on the first
20   row who thinks you might have heard about this
21   case?  Okay.
22          Ma'am, could you come up, please.
23          (Prospective juror Regina Polk
24   approached the bench, and the following
25   proceedings were had:

                                          2580

1    THE COURT:  This is number 2 on panel

2 5, Ms. Regina Polk.

3    What do you think you heard?

4    THE PROSPECTIVE JUROR:  I had saw the

5 original report of it on Channel 13 when it

6 happened.

7    THE COURT:  Can you give me more

8 information?

9    THE PROSPECTIVE JUROR:  They were

10 musicians of some sort, I think, if it's the one

11 I am thinking about.  That's about it.  But I

12 just remember hearing about them.

13    THE COURT:  It was about a year or so

14 ago, so you think that is about the same time

15 frame?

16    THE PROSPECTIVE JUROR:  Yes.

17    THE COURT:  Does anybody happen to

18 have the Code handy?

19    Whatever it was you heard, by the way,

20 you think it was only on TV, not on the radio or

21 in the newpaper?

22    THE PROPECTIVE JUROR:  I usually do

23 read the newspaper, but I don't remember

24 anything.

25    THE COURT:  You think it was Channel

1    13 because that is what you usually watch?

2                THE PROSPECTIVE JUROR:   Yeah.

3                THE COURT:   In your mind, do you have

4    any conclusion as  to the guilt of the defendant

5    in this case?

6                THE PROSPECTIVE JUROR:   No.

7                THE COURT:   I am not suggesting that

8    you should have, but I have to ask the question.

9                Is there anything about what you heard

10   that would influence you in this action in any

11   way?

12               THE JUROR:   I don't think so.

13               THE COURT:   I am just going to

14   reiterate that you are suppose to hear the

15   evidence and make a determination as to guilt

16   based on what you heard in the courtroom.

17               THE PROSPECTIVE JUROR:   Yes.

18               THE COURT:   So you don't think that

19   whatever it was that you heard would affect your

20   actions in any way?

21               THE PROSPECTIVE JUROR:   No, sir.

22               THE COURT:   Whatever it was that you

23   heard, do you think you would still be able to

24   render an impartial verdict based on the law and

25   evidence?

2582

1        THE PROSPECTIVE JUROR:   Yes, sir.

2        THE COURT:   Do you have any questions?

3        MS. KAISER:    Do you remember any

4   story on TV regarding an arrest or anything like

5   that?

6        THE PROSPECTIVE JUROR:   It was just

7   the original.

8        MS. KAISER:   Nothing further.

9        THE COURT:   Just have a seat.

10       (Prospective juror Forrest Lynn Luce

11   approached the bench, and the following

12   proceedings were had:)

13       THE COURT:   What was it that you

14   heard?

15       THE PROSPECTIVE JUROR:   Sounds like

16   the one where the two guys had just built a new

17   home and a recording studio and they were

18   murdered.   Just spent the first night there.

19       THE COURT:   Where did you hear your

20   information?

21       THE PROSPECTIVE JUROR:   Newspaper and

22   on the news, TV news.

23       THE COURT:   What do you normally watch?

24       THE PROSPECTIVE JUROR:   Usually

25   Channel 2.

1           THE COURT:  So, probably whatever you

2     heard, if this is the same case, was on Channel

3     2 television and from the daily newspaper?

4           THE PROSPECTIVE JUROR:   Houston

5     Chronicle.

6           THE COURT:  Is that the paper you

7     subscribe to?

8           THE PROSPECTIVE JUROR:  Yes, sir.

9           THE COURT:  Do you remember if you

10    read about this on more than one occasion or saw

11    it on TV on more than one occasion?

12          THE PROSPECTIVE JUROR:  I don't

13    remember.  I know I saw it on TV and read about

14    it in the paper.

15          THE COURT:  Do you recall whether or

16    not you heard about it at the time of the

17    alleged offense?

18          THE PROSPECTIVE JUROR:  Yes, sir, soon

19    after that, yes, sir.

20          THE COURT:  Do you recall whether you

21    heard or read anything about any kind of arrest

22    in the case?

23          THE PROSPECTIVE JUROR:  No, I didn't

24    hear about that.

25          THE COURT:  Just the initial

2584

1   discovery?

2         THE PROSPECTIVE JUROR:   Yes.

3         THE COURT:   If we are talking about

4   the same case?

5         THE PROSPECTIVE JUROR:   Yes.

6         THE COURT:   Whatever it was that you

7   heard or saw about this case, is there

8   established in your mind any conclusion as to

9   the  guilt or innocence of the defendant that

10   would influence you in any action of finding a

11   verdict?

12         THE PROSPECTIVE JUROR:   No.

13         THE COURT:   Do you feel that you would

14   be able to render an impartial verdict on  the

15   law and the evidence?

16         THE PROSPECTIVE JUROR:   Yes.

17         THE COURT:   Any questions?

18         MS. KAISER:   No.

19         MS. DAVIES:   No.

20         THE COURT:   Just have a seat.

21         (Before the panel)

22         THE COURT:   You are beginning to see

23   why it takes so long in a case like this.  If at

24   any time there is somebody who thinks you know

25   something about this case, do bring it to our

1    attention.  None of these are

2    disqualifications.  The other side is simply

3    entitled to know -- well, each side is entitled

4    to know this kind of information, but there may

5    be information that would be helpful to one side

6    or the other in making a determination of how

7    they use their strikes in this case.  While I am

8    asking you questions and the counsel are asking

9    you questions, we are going to encourage you to

10    answer just as honestly as you possibly can.

11    There are no right or wrong answers to any of

12    the questions we put to you.  The correct

13    response is an honest response.  We don't want

14    you loading up on us.  We don't want you

15    answering in such a way that you think will get

16    you struck from this jury or answering in such a

17    way that you think will make sure that you get

18    to serve on this jury.  We do get upset when we

19    think people are handling themselves in that

20    fashion, also.  So just answer as honestly as

21    you possibly can.

22         When they are asking you questions,

23    sometimes they ask you something that the answer

24    to which is embarrassing perhaps or simply is

25    information that you don't want to share with

1      twenty-one other strangers out there.  If that

2      this is the case, do raise your hand, ask to

3      approach the bench, and we will try to talk

4      about it outside the presence of everyone else.

5              Witnesses.  You should anticipate you

6      are going to hear witnesses in this case.  As

7      jurors, you get to determine the credibility of

8      every witness who testifies.  You may decide to

9      believe everything one citizen says and

10     disregard everything another witness says.  That

11     is up to you.  You may choose to believe part of

12     what a witness says and disregard the rest of

13     it.  That is up to you.  What is important is

14     that you don't make a determination prior to the

15     time of hearing the testimony of a witness that

16     you are either going to believe or disbelieve

17     everything a witness says simply because he is a

18     member of a particular class or has a particular

19     position or holds a certain kind of job.  You

20     don't, for example, say I am going to believe

21     everything a priest might tell me and I am going

22     to disregard everything a used car salesman

23     might tell me.  You wait and you listen to the

24     testimony.  A frequently asked question in

25     criminal cases is would you believe the

1    testimony of a police officer simply because he

2    is a police officer and for no other reason.

3    You should anticipate, in murder cases

4    particularly, that you will hear from police

5    officers at some point.  Perhaps after that

6    witness or any other witness has testified, you

7    may say to yourself:  Well, based on this

8    witness' background, his training, his

9    expertise, what this witness was able to observe

10   in the case on trial, I am going to believe him

11   more in this case.  Maybe not.  That is up to

12   you.  But before you have ever heard a word of

13   testimony, you don't say you are automatically

14   going to believe a police officer because he

15   wears a blue uniform or disregard someone else

16   because he is a wrecker driver.  Any questions?

17   Anybody have any conflict with that?

18            I told you a little while ago about

19   the indictment in a criminal case being no

20   evidence of guilt whatsoever.  I want to go over

21   several general principles of law.  Many of

22   those you are familiar with, particularly those

23   who have served on criminal juries in the past,

24   and most of you, because you have seen far too

25   much television in your lifetimes, and we have

1    to re-educate you, since you have seen too much

2    L A Law and Petrochelli and Perry Mason and all

3    the rest of them.   But a defendant does have the

4    presumption of innocence.   As this defendant or

5    any defendant in a criminal case sits in a

6    courtroom, he is not a little bit guilty.   He is

7    presumed innocent.   That is a legal

8    presumption.   It may be overcome by legally

9    competent evidence.   That is what the State

10   attempts to do when they call witnesses to the

11   stand.   They are attempting to chip away at his

12   presumption of innocence so that, in their

13   opinion, at the time they rest, they are, in

14   effect, saying:   We, the State, think we have

15   now proved this defendant's guilt beyond a

16   reasonable doubt.   We have met our burden of

17   proof.   And they rest.   He is presumed

18   innocent.   It's a legal presumption.   It can be

19   overcome with legally competent evidence.   The

20   burden of proof in a criminal case is for the

21   State to prove a defendant's guilt beyond a

22   reasonable doubt.   Not beyond all doubt,

23   contrary to television, not beyond a shadow of a

24   doubt but beyond a reasonable doubt.   For most

25   prospective jurors to have a case proven to

1    their satisfaction beyond all doubt, that juror

2    would have had to have been present and observe

3    the offense occur.  If that were the case, you

4    would be a witness and you could not sit as a

5    juror in a case.  We have those rare

6    circumstances where video cameras are filming

7    everything that occurs in a criminal offense.

8    Bank robbery, the occasional convenient store

9    robbery, that kind of thing.  Those cases

10   usually have evidence that is so overwhelming,

11   with the tapes rolling, that they never get to

12   trial.  For some jurors, that is what they would

13   need to find a defendant guilty beyond all doubt

14   or beyond a shadow of a doubt.  What we are left

15   with are all those other cases where you have to

16   hear witnesses come to court, take the witness

17   stand under oath and tell you what they saw

18   occur or what their investigation resulted in.

19   You are getting information second and third

20   hand.  For that reason, the burden is to prove a

21   defendant's guilt beyond a reasonable doubt.

22   Reasonable doubt means different things to

23   different people.  There is not going to be a

24   definition that I am going to tell you right

25   now.  Each side may get up and tell you a

2590

1    definition of reasonable doubt because, after

2    well over a hundred years, our Court of Criminal

3    Appeals in the last few months has finally given

4    us a definition of what beyond a reasonable

5    doubt means.  And if they want to read it to

6    you, they certainly may; but it's a very

7    individual kind of concept.  What is reasonable

8    doubt for juror number one would not be

9    reasonable doubt for juror number five even

10   though they both sat here and listened to the

11   very same testimony.  It's not a matter of

12   numbers; it's not a matter of percentages; it's

13   not a matter of who calls the most witnesses.

14   It's up to you to make that determination.

15             As I said earlier, at some point the

16   State will rest, and the defense has the burden

17   or has the -- I slipped up there -- does not

18   have any burden.  The defense has the

19   opportunity to go forward.   The defense doesn't

20   have to call witnesses.  They do have to call

21   the defendant, they do not have to call any

22   witnesses at all, and the State can not call the

23   defendant to the stand.  Oftentimes in criminal

24   cases you will see the defense rest right behind

25   the State without ever having called any

1    witnesses at all.  Keeping in mind, the State at
2    the point where they are resting are, in effect,
3    saying we think we have met our burden of proof,
4    we have proven the defendant's guilt beyond a
5    reasonable doubt, we rest, it's passed to the
6    defense to go forward if they choose to do so.
7    Oftentimes the defense rests, in effect, saying
8    we don't believe the State has met their burden
9    of proof.  We don't believe they have proven his
10   guilt beyond a reasonable doubt.  And if you had
11   to go back right now and decide this case, you
12   would have to note not guilty.  They might do
13   that.  They might call witnesses.  I don't know
14   in advance what is going to happen.  There are
15   subpoena lists on file, but they don't have to
16   call everyone on the subpoena lists.  Frequently
17   in criminal cases the subpoena lists of the
18   State and defense are identical.  And the State
19   gets first crack at the witnesses.  They get to
20   go first.  So, if the defense were going to call
21   someone for some particular object, I don't know
22   why, but if they were going to call somebody to
23   get some kind of fact before the jury, it may
24   well be they can get that out in cross examining
25   the witnesses called by the State and

2592

1    effectively present whatever case they wanted to
2    present and rest without ever having called
3    anyone.    The defense does not have to call that
4    defendant to the stand.   A defendant in a
5    criminal case has the fifth amendment
6    privilege.   He does not have to take the stand
7    and testify in his own behalf.   Each of you as
8    potential criminal defendants has that right.   I
9    know full well that many of you would say
10   individually that if you were ever charged with
11   a criminal offense you would want to get up
12   there and tell everything you knew.   Maybe you
13   would and maybe you wouldn't.   There are many
14   legitimate reasons why people don't take the
15   stand in their own behalf.   Usually that
16   decision is made in conference between the
17   defendant and his counsel after the State has
18   rested.   Your counsel may well be telling you,
19   properly, not to get on the stand and testify.
20   You can't help yourself at this point, the State
21   hasn't proven their case, we shouldn't do
22   anything.   Many people, prospective defendants
23   in criminal cases in this courthouse have severe
24   accents and don't want to take the stand.   Many
25   defendants appear for all the world like they

2593

1    are telling a lie when in fact they are telling
2    the truth simply because of the stress they are
3    under when they are on the witness stand.   So,
4    there are many ligitimate reasons why people
5    don't take the stand in their own behalf, and
6    you can't speculate on those reasons.   I know
7    it's natural curiosity to try to figure out why
8    didn't so and so take the stand.   You can't
9    think like that; you can't speculate on things
10   you haven't heard.   You have to be able to base
11   a verdict on what you have heard, on the
12   evidence that is presented in the courtroom.   If
13   there is not enough evidence to establish a
14   defendant's guilt beyond a reasonable doubt, you
15   vote not guilty.   If you do believe the
16   defendant had been proven guilty beyond a
17   reasonable doubt, you vote guilty.   If a
18   defendant does not take the stand and testify in
19   his own behalf, I will give you an instruction
20   in the Court's Charge to the effect that his
21   failure to testify is not to be considered as
22   any evidence of guilt whatsoever.   Anybody have
23   any problem with that?   Any conflicts so far?
24             Let's take a couple of hypotheticals
25   and make sure you understand.   Indictment is no

2594

1    evidence.  A defendant is presumed innocent.
2    The State has the burden of proof.  And failure
3    to testify is no evidence of guilt whatsoever.
4    Let's say we suddenly selected twelve members of
5    the jury, the defendant was arraigned, entered a
6    plea of not guilty after the indictment was
7    read, and I immediately charged the jury and
8    sent you to the back to deliberate the case.
9    You would have to vote not guilty in that
10   situation because he is presumed innocent, the
11   indictment isn't any evidence, failure to
12   testify isn't any evidence at all, and the State
13   had the burden of proof and didn't go forward.
14   You would have to be able to vote not guilty in
15   that situation.  You would be obligated to vote
16   not guilty.
17            Anybody have any problem with that?
18            Let's take another hypothetical.  The
19   defendant is arraigned, a plea is entered, State
20   goes forward by calling witnesses to the stand.
21   At some point, the State rests.  Defense rests
22   right behind the State without ever having
23   called any witnesses, including the defendant.
24   Charge is read to you.  You go back to
25   deliberate.  This case, you as an individual

2595

1   juror believe that the defendant's guilt had

2   been proven beyond a reasonable doubt.  Whatever

3   it took for you, the State had met their

4   burden.  In your mind, the State had proven his

5   guilt beyond a reasonable doubt, but he didn't

6   testify.  You would have to vote guilty in that

7   situation.  Is there anybody who could not vote

8   guilty even if you believed the State had proven

9   a defendant's guilt beyond a reasonable doubt?

10   Seems like a silly question, but occasionally we

11   have members of a  prospective jury panel who

12   believe, for whatever reason, be it personal or

13   philosophical or religious reasons, they simply

14   could never participate in a verdict of guilty

15   even if they believed the defendant guilty

16   beyond a reasonable doubt.  Is there anybody of

17   that mind on this panel?  I assume by your

18   silence there is none.

19        Third and last hypothetical.  State

20   goes forward, calls witnesses, State rests.

21   Defense rests right behind the State.  You go

22   back to deliberate.  In this scenario you as an

23   individual juror believe the State had not

24   proved the defendant's guilt beyond a reasonable

25   doubt.  Whatever it took for you individually,

1    the State hadn't done it.  After deliberating
2    with those other jurors, talking about the case,
3    you believe the State had proven his guilt
4    beyond a reasonable doubt, but he didn't
5    testify.  You would be obligated to vote not
6    guilty.  You cannot use failure to testify for
7    any purpose.  You can't give it any weight to
8    get you over the hump, so to speak, from not
9    guilty to guilty.  Anybody have any problem or
10   any conflict with that?  All right.  No
11   questions at all so far?  You're hardly even
12   nodding.  They are going to make you speak up
13   when they start talking to you.
14           Lesser included offenses.  There are
15   certain other offenses than the primary charge
16   which you may see when you go back to deliberate
17   a case.  That is to say you may hear evidence
18   regarding another offense or be given an option
19   to find a defendant guilty of a lesser offense
20   than the primary charge.
21           Murder.  If somebody knowingly or
22   intentionally causes the death of another
23   person, that is murder.  That is a first degree
24   felony offense of what we refer to as simple
25   murder or straight murder.   A lesser included

1   offense of that may be such things as voluntary
2   manslaughter, a second degree felony,
3   involuntary manslaughter, a third degree felony,
4   a class A misdemeanor offense of negligent
5   homicide perhaps.  It just depends on the case
6   and what the testimony shows and what kind of
7   evidence has been admitted.  I don't know in
8   advance, like I said before, what I am going to
9   hear in this case.  If there is anything in the
10  record about a possible lesser offense, I am
11  obligated to put that in the Court's Charge.
12  That is to give the jury an option of finding a
13  defendant guilty of a lesser offense, if
14  anything.  A capital murder case is the ultimate
15  offense in Texas.  We have misdemeanor offenses,
16  we have felony offenses, we have capital murder
17  offenses.  When I am saying a capital murder
18  offense, I am talking about an offense for which
19  on conviction there are only two possible
20  punishments, either a life sentence or the death
21  penalty.  That is what a capital offense is, one
22  which can only result in a life sentence or the
23  death penalty, not a term of years.  We know
24  that lesser included offenses of capital murder
25  can be murder, voluntary manslaughter,

2598

1    involuntary manslaughter, on down the line like

2    that.   Those first, second, third degree

3    felonies.   They just stair step down from

4    capital murder at the stop down through murder,

5    a first degree felony, which is punishable by

6    confinement for not less than five years nor

7    more than 99 years or life, down to voluntary

8    manslaughter, two to twenty years, involuntary

9    manslaughter, two to ten years, misdemeanor

10   offenses up to a year in county jail.   They

11   just stair step down and are lesser included

12   offenses.   If I give you a charge that has a

13   lesser included offense in it, I am not making a

14   determination that is what you should find a

15   defendant guilty of, if anything.   I am merely

16   obligated to put it in the charge.   So, you

17   might see a charge which asks you whether or not

18   you believe that the State has proven the

19   defendant's guilt beyond a reasonable doubt and

20   vote guilty or not guilty.   You may see a

21   charge that has in it something to the effect

22   that if you do not believe beyond a reasonable

23   doubt that a defendant is guilty of capital

24   murder, you are next to consider a lesser

25   charge, such as murder or voluntary manslaughter

2599

1   or involuntary manslaughter.  Those are options
2   you may see later.  I just don't want you to
3   get hit blindsided by that for the first time
4   when you hear about it later on in individual
5   questioning.
6         Any questions so far?
7         All those other offenses have ranges
8   of punishment, as I said, that include a term of
9   years as a possibility.  Capital murder does
10  not.  It's either life or death.  We have very,
11  very wide ranges of punishment for those other
12  offense because there are so many different ways
13  in which certain kinds of offenses can be
14  committed.  All first degree felony offenses
15  have the same range or punishment, five to 99
16  years or life.  In addition, a fine not to
17  exceed ten thousand dollars may be assessed.
18  First degree felony offenses include everything
19  from delivery of cocaine to burglary of a
20  habitation, aggravated robbery.  Straight or
21  simple murder, is a first degree murder.  The
22  ranges are so wide because there are so many
23  different ways that each one of those different
24  kinds of offenses can be committed.  When I say
25  murder, most of you think of some kind of

1    preconceived type murder type situation.    It
2    may be a husband killing a wife, somebody who
3    has had a quarrel with somebody and lies in wait
4    and assassinates them.    You usually think of
5    the kinds of offenses which are, for want of a
6    better term, more aggravated.    It's usually more
7    difficult for jurors to consider those
8    hypothetical situations in which the lesser
9    range of punishment might be appropriate in a
10   proper case.    We disagree over our
11   hypotheticals.    And if there is disagreement in
12   hypotheticals, each side has the opportunity to
13   present their own.    But a possible murder
14   hypothetical, one that you may have never
15   considered before is one involving a euthanasia
16   type case where someone--
17             MR. STAFFORD:    May I have the record
18   reflect my objection?
19             THE COURT:    The record so reflects
20   your objection.
21             Where, for example, we extend
22   hypotheticals because we are trying to make a
23   point.    Let's say husband and wife have been
24   married for sixty years.    They love each other
25   dearly.    Wife is dying of some incurable

2601

 1   disease, some painful disease.  She's on

 2   life-support equipment.  The doctors have been

 3   in and said she only has twelve to twenty-four

 4   hours to live.  She's in extreme pain; but

 5   because of the nature of her life-support

 6   equipment, she can't receive any medication to

 7   relieve her pain.  Doctors leave the room, she

 8   pleads with the husband to, in effect, pull the

 9   plug.  He does so.  He has committed an act

10   clearly dangerous to human life, some would

11   argue, resulting in her death.  Even though she

12   would have been dead hours later perhaps, he has

13   caused her death.  That could be charged as a

14   murder case, a person could be indicted for,

15   could be tried for that offense, could perhaps

16   be convicted of the offense of murder, and if

17   convicted, a jury would determine the

18   appropriate punishment, that perhaps, remember I

19   am extending this hypothetical, is the kind of

20   case where a jury might be able to consider the

21   lesser range of punishment.  It's usually easy

22   for jurors to think of a situation which is more

23   aggravating.  I am just saying that to

24   illustrate to you that we have to have these

25   very, very wide ranges of punishment.  We can't

2602

1   commit you to what you would do in a certain

2   fact situation.  We want you to be able to keep

3   open minds when you come in here and be able to

4   consider the entire range of punishment after

5   you have heard what the circumstances were.

6   Anybody who thinks you could not do that?

7            Let's go back to the offense of

8   capital murder.  When a jury finds a defendant

9   guilty of the offense of capital murder, we

10  don't ask the jury to go back and vote either

11  life or death; instead, we ask them to answer

12  certain questions.  Now, while I said earlier

13  that a capital murder offense is a murder plus

14  some other aggravating factor, I think we

15  probably need to go through under the Texas

16  statutes what those all include because some of

17  you are very confused about those and don't

18  consider that certain offense are capital murder

19  offenses.  Our statutes set out six different

20  ways in which the offense of capital murder can

21  be committed.  One is where a fireman or a

22  police officer is murdered in the lawful

23  discharge of an official duty.  You probably

24  have seen those on television, read them in the

25  newspaper.  That is a capital murder offense.

2603

1    Murder plus the aggravating factor of the victim

2    being a fireman or police officer in the lawful

3    discharge of an official duty.  One is the case

4    where somebody commits a murder for remuneration

5    or the promise of remuneration.  Murder for hire

6    schemes.  You probably read about those.  There

7    was a famous one in the courts recently in this

8    county.  One is the situation where someone is

9    incarcerated in a penitentiary and murders an

10    employee of that penal institution.  That is

11    capital murder.  One is where someone is

12    escaping or attempting to escape from a penal

13    institution and commits a murder.  That is

14    capital murder.  The category that most of you

15    are familiar with, the ones that you see on

16    television and read about in the papers

17    sometimes on a daily basis is where someone is

18    in the course of committing another felony or

19    attempting to commit another felony and commits

20    a murder.  The other felony being robbery,

21    burglary, kidnapping, aggravated sexual assault

22    or arson.  If somebody is in the course of

23    committing one of those offenses or attempting

24    to commit one of those offenses and murders

25    someone, that is a capital murder offense,

1    punishable on conviction only by life or

2    death.    Such as the example where a woman is

3    kidnapped from a parking lot, taken somewhere,

4    raped and murdered.    That is a capital murder

5    situation.  A convenient store clerk in the

6    course of committing a robbery, he is murdered,

7    that is the robbery plus the murder, that is a

8    capital murder situation.  The sixth and final

9    category we have of capital murder is where

10   someone murders more than one person in the same

11   criminal transaction.  It can be a number of

12   people.  It can be as few as two people.    The

13   Jeffrey Dahmer situation in Wisconsin could be a

14   capital murder situation.  We know from my

15   having read this indictment to you that the

16   allegation in this case is that two people were

17   murdered in the same criminal transaction.    That

18   is what gets it to capital murder status.  You

19   have those six different ways, everything from

20   murder of a police officer in the course of the

21   lawful discharge of an official duty to murder

22   in the commission of another felony to murder of

23   two or more people in the same criminal

24   transaction and all those other things.

25              Many of you did not know that all of

2605

1   those cases were capital murder offenses.   I

2   know you have to answer certain questions in

3   this long form questionnaire before we tell you

4   about that kind of thing.

5            Now, what happens if a jury returns a

6   verdict of guilty of capital murder.   There is

7   a second stage of trial, just as there would be

8   a second stage of trial if you found the

9   defendant guilty of any other offense.   Again,

10   that is where you might hear evidence of

11   background, reputation, prior bad acts, previous

12   criminal convictions, if any, that kind of

13   thing.  The information you think would be

14   helpful in deciding in another case what the

15   range of punishment should be but in a capital

16   murder case how you answer certain special

17   issues.  Both the jury and I are insulated a bit

18   in a capital murder case because you do not go

19   back and vote for life or death on conviction of

20   capital murder; instead, you answer certain

21   special issues.  And I will tell you in advance

22   exactly what I am going to do, whether I assess

23   life imprisonment or the death penalty as

24   required by law, depending on how you answer

25   those questions.

1          The first question I would give you is
2     over here on this board, and we will let you see
3     it at a later time.  The question is:  Do you
4     find from the evidence beyond a reasonable doubt
5     that there is a probability that the defendant
6     would commit criminal acts of violence that
7     would constitute a continuing threat to
8     society.  Now, keeping in mind you have already
9     heard the evidence in the case in chief.  You
10    have already found somebody guilty of capital
11    murder and you have heard additional evidence
12    perhaps in the second stage of trial, and now
13    you are asked to answer this special issue, this
14    question.  This is the question where we are
15    asking the jury to make a determination of a
16    defendant's future dangerousness.  I would give
17    the jury an additional instruction that you are
18    to consider all the evidence admitted at the
19    guilt or innocence stage, all the evidence at
20    the punishment stage, including evidence of a
21    defendant's background or character or
22    circumstances of the offense that militate for
23    or mitigate against the imposition of the death
24    penalty.  So you have everything, both stages
25    of trial when you go back and decide this issue

2607

1    of future dangerousness.

2             The word probability is in there.   In

3    common usage, we would say that probability

4    means more likely to occur than not.

5             The last word in that question is

6    society.   Criminal acts of violence that would

7    constitute a continuing threat to society.

8    Society is a term that goes undefined.   I don't

9    give a definition in the Court's Charge.

10   Society does include the society within the

11   penal system.   The penitentiary system is part

12   of society, what we used to call TDC, what we

13   now call the Institutional Division of the Texas

14   Department of Criminal Justice.   So, do you find

15   beyond a reasonable doubt that there is a

16   probability that the defendant would commit

17   criminal acts of violence that would constitute

18   a continuing threat to society.   You answer yes

19   or no.   It takes all twelve jurors agreeing, a

20   unanimous verdict to answer that question yes.

21   Ten or more have to agree to return a no

22   answer.   If you answer no on number one, there

23   is no such probability beyond a reasonable

24   doubt, I take the case back, I assess life

25   imprisonment, your job is ended.   If you answer

                                          2608

1    that question unanimously yes, there is such a

2    probability that the defendant would commit

3    criminal acts of violence constituting a

4    continuing threat to society, then you proceed

5    to the second special issue.  Sometimes when you

6    are answering number one you do get other

7    evidence of a defendant's background, character,

8    prior bad acts, that kind of thing.  Sometimes

9    that information is not made available to you.

10   Sometimes you have to answer that question based

11   solely on what you have heard in the case in

12   chief.  We would say that there are those cases,

13   those capital murder offenses where the

14   circumstances surrounding the commission of the

15   offense are so horrendous that based on the

16   commission of that offense alone a juror could

17   in the proper case find that there would be a

18   probability that defendant would commit criminal

19   acts of violence constituting a continuing

20   threat to society.  You make up your own kind of

21   hypothetical.  This being the fifth week, I

22   won't give you a hypothetical.  If these parties

23   want to do so, they may.

24          Is there anybody here who can not see

25   how under some circumstances that question as to

1    probability could be answered yes and sometimes

2    be answered no, depending on the evidence you

3    had before you?

4              Proceeding to number two.  And you

5    only get to number two if you have answered

6    number one yes there is such a probability.  The

7    number two question is asking whether, taking

8    into consideration all the evidence, including

9    the circumstances of the offense, the

10   defendant's character and background and the

11   personal moral culpability of a defendant, there

12   is a sufficient mitigating circumstance or

13   circumstances that warrant that a sentence of

14   life imprisonment rather than a death penalty be

15   imposed.  I would instruct you that mitigating

16   evidence is evidence you might regard as

17   reducing a defendant's moral blameworthiness.

18   Our statutes don't help us out a whole lot

19   here.  They don't tell us exactly what is

20   mitigating and what isn't.  The statutes don't

21   define or limit the aspects of a defendant's

22   character or background or record or the

23   circumstances of the offense that are

24   mitigating.  And the law doesn't impose any kind

25   of formula for determining how much weight to

2610

1   give a mitigating circumstance.  This is a
2   rather new wrinkle in our capital murder law.
3   Each side has the opportunity at the punishment
4   stage to call witnesses.  Each side has the
5   opportunity to present other kinds of evidence.
6   You cannot require one side or the other to
7   present certain kinds of evidence.  You might
8   anticipate that a certain type of mitigating
9   evidence might come from one side as opposed to
10  the other but you can't require it.  Sometimes
11  jurors hear what they feel is mitigating from
12  the State's case.  They may hear evidence of a
13  defendant's age perhaps, that that particular
14  juror would think would be mitigating in the
15  case on trial.  Frequently mitigating evidence
16  comes in the form of witnesses called by the
17  defense.  For example, you might hear evidence
18  of a very bad kind of background that a
19  defendant had lived through, and you might think
20  that is mitigating in the case you have before
21  you.  I can't tell you exactly what is
22  mitigating and what isn't.  I can't tell you if
23  the list of mitigating circumstances is twenty
24  items long or if it's twenty thousand items
25  long.  That is up to you to decide.  You may

2611

1    hear this evidence and you may say it's

2    mitigating, or you might say to yourself:  This

3    could be mitigating in another case but not in

4    this case.  Even if you do decide it's

5    mitigating, you decide how much weight to give

6    it.   One juror might give it very little

7    weight, another might rely on it a great deal in

8    answering special issue number two.  There is no

9    burden of proof in special issue number two.

10   You are simply asked to go back there and look

11   at everything you have before you and decide if

12   there is some kind of mitigation why the death

13   penalty should not be imposed.  While I can't

14   tell you exactly what is and is not mitigating,

15   I can tell you that mitigating evidence does

16   include such things as mental retardation and

17   mental illness.   In the proper case, it can

18   include such things as a defendant's good

19   behavior in prison or in jail while he is

20   awaiting trial.   It can include an exceptionally

21   unhappy or unstable childhood, drug use or

22   economic deprivation, youth, a defendant's age,

23   voluntary intoxication, drug dependency,

24   illiteracy, opinion testimony of lay witnesses

25   or psychiatric opinion testimony that a

2612

1    defendant would not be a danger in the future.

2    All those things in a proper case could be

3    mitigating evidence.  But you listen to it and

4    you make a determination as to mitigation and

5    you determine the weight to give it when you're

6    answering this question.  Here it takes all

7    twelve people to agree on a no answer.  It takes

8    ten or more to agree to a yes answer.  If that

9    question is answered yes, again I assess life

10   imprisonment.  A death penalty only results if

11   the unanimous answer to number one regarding

12   probability is yes and the unanimous answer on

13   number two is no.  A yes, no, I assess the death

14   penalty.  We are each insulated a little bit

15   from voting for life or death, but you get to

16   know exactly what I am going to do depending on

17   how you answer those two questions.

18            Any questions so far?

19            We want to make it clear that there

20   are no automatic yes, no answers on these

21   questions.  Each one is going to vary, depending

22   on what you have before you, the circumstances

23   of the offense, the kind of evidence that has

24   been admitted and that you have to deliberate on.

25            Any questions at all so far?  You are

2613

1    very confused.

2                THE COURT:   Ms. Davies.

3           VOIR DIRE EXAMINATION BY THE STATE

4    BY MS. DAVIES:

5                Let me introduce myself again.   My

6    name is Carol Davies.   This courtroom is really

7    uncomfortable with the post and the setup.   We

8    think we all have a hard time getting situated

9    and having a comfortable place to work, so you

10   will have to bear with us a little bit.

11               My name is Carol Davies.   I am an

12   assistant district attorney.   You probably all

13   know by name your elected district attorney,

14   Johnny Holmes.   I am sure you understand there

15   is no way Mr. Holmes can be in all the criminal

16   courts in this county handling the hundreds,

17   thousands of criminal cases that are pending.

18   There are close to two hundred attorneys who are

19   his assistants.   I am one of them.   And we are

20   each assigned to different courts handling

21   different types of cases, depending on our

22   experience and whatever.   That is why I am

23   here.   You have heard the judge use the term the

24   State.   The State does this, the State has the

25   burden of proof.   A lot of references to the

2614

1   State.  He is talking about me.  I am here

2   representing the State.  I am here to see that

3   the laws of the state are enforced, hopefully

4   that justice is done, and that appropriate

5   punishments are given out in the case that is on

6   trial.  So, that is who they are talking about.

7   I always like to mention that because I think

8   it's easy to recognize the court reporter, the

9   judge and the bailiff.  I mean, their roles are

10  pretty well defined.  But a lot of time people

11  scratch their heads over that.  So, you know my

12  job.  And the twelve of you who are chosen to be

13  on this jury have the job of deciding what is

14  the truth, what really happened.  You will

15  decide the facts in the case while the judge

16  decides the law, makes the legal decisions.

17          This is kind of an orientation

18  session.  When we are talking about a capital

19  murder case, we have the opportunity to talk to

20  each one of you individually.  But, hopefully,

21  we are going to save time over the long run here

22  by having this opportunity to talk to you

23  individually.  I am going to use this time to

24  talk about some of the concepts that come up in

25  just about any criminal case, not just capital

1     murder.  I am going to wait and talk about those

2     things that are unique to capital murder cases,

3     at least in the most part those things are

4     unique to capital murder cases, for example, the

5     two issues at the punishment stage.  I am going

6     to wait and talk to you about those things when

7     we meet and talk individually, but for now we

8     want to just go over some of the standard things

9     that come up.  I noticed there are a few of you

10    who have been on juries before but most of you

11    haven't, so for those of you who have had jury

12    service, kind of bear with us because the ones

13    who come in here and have never had that

14    experience I think usually can appreciate this.

15    There are things that they are not familiar with

16    in everyday life.  And capital murder is one of

17    them.

18             How many of you came in here today

19    thinking that the death penalty was a

20    possibility in any murder case?  Anybody under

21    that impression?  No.  Usually several people

22    raise their hand.

23             THE PROSPECTIVE JUROR:  State the

24    question again.

25             MS. DAVIES:  Think that the death

2616

penalty was a possibility in any murder case?

THE PROSPECTIVE JUROR:  Sure.

MS. DAVIES:  But it is not.  That is a
very common misconception because people think
it's kind of an eye for an eye notion, that the
death penalty is a possibility in any murder.
It has to be capital murder.  That it's a unique
kind of murder.  And that is why it's important
that we explain all these things to you so that
everybody understands what we are dealing with
as we get into it.

There are many varieties of murder or
homicide under our state law.  The judge has
touched on them, and I want to go over them
again.  We will start at the top of the ladder.
The most serious, the top rung of the homicide
scheme is capital murder.  Capital murder is the
only offense where the death penalty is a
possibility.  There are only two possible
punishments, life or death.  That capital
murder offense is an intentional murder plus
something more, the aggravating factor.  That
aggravating factor that elevates an intentional
murder to capital murder can be something like
it's the murder during the course of a robbery,

2617

1    murder during the course of a rape, murder of a

2    police officer in the lawful discharge of his

3    duty, the murder of more than one person in the

4    same criminal transaction.  So, just -- I may

5    sound like I am minimizing murder, but just

6    plain murder, just intentional murder is not

7    enough.  It has to be murder plus the

8    aggravating factor.

9          Below that, if we come on down the

10   ladder, looking at all the different -- we refer

11   to them as lesser included offenses because the

12   lesser offenses are all a part of the greater

13   offense, the greatest one is capital murder.

14   It's kind of like taking off the layers of an

15   onion or, you know, those dolls that kids play

16   with that nest inside, they get bigger and

17   bigger, so the little one, the lesser offense is

18   always a part of the other.  You just keep

19   adding other factors to make it more serious to

20   get to the greater offense.  So, start at the

21   top and come down.  Capital murder is at the

22   very top.  Below that is your first degree

23   murder, first degree felony punishable by five

24   to 99 years or life.  And by the way, all these

25   lesser ones also have a possible optional fine

2618

1   attached.  I am going to mention that once and
2   leave it off because I think it's the number of
3   years that is the more significant part of the
4   punishment.  First degree murder, five to 99
5   years or life.  That is the intentional or
6   knowing taking of someone's life.  No
7   aggravating factor; otherwise, it would be
8   capital murder.  And, I mean, it could be as
9   brutal as you want it to be, but it still is
10  just the intentional or knowing taking of
11  somebody's life.  That could be anything.  Most
12  people come in with the idea, I mean, you have
13  some notion of what is murder.  That intentional
14  murder could be a sniper who sits up on the roof
15  of a building and picks off, just shoots a
16  stranger on the street.  It could be a domestic
17  quarrel, something that has been festering and
18  growing for years where somebody just finally
19  loses it and shoots a spouse.  It could be a
20  barroom fight.  It could be the mercy killing or
21  euthanasia example that the judge has given
22  you.  And I give all those examples to point out
23  it could be anything from a somewhat sympathetic
24  sad situation to a brutal killing of a
25  stranger.  All intentional or knowing murder.

2619

1    All first degree felonies.   If you come on down

2    the hierarchy down to the next lower rung on the

3    ladder, that is voluntary manslaughter, second

4    degree felony.   Second degree felony is

5    punishable by two to twenty years.   Voluntary

6    manslaughter is, again, an intentional or

7    knowing killing, intentionally taking someone's

8    life; however, it is done under certain unique

9    circumstances.   The legislature has seen fit to

10   downgrade an intentional or knowing killing when

11   it is committed under the influence of sudden

12   passion from an adequate cause.   And then it

13   gives -- the legislature has given us a

14   definition which would explain that when one is

15   acting under the influence of the kind of

16   emotion, rage or passion they don't have time to

17   reflect.   In other words, they act very quickly

18   and under the influence of this rage, and the

19   rage was induced by the deceased under

20   circumstances that a reasonable person would

21   accept as reasonable.   That is to paraphrase in

22   laymen's terms.   Let me give you an example to

23   try to illustrate that.   This would be an

24   example of why an intentional or knowing murder,

25   first degree murder would be downgraded in this

2620

1    kind of situation.  You come home from work.

2    Your twelve-year-old daughter was home alone.

3    You get home from work.  There is.  She's

4    beaten, she's cut up, she is bleeding, she's

5    sobbing, she has been raped.  Mr. Jones, who

6    lives down on the corner, forced his way into

7    the house and, you know, raped her, slashed her

8    up.  You as a parent are enraged.  Instead of

9    reaching for the phone to call the police, grab

10   a gun, go down to the corner, blow him away.

11   You kill him.  Intentional murder.  The law

12   says, yes, it's intentional murder, but if a

13   jury believes that a reasonable person may very

14   well be so enraged they would act this way they

15   can say this is voluntary manslaughter, and it

16   would not be one punished as seriously.  So that

17   is an extreme example.  With all of these

18   examples, you are going to find out we use

19   extreme examples because it kind of helps to

20   illustrate the point a little bit.

21           The next lower or lesser homicide

22   offense would be involuntary manslaughter.

23   That is a third degree felony, punishable by two

24   to ten years.  That is the reckless taking of

25   someone's life.  Reckless means you should have

2621

1    known that your conduct was going to present a

2    serious threat to someone's life -- pardon me --

3    you did know.  You did know that your conduct

4    was a serious threat, but you disregarded that

5    and acted anyway, and the result was that

6    somebody died.  Common example of involuntary

7    manslaughter, your third degree homicide, would

8    be the situation that you read about in the

9    newspaper every day where someone is driving

10   while intoxicated, they hit a car, somebody is

11   killed.  They knew there was a risk, get behind

12   the wheel drunk, disregarded the risk, result of

13   their conduct is somebody's death.    Involuntary

14   manslaughter.  And then at the very bottom rung

15   of the homicide ladder, the last lesser, is

16   negligent homicide.  That isn't even a felony

17   offense.  Misdemeanor offense punishable,

18   maximum, a year in the county jail.  That is

19   where one negligently causes death where they

20   should have known that their conduct was going

21   to endanger someone but didn't know.    Still

22   resulted in somebody's death.

23            Now, the reason we want to be sure

24   that you understand all of those -- and for now

25   let's just disregard capital murder.  Let's just

2622

1    talk about all of those lessers.  Ranging all

2    the way at the top, the intentional, five to

3    life range, down to involuntary, two to ten.

4    All the felonies.

5         In any instance where we are in trial

6    on a greater offense, there is the possibility

7    that a jury would get an instruction from the

8    judge that permits them to consider finding one

9    guilty of the lesser offense.  And in an

10   instance like that, if you were on the jury, we

11   would need to know whether you could consider

12   the entire range of punishment.  Remember now

13   we are not talking about death penalty.  We are

14   not talking about a capital murder.  We are just

15   talking about the term of years that would be

16   included in any of those lesser offenses, two to

17   ten, two to twenty, five to life, depending on

18   which category of homicide we would be talking

19   about.

20        Is there anyone here who could never

21   consider sentencing someone to life in the

22   penitentiary?  No matter what the crime is, they

23   just felt like, no, I couldn't do that, no

24   matter what the facts.  Anyone feel that way?

25   Are you awake out there?  Usually there is

2623

1    somebody who does feel that way.  By the way,

2    you know, nod your head, raise your hand, stomp

3    your feet, whatever it takes to let me know how

4    you feel about some of these things.   I just

5    need to know if you could if you thought it was

6    a proper case sentence someone to life in the

7    penitentiary for homicide, first degree

8    homicide.  Okay.

9         The other end of the range, the judge

10   focused on this more, is the minimum, as little

11   as -- let's talk about intentional -- as little

12   as five years or, if you were talking about the

13   second or third degree, as little as two

14   years.  There is a very wide range of fact

15   situations, which I think you all realize now.

16   And that is why there is such a wide range of

17   punishment.   So our concern is to know and be

18   sure that each of you is the kind of person who

19   would keep an open mind, wait, hear the facts of

20   the case and then be able to decide what was

21   appropriate, given the facts that you heard in

22   evidence.   Can each of you do that?   In other

23   words, consider the minimum as well as the

24   maximum and anything in between if you sat on a

25   jury for either a first, second or third degree

2624

1    homicide.   You can do that?   Okay.

2         You know that this is the intentional

3    taking -- this particular case, the indictment

4    is for the intentional taking of two lives, both

5    Brad and Charles Allen.   That is what makes it

6    capital murder is two people.   When we are

7    talking about capital murder, I have to prove

8    that it was an intentional killing.   Doesn't say

9    anything about premeditated.

10        Anybody feel like it would have to be

11   a premeditated crime for it to be an offense

12   that should be a capital murder?   I know you

13   have all heard that term.   It's mainly on TV.

14        What does it take to act

15   intentionally?   I am going to suggest to you

16   that a person can form the intent to kill just

17   as quickly as they can form the intent to do

18   anything else.   And I guess the other thing I

19   want us to think about is how one proves the

20   intent.   You know, the judge has already

21   reminded each of you that this defendant, every

22   defendant has the right to remain silent.   He

23   doesn't have to testify.   I can't make him

24   testify.   If he did testify, he may or may not

25   tell the truth.   He has a lot at stake.   Under

2625

1    those circumstances, I have got to come into

2    court in this case, like I do in every case, and

3    prove intent based on the circumstances.  You

4    look at his conduct.  You look at what he did to

5    determine what he intended to do.  Do you feel

6    like you can do that?  Is there anybody who

7    thinks they couldn't, that they couldn't decide

8    what somebody intended to do by looking at their

9    conduct in the circumstances?  Anybody

10   troubled?  For example, I think sometimes that

11   is kind of a vague notion.  If I am standing

12   here with my cup and it falls to the ground as

13   I'm standing here now, you might not be entirely

14   sure whether I intended to drop the cup or it

15   just slipped out of my hand.  On the other hand,

16   if I brought my hand back and slammed it

17   against, hurled it across the room and hit the

18   wall with it, based on my conduct, you might be

19   able to conclude she intended to drop the cup.

20   Or say it slipped out of my hand, hit the floor,

21   you are not too sure.  I picked it up and

22   slammed it down again.  Do you think you can

23   look at the circumstances and decide what the

24   intent was?  Anybody who thinks that is not

25   possible or that you could not do it?

2626

1          As far as being able to decide how

2    long it takes, because when we are talking about

3    murder, as I say, it doesn't have to be

4    premeditated.  It could be a barroom fight could

5    erupt suddenly.  Two people didn't plan ahead.

6    Or any of us who drive the freeways these days

7    and you read the newspapers, there could be a

8    situation where you cut somebody off, cut in

9    front of them on the freeway, makes them mad,

10   they reach under the seat of the car, pull out a

11   gun, take aim, shoot, kill.  Intended to do it,

12   but certainly it was something that was done

13   very spontaneously, they didn't take long to

14   think it through.  It was just you cut them off,

15   they get mad, reach for the gun and shoot.    I

16   am suggesting that that is an intentional

17   murder.

18          MR. STAFFORD:  I object, Your Honor. I

19   suggest that is involuntary manslaughter.  He

20   acts out of passion.    Could be.

21          THE COURT:  Rephrase it, please.

22          MS. DAVIES:  Well, actually, Mr.

23   Stafford, I think that is an interesting

24   notion.

25          And actually it would be for a jury to

                                              2627

1   decide under those circumstances whether it

2   would be reasonable for a person to get so angry

3   to react in such a way in response to being cut

4   off on the freeway.  But let's assume that a

5   jury rejected that notion and they didn't think

6   that was a reasonable response in the

7   circumstances.  Focusing on the intent because

8   even if you were a jury of people who thought it

9   was reasonable to get so angry as to kill, it

10  still is an intentional murder.  That is a part

11  of the voluntary manslaughter scheme.  So

12  focusing on whether it's intentional or not.  Is

13  there anybody who disagrees with the notion that

14  you could form the intent to kill that quickly?

15  Okay.

16          Kinds of evidence.  We have done this

17  so many times I can't remember whether I heard

18  the judge say this today, frankly, or whether he

19  said it another day.

20          THE COURT:  He didn't.  I know what

21  you are going to say.

22          MS. DAVIES:  About witnesses and

23  evidence.  I apologize.  It begins to all run

24  together.  Types of evidence.  I think a lot of

25  time people think of evidence as bullets and

2628

1    guns and fingerprints and things you can touch

2    and feel.   Witnesses who come in to testify,

3    the words, their testimony, that is evidence.

4    And as simple and obvious as that seems, I like

5    to mention it because I think people sometimes

6    don't realize that.   That is evidence.   It's the

7    most typical, the most common kind of evidence

8    you have.   Citizens like you and me who come in

9    and under oath tell you what they saw or heard

10   or know about a case.   And that is the jury's

11   job, to decide what is believable.   If during

12   lunch, when you were out, if there had been an

13   automobile accident out on the corner and there

14   had been a witness, four witnesses, one on each

15   of the four corners viewing that accident, and

16   they came up here immediately after lunch and

17   told you about what they saw, would it surprise

18   anybody to think there may be some discrepancies

19   or differences in the way they reported what

20   they saw?   Anybody expect everybody to have

21   exactly the same version of what happened?

22                  THE PROSPECTIVE JUROR:   No.

23                  MS. DAVIES:   Why?

24                  THE PROSPECTIVE JUROR:   Four different

25   corners.

1          MS. DAVIES:  Right.  Different

2     perspectives.  They are seeing it from different

3     angles.  Maybe one of them blinked at the wrong

4     moment, turned aside, maybe one had better

5     eyesight than the other.  What?  Maybe one is

6     more articulate than another.  One is better

7     able to come in and describe what they saw or

8     has a better memory.  And these are all the

9     kinds of things that a jury can take into

10    account when they are deciding which of the

11    witnesses is the most believable.  What if one

12    of those witnesses happened to be  the brother

13    or the father of the driver of one of the cars

14    in the accident?  May be more inclined to favor

15    one version or another or if it would help

16    someone they are related to.  Those are the kind

17    of things that a jury could consider in deciding

18    which of those people to believe.

19          So you are in the business, if you are

20    on the jury, of resolving the conflicts,

21    deciding what fit with the other evidence.  You

22    know, one of them might have told you it was a

23    maroon car and you looked at the pictures of the

24    accident, you say there is not a maroon car

25    here.   There is a brown car or there is a red

                                              2630

1   car.  I mean, partly it's visual perception and
2   the names that people use.  But if there is a
3   blue car and a red car and somebody is talking
4   about maroon car, you might be able to fit that
5   together.  Do you see what I mean by resolving
6   conflicts?  Anybody who feels like they
7   couldn't resolve conflicts in testimony, though,
8   that they couldn't make that kind of decision?
9   Anyone at all?  Because it is very difficult for
10  some people to do that, and we don't want to put
11  you in that position if you feel like you
12  couldn't do that.
13          Sometimes we don't have a problem with
14  conflicts because there is only one witness.
15  The law says that we can get a conviction based
16  on the testimony of just one witness.  Now,
17  obviously, a jury of twelve people is going to
18  have to be convinced beyond a reasonable doubt
19  that they believe that witness and that that
20  witness' testimony is enough to prove up the
21  case.  We are talking about capital murder here,
22  though.   Is there anyone who feels like they
23  simply could not ever convict based on the
24  testimony of just one witness?  Assuming, of
25  course, that you believe that witness beyond a

2631

1    reasonable doubt.  Anyone who feels that way?

2    No?  Either you are sleeping or -- I mean, I

3    have never had a group that nobody answered to

4    this.  Think about that a minute.  I am going to

5    be asking you to find somebody guilty of capital

6    murder and I am going to be asking for the death

7    penalty and I am telling you that that could be

8    done based on the testimony of just one witness

9    if you believe that witness.  Anyone who thinks

10   that just isn't right, you couldn't do that?

11   Okay.

12            Did I see you shaking your head back

13   there?  Is it Ms. Wright?

14            THE PROSPECTIVE JUROR:  Yes.

15            MS. DAVIES:  Do you feel like that

16   would be okay?

17            THE PROSPECTIVE JUROR:  If I was

18   convinced that they were really telling the

19   truth.

20            MS. DAVIES:  Absolutely.  That is a

21   part of it.  Any witness you hear, you can

22   believe all, none or part because sometimes,

23   it's just like we were talking about where there

24   are four witnesses, one of the witnesses may

25   have blinked and they may be mistaken about one

1    thing they tell you about, but 90 percent of

2    what they are telling you may be absolutely

3    true.  You would have to put it together.

4              Kinds of witnesses.   The judge

5    touched on this when he talked about -- what did

6    he say?  Police officers.  Status basically is

7    what we are talking about.  Status, the uniform,

8    a title.  Do you feel like you are going to

9    automatically believe or automatically

10   disbelieve a police officer?  Anyone who feels

11   that way?  Never going to believe a police

12   officer or always?  Or never believe a doctor,

13   always believe a doctor.  Anyone feel that way?

14   The idea is wait and hear what they have to say

15   before you decide, you know.  You can always

16   consider a person's special training and

17   expertise if it has something to do with what

18   they are testifying about, and you know, that

19   may or may not be beneficial.

20             Believing all or part applies, all or

21   part of a witness' testimony, applies in another

22   area, too.  In some instances, even though the

23   defendant has the right to remain silent and may

24   not testify, in some instances you would hear

25   evidence in the form of a statement that a

1     defendant gave to the police.  Do you feel like

2     if a defendant spoke to the police and gave a

3     written statement that he is always going to be

4     totally honest with the police?  Do you think

5     there is a chance some of it may be self-serving

6     if he talks to the police?  Any reaction there?

7          THE PROSPECTIVE JUROR:  I would have

8     to hear the statement.

9          MS. DAVIES:  The point to that is, I

10     mean you can believe all or part or none of a

11     statement, just like you could of any witness.

12     Does that seem appropriate?

13          There is a rule of evidence if I offer

14     a defendant's statement into evidence I can

15     delete certain portions if I choose to do so for

16     whatever strategy.  It can relate to this notion

17     of the ability to believe all or part of

18     anything.  So if I offered a statement and I

19     deleted certain parts of it, you would know it.

20     It's not like there would be portions excised

21     and you would never know.  It would be made

22     clear -- I am offering this statement with the

23     exception of the last paragraph.  Anybody's

24     first reaction is that they are highly offended

25     at that notion?  They would think that was wrong

1    for me to do that.  Ms. Polk.

2              THE PROSPECTIVE JUROR:  Yes.

3              MS. DAVIES:  Ms. Polk is being real

4    honest.  There are usually a number of people.

5    What is your feeling there?

6              THE PROSPECTIVE JUROR:  Something

7    could be taken out of context from the entire

8    statement that was given.

9              MS. DAVIES:  Well, and you would know

10   that.  It's not like it would be done -- I would

11   be telling you, or the witness would make clear

12   certain things have been left out here.  You

13   would know that.  And that would bother you?

14             THE PROSPECTIVE JUROR:  You would know

15   what was left out also?

16             MS. DAVIES:  Well, we will get to

17   that.  One step at a time.  Yes, the answer is

18   yes.  But the idea that I might offer a

19   statement but leave out certain words or

20   sentences, would that offend anybody?

21             THE PROSPECTIVE JUROR:  Sure.

22             MS. DAVIES:  Well, would it make a

23   difference -- you are Mr. Ketchie?

24             THE PROSPECTIVE JUROR:  Yes.

25             MS. DAVIES:  The other part of the

1    rule that would permit me to do that also makes

2    very clear that if I do leave out part, and the

3    jury would know it, the defense immediately has

4    the right to offer what I left out.  So it's

5    like, okay, this has to be fair, folks, rule.

6    Yeah, you don't have to offer it all.  It's for

7    trial strategy, whatever strategy that I may

8    have in presenting my case that I don't want to

9    be the one who offers this particular bit of

10   evidence.  The judge, both sides, the jury all

11   know that the defense, if they want the jury to

12   hear it and they think it would benefit their

13   case, they immediately can offer that, too.   So

14   nothing is taken, you know, meaning it can't be

15   distorted or whatever.  Does that make a

16   difference to you?  What about you?

17          THE PROSPECTIVE JUROR:  Yes, as long

18   as you have some chance, either side has a

19   chance to do it.

20          MS. DAVIES:  Oh, absolutely.   I want

21   you to understand how the rule works.   In other

22   words, if I did that, would you hold it against

23   me or be angry with me if I did it?

24          THE PROSPECTIVE JUROR:  No, I wouldn't

25   think so.

2636

 1            MS. DAVIES:  Because you know the

 2    defense has the right to put the rest in if they

 3    want to.

 4            THE PROSPECTIVE JUROR:  Yes.

 5            MS. DAVIES:  Is that okay with you?

 6            THE PROSPECTIVE JUROR:  Yes.

 7            MS. DAVIES:  Another thing that can

 8    come up in any criminal case where there is a

 9    statement of the defendant offered into evidence

10    has to do with whether his statement was given

11    voluntarily.  There are a number of requirements

12    under the law that the police must conform with

13    to be sure that a statement is given

14    voluntarily.  Anybody ever heard of Miranda

15    warnings?  If anybody watches TV -- you have the

16    right to have an attorney.  You have the right

17    to remain silent.  Anything you say will be

18    used against you in court.  Et cetera, et

19    cetera.  These are requirements under the

20    constitution and they are also requirements

21    under our state law.  Anytime a statement of a

22    defendant is offered into evidence you may very

23    well get a charge from the judge at the

24    conclusion of the trial that tells you -- and

25    remember, this has to do with a statement that

                                                    2637

1   was offered.  You have read it.  You have seen

2   it.  You know what is in it.  The judge then at

3   the end of the trial will tell you:  Now, jury,

4   this is one of those rare situations where you

5   get to decide whether that statement should be

6   used as evidence.  You have got to be convinced

7   that it was given voluntarily.  Now, I mean,

8   one kind of situation might be you might hear --

9   again I am going to use an extreme example, but

10  you could hear testimony from a police officer

11  who gets up there and tells you:  Well, we

12  tortured this man for a week before we got his

13  statement.  You might very well conclude under

14  circumstances like that this was not really

15  voluntary.  On the other hand, the judge is

16  also going to tell you that all those Miranda

17  warnings have to be given, and he will set them

18  out for you, he will list them one, two, three,

19  four, five.  Every one of them has to be given.

20  You could have a situation where you have heard

21  a rookie cop testify and say:  Well, I didn't

22  have my card with me, I couldn't remember, and I

23  didn't tell him all those warnings or I left out

24  one of them or whatever.  If you were in a

25  situation where you had heard evidence and you

1   are not convinced that it was voluntary, the

2   judge will tell you you have got to disregard

3   that statement that you heard.  In other words,

4   it's kind of like unringing a bell.   There is

5   no erase button in your brain.   It's not a

6   matter that you can forget it.  And nobody is

7   suggesting that you can forget.  But you would

8   have to go through a process of mental

9   discipline.  If you had heard evidence and you

10   are not convinced that it's voluntary, you would

11   have to throw it out, look at the rest of the

12   evidence and decide without that statement is

13   there enough other evidence to convict this

14   person.  Of course, if there is enough other

15   evidence and you are convinced by that other

16   evidence beyond a reasonable doubt, you could

17   find the person guilty.  However, if it's a

18   situation where you have heard evidence and you

19   are convinced that it's not voluntary, that you

20   must disregard that statement, you would throw

21   it out, you look at the rest of the evidence

22   and, hey, this is a tough situation.  Maybe

23   there is not enough evidence there.   Maybe

24   there is no other evidence there.  Let's use the

25   most extreme example.  The only evidence I have

2639

 1    brought you was his statement.  So, obviously,
 2    if you decide it wasn't voluntary and you throw
 3    it out, you would be in a situation of, once you
 4    disregarded it, of looking over here, there is
 5    no other evidence on the table.  You would have
 6    to find him not guilty.  It would be difficult
 7    under a situation where you have read a
 8    statement that maybe confesses his guilt.  But
 9    that is exactly what the judge will tell you
10    that you have to do if you were presented with
11    that kind of situation.  It would be each
12    individual juror's decision in their own mind
13    whether it was voluntary and whether they should
14    consider that statement.  Can each of you do
15    that?  Can you follow that instruction?  I need
16    for you to be sure that you can.  You know, in a
17    situation like that, it may be that twelve
18    jurors would look at it, if it's not a clear-cut
19    fact situation, one juror may think it was
20    voluntary and consider the statement, another
21    juror may think, no, it wasn't voluntary, I am
22    not going to consider the statement, but look at
23    the rest of the evidence, and I don't think
24    there is enough evidence otherwise.  It's a
25    really tough one, that extreme situation where

1    there is no other evidence at all, and in that
2    situation you would have to find not guilty.
3    Okay?
4              THE COURT:  Ms. Davies.
5              (Off the record bench conference)
6              THE COURT:  Ladies and gentlemen, we
7    are going to take about ten minutes for a
8    break.  The snack shop on the first floor is
9    still open in case you need to get some kind of
10   caffeine fix down there.  The restrooms are on
11   this floor. Let's take ten or fifteen minutes.
12             (Recess; after which, the following
13   proceedings were had:)
14             MS. DAVIES:  I was really nearly
15   through.  I am sure y'all are glad for the
16   break, anyway.
17             A couple of things I do want to touch
18   on.  From looking over your questionnaires, I
19   know that a number of you expressed concern
20   about early release.  I think the judge has
21   already mentioned to you that parole, early
22   parole is something that you cannot consider in
23   reaching your verdict in deciding punishment.
24   It's something that is outside our control.  So,
25   if you have a strong feeling about that, it's

2641

1  something that you would have to deal with with

2  your legislator, through some other part, make

3  some changes some other way.  My main concern is

4  to be sure that each of you would, despite any

5  feelings that you might have, that you would

6  follow the judge's instruction and not let those

7  feelings interfere or influence your decision in

8  sentencing in this case or in any case.  Can you

9  follow those instructions?  Assure us that you

10  can do that.  Okay.

11         One of the other things that, I mean,

12  the judge and I both have touched on a number of

13  the protections that any defendant has when they

14  come in here in the courtroom, and one of them

15  is that presumption of innocence.  It doesn't

16  mean he didn't do it.  It means that he has a

17  protective bubble around him at this point.  I

18  have got to bring evidence to the courtroom to

19  convince the jury beyond a reasonable doubt.

20  Once I have brought evidence to court, that

21  bubble bursts, once you are convinced beyond a

22  reasonable doubt of guilt.  But as you sit there

23  right now, the bubble is still in place.  We

24  need to be sure that each of you will respect

25  that constitutional right and presume him to be

1    innocent at this point prior to hearing any

2    evidence.  Can you do that?

3           As I said at the beginning, I am going

4    to save all -- you know, it's a two stage trial,

5    and the second stage of trial is where you deal

6    with these questions that determines whether or

7    not a death penalty is given.   I am going to

8    save most of my conversation in that regard to

9    when we talk individually.  But as you sit here

10   right now today, I do want to know one thing,

11   and that is whether there is anyone here who

12   knows already that they could never ever be a

13   part of a jury that gave the death penalty.   I

14   know a couple of you answered that questionnaire

15   to suggest that that is the way you feel.   Is

16   there anyone who feels like they simply could

17   not personally participate in a verdict that was

18   going to result in the death penalty?  Anyone

19   feel that way?  Does anybody have any questions

20   of me?   Thank you.

21

22

23

24

25

1          VOIR DIRE EXAMINATION BY THE DEFENSE

2    BY MR. STAFFORD:

3               May it please the court.

4               How many of y'all want me to talk for

5    an hour?  Nobody.  Hurt my feelings to the

6    bone.

7               Mondays are often difficult times for

8    us lawyers, I think.  If you are as tired as I

9    am, for example, you are tired to the bone.    I

10   think often we spend the whole weekend doing our

11   honey-do's around the house and then, come

12   Monday morning, as jurors, you have other things

13   on your mind, such as what I didn't get

14   accomplished over the weekend or what is waiting

15   for me at work or where I need to go.  So, I

16   realize that it's kind of difficult.  And I have

17   been doing this for fifteen years, and I hate

18   Monday morning jurors.  No offense against you

19   personally.  You are so preoccupied by other

20   things, it's kind of hard to get y'all livened

21   up and let loose, let your hair down.   Let me

22   suggest something to you.  A lot of you have

23   never been into a courtroom before.  I think

24   when you come here you see -- this courtroom

25   doesn't have -- but normally you have the

2644

1   American and state flag and you see a judge, and
2   judges are people that, you know, from birth we
3   are taught to respect and we are taught to put
4   them up on a pedestal up here and whatever they
5   say we take as gospel.  You hear of the
6   prosecutor.   You are programmed from birth,
7   when you start watching television, that
8   prosecutors uphold the law, they do good and
9   they wear the white hat and they do all of this.
10  I know that you are programmed from your
11  television that defense lawyers are a bunch of
12  slime balls who go around and get horrible
13  people off for crimes that they have committed.
14  We all have these preconceived ideas.   So what
15  I really want -- I am not going to waste my time
16  or waste your time going through a litany of
17  things whether or not you can keep an open mind
18  or whether or not you will keep an open mind.
19  Sometimes I feel like we almost give you such a
20  pep talk and a pep rally that you could almost
21  walk out with the American flag and say I am a
22  law-abiding citizen and I am going to uphold the
23  law and yea, yea, yea.  It's kind of like a pep
24  rally up here.  Really, what we are trying to
25  accomplish is real simply put.   I am going to

1    be just as up front with you as you would be up

2    front with me if I was sitting on your living

3    room couch in your house because that is when

4    your guards are down and that is when you are

5    going to tell it like it is.  There ain't going

6    to be any beating around the bush or you are

7    afraid of the prosecutor, you are going to tell

8    me what is down here and how you feel about

9    things.  That is what you are going to tell

10   me.    That is what we want.  If we could, when

11   you come back on voir dire, individual voir

12   dire, try to relax, try to assume you are in the

13   confines of your home and also try to be just as

14   honest and candid with us as you possibly can.

15   Because I promise you, if I had everyone of you

16   raise your hand, everyone of you will tell me

17   you will be fair.  Well, what we have found the

18   last fifteen or twenty years of jury selection

19   is people want to be fair.  And what makes

20   jurors defensive, we all have defensive

21   mechanisms about ourselves, and one of the first

22   things that makes jurors defensive is when

23   someone suggests to them that they couldn't be

24   fair and follow the law.  You will say

25   pointblank yes I will keep an open mind and I am

1    going to be fair, when we really haven't

2    discovered how you feel about anything or how

3    you feel about the death penalty or how you feel

4    about someone not testifying because we all know

5    when we come in to make a decision where the

6    discretion is yours, you are the discretionary

7    person who has to make the decision, what we

8    know and you know, when you are truthful to

9    yourself, is what you believe and what you think

10   and your biases and prejudices, that is what is

11   going to regulate how you vote.  The law will be

12   given to you, but there is a lot of us that have

13   such strong opinions and gut reactions about

14   certain laws that it will affect you when it

15   comes to decision making time.  And as you know

16    -- and when y'all go back home tonight and what

17   I want you to know about, this is not

18   television.  This is not -- this is not a dress

19   rehearsal, because the way you feel and believe

20   is going to determine whether my client lives or

21   dies.  We are that close.  And your attitudes

22   and your thoughts.  So when you come back,

23   because often I think what we have covered is

24   whether or not you can follow the law.  Again,

25   everybody wants to follow the law.  Everybody

1  wants to say yes, I am a law-abiding citizen or
2  I wouldn't be here.   But it takes often more
3  courage and more stamina and more backbone to
4  stand up and say I disagree with that law, which
5  is nothing wrong with that.   You have the right
6  to say that.   It takes more courage and shows
7  you a much better of a person to say I don't
8  like that law, it's going to influence my
9  decision, et cetera, et cetera.   If you feel
10 that way, you are entitled to let us know that.
11 True, you may keep an open mind.   True, you
12 will want to follow the law if you are in that
13 situation; but, true, you know you didn't fall
14 off the turnip truck last night, and you may
15 have been born at night but you know your
16 attitudes and your philosophies will affect how
17 you approach things.   And the hypothets often
18 are misleading that we give you because the
19 ultimate decision and what we really I think
20 every one of you have kind of soaked into, what
21 we are dealing with here is a capital murder
22 case.   That means my client has been charged
23 with capital murder.   And if he is found guilty,
24 there is only two possible punishments, life or
25 death.   We need to know your attitudes.   There

2648

1    is a bunch of jurors who believe once I have

2    passed that hurdle, once I find someone guilty

3    of intentionally taking someone's life, there is

4    not a doubt in my mind that he did that, there

5    is only one punishment in my mind that I feel

6    like is justifiable, and that is death.  He took

7    somebody else's life, he took two people's lives

8    or he killed a police officer or he took a life

9    during a burglary, in my opinion there is only

10   one just punishment.  That is death.  We need to

11   know that.   Don't feel guilty by feeling that

12   way.   That is why we are the country that we

13   are.   That is why we have Reganomics and

14   Bushanomics, I guess, and if we Democrats are

15   lucky we are going to have a little

16   Arkansasanomics.

17           Also, on the hypothet as far as lesser

18   includeds.  You have to understand we are not

19   going to be dealing with a husband who pulls the

20   plug on somebody's wife.  We are dealing with

21   someone who is charged with capital murder and

22   something comes up within that case that would

23   give you the benefit of determining whether or

24   not he is guilty of murder versus capital

25   murder.  Because it may be in a situation where

2649

1    if it was a burglary/murder you may, after

2    examining the evidence, say, yes, it was an

3    intentional murder, it was an unjustifiable

4    killing, but there is no evidence to convince me

5    beyond a reasonable doubt that there was a

6    burglary.  He didn't go in there with the intent

7    to commit burglary.  It could be numerous

8    things.  He didn't go in there with any intent

9    to kill, any kind of felony.  So when we talk

10   about low end versus the high end, you have to

11   remember you are coming from the high down to

12   the next level.  We are not asking you what you

13   would do in a situation because, that is not the

14   kind of case we are dealing with.  Same way,

15   capital murder case, I am trying to save my

16   life, I don't take the stand and testify.  Some

17   jurors feel like:  Hey, pardner, in a close

18   case, when your life is on the line, we expect

19   to hear from you.  And if it's a close case, I

20   am going to go with the State because you didn't

21   testify because I ain't going to give you the

22   benefit of the doubt.  Nothing wrong with

23   feeling that way.  You have the right to feel

24   that way.  But if you are a defense lawyer, sure

25   would be glad to know that if you didn't put

1    your client on the stand.   Those are the things

2    I want you to level with us and tell us about.

3              And, also, another thing is the burden

4    of proof.  We kind of skate on that every now

5    and then, but I think all of us have the

6    intelligence to realize, especially you history

7    buffs know that our government has always placed

8    the burden on the state or the government to

9    prove beyond a reasonable doubt that the people

10   did what the state or the government said you

11   did.  Just because a prosecutor or an assistant

12   U. S. Attorney says something ain't so doesn't

13   mean it ain't so.  Just because U. S. Attorney

14   thinks something is a lie doesn't mean it's a

15   lie.  They have to offer you some sort of

16   physical, whether from the witness stand,

17   whether it's some sort of documentation or some

18   sort of evidence to support their theory because

19   basically Our Honor will tell you that what I

20   say and what a prosecutor says is not evidence.

21   The only evidence there is is what you hear from

22   the witness stand.  And you judge that evidence

23   and give it whatever weight you want to.  Just

24   because I say something is a lie doesn't mean

25   it's a lie and vice versa.  We have to prove it

1    to you that it's a lie or offer some sort of

2    alternative theory through the witness stand.

3              MS. DAVIES:  Your Honor, the jury

4    decides what is credible in terms of evidence.

5              MR. STAFFORD:  By all means.  That is

6    your role.

7              MS. DAVIES:  I object to suggesting

8    there has to be evidence offered as to the truth

9    or veracity of any particular witness.

10             THE COURT:  Sustained.

11             MR. STAFFORD:  I am suggesting that

12   the burden of proof is on the State.  And often

13   the government doesn't like something that is

14   introduced, so they suggest to you that it's a

15   lie, when there is no iota of evidence to

16   support that.  The only basis that serves the

17   premise that it's a lie is the government or the

18   state prosecutor's statement it's a lie.  There

19   is nothing else to justify it.  My point is

20   that doesn't necessarily mean it's a lie.  That

21   is not a lie until they prove to you beyond a

22   reasonable doubt through the witness stand that

23   it is a lie.  Okay?

24             MS. DAVIES:  Your Honor, I have to

25   object to the way this is being presented.  The

2652

1   jury decides on the credibility of the witness

2   based on that witness' testimony, not on what I

3   say about the witness or what the defense says

4   about the witness, and neither of us have to

5   prove--

6           THE COURT:  I am going to remind you,

7   ladies and gentlemen, probably for the first of

8   many times, that nothing the attorneys are

9   telling you is evidence in this case, not when

10  they are talking to you now or giving opening

11  statements or arguing the case to you.  The

12  evidence is going to come on what I am going to

13  allow in through testimony from the witnesses'

14  testimony on the witness stand.  And you do

15  individually determine credibility of every

16  witness who testifies.

17          Proceed, please.

18          MR. STAFFORD:  Thank you, Judge.

19          Actually that is all I am going to

20  say.  I am through.  I would like to spend my

21  time with you when you come back on individual

22  basis.  I hope we can share our respective

23  attitudes.  I don't want you to be put on a

24  guilt trip by expressing yourself or how you

25  feel, that there is something wrong with that.

2653

1    If you don't think you can follow a particular

2    point of law, don't feel threatened or feel bad

3    about that.  You have the right to express what

4    you want to express.   I thank you.

5             THE COURT:  Ladies and gentlemen, I

6    ask you to step out into the hallway.  We will

7    probably be back with you within the next ten

8    minutes or so to let you know when you are

9    coming back.

10            (The panel of prospective jurors

11   leaves the courtroom)

12            THE COURT:  It's my understanding that

13   by agreement of all parties the following

14   prospective jurors are being excused:

15   Prospective juror number one on panel number

16   five, Ms. Keys; number five, Ms. Sparks; number

17   seven, Ms. Tennebaum; number eight, Mr. White;

18   number twelve, Mr. Gafrick; and number sixteen,

19   Mr. Ratcliff.

20            Is that your agreement, Ms. Davies?

21            MS. DAVIES:  It is.

22            THE COURT:  And yours, Mr. Stafford?

23            MR. STAFFORD:  Yes.

24            THE COURT:  Yours, Mr. Rhoades?

25            THE DEFENDANT:  Yes, Your Honor.

2654

1            THE COURT:   Bring them in.

2            (Jurors enter the courtroom)

3            THE COURT:   Ladies and gentlemen, six

4    of you aren't coming back to visit with us.

5    This gentleman is passing out slips right now.

6    As I call out your name, the following people

7    may be excused.    Number one, Ms. Keys; number

8    five, Ms. Sparks; number seven, Ms. Tennebaum;

9    number eight, Mr. White; number twelve, Mr.

10   Gafrick; number sixteen, Mr. Ratcliff.    Thank

11   you for coming.

12           Mr. Drury has not been excused.

13           THE COURT:   For the remainder of you,

14   you have some slips or are about to get some

15   slips that have days and times for you to be

16   back here.   Go ahead and pass those out, and I

17   will confirm.  You are not to leave yet.  I have

18   to give you some additional instructions.

19           Number two, Ms. Polk, at 9:30

20   tomorrow, Tuesday.   Number three, Mr. Ritch,

21   tomorrow morning at 9:30 also.   Ms. Bruckler,

22   number four, tomorrow at one p.m.   Mr. Drury,

23   number six, tomorrow at 1:00 p.m.   Mr. Ketchie,

24   tomorrow at two p.m.   On Wednesday morning,

25   there is only going to be one person, Mr. Davis,

at 9:30.    Mr. Raeburn Davis at 9:30.    Mr.
Curtis Ray Davis is at 1:15  on Wednesday.    Also
Wednesday at 1:15 Mr. Y'Barbo.   At 2:30
Wednesday, Mr. Vervalin.   Thursday morning at
9:30, Ms. Ackerman and Mr. Luce.    Thursday at
1:00 p.m. Ms. Gray and Mr. Garcia.   At 2 p.m.
Thursday, Ms. Wright.    On Friday at 9:30 Ms.
Adams and Mr. Brooks.

Those slips y'all have have the same
information.   Anybody have anything different?

The previous admonitions are still in
effect, that is, you are not to discuss this
case among yourselves or with anyone else
including spouses.   You are not to discuss
anything on the questionnaire.   I realize you
have to tell your spouses and employers that you
are down here for selection on a capital murder
case.    Again, don't let them impart any
information or misinformation to you regarding
murder, capital murder or how they think the
system works or doesn't work or anything else.
The attorneys have been instructed not to engage
you in conversation.   If they see you in the
hallway or in the elevators, they are not going
to be talking to you, but they may nod in

2656

1    recognition, nod hello, that kind of thing.  If

2    anybody attempts to talk to you about the case,

3    bring it to our attention immediately.  Tell me,

4    tell the clerk, tell the bailiff who has you in

5    charge.  I don't anticipate you are going to see

6    anything in the media regarding this case.

7    They commonly don't cover these cases until the

8    case is at least in trial.  Don't make any kind

9    of independent investigation.  That is to say

10   don't go read any law you think might apply in

11   this case.  Do not attempt to find out exactly

12   which case it is we are trying.  When you come

13   down, I don't care where you park as long as you

14   park where you retain your car keys.  There are

15   some attendants who keep your car keys.  Don't

16   do that.  Move to another parking lot where you

17   retain your own car keys.

18          Any requested instructions, Mr.

19   Stafford?

20          MR. STAFFORD:  Other than possibly

21   advise the jurors that they may have long waits.

22          THE COURT:  Ms. Davies?

23          MS. DAVIES:  That is all.

24          THE COURT:  You may well have some

25   long waits.  If you are called down for the

                                            2657

1    morning session, it hasn't been unusual for the

2    second person, if we really get active with the

3    first one, not to be called to the stand until

4    eleven o'clock or even after.  Bring reading

5    material, newspapers, magazines, books.  When

6    you come back, you don't have to wait in the

7    hallway.  We want you to have a seat in the

8    anteroom out here.  The doors will normally be

9    closed if we are in progress.  You can go in

10   there and have a seat.  You can sit there and

11   read.  You can bring candy or whatever you

12   need, cokes, coffee.  Sometimes you will be

13   seated for a long time.  As I said earlier, at

14   the end of the session we will let you know

15   whether or not you have been selected to serve

16   as a juror in the case.  If you are not selected

17   to serve, we will excuse you for all purposes.

18   If you are selected to serve as a juror, we will

19   give you some additional instructions at that

20   time.

21            Any questions at the moment?

22            You come back to this room, not to our

23   courtroom but to this room.

24            Anybody have any questions about the

25   times you are supposed to be here?  If there is

                                              2658

1      nothing else, you are excused until your

2      assigned times and days.

3                  Ms. Polk and Mr. Ritch, we will see

4      you tomorrow at 9:30.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25