APPELLATE COURT NO. *71595*

IN THE COURT OF CRIMINAL APPEALS

OF THE STATE OF TEXAS

AT AUSTIN

RICK ALLAN RHOADES,

Appellant

VS.

THE STATE OF TEXAS,

Appellee.

APPEAL FROM 179TH DISTRICT COURT OF HARRIS COUNTY,

TEXAS

Judge J. Michael Wilkinson   Presiding

STATEMENT OF FACTS

VOLUME___XXV_____   OF _40_   VOLUMES

Marlene Swope
Official Court Reporter
301 San Jacinto
Houston, Texas  77002

FILED IN
COURT OF CRIMINAL APPEALS

MAR 5  1993

Thomas Lowe, Clerk

3521

```
1                          INDEX

2                       VOLUME XXV

3        VOIR DIRE EXAMINATION OF PROSPECTIVE JURORS

4                                                   Page
```

```
5    MARY KING
             By the Court                          3523
6            Excused by the State                  3533

7    JOSEPH E. SHEEHAN
             By the Court                          3534
8            By the State                          3547
             By the Defense                        3570
9            (Sworn as alternate juror)            3573

10   MARIAN SCOTT
             By the Court                          3577
11           Excused by agreement                  3585

12   TODD BRATTON
             By the Court                          3586
13           By the State                          3601
             By the Defense                        3617
14           By the State                          3632
             By the Defense                        3634
15           Excused by the defense                3639

16   ROBERT GUERRERO
             By the Court                          3639
17           By the State                          3655
             By the Defense                        3675
18           Defense challenge granted             3681

19   LARRY W. WHITTEN
             By the Court                          3682
20           By the State                          3695
             By the Defense                        3721
21           Sworn as alternate juror              3726
```

```
22

23

24

25
                                                    i.
```

```
 1                      ALPHABETICAL INDEX

 2                        VOLUME XXV

 3                                                    Page

 4      BRATTON, TODD
             By the Court                            3586
 5           By the State                            3601
             By the Defense                          3617
 6           By the State                            3632
             By the Defense                          3634
 7           Excused by the defense                  3639

 8      GUERRERO, ROBERT
             By the Court                            3639
 9           By the State                            3655
             By the Defense                          3675
10           Defense challenge granted               3681

11      KING, MARY
             By the Court                            3523
12           Excused by the State                    3533

13      SCOTT, MARIAN
             By the Court                            3577
14           Excused by agreement                    3585

15      SHEEHAN, JOSEPH E.
             By the Court                            3534
16           By the State                            3547
             By the Defense                          3570
17           Sworn as alternate juror               3573

18      WHITTEN, LARRY W.
             By the Court                            3682
19           By the State                            3695
             By the Defense                          3721
20           Sworn as alternate juror               3726

21

22

23

24

25

                                                      ii.
```

1                    CAUSE NO. 612408

2   STATE OF TEXAS        IN THE 179TH DISTRICT COURT

3   VS.                          OF

4   RICK ALLAN RHOADES      HARRIS COUNTY, T E X A S

5

6   A P P E A R A N C E S:

7   For the State:        Ms. Carol Davies
                          Assistant District Attorney
8                         Harris County, Texas

9   For the Defendant:    Mr. James Stafford
                          Ms. Deborah Kaiser
10                        Attorneys at Law
                          Houston, Texas

11

12

13          BE IT REMEMBERED that upon this the

14   10th day of September A.D. 1992, the above

15   entitled and numbered cause came on for

16   continued voir dire examination of prospective

17   jurors before the Honorable J. Michael

18   Wilkinson, Judge of the 179th District Court of

19   Harris County, Texas; and the State appearing by

20   counsel and the Defendant appearing in person

21   and by counsel, the following proceedings were

22   had, viz:

23

24

25

                                              3522

1                     MARY KING,

2      called as a prospective juror, was examined as

3      follows:

4                     EXAMINATION BY THE COURT.

5           Q.   This is prospective juror number ten

6      on panel six, Ms. Mary King.

7                     Have you been at the same elementary

8      school for twelve years?

9           A.   Yes.

10          Q.   One of the things you like least is

11     dealing with difficult parents?

12          A.   Yes.

13          Q.   You have a daughter that works at

14     American General.

15          A.   Actually Valet is the company she

16     works for, like it's a subsidiary of American

17     General.

18          Q.   Your son, what does he do?

19          A.   He works at a bike shop.  Bike Route.

20          Q.   That is the name of the shop?

21          A.   Yes.

22          Q.   Concerned about early release.  There

23     is a question that says have you or a family

24     member or a close friend ever been arrested or

25     charged with an offense.  And said your son was

1    charged in high school.  Can you tell me how old

2    he was and what that was about?

3         A.   He was, I believe he was a senior in

4    high school.  He got in with the wrong crowd.

5    They were breaking into cars on a lot, cars on a

6    parking lot of the school.  And he had the

7    speakers and radio, I think, something like

8    that, a few items like that, and he had them

9    there at the house, and they found them.  He is

10   on probation.  Deferred adjudication.

11        Q.   He was seventeen years old when that

12   happened.  He came to court down here?

13        A.   No, Fort Bend.

14        Q.   He was placed on deferred adjudication

15   in Fort Bend County?

16        A.   Yes, sir.

17        Q.   He is on deferred adjudication now?

18        A.   Yes.

19        Q.   Does he live at home?

20        A.   Yes.

21        Q.   What about the other people involved,

22   were they arrested also?

23        A.   Yes.

24        Q.   Several of them placed on deferred

25   adjudication?

1      A.   I really don't know.  I think a
2  couple.  I am not sure what all happened.
3      Q.   Who represented him?
4      A.   Roger Barrett.
5      Q.   Did you go to court with him in Fort
6  Bend County?
7      A.   Yes.
8      Q.   How many times?
9      A.   Twice, I think.
10     Q.   Anything about that experience that
11  was very upsetting?   Of course it was upsetting
12  to have him arrested and charged.
13     A.   Yeah.
14     Q.   Was he treated fairly, in your opinion?
15     A.   I think so.
16     Q.   Did you know the other people involved?
17     A.   Not really.
18     Q.   How long ago was that?
19     A.   It's a little over four years.  My son
20  has always been the type, ever since he was in
21  elementary school, he is not a leader, he is a
22  follower, and he just got in with the wrong
23  group of kids, and that is what happened.
24     Q.   Has he had any problems while he has
25  been on deferred adjudication?

1          A.   No.

2          Q.   Is he still reporting monthly?

3          A.   Yes.

4          Q.   Was there a large amount of

5     restitution to be paid?

6          A.   No.

7          Q.   A long time ago, you were on a

8     criminal jury?

9          A.   I don't remember anything about that.

10    I mean, you know.

11         Q.   Was it down here in Harris County?

12         A.   Yes.

13         Q.   Do you remember if you reached a

14    verdict in the case?

15         A.   Yeah.

16         Q.   Do you remember if you participated in

17    deciding what the punishment should be in that

18    case?

19         A.   Yes, but.

20         Q.   About how long do you think it was?

21         A.   It has been four years since I was

22    called the last time.  Five years, six years

23    maybe, I am not sure.

24         Q.   Pages eight and nine of this long form

25    list statements and ask you to either check the

1    one which best summarizes your general views
2    about capital punishment or ask you to agree or
3    disagree with certain statements.  And I have
4    some conflicts with the way you answered.  You
5    checked the box which says I am in favor of
6    capital punishment except in a few cases where
7    it may not be appropriate.  On the next page you
8    said I do not believe in capital punishment
9    under any circumstances.
10         A.   Oh.
11         Q.   Do you want to look at it?  I am
12   looking at the top, number four on that top
13   one.  Then on the next page, I probably have it
14   circled in red on the next page.
15         A.   Yeah.
16         Q.   There is a pretty big difference in
17   those two statements is what I was looking at.
18         A.   Well, I am in favor of capital
19   punishment.
20         Q.   On the next page, except for that one
21   statement, it appears you wish it weren't
22   necessary but believe it's necessary for some
23   cases; right?
24         A.   Yes.
25         Q.   At any rate, you checked the statement

1    which said your decision on whether or not the

2    death penalty should be assessed would depend on

3    the facts and circumstance of the individual

4    case; correct?

5         A.   Yes.

6         Q.   Since you have been called for jury

7    service in the past, a lot of what we talked

8    about yesterday you were probably familiar with

9    -- presumption of innocence, the defendant is

10   presumed innocent; you agree with that?

11        A.   Yes.

12        Q.   State has the burden of proof.  They

13   have to prove a defendant's guilt beyond a

14   reasonable doubt.  Agree?

15        A.   Yes.

16        Q.   The indictment in a criminal case is

17   no evidence of guilt.  Agree?

18        A.   Yes.

19        Q.   If the defendant does not take the

20   stand and testify in his own behalf, that can

21   not be considered as any evidence of guilt

22   whatsoever.

23        A.   Yes.

24        Q.   Are you pretty sure the case you were

25   called on last time wasn't a murder case?

3528

1    A.   No, it wasn't.  No, it wasn't murder.

2    Q.   With murder, we are talking about

3    usually a first degree felony offense, the range

4    being five to 99 years or life.  What we call

5    sometimes simple murder or straight murder,

6    somebody intentionally or knowingly causing the

7    death of another person.  When we are talking

8    about capital offense we are talking about one

9    where the only possible punishments are life or

10   death if somebody is convicted of capital

11   murder.  So capital murder is at the top of the

12   scheme of things.  Stair-stepping down, we

13   talked about lesser included offenses, murder,

14   first degree felony, second degree felony

15   offense of voluntary manslaughter, third degree

16   felony offense, involuntary manslaughter, with

17   reduced ranges of punishment as we go down the

18   scheme through the felonies all the way to

19   misdemeanor.  But at the top it's capital

20   murder.   I had asked if you had participated in

21   assessing punishment in that previous trial you

22   sat on to see if you remember going through that

23   second stage.  After the jury finds a defendant

24   guilty, there is a second stage of trial where

25   additional evidence may be presented.  You may

3529

1    receive evidence about a defendant's background

2    or reputation or prior criminal acts, previous

3    criminal convictions, if any.  It's usually

4    helpful for jurors when they go back to assess

5    the appropriate punishment.  The same happens in

6    a capital murder case.  If the jurys find the

7    defendant guilty of capital murder, we know that

8    the only possible punishments are life or

9    death.  We have the second stage of trial, the

10   penalty stage, where again you may hear

11   additional evidence.  That might be the time

12   when you would hear something brought forth that

13   you might consider mitigating.  Mitigating

14   against the imposition of the death penalty.

15   When the jury goes back to deliberate on a

16   capital murder case after having found guilty of

17   capital murder, we don't ask the jury to vote

18   life or death; instead, we ask them to answer

19   certain questions, certain special issues.  Did

20   you understand that is how it worked in a

21   capital murder case before you came in here the

22   other day?

23        A.    Yes.

24        Q.    The various ways that we can get to

25   capital murder from the murder offense are set

3530

1    out in our statutes, and I told you about six

2    different statutory ways that murder is elevated

3    to capital murder status, everything from the

4    victim being a fireman or policeman in the

5    lawful discharge of an official duty to murder

6    for hire cases, to where somebody is in the

7    course of committing another felony offense,

8    robbery, burglary, kidnapping, arson, aggravated

9    sexual assault and murders that person, that is

10   a capital murder offense.  The kind of murder

11   offense that we are trying elevated to capital

12   murder status is where someone murders more than

13   one person in the same criminal transaction.  It

14   can be a number of people, it can be as few as

15   two people.  The allegation in the case we have

16   is two people murdered in the same criminal

17   transaction.

18            Are all those different ways of

19   elevating murder to capital murder status things

20   that you think should be capital offenses?

21            A.   --.

22            Q.   On conviction, should result in a life

23   sentence or the death penalty?

24            A.   Yes.

25            Q.   Now, as I said before, if you find

1    someone guilty of capital murder and you go back
2    to deliberate after the second stage of trial,
3    you are asked to answer those special issues
4    which I will refer back and forth to over here
5    on this board.  The first one asks do you find
6    from the evidence beyond a reasonable doubt that
7    there is a probability that the defendant would
8    commit criminal acts of violence that would
9    constitute a continuing threat to society.  That
10   is the issue where we are asking the jury to
11   make determination of the defendant's future
12   dangerousness.  I would instruct the jury that
13   they are to consider all the evidence admitted
14   at the guilt or innocence stage and all the
15   evidence at the punishment stage including
16   evidence of a defendant's background and
17   character or the circumstances of the offense
18   that militate for or mitigate against the
19   imposition of the death penalty.  Consider all
20   that information when you are answering special
21   issue number one.  By probability we mean more
22   likely to occur than not.  And that last term,
23   society, while it won't be defined for you,
24   includes all of society, including prison
25   society.   It's probably something you have

3532

```
 1    never thought of before.  It includes all of
 2    society when you are answering special issue
 3    number one.  The jury answers that question yes
 4    or no, all twelve jurors have to agree
 5    unanimously to return a yes answer.  Ten or more
 6    have to agree to return a no answer.  If the
 7    jury answers no, there is no such probability, I
 8    assess life imprisonment.  If the jury answers
 9    yes unanimously, there is such a probability,
10    then they proceed to special issue number two.
11    As to special issue number one -- excuse me just
12    a second.
13              Could you step outside this door for
14    just a moment?
15              (The prospective juror leaves the
16    courtroom)
17              MS. DAVIES:  Your Honor, I asked you
18    to break in the interest of time.  We have a lot
19    of jurors sitting out there.  I am going to use
20    a peremptory strike.
21              THE COURT:  State is striking
22    prospective juror number ten on panel number
23    six, Mrs. Mary King.
24
25
```

3533

```
 1                    JOSEPH E. SHEEHAN
 2    called as a prospective juror, was examined as
 3    follows:
 4                 EXAMINATION BY THE COURT.
 5         Q.    This is prospective juror number
 6    twelve on panel number six, Mr. Joseph Sheehan.
 7               Same job fifteen years basically?
 8         A.    Yes, sir.
 9         Q.    What route do you travel?
10         A.    Right now, I drive from Houston to
11    Mobile, Alabama.
12         Q.    How often?
13         A.    Every other night.
14         Q.    Is that about seven hours or more?
15         A.    About eight or nine.
16         Q.    Two children.   One works as security
17    at -- I can't read this.
18         A.    M. Pace.
19         Q.    M. Pace?
20         A.    M. Pace Security.
21         Q.    What kind of security is that?
22         A.    They do security for hotels, stores.
23         Q.    Is that here in Houston?
24         A.    I believe they are out off of 290 and
25    Beltway 8.
```

1       Q.    You have another child in Penn State?

2       A.    Yes, sir.

3       Q.    He is twenty-five.  Is he a graduate

4 student?

5       A.    He is doing it for the Navy.  He is

6 out of the Navy to get his degree to go back

7 into the Navy.

8       Q.    How long were you in the Navy?

9       A.    Four years.

10       Q.    There is a bumper sticker question.

11 The Hundred Club.  A lot of people have bumper

12 stickers on cars they didn't buy.  Are you a

13 member of the One Hundred Club?

14       A.    Yes.

15       Q.    Last movie you saw in a theater was

16 "Red October".  It has been awhile?

17       A.    Yeah.  It was up in Virginia.

18       Q.    Pages eight and nine of this long form

19 questionnaire list statements and ask you to

20 check the one which best summarizes your views

21 about capital murder or ask you to either agree

22 or disagree with certain statements.  Number 61,

23 you didn't answer that question.  Gives you

24 choices of being opposed to, neither opposed to

25 nor in favor of, strongly in favor of.  But on

1    the next page, in summary, it appears that you

2    do not believe in capital punishment but you

3    don't think it should be abolished, you wish it

4    weren't necessary and you don't believe in it

5    but you believe we must have it for some

6    offenses.  Is that basically right?

7         A.   Yes.

8         Q.   At any rate, you checked the box which

9    says your decision on whether or not the death

10   penalty should be assessed would depend on the

11   facts and circumstances of the individual case.

12   Correct?

13        A.   Yes, sir.

14        Q.   Have you ever been called for jury

15   service before?

16        A.   Yes, sir.

17        Q.   Have you ever been selected?

18        A.   One time for civil.

19        Q.   Have you ever gone through the

20   examination process on a criminal case?

21        A.   No, sir.

22        Q.   Let's go over some of the general

23   principles we talked about yesterday.  We

24   discussed presumption of innocence.  As the

25   defendant sits in court, he is not a little bit

1    guilty.  He is presumed innocent.  Do you agree?

2         A.   Yes, sir.

3         Q.   Burden of proof is on the State to

4    prove his guilt beyond a reasonable doubt.

5    Agree?

6         A.   Yes, sir.

7         Q.   The indictment which I read to you

8    yesterday is no evidence of guilt whatsoever.

9    Agree?

10        A.   Agree.

11        Q.   If a defendant does not take the stand

12   and testify in his own behalf, that can not be

13   considered as any evidence of guilt whatsoever.

14   Agree?

15        A.   Agree.

16        Q.   We talked about the distinction

17   between murder and capital murder.  When we say

18   murder, we sometimes say straight murder, plain

19   murder, first degree felony offense of murder.

20   Somebody intentionally or knowingly causing the

21   death of another person.  When we are saying

22   capital murder, we mean a murder but some other

23   additional aggravating factor that makes it

24   capital murder, to elevate it to capital murder

25   status.  A first degree felony offense of murder

3537

1       has a range of punishment of from five to 99

2       years or life.  Capital murder has only two

3       options.  If one is convicted of capital murder,

4       he either receives the death penalty or life

5       imprisonment as a sentence.  Did you understand

6       that?

7               A.    Yes.

8               Q.    Did you know that before you came in

9       here yesterday?

10              A.    Yes.   No.   Excuse me.   No, I did

11      not.

12              Q.    We asked the jurors on this

13      questionnaire at some point whether or not they

14      think capital murder should apply to more

15      offenses than it already does, and most don't

16      have any kind of idea how many kinds of offenses

17      it applies to right now.  I ran through that

18      list of six different ways in which murder can

19      be elevated to capital murder status.  Somebody

20      murdering a peace officer or fireman in the

21      lawful discharge of an official duty, someone

22      who commits murder for hire, someone who murders

23      an employee in a penitentiary while he is an

24      inmate in the penitentiary, someone who is

25      escaping from or attempting to escape from the

                                                    3538

1    penitentiary and murders someone, someone who

2    murders another person while he is in the course

3    of committing felony offense of kidnapping,

4    burglary, robbery, arson or aggravated sexual

5    assault.   And the final category we have is

6    where someone murders more than one person in

7    the same criminal transaction.   That is the kind

8    of case we have to try.   The allegation in the

9    indictment is that two people were murdered in

10   the same criminal transaction.   Are all those

11   different kinds of ways of committing the

12   offense what you think should be capital murder

13   offenses, that is, on conviction of those six

14   categories somebody should receive either a life

15   sentence or the death penalty?

16       A.   --.

17       Q.   Some people think more things should

18   apply.

19       A.   I don't know how to answer that.

20       Q.   Well, if you had to write the law, do

21   you think you would include some of those things

22   that I just did?

23       A.   Yes.

24       Q.   We talked about lesser included

25   offense, that you might receive a charge to the

1    effect that if you did not believe the defendant
2    had committed the offense of capital murder you
3    might be asked to next consider lesser included
4    offenses. I stair-stepped through them.  Murder,
5    first degree, voluntary, second degree, third
6    degree would be involuntary, on down to the
7    misdemeanors.  I might be obligated to put in
8    the charge, without commenting at all on whether
9    or not I thought one of those was the
10   appropriate offense that the jury should
11   consider in determining guilt.
12            Did you understand that in a criminal
13   case the trial is in two stages?  The first
14   stage is where the jury listens to the evidence
15   and goes back and makes the determination as to
16   guilt.   If the jury returns a verdict of
17   guilty, there is a second stage of trial.
18        A.   Yes.
19        Q.   Additional evidence may be
20   presented.   That might be the time when a jury
21   would hear evidence of a defendant's background,
22   reputation, prior bad acts, previous criminal
23   convictions, if they exist.  Those kind of
24   things most jurors would think would be helpful
25   in determining the appropriate penalty.  In a

3540

1      capital murder case, there is a second stage of
2      trial if the defendant is found guilty of
3      capital murder.  You might hear additional
4      witnesses testify.  There may be additional
5      evidence for you to consider.  You might hear
6      things that you would think would be mitigating
7      circumstances.  Neither side has to bring you
8      anything in that second stage of trial.  But
9      either side may if they want to.  When I send
10     you back in the second stage of a capital murder
11     case, you are not going back to vote for life or
12     death; you have to, instead, answer certain
13     questions, but you get to know in advance that
14     the way you answer those questions is going to
15     determine how I assess the penalty.  First
16     question we would ask you is special issue
17     number one over here on the blackboard.  Do you
18     find from the evidence beyond a reasonable doubt
19     that there is a probability the defendant would
20     commit criminal acts of violence that would
21     constitute a continuing threat to society.  This
22     is the special issue where we are asking you to
23     make a determination of the defendant's future
24     dangerousness.  I would instruct you that you
25     are to consider all the evidence admitted at the

3541

1   guilt-innocence stage and the punishment stage,

2   including evidence of the defendant's background

3   or character or the circumstances of the offense

4   that militate for or mitigate against the

5   imposition of the death penalty.   By

6   probability, in common usage, we mean more

7   likely to occur than not.   And that last word

8    "society", that is a term that is not going to

9   be defined in the Court's Charge, but we know it

10  means all of society, including society within

11  the penitentiary system.   Can you see that?

12      A.   Yes, sir.

13      Q.   We ask the jury to answer that yes or

14  no.   It takes all twelve jurors agreeing

15  unanimously to answer yes, return a yes

16  answer.   It takes ten or more agreeing to

17  return a no answer.   If the jury says no there

18  is not a probability the defendant would commit

19  criminal acts of violence constituting a

20  continuing threat to society, I assess life

21  imprisonment.   If the jury answers unanimously

22  yes there is such a probability, the jury then

23  proceeds to number two.   Can you see how number

24  one could sometimes be answered yes, sometimes

25  no, depending on the facts and circumstances you

1    have before you?

2         A.   Yes.

3         Q.   The answers aren't automatic in either

4    case.

5         A.   No.

6         Q.   Sometimes you don't have all that

7    extra information from the second stage of trial

8    about reputation, background, prior bad acts.

9    Sometimes all you have is the offense committed

10   that you found him guilty of.  Do you see how

11   there are some cases where the facts surrounding

12   the commission of the capital murder offense

13   would be so horrible that based on the way that

14   defendant committed that offense alone a jury

15   could find there would be a probability he would

16   commit criminal acts of violence constituting a

17   continuing threat to society?

18        A.   Yes, sir.

19        Q.   If the jury answers number one yes,

20   you proceed to number two.  Number two is asking

21   whether, taking into consideration all of the

22   evidence, including the circumstances of the

23   offense, the defendant's character and

24   background and personal moral culpability of the

25   defendant, there is a sufficient mitigating

3543

1   circumstance or circumstances to warrant that a

2   sentence of life imprisonment rather than a

3   death sentence be imposed.  I would instruct you

4   that you are to consider mitigating evidence to

5   be evidence you might regard as reducing a

6   defendant's moral blameworthiness.  You have to

7   answer this one yes or no also.  Here it takes

8   all twelve jurors agreeing unanimously to return

9   a no answer.   Ten or more can return a yes

10  answer.   A yes answer meaning there would be

11  sufficient mitigating circumstance or

12  circumstances to warrant life imprisonment

13  rather than a death penalty.   In that case, a

14  no answer on -- I'm sorry -- a yes answer on

15  number two, I would assess life imprisonment.

16  Only if the jury unanimously answers number two

17  no after a unanimous yes on number one do I

18  assess the death penalty.  You get to know that

19  in advance.  Only a yes, no, number one and

20  number two, respectively, results in the death

21  penalty.

22          Mitigating circumstances.  What are

23  they?  I don't know what all that includes.

24  Our statutes aren't very clear.  They don't set

25  out exactly or limit the aspects of a

                                        3544

1    defendant's background, character or the

2    circumstances of the offense, that kind of

3    thing, that are mitigating, and the law doesn't

4    impose any kind of formula for determining how

5    much weight to give a mitigating circumstance

6    should you hear about them.   I don't know if

7    that is twenty items long or twenty thousand

8    items long, things that might be mitigating to

9    jurors in proper cases.  You decide if what you

10   have heard is mitigating in that case and how

11   much weight to give it.  You might feel that

12   something like drug dependency deserves a lot of

13   weight, and another juror on the same jury might

14   decide it doesn't deserve a whole lot of

15   weight.  That is up to you.  While we don't have

16   a list of everything that is included, we know

17   that certain things can be mitigating in proper

18   cases.  We know that mental retardation, mental

19   illness are mitigating.  Mitigating evidence can

20   include such things as a defendant's good

21   behavior while he is in prison or in jail.   Can

22   include an exceptionally unhappy or unstable

23   childhood, childhood drug abuse, economic

24   deprivation, it can include youth, a defendant's

25   age, voluntary intoxication, drug dependency,

1    illiteracy, opinion testimony of lay witnesses

2    or psychiatric opinion testimony that a

3    defendant would be a danger in the future.  All

4    of those things in the proper case could be

5    mitigating circumstances.  If you hear about

6    those or any others that you think are

7    mitigating, you decide how much weight to give

8    it in answering number two.  Do you understand?

9         A.   Yes, sir.

10        Q.   Do you see how the answers to these

11   special issues aren't automatic, they are

12   sometimes yes, sometimes no, depending on what

13   you have to review?

14        A.   Yes.

15        Q.   We want to make sure that you are not

16   automatically predisposed to answer a certain

17   way simply to insure that a life sentence

18   results or the death penalty results.

19             Is there anything about your views

20   regarding capital punishment, the death penalty

21   which would prevent or substantially impair the

22   performance of your duty as a juror in

23   accordance with the instructions I would give

24   you and your oath as a juror?

25        A.   No, sir.

1              THE COURT:  Ms. Davies.

2              EXAMINATION BY THE STATE

3    BY MS. DAVIES:

4         Q.    Hello, Mr. Sheehan.  How long have you

5    been driving the route between Houston and

6    Mobile?

7         A.    I am just starting it. I used to drive

8    from Houston to New Orleans.

9         Q.    Do they change your route regularly?

10        A.    It all depends.   Three or four

11   months, they change.

12        Q.    Get tired of driving the same road on

13   a regular basis, or is that just part of it?

14        A.    Normally I drive the same road anyway

15   because I used to drive to Tallahassee.

16        Q.    Well, we want to find out a little bit

17   more today, if we can, about your attitudes and

18   opinions.  You have had overnight to think about

19   some of these things since we talked yesterday.

20   I am interested to know what your first reaction

21   was when you got this questionnaire and realized

22   that you might be sent over on a case that might

23   involve the death penalty.

24        A.    Do you want to know what my reaction

25   was?

                                                 3547

1          Q.    Yes.

2          A.    I had no reaction, I don't believe.   I

3     just figured I would be on a case, that they

4     wanted to know a little bit about me.

5          Q.    Okay.  So, when you got this

6     questionnaire -- you said you really haven't

7     been on a jury before?

8          A.    No.

9          Q.    You might very well have thought that

10    every juror who comes in gets such a

11    questionnaire?

12         A.    Yes.

13         Q.    Once you were up here and you realized

14    that in fact this was a case that would involve

15    the possibility of a death penalty, was there

16    any reaction then?  How do you feel about that?

17         A.    There was no reaction.  I guess it's

18    something I have to do.

19         Q.    Tell me what -- do you think the death

20    penalty is necessary in some cases?

21         A.    That is hard to answer.

22         Q.    Well.

23         A.    You have to know what the full case is

24    before you can make a decision.

25         Q.    Oh, right.  I understand that.  And,

3548

1    unfortunately, we can't tell you about the facts

2    of this case.   I am not asking what you would

3    do in this case.   I am asking in some instances

4    do you think the death penalty is appropriate?

5         A.   Yes.

6         Q.   Can you tell me why?  I mean, have you

7    given any thought to that?  I mean, do you think

8    it's necessary to protect society?

9         A.   No, I cannot.   I can't tell you

10   why.   It's just, I don't know.

11        Q.   Have you ever had a change of

12   opinion?  At some other point in your life, did

13   you think differently about that?

14        A.   No.   Never thought about it.

15        Q.   Did you give any thought last night to

16   whether or not you personally would be able to

17   participate in a verdict that was going to

18   result in the death penalty?

19        A.   No, not really.

20        Q.   Could you do it?

21        A.   I don't know.   I really don't know if

22   I could or not.

23        Q.   You know, for a lot of people, they

24   come on strong and say I believe in the death

25   penalty, it's necessary for society, but then,

3549

1    when it comes down to they know that they

2    couldn't do it personally.  Of course, here you

3    are kind of -- you are at it.  You're facing the

4    situation now because, if you are on the jury,

5    those people who serve on the jury take an oath

6    to base their verdict on the law and the

7    evidence.  We are here to see, hopefully, there

8    is a fair trial.  The defendant has many

9    constitutional rights that will be protected.

10   My attitude is, for anything to be fair, that

11   means both sides.

12        A.    Okay.

13        Q.    Do you agree with that?

14        A.    Yes.

15        Q.    So, obviously, nobody wants anybody

16   who is going to automatically answer those

17   questions one way or the other, but I need to be

18   sure that if I bring the evidence in that

19   justifies it that people on that jury can

20   actually participate in a verdict that is going

21   to result in the death penalty, not face some

22   kind of moral crisis back there in the jury

23   room.  I need you to think about that and try to

24   be real open with me about it.

25        A.    I could.  If I had to, I could

3550

1    probably bring a sentence of death if I had
2    to.   Like I said, I can't answer that now
3    because I don't know what the circumstances
4    are.
5         Q.   Okay.   Well, in your mind would there
6    ever be a case that you think deserves the death
7    penalty, that you could be a part of a verdict
8    of a jury that, I mean, might be called on to
9    write your name on that verdict page.
10        A.   I don't know.
11        Q.   You are making it awfully hard for me,
12   Mr. Sheehan.
13        A.   What can I tell you?
14        Q.   Do you feel like you are the kind of
15   person who -- I mean, you are insulated here,
16   you know that you don't say life or death, you
17   answer those questions yes or no, and depending
18   on how the question is answered, the judge is
19   the one who imposes the sentence, but you know
20   going in, that if you answer the first question
21   yes and the second one no, the judge is going to
22   give the death penalty, he has no choice.   So, a
23   jury certainly, any juror can manipulate their
24   answers to achieve the result they want.   Do you
25   feel like you would be inclined to try to avoid

3551

1    the death penalty?

2         A.   I don't think so.

3         Q.   If the evidence was there, you would

4    do it?

5         A.   Yes.

6         Q.   I guess -- I am looking at you --

7    could the evidence ever be there?  Could I bring

8    you enough evidence to convince you?

9         A.   Could you bring me enough evidence?  I

10   don't know.   Could you?

11        Q.   I am sure going to try.  That is my

12   job.   But I am wanting to know what is in your

13   mind.   I mean, is there a situation -- I feel

14   like you are daring me here.  And I understand

15   it's a big job.   It's a heavy burden.

16        A.   It's a hard job.

17        Q.   I take it seriously.   I shoulder the

18   burden gladly, but I want to be sure I have got

19   somebody sitting in that jury box who if I do my

20   job they can answer those questions and come

21   back with the death penalty.

22        A.   I could.   I could answer the

23   question.   I mean, I could possibly -- not

24   possibly -- if I had to and I had all the

25   evidence, yes, I would give the death penalty.

3552

1    Okay?

2         Q.   Okay.  What about some of the things

3    we talked about yesterday, did you have any

4    questions, disagree with any of the things we

5    talked about that you want to mention to us?

6         A.   No.

7         Q.   You know, one of the phrases that we

8    have used a lot is beyond a reasonable doubt.

9    Keep talking about the State has to prove this

10   beyond a reasonable doubt.   And the burden of

11   proof is on me.  They don't ever have to bring a

12   thing.   That is true at both stages of trial.

13   I have got to produce the evidence to convince

14   the jury beyond a reasonable doubt.   There is a

15   legal definition of that term and a lenghty

16   instruction that the judge gives you about just

17   what beyond a reasonable doubt means.   A part of

18   that instruction makes clear that it is not

19   beyond all doubt.  Some people come in here and

20   tell me:  Hey, you are talking capital murder,

21   you are telling me you are going to be asking

22   for the death penalty, I have to have all doubt

23   removed.  Beyond a reasonable doubt just isn't

24   enough for me.  Do you feel that way?   I need to

25   know it if you do.

1       A.   Yes.

2       Q.   You are going to require more of me

3 than beyond a reasonable doubt; is that what you

4 are telling me?

5       A.   I don't know.

6       Q.   Let's think about what beyond a

7 reasonable doubt means.  I mean, for you.

8 Again, I am not suggesting that it's anything

9 minimal.  I mean, it's a heavy burden, but it's

10 not beyond all doubt basically because that

11 would be an impossibility.  The law requires a

12 lot of proof, but it doesn't require the

13 impossible.  If you weren't there to see it,

14 there are very few people who are ever going to

15 be absolutely one hundred percent certain.

16      A.   True.

17      Q.   But if that is your personal

18 requirement, you are entitled to tell us now.

19 Again, it goes back to that notion of a fair

20 trial.  The defendant's rights are going to be

21 protected, but for the trial to be fair, I need

22 to have a chance going in.  If I have got

23 somebody in that jury who requires one hundred

24 percent certainty, I have lost before we

25 start.  So, where do you stand?

3554

1          A.    I don't know.

2          Q.    I have to press you for an answer.    I

3     need to know.    You know.    This isn't a crap

4     shoot.    I need to know.    You are the only one

5     who can look in your heart and tell me how you

6     feel about that.

7               MR. STAFFORD:    Your Honor, I object to

8     the prosecutor trying to pin him down.    I think

9     the proper inquiry would be could he follow the

10    court's instruction and the definition of

11    reasonable doubt and base his decision thereon.

12               THE COURT:    It's overruled.

13         A.    I guess I could follow them rules.    I

14    could go with the reasonable doubt.

15         Q.    Do you feel sure about that?

16         A.    I am sure but not absolutely sure.

17         Q.    Do you understand where I am coming

18    from?

19         A.    Uh-huh.

20         Q.    You know, I think -- I just want to be

21    sure you are going to give me a fair shot at

22    this.    Do you feel like you can be?

23         A.    Uh-huh.

24         Q.    At this point, the oath is just to

25    tell the truth.    People who serve on the jury

1    will take that second oath to base a verdict on

2    the law.   The judge is going to tell you the

3    law, the legal standard is beyond a reasonable

4    doubt.   You will be taking an oath to follow

5    that.   So this is kind of like a fail-safe

6    period.   People have a chance to say I disagree

7    with the law, I am not going to be in the

8    position of taking an oath to do something I

9    know I can't do.   That is one of the main

10   reasons we have this individual questioning, to

11   give you a chance to tell us that if that is the

12   way you feel.   Do you think you can follow

13   beyond a reasonable doubt?

14        A.    Uh-huh.

15        Q.    Yesterday talked about intent.   I have

16   to prove that there were two intentional

17   murders.   And I suggested -- I think I gave an

18   example of somebody cutting somebody off on the

19   freeway, kind of the spur-of-the-moment killing

20   but somebody intentionally killed, they get mad,

21   they pull a gun, they aim, they fire.    I

22   suggested that the intent to kill can be formed

23   very quickly.   Do you have any disagreement with

24   that?

25        A.    No.

1    Q.   How do you feel about this?  If

2    somebody intentionally takes another person's

3    life, spur-of-the-moment decision, intentional

4    killing, is that less serious to your way of

5    thinking than somebody who takes somebody's

6    life, say a gun to the head?

7    A.   I don't think it's less serious.  I

8    don't think anybody should take anybody's life,

9    but it happens.

10   Q.   Okay.

11   A.   I think anybody that takes somebody's

12   life, it's serious.  Very serious.  Whether it

13   be one, two, three or four, it's serious.

14   Q.   One of the things we didn't touch on

15   yesterday was talking about self-defense.  Do

16   you feel like you have the right to defend

17   yourself?

18   A.   Yes.

19   Q.   And others?

20   A.   Yes.

21   Q.   Your family, your home, even your

22   property in some circumstances.  Do you feel

23   that way?

24   A.   Yes.

25   Q.   The law certainly allows that.   There

3557

1    are limitations on the right to self-defense.
2    You certainly are not entitled, or the
3    limitation would include that you can use force
4    to a reasonable degree.  In other words, the
5    amount of force that is necessary in the
6    circumstances, that is immediately necessary.
7    And you need to be acting lawfully.  Let's use
8    an example to try to get into talking about
9    self-defense a little bit.   I am going to try
10   to get your feelings a bit.   Let's use the
11   hypothetical, say two guys are working late.
12   They stayed after hours working at the office.
13   Office is closed for the night.  There is a sign
14   on the door that says open eight to five, Monday
15   through Friday.  They didn't bother to lock the
16   door.  They are in a back office doing their
17   work.  All of a sudden they hear a noise out in
18   the front office.  Joe, first guy in the back,
19   he is going to go check on that noise.   He goes
20   out front.  He encounters a burglar who is in
21   there going through the desk drawers looking for
22   petty cash.  Joe lets out a yell.  Mike, who is
23   still in the back, comes out.  He thinks:  Oh
24   dear, there may be trouble.  He grabs something
25   to try to protect himself.  They play baseball

1    after work a couple of nights a week, so there

2    is a baseball bat there, he grabs the bat, runs

3    out and encounters his co-worker friend Joe

4    struggling with this burglar.  Mike runs out

5    with the baseball bat, burglar wrestles the

6    baseball bat away from Mike and uses it, beats

7    him in the head, kills him.  Comes time for

8    trial, burglar says:  Hey, it was self-defense.

9    I had to protect myself.  That guy came after

10    me with a baseball bat.  What do you think

11    about that?

12        A.  Well, it is self-defense because the

13    guy did come after him with a baseball bat; but,

14    on the other hand, he was trying to protect his

15    friend.

16        Q.  That's right.  Do you feel like Mike

17    had the right to defend himself under those

18    circumstances and his friend?

19        A.  Yes.

20        Q.  Well, see, for most of us, and my

21    interpretation of the law is, first off, the

22    burglar -- the person who had the right to claim

23    self-defense would be Mike, not the burglar.

24        A.  True.

25        Q.  Because Mike is acting lawfully.  He

3559

1    is where he is supposed to be.  He is protecting

2    his friend, his workplace.  Burglar has no right

3    to claim self-defense when he is acting

4    unlawfully to begin with.  Does that make

5    sense?

6         A.    Yeah.

7         Q.    You know, the limitation, the

8    restrictions on the right to defend yourself,

9    you can only use the amount of force that is

10   immediately necessary; and if a reasonable

11   person would retreat in that situation, they

12   must do so.  So, in that kind of situation, I

13   mean, I feel like you would expect the burglar

14   to be the one to retreat, to run away.  After

15   all, Joe and Mike were where they have a right

16   to be; right?

17        A.    --.

18        Q.    Or no?  How do you feel about that?

19        A.    You are right.

20        Q.    What about the idea, you know, they

21   didn't bother to lock that door.   Do you think

22   that made it okay for the burglar to come

23   inside?

24        A.    No.

25        Q.    What about if you were in a hurry this

1   morning to come down here and left your front

2   door unlocked or even ajar, didn't close it

3   good, does that mean it's okay for others to go

4   into your house in your absence?

5        A.   No, it's not.

6        Q.   Do you think a reasonable person would

7   think it was okay to go into your house?

8        A.   No, I don't think so.

9        Q.   You know, this is a two stage trial.

10  The first stage is guilt.  The only evidence you

11  hear at that stage of trial surrounds the

12  capital murder offense that is on trial.  Just

13  that offense.  Again, it's a notion of fairness

14  in the law.  A person should be tried for this

15  particular offense, not because they did

16  something bad in the past or whatever.  So the

17  judge limits the evidence that is admissible at

18  that first stage of trial.  You will hear all

19  the evidence, both sides will argue the case,

20  the judge gives the jury instruction, you go

21  back in the back and deliberate.  Now, nobody

22  expects an immediate unanimous verdict.  It

23  takes time.  Deliberation means just that.  All

24  the jurors talk, they think about, compare their

25  opinions, think through the evidence;

3561

1    ultimately, after they have conferred with one
2    another, hopefully, they do come up with a
3    unanimous verdict.  It's only after a jury has
4    come back with that verdict of guilty of capital
5    murder that you get to that second stage of
6    trial where you address those two questions.
7    Now, at the second stage of trial, then the jury
8    will come out and they hear more evidence,
9    maybe, if there is more evidence.  Sometimes the
10   only evidence you have to consider at that
11   second stage of trial is the same evidence you
12   hear, I mean we don't put it on again, but you
13   still consider all that evidence you heard the
14   first time about the facts surrounding the
15   capital murder.  There are times that I would be
16   asking a jury to answer those questions yes, no,
17   in other words, result in the death penalty,
18   based just on the facts of the capital murder
19   itself.  Can you see that some capital murders
20   may be so bad that that alone would be enough to
21   justify answering those questions?
22        A.    Yes.
23        Q.    Even though it may result in the death
24   penalty?
25        A.    Uh-huh.

                                              3562

1          Q.    Other times you may have additional

2    evidence.  Now, again, the burden never shifts.

3    It's always on the State.  Defense can bring

4    evidence if they want to.  They have the same

5    subpoena power the State does.  They just don't

6    have to use it unless they choose to.  At that

7    second stage of trial, the judge will let in a

8    lot of other types of evidence, anything that

9    either side offers that they think might assist

10   the jury.  It could be evidence about a past

11   criminal history.  On the other hand, they might

12   bring you something that says what a

13   hard-working, church-going, good member of the

14   community this person is, never been in trouble

15   before.  It could be, what, background

16   information.  Typical kind of thing might be for

17   a psychologist or psychiatrist to come in for

18   the defense and testify about this person's

19   background, what makes them tick kind of thing.

20   Maybe what we refer to as mitigating evidence.

21   Do you know any psychologists or psychiatrists

22   or had any dealings with them, know anything

23   about that field?

24          A.    No.

25          Q.    Do you have any strong feelings about

3563

1    how reliable that type of testimony might be?

2         A.   No.

3         Q.   Do you feel like you would treat that

4    kind of an expert any differently than any other

5    witness?

6         A.   No.

7         Q.   At that second stage of trial, the

8    first -- you are going to consider all the

9    evidence, original offense, anything else we

10   bring you.   First you look at that first

11   question.   This is the one that talks about

12   whether there is a continuing threat to

13   society.   Talks about probability.   Is there a

14   probability that the defendant would commit

15   criminal acts of violence that would constitute

16   a continuing threat to society.   Some people

17   look at that and they think that is kind of

18   crystal ball gazing, there is no way you could

19   ever be sure enough about the future to answer

20   that question yes.

21        A.   That's true.   You can't.

22        Q.   Can't be sure about the future.

23        A.   True.

24        Q.   Okay.   Could you never answer that

25   question yes?

1        A.    I don't know.  Possible.

2        Q.    Talks about probability, not

3   certainty, because you couldn't be certain about

4   the future.  Do you think that a person's past

5   conduct is any indicator of how they might

6   behave in the future?

7        A.    Possibility.  They might change.  You

8   don't know.

9        Q.    Some people do, some people don't?

10       A.    True.

11       Q.    In your mind, is there any particular

12   kind of evidence that, things might help you to

13   answer that question?  Do you think a past

14   criminal history would be of any significance at

15   all?

16       A.    Might be.  I really couldn't say.

17       Q.    Do you think the offense that was

18   committed would be helpful, the kind of capital

19   murder?

20       A.    I am not sure.

21       Q.    Can you see yourself ever able to

22   answer that question yes?

23            MR. STAFFORD:  Has been asked and

24   answered, Your Honor.

25            THE COURT:  Overruled.

1          MR. STAFFORD:  I would ask that it be
2     phrased if he believes it should be answered yes
3     beyond a reasonable doubt.
4          THE COURT:  These aren't trick
5     questions.
6          MS. DAVIES:  They really aren't.  I
7     mean, beyond a reasonable doubt is right there
8     in the question.
9          THE COURT:  They are not going to ever
10    be allowed to pin you down on a set of facts.
11    I am not going to let them tell you what they
12    anticipate the facts are going to be in this
13    case, so they are having to ask you all of these
14    things in a vacuum, these never, neverland
15    hypotheticals.  And the first thing I have got
16    to know is:  If you believe the State has proven
17    the defendant's guilt beyond a reasonable doubt
18    of a capital murder offense, can you vote guilty
19    knowing that the only punishments are life and
20    death?
21         A.   Yes.
22              THE COURT:  And then the next thing is
23    if you found somebody guilty of capital murder
24    can you answer those questions without -- the
25    way I phrased it earlier was trying to make sure

3566

```
 1    you are not predisposed to answer things a

 2    certain way just to make sure someone gets a

 3    life sentence or answer a certain way just so

 4    somebody gets the death penalty, but actually

 5    look, examine, I mean, not just look at but

 6    carefully consider and in your own mind make up

 7    for yourself whether or not, number one, they

 8    have proven to your satisfaction beyond a

 9    reasonable doubt because it's still the State's

10    burden in question number one to prove there is

11    a probability, not a certainty but a

12    probability, more likely than not that the

13    defendant you have already found guilty of

14    capital murder and you might have heard some

15    additional information about would commit

16    criminal acts of violence constituting a

17    continuing threat to society.

18         Do you believe there is ever a set of

19    circumstances out there where you would be able

20    to find that there is such a probability that

21    defendant you just heard about would commit

22    criminal acts of violence constituting a

23    continuing threat to society?

24       A.    Yes.

25            THE COURT:  If you believe there was,
```

3567

1    could you vote that way?

2         A.    Yes.

3              THE COURT:   On number two -- I'm

4    sorry.   I am taking it away from you guys

5    again.   Rattling on.   You can have it again, Ms.

6    Davies.

7    BY MS. DAVIES:

8         Q.    Okay.   If you were on a jury -- and I

9    think you just told the judge that you can see

10   there may be a set of facts that you could

11   answer that first question yes?

12        A.    Yes.

13        Q.    Even though you knew that was one step

14   on the way to the death penalty; right?

15        A.    Yes.

16        Q.    If you had done that, then you would

17   look at the second question.   And this time

18   again you are going to consider all the

19   evidence, the facts of the offense plus any

20   mitigating evidence that might be there.    The

21   question here -- that is a long question.   And I

22   think it gets, because it's so wordy, it gets

23   complicated.   Basically what it is saying is

24   look at any mitigating evidence that is there,

25   also look at the facts of the offense and you

1    see how they weigh out, is the mitigating stuff

2    sufficient to outweigh the danger that this

3    person is to society and to outweigh the crime

4    they have committed, is it sufficient that you

5    think this person should get life instead of

6    death.    If you say no, it's not sufficient, he

7    gets the death penalty.

8         A.    I understand that.

9         Q.    Okay.  Can you see yourself ever able

10   to look at evidence and conclude that, yeah,

11   there may be something mitigating but I don't

12   think it's sufficient, I think the answer should

13   be no?

14        A.    Yes.

15        Q.    Do you have any questions for me?

16        A.    No.

17             MS. DAVIES:   Thank you.   I pass.

18

19

20

21

22

23

24

25

EXAMINATION BY THE DEFENSE

BY MR. STAFFORD:

Q.   Mr. Sheehan, I am James Stafford, as
you heard earlier.  I often say I have the honor
of trying to save my client's life because it
has been known that the State is seeking the
death penalty in this case.  So, I think it's an
honor to have the privilege of trying to defend
someone to save his life.  I apologize to you
because I realize you have never had to do this
before, and it's kind of an invasion of your
privacy for us to ask you so many personal
questions.  We are not doing it to be mean to
you or to be rude to you, it's to help us make
this monumental decision of whether or not you
are a fit juror to sit on this case.

A.   I understand that.

Q.   You understand what I am trying to do?

A.   Yes.

Q.   And I get -- I am sure from your job
being on the road for so many hours and dealing
with so many people, you have a tendency of
probably watching them as they are boarding to
kind of get a visual impression of what kind of
people and what kind of passengers they are

3570

1    going to be and whether they are going to give

2    you trouble or going to be talkers, or you get

3    these mental images of people.  Sometimes you

4    are right.  And the older you get I think we

5    conclude we are more right than wrong.  But I

6    see you somewhat as a sensitive person and

7    compassionate person, but I am wondering that if

8    you are sitting on this jury, because from the

9    questionnaire I couldn't really -- you left

10   blank on my sheet the one through five as to --

11            MR. STAFFORD:  Can I approach the

12   juror, Your Honor?

13            THE COURT:  Yes, sir.

14   BY MR. STAFFORD:

15       Q.   As to which one of these you would

16   have checked if you had to choose one.

17       A.   Number three.

18       Q.   Okay.  I think some of the questions

19   that Ms. Davies asked you I would like to kind

20   of follow up on.  Like I think you realize that

21   there are probably -- you stated that all murder

22   cases are serious.

23       A.   Yes.

24       Q.   And our law understands that, but one

25   of the luxuries as a juror if you are on this

3571

1    case is, for example, we know that just because

2    I commit the offense of capital murder does not

3    necessarily mean that I deserve to die.  Jurors

4    have the luxury of evaluating whether this is

5    the type of case where I went out and did

6    ritualistic carvings or whether it's a type of

7    case, using her hypothet, where I went into the

8    building maybe to burglarize the building, with

9    no weapons, thinking that no one was there, the

10   homeowner, I mean, the shop owner attacked me

11   and I was defending my life and took his life.

12   That is not justified.  That is capital

13   murder.   But that is something that you could

14   take possibly, if you thought it was, as

15   mitigating to determine whether that warranted

16   life imprisonment.   Those are the type of

17   things that you could take into consideration

18   and consider.  You understand that would be your

19   role?

20        A.   Yes.

21        Q.   If you are on this jury and if a

22   psychologist testifies, the fact that he gets

23   paid for his services to come here to testify,

24   would that offend you in any way?

25        A.   No.

3572

```
 1              Q.   I think everybody likes to be paid for
 2      what they do.
 3              A.   True.
 4              MR. STAFFORD:   I have no other
 5      questions, judge.
 6              THE COURT:   Why don't you step outside
 7      this door right here?
 8              (The prospective juror leaves the
 9      courtroom).
10              MR. STAFFORD:   I do not exercise a
11      strike.
12              THE COURT:   It's my understanding for
13      the record that the defense is not exercising a
14      strike on this juror.
15              Is that correct, Mr. Stafford?
16              MR. STAFFORD:   That is correct.
17              THE COURT:   It appears Mr. Sheehan is
18      going to be our first alternate.
19              Would you bring him in, please?
20              (The prospective juror returns to the
21      courtroom).
22              THE COURT:   Mr. Sheehan, you have been
23      selected.
24              THE JUROR:   Thank you.
25              (Juror sworn)
```

3573

1            THE COURT:   In a minute, she is going
2   to give you two pieces of paper.   One of them
3   is going to tell you to be back here on Monday,
4   September 28th at 10:00 a.m. to start trial.   We
5   are also going to give you a badge.   You are to
6   wear it at chest pocket level at all times when
7   you are in and around the courthouse from the
8   time you get out of your vehicle in the morning
9   until you get back in it in the afternoon.   It
10  identifies you as a juror, and we are not going
11  to be discussing cases in front of you.   The
12  attorneys involved in this case are being
13  instructed not to engage you in conversation.
14  If anybody attempts to talk to you about this
15  case, bring it to our attention immediately.
16  There's phone numbers on there and on the badge
17  also.   You can contact me or the bailiff or the
18  clerk.   I don't anticipate that is going to
19  happen.   I don't anticipate there is going to
20  be any publicity, newspaper, television,
21  hopefully, before we begin testimony in this
22  case.   If there is, it's usually only of the
23  nature that jury selection is concluded, the
24  case is going to begin on a certain day.   If you
25  should see anything about this case or what you

1    think is this case, don't pay any attention to

2    it, change the channel, station, don't read

3    it.   Don't make any kind of independent

4    investigation.   Don't attempt to read any law

5    you think might apply in this case.   Don't

6    attempt to find out what capital murder case we

7    are going to be trying.   When you come down here

8    starting on Monday, the 28th, park where you

9    keep your car keys.   I don't care where you park

10   as long as you keep your car keys during the

11   day.   You work for Greyhound?

12          A.    Yes, sir.

13          THE COURT:   You have to tell them that

14   you have been selected.   It's not definite as

15   to how many days you are going to be down here

16   starting September 28th.   It could be as much as

17   two weeks.   When you tell people that you are

18   selected to serve on a capital murder case,

19   don't hang around and let them impart

20   misinformation to you like people usually do.

21          Any requested admonitions, Ms. Davies?

22          MS. DAVIES:   I think you have covered

23   it all.

24          THE COURT:   Ms. Kaiser, any requested

25   admonitions?

3575

1           MS. KAISER:  Nothing further.

2           THE COURT:  Do you have any questions

3      of me?

4           A.    No, sir.

5           THE COURT:  28th, that is a Monday.

6      We are going to be in our courtroom up on the

7      8th floor.

8           Also we want you to wait out in the

9      hallway.  Be wearing your badge and wait out in

10     the hallway, and we will come out and get you,

11     round up everybody that is out there wearing the

12     appropriate yellow badge and take you in a group

13     to the jury deliberation room.   Okay?

14          A.    Yes, sir.

15          (The juror leaves the courtroom).

16          MS. DAVIES:  I want to be sure that

17     the record reflects that at this point the State

18     has used a total of fourteen strikes.  Thirteen

19     of those were during the original proceedings of

20     selecting twelve jurors.  The fourteenth strike

21     was on an alternate.  And of those total of

22     fourteen strikes, twelve of them, the twelve

23     individuals who the State struck were white.

24          THE COURT:  That is correct.

25          MS. DAVIES:  I don't think the record

                                                   3576

1    reflected that.   I wanted it to reflect that.

2                       MARIAN SCOTT,

3    called as a prospective juror, was examined as

4    follows:

5                  EXAMINATION BY THE COURT.

6         Q.   This is prospective juror number

7    thirteen on panel number six, Ms. Marian Scott.

8                  Which school are you a counselor at?

9         A.   Seabrook High School.   It's Clear

10   Creek District.   It's in Friendswood.   That is

11   the mailing address.

12        Q.   When you lived in Kingsville, that is

13   when you were at A & I?

14        A.   Yes.

15        Q.   Is your daughter an accountant?

16        A.   Yes.

17        Q.   What is the youngest one studying?

18        A.   Mechanical engineering.

19        Q.   Freshman this year?

20        A.   Yes.

21        Q.   You've served on a criminal jury but

22   it's evidently been sometime ago and it was a

23   misdemeanor offense?

24        A.   It was in El Lago, and it was at

25   night.

1       Q.   Traffic case or simple assault?

2       A.   Yeah, I think it was simple assault.

3  Everybody was drunk.

4       Q.   Did you live in El Lago?

5       A.   Yes.  Seabrook is my mailing address.

6       Q.   Used to have a lot of traffic cases in

7  El Lago.  Subsidized the city coffers, I think.

8           There is a couple of questions asking

9  about psychiatrists and psychologists.  One is

10  have you or anyone in your immediate family ever

11  been under a doctor's care for any mental

12  illness, and the other is has any member

13  consulted a psychiatrist or psychologist.  Can

14  you tell me who and what was the nature of that?

15       A.   Many years ago, when my mother was

16  alive, she consulted one for alcoholism, and

17  more recently I took my son to a psychiatrist

18  for depression.

19       Q.   Your youngest child?

20       A.   Yes.

21       Q.   You said to a psychiatrist?

22       A.   For depression, or I perceived that he

23  was depressed.  Psychiatrist saw him and said he

24  was fine.

25       Q.   Said you are wrong, he is okay.  How

3578

1    old was he at the time?

2         A.    Seventeen.

3         Q.    So your son was able to say I told you

4    so?

5         A.    He said, "Okay, Mom?"  I said, "Okay."

6         Q.    What is "Little House on the Freeway"

7    about?

8         A.    It's a book about the hurried family

9    today.  It's a contrast to the "Little House on

10   the Prairie".  It's how to slow down.  It's

11   very good.  I recommend it.

12        Q.    Did you find out about it through

13   counseling?

14        A.    I am going to a program at our church

15   on the hurried family.

16        Q.    Okay.  Was that just yesterday we

17   talked to you?

18        A.    Yes.

19        Q.    We had a long night.  We were here

20   until nine last night.  There are some I don't

21   know if we call them conflicts or

22   inconsistencies on pages eight and nine of the

23   long form that I need to get clear.

24        A.    Okay.

25        Q.    On one page it asks you to check a

1    statement which best summarizes your general
2    views about capital punishment, and on the other
3    page it asks you to check whether or not you
4    agree or disagree with certain statements.    I
5    know that I have you fill these out long before
6    we ever talk to you and tell you some general
7    information and general concepts and what it is
8    we are going about doing in this case.  You had
9    checked on question 61 I am neither generally
10   opposed to nor generally in favor of capital
11   punishment.  And from the next page your opinion
12   seemed to go from capital punishment gives the
13   criminal what he deserves to execution of
14   criminals is a disgrace.  We must have capital
15   punishment for some crimes, wish it weren't
16   necessary but believe it's necessary.  And had
17   checked the box I cannot vote to assess the
18   death penalty under any circumstances.  Help me
19   out.  Tell me what you believe.
20        A.    Mentally or?
21        Q.    Philosophically.
22        A.    Philosophically, no.
23        Q.    Philosophically you are opposed to the
24   death penalty?
25        A.    Yes.  Because, well, I am not opposed

1   to the death penalty.  I personally could not
2   condemn someone to die.
3       Q.   Okay.  Page ten you actually had
4   written, "I don't feel qualified to judge
5   another person."  Is this personal or
6   philosophical or religious?
7       A.   Religious probably.
8       Q.   Or combination?
9       A.   Comes from my religious background.
10      Q.   I know the participants in this case
11  fairly well, and I think I can tell you that you
12  should anticipate -- I am going to skip over a
13  whole lot of this stuff right now -- you should
14  anticipate that at some point, if you are
15  selected to serve on this jury, this lady over
16  here is going to be asking the jury to return a
17  verdict of guilty of capital murder.  If a
18  verdict of guilty of capital murder is returned,
19  there is only two possible punishments, life
20  sentence or the death penalty.
21      A.   Right.
22      Q.   I feel it's fairly certain that you
23  should anticipate that this side of the table,
24  the defense, is going to be asking you to either
25  find the defendant not guilty or not guilty of a

3581

1    capital murder offense and guilty of some lesser

2    offense.  Now, I notice you have sat on a jury,

3    though it might have been a class C misdemeanor

4    offense, sometime in the past.

5         A.   Yes.

6         Q.   Are you telling me that you could

7    never sit on a jury in which the death penalty

8    is a possibility?

9         A.   No, I didn't say that.  I said I, when

10   it came down to--

11        Q.   It's the penalty part you have problem

12   with?

13        A.   Yes, that is what I have problem with.

14        Q.   All right.  So you believe that if

15   they prove to your satisfaction beyond a

16   reasonable doubt that the defendant was guilty

17   of capital murder you could vote guilty of

18   capital murder knowing that there is only those

19   two possibilities; right?

20        A.   Uh-huh.

21        Q.   But when it came down to answering

22   those special issues which determine whether I

23   am going to assess the death penalty or not, you

24   would always answer in a way that the death

25   penalty was not imposed?

     A.   I have never been acquainted with this
before, and yesterday I spent a lot of time
thinking about it.   And I don't know.   As I
say, I could not do it.   I don't perceive I
would be doing it but that you would be doing
it, but that I would be giving you permission to
do it.   I have a lot of trouble with that.
     Q.   There is a little bit of insulation
here, you don't have to go back and vote for the
death penalty, but you know if you vote yes on
one and no on the other one and it's unanimous
it happens.   As sure as night follows day, I am
going to be assessing the death penalty.
     A.   Right.
     Q.   That is what I need to know, if you
can answer those questions, if the evidence was
presented to you and number one was proven to
your satisfaction beyond a reasonable doubt that
there is a probability that the defendant on
trial would commit criminal acts of violence
constituting a continuing threat to society, you
believe that had been proven beyond a reasonable
doubt, if you could vote yes on that one, and if
you didn't think there were mitigating
circumstances to warrant life imprisonment being

                                              3583

1    imposed, could you vote no on the other one?

2         A.   I don't know.   I have a real hard time

3    with that.

4         Q.   No one ever knows until you actually

5    have to face it.   They are entitled to answers

6    on these.

7         A.   I know that.

8         Q.   It's a very serious situation.

9         A.   I realize that.

10        Q.   They don't want to go into a trial,

11   particularly when it takes as long as this one

12   does, as long as the process does, knowing they

13   don't stand a chance.

14        A.   I spent a long time prior to this

15   dealing with taking a life, whether it be

16   abortion, what have you.   I have a real hard

17   time taking a life.   To me, that would be taking

18   a life.   I have spent half my life with the

19   idea that you don't take another person's life.

20        Q.   It's okay to feel that way, but we

21   have to know.

22        A.   And I do feel that way.

23        Q.   You can be assured, if the jury finds

24   the defendant guilty of capital murder, Ms. Davies

25   is going to be asking that number one be

3584

1    answered yes and number two be answered no.

2        A.   I realize that.

3        Q.   And I want to know if you come in with

4    preconceived notion as to how those answers

5    should be, or are you always predisposed to

6    answer certain way to insure that the death

7    penalty doesn't result?

8        A.   I think I would be predisposed.

9        THE COURT:  Why don't y'all approach

10   the side over here?

11        (Off the record bench conference).

12        THE COURT:  It's my understanding by

13   agreement of all parties concerned prospective

14   juror number thirteen on panel number six, Ms.

15   Marian Scott, is being excused.

16        Is that your agreement, Ms. Davies?

17        MS. DAVIES:  Yes, sir.

18        THE COURT:  Yours, Ms. Kaiser?

19        MS. KAISER:  That is correct.

20        THE COURT:  Yours, Mr. Rhoades?

21        THE DEFENDANT:  Yes, sir.

22        THE COURT:  You are excused.

23

24

25

1                    TODD BRATTON,
2       called as a prospective juror, was examined as
3       follows:
4                    EXAMINATION BY THE COURT.
5            Q.    This is prospective juror number
6       fifteen on panel number six, Mr. Todd Bratton.
7                    It's a long drive from Kingwood to
8       Waller.
9            A.    You are right.
10           Q.    Are you going to change the house or
11      change the job?
12           A.    Well, you know, I have a wife and two
13      kids that don't want to move, so I imagine I
14      will keep driving.
15           Q.    I guess you have to go back and forth
16      on 1960?
17           A.    Well, actually I go 2920 across and
18      also the toll road.  I go both ways.
19           Q.    Galveston-Houston company, is that the
20      same that used to build offshore oil living
21      quarters?
22           A.    We own the company, yeah.  At one
23      time.
24           Q.    They made them over there off of
25      Channelview?

                                                    3586

1          A.    Yes.   La Porte was the name.

2    G. H. La Porte Company.

3          Q.    Two children.   One at TCU?

4          A.    Right.

5          Q.    Studying what?

6          A.    It's a good question.   Some type of

7    marketing.   And that is changing.   So.   I am not

8    sure, but she is in school.

9          Q.    At the University of Arkansas, your

10   degree, you had a BSIM.   What's the IM?

11         A.    Industrial Management.

12         Q.    How long were you in Vietnam?

13         A.    One year.

14         Q.    I think I have seen The Firm as the

15   last book read in about half of the last ten or

16   so people.   Amazing.

17              Pages eight and nine of our long form

18   questionnaire either list statements and ask you

19   to check the one which best summarizes your

20   general views about capital punishment or ask

21   you to check whether or not you agree or

22   disagree with statements.   It appears you are

23   strongly in favor of capital punishment, you

24   wish it weren't necessary, it's basically wrong,

25   but we have to have it for some offenses.

3587

1    Correct?

2         A.   That is correct.

3         Q.   When I am saying capital offense I am

4    talking about one for which the only punishment

5    is life or death if somebody is convicted.

6    There is a statement that says any person, man

7    or woman, young or old, who commits capital

8    murder should pay with his own life.  You

9    understand the scheme that we have?  If you find

10   somebody guilty of capital murder, there are

11   only two possible punishments, and you have to

12   answer certain special issues which determine

13   whether or not I assess the death penalty?

14        A.   That is correct.

15        Q.   So, some might interpret that as

16   saying that anybody who is convicted of capital

17   murder should automatically get the death

18   penalty.

19        A.   Well, I wouldn't say automatically.

20   It would depend on the case and the

21   circumstances, but I still feel strongly that

22   the law is lenient with the crime that we have.

23   I think it doesn't make sense to me to put a guy

24   in prison for life and the taxpayers pick up

25   the, you know, enormous bill when a jury has

3588

1    decided that they should spend life in prison.
2    I guess I am pretty strong advocate of capital
3    punishment.
4            Q.    There is a statement which says
5    capital punishment is justified only for
6    premeditated murder.  You understand, after
7    these people talked to you yesterday,
8    premeditation is not a part of it?
9            A.    Right.   I know now.
10           Q.    There is another statement which says
11   capital punishment should be available for more
12   crimes than it is now.   And you probably had no
13   idea about how many different kinds of crimes it
14   was available for when you answered this.
15           A.    That is true.
16           Q.    Have you ever served on a jury before?
17           A.    No.  I have been called several times
18   but never served.
19           Q.    Have you ever been called and actually
20   gone through the process in a criminal case as
21   opposed to a civil case?
22           A.    No, just civil.
23           Q.    I want to make sure that you are
24   basically in agreement on the general
25   presumptions, some of them that we talked about

                                                3589

1    yesterday.  A defendant in a criminal case is

2    not a little bit guilty as he sits in court; he

3    is presumed innocent.   Do you agree?

4         A.   I agree.

5         Q.   State has the burden of proof.  Their

6    burden is to prove the defendant's guilt beyond

7    a reasonable doubt.  Agree?

8         A.   Agree.

9         Q.   The indictment in a criminal case is

10   no evidence of guilt.  Agree?

11        A.   Agree.

12        Q.   If a defendant does not take the stand

13   and testify in his own behalf, that can not be

14   considered as any evidence of guilt whatsoever.

15        A.   Agree.

16        Q.   Let's talk about that distinction

17   between murder and capital murder.  When I am

18   saying murder, I am talking about somebody who

19   intentionally or knowingly causes the death of

20   another individual.   That is, for our purposes,

21   a first degree felony offense of murder.  The

22   range of punishment is five to 99 years or

23   life.  For something to be elevated to capital

24   murder status where the only possible punishment

25   is a life sentence or the death penalty, not a

```
 1      term of years, it has to be intentional taking
 2      of a life plus some other aggravating factor.
 3      And I ran through about six different ways that
 4      we do that under Texas law.  Somebody murders a
 5      peace officer or fireman acting in the lawful
 6      discharge of an official duty and a person knows
 7      he is a peace officer or fireman, that is a
 8      capital murder offense.  If somebody commits
 9      murder for remuneration, promise of
10      remuneration, or employs another to commit a
11      murder for remuneration or the promise of
12      remuneration that is capital murder offense.  If
13      somebody commits murder while escaping or
14      attempting to escape from a penal institution,
15      that is a capital murder offense.  If somebody
16      while incarcerated in a penal institution
17      murders another person who is employed in the
18      operation of the penal institution, that is a
19      capital murder offense.  If someone
20      intentionally commits a murder in the course of
21      committing or attempting to commit another
22      felony, kidnapping, burglary, robbery,
23      aggravated sexual assault, or arson, that is a
24      capital murder offense.  That is the kind most
25      prospective jurors are most familiar with.  And
```

3591

1    the final category is where a person murders

2    more than one person in the same criminal

3    transaction, the multi murder situation.   We

4    know from my having read the indictment to you

5    that the allegation in this case is that the

6    defendant murdered more than one person in the

7    same criminal transaction.   So we have all those

8    different kinds of circumstances, murder plus

9    some other aggravating factor.   Are all those

10    kinds of offenses offenses which you think on

11    conviction should result in either a sentence of

12    life or the death penalty?

13        A.   Yes.

14        Q.   Did you understand the concept of

15    lesser included offenses we talked about briefly

16    with you yesterday where you might receive a

17    charge to the effect that if you do not believe

18    the State had proven the defendant's guilt

19    beyond a reasonable doubt of the primary

20    offense, for example, capital murder, you might

21    be asked to next consider whether what he did,

22    if anything, was a lesser included offense, for

23    example, murder, a first degree felony,

24    voluntary manslaughter, a second degree, or

25    involuntary manslaughter, stair-stepping down

1    through the felonies like that?

2         A.   Yes.

3         Q.   In any criminal case, if a jury finds

4    a defendant guilty, there is a second stage of

5    trial.  We will call it the penalty stage.

6    Additional evidence may be presented.  Each side

7    has the opportunity to call additional

8    witnesses.  They don't have to, they are not

9    required to, but they may.  And that is the

10   stage where you normally hear about a

11   defendant's background or reputation, prior bad

12   acts, previous criminal convictions if they

13   exist, those kind of things which most jurors

14   would think would be helpful in deciding what

15   the appropriate penalty should be.  In a capital

16   murder case, the jury has found a defendant

17   guilty of capital murder, we also have that

18   second stage of trial where each side has the

19   opportunity to call witnesses and present

20   additional evidence.  They don't have to but

21   they may.  They may even present what we refer

22   to as mitigating evidence.  We will talk about

23   that in a minute.  But you might hear perhaps

24   about a deprived background or drug dependency

25   or something like that.  Just in hypothetical

1    terms.  At any rate, you go back then and
2    reevaluate all the evidence you received in the
3    case in chief and the penalty stage and, instead
4    of voting for life or death, you have to answer
5    certain special issues, certain questions I
6    present to the jury.  Did you know that is how
7    the capital murder trial went in that order,
8    instead of voting for life or death, answering
9    these questions instead?
10           A.    I do now.  I mean, since yesterday.
11           Q.    Okay.
12           A.    But previous to that, no, I did not.
13           Q.    That is how it works.  And depending
14   on how you answer those questions determines
15   whether or not I assess life in prison or the
16   death penalty.  I am going to refer you over
17   here to the blackboard.  Number one question
18   would ask whether there is a probability that
19   the defendant would commit criminal acts of
20   violence that would constitute a continuing
21   threat to society.  This is the question where I
22   am asking the jury to make a determination of
23   the defendant's future dangerousness.  I would
24   instruct the jury that they are to consider all
25   the evidence admitted at the guilt or innocence

1    stage and the punishment stage, including any

2    evidence of the defendant's background or

3    character or the circumstances of the offense

4    that militate for or mitigate against the

5    imposition of the death penalty.  By

6    probability, in common usage, we mean more

7    likely to occur than not.  That term society,

8    the last word in that question, is a term which

9    is not going to be defined for you, but we know

10   that it includes all of society, including

11   society within the penitentiary.  Have you ever

12   thought about that before?  Having never seen

13   these questions, there is no reason you should

14   have.  Can you see how that would be

15   appropriate?

16        A.    Yeah, I can see how it would be

17   appropriate.  I don't necessarily agree with

18   it.    I mean, those are the rules.

19        Q.    You don't have to agree.  But in

20   answering special issue number one, while I

21   don't instruct you, I am telling you that the

22   society within the penitentiary is included

23   within that term.

24        A.    Yes.

25        Q.    Could you evaluate it that way?

3595

1      A.   Yes.

2      Q.   We ask you to answer that question yes

3  or no.   Takes all twelve jurors agreeing

4  unanimously to return a yes answer on issue

5  number one.   Ten or more can agree on a no

6  answer, in effect, there is no such

7  probability.   If the answer is no, that is the

8  end of it as far as the jury is concerned.   I

9  assess a life sentence.   If the answer is yes,

10 there is a probability the defendant would

11 commit criminal acts of violence constituting a

12 continuing threat to society, I ask the jury to

13 answer that issue number two.   In answering

14 number one, sometimes you have that information

15 about the background, reputation, those kind of

16 things before you.   Sometimes you don't.

17 Sometimes in a capital murder case all the jury

18 has to evaluate is the circumstances surrounding

19 the commission of the capital murder offense.

20 Do you see that in some capital murder cases the

21 circumstances surrounding the commission of the

22 offense could be so horrible that a jury could

23 find, based on that alone, there would be a

24 probability that defendant would commit criminal

25 acts of violence constituting a continuing

3596

1    threat to society?

2         A.    Yes.

3         Q.    If the jury has answered number one

4    yes, you proceed to number two, which is asking

5    whether, taking into consideration all the

6    evidence, including the circumstances of

7    offense, the defendant's character and

8    background and personal moral culpability of the

9    defendant, there is a sufficient mitigating

10   circumstance or circumstances to warrant that a

11   sentence of life imprisonment rather than a

12   death sentence be imposed.  I would instruct you

13   that you are to consider mitigating evidence to

14   be evidence you might regard as reducing a

15   defendant's moral blameworthiness.  Our statutes

16   do not set out for us, don't limit, give us any

17   definition of what exactly is mitigating

18   evidence.  They don't tell us what circumstances

19   of the offense, what the defendant's background

20   is mitigating.  The law does not impose any kind

21   of formula for determining how much weight to

22   give a mitigating circumstance in answering

23   issue number two.   We ask the jury to answer

24   that yes or no.  This time it takes all twelve

25   jurors agreeing unanimously to return a no

1    answer.  Takes ten or more to agree for a yes

2    answer to be returned.   A yes answer on number

3    two also results in the imposition of a life

4    sentence.  Only if number two is unanimously

5    answered no after a unanimous yes on number one

6    do I assess the death penalty.   A yes, no,

7    respectively, on one and two is the only way the

8    death penalty is imposed.  You have the right to

9    know that in advance exactly what I am going to

10   do.  You are insulated to some extent from

11   having to vote for life or death, but you get to

12   know exactly what I am going to do depending on

13   how you answer those two special issues.  While

14   we don't have a list of the kinds of things that

15   are mitigating, whether it's twenty items long

16   or twenty thousand items long, in the

17   appropriate case, we know certain things are

18   mitigating.   I do not know where you might get

19   mitigating evidence from.   Sometimes it's

20   something you have heard in the State's case in

21   chief.  You might have heard something through

22   one of their witnesses that you think is

23   mitigating circumstances.  Oftentimes the

24   defense calls witnesses in the second stage of

25   trial, and you might hear evidence at that time

3598

1    perhaps from family members or someone else
2    about some kind of deprived background, perhaps,
3    something you might consider to be mitigating.
4    Whatever it is, you determine how much weight to
5    give it.  We know that mental retardation and
6    mental illness are mitigating circumstances.  We
7    know that in the proper case mitigating evidence
8    can include such things as a defendant's good
9    behavior while in prison or in jail, an
10   exceptionally unhappy or unstable childhood,
11   childhood drug abuse, economic deprivation,
12   youth, a defendant's age, voluntary
13   intoxication, drug dependency, illiteracy,
14   opinion testimony of lay witnesses or
15   psychiatric opinion testimony that a defendant
16   would not be a danger in the future.  Those and
17   many more things in the proper case could be
18   mitigating circumstances.  Whatever it is, you
19   make the determination how much weight you are
20   going to give a circumstance.  One juror might
21   give something like drug dependency very small
22   amount of weight and somebody might give it a
23   great deal of weight.  Just depends on the jury
24   and how you weigh these different things you
25   might be hearing about.  At any rate, do you see

3599

1    how both number one and number two don't have

2    automatic answers, they are not automatically

3    yes or no, they are going to depend on the facts

4    and circumstances of each case you have to

5    evaluate?

6         A.   Yes, I understand.

7         Q.   I have to make sure you are not

8    predisposed to always answer a certain way

9    simply to insure that a death penalty results or

10   to insure that a life sentence results.

11              Is there anything about your views

12   regarding capital punishment or the death

13   penalty which would prevent or substantially

14   impair the performance of your duties as a juror

15   in accordance with the instructions I would give

16   you and your oath as a juror?

17        A.   No, I don't think so.

18              THE COURT:   Ms. Davis.

19

20

21

22

23

24

25

1                    EXAMINATION BY THE STATE

2      BY MS. DAVIES:

3           Q.    Hello again, Mr. Bratton.

4           A.    Hi.

5           Q.    I think I am understanding that what

6      you are telling the judge pretty clearly here,

7      combined with your questionnaire, that if I

8      brought you the evidence to convince you beyond

9      a reasonable doubt first that an individual is

10     guilty and then that those questions should be

11     answered yes and no that you could actually

12     participate in the verdict that was going to

13     result in the death penalty?

14          A.    Yes.

15          Q.    Has your attitude toward the death

16     penalty been an opinion you have held for a long

17     time, or has it changed at some point in your

18     life?

19          A.    I think I probably always had an

20     opinion.  It's probably stronger in the past

21     couple of years just because of the crime that

22     has developed over the past few years.

23          Q.    Okay.  At the same time, I think you

24     have an appreciation for the concept, I mean, we

25     are here, we have to be careful to protect the

                                                    3601

1    defendant's rights, we need a fair trial, both

2    sides of the table.  Of course that is why I am

3    very concerned to be sure you are a person that

4    if I bring you the evidence you could give the

5    death penalty.  But the defense, of course, has

6    the other concern.  So I want to be sure there,

7    too, that I am understanding that you are not

8    going to automatically always answer those

9    questions so as to result in the death penalty,

10   that it would just depend on the evidence in a

11   given case.

12        A.    That is true, it would depend on the

13   evidence.

14        Q.    Okay.  So, am I understanding that

15   sometimes those questions, sometimes the

16   questions might go my way, sometimes they might

17   go the defense's way, depending on the evidence?

18        A.    That is correct.

19        Q.    There were a couple of things that you

20   had expressed concern about.  And on your

21   questionnaire you said something about concern

22   about parole, early release.  And yesterday the

23   judge had told you, I think I did, too, that he

24   is going to instruct you that you can't consider

25   that in reaching your verdict.  Can you follow

3602

1    that instruction?

2         A.   I don't agree with it, but I can

3    follow it, yes.

4         Q.   And that is really what we are needing

5    to know here.

6         A.   Right.

7         Q.   There are a few things -- like the

8    judge went down most of that list of the things

9     -- the right to remain silent and so forth, but

10   there were a couple of other things that were

11   sensitive that we want to be sure that you could

12   follow the law if you are on the jury because

13   that is what your oath is.

14        A.   Right.

15        Q.   I had mentioned the possibility

16   whenever a defendant's statement is offered into

17   evidence there is a possibility of the judge

18   telling the jury that they would consider the

19   evidence and decide whether that statement was

20   voluntary.  And if they were not convinced that

21   it was voluntary, whether that may be because of

22   some blatent type of coercion or whether it may

23   be, for example, some rookie cop forgot to -- I

24   started to say cross his I's and dot his T's --

25   or maybe because he did cross his I's and dot

1    his T's -- it could be something that trivial.

2    If you weren't convinced it was voluntary, you

3    would have to disregard it, let the chips fall

4    where they may.  The most difficult scenario is

5    where if you have gone through that mental

6    exercise of concluding you have to disregard the

7    statement and there is not enough other

8    evidence, that you would have to actually find

9    somebody not guilty even though you have heard a

10   statement that convinced you in your heart that

11   they were.

12        A.    Yes, I understand.

13        Q.    So we need to be sure you could follow

14   that aspect of the law also.

15        A.    Yes, I could.

16        Q.    Thank you.   Were there any of the

17   things we talked about yesterday that you found

18   yourself in disagreement with, maybe you didn't

19   say anything but?

20        A.    Well, I mean, where a jury awards a

21   life sentence, and which I have already stated,

22   the right of the governor or whoever to release

23   that person early.  I don't agree with that.

24        Q.    Okay.   I think you have already said

25   you would not let that influence your verdict.

3604

1        A.    Right.

2        Q.    Fair enough.  Sometimes -- let me talk

3    about this, the phrase beyond a reasonable

4    doubt, you have heard us use that frequently.

5    Haven't really gotten into it in depth.  The

6    burden of proof is always on me.  That is true

7    at both stages of trial.  You can never require

8    the defense to produce any evidence whatsoever.

9    That is my responsibility.  They do have the

10   same subpoena power; they can bring evidence if

11   they choose to do so; but you must not require

12   that of them at either stage of trial.  I have

13   to convince the jury of guilt and then at

14   punishment the answer to that first question

15   beyond a reasonable doubt.  The instruction the

16   judge will give you about the standard of proof

17   makes clear that it is not beyond all doubt.

18   Because we are talking about the death penalty,

19   some jurors, their personal preference is they

20   require it.  I need to be sure that beyond a

21   reasonable doubt would satisfy you, that you

22   would not hold me to some higher burden.

23       A.    Yeah, I could do that.

24       Q.    We talked a little bit yesterday about

25   intent.  I suggested that one could form the

3605

1    intent to kill very quickly.  Do you have any

2    disagreement with that concept?

3         A.    No, I think you can.

4         Q.    One thing we didn't talk about was the

5    notion of self-defense.  And that is something

6    that comes up in just about any murder case, or

7    certainly the idea, the concept, whether

8    factually it does or not.  And the law

9    certainly includes that right of self-defense

10   within certain limitations.  I assume that you

11   would agree with that aspect of the law?

12        A.    Yes, I would.

13        Q.    Sometimes the idea gets a little

14   garbled, though, when we get into different fact

15   situations.  You probably hear examples of it on

16   the news on a daily basis.  Hypothetically

17   speaking, you could have a situation where

18   somebody is working late at night, they are in

19   the back office, didn't bother to lock the front

20   door, although there is a sign on the door that

21   says the office closes at 5:00 and this is

22   obviously well after five.  They are in the

23   back.  Burglar comes in, is going through the

24   drawers for petty cash.  Man in the back hears a

25   noise, grabs something heavy to protect himself

3606

1    because that is all he has at hand.   Say, for

2    whatever reason, there happens to be a baseball

3    bat laying around the office, grabs that to go

4    out to see what that noise is, confronts the

5    burglar, who proceeds to wrestle the baseball

6    bat out of the man's hands, beat him in the

7    head, kills him.   Comes trial time, burglar

8    claims:   Hey, it was self-defense, I had to

9    defend myself, that man came out with a baseball

10   bat.   What is your reaction to that?

11        A.   I think I would have a problem with

12   that.

13        Q.   Well--

14        A.   I mean, I think the guy is guilty.   I

15   mean, he entered a private residence, and I

16   don't think he has -- I wouldn't think he would

17   have much defense.

18        Q.   Well, and I would tend to agree with

19   you on that.   I think, you know, when I say he

20   claimed self-defense, a person can say anything

21   they want to.

22        A.   Right.

23        Q.   They can claim anything they want

24   to.   That doesn't mean they are legally

25   correct.   Because the law gives the right of

3607

1    self-defense to someone who is acting within the

2    law.   So, for starters, I would say the burglar

3    in that hypothetical is not acting lawfully, to

4    begin with.   So, the man who is working late

5    certainly has the right to defend himself in

6    those circumstances as long as the amount of

7    force that he uses is reasonable, the amount,

8    the degree that is immediately necessary, given

9    the situation.   And the further requirement of

10   the law of self-defense is that a person retreat

11   if a reasonable person would do so under the

12   circumstances.   My suggestion is in that kind of

13   situation the burglar is the one who should get

14   out of Dodge, not the person who is at home or

15   in their own office.

16         A.    Right.

17         Q.    I just wanted to be sure that you feel

18   like that a person does have the right to, I

19   mean, some people feel like if I was in a

20   situation like that I would hide under the

21   desk.   Others are braver and they would try to

22   protect themselves.   Do you feel like a person

23   has the right to fight for their life if they

24   are in that situation?

25         A.    If you are the burglar?

3608

1    Q.   No, really I was thinking in terms

2  of--

3    A.   Yes, I think a person has the right to

4  defend himself.

5    Q.   Okay.  Two stage trial.  The first

6  stage of trial, as a rule, the evidence, well,

7  always the evidence is limited to the facts

8  surrounding the capital murder itself.   Idea

9  being you stand trial for this offense, not for

10  past wrongdoings.   So that is all the evidence

11  the judge is going to let the jury hear at that

12  stage.  After they have heard the evidence,

13  heard the lawyers' arguments and the judge's

14  instructions, the jury deliberates, discusses

15  the evidence, confers with one another, reaches

16  a verdict.   It's only after the jury reaches a

17  verdict of guilty of capital murder that they

18  then return to the courtroom to hear evidence at

19  that second stage of trial and deal with those

20  other two questions.   Now, sometimes there is no

21  additional evidence.   Sometimes I would be

22  asking the jury to answer those questions to

23  result in the death penalty based just on the

24  facts of that particular capital murder.   Can

25  you see that there may be some capital murders

1    that are bad enough in and of themselves to

2    justify the result being the death penalty?

3        A.    Yes, I can.

4        Q.    Other times you would have other

5    background information.  Again, burden of proof

6    is always on me.  Never can look to them to

7    produce any evidence.  You could hear past

8    criminal history, or they might bring in good

9    stuff.  This was a good guy, goes to church, has

10    a job, he takes care of his family.  Or the

11    kinds of things that they refer to as

12    mitigating.  Maybe had a deprived childhood, an

13    abused childhood, mentally ill or mentally

14    retarded, a drug addiction, whatever.  At that

15    second stage of trial, the instruction is you

16    consider all the evidence, the facts of the

17    crime as well as anything that has been offered,

18    good, bad or indifferent.  Certainly including

19    the mitigating.   I think the important thing is

20    going to be for us to know that you would be the

21    kind of person who would keep an open mind and

22    would consider all the evidence, including the

23    mitigating.   Is it fair to assume that whatever

24    evidence is there, I mean, I don't, well, let me

25    start all over.

1          Certainly can't ask you how you would
2     weigh any particular kind of evidence at this
3     point.   I think you would have to have it in
4     context.   Does it seem fair to think that one
5     mitigating factor, say it's because somebody is
6     addicted to drugs, it may weigh differently for
7     you in different cases.   If somebody has
8     recently started using crack cocaine and is out,
9     you know, robbing to get the money for drugs and
10    robbing because they are on drugs, just an
11    endless cycle, that might be one scenario.   On
12    the other hand, in another situation you could
13    have evidence that this person has a terrible
14    drug addiction because their mother put LSD in
15    their bottles when they were a baby.   You know,
16    depending on the situation, sometimes it may
17    weigh very little; other times it may weigh a
18    lot.   The concern is just to be sure that you
19    would consider what was there and give it the
20    weight that you thought was appropriate in the
21    particular case.
22         A.   Yes, I think you would just have to
23    make a judgment, yes.
24         Q.   Considering all the evidence, the
25    offense as well as whatever else is introduced.

3611

1          When you look at that first question,

2     it talks about probability, not certainty but

3     probability.   At the same time, it is looking

4     to the future.   Some people feel like that that

5     is just crystal ball gazing, you could never be

6     sure enough to answer that question.   How do you

7     feel?

8          A.   I think it is probably guessing.

9     Really, I mean, I don't know, you just have to

10    look at the circumstances; but, you know, if he

11    has committed a crime once, a murder, I don't

12    really know, you know, without hearing the case,

13    whether, you know; but it doesn't seem like

14    that, I mean, it seems like he would be a, you

15    know, a threat to society.

16         Q.   Well, anytime that you address either

17    one of those questions you are in the position

18    of having found somebody guilty of capital

19    murder.   That is where you are.   That is why,

20    you know, it's like from my side of the table I

21    want to be sure that you read that question and

22    you say yes, I can see that there may be times

23    that it would be appropriate to answer that

24    question yes, given the evidence.

25         A.   Yes.

1          Q.   And on the other hand, I know that,

2     when Mr. Stafford or Ms. Kaiser talk to you,

3     they are going to want to be darn sure they

4     don't have somebody sitting on that jury who

5     automatically answers it yes just because

6     they've found guilty of capital murder.  They

7     are going to want an open-minded person who is

8     going to say yes or no depending on how that

9     evidence comes out at trial.

10         A.   I think I would say yes or no, but I

11    think it would really have to be -- I don't know

12    what it would be, but I think it would have to

13    be some pretty strong evidence to convince me

14    that he would not, that a person would still not

15    be a threat to society if in fact he had been, I

16    mean, we had convicted him of capital murder.  I

17    would try to be open-minded that -- yes, maybe

18    there are cases.  Frankly, I can't think of any

19    right now.

20         Q.   Well, and neither one of us are going

21    to put you on the spot to make you come up with

22    a particular one.  But, you know, there may be

23    that one situation out there or two or three

24    where somebody is guilty of capital murder and,

25    yet, you think no.  You know, well, for example,

3613

1    in the capital murder context, the judge used an

2    example, when we were talking about murder, of a

3    mercy killing.  I guess you could have a

4    situation where that was actually a capital

5    murder.

6          A.    Right.

7          Q.    You could have a situation where a

8    parent, say, has two children who were injured

9    in an automobile accident who have been lying on

10   life-support systems and their injuries, and

11   they have been there for months, the doctors are

12   telling them there is absolutely no hope of

13   recovery, and they are in pain and they can't

14   give them medication for pain, and a parent

15   finally can't stand it anymore, I have to put

16   these two kids out of their misery.    It's

17   intentional.

18         A.    Yeah.

19         Q.    It's more than one death.    It's

20   capital murder.    But?

21         A.    That would be an easy no for me.

22         Q.    Yeah.  You know.  And there could be

23   others.  You know, we all have pretty good

24   imaginations.  That is why, you know, we come up

25   with hypotheticals that are bizarre sometimes,

3614

1    but it's just to illustrate that in the universe
2    of fact situations we need to be sure that you
3    are not going to automatically answer that
4    question yes or no.
5         A.    Right.   I think I could do that.
6         Q.    Okay.   The judge touched on that term
7    society, and I want to touch it again.   It's not
8    a legal definition, but the law makes clear that
9    it includes all aspects of society.   I want to
10   be sure that you would keep an open mind in that
11   regard, too.
12        A.    Yes.
13        Q.    There are people in houses,
14   apartments, on the street, in prison, include
15   them all, not exclude anyone.
16        A.    Yes.
17        Q.    If a jury answers that first question
18   yes, then they would deal with the second
19   question.   And this is where basically you
20   reweigh the evidence, decide whether the
21   mitigating circumstances rise to the level of
22   indicating to you that this person deserves a
23   life sentence instead of the death penalty.
24   It's a weighing test.   And we talked about some
25   of the mitigating kind of factors a few minutes

1    ago.  The drug addiction might weigh differently

2    in different cases.  Would you also keep an open

3    mind to all of the mitigation that the defense

4    might bring, decide how to weigh it, once you

5    are in the jury room?

6         A.   Yes, I could.

7         Q.   In some situations might there be

8    mitigating evidence and even so you might not

9    think that it was sufficient to outweigh the

10   enormity of the crime so that you would answer

11   that question no?

12        A.   Yes, I think there are.

13        Q.   On the other hand, it may weigh--

14        A.   Right.

15        Q.   I know I am beating a dead horse

16   here.   I just want to be sure that you are not

17   going to answer those questions automatically

18   either way.

19             Do you have any questions for me?

20        A.   No.

21             MS. DAVIES:   Thanks.   I pass.

22

23

24

25

                                              3616

```
 1                 EXAMINATION BY THE DEFENSE
 2   BY MS. KAISER:
 3        Q.    Good afternoon.   We slid right from
 4   morning to afternoon.
 5        A.    Okay.
 6        Q.    My name is Deborah Kaiser.   And you
 7   and I haven't had a chance to speak at all.   I
 8   have been looking over your form.   How are you
 9   involved with Little League?
10        A.    I have a son that has played.   Of
11   course he is fifteen now.
12        Q.    He is not involved anymore?
13        A.    No, he played his last year this past
14   year.
15        Q.    Do you think you will still keep up
16   with it?
17        A.    No, probably not.   I am going to
18   retire.
19        Q.    I sponsored my nephew's team the last
20   several years and have gone from T-ball to the
21   minors to majors.   And how they develop is
22   really interesting.   And they tried to talk me
23   into being team mom.
24        A.    That is my wife's job.
25        Q.    That is a thankless job.   I saw, not
```

3617

1    being a real mom, I saw what the real moms go

2    through.   That is why they were trying to shove

3    it off on me.   I was too wise to rise to the

4    bait, though, I said absolutely not.

5              Exactly what is GH Bettis?

6         A.   GH stands for Galveston-Houston

7    Company.   They are a public company, holding

8    company, and they have three subsidiaries, and

9    GH Bettis is a subsidiary.   We manufacture

10   valve actuators.   It's just a device that

11   automates a value anywhere from a two inch valve

12   up to sixty inch diameter.

13        Q.   So the Bettis part of that subsidiary

14   is located in Waller?

15        A.   That's true, unfortunately.

16        Q.   You have drawn the black bean on that

17   one?

18        A.   Yeah.

19        Q.   You are the president of that

20   subsidiary?

21        A.   I am president of Bettis and I am also

22   an officer, senior vice-president in the

23   corporation, but I office at Waller.

24        Q.   Your wife is no longer a school

25   teacher?

                                              3618

1       A.    No, she retired.   She taught five

2   years right after we were married, and she just.

3       Q.    What level did she teach?

4       A.    Third grade.

5       Q.    Kingwood is a lovely area.   How long

6   have y'all lived up there?

7       A.    We have been there fourteen years.

8       Q.    You understand that now is the time

9   for you to be able to fully express your

10  opinions and say I understand that is what the

11  law is and I disagree with it, and you can

12  either say I disagree with it but I can follow

13  the law or I disagree with it and I am going to

14  sit tough with my convictions, I disagree, and

15  the judicial system is just going to have to

16  work its way without me.   That is your option at

17  this particular point in time.   So I don't want

18  you to feel like anybody is trying to narrow you

19  down or shove you into their corner.

20      A.    I understand.

21      Q.    In listening to your responses to both

22  the judge and to Ms. Davies, obviously I am a

23  little concerned because you seem to be an

24  extremely strong supporter of capital

25  punishment.   And probably, just like you

                                              3619

1    expressed, more so the last several years,
2    because of this crime wave that seems to have
3    overtaken us all, and I don't know that any of
4    us have gone untouched either by people we know
5    or family members or whatever, and that
6    certainly is not an unusual position nowadays or
7    an unusual reaction.
8              Do you read the newspaper fairly
9    regularly?
10        A.    Yes.
11        Q.    Are there times when you are reading
12   the newspaper or you are watching TV and, of
13   course, the reporters are always very concerned
14   about different capital murder trials that are
15   going on here in the courthouse, and,
16   unfortunately, there are always several going on
17   at the same time.  Do you recall anytime that
18   you might have heard, kind of followed a case
19   along to its conclusion and the jury convicts
20   the defendant of capital murder and then come
21   back and gives them a life sentence?  Do you
22   recall ever reading a story of that happening?
23        A.    Not--
24        Q.    I am not asking you to come up with
25   one out of your mind.

3620

1    A.   Not specifically.   I mean, I guess I

2  would have to answer yes in general.

3    Q.   Would you have a reaction if you had

4  read or heard that?  I mean, would your reaction

5  be:  What in the world!  My God, I remember the

6  facts of this, how in the world could they give

7  him life?

8    A.   I would say, yeah, I have had some

9  questions.  I mean, of course, you don't know

10 all the detail, but what you read in the

11 newspaper, sometime you really wonder, you know,

12 how someone could get a life sentence.

13    Q.   Would you think, that generally

14 speaking, once you had found someone guilty of

15 capital murder, once you had reached that point

16 where you had found that they had either killed

17 somebody in the course of sexually assaulting

18 them or killed two people in a criminal

19 transaction, once you had reached that point, do

20 you think that, because of your reactions and

21 your feelings and beliefs, you would be leaning

22 more towards favoring the death penalty for

23 punishment as opposed to a life sentence, or

24 would you just be right down the middle, or how

25 would you stand on something like that just

3621

1    heading into it?

2         A.   Heading into it, I would probably lean

3    toward capital punishment.

4         Q.   So my job as defense lawyer would be

5    to kind of pull you back around, to present

6    certain evidence to bring you back into the main

7    line or over into my part of the graph?

8         A.   That is correct.

9         Q.   So, to phrase it another way, you

10   might be a little predisposed toward capital

11   punishment heading in; but then, once you start

12   hearing the evidence, then you may be swayed a

13   different direction; but just going in, just

14   after having convicted someone of capital

15   murder, you are probably leaning a little bit

16   more toward the death penalty as an appropriate

17   punishment?

18        A.   That is correct.

19        Q.   Well, let's go a step further.   In

20   looking at issue number one, when you were

21   speaking with Ms. Davies about this and talking

22   about assessing the probability of whether or

23   not a person would commit criminal acts of

24   violence that would be a continuing threat to

25   society, what I think I heard you say -- and

3622

1    tell me if I am wrong -- was that, of course,
2    you had already found that they had committed
3    this capital murder, so that in itself in your
4    mind may have been a continuing threat to
5    society, and then you would kind of look to the
6    defense to give you evidence or information that
7    would make you think that they would not be a
8    threat to society?
9         A.    That is true.  You know, for instance,
10   in the example she gave, I think they would not
11   be.  And, I mean, there are instances, sure,
12   that they would not be a threat.    But I think
13   it's, I mean, if a person has been found guilty
14   of murder, I mean, that is a tough judgment to
15   make, to turn them back to society.  I mean,
16   that they won't be a threat to society at some
17   point.
18        Q.    So, once again, and because we get so
19   wrapped up in legal terminology and magic words
20   and everything, in approaching question number
21   one, once you found somebody guilty of
22   committing a capital murder, what I am hearing
23   you say is that you would be predisposed to
24   thinking that they would be a continuing threat
25   to society absent other evidence from the

3623

1  defense convincing you otherwise?

2       A.   I would say that is true.

3       Q.   The issue of parole is always a sticky

4  one because anybody that reads the papers or

5  watches the news or has half a brain, you can't

6  escape knowing or thinking that you know and

7  feeling like there are some severe inequities

8  that are going down with people only serving a

9  portion of their sentence.   As you have been

10 told, the issue of parole is not something that

11 a juror is to consider.  Now, granted, you can't

12 just flush your mind of whatever you might know

13 or think that you know, but you are not to give

14 it any effect or take it into consideration at

15 all in reaching your conclusion.   But say, for

16 instance, you had found somebody guilty of

17 capital murder, you were on the punishment stage

18 of the trial and had been given evidence by the

19 state and by the defense regarding the two

20 special issues and you were sitting back in the

21 jury room and considering your responses to

22 these special issues, and you were kind of on a

23 bubble because you were having a tugging both

24 directions I guess, it didn't seem extremely

25 clear cut to you, and could you put the issue of

1    -- my fear is that some people might look at

2    that and say:  Well, he might be okay with a

3    life sentence if I really thought he was going

4    to be in jail for life, but because I really

5    know what I know and what I have read in the

6    paper, I am going to go ahead and answer these

7    questions in a way that a death sentence would

8    result because I don't feel like he would

9    actually serve a life sentence in prison.   Do

10   you think it's a possibility that those type of

11   thoughts might be going on in the back of your

12   mind if you were in that particular position?

13        A.   Well, again, I don't agree with the

14   law, but I think I could make the judgment,

15   yeah, I think I could put it out of my mind.  I

16   think you just weigh the death penalty and the

17   life sentence.

18        Q.   So you could in a situation like that

19   go ahead and answer those questions in a manner

20   in which a life sentence would result even

21   though it was your fear that a life sentence

22   wouldn't be served, that wouldn't be a part of

23   your thought process at all?

24        A.   I don't think so, no.

25        Q.   If you were a criminal defense lawyer

1    and you were defending a fellow that had been
2    charged with capital murder and going through
3    the process like we are going through right now
4    and you were sitting here in this chair and
5    speaking with a fellow of similar beliefs and
6    like circumstances that you have, would you put
7    that person on the jury?
8         A.   Yeah.   I am a nice guy.
9         Q.   Nice has nothing to do with it.   If
10   you wanted to save your client's life and
11   knowing how you feel and your predisposition
12   toward certain things, once a person has been
13   convicted of capital murder, would you put a
14   person of similar thought processes on your
15   jury?
16        A.   I would say yes.   I mean, I think I
17   am a reasonable person and a reasonable
18   upstanding citizen that uses good judgment.
19   Yes.   In the first place, I don't want to be a
20   lawyer, okay.
21        Q.   Good.   Everybody else does.   When you
22   look at issue number two that deals with
23   mitigation evidence, let's just talk about
24   certain things.   What are your general thoughts
25   about drug addiction?   Can you ever foresee a

3626

1    case in a proper case that evidence of drug

2    addiction might be a mitigating factor for you,

3    given whatever weight you want to give it?

4         A.    I think I could where the addiction

5    that had probably developed up through, you

6    know, through the parents somehow.

7         Q.    So, if it began involuntary?

8         A.    Right.

9         Q.    But a voluntary --

10        A.    I think I would just have to consider

11   the circumstances.  I think it would be more

12   difficult if it had been a, you know, someone

13   had been on drugs continuously and had a chance

14   to get off.  I mean, it would be a more

15   difficult decision for me.  I think really it

16   would depend on the specific circumstances.

17        Q.    But outside of the situation where the

18   drug addiction began involuntary through the

19   mother putting LSD in the bottles or whatever

20   the hypothetical was, I would assume a very rare

21   situation.  We are probably looking at more of a

22   voluntary drug situation in 99.9.  And a

23   voluntary drug or alcohol abuse situation, in

24   those set of circumstances, in a proper case, do

25   you ever think you could consider that type of

3627

1      evidence as mitigating?

2          A.   I think there are cases, yes, that I

3      could, yes.

4          Q.   How do you feel about -- what is your

5      reaction about people committing crimes and then

6      saying, well, I don't know why I did that, and

7      then you hear evidence of an extremely abusive

8      childhood and things where they might have

9      received some type of an emotional or mental

10     flaw early on in their years that somehow

11     appears to have resulted in a life of crime

12     later down the road?  What is your immediate

13     reaction to hearing a story like that?

14         A.   Well, I agree.   I mean, I think that

15     happens in cases.

16         Q.   Is evidence of that nature in a proper

17     case something that you might be able to

18     consider mitigating?

19         A.   Yes.

20         Q.   Let me back up just one minute and we

21     will let you get out of here.   Back to issue

22     number one.  When we were talking about the

23     continuing threat to society.  I believe what

24     you have stated to me earlier is that by virtue

25     of the defendant having been found guilty of

                                              3,628

1    committing a capital murder, which is a

2    horrible, unexcusable deed, that in approaching

3    issue number one you would already have thought

4    that he would be a continuing threat to society

5    and it would be incumbent upon the defense to

6    bring you evidence or information or somehow

7    sway you back to the belief that he would not be

8    a threat to society, that life imprisonment

9    might be an appropriate punishment for him.

10   Have I stated your position correctly?

11          A.   Yes, I think so.

12          Q.   Do you feel pretty strongly about

13   that?

14          A.   Yes.

15          MS. KAISER:   Your Honor, I would like

16   to make a motion outside the presence of the

17   juror.

18          MS. DAVIES:   I am going to want to

19   have an opportunity to ask him some questions.

20          THE COURT:   I know.   You are making a

21   challenge?

22          MS. KAISER:   Yes.

23          THE COURT:   I want to ask you some

24   questions, too, about issue number one.   You

25   don't get to issue number one until the jury has

3629

1   already found someone guilty of capital murder
2   when you get those two special issues to answer.
3   We told you in the case in chief the burden of
4   proof is on the State to prove the defendant's
5   guilt beyond a reasonable doubt.  Issue number
6   two doesn't carry a burden on it.   If you read
7   it, there is no beyond a reasonable doubt
8   information in there.   Issue number one does.
9   The burden of proof is on the State in issue
10  number one.   I don't think anyone has explained
11  it in those terms to you.  But that first line
12  -- do you find from the evidence beyond a
13  reasonable doubt.  There are circumstances of
14  the offense, whatever it took for the jury to
15  find the defendant guilty of capital murder can
16  certainly be taken into consideration.  In fact,
17  I will instruct you specifically that you are to
18  take into consideration that information.  But I
19  need to know whether or not you think the answer
20  to number one is an automatic yes there is a
21  probability simply because you found somebody
22  guilty of a capital murder offense?
23       A.   It's not an automatic yes.
24       Q.   Do you see what I think is important
25  that issue number one begins as a no?  Do you

3630

1    find from the evidence beyond a reasonable doubt

2    there is a probability that the defendant would

3    commit criminal acts of violence that would

4    constitute a continuing threat to society.  The

5    answer to that issue is no until the State has

6    proven to your satisfaction beyond a reasonable

7    doubt that the answer should be yes.  Part of

8    that can be the case in chief, or all of it can

9    be in the proper set of circumstances.  Do you

10   see how that sometimes in some circumstances can

11   be answered no?

12        A.   Yes, I do.

13        Q.   Even though somebody is convicted of

14   capital murder, there might not be a probability

15   that defendant would commit criminal acts of

16   violence constituting a continuing threat to

17   society?

18        A.   That is correct.  I guess what I am

19   saying is I think I understand where it can be

20   no sometimes, and it would certainly depend on

21   the circumstances.  I can't think, I mean, there

22   are a few circumstances I can think of, I think

23   it just depends on the case.  But I think it can

24   be no sometimes.

25             THE COURT:   Ms. Davies.

3631

```
 1
 2                    EXAMINATION BY THE STATE
 3      BY MS. DAVIES:
 4           Q.    I think in a way what happens here,
 5      Mr. Bratton, typical lawyers, we play word
 6      games.    I think I am understanding what you are
 7      saying and that you and I understood each other,
 8      but some of the answers began to sound a little
 9      different as Ms. Kaiser was questioning you.
10      There are two things here, I think.    For most
11      laymen, I think you come in here expecting each
12      of us to try to persuade you of our point of
13      view.    And you are absolutely right.    That is
14      what we will do.    After the evidence is in and
15      the attorneys stand up and argue their case, we
16      are trying to persuade you.    I will try to
17      persuade you that the answer to that first
18      question should be yes.    And they will be
19      trying to persuade you that I have not brought
20      you enough evidence to justify that, that the
21      answer should be no.    But there is a difference
22      between trying to persuade you of something and
23      being required to produce evidence.    I am the
24      only one who can ever be required to produce
25      evidence.
```

3632

1      A.    Right.

2      Q.    And I think some of your answers,

3 because of the way the questions were worded,

4 sounded like you would require the defense to

5 produce evidence to convince you that the answer

6 to that first question should be no.  So that is

7 what we need to clarify.

8      A.    Well, I mean, if the evidence was

9 presented by the State that -- I think it would

10 depend on what that evidence is -- I could

11 answer no or yes.

12     Q.    You are not telling us that you would

13 require the defense to produce any evidence at

14 any point in the trial; are you?

15     A.    No.

16     Q.    I think I am hearing you say, that

17 depending on the evidence that is produced from

18 whatever side, that sometimes you would answer

19 that first question yes and sometimes no, just

20 depending on that evidence?

21     A.    That is correct.

22          MS. DAVIES:  I pass.

23

24

25

```
 1               EXAMINATION BY THE DEFENSE
 2    BY MS. KAISER:
 3         Q.   I don't want you to feel like a ping
 4    pong ball.   That is what you feel like right
 5    about now.   Because we are hearing different
 6    things, and lots of times we are accused of
 7    hearing what we want to hear.   I didn't mean to
 8    put any words in your mouth at all, and I didn't
 9    feel like I did.   My thought is still that what
10    you were saying and your feeling is that once
11    you have convicted and found a person guilty of
12    committing capital murder that your initial
13    approach to issue number one is that the answer
14    is yes that he is going to be a continuing
15    threat to society by virtue of the capital
16    murder that you have just found him guilty of
17    committing and that evidence may bring you off
18    of that yes but you are going to start out with
19    a yes and perhaps retreat.   But then, when you
20    just spoke with the judge and he said you
21    started out with a no, then you said something
22    different.   We just need -- there is no right
23    or wrong answer for you.
24         A.   Must be.
25         Q.   This is not a pop quiz.   You will not
```

3634

1    be given a grade when you leave the room.

2        A.    I understand.

3        Q.    I just need to know how you feel.

4        A.    Okay, the guy is convicted, you know,

5    of capital murder.  And there has got to be some

6    evidence presented by the State that sways me

7    one way, yes or no.  And I think there is

8    probably cases -- I can't think of any either

9    way.  Well, the one she presented, I guess,

10   there probably, depending on the evidence in the

11   case, you know, I think I can answer yes or

12   no.  But I think those circumstances, you know,

13   to get a no, are probably on the end of the

14   scale that she presented, that particular

15   example.  I don't know how to explain that any

16   better.

17       Q.    So it would be an extremely rare

18   circumstance?

19       A.    I think so, yes.

20       Q.    And that your predisposition, I guess,

21   would be to view the evidence and weigh it in a

22   manner in which you thought you would be

23   predisposed to thinking that the death penalty

24   might be more appropriate than a life sentence

25   except in a very rare circumstance?

3635

1        A.   Still, it depends on the evidence.  I
2   mean, I think that evidence has to be -- and I
3   don't know whether it's rare or not as far as
4   cases go, but I think it has to be along the
5   lines of what she presented.
6        Q.   But would you be able to start off--
7        A.   I would start off at zero.  The
8   evidence in the case and I think, you know, at
9   that point I am not yes or no, but I think you
10  look at the evidence and you answer yes or no.
11       Q.   Okay.  I believe earlier when we
12  talked you expressed the opinion to me, that
13  because of the various nature of all the crimes
14  that have been committed in the community in the
15  recent years and everything, that your view
16  toward the death penalty has become strengthened
17  recently and that, all things being equal, you
18  would be predisposed to thinking that a death
19  penalty would be more of an appropriate
20  punishment than a life sentence once you had
21  found somebody has been guilty of committing
22  capital murder?
23       A.   I didn't say that.
24            MS. DAVIES:  Your Honor, I have to
25  object to misstating Mr. Bratton.

3636

1        THE COURT:  He just said he didn't say

2   that.

3        A.   I said that -- I guess I think the --

4   I don't agree with the laws as they are.   I

5   think I can abide by them.   I think the

6   punishment should be much stronger than it is.

7   But the law is not that way, and I think I can

8   follow what the law is, is all I am saying.   If

9   I was making the rules, it might be different,

10  but I am not.

11        MS. KAISER:  I have no further

12  questions.

13        THE COURT:  Could you step outside

14  this door for just a minute, please?

15        (The prospective juror leaves the

16  courtroom).

17        THE COURT:  What says the State?

18        MS. DAVIES:  I don't think the State

19  gets to say anything.

20        THE COURT:  That is true.

21        MS. DAVIES:  I certainly will accept.

22        MS. KAISER:  For the record, since the

23  juror was in here, I wasn't allowed to fully

24  enunciate my motion for challenge, and I would

25  like to do that at this point.

3637

1          THE COURT:  We covered everything.

2          MS. KAISER:  We covered everything.  I

3     would like to be more specific.

4          THE COURT:  Go ahead.

5          MS. KAISER:  I challenge this juror

6     for cause because according to 35.16 (c) 2 he

7     has a bias or prejudice against the law in the

8     case to which the defendant is entitled, and

9     that, although he certainly waffled there toward

10    the end, he was very explicit in both his

11    answers to the prosecutor, which I made

12    notations from, which caused me to go back and

13    question him further, that on issue number one

14    the fact that he has found a person guilty of

15    capital murder he would come from the position

16    that they were, by virtue of that guilty

17    finding, a continuing threat to society, and

18    would require the defense to bring information

19    and evidence to him to convince him that somehow

20    they would not be a continuing threat to

21    society.  I realize that upon further

22    questioning he sat there and waffled around a

23    bit, but he said it several times when I was

24    talking to him and was very pointed in that

25    statement.  And I believe that particular

3638

1    situation causes this juror to be disqualified

2    for cause.

3            THE COURT:   Motion is denied.

4    Challenge overruled.   Whichever may be

5    appropriate.

6            Now what says the defense?

7            MS. KAISER:   The defense will strike

8    this juror.

9            THE COURT:   Prospective juror number

10   fifteen on panel number six, Mr. Todd Bratton,

11   is struck by the defense as a prospective

12   alternate on this jury.

13               ROBERT GUERRERO,

14   called as a prospective juror, was examined as

15   follows:

16            EXAMINATION BY THE COURT

17      Q.   This is prospective juror number

18   seventeen on panel number six, Mr. Robert

19   Guerrero.   Are you related, by any chance, to

20   Rubin Guerrero, the attorney?

21      A.   No.

22      Q.   You have had the same job the last two

23   and a half years?

24      A.   Correct.

25      Q.   Where did you work before that?

3639

1        A.    Johnston Pumps service center.   I was
2   there eight years with the company.
3        Q.    You have five children?
4        A.    That is correct.
5        Q.    You had three or four in diapers at
6   the same time; didn't you?
7        A.    Yes, sir.
8        Q.    The oldest one is self-employed doing
9   what?
10       A.    He is in the pharmaceutical sales.   I
11  don't know the name of the company.
12       Q.    What does Robert do?
13       A.    He is a truck driver for the company.
14  Delivery service.
15       Q.    And Michael at Continental?
16       A.    Yes.
17       Q.    What does he do?
18       A.    He works in ticketing, ticket agent.
19       Q.    And the two girls are married?
20       A.    That is correct.
21       Q.    About twenty years ago, you served on
22  a jury?
23       A.    As well as I can remember, it has been
24  about that long.
25       Q.    You say it was a robbery case?

1      A.    That is correct.

2      Q.    And y'all reached a verdict in the

3 case but you did not set the punishment?

4      A.    That is correct.

5      Q.    Your wife doesn't work outside the

6 home; right?

7      A.    Not at the present, sir.

8      Q.    Pages eight and nine of this

9 questionnaire ask you to look at statements and

10 either check the one which best summarizes your

11 views about capital punishment or asks you to

12 agree or disagree with the statement.  It

13 appears you think capital punishment is wrong;

14 you don't necessarily believe in it but you are

15 in favor of it as an appropriate penalty in some

16 cases; correct?

17     A.    That is correct.

18     Q.    When I am talking about a capital

19 offense I am talking about one for which on

20 conviction there are only two possible

21 punishments, either a life sentence or the death

22 penalty.  There is a statement that reads:  Any

23 person, man or woman, young or old, who commits

24 capital murder should pay with his own life.   I

25 want to see what you think about that or make

3641

1   sure you understand that if you convict somebody

2   of capital murder the death penalty is not

3   automatic in our system.  Do you think it should

4   be automatic?

5        A.   I think it should, Your Honor.  I

6   really do.  My personal convictions, I do.

7        Q.   Did you understand the method by which

8   we go about assessing punishment in a capital

9   murder case when I spoke to the jury the other

10  day?  We don't ask you to go back and vote for

11  life or death; we, instead, ask you to answer

12  certain questions.

13       A.   Correct.

14       Q.   It's going to depend on how you answer

15  those questions as to whether or not I assess

16  the death penalty.   Did you understand how that

17  worked pretty much, sir?

18       A.   Yes, I did.

19       Q.   We give you those two special issues

20  to answer, and we would say that the answers

21  aren't automatic, but we want to know if you are

22  so convinced that the death penalty should

23  automatically result in the capital murder case

24  that you would always answer those questions a

25  certain way to make sure a death penalty results

3642

1    instead of basing your answer on the facts and
2    circumstances of the individual case.
3         A.    Correct.
4         Q.    Which?
5         A.    Well, I do believe in the death
6    penalty if someone takes someone else's life.
7    If I may take the court's time just a little bit
8    because it happened in our family.
9         Q.    Okay, tell me a little bit about it.
10        A.    A member of our family was murdered,
11   and.
12        Q.    How long ago?
13        A.    It happened about twenty years ago.
14   And the gentleman was given lesser punishment.
15   I think they went for the death penalty, and he
16   was given lesser.  They use to call it murder
17   one or murder two.  The gentleman is out on the
18   street right now.
19        Q.    Who was this family member?
20        A.    First cousin of mine.
21        Q.    Where was he when he was killed?
22        A.    This happened on the north side area
23   of town.  He went to collect his money from a
24   job he had worked on, and the altercation
25   happened to come up, and the other guy pulled a

                                              3643

1   gun on him and killed him.

2       Q.   Did you go to the trial on that case?

3       A.   No, sir, I didn't go to the trial.

4       Q.   But you were close to this person who

5   was killed?

6       A.   Right.   My first cousin.

7       Q.   Well, that sounds like, what you have

8   described basically sounds like what we would

9   call first degree felony murder.

10      A.   Right.

11      Q.   Or simple murder or straight murder,

12  whatever you want to call it.   And the range of

13  punishment now -- of course, I don't exactly

14  know what year that occurred, I don't know what

15  penal code that might have been tried under, but

16  the range we have now is if somebody is

17  convicted of the first degree felony offense of

18  murder the range of punishment is by confinement

19  in the penitentiary for not less than five years

20  nor more than 99 years or life.   Do you happen

21  to know what the term was this man got who

22  killed your cousin?

23      A.   I think it was called a second degree.

24      Q.   I mean how many years he got?

25      A.   I think he got from five to twenty.

3644

1      Q.   You understand capital murder is
2    different from murder.  You have to have a
3    murder but you have to have something in
4    addition to make it capital murder, so we are
5    not looking at that range of punishment in terms
6    of years, we are looking at only two
7    possibilities, life or death?
8      A.   Right.
9      Q.   I had told the jurors about the
10   different ways in which a murder case is
11   elevated to capital murder.  There is a question
12   in the questionnaire or statement which says:
13   Capital punishment should be available as
14   punishment for more crimes than it is now.  Most
15   people do answer that not knowing all the
16   different circumstances for which capital
17   punishment is available presently, everything
18   from a police officer being killed in the line
19   of duty to a fireman, to murder for hire, murder
20   while somebody is committing another felony,
21   like kidnapping or rape or burglary or arson.
22   One of the ways we have is when people commit
23   more than one murder in the same transaction.
24   But we have all these different kinds of schemes
25   so that if anybody is convicted of one of those

3645

1    offenses as a capital murder offense the only

2    possibilities are a life sentence or a death

3    sentence.    We ask you to answer those questions

4    for me to assess punishment.    How you answer

5    those questions is going to determine what I

6    do.

7         A.    Right.

8         Q.    I want to know whether or not, if you

9    sat on a jury and if you happened to participate

10   in a guilty verdict of capital murder, if there

11   is the possibility out there that you are going

12   to be able to vote yes or no on either one of

13   these questions, depending on what the

14   circumstances are, or if you are always going to

15   answer a certain way, no matter what the

16   circumstances are, just to make sure that a

17   death penalty results?

18        A.    I agree with you.    I understand what

19   you are saying.    But there again you are right,

20   I would have to sit on the jury panel to find

21   out what the circumstances were where I could

22   really come up with an evaluation of the

23   judgment.

24        Q.    Do you think that there might be a

25   case out there the circumstances of which where

3646

1   you would be able to answer those special issues

2   in such a way that the death penalty didn't

3   result?

4        A.   It's a possibility.

5        Q.   All right.   Let's talk about some of

6   the general concepts I talked to you about

7   yesterday.   Presumption of innocence.   A

8   defendant is presumed innocent.   This defendant

9   or no defendant is a little bit guilty when they

10  sit in the courtroom.   They are presumed

11  innocent.   Do you agree with that, sir?

12       A.   Yes, I do.

13       Q.   The State has the burden of proof.

14  Their burden is to prove the defendant's guilt

15  beyond a reasonable doubt.   Do you agree with

16  that, sir?

17       A.   Yes, I do.

18       Q.   The indictment in a case is no

19  evidence of guilt whatsoever.   Do you agree?

20       A.   I agree with that.

21       Q.   If a defendant does not take the stand

22  and testify in his own behalf you cannot

23  consider that as any evidence of guilt

24  whatsoever.

25       A.   No, I won't, Your Honor.

1    Q.    You agree with me then?

2    A.    Right.

3    Q.    We talked about those different ways

4  of committing the offense of capital murder.

5  We talked about how if you convict somebody of

6  capital murder the only possible punishments are

7  life or death.  There are two steps in the

8  process.  You never got to that in that case

9  that you sat on twenty years or so ago, but if

10  somebody is found guilty there is a second stage

11  of trial where the jury gets to hear some

12  additional information.  They may be able to

13  hear some additional information.  Each side has

14  the opportunity to go forward.  They are not

15  required to, but they have the opportunity to

16  call additional witnesses, to present additional

17  evidence, present some witness who might have

18  mitigating evidence about a defendant, something

19  that you think should weigh in his favor perhaps

20  in deciding life versus death when you're

21  answering those special issues.  After that

22  stage has ended, I send you back and ask you to

23  answer these two questions, you and the other

24  members of the jury.   That first question -- I

25  will refer you over there to the board to take a

3648

1    look at it -- asks whether there is a
2    probability that the defendant would commit
3    criminal acts of violence that would constitute
4    a continuing threat to society.  In this issue
5    we are asking the jury to make a determination
6    as to a defendant's future dangerousness.  I
7    would instruct you that you are to consider all
8    the evidence admitted at the guilt or innocence
9    stage and at the punishment stage, including
10   evidence of the defendant's background or
11   character or the circumstances of the offense
12   that militate for or mitigate against the
13   imposition of the death penalty.  By
14   probability, in common usage, that word we would
15   say means more likely to occur than not.  That
16   last word, society, is a term which is going to
17   go undefined.  There will not be a definition of
18   the word society in the Court's Charge, but we
19   know that society includes all of society,
20   includes people in the penitentiary as well as
21   people out of the penitentiary.
22        A.    Correct.
23        Q.    Can you see that, sir?
24        A.    Right.
25        Q.    We ask the jury to answer special

1      issue number one yes or no.   It takes all

2      twelve jurors agreeing unanimously to return a

3      yes answer.   Ten or more can agree to return a

4      no answer.  If the jury answers that no, I

5      assess life imprisonment.  If the jury answers

6      it yes, then I ask them to take a look at issue

7      number two.

8              Now, as to issue number one, first of

9      all, you realize you have already found somebody

10     guilty of the offense of capital murder?

11         A.   Right.

12         Q.   And then you have to take a look at

13     that special issue and decide whether or not the

14     State has proven to you beyond a reasonable

15     doubt that there is a probability that defendant

16     is going to commit criminal acts of violence

17     constituting a continuing threat to society.

18              Do you see how in some circumstances

19     that question can be answered no?

20         A.   Certainly.

21         Q.   Okay.  And in some circumstances it

22     can be answered yes?

23         A.   Right.

24         Q.   Just depends on the individual case?

25         A.   Correct.

3650

1    Q.  If the jury has answered number one
2    yes, you proceed to number two.  Number two asks
3    whether, taking into consideration all the
4    evidence, including the circumstances of the
5    offense, the character and background of the
6    defendant and the personal moral culpability of
7    the defendant, there is a sufficient mitigating
8    circumstance or circumstances to warrant that a
9    sentence of life imprisonment rather than a
10   death sentence be imposed.  I would instruct you
11   that you are to consider mitigating evidence to
12   be evidence you might regard as reducing a
13   defendant's moral blameworthiness.  You have to
14   answer that one yes or no also.  If all twelve
15   jurors answer that no unanimously after a
16   unanimous yes on number one, I assess the death
17   penalty.  If the jurors, ten or more of them,
18   agree on yes answer to number two, I assess life
19   imprisonment.  So you get to know in advance
20   that if you answer no on number one or a yes on
21   number one and yes on number two I assess a life
22   imprisonment sentence.  If you answer yes on
23   number one and no on number two I assess the
24   death penalty.
25        A.   Okay.

1    Q.    Do you see how number two can

2  sometimes be answered yes and sometimes be

3  answered no?

4    A.    Right.

5    Q.    Each one of these answers, how the

6  jury goes about evaluating those special issues

7  and the answering is going to depend on what you

8  have before you, what kind of evidence you have

9  in front of you.    Do you agree?

10    A.    Yes, sir.

11    Q.    Our statutes don't tell us, they don't

12  define for us what mitigating circumstances are,

13  they don't limit them, they don't limit the

14  aspects of a defendant's character or reputation

15  or the circumstances of the offense that are

16  mitigating.    And our law doesn't set out any

17  kind of formula for the jurors to determine how

18  much weight to give a mitigating circumstance.

19  It's left up to the jurors.    I don't know what,

20  if anything, might be presented in this case.

21  We don't have a list of twenty different kinds

22  of things that might be mitigating or twenty

23  thousand different kinds of things.    There may

24  be a whole lot of things that are mitigating or

25  different jurors would see as mitigating.

3652

1    Whatever it is, you make your own determination
2    as to how much weight to give it in answering
3    number two.  We know that mental retardation and
4    mental illness are mitigating circumstances, for
5    example.  We know that in the proper case
6    mitigating evidence can include such things as
7    the defendant's good behavior in prison or in
8    jail; it can include an exceptionally unhappy or
9    unstable childhood; childhood drug abuse or
10   economic deprivation, youth, a defendant's age,
11   voluntary intoxication, drug dependency,
12   illiteracy, opinion testimony of lay witnesses
13   or psychiatric opinion testimony that a
14   defendant would not be a danger in the future.
15   All those kinds of things in the proper case can
16   be mitigating.  Those and perhaps many, many
17   more.  From whatever it is you hear at either
18   the first stage of trial or in the penalty stage
19   of trial, you have to evaluate that evidence.
20   You decide how much weight to give a mitigating
21   circumstance.  You might hear evidence about
22   somebody's drug dependency and think that
23   deserves a whole lot of weight.  Or you might
24   hear evidence from some psychiatrist that a
25   defendant would not be a danger in the future

3653

1   and decide not to give it much weight.  It's up

2   to you to decide.

3        A.   Right.

4        Q.   You do see how that could be answered

5   yes under some circumstances and no in others?

6        A.   Yes, sir.

7        Q.   We need to make sure that you are not

8   going to automatically answer these one way or

9   the other, that you are going to wait, evaluate

10  the evidence and then make a determination and

11  realize that there is some situation out there

12  where you know you would be able to answer that

13  either way depending on the facts.

14       A.   Right.

15       Q.   That is why I was questioning you so

16  much on the death penalty earlier because, even

17  though you had checked the box that says you are

18  strongly in favor of capital punishment, you see

19  it's not an automatic kind of thing in a capital

20  murder case?

21       A.   Right.

22       Q.   You have to answer those special

23  issues.

24       A.   Right.

25       Q.   On number one, the State has to prove

3654

1    to your satisfaction that that defendant does

2    have a probability of committing criminal acts

3    of violence constituting a continuing threat to

4    society.   Do you see that, sir, and agree with

5    it?

6         A.   Right.

7         Q.   Is there anything about your views

8    regarding capital punishment or the death

9    penalty which would substantially impair or

10   prevent the performance of your duties as a

11   juror in accordance with the instructions I

12   would give you and your oath as a juror?

13        A.   No, none at all.

14             THE COURT:   Ms. Davies.

15                EXAMINATION BY THE STATE

16   BY MS. DAVIES:

17        Q.   Hello, Mr. Guerrero.

18        A.   Good afternoon.

19        Q.   I want to talk to you a little bit

20   more, hear a little bit more about your

21   attitudes and your beliefs.   You know, we talk

22   a lot about a fair trial.   The judge has gone

23   over that list of constitutional rights that the

24   defendant has.   And it's very important to all

25   of us to be sure that his rights are protected

1    so it's a proper trial and it's a fair trial.

2    He doesn't have a right to a juror without

3    strong feelings, you know.  We all come to the

4    courtroom, all jurors do, with their own

5    personal experiences and attitudes.  But he

6    certainly does have a right to a jury that will

7    follow the law and respect his constitutional

8    rights.  So we want to be sure that you are able

9    to do that.

10         A.    Yes.

11         Q.    I didn't mean to cut you off.

12         A.    No, that's fine.

13         Q.    You know, we talk about fairness.  As

14   far as I am concerned, it has to be fair to both

15   sides of the table, too.  The State deserves a

16   fair trial.

17         A.    Right.

18         Q.    And, so, it's kind of like bounce back

19   and forth because I know that some of the

20   things, if I don't ask you about it, when Mr.

21   Stafford gets a chance, or Ms. Kaiser, whichever

22   one is going to talk to you, when they talk to

23   you they will be concerned about some of these

24   things.

25         A.    Certainly.

1          Q.    For example, you have mentioned this

2     experience in your family, having the tragedy of

3     having a close relative killed.   That is

4     something that you will have with you always.   I

5     am sure you have very strong feelings about it.

6          A.    Right.

7          Q.    Certainly this defendant didn't have

8     anything to do with his death.

9          A.    Correct.

10         Q.    Can we be sure that you are not going

11    to hold that experience against this defendant?

12         A.    If I am picked as a juror, I certainly

13    would not.   I would try my best to do the job

14    as honest as I can come up with.

15         Q.    Okay.   That is all anybody could ask

16    of you.

17         A.    Correct.

18         Q.    But I am sure you can see why the

19    defense would be concerned about that.

20         A.    I certainly can.

21         Q.    Before we get into talking about some

22    of these issues and all, I know some of the

23    things we talked about yesterday are touchy

24    subjects for some people, and you mentioned this

25    person who killed your cousin is out on the

3657

1   street.  Several people have expressed concern
2   yesterday about early parole.
3       A.   Correct.
4       Q.   And you know from Judge Wilkinson that
5   he is going to instruct this jury that you
6   cannot consider when someone might be parolled
7   in reaching a verdict, a sentence in a case.
8       A.   Correct.
9       Q.   Can you assure us that you can follow
10  the judge's instruction in that regard?
11      A.   If I am picked as a juror, I certainly
12  can.
13      Q.   Okay.  You might disagree with the way
14  things work right now, but you still can follow
15  the instruction?
16      A.   Well, I would do my best to serve as
17  honestly as, well, see the presentation of the
18  crime.
19      Q.   In other words, base your sentence on
20  the evidence you have heard?
21      A.   On the evidence I heard.
22      Q.   Not on some idea of when this person
23  might get out of prison if you gave him a life
24  sentence?
25      A.   Well, yes.

3658

1    Q.   Does that sound right to you?

2    A.   Right.

3    Q.   Okay.  I guess one of the other things

4    that we talked about yesterday that probably is

5    a little difficult for some people.  I had told

6    you about how in some instances I might offer a

7    defendant's statement.  And the judge would tell

8    the jury that they would have to decide whether

9    it was a voluntary statement.  And they have to

10   be convinced that it was voluntary to consider

11   it as evidence.  If they are not convinced that

12   it's voluntary, they would have to literally

13   throw that evidence out.   It wouldn't make any

14   difference whether it failed the test of

15   voluntariness, whether it was because some

16   officer had really gone out of bounds and abused

17   and mistreated a prisoner or whether it was

18   because they just didn't dot their I's and cross

19   their T's, didn't follow every little step.

20   A.   Right.

21   Q.   The consequence is that if you as a

22   juror were not satisfied that it was voluntary

23   and you decided you had to disregard that

24   evidence you would have to just look at the

25   other evidence.  It's a tough situation.  If you

3659

1    look and there is no other evidence and you

2    might be in the position of having to find

3    somebody not guilty even though you heard and

4    read a statement that convinces you they did the

5    crime.  That is a tough one for some people, but

6    that, too, is a part of the instruction the

7    judge is going to give you.  Can you follow

8    that aspect?

9        A.   Yes.

10       Q.   Okay.  I think you have made clear

11   that you believe the death penalty is necessary

12   in some cases?

13       A.   Yes, I do.

14       Q.   If I bring you the evidence that

15   convinces you that it's right, you are convinced

16   beyond a reasonable doubt, can you actually

17   participate in a verdict that would result in

18   the death penalty?

19       A.   Yes, I could.

20       Q.   Sometimes the only evidence you have

21   is the evidence surrounding a capital murder

22   offense, in other words, no background

23   information, just the crime itself.  Can you see

24   that sometimes the offense alone would be enough

25   to justify the death penalty?

1          A.    Yes, I could.

2          Q.    Other times you might have more?

3          A.    Right.

4          Q.    But not always.  We keep hearing the

5    phrase as we talk, beyond a reasonable doubt.

6    Judge is going to give you a definition, an

7    instruction in that regard.  It makes clear that

8    beyond a reasonable doubt does not mean beyond

9    all doubt.  However, some people disagree with

10   that.  Some people feel like when we are talking

11   capital murder, we are talking about the death

12   penalty, that they would have to have more than

13   beyond a reasonable doubt.  I need to know how

14   you feel.

15         A.    Well, with the evidence presented,

16   with all reasonable doubt, I could vote for the

17   death penalty where the evidence was presented

18   to the jury.

19         Q.    If I convince you beyond a reasonable

20   doubt?

21         A.    Correct.

22         Q.    One of the things talked about

23   yesterday was intent because I have to prove

24   beyond a reasonable doubt that there were two

25   intentional murders committed.  That is what

1    makes up the capital murder in this case, the

2    intentional murder of Charles and Bradley Dean

3    Allen.   I suggested that the intent to kill can

4    be formed very quickly.   Do you have any

5    disagreement with that?

6        A.    No, I don't.

7        Q.    We didn't talk about self-defense.

8    And that is something that comes up in most any

9    murder case.   Do you feel like that each of us

10   have the right to defend ourselves and our

11   family?

12       A.    Yes, I do.

13       Q.    The law certainly agrees with that.

14   You do have.   There are limitations.   You can

15   only use that degree of force that is

16   immediately necessary in the circumstances.

17   And you have to be acting lawfully.   You have to

18   be responding to unlawful force.   The other

19   requirement is that a person retreat if they can

20   reasonably do so or if a reasonable person would

21   do so in the circumstances.   I know we all hear

22   situations where somebody is in the middle of

23   committing a robbery or a burglary and the

24   person, say, that they are robbing tries to

25   defend themselves, and the robber turns it

3662

1   around and says:  Oh, well, I shot him because I

2   had to protect myself.  How do you feel when you

3   hear things like that in the news?

4        A.   Well, you hear so much of that

5   nowadays, you see it constantly in the news, the

6   news media.  I really feel that they are taking

7   the privilege of the citizen away from them when

8   robbery is committed, murder is committed, that

9   they should be punished.  Again, that is my

10  personal opinion.  Like you say, it can happen

11  to anybody nowadays.

12       Q.   Well, it's kind of a distortion of the

13  notion of self-defense because, at least the way

14  I understand the law, the burglar or the robber,

15  the one who is breaking the law, doesn't have

16  the right to self-defense.  He is acting

17  unlawfully to begin with.  It's the victim who

18  has the right to defend themselves.

19       A.   Right.

20       Q.   Now, that might be the kind of thing

21  that somebody might consider mitigating.  Say,

22  well, you know, I shot him because of something

23  they did.  Maybe, maybe not.  In a trial -- I

24  think you said you have never served on a jury

25  before; am I right?

3663

1   A. Yes, I did serve on a jury.

2   Q. You did.  As soon as I said that, I

3 knew I was wrong.  Was there anything about that

4 that bothered you?  Were you pleased with the

5 outcome?

6   A. Well, I think later we found out that

7 he was -- the reason they didn't sentence him

8 because he was up for other trials besides the

9 one he was being tried for at that particular

10 time that I was on the jury.

11   Q. Okay.  So the judge did the

12 punishment?

13   A. I guess so.  Then we were told by the

14 district attorney that he had other trials.  He

15 was charged with other charges besides the

16 robbery charge.

17   Q. Okay.  So, what?

18   A. We did find him guilty of that

19 particular.

20   Q. So you don't really know what the

21 sentence turned out to be?

22   A. No.

23   Q. Well, so, you didn't do the two stages

24 of trial?

25   A. No.

3664

1        Q.    You just did the first part.  And the

2   first part of this trial will be similar if you

3   remember how that went.    You hear the evidence

4   only about the offense, not about any past

5   history.

6        A.    Correct.

7        Q.    Because that is basically not fair.

8   You should be put on trial for did he do this

9   trial.    You hear all the evidence, the

10  attorneys will argue, the judge gives the

11  instruction and then the jury goes back to

12  deliberate.  Did y'all reach a quick verdict in

13  that case?

14       A.    Well, as I recall, it probably took

15  about an hour.

16       Q.    Okay.    That is pretty quick,

17  actually.    You know, nobody ever expects an

18  instantaneous verdict.   Deliberate means just

19  that, the jury is going to go back there, talk

20  to one another, think about it, consider the

21  evidence and collectively reach a decision.

22  It's only after the jury has reached a unanimous

23  verdict of guilty of capital murder that you

24  move then into the second stage of trial.  As I

25  already said, sometimes there is no additional

1    evidence.  Sometimes I would be asking the jury
2    to answer those questions yes, no to result in
3    the death penalty based just on the facts of the
4    crime itself.  Other times there would be
5    additional evidence.  Now, the burden of proof
6    is always on the State even at that second stage
7    of trial.  You know, you may assume that as a
8    rule mitigating type evidence is going to come
9    from the defense.  And it may.  They can bring
10   evidence if they want to, they have the same
11   subpoena power as the State, but you can't ever
12   require them to produce any evidence.  Does that
13   sound fair?
14        A.    Right.
15        Q.    I have got to prove the case.   I have
16   to convince you first of guilt, then at the
17   second stage I have to convince you that that
18   question about future dangerousness should be
19   answered yes.   The defense doesn't have to
20   prove or introduce evidence of any kind.  Now,
21   when the lawyers get to argue, they will try to
22   persuade you one way or the other, just like I
23   will; but it always is only the State that has
24   to bring forward any evidence.  Sometimes even
25   in the evidence I bring there may be something

```
 1    that you think of as mitigating.  You know, I
 2    put on my case, and as my victim or witnesses
 3    describe what happened you might find out that
 4    the defendant is very young.  It's even
 5    conceivable that you could find out that the
 6    defendant had an abused childhood.  Say if I
 7    was putting on evidence in a case that involved
 8    a rape and murder, there might be a witness who
 9    was hiding and heard the whole thing and heard
10    them tell them I am going to beat you, I am
11    going to burn you like my mommy used to do to
12    me, you know, the defense didn't bring it out,
13    it just happened to come out in the State's
14    case.   And it might be background information
15    that you might consider mitigating.  I am just
16    using that as an example to illustrate.
17    Conceivably, mitigation can come from the state
18    or from the defense.  At any rate, wherever the
19    evidence comes from, at that second stage of
20    trial you still will look at the evidence of the
21    facts surrounding the crime, plus any background
22    information.   There could be background
23    information about past criminal history or good
24    history, church-goer, hardworker, family man,
25    that kind of thing.  You consider it all.   Can
```

3667

1    you keep an open mind and consider any and all

2    of the evidence that is presented to you?

3          A.    Yes, I could.

4          Q.    What kind of weight you give it is up

5    to you, little or great.    Just consider it all.

6          A.    Correct.

7          Q.    You first look at question number one

8    that talks about probability of future

9    dangerousness.    And this is the one I have got

10   to produce the evidence and I have got to

11   convince you beyond a reasonable doubt that

12   there is a probability that the defendant would

13   commit criminal acts of violence that would

14   constitute a continuing threat to society.    Do

15   you feel like that question can be answered yes?

16         A.    Yes.

17         Q.    Given the proper information?

18         A.    That is correct.

19         Q.    You are not ever going to be

20   absolutely certain about what somebody is going

21   to do in the future.    That talks about

22   probability.  Do you think that is appropriate?

23         A.    I think so.

24         Q.    Talks about probably going to commit

25   criminal acts of violence.    Doesn't say murder

1    but criminal acts of violence.  Do you feel like

2    there may be some acts of violence or criminal

3    acts that would constitute a continuing threat

4    to society short of murder?

5         A.    Certainly.

6         Q.    And the concern there is whether there

7    is a threat to society.  It uses the word

8    society.  Most of us haven't given much thought

9    to what that word means.  The judge has already

10   told you that here in the courtroom it includes

11   prison.  That doesn't mean it's limited to

12   prison, of course.  It includes everybody.  You

13   know, some people live in houses, some in

14   apartments.  These days we see people living on

15   the street, and there are some people living

16   behind prison walls.

17        A.    Correct.

18        Q.    We don't want you to exclude

19   anybody.  Can you assure us that you would

20   consider all aspects of society?

21        A.    Yes, I could.

22        Q.    If you should answer that question yes

23   -- well, let me back up and ask it this way.

24   Can you see that sometimes you might answer that

25   question yes and sometimes you might answer it

1    no, depending on the evidence?

2         A.    That is correct.

3         Q.    You are not going to automatically

4    answer either way?

5         A.    No, I wouldn't automatic, no.

6         Q.    Do you feel like you are predisposed

7    or inclined to look for a way to try to

8    manipulate your answers to get the result?

9         A.    No, I wouldn't do that.

10        Q.    You are just going to look at the

11   evidence?

12        A.    I am going to look at the evidence,

13   definitely.

14        Q.    If I bring you the evidence that

15   convinces you that the answer should be yes and

16   that is one step on the way to the death

17   penalty, can you do that?

18        A.    Yes, I could.

19        Q.    If the twelve jurors agree and answer

20   that question yes, then you would look at the

21   second question.  And that is the one that talks

22   more about mitigation.  It's a very wordy

23   question.  Basically I think what it is telling

24   you is look again at all the evidence, keep in

25   mind the facts of the offense but don't forget

3670

1    any mitigation that is in there, and you decide

2    whether there is sufficient mitigation that this

3    person deserves a life sentence instead of the

4    death penalty.  If you think there is sufficient

5    mitigation, you answer it yes, and he gets a

6    life sentence.  If you don't think the

7    mitigation is sufficient, you answer it no.

8          A.    Correct.

9          Q.    And the result is the death penalty.

10   Can you see yourself answering it either way

11   just depending on the evidence?

12         A.    I would have to weigh it on the

13   evidence, definitely.

14         Q.    What is mitigating is something that

15   nobody is going to try to give you a limiting

16   list.  You might be able to think of twenty

17   things that to you are mitigating that I would

18   never have dreamed of, and I may be able to

19   think of something you wouldn't have thought of.

20         A.    Correct.

21         Q.    I think the important thing is, you

22   know, whether it's retardation or abused

23   childhood or because someone is addicted to

24   drugs or whatever, the important thing is can

25   you keep an open mind and consider anything as

3671

1   mitigating if within the facts of this

2   particular case you thought it was?  I didn't

3   word that very well.  It got long.

4        A.   If I answer yes to issue number one,

5   if I was presented all the evidence, and we had

6   to mitigate on like you are talking about

7   bringing up something before that, I made up my

8   personal mind about it, I don't think I could be

9   persuaded either way then if I had all the

10  evidence present.

11       Q.   Okay, I am not sure that I am

12  understanding.

13       A.   Well--.

14       Q.   If you answered issue number one,

15  let's assume that you have answered it yes.

16  You think this person is a continuing threat

17  because you don't even look at number two--

18       A.   Right.

19       Q.   -- unless you have decided, yes, the

20  person is a continuing threat.  So, when you

21  look at issue number two, you have already

22  decided the person is guilty of capital murder.

23  And you have decided, yes, they are a continuing

24  threat to society.  This is like, you know, a

25  fail-safe.  Look at it again, now don't forget

1    to look at the mitigation, weigh it, decide is

2    it sufficient.

3         A.    Correct.

4         Q.    That the person deserves life instead

5    of death.   Okay.   Now, what are you telling me

6    here?  At first I thought I heard you say you

7    would answer it yes or no, depending on the

8    evidence.

9         A.    That is what I meant.

10        Q.    Okay.

11        A.    We go back.   You said you will send

12   us back again to mitigate, to weigh the first

13   one?

14        Q.    No.   You are going to go back in the

15   jury room -- after you have found him guilty,

16   you are going to come out and hear more evidence

17   at the second stage of trial.   Then, when you go

18   back into the jury room the second time to

19   deliberate, to decide on the sentence, you will

20   look at the evidence, answer question number

21   one, you are still back there in the jury room,

22   look at the evidence again and answer question

23   number two.   Okay?

24        A.    Right.

25        Q.    And I just want to be sure I am

1    understanding you to say that your answer to

2    question number two could be yes or no just

3    depending on whether you think there is

4    sufficient mitigation or not?

5        A.   That is correct.

6        Q.   Sometimes there may be, sometimes

7    there may not.

8        A.   That is correct.

9        Q.   No automatic answers either way?

10       A.   No.

11       Q.   And, yet, at the same time, I want to

12    be sure, if you think there is not sufficient,

13    can you answer that no, knowing the result is

14    going to be the death penalty?

15       A.   That is correct.

16       Q.   Do you have any questions for me?

17       A.   Oh, no.

18           MS. DAVIES:  Thank you.  Pass.

19

20

21

22

23

24

25

1                EXAMINATION BY THE DEFENSE

2       BY MS. KAISER:

3            Q.   Afternoon, Mr. Guerrero.  How are you?

4            A.   Good afternoon.

5            Q.   Initially when you were speaking with

6       the judge -- and I know that it was all new

7       subject matter to you and you are learning as

8       you go along -- you indicated that what sounded

9       to me like a pretty strong belief, that once a

10      person is convicted of having committed capital

11      murder, that the death penalty ought to be

12      pretty close to automatic.  Do you still feel

13      that way?

14           A.   Yes, that is my deep personal opinion.

15           Q.   Okay.  And although I am sure you

16      gathered by the questions that the judge has

17      posed to you and Ms. Davies has posed to you

18      that our law provides a selection of penalty,

19      it's not an automatic thing, it's either life

20      imprisonment or the death penalty, you

21      understand that our law provides for those two

22      options; but am I understanding, that although

23      the law provides for those two options, your

24      personal opinion, that once a person has been

25      convicted of capital murder, that the death

3675

1 penalty should be an automatic thing?

2  A. Yes, I do.

3  Q. And, so, your belief along those

4 lines I guess is based on your personal family

5 experience?

6  A. That is correct.

7  Q. Probably in addition to all the things

8 that you have seen on TV and read in the

9 newspaper and things like that?

10  A. That is correct.

11  Q. Has that been your feeling for quite a

12 while, or has it changed -- how long ago was the

13 killing of your cousin?

14  A. About twenty years ago.

15  Q. About the same time you served on the

16 jury?

17  A. Yes.

18  Q. Had that happened at the time you

19 served on that jury?

20  A. I don't remember.

21  Q. Has your opinion gotten stronger as

22 the years have gone along?

23  A. Well, I felt that way kind of all the

24 incidents, I mean, you can't look in the paper

25 and television, the crimes that are committed

3676

1    nowadays to citizens, and a lot of them just

2    getting away with murder, period, you know.    I

3    have got pretty bad feelings about that.

4         Q.    And, so, do you think, that once a

5    person has been found guilty of committing a

6    capital murder, sexually assaulted someone,

7    killed them in the commission of the sexual

8    assault or killed two people in the same

9    criminal transaction, once they have been found

10   guilty of that, can you even envision a

11   situation that life imprisonment might be an

12   appropriate penalty, or would the death penalty?

13        A.    The death penalty.

14        Q.    That's it.  And you recognize that --

15   and this is certainly the time for you to assert

16   your opinion.   Even though your opinion is

17   different than what the law allows, right now

18   you are saying you understand what the law

19   allows, but despite that, this is my personal

20   opinion, and you are telling us about it?

21        A.    Yes, ma'am.

22        Q.    Okay.  So, if I as the defense lawyer,

23   I mean, and be honest with me, you are not going

24   to hurt my feelings at all, if I as the defense

25   lawyer am trying a capital murder case and I am

.3677.

1    trying to get a life sentence for my client, do

2    you feel like I have got a fair shake putting a

3    juror like yourself on the jury?

4        A.    Well, if I went on the jury panel and

5    made a note, I would have to hear all the

6    evidence presented.  I will be as fair as I

7    could.  But, again, I am saying my personal

8    views.  I should keep them out of it.

9        Q.    No, this is the place to tell us your

10   personal views.

11       A.    If I was picked as a juror I would

12   sure have an open mind to the evidence presented

13   to make a fair judgment in the best of my

14   ability that I could.  That I can.

15       Q.    But your personal view -- and viewing

16   the evidence, you are already coming from a

17   pretty strong death penalty position; is that

18   right?

19       A.    That is probably true.

20       Q.    Even though you are going to look at

21   the evidence and you are going to try to be

22   fair, in your heart you know that you are

23   already kind of leaning that direction; isn't

24   that what you are telling me?

25       A.    Probably true, counselor.

3678

1    Q.   And, so, although I know people, for

2  some reason, this word kind of has a negative

3  sound to it, but would it be fair to say that

4  personally that you have a bias toward the death

5  penalty in a situation where somebody has been

6  convicted of capital murder?

7    A.   Yes, I do.

8    Q.   And if you were placed on the jury,

9  you would be required to take an oath that you

10  wouldn't have any biases toward anything, do you

11  really, I mean, deep in your heart do you really

12  think you could put all of that aside, or is

13  that going to kind of be back in the back of

14  your mind?

15    A.   That would be hard to answer.  There,

16  again, I would try to do my best if I was picked

17  as a juror.   My personal feeling still exists.

18    Q.   You can't leave it out on the doorstep

19  when you go inside the jury room.  You are going

20  to take the personal feelings in there with you.

21    A.   I am not really going to try to take

22  them with me, but that is my own personal

23  opinion.

24    Q.   And, so, do you feel like anybody that

25  has been found guilty of committing capital

1    murder, are they automatically a continuing

2    threat to society?

3        A.   I think so.

4        Q.   And, so, if you had found a person

5    guilty of having committed capital murder and

6    then you came back out and started looking at

7    these questions, and that first question asks

8    you whether or not this person, there is a

9    probability that he is going to commit future

10   acts of violence and be a continuing threat to

11   society, just based on what you have just told

12   me, it would appear that, since you have already

13   found him guilty of capital murder, that pretty

14   much the answer to that question is going to be

15   yes because you have already found him guilty of

16   capital murder; isn't that right?

17       A.   That is correct.

18       Q.   And, so, you are going to be -- how is

19   it that -- so I wonder what it would take to try

20   and get a no -- can you even envision any case

21   in the world that you might be presented with

22   evidence to where the answer to that first

23   question would be no, once you had already found

24   somebody guilty of committing capital murder?

25          MS. DAVIES:  I object to trying to get

1    Mr. Guerrero to come up with a fact situation.

2              THE COURT:   Sustained.

3    BY MS. KAISER:

4         Q.   Do you think in any instance at all, I

5    am not asking for a fact situation, that

6    regardless of whatever evidence was presented to

7    you that there would be any evidence that could

8    be presented to you where the answer to that

9    first question would ever be no, or is it

10   automatically going to be yes they would be a

11   continuing threat to society because they have

12   already been found guilty of committing this

13   capital murder?

14        A.   That is the way I feel, counselor.

15             MS. KAISER:   Challenge.

16             THE COURT:   Off the record.

17             (Off the record).

18             MS. KAISER:   Defense exercises a

19   challenge for cause.

20             THE COURT:   It's granted or sustained,

21   whichever way you choose.

22             You are not going to have to serve.

23   You may stand down.

24

25

                                               3681

1                      LARRY  W.  WHITTEN,

2     called as a prospective juror, was examined as

3     follows:

4                   EXAMINATION BY THE COURT.

5          Q.    This is prospective juror number

6     twenty on panel number six, Mr. Larry Whitten.

7     Manager at Radio Shack.

8                How long were you in the Navy?

9          A.    Five years.

10         Q.    How long were you an MP?

11         A.    I cross rated at three years, so I

12    spent my last two years there as an MP.

13         Q.    Were you at Norfolk all that time?

14         A.    We were stationed in Norfolk.  About

15    half that time we were in Europe.

16         Q.    So you were just stationed at

17    different Navy ports?

18         A.    We were at sea.

19         Q.    You were an MP at sea?

20         A.    Yes, sir.

21         Q.    Not at port?

22         A.    No, on board ship.

23         Q.    Pages eight and nine of the long form

24    questionnaire list statements and ask you to

25    check the one that best summarizes your general

3682

1  views about capital punishment or asks you to

2  agree or disagree with certain statements.

3      A.    Uh-huh.

4      Q.    It appears that you are in favor of

5  capital punishment, you don't believe in it,

6  wish it weren't necessary but believe it is

7  necessary for some offenses?

8      A.    That's true.

9      Q.    At any rate, your decision on whether

10 or not the death penalty should be assessed

11 would depend on the facts and circumstances of

12 the individual case?

13     A.    Right.

14     Q.    Had you ever been called for service

15 on a criminal jury before?

16     A.    Never.   I have never been called for

17 jury duty at all.

18     Q.    Okay.   Some of the general principles

19 we talked about are probably familiar to you

20 anyway.   You understand that the defendant, this

21 defendant or any other defendant in a criminal

22 case is not a little bit guilty as he sits in

23 court, he is presumed innocent?

24     A.    Right.

25     Q.    The burden of proof is on the state,

1    stays on the state to prove the defendant's

2    guilt beyond a reasonable doubt.  Do you agree?

3         A.    True.

4         Q.    The indictment in a criminal case is

5    no evidence of guilt whatsoever.

6         A.    True.

7         Q.    If a defendant should not take the

8    stand and testify in his own behalf you can not

9    use that as any evidence against him.

10        A.    Right.

11        Q.    There is a question or a statement on

12   page eight or nine of the long form

13   questionnaire to the effect that capital

14   punishment should be available as punishment for

15   more crimes than it is now.  We ask the

16   prospective jurors to answer that prior to the

17   time we talked to them and told them all the

18   many different ways that capital punishment is

19   available as punishment for crimes.  We are

20   talking about specifically distinction between

21   murder and capital murder.  Murder being an

22   intentional or knowing taking of a human life.

23   That is a first degree felony offense, five to

24   99 years or life.  When we are saying capital

25   murder, we are talking about somebody

3684

1    intentionally or knowingly causing the death of

2    another individual but there is some other

3    aggravating factor which makes it a capital

4    offense, that is, an offense for which, on

5    conviction, the only possible punishments are

6    life sentence or the death penalty.  We went

7    over briefly the different ways that can be

8    accomplished.   One is when someone murders a

9    peace officer or a fireman who is acting in the

10   lawful discharge of an official duty and the

11   person knows that he is a peace officer or a

12   fireman.   One is where somebody commits murder

13   for remuneration, murder for hire or promise of

14   payment of money or employs somebody else to

15   commit a murder for hire or the promise of

16   money.  One is where somebody commits a murder

17   while escaping or attempting to escape from a

18   penal institution.   One is where someone is

19   incarcerated in a penal institution and murders

20   an employee of the institution.   The most

21   common type of capital murder offense, the one

22   most people see on television and read about in

23   the newspaper is where a person intentionally

24   commits a murder and he is in the course of

25   committing or attempting to commit another

3685

1    felony.   The other felony being kidnapping,

2    burglary, robbery, aggravated sexual assault,

3    arson.   The final category is where someone

4    murders more than one person, two or more people

5    in the same criminal transaction.   Each one of

6    those types of offenses is a capital murder

7    offense.   On conviction, only possible

8    punishments are life or the death penalty.   Are

9    those the kinds of offenses you think capital

10   punishment should apply to?

11        A.   Definitely.

12        Q.   I talked briefly about lesser included

13   offenses the other day.   Lesser included

14   offenses of capital murder in a proper case

15   might be such things as murder, first degree

16   felony, five to 99 or life, voluntary

17   manslaughter, second degree felony, two to

18   twenty years, third degree felony offense of

19   involuntary manslaughter, two to ten years.

20   Just stair-stepping from capital murder at the

21   top of this scheme down through the felonies and

22   all the way to misdemeanor that you might in the

23   proper case have an option when you go back to

24   deliberate the case that if you did not find the

25   defendant guilty of the offense of capital

3686

1    murder you might be asked to consider one of the
2    lesser included offenses.  But no matter what a
3    person is convicted of, if a jury returns a
4    verdict of guilty, there is a second stage of
5    trial.  The jury returns their verdict of guilty
6    and comes back into court and additional
7    testimony may be heard.  Each side has the
8    opportunity to call witnesses; each side has the
9    opportunity to present additional evidence in
10   the case.  There is another charge, the jury
11   goes back to deliberate, and if it's a capital
12   murder case I don't ask them to go back and vote
13   for life or death, I ask them to go back and
14   answer yes or no to two special issues, two
15   questions that I submit to them.  Depending on
16   how the jury answers those questions determines
17   how I am going to assess punishment.

18            Did you understand that is the way it
19   worked?
20        A.   Yes.
21        Q.   Before you came in here yesterday, did
22   you understand that?
23        A.   No, not before that.
24        Q.   I am going to ask you to turn over
25   here to the blackboard.  If you have found

                                              3687

1    somebody guilty of capital murder and I sent you

2    back in to deliberate on the issue, after the

3    penalty stage you would first be asked to answer

4    number one, which is asking whether there is a

5    probability that the defendant would commit

6    criminal acts of violence that would constitute

7    a continuing threat to society.   That is the

8    one where we are asking the jury to make a

9    determination of a defendant's future

10   dangerousness.   I would instruct you that when

11   you are answering that question you are to

12   consider all the evidence that was admitted at

13   the guilt or innocence stage plus all the

14   evidence admitted at the penalty stage including

15   evidence of a defendant's background or

16   character or the circumstances of the offense

17   that militate for or mitigate against the

18   imposition of the death penalty.   Consider

19   everything you've heard so far in the trial and

20   go back and answer that as to whether or not

21   there is a probability this defendant would

22   commit criminal acts of violence constituting a

23   continuing threat to society.   By probability

24   we say it means more likely to occur than not.

25   I believe I explained about the word society the

1    other day, that I won't give you a definition of

2    society, but society does include all of society

3    including society even within the penitentiary.

4         A.    Right.

5         Q.    Can you see that, sir?

6         A.    Yeah.

7         Q.    And we ask you to answer that yes or

8    no.  If all twelve jurors agree unanimously it

9    should be yes, then you move onto number two

10   special issue.  If ten or more people agree that

11   the answer is no there is no such probability, I

12   take the case back, I assess life

13   imprisonment.  Okay?

14        A.    Uh-huh.

15        Q.    Do you see that the answer to number

16   one is not an automatic yes or no; it's going to

17   depend on the individual case you are trying?

18        A.    Right.

19        Q.    And on the individual circumstances

20   and the evidence put before you both in the

21   first stage of the case and in the penalty stage

22   if either side happens to offer any evidence?

23        A.    Uh-huh.

24        Q.    It's not an automatic yes or no.

25   Just because you found someone guilty of capital

3689

1    murder doesn't mean that he is necessarily going

2    to be committing criminal acts of violence

3    constituting a continuing threat to society.

4    Do you agree?

5         A.    That is true.  I do agree.

6         Q.    Do you see also how in some cases -- I

7    can't tell you exactly what is going to happen

8    in this case -- but in some cases the jury

9    doesn't have access to a defendant's background

10   or reputation, and sometimes they can just look

11   at the circumstances of the offense committed

12   and say that is so horrible, what that person

13   did, the way he went about doing it, that based

14   on the way that capital murder offense alone was

15   committed we can determine there is a

16   probability that defendant would commit criminal

17   acts of violence constituting a continuing

18   threat to society.  Sometimes you have the

19   additional information.  Sometimes you don't.

20   Can you see that there might be that kind of

21   case out there somewhere in the realm of

22   hypotheticals?

23        A.    Yes, sir.

24        Q.    If you have answered that question

25   yes, you move on to question number two.  It's a

1    very different kind of question.  There is no

2    burden of proof in it like there is on number

3    one.  Where the burden of proof in number one is

4    on the State to prove there is  a probability

5    beyond a reasonable doubt, in number two you are

6    being asked whether, taking into consideration

7    all the evidence, including the circumstances of

8    the offense, the defendant's character and

9    background and the personal moral culpability of

10   the defendant there is a sufficient mitigating

11   circumstance or circumstances to warrant that a

12   sentence of life imprisonment rather than the

13   death penalty be imposed.  So here, once again,

14   you are considering everything from both stages

15   of trial.   I will give you an instruction that

16   you are to consider mitigating evidence to be

17   evidence that you might regard as reducing a

18   defendant's moral blameworthiness.  You answer

19   that one yes or no.  If ten or more people agree

20   the answer is yes, I assess life imprisonment.

21   If all twelve agree unanimously that number two

22   should be answered no after returning a

23   unanimous yes on issue number one, I assess the

24   death penalty.  That is the only way the death

25   penalty is assessed.  A yes answer on number one

3691

1    coupled with a no answer on number two means I

2    assess the death penalty.  Do you understand?

3         A.   Yes, sir.

4         Q.   So you know in advance exactly what I

5    am going to do depending on how you as a member

6    of the jury answer those special issues.  I want

7    to make sure that you are not going to

8    automatically answer one way or another simply

9    because you found somebody guilty of capital

10   murder.   You review the evidence and you make

11   that determination.   There is always that

12   possibility out there that you can answer either

13   way depending on the circumstances in the

14   individual case you are looking at.   Agree?

15        A.   Yes.

16        Q.   The statutes do not identify or limit

17   the aspects of a defendant's background,

18   reputation, character or circumstances of an

19   offense that are mitigating.   They don't set

20   out for us any kind of formula for determining

21   how much weight to give a mitigating

22   circumstance.  So I don't know exactly what that

23   might be.  You might hear something that you

24   think is a mitigating circumstance and would

25   mitigate against the death penalty from the case

3692

1    in chief, maybe the defendant's age, you heard a

2    witness testify about something in his

3    background and you thought that's a mitigating

4    circumstance, I am going to give that some

5    weight.  Perhaps in the second stage of trial,

6    the penalty stage, the defense had called a

7    witness to testify to something about something

8    else in his background that you found

9    particularly mitigating, something about some

10    terrible childhood or some drug dependency,

11    something like that which you might consider

12    would be mitigating.  You might get this

13    information from either side at any point during

14    the trial.  But you have to review everything

15    that you have heard.  There is no list of what

16    is mitigating.  I don't have any idea what kinds

17    of different things might come up in this

18    trial.  I don't know if there are twenty items

19    on the list or twenty thousand, but we know that

20    certain things in the proper cases are

21    mitigating evidence.  We know that mitigating

22    evidence includes such things as mental

23    retardation, mental illness.  We know that in

24    the proper case mitigating evidence can include

25    such things as a defendant's good behavior while

3693

1    in prison or in jail perhaps awaiting trial, an
2    exceptionally unhappy or unstable childhood,
3    childhood drug abuse or economic deprivation,
4    youth, a defendant's age, voluntary
5    intoxication, drug dependency, illiteracy,
6    opinion testimony of lay witnesses or
7    psychiatric opinion testimony that somebody
8    would not be a danger in the future.  All those
9    things in the proper case may be mitigating.
10   And if you hear something about that, you hear
11   testimony regarding one of those circumstances
12   or perhaps many, many more, you evaluate it, you
13   determine how much weight to give that
14   mitigating circumstance when you are looking at
15   issue number two and you decide whether or not
16   there is a sufficient mitigating circumstance or
17   circumstances to warrant a sentence of life
18   imprisonment being imposed as opposed to a death
19   sentence.  Okay?
20        A.   Okay.
21        Q.   Can you see how both of those could be
22   answered yes or no, depending on the individual
23   case?
24        A.   Yes, sir.
25        Q.   We want to make sure you are not

3694

1    predisposed to answering the questions in such a

2    way that you insure that a death penalty results

3    or you insure that a life sentence results.

4    Just answer them as honestly as you possibly

5    can.   Do you think you can do that?

6          A.   Yes, sir.

7          Q.   Is there anything about your views

8    regarding capital punishment or the death

9    penalty which would prevent or substantially

10   impair the performance of your duties in

11   accordance with the instructions I would give

12   you and your oath as a juror?

13         A.   No, sir.

14              THE COURT:   Ms. Davies.

15

16              EXAMINATION BY THE STATE

17   BY MS. DAVIES:

18         Q.   Hello, Mr. Whitten.

19         A.   How are you doing?

20         Q.   Looks like you moved to Houston area

21   when you were about eight years old, something

22   like that?

23         A.   No, I was born here.   I left here and

24   went to Europe.

25         Q.   Okay.   I see.   So you've got family

1    here in the Houston area?

2         A.   Yes, ma'am.

3         Q.   What, brothers, sisters, parents,

4    what?

5         A.   Parents, aunts, uncles, the entire

6    family.

7         Q.   Okay.   Do you have brothers or

8    sisters?

9         A.   I have a sister.

10        Q.   Older or younger?

11        A.   Older.

12        Q.   So, well, this is home.   How old were

13   you when you went into the Navy?

14        A.   Eighteen.

15        Q.   How did you choose the Navy?

16        A.   It's a hard question to answer.

17   Basically I looked at which service was offering

18   what schools and tried to pick out the one that

19   had the best schools and the best educational

20   advancements.

21        Q.   You took advantage of some of the

22   educational opportunities in the Navy?

23        A.   Yes.

24        Q.   I'm going to show my ignorance as far

25   as -- I assume in the military you don't have

1    much choice what area you go into.  Then maybe

2    you do.   I am curious how you ended up being an

3    MP.

4         A.   I cross rated.   It's something I

5    elected to do.

6         Q.   Okay.   And my experience and

7    knowledge of that is like, you know, movies you

8    see, uniform with MP on the arm, and I think of

9    somebody on the street, not on a ship.  I was

10   intrigued when you said it was mostly on board

11   ship.  What is your job there?

12        A.   On board ship as an MP, what you are

13   mainly assigned to do is maintain records on

14   board ship as far as when the CO of the boat

15   assesses punishment you simply make sure that

16   the punishment is carried out.  You also take

17   care of shipboard items such as security

18   lockers, anyplace where they would lock up

19   expensive merchandise that is not to be kept

20   available to the crew at all times.  That is

21   what we did.  It's a lot different than what

22   they show on the movies where everybody is

23   running around.

24        Q.   That is what I always pictured, so I

25   couldn't visualize what your job was there.

1          Apparently you left the service.  Did
2    you ever consider making it a career or?
3          A.   I considered, but I had a better offer
4    come up.
5          Q.   Okay.  Tell us a little bit about how
6    you -- what your beliefs are about the death
7    penalty.  I know we asked it a bunch of
8    different ways, but I think it means more to
9    hear you say what your attitude is.
10         A.   Well, as far as the death penalty
11   goes, if it's necessary, it should be carried
12   out.  If you tell someone that you are going to
13   execute them, I don't feel that they should have
14   to sit there for five and ten years waiting for
15   you to do it.   If they don't deserve it, then
16   there is alternate methods that you can go about
17   other than, you know, sentencing them to death.
18         Q.   Like in our capital murder statute
19   there are two possibilities, the death penalty
20   or life sentence.
21         A.   Right.
22         Q.   Is that what you have in mind, or do
23   you have something?
24         A.   No, that is what I have in mind
25   exactly.  I mean, if the crime is bad enough and

                                                  3698

1    severe enough and the circumstances point to it,

2    then if the death sentence is warranted then it

3    should be carried out, you know, rather than

4    tell someone:  Look, we are going to put you to

5    death, but we are going to put you in this

6    little bitty room over here and let you stew on

7    it for a year or two knowing that somewhere down

8    the line your number is going to be pulled.

9    But if you tell somebody because the

10   circumstances pointed to it and said:  Okay,

11   look, you know, we don't feel that you need to

12   go, if we sentence you to life, at least you

13   will have the opportunity to live in a different

14   society, but you will have the opportunity to

15   live and grow.

16        Q.   Okay.  I am getting a sense that you

17   have some feelings -- there is something going

18   on in the system that you don't approve of in

19   the sense of not carrying out the death penalty.

20        A.   Yeah.

21        Q.   More efficiently.  Do you have a feel

22   for why that is, why there is a delay in

23   carrying it out?

24        A.   That's politics.  I have nothing to do

25   with politics at all.  It's like if you tell the

3699

1   person that that is what you are going to do and

2   they are expecting it, then they are going to

3   live their life knowing it's going to happen.

4   That is, to me, that is more torture.    That is

5   mental torture, too.

6        Q.    Do you think sometimes that there are

7   steps in the legal process where perhaps the

8   defendant is delaying that execution?

9        A.    It's possible.  You know.  But, I

10  mean, I don't know that.   Nobody that watches

11  TV, nobody on the outside really knows what is

12  going on, you know, not as far as that goes.

13       Q.    Okay.  Those thoughts and concerns

14  that you have, do you think would those affect

15  whether you assess or how you answered those

16  questions?

17       A.    No.

18       Q.    Are you one of the people -- several

19  people had spoken up yesterday that were

20  concerned about early parole.   I don't remember

21  whether you did or not.

22       A.    No, I didn't.

23       Q.    Because I think you know the judge is

24  going to tell you you shouldn't consider that.

25       A.    That's right.

3700

1    Q.    Is that an instruction that you could

2    follow?

3    A.    Sure.   Early parole is just like

4    anything else.   You have x number of people

5    that's going to be here; yet, when you exceed

6    this, concessions have to be made.    It's

7    life.   Concessions have to be made.    Early

8    parole, some people warrant it, some people

9    deserve it, some people deserve to stay right

10   where they are.   It's all a matter of what the

11   case and what their situation is.

12   Q.    That would not affect your decision?

13   A.    No.

14   Q.    To go back to whether you think the

15   death penalty is necessary in some cases.  Did I

16   understand you to say you think it is in some

17   cases?

18   A.    In some cases, yeah.

19   Q.    Judge went over the long list of those

20   offenses that are included in the capital murder

21   statute.   Are things like murder during the

22   course of a robbery, is that the kind of thing

23   you think the death penalty should be available

24   for?

25   A.    I don't know.   I really don't know.

3701

1    I mean, was he running out of the building and

2    fired a missing shot and didn't know what it hit

3    and someone died because he didn't know where it

4    went or did he stand over the person and shoot

5    them multiple times?  It depends on the

6    circumstances.

7         Q.   Okay.  Well, and whenever we talk

8    about capital murder we are talking about

9    intentional killing.   We are not talking about

10   some accidental shooting.

11        A.   Right.  I am aware of that.

12        Q.   So assuming that always we are talking

13   about intentional killing, if that was the case?

14        A.   Right.

15        Q.   Do you think, if you were going to

16   write the capital murder statute, would you

17   include murder during the course of a robbery?

18        A.   Well, to get to the very beginning, I

19   wouldn't write the statute to start off with.  I

20   would leave that to somebody else.

21        Q.   You are too smart for that?

22        A.   Exactly.  Yeah, it would be

23   included.   I mean, I have no problems right now

24   with the way the system is set up because it

25   works.

1    Q.   Okay.

2    A.   Okay.  I mean, it's changing to fit

3    the needs, but, you know, it changes through due

4    process, not through somebody injecting their

5    opinion.

6    Q.   Do you feel like if -- well, let me

7    back up.  Types of crime.  Killing more than one

8    person intentionally in the same transaction,

9    does that sound like an offense--

10    A.   That sounds more like an offense that

11    would be considered capital punishment.  You

12    also take into consideration, if you find a

13    person guilty of doing that, then how many

14    people are guilty of capital murder that went to

15    Vietnam?  They killed multiple people over

16    there, too.

17    Q.   Well, I understand that.

18    A.   I mean, that is the same principle

19    that you are, same point in fact that you are

20    bringing up.  But it depends on the situation

21    once again.  If a person is attacked by two

22    people and he does manage to kill them, you

23    know, I mean, that is capital murder, but

24    depending on the circumstances.  That is all

25    that I can look at.  I can't tell you what my

1    feelings are until I see the facts, until I know

2    what I am trying to judge.

3        Q.   I know that you can't tell me what you

4    are going to do in this case.   I am not going

5    to ask you what you are going to do in this case

6    because you don't know the facts of this case or

7    any particular fact situation.   I am just trying

8    to get a feel for your general attitudes.

9        I guess what I am not sure of is where

10   you are coming from in comparing capital murder

11   to killing during war.

12       A.   You are talking about capital murder

13   being killing more than one person.   It's the

14   same thing in a war situation where they go and

15   they have to kill more than one person.

16       Q.   Well, both sides are involved there.

17       A.   Exactly.

18       Q.   I think most of us would see victims,

19   people who were just citizens, civilians on the

20   street or in their homes or whatever being

21   killed, being a little different than a war time

22   confrontation.

23       A.   Yeah, that is a lot different.

24       Q.   Okay.   And, so, then that is what we

25   are talking about.   We are talking about peace

3704

1    time civilians, somebody who didn't ask or

2    willingly become involved.

3         A.   Okay.

4         Q.   Some people say that they believe the

5    death penalty is necessary in some situations

6    but they would not personally ever be able to be

7    involved in rendering a verdict that was going

8    to result in the death penalty.  How do you feel

9    about that?

10        A.   That is a good question because, like

11   the judge said, all I have to do is answer those

12   two questions.  And if I answer those two

13   questions honestly based on how I feel and on

14   the facts of the situation, then it's up to

15   everyone else what they want to do with it.

16        Q.   Well, okay.  In answering those

17   questions, you answer them honestly, but you are

18   back there deliberating with eleven other

19   jurors, and it's not like everybody casts one

20   vote, we are through.  You deliberate, you talk,

21   you compare.  Somebody might change their mind,

22   somebody might not.  You compare notes, you

23   discuss the evidence, hopefully you reach a

24   consensus.

25        A.   Okay.

3705

Q.   You each have your own opinion, but
you do compare opinions and discuss the
evidence, consider it, reconsider it.   Your
answer, you don't write death or life, you
answer those questions yes or no.

A.   Exactly.

Q.   You know going in what the result is.

A.   Uh-huh.

Q.   Obviously.   You know if you answer
yes, no the judge has no choice but to give the
death penalty.

A.   Uh-huh.

Q.   You don't answer that way, you know,
if it's the opposite, you give a no answer to
that first one or whatever, the judge has no
choice but to give a life sentence.

A.   Uh-huh.

Q.   Clearly, if you want to achieve
certain results you can if you are inclined to
do that.   You know, some people would say I
could not be a part of something that was going
to result in the death penalty.   I couldn't
live with myself after that, you know, I am
going to answer those questions to be sure that
doesn't happen.

1       A.    Okay.

2       Q.    I need to know how you feel.

3       A.    I don't have an opinion one way or the

4  other on that.

5       Q.    Last night after you left here, did

6  you give any thought to, I mean, we are talking

7  about possibility of the death penalty.   Does

8  that present a problem for you, that you think:

9  Gee, I don't know if I could do that?

10       A.    Not a bit.

11       Q.    Do you feel like you could do it?

12       A.    Sure.

13       Q.    If the evidence was there?

14       A.    If the evidence was there.

15       Q.    I have to ask because you emphasized

16  the word if.  Are you telling me that:  Lady,

17  there is no way you could ever bring me enough

18  evidence?

19       A.    No.

20       Q.    If I brought you the evidence that

21  convinced you, you could answer those questions

22  in such a way to result in the death penalty?

23       A.    Yes, ma'am.

24       Q.    Sounds like if I didn't bring it you

25  would answer them in such a way that was going

1     to be life sentence?

2          A.   If that is it.  If the facts are

3     there.   Okay.  Because I don't know the

4     situation.   I don't know anyone involved in

5     this, and, I mean, the only thing I have to go

6     on is what you tell me I have to make a decision

7     on.   And I have been taught in the service that

8     if you follow the facts that is what you have to

9     live with, you know.

10         Q.   Tell me if I am understanding you

11    correctly.  You are going to look at the

12    evidence, you are going to answer those

13    questions based on the evidence, let the chips

14    fall where they may?

15         A.   Pretty much.

16         Q.   If the result is the death penalty,

17    fine?

18         A.   If that is the way it goes, then that

19    is what I have to live with.

20         Q.   Do you feel like you could live with

21    that?

22         A.   If it come down to that.

23         Q.   Sometimes I would be asking a jury to

24    answer those questions yes, no, in other words,

25    resulting in the death penalty, based on the

1    facts of just the offense that is on trial.   In

2    other words, sometimes there is no background

3    information, no past history introduced.

4         A.    Okay.

5         Q.    Just the facts of the case that is on

6    trial.   Can you see that ever being a

7    possibility?

8         A.    Yeah.   Yeah, it's a possibility.

9         Q.    Other times there may be additional

10   evidence, but not always.   Does that seem fair

11   enough to you?

12        A.    It's fair.

13        Q.    Mentioned beyond a reasonable doubt.

14   We have used that term.   Burden of proof is

15   always on the State.

16        A.    Uh-huh.

17        Q.    And I have to prove the case beyond a

18   reasonable doubt.   There is a lengthy

19   instruction explaining what beyond a reasonable

20   doubt means, and it makes clear that it does not

21   mean beyond all doubt.   I need to know how you

22   feel about that.   The reason is some people come

23   in here and they tell me, when you are talking

24   about capital murder and you are talking about

25   the death penalty, beyond a reasonable doubt

3709

1    just isn't enough, I have to have absolute

2    certainty.   How do you feel?

3        A.   I don't understand the question that

4    you are asking, really.

5        Q.   I want to know whether you are going

6    to require more than beyond a reasonable doubt

7    of me.

8        A.   I don't think so.

9        Q.   I mean, the reason I am asking, beyond

10   all doubt is impossible.

11       A.   Exactly.   That is like being perfect.

12       Q.   Yeah.   I can't do that.

13       A.   Right.

14       Q.   So if I am talking to somebody, you

15   know, if you need that, if you are going to

16   require that, out of all fairness, I need to

17   know.

18       A.   Okay.

19       Q.   That is why I am asking.   Do you

20   think beyond a reasonable doubt is a standard?

21       A.   Yes.

22       Q.   That is the legal standard.   You could

23   live by that?

24       A.   Yes, ma'am.

25       Q.   I have to prove two intentional

1    murders. I suggested yesterday when we talked

2    that the intent to kill, like the intent to do

3    anything, can be formed very quickly.  Do you

4    have any disagreement with that?

5         A.   No, I don't.

6         Q.   One thing we didn't talk about was the

7    idea of self-defense.  That concept -- and you

8    said something a minute ago that kind of touched

9    on that, talking about somebody being attacked.

10   You know, do you feel like you have the right to

11   defend yourself?

12        A.   Yes.

13        Q.   And others.  You have the right to

14   defend a family member or friends if the

15   situation requires it.

16        A.   Sure.

17        Q.   Even your property under certain

18   circumstances.

19        A.   True.

20        Q.   The law certainly gives you that

21   right, gives all of us that right.

22        A.   Within limits, yeah.

23        Q.   Absolutely.   You are right, within

24   limits.   And those limits, sometimes it gets

25   garbled, who has the right to self-defense.

3711

1    When we get into these different fact
2    situations, it can get confused at times, so I
3    want us to talk about that a little bit.
4    Hypothetical example, just to kind of get your
5    reaction and your feeling.   Let's say Joe is
6    working late tonight.   He stays at the office
7    late, it's after hours, office is closed.   There
8    is a sign on the door that says we are open from
9    nine to five.   It's ten o'clock at night.   He is
10   in the back working.   He didn't bother to lock
11   the front door.   He is in the back.   Hears a
12   sound out in the front office.   Thinks:   What's
13   that?   I better go check.   He is a little
14   concerned so he grabs something for safety
15   sake.   They play ball in a baseball league, so
16   there is a bat there in the office.   He picks
17   that up, goes out in the front office and, sure
18   enough, there is a burglar ransacking the
19   drawers, looking for petty cash.   Burglar turns,
20   wrestles that basball bat out of Joe's hand,
21   beats Joe in the head, beats him to death.
22   Comes trial time, the burglar says:   Hey, it was
23   self-defense, the man came after me with a
24   baseball bat.   What is your reaction to that?
25        A.    Was killing him necessary?

3712

1    Q.   Well, I mean, you said there were

2  certain limits.   Whether that amount of force

3  was necessary is one of the questions, I think.

4    A.   Exactly.   That would determine

5  self-defense.

6    Q.   One of the things -- of course, the

7  law of self-defense also requires you have to be

8  acting lawfully.   For you to have the right to

9  self-defense, you have got to be responding to

10  someone else's unlawful use of force.   My

11  suggestion is there is nothing unlawful about

12  Joe grabbing something to protect himself in a

13  situation like that.   Do you think?

14    A.   None whatever.

15    Q.   I mean, do you think a person has the

16  right in that kind of encounter to protect

17  themselves?

18    A.   Yes.

19    Q.   So I think the question is, the law

20  would say, yeah, you can defend yourself, but

21  only, number one, you have to be acting

22  lawfully, then you can only use the amount of

23  force that is immediately necessary in the

24  circumstances.   Not only that--

25    A.   I am aware of the use of deadly force.

.3713.

1    Q.    Pardon me?

2    A.    I am aware of the laws surrounding the
3    use of deadly force.  I still remember that from
4    the service.

5    Q.    Okay.  And Texas also adds another
6    requirement, that you retreat if a person, a
7    reasonable person would do so in the
8    circumstances.

9    A.    Uh-huh.

10   Q.    So the question that kind of comes up
11   in that kind of situation, do you think what
12   would be reasonable would be for the burglar to
13   retreat?  He doesn't belong there in the first
14   place.  Not Joe.  It's his office.

15   A.    Yeah, I agree.

16   Q.    What about the fact that Joe left the
17   door open?

18   A.    That was his negligence.

19   Q.    He was careless.

20   A.    Exactly.

21   Q.    Does that make it okay for the burglar
22   to come in?

23   A.    No.

24   Q.    What about if you were in a rush when
25   you leave your house and don't lock the door?

1          A.    Same thing, it's your negligence.

2          Q.    Negligence.  But what about if

3     somebody comes in, do you think, well, that is

4     understandable, I should have locked the door?

5          A.    No.

6          Q.    Or, I mean, say you were in such a

7     hurry it didn't even catch good and it was

8     ajar.  Is that an invitation to say:  Hey, come

9     on in, everybody?

10         A.    No.  All locks are for is to keep

11    honest people honest.  If a burglar wants what

12    you have got, he will find a way to get in and

13    get it.

14         Q.    I think you are probably right.

15    You're right.  Would it make any sense to you

16    for a burglar to say:  Well, the guy didn't lock

17    the door, I thought it was okay to go in?  Or

18    the door was standing open, so I went in,

19    fine.

20         A.    Depends on if he said that or not.

21    If he went in to see what was wrong because the

22    door was standing open, then why was he going

23    through the drawers?  Why didn't he say

24    something when he entered the building?

25         Q.    In that situation, I think that is a

1    good question.

2         A.    Okay.

3         Q.    And then it would come down to

4    credibility, too.   If they said I went in to

5    see if something was wrong, you might look at

6    the circumstances and think does that ring true

7    or not.

8         A.    Uh-huh.   If you went in to see if

9    something is wrong and somebody is running at

10   you with a bat, what is your natural response?

11        Q.    My natural response would be to turn

12   around and run.

13        A.    Okay.

14        Q.    What about yours?

15        A.    I would do the same thing.

16        Q.    Okay.

17        A.    I have no intention of trying to

18   wrestle with someone.

19        Q.    Okay.   Can you understand that if

20   somebody did, I mean, if an intruder, an

21   uninvited person came into the house, that also

22   you think it would be appropriate for somebody

23   to grab something to protect themselves?

24        A.    Yes.

25        Q.    Check out what is going on, what that

1    person is doing in the house or the office.

2         A.    Uh-huh.

3         Q.    That first stage of trial, you only

4    hear evidence about the case itself, the capital

5    murder case itself.

6         A.    Okay.

7         Q.    After you hear that evidence and the

8    attorneys' argument and the instructions from

9    the judge, the jury deliberates.  Hopefully,

10   they will reach a verdict.  After they have

11   reached a verdict of guilty of capital murder,

12   that is when you go to the second stage of

13   trial.  There may or may not be additional

14   evidence.   If there is, it can come from either

15   source.  The defense never is obligated to

16   produce any evidence, but they can if they want

17   to.  They have the same subpoena power.  But the

18   only one with any responsibility to present

19   evidence is me, the State.

20        A.    Uh-huh.

21        Q.    You could hear all kinds of evidence

22   at that second stage of trial.  Past criminal

23   history or good past, you know, went to church,

24   always held a job, always took care of his

25   family, never got in trouble before.

3717

1    Mitigating stuff.  Could be stuff about
2    childhood, sad stories about childhood, drug
3    addiction, whatever.  You consider all of it as
4    you look at those two questions.  Can you see,
5    looking at that first question, talking about
6    probability of being a continuing threat to
7    society, it's really asking about the future.
8    Not with a certainty but a probability.  Do you
9    think that that question could ever be answered
10   yes, that someone would probably commit acts of
11   violence in the future that would be a
12   continuing threat to society?
13        A.   Yes.  Depending on the person.
14        Q.   And the evidence that you have about
15   what they have done and whatever background
16   information you have.
17             Talks about criminal acts of
18   violence.  Doesn't say murder.
19        A.   Uh-huh.
20        Q.   Can you see that some acts of violence
21   short of murder, that there are other criminal
22   acts that would be a threat to society?
23        A.   Yes, ma'am.
24        Q.   If the evidence was there to convince
25   you to answer that question yes, could you do so?

3718

Case 4:14-cv-03152   Document 38-45   Filed on 09/01/16 in TXSD   Page 201 of 212

1     A.    Yes, ma'am.

2     Q.    Knowing that that is one step on the

3     way to the death penalty?

4     A.    Uh-huh.

5     Q.    You could.   Is that term society, by

6     the way -- I think the judge touched on this --

7     includes everybody.   Certainly isn't limited to

8     prison society, but includes them, too, as well

9     as free society.   Can you do that?

10    A.    Yes, ma'am.

11    Q.    If the jury has answered that question

12    yes, then you move to the second question.

13    Basically at that point you have found somebody

14    guilty of capital murder and the jury has agreed

15    that he is a continuing threat to society.   And

16    this is telling you now look at the evidence

17    again, remember consider the crime he committed,

18    weigh it again with any mitigating circumstances

19    that are there, and you decide are there

20    sufficient mitigating circumstances that this

21    person deserves a life sentence instead of the

22    death penalty.   If you think there is

23    sufficient mitigation, you answer it yes, the

24    result is life sentence.   You might think there

25    is some mitigation but it's not sufficient, not

1  enough to outweigh what he has done.  You would

2  answer it no.   The result would be the death

3  penalty.   Can you see that going either way?

4        A.   Yes, ma'am.

5        Q.   Can you ever see a situation where

6  there is some mitigation but it wouldn't be

7  enough for you, you might think, well, there is

8  some mitigating stuff, sure, he had some things

9  to his credit, but it's not sufficient, he still

10  deserves the death penalty?  Can you see that

11  ever happening?

12        A.   Yes, ma'am.

13        Q.   It's not just anything mitigating at

14  all is always going to be enough for you?

15        A.   I don't know.   I mean, I can't tell

16  you what I am going to do until I hear.

17        Q.   I understand that.

18        A.   Okay.   I don't prejudge anything.

19        Q.   I understand you can't tell me what

20  you are going to do.   I just want to be sure, I

21  mean, in other words, different mitigation is

22  going to weigh differently different times.

23  Does that sound fair?

24        A.   Yes.

25        Q.   Do you have any questions for me?

3720

1          A.    No.

2                MS. DAVIES:   Thanks.   Pass.

3                EXAMINATION BY THE DEFENSE

4     BY MR. STAFFORD:

5          Q.    I think you are my neighborhood Radio

6     Shack manager.   I live in Garden Oaks.   You

7     are up at Ella and 43rd?

8          A.    Right.

9          Q.    How did you get involved in computers?

10    Back in high school?

11         A.    In the Navy.

12         Q.    What kind of computer games do you

13    play -- y'all have a little bit of everything

14    there to play with at Radio Shack.

15         A.    Yeah, a little bit of everything. That

16    is what we play with, a little bit of

17    everything.   Anything from Scrabble, Monopoly,

18    Sub-battle, any kind of tactical game.

19         Q.    Y'all sell any softwear for your

20    computers there at all?

21         A.    Yes.

22         Q.    Like dictionaries for translation of

23    foreign languages?   Whatever I want they have it

24    there?

25         A.    If not, they can get it.

1          Q.   They can get it for you.

2               As a child, what religion were you

3    raised as?

4          A.   Baptist.

5          Q.   McArthur is what part of town?

6          A.   North side.

7          Q.   The high school you went to.   North

8    side is where?

9          A.   Off of Aldine-Westfield and

10   Aldine-Mail Route.  It's out towards Humble,

11   towards the Intercontinental Airport.

12         Q.   Is that basically the area of town you

13   were raised in?

14         A.   That and up in East Texas.

15         Q.   Where in East Texas?

16         A.   Up around Tyler.

17         Q.   Tyler Rose?

18         A.   Uh-huh.

19         Q.   What did your father do for a living?

20         A.   He is a master mechanic and welder,

21   certified welder.

22         Q.   Okay.  I am not going to ask you very

23   many questions, but I think you have a little,

24   probably based upon your training as an M.P.,

25   you are a little step ahead of some of the

                                              3722

1     jurors, that you sense that punishment is often

2     handed out or meted out, depending on how the

3     crime was committed and why it was committed and

4     depending on the circumstances.

5          A.     Right.

6          Q.     I gather you would agree with me,

7     would you not, that all capital murder cases are

8     bad?

9          A.     All capital murder cases are bad,

10    yeah.

11         Q.     But we also know that just because I

12    am guilty of capital murder, you would agree

13    with me, that doesn't automatically mean I

14    deserve to die for it?

15         A.     That's true.

16         Q.     Because I think you have already told

17    the prosecutor there are situations where, for

18    example, using the Radio Shack, and a guy went

19    in and lined everybody up and shot them

20    execution style, that is one scenario in a

21    course of a robbery where maybe you caught

22    someone burglarizing -- not you, or one of your

23    employees confronted him and they have a tussle,

24    and wouldn't you agree with me that probably a

25    robber or burglar's desire to live is just as

3723

1    great as an innocent person's desire to live,

2    they both want to live?

3         A.    Sure.

4         Q.    When they are both facing death, they

5    are going to react probably in a manner to

6    protect their lives even though one is there

7    unlawfully and one is there lawfully?

8         A.    True.

9         Q.    Those are factors which I contend are

10   mitigating factors that you can take into

11   consideration.  Did he execute them?  Did he

12   come in there with a weapon to do a dastardly

13   deed.  Things like that to aid you to determine

14   whether one lives or dies.   Do you think that

15   is a fair thing to look at?

16        A.    Yes.

17        Q.    Have you ever -- I am curious, since

18   you are the manager of the store, how much

19   hardship two weeks is going to cause you if you

20   are down here for two weeks.  You are not going

21   to get fired, I hope.

22        A.    I don't know.  I doubt that I will get

23   fired.  I may be put in a different position,

24   but I won't be fired.   Tandy Corporation is not

25   like that.

3724

1      Q.   Y'all close at six?

2      A.   Seven.

3      Q.   Seven o'clock?

4      A.   Uh-huh.

5      Q.   How long have you been a manager

6  there?

7      A.   I have been a manager roughly one

8  month.

9      Q.   You are a baby manager?

10      A.   Exactly.  A rookie.

11      Q.   You have already finished your

12  training?

13      A.   Yes.   I have already been to Fort

14  Worth and back.

15      Q.   That is my home town now, Fort Worth

16  is.  So this is your first store?

17      A.   Right.

18      Q.   Oh, good.   Well, it's unfortunate

19  that this came at this particular time, I guess,

20  for you.

21      A.   I got the summons I think it was like

22  two weeks before I got promoted, so they knew I

23  was coming down here, and they still elected to

24  promote me.

25      Q.   Well, good.  Congratulations.

3725

```
 1              MR. STAFFORD:  I have no other
 2     questions, judge.
 3              THE COURT:  Why don't you step outside
 4     this second door right here for just a minute?
 5              (The prospective juror leaves the
 6     courtroom).
 7              (Off the record)
 8              THE COURT:  Bring him in and swear
 9     him.
10              (The prospective juror returns to the
11     courtroom)
12              THE COURT:  Mr. Whitten, you have been
13     selected to serve.  Lucky you.  Not exactly
14     like being drafted.  First raise your right
15     hand.
16              (Juror sworn)
17              THE COURT:  You are the last person we
18     are selecting.  We are wrapping it up.  She's
19     going to give you one piece of paper which tells
20     you we are going to begin testimony on Monday,
21     September 28th, at ten a.m. in our courtroom,
22     which is on the floor above is, the eighth
23     floor.  This gentleman is going to give you a
24     badge.  Right there he is handing it to you.
25     You are to wear it at about chest pocket level.
```

3726

```
 1        It identifies you as a juror.   You are to wear
 2    that at all times when you are in and around the
 3    courthouse from the time you get out of your car
 4    in the mornings until you get back in it in the
 5    afternoon.    The attorneys are being instructed
 6    not to engage you in conversation.   If they run
 7    into you, they will nod in recognition but not
 8    talk.    If anybody attempts to talk to you about
 9    the case, bring it to our attention immediately,
10    call us or when you come in let somebody know.
11    I don't anticipate there is going to be anything
12    in the media, radio, TV, newspapers about this
13    case.   If there was, it would only be to the
14    effect that the jury selection has been
15    completed and testimony is going to start on
16    Monday, the 28th.   If you should see anything in
17    the newspaper, hear it, see it on TV or radio,
18    change the channel, turn it down, put it aside,
19    don't pay any attention to it.   You are going to
20    have a front row seat to what is going on in the
21    case.   Don't make any kind of independent
22    investigation.   Don't try to read any law you
23    think might apply in the case.  Don't attempt
24    to find out which capital murder case it is we
25    are trying starting Monday, September 28.   When
```

3727

1    you come in on the 28th, we ask that you not

2    come into the courtroom but remain out in the

3    hallway.  You will see a bunch of people with

4    the same yellow tags on in that hallway on the

5    eighth floor.  There are some benches past the

6    elevators to sit down.  At ten o'clock I will

7    send the bailiff out to count heads and take you

8    in a group through the courtroom and back to the

9    jury deliberation room.  I know your employer is

10   interested in some of this information.  You

11   have to tell him you have been selected to

12   serve.  Don't let anybody try to impart any

13   information about the criminal justice system or

14   capital murder cases or anything else.  Most of

15   it will be misinformation, unfortunately.  This

16   panel did not ask any questions about being

17   sequestered.  I don't anticipate the jury will

18   be sequestered, will be locked up overnight in a

19   hotel.  You will be going home every evening.

20   But the possibility usually arises once the jury

21   has been charged and you are back deliberating.

22   Try to charge them in the morning so they can

23   deliberate all day.  We don't normally try to

24   rush a verdict.  I will try to give you advance

25   notice the day before at least.  As far as

1    hours, we won't ever be starting testimony, as
2    far as I can see, before ten a.m.  Probably
3    won't be working much past 5:30.
4              Do you have any questions?
5              THE JUROR:  No.
6              THE COURT:  Any requested admonitions
7    or instructions, Ms. Davies?
8              MS. DAVIES:  Nothing further.
9              THE COURT:  Mr. Stafford?
10             MR. STAFFORD:  None.
11             THE COURT:  That's it.  Also double
12   check his phone number and things.  On the week
13   of Monday, September 21st, we are going to
14   verify all the people selected that they are
15   still supposed to come in on Monday, September
16   21st.  If you haven't heard from us by Tuesday,
17   the 22nd, give us a call.
18             (End of session)
19
20
21
22
23
24
25

1                    CAUSE NO. 612408

2    THE STATE OF TEXAS   IN THE 179TH DISTRICT COURT

3    VS.                            OF

4    RICK ALLAN RHOADES   HARRIS COUNTY, T E X A S

5

6

7                    I, Marlene Swope, Official

8    Court Reporter of said court, hereby certify

9    that the foregoing 3729 pages comprise a true,

10   complete, and correct transcript of the voir

11   dire examination of prospective jurors had in

12   the above styled and numbered cause.

13                    WITNESS MY HAND this, the _17th_

14   day of _October_, 1992.

15

16              _Marlene Swope_

17              Marlene Swope
                Official Court Reporter
18              179th District Court
                Harris County, Texas
19              Certificate NO. 164
                Expires: December 31, 1992

20

21

22

23

24

25

                                              3730