APPELLATE COURT NO. *71595*

IN THE COURT OF CRIMINAL APPEALS

OF THE STATE OF TEXAS

AT AUSTIN

---

RICK ALLAN RHOADES,

                        Appellant

VS.

THE STATE OF TEXAS,

                        Appellee.

---

APPEAL FROM 179TH DISTRICT COURT OF HARRIS COUNTY,

TEXAS

Judge J. Michael Wilkinson  Presiding

---

STATEMENT OF FACTS

VOLUME _XXVII_ OF _40_ VOLUMES

Marlene Swope
Official Court Reporter
301 San Jacinto
Houston, Texas  77002

FILED IN
COURT OF CRIMINAL APPEALS

MAR 5  1993

Thomas Lowe, Clerk

1

1                           INDEX

2                      VOLUME XXVII

3                                                    <u>Page</u>

4    DAVID SANDERS
          Direct                          41
5         Direct, continued               97

6    K. W. ROGERS
          Direct                          123
7         Cross                           131
          Redirect                        135
8         Recross                         136

9    JAMES BOLDING
          Direct                          137
10        Cross                           202
          Redirect                        204
11        Recross                         205

12   WESLEY CHARLES SHELDON
          Direct                          206
13        Cross                           239

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    ALPHABETICAL INDEX

2                      VOLUME XXVII
```

```
3                                              Page
    BOLDING, JAMES
4        Direct                                137
         Cross                                 202
5        Redirect                              204
         Recross                               205
6
    ROGERS, K. W.
7        Direct                                123
         Cross                                 131
8        Redirect                              135
         Recross                               136
9
    SANDERS, DAVID
10       Direct                                41
         Direct, continued                     97
11
    SHELDON, WESLEY CHARLES
12       Direct                                206
         Cross                                 239
```

```
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    CAUSE NO. 612408

2   STATE OF TEXAS        IN THE 179TH DISTRICT COURT

3   VS.                            OF

4   RICK ALLAN RHOADES     HARRIS COUNTY, T E X A S

5

6   A P P E A R A N C E S:

7   For the State:       Ms. Carol Davies
                         Ms. Claire Connors
8                        Assistant District Attorneys
                         Harris County, Texas
9
    For the Defendant:   Mr. James Stafford
10                       Ms. Deborah Kaiser
                         Attorneys at Law
11                       Houston, Texas

12

13           BE IT REMEMBERED that upon this the

14   28th day of September A.D. 1992, the above

15   entitled and numbered cause came on for trial

16   before the Honorable J. Michael Wilkinson, Judge

17   of the 179th District Court of Harris County,

18   Texas; and the State appearing by counsel and

19   the Defendant appearing in person and by

20   counsel, the following proceedings were had,

21   viz:

22

23

24

25

                                                        2

1           (Not before the jury).

2           MR. STAFFORD:  For purpose of the

3      record, Your Honor, before the jury is sworn in

4      to hear the testimony and evidence in this case,

5      I have previously filed an additional motion to

6      prohibit the impaneling of the jury, requesting

7      that this selected group of citizens be

8      dismissed and another array of jurors be called

9      over for the purpose of jury selection.  As

10     stated previously, Your Honor, on the record,

11     that there were a couple of prospective jurors

12     who we believe the court erroneously failed to

13     grant our Batson motion.  I think the motion in

14     writing speaks for itself.  I would ask the

15     court to grant the motion and give us the relief

16     that we have requested.

17          THE COURT:  That motion is denied.

18          MR. STAFFORD:  Also, Your Honor, I

19     have previously filed a motion regarding the

20     potential outbursts.

21          THE COURT:  Tell me which motion it

22     is.

23          MR. STAFFORD:  It would be the motion

24     regarding admonishing the family.  Just for the

25     purposes of the record, I guess it's a form of a

3

```
 1    motion in limine.  I think, as far as the
 2    defense team is concerned, our emotions and our
 3    hearts definitely go out to the Allen family.
 4    We understand their grief.  However, under the
 5    Constitution of the State of Texas and the
 6    United States, I am bound to assure that my
 7    client gets a fair trial.
 8              THE COURT:  All right, I understand
 9    there are a number of family, friends, observers
10    on both sides in this case in the courtroom.  I
11    don't intend to deny access to anybody in the
12    courtroom unless there is going to be some kind
13    of disruption.  We won't tolerate any kind of
14    disruptions.  If there are such, you will be put
15    outside.
16              MS. DAVIES:  I would like for the
17    court to know that I have tried to speak
18    individually and certainly as a group with all
19    the Allen friends and family who I know who are
20    here today.   And I know they are well aware
21    that they must conduct themselves with restraint
22    in the courtroom, and I know that that is their
23    intention.
24              THE COURT:  This is a very difficult
25    room to hear in.  Our acoustics are terrible.
```

4

```
 1    We have outside hallway noises, we have noise
 2    from the holdover in the back.  We have elevator
 3    noise.  We have unexplained noise we haven't
 4    been able to take care of in the last four years
 5    coming out of our speakers.  It's very difficult
 6    to hear.  People are not going to be able to
 7    come in and out of the courtroom except on
 8    breaks.  We will try to break approximately
 9    every hour and fifteen minutes or so.  This will
10    also include, as far as disruptions are
11    concerned, conversation back and forth among
12    spectators, gestures, winks.
13            What else did you have in this
14    motion?
15            MR. STAFFORD:  I hate to belabor the
16    point, but, again, since the jury impression,
17    the jurors' minds are like tape recorders, I
18    would also ask the court to instruct the
19    audience not only on my family's part but on the
20    Allen family's part that if they come to a point
21    where -- just getting up in the middle of the
22    testimony and leaving the courtroom is going to
23    make such a lasting impression on the jury -- I
24    would ask, that if they feel in their heart and
25    good conscience that they can't hear the
```

5

1    testimony, that they not come into the

2    courtroom.  I ask the court to admonish both

3    sides of the family because once the damage is

4    done it's done.

5         THE COURT:  I can't begin to foresee

6    the outbursts you might be talking about.  I

7    know it's going to be an emotional trial.  We

8    are going to ask the audience to attempt to

9    restrain yourselves.  If you think you cannot

10   take it sitting here in the courtroom, you may

11   as well leave now.  We are not going to have a

12   lot of people getting up and going out.

13        MR. STAFFORD:  My last thing, judge,

14   is the motion in limine that I filed in

15   reference to evidence of family impact, and the

16   motion in limine basically is that the state

17   approach the bench and.

18        THE COURT:  I have already instructed

19   Ms. Davies to approach the bench if she thinks

20   she's going to get into anything covered in your

21   motion in limine.  We will probably take

22   portions of this up at a later time specifically

23   on punishment.

24        MS. DAVIES:  Your Honor, the way that

25   this motion in limine is worded.

6

1          THE COURT:  It's overbroad.

2          MS. DAVIES:  It's so broad.

3    Characterizations of present crime?  I have

4    people who were at the crime scene.   And

5    certainly I will be asking them to describe and

6    explain what happened then and there.

7          THE COURT:  I am not going to be

8    asking you to approach the bench on such.

9          MS. DAVIES:  Certainly some limited

10   amount of background information about the

11   circumstances and the victims will be

12   appropriate at guilt stage.

13         THE COURT:  It will be allowed.

14         Anything else?

15         MS. DAVIES:  Your Honor, to return, if

16   I may, to the issue of the family.  I know you

17   have made quite clear about coming and going.

18   I have told the family members that if they were

19   in the courtroom and felt that it was best for

20   them to leave that they could quietly do so.  If

21   the court is saying anything different now, I

22   want to be sure that my instructions are not

23   going to be contrary to the court's.

24         THE COURT:  They are not.

25         MS. DAVIES:  Mr. Stafford and I

                                              7

1     discussed outside just informally this morning

2     what his approach or objections might be

3     surrounding the circumstances of the defendant's

4     arrest.  I had inquired of Mr. Stafford, because

5     when I make my opening statement I wanted to

6     know whether -- I assume that I would not be

7     able to mention that the defendant was arrested

8     while burglarizing a building and was in fact in

9     custody when he gave the statement.  Mr.

10    Stafford has indicated to me that he would have

11    no objection to that, that he intends to take a,

12    quote, let it all hang out approach.  And I just

13    wanted to be sure we were all on the same track

14    and that was the understanding before I get up

15    in front of this jury and refer to that.

16         THE COURT:  That is my understanding

17    concerning that matter in a session we had off

18    the record earlier today.

19         MR. STAFFORD:  That is my intent, Your

20    Honor.  I have no objection to the State going

21    into that at this time.  However, Your Honor, I

22    cannot anticipate the State's opening argument.

23    But, again, as far as Officer Butler's testimony

24    in reference to my client stating that the

25    individual who supposedly was responsible for

8

1 the killing took a hundred and sixty dollars, I

2 am still objecting under the Code of Criminal

3 Procedure 38.22 that this was a direct response

4 to the officer's inquiry into that matter.  I

5 think it's subject to the State laying the

6 proper predicate as to an exception of why that

7 oral statement -- he was in custody.  It was in

8 direct response to custodial interrogation.  And

9 I am contending it's not admissible for any

10 purpose.  And I would ask her not to go into

11 that on her opening statement until the court

12 rules on whether or not that part of the

13 statement is in fact admissible.

14    MS. DAVIES:  Your Honor, I am sure the

15 court will remember that the written statement

16 also contains admission from the defendant that

17 he took money from the billfold or from the

18 wallet before he left the house.  So I do expect

19 to refer to that.

20    THE COURT:  That is my recollection also.

21    MR. STAFFORD:  I think the statement

22 and the confession is ambiguous.  It could be

23 interpreted two ways -- that I left the wallet

24 and the money both there, or possibly I took the

25 money with me or I did not.  I think it's an

9

1    ambiguous statement.

2              THE COURT:  Officer Butler we are not

3    going to be hearing from this morning?

4              MS. DAVIES:  I don't expect we would

5    get to him until after lunch.

6              THE COURT:  I will review his

7    testimony.

8              MR. STAFFORD:  Yes, sir, it's right

9    here.

10             THE COURT:  I will review it from my

11   notes and let you know after lunch

12             Would you avoid mentioning the exact

13   amount of money?  If you want to refer to what

14   is in the so-called confession you may do that.

15             Are you going to wish to make any kind

16   of opening statement?

17             MR. STAFFORD:  Yes.

18             THE COURT:  Following the State or at

19   a later time?

20             MR. STAFFORD:  Following the State.

21             MS. DAVIES:  Your Honor, we have a

22   custodian of the records from the Board of

23   Pardons and Paroles in the courtroom in response

24   to my subpoena.  And my understanding he has

25   some records with him.

10

1            THE COURT:   Is that somebody

2    appearing--

3            MS. DAVIES:   Mr. Green.

4            MR. STAFFORD:   Could I get some water

5    real quick?

6            THE COURT:   You might want to hear this.

7            It's my understanding there was a

8    subpoena duces tecum issued at the request of

9    the district attorney's office.   Mr. Green is

10   general counsel for the Texas Department of

11   Criminal Justice Pardons and Paroles?

12           THE WITNESS:   That is correct.

13           THE COURT:   You have filed a motion to

14   quash the subpoena or to allow in camera

15   inspection of confidential subpoenaed records.

16           THE WITNESS:   Correct.

17           MS. DAVIES:   Your Honor, my request is

18   that the court order Mr. Green to leave his file

19   with the court for in camera inspection so this

20   court can determine whether there is anything

21   relevant and, hopefully, turn the file over to

22   the State and even to the defense if there is

23   anything mitigating.   I think the fact that

24   this is a capital murder, and the rules of

25   evidence, as we all know, are very broad at the

                                              11

1    punishment stage, the information in regard to
2    this defendant in the parole board file might
3    very well be relevant.   I know that he has
4    spent an extraordinarily long time by present
5    standards in the penitentiary on a five year
6    sentence on his last stay, and I think the key
7    to that may be in the file that Mr. Green has.
8              THE COURT:   Mr. Green, since you filed
9    your motion in the alternative, I'm assuming
10   that will be okay, that you leave it with the
11   court.   You don't have to remain with the
12   records.   I assume these are originals?
13             THE WITNESS:   These are copies of the
14   originals.   I have retained the originals.   I
15   have them in my car, but I didn't bring them in.
16             THE COURT:   You have copies.   For the
17   State's purposes, are you asking that I actually
18   look at the originals?
19             MS. DAVIES:   If Mr. Green can vouch
20   for the fact that these are accurate copies.
21   What I would really like is those files to be
22   turned over to me as subpoenaed, but if the
23   court will examine them in camera.
24             THE COURT:   You have two different
25   things here.

                                                        12

1           THE WITNESS:   That is case law on my

2      motion, Your Honor.

3           THE COURT:   Okay.   What else do you

4      have?

5           THE WITNESS:   Another file for another

6      court.

7           MR. STAFFORD:   I would request that

8      the motion to quash the subpoena be granted.

9           THE COURT:   You are urging Mr. Green's

10     motion?

11          MR. STAFFORD:   I ask the court to

12     adopt his motion and abide by his wishes.   For

13     purposes of the record, I would ask the State

14     subpoena be quashed for the reasons stated in

15     the parole board motion to quash the subpoena.

16          THE COURT:   Okay, his motion is in the

17     alternative, and I am going to permit in camera

18     inspection of these subpoenaed records.

19          Anything else we need to take up?

20          MS. DAVIES:   I would ask that the

21     court put Mr. Green or custodian on call so that

22     if it would become necessary to have the

23     custodian of the records to return after we have

24     had an opportunity to see what is in there that

25     he would be available to do so.

13

```
 1              THE COURT:  Any objection?
 2              THE WITNESS:  No problem.
 3              THE COURT:  Do you have a phone
 4    number?
 5              THE WITNESS:  As long as it's past a
 6    week from now.  I am leaving for Ohio in the
 7    morning.  I will be back next Wednesday.
 8              THE COURT:  I think you need to step
 9    over here and talk to Ms. Davies.
10              MS. DAVIES:  In your absence, is there
11    someone else to act as custodian of records?
12              THE WITNESS:  Mr. Hubbard, who is my
13    assistant, would be available.
14              THE COURT:  Is he in Huntsville?
15              THE WITNESS:  No, in Austin.
16              MS. DAVIES:  My request would be that
17    whoever the custodian of the records at whatever
18    time we need them during the process of this
19    court be available to testify.
20              THE COURT:  Any objection?
21              MR. STAFFORD:  No.
22              THE COURT:  That's fine.
23              Let's arraign the defendant outside
24    the presence of the jury.
25              MR. STAFFORD:  Your Honor, for
```

14

1    purposes of the record, the State and I have

2    entered into an agreement as far as the rule is

3    concerned as far as family members, that we are

4    relaxing the rule to allow Mr. and Mrs. Rhoades,

5    even though they are going to be witnesses at

6    the time of punishment if we get to punishment,

7    and, likewise, I have agreed to do that with the

8    Allen family, Your Honor.

9              THE COURT:  All right.  Anything else?

10             MS. DAVIES:  Your Honor, I want to be

11   sure that I understand that the defense and I

12   are in agreement that those family members and

13   friends who may only testify at punishment will

14   be excused from the rule during the guilt stage

15   of trial.

16             THE COURT:  That is my understanding.

17             MS. DAVIES:  When we get to that

18   point, I also was going to ask that Mr. Allen,

19   the father of our two complainants, will testify

20   in the guilt stage; and, hopefully, after his

21   testimony is complete, the rule could be relaxed

22   as to him also.

23             MR. STAFFORD:  No objection.

24             THE COURT:  Anything else?

25             MS. DAVIES:  At this point I would

15

1  like to ask the court and Mr. Stafford to be

2  sure that when we get to -- I want to have an

3  opportunity to see his witnesses' reports at

4  punishment stage.  I want to tell the court

5  this.  We all know that a Doctor Dickerson is

6  going to testify because he said so in a

7  pre-trial motion.  I anticipate that he will

8  have a lengthy report.  The State is entitled to

9  and certainly will need time to look at that

10 report.  We are on notice Doctor Dickerson's

11 office is out of town.   I would hate for things

12 to be delayed because he comes to court and

13 doesn't have all those documents that we are

14 entitled to look at available.

15          THE COURT:  Let's take this up later.

16          MS. DAVIES:  I would like to have the

17 court to instruct Mr. Stafford to be sure that

18 those witnesses, that the defense have those

19 things in the courtroom so that we don't delay

20 the trial.

21          THE COURT:  Have you filed a subpoena

22 on these people, Mr. Stafford?

23          MR. STAFFORD:  No, I haven't.  They

24 are going to be here.

25          THE COURT:  How many people are we

                                              16

```
 1    talking about?

 2              MR. STAFFORD:  Two.

 3              THE COURT:  Doctor Dickerson and

 4    Doctor?

 5              MR. STAFFORD:  Proler.

 6              MS. DAVIES:  I guess one option would

 7    be the State to subpoena those.

 8              THE COURT:  Since the State knows who

 9    the witnesses are, you can file you--

10              MS. DAVIES:  I certainly considered

11    that.  I mean, they are not State's witnesses.

12    And, of course, if defense doesn't bring them

13    in, I have no reason to inconvenience either one

14    of those professional men.

15              MR. STAFFORD:  Both of these gentlemen

16    are going to testify, and I will supply under

17    the rules of evidence copies of their reports as

18    required by the rules of evidence to the State.

19              THE COURT:  If that is not enough, you

20    can file your subpoena.

21              MR. STAFFORD:  I will file a motion to

22    quash if they issue a subpoena duces tecum.

23    It's not discoverable under the rules of

24    evidence.  Plus they are not ready.

25              MS. DAVIES:  I just want to be sure
```

17

1    all the documents are available to the State.

2              (Pause).

3              THE COURT:   We are back on the record

4    in cause number 612408, State of Texas vs. Rick

5    Allan Rhoades, also known as David Allan

6    Marcas.   Defendant is present and represented by

7    counsel Mr. Stafford and Ms. Kaiser.   State is

8    represented by Ms. Davies.

9              MS. DAVIES:   And Claire Connors.

10             THE COURT:   And Claire Connors.

11             As I recall, some weeks ago the State

12   abandoned and dismissed paragraph two of the

13   indictment in cause number 612408.

14             Is that your recollection, Mr.

15   Stafford?

16             MR. STAFFORD:   It is.

17             THE COURT:   And yours, Ms. Davies?

18             MS. DAVIES:   That is correct.   We are

19   proceeding on the first paragraph of the

20   indictment.   I did not abandon the two

21   enhancement paragraphs.   Did abandon the second

22   paragraph.

23             THE COURT:   Making a notation on the

24   original indictment -- I know we did this

25   sometime previous.   I don't know if it's on the

                                              18

1    docket sheet at this time or not.  If not, there

2    will be an entry at this time.

3             Are you ready to arraign the defendant

4    outside the presence of the jury?

5             MS. DAVIES:  Yes, sir.

6             THE COURT:  Proceed.

7             MS. DAVIES:  In cause number 612408.

8    In the name and by authority of the State of

9    Texas.  The duly organized Grand Jury of Harris

10   County, Texas, presents in the District Court of

11   Harris County, Texas, that in Harris County,

12   Texas, Rick Allan Rhoads, also known as David

13   Allen Marcas, hereafter styled the defendant,

14   heretofore on or about April 13, 1991, did then

15   and there unlawfully intentionally and knowingly

16   cause the death of Bradley Dean Allen, hereafter

17   styled the complainant, by stabbing the

18   complainant with a deadly weapon, namely, a

19   knife, and during the same criminal transaction

20   the defendant did there and there unlawfully

21   intentionally and knowingly cause the death of

22   Charles Allen by stabbing Charles Allen with a

23   deadly weapon, namely, a knife, and by striking

24   Charles Allen with a deadly weapon, namely, a

25   bar.  Against the piece and dignity of the

1   state.   Signed by the foreman of the Grand

2   Jury.

3              THE COURT:   To which the defendant

4   pleads guilty or not guilty?

5              THE DEFENDANT:   Not guilty.

6              THE COURT:   With your permission, I

7   will enter that plea for him at the time he is

8   arraigned in the presence of the jury.

9              Is that all right, Mr. Stafford?

10              MR. STAFFORD:   That's fine, judge.

11              THE COURT:   Anything else we need to

12   take up before we get the jury?

13              MR. STAFFORD:   I will renew all the

14   motions I have heretofore made before the court

15   and reurge them at this time and ask the court

16   to grant relief that was requested at the time

17   they were argued before the court.

18              THE COURT:   All motions filed no

19   matter what?   Are you going to take up any one

20   individually?

21              MR. STAFFORD:   I am just renewing all

22   of them, constitutionality of the statute.

23              THE COURT:   All those I previously

24   ruled on, the rulings are still in effect.   I

25   haven't changed any rulings.

20

1           MR. STAFFORD:  Failure to inform the

2     jury of the thirty-five-year rule as far as

3     parole is concerned.

4           THE COURT:  I understand.

5           Do we have witnesses in the

6     courtroom?

7           MS. DAVIES:  May I ask a question?  It

8     has been called to my attention.  I know the

9     indictment says that this offense occurred on

10    September 13, 1991.  I thought that is what I

11    was reading, but it's been called to my

12    attention that I may have said another month.

13    I want to correct that.

14          MR. STAFFORD:  I will correct it for

15    her on appeal, judge.

16          THE COURT:  Would you like Ms. Swope

17    to take a look and see what you said?  I didn't

18    catch it.

19          MS. DAVIES:  I don't know that is

20    necessary.  As far as the defendant's pleading--

21          THE COURT:  There is no question the

22    indictment alleges the offense date is September

23    13, 1991.

24          Was that your understanding, Mr.

25    Rhoades?

                                                    21

1             THE DEFENDANT:  Yes, sir.

2             THE COURT:  Yours, Mr. Stafford?

3             MR. STAFFORD:  Yes.

4             THE COURT:  Anything else?

5             Witnesses present in the courtroom?

6             MR. STAFFORD:  Could they be sworn and

7  rule be invoked?

8             THE COURT:  Anyone who is going to

9  testify in this case, please stand up and raise

10  your right hand and be sworn if you are

11  testifying in the case in chief.

12           MS. DAVIES:  I believe that is all in

13  the courtroom at the moment.

14           (Two witnesses sworn)

15           THE COURT:  The rule has been

16  invoked.  You have to remain outside the

17  courtroom while other witnesses are testifying.

18  Don't discuss this case among yourselves or with

19  anybody else except the attorney who has you in

20  charge.  We will call you in one at a time.

21           Who is your first witness?

22           MS. DAVIES:  My first witness will be

23  David Sanders.  I do intend to make an opening

24  statement.

25           THE COURT:  Mr. Sanders, why don't you

1   come back here and have a seat in the hallway so
2   we can get to you easily?
3           Paul, get the jury.
4           (Jury enters the courtroom).
5           THE COURT:  We thank you for your
6   patience.  We know that you have been back there
7   for quite some time.  You are going to be called
8   upon from time to time to have to go back to the
9   jury room while we are taking up matters outside
10  your presence.  If you would all stand up and
11  raise your right hands and be sworn as jurors.
12          (Jury sworn)
13          THE COURT:  Ms. Davies, will you
14  arraign the defendant in the jury's presence,
15  please?
16          MS. DAVIES:  In cause number 612408.
17  In the name and by authority of the State of
18  Texas.  The duly organized Grand Jury of Harris
19  County, Texas, presents in the District Court of
20  Harris County, Texas, that in Harris County,
21  Texas, Rick Allan Rhoades, also known as David
22  Allan Marcas, hereafter styled the defendant,
23  heretofore on or about September 13, 1991, did
24  then and there unlawfully intentionally and
25  knowingly cause the death of Bradley Dean Allen,

                                                    23

1    hereafter styled the complainant, by stabbing

2    the complainant with a deadly weapon, namely, a

3    knife.   And during the same criminal

4    transaction the defendant did then and there

5    unlawfully intentionally and knowingly cause the

6    death of Charles Allen by stabbing Charles Allen

7    with a deadly weapon, namely, a knife, and by

8    striking Charles Allen with a deadly weapon,

9    namely, a bar.

10              Against the peace and dignity of the

11   state.   Signed by the foreman of the Grand

12   Jury.

13              THE COURT:   To which charge, ladies

14   and gentlemen, the defendant pleads not

15   guilty.

16              Please be seated.

17              It's my understanding Ms. Davies has

18   an opening statement.   And, also, there is

19   somebody else at the table you have not been

20   introduced to.   Ms. Claire Connors is sitting

21   second chair to Ms. Davies.

22              Proceed, please.

23              MS. DAVIES:   We have a chance at this

24   point, each side, to make a very brief opening

25   statement, not a jury argument but just to tell

24

1    you briefly what we expect the evidence to show,

2    what I expect the evidence to show at this

3    point.

4              You are going to hear testimony from

5    quite a few different people, ordinary citizens,

6    police officers, experts, DNA expert, medical

7    examiner, a wide variety of people are going to

8    come in here in the courtroom to tell you bits

9    and pieces of what they know and what they can

10   contribute to the evidence in this case.  So

11   that you have something of a framework so that

12   as you take each of those pieces of the puzzle

13   you will have a better idea of how to put it in

14   place, we have this opportunity to tell you what

15   we expect the evidence to show.

16             As these witnesses come in and

17   testify, you are going to learn that Charles and

18   Bradley Dean Allen were brothers.  You are going

19   to learn that they moved onto Keith Street with

20   their parents when they were just little kids.

21   They grew up on Keith Street.  The Allens had

22   six children, five sons and a daughter, James,

23   Kevin, Brad, Charles, Donnie, frequently

24   referred to by the family as little Donnie, and

25   the one sister Janis.  They moved on to Keith

25

1    Street in their family home when the kids were

2    young.  Lived across the street from a family,

3    the Sanders family.   All those kids grew up on

4    that street, they lived there, they played

5    there, they worked there--.

6            MR. STAFFORD:  Excuse me, Ms. Davies.

7    Again, this goes to my motion in limine that I

8    previously filed.  I don't think it's proper

9    opening argument.

10           THE COURT:  Overruled.

11           MS. DAVIES:  I expect the evidence

12   will show that Charles and Bradley at 32 and 33

13   years of age died there, died in their brand new

14   home, or Charles' brand new home on Keith

15   Street.  As you hear from the witnesses, you

16   will learn as adults -- in fact, the first

17   witness you are going to hear from is David

18   Sanders, one of the Sanders kids who lived

19   across the street from the Allens.  Same age as

20   Charles.  They grew up together and were the

21   best of friends all through school and high

22   school.  When you hear from David, you will

23   learn how they continued to be friends even

24   after they got out of school.  David Sanders

25   went to college, came back, began a construction

1  business.  And Charles, after high school -- in
2  fact, all the boys, Bradley and Charles were
3  both good friends of David, but David and
4  Charles were special friends, the best of
5  friends.  When Charles graduated from high
6  school, he went to work, his first job was with
7  Lubrizol.  He worked with them until the time of
8  his death.
9        You will learn that as adults in the
10 year or so just prior to the death, or a few
11 years, both Brad Allen and Charles Allen had
12 gotten married, both had been divorced.  Charles
13 had contracted with his friend David Sanders
14 from across the street, a life-long friend, to
15 build a home for him.  And that home that was
16 right next door to the Sanders home, was right
17 across the street on Keith Street from the
18 Allen's family home where Charles and Bradley
19 had grown up.  The house was near enough
20 completion on the first of September that
21 Charles moved into his new home.  It was his
22 house that he had had built, but he was letting
23 his brother Brad live with him for a period of
24 time, so one of those rooms in the house was
25 designated as Brad's room and the other, the

27

1   master bedroom, was Charles'.  The two brothers,

2   early thirties, both divorced, were going to

3   live together for a short period of time, or

4   temporarily.

5               They had been in the house less than

6   two weeks, when on a Thursday night, the 12th of

7   September, there was a football game on TV.  You

8   are going to hear from the witnesses that

9   family, friends, neighbors, the brothers, the

10  dad, some of the men had gathered in Charles'

11  new home with him and Brad to watch TV, to watch

12  the football game because Charles had gotten

13  cable.  They watched TV, they ate pizza.  These

14  were the kind of what we used to call back-door

15  friends, the kind who come in and out because

16  neighbors and family were so near by.  They all

17  spent the evening together.  David and his

18  brother Daniel were part of the group of men who

19  were in and out of Charles and Bradley Allen's

20  home that evening watching the game.  During the

21  course of the evening, all the friends and

22  family, including the Allen brothers' dad, were

23  in and out and left.  The last to leave were

24  David and Daniel Sanders.

25              The house included in the back,

28

1  instead of a garage, a recording studio because
2  not only did Charles Allen have a job, in his
3  adult years he had developed a talent for
4  music.  He in fact had recorded a CD.  He was
5  very interested in developing that talent; and
6  along with the construction of the house had a
7  very sophisticated recording studio built in the
8  back.  There were plans for that weekend grand
9  opening of the recording studio.  There were
10  still finishing touches to be done on the house
11  and the recording studio in order to move things
12  in, to get ready for the event, even to close on
13  the house.  So, as David Sanders left the house
14  that night, the last to leave, he told his
15  friends goodbye for the night, the plan was for
16  David Sanders to return early the next morning
17  because FHA inspectors were going to come.
18  There were little things that needed to be
19  completed.  The evidence will show that that
20  was the last time David Sanders saw his friends
21  Brad and Charles alive.  Around eight o'clock
22  the next morning, when David Sanders came to the
23  door to awaken his friends or to come in and
24  complete his work, he got no answer.  He waited,
25  finally went back and got his key to the house

1    -- they were the kind of friends who had keys
2    to each other's houses -- and let himself into
3    the back door.  When he got in the house, he
4    first sees blood in the kitchen.  He was
5    alarmed.  Continues on into the house to see
6    first behind, barely see behind a closed door
7    the body of Brad crouched and bleeding, or
8    bloody, at his bedroom door.  And then in the
9    master bedroom David finds his friend Charles
10   beaten, bloody, dead.  David runs back home to
11   get a gun, to get his brother to call for help.
12   The two brothers come back.  They don't know
13   what the situation is.  They call for the
14   police.  They run down the street to tell Mr.
15   and Mrs. Allen just a few houses down across the
16   street two of their sons lie dead in their new
17   home.
18          I expect the evidence to show that
19   there was a very thorough investigation.  You
20   will hear from witnesses who took fingerprints
21   throughout that house and learned, that despite
22   their efforts, there were no fingerprints
23   available suitable for identification.
24          You will hear from a serologist expert
25   who came out to the scene and took samples of

30

1    blood in various parts of the house.  You will

2    hear from him and from the other witnesses who

3    bring these bits of information that as the

4    detectives and all of the crime scene

5    specialists combed through the scene there in

6    the Allen brothers home on Keith Street they

7    learned, with blood spattering pooled

8    everywhere, it appeared clearly to come from the

9    two brothers as they fought and died.  There

10   were also some other spots, drops of blood,

11   apart, away from the bodies.  When they examined

12   those, they learned that there were some small

13   droplets of blood, dripped blood that were type

14   A.  They determined, as they analyzed their

15   findings in the laboratory, that both Brad and

16   Charles had type O blood.   So as they

17   investigated, they determined that the other

18   person who was in that house and apparently

19   become cut had type A blood.

20           As the detectives investigated this

21   case, you will hear how they talked to every

22   friend, every neighbor, every construction

23   worker who had been in the house, everyone who

24   worked with, might have been invited to come

25   over.  They talked to endless numbers of

31

1    people.   And you will learn from the evidence

2    that it was about a month before a real break

3    came in the case, and that was when, about a

4    month later, a burglar alarm went off at Young

5    Elementary School in Pasadena.   And Officer

6    Lopez, who works for the Pasadena Independent

7    School District, answered that alarm, goes to

8    that elementary school and arrests this man,

9    Rick Allan Rhoades, as he is coming out of that

10   school at the door with equipment, VCR, display

11   type equipment.   Officer Lopez arrests this

12   defendant, puts him in jail in the Pasadena

13   jail, and the evidence will show that the next

14   day, after he was in custody, this defendant,

15   after first having given a false name to Officer

16   Lopez, made it known to the jailer there at the

17   Pasadena jail that he wanted to talk to

18   somebody, he had information about a murder.

19   As a result, the Pasadena jailer or detectives

20   contacted the Houston Police Department.

21   Detectives who were handling this case,

22   Sergeants Maxey and Kennedy, went over to

23   Pasadena jail to talk to this man.   Found out he

24   did in fact know something about the case.   They

25   read him his Miranda warnings.   He proceeded to

32

1   tell Sergeants Kennedy and Maxey about how he

2   had killed Charles and Bradley Allen.    In the

3   statement he gave to the police he detailed how

4   he had stabbed each of the men, first Charles,

5   beat Charles in the head with a weight bar,

6   stabbed him with a butcher knife, and leaving

7   his body on his bed, and then, when the brother

8   Bradley awakened and came running in to come to

9   the aid of his brother, he described how he then

10  turned on him and stabbed him repeatedly with a

11  butcher knife.   Finally losing the knife, the

12  knife flying out of his hand in one of the

13  stabs, one of the thrusts of the knife.   That

14  was when Bradley managed to slam the door to his

15  bedroom as he lay crouched, bleeding on the

16  floor, blocked the door so that this defendant

17  couldn't come back.   In fact, in the defendant's

18  statement he also describes how, once he lost

19  that knife, he goes back to the kitchen, gets

20  two more knives and returns to the two bedrooms

21  in turn where Charles and Bradley were dying or

22  dead.

23          There are certain aspects of the

24  statement that this defendant gave to the

25  police, things he admitted to them, the weapons

33

1  that he used, there are certain aspects of that

2  statement I think you will find that the

3  evidence, the physical evidence at the scene is

4  not consistent with.  You will learn that, when

5  this defendant talked to the police, he

6  suggested that the way this happened was that he

7  was out taking a walk at 2:30 in the morning and

8  saw Charles Allen come to his door as if he was

9  locking up for the night and they had a

10  something of a staring match and exchanged words

11  there in the street and that this defendant was

12  so alarmed that that prompted him, after Charles

13  Allen, according to the defendant, turned and

14  went back in the house, prompted him to follow,

15  to go into the Allen brothers' home, uninvited,

16  and picks up a weight bar, picks up knives,

17  proceeds to defend himself from whatever his

18  perceived slight or danger was by slaughtering

19  the two men.

20         The evidence that you will hear about,

21  the physical evidence, will indicate that it is

22  far more likely that Charles Allen was first

23  attacked while he was in his bed or beside his

24  bed in those wee morning hours and that Bradley,

25  in fact, was slashed and killed as he came to

34

1    his brother's defense.

2              This defendant described when he gives

3    the statement how after -- oh, he also, by the

4    way, told the police when he talked to them that

5    he cut his hand during this attack.   According

6    to the defendant, he cut his hand trying to

7    disarm Charles Allen.   And that explains -- the

8    fact that he cut his hand explains the drop of

9    his blood.

10             Once he had given this statement, a

11   search warrant was obtained and a sample of the

12   defendant's blood was turned over to the

13   laboratory.   DNA analysis compared this

14   defendant's blood with the blood sample, the

15   droplets in the kitchen, and confirmed that in

16   fact this defendant was the person who was in

17   that house and who did this dastardly deed.

18             THE COURT:   Mr. Stafford.

19             MR. STAFFORD:   May it please the

20   court.

21             I want to thank y'all for bearing with

22   us.   The trial, I don't know how long it will

23   last, but some of the evidence I think is going

24   to be very emotional, very dramatic.   And I

25   expected it to be that way as I talked to you on

                                                  35

1    voir dire.

2              An interesting factor that I would

3    like for y'all to keep in mind, if you can, is

4    that when the detectives made the call out at

5    Keith Street they were really puzzled because

6    there was no forced entry into the house, there

7    was no evidence that any burglary had taken

8    place.  In fact, I think the evidence will show,

9    that when the witnesses showed up the next

10   morning, the automobile was in the parking lot,

11   motorcycle was in the driveway, there was

12   substantial amount of items in the house that

13   could have been taken, that could have been

14   easily pawned.  So the detectives I think will

15   tell you that they ruled out burglary and theft

16   almost immediately because the house was not in

17   a disarray from the standpoint like something

18   was wanted to be taken.  So they assumed that

19   the assailant knew the victims somehow.  They

20   didn't know.  I think the evidence will even

21   show that they were so frustrated that at the

22   funeral they noticed an individual with a cut on

23   his hand and they even took his blood sample,

24   just looking for leads.  This went on for

25   almost a month.  No leads.  And I think the

36

1   detectives will tell you, that if they had not

2   got that phone call from the Pasadena PD, to

3   this day, possibly five years from now, they

4   still would not have known how and why this

5   happened, but for a phone call.  I think the

6   detectives will tell you that, when they

7   captured Mr. Rhoades, that they informed, or Mr.

8   Rhoades informed them I could have gotten away

9   with that burglary at the school if I had wanted

10  to.  I could have gotten away.  But I wanted, I

11  was tired of running, I wanted to tell what

12  happened.  He told the detectives before he gave

13  his confession I contemplated suicide.   I had

14  never been a violent person.  I don't understand

15  why I did this.  And he proceeds to make a

16  statement.  He didn't go in and negotiate some

17  sort of deal.  Look, I will tell you something

18  if you give me this.  He didn't try to exchange

19  information for a better deal for himself.  He

20  came forward and said I want to tell you what

21  happened.  I don't understand why I did it

22  myself because I am not a violent person.    I

23  think the detectives will tell you and the

24  statement will substantiate that this was not

25  done for money, it was not done for burglary.

37

1   But for, as Ms. Davies has told you, he was
2   walking down the street.  I think in his
3   confession he will tell you, and I think the
4   evidence will show that in this case we are
5   going to let it all hang out.  We are not going
6   to hide one thing from you.  My client just got
7   out of prison.  In the confession he said I just
8   got out of prison, just got off the bus.  I was
9   suppose to go to a halfway house, but I went
10  over to my neighborhood where I used to live.  I
11  went and tried to find my parents.  I couldn't
12  find them.  So I drank some beer.  I think he
13  even said I was feeling kind of good about being
14  out and I decided to walk down the street and I
15  saw this gentleman standing in the door and he
16  asked me why I was there or something to that
17  effect.  Confession will speak for itself.  And
18  we had words.  And he told me to get my ass on
19  down the road.  And I said I have the right to
20  stand in the middle of the road as long as I
21  want to.  And I think the confession will tell
22  you that the gentleman went into the house and
23  my client thought he was going in for a gun.  He
24  says in the confession I didn't have any
25  weapons.  I didn't have anything on me.  He runs

38

1    around to the back of the house.  Then he runs
2    into the front of the house.  And the door was
3    open.  And he walks in, and he sees the
4    gentleman getting a knife.  And he has a bar in
5    his hand.   And he says I thought about
6    running.   I thought about getting out.    I
7    thought about leaving, but he had my path
8    blocked and he came toward me with a knife, and
9    I punched him in the nose, or hit him in the
10   nose.  I think the medical testimony will
11   support that Mr. Allen was hit in the nose.  And
12   I think the evidence will show that there was a
13   massive struggle.  And I think the evidence will
14   support through the physical evidence -- and I
15   think as laymen you realize physical evidence
16   has no bias or prejudice.  It speaks for itself
17    -- that the scar or the wound on his hand is
18   consistent with someone grabbing a knife as they
19   are coming toward you.   There is a cut there.
20   We will show you pictures of it.   And the
21   events that lead up to that I agree, according
22   to the prosecutor, are horrible.  And he left.
23   But for that phone call, but for that trip to
24   ask the detectives, today you wouldn't be here
25   and we wouldn't know the evidence.  I think that

                                                    39

1    is what the evidence will show.

2              Thank you, Your Honor.

3              THE COURT:  Ms. Davies, call your

4    first witness, please.

5              MS. DAVIES:  The State calls David

6    Sanders.

7              (The following proceedings were had at

8    the bench:)

9              MR. STAFFORD:  I renew my motion in

10   limine once again, that a substantial narrative

11   background relationship between the deceased and

12   this witness has no bearing on the subject

13   matter presently in the indictment, going to

14   high school together, being raised on Keith

15   Street and, again, goes right to the thrust --

16   I think it has very little relevancy, has no

17   relevancy at all to whether or not my client

18   committed the acts that they say he committed.

19   And this is only an attempt to humanize the

20   victims and bring on an emotional impact on the

21   jury.  I strongly object to going into all of

22   this personal history, as it has no relevancy at

23   all in this case.

24             MS. DAVIES:  This witness, he was the

25   main suspect.  He is the last person who sees

                                                    40

1  them alive.

2              THE COURT:  Overruled.

3              MR. STAFFORD:  May I have a running

4  objection on every question?

5              THE COURT:  Proceed, please.

6

7                      DAVID SANDERS

8  was called as a witness by the State and, having

9  been duly sworn, testified as follows:

10                  DIRECT EXAMINATION

11  BY MS. DAVIES:

12       Q.   Would you, please, state your name for

13  the record?

14       A.   David Lee Sanders.

15       Q.   Mr. Sanders, do you mind telling us

16  how old a man you are?

17       A.   I'm sorry?

18       Q.   How old are you?

19       A.   Thirty-three.

20       Q.   And are you married?

21       A.   No, ma'am.

22       Q.   Do you have a family here in Houston?

23       A.   Yes, ma'am.

24       Q.   Would you describe for the jury the

25  kind of family you come from, the size of your

1    family?

2             MR. STAFFORD:   Again, I object as to

3    the relevancy to this indictment.   Has no

4    bearing at all.

5             THE COURT:   Rephrase your question as

6    far as "kind of."

7    BY MS. DAVIES:

8        Q.   Do you have family here in Houston?

9        A.   Yes, ma'am, my parents--.

10           MR. STAFFORD:   That has been asked and

11   answered, judge.

12          THE COURT:   Overruled.

13   BY MS. DAVIES:

14       Q.   What family do you have here?

15       A.   My parents live here.   I have a

16   brother and two sisters.   I have a dog named

17   Buddy.

18       Q.   How long have you lived in Houston or

19   in this area?

20       A.   I was born in this area; and other

21   than attending college and working in another

22   state building houses, all my life I have lived

23   here.

24       Q.   Where did you go to college?

25       A.   University of Texas.

1    Q.   I phrased my question about living in
2    the Houston area and I saw some hesitation.   Is
3    your mailing address actually Houston or is it
4    Pasadena?
5    A.   It's actually Pasadena, but physically
6    we live in the City of Houston.
7    Q.   Can you tell us what street you live on?
8    A.   Keith Street.
9    Q.   How long have you lived on Keith Street?
10   A.   We moved there in 1969, and I lived
11   there until '77, when I went to Austin.
12   Q.   Is that when you went to college?
13   A.   Yes, ma'am.   And then back over the
14   summers, you know, lived there during that
15   time.   It's really -- it's considered my home.
16   Q.   What address do you live at on Keith
17   Street?
18   A.   618.   618 Keith.
19   Q.   Is that the same house you lived in
20   from the time you moved onto that street?
21   A.   Yes, ma'am.
22   Q.   At the present time, who do you live
23   with at 618 Keith Street?
24   A.   My brother Daniel and my sister Dawn.
25   Q.   How old were you when you moved onto

43

1    Keith Street?

2         A.    Ten years old.

3         Q.    Did you at that point in your life

4    come to know the Allen family?

5         A.    --.

6         Q.    Did you know them before?

7         A.    No.    When we were building the house,

8    they were a family of five brothers and a

9    sister, and they were approximately my age, and

10   they wanted to see what the new house was going

11   up on the street, and they would come over there

12   and, you know, do what kids do.    That is how I

13   met them.    They came over there while it was

14   under construction.    We had to run them off a

15   few times.    I just got to know them through

16   that.

17        Q.    Did you strike up a friendship with

18   any particular ones of the Allen family?

19        A.    Yes, ma'am.    Charles and I were the

20   same age, in the same class.    There were five

21   brothers within seven years of each other.

22   Charles was the second youngest, so all the rest

23   of the brothers were within a year of each

24   other.    It was a real close family.

25        Q.    Did you get to know Bradley Dean also?

                                                      44

1    A.    Oh, yes.  It's kind of like if--

2          MR. STAFFORD:  Has been asked and

3    answered.  I object to the pre-narrative

4    response to the question.

5          THE COURT:  Sustained.

6    BY MS. DAVIES:

7    Q.    Did you see a lot, during your

8    childhood years did you see a lot of Brad and

9    Charles?

10   A.    Practically every day.

11   Q.    Were you friendly with the rest of the

12   brothers and sisters also?

13   A.    Yes, ma'am.

14   Q.    And with Mr. and Mrs. Allen?

15   A.    Yes, ma'am.

16   Q.    Would they be in your home?

17   A.    As much as I could invite them, yes.

18   Q.    What about, did you go to their house?

19   A.    I spent more time over at their

20   house.  It was a lot more fun over there.

21   Q.    Through the years, did you continue to

22   be friends with Charles and Brad, the Allen

23   brothers?

24   A.    Yes, ma'am.  It's life-long friends,

25   the whole family, since I was ten.

45

1      Q.   Did you and Charles go to the same
2  school?
3      A.   Yes, ma'am, we went to intermediate
4  together and we went to South Houston High
5  School together.
6      Q.   During the high school years, were
7  there any particular activities that you and
8  Charles and Brad shared?
9           MR. STAFFORD:   Same objection as to
10  relevancy to this indictment.
11          THE COURT:   Sustained.
12  BY MS. DAVIES:
13      Q.   Did your relationship with Charles
14  continue to be close during high school?
15      A.   Yes, ma'am.  It just got closer.  We
16  had a lot of the same classes and ended up in
17  the same--.
18          MR. STAFFORD:   Asked and answered,
19  Judge.  I object to the pre-narrative.
20          THE COURT:   Sustained.
21  BY MS. DAVIES:
22      Q.   How often would you see them during
23  those teenage years?
24      A.   Until I went to college, every day.
25      Q.   During all those years, did they all

46

1    also live on Keith Street?

2         A.   Yes, ma'am.

3         Q.   You said you went off to college.

4    When you graduated from high school, do you know

5    whether Charles went off to college?

6         A.   Yes, ma'am, I do know he didn't.

7         Q.   He did not?

8         A.   No, ma'am, he did not.

9         Q.   Do you know what Charles did when you

10   went off to college?  Or let me reword it.  Did

11   Charles go to school or did he take a job after

12   high school?

13        A.   After high school, he waited to get

14   employed by Lubrizol Corporation.  After eight,

15   ten months, he was out of high school, and he

16   worked there continuously until September 13th.

17        Q.   What about Brad, did you stay in touch

18   with him, too, after you graduated from high

19   school?

20        A.   Yes, ma'am.  He got married and, you

21   know, moved out of the house with his wife, and

22   they lived in the same general area in

23   Pasadena.  We all stayed in contact.

24        Q.   Did you know Brad's wife?

25        A.   Yes, ma'am.

                                              47

1       Q.   Go to the wedding?

2       A.   I think I went to the reception.  I am

3  not sure -- I am hazy on the wedding.

4       Q.   Okay.  Was Brad, did he stay married?

5       A.   No, ma'am.  He divorced in the last

6  two years, I believe.

7       Q.   Do you know whether Charles ever got

8  married?

9       A.   Yes, ma'am, he got married in '87, I

10  believe. '87, '88.

11       Q.   Were you at Charles' wedding?

12       A.   Yes, ma'am, I was.

13       Q.   What was the bride's name?

14       A.   Marlo McBroom was her maiden name.

15       Q.   Where was that wedding?

16       A.   In Illinois.

17       Q.   Were you there?

18       Q.   Yes, ma'am.

19       Q.   In the wedding?

20       A.   Yes, ma'am, I was best man.

21       Q.   When he died, was Charles still

22  married?

23       A.   No, ma'am.

24       Q.   Was there a period of time, while he

25  was married, did Charles and Marlo live here in

48

1    Houston?

2         A.    Yes, ma'am, they did.

3         Q.    Did you stay in touch with them during

4    that period of time?

5         A.    By the time they were married, I moved

6    back also to Houston from North Carolina where I

7    was building homes, and I started a home

8    building company myself, and I was in touch with

9    them virtually every day.

10        Q.    During that period of time, while they

11   were married, were they still living on Keith Street?

12        A.    No, ma'am, they moved over to

13   Arlington Heights, which is a subdivision a mile

14   from Keith Street.

15        Q.    Did you still see them often?

16        A.    Yes, ma'am.

17        Q.    What is the name of your home building

18   business?

19        A.    Master Home Builders.

20        Q.    What about, I believe you said at some

21   point Charles and Marlo became divorced also?

22        A.    Yes, ma'am.  About approximately a

23   year after they were married, her little sister

24   died tragically in an auto accident, and Marlo

25   kind of blamed herself.

1    MR. STAFFORD:  Your Honor, I object
2  again to the relevancy of any of this.
3    THE COURT:  Sustained.
4  BY MS. DAVIES:
5    Q.  Did they get divorced?
6    MR. STAFFORD:  Object to that as to
7  relevancy.
8    THE COURT:  I believe it has been
9  alluded to several times.  Overruled.
10   A.  Eventually they did get divorced, yes,
11 ma'am.
12   Q.  At some point, did Charles make
13 arrangements with you to build a house for him?
14   A.  Originally I was building it for he
15 and Marlo.
16   Q.  And where was that house to be built?
17   A.  At 618 Keith where I live we had a --
18 it is a five acre plat.  We live on two and a
19 half acres, and there is a two and a half acre
20 pasture which I developed and built right next
21 door to my house.  That is where I built his
22 house.
23   Q.  You said originally it was to be for
24 Charles and Marlo.  Who did the plans for the
25 house?

50

1      A.   Charles and Marlo picked them out, and

2  we got them from Adams Design.

3      Q.   Apparently they did get divorced.   Did

4  that cancel the house building plans?

5      A.   No, ma'am, it was during the

6  construction she moved back to Illinois, and it

7  became just his house alone.   She was taken off

8  the mortgage.   This is when their divorce came

9  through.   And the mortgage company proceeded

10  with Charles Allen singularly.

11      Q.   Would that be on the application for

12  the mortgage?

13      A.   Yes, ma'am.

14      Q.   At that point, were you working

15  closely with Charles on construction of the

16  house?

17      A.   Close.   He was over there every day.

18  He was over there more than I was.

19      Q.   When you say over there?

20      A.   At the residence I was building for

21  him next door to my house.

22      Q.   And the house you were building for

23  Charles, what was that street address?

24      A.   624 Keith.

25      Q.   Was Charles going to live there alone

51

1    at that point while you were building?

2         A.    He vacillated.  At that point he was

3    going to live alone and then later he decided

4    that Brad was going to live with him.

5         Q.    Was there any -- you mentioned that

6    Charles worked for Lubrizol.  What type of work

7    was he doing?

8         A.    He was a chemical operator on shift

9    work.

10        Q.    And what kind of work did Brad do?

11        A.    Brad was a freelance artist production

12   type.  He put ads and displays together for

13   magazines, periodicals, anybody who advertises,

14   basically.

15        Q.    Other than his job with Lubrizol, did

16   Charles have any other special endeavors that he

17   was working on?

18        A.    Yes, ma'am.  During that eight to ten

19   months after high school I think he picked up a

20   guitar at that time and started, just got into

21   it.  He got into his music real heavy, and that

22   was his dream to compose, write, record, produce

23   records.

24        Q.    You said right after high school.

25   During the high school years, was he involved in

                                                    52

1    music at that point?

2              MR. STAFFORD:  Again, I object.

3              THE COURT:  Sustained.

4    BY MS. DAVIES:

5        Q.   Was there anything related to Charles'

6    interest in music, anything special about the

7    house that you were building for him in that

8    regard?

9        A.   Yes, ma'am.  In lieu of a garage, a

10   detached garage, Charles researched and designed

11   a recording studio.  It was a state of the art

12   digital recording studio.  There is only one

13   other in Houston.

14             MR. STAFFORD:  Again, that is not

15   being responsive to the question.  I object to

16   the pre-narrative response.

17             THE COURT:  Once she asks a question,

18   just answer what she asks.  If she wants to

19   follow up with another question, she may do so.

20             Proceed, please.

21   BY MS. DAVIES:

22       Q.   Did Charles actually design the studio

23   himself?

24             MR. STAFFORD:  Your Honor, I would ask

25   the court to admonish the prosecutor to keep

53

1    from going into these irrelevant questions that
2    have no bearing.  I renew my motion.
3              THE COURT:  As to that question, it's
4    overruled.
5              THE WITNESS:  I'm sorry, what was the
6    question?
7    BY MS. DAVIES:
8         Q.   Did Charles design the recording
9    studio himself?
10        A.   Yes, ma'am.
11        Q.   Do you recall when it was that Charles
12   actually was able to move into the house you
13   were building at 624 Keith Street?
14        A.   September 1st he moved in, or possibly
15   the end of August.  Either the last day of
16   August or the first day of September.
17        Q.   Had you actually closed, gone to the
18   closing and had the papers signed?
19        A.   No, ma'am.  He just moved in.  His
20   rent was, I mean, his lease was up at his
21   previous residence in Arlington Heights, and we
22   weren't closed, and I was going to have a rent
23   agreement with him until we did close.
24        Q.   Was there any work remaining to be
25   done on the house or the recording studio?

54

1       A.   Yes, ma'am.  The house, it was

2   beneficial to Mr. Allen to have an FHA loan, and

3   I was not an FHA approved builder at the time,

4   and going through the process, we finished the

5   house but the FHA inspector hadn't been out to

6   give his final approval.  And there was some

7   painting, some caulking, some miscellaneous

8   cosmetic items that needed to be done in the

9   house.  And in the studio, the wood floors were

10   in the process of drying.

11       Q.   What part of the house was that in?

12       A.   In the studio.  It's a detached

13   building behind the house.  It's a recording

14   studio.

15       Q.   So, those floors had been stained

16   when?

17       A.   Two days before they had been

18   stained.  The day before, which would be the

19   twelfth, they had been sealed and were in the

20   process of drying at that time.

21       Q.   Was there any particular reason -- was

22   there any concern about getting those floors

23   dried and the recording studio finished?

24       A.   Yes, ma'am.  We had a studio opening

25   the fourteenth, and the floors were not quite

1    dry, and they were -- we had equipment to move

2    in that next day, which would have been the

3    thirteenth.  We had a big workday planned to get

4    all the equipment in there before the opening.

5    And Charles was concerned that it wasn't going

6    to be dry, so we left the doors open and the AC

7    running to facilitate the drying process.

8         Q.   This was in the recording studio?

9         A.   Yes, ma'am.

10        Q.   Was that detached from the main house

11   or was it actually connected to the main house

12   at 624 Keith?

13        A.   No, ma'am, it was a detached building.

14        Q.   Let me direct your attention to

15   Thursday, the twelfth of September, a year ago,

16   1991.  Do you recall did you see Charles or Brad

17   during the day on that day, on Thursday?

18        A.   Yes, ma'am.

19        Q.   Did you see Brad?

20        A.   Yes, ma'am.

21        Q.   When was that?  During the day?

22        A.   During the day.

23        Q.   On Thursday.  When?

24        A.   In the afternoon, approximately twelve

25   to one.

                                                    56

1         Q.    Where was it that you saw Brad?

2         A.    At the house.  I think he went that

3    afternoon with his girlfriend Kelly Petersen.

4               MR. STAFFORD:  The question has been

5    answered.  I object.

6               THE COURT:  Sustained.

7    BY MS. DAVIES:

8         Q.    At the time of his death, did Brad

9    have a special girlfriend?

10        A.    Yes, ma'am, he did.

11        Q.    Had you met her?

12        A.    Yes, ma'am.

13        Q.    At their house at 624 Keith?

14        A.    Yes.

15        Q.    What was her name?

16        A.    Kelly Petersen.

17        Q.    I think, if I understood you

18   correctly, you saw Brad during the middle of the

19   day on Thursday?

20        A.    Yes, ma'am.

21        Q.    The twelfth of September?

22        A.    I believe so.

23        Q.    Did you still have a key to their

24   house?

25        A.    Yes, ma'am.

1          Q.    Did they have a key to your house?

2          A.    I don't believe so.   I think me and my

3    brother had the only keys to the house.

4          Q.    During that day, again, we are talking

5    about Thursday, the twelfth, did you see Charles

6    during the day?

7          A.    Yes, ma'am.

8          Q.    What were the circumstances that you

9    saw him?

10         A.    We went to lunch during the day.   He

11   was--.

12               MR. STAFFORD:   That has been answered,

13   Judge.

14               THE COURT:   Sustained.

15   BY MS. DAVIES:

16         Q.    What hours did Charles ordinarily

17   work, if you know?

18         A.    He worked shift work.   He worked

19   twelve to twelve, and it was either nights or

20   days.   Or maybe six to six.

21         Q.    So he would work twelve hour shifts

22   day or night?

23         A.    Yes, ma'am.

24         Q.    Would that vary from time to time?

25         A.    Yes, ma'am.   It was a set schedule,

                                                  58

1    but it varied during the month.  It wasn't seven

2    on, seven off, then switched to something else,

3    it was varying schedule.

4         Q.   Given that schedule, would there be

5    times that Charles had days off at a time?

6         A.   Yes, ma'am.  He physically worked less

7    than six months, which gave him ample

8    opportunity to practice his music.

9         Q.   Six months out of the year?

10        A.   Yes, ma'am.

11        Q.   Because of the shift work schedule?

12        A.   Yes, ma'am.

13        Q.   Worked longer hours than some of us do

14   during the day but?

15        A.   It's compensated by the off time.

16        Q.   You said you saw Charles during the

17   day, and Brad.  What about in the evening of

18   Thursday, September twelfth, 1991, did you see

19   the two men, or either of them?

20        A.   Yes, ma'am.  Charles had gone skiing

21   with his brother Kevin to catch some rays for

22   his studio opening.

23             MR. STAFFORD:  Judge, that is

24   nonresponsive to the question.  He either saw

25   him or he didn't.

59

```
 1                    THE COURT:  Just respond to the
 2       question.  Do you understand, sir?
 3                    THE WITNESS:  Yes, sir.
 4       BY MS. DAVIES:
 5            Q.   Did you see Charles come or go from
 6       going skiing with his brother?
 7            A.   Yes, ma'am, I did.
 8                    MR. STAFFORD:  Again, unless they were
 9       skiing on the twelfth, I don't know what
10       relevancy skiing would have in this matter.
11                    THE COURT:  That's my understanding.
12                    MS. DAVIES:  I think that is exactly
13       what he testified to.  They went skiing on the
14       twelfth.
15                    MR. STAFFORD:  Water skiing?
16            A.   Yes, sir.
17       BY MS. DAVIES:
18            Q.   What time of day was it did you see
19       him come or go from the water skiing trip?
20            A.   He left as soon as we got up -- well,
21       maybe around three.  Returned approximately
22       seven o'clock that evening.
23            Q.   So, during the evening hours, did you
24       see the brothers, Charles and Allen.   Charles
25       and Brad?
```

60

1       A.    Yes, ma'am, I did.

2       Q.   Where was that?

3       A.    At their house at 624 Keith.

4       Q.    Was there any special occasion that

5  you saw them that evening?

6       A.    There was a big football game on that

7  night.   University of Houston was playing

8  number one ranked Miami, and we proposed

9  watching it over at Charles' house.

10      Q.    Why was that?

11      A.    Because he had cable.

12      Q.    Who came over to watch the game at the

13  new house?

14      A.    Myself and my brother Daniel Sanders,

15  Jamie Allen, Mr. Allen, cousin Zack I believe.

16      Q.    Whose cousin?

17      A.    That was the Allens, Charles and

18  Brad's cousin who lives across the street on

19  Keith came over with Mr. Allen, their father, to

20  watch the game.  And one other friend, Chris

21  Porter.

22      Q.    Was it a special party?

23      A.    No, ma'am, it was just to watch the

24  game.

25      Q.    Did you stay there in the house?  Did

61

1    everybody arrive at the same time and leave at

2    the same time?

3         A.    No, ma'am, I think the game had

4    probably begun when Charles returned from his

5    skiing trip, and Brad was there, and actually it

6    was me and my brother were more interested in

7    watching the game than the rest of the family.

8    Mr. Allen came over after half time.  That is

9    when he and Zack came over.

10        Q.    When you say Mr. Allen, you are

11   talking about?

12        A.    Don Allen, the father.

13        Q.    Charles and Brad's father?

14        A.    Yes, ma'am.

15        Q.    Were there any refreshments?

16        A.    We probably had some beer.  There

17   weren't a lot of big drinkers.  Charles didn't

18   drink.

19        Q.    Did Charles drink any beer at all?

20        A.    No, ma'am.

21        Q.    Did he ever drink beer?

22        A.    I could take him out and twist his arm

23   if we were going out to a club; but other than

24   that, he doesn't drink at all.

25        Q.    Did you notice whether he was drinking

1    that evening?

2          A.    Yes, ma'am, I noticed he wasn't.

3          Q.    What about Brad, did you notice

4    whether he was drinking?

5          A.    I have no recollection of that, to

6    tell you the truth.

7          Q.    Did y'all have anything to eat during

8    that evening?

9          A.    Yes, ma'am.  I don't know that

10   directly, but there was a pizza box there.    I

11   went back and forth to my house.  That is when I

12   make calls to my subs in the evening.

13         Q.    Let me understand you.  You were going

14   back and forth during the evening?

15         A.    Yes, ma'am.  I'd watch some of the

16   game and then go next door to my house and call

17   the subcontractors who I needed the next day.

18   And when I went, during one of these trips when

19   I came back, there was a pizza box there.

20         Q.    They didn't leave any pizza for you?

21         A.    No, ma'am.

22         Q.    The other men that were still there,

23   did they appear to have been eating pizza?

24         A.    They all had smiles on their face.

25         Q.    Do you know what kind of pizza it was?

1     A.    It was Domino's pizza, and I assume it
2  was pepperoni.   That is what Charles ordered all
3  the time.
4     Q.    Did the rest of the group stay the
5  entire evening until the end of the evening?
6     A.    No, ma'am.  Brad stayed, and Charles
7  stayed, of course, they were living there.  Mr.
8  Allen and Zack I believe were the first to go,
9  and then the others kind of straggled out.  It
10  wasn't really much of a game.  They got
11  clobbered, the University of Houston got
12  clobbered that day, so there was no need to stay
13  and watch the final mop up, so they just left.
14  And I believe my brother Daniel and I were the
15  last ones to leave.
16     Q.    When you and your brother left, do you
17  recall what time that was?
18     A.    It was right about eleven o'clock in
19  the evening.
20     Q.    We are talking about Thursday night,
21  September 12th, 1991?
22     A.    Correct.
23     Q.    Were Charles and Brad still up when
24  you left, or had either of them gone to bed?
25     A.    No, both of them were still up.

64

1    Charles was concerned about his studio floor,

2    and he was going in and out, touching it to see

3    how quick it's drying.  Coming and giving me

4    reports.

5         Q.   Let me understand that.  You say

6    coming and giving you reports.  During the

7    course of the evening, what did you see Charles

8    do in connection with that floor that had been

9    sealed out in the recording studio?

10        A.   Just walk out the back door, walk into

11   the studio, touch the floor and see if it was

12   still sticky, come back in and tell me, "I don't

13   know, Dave," or "I think it will be all right."

14   Just updates.

15        Q.   Were there -- was there any special

16   reason that there was concern over when that

17   floor was going to be dry?

18             MR. STAFFORD:  I believe that has been

19   asked and answered.

20             THE COURT:  I think it has, but I

21   haven't heard his answer yet.  You may answer

22   it.

23        A.   Yes, ma'am.  We had a studio opening

24   Saturday, the 14th.

25             MR. STAFFORD:  I object to that.

                                              65

1            THE COURT:  It's repetitious.  It's

2    sustained as to repetitious.

3    BY MS. DAVIES:

4         Q.    Did you have any plans with Charles in

5    connection with any specific work that needed to

6    be done on the day following the football game,

7    in other words, on Friday, the thirteenth?

8         A.    Yes, ma'am.  As I stated earlier, the

9    FHA inspector was due to come at nine o'clock

10   the next morning, the thirteenth, Friday.

11        Q.    And what was it that you needed to do

12   for that?

13        A.    Some painting, caulking, little

14   touch-up stuff.  They had been out and

15   structurally seen the house, had approved it,

16   but cosmetically they wanted to make sure that

17   it's painted.

18        Q.    Were those things to be done inside

19   the recording studio or inside the main house?

20        A.    Inside the main house.

21        Q.    During the period of time that first

22   part of September where Charles and Brad had

23   been living next door to you at 624 Keith

24   Street, were you in and out of their house

25   often?

66

1      A.   Daily.

2      Q.   Can you tell us, based on your

3  observations from going to their house, did they

4  always lock the doors?

5      A.   No, ma'am, they didn't.

6      Q.   Based on your experience, would it be

7  unusual for them not to have locked all the doors?

8      A.   No, ma'am.   Brad I believe was pretty

9  good about locking the doors, where Charles

10  didn't care.   It just wasn't top priority.   When

11  he left during the day, he would, you know, I

12  would come over and there would be doors open.

13      Q.   Had you installed a burglar alarm

14  system in that house?

15      A.   Yes, there was a Brinks security

16  system in the house, every door and every

17  window.

18      Q.   Based on your comings and goings

19  during that first couple of weeks, had they

20  gotten in the habit of regularly setting that

21  burglar alarm system?

22      A.   No, ma'am, they didn't.

23      Q.   You said you left on Thursday evening

24  about eleven.   Planned to return at what time?

25      A.   Seven to 7:30 in the morning.

1    Q.   On Friday morning?

2    A.   Yes, ma'am.  They were going to assist

3  me in the painting.

4    Q.   Do you recall about what time it was

5  that you got up on Friday morning, the

6  thirteenth of September, 1991?

7    A.   Between 6:30 and seven.

8    Q.   Did you go directly next door to the

9  Allen house?

10   A.   No, ma'am, I went to Whataburger and

11  got some breakfast and consumed it on the way

12  back and pulled into their place about 7:30

13  ready to finish up our touch-up.

14   Q.   Did you park your car in their

15  driveway?

16   A.   No, ma'am.  I live next door.   I

17  parked it at my house.

18   Q.   And then what did you do after you

19  parked your car?

20   A.   I walked over to their house, and I

21  banged on the back door and waited for them to

22  open it.

23   Q.   You say you banged on the back door.

24  Did you go to the front door?

25   A.   No, ma'am.

1       Q.    Ordinarily, when you would come and go

2   from your friends' house, did you go to the

3   front or the back?

4       A.    Back.

5       Q.    Did you get an answer when you knocked

6   on that back door?

7       A.    No, ma'am.   There's three doors at the

8   back of the house.   The one that leads to the

9   kitchen is the one I always knock on, but there

10  is a door to Charles' bedroom, the master, that

11  after nobody answered there I went over and

12  banged on that door because I knew they were

13  expecting me.   And their cars were there.

14      Q.    When you say you banged on that door,

15  are you talking about the door that actually, an

16  exterior door to the master bedroom?

17      A.    Yes, ma'am.

18      Q.    Did you get any response?

19      A.    No, ma'am.

20      Q.    Hear anything?

21      A.    No, ma'am.

22      Q.    Then what did you do?

23      A.    I went back to my house and got a key

24  and came back and let myself in the utility room

25  door.

69

1        Q.    What did you see when you walked into

2   the house?

3        A.    I had my caulking gun and paint brush

4   with me, and I set it on the kitchen counter

5   top, I saw blood on the floor in the kitchen.

6        Q.    What was your first reaction?  What

7   did you think when you saw blood on the kitchen

8   floor?

9        A.    I thought somebody had stepped on

10  something and walked in there and forgot to

11  clean it up.

12       Q.    So what did you do?

13       A.    I was heading to admonish them.  And

14  then I saw more blood.

15       Q.    As you went into the house through the

16  kitchen, were you calling their names?  What

17  were you doing?

18       A.    No, ma'am, it was pretty evident that

19  something had gone wrong there.

20       Q.    At what point did it become evident to

21  you that something had gone wrong?  Where were

22  you in the house?

23       A.    I had left the kitchen and headed back

24  toward the bedrooms, and there was a large pool

25  of blood underneath Brad's door.

1   Q. Was Brad's door open or closed?

2   A. It was closed.   It wasn't -- the

3 keeper -- it wasn't completely closed, but it

4 was -- there was a crack about an inch big in

5 it.

6   Q. You held your fingers up.   About an

7 inch crack?

8   A. Yes, ma'am.

9   Q. Did you look inside that crack?

10   A. Yes, ma'am, I did.

11   Q. What did you see?

12   A. I saw Brad.

13   Q. Where was he?

14   A. He was kneeling on the floor with his

15 head on the bed.

16   Q. Was he up against the door?

17   A. Yes, ma'am.

18   Q. Could you open the door?

19   A. No.   Looked like he was trying to keep

20 somebody out.

21   Q. Did you try to open the door?

22   A. Yes, ma'am, I did.   Briefly.

23   Q. Did you try to talk to Brad?

24   A. No, ma'am.

25   Q. Why not?

71

1      A.   I didn't know if there was still
2  somebody in the house, and I wanted to go check
3  on Charles.
4      Q.   Was Brad making any sounds at all?
5      A.   No, ma'am.
6      Q.   What did you do?
7      A.   There is a hallway that leads to the
8  master.  I started walking down it.
9      Q.   What did you see in the hallway?
10     A.   A blood bath.  There was blood all
11 over the walls, all over the doors, everywhere.
12     Q.   Did that hallway lead to Charles'
13 room?
14     A.   Yes, ma'am, it did.
15     Q.   Did you go there?
16     A.   Yes, ma'am.
17     Q.   What did you see when you got to
18 Charles' bedroom?
19     A.   I saw a body laying crossways on the
20 bed.
21     Q.   Could you tell the jury what it was
22 like?
23     A.   It looked like a body.  I didn't
24 know.  You know, in the back of my mind I think
25 I was hoping it wasn't Charles.

72

1      Q.   Was it easy to recognize Charles?

2      A.   No, ma'am, I couldn't tell who it was

3  at first.

4      Q.   Why not?

5      A.   He had been beaten on the head, and

6  his face had swollen up.

7      Q.   Was there any blood in that room?

8      A.   Yes, ma'am.

9      Q.   Where?

10     A.   Underneath his head.  It was dripping

11 on the floor.  And as soon as you open up the

12 door there was splatter marks there on the wall

13 coming.  And there was some on the headboard.

14     Q.   You said as soon as you open up the

15 door.  Was the door of Charles' bedroom closed?

16     A.   No, ma'am, it was open.

17     Q.   When you say there were splatter marks

18 there, you are just talking about where it was

19 next to the door?

20     A.   Yes, ma'am.

21     Q.   Was that your friend Charles on the

22 bed?

23     A.   Yes, ma'am, it was.

24     Q.   What were you thinking at that point?

25 How did you feel?

73

1          MR. STAFFORD:  I object to relevancy

2     as to that issue.

3          THE COURT:  It's overruled.

4     A.   My first thoughts were to get the

5     son-of-a-bitch that did it.   And I ran back to

6     the house and got a gun.   I didn't know if he

7     was still there or not.

8     Q.   Was anybody at your house?

9     A.   Yes, ma'am, my brother was at my

10    house.  He was getting up, getting ready to go

11    to work.

12    Q.   Did you talk to him?

13    A.   I ran upstairs, grabbed my gun and

14    came downstairs and yelled to him.  I forget

15    what I yelled.   I alerted him to come over to

16    Charles' house now.

17    Q.   This is your brother Daniel?

18    A.   Yes, ma'am.

19    Q.   Did he come with you when you went

20    back to Charles and Brad's house?

21    A.   Somewhere behind me.   I didn't look,

22    I just ran over there with the gun.

23    Q.   When you were at your home, or at any

24    point prior to this, had you called for the

25    police?

74

1      A.    No, ma'am, not at that time.

2      Q.    So what did you do?

3      A.    I ran, went back to the house and did

4  a room to room to see if anybody was in there,

5  at which time my brother came in and.

6      Q.    Did he have a weapon?

7      A.    Yes, ma'am, he had a broomstick.   He

8  came over with a broomstick.   When he got to

9  the house, there was a butcher block in the

10 kitchen with knives in there.   I think he

11 grabbed one of those at that time.

12     Q.    So did he accompany you walking

13 through the house?

14     A.    Sometime behind me.

15     Q.    You said you did a room to room.

16 Describe to the jury what it was that you did.

17     A.    I opened closet doors, I looked under

18 things, hoping somebody was still there.

19     Q.    Did you actually go into Brad's room?

20     A.    No, ma'am.

21     Q.    Why not?

22     A.    I didn't want to disturb any of the

23 evidence, and the door wouldn't open.   He was up

24 against it.

25     Q.    Now, did you or your brother touch or

1    move.
2              Let me reword my question.  Did you or
3    your brother move anything in the Allen house
4    other than opening and closing closet doors?
5         A.   I don't believe so.  I can't speak for
6    my brother, but I don't think we did.
7         Q.   Did you see your brother move anything
8    in the house?
9         A.   Other than picking up that knife.
10   When we were satisfied that nobody else was
11   there, went to Brad's room, and he pushed it
12   open a little bit more.  There was no signs of
13   life.
14        Q.   Did you use the telephone there in
15   Charles and Brad's house?
16        A.   No, ma'am.
17        Q.   Did you touch Charles or move anything
18   on the bed?
19        A.   No, ma'am.
20        Q.   Did you see your brother Daniel do
21   that?
22        A.   No, ma'am.
23        Q.   So then what did you do next?
24        A.   I ran back to the house, called 911.
25   You know, there wasn't any reason to, but I

                                              76

1   wanted to get the police coming also.  And I

2   told them that there had been a double

3   homicide.  I think I told them two people had

4   been killed or something.  I don't remember what

5   I told them.

6           Q.    Mr. Sanders, were you talking and

7   acting as calmly then as you are here in the

8   courtroom?

9           A.    No, ma'am.

10          Q.    Can you describe for the jury how you

11  were handling yourself when you ran back and

12  called 911?

13          A.    Probably pretty hysterical.  I don't

14  remember a lot of that time.  I know I talked

15  to some knothead lady who was asking me a bunch

16  of stupid questions.  I just told her to get

17  some police over there now.  I was probably

18  yelling at her.

19          Q.    Then what did you do?

20          A.    I went across the street, and I had to

21  tell his parents.

22          Q.    You went to Mr. and Mrs. Allen's

23  house?

24          A.    Yes, ma'am.

25          Q.    Tell us what happened.

77

1      A.   They were sitting at their -- I walked

2  in.  I didn't know what to say.  They were

3  sitting at the table.  They were drinking their

4  morning coffee.  Mrs. Allen asked what was the

5  matter, what do you want.

6         MR. STAFFORD:  I object.  My motion

7  in limine.

8         THE COURT:  Approach the bench.

9         (The following proceedings were had at

10  the bench:)

11         MR. STAFFORD:  Once again, as to the

12  relevancy of the subject matter of the

13  indictment of how the parents, bless their

14  little hearts, responded when they found this

15  out, the only reason this is being introduced is

16  to tug at the emotional strings of this jury,

17  has no other purpose and design by the State

18  other than to pull their emotional strings.  It

19  has no relevancy as to whether or not my client

20  committed this crime.  It's offered for

21  emotional reasons only.  I strongly object as to

22  the relevancy.

23         THE COURT:  I am going to allow the

24  State to speak.  I also must state for the

25  record at this point we do have a defendant who

78

1   has entered a plea of not guilty and we have the

2   person on the witness stand at the moment who

3   was evidently the last to see the victims alive

4   and the one to discover the bodies the next day

5   and who is, as I understand it, was a suspect

6   for sometime in this case, so his actions are at

7   least relevant.

8           MR. STAFFORD:  What relevance does it

9   have as to how Mr. and Mrs. Allen responded?

10          MS. DAVIES:  I asked him what he did,

11  and that is what he is describing.

12          THE COURT:  That is my understanding

13  so far.  You may have another objection after

14  another question or two.

15          MR. STAFFORD:  The fact I anticipate

16  the reaction was going to be Mr. and Mrs. Allen

17  asked him if he shot them because he was

18  standing there with a gun.  I object to the

19  hearsay statement of Mrs. Allen.

20          THE COURT:  You may object.

21          Proceed, please.

22          (Before the jury)

23  BY MS. DAVIES:

24      Q.   I think I had asked you about -- you

25  were telling us that you went to Mr. and Mrs.

79

1    Allen's home.   By the way, how far is Mr. and
2    Mrs. Allen's home from Charles' new house at
3    624?
4         A.   Stone's throw.  It's a hundred feet.
5         Q.   Could you see Mr. and Mrs. Allen's
6    house from 624 Keith Street?
7         A.   Yes, ma'am.
8         Q.   What, I mean, from inside at 624
9    Keith, could you see the parents, Mr. and Mrs.
10   Allen's, home?
11        A.   Yes, ma'am, you could.
12        Q.   From where?
13        A.   Kitchen window especially.  It was a
14   garden window that Charles used to look and
15   point over there and say, "There's Mom," when
16   she was outside.
17        Q.   So, how far did you have to go when
18   you went to tell the Allens about your discovery
19   on that morning of Friday, the thirteenth?
20        A.   Across the street, it's less than a
21   hundred feet from my house.  I think I left from
22   my house to tell them after I called the police.
23        Q.   Did you still have the gun in your
24   hand?
25        A.   I guess I did.

80

1          Q.    Did you realize that?

2          A.    No.    No.

3          Q.    So what did you do when you arrived at

4     Mr. and Mrs. Allen's house?

5          A.    I walked in with the gun in my hand, I

6     guess, and I just sat there.   They were having

7     their coffee.

8          Q.    Were you calm?

9          A.    No, ma'am.

10         Q.    What were you doing?

11         A.    Shaking.

12         Q.    What did you tell Mr. and Mrs. Allen?

13         A.    I said, "Somebody shot the boys."

14         Q.    What was their reaction?

15              MR. STAFFORD:   I object to the hearsay

16    nature and the relevancy, Your Honor, again.

17              THE COURT:   Sustained.

18              MS. DAVIES:   I didn't ask for

19    hearsay.   I asked what their reaction was.

20              MR. STAFFORD:   It would be nonverbal

21    hearsay.   Would be the same thing.

22              THE COURT:   It's sustained.

23    BY MS. DAVIES:

24         Q.    Were they upset or excited when you

25    went in with that announcement?

                                                    81

1        MR. STAFFORD:  Again, judge, I ask the

2   court to admonish the prosecutor when asking

3   questions she knows are not admissible.

4        MS. DAVIES:  Your Honor, I object to

5   the sidebar remark encompassed in that

6   objection.

7        THE COURT:  You may answer that in a

8   limited fashion, sir.

9   A.    What was the question?  What was their

10  reaction?

11  Q.    Were they upset?  What was their

12  demeanor when you walked in with this

13  announcement that somebody had shot their boys?

14  A.    Disbelief at first.  She asked me if

15  I was kidding, Mrs. Allen did.

16  Q.    Did she seem upset or excited?

17  A.    Not at first.  As I didn't say it's a

18  joke, she started to believe what I said had

19  happened.  And she started screaming.

20  Q.    Were you still standing there with the

21  gun in your hand?

22  A.    Yes, ma'am.

23  Q.    What happened about that gun?

24  A.    I think Mr. Allen came and took it out

25  of my hand.

1    Q.   Did you stay there at the Allen's
2    house?
3    A.   No, ma'am.   Mrs. Allen ran back to her
4    bedroom.
5    Q.   What did you do?
6    A.   Mr. Allen followed her back there and
7    comforted her a bit.   And then he and I left to
8    go over to the house.
9    Q.   Did you take or go inside the house
10   with Mr. Allen?
11   A.   No, ma'am.   When we were walking back
12   over there, the police were pulling up into the
13   driveway.
14   Q.   Did more than one police car come?
15   A.   Yes, ma'am, I think three initially
16   came.
17   Q.   Did you talk to the police about this?
18   A.   Yes, ma'am.
19   Q.   Once the police arrived, did they take
20   over--
21   A.   Yes, ma'am.
22   Q.   -- the investigation of the house?
23   A.   Closed the house down and sealed it
24   off, tried to, you know, keep everybody out.
25   Q.   Did you stay outside, or did you go

83

1   inside the house to point anything out to the

2   police?

3         A.   Yes, I went back in with the

4   detectives a couple of times.   There was a floor

5   safe in there that they didn't know the

6   combination to.   It was inoperable.

7         Q.   Inoperable?

8         A.   Yes, ma'am.

9         Q.   Why was that?

10         A.   We put it in the slab, and we put it

11   too close to a wall, evidently, and when they

12   put the baseboard on, the lid wouldn't come

13   up.   So Charles pointed that out to me a couple

14   of days before.   And I knew there was nothing

15   in it.   So, you know, I told them that at that

16   time, it hasn't been opened in a month.   There

17   is nothing in there.

18         Q.   So, the safe, if I am understanding

19   you correctly, was closed on that morning?

20         A.   Yes, ma'am.

21         Q.   Did you assist the police by answering

22   any of their questions or going in the house any

23   other way?

24         A.   No.   I think most of the other

25   interview was outside the house in a police car.

1      Q.   About how long were the police out
2  there, do you recall?
3      A.   They left approximately 2:30, three
4  o'clock.  They arrived at 7:45, 8:00.
5      Q.   Since you built the house, are you
6  familiar--
7      A.   Oh, that's right.  I went back in and
8  brought them a floor plan of the house so they
9  would have a working diagram.
10      Q.   And, certainly, having constructed the
11  house, I take it you are familiar with the
12  layout of the house?
13      A.   Yes, ma'am.
14      Q.   During the construction of the house,
15  were there any pictures taken that showed the
16  layout of the house prior to Charles and Bradley
17  moving in?
18      A.   During the construction of the house,
19  Charles kept a running video of the construction
20  of the house.  He jokingly referred to it as
21  "this new house", and every week or so he would
22  give updates, give a narrative about what was
23  going on, what was going to happen, when we were
24  going to finish, pointing out all the special
25  things we did.

85

1          Q.    Let me show you several things and ask

2    you to identify them, if you will.    Without

3    going into the contents, at this point I just

4    want you to identify what these items are.    Let

5    me ask you to look at what has been marked as

6    State's Exhibit 2 and State's Exhibit 3.    Can

7    you tell me what is State's Exhibit 2?

8          A.    This is Charles' last compilation of

9    recordings that he wrote, recorded.

10               MR. STAFFORD:    Before they are

11   identified, I haven't had a chance to view them.

12               THE COURT:    All right, we are going to

13   take a lunch break right now.

14               Ladies and gentlemen, we are going to

15   recess for lunch.    I am going to admonish you

16   not to be discussing this case among

17   yourselves.    You will get to talk about this

18   case among yourselves once the case has been

19   argued to you and you are back in the jury room

20   deliberating the case.    We talked to so many

21   people over so many weeks as far as prospective

22   jurors are concerned, I don't remember if we

23   told some of you one thing and some another.

24   You are not allowed to take notes during the

25   course of the trial.    When you go back to the

86

1    jury room right now, if you have taken any

2    notes, please turn them over to the bailiff.

3    There is only one official notetaker in this

4    courtroom, and that is going to be the court

5    reporter.  If in jury deliberations you have

6    some kind of conflict as to testimony produced,

7    you may ask me in writing to have that read back

8    to you.  If you would, please, follow the

9    bailiff back to the jury room right now.

10                (Jury removed from the courtroom)

11                THE COURT:  Mr. Stafford, I thought

12   you had had access to everything that was being

13   produced.

14                MR. STAFFORD:  No.

15                MS. DAVIES:  I think he has.

16                MR. STAFFORD:  The CD, State's Exhibit

17   2, again is a purported recording.

18                THE COURT:  I don't know yet.  As far

19   as we had gotten, it has been marked as State's

20   Exhibit No. 2 and the witness has described it I

21   believe as Charles' last compilation, but I

22   didn't know if that was going to be the

23   narrative as to the video or what it might be.

24                MR. STAFFORD:  I object to State's

25   Exhibit No. 2 and State's Exhibit No. 3 under

87

1    the rules of evidence, that it has no bearing,

2    relevancy to anything other than what I have

3    been arguing about throughout this whole trial.

4            THE COURT:  They haven't been tendered

5    to you or offered.

6            MR. STAFFORD:  They are getting ready

7    to, and I jumped the gun and objected to this.

8            MS. DAVIES:  Premature objection.

9            MR. STAFFORD:  I am already making the

10    jury mad, which I think is a good ploy by the

11    State.  I think all of this stuff is

12    irrelevant.  I have to do nothing but object.

13    This again goes to the victim impact, which I

14    filed a motion in limine in good faith to keep

15    all this out.  And I have to stand on my feet

16    all the time and alienate the jury.

17            THE COURT:  As to State's 2 and 3 or

18    whatever that is.  As to the photographs,

19    specifically have you seen the photographs?

20            MR. STAFFORD:  I don't know which ones

21    she is trying to introduce.

22            MS. DAVIES:  He has seen all the

23    photographs.

24            THE COURT:  If they are all marked,

25    take a look at them now.  She's holding the

1    video tape.  Have you seen that?

2             MS. DAVIES:  He has been provided with

3    a copy.

4             MR. STAFFORD:  I object to the verbal

5    narrative as far as the -- if they want to cut

6    out the audio, I object to the audio.  The video

7    I don't object to.

8             THE COURT:  I will review it during

9    the lunch hour.

10            MR. STAFFORD:  The audio would be

11   hearsay, would also be another ploy for them to

12   insert the voice of the deceased and denies my

13   client the sixth amendment right, any possible

14   cross-examination.  But as far as the layout of

15   the house, I would also object to any part of

16   the video that shows Charles or Brad.

17            THE COURT:  We are going to be in

18   recess until 1:45 p.m.

19            (Lunch recess; after which, the

20   following proceedings were had:)

21            THE COURT:  Do you have anything else

22   you want to put on the record before we bring

23   the jury back?

24            MR. STAFFORD:  Well, everything I have

25   told you was off the record.  So that is the

                                              89

1    problem.

2              THE COURT:  Everything I told you is

3    also off the record until now, but if I can have

4    some of those exhibits I can tell you what I am

5    going to do with some of them.

6              MR. STAFFORD:  Okay.

7              MS. DAVIES:  I believe when we broke

8    for lunch--

9              THE COURT:  You were in the process of

10   marking.

11             MS. DAVIES:  Things had not even been

12   identified in front of the jury.

13             THE COURT:  But had been marked.

14             MS. DAVIES:  I have pre-marked

15   exhibits.

16             THE COURT:  Specifically as to

17   pre-marked State's Exhibits 2 and 3.

18             MR. STAFFORD:  I object and ask that

19   they not be displayed for any purposes in front

20   of the jury.

21             THE COURT:  Your objection will be

22   sustained as to State's Exhibits 2 and 3 as

23   pre-marked.

24             MR. STAFFORD:  I also object to the

25   introduction of it as well.

90

1        THE COURT:  I think it would at least

2   include the introduction of it.

3        MS. DAVIES:  As to the rest of the

4   exhibits that I have pre-marked--

5        THE COURT:  I am going to have to hear

6   the predicate on the photos.

7        MR. STAFFORD:  I have no objection to

8   the actual still photos as being a true and

9   accurate depiction of the house.  I have been

10  to the house, I know what it looks like, I have

11  no objection.

12       MS. DAVIES:  I have not had an

13  opportunity to identify or properly lay the

14  predicate for the photos or for a video tape

15  which has been pre-marked as State's Exhibit 11,

16  although that number hasn't been used in front

17  of the jury.

18       THE COURT:  What has been pre-marked

19  as State's 11 is the video that we have all

20  previously discussed and which we have all

21  seen.

22       MR. STAFFORD:  My objection is proper

23  predicate to be laid under the rules of criminal

24  evidence.  Secondly, I would object to any audio

25  portion of the tape.

91

1      THE COURT:  Let me cut you off for a

2   minute.  It's a little difficult to hear your

3   objection on predicate since she hasn't had to

4   lay it yet.  At the very least, I would not be

5   allowing the audio portion of the tape nor the--

6      MS. DAVIES:  Your Honor, I would ask

7   to be allowed to offer at least the entire video

8   portion.  I expect that my witness is going to

9   be able to testify that this is an accurate

10  depiction of the layout of the house.  And

11  absent the audio, I will just have to rely on

12  David Sanders to describe what is being seen as

13  that video is shown.

14      THE COURT:  Is there another video

15  tape which has been pre-marked?  Is there a

16  police video tape of the house?

17      MS. DAVIES:  I haven't pre-marked it,

18  but there is a police video tape of the house;

19  however, the police video tape tends to show

20  specific areas of the house.  It does not show

21  the layout of the house as fully as this one

22  does.  This video tape--

23      THE COURT:  As a walk through by

24  comparison.

25      MS. DAVIES:  That's right.  I think

92

1    that is a good description of that exhibit.  It

2    is a walk through.  And the police video doesn't

3    take that approach.  And given the defendant's

4    statement, which we all know is going to be

5    offered into evidence, that describes his

6    actions as he walked in and through the house, I

7    think this video, the picture portion of it

8    would be helpful to the jury to understand the

9    appearance of the house as one does walk

10   through.

11             MR. STAFFORD:  My further objection,

12   this does not accurately and truly depict a

13   condition of the scene of the crime as it was at

14   the time my client was charged with the present

15   offense.  I think under the rules of evidence

16   that the proper predicate--

17             THE COURT:  Are you saying that the

18   architectual schematics wouldn't be able to be

19   introduced?

20             MR. STAFFORD:  I think the State has

21   floor plans already drawn out, judge.  They have

22   a big bulletin board here type of layout.

23             THE COURT:  Are you saying that does

24   depict it?

25             MR. STAFFORD:  Yes, at the time of

93

1    commission of the offense.

2              THE COURT:  Wouldn't this be even

3    closer if it has walls up and everything?  It

4    has everything except furniture.

5              MR. STAFFORD:  As far as the naked

6    house, yes, that would depict the house.

7              MS. DAVIES:  That is basically what it

8    is, is an empty house.

9              MR. STAFFORD:  I object to the scenes

10   of the deceased.

11             THE COURT:  The reflection of the

12   deceased in this video tape?

13             MS. DAVIES:  Your Honor, I don't see

14   anything prejudicial about that.  It's just a

15   picture of the man who is taking the photograph.

16             THE COURT:  I don't intend to try this

17   a second time, if possible, so, if you want to

18   offer this with those portions blocked out, stop

19   it on a certain number on the VCR and you offer

20   the proper predicate, you may do so.

21             MS. DAVIES:  Let me be sure that I

22   understand what the court is suggesting.

23             THE COURT:  If you have the proper

24   predicate, I will allow this tape as to its

25   introduction without the audio and without these

                                                    94

1    scenes showing the deceased on this tape.

2         MS. DAVIES:  Would the court consider

3    the fact that the deceased Charles Allen, that

4    is a very accurate depiction of his size and

5    physique at the time of the offense, which I

6    think would be relevant?

7         THE COURT:  You haven't argued that

8    one before.

9         MS. DAVIES:  Well, now I am.  The

10   defendant in his statement says that Charles

11   Allen supposedly threatened him.  He is so

12   afraid, he goes into the house.  I think his

13   size and physical appearance -- he describes

14   that he is just in his underwear, maybe an

15   undershirt.

16        THE COURT:  Depending on what comes

17   into the record, you might be able to reoffer

18   this at a later time in this trial, but I am not

19   going to allow the reflective scenes from this

20   tape pre-marked as State's Exhibit 11.

21        MR. STAFFORD:  I presented you a

22   motion on the impact evidence.  Again I would

23   ask the court to set certain boundaries for the

24   State and also identify those boundaries so I do

25   not have to continuously offend this jury,

95

```
 1   offend the family by having to object to things
 2   that I don't think are relevant.  The rules of
 3   evidence in Boothe vs. Maryland and even Payne
 4   vs. Tennessee would hold it's not relevant.  And
 5   my contention, judge, is that under the Code of
 6   Criminal, Texas Rules of Criminal Evidence, our
 7   Texas Constitution, that the evidence which has
 8   been elicited from this prospective witness as
 9   to the long, long family history, all those
10   things have no bearing at the guilt and
11   innocence stage.  And there are going to be some
12   future witnesses that testify, that without
13   guidance from this court to direct the
14   prosecutor, she's going to take whatever leeway
15   that is not defined for her.  I don't blame her.
16           THE COURT:  I believe the State has
17   been constrained pretty much up to this point.
18   I am going to rely on your objection in the
19   future.  I believe there may only be one more
20   witness under this motion who is going to
21   testify on the case in chief.
22           MR. STAFFORD:  So the court is
23   overruling my motion?
24           THE COURT:  I am going to rely on you
25   to make objections at the proper time.  In its
```

96

1      present form, the motion is denied.
2                  MR. STAFFORD:  Thank you.
3                  THE COURT:  Are y'all ready to proceed?
4                  MS. DAVIES:  Yes, sir.
5                  THE COURT:  Bring in the jury,
6      please.
7                  (Jury in)
8                  THE COURT:  When we broke, ladies and
9      gentlemen, the State still had this witness on
10     direct examination.
11                 Proceed.
12                 MS. DAVIES:  May I approach?
13                 THE COURT:  Yes, ma'am.
14                      DAVID SANDERS,
15     called as a witness by the State and on the
16     stand at the time of the recess, resumed the
17     stand and testified further as follows:
18                    DIRECT EXAMINATION
19                      (CONTINUED)
20     BY MS. DAVIES:
21        Q.   Mr. Sanders, I think I was showing you
22     some exhibits that have been marked for
23     identification purposes.  I would like for you
24     first to look at these photographs that are
25     marked State's Exhibits four through nine.  If

                                                    97

1    you would look at those.  Can you tell the jury

2    whether the first photographs, State's four

3    through eight, are depictions of the exterior of

4    624 Keith?

5         A.   Yes, ma'am.  And eight is the studio

6    behind the house.

7         Q.   And State's Exhibit 9, is that

8    depiction of a scene in the kitchen at 624

9    Keith?

10        A.   Yes, ma'am, it is.

11        Q.   In each instance, are those

12   photographs accurate depictions of the scene?

13        A.   Yes, ma'am.

14        Q.   Now, State's Exhibit 4, can you tell

15   us were you present when that photograph was

16   taken?

17        A.   Yeah, I was.

18        Q.   Was that taken on September 13, 1991?

19        A.   No, ma'am, it wasn't.

20        Q.   Despite the fact that it was taken at

21   a later date, is that a fair and accurate

22   depiction of the relationship of 624 Keith

23   driveway to the driveway at your house next

24   door?

25        A.   Yes, ma'am.

98

1     Q.   Is that the same way it appeared back

2  on September 13, 1991?

3     A.   Yes, ma'am.

4     Q.   And the balance of the photographs

5  that you looked at, are those the way the

6  location looked back on September 13, 1991?

7     A.   Yes, ma'am.

8          MS. DAVIES:  I am offering State's

9  Exhibits four through nine.

10         MR. STAFFORD:  No objection, Judge.

11         THE COURT:  State's Exhibits four

12  through nine are admitted.

13  BY MS. DAVIES:

14    Q.   While we are identifying things, let

15  me show you a couple of other exhibits, Mr.

16  Sanders.  I have got a diagram marked State's

17  Exhibit 10.  Have you looked at that diagram

18  before?

19    A.   Yes, ma'am, I have.

20    Q.   Is it an accurate depiction of the

21  layout of the interior of the house as it

22  appeared on that Friday morning, September 13th,

23  when you went in and found Charles and Brad?

24    A.   Yes, ma'am, it is.  No, wait a

25  minute.  That door wasn't open.

99

1    Q.   Well, as far as the layout, the

2  floorplan?

3    A.   Yes, ma'am.

4    Q.   There are indications of where there

5  are doors and windows in the house.  I am not

6  asking you whether those--

7    A.   Were open or closed?

8    Q.   Were open or closed.

9    A.   That is an accurate depiction.

10    Q.   And look at State's Exhibit 12 and

11  tell us whether have you looked at this before

12  also?

13    A.   Yes, ma'am, I have.

14    Q.   Is that an accurate depiction of the

15  relationship or the area there around Keith Street?

16    A.   Yes, ma'am.

17    MS. DAVIES:  Your Honor, I will ask

18  the court to permit me to use State's Exhibits

19  10 and 12, after tendering to defense counsel

20  for inspection, just for assistance in the jury

21  understanding various witnesses' testimony.  I

22  am not offering it at this time because I expect

23  witnesses to place additional marks on them

24  during the course of their testimony.

25    MR. STAFFORD:  I have previously seen

100

1    these exhibits, and I have no objection.

2              THE COURT:   All right.

3    BY MS. DAVIES:

4         Q.   Mr. Sanders, first, if you would, I

5    ask you to step down around here and help me a

6    little bit.   Move a little closer to the jury.

7    Now, this is a small courtroom and we have the

8    additional problem of fourteen people here.   Let

9    me step around this way.   Hopefully, I can get

10   out of the way.

11             Can you show the jury where Keith

12   Street is on State's Exhibit 12?

13        A.   This is Allen-Genoa Road and this is

14   Keith Street.

15        Q.   Can you point out on State's Exhibit

16   12 where 624, Charles and Brad's house is?

17        A.   It's where the dot is located right

18   here.

19        Q.   I am going to use the red ink for

20   624.   Now, where would your house number 618 be?

21        A.   Right there.   Right next to it.

22        Q.   I am going to write 618.   Is that

23   right?   Right next door?

24        A.   That is it.

25        Q.   Where are the driveways between -- are

101

1    there two driveways between your houses or just

2    one?

3        A.    He has a driveway and I have a

4    driveway, and they are eight to ten feet apart.

5        Q.    All right.   Is there a house on the

6    other side of 624 Keith?

7        A.    Yes, ma'am, it's 640.

8        Q.    You built it?

9        A.    Yes, ma'am.

10       Q.    That is 640?

11       A.    Yes, ma'am.

12       Q.    Was it completed at the time that you

13   went into Charles and Brad's house and found

14   their bodies?

15       A.    Yes, ma'am.

16       Q.    Was there somebody living there?

17       A.    Yes, ma'am.

18       Q.    Now, can you show the jury where Mr.

19   and Mrs. Don Allen's house is?

20       A.    It's right here on the other side of

21   the street.

22       Q.    Do you happen to know their house

23   number?

24       A.    609.

25       Q.    Let me get a couple of photographs.   I

102

1    think I left them over here.  I want you to keep

2    your voice up for the court reporter.  First

3    let's look at State's Exhibit 4.   I want you

4    to, if you would, step around here and show the

5    jury -- we'll have to start at this end and

6    repeat as we go down.   Now, this is the

7    photograph I believe you said was taken not on

8    the morning of September 13 but later?

9         A.   Correct.

10        Q.   Can you show us or explain to the jury

11   what this photograph shows?

12        A.   You are standing down this way looking

13   towards my house and Mr. and Mrs. Allen's

14   house.  You are standing directly in front of

15   Charles Allen's house at 624.  Standing right

16   there.

17        Q.   You're standing -- I am going to write

18   SX-4.  What direction would you be looking?

19        A.   This way.

20        Q.   If I put an arrow this way?

21        A.   That's it.

22        Q.   What is this brick thing here?

23        A.   Mail box.

24        Q.   For whose house?

25        A.   624 Keith, Charles Allen.

103

1      Q.    What is this?  It appears to be a

2  driveway.  Whose driveway is that?

3      A.    Mr. Allen's driveway.

4      Q.    When you say Mr. Allen, are you

5  talking about Charles or his dad?

6      A.    Talking about Charles.

7      Q.    And then can we see your driveway in

8  this photograph?

9      A.    Yes, ma'am.  It's right there.

10     Q.    Right here?

11     A.    Yes, ma'am.

12     Q.    Let's walk down this way so these

13 jurors can see.  Would you point out Charles'

14 mail box and driveway?

15     A.    Mail box and this is his driveway, and

16 this is my driveway.

17     Q.    Let's step down this way so these

18 jurors can see.  Point out Charles' mail box and

19 driveway.

20     A.    Charles' mail box and driveway.  And

21 my driveway.

22     Q.    Now, I notice there is a lot of trees

23 and shrubbery here.  This greenery, this growth,

24 was that there back in 1991 also?

25     A.    Yes, ma'am.

104

1      Q.    This row of trees and greenery, is

2   that between your house and Charles' house?

3      A.    Yes, ma'am, it is.

4      Q.    Let's start down here.  State's

5   Exhibit 5.  Can you tell us what this is a

6   picture of?

7      A.    That is a picture of Charles Allen's

8   residence at 624 Keith on September 13, 1991.

9      Q.    Now, through the trees I appear to be

10  seeing -- I think I see another house.  Is that

11  correct?

12     A.    Yes, ma'am.

13     Q.    Whose house is that?

14     A.    My house.  That is where I reside.

15     Q.    And can you tell me what this is right

16  down here in the middle right side of that

17  photograph?

18     A.    It's--.

19     Q.    Appears to be on the driveway or near

20  the driveway.

21     A.    I don't know what time this was taken,

22  but after the officers got through with the

23  house, I pulled out all the carpet and trash and

24  stuff here.

25     Q.    Earlier, was there any construction

105

1    debris in front of the house?

2         A.   Yes, ma'am.

3         Q.   In this location?

4         A.   Yes.

5         Q.   Let's move down this way and show

6    these jurors.  Would you point out in State's

7    Exhibit 5 which is Charles' house?

8         A.   This is Charles' house here.

9         Q.   And yours?

10        A.   My house is back over here.  There is

11   part of it.

12        Q.   You need to keep your voice up for the

13   court reporter.  Right here?

14        A.   That is my house there, correct.

15        Q.   All right.  Over here on this

16   right-hand side, was there any construction

17   debris in front of the house?

18        A.   Yes, construction debris to the left

19   side of the driveway.

20        Q.   Let's move down this way to be sure

21   these jurors can see.

22             Can you point out your house in

23   State's Exhibit 5?

24        A.   My house is over here.   This is

25   Charles Allen's house.  This is the driveway.

106

1   That is the debris on the side of the driveway.

2   This is on the morning of September 13, 1991.

3        Q.   Now, State's Exhibit 6.  It appears to

4   be still the front of Charles' house.  I want to

5   call your attention to this vehicle that is in

6   the driveway.  Do you know whose vehicle that

7   is?

8        A.   Yes, ma'am.  That is Charles' Blazer.

9        Q.   Was it there when you went to the

10  house that morning?

11       A.   Yes, ma'am, it was.

12       Q.   While we are looking at this, let's

13  look also at State's Exhibit 7.   We are seeing

14  the front end of a vehicle.  Is that the same

15  vehicle that we are seeing the rear of in

16  State's Exhibit 6?

17       A.   Yes, ma'am, it is.

18       Q.   That is Charles' car?

19       A.   Correct.

20       Q.   What is this?

21       A.   That is Bradley's motorcycle.

22       Q.   Was Charles' car and Bradley's

23  motorcycle there in the driveway like they are

24  shown when you went to the door that morning?

25       A.   Yes, ma'am, they were.

1        Q.    Tell the jury also what, here on the
2   right of State's Exhibit 7, what this building
3   is.
4        A.    That is the recording studio.
5        Q.    The white frame building?
6        A.    Yes, ma'am.
7        Q.    Was the door open like that when you
8   arrived that morning?
9        A.    I don't remember, honestly.
10        Q.    Move down this way and let's point out
11   the vehicle.  If you would point out Charles'
12   car.
13        A.    Here's Charles' Blazer here, the rear
14   end.  Standing on the front side.  And that is
15   the same vehicle.  That is Bradley's
16   motorcycle.
17        Q.    And the recording studio?
18        A.    This is the recording studio back over
19   here.
20        Q.    Again for these jurors, if you would
21   point out Charles' car.
22        A.    Front of 624, Charles' house.  Here is
23   the driveway we looked at.   Back of Charles'
24   Blazer.  Here is the front of Charles' Blazer.
25   Bradley's motorcycle.  And recording studio.

108

1    Q.    Is this picture of the recording
2   studio, is this where you were going in and out
3   the evening before as you described checking on
4   the floor?
5    A.    Yes, ma'am, it is.
6    Q.    Is that the only door to the recording
7   studio?
8    A.    Yes, ma'am, it is.
9    Q.    I forgot to ask you here on State's
10  Exhibit 7, can you see the door that you went to
11  and unlocked to go into the house that morning?
12   A.    Yes, ma'am, it's this one right here.
13   Q.    Let's move down this way and show
14  these jurors which door it was that you entered
15  the house by on September 13th.
16   A.    That is the utility room.   That is
17  the master bedroom.   That is the one I knocked
18  on also.
19   Q.    Which one did you enter?
20   A.    Utility room door right here.
21   Q.    We need to let these jurors see.
22  Point to the utility door where you entered.
23   A.    This one.
24   Q.    The other one you knocked on?
25   A.    Master bedroom exterior door.

109

1    Q.    Did you try the door handle on the

2    master bedroom door to see whether it was

3    locked?

4    A.    Yes, ma'am.

5    Q.    Was it locked?

6    A.    Yes, ma'am.

7    Q.    What about the front door, did you try

8    the front door to see whether it was locked?

9    A.    No, I didn't.

10    Q.    Tell the jury what State's Exhibit 8 is.

11    A.    Just a different view of the recording

12    studio.  This is that door that was open.  It's

13    just a different view of it.

14    Q.    Now, there looks to be a desk and some

15    lumber out there.

16    A.    This is what we pulled out of here

17    while the floor was drying and set it outside.

18    Q.    You had pulled this desk out of where?

19    A.    Out of this first room right here.

20    You can't really see in there.

21    Q.    Is that because the floors were being

22    refinished?

23    A.    Yes.

24    Q.    So, as far as you know, those items --

25    I notice there is a beer bottle here on this

110

1    desk.

2         A.    I think that had been there about a

3    week.

4         Q.    You don't know who left that beer

5    bottle there?

6         A.    No.

7         Q.    Now, let me show you what you have

8    identified as State's Exhibit 9.  Can you tell

9    the jury what this shows?

10        A.    This is what I saw when I walked in.

11              MR. STAFFORD:   He is blocking our

12   view.

13        A.    This is the view coming in from the

14   utility room, the door I went in.   There is

15   bloody footprints.   I thought somebody had

16   stepped on something.   Caulking gun and paint

17   brush that I had in my hands and set down on the

18   counter.   This is the kitchen.   That is what I

19   first saw.

20        Q.    Do you remember, when you got to this

21   point and saw this scene, do you remember

22   whether you walked through the kitchen where

23   that blood is on the floor, or did you go the

24   other way?

25        A.    I think I came back around the other

1  way.

2      Q.   Point out for these jurors what it is

3  you saw on the floor when you first walked in.

4      A.   I entered through the utility room

5  which leads right into the kitchen.  There is

6  the bloody footprints.  I didn't think too much

7  of it at the time.  There is the caulking gun I

8  put down on the counter.

9      Q.   Right here?

10      A.   Yes, ma'am.

11      Q.   Show these jurors here.

12      A.   Once again, walking in through the

13  utility room, kitchen floor.

14      Q.   And the caulk gun that you had with

15  you?

16      A.   Here.  Just kind of walked in and set

17  it down there and said somebody stepped on

18  something.

19      Q.   Okay.  Let me get you to help us a

20  little bit with this other diagram.  Let's put

21  it up here.  State's Exhibit 10.  Does this show

22  the layout of the house that you built for

23  Charles Allen?

24      A.   Yes, ma'am.  Fairly adequately.

25      Q.   Perhaps not to exact scale?

112

1      A.   No, ma'am.

2      Q.   And we are not suggesting that, for

3   instance, here is -- you described the door that

4   you knocked on that was locked?

5      A.   Correct.

6      Q.   I believe you said the door to the

7   master bedroom?

8      A.   Correct.

9      Q.   Can you point that out for us on this

10  diagram?

11     A.   It's right here.  It just shows that

12  it swings open that way.

13     Q.   The fact that this is at an angle

14  showing the doorway is no indication that that

15  door was open when you went that morning?

16     A.   Correct.

17     Q.   Now, can you show us where the door is

18  on this diagram that you entered by, where you

19  used your key and walked into the house?

20     A.   The motorcycle was sitting right

21  here.  Charles' vehicle was right here.  I

22  walked -- I eventually came in this door.   I

23  went over here initially and knocked at both of

24  them.  No answer.  I went back next door, got my

25  key, came over here, opened up this door and

113

1    walked in here.  This thing was back a little

2    bit.  You can see the blood through here.

3         Q.    I am going to take a blue marker and

4    just put an arrow.   If I put your initials

5    D.S., would that adequately show where you

6    entered the house?

7         A.    That is the entry point, yes.

8         Q.    You had to use your key?

9         A.    Correct.

10         Q.    In this picture that we were looking

11    at of the kitchen, State's Exhibit 9, can you

12    pinpoint for us on this diagram, State's Exhibit

13    10, what portion of the house one would be

14    seeing?

15         A.    Well, this marks off depicted in this

16    representation.  Here is the end of this

17    counter.  You can see this is a lot wider than

18    this is here.  This was cut back some over here

19    and have a big entryway through here.  There is

20    the kitchen.  Here is the window that goes right

21    here.  Kitchen sink.

22         Q.    You pointed out the window.  And there

23    is a window here on this diagram.  I think you

24    described it as a garden window?

25         A.    Yes, ma'am.

114

1    Q.   Was there any covering on that window?

2    A.   No.   The only window in the house that

3    didn't have cover.

4    Q.   So, one could see in or out of that

5    window freely?

6    A.   Yes, ma'am.

7    Q.   What, mini blinds on the rest of the

8    house?

9    A.   Mini blinds on the rest, as you can

10   see.   The doors were French doors but they had

11   coverings on them also.

12   Q.   To mark on the diagram, State's

13   Exhibit 10, the location of this scene, State's

14   Exhibit 9, would it be accurate to say that the

15   scene--

16   A.   You are standing about here.

17   Q.   About here?

18   A.   Yes.

19   Q.   I am going to write SX-9.   What

20   direction would you be looking?

21   A.   This way.

22   Q.   I am going to draw an arrow the

23   direction you have indicated.

24        Now, do you recall what route you took

25   to get back to the rest of the house after you

115

1    saw the blood on the floor?

2        A.    Came through here, saw the blood.  Set

3    my work tools here.   Saw the blood, didn't know

4    if there was glass on the floor or what.   I

5    think I came back around here.  Walked toward

6    probably back this way behind the sofa, and I

7    saw blood here at this door of Bradley's room.

8        Q.    You are pointing to this location.

9    You are referring to this room as Brad's room?

10       A.    Yes, ma'am.

11       Q.    Let's write Brad's room on there.

12             Would that be the front of the house?

13       A.    Yes, ma'am.  I can show you on the

14   pictures if you want to see where it is.   If you

15   want to look at the exterior.

16       Q.    State's Exhibit 6, can you point out

17   which windows where Brad's room is?

18       A.    This is the front of the house.   It

19   sticks out, as you can see, from the rest of the

20   slab.   And this is Brad's room right there.   Has

21   three windows and three transits up above.

22       Q.    So you are pointing to these three

23   windows right in front?

24       A.    Yes, ma'am.

25       Q.    Would we also be accurate if we refer

1    to that as the front bedroom on the house?

2         A.   Yes, ma'am.

3         Q.   Front in terms of the street?

4         A.   Yes, ma'am.

5         Q.   During the planning stages, was -- I

6    notice this says bedroom here on our diagram,

7    State's Exhibit 10.  On your plans, is that

8    characterized as a bedroom?

9         A.   Originally, yes.

10        Q.   And how did Charles and Brad use that

11   room?

12        A.   Workout room.  We kind of modified it

13   as we were going.  Just did some structural

14   changes in there to support some of those that

15   hang down and and put a barbell here so you

16   could stretch out on it.  I didn't make a closet

17   here, I just left an opening so they could put

18   their stuff in.

19        Q.   When you say their stuff, what kind of

20   things were kept in that closet?  Let's call

21   this workout room or weight room.

22        A.   We call it the weight room.

23        Q.   Weight room.  Okay.  Use the

24   abbreviations.  What kind of things were kept in

25   this open closet in the weight room?

117

1       A.    Originally we were supposed to put the

2   bench this way with the barbell going this way.

3   That is why we didn't put any doors on it.    We

4   didn't quite get that far.    The weight bench was

5   here, barbells were here, the dumbbells, the

6   barbells.

7       Q.    The barbells and the bars to the

8   weight bench, exactly where were they kept, in

9   this closet or out?

10      A.    They were out here in this area.    You

11  come in, work out and, you know, access.

12      Q.    Is that something that your friends

13  and you would do, work out in there?

14      A.    Donnie and Charles worked out Monday,

15  Wednesday, Friday.    Me and my brother would join

16  them occasionally.    But that is what the purpose

17  of the room was for.

18      Q.    You mentioned that you came around in

19  back of this sofa.    Was the furniture arranged

20  so plenty of room to walk in back or on either

21  side of that sofa to get to the hall?

22      A.    Yes, ma'am, it was.

23      Q.    Again to continue on the layout of the

24  house.    If you are standing here -- is this what

25  you would call the living room area?

118

1    A.   Yes, ma'am.

2    Q.   Could you see into the weight room

3  from that room?

4    A.   Only from behind the sofa here.

5    Q.   In other words, was this door from the

6  living room to the hall and the door to the

7  weight room, were they aligned in such a way

8  that one could see?

9    A.   Right.   This is just a cased opening,

10  there is no door here.   There was a straight

11  shot through here.   There's a door here on this

12  bedroom and on this bedroom.   That is just an

13  opening.

14    Q.   Here off the hallway there is another

15  room.  Whose bathroom was that?

16    A.   Brad's bathroom.

17    Q.   And then the room at the end of the

18  hall, whose room was that?

19    A.   Master bedroom.   Charles' room.

20    Q.   Now, when you went -- who was on the

21  bed?

22    A.   Charles was, just about like it shows.

23    Q.   Even though he was difficult to

24  recognize?

25    A.   Yes, ma'am.

119

1      Q.   Who was at the door?  Was that Bradley

2  Dean Allen in Brad's room?

3      A.   Yes, ma'am, it was.

4      Q.   Did you move any items that were on

5  the floor?

6      A.   Not unless I kicked them.  Not

7  intentionally or not that I realized.

8      Q.   And, finally, this last room, this is

9  what?

10     A.   It's the master bath.  There is a

11  closet off over here, a corner unit jacuzi and

12  separate shower and a john room.

13     Q.   Did you actually go into that room

14  that morning when you found your friends?

15     A.   Yes, ma'am, I did.

16     Q.   Is that when you did your walk through

17  with your gun?

18     A.   Yes, ma'am.

19     Q.   Did you find anything out of place

20  that you noticed in there?

21     A.   Not really.  This room was untouched

22  basically.

23     Q.   When you and your brother went into

24  the house, were either one of you walking around

25  in sock feet?  In other words, just socks on

```
 1    your feet but walking around with socks on?
 2         A.   No, ma'am.
 3         Q.   Did you have on shoes?
 4         A.   I had on some boat shoes.
 5         Q.   And do you know whether your brother
 6    had on shoes?
 7         A.   I can't recall.
 8         Q.   Do you recall whether he was walking
 9    around in socks?
10         A.   No, he wasn't in socks.
11         Q.   Either bare feet?
12         A.   Either barefoot or shoes.
13         Q.   You can have a seat.
14              You mentioned earlier that at some
15    point you had done something with the carpet to
16    the house?
17         A.   I pulled it all out.
18         Q.   When did you do that, do you recall?
19         A.   The officers left at 3:00.  I was
20    probably in there at 3:15.
21         Q.   Why did you do that?
22         A.   I didn't want it in there.  It was
23    bloody.   Not all of it, but I just didn't want
24    anything in there.
25         Q.   Did you do that yourself?
```

121

1      A.    No, my father and my brother,

2   cousins.  I think some of the Allens might have

3   assisted.  I don't remember.

4      Q.    When you went through the process of

5   pulling out that carpet, did you notice whether

6   there were any areas that were heavily damaged

7   with blood?

8      A.    Yes, ma'am, two areas come to mind.

9      Q.    What area of the house was that in?

10     A.    In the master bedroom directly under

11  Charles' head.  He was hanging off the bed.  His

12  head was.  And in Brad's room right up next to

13  the door.  Both of those seeped through the

14  carpet, the pad and ended up on the concrete

15  floor.

16          MS. DAVIES:  I pass the witness.

17          MR. STAFFORD:  Judge, could I see his

18  statement under rule 614?

19          MS. DAVIES:  May the record reflect

20  that I am tendering a two page statement given

21  by David Sanders to defense counsel.

22          THE COURT:  It will.

23          MR. STAFFORD:  May I have a moment,

24  judge?

25          THE COURT:  Yes, sir.

1          MR. STAFFORD:  Your Honor, I don't

2     have any questions at this time.  I reserve my

3     right to cross at a later time.

4          THE COURT:  You may stand down.

5          Call your next witness.

6          MS. DAVIES:  The State calls Jim

7     Bolding.

8          Excuse me, let me call K. W. Rogers

9     first.

10               K. W. ROGERS

11    was called as a witness by the State and, having

12    been duly sworn, testified as follows:

13               DIRECT EXAMINATION

14    BY MS. DAVIES:

15        Q.   Would you, please, state your name for

16    the record?

17        A.   Kirk W. Rogers.

18        Q.   How are you employed?

19        A.   City of Houston Police Department.

20        Q.   Tell us how you are employed.

21        A.   City of Houston Police Department.

22        Q.   How long have you been in law

23    enforcement?

24        A.   Approximately thirteen years this

25    January.

123

1       Q.    What is your assignment with the
2   Houston Police Department?
3       A.    I ride radio patrol.
4       Q.    Any particular area of the city?
5       A.    The southeast part of town around
6   Pasadena city limits, Almeda Mall area.
7       Q.    Does that include the area of the city
8   where 624 Keith Street is?
9       A.    Yes, ma'am.
10      Q.    Is that location in Harris County,
11  Texas?
12      A.    Yes, ma'am, it is.
13      Q.    Officer, I want you to think back to
14  the morning of Friday, September 13, 1991.   Did
15  you have an occasion to go to 624 Keith?
16      A.    Yes, ma'am.
17      Q.    How was it that you happened to go there?
18      A.    I was dispatched to a possible
19  shooting.
20      Q.    What time of day was it?
21      A.    Approximately 8:30, 8:32.
22      Q.    Is that when you arrived?
23      A.    I arrived at 8:34.
24      Q.    Is that approximately?
25      A.    Yes, ma'am, approximately.

                                                    124

1    Q.   Officer Rogers, can you describe for

2    the jury what you saw when you rolled up to 624

3    Keith?

4    A.   There was a man standing in the

5    driveway later that I found out was the

6    complainant, or the reportee.  And he flagged me

7    down, and I stopped my car.  I had to back up

8    because I passed the driveway just a little bit.

9    Q.   You say you passed the driveway a

10   little bit.  Did you nearly pass the house?

11   A.   Yes, ma'am.

12   Q.   Is there any reason you were passing

13   by?

14   A.   I just didn't see the numbers on the

15   house.  It was sitting up off the street a

16   little bit.  I didn't see the numbers on the

17   house.  I was looking for numbers on mail boxes

18   or on the street.

19   Q.   Did you notice whether there was any

20   trash or debris at the street by that house?

21   A.   Yes, ma'am.  There was some trash and

22   debris on the right-hand side of the driveway.

23   Q.   Did the house appear from the street

24   to be occupied?

25   A.   It looked like it was under construction.

125

1    Q.   So then, when you were flagged down by

2    someone in the driveway, was that a Mr. Sanders?

3    A.   Yes, ma'am.

4    Q.   What did you do?

5    A.   I pulled up into the driveway and got

6    out and asked him what was going on.

7    Q.   Did he give you some information?

8    A.   He told me something bad had happened

9    inside, and he was real excited, and I tried to

10   calm him down so we could talk, and we went to

11   the back of the house to the back door.

12   Q.   At that point, did you even try to

13   enter through the front door?

14   A.   No, ma'am.

15   Q.   When you went to the back of the

16   house, what did you see?

17   A.   There was a truck parked in the

18   driveway and a motorcycle parked on the back

19   porch, and the back door was open.

20   Q.   At that point, did you know whether

21   anyone was dead at that location?  Or what was

22   your objective as you entered?

23   A.   To find out what was wrong inside the

24   house.

25   Q.   Were you alone in terms of law

126

1    enforcement at that point?

2         A.    Two other officers had arrived right

3    behind me.

4         Q.    So, did all of you go into the house?

5         A.    I went into the house first.

6         Q.    Did Mr. Sanders go in with you?

7         A.    No, ma'am.

8         Q.    Had he given you any information?

9         A.    Just that something bad had happened

10   inside.

11        Q.    And what did you do when you went into

12   the house then?

13        A.    Went into the back door of the house,

14   looked into the kitchen area, saw some bloody

15   footprints in the kitchen, went on into the

16   living room area, didn't see anything, looked

17   down the hall area and could see blood on the

18   walls and on a door and went and checked the

19   first bedroom door to the left.

20        Q.    Were you able to go into that first

21   bedroom?

22        A.    No, ma'am.

23        Q.    Why not?

24        A.    One of the deceased was up against the

25   door to where we couldn't open the door but just

                                              127

1    a few inches.

2        Q.   At this point, as you are walking

3    through the house, did you have your weapon

4    drawn or?

5        A.   I had my weapon in my hand, yes, ma'am.

6        Q.   Why was that?

7        A.   Mr. Sanders wasn't sure if anybody

8    else was in the house that had, you know,

9    committed this act of violence.

10        Q.   So when you tried that first bedroom

11    door and were not able to get in, what did you

12    do?

13        A.   I immediately -- I could see blood

14    coming down the hallway.  I looked down the

15    hallway and walked down that hallway, checked

16    the bathroom doors as I passed, and when I got

17    to the back bedroom I could see another young

18    man laying in the bed.

19        Q.   What was his condition from your first

20    look?

21        A.   That he was dead.

22        Q.   Did you or the other officers who went

23    into the house with you at that point, did any

24    of you disturb anything that was in the house?

25        A.   No, ma'am.

128

1    Q.   Did you notice whether the lights were
2  on in the house?
3    A.   I don't recall the lights being on in
4  the house.
5    Q.   Once you walked through, what did you
6  do next?
7    A.   I immediately turned the scene over to
8  the other two officers that were there, and I
9  walked outside and asked Mr. Sanders if he had a
10  telephone that I could use.
11    Q.   What was your purpose in using the
12  telephone?
13    A.   I needed to call the homicide division
14  and CSU unit and the M. E.'s office.
15    Q.   Did you do that?
16    A.   Yes, ma'am, I did.
17    Q.   And did people from those offices come
18  out?
19    A.   Yes.
20    Q.   At 624 Keith.  Now, once you called
21  them, what was your responsibility and the
22  responsibility of the other two officers who
23  were there?
24    A.   Just to secure the scene and not let
25  anybody disturb the scene until the homicide

1   detectives got there.

2       Q.   Did you do that?

3       A.   Yes, ma'am.

4       Q.   Did an ambulance crew arrive?

5       A.   Yes, ma'am.

6       Q.   About how long was it before that

7   happened?

8       A.   Approximately two to four minutes

9   after we arrived.

10      Q.   When they arrived, did they move the

11  bodies?

12      A.   No.

13      Q.   Why not?

14      MR. STAFFORD:  That would be

15  speculation as to why not.

16      THE COURT:  Sustained.

17  BY MS. DAVIES:

18      Q.   Did you give any instructions in

19  regard to whether or not those bodies should be

20  moved?

21      A.   Yes, ma'am.  We told them not to touch

22  or disturb anything.

23      Q.   Did you see to it that that

24  instruction was followed?

25      A.   Yes, ma'am.

130

1    Q.   Other than securing the scene for the

2    crime scene unit and the detectives and

3    specialists who were on the way, were you

4    involved in the investigation of this case?

5    A.   Just securing the scene and initially

6    talking to Mr. Sanders.  That was it.

7         MS. DAVIES:  Pass the witness.

8              CROSS EXAMINATION

9    BY MR. STAFFORD:

10   Q.   Officer Rogers, did you prepare a

11   supplement to the offense report?

12   A.   I did not.

13   Q.   Did you turn over your field notes or

14   anything to the detectives, or what kind of

15   verbal report -- who did you make a verbal

16   report to?

17   A.   The officers that were initially

18   dispatched to the call made the supplemental

19   report.

20   Q.   Who was that, can you tell me?

21   A.   Mike McCoy.

22   Q.   Did you read that to refresh your

23   memory prior to testifying today?

24   A.   Yes, sir.

25        MR. STAFFORD:  May I have that for

131

1    purposes of cross examination?

2              MS. DAVIES:  Your Honor, may the

3    record reflect that I am tendering a copy of

4    Officer McCoy's supplement to defense counsel

5    for his inspection.

6              THE COURT:  It will so reflect.

7    BY MR. STAFFORD:

8         Q.   Would you tell the jury basically the

9    purpose of the offense report is to help you

10   refresh your memory later down the road; is that

11   not true?

12        A.   The offense report is to reflect all

13   the facts that we found.

14        Q.   And due to the fact that you make many

15   calls and many things happen, this often helps

16   you refresh your memory as to what you found and

17   what you saw and who you talked to; does it not?

18        A.   Yes.

19        Q.   This is entered into a computer over

20   at the Houston Police Department; is it not?

21        A.   Yes, sir.

22        Q.   That is made available to the District

23   Attorney's Office; is it not?

24        A.   Yes, sir.

25        Q.   It's not available to the defense; is

                                              132

1      it?

2           A.    You are looking at it.

3           Q.    Other than now.

4                 Could you tell the members of the jury

5      that when you arrived on Keith Street, as far as

6      the driveway is concerned, assuming this is

7      Keith?

8           A.    Could you move that out a little?

9           Q.    Sure.   I am being rude to you.   Have

10     you used this diagram at all before testifying?

11          A.    No.

12          Q.    Have you ever seen it?

13          A.    --.

14          Q.    Let me get some photographs, then.

15                MR. STAFFORD:   May I approach the

16     witness, judge.

17                THE COURT:   Yes, sir.

18     BY MR. STAFFORD:

19          Q.    Let me show you what has been marked

20     as State's Exhibit No. 6 and State's exhibit No.

21     5.   That basically represents the Allen's house;

22     does it not?

23          A.    Yes, sir.

24          Q.    And the debris that you are talking

25     about is this little small amount of debris that

                                                      133

1    is over here on the side of the sidewalk?

2         A.   Yes, sir.

3         Q.   There was no debris out in front of

4    the house, as you recall, when you drove up that

5    day?

6         A.   Not out in the very front.

7         Q.   And as reflected by State's Exhibit

8    No. 6, as you drove up, one could see a motor

9    vehicle in the driveway; couldn't they?

10        A.   When I pulled into the driveway, yes,

11   sir.

12        Q.   If you were walking down the street,

13   looking down the driveway, you could also

14   observe a vehicle if you were walking down the

15   street as well and happened to stop right here?

16        MS. DAVIES:   Object to speculation.

17   BY MR. STAFFORD:

18        Q.   Let me rephrase it this way.   If you

19   were standing in the driveway at the foot of

20   this driveway back on Friday, the 13th, would

21   you have been able to see the vehicle?

22        A.   Yes, sir, I could have seen it.

23        Q.   If anybody had been walking down the

24   street, standing in the same position, if they

25   had 20/20 vision or good vision, there would

134

1    have been nothing in their way to keep them from

2    seeing the vehicle; would there?

3         A.    Not at that point.

4         Q.    Did you ever try the front door?

5         A.    I didn't try to go in the front door,

6    no, sir.

7         Q.    You did not?

8         A.    I did not.

9         Q.    Did you ever have an occasion to try

10   the front door?

11        A.    Yes, I did.

12        Q.    Was the door locked or unlocked?

13        A.    The door was locked.

14              MR. STAFFORD:  I have no other

15   questions.

16              THE COURT:  Anything else?

17                   REDIRECT EXAMINATION

18   BY MS. DAVIES:

19        Q.    Officer Rogers, are you aware of the

20   fact that the D. A.'s office in Harris County

21   pretty much has an open file policy and in fact

22   those offense reports are made available to the

23   defense prior to trial?

24        A.    Yes, ma'am.

25              MS. DAVIES:  Pass the witness.

                                                    135

RECROSS EXAMINATION

BY MR. STAFFORD:

      Q.   I don't get to take them home with me and read them; do I?

      A.   I don't know, sir.

      MR. STAFFORD:  Nothing further.

      THE COURT:  Anything else?  You may step down.

      Call your next.

      MS. DAVIES:  State calls Jim Bolding.

      Did we ask the court whether Officer Rogers can be excused?

      THE COURT:  Do you have any objection to this officer being excused?

      MR. STAFFORD:  No.

      THE COURT:  You may be excused.

JAMES BOLDING

1    was called as a witness by the State and, having

2    been duly sworn, testified as follows:

3                    DIRECT EXAMINATION

4    BY MS. DAVIES:

5        Q.    Could you, please, introduce yourself

6    to the jury?

7        A.    My name is James Bolding.   I work at

8    the police crime laboratory.

9        Q.    What is your position at the crime

10   laboratory?

11       A.    I am the supervisor of the serology

12   section in the Houston Police Department crime

13   lab.

14       Q.    Explain to us what the serology

15   section does.

16       A.    Serology is the analysis of body

17   fluids.   In the Houston Police Department, it is

18   the analysis of body fluids that may be related

19   or found in potential crime scenes.

20       Q.    Have you had any special education or

21   training for this position?

22       A.    Yes, ma'am, I do.

23       Q.    Would you describe for us your

24   educational and your professional experience

1    background?

2         A.    Yes, ma'am.    I have a bachelor's

3    degree and a master's degree in biology and

4    biochemistry, both from Texas Southern

5    University.    I also have credits in the Ph.D.

6    degree in biochemistry from the University of

7    Texas.    I have undergone extensive training in

8    forensic science and forensic serology at the

9    Houston Police Department laboratory, at the FBI

10   laboratory in Quantico, Virginia, also at the

11   Serology Research Institute which is in

12   Emeryville, California.    Also I have undergone

13   training at the Alopac Company that was in

14   Atlanta, Georgia.

15        Q.    Mr. Bolding, how long have you been

16   with the Houston Police Department?

17        A.    I'm coming up on my fourteenth year in

18   the Houston Police Department.

19        Q.    How long have you been in charge of

20   the serology laboratory?

21        A.    Approximately twelve years.

22        Q.    For the most part, is your work done

23   in the laboratory, or do you actually go out to

24   the scene sometime?

25        A.    From time to time, we go to crime

138

1    scenes also, yes.

2         Q.   Do you go to crime scenes everytime

3    there is a murder case?

4         A.   No, ma'am, we don't.

5         Q.   What determines whether or not you are

6    called out of your laboratory to a crime scene,

7    if you can tell us?

8         A.   Right.  From time to time, crime

9    scenes that are specifically enigmatic, they are

10   complicated, or there may be multiple homicides

11   or whenever there is some difficulty that a

12   homicide sergeant or a supervisor sees at a

13   crime scene will call out the crime lab and the

14   photo lab and the laboratory for latent prints.

15        Q.   Were you working on Friday, September

16   13, 1991?

17        A.   Yes, ma'am, I was.

18        Q.   Were you called out to a crime scene

19   on that day?

20        A.   Yes, ma'am, I was.

21        Q.   Do you recall going to 624 Keith?

22        A.   I do.

23        Q.   Do you recall what time of day it was

24   that you were called out there?

25        A.   I don't recall specifically what time

                                          139

1    of day it was.

2         Q.    Did you spend a good portion of your

3    day out there, Mr. Bolding?

4         A.    Yes, ma'am, I did.

5         Q.    Do you recall whether it was morning?

6         A.    I believe it was late morning.

7         Q.    When you go to a crime scene, is there

8    any particular type of evidence that you focus

9    on when you go to the scene?

10        A.    Yes, ma'am.

11        Q.    What is that?

12        A.    I specifically am interested in

13   evidence that may implicate one or several

14   persons that have left that crime scene.   In

15   other words, I am primarily focusing on evidence

16   that will earn us a suspect.

17        Q.    Now, when you arrived at 624 Keith,

18   were there other members of the Houston Police

19   Department on the scene?

20        A.    Yes, ma'am.

21        Q.    Were there other -- well, for

22   instance, what about fingerprints?   Do you deal

23   with fingerprints?

24        A.    No, ma'am, I do not.

25        Q.    Was there someone there who has that

                                              140

1    area of specialization?

2        A.   Yes, ma'am, as I recall, there was.

3        Q.   What about photographs, are you

4    responsible for taking photographs?

5        A.   No, ma'am, I am not.

6        Q.   Do you recall whether there was

7    someone there taking pictures?

8        A.   Yes, ma'am, I do.

9        Q.   Do you remember who that was?

10       A.   Yes, ma'am.  I think I remember that

11   Officer Jordan was in charge of taking pictures

12   on that day.

13       Q.   Is that what we refer to as a crime

14   scene unit?

15       A.   Yes, ma'am.

16       Q.   What about homicide detectives, were

17   there any homicide detectives on the scene?

18       A.   Yes, ma'am.

19       Q.   So, as you arrived, apparently there

20   were others already there?

21       A.   That is correct.

22       Q.   At the point that you arrived, do you

23   know whether the bodies of Charles and Brad

24   Allen had been moved?

25       A.   They were in the process, at the time

1    that we arrived they were in the process of

2    being removed from the premises.

3         Q.   So your investigation focused not on

4    the bodies of the two men; is that correct?

5         A.   That is correct.

6         Q.   Can you describe for the jury what

7    your actions were when you first arrived at 624

8    Keith?

9         A.   My actions were, first of all, to get

10   an overall, general layout of the premises, that

11   is, to find out if indeed the bodies are still

12   there and where they are located and to peruse

13   any of the rooms that may have physical evidence

14   that can be moved.  This is what I did on that

15   day.

16        Q.   So, did you actually determine the

17   location of the bodies and view the evidence

18   initially?

19        A.   That is correct.

20        Q.   And during the course of your

21   investigation there, did you actually recover

22   any evidence and take it from the scene?

23        A.   Yes, ma'am, I did.

24        Q.   In a minute we will go over the

25   details of what you took from the scene.  Can

                                              142

1   you tell us now what your purpose is in taking

2   evidence from that scene and taking it back to

3   your laboratory?

4       A.   Well, the purpose is to preserve any

5   physical evidence that may be found at the crime

6   scene but also it is to unearth a possible

7   suspect or a possible witness that has left that

8   crime scene and any possible evidence of

9   tampering with the crime scene.

10      Q.   As you walked through the scene there

11  at 624 Keith, as far as any evidence that

12  involves blood or bodily fluids, did anything in

13  particular catch your attention?

14      A.   Yes, there were in the kitchen several

15  drops of blood that were likely not to have come

16  from the decedents in this case.

17      Q.   They were likely to have come or not

18  to have come?

19      A.   Not to have come.

20      Q.   All right.

21      A.   From the deceaseds in this case.

22      Q.   Why did you reach that conclusion?

23      A.   Because they were, in essence, 90

24  degree droplets from some object that was wet

25  and bleeding or from an individual that was

1    bleeding.   And the individuals in this case were

2    not -- were disassociated from that kitchen

3    area.

4         Q.   What did you observe -- let's back up

5    first.   When you say 90 degree droplets.   Can

6    you explain that to me a little bit in laymen's

7    terms what is it that you mean?

8         A.   Right.   If you were to hold a droplet

9    of liquid above the floor at a 90 degree angle

10   and drop it onto the floor, it would make a

11   concentric circle.   That is what is considered

12   to be a 90 degree droplet.

13        Q.   Can you explain to us why you reached

14   the conclusion that the two men, the two dead

15   men were not associated with those droplets that

16   you saw in the kitchen?

17        A.   Because, again, they would have been

18   bleeding so very profusely that there would have

19   been much more blood in that area.   There was

20   also footprints in that area that indicated that

21   whoever was there was standing in the positions

22   that were associated with that 90 degree

23   droplets.   I did not see the same kind of blood

24   pattern, or the individuals as I understood

25   would have had to have blood on their feet at

144

1    the time.

2         Q.    Because of your observation of these

3    droplets of blood, did you take any evidence

4    from that kitchen area?

5         A.    Yes, ma'am, I did.

6         Q.    Can you tell the jury what that was?

7         A.    I took, from the kitchen I took blood

8    droplets from the kitchen drawer, blood droplets

9    from the kitchen floor and blood droplets from a

10   pack of kitchen utensils that was inside of the

11   drawer.  I also took in that kitchen a tape lift

12   of a footprint.

13        Q.    When you say a tape lift of a

14   footprint, now I understood that you were

15   looking not for fingerprints.  Do you deal with

16   footprints?  Or why did you take that lift?

17        A.    It was to see if indeed the blood type

18   of the footprint was the same blood type as the

19   droplets.

20        Q.    The sample and the lift that you took

21   were to determine the type of blood?

22        A.    That is correct.

23        Q.    How do you go about taking a sample

24   from a blood droplet?  You described you took

25   one from the drawer, the floor and from

                                              145

1    something inside the drawer.  How do you do
2    that?
3         A.    We take a scalpel blade and an
4    uncontaminated sheet of bond paper and
5    physically scrape any blood that is there onto
6    the bond paper.  The alternative to that is to
7    take a swab, a cheesecloth or a cotton swab,
8    moisten it with either saline water and lift it
9    with the small amount of the saline water on the
10   swab.
11        Q.    Is that what you did in this instance?
12        A.    Yes, ma'am.
13        MS. DAVIES:  Your Honor, if I may have
14   just a moment.  And I have number of photographs
15   here that I want to mark for Mr. Bolding.  Have
16   not been pre-marked.
17        Q.    Let me show you some photographs that
18   I have marked for identification purposes as
19   State's Exhibits 13 through 23.  Would you look
20   through those and tell me whether those
21   accurately depict the kitchen and breakfast room
22   area as it appeared that morning at 624 Keith?
23        A.    Yes, ma'am, it does.
24        Q.    Do they accurately depict the scene?
25        A.    They do.

146

1      Q.    I will also draw your attention to

2   what is already in evidence as State's Exhibit

3   9.  Does that also accurately depict the scene

4   in the kitchen area that morning?

5      A.    Yes, ma'am, it does.

6          MS. DAVIES:  Your Honor, I am offering

7   State's 13 through 23 after tendering them to

8   defense counsel for his inspection.

9          MR. STAFFORD:   Thirteen through

10  twenty-three, we have no objection.

11         THE COURT:  They are admitted.

12  BY MS. DAVIES:

13     Q.    Can you tell me, Mr. Bolding,

14  referring to State's Exhibits -- would you look

15  through these and select those photographs that

16  depict that 90 degree drop or droplet that you

17  described?

18     A.    These are the photographs that best

19  depict the 90 degree falling of blood to the

20  floor.

21     Q.    Okay.  You have selected State's

22  Exhibits 16, 17, 18, 20, 21 and 22.

23         Could I ask you to step down here in

24  front of the jury, if you would.

25         MS. DAVIES:  Your Honor, could I ask

147

1    that these be passed to the jury first so that

2    they might look at them and pass them on to the

3    next person before we begin talking about them?

4                    THE COURT:   You may.

5    BY MS. DAVIES:

6         Q.   Take your seat.  Give the jury a

7    chance to look at those.

8                    (Defense Exhibits 1 through 4

9    marked).

10   BY MS. DAVIES:

11        Q.   Mr. Bolding, let's look first at

12   State's Exhibit 20.  And you had indicated that

13   there were drops of blood on the floor?

14        A.   Yes.

15        Q.   Now, are those drops of blood

16   consistent with the kind of wounds that you had

17   seen that the two deceased had sustained?

18        A.   No, they are not.

19        Q.   Were they consistent with someone who

20   had cut their hand?

21        A.   Yes.

22        Q.   And just dripping a small amount of

23   blood?

24        A.   That would be one of the

25   consistencies, yes, ma'am.

148

1      Q.   Now, the fact that those droplets of

2  blood such as are shown in State's Exhibit 20,

3  were they perfectly round?

4      A.   They were as round as blood droplets

5  can be when hitting a rather hard surface, yes.

6      Q.   While we are looking at these, let's

7  also look at State's Exhibit 18, which appears

8  to be an open drawer.  Was there a round drop of

9  blood there also?

10      A.   Yes, there is.

11      Q.   Can you point out?  You have pointed

12  both inside the drawer on the wood and on a --

13  what is this?

14      A.   It's a package of something to hold

15  kitchen utensils to the wall.  There was a

16  droplet there.

17      Q.   As well as droplets on the floor?

18      A.   That is correct.

19      Q.   All right.  Now, the fact that these

20  droplets you saw were close to being round, what

21  significance does that have?

22      A.   It indicated that there was still

23  movement, that the person who left the drops was

24  standing or was not moving.  That person was

25  above the places where the droplets were being

                                                    149

1    left.

2         Q.    Let me be sure I understand you.

3    When you say a person was standing still or?

4         A.    Or moving very, very slowly.

5         Q.    If a person was bleeding from a wound

6    and waving their arms around at the same time,

7    moving, would you expect to see a nearly round

8    droplet such as you got on the floor here?

9         A.    That would be inconsistent with this

10   particular pattern.

11        Q.    Inconsistent?

12        A.    That is correct.

13        Q.    So, at best, a person who left a blood

14   droplet such as this would be moving slowly?

15        A.    Extremely slowly, yes.   It's

16   consistent with having blood form on an

17   extremity and allowing that blood drop to fall

18   to the floor with very little movement in any

19   direction.

20        Q.    Is that true of all of the blood drops

21   that you see on these photographs?

22        A.    That is correct.

23        Q.    Is that consistent with what you saw

24   at the scene?

25        A.    Yes, ma'am, it is.

                                              150

1      Q.   Now, let's look at State's Exhibit 22,

2   21 and 22.  Can you explain to the jury what

3   those show?

4      A.   It shows that there is a small amount

5   of blood that has fallen onto a vertical surface

6   and it has trickled down on that vertical

7   surface, but there is also a droplet that never

8   touched that vertical surface.

9      Q.   Which is that?  You say a droplet

10  never touched the surface?

11     A.   This particular drop did not come from

12  this surface.  It was left, and the person moved

13  closer to that vertical surface and dropped

14  another drop of blood.

15     Q.   So, in other words, you are saying you

16  see blood slide down the cabinet?

17     A.   Right.

18     Q.   Is what you are calling the vertical

19  surface?

20     A.   Right.

21     Q.   And then hit the floor?

22     A.   Right.  The blood here on the cabinet,

23  it's a thick drop.  It came down the cabinet,

24  but the drop next to it was a drop that formed

25  independently of the one on the cabinet.

151

1    Q.   Hit the floor directly without hitting

2    the cabinet?

3    A.   That is correct.

4    Q.   And what is the location in the

5    kitchen where these two photographs were taken?

6    A.   They were by the dishwasher and the

7    sink.

8    Q.   By the kitchen sink.

9    Can you point out for us in these

10   photographs what the exact locations were where

11   you took the samples of blood in the kitchen?

12   A.   I took as much blood as I possibly

13   could from all of the 90 degree droplets in the

14   middle of the floor.  I also took samples from

15   the drawer here, and I also took this particular

16   kitchen utility package.

17   Q.   Let me be sure I am understanding.

18   You took a sample from the drop that is shown

19   inside the drawer depicted in State's Exhibit 18?

20   A.   That is correct.

21   Q.   As well as taking this hardware

22   container?

23   A.   That is correct.

24   Q.   That is shown in State's Exhibit 18?

25   A.   That is correct.

152

1    Q.   Now, you said you took samples from
2  all the drops that you could on the kitchen
3  floor.   Do you take an individual sample from
4  each droplet and keep them separate, or were you
5  taking swabs and combining those?
6    A.   I took droplets that were separate and
7  kept them separate as best as I could.   However,
8  there were several droplets here that I combined
9  because of the proximity they were, within one
10 or two or three inches of themselves, indicating
11 that they may have been from the same bleeding
12 source.
13   Q.   If you combine those samples like that
14 and you get back to the laboratory with those,
15 if it had been two different types of blood,
16 would your analysis reveal that?
17   A.   It would.
18   Q.   Did that happen in this instance?
19   A.   No, ma'am, it did not.
20   Q.   So you took samples from the drawer
21 and from the kitchen floor.   Were there any
22 other places that you actually took blood
23 samples in the kitchen area?
24   A.   I took something called a tape lift of
25 an area of a footprint.   That is, I took a piece

                                           153

1    of tape and pressed it onto a footprint and

2    adhesive tape lifted some of the footprint and

3    with the fiberous debris that was associated

4    with that footprint.

5         Q.    You may have a seat.

6              When you are working a case like this

7    and you take evidence to your laboratory, do you

8    have any system in your laboratory for assigning

9    an identifier to the evidence?

10        A.    Yes, ma'am, I do.

11        Q.    Describe for the jury what you do in

12   that regard.

13        A.    There is a unique laboratory number

14   that always appears on any of the evidence that

15   is taken, and that laboratory number appears

16   only on evidence that is associated with this

17   particular case.

18        Q.    So, when you went back to your

19   laboratory, did you -- or at what point did you

20   assign a number to any evidence for this case?

21        A.    When the evidence was recovered and

22   taken back to the laboratory.

23        Q.    And what number did you assign to the

24   evidence in this case?

25        A.    L91-9937.

154

1        Q.   L91-9937?

2        A.   That is correct.

3        Q.   Is that correct?

4        A.   That is correct.

5        Q.   So, do you actually put that number on

6    the evidence that you are going to analyze for

7    identifying purposes?

8        A.   That is correct.

9        Q.   Let me show you what I have marked for

10   identification purposes as State's Exhibits 26

11   and 27.   Do you recognize those items?

12       A.   Yes, ma'am, I do.

13       Q.   How is it that you are able to

14   recognize the contents of the envelopes that I

15   have marked State's Exhibits 26 and 27?

16       A.   They have the lab number L91-9937 and

17   my initials on both packets of the evidence.

18       Q.   Did you put the evidence in these

19   packets then when you returned to the laboratory

20   or at the scene?

21       A.   Yes, ma'am, I put them into the

22   packets at the crime scene.

23       Q.   And then actually put your initials

24   and the laboratory number?

25       A.   Yes, ma'am.

155

1    Q.    Can you tell us what it is that you

2    put in the packet that has been marked State's

3    Exhibit 26?

4    A.    This is the holder that was in the

5    kitchen drawer that had the blood droplet on it

6    on the date that I collected it.

7    Q.    All right.  I see, in addition to that

8    little holder, it appears to be a smaller

9    packet.  Would you open that for me, Mr.

10   Bolding, and tell us what is contained in

11   State's Exhibit 26?

12   A.    This is also a glossy paper which is a

13   wax kind of paper container that has the blood

14   from the kitchen drawer in it.

15   Q.    Is that the sample that you took there

16   at the scene?

17   A.    Yes, ma'am.

18   Q.    So you put both of those items in this

19   one envelope State's Exhibit 26?

20   A.    That is correct.

21   Q.    And can you tell us what is contained

22   in the envelope marked State's Exhibit 27?

23   A.    The envelope marked State's 27

24   contains blood from outside of the kitchen

25   drawer, blood from kitchen floor, and another

156

1    sample of blood from the kitchen floor.

2         Q.    So there are three smaller envelopes

3    containing those samples?

4         A.    That is correct.

5         Q.    Are those the samples that you

6    actually recovered at the scene?

7         A.    Yes, ma'am, they are.

8         Q.    And put in this larger envelope,

9    State's Exhibit 27?

10        A.    That is correct.

11             MS. DAVIES:   Your Honor, at this time

12   I tender State's Exhibits 26 and 27 to defense

13   counsel for his inspection.   Offer them into

14   evidence.

15             MR. STAFFORD:   No objection.

16             THE COURT:   State's 26 and 27 are

17   admitted.

18   BY MS. DAVIES:

19        Q.    Mr. Bolding, when I look at the --

20   contained in State's Exhibit 26, it looks like

21   it's a floor guide.   Is this the object that

22   you pointed out to us in the drawer that you

23   took the blood sample from?

24        A.    Yes, ma'am, it is.

25        Q.    I believe it's actually depicted in

                                              157

1    State's Exhibit 18?

2         A.    That is correct, it is.

3         Q.    Can't help but notice that when I look

4    at the actual package and compare it to the

5    photograph, State's Exhibit 18, there doesn't

6    appear to be nearly as much blood on this

7    package in the flesh as there appears to be in

8    the photograph.

9         A.    That is correct.

10        Q.    Can you explain that to us?

11        A.    Yes, ma'am, I removed it.

12        Q.    You removed it?

13        A.    Yes, ma'am.

14        Q.    The blood from the actual package?

15        A.    That is correct.

16        Q.    How did that happen?

17        A.    In order to do the analysis, it is

18   necessary that I take the blood off of the

19   package and put them into tubes or into trays or

20   other reaction vessels to perform the analysis.

21        Q.    Is that what you did in this case?

22        A.    Yes, ma'am.

23        Q.    What was your purpose in removing

24   that?

25        A.    We wanted to find out, first of all,

1    whether or not the blood was blood, whether or

2    not the blood was human, and, if possible, to

3    obtain a type and other comprehensive tests of

4    character or genetic identification on the

5    blood.

6         Q.   The items that I have shown you there

7    in the kitchen samples from the drawer, the

8    floor and that packaging, when you took those

9    back to the laboratory, did you determine the

10   blood type on those items?

11        A.   Yes, ma'am, I did.

12        Q.   Can you tell us what the blood

13   droplets from the drawer, what type blood those

14   were?

15        A.   The blood droplets from the drawer

16   were type A.

17        Q.   And did you examine the blood droplets

18   from the floor, the samples that you had taken

19   back to the lab?

20        A.   Yes, ma'am, I did.

21        Q.   What type blood were those?

22        A.   The blood droplets from the kitchen

23   floor were also type A.

24        Q.   What about the droplets on that little

25   hardware package contained in State's Exhibit

159

1    No. 26?

2         A.    That was also type A.

3         Q.    You indicated that you did a lift of

4    one of the bloody footprints on the floor there

5    in the kitchen.  Did you determine what blood

6    type that was?

7         A.    That was retained without examination

8    as to type.

9         Q.    You did not determine what type blood

10   that was?

11        A.    That is correct.

12        Q.    Now, I have asked you about the blood

13   type.  When you do this examination, are you

14   determining first whether it's human blood?

15        A.    Exactly.  There are a set of steps

16   that go or follow in order to complete the

17   analysis.  The first step is to determine

18   whether or not the sample is indeed blood.  The

19   next step is to determine whether or not it is

20   from a human being.  And then the third and

21   fourth steps are to determine genetic content,

22   type of blood and other physical characteristics

23   that may point to one or several individuals.

24        Q.    Did you go through all those steps in

25   this instance?

160

1      A.    That is correct.

2      Q.    Now, you say that you determined that

3   those samples were type A human blood that you

4   recovered in the kitchen.  At some point, did

5   you get samples from Bradley Allen or from

6   Charles Allen to determine what their blood type

7   was?

8      A.    Yes, ma'am, I did.

9      Q.    Can you tell the jury what you

10  received in that regard?

11     A.    I received a sample of blood from

12  Charles Allen.

13     Q.    Was that a sample from the morgue?

14     A.    That is correct.

15     Q.    Did you determine what Charles Allen's

16  blood type was?

17     A.    Yes.

18     Q.    What was his blood type?

19     A.    His blood type was type O.

20           THE COURT:  Ladies and gentlemen, we

21  are going to take a short break.  How many

22  smokers are there?  Three, four, five, whatever.

23  We are going to put you all back in the jury

24  room.  And we have a little terrace; we will

25  bring you back out for the smokers so that you

161

1   can get away from that jury room, and the others

2   don't have to be associated with it.  Some of

3   you are going to be wondering how long we are

4   going to be working tonight.  You have

5   two-year-old twins at home.  Are they in day

6   care or somebody else is taking care of them?

7           THE JUROR:  Somebody else.

8           THE COURT:  We are going to be working

9   until at least six this evening to try to get

10  through some of these witnesses.  If anybody

11  wants to go use the phones right now you may do

12  so on this break.  If you would, just follow the

13  bailiff down the hall.  We will be back with you

14  in a few minutes.

15          (Recess; after which, the jury returns

16  to the courtroom).

17          THE COURT:  Proceed, please.

18  BY MS. DAVIES:

19      Q.   Mr. Bolding, I believe, as we broke,

20  do I remember correctly that you had just

21  indicated that the blood sample from the morgue

22  indicated that Charles Allen's blood was type O?

23      A.   That is correct.

24          MS. DAVIES:  Your Honor, at this time

25  I have marked for identification purposes as

162

1    State's Exhibit 28 some business records which
2    have been on file with the court since June 22,
3    1992, and notice was given to defense counsel in
4    accordance with the rules of evidence.    I am
5    offering these records from the Gulf Coast
6    Regional Blood Center into evidence at this
7    time.
8                MR. STAFFORD:   No objection.
9                THE COURT:   State's Exhibit 28 is
10   admitted.
11               MS. DAVIES:   May I read from a portion
12   of these records for the jury?
13               THE COURT:   Yes, ma'am.
14               MS. DAVIES:   These are business
15   records kept in the regular course of business
16   of the Gulf Coast Regional Blood Center here in
17   Houston accompanied by an affidavit from the
18   custodian of the records there that indicate
19   that the blood type of Bradley Dean Allen is
20   type O.
21        Q.   Mr. Bolding, you have described for us
22   your analysis of evidence from the kitchen.   Did
23   you recover evidence from any other portion of
24   the house?
25        A.   Yes, ma'am, I did.

                                            163

1    Q.    The front bedroom, the bedroom on the

2    front of the house?

3    A.    Yes, ma'am.

4    Q.    Did you recover any evidence from that

5    room?

6    A.    Yes, ma'am, I did.

7    Q.    Can you tell the jury what that was?

8    A.    Yes, ma'am.   I recovered one knife.   I

9    took the bedding off the bed.   I took a sample

10   of blood from a love seat that was located in

11   that front bedroom.

12   Q.    Let me call your attention, Mr.

13   Bolding, to be sure we are talking about the

14   same room.   We have this diagram here, State's

15   Exhibit 10.   Are you referring, when we say the

16   front room, are you referring to this room on

17   the front of the house that we have labeled on

18   State's Exhibit 10 as Brad's room?

19   A.    That is correct.

20   Q.    Let me show you what has been marked

21   for identification as State's Exhibits 24 and

22   25.   Can you tell us what those are?

23   A.    This is a carpet sample from the

24   bedroom.   And this is a swatch of cloth also

25   from that bedroom, a love seat in that bedroom.

164

1        Q.   Why did you choose those particular

2  items to take as evidence?

3        A.   They appeared to be droplets that were

4  away from the large patterns of blood that could

5  possibly be from the decedent that was found in

6  that bedroom.

7        Q.   All right.  So, looking at this

8  diagram, were the samples, State's Exhibit 25,

9  which I believe you indicated was from a love

10  seat, and State's Exhibit 24, carpet, were those

11  taken from this area by the door into Brad's room?

12        A.   No, they were not.

13        Q.   What area of the room were they taken

14  from?

15        A.   They were taken from near the foot of

16  the bed toward the front of the house.

17        Q.   We have got the bed designated here.

18  Would it be fair to say between where the words

19  "Brad's room" is written and the end of the bed

20  in the diagram?

21        A.   That is correct.

22        Q.   Did you do any testing on these items,

23  State's Exhibits 24 and 25?

24        A.   Yes, ma'am, I did.

25        MS. DAVIES:  Your Honor, at this time

1    I am tendering State's 24 and 25 to defense

2    counsel and offer them into evidence.

3              MR. STAFFORD:  No objection.

4              THE COURT:  State's Exhibits 24 and 25

5    are admitted.

6    BY MS. DAVIES:

7         Q.   Were you able to determine whether

8    there was blood on State's Exhibit 24?

9         A.   24 is the love seat?  Yes, ma'am, I

10   was.

11             THE COURT:  I believe 24 is the carpet

12   sample.

13   BY MS. DAVIES:

14        Q.   I'm sorry.  State's Exhibit No. 24.

15        A.   Yes, ma'am, I did.

16        Q.   By the way, on these items, did you

17   also use that unique laboratory number to

18   identify these items?

19        A.   I did.

20        Q.   L91-9937?

21        A.   That's it.

22        Q.   When you examined State's Exhibit 24,

23   the carpet sample, were you able to determine

24   whether there was human blood on that?

25        A.   Yes, ma'am, I did determine there was

                                          166

1    human blood on that sample.

2         Q.   Did you determine the type of the

3    blood?

4         A.   The type of blood was inconclusive,

5    that is, I could not determine what type that

6    was on that sample.

7         Q.   Can you explain to the jury why it is

8    that sometimes you cannot determine the type of

9    blood when you examine it?

10        A.   Sometimes the environment of the room

11   or the facility may interfere with the test.

12   Strong detergents or acids or bases or strong

13   oxidizing substances in chemicals have an

14   influence on whether or not testing is possible

15   in any certain type of blood.

16        Q.   This was a relatively new house and

17   new carpet.  Can you explain to us what there

18   might have been that would interfere with your

19   test in this instance?

20        A.   Yes.  If the carpet had been treated

21   with stain preventors which may interfere with

22   the testing of the blood, that is a possibility

23   as to why I got an inconclusive as to type.

24        Q.   Were you able to tell that it was

25   human blood, though?

167

1      A.    Yes, I was.

2      Q.    Now, as to State's Exhibit 24.   This

3  sample.   I notice there is a little hole.

4            THE COURT:   Back up.   You referred to

5  24 a minute ago when you started talking.   That

6  is what we were just talking about.

7            MS. DAVIES:   I'm sorry.   I apologize.

8      Q.    State's Exhibit 25.   The sample from

9  the love seat that you identified.   I notice

10 there is a little hole in the middle of that.

11 Can you explain to us why there is a hole in the

12 middle of that fabric sample?

13     A.    I physically removed that sample to

14 put into my test tubes and to put into chemicals

15 to react whether or not it was human and whether

16 or not it was blood and whether or not it had

17 specific type.

18     Q.    You cut a little piece out of the

19 center of this?

20     A.    I did.

21     Q.    Did you determine whether there was

22 human blood on this fabric sample?

23     A.    I did, yes, ma'am.

24     Q.    What was your opinion?

25     A.    The conclusion was that it was human

                                                    168

1    blood.

2         Q.    Were you able to determine the type

3    from that?

4         A.    Yes, I was.

5         Q.    What type blood was that?

6         A.    It was type A also.

7         Q.    Now, Mr. Bolding, did you take any

8    blood samples in the area just inside the door

9    of Brad's room?

10        A.    No, ma'am, I did not.

11        Q.    Any particular reason why not?

12        A.    In my opinion, the blood samples were

13   likely to have come from the decedent that was

14   found in that room.

15        Q.    And you were looking for what?

16   Something other than a sample from the decedent?

17        A.    Right.    I was looking for samples that

18   could possibly have come from an assailant that

19   had been in that room.

20        Q.    Did you recover any other evidence

21   from Brad's room?

22        A.    No, ma'am, I think that is all.

23        Q.    Was there a knife on the bed in Brad's

24   room?

25        A.    Yes, ma'am, I did recover that knife.

169

1    Q.    You did recover that.   Let me show you

2    the knife that is contained in an envelope

3    marked State's Exhibit 29.   Can you tell us

4    whether you recognize that?

5    A.    Yes, ma'am, I can.

6    Q.    Where did you first see that knife?

7    A.    That knife was in the bedroom, in the

8    front bedroom of the home at 624 Keith.

9    Q.    Where was it in that room?

10   A.    It was on the bed.

11   Q.    Let me show you a photograph that I

12   have marked for identification purposes as

13   State's 29-A.   Does that photograph accurately

14   depict the location where you recovered the

15   knife that you have just identified?

16   A.    Yes, it does.

17   Q.    When you first first saw this knife,

18   was there anything on it, anything visible to

19   the human eye?

20   A.    Yes, ma'am, it was.

21   Q.    What was that?

22   A.    The substance was reddish to brown

23   substance that appeared in my opinion to be

24   blood.

25   Q.    Have you made many crime scenes?

170

1    A.    Yes, ma'am, I have.

2    Q.    You recognize what blood looks like?

3    A.    Yes, ma'am, I do.

4    Q.    In crime scenes as well as in the

5  laboratory.  Was it your opinion that was blood

6  on that knife?

7    A.    It was my opinion, as a cursory look,

8  that that was blood.

9    Q.    Now, did you actually test this knife

10  for blood?

11    A.    Yes, ma'am, I did.

12    Q.    What did you determine?

13    A.    I determined that there was human

14  blood on that knife.

15    Q.    We are referring to State's Exhibit 29?

16    A.    Yes, ma'am.

17    Q.    Did you type the blood?

18    A.    Yes, ma'am, I did.

19    Q.    What type blood was on State's Exhibit

20  29?

21    A.    I did not get one blood type.  As a

22  result of not getting one type, I said that the

23  type was inconclusive.

24    Q.    Explain to us what you mean when you

25  got more than one blood type.  For example, if

                                              171

1  somebody who is bleeding is handling a knife or

2  two different people's blood gets onto a knife,

3  what type of result would you expect in the

4  laboratory?

5       A.   I would expect to find that there was

6  multiple blood types on that knife.  However, I

7  did not know whether or not two people were

8  bleeding as a result.  Whenever I see multiple

9  blood types on a knife, we can not say that it

10 belongs to one human being, and we call it

11 inconclusive.

12      Q.   Now, as I observe the knife, State's

13 Exhibit 29, here in the courtroom today, and you

14 have identified 29-A as a photograph depicting

15 the knife as you recovered it, they don't look

16 the same in terms of coloration.  Can you

17 explain to us why there would have been a change

18 in the appearance of the knife?

19      A.   Right.  The knife was submitted to the

20 latent print laboratory for examination for

21 prints, and they use different chemicals to

22 highlight or to bring out prints on the knife.

23 And just so happens that the chemicals, some of

24 the chemicals that they use also color or

25 discolor blood and change it from the

172

1    reddish-brown color to bluish or black color.

2          Q.    Now, you actually took the knife,

3    State's Exhibit 29, from the scene?

4          A.    That is correct.

5          Q.    And before it was processed for

6    prints, you did some testing for blood; am I

7    understanding correctly?

8          A.    That is correct.

9          Q.    As you are handling the knife in

10   processing it for the blood, do you take any

11   steps to preserve any possible prints that might

12   have been on that knife?

13         A.    Yes, I do.

14         Q.    What is it that you do?

15         A.    I always wear gloves against the

16   spread of disease, but I also wear them so that

17   my prints don't end up on the knife, and I

18   handle very carefully the handle of the knife

19   and any other area that may contain a print that

20   could identify a human being.

21         Q.    And State's Exhibit 29-A, is that the

22   location of the knife as you picked it up?

23         A.    That is correct.

24         Q.    And that is on the bed?

25         A.    That is correct.

1        Q.    In Brad's room?

2        A.    Yes, ma'am.

3             MS. DAVIES:    Tendering State's 29 and

4    29-A to defense counsel, offer those into

5    evidence at this time.

6             MR. STAFFORD:    I have no objection.

7             THE COURT:    State's 29 and 29-A are

8    admitted.

9             MS. DAVIES:    May I ask that these two

10   items be passed to the jury at this time?

11            THE COURT:    They may be.

12   BY MS. DAVIES:

13       Q.    Let me show you what I have marked for

14   identification purposes as State's Exhibit 32

15   and a photograph marked 32-A.  Do you recognize

16   those items?

17       A.    Yes, ma'am.

18       Q.    Can you tell us did you recover the

19   contents of the envelope marked 32?

20       A.    No, ma'am, I did not.

21       Q.    Do you recognize those from the scene?

22       A.    Yes, ma'am, I do.

23       Q.    And were they in the location as shown

24   in 32-A?

25       A.    Yes, ma'am, they were.

174

1     Q.   So, did you do any testing at all on

2 the contents of State's Exhibit 32, the sunglasses?

3     A.   No, ma'am, I did not.

4     Q.   Did you recover any evidence in the

5 master bedroom, Charles' room?

6     A.   Yes, ma'am, I did.

7     Q.   Can you tell us what it is you recall

8 recovering in that room?

9     A.   I recovered a black metal weight bar,

10 a threaded-head weight bar, the bedding from the

11 bed where the complainant was found, a section

12 of cardboard box.  There was on the bedding,

13 found on the bed there was a ring and one tooth

14 that was recovered.  There were also two knives

15 that were recovered in that room.

16     Q.   Were the knives in the bed?

17     A.   No, ma'am, they were not.

18     Q.   Where were they?

19     A.   They were on the floor.

20     Q.   You mentioned a couple of weight bars?

21     A.   Yes, ma'am.

22     Q.   A difference in the way you described

23 them.  What, a threaded weight bar?

24     A.   That is correct.

25     Q.   Where was it located?

175

1       A.   It was on the floor near the knives.

2       Q.   And the other weight bar, was it also

3  a threaded weight bar?

4       A.   No, it was not.

5       Q.   Where was it located?

6       A.   As I recall, I recall it being on the

7  bed.

8       Q.   Let me show you what we have marked

9  for identification purposes.  Can you see these

10 items?

11      A.   Yes.

12      Q.   State's Exhibit 30.  Do you recognize

13 that?

14      A.   I do.

15      Q.   What is that?

16      A.   That is the black metal weight bar.

17      Q.   And is that the one that was recovered

18 on the bed?

19      A.   That is correct.

20      Q.   The bed that Charles Allen's body was on?

21      A.   That is correct.

22      Q.   And State's Exhibit 31, do you

23 recognize that?

24      A.   Yes, ma'am, I do.

25      Q.   Where was that recovered?

1    A. That was on the floor next to the
2 knives in the master bedroom.
3    Q. Let me show you what I have marked for
4 identification purposes as State's Exhibit 33,
5 an envelope containing two knives.
6    A. Yes, ma'am.
7    Q. Do you recognize those two knives?
8    A. I do.
9    Q. Where did you first see those two
10 knives?
11    A. They were on the floor in the back
12 bedroom at the address 624 Keith.
13    Q. Let me show you these two photographs
14 30-A and 33-A.  Are these accurate depictions of
15 the weight bar and the knives, threaded weight
16 bar, 31, and the knives, State's Exhibit 33?
17    A. They are.
18    Q. Do these photographs show where those
19 items were when you recovered them at the scene?
20    A. That is correct, they do.
21    MS. DAVIES:  Your Honor, I am
22 tendering State's Exhibits 30, 31, 33, as well
23 as photographs 30-A and 33-A to defense counsel
24 for his inspection.
25    MR. STAFFORD:  May I have a moment,

1    judge?

2              THE COURT:  Yes, sir.

3              MS. DAVIES:  Actually, to keep the

4    record straight, let me -- for the record, the

5    photograph which we have previously referred to

6    as 30-A I am going to mark as 31-A for the

7    record because that corresponds with the weight

8    bar 31.

9         Q.   Is this the threaded weight bar where

10   you found it?

11        A.   That is correct.

12        Q.   I am referring to photograph 31-A.

13        A.   That is correct.

14             MS. DAVIES:  So my proffer, Your

15   Honor, is State's Exhibits 30, 31, 33, 31-A and

16   33-A.  The A referring to the photographs.

17             MR. STAFFORD:  No objection.

18             THE COURT:  State's Exhibits 30, 31,

19   31-A, 33 and 33-A are admitted.

20             MS. DAVIES:  Your Honor, I would ask

21   that photographs 31-A, 33-A and the knives 33 be

22   passed to the jury.  Rather than passing them,

23   with the court's permission, I would like to

24   show State's Exhibit 30 and 31 to the jury.

25             THE COURT:  All right.   Start the

                                              178

1    photographs and exhibits on the different rows.

2    BY MS. DAVIES:

3         Q.   Mr. Bolding, these two knives that are

4    contained in State's Exhibit 33 that you

5    recovered from the floor in Charles' room, did

6    you test those for the presence of blood?

7         A.   I did.

8         Q.   What did you determine?

9         A.   I determined that there was human

10   blood on both knives; however, the blood type

11   was inconclusive.

12        Q.   Was that for similar reason as you

13   described on the other knife?

14        A.   Yes.   There was multiple blood types

15   found on the knives.

16        Q.   Again, did you take care, as you

17   handled these knives, so that they could be

18   checked for fingerprints?

19        A.   I did, yes, ma'am.

20        Q.   In fact, after you processed the three

21   knives that you have described and all this

22   physical evidence, did you turn it over to the

23   fingerprint laboratory?

24        A.   I did.

25        Q.   These weight bars that are in

179

1    evidence, State's Exhibits 30 and 31, did you
2    examine these for any evidence?
3         A.    Yes, ma'am, I did.
4         Q.    Was there blood visible on either of
5    these items?
6         A.    There was blood visible on both of
7    them, yes, ma'am.
8         Q.    And as to State's Exhibit 30, the
9    straight bar, what did you determine when you
10   tested it?
11        A.    There was human blood that was type O
12   found on that particular bar.
13        Q.    Only type O?
14        A.    That is correct.
15        Q.    When you tested the threaded bar,
16   State's Exhibit 31, what did you determine?
17        A.    I determined that human blood also was
18   present, and there was type blood O on that
19   weight bar also, the threaded bar.
20        Q.    I call your attention to what we have
21   marked as State's Exhibit 34.  I have marked the
22   plastic container.  Can you tell us what is
23   contained in the plastic, State's Exhibit 34?
24        A.    It is a window mini blind.
25        Q.    Where was this in the house?  Was it

                                              180

1    on a window?

2        A.   I don't recall seeing that at the

3    house.

4        Q.   I am going to remark this exhibit.

5    Let me ask you about that in just a moment.  Go

6    back to the house.  I call your attention to --

7    State's Exhibit 34 was supposed to be on this

8    other item.  I apologize.  For the record, I am

9    going to take that off the mini blind.  That is

10   not State's Exhibit 34.   State's Exhibit 34

11   now.  Can you tell me what is the contents of

12   that envelope?

13       A.   This was a portion of a cardboard box

14   that was located in the master or the back

15   bedroom of that home.

16       Q.   This bedroom that we have labeled

17   Charles' bedroom?

18       A.   That is correct.

19       Q.   Do you recall approximately where in

20   the bedroom that box was located?

21       A.   It was sitting between the door and

22   the bed, the door leading to the hallway and the

23   bed.

24       Q.   All right.  What was your reason for

25   taking that -- was that the entire item there,

1    or did you just take a portion of the box?

2          A.    I just took a portion of the box.

3          Q.    Did you test that to determine what

4    type blood was on that?

5          A.    Yes, ma'am, I did.

6          Q.    What did you learn?

7          A.    I learned that the blood type, that

8    this was human blood, but there was multiple

9    blood types, therefore, the type was

10   inconclusive as to the cardboard box.

11         Q.    When you say it was between the bed

12   and the door -- let me get a picture so we can

13   be sure.

14               Let me show you -- does this

15   photograph show the location of the box?

16         A.    Yes, ma'am, it does.

17         Q.    All right.  Let's mark that as 34-A.

18               Can you point out for us where the box

19   is, where you recovered this sample?

20         A.    This is the box where I recovered the

21   sample.

22         Q.    You are pointing to the lower

23   left-hand corner?

24         A.    That is correct.

25               MS. DAVIES:  I offer State's Exhibit

1    34 and 34-A after tendering them to defense

2    counsel.

3              MR. STAFFORD:  No objection.

4              THE COURT:  State's Exhibits 34 and

5    34-A are admitted.

6    BY MS. DAVIES:

7         Q.    Is my finger pointing to the box that

8    you recovered this sample 34 from?

9         A.    Yes, ma'am, it is.

10        Q.    Is this right next to that bedroom door?

11        A.    It is.

12        Q.    Did you test the sample from the

13   cardboard box, State's Exhibit 34?

14        A.    I did.

15        Q.    And did you determine whether or not

16   there was human blood on that item?

17        A.    I did determine that it was human

18   blood.

19        Q.    What was your determination?

20        A.    It was human blood but the type was

21   inconclusive.

22        Q.    Can you explain to us why, I mean, was

23   this a matter of there being two kinds of blood

24   on there, or what would the reason have been on

25   this sample?

1    A.    That was a possibility, the

2    possibility was that I got multiple blood

3    typings out of the samples there.   There could

4    have been more than one type of blood there,

5    more than one person bleeding, or that the other

6    scenario is there could have been a contaminate

7    that caused me to get multiple blood types

8    there.    In either event, I did not determine

9    that there was one blood type there, and I said

10   inconclusive at the time.

11        Q.    When you say a contaminant, some

12   foreign matter that was on the box that would

13   affect your testing?

14        A.    That is correct.

15        Q.    I believe you said that you recovered

16   this bar, State's Exhibit 30, from Charles

17   Allen's bed?

18        A.    That is correct.

19        Q.    What else did you recover from the bed

20   other than the bedding, if anything?

21        A.    There was a ring found on the bed.

22        Q.    What condition was that ring in?

23        A.    It was broken.   It was not intact.

24        Q.    Let me show you what we have marked

25   for identification as State's Exhibit 35.   Do

184

1    you recognize that?

2         A.    Yes, I do.

3         Q.    What is that?

4         A.    This is a ring that was collected by

5    myself from the bedding.

6         Q.    In Charles Allen's room on the bed?

7         A.    That is correct.

8         Q.    Did I hear you say you also recovered

9    a tooth?

10        A.    There was a tooth on the bedding also.

11        Q.    Under the body?

12        A.    The tooth and the ring were recovered

13   in the crime lab itself.  So that the body --

14   the body may have been on top of it; however, it

15   would have been impossible for me to say.

16        Q.    When you took the bedding to the

17   laboratory and examined it, you discovered

18   State's Exhibit 35 as well as a tooth?

19        A.    That is correct.

20             MS. DAVIES:   Tender State's Exhibit 35

21   to defense counsel and offer it into evidence.

22             MR. STAFFORD:   No objection.

23             THE COURT:   35 is admitted.

24             MS. DAVIES:  With the court's

25   permission, may I just show this to the jury?

185

1                THE COURT:  You may.

2    BY MS. DAVIES:

3         Q.    Mr. Bolding, other than looking for

4    blood, did you examine -- well, let me start

5    over.  Did you examine the bedding for physical

6    evidence?

7         A.    Yes, ma'am, I did.

8         Q.    Did you find any significant evidence

9    other than the tooth and the ring that you just

10   described?

11        A.    No, ma'am, I did not.

12        Q.    What condition was the bedding in that

13   you took from Charles and from Brad Allen's bed?

14        A.    They were both bloody, bloody items of

15   bedding.

16        Q.    Did you actually do blood testing on

17   those items to determine the type of blood?

18        A.    No, ma'am, I did not.

19        Q.    Did that seem necessary to know whose

20   blood it was on those items?

21        A.    It did not, in my opinion.

22        Q.    At some point, were you also asked to

23   look at some evidence that was submitted to you

24   in this case but was not evidence that was

25   recovered from this scene at 624 Keith?

1      A.   Yes, ma'am, I was.

2           MS. DAVIES:   Your Honor, with the

3  court's permission, there will be subsequent

4  witnesses to identify these items, but rather

5  than have to recall Mr. Bolding, with the

6  court's permission I would like to get him to

7  identify and describe what he did in connection

8  with this evidence, and then we will connect it

9  up with the later witness.

10          MS. STAFFORD:   Under rule 104 B, that

11  is permissible.

12          THE COURT:   You have no objection?

13          MR. STAFFORD:   No, not at this time.

14  BY MS. DAVIES:

15      Q.   Let me show you an envelope which has

16  been marked as State's Exhibit A-1.  I am going

17  to identify these things beginning with the

18  letter A so that we don't get them confused with

19  the scene at 624 Keith.  All right.

20          Can you tell me what the large brown

21  envelope that has been marked State's Exhibit

22  A-1 is?  Without reading the information on it,

23  just tell us what that is.

24      A.   It's a storage bag used by the Houston

25  Police Department property room.

187

1      Q.    Is there a lab number affixed to this

2   evidence bag?

3      A.    Yes, it is.

4      Q.    What is that lab number?

5      A.    It is 91-9937.

6      Q.    At what point would that lab number be

7   put on the evidence bag that is submitted to

8   your laboratory?

9      A.    When it physically enters the lab or

10  was taken from the property room to the crime

11  lab, that is when the number would be applied.

12     Q.    When it is actually taken to the

13  laboratory?

14     A.    That is correct.

15     Q.    Now, can you tell us do you recall

16  were you asked to do any testing on the contents

17  of State's Exhibit A-1?

18     A.    I was.

19     Q.    Was that done at my request?

20     A.    Yes, it was.

21     Q.    Let me show you some envelopes

22  contained in that outer envelope.  They have

23  been marked as A-2, A-3, and A-4.  Can you look

24  at those envelopes and tell me whether you

25  recognize them?

                                        188

1      A.    I can recognize them.

2      Q.    Are there identifying marks on those

3  so that you are able to recognize those items?

4      A.    Yes, ma'am, there are.

5      Q.    The lab number?

6      A.    Lab number is L91-9937 on each of

7  these envelopes.

8      Q.    And your initials?

9      A.    That is also correct.

10     Q.    Let me also call your attention to

11 what has been marked now as State's Exhibit A-7.

12 Do you recognize this item?

13     A.    Yes, ma'am, I do.

14     Q.    What is it?

15     A.    It's a mini blind.

16     Q.    Did you also at my request examine

17 this mini blind?

18     A.    Yes, I did.

19     Q.    Where did you recover the mini blind

20 contained in the plastic covering marked A-7?

21     A.    It was also retrieved from the police

22 property room.

23     Q.    Along with these items that you have

24 just identified as State's A-2, A-3 and A-4?

25     A.    That is correct.

1    Q.    Also contained in the envelopes
2 State's A-1 are some bags.  One is labeled A-5.
3 Looks like it has a smaller paper in there that
4 is marked A-5-A?
5    A.    That is correct.
6    Q.    And another envelope, A-6, that has a
7 paper inside it marked A-6-A?
8    A.    Yes, ma'am.
9    Q.    Do you recognize those items?
10    A.    I do.
11    Q.    Did you also do some testing on those
12 items?
13    A.    I did.
14    Q.    All right.
15         MS. DAVIES:  Your Honor, at this time
16 I offer into evidence and tender to defense
17 counsel State's Exhibits A-2 through A-7.
18         MR. STAFFORD:  Not waiving my 104
19 objection, Judge, I have no objection at this
20 time.
21         THE COURT:  All right, as to those
22 last two items you referred to it as A-5-A and
23 A-6-A.   Is it A-5 and A-6?
24         MS. DAVIES:  A-5 contains a little
25 piece of paper that is marked A-5-A.   I am

                                              190

1    offering the contents of A-5, which includes

2    what is marked as A-5-A.   And the contents of

3    A-6, which includes A-6-A.

4              THE COURT:   A-1 is a large envelope

5    which contains A-2, A-3, A-4, A-5 and A-6.

6    You are offering A-2, A-3, A-4, A-5-A and

7    A-6-A.   Correct?   As well as A-7?

8              MR. STAFFORD:   She is offering it

9    all.

10             MS. DAVIES:   A-6-A is the contents of

11   A-6.   So I am offering both.

12             THE COURT:   Both A-5 and A-6 as well

13   as A-5-A and A-6-A?

14             MS. DAVIES:   Right.

15             THE COURT:   Are you offering A-1

16   also?

17             MS. DAVIES:   No, I am not offering

18   A-1.   I am offering the contents of each of

19   these marked.

20             THE COURT:   Do you understand the

21   tender, Mr. Stafford?

22             MR. STAFFORD:   Yes, Your Honor.

23             THE COURT:   You have no objection?

24             MR. STAFFORD:   Subject --

25             THE COURT:   You either do or you

191

1    don't.

2              MR. STAFFORD:   I may have an objection

3    once it's tied in.   What I am saying for this

4    purpose of 104 A, she can tie it up later.   If

5    she doesn't tie it up later, then I'm going to

6    object.   She says she's going to be able to tie

7    it in later.

8              MS. DAVIES:   Your Honor, my proffer is

9    based on expectation of being able to identify

10   these objects by the officer.

11             THE COURT:   I am being asked to admit

12   certain items.   If they are offered and

13   admitted, she's going to be perhaps passing

14   things to the jury.

15             MR. STAFFORD:   I don't think she's

16   entitled to pass them until--

17             MS. DAVIES:   Your Honor, I am not

18   going to ask to pass these things to the jury.

19   Rather than recall Mr. Bolding at a later time,

20   I want to elicit, with the court's permission,

21   the results of his testing on these items.

22             THE COURT:   All right.

23             MR. STAFFORD:   Judicial economy, I

24   have no objection to that.

25             THE COURT:   State's Exhibits A-2, A-3,

                                                    192

1    A-4, A-5, A-5-A, A-6, A-6-A, and A-7 are admitted.

2    BY MS. DAVIES:

3         Q.   Mr. Bolding, now you said you

4    recovered these items from the property room.

5    So do you have any personal knowledge of the

6    scene or location where these items were

7    recovered?

8         A.   I do not.

9         Q.   Okay.  Let's start with State's

10   Exhibit A-2.  Can you tell the jury what the

11   contents are of the plastic envelope?

12        A.   It's a tissue paper that has a

13   reddish-brown substance on it that appears to be

14   blood.

15        Q.   Did you test it to determine whether

16   it was in fact blood?

17        A.   Yes, I did.

18        Q.   What did you determine?

19        A.   I determined that human blood that was

20   type A was found on this particular item.

21        Q.   Type A human blood on the tissue in

22   State's A-2?

23        A.   That is correct.

24        Q.   Did you test the contents of State's

25   Exhibit A-3?

                                                   193

1      A.    Yes, I did.

2      Q.    Do you know what that is?

3      A.    It's insulation for a pipe.

4      Q.    What did you find on that insulation,

5  if anything?

6      A.    I found that human blood having

7  inconclusive blood type was found on this

8  particular insulation piece.

9      Q.    Can you tell us why the inconclusive

10 result on this?

11     A.    Again, I can't tell you specifically

12 why.  I can give you scenarios of

13 possibilities.  It could have been.

14          MR. STAFFORD:  I object.  If he

15 doesn't know, he doesn't know.   I object to

16 scenarios, I guess.

17          THE COURT:  Just a minute.  He is

18 objecting to your speculation.  I suppose that

19 is sustained.   It's the same thing we have

20 already heard two or three times.

21 BY MS. DAVIES:

22     Q.    It could be from contaminants?

23     A.    That is a possibility.

24     Q.    So there is human blood on the

25 contents of A-3, but you can't tell us what type

                                        194

1    it is; is that correct?

2         A.    That is correct.

3         Q.    Can you tell us what is contained in

4    envelope marked A-4?

5         A.    There is a gray and white sock.

6         Q.    Did you test that item?

7         A.    Yes, ma'am, I did.

8         Q.    What were you looking for?

9         A.    I was also looking for blood.

10        Q.    What did you determine?

11        A.    Determined there was human blood on

12   the sock.

13        Q.    Were you able to determine the type?

14        A.    No, ma'am, I was not.

15        Q.    So, what was your opinion as to what

16   might be on the sock in State's Exhibit A-4?

17        A.    There was a small amount of blood.

18   It was human; however, there was not enough

19   blood to go ahead and finish the type test on

20   that sock.  It was just not enough present to

21   attempt to type it.

22        Q.    It was a matter of the quantity in

23   this instance?

24        A.    That is correct.

25        Q.    Did you do some testing on the samples

195

1   contained in the envelopes, the outer envelopes

2   that are marked State's A-5 and A-6?

3       A.   Yes, ma'am.

4       Q.   As to A-5, the sample in there that is

5   marked A-5-A, what did you determine?

6       A.   There was human blood with

7   inconclusive blood type.  Sample from the

8   shower.

9       Q.   And the sample A-6-A contained in the

10   envelope A-6, did you test it?

11       A.   Yes, ma'am, I did.

12       Q.   What did you determine there?

13       A.   There was an indication that blood was

14   present; however, I could not confirm it due to

15   the amount of sample that was present.

16       Q.   Was this just a small amount of blood?

17       A.   That is correct.

18       Q.   And the sample, what, just an

19   inadequate amount for you to test?

20       A.   That is correct.

21       Q.   So you said it's blood.  Can you even

22   go so far as to say whether it's human blood or

23   not?

24       A.   I don't know if it's human or not.

25       Q.   What about the mini blind that is

1    contained in the wrapper, State's Exhibit A-7?

2         A.    It was human blood.

3         Q.    On the mini blind?

4         A.    That is correct.    The type was

5    inconclusive as to whether or not it contained

6    one human blood type or not.

7         Q.    As to what?

8         A.    As to whether or not it contained one

9    human blood type or not.

10        Q.    So you had enough to tell it was

11   human, but you just couldn't tell whether it was

12   all one type?

13        A.    That is correct.

14        Q.    When you have got a situation where

15   you can't tell whether it's all one type, can

16   you separate them out and tell what the multiple

17   types are?

18        A.    We could tell what the multiple types

19   are, yes, ma'am.

20        Q.    Did you do that in this instance?

21        A.    I did not.    We can not attribute the

22   types to any one source, so we did not determine

23   what the number of multiple types were.

24        Q.    Let me show you two items contained in

25   plastic envelopes marked State's Exhibits 36 and

197

1  37.   Do you recognize the vials contained in
2  State's Exhibits 36 and 37?
3       A.    Yes, ma'am, I do.
4       Q.    How is that you are able to recognize
5  those?
6       A.    They have lab number L91-9937 and my
7  initials on them.
8       Q.    All right now, you placed your
9  initials on these vials, you have indicated, and
10 there is a lab number on there.  Did you
11 actually do any testing on the vials contained
12 in State's Exhibits 36 and 37 yourself?
13      A.    I did determine the blood types in
14 each of those vials.
15      Q.    And that blood type was?
16      A.    Type A.
17      Q.    And other than determining the blood
18 type, what did you do with the contents of these
19 vials?
20      A.    I retained one of the vials, and I
21 gave one of the vials to Ms. Monica Thompson.
22      Q.    Which vial did you give to Monica
23 Thompson, if you would?
24      A.    State's Exhibit 36.
25      Q.    Did you ask Ms. Thompson to do

198

1    anything in connection with the blood vial

2    contained in State's Exhibit 36?

3         A.    I did.

4         Q.    What did you ask her to do?

5         A.    I asked her to extract DNA from the

6    blood vial in State's Exhibit 36.

7         Q.    Does Monica Thompson work there at the

8    laboratory?

9         A.    Yes, ma'am, she does.

10        Q.    Does she work under your supervision?

11        A.    Yes.

12        Q.    Is she qualified, in your opinion, as

13   her supervisor, to perform the extraction that

14   you asked her to perform?

15        A.    Yes, ma'am, she is.

16        Q.    Now, as to State's Exhibit 37, the

17   other blood vial, you said you recognized it.

18   Is that the one that you used to determine blood

19   type?

20        A.    Yes, it is.

21        Q.    I believe you said the blood type of

22   the individual whose blood is in that vial was

23   determined to be what?

24        A.    Type A.

25        Q.    When you were at the scene, you

1   mentioned that you lifted one of the bloody

2   footprints in the kitchen just to try to

3   determine type of blood.  While you were at 624

4   Keith, did you notice the prints, the bloody

5   footprints that were on the floor?

6        A.   Yes, ma'am, I did.

7        Q.   Did you look at them even though you

8   were not the -- you are not in the fingerprint

9   or footprint business, did you look at them?

10       A.   Yes, ma'am, I did.

11       Q.   Just looking at them with the naked

12   eye, did those footprints appear to be made by a

13   bare foot?

14       A.   They did not appear to be made by a

15   bare foot.

16       Q.   Anywhere in the house, did you, while

17   you were at the scene, observe what appeared to

18   be any prints made by bare feet?

19       A.   I did not.

20       Q.   Or did you see any prints that

21   appeared to be shoe prints?  In other words,

22   someone who was wearing a shoe may have stepped

23   in blood?

24       A.   I did not.

25            MS. DAVIES:  Pass the witness.

200

1          THE COURT:  Mr. Stafford.

2          MR. STAFFORD:  May I see his reports,

3     narrative, et cetera, et cetera?  I have never

4     seen this report.  It may take awhile.

5          THE COURT:  Just a minute.  The lab

6     report?

7          MR. STAFFORD:  I want to see his notes

8     and everything.   I have not seen them.

9          MS. DAVIES:  I have a copy of Mr.

10    Bolding's supplement which has been shown to Mr.

11    Stafford which I will make available to him.

12         THE COURT:  What is it specifically

13    you are pointing at or talking about?

14         MR. STAFFORD:  His whole file, notes,

15    findings, et cetera.

16         THE COURT:  Is that all in this case,

17    or is there something else also?

18         THE WITNESS:  This is all this.

19

20

21

22

23

24

25

                                              201

1                    CROSS EXAMINATION

2    BY MR. STAFFORD:

3         Q.    Do you recall who called you to make

4    the Keith Street scene?

5         A.    I don't recall.

6         Q.    You made an interesting comment to the

7    jury in reference to the prosecution's direct

8    examination that you don't usually make all

9    murder scenes so it has to be something unique

10   or unusual about the scene for you to make it;

11   is that correct?

12        A.    That is correct.

13        Q.    The unique quality about this case was

14   there was no apparent motive for the murder,

15   there was no sign of burglary or no sign of

16   robbery, no sign of anything.  Is that the

17   reason they called you?  Or do you know why they

18   called you?

19        A.    I do not know what the uniqueness was.

20        Q.    Were the homicide detectives there

21   when you arrived?

22        A.    Yes, they were.

23        Q.    They were there at the scene?

24        A.    Yes, sir.

25        Q.    Did they aid you or direct you as to

                                                  202

1    what they wanted you to recover, or were you

2    totally the captain of your ship and took what

3    you wanted to take?

4         A.   They could make suggestions and

5    comments, but it's quite often that I am the one

6    who determines what is to be taken.

7         Q.   And as far as the many, many exhibits

8    which the State has introduced, as far as the

9    blood samples are concerned, did you ever do any

10   age comparison as to the age of the blood?  For

11   example, I think you took a little sample of

12   blood from the love seat in the front bedroom?

13        A.   Yes, sir.

14        Q.   Did you do any age comparison on any

15   of those?

16        A.   No, sir.

17        Q.   We do know there are two individuals

18   involved in this case with type A blood, though;

19   were they not?

20        A.   I am not sure.  I know there were two

21   individuals that were tested that had type A

22   blood.

23        Q.   That were submitted to you in this

24   case?

25        A.   Yes, sir.

1      Q.   Can you tell the jury, as far as the

2   long bar is concerned, the one that you

3   supposedly recovered from the bedroom, have you

4   ever seen a picture of this on the bedroom, or

5   do you just don't recall?

6      A.   I did not see a still photograph of

7   that.

8           MR. STAFFORD:   I have no other

9   questions.

10          THE COURT:   Anything else, Ms. Davies?

11               REDIRECT EXAMINATION

12   BY MS. DAVIES:

13      Q.   Mr. Bolding, Mr. Stafford asked you

14   there was a sample from another individual who

15   had type A blood.   Can you tell the jury whose

16   blood sample that was based on the evidence that

17   was given to you?

18      A.   David Lee Sanders I think is the

19   gentleman's name.

20      Q.   David Sanders?

21      A.   Yes, ma'am.

22      Q.   Mr. Stafford also asked you about a

23   photograph of the location of where this weight

24   bar, State's Exhibit 30, was recovered.   Had

25   Charles Allen's body been moved when you

                                                    204

1    recovered this weight bar?

2        A.    It had been.

3        Q.    So do you have any personal knowledge

4    of where it was in relation to Charles Allen's

5    body?

6        A.    I have no personal knowledge as to

7    where it was.

8        Q.    Where was it when you picked it up at

9    the scene and kept it for evidence?

10       A.    It was on the bed in Charles Allen's

11   room.

12       Q.    Thank you.

13       MS. DAVIES:   Pass the witness.

14

15                    RECROSS EXAMINATION

16   BY MR. STAFFORD:

17       Q.    The blood droplets on the floor in the

18   kitchen that you made reference to with the

19   bloody sock prints -- am I ringing a bell?

20       A.    Yes, sir.

21       Q.    That would be consistent with someone

22   walking, would it not, and blood dripping from

23   their hand?

24       A.    Yes, sir, it would be.

25       MR. STAFFORD:   No other questions.

205

1          THE COURT:  Anything else?

2          MS. DAVIES:  May he be excused subject

3    to recall?

4          THE COURT:  Any objection to him being

5    on call?

6          MR. STAFFORD:  No.

7          THE COURT:  You may be on call.

8          Call your next.

9          MS. CONNORS:  State would call Chuck

10   Sheldon, Your Honor.

11              WESLEY CHARLES SHELDON

12   was called as a witness by the State and, having

13   been duly sworn, testified as follows:

14              DIRECT EXAMINATION

15   BY MS. CONNORS:

16       Q.    Sir, could you state your name, please?

17       A.    Wesley Charles Sheldon.

18       Q.    Where do you work, Mr. Sheldon?

19       A.    I'm a latent print examiner with the

20   Houston Police Department.

21       Q.    How long have you worked with the

22   Houston Police Department?

23       A.    I have been with the department twenty

24   years and seven months.

25       Q.    How long have you worked with the

                                              206

1  latent print division of the Houston Police

2  Department?

3      A.   I have been a latent print examiner

4  for fifteen years.

5      Q.   Can you explain to the jury what a

6  latent print examiner is, please?

7      A.   Basically a latent print is a chance

8  impression of friction ridges on your fingers,

9  your palms, soles of your feet on some surface.

10 Normally it's hidden and needs to be developed

11 in some way.

12     Q.   Can you also tell the jury what your

13 background and training are that allow you to

14 hold your present position?

15     A.   Briefly, I have been with the

16 department twenty years, with the division of

17 latent prints for fifteen years.  I have gone to

18 numerous schools in my field, both locally, with

19 the State DPS in Austin and federally with the

20 FBI in Quantico, Virginia.  I am a member of

21 several professional organizations of which the

22 International Association of Identification has

23 certified me as a latent print examiner.

24     Q.   Directing your attention back to

25 September 13th of 1991.  Were you sent out to

1      624 Keith?

2           A.    Yes, I was.

3           Q.    Approximately what time was it that

4      you arrived there?

5           A.    Between ten and eleven.

6           Q.    Why was it that you were sent there?

7           A.    This was a multiple homicide scene

8      with a tremendous amount of blood, and my

9      expertise was requested.

10          Q.    Did you take anyone else from your

11     section with you?

12          A.    Yes, I did.

13          Q.    Who was that?

14          A.    Al Pedia.

15          Q.    What did you and Mr. Pedia do when you

16     arrived at the residence at 624 Keith?

17          A.    Well, we were briefed by the

18     detectives at the scene that were in charge.  We

19     waited until our turn came about to collect

20     evidence and do our search for latent prints.

21          Q.    What do you mean when you say we

22     waited for our turn to come about?

23          A.    Well, there was one body in one

24     bedroom up against a door.  We had to wait until

25     that was cleared.  The crime lab had to do their

1    search, the CSU officer had to do his scene

2    diagrams and everything else.  We are normally

3    the last team to attack a scene, and usually

4    when we are through then everything is finished.

5         Q.   Can you explain to the jury what the

6    crime scene unit officer is supposed to do?

7         A.   Basically they do everything.   They

8    diagram the scene, they video the scene, they

9    photograph the scene.   In normal scenes they

10   will do the latent print work themselves.  They

11   will collect the evidence, ballistics and things

12   like that.   In this particular scene, the crime

13   lab was called out so they could do their

14   collection, and the latent print lab was called

15   out so we could collect our evidence.  In the

16   normal scene, the CSU officer will try to handle

17   everything.

18        Q.   Where was it that you and Mr. Pedia

19   began your search for fingerprints?

20        A.   Well, actually we started in two ends

21   of the house and kind of converged toward the

22   middle, say.  I worked from the back bedroom

23   forward.  He worked the kitchen toward the front

24   of the house.

25        Q.   Did you print everything in the house?

1      A.    In a normal latent print search we are

2  going to examine, dust, try to get prints off of

3  every surface that could normally be touched,

4  hard surfaces that might yield a print.   We are

5  not going to leave anything unturned.

6      Q.    What are the factors that affect

7  whether or not someone leaves a fingerprint when

8  they touch a particular surface?

9      A.    Basically the person themselves,

10  whether their hands are clean or dirty; the

11  surface that is being touched, whether it's

12  clean or dirty; the temperature; the relative

13  humidity.   All these factors factor into the

14  retention of a print on a surface.

15      Q.    Were there specific items that you

16  removed from the residence at 624 Keith?

17      A.    Yes, there was a few items I removed.

18      Q.    Let me show you what has been marked

19  for identification purposes only as State's

20  Exhibit 41.   Is that an evidence envelope with

21  the date, the case number assigned to it, your

22  name and the description of all the property

23  that you removed from 624 Keith?

24      A.    That is correct.

25      Q.    Mr. Sheldon, the property that you

210

1   recovered from 624 Keith, did you place it in
2   this cardboard box?
3        A.   Yes, I did.
4        Q.   Let me show you what has been marked
5   for identification purposes only as State's
6   Exhibits 39, 40, 38, 42, 43, and 44.  Do you
7   recognize these objects?
8        A.   Yes, I do.
9        Q.   Did you take the objects that I just
10  the numbers of the objects that I just read off
11  to you and did you take them with you down to
12  the Houston Police Department?
13       A.   Yes, I did.
14       Q.   What did you do with them?
15       A.   Each item needed some sort of
16  additional development, another step in our
17  process to develop prints on this.  It would be
18  more advantageous to do it downtown in the lab
19  than to do it at the scene.   Consequently, I
20  recovered these items and removed them to the
21  downtown lab.
22            MS. CONNORS:  Your Honor, after
23  tendering to defense counsel, I would offer
24  State's Exhibits 38, 39, 40, 42, 43 and 44.  The
25  contents of all those numbers.

211

1          MR. STAFFORD:  I have no objection.

2          THE COURT:  State's Exhibits 38, 39,

3     40, 42, 43, 44 are admitted.

4          Did you also say 41?

5          MS. CONNORS:  No.   That was the

6     evidence envelope.

7          THE COURT:  You are not tendering

8     that?

9          MS. CONNORS:  No, sir.

10         THE COURT:  Those six exhibits are

11    admitted.

12    BY MS. CONNORS:

13        Q.   Let me show you State's Exhibit 38,

14    Mr. Sheldon.  Are those two CD'S?

15        A.   They are.

16        Q.   And where did you obtain these two

17    CD'S from?

18        A.   Directly coming in the front door past

19    the sofa we have a book rack where it's called

20    here.  That was a rack that contained numerous

21    CD'S.  These were two CD'S that were on the top,

22    and I theorized that they possibly could have

23    been touched, so consequently I recovered them.

24        Q.   Contents of State's Exhibit 40, what

25    is that, sir?

1          A.    This is the doorknob from inside the
2    front door.
3          Q.    On the diagram, State's Exhibit 10, is
4    that the door located where I am pointing my
5    finger?
6          A.    That is correct.
7          Q.    State's Exhibit 39, what is that, sir?
8          A.    Two coupons from Dominoe's Pizza.
9          Q.    Where did you find the two coupons in
10   State's Exhibit 39?
11         A.    This was in the kitchen area.
12         Q.    Let me show you State's Exhibit 19,
13   the photograph.  Are those two coupons the same
14   coupons that are State's Exhibit 39 that are
15   depicted in State's Exhibit 19?
16         A.    Yes, they are.
17         Q.    And can you tell the jury what the
18   contents of State's Exhibit 43 is?
19         A.    This is the operating handle for the
20   faucet in the kitchen sink.
21         Q.    And again that is also shown in
22   State's Exhibit 19; is that correct?  State's
23   Exhibit 43?
24         A.    That is correct.
25         Q.    State's Exhibit 32, what is that, sir?

213

1      A.    A pair of sunglasses.

2      Q.    Did you recover those?

3      A.    Yes, I did.

4      Q.    Where were they recovered?

5      A.    From the front bedroom.

6      Q.    State's Exhibit 44, what is that?

7      A.    This is a piece of sheetrock we cut

8   out of the hallway.

9      Q.    On State's Exhibit 10 where would that

10   be approximately, Mr. Sheldon?

11      A.    On the way to the master bedroom on

12   the right-hand side right about there.

13      Q.    Right about here?

14      A.    Sure.

15      Q.    How did you go about processing the

16   two coupons, State's Exhibit 39, that are shown

17   in State's Exhibit 19?

18      A.    With a paper article, we would threat

19   that with chemical called ninhydrin.   Ninhydrin

20   would react with the amino acids left from a

21   chance impression on this article and hopefully

22   develop a suitable print.

23      Q.    And the sunglasses, State's Exhibit

24   32, that are shown in State's Exhibit 32-A, how

25   did you go about processing the sunglasses

214

1 looking for latent prints?

2   A. I would first submit this article to

3 an atmosphere of super glue.  This would develop

4 a print on the surface.  And then my next step

5 would be to dust that article with fingerprint

6 powder and hopefully develop a suitable print.

7   Q. Is fingerprint powder black?

8   A. Yes, it is.

9   Q. Is that why the plastic bag, State's

10 Exhibit 32, appears to be black and the

11 sunglasses and the lens are all black?

12   A. That is why it's dirty.  I think the

13 lenses are tinted anyway.

14   Q. State's Exhibit 44, the piece of

15 sheetrock, how did you go about processing that?

16   A. This was an impression in the wall

17 that was visible.  I sprayed it with amido black

18 which would react with the serum protein left

19 with the chance impression and hopefully enhance

20 and develop a suitable print also.  This print

21 looked suitable, you know, on the wall.  We

22 removed that section so I could take it back to

23 the lab to do a better analysis of it.  And,

24 consequently, it is not suitable for

25 identification.

1    Q.   When you say it's not suitable for

2    identification, what do you mean?

3    A.   Within the friction ridges of your

4    fingers, your palms and your soles there are

5    what we call minutia.   These ridges abruptly

6    stop, they split, they come together, each one

7    of these minutia, when compared one to another

8    in a known ink print and unknown print, when we

9    have a sufficient amount that correspond we can

10   effect an identification.   If we do not have a

11   suitable amount of these individual identified

12   minutia then we can not identify that print.

13   Q.   There wasn't sufficient

14   characteristics to be able to identify this

15   print; is that correct?

16   A.   That is correct.

17   Q.   What type of print was that, could you

18   tell from looking at it?

19   A.   It's a palm print.

20   Q.   You talked about serum protein.   What

21   do you mean by serum protein?

22   A.   It's a component of your blood.   This

23   chemical that we use, amido black, will react

24   with this chemical and give us a purple sort of

25   stain.   The serum protein can be invisible and

216

1  not visible to the eye.  It doesn't have to be a
2  red blood looking print.   It can be a chance
3  impression that contains a serum protein, and
4  when it reacts with amido black it will give us
5  a visible stain print.
6        Q.   Directing your attention to the part
7  of the faucet in State's Exhibit 43.  Were you
8  able to obtain any type of latent prints in
9  State's Exhibit 43?
10       A.   Yes, I was.
11       Q.   What did that latent print show?
12       A.   On the top of this handle, invisible
13 at the time -- I was examining the whole kitchen
14 area and the sink area -- a print developed on
15 this handle.
16       Q.   And what did you see when you looked
17 at that print?  Did you see any type of blood?
18       A.   No, there was no visible red-looking
19 blood at all on this.  It developed from my
20 amido black process.
21       Q.   What else did you see from that
22 print?  Anything else?
23       A.   It was identifiable as suitable for
24 identification.
25       Q.   Did you compare the print found on

217

1  State's Exhibit 43 with the two men who were

2  murdered in this case, Charles and Bradley

3  Allen?

4       A.   I did with the prints that were

5  submitted to me from the morgue.  Since this

6  impression is a very small, minute area, it

7  really could come anywhere within the fingers or

8  the palm.  And their prints were not of the best

9  quality to definitely eliminate them.  From what

10  I could examine, I could not identify that print

11  as theirs.

12       Q.   Did you also compare this print with

13  the defendant Ricky Allan Rhoades?

14       A.   Yes, I did.

15       Q.   Were you able to determine whether or

16  not the print came from the defendant Ricky

17  Allan Rhoades?

18       A.   Again, I was not.   I did not identify

19  that print as his.

20       Q.   Those were the only persons that you

21  compared this print on State's Exhibit 43 with,

22  the two dead men, Charles and Bradley Allen, and

23  the defendant Ricky Allan Rhoades; is that

24  correct?

25       A.   That is correct.

218

1     Q.   Mr. Sheldon, say if on September

2  first, someone had turned the water on and

3  touched this faucet and left that print, would

4  time do anything -- two weeks later, when you

5  went to lift this print, would time affect the

6  print?

7     A.   It's a factor in the retention of a

8  print on a surface.

9     Q.   Is it possible that had one of the

10  relatives or one of their friends left this

11  print say on September 1st or 2nd, is it

12  possible that print could have still been there

13  September 13th?

14     A.   Yes.

15     Q.   Did you also dust for fingerprints the

16  two pizza boxes that you found?

17     A.   That would be the chemical spray I

18  referred to earlier, ninhydrin.

19     Q.   Did you find some beer cans?

20     A.   We had several beer cans and Coke

21  cans.

22     Q.   Where did you find the beer cans and

23  Coke cans?

24     A.   These were in the trash can in the

25  kitchen area.

1      Q.   Were you able to lift any fingerprints
2   from the beer cans?
3           MR. STAFFORD:  Object to anything that
4   is not introduced into evidence as to
5   fingerprints, judge, as far as beer cans.
6           THE COURT:  You are objecting to
7   results or lack thereof?
8           MR. STAFFORD:  Results, the whole ball
9   of wax.
10          THE COURT:  Sustained.
11  BY MS. CONNORS:
12     Q.   What did you do with the beer cans and
13  the Coke cans you found?
14     A.   I dusted those for latent prints with
15  fingerprint powder.  I lifted the prints and
16  retained them on a three by five card.
17     Q.   Do you have those prints with you
18  here?
19     A.   Yes, I do.
20     Q.   Do you want them all and the
21  envelope?
22          MS. CONNORS:  Yes.
23     Q.   State's Exhibit 45, is that an
24  evidence envelope that you have placed the index
25  cards State's Exhibits 46 through 52 in; is that

1    correct?

2         A.    That is correct.

3         Q.    Directing your attention to State's

4    Exhibits 46, 47, 48, 49, 50, 51, 52.   Are these

5    latent prints that you lifted from the kitchen?

6         A.    Yes, from the Coca-Cola cans.   Yes,

7    all from Coca-Cola cans.

8         Q.    Were you able to obtain any prints

9    from the Coca-Cola cans that you examined in the

10   trash can in the kitchen?

11        A.    One.

12        Q.    Did you compare that one print that

13   you obtained from a Coca-Cola can in the trash

14   can in the kitchen with Charles Allen?

15        A.    Yes, I did.

16        Q.    Was it Charles Allen's print?

17        A.    It was not.

18        Q.    Did you compare it with Bradley

19   Allen's prints?

20        A.    Yes, sir.

21        Q.    Was it Bradley Allen's print?

22        A.    It was not.

23        Q.    Did you compare the print with the

24   defendant, Ricky Rhoades?

25        A.    Yes, I did.

221

1        Q.    Was it Ricky Rhoades' print?

2        A.    It was not.

3        Q.    You have met the defendant Ricky

4   Rhoades before; is that correct?

5        A.    Yes, I have.

6        Q.    Could you point out the person that

7   you know as Ricky Rhoades if you see him in the

8   courtroom?

9        A.    The man with the white shirt.

10            MS. CONNORS:   Your Honor, may the

11   record reflect the witness has identified the

12   defendant?

13            THE COURT:   It will

14   BY MS. CONNORS:

15        Q.    Those are the only three persons that

16   you compared that print that you found from the

17   Coke can, one of the Coke cans that you found in

18   the trash can; is that correct?

19        A.    That is correct.

20        Q.    When you were in the kitchen, Mr.

21   Sheldon, let me show you State's Exhibit 42.

22   Did you examine what appeared to be footprints

23   on the floor of the kitchen?

24        A.    Yes, I did.

25        Q.    And the contents of State's Exhibit

1   42, are these floor tiles that you actually took

2   up from the kitchen floor?

3       A.   Yes, they are.

4       Q.   Do you know approximately what area it

5   would have been on the kitchen floor that you

6   removed these from?

7       A.   I can pick them out from the scene

8   photos.  They were two of the impressions that

9   were generally unobscured by any other

10   impressions over them or on top of them.

11           THE COURT:  Could y'all approach the

12   bench?

13           (Off the record bench conference).

14           MS. CONNORS:  After showing to defense

15   counsel, I would offer State's Exhibits 32 and

16   32-A, I would offer them into evidence.

17           MR. STAFFORD:  No objection.

18           THE COURT:  State's Exhibits 32 and

19   32-A are admitted.

20   BY MS. CONNORS:

21       Q.   Mr. Sheldon, going back to State's

22   Exhibit No. 44, the piece of sheetrock.  Did you

23   say that it would have been approximately in

24   this area that you found the sheetrock?

25       A.   On the right-hand side of the hallway.

223

1      Q.    I will put SX-44.

2            Somewhere along in that doorway, not

3      obviously in front of the door because there is

4      a door there?

5      A.    Yes, correct.

6      Q.    Would you step down in front of the

7      jury, please?   Showing you State's Exhibit 19.

8      These are the coupons, State's Exhibit 39, is

9      that correct?

10     A.    That's correct.

11     Q.    And the sunglasses, State's Exhibit

12     32, are shown in 32-A on the floor in the front

13     bedroom; is that correct?

14     A.    That is correct.

15     Q.    Remove the two floor tiles from

16     State's Exhibit 42.   I am going to ask you to

17     look at State's Exhibit 15.   Could you show us

18     where on State's Exhibit 15, would you circle

19     where these two floor tiles were removed?

20     A.    (Complies).

21     Q.    Let me show you what has been marked

22     for identification purposes only as State's

23     Exhibit 53 and 54.   Do these accurately depict

24     footprints as shown in State's Exhibits 53 and

25     54?

224

1          A.    Yes.

2          Q.    When you looked at the two tiles,

3    State's Exhibit 42, what were you looking for?

4          A.    Hopefully I was looking for some ridge

5    details so that if I had a sufficient amount I

6    could identify the footprint.

7          Q.    If a person was barefoot and made

8    these prints, would you see ridge detail?

9          A.    Hopefully, you would.

10          Q.    If a person were wearing socks and

11    made these prints, would you see any ridge

12    details?

13          A.    No, you would not.

14          Q.    Did you, on June 11th, go to the

15    Harris County jail and take footprints from the

16    defendant Ricky Rhoades?

17          A.    The 9th.

18          Q.    June 9th?

19          A.    Yes.

20          Q.    When you went to the Harris County

21    jail, did you bring with you another pair of

22    socks?

23          A.    Yes, I did.

24          Q.    And what instructions did you give the

25    defendant Ricky Rhoades?

1      A.    I asked him to remove his jail socks

2  so I could put on these other socks.

3      Q.    When you examined him to remove his

4  jail socks, what did he say?

5      A.    Well, he was thinking I was.

6           MR. STAFFORD:  May we approach?

7           THE COURT:  Yes.

8           Ladies and gentlemen, if you would,

9  please go with the bailiff back to the jury

10 room.

11          (Jury leaves the courtroom)

12          THE COURT:  All right, the jury is

13 outside the courtroom.  This is specifically

14 regarding what I believe was referred to as

15 State's Exhibits 53 and 54 and the June 9th,

16 1992, taking of prints of the defendant at the

17 county jail by this witness.  Proceed.

18 BY MS. CONNORS:

19     Q.    When you went to the county jail to

20 see the defendant, was the defendant placed in a

21 special room for you?

22     A.    No, it was the regular room where all

23 inmates are printed.

24     Q.    The particular room where they put

25 inmates when they want to take prints; is that

226

1    correct?

2         A.    That is correct.

3         Q.    When you got in the room, was the

4    defendant there?

5         A.    No, I believe I had to wait for him.

6         Q.    When the defendant came to the room,

7    what, if anything, did you say to him?

8         A.    I don't recall saying anything to

9    him.    I proceeded to -- I did ask him to wash

10   his hands, and I started to fingerprint his

11   fingers and his palms.

12        Q.    And then, after you finished

13   fingerprinting his fingers and his palm, what,

14   if anything else, did you say?

15        A.    I asked him to sit down and take off

16   his shoes and socks.

17        Q.    When you told him to take off his

18   shoes and socks, what, if anything, did the

19   defendant say?

20        A.    He stated that he had socks on in the

21   house.

22        Q.    And then what did you say?

23        A.    I said, "I knew that.  I have another

24   pair of socks for you to wear that I am going to

25   ink."

227

1          MS. CONNORS:  I think that is as far

2     as we need to go at this point.

3          MR. STAFFORD:  Our argument is there

4     were insufficient warnings given to him, he was

5     in police custody.  It was taken without a

6     warrant.   Taken without the ability of counsel

7     being present.

8          THE COURT:  Specifically I don't see

9     that there is any custodial interrogation.   I

10    believe that is the only issue here.

11         MR. STAFFORD:  My client didn't

12    voluntarily go down there.  They went and got

13    him.

14         THE COURT:  There is no question he is

15    in custody.

16         MR. STAFFORD:  Moreover, he was

17    brought down not at his request but at the

18    request of the police.  He was there because

19    they had him there for specific reasons.  And I

20    am contending that all the conversations that he

21    had with this fine officer is not admissible

22    before this jury based on the Code of Criminal

23    Procedure and the rules of evidence.

24         MS. CONNORS:  38.22 speaks to

25    custodial interrogation and not to voluntary

228

 1    statement.   It's a voluntary statement that he
 2    made; was not in response to any question by Mr.
 3    Sheldon who works for  the police department.
 4              THE COURT:   That is my
 5    understanding.   I am going to allow it.
 6              Was there anything else we need to
 7    cover with this witness while the jury is out of
 8    the room?
 9              MR. STAFFORD:   I object to the prints
10    being admitted at all because it was done
11    without counsel being present, was done without
12    counsel's knowledge.   They already had
13    sufficient fingerprints.   It was done without a
14    proper warrant.
15              THE COURT:   I don't think they have
16    been tendered yet, and I believe I am
17    anticipating the testimony will be that there
18    could be no match as to prints.   If anything,
19    all it could be would be that the size and shape
20    of the foot weren't inconsistent with what was
21    recovered from the house.   Is that your
22    understanding?
23              MR. STAFFORD:   Yes, Your Honor.
24              MS. CONNORS:   Yes, Your Honor.
25              THE COURT:   Bring the jury in.

                                                    229

1           MR. STAFFORD:  Do you overrule my

2   objection?

3           THE COURT:  Yes.

4           (Jury in)

5   BY MS. CONNORS:

6       Q.   Mr. Sheldon, on June 9, did you go to

7   the Harris County jail?

8       A.   Yes, I did.

9       Q.   And did you see this defendant, Ricky

10  Allan Rhoades?

11      A.   Yes, I did.

12      Q.   And did you meet the defendant in a

13  particular room at the Harris County jail that

14  is used for taking fingerprints?

15      A.   Yes, I did.

16      Q.   When you got to that room, was the

17  defendant there?

18      A.   No, I believe I had to wait for him to

19  arrive.

20      Q.   When he arrived, what did you do?

21      A.   I asked him to wash his hands, and I

22  proceeded to fingerprint his fingers and his

23  palms.

24      Q.   Why did you ask him to wash his hands?

25      A.   We like to have the hands clear, free

                                              230

1   of any debris so I can get a good impression of

2   his friction ridge formations.

3        Q.   The person that you took the

4   fingerprints of that you met in that room at the

5   Harris County jail back on June 9 is this man

6   you have identified earlier in the white shirt;

7   is that correct?

8        A.   That is correct.

9        MS. CONNORS:  Your Honor, may the

10  record reflect that he has identified the

11  defendant?

12       THE COURT:  It will.

13  BY MS. CONNORS:

14       Q.   Mr. Sheldon, after you took the

15  defendant's fingerprints and palm prints, what

16  did you do?

17       A.   I asked him to sit down and take off

18  his shoes and his socks.

19       Q.   After you asked him to take off his

20  shoes and socks, what, if anything, did he do or

21  say?

22       A.   He stated that he had his socks on in

23  the house.

24       Q.   After the defendant told you he had

25  his socks on in the house, what did you do?

1        A.    I stated I knew.    I had another pair
2    that I wanted him to put on so I could ink those
3    up.
4        Q.    You brought an additional pair of
5    socks; is that correct?
6        A.    That is correct.
7        Q.    And did you give those socks to the
8    defendant?
9        A.    Yes, I did.
10        Q.    And then what did he do with them?
11        A.    He put them on his feet, I inked up
12    his feet, and I took some impressions of when he
13    stood up, of his sole impression on some paper.
14        Q.    When you say you inked up his feet,
15    what do you mean?
16        A.    I put the sock on his foot and I took
17    our fingerprint roller, which I applied a thin
18    layer of fingerprint ink, and I rolled his foot.
19        Q.    Would that have been the left foot or
20    right foot?
21        A.    Left foot.   I did both feet.   Excuse
22    me.
23        Q.    State's Exhibits 53 and 54 are the two
24    left footprints of the defendant in his socks;
25    is that correct?

1      A.    Yes, two impressions of the left foot.

2            MS. CONNORS:   Your Honor, I tender to

3      defense counsel State's Exhibits 53 and 54 and

4      offer them into evidence.

5            MR. STAFFORD:   Subject to my objection

6      outside the jury, I renew the same.

7            THE COURT:   State's Exhibits 53 and 54

8      are admitted.

9      BY MS. CONNORS:

10     Q.    Mr. Sheldon, after you took the inked

11     impression from both the defendant's right and

12     left feet, what then did you do?

13     A.    I returned to my office and started

14     the comparison.

15     Q.    And you were comparing the inked

16     impression in State's Exhibits 53 and 54 with

17     the two tiles from the kitchen floor in State's

18     Exhibit 42; is that correct?

19     A.    That is correct.

20     Q.    What were you looking for?

21     A.    I was looking for similarities.

22     Q.    What similarities were you looking

23     for?

24     A.    Generally we call them class

25     characteristics.   We have size, shape, general

233

1    pattern type.  Due to the lack of identifying

2    characteristics, I couldn't positively identify

3    that print.

4         Q.    When you say due to the lack of

5    identifying characteristics, that is because the

6    defendant had socks on when he was standing in

7    the kitchen; is that correct?

8         A.    That is correct.

9         Q.    With respect to size, the two tiles,

10    State's Exhibit 42, that you took from the

11    kitchen floor, and the prints that you took from

12    the defendant on June 9th, the footprints, could

13    you compare the size of the two different

14    prints?

15         A.    Yes, I could.

16         Q.    And what was that?

17         A.    They are generally the same size.

18         Q.    What about the shape from the shape of

19    State's Exhibit 42 and the shape of the

20    defendant's feet that you took shown in State's

21    Exhibits 53 and 54?

22         A.    Again, they are generally the same

23    size.

24         Q.    And what other things were you looking

25    at?

1      A.    Looking at the basic shape.  We could
2  tell that there was a high arch looking area
3  where we didn't get a real good impression from
4  the kitchen floor in the arch area, and
5  correspondingly we had the same sort of
6  impression, sort of design, not design, but
7  impression from the inked pattern.
8      Q.    Mr. Sheldon, in order to have left
9  those footprints on State's Exhibit 42 with the
10 amount of blood that is shown on these prints,
11 would the sock have to have had a little bit of
12 blood, or would it have been saturated in blood
13 to have left those?
14     A.    In my opinion, I would say it would be
15 saturated.
16     Q.    Can you step down for a moment, please?
17           Can you show the jury, when you talked
18 about the size, what you were looking at?
19     A.    Generally from heel to toe.  That
20 distance.  The width in the heel.  The width in
21 this area.  The width in the toes.  The toes
22 themselves.  And talking about the instep right
23 in this area right here.
24     Q.    And when you talk about the shape,
25 what are you looking at?

1        A.   Again, what I refer to toes, shape of

2   the instep, the curvature here.

3        Q.   Was there anything else you were

4   looking at?

5        A.   Basically that is it.

6        Q.   What opinion did you reach as to the

7   footprints shown in State's Exhibit 42 and the

8   defendant's footprints that you took in 53 and

9   54?

10       A.   They are similar in class

11  characteristics.

12       Q.   And unlike fingerprints or footprints

13  made with the barefoot, because a sock was worn,

14  you can say only that they were similar, the

15  footprints appeared similar; is that correct?

16       A.   That is correct.

17       Q.   As one of your duties as a latent

18  print examiner, you keep statistics concerning

19  the percentage of prints that are linked up with

20  a suspect with the evidence that is submitted on

21  a yearly basis to the Houston Police Department?

22       A.   Yes, my duty is to keep the statistics

23  for our division and compile them with the

24  report.

25       Q.   What percentage of evidence do you

1    find prints to have characteristics that are
2    suitable for identification of the one hundred
3    percent of evidence?
4         A.    Fifteen percent.
5         Q.    Of the fifteen percent suitable
6    characteristics for I. D., of that fifteen
7    percent of evidence, what percent of that
8    fifteen percent of evidence are you able then to
9    link up with a suspect?
10        A.    Ultimately identified, two percent of
11   that fifteen percent.  Those are identified.
12   The fifteen percent are able to be identified.
13   Two percent are identified.
14             THE COURT:  Two percent of the
15   fifteen?
16        A.    Two percent of the fifteen percent.
17   85 percent are no good.   No good to us at all.
18   We can't do anything with it.  Of the fifteen
19   percent that we can do something with, two
20   percent are ultimately identified.
21        Q.    It's not like TV, then, where people
22   touch surfaces and you automatically get
23   fingerprints and link them up with the suspect;
24   is that correct?
25        A.    No, it's not like TV.

237

1    Q.   Let me show you State's Exhibits 30
2    and 31.   Do you recognize State's Exhibit 30,
3    this straight bar, and State's Exhibit 31, a
4    threaded weight bar?
5    A.   Yes, I do.
6    Q.   And did you also print State's
7    Exhibits 30 and 31?
8    A.   Yes, I did.
9    Q.   What type of substance did you use to
10   print those two particular items?
11   A.   Since these had blood residue on them,
12   or suspected blood residue, I used amido black
13   for the process.
14   Q.   Were you able to obtain prints from
15   either State's Exhibits 30 or 31?
16   A.   I was not.
17   Q.   Let me show you what has been
18   introduced into evidence as State's Exhibit 29.
19   Did you also print State's Exhibit 29?
20   A.   Yes, I did.
21   Q.   Looking at the blade of State's
22   Exhibit 29, why is it that bluish black color?
23   A.   This is the residue from my amido
24   black process.
25   Q.   When you received State's Exhibit 29,

238

1    do you remember whether or not there was blood

2    visible to the eye on the blade of State's 29?

3         A.    Yes, there was.

4         Q.    And State's Exhibit 33, one smaller

5    knife and a larger knife, butcher knife, did you

6    also print State's Exhibit 33, the two knives in

7    there?

8         A.    Yes, I did.

9         Q.    Were you able to obtain prints from

10   either the knives in State's Exhibit 33?

11        A.    No, I was not.

12             MS. CONNORS:  No further questions.

13             THE COURT:  Mr. Stafford.

14                  CROSS EXAMINATION

15   BY MR. STAFFORD:

16        Q.    Sir, as far as the fifteen and two

17   percent is concerned, if an accused admits being

18   there and committing the offense, fingerprints

19   really have no bearing or significance; do they?

20        A.    As far as my percentages?

21        Q.    Yes?

22        A.    Well, if we make an identification,

23   that is going to go on our records as

24   identification.   We like to show results, so we

25   are not going to overlook anything.

                                              239

1        Q.   It just helps your statistics and
2   nothing else; is that correct?
3        A.   It shows our workload when we
4   accomplish something.
5             MR. STAFFORD:  I have no other
6   questions.
7             THE COURT:  Any objection to this
8   witness being excused subject to being on call?
9             MR. STAFFORD:  No.
10            THE COURT:  You may be excused, sir.
11            Ladies and gentlemen, we are going to
12  break for the day.  Need to cover some
13  housekeeping chores here.   I know sometimes it
14  seems cold in here and sometimes hot, depending
15  on where you are setting.  Are you cold sitting
16  in front of the vent?  You might want to bring a
17  jacket.
18            I don't always take breaks at exactly
19  an hour and fifteen minutes.   If anybody needs
20  to have a break, just raise your hand and we
21  will take a break.
22            Did everybody park today where you
23  keep your car keys?  You are all pointing back
24  there.   I hope it's not locked up.  Do you know
25  where you left it?

240

1          THE JUROR:   I know where I left it.

2          THE COURT:   Several members of the

3   media have been in and out of the courtroom.   I

4   have seen Channel 13 and I have seen the

5   Chronicle and the Post.   It has been brought to

6   my attention, I don't think the attorneys are

7   aware of this, that Mr. Copus with Channel 13

8   does know and lives in the same neighborhood as

9   Mr. Yust.   Y'all have seen each other in the

10  courtroom today.   You do know each other, you

11  are on speaking acquaintance.   You didn't know

12  he was going to be here today, and he didn't

13  know you were going to be on this jury.

14  Regarding the media, it is evidently going to be

15  appearing in the newspapers and on some of the

16  stations and maybe on radio as well as

17  television.   Some aspects of this case.   I am

18  admonishing you not to pay any attention to

19  that.   If you see an article on this case, don't

20  read it.   Save your newspapers until the case is

21  over.   If you are thumbing through a section of

22  the newspaper and you come across anything, if

23  you think you are capable of skipping over that,

24  fine.   I am quite sure at least on one

25  television station it's going to be appearing

241

1    there, so don't watch anything on TV about this

2    case.  Again, those people were in and out.  You

3    have been here all day.   You are going to know

4    what is happening in this case.  I don't want

5    you talking about this case with anyone, not

6    with your spouses, not with your employers, not

7    among yourselves until you are back there

8    deliberating the case.  The attorneys have all

9    been admonished not to engage you in

10   conversation, which is to say that if they

11   should see you in the hallways or around the

12   elevators or anything like that, we may nod that

13   we recognize you as a juror but not engage you

14   in conversation.   If anybody attempts to talk

15   to you about the case, bring it to our attention

16   immediately, tell me or tell the bailiff who has

17   you in charge.  Don't make any kind of

18   independent investigation.  Don't attempt to

19   read law that you think might apply in this

20   case.   You know now some specific addresses.

21   Don't make any drive-byes.  I don't think there

22   is anybody here who lives in the vicinity of

23   Pasadena, as I recall from your questionnaires.

24          Do y'all have any requested

25   admonitions at this time?

1          MS. DAVIES:  Just to avoid the media

2     as you have instructed them.

3          THE COURT:  Very much avoid the

4     media.  Continue to wear your badges at all

5     times.  Ask you be back down here tomorrow at

6     10:00 a.m.  Again I am not going to know exactly

7     where we are going to be at four or five or six

8     o'clock tomorrow.  I would like to get through

9     as many witnesses as possible.

10          Any questions?  If there is nothing

11     else.   I want y'all to go back in a group to

12     the jury room and retrieve all your belongings.

13     We will get an elevator to take you down at one

14     time.   Ten a.m. tomorrow morning in the

15     hallway.

16

17

18

19

20

21

22

23

24

25