APPELLATE COURT NO. *71595*

IN THE COURT OF CRIMINAL APPEALS

OF THE STATE OF TEXAS

AT AUSTIN

RICK ALLAN RHOADES,

Appellant

VS.

THE STATE OF TEXAS,

Appellee.

APPEAL FROM 179TH DISTRICT COURT OF HARRIS COUNTY,

TEXAS

Judge J. Michael Wilkinson   Presiding

STATEMENT OF FACTS

VOLUME _XXVIII_  OF _40_  VOLUMES

Marlene Swope
Official Court Reporter
301 San Jacinto
Houston, Texas   77002

FILED IN
COURT OF CRIMINAL APPEALS

MAR 5  1993

Thomas Lowe, Clerk

244

1                              INDEX

2                        VOLUME XXVIII

3                                                          Page

4    FRANK LOPEZ
          Direct                                          246
          Cross                                           266
5         Redirect                                        268
          Recross                                         269
6
     STEVE BROWN
7         Direct                                          270
          Cross                                           274
8
     H. W. BUTLER
9         Direct                                          282
          Cross                                           292
10
     MICHAEL MASSEY
11        Direct                                          293
          Cross                                           305
12
     STEWART H. KENNEDY
13        Direct                                          310
14
     KEN HILLEMAN
          Direct                                          424
15        Cross                                           434
16
     MONICA THOMPSON
          Direct                                          435
17
     KRISTY KIM
18        Direct                                          446
          Cross                                           449
19        Redirect                                        451
          Recross                                         452
20
     HAROLD JORDAN
21        Direct                                          454
          Cross                                           458

22

23

24

25

                                                           i.

1                    CAUSE NO. 612408

2    STATE OF TEXAS          IN THE 179TH DISTRICT COURT

3    VS.                              OF

4    RICK ALLAN RHOADES      HARRIS COUNTY, T E X A S

5

6    A P P E A R A N C E S:

7    For the State:        Ms. Carol Davies
                           Ms. Claire Connors
8                          Assistant District Attorneys
                           Harris County, Texas
9
     For the Defendant:    Mr. James Stafford
10                         Ms. Deborah Kaiser
                           Attorneys at Law
11                         Houston, Texas

12

13            BE IT REMEMBERED that upon this the

14   29th day of September A.D. 1992, the above

15   entitled and numbered cause came on for

16   continued trial before the Honorable J. Michael

17   Wilkinson, Judge of the 179TH District Court of

18   Harris County, Texas, and a jury; and the State

19   appearing by counsel and the Defendant appearing

20   in person and by counsel, the following

21   proceedings were had, viz:

22

23

24

25

                                                    245

```
 1            (Witnesses sworn  and admonished as to

 2       the rule).

 3            (The jury enters the courtroom)

 4                      FRANK LOPEZ

 5       was called as a witness by the State and, having

 6       been duly sworn, testified as follows:

 7                    DIRECT EXAMINATION

 8       BY MS. DAVIES:

 9            Q.    Tell us your name, please.

10            A.    Frank Lopez. I am a police officer.

11            Q.    With what agency?

12            A.    Pasadena School District Police

13       Department.

14            Q.    Pasadena School District?

15            A.    School district.

16            Q.    What is your responsibility?  Is it

17       limited to problems within the school in

18       Pasadena?

19            A.    No, our primary function is patrol all

20       the school district.

21            Q.    Within the area?

22            A.    Within our district, right.

23            Q.    How long have you been employed there?

24            A.    Eight years.

25            Q.    Were you on duty back on October 11th
```

246

1    of 1991?

2         A.    Yes, I was.

3         Q.    I want you to think back to that day,

4    October 11th, 1991.  Do you recall what shift

5    you were working?

6         A.    I was working the night shift.

7         Q.    What hours did that include?

8         A.    Eleven to seven.  Eleven p.m. to seven

9    a.m.

10        Q.    While you were on duty, did you have

11   an occasion to go to the Young Elementary School?

12        A.    Yes, I did.

13        Q.    Where is that located?

14        A.    In the I believe 4200 block of

15   Foxmeadow.

16        Q.    Is that in Harris County, Texas?

17        A.    Yes, it's in the City of Pasadena.

18        Q.    How was it that you happened to go to

19   the Young Elementary School?

20        A.    I was dispatched to that location on a

21   burglary alarm.

22        Q.    When you say an alarm, how do you

23   receive word that there is an alarm at that

24   particular location?

25        A.    We get it through our dispatcher who

247

1    receives the call from ULtra Security who

2    monitors the alarm system at all the schools.

3          Q.   So you were dispatched to that

4    school.  Do you recall about what time that was?

5          A.   12:45 a.m.

6          Q.   That Young Elementary School, are you

7    familiar with the layout of that school?

8          A.   Yes, I am.

9          Q.   As you approach the school, did you

10   direct your attention to any particular location

11   in the school?

12         A.    Yes, I responded to the southeast

13   corner, second grade classroom.

14         Q.   Now, as you arrived, how was it that

15   you knew to focus on that second grade class

16   room in the southeast corner?

17         A.    I was advised by the dispatcher that

18   is where the intrusion alarm was sounding at.

19         Q.   When you say the alarm was sounding,

20   is that one of these alarms like goes off in my

21   neighborhood that makes a good racket?

22         A.   No, they are silent alarms.

23         Q.   Were you working alone at that time?

24         A.   Yes, I was.

25         Q.   In uniform?

248

1      A.    Yes.

2      Q.    Were you in a marked patrol car?

3      A.    Yes, I was.

4      Q.    When you arrived at Young Elementary

5  School, what did you do?

6      A.    Upon arrival, I went to the area where

7  the alarm was at.    I approached the exterior

8  door going into the classroom.

9      Q.    This is on the southeast corner?

10     A.    On the southeast corner of the

11 building.

12     Q.    As you approached the door, did you

13 see anything?

14     A.    As I approached the door and went to

15 open the door, there was a subject on the inside

16 reaching for the door also to come out.

17     Q.    Can you describe that door for us?   Is

18 it a solid door or is there some way you can see

19 who is on the other side of the door?

20     A.    It's an exterior door that has view

21 glass where you can see inside the room.

22     Q.    Is that how you were able to see there

23 was someone on the other side of that door?

24     A.    Yes.

25     Q.    Near that doorway on that building

1    were there any windows?

2         A.   Yes, there is windows on both sides of

3    the door, around the door, rather.

4         Q.   Right next to the doorway?

5         A.   Yes.

6         Q.   When you realized there was someone

7    inside the building -- by the way, let me back

8    up.  Was the school open at that hour?

9         A.   No.

10         Q.   What did you do when you saw that

11    there was someone on the other side of that

12    door?

13         A.   I immediately retreated back to the

14    corner of the building where it was safe for me

15    and hollered at the subject to come out of the

16    building.

17         Q.   What happened?

18         A.   I got no response right away.

19         Q.   So what did you do?

20         A.   I temporarily lost sight of him

21    because of the door.  So I went to -- directly

22    across there is a column on the outside of the

23    building.  I moved to the column so I could get

24    a better view inside the door or through the

25    view glass.

1      Q.    Were you able to see through that view

2   glass?

3      A.    Yes.

4      Q.    What did you see?

5      A.    At that point I couldn't see anything

6   but a portion of the room.

7      Q.    What room was it that you were seeing

8   into?

9      A.    It's a second grade classroom.  It's a

10  very large room.

11     Q.    Is that an open, they refer to it as

12  an open concept teaching area in that school?

13     A.    Yes.

14     Q.    What did you do next?

15     A.    I continued to order the subject out,

16  which eventually he did come out.

17     Q.    When you say you were ordering him

18  out, how did you go about doing that?

19     A.    Identified myself as a police officer,

20  told him to come on out of the building.

21     Q.    Conversational tone of voice?

22     A.    No, very loud, aggressive sounding

23  voice.

24     Q.    Okay.  Did you get a response?

25     A.    Yes, after a couple of minutes he

1    walked out of the door.

2         Q.    Out that same door that you had just

3    seen him by?

4         A.    Yes.

5         Q.    Can you describe for us the person who

6    walked through that door?

7         A.    The gentleman sitting right here to

8    your right.  He is in a plaid shirt.

9         Q.    In the plaid shirt here in the

10   courtroom?

11        A.    With no tie.

12             MS. DAVIES:  Your Honor, may the

13   record reflect the witness has identified the

14   defendant?

15             THE COURT:  It will.

16   BY MS. DAVIES:

17        Q.    Did he just walk out?

18        A.    Yes, he came out as ordered.

19        Q.    How far out the door did he walk or

20   how far outside the building was it that you

21   first came into physical contact with this

22   defendant?

23        A.    Approximately three feet outside the

24   doorway.

25        Q.    What did you do?

1        A.    I ordered the subject to the ground,
2    to lay face down on the ground, at which time he
3    did comply.
4        Q.    What was your purpose in telling him
5    to get down on the ground?
6        A.    For his safety and mine, to take him
7    into custody.
8        Q.    Did he do that?
9        A.    Yes, he did.
10        Q.    Did you handcuff the man?
11        A.    Yes, ma'am.
12        Q.    Now, as you arrested him, at some
13    point did you have an opportunity to check
14    inside the building to see whether everything
15    was intact?
16        A.    Yes, I did.
17        Q.    Did you do that before or after you
18    arrested this defendant?
19        A.    Afterwards.
20        Q.    What did you see when you checked
21    inside the building?
22        A.    There was a -- I found a blue bag
23    inside the door, blue nylon bag.
24        Q.    How far inside the door?
25        A.    Just inside the door to the right of

1    the door.

2         Q.   And you are talking about this

3    entrance door where you had first seen the

4    defendant on the other side of the door?

5         A.   Yes.

6         Q.   Describe that blue bag for us, if you

7    can.

8         A.   It's a large nylon blue bag

9    approximately two and a half feet wide, maybe

10   two feet deep if it was expanded out, with a

11   blue leather strap or nylon strap.

12        Q.   Was there anything in the bag?

13        A.   Yes.  VCR and a multi channel laser

14   disk player.

15        Q.   Are you familiar with the layout of

16   the second grade classroom?

17        A.   Yes, I am.

18        Q.   Did you look to see whether you could

19   tell where that VCR and disk player may have

20   come from?

21        A.   Yes, I did.

22        Q.   What did you see?

23        A.   I found the TV cart in the southern

24   center side of the room where the VCR was

25   normally located was missing from that

1    location.   Then I found the table in the center
2    portion on the west side of the room, there was
3    a like a TV cart again with nothing there.
4         Q.   Did it appear those items may have
5    been removed from the location that you
6    described?
7         A.   Yes, it did.
8         Q.   Did you look to see whether you could
9    determine how entrance had been gained into the
10   school?
11        A.   Yes, I did.
12        Q.   Is the school ordinarily locked at
13   that hour?
14        A.   Yes.
15        Q.   Were you able to determine how this
16   defendant had gotten into the school?
17        A.   Yes, I was.
18        Q.   What did you determine?
19        A.   He broke out a window, reached in and
20   unlocked the window.
21        Q.   Did you see the broken window?
22        A.   Yes, I did.
23        Q.   Where was it?
24        A.   It was approximately five feet from
25   the door, to the right of the door.

1          Q.    Close enough that one could reach in

2     and open the door from the inside?

3          A.    No.

4          Q.    Was the opening in the window large

5     enough for somebody to crawl through?

6          A.    No.

7          Q.    So how did you figure out that he got

8     in through that broken window?

9          A.    Well, the window was unlocked when I

10    checked it, and then after I had arrested the

11    subject and Mirandized him he told me how he got

12    into the building.

13         Q.    Was the shape, the type of window

14    such, that once it was broken, one could reach

15    in and unlock the window in order to make a

16    larger opening?

17         A.    Yes.

18         Q.    Did you examine the disc player and

19    VCR to determine whether there were any

20    identifying marks on those items?

21         A.    Yes, I did.

22         Q.    Can you tell us, describe in a little

23    more detail the brand and any identifying

24    markings that might have been on those?  First

25    the disc player.

256

1      A.    The disc player was Panasonic multi

2   laser disc player model number LX120.  And the

3   serial number on it was DA1263836.  The disc

4   player also carried a fixed asset number that is

5   assigned by the school district itself.

6      Q.    All right.  You are familiar with the

7   labeling of the Pasadena School District of

8   their property with those fixed asset numbers?

9      A.    Yes.

10     Q.    What was the fixed asset number on

11  that disc player?

12     A.    59199.

13     Q.    What about the VCR, what type, what

14  brand was it?

15     A.    The VCR was a Sharp VCR model XA305.

16     Q.    Do you know the serial number?

17     A.    009324281.

18     Q.    Did it have a Pasadena school district

19  fixed asset?

20     A.    Yes.    56027.

21     Q.    Did you retain those items as evidence

22  in this case?

23     A.    Yes, I did.

24     Q.    Were those items ultimately turned

25  back over to the Young Elementary School?

1       A.    Yes, they were.

2       Q.    Officer Lopez, after you arrested this

3  defendant, did you make any inquiry of him as to

4  what his name was?

5       A.    Yes, I did.

6       Q.    And what did he tell you?

7       A.    He identified himself to me as Steven

8  Ray Leland.

9       Q.    Steven Ray Leland?

10      A.    Yes, ma'am.

11      Q.    Did he give you a date of birth?

12      A.    At that time, he gave me 4/12/69.

13      Q.    Four, twelve of '69.  Since you had

14  arrested this defendant in connection with the

15  burglary -- by the way, did you have any

16  involvement whatsoever in the investigation of

17  the killing of the Allen brothers?

18      A.    No, I didn't.

19      Q.    Back a month earlier.  Did you give

20  this defendant any warnings out there when you

21  arrested him at the Young Elementary School?

22      A.    Yes, I did.  I read him the Miranda

23  warnings.

24      Q.    You say Miranda warnings, is that what

25  you police officers refer to those?

258

1          A.    The constitutional warnings.

2          Q.    Okay.  Would you tell the jury exactly

3    what it was that you told this defendant his

4    rights were?

5          A.    I can read it off the card.

6          Q.    Is that the way you did it that night?

7          A.    Yes, ma'am.

8          Q.    Do you carry a card with you for that

9    purpose?

10         A.    Yes.

11         Q.    Do you have it with you today?

12         A.    Yes, I do.

13         Q.    Is that the card that you read from

14    when you read the rights to this defendant?

15         A.    Yes, it is.

16         Q.    Tell the jury exactly what it was you

17    told him.

18         A.    You have the right to remain silent

19    and not make any statement and that any

20    statement you make may be used against you and

21    probably will be used against you at your

22    trial.  Any statement may be used as evidence

23    against you in court.  You have the right to

24    have an attorney present to advise you prior to

25    and during any questioning.  If you are unable

1    to employ a lawyer, you have the right to have a

2    lawyer appointed to advise you prior to and

3    during any questioning.  You have the right to

4    terminate this interview at any time.

5         Q.   When you read those warnings to this

6    defendant, did he make any response whatsoever?

7         A.   Yes, he did.  And he agreed to talk to

8    me.

9         Q.   Did he give any indication that he

10   didn't understand his rights?

11        A.   No.

12        Q.   Did he ask for an attorney?

13        A.   No.

14        Q.   In fact, you say you did have some

15   conversation with him out there.  Did he appear

16   to understand and communicate?

17        A.   Yes, he did.

18        Q.   In an intelligent manner?

19        A.   Yes.

20        Q.   Did he appear to be intoxicated at

21   that time?

22        A.   No.

23        Q.   So what did you do after you had read

24   this defendant his warnings and determined,

25   thought you determined his identity, what did

                                              260

1    you do with him?

2        A.   After I talked with him, I then

3    released him from my custody to the custody of

4    the Pasadena police officer Robert Cissel.

5        Q.   Where did that take place?

6        A.   On the side of the school.

7        Q.   At what point did this other officer

8    show up at Young Elementary?

9        A.   Approximately three to five minutes.

10       Q.   After you had arrived?

11       A.   Right.

12       Q.   After you turned this defendant over

13    to Officer Cissel, did you have any further

14    contact with him?

15       A.   No.

16       Q.   And what was your purpose in turning

17    him over to Officer Cissel?

18       A.   The school -- I needed to stay there

19    for further investigation at the school, and I

20    released him to Officer Cissel to be transported

21    to the city jail.

22       Q.   You mentioned that you did some

23    further investigation at the school.  Let me ask

24    you about that.  Did you look around in that

25    second grade teaching area to observe the

261

1    condition?

2         A.    Yes, I did.

3         Q.    Tell the jury what it is you saw.

4         A.    Several of the cabinets, storage

5    cabinets were open.  There were some books

6    scattered on the floor, a couple of teachers

7    desk drawers were open.

8         Q.    I think you have already described

9    some TV carts or shelves in there?

10        A.    Right.

11        Q.    Did it appear that there was anything

12   missing from those locations?

13        A.    Just on the two TV carts.

14        Q.    Let me show you what I have marked for

15   identification purposes as State's Exhibit 55.

16   You have identified the defendant here in the

17   courtroom today.  Was his physical appearance

18   any different in terms of haircut or facial hair

19   back when you arrested him?

20        A.    Yes, it was.

21        Q.    Is State's Exhibit 55 an accurate

22   depiction of his appearance when you arrested

23   him on October 11th?

24        A.    Yes.

25        Q.    I also want to show you what I have

1    marked as State's Exhibit 56.  Ask you if you
2    recognize that item?
3         A.   Yes, I do.
4         Q.   State's Exhibit 56, at a future date
5    after October 11th, did you come into possession
6    of State's Exhibit 56?
7         A.   Yes, I did.
8         Q.   And how did that happen?
9         A.   One of my patrolmen, day shift patrol
10   officers called back to Young Elementary.  At
11   that point in time it was discovered they found
12   the item behind a poster I believe.
13        Q.   And this was approximately what date?
14        A.   5/27/92.
15        Q.   Was State's Exhibit 56 then turned
16   over to you by that officer?
17        A.   Yes, it was.
18        Q.   Who was that?
19        A.   Cliff O'Quinn.
20             MS. DAVIES:  Your Honor, at this time
21   I am tendering State's 55 and 56 to defense
22   counsel and offer them into evidence.
23             MR. STAFFORD:  I object to number 55,
24   Your Honor.
25             THE COURT:  Let me see it.

```
 1              MR. STAFFORD:  As to the relevancy.
 2   Since identification has never been in issue.  I
 3   have no objection to 56.
 4              THE COURT:  That is your only
 5   objection to?
 6              MR. STAFFORD:  Relevancy.  Has no
 7   relevancy in this matter.
 8              THE COURT:  Approach the bench.
 9              (Off-the-record bench conference)
10              THE COURT:  All right, for the record,
11   State's Exhibit 55 is being withdrawn at this
12   time.
13              Regarding State's Exhibit 56, was
14   there an objection to 56?
15              MR. STAFFORD:  No.
16              THE COURT:  State's Exhibit 56 is
17   admitted.
18   BY MS. DAVIES:
19        Q.   Let me show you 55-A.  Is this also an
20   accurate depiction of the defendant as he
21   appeared when you arrested him?
22        A.   Yes.
23              MS. DAVIES:  Tender 55-A.
24              MR. STAFFORD:  No objection.
25              THE COURT:  No objection to 55-A?
```

```
 1              MR. STAFFORD:  No.
 2              THE COURT:  State's Exhibit 55-A is
 3    admitted.
 4    BY MS. DAVIES:
 5         Q.   Let me call your attention again to
 6    State's Exhibit 56.  Can you tell the jury what
 7    that is?
 8         A.   It's a Texas Department of Corrections
 9    inmate ID card.
10         Q.   And is there a photograph on that
11    card?
12         A.   Yes, there is.
13         Q.   Do you recognize the person on that
14    photograph?
15         A.   Yes, I do.
16         Q.   Who is it?
17         A.   The defendant.
18         Q.   Can you tell us what name is on that
19    ID card?
20         A.   David Allan Marcas.
21         Q.   What is the date of birth?
22         A.   4/10/62
23              THE COURT:  Spell the last name.
24         Q.   M-a-r-c-a-s.
25              MS. DAVIES:  Your Honor, I would ask
```

1    that State's Exhibits 55-A and 56 be passed to

2    the jury.

3                THE COURT:   You may.

4                      CROSS EXAMINATION

5    BY MR. STAFFORD:

6         Q.    Well, in fact, officer, as you have

7    been on this case, it has come to your attention

8    that my client has used several aliases when he

9    has been dealing with the police from time to

10   time; hasn't he?

11        A.    Yes, he has.

12        Q.    I think a matter of four or five

13   different names?

14        A.    I believe so.

15        Q.    And often the reason this is done is

16   that if I get caught and go to prison I get less

17   time if they don't know about my enhancement

18   paragraphs?

19                MS. DAVIES:   I object to speculation

20   as to why.

21                THE COURT:   Sustained.

22   BY MR. STAFFORD:

23        Q.    But, anyway, back on this particular

24   day, it would be safe to say I think what you

25   told the prosecutor is that when you got Mr.

1    Rhoades in custody it was apparent that he was

2    not intoxicated; was he?

3        A.   No, sir.

4        Q.   He wasn't under the influence of

5    drugs, nothing to indicate that he was taking

6    drugs.  He appeared to be rational and of sound

7    mind?

8        A.   Yes.

9        Q.   And you told the jury that when you

10    placed him in, I mean, when you first approached

11    that door, that once you observed someone in

12    there, you went over to the southeast corner?

13        A.   Yes.

14        Q.   And in that length of time if someone

15    had wanted to -- and I think you told me

16    previously he had ample opportunity to escape or

17    run through the building if he had wanted to?

18        A.   Yes.

19        Q.   Is that correct?  And that was not the

20    only door in that schoolhouse; was it?

21        A.   No.

22        Q.   So there would have been plenty of

23    chances for him to escape if he wanted to.  And

24    I think you have already told the jury, that

25    when you got him into custody, he cooperated

1    with you and, for example, once you got him on

2    the ground and handcuffed, he was totally

3    cooperative?

4         A.    Yes.

5         Q.    And polite to you?

6         A.    Yes.

7         Q.    And did what you told him to do?

8         A.    Yes.

9         Q.    One other thing.   When you placed him

10   in custody, you did not find any weapons on him;

11   did you?

12        A.    No.

13             MR. STAFFORD:   I have no other

14   questions.

15                  REDIRECT EXAMINATION

16   BY MS. DAVIES:

17        Q.    When you realized someone was on the

18   other side of that door and you started yelling

19   for them to come out, were you armed?

20        A.    Yes, I was.

21        Q.    Did you draw your weapon?

22        A.    Yes, I did.

23        Q.    When this defendant came out from that

24   door, was your weapon drawn?

25        A.    Yes, it was.

1    Q.   In such a manner that he was able to
2  see that you were holding a gun on him?
3    A.   Yes.
4         MS. DAVIES:  Pass the witness.
5                   RECROSS EXAMINATION
6  BY MR. STAFFORD:
7    Q.   When he was inside, you can't tell
8  this jury he knew you had your gun drawn?
9    A.   No.
10        MR. STAFFORD:  No other questions.
11        THE COURT:  Anything else?  Any
12  objection to this witness being excused, Mr.
13  Stafford?
14        MR. STAFFORD:  No.
15        MS. DAVIES:  Subject to recall.
16        THE COURT:  You are excused.
17        Call your next.
18        MS. DAVIES:  Steve Brown.
19
20
21
22
23
24
25

269

```
 1                    STEVE BROWN

 2    was called as a witness by the State and, having

 3    been duly sworn, testified as follows:

 4                    DIRECT EXAMINATION

 5    BY MS. DAVIES:

 6         Q.    Tell us your name, please.

 7         A.    Officer Steve Brown.

 8         Q.    You might need to adjust the

 9    microphone just a little, Officer Brown.

10               Was it Steve Brown?

11         A.    Yes, ma'am.

12         Q.    How are you employed?

13         A.    City of Pasadena Police Department.

14         Q.    How long have you been with Pasadena

15    Police Department?

16         A.    Eight years.

17         Q.    What is your present assignment?

18         A.    Patrol officer day shift.

19         Q.    Back on October 11th of 1991, were you

20    working patrol shift then?

21         A.    Yes, ma'am, I was.

22         Q.    Do you recall whether you were on duty

23    on that day, that Friday, October 11th, 1991?

24         A.    Yes, ma'am, I was.

25         Q.    Where were you working that day?
```

1      A.    I was assigned to the jail.

2      Q.    When you say you were assigned to the

3    jail, what are your duties under that assignment?

4      A.    Taking care of all the inmates.

5      Q.    Did you have an occasion to meet with

6    an inmate there at the Pasadena jail by the

7    name, as far as you knew, the name of Steven

8    Leland?

9      A.    Yes, ma'am, I did.

10     Q.    What happened to cause you to come in

11   contact with Steven Leland?

12     A.    The doors in the back, a lot of the

13   inmates sometimes bang on the door when they

14   need the attention of the jailer.  At that time

15   of day he was knocking on the door, and I went

16   back there to see if maybe he was hurt or if he

17   needed to talk to somebody.

18     Q.    You say at that time of day.  Do you

19   remember what time of day it was?

20     A.    I am not real sure exactly what time

21   of day.  It was before two o'clock.

22     Q.    Before 2:00 p.m.?

23     A.    Yes, ma'am.

24     Q.    Why is it you know it was before 2:00 p.m.?

25     A.    Two p.m. is my end of duty.

1    Q.    You said you heard a noise or banging

2    sound; is that correct?

3    A.    Yes, ma'am, metal doors.

4    Q.    So what did you do?

5    A.    I went back there to see what he

6    needed or if he was sick or ill, and that is

7    when I contacted him inside the cell.

8    Q.    He was actually in a cell?

9    A.    Yes, ma'am, he was.

10   Q.    Do you recall whether there was anyone

11   in that cell with him?

12   A.    No, ma'am, I don't recall.

13   Q.    The person who was banging on the

14   door, were you face to face with them and have a

15   conversation?

16   A.    Yes, ma'am, I did.

17   Q.    Do you see that person here in the

18   courtroom today?

19   A.    Yes, ma'am, I do.

20   Q.    Would you point him out for us?

21   A.    Yes, the defendant sitting at this

22   table.

23   Q.    Are you referring to the man here in

24   the plaid shirt?

25   A.    Yes, ma'am, I am.

1            MS. DAVIES:  May the record reflect

2     this witness has identified the defendant?

3            THE COURT:  It will.

4     BY MS. DAVIES:

5        Q.   When you went back there, at that

6     point what did you believe this defendant's name

7     to be?

8        A.   The one that he was booked in on,

9     Steven Leland, I believe.

10       Q.   And did you learn what it was that he

11    was trying to attract your attention for?

12       A.   Yes, ma'am.

13       Q.   Did he tell you?

14       A.   Yes, ma'am, he said he needed to speak

15    to a detective about some murder.

16       Q.   Did you ask the defendant any details

17    or any questions about the murder he was

18    referring to?

19       A.   No, ma'am, I did not.

20       Q.   What did you do?

21       A.   Shortly after, I contacted Lieutenant

22    Goad, who is over the detective division, and

23    told him there was an inmate that needed to

24    speak to a detective about some murder.

25       Q.   When the defendant told you he wanted

                                          273

1   to talk to somebody about some murder, did you

2   tell him you would pass that word on?

3        A.   Yes, ma'am, I did.

4        Q.   Can you describe for the jury what his

5   manner or demeanor was there in his cell when he

6   told you he wanted to talk to somebody?

7        A.   He appeared very nervous and I recall

8   very sweaty at the time.

9        Q.   Was he crying or emotional?

10       A.   No, ma'am, didn't appear to be.

11       Q.   Was that the extent of your

12  involvement with this defendant?

13       A.   Yes, ma'am, I believe it was.

14            MS. DAVIES:   Pass the witness.

15

16                 CROSS EXAMINATION

17  BY MR. STAFFORD:

18       Q.   So he appeared to you very nervous,

19  sweaty.  Didn't come across to you cocky at all;

20  did he?  He wanted to give some information?

21       A.   Yes, sir, he appeared very nervous.

22       Q.   Could you tell the jury what time do

23  you come on duty?

24       A.   Six o'clock in the morning.

25       Q.   Six o'clock.  If this is an accurate

1    booking photo made at your police agency that

2    looks like he was being booked in around 6:15;

3    is that correct?  Or am I reading that clock

4    wrong?

5         A.    It looks to be about 8:15.

6         Q.    8:15?

7         A.    Yes, sir.

8         Q.    How long does your booking process

9    take?

10        A.    Usually takes about ten minutes.

11        Q.    Is that your responsibility?

12        A.    Sometimes it is, yes, sir.

13        Q.    But you don't recall you booked in Mr.

14   Rhoades?

15        A.    No, sir, I did not.

16        Q.    Okay.  And, in fact, the banging on

17   the lock up door, as you have already told the

18   jury, there is nothing unusual about that

19   because that is their means to get your

20   attention to communicate with them?

21        A.    Yes, it is.

22        Q.    At that particular time, there is

23   nothing in your records or the Pasadena police

24   records that would indicate that Mr. Rhoades was

25   under the influence of drugs or drunk or

275

1     anything of that nature; is there?

2          A.    No, sir.

3          Q.    And actually that was just a holding

4     cell before y'all transported him to the Harris

5     County jail; was it not?

6          A.    Yes, sir.

7          Q.    Normally how long do you keep your

8     prisoners there before they are transported?

9          A.    Just depends on when the warrant comes

10    back from the DA'S office, six to eight hours.

11         Q.    When you went down to answer the

12    banging on the door which was there to get your

13    attention, did you, in fact, when you saw Mr.

14    Rhoades, did you even know who he was?  Did you

15    even know his name?

16         A.    No, sir, not at that time I did not.

17         Q.    Did you make a note or something in

18    writing that he had some information that he

19    wanted to pass along?

20         A.    No, sir.  I asked him his name.  I

21    went back and looked up his chart and called the

22    detective division.

23         Q.    And it would be true or safe to say,

24    is it not, that when he informed you of this he

25    didn't say I want to trade off something for a

                                             276

1    lighter sentence, or he didn't try to make any

2    deals; did he?

3         A.    No, sir.

4         Q.    Said he had some information he wanted

5    to pass on?

6         A.    Yes, sir.

7              MR. STAFFORD:  I pass the witness.

8              MS. DAVIES:  May the witness be

9    excused?

10             THE COURT:  What was the lieutenant's

11   name?

12        A.    Goad.

13             THE COURT:  You may stand down.

14             Call your next.

15             MS. DAVIES:  H. W. Butler.

16             (The following proceedings were had at

17   the bench:)

18             MR. STAFFORD:  For purposes of the

19   record, this is the detective that came and

20   talked to my client in reference to this double

21   killing.  I am contending under 38.22 he was in

22   custody.  And during the course of the

23   conversation, the police officer, starting on

24   page 78 of a transcript of his testimony from

25   motion to suppress the confession the court

                                                    277

1  reporter has previously prepared for us in this
2  trial, I will introduce this thing for a exhibit
3  for this purpose only, the officer asked:
4          "Question:   What did you do then?"
5  Starting on line 24.
6          Line 25 is the answer: "I asked him to
7  tell me something about the incident that would
8  lead me to believe that he really and truly had
9  information pertaining to the case."
10          Then the question:  "What is the
11  purpose of doing that?
12          "Answer:   Just to find out if he does
13  have some information pertinent to the
14  investigation or if he is just trying to offer
15  worthless information to get out of jail.
16          "Question:  How did the defendant
17  respond?"
18          "Answer:  He told me that one of the
19  subjects had his wallet taken and that there had
20  been some money taken out of the wallet."
21          "Question:  Did he say how much money?
22          "Answer:   I believe he said one
23  hundred and sixty dollars had been taken from
24  the wallet."
25          I object to all of that testimony as

278

1    being an in-custody statement. It was made

2    directly in response to interrogation or

3    questions asked by this fine officer, and I

4    don't know of any grounds under the Code of

5    Criminal Procedure or the rules of evidence that

6    it would be admissible in this particular case.

7    And I ask the Court to not allow this

8    information or this testimony as referred to on

9    pages 78 and 79.

10              THE COURT: All right. Does the State

11   wish to respond? As I recall, I previously

12   heard this officer testify on September 8, 1992,

13   my recollection was that this was a Pasadena

14   detective, not the Houston police detective but

15   Pasadena police detective who went to the

16   defendant in jail to see exactly why he needed

17   to talk to somebody, having already indicated to

18   Officer Brown, who previously testified, that he

19   wanted to talk to some detective. That this

20   witness, Detective Butler, didn't even know

21   about the commission of the double murder which

22   is the subject of this capital murder offense on

23   trial. That the investigation certainly had not

24   focused on this defendant by that time and that

25   he was meaning to ascertain what kind of

279

1    information the defendant had that he wanted to
2    impart to other detectives.   That is how I
3    remember what happened.
4              Do you want to put something on the
5    record?
6              MS. DAVIES:   I think the recollection
7    is accurate.   I object to the fact that the
8    highlighted portion in Mr. Stafford's transcript
9    as not being the only relevant portions.   I
10   think the record will speak for itself.   You
11   have to look at the entire context and content
12   of this detective's testimony as the Court had
13   obviously been doing.   He wasn't interrogated
14   for incriminating -- this witness was not
15   interrogating for incrimination information.   He
16   didn't even know what crime had been committed
17   or what the man was talking about.
18             THE COURT:   It is my recollection he
19   didn't know the man's name.   He knew him as
20   somebody else.   He asked questions regarding his
21   name for identification purposes.   As I recall
22   from the previous testimony regarding focus of
23   this case, when the defendant told him about the
24   murder of those brothers, this detective
25   obviously knew nothing about this case because

                                              280

1    he assumed the defendant was talking about two

2    black people having been killed, and he was

3    asking some of this information to give to

4    whoever might be investigating the case.

5    Certainly the investigation of the murder of the

6    Allen brothers had not in any way focused on

7    this defendant at that time.

8                MS. DAVIES:   I have to agree with the

9    court's analysis.  The record of the previous

10   hearing speaks for itself.  Just because the

11   conversation includes comments that may have a

12   question mark at the end does not mean that that

13   rises to the level of interrogation.

14               MR. STAFFORD:    Judge, we can waltz

15   with this or play the cha-cha, however we want

16   to do it, but the bottom line is I will

17   stipulate that my client contacted and wanted to

18   talk to the detective.  My remembrance of this

19   conversation is this detective shows up, my

20   client says, "You are not the detective I need

21   to talk to, I need to talk to the detective in

22   charge."  This guy kept pumping him for

23   information.  He immediately told him I know

24   something about the Allen brothers killing, and

25   then from there he got into a custodial

1    interrogation, and, finally, he told this

2    officer, "I don't need to talk to you anymore, I

3    need to talk to the detective in charge."

4    Basically right here.

5              THE COURT:  That is not how I remember

6    it fully.  The record will speak for itself.

7              MR. STAFFORD:   Do you overrule my

8    objection?

9              THE COURT:  Yes, sir.

10             (The following proceedings were had

11   before the jury:)

12                     H. W. BUTLER

13   was called as a witness by the State and, having

14   been duly sworn, testified as follows:

15                  DIRECT EXAMINATION

16   BY MS. DAVIES:

17       Q.    Please tell us your name for the

18   record.

19       A.    H. W. Butler.

20       Q.    How are you employed?

21       A.    I am a detective with the Pasadena

22   Police Department.

23       Q.    What division of the Pasadena police

24   are you assigned?

25       A.    Detective division.

282

1       Q.   How long have you been with the
2  Pasadena Police Department?
3       A.   Twenty-six years.
4       Q.   And you have been a detective for how
5  many years?
6       A.   About four years.
7       Q.   Were you on duty there on Friday,
8  October 11th, 1991?
9       A.   Yes, ma'am.
10      Q.   Did you have an occasion to go to the
11  Pasadena jail on that day?
12      A.   Yes, ma'am.
13      Q.   Why did you happen to do that?
14      A.   I was approached by my supervisor,
15  Lieutenant Goad, and he advised me that a
16  subject by the name of Steven Ray Leland was in
17  custody in jail and that this subject had some
18  information he wanted to talk with a detective
19  about.
20      Q.   At that point, Detective Butler, did
21  you know what case Steven Leland had information
22  on?
23      A.   The lieutenant told me it was a
24  case--.
25         MR. STAFFORD:  Object to hearsay, what

1       the lieutenant told him.

2                   THE COURT:  Sustained.

3       BY MS. DAVIES:

4            Q.    After you received word that Steven

5       Leland might have information, what did you do?

6            A.    I went to the jail.

7            Q.    Did you look up Steven Ray Leland?

8            A.    Ma'am?

9            Q.    Did you look up Steven Ray Leland in

10      jail?

11           A.    Yes, ma'am.

12           Q.    Where was he?

13           A.    He was in a cell by himself.

14           Q.    Do you see that person here in the

15      courtroom?

16           A.    Yes, ma'am.

17           Q.    Can you identify him?

18           A.    Yes, ma'am, seated at the table

19      wearing long-sleeve white shirt.

20           Q.    The shirt with the plaid?

21           A.    Yes.

22                 MS. DAVIES:  May the record reflect

23      that this witness has identified the defendant?

24                 THE COURT:  It will.

25

                                                    284

BY MS. DAVIES:

    Q.   At the point that you approached this defendant in his cell, did you know what case it was that you were going over there to inquire about?

    A.   Yes, ma'am.

    Q.   Did you have a conversation with this defendant?

    A.   Yes, ma'am.

    Q.   Who spoke first?

    A.   I spoke first.

    Q.   What did you say?

    A.   I asked him if he was Steven Ray Leland.

    Q.   How did he respond?

    A.   He said, "No, that is not my real name."

    Q.   What did he tell you his name was?

    A.   Ricky Rhoades.   Rick Rhoades.

    Q.   Rick Rhoades.  At that point, did you ask for a date of birth or anything?

    A.   Yes, ma'am.  I asked him for a date of birth.  He also volunteered at that time that he had been in the pen under the name of David Marcas.

1     Q.   Did he give you a date of birth for

2    the name Rick Rhoades?

3     A.   Yes, ma'am.

4     Q.   Do you recall what that was?

5     A.   I believe it was the fourth, ten of --

6    the year was '64.  I am not sure of the day and

7    the month.

8     Q.   Okay.  What case was it that you

9    thought you were going to talk to this man

10   about?

11    A.   I asked him if he had information

12   pertaining to a case involving a murdered deputy

13   sheriff.

14    Q.   That was what you had in mind when you

15   walked over there?

16    A.   Yes, ma'am.

17    Q.   At that point, did you even know

18   anything about the killing of the Allen brothers

19   that had happened in September?

20    A.   No, ma'am.

21    Q.   Any reason why you might have missed

22   hearing that?

23    A.   I believe I was out of town when the

24   offense occurred.

25    Q.   So did you ask this defendant about

286

1   the killing of some deputy?

2        A.   Yes, ma'am.

3        Q.   What was his reaction?

4        A.   He told me he didn't know what I was

5   talking about.

6        Q.   Did he volunteer any other

7   information?

8        A.   Yes, ma'am.  He said he was talking

9   about the two brothers that had been killed off

10  of Mize Street three or four weeks ago.

11       Q.   When he said that, did you immediately

12  recognize what case he was talking about?

13       A.   No, ma'am, I still didn't know what he

14  was talking about.

15       Q.   So what did you do?

16       A.   I asked him if in fact the two

17  brothers had been killed.  And he replied yeah.

18       Q.   Did he say anything else?

19       A.   No, ma'am.  I then asked him if he

20  knew who killed the two brothers.

21       Q.   What was his reaction?

22       A.   He laughed and said, "Yeah, I know."

23       Q.   How would you describe his demeanor

24  and attitude as you were talking to him at that

25  point?

1     A.   Cocky.

2     Q.   So what did you do next?

3     A.   I asked him if he could tell me

4 something about the offense.

5     Q.   What was the reason for doing that?

6     A.   To see if he really had information

7 that would help in the investigation.

8     Q.   Did you have any idea what information

9 might be incriminating or helpful in that?

10    A.   No, ma'am, I did not.

11    Q.   Given the information that you had at

12 that point, did you know what case to track

13 down, who to call?

14    A.   No, ma'am, not at that point.

15    Q.   Did the defendant offer any additional

16 information to assist you in doing that?

17    A.   Yes, ma'am.  He told me one of the

18 victims wallet was missing and it was one

19 hundred and sixty dollars taken from it.

20    Q.   At this point, did you recognize or

21 had anything been said to indicate that this

22 defendant was the person who had committed the

23 crime?

24    A.   No, ma'am.

25    Q.   Did he tell you anything else to help

1      identify?

2          A.   Yes, ma'am, he then told me that one

3      of the victims was alive when, quote, he left,

4      meaning whoever was at the scene.

5          Q.   All right.   Did he tell you anything

6      else to identify the case?

7          A.   He told me one more thing.   He said

8      one of the victims had been beaten with a weight

9      bar in the area of the head.

10         Q.   Did he tell you anything more?

11         A.   No, ma'am.   At that point, I

12     recollected the case that he was talking about,

13     and at that point he said he didn't want to talk

14     to me anymore.

15         Q.   Did he indicate whether he did want to

16     talk to anybody else?

17         A.   Yes, ma'am.   He said he wanted to talk

18     to the detectives that were assigned to that case.

19         Q.   What did you do?

20         A.   I left the jail area and went upstairs

21     and attempted to locate the case information,

22     case number with HPD and what detectives were

23     assigned the case.

24         Q.   Did you actually talk directly to the

25     detectives who you learned were handling the

1    case?

2         A.    No.

3         Q.    What did you do to make contact with

4    them?

5         A.    My shift was ending about four

6    o'clock, and Sergeant Massey was working the

7    evening shift that day.  I gave all this

8    information to him, and I emphasized that he

9    needed to find these two detectives and pass

10   this information along to them.

11        Q.    Detective Butler, did this defendant

12   try to make any kind of deals or anything with

13   you?

14        A.    No, ma'am.  No.

15        Q.    That just wasn't discussed at all?

16        A.    No.  He was coming at me like he had

17   information about this case.  He wasn't

18   admitting to me that he had any involvement in

19   it.

20        Q.    In fact, when you walked off from your

21   conversation with this defendant and contacted

22   the Houston Police, did you think you had been

23   talking to the  suspect?

24        A.    No, ma'am.

25        Q.    If he had approached you about trying

290

1    to make some kind of deal in exchange for

2    information, would you have been in a position

3    to make a deal?

4         A.    No.

5              MR. STAFFORD:   Object to speculation,

6    judge.

7              THE COURT:   I am sustaining his

8    objection unless y'all want to argue about it.

9              MS. DAVIES:   I will ask another

10   question.

11        Q.    Well, I certainly don't want you to

12   speculate about anything, but are you in a

13   position as a detective with the Pasadena police

14   to make a deal with anyone in regard to a case

15   that the Houston Police were handling?

16        A.    No, ma'am.

17             MS. DAVIES:   Pass the witness.

18

19

20

21

22

23

24

25

<pre>
 1                    CROSS EXAMINATION
 2   BY MR. STAFFORD:
 3        Q.   It's nothing unusual for persons with
 4   information to try to make a deal; is it?  I
 5   have some information, and you give me something
 6   in return and I will give you what I know about
 7   a crime.  That happens every day; doesn't it?
 8        A.   Yes.
 9             MS. DAVIES:  Objection.
10             THE COURT:  Overruled
11   BY MS. STAFFORD:
12        Q.   What we are trying to tell this jury
13   is Mr. Rhoades didn't attempt that with
14   information about two murders; did he?
15        A.   No.
16             MR. STAFFORD:  I have no other
17   questions.
18             THE COURT:  Anything else?
19             MS. DAVIES:  May this witness be
20   excused?
21             THE COURT:  You may down, sir.
22             MR. STAFFORD:  I do have one other
23   question.
24   BY MR. STAFFORD:
25        Q.   When you went down to see him in
</pre>

1    response to your supervisor sending you down,
2    you didn't read him his Miranda warnings; did
3    you?
4         A.    No, sir.
5         Q.    Didn't tell him he had a right to a
6    lawyer or anything of that nature?
7         A.    No, sir.
8         Q.    You just started asking him questions?
9         A.    Yes, sir.
10             MR. STAFFORD:  No other questions.
11             THE COURT:  Anything else?
12             You are excused.
13             Call your next.
14             MS. DAVIES:  Sergeant Massey.
15                     MICHAEL MASSEY
16   was called as a witness by the State and, having
17   been duly sworn, testified as follows:
18                   DIRECT EXAMINATION
19   BY MS. DAVIES:
20        Q.    Tell us your name, please.
21        A.    Michael K. Massey.
22        Q.    How are you employed?
23        A.    I am a Pasadena police officer.
24        Q.    How long have you been in law
25   enforcement?

                                              293

1      A.    Fourteen years.

2      Q.    Have you been with Pasadena all that

3    time?

4      A.    Yes, ma'am.

5      Q.    What is your assignment?

6      A.    I am a sergeant, I am a supervisor in

7    the juvenile division.

8      Q.    Was that position that you held back

9    in October of 1991?

10     A.    No, it's not.

11     Q.    You changed assignments since then?

12     A.    Yes.

13     Q.    What was your job on October 11 of

14   1991?

15     A.    I was assigned to the detective

16   division.

17     Q.    Were you on duty on that date?

18     A.    Yes, I was.

19     Q.    Do you recall having any dealings in

20   regard to an inmate named Steven Leland or Rick

21   Rhoades?

22     A.    Yes, I do.

23     Q.    What hours were you working that day;

24   do you remember?

25     A.    That time of year I was working

1    evening shift.  It was from two in the afternoon

2    until 10:30 at night.

3        Q.   How did you first become aware -- or

4    let me ask it this way.  Did you have any

5    conversation with any Houston Police detectives?

6        A.   Yes, I did.

7        Q.   When did you first come in contact

8    with Detectives Maxey and Kennedy, if you did?

9        A.   I had been approached by another

10   sergeant who was working day shift detectives at

11   the time and told me a prisoner in our jail

12   wanted to speak to some Houston detectives.

13       Q.   Did you do anything to facilitate that

14   conversation taking place?

15       A.   I contacted Houston Police Department

16   and spoke to a lieutenant in their homicide

17   division, and he directed me to or he told me he

18   would get ahold of some detectives who were

19   handling the particular case, and they called me

20   back.

21       Q.   And was that Sergeant Kennedy or Maxey

22   who called you back, or do you recall?

23       A.   I don't recall who called me, but it

24   was one of those two, yes.

25       Q.   Did they then come to your Pasadena

1    jail on that date?

2         A.    They came to the detective division.

3         Q.    Did they came to meet you there?

4         A.    Right.

5         Q.    Did you do anything to assist them?

6         A.    I took them to our jail and checked

7    the prisoner out and brought them back up to our

8    offices and provided them an interview room to

9    talk to the prisoner.

10        Q.    Describe for the jury your offices,

11   the interview room, what the layout is.

12        A.    Well, it's called the bull pen.   It's

13   a great big office or big area that has several

14   desks in it, has an office for one supervisor

15   and has two smaller rooms that we use as

16   interview rooms.

17        Q.    Those interview rooms, are they open

18   to view from the large bull pen area of the

19   office?

20        A.    If the door is left open, they are

21   open to view.

22        Q.    All right.   Are those rooms that you

23   routinely use for the purpose of interviewing

24   witnesses or suspects?

25        A.    Yes.

296

1    Q.    Did you stay in the interview room

2    that you permitted Officer Maxey and Kennedy to

3    use?

4    A.    No.

5    Q.    Did you stay there at the office?

6    A.    Yes, I did.

7    Q.    What area were you in?

8    A.    I was in the bull pen area, our office

9    area at my desk doing my work.

10    Q.    I believe you said that you got this

11    defendant, what, from the jail?

12    A.    Yes.

13    Q.    And brought him to that interview

14    room?

15    A.    Yes.

16    Q.    Did you notice who went into the

17    interview room with the defendant?

18    A.    The two Houston Sergeants Kennedy and

19    Maxey.

20    Q.    During the period of time that they

21    were there in using your interview room, did you

22    notice whether anybody came in and out for

23    coffee or refreshments or for any purpose?

24    A.    One of the two would come out every

25    now and then and go get water, coffee, and bring

1        it back into the room.

2              Q.    Did you notice whether anybody was, as

3        you were sitting out in that open area, did you

4        notice whether anybody was smoking or whether

5        this defendant was permitted to smoke, if you

6        saw?

7              A.    I did not see him smoking, no.

8              Q.    Did you actually go into the room

9        where you would have an opportunity to see that?

10             A.    No, I did not.

11             Q.    At some point, did you provide any

12       paperwork for Sergeant Kennedy or Maxey?

13             A.    Yes, I did.

14             Q.    What did you provide for them?

15             A.    I provided them a form that we use for

16       taking a statement of person in custody.

17             Q.    Is that a special printed form that

18       you use?

19             A.    Yes, it is.

20             Q.    Why is it that you use that form?

21             A.    We use the form because it has the

22       suspect's warnings printed on that form.

23             Q.    Let me show you what has been marked

24       for identification purposes as State's Exhibit 1

25       consisting of five pages.  Do you recognize --

1    is there any printed material on that document

2    on the first page?

3        A.    Yes, there is.

4        Q.    Is that the form that you are

5    referring to as a form that you use at the

6    Pasadena police for taking statements?

7        A.    Yes, it is.

8        Q.    Is that the form or the type form that

9    you provided for the Houston detectives who were

10   there?

11       A.    Yes, it is.

12       Q.    Can you describe for the jury what are

13   those warnings that are printed on the top of

14   that form?

15       A.    They are the defendant's or suspect's

16   Miranda warnings that are used before you ask

17   them if they understand the warnings before they

18   give a statement.    It's the warnings that you

19   have to give them.

20       Q.    After you provided that form to the

21   Houston detectives, did you continue to work out

22   in the outer office?

23       A.    Yes, I did.

24       Q.    Were they still in the interview room

25   with this defendant?

1   A. Yes, they were.

2   Q. At some point were you asked to assist

3 again?

4   A. Yes, I was.

5   Q. What were you asked to do?

6   A. I was asked to witness the defendant

7 signing the statement.

8   Q. Were you the only one who was asked to

9 witness the statement?

10   A. No, I was not.

11   Q. Who else was asked to assist?

12   A. The person I was working with that

13 night, Sergeant Fickessen.

14   Q. How did you go about -- when you said

15 you were asked to witness the statement, did you

16 go into the interview room, or how did you go

17 about doing that?

18   A. The Houston officers brought the

19 defendant into the bull pen or office area and

20 they left for awhile.  At that point, I asked

21 the defendant if he was signing this because he

22 wanted to, and he said he was.

23   Q. What was the defendant's demeanor

24 during the period of time that you saw him on

25 this date?

1      A.   He seemed to be carefree and relieved

2  more than anything else.

3      Q.   Was he tearful, emotional, crying or

4  anything like that?

5      A.   No, he wasn't.

6      Q.   Did he appear to be intoxicated?

7      A.   No, he didn't.

8      Q.   The conversation that you had with

9  him, did he appear to understand what you were

10 saying to him and respond appropriately?

11     A.   Yes, he did.

12     Q.   When you went in to that interview

13 room, I think you said Sergeant Kennedy and

14 Maxey stepped out of the room for a short period

15 of time?

16     A.   Yes.

17     Q.   Is that while you were witnessing the

18 signature?

19     A.   Yes.

20     Q.   Before a signature was placed on this

21 five page document, State's Exhibit 1, did you

22 inquire about the warnings that are printed at

23 the top of the page?

24     A.   No, I did not.

25     Q.   Did you make any inquiry of the

1    defendant as to whether he was willing to sign

2    this statement?

3        A.    I asked if he wanted to sign it, and

4    he said he did.

5        Q.    There is a signature of person making

6    statement on each of these five pages.  Who

7    signed that?

8        A.    The defendant did.

9        Q.    Can you point out for us in the

10    courtroom today who you saw sign as the

11    signature of person making statement?

12        A.    He is the subject sitting over there

13    in the white checked shirt and blonde hair.

14        MS. DAVIES:  Your Honor, may the

15    record reflect that this witness has identified

16    the defendant?

17        THE COURT:  It will.

18    BY MS. DAVIES:

19        Q.    There are two signatures of witnesses

20    on each of those pages also.  Can you tell us

21    whose signatures those are?

22        A.    One of the signatures is mine.  And

23    the other one is Sergeant Fickessen's.

24        Q.    He was there with you at the same time

25    to witness this?

1       A.   Yes.

2       Q.   Did the defendant at any point ask for

3   an attorney in your presence?

4       A.   Not in my presence, no.

5       Q.   Did he demonstrate any reluctance to

6   talk to the Houston detectives in your presence?

7       A.   No, ma'am.

8       Q.   Did he demonstrate any reluctance to

9   sign this statement?

10       A.   No, ma'am.

11       Q.   After the statement was signed, did

12   you turn that over to the Houston detectives?

13       A.   Yes, I did.

14       Q.   After that, did you assist them in any

15   other way in connection with this defendant?

16       A.   They had wanted to check him out of

17   jail to go to some location with him.  And I

18   took him down to the jail and showed them the

19   procedure how to check him out of the jail, and

20   they did so.

21       Q.   This was after the statement was

22   signed and witnessed; is that correct?

23       A.   Yes.

24       Q.   Did the defendant demonstrate -- did

25   he appear to be willing and cooperative in going

1    with the Houston detectives, or was he reluctant

2    to do that?

3         A.    He was cooperative.

4         Q.    Did you ever see any demonstration of

5    emotion on this defendant's part during this

6    entire process?

7         A.    No, ma'am.

8              MS. DAVIES:   Pass the witness.

9              MR. STAFFORD:   May I see his report,

10   Your Honor?

11             MS. DAVIES:   I am not aware that

12   Sergeant Massey made a report.   Did you,

13   Sergeant Massey?

14             THE WITNESS:   No, ma'am, I did not

15   make a report.

16

17

18

19

20

21

22

23

24

25

CROSS EXAMINATION

BY MR. STAFFORD:

Q.   You did describe to the jury that when
he was coming up from the -- when you were
bringing him up, that he appeared to be somewhat
in a mood that he was wanting to get something
off his chest, basically, he wasn't acting cocky
or anything?

A.   He was carefree and just like he was
relieved.  That is all I can say.

Q.   Somewhat relieved.  And could you tell
the jury, when he went into the interview room
to start talking to the Houston detectives, how
long were they in there approximately before
they came out and asked for the confession
papers that you have already identified?

A.   I can't give you an exact time how
long they were there.  Maybe thirty minutes.  I
can't tell exactly.

Q.   They were in there for awhile talking;
is that correct?

A.   Yes.

Q.   And you have no idea what they were
talking about?

A.   No, sir, I don't.

305

1      Q.    And there is nothing that occurred,

2    either the detectives talking to you or any

3    conversation you had with my client, that would

4    indicate to you that my client did not

5    corporate, was not in the mood to tell them

6    everything he knew about this crime?  He just

7    wanted to get it off his chest?

8      A.    As far as I knew, he was cooperative.

9      Q.    There was nothing there to indicate

10   that you did anything to force him to tell you

11   about it; is that correct?

12     A.    No, sir.

13     Q.    There was none of this bad guy, good

14   guy routine going on, we will make you a deal,

15   or one of the cops being kind of tough, he was

16   just forthcoming and telling them everything he

17   possibly knew about it?

18     A.    I wasn't in the room; so, therefore, I

19   don't know if there was a good guy or bad guy

20   routine going on.  He never said anything to me

21   as far as wanting to talk.  He was not talking

22   to me at all.

23     Q.    In fact, when you came in to witness

24   the confession that he made, he signed it freely

25   and voluntarily in front of you?

1      A.   He came out to our office and we
2  witnessed it there.  And, yes, he did sign it
3  voluntarily.
4      Q.   And this was almost a month after the
5  fact?
6      A.   I don't know the exact date of when
7  this incident occurred.
8      Q.   Do you recall, when Sergeant Butler
9  informed you about contacting the detectives
10 over at HPD, approximately what time was that;
11 do you remember?
12     A.   It was about between 3:30 and 4:00 in
13 the afternoon because I had just come on duty at
14 2:00 and he was scheduled to get off at 4:00.
15     Q.   Do you recall approximately what time
16 it was when the Houston detectives finally
17 arrived?
18     A.   I believe it was about seven, 6:30 or
19 seven.
20     Q.   But it was during your shift?
21     A.   Yes.
22     Q.   On the same day?
23     A.   On the same day, yes, sir.
24     Q.   And I assume that from your
25 conversations with Sergeant Butler you had

1    learned or come to know that you actually had

2    Rick Rhoades in custody and not the person that

3    he was booked in as?

4        A.   Yes.

5        Q.   And this information was volunteered

6    by Mr. Rhoades himself?

7            MS. DAVIES:  I object.  It's hearsay.

8            THE COURT:  Sustained

9    BY MR. STAFFORD:

10       Q.   Did you come to find out on your own

11   independent recollection that Mr. Rhoades was

12   the one that corrected the agency as to who he

13   was?

14          MS. DAVIES:  Back door hearsay.

15          THE COURT:  Sustained.

16    BY MR. STAFFORD:

17       Q.   Had your department made any

18   fingerprint investigation through the FBI to

19   determine the fingerprints of the person who was

20   booked in your facility to determine who he was?

21       A.   I am not aware of any.

22       Q.   And I think you have already told the

23   prosecutor that when they were checking Mr.

24   Rhoades out to go to a location to recover some

25   items from this offense he went voluntarily and

1    cooperative; did he not?

2         A.   Yes, he did.

3              MR. STAFFORD:   I have no other

4    questions.

5              THE COURT:   Do you have anything

6    else?

7              MS. DAVIES:   No.

8              THE COURT:   Please approach the

9    bench.

10             Ladies and gentlemen, take five

11   minutes, if you would.  We are not breaking for

12   lunch yet.  We are going to probably get another

13   45 minutes or hour testimony in before lunch.

14             (Recess; after which, the jury returns

15   to the courtroom)

16

17

18

19

20

21

22

23

24

25

1                    STEWART H. KENNEDY

2    was called as a witness by the State and, having

3    been duly sworn, testified as follows:

4                    DIRECT EXAMINATION

5    BY MS. DAVIES:

6         Q.    Would you, please, tell us your name?

7         A.    Stewart H. Kennedy.

8         Q.    How are you employed?

9         A.    City of Houston police officer.

10        Q.    How long have you been in law

11   enforcement?

12        A.    Eighteen years.

13        Q.    What is your rank with the Houston

14   Police Department?

15        A.    Sergeant.

16        Q.    Have you been with the Houston Police

17   for eighteen years?

18        A.    Yes.

19        Q.    Sergeant assigned to what division?

20        A.    Homicide division.

21        Q.    How long have you been in homicide?

22        A.    Ten years.

23        Q.    Do you have a partner who works with

24   you?

25        A.    Yes, I do.  R. L. Maxey.

1      Q.    Y'all work together routinely?

2      A.    Yes, we do.

3      Q.    Were you on duty back on September 13

4   of 1991?

5      A.    Yes, I was.

6      Q.    Were you called out to 624 Keith

7   Street on that day?

8      A.    Yes.

9      Q.    Is that location in Harris County,

10  Texas?

11     A.    Yes, it is.

12     Q.    Do you recall about what time of day

13  it was that you went out to 624 Keith?

14     A.    It was approximately eight, 8:30 a.m.

15  when we were advised to go out there.

16     Q.    Did you go by yourself or did you go

17  with your partner?

18     A.    Myself and Sergeant Maxey went

19  together.

20     Q.    When you arrived at 624 Keith, were

21  there any other law enforcement people already

22  on the scene?

23     A.    Yes, there were numerous police

24  officers already arrived at the scene, including

25  CSU Officer Jordan.

311

1      Q.    In fact, is that Harold Jordan?

2      A.    Yes, it is.

3      Q.    What about Jim Bolding, do you know

4    him?

5      A.    Yes, I do.

6      Q.    From the crime lab?

7      A.    Yes, ma'am.

8      Q.    Was he there when you arrived?

9      A.    No, I think I got there before Jim did.

10     Q.    What about Chuck Sheldon?

11     A.    I was there before Sheldon was, also.

12     Q.    When you arrived, had the scene been

13   secured by the officers that arrived there prior

14   to you?

15     A.    Yes, it had.

16     Q.    Can you tell the jury what it was you

17   and Sergeant Maxey did when you first got there?

18     A.    Upon arrival at a scene, determination

19   is made which partner will handle which part of

20   the investigation.  There is basically two parts

21   to a homicide investigation, one is the scene

22   investigation, which includes processing of the

23   scene, collecting the evidence, photography, and

24   stuff like that, the other is the witness side

25   of the investigation.  One partner talks to all

312

1    the potential witnesses and one partner handles

2    the scene.   It was my duty to handle the scene

3    on this investigation.

4        Q.   So, were there witnesses there who

5    needed to be talked to immediately upon arrival?

6        A.   Yes, there was.

7        Q.   Who took care of that?

8        A.   Sergeant Maxey.

9        Q.   In order to, when you say take care of

10   the scene, do you actually as a homicide

11   detective do you physically pick up the evidence

12   yourself and take it in?

13        A.   No, I do not.

14        Q.   You are in a supervisory capacity?

15        A.   That is correct.

16        Q.   In order to accomplish that, what did

17   you do first?

18        A.   Well, we made a walk through the scene

19   to determine what we had and what we didn't

20   have.   It was already roped off with tape so

21   nobody could get in.

22        Q.   When you walked through the scene,

23   there was a front bedroom there where there was

24   some blood at the door, I understand.

25        A.   That is correct.

1       Q.   Was that door, had it been opened at
2    the point that you arrived?
3       A.   The front door of the house?  Or front
4    door of the bedroom.
5       Q.   That front bedroom.
6       A.   It was standing ajar.  It was open
7    maybe two or three inches.
8       Q.   Was there anything there preventing
9    that door from being opened?
10      A.   Yes, there was a body.
11      Q.   Could you tell the jury, just not in
12   precise detail, but just your first impression
13   as you walked through the house, what things you
14   observed that stood out in your mind?
15      A.   The house was very neat and clean, but
16   the murder scene, it was a bloody mess.  There
17   was blood everywhere.  There didn't appear to be
18   anything torn up or ransacked or anything like
19   that.
20      Q.   In the front part of the house, did
21   you notice in the living area, the kitchen area,
22   what would ordinarily be the dining room, was
23   there any signs of a struggle in that part of
24   the house that you observed at that point?
25      A.   No.

1          Q.    Were there areas of the house that
2     appeared otherwise in terms that there had been
3     a struggle?
4          A.    Oh, yes.
5          Q.    What portion of the house would that
6     be?
7          A.    In either of the bedrooms, the front
8     bedroom that you alluded to earlier that had the
9     door closed.  I mean, obviously, it appeared
10    that the man behind the door tried to close the
11    door to protect himself.  And the master
12    bedroom, there were a few items knocked over
13    that could have been part of a struggle.
14         Q.    Did you arrange to have anyone take
15    photographs there at the scene?
16         A.    Yes.
17         Q.    Who was that?
18         A.    Officer Harold Jordan.
19         Q.    Did you also arrange for a video tape
20    to be made of the scene?
21         A.    Yes.
22         Q.    Who did that?
23         A.    Officer Jordan.
24         Q.    Have you worked with him before?
25         A.    Yes.

1      Q.    Is he a crime scene unit officer?

2      A.    That is correct.

3      Q.    Just what is a crime scene unit

4   officer?

5      A.    Their function is to go to murder

6   scenes, collect any evidence, photograph the

7   scene, make diagrams, measurements, video tape.

8   He handles all the evidence.

9      Q.    Based on your observations and

10  experience with Officer Jordan, he takes care of

11  operating the video camera and so forth?

12     A.    Yes.

13     Q.    And takes accurate pictures.

14           Let me show you some photographs.  In

15  fact, did Officer Jordan take a video at your

16  request in this?

17     A.    Yes.

18     Q.    Did you bring it to court with you?

19     A.    Yes, I did.

20     Q.    Could I have it, please?

21           I am going to mark the video that you

22  just handed me as State's Exhibit 87.   Have you

23  viewed this video recently?

24     A.    Yes, I have.

25     Q.    Is this video, the pictures contained

1    on this, do they adequately depict the scene at

2    624 Keith as you saw it on the morning of

3    September 13, 1991?

4         A.   Yes, they do.

5         Q.   Let me show you some photographs.   I

6    have exhibits, photographs marked exhibits 57

7    through 62.

8         Q.   Can you look at those and tell us

9    whether those are accurate depictions of the

10   scenes on the exterior of the house on that

11   date?

12        A.   Yes, they are.

13        Q.   State's Exhibits 63 through 67.   Are

14   these accurate depictions of scenes in the

15   interior of the house as they appeared on that

16   morning?

17        A.   Yes.

18        Q.   Is the same true of the photographs

19   marked State's 68 and 69?

20        A.   Yes.

21        Q.   Would you look through State's

22   Exhibits 70 through 76 and tell me whether these

23   are accurate depictions of the scene in that

24   front bedroom where the door was ajar and

25   blocked and then the interior of that room as it

317

1    appeared on that day?

2         A.    Yes, they are.

3         Q.    Let me show you photographs that have

4    been marked as 77 through 81.  Do those

5    photographs accurately depict the back bedroom

6    of 624 Keith as it appeared on that morning?

7         A.    Yes, they do.

8              MS. DAVIES:  Your Honor, at this time

9    I am tendering to defense counsel the video tape

10   marked State's Exhibit 87, a copy of which has

11   been provided previously to defense counsel.

12   And I am also tendering to him State's Exhibits

13   57 through 81.  Offer all of those items into

14   evidence at this time.

15             MR. STAFFORD:  May I take the witness

16   on voir dire for purpose of the video?

17             THE COURT:  Yes.

18

19

20

21

22

23

24

25

```
 1                    VOIR DIRE EXAMINATION
 2   BY MR. STAFFORD:
 3        Q.   Sergeant Kennedy, can you tell me
 4   whether this is the original?
 5        A.   Yes, it is.
 6        Q.   Do you know of your own personal
 7   knowledge whether it has been edited or not?
 8        A.   It has not.
 9        Q.   It has not been edited.
10             MR. STAFFORD:  That is all the
11   questions I have.
12             THE COURT:  First of all, as to
13   State's Exhibit 87, do you have any objection?
14             MR. STAFFORD:  Only to the audio.
15             MS. DAVIES:  I don't believe there is
16   any audio.
17             THE COURT:  Are you talking about 87
18   or another exhibit?
19             MR. STAFFORD:  I am talking about 87.
20             THE COURT:  I am not aware of audio on
21   87.
22             THE WITNESS:  There is no audio.
23             THE COURT:  State's Exhibit 87 is
24   admitted.
25             MR. STAFFORD:  Judge, I am going to
```

1    have numerous objections.  I am going to tender

2    case law to the point.

3              THE COURT:  Do you want the court

4    reporter taking this down?

5              MR. STAFFORD:  I have tendered to the

6    court some case law in reference to my objection

7    under rule 403 of the Code of Criminal

8    Evidence.  After I view these, I will have

9    objections to some of them, Your Honor.

10             THE COURT:  Do you wish to make your

11   objections up here?

12             MR. STAFFORD:  I am just going to do

13   the ones I don't object to.  State's 63, 64, 65,

14   66, 67, 68, 69, 81, 77, 70, 73, 71.  The rest of

15   them I have objections to them.

16             THE COURT:  What about 57 and 62?

17             MR. STAFFORD:  I have several here.

18   No objection to 57 and 62.

19             THE COURT:  State's Exhibits 57, 58,

20   59, 60, 61 and 62, 63, 64, 65, 66, 67, 68, 69,

21   70, 71, 73, 77, and 81 are admitted.  Let me see

22   72, 73, 75, 76, 78, 79 and 80.

23             THE COURT:  Ladies and gentlemen, I

24   have to ask you to step down the hallway for

25   just a moment.  Follow the bailiff.

1          (The jury is removed from the

2     courtroom).

3          MR. STAFFORD:  Judge, for purpose of

4     the record I have tendered to the court a law

5     review article and the Long vs. State of Texas.

6          THE COURT:  I am keeping in mind that

7     the Long case, they found it was harmless error.

8          MR. STAFFORD:  I understand.   But it

9     still was error.   I think it's unfair for the

10    court to say, well, or the trial court to

11    address the issue and say, well, I know it's

12    error but it would be harmless error so I am

13    going to let it in anyway.

14         THE COURT:  That was a different kind

15    of case.   These are close-ups at the morgue of

16    the same evidence that was photographed at the

17    scene.  Is that what we are talking about?

18         MR. STAFFORD:  Yes.  We have a video

19    which is going to show substantially the same

20    thing the photographs show, and it's just

21    needless accumulation of evidence, more so,

22    pictures that I have given you.

23         THE COURT:  All right.  Just a

24    moment.

25         Paul, take them to lunch.

321

1          MR. STAFFORD:  Have no probative

2     value.  They are gross, grotesque.

3          THE COURT:  I am going to have to look

4     at the video also.  We may as well do that now

5     while the jury is gone.

6          MS. DAVIES:  I would like to say we

7     have a murder scene.  The sequence of the

8     events, what took place inside that house, I

9     expect to show a different version based on the

10    physical evidence.  There are certain aspects of

11    this physical evidence that will I think rebut

12    part of the defendant's statement when it comes

13    in.  The court is on notice, as is the defense,

14    and has been for months that we intend to offer

15    some blood spatter testimony from experts.  And,

16    so, to show part and not all of the details of

17    exactly where there was blood and the appearance

18    and pattern and all, it's doing a disservice.

19    We can't possibly get a fair trial and a just

20    result without being able to show the jury

21    exactly what kind of a scene this man created at

22    that address.

23          THE COURT:  I don't see that there are

24    too many of these photographs.  Each one of

25    these shows something different, including

322

1    weapons, blood spatter, location of wounds.

2         MR. STAFFORD:  For purpose of the

3    record, Your Honor, so Ms. Davies can go ahead

4    and address the record.  I conferred with

5    co-counsel.  And if the State has put me on

6    notice that there was going to be blood spatter

7    expert testimony, this is the first time I have

8    been notified of it.

9         THE COURT:  I am not addressing

10   whether or not you have had notice of blood

11   spatter testimony.  I am inclined to allow the

12   photographs in.  I will be looking at the video

13   tape.  Let's go ahead and take care of that

14   before we break for lunch.

15        MR. STAFFORD:  Judge, again, so the

16   record is clear as to my 403 objection under the

17   Rules of Criminal Evidence, I put the court on

18   notice that they are gross, have no probative

19   value other than to highly prejudice and inflame

20   this jury.  It doesn't go to any question of

21   fact.  There are going to be other, I mean, the

22   video will depict the same thing.  It's just a

23   needless accumulation of evidence.

24        THE COURT:  I also understand, in

25   arguing to the jury, that you can't use the

1    video but you can use the photographs.

2          MS. DAVIES: Your Honor, when the

3    court looks at the video you are going to see

4    that there are a few spots, a few scenes that

5    are shown on the video that 35 mm pictures were

6    not taken of.  So the video does include some

7    things in addition to what is portrayed.

8          THE COURT:  The video is not objected

9    to.  The video is in evidence.

10          MS. DAVIES:  I am pointing out to the

11    court that there are some differences in the

12    view one gets.

13          I would also point out for the court

14    that my recollection is that when we had a

15    hearing on this, I believe it was on the date

16    that we began jury selection, and we had some

17    hearings concluding some discovery matters and

18    motions at the very beginning of the trial, I

19    believe at the end of July, I don't remember the

20    exact date, 27th or 28th.  When we were

21    discussing that, I am confident it was even on

22    the record that I had advised defense counsel

23    that in addition to the photographs that we have

24    there will be slides made of some of these same

25    photographs for the use of the blood spatter

1    expert.   Sergeant Hoffmaster and Welch have been

2    on the subpoena list all along.   And they were

3    advised of that.

4            MR. STAFFORD:   As well as other people

5    on the subpoena list I have no earthly idea what

6    they are going to testify to.   Also, the court

7    has given them advance notice under discovery,

8    they have not supplied me one iota of what this

9    expert is going to testify to, and I had no

10   knowledge that they were experts and subject to

11   -- I would like to have their findings

12   submitted to my experts to see if they are the

13   same and consistent with what their expert

14   says.   This is the first time I ever heard of it.

15           MS. DAVIES:   I am sorry Mr. Stafford

16   does not recall, but I specifically told him

17   that there would be slides which are duplicates

18   of not all but some of those 35 millimeter eight

19   by ten photographs that the court is looking at

20   right now, and they have been available to

21   defense counsel for months.

22           MR. STAFFORD:   I haven't seen any

23   slides yet.

24           THE COURT:   Would you like to see

25   them?   Get them over here during the lunch hour,

325

1   please.

2          MS. DAVIES:  I will try to get in

3   touch with them over the lunch hour.   They

4   depict the same scenes as the eight by ten's,

5   and I advised Mr. Stafford of that.   And asked

6   him if he needed to see them ahead of time.

7          THE COURT:  I'll look at the video and

8   I will rule on the photographs.

9          MR. STAFFORD:  I would ask that the

10  same evidence that their expert is looking at as

11  far as splatters, I should find an expert to see

12  if they are telling the truth, judge -- not

13  telling the truth, whether their deductions are

14  as reasonable as mine would be.  I have no idea

15  what he is going to say, first of all.  Does he

16  have a report?

17         THE COURT:  Is this somebody from

18  serology?  Who has the slides?

19         MS. DAVIES:  I will have to contact

20  the detective.  I assume that Sergeant

21  Hoffmaster has them.

22         MR. STAFFORD:  Who is the expert?

23         THE COURT:  Is he on your subpoena

24  list?

25         MS. DAVIES:  Yes.  Sergeant Hoffmaster

326

1    and Welch.

2            MR. STAFFORD:  They are the experts on

3    blood spatter?

4            MS. DAVIES:  They will be blood

5    spatter testimony.   I advised you of that.   I

6    told you we had slides made, they would be

7    slides of the same photographs that you had

8    seen.

9            MR. STAFFORD:  I take issue.  I was

10   not notified.

11           (Video viewed).

12           MR. STAFFORD:  Judge, I believe it's

13   obvious from the viewing of the video that the

14   video is more than sufficient in detail to

15   accurately depict the scene, placing of the

16   bodies and to give this jury an intelligent

17   understanding of positioning, the blood, et

18   cetera, et cetera, et cetera.  That the only

19   purpose that the exhibits which I have objected

20   to, the still photos, could serve would not aid

21   this jury in any shape, form or fashion.  It

22   would only be introduced to inflame their minds

23   and cloud their objectivity to determine really

24   what happened here.   I ask the court to use the

25   balancing test that was set out in Long and also

327

1    use the test that is articulated in rule 403 of

2    the Rules of Criminal Evidence and not allow

3    those objected to photos to be introduced in

4    evidence.

5              THE COURT:   Your objection is

6    overruled.   State's Exhibits 72, 74, 75, 76,

7    78, 79, and 80 are admitted, which, by my

8    calculations, all State's Exhibits from 57

9    through 81 are admitted.   Plus State's Exhibit

10   87, which is the scene video.

11             (The jury enters the courtroom)

12             THE COURT:   Proceed, please.

13             MS. DAVIES:   Your Honor, before I

14   resume questioning Sergeant Kennedy, may I, in

15   regard to State's Exhibits 56, the TDC card that

16   is in evidence.   During lunch break, co-counsel

17   called to my attention that when I wrote the

18   date of birth up on the board over here I wrote

19   it incorrectly.   State's Exhibit 56 shows

20   4/10/62.   And I need to make that correction.

21             THE COURT:   It's not an exhibit

22   anyway.   Just go ahead.

23             MS. DAVIES:   I didn't want to make a

24   change without the court's permission.

25

1                         STEWART H. KENNEDY,

2       called as a witness by the State and on the

3       stand at the time of the recess, resumed the

4       stand for further examination as follows:

5                       DIRECT EXAMINATION

6                          (Continued)

7       BY MS. DAVIES:

8           Q.   Sergeant Kennedy, right before we

9       broke for lunch you had identified a number of

10      photographs and a video tape.

11              MS. DAVIES:   Your Honor, again, in the

12      presence of the jury, I would like to offer into

13      evidence and have the Court's ruling for both

14      the jury as to the photographs which I have

15      tendered to defense counsel.

16              MR. STAFFORD:   I object.   I don't see

17      any necessity, in that the court has already

18      made a finding for purposes of the record.

19              THE COURT:   Some of them had not been

20      presented.   All photographs previously

21      discussed, State's Exhibits 57 through State's

22      Exhibit 81 are admitted.

23              MR. STAFFORD:   I also make my same

24      objection.

25

329

BY MS. DAVIES:

Q.   Sergeant Kennedy, I would like to come back with you.  You identified those photographs as being accurate depictions of the things you saw at the scene.  For the moment I would like to move forward.  We will come back and talk about those some more before you are through, but for the moment I would like to go forward and discuss your investigation with you.

Do you recall how much of the day that Friday, September 13th, you were at 624 Keith supervising the scene investigation?

A.   Large amount of it.  I don't recall exactly the time that we left the scene investigation, but we were there for the better part of the day.

Q.   Now, some of the pictures that you have identified I believe you indicated were of the interior of that front bedroom where Brad Allen's body was found.  You indicated that that door was ajar but blocked by his body.  Can you explain to the jury how you managed to get into that room to take photographs that would adequately show the position of his body and the things that were in the room?

1    A.    Myself and Officer Harold Jordan broke

2    out a window on, an outside window on the north

3    wall of that bedroom, and we entered the bedroom

4    through the broken window.

5    Q.    Were you the first one then to enter

6    that room?

7    A.    Yes, I was.

8    Q.    Did you have pictures taken before

9    anything was disturbed in the room?

10    A.    Yes.

11    Q.    Is that true of the rest of the house

12    as well?

13    A.    That is correct.

14    Q.    You said your partner Sergeant Maxey

15    was interviewing witnesses.  Did you participate

16    in that aspect on that particular day?

17    A.    I did not.

18    Q.    Later, after that scene investigation

19    was complete, did you participate along with

20    your partner in talking to witnesses?

21    A.    Yes, I did.

22    Q.    At the point when you left 624 Keith

23    on September 13, did you have any hard leads,

24    any serious suspects in the case?

25    A.    We did not.

331

1      Q.   At that point, did you have the
2  benefit of the blood sampling that Jim Bolding
3  was doing or any result from the fingerprint
4  people?
5      A.   We did not.
6      Q.   After you had the scene investigation
7  done, what was your next step?
8      A.   We interviewed all the complainants'
9  friends, relatives, potential enemies, trying to
10 find out any background information that we
11 could.
12     Q.   Did you find any potential enemies of
13 Brad or Charles?
14     A.   No enemies, no.
15     Q.   Were there a number of family members
16 and friends there available to talk to you on
17 that Friday, September 13?
18     A.   Yes, there were.
19     Q.   Did you go to any other location to
20 interview anyone in connection with the pizza
21 boxes that were seen at the house?
22     A.   I did not, no.
23     Q.   Did you have that done?
24     A.   Yes.  If I recall correctly, Sergeant
25 Maxey handled that part of the investigation.

1    Q.   As far as you know, what was your plan
2  in terms of investigating -- what was the plan
3  in terms of checking out the fact that there
4  were pizza boxes at the house?
5    A.   Determine where they came from, what
6  time they were delivered, who was at the house
7  when they were delivered.
8    Q.   Did you check all that out?
9    A.   Yes, we did.
10   Q.   Did you interview David Sanders?
11   A.   Yes, we did.
12   Q.   I believe you said various family
13 members.  What about neighbors, people who lived
14 in the neighborhood?
15   A.   Yes, we interviewed all the neighbors.
16   Q.   If you would think ahead to the days
17 after September 13th.  That was a Friday.  On
18 that weekend, did you do any follow-up
19 investigation?
20   A.   Yes.
21   Q.   Do you recall any people who you
22 talked to?
23   A.   We talked to numerous people.  We
24 talked to the close friends of both brothers.
25 One in particular was James Hinkle.  We talked

333

1    to one neighbor who purportedly had a violent

2    temper, named Mario Sowarto (phonetically).   We

3    interviewed anybody who came into the

4    investigation.

5        Q.    What about girlfriends?

6        A.    We interviewed all girlfriends we knew

7    about.

8        Q.    Other family members who had not been

9    available on Friday?

10       A.    Yes.

11       Q.    Do you recall when the funeral was?

12       A.    I do not recall the day, no.

13       Q.    Did you go to the funeral?

14       A.    Yes, I did.

15       Q.    What was your purpose in going to the

16   funeral?

17       A.    I was going to try to talk to Mr.

18   James Hinkle.

19       Q.    Did you make any observations or try

20   to locate, see anybody at the funeral?

21       A.    While we were at the funeral, we

22   noticed one individual had a cut on his hand

23   which would be very much like the one you would

24   receive if your hand had slid down the blade of

25   a knife.

334

1      Q.   And did you follow up on that?

2      A.   Yes, we did.

3      Q.   Do you remember what that person's

4   name was?

5      A.   First we thought his name was Donald

6   Graham.   Turned out later his name was actually

7   Michael Weber.   We talked to both Graham and

8   Weber.

9      Q.   What did you find out about the cut?

10      A.   It had absolutely nothing to do with

11   our investigation.

12      Q.   What about Charles Allen's ex-wife,

13   was she at the funeral?

14      A.   Yes.

15      Q.   Did you talk to her?

16      A.   Yes, we did.

17      Q.   Did you have -- David and Daniel

18   Sanders, did you talk to them?

19      A.   Yes, I did.

20      Q.   Take statements from them?

21      A.   Yes.

22      Q.   As you were talking to the various

23   family members and friends, did you get

24   fingerprints or blood samples or anything from

25   them for any purpose?

1       A.    We took elimination fingerprints and

2   shoe sizes from each and every one of them.  We

3   only took blood samples from a couple, but we

4   did take elimination fingerprints from

5   everybody.

6       Q.    When you say elimination fingerprints,

7   what does that mean?

8       A.    Set of fingerprints furnished to the

9   police department so you can be either

10  eliminated or identified in a particular

11  investigation.

12      Q.    In other words, if they had developed

13  some prints that were usable, if one of these

14  people turned up to be a suspect, you could

15  compare their prints?

16      A.    That is correct.

17      Q.    Prints, was that fingerprints -- did

18  you also get footprints from some of these

19  people?

20      A.    Right, we took shoe sizes and

21  footprints from each one of these individuals.

22      Q.    Check out blood types on any of them?

23      A.    Yes.

24      Q.    As you were talking to all of these

25  people, did anybody come along who was not

336

1    cooperative?

2         A.    No.

3         Q.    Let me direct your attention to the

4    days and that week ahead.  Did you get any other

5    information on other people to give you

6    additional leads?  Did you ask the Sanders

7    brothers for any assistance?

8         A.    Yes.

9         Q.    Did you get any other names from them?

10        A.    Yes, we did.  They furnished us, since

11   the Allen brothers' house had just recently been

12   completed, we wanted to look at all the

13   construction workers that assisted in the

14   building of the house.  Sanders brothers were

15   able to help us with that.  They furnished us

16   with names of all contractors and

17   subcontractors.

18        Q.    Did you talk to a number of those

19   people?

20        A.    Yes, we did.

21        Q.    Was there a guest list of people who

22   were coming to the studio party?

23        A.    There was a party, they were suppose

24   to have had a party in the recording studio

25   behind the house, if I recall correctly, the day

337

1    or day after they were murdered, I can't recall
2    exactly, but they had sent out invitations to
3    numerous people that were supposed to attend the
4    party, and we did check out as many of these
5    people as we could.
6         Q.    Did any of these leads turn up any
7    suspects?
8         A.    No.
9         Q.    Did you talk to all the brothers, all
10   the Allen brothers?
11        A.    Yes.
12        Q.    The footprints, did you observe the
13   footprints at the scene?
14        A.    Yes, I did.
15        Q.    After you had exhausted all of the
16   friends, family and construction workers, did
17   you make any effort to try to develop some
18   evidence, sock prints that were at the scene?
19        A.    We picked a podiatrist out of the
20   phone book and ran them.   Took some of the
21   tiles off the floor, took them to him and asked
22   his opinion about it, which didn't help us much
23   because we found out later in the homicide
24   office on our own with an ink pad, that once a
25   sock is on a foot, it makes a foot appear a lot

338

1  smaller.  Like a normal size man's foot would
2  appear to be a woman's foot with a sock on it.
3        Q.    How did you figure that?
4        A.    I took my shoes off and took an ink
5  pad and stepped in it and walked around the
6  homicide division.
7        Q.    Up until the point that you did that,
8  what had you -- you are laughing -- had you been
9  looking for a smaller size foot?
10       A.    Yes, we had been looking for a small
11  individual.
12       Q.    Was there any reward offered in this
13  case?
14       A.    Yes, there was substantial award.
15       Q.    How did that come about?
16       A.    It was generated by the family.  I
17  don't remember exactly who put it together, but
18  myself and Sergeant Maxey assisted in setting up
19  a bank account at their bank.   It was a
20  sizeable award.  I don't remember exactly how
21  much it was.
22       Q.    Was anything done to let the public
23  know about that?
24       A.    Our Crime Stoppers division made a
25  bunch of flyers and circulars that were put out

339

1    throughout that area of the city.

2        Q.    They were actually, what, posted in

3    stores?

4        A.    Yes, they were.

5        Q.    What is Crime Stoppers?

6        A.    I think most everybody knows what

7    Crime Stoppers is.

8        Q.    I know, but I have to ask.

9            MR. STAFFORD:   I object to the

10   relevancy, anyway, Your Honor.

11           THE COURT:   Sustained.

12           MR. STAFFORD:   Thank you.

13   BY MS. DAVIES:

14       Q.    You referred to Crime Stoppers.  When

15   you put out this flyer, this reward flyer, if an

16   individual had information, did you give out

17   instructions on what to do?

18       A.    Yes.

19       Q.    What were those instructions?

20       A.    Call Crime Stoppers.

21       Q.    Is there a phone number for Crime

22   Stoppers?

23       A.    Yes, there is.

24       Q.    Has that been a successful technique

25   in getting information on crimes in the past?

340

1          MR. STAFFORD:  I object.

2          THE COURT:  I don't see what the

3    relevancy is.

4          MS. DAVIES:  There have been questions

5    from the defense about, you know, they would

6    never have been able to get a lead, and there

7    were some questions about the same kind of thing

8    I believe from one of the other witnesses.

9          THE COURT:  Sustained.

10   BY MS. DAVIES:

11        Q.   At some point, did you have information

12   that led you to believe that someone other than

13   Brad and Charles Allen's blood was in the house?

14        A.   Yes.

15        Q.   What caused you to form that opinion?

16        A.   Well, because, obviously, from the

17   wounds they sustained during their attack, that

18   they hadn't moved far from where they were

19   attacked.  There was blood in other places in

20   the house that appeared to have just been

21   dropped straight down, like the kitchen.

22        Q.   Did you make any efforts, other than

23   noticing a man at the funeral, any effort to try

24   to locate whether anybody had been treated for a

25   cut around that time?

341

1    A.    Yes, we contacted every hospital that

2    side of town.

3    Q.    Were you successful in getting a

4    suspect in that regard?

5    A.    No.

6    Q.    When you first went to the scene on

7    that first day and saw the physical evidence, at

8    that point, based on your experience as a

9    detective, at that point, that very first day,

10   did you believe this to appear to be a burglary?

11   A.    No.

12   Q.    At some point in your investigation,

13   did you change your mind about that?

14   A.    Yes.

15   Q.    Can you tell us why you changed your

16   opinion?  Or at what point?

17   A.    After I talked to a suspect who ended

18   up being charged in the case.

19   Q.    Prior to talking to the defendant,

20   thinking back to that first week of October, in

21   fact, October 7, did you go back out to the area

22   around Keith Street?

23   A.    Yes.

24   Q.    What was your purpose in going back

25   out to that area at that time?

 1          A.    On the  west side of Keith Street,
 2     where it dead ends, there is a large horse
 3     pasture, probably fifty or sixty acres.   It's
 4     real brushy, has got a lot of brush and stuff.
 5     So I got out and walked this horse pasture
 6     trying to, looking for anything, like maybe the
 7     guy that killed them threw something out while
 8     he was running away.
 9          Q.    Go ahead.
10          A.    While I was out there, the owner
11     caught me out there on his property, wanted to
12     know who I was.   And he got to telling me these
13     stories about this apartment complex on South
14     Shaver, which is just a little bit further west
15     of his horse pasture, all these kids.
16          Q.    Let me interrupt you.   Don't go into
17     things anybody said.   Did you find anything out
18     in that part of town?
19          A.    No.
20          Q.    After your conversation with the owner
21     of the horse pasture, did you go someplace else?
22          A.    Yes.
23          Q.    Where did you go?.
24          A.    Park Hollow Apartments on South
25     Shaver.

1      Q.    What was your purpose in going there?

2      A.    To talk to the manager and maintenance

3    man.

4      Q.    Did you walk around, do any checking

5    around the Park Hollow Apartments?

6      A.    Yes.

7      Q.    Did you talk to a number of people?

8      A.    Yes, I did.

9      Q.    As you are talking to those people,

10   what do you do when you go out like that, do you

11   leave your card?

12     A.    Yes.

13     Q.    And information, let it be known there

14   is a reward or anything like that?

15     A.    Yes.

16     Q.    That was on October 7th?

17     A.    Correct.

18     Q.    Just a few days later -- I want you to

19   think ahead on October the 11th of 1991.  Were

20   you on duty on that day?

21     A.    Yes, I was.

22     Q.    Were you with your partner, Sergeant

23   Maxey?

24     A.    Yes, I was.

25     Q.    Did anything happen -- in fact, were

344

1    you working on this case, on the Allen brothers'

2    murders on that day?

3         A.    No.

4         Q.    Do you recall where you were?

5         A.    I was at Fairbanks North Houston and

6    149.

7         Q.    Working on another case?

8         A.    That is correct.

9         Q.    Did anything happen to call you away

10   from that?

11        A.    We were contacted by the Pasadena

12   police department in regard to this case.

13        Q.    What did you do?

14        A.    Called the homicide division of the

15   Pasadena police department and talked to a

16   Sergeant Massey.

17        Q.    After you talked to Sergeant Massey,

18   did you go to the Pasadena jail?

19        A.    Yes, we did.

20        Q.    Do you recall about what time of day

21   that was?  When did you first hear from Sergeant

22   Massey, if you recall?

23        A.    It was approximately 6:00.  Maybe a

24   little after.  I am not exactly sure.

25        Q.    About what time was it when you got

345.

1    over to the Pasadena jail?

2         A.    Probably about seven o'clock or

3    shortly thereafter.

4         Q.    Both you and Sergeant Maxey?

5         A.    That is correct.

6         Q.    What happened when you got there to

7    the jail?

8         A.    We had been advised prior to going to

9    the Pasadena police department that they had a

10   suspect in custody that might have some

11   information on the Allen brothers murder.

12        Q.    At the point that you went over there,

13   did you have any reason to think that they

14   actually had the killer you were looking for in

15   custody?

16        A.    No.

17        Q.    So what did you do when you got there?

18        A.    We went to the their detective bureau,

19   and they advised us they had this individual in

20   jail that wanted to talk to us.

21        Q.    Was that person there available

22   immediately?

23        A.    No, he was not.  He was still in

24   jail.  They had to go get him for us.

25        Q.    Did they give you an opportunity to

346

1   talk to him?

2       A.   Yes, in one of the interview rooms in

3   their detective bureau.

4       Q.   Was that the first time you had seen

5   that person?

6       A.   That is correct.

7       Q.   Who was in the interview room as you

8   mentioned?

9       A.   Myself, individual we had been called

10   to talk to and Sergeant Maxey.

11       Q.   Did the Pasadena detectives stay in

12   the room with you, in the actual interview room?

13       A.   No, they did not.

14       Q.   What did this person say when you

15   first came into the room?

16       A.   We identified ourselves.

17       Q.   You and Sergeant Maxey?

18       A.   That is correct.

19       Q.   When you say you identified

20   yourselves, what did you tell that person?

21       A.   I am Sergeant Kennedy, this is

22   Sergeant Maxey from the Houston homicide

23   division, and we understood he had some

24   information on a case we were working on.

25       Q.   How did he respond?

1     A.   He said that he did.

2     Q.   What happened next?

3     A.   I asked him what he knew.  And he made

4  some comment like I was there or something like

5  that.

6     Q.   So what did you do?

7     A.   I asked him, "Well, go ahead and tell

8  us what you know."  And he said that he did it.

9     Q.   I mean, what words did he use?

10     A.   That is the way I recall the

11  conversation.  He just said that I did it.

12     Q.   Was that the first point that you had

13  any inkling that you were talking to somebody

14  that was actually going to give a confession?

15     A.   Yes.

16     Q.   What was your expectation when you

17  went to the Pasadena jail?

18     A.   Well, I talked to Massey on the phone,

19  he told me the guy was in jail for burglary.  I

20  thought he might possibly have some information

21  on our murder and wanted to flip one of his

22  friends or something and get a deal on his

23  burglary.

24     Q.   You used the term flip.

25     A.   Turn in somebody.   He wanted to turn

348

1    in somebody for consideration on his case he was

2    in jail for.

3        Q.   Now, when he showed up there in that

4    interview room and said he did it, or words to

5    that effect, what was the first thing you did?

6        A.   I asked him if he wanted to talk about

7    it.

8        Q.   What did he say?

9        A.   He said yes.  He just started talking

10   about it.

11       Q.   What did you do?

12       A.   I had to stop him.

13       Q.   Why?

14       A.   To read him his legal warnings.

15       Q.   When you say his legal warnings, is

16   that what we commonly refer to as Miranda

17   warnings?

18       A.   Correct.

19       Q.   How did you go about giving him those

20   warnings?

21       A.   I read them off a blue card that is

22   furnished to the police department from the

23   District Attorney's Office.

24       Q.   Is that something that you carry with

25   you all the time?

1      A.   Yes, it is.

2      Q.   For the benefit of the jury, would you

3  tell us exactly what you told him?

4      A.   Do you want me to read the warnings?

5      Q.   Yes, sir.  Let me, before you start

6  reading that, let me ask you for the record, for

7  the jury's benefit, who was the person that came

8  into the interview room and told you I did it

9  and you stopped him?

10      A.   It was Mr. Rick Rhoades.

11      Q.   Would you point him out?

12      A.   He is the man sitting here with the

13  white I guess it's plaid shirt, I am not sure.

14      MS. DAVIES:  May the record reflect

15  that this witness has identified the defendant?

16      THE COURT:  It will.

17  BY MS. DAVIES:

18      Q.   Now, would you tell the jury exactly

19  what warnings you gave this defendant?

20      A.   You have the right to remain silent

21  and not make any statement at all and any

22  statement you make may be used against you and

23  probably will be used against you at your

24  trial.  Any statement you make may be used as

25  evidence against you in court.  You have the

350

1    right to have a lawyer present to advise you

2    prior to and during any questioning.  If you are

3    unable to employ a lawyer, you have the right to

4    have a lawyer appointed to advise you prior to

5    and during any questioning.  You have the right

6    to terminate this interview at any time.

7         Q.   What was this defendant's reaction

8    when you read those warnings to him?

9         A.   He stated he understood.

10        Q.   As you talked to him, did he appear to

11   understand, be able to communicate freely with

12   you?

13        A.   Yes.

14        Q.   Did he appear to be intoxicated or on

15   drugs of any kind?

16        A.   No.

17        Q.   Did you offer him a cigarette or

18   anything?

19        A.   Yes, my partner did, Sergeant Maxey.

20        Q.   So after you read those warnings, did

21   he, the defendant, did he change his mind, say,

22   no, I want a lawyer?  What happened?

23        A.   No.   He still wanted to talk about it.

24        Q.   Were y'all still there in that

25   interview room?

351

1 A. Yes.

2 Q. At that point, did the defendant give

3 you information about the killing of the Allen

4 brothers?

5 A. Yes, he did.

6 Q. Did you notice whether he had any

7 injuries?

8 A. He had a cut on his right hand like at

9 the base of the thumb, between the forefinger

10 and thumb.

11 Q. Did he show that cut to you?

12 A. Yes, he did.

13 Q. After you talked to the defendant, in

14 fact, for a period of time, did y'all just sit

15 there and talk about it?

16 A. For a short period of time, yes.

17 Q. At some point did you ask whether he

18 would give you that statement in writing?

19 A. Yes.

20 Q. What was the defendant's reaction?

21 A. He agreed to do so.

22 Q. At first, before you started putting

23 it in writing, can you tell the jury was he

24 describing the details of what had happened?

25 A. Yes, he was.

352

1      Q.    And what was his manner of speaking?

2      A.    He was calm, collected.

3      Q.    Did he ever break down with emotion or

4   anything?

5      A.    No.

6      Q.    When you asked whether he would be

7   willing to put that in writing, what was his

8   response?

9      A.    He agreed to do so.

10     Q.    So what did you do?

11     A.    So we moved over to another room and

12  got a typewriter and started to take the written

13  statement from him.

14     Q.    How did you go about taking that

15  written statement?

16     A.    It's on a form.  We hadn't

17  anticipated taking a confession when we went

18  over there, we didn't take any forms.  We had to

19  use Pasadena police department forms.

20     Q.    You have a special form in the Houston

21  Police Department?

22     A.    They are very similar.  It's the same

23  thing.

24     Q.    What, you have a word processor over

25  at the Houston Police Department?

353

1       A.    Yeah, but I don't know how to use it.

2       Q.    Do you know how to type?

3       A.    Yes.

4       Q.    What did they provide for you at the

5   Pasadena police department?

6       A.    Typewriter.

7       Q.    Typewriter.  So, you said you didn't

8   have your form with you.  What did you do?

9       A.    We used a form that the Pasadena

10  police department uses.

11      Q.    Let me show you what has been marked

12  for identification, a five page document,

13  State's Exhibit 1.  Do you recognize that?

14      A.    Yes, I do.

15      Q.    In reference to the top printed

16  portion, is that the printed portion, is that

17  the form that was provided for you?

18      A.    Yes, it is.

19      Q.    Tell the jury why it is you use a

20  special form when you take a statement.

21      A.    In regard to a confession or witness

22  statements or what?

23      Q.    In regard to a confession.

24      A.    Because it has the rights, the legal

25  rights written on the top again.

1    Q.   So, before you started typing the
2    statement, I think you said you had already read
3    the warnings from your blue card.  Once you got
4    this form and you were going to type the
5    statement, did you do anything in connection
6    with those warnings again?
7         A.   I asked him to read them, but I did
8    not read them to him a second time.
9         Q.   Who did you ask to read them?
10        A.   Mr. Rhoades.
11        Q.   Did you make that form, the warnings
12   that are printed on the first page of State's
13   Exhibit 1, did you put it in front of this
14   defendant so that he could have an opportunity
15   to read it?
16        A.   That is correct.
17        Q.   Did he appear to read it?
18        A.   Yes.
19        Q.   Was there anything about the way he
20   handled himself or anything that he said that
21   would have caused you to doubt whether he was
22   capable of reading?
23        A.   No.
24        Q.   After he read those rights, did you
25   ask him whether he was willing to go ahead and

1     give the statement to you?

2          A.   Yes.

3          Q.   What was his response?

4          A.   Yes.

5          Q.   What did you do?

6          A.   I proceeded in taking the written

7     statement from him.

8          Q.   How do you go about doing that?  Is it

9     question and answer, how do you?

10         A.   It's a little bit of both.  Just ask

11    them what happened, and they start telling you.

12    You ask them questions if you need to clarify

13    something.

14         Q.   Do you try to type the words as the

15    defendant is telling you?

16         A.   Yes.

17         Q.   Five page statement, did you type the

18    entire thing?

19         A.   No, I did not.

20         Q.   Why not?

21         A.   It's a long statement.  Sergeant Maxey

22    typed about half of it, the last portion.

23         Q.   Now, as the three of you are in that

24    room, by the way, did you have a weapon on you,

25    or your partner?  Do you take a weapon into an

356

1  interview room like that?

2       A.   No.

3       Q.   What time was it that you started

4  typing that statement?

5       A.   Approximately eight p.m.

6       Q.   During the entire period of time that

7  you were with this defendant on October 11th of

8  1991, prior to the signing of this statement,

9  did he ever indicate that he wanted to quit

10 talking?

11      A.   No, he did not.

12      Q.   Did he ever ask for an attorney?

13      A.   No.

14      Q.   Did he ever ask for any favors or

15 promises?

16      A.   No, he did not.

17      Q.   Did you ever give him any promises?

18      A.   No.

19      Q.   Or did your partner?

20      A.   No.

21      Q.   Did either you or your partner ever

22 coerce him or threaten him?

23      A.   No.

24      Q.   Use any force against him whatsoever?

25      A.   No.

1    Q.    What was his demeanor throughout the
2    telling and typing of the statement?
3    A.    As I stated before, he was calm and
4    collected.
5    Q.    He never changed?
6    A.    No.
7    Q.    Once you finished typing it, the five
8    pages, or you and your partner finished typing
9    State's Exhibit 1, then what did you do?
10   A.    At that time we asked him to read what
11   we had just typed, make sure that is what he
12   told us, in case he wanted to make any changes
13   or additions.
14   Q.    Did you actually give him all five
15   pages where he could have them in front of him
16   and look at them?
17   A.    Yes, ma'am.
18   Q.    Did he make any change?
19   A.    He made one change.
20   Q.    What was that?
21   A.    I misspelled a name on the first page
22   of the statement, and he corrected it.
23   Q.    In the typewritten portion, is that
24   about five  lines down on that second paragraph?
25   A.    Yes, it is.

1    Q.   Where that correction is made, did he
2  initial that?
3    A.   Those are his initials where the
4  corrections are.
5    Q.   Did he make any other corrections?
6    A.   No.
7    Q.   If he had indicated that anything you
8  had typed on here was wrong, would you have made
9  the change?
10   A.   Yes, I would.
11   Q.   So after the defendant had a chance to
12 look over the statement, then what did you do?
13   A.   We called two Pasadena police officers
14 in to witness the signing of the statement by
15 Mr. Rhoades.
16   Q.   Who was that, do you recall?
17   A.   Sergeant Maxey and another guy's name
18 was Fickessen or something like that.  I may be
19 wrong about that.
20   Q.   Do their names appear on the witness
21 signature line on that five page statement?
22   A.   Yes, they do.
23   Q.   Now, did you and your partner stay in
24 the room while Sergeant Massey and Fickessen
25 witnessed the signing of the statement?

1    A.   No, we did not.

2    Q.   How long were you gone for that to

3    take place?

4    A.   Five, ten minutes, maybe fifteen

5    minutes at the most.

6    Q.   Is that typical, do you usually leave

7    the room?

8    A.   Yes.

9    Q.   Why is that?

10   A.   To let the witnesses who are going to

11   witness the signature be alone with the person

12   who is going to sign the statement.

13   Q.   Does that give them a chance, if you

14   had coerced them, they would have a chance to

15   tell somebody else; is that the idea?

16   A.   Yes.

17   Q.   Is State's Exhibit 1 the statement

18   that you took from this defendant, Rick Allan

19   Rhoades?

20   A.   Yes, it is.

21        MS. DAVIES:  Your Honor, at this time

22   I offer State's Exhibit 1 in its entirety.

23   Tendering it to defense counsel.

24        MR. STAFFORD:  No objection.

25        THE COURT:  State's 1 is admitted.

1            MR. STAFFORD:  Other than what I

2    previously made outside the presence of the

3    jury, without waiving that objection.

4            MS. DAVIES:  Your Honor, may I read

5    State's Exhibit 1 to the jury?

6            THE COURT:  You may.

7            MS. DAVIES:  Omitting the typewritten

8    enumerated warnings at the top of the page.

9            "My name is Rick Rhoades.  I also go

10   by Steven Ray Leland and David Marcas.   I am

11   giving this statement to Sergeant Kennedy in

12   regards to the death of the Allen brothers on

13   Keith Street back on September 13th.  I

14   contacted the police and wanted to tell them

15   about this deal.  They did not call me.

16           "I have been to the joint four times,

17   twice in Indiana and twice in Texas.  It was

18   always for burglary or auto theft, never

19   anything violent.  I got out of the joint on

20   September 12th of this year.  I processed out

21   at the Walls Unit in Huntsville and caught a bus

22   to Houston.  I was in the joint this last time

23   under an alias of David Marcas.  I was suppose

24   to go to a half-way house in Beaumont, but I

25   came to Houston instead.  I took the bus to

                                              361

downtown Houston and then I took a cab to the
southeast area of town.  I was looking for a guy
named Mike that had some clothes of mine in
Pasadena, but I could not find him.  I then
took a cab to La Porte to try and find my
parents.  I called their number, but someone
else answered the phone.  I did not know where
they moved.  When I could not find my parents, I
took a cab back to Pasadena.  I went to the Park
Hollow Apartments on Shaver Road.  I had lived
there before, and it was just a place that I
know.  I got there about seven p.m.  I got a
six-pack across the street from the apartments
and hung out around the pool.  I talked to a few
people for awhile.  I wandered around the
neighborhood for awhile.  I went to the store
at the Pak & Go and got a sandwich.  I played a
few video games and just kind of hung around.
I sat around behind the complex for quite
awhile.  I also located a vacant apartment that
I figured I could spend the night in.  I
probably drank about ten beers during this time,
but I was not drunk.  I was feeling real good
about getting out of prison.  It was a real
nice night, and I was feeling good about being

362

1    out again.   I decided that I would just walk

2    around.   I walked behind the apartment complex,

3    and I think I was on Mize Street.   I walked down

4    the street until it came to another street, and

5    I turned and walked down another street.

6          "I was just walking down the street

7    when I noticed this guy standing in the doorway

8    of his house.   It looked to me like he was

9    locking up for the night.   This was late at

10   night, maybe 2:30 a.m. or so.   I was not

11   looking to steal anything.   I was just walking

12   down the street.   I had over a hundred dollars

13   in my pocket from getting out of the joint.   The

14   guy was tall and brownish hair.   I think he had

15   on underwear, but I am not sure.   When the guy

16   saw me walking down the street, he just folded

17   his arms and started staring at me.   He looked

18   like he had an attitude.   I stopped walking and

19   stared back at him.   I asked him what was up.   I

20   then asked him why he was staring at me.   He

21   asked me what I was looking at and why I was

22   staring at the house.   He then told me that I

23   needed to take my ass on down the road.   I told

24   him that is what I was trying to do but that he

25   was staring at me.   I also told him that he did

363

1       not own the street and that if I wanted to stand

2       there all day I would.  I then told him that if

3       he had a problem he could come on out in the

4       street and we would take care of it.  I did not

5       have any weapons of any kind.  I had just got

6       out of the joint.  When I told him to come

7       outside, the guy ran back in the house.  I

8       thought he was going to get a gun.  When I saw

9       him go back in the house, I ran around back of

10      the house.  I don't know why I ran around

11      back.  I did not try to go in the back door.  I

12      then ran to the back.  I then ran around to the

13      front of the house.  The front door was open,

14      and I went inside.  When I went in the front

15      door, there was a large family room.  The

16      kitchen was back to the right.  I did not see

17      the guy when I went in the house.  I saw a

18      hallway to the left, and I went down the hallway

19      to a bedroom that had the door open.  I noticed

20      a small room with a weight bench in it.    I

21      picked up a small metal bar, and I walked back

22      to the family room.  When I got back into the

23      family room, I could see the guy in the

24      kitchen.  I saw the guy over by the sink.  And

25      he took a knife out of a drawer.  The guy then

364

1    started coming towards me with the knife.  He

2    asked me what the fuck I was doing in his

3    house.  I thought about running out the door but

4    he had me cut off.  The guy came up on me with

5    the knife.  I had the weight bar in my left

6    hand, but I am right handed.  When he got up on

7    me, I hit the guy in the nose with my right

8    hand.  I hit him several times.  We started

9    scuffling in the hallway.  I grabbed his hand

10   that he had the knife in so that he could not

11   stab me.  I cannot remember what hand he had the

12   knife in.  I know that when I grabbed at his

13   hand the first time I grabbed the knife itself

14   and I got cut on the right thumb.  Anyway, we

15   were scuffling around and we ended up in the

16   open doorway to a large bedroom.  I then hit the

17   guy in the head with the pipe that I had.    I

18   hit the guy a couple of times, and he fell on

19   the bed.  I hit the guy a couple more times with

20   the pipe while he was laying there.  When I

21   started hitting the guy with the pipe, he

22   dropped the knife.  The knife fell on the bed,

23   and I picked it up.   I started stabbing the guy

24   then.  I think that I stabbed the guy in the

25   side the first time, but I really don't

1    remember.  I then stabbed him maybe five or six

2    times.  I don't remember everywhere else I

3    stabbed him.  The lights in the bedroom were off

4    and I really don't remember.  I then got off

5    the guy, and another guy came through the

6    bedroom door.  The guy said something, but I

7    don't remember what it was.  This guy was

8    dressed only in his underwear.  The guy then

9    hollered real loud.  I jumped up and I still had

10   the knife in my hand.  The guy started swinging

11   at me, and I started stabbing him.  We went in

12   his bedroom, and I stabbed him some more.  The

13   last time that I stabbed this guy I stabbed him

14   in the leg and the knife went flying out of my

15   hand.

16          "I then walked out of the bedroom, and

17   he slammed the door.  The door to the second

18   guy's bedroom was closed when I first went into

19   the house and got into it with the first guy.  I

20   guess that he heard what was going on and woke

21   up.  The second guy was stronger than the first

22   guy, I know that.  I then walked back into the

23   family room of the house.  I took my boots off

24   and I set them in a small room that is just to

25   the right of the front door of the house.  I

366

1    have been tracked by dogs before, and I thought

2    that they might get the scent off my boots when

3    I ran.  I walked to the back door and thought

4    about going out that way but I saw the alarm box

5    with the lights, so I figured I better not go

6    out that way.  I then went to the kitchen, and

7    the kitchen drawer was open.  I saw the knives

8    in it.  I grabbed one knife, then grabbed the

9    other one.  I knew the last guy was still alive

10   and thought he might come out after me.  That is

11   why I grabbed the knives.  I went back down the

12   hallway, and I could hear the guy in the front

13   bedroom kind of whining.  I could hear the guy

14   in the back bedroom kind of gurgling or

15   something.  I went to the back bedroom, and

16   there were some clothes hanging on something in

17   the room.  I had blood all over me, so I grabbed

18   them.  It was some jeans and some kind of

19   button-up shirt.  There was a wallet in the

20   jeans, and I think there were some keys.  I am

21   not sure, but I think I felt the wallet as I was

22   getting ready to go out the door.  I did not

23   want to take it with me, so I took the money out

24   of the wallet and threw it down there.  I want

25   to say that the money was not the reason this

1    happened.  I walked back to the living room area

2    and I picked up my boots and I walked out the

3    front door of the house.  I do not know at what

4    point I got the blood on my socks, but I saw I

5    was leaving footprints on the driveway.  I

6    remember thinking that the footprints were small

7    and that would throw the police off.  I wear a

8    nine and a half shoe.  I do not remember exactly

9    where, but I put my boots back on sometime after

10    I hit the street.  I do not remember how I did

11    it, but I went through some weeds and ended up

12    at the back of a trailer park.  I think it was

13    somewhere in there I got rid of the keys.  I

14    walked down Smith Street to the Park Hollow

15    Apartments.  I went to one of the abandoned

16    apartments.  I do not remember the apartment

17    number, but it was downstairs.  I got in through

18    a broken window.  I changed into the guy's

19    clothes in a bedroom.  I do not know why I did

20    it, but I put the socks in the little door where

21    the furnace is.  I went out through the front

22    door and left it unlocked.  I went to the

23    dumpster and stuffed the clothes in the

24    dumpster.  I went to another abandoned apartment

25    and went in through the window again.  I spent

1    the night there.  I had also already showered in

2    the first apartment I had been in.  I had to get

3    all the blood off of me.  I got sick while I was

4    in the shower.

5         "I only slept for a few hours.  I

6    guess I got up around nine a.m.  I walked to the

7    back of the apartments and I saw the news

8    trucks.  I just walked around hiding most of

9    the day.  I went to a Chinaman's Restaurant on

10   Shaver sometime that afternoon.  There was a

11   movie on, on Channel 13, and they had a news

12   brief and said that two brothers had been

13   killed.  I did not know until then that the

14   second guy was dead.  I think I left but came

15   back and watched the 5:00 news.  He had the TV

16   up on a little stand, so that is how I saw it.

17        "Later that night, I went back to the

18   first apartment.  I was going to clean the blood

19   up because I knew there had to have been some

20   there.  I was going to get the socks.  When I

21   got there, the window was fixed and the door was

22   locked, so I could not get in.  I spent that

23   night in another apartment.

24        "Since that time, I have just been

25   hanging out wherever I could.  I have been

369

1    selling blood or plasma to live off of.  A few

2    days after it happened, I left my boots

3    somewhere around the apartment.  I was afraid I

4    might have left some boot tracks somewhere at

5    the house.

6            "1 I have not told anyone else about

7    this.  This has been bothering me ever since.  I

8    got arrested last night burglarizing a school.

9    There was only one cop.  I could have gotten

10   away, but I was just tired of running.  Today I

11   decided to tell what happened.  I called for a

12   jailer and told him I wanted to tell something

13   about the Allen brothers getting killed.  He

14   said he could not get hold of a detective at

15   first, then one came down and said something

16   about me wanting to talk about a deputy getting

17   killed.  I told him, no, that I wanted to talk

18   about the Allen brothers.  He told me that it

19   was a Houston case and for me to tell him

20   something so the Houston detectives would know I

21   knew something.  He took down a few notes.  I

22   did not tell him that I had done it.  Sergeants

23   Maxey and Kennedy came tonight, and I told them

24   that I did it.

25            My date of birth is 5/10/64.  I just

370

1    noticed on the other pages that Sergeant Maxey

2    and Kennedy have spelled my middle name

3    A-l-l-e-n.    It is spelled A-l-l-a-n.    I have

4    gotten two GED's in prison as I went in under

5    two different names.    I have been tested as

6    having 140 IQ.

7              Signed by Rick Allan Rhoades."

8         Q.    Sergeant Kennedy, after you finished

9    taking the statement from this defendant -- let

10   me back up and ask you a few questions about

11   that statement.    Did you manage to put every

12   word that this defendant told you in the written

13   statement?

14        A.    No.

15        Q.    When you had been at the scene on 624

16   Keith, was there some sunglasses recovered?

17        A.    Yes, ma'am.

18        Q.    Let me show you what is in evidence as

19   State's Exhibit 32.    Do you recognize those?

20        A.    Yes, I do.    These are the sunglasses.

21        Q.    Do you recall what room of the house

22   those were found in?

23        A.    They were in the front bedroom where

24   Bradley Allen was found.

25        Q.    At the time that you talked to this

1    defendant on October 11, at that point did you

2    have any idea whose sunglasses those were?

3        A.    No.

4        Q.    Or have any idea how they might have

5    gotten into the Allen brothers home?

6        A.    No.

7        Q.    Did the defendant tell you anything to

8    shed some light on that?

9        A.    Yes, he did.

10       Q.    What was that?

11       A.    He told me he had lost his  glasses

12   during the struggle with Bradley Allen, that he

13   had them in his pocket before he had ever gone

14   into the house and when he ran away from the

15   house he realized that the only thing he had

16   left in his pocket was an earpiece.  The

17   sunglasses had broken away from the earpiece and

18   were still inside the house.

19       Q.    So the sunglasses that you recovered

20   or saw there in Brad Allen's bedroom that you

21   have just identified, were they missing an

22   earpiece?

23       A.    Yes.

24       Q.    There were a couple of knives in

25   Charles Allen's bedroom.  Do you remember seeing

372

1    those?

2         A.    Yes, I do.

3         Q.    Let me show you what is in evidence as

4    State's Exhibit 33.   Do you recognize those as

5    the two knives that were on the floor in Charles

6    Allen's bedroom?

7         A.    Yes, they are.

8         Q.    Is that something that you had

9    attempted to process for fingerprints or asked

10   the laboratory?

11        A.    Yes, ma'am.

12        Q.    Did this defendant tell you anything

13   about those knives?

14        A.    He told us that they were bloody and

15   that he had wiped the handles off.

16        Q.    Did the defendant agree to show you

17   some of the places that he had described for you

18   in detailing his activity?

19        A.    Yes, he did.

20        Q.    Did you make arrangements to take him

21   with you after you had finished taking the

22   statement?

23        A.    Yes.   We checked him out of the

24   Pasadena jail in our custody.

25        Q.    Was that still on October 11?

373

1        A.    Yes, it was.

2        Q.    Where was it that you went with this

3   defendant?

4        A.    He took us out on South Shaver.

5        Q.    Now, was this still you and Sergeant

6   Maxey and this defendant?

7        A.    Yes, it was.

8        Q.    What was he going to show you?

9        A.    He showed us the Chinese restaurant

10  where he told us he had eaten and seen the news

11  reports of the murder on TV, showed us the

12  convenient store where he bought the beer that

13  he told us about.  Also took us to the apartment

14  complex where he said he had been staying in the

15  abandoned apartment.

16       Q.    Let me show you what I have marked for

17  identification purposes as State's Exhibits 82

18  and 83.  Do you recognize those two scenes?

19       A.    Yes, I do.

20       Q.    Are those accurate depictions of the

21  location at the Pak & Go and the Chinese

22  restaurant that this defendant showed you?

23       A.    Yes, they are.

24       Q.    Let me also show you what has been

25  marked for identification as State's Exhibits

374

1   84, 85 and 86.  State's Exhibits 84, 85 and 86,

2   are those accurate depictions of the area behind

3   and in the Park Hollow Apartments?

4        A.   Yes, they are.

5        Q.   Is that one of the locations that this

6   defendant took you to?

7        A.   Yes, it is.

8        MS. DAVIES:  Your Honor, I am offering

9   State's Exhibits  82 through 86 to defense

10  counsel and offer them into evidence.

11       MR. STAFFORD:  No objection.

12       THE COURT:  State's Exhibits 82

13  through 86 are admitted.

14  BY MS. DAVIES:

15       Q.   Sergeant, I have an area diagram here

16  that we have marked as State's Exhibit 12.  Do

17  you want to step down here?  Maybe you can see a

18  little better.  Keep your voice up if you

19  would.  Can you point out for us 624 Keith

20  Street?

21       A.   It would be right here.

22       Q.   In fact, we have 624 written here.

23  The defendant, as he gave his statement,

24  describes a route that he took.  He says I

25  walked behind the apartment complex.  Did he

1    show you what apartment complex he was talking

2    about?

3          A.    Park Hollow Apartments right here.

4          Q.    You have to remember to keep your

5    voice up.   There is a rectangle here I am going

6    to mark with a red x on it.   That is the Park

7    Hollow Apartments?

8          A.    Yes.

9          Q.    He stated, "I walked behind the

10   apartment complex.   I think I was on Mize

11   Street."   Can you point out Mize Street for us?

12         A.    Right here.   North and south.

13         Q.    Now, is it possible to get from the

14   back of that apartment complex to Mize Street

15   without going all the way around on the major

16   thoroughfares?

17         A.    Yes.

18         Q.    How could one do that?

19         A.    All you have to do is walk to Smith

20   Street and, obviously, walk to Mize Street.

21         Q.    Can you cut through the back of the

22   apartments here?

23         A.    Yes.

24         Q.    Let me show you State's Exhibit 84.

25   Can you tell us what scene that shows?

1      A.    This is going to the end of the

2   parking lot at the Park Hollow Apartments.

3   Northeast corner right here.

4      Q.    What direction would one be looking?

5      A.    Looking east toward dead end of Smith

6   Street right there.

7      Q.    State's Exhibit 84.   I am going to

8   draw an arrow.   You are looking this direction

9   toward the end of Smith Street; is that correct?

10      A.    Yes.

11      Q.    Now, there appears to be a metal bar

12   along here.   There was something in the

13   defendant's statement about drinking beer.   Was

14   there anything about this area that he pointed

15   out to you?

16      A.    He told us this is where he sat on

17   this rail here and drank beer before the

18   incident occurred.

19      Q.    Talking about this railing right here?

20      A.    Yes.

21      Q.    Right where you can cut through Smith

22   Street.   There appears to be a fence there

23   between these apartments at Smith Street?

24      A.    Yes.

25      Q.    Can you get through there anyway?

377

1        A.     Several places.

2        Q.     Now, State's Exhibits 85 and 86, can

3    you tell us what that shows?  First, 85.

4        A.     85, this is by the same parking lot on

5    the north side of the apartment complex.    He

6    went -- looking at it like this, he went to the

7    left.  If you are looking straight down Smith

8    Street, the rail where he sat and drank beer

9    would be down here.

10        Q.     It's in back of these Park Hollow

11    Apartments?

12        A.     That is correct.

13        Q.     State's Exhibit 85.    What about

14    State's Exhibit 86?

15        A.     Same thing.

16        Q.     Is that going the other direction?

17        A.     Yeah, it's going the other direction.

18    This is going out back.

19        Q.     About how many apartments are in the

20    Park Hollow Apartments?

21        A.     I have no idea.

22        Q.     More than one building?

23        A.     Several different buildings.

24        Q.     Did the defendant point out any

25    particular apartment to you as the one where he

378

1    had showered and changed clothes?

2         A.    Apartment 1102.

3         Q.    In fact, did you go into that

4    apartment with the defendant that night?

5         A.    Yes, I did.

6         Q.    You actually went inside the apartment

7    with him?

8         A.    Yes.

9         Q.    Did you gather any evidence at that

10   time?

11        A.    No, we did not.

12        Q.    Did you take any steps to get evidence

13   from apartment 1102?

14        A.    Yes.

15        Q.    What did you do?

16        A.    The night in question we couldn't get

17   a CSU unit out there where we were because there

18   was too much going on that night.  We made

19   arrangements the next day for CSU officer to

20   meet us out there at daylight, and we collected

21   some evidence.

22        Q.    Do you recall who the crime scene

23   officer was who met you the next day?

24        A.    I know his name.

25             MR. STAFFORD:  You can refresh his

1   memory.

2        Q.    Was it Officer Hilleman?

3        A.    Yes, it was.   Thank you.

4        Q.    Let me show you State's Exhibits 82

5   and 83.   Can you tell us first 83.

6        A.    Shows intersection of Viceroy and

7   Shaver.

8        Q.    Can you show us where that is on the

9   diagram?

10        A.    Right here.

11        Q.    I will write State's Exhibit 82.   And

12   State's.   No, that is wrong.   That was State's

13   Exhibit 83; isn't it?   And State's Exhibit  82,

14   where is that?

15        A.    This is just a frontal shot of the

16   Pak & Go and the Chinese restaurant right here.

17        Q.    What did the defendant point out to

18   you took place at those two locations?

19        A.    He said he ate at the Chinese

20   restaurant and he saw news reports of the

21   murders on TV there, and he purchased the beer

22   that he drank at the Pak & Go.

23        Q.    Now, that diagram makes it appear

24   these locations were virtually across the

25   street, maybe a block away from the Park Hollow

1    Apartments?

2        A.    It's almost directly across the

3    street.

4        Q.    You can have a seat.

5              You said that you had made

6    arrangements for a crime scene unit to go out to

7    apartment 1102.  Did you accompany Officer

8    Hilleman?

9        A.    Yes.

10       Q.    When was that?

11       A.    That was the next morning, on the twelfth.

12       Q.    Were you present when he took some

13   photographs?

14       A.    Yes.

15       Q.    Did he take photographs and recover

16   some evidence from that location?

17       A.    Yes.

18       Q.    Did you make any arrangements to have

19   this defendant's footprints and fingerprints

20   taken?

21       A.    Yes.

22       Q.    What did you do?

23       A.    Well, his fingerprints were readily

24   available.  As far as his footprints, he told us

25   what size shoe he wore.

381

1      Q.    Did you have Chuck Sheldon from the
2  latent print lab take any other prints from the
3  defendant?
4      A.    I did not, no.
5      Q.    Did you take any steps to obtain a
6  search warrant?
7      A.    Yes.
8      Q.    What did you do in that regard?
9      A.    I myself and Sergeant Maxey elicited
10  your help and had a search warrant written up to
11  obtain a blood sample from Mr. Rhoades on the
12  28th of October after he was already transferred
13  over to the Harris County jail.
14      Q.    There was a slight delay in getting
15  the search warrant?
16      A.    Yes.
17      Q.    Why was that?
18      A.    We had a lot of stuff to do.
19      Q.    Did you have that search warrant
20  signed then by the judge?
21      A.    Yes, we did.
22      Q.    And what was the search warrant for?
23      A.    For blood sample.
24      Q.    Why did you want to get a blood
25  sample?

1    A.   So we could compare Mr. Rhoades' blood
2    to the blood that was found inside the kitchen
3    which we believed not to be that of either
4    complainant.
5    Q.   When you were talking to Mr. Rhoades,
6    did he give any indication of what he thought
7    his blood type was?
8    A.   Told me he thought his blood type was A.
9    Q.   After you got the search warrant for
10   his blood, what did you do with that search
11   warrant?
12   A.   We went to the Harris County jail,
13   made arrangements, before we got there, with
14   medical personnel, we brought Mr. Rhoades in
15   from his cell into the medical area or whatever
16   it is, hospital, and then we witnessed them take
17   blood from him.
18   Q.   Were you actually present when the
19   medical technician drew the blood for comparison
20   purposes from this defendant?
21   A.   Yes, I was.
22   Q.   I want to show you -- I have two vials
23   of blood here.  They are contained in plastic
24   envelopes that have been marked as State's
25   Exhibits 36 and 37.  I think you can look

383

1    through the plastic there and look at the

2    labeling on those vials, please.

3        A.   Yes.

4        Q.   Look at both of them, if you will.

5    Have you had a chance to look at those?

6        A.   Yes.

7        Q.   You said that you were present while

8    the medical technician drew the blood.  Whose

9    blood did they draw into those two vials?

10       A.   Mr. Rhoades.

11       Q.   Did you put any markings on these so

12    that you would be able to recognize them in the

13    future?

14       A.   Yes, I put my initials on both of

15    them.

16       Q.   Do you see those on that vial?

17       A.   Yes.

18       Q.   Are there any other identifiers that

19    you put on there so that you would be able to

20    identify these in the future?

21       A.   Yes.  The lab number of this case is

22    put on the vial.  I was there when I turned them

23    over to the lab.  I didn't actually put the

24    number on them.

25       Q.   You wrote your initials on them?

384

1     A.    Correct.

2     Q.    And the lab technician, there is a

3 name written on there?

4     A.    Yes.

5     Q.    Do you see that?  Who wrote the name

6 Robert Rhodea on there?

7     A.    The technician in the Harris County

8 jail that actually took the blood.

9     Q.    When you put your initials on these

10 vials, did you notice that the technician had

11 written an incorrect name on there?

12     A.    No.

13     Q.    What did you do with the two vials of

14 blood as soon as this defendant's blood was

15 drawn and placed in these two vials?

16     A.    We left the Harris County jail and

17 went directly to the Houston Police crime lab

18 and turned them over to crime lab personnel.

19     Q.    Did you keep these two vials of blood

20 that are contained in the envelopes marked

21 State's Exhibits 36 and 37 in your care, custody

22 and control from the time they were handed to

23 you in front of Mr. Rhoades at the jail until

24 the time you got to the laboratory?

25     A.    Yes.

385

1    Q.    Did you permit anything to happen to

2    those to change the contents?

3    A.    No.

4    Q.    In fact, how long was it from the time

5    you got this blood into your hands until you

6    went to the laboratory?

7    A.    As long as it took to drive from the

8    county jail down here to downtown police

9    station, maybe five minutes at the most.

10   Q.    What did you do with these two vials

11   of blood when you got over to the laboratory?

12   A.    I turned them over directly to the lab

13   technician in the Houston crime lab.

14   Q.    Did you give the lab technician any

15   information as to which case these belonged to?

16   A.    Yes, I filled out a form.

17   Q.    A submission form?

18   A.    Yes.

19   Q.    In fact, did you already have a case

20   number and a laboratory number in connection

21   with this case?

22   A.    I didn't have a lab number.   I had

23   the case number.

24   Q.    Had laboratory work been done on this

25   case?

386

1     A.   Yes.

2     Q.   What is the case number on this case,

3  do you know that?

4     A.   Not off the top of my head, no.

5     Q.   I just handed you what is commonly

6  referred to as a blue back.  What is that?

7     A.   This is the Houston Police offense

8  report.

9     Q.   When you start the investigation on a

10  case, do you have a case number?

11     A.   Yes.

12     Q.   What is the case number that you got

13  when you started the investigation on the Allen

14  brothers case?

15     A.   97682691.

16     Q.   97682691?

17     A.   That is correct.

18     Q.   So, when you took the two vials to the

19  laboratory, did you advise them that that was

20  the case number, your case number?

21     A.   Yes.

22     Q.   And they in turn have their own unique

23  lab number that is related to that case number;

24  is that correct?

25     A.   That is correct.

387

1    Q.    Once you turned those two vials over
2  to the laboratory, did you have anything more to
3  do with any testing or handle that piece of
4  evidence again?
5    A.    No, I did not.
6    Q.    You indicated that this defendant had
7  showed you a cut on his hand.  Have you been
8  able to locate for me any photographs of that
9  cut?
10    A.    I have not.
11    Q.    Based on your recollection of the
12  appearance of that cut and based on your years
13  of experience as a homicide detective, was the
14  cut that you saw on this defendant's hand, was
15  it consistent with -- well, let me back up.  Let
16  me withdraw that question and ask you this.
17  You had been at the scene.  You had seen the
18  amount of blood at the scene.  Based on your
19  years of experience in investigating homicides,
20  would you expect the person who inflicted the
21  wounds that you saw on Charles and Bradley
22  Allen, would you expect them to have much blood
23  on them?
24    A.    Yes.
25    Q.    Blood on their hands?

1          A.    Yes.

2          Q.    The wounds that you saw on this

3     defendant or the cut on his hand that he showed

4     you, let me show you what is in evidence as

5     State's Exhibit 26.   The cut that he had on his

6     right hand, would it have been consistent with

7     someone with a wet, bloody hand as they are

8     stabbing, their hand slipping on the blade of

9     the knife and getting cut?

10         A.    Yes.

11         Q.    Would it also be consistent with

12    somebody grabbing a knife out of somebody else's

13    hand?

14         A.    It's possible.

15         Q.    Based on the evidence you saw at that

16    scene, in your experience which do you think is

17    more consistent?

18              MR. STAFFORD:   That is basically

19    self-serving to the State.   It could be equally

20    well to me, and I object to the speculation.

21              THE COURT:   To the speculation, I will

22    sustain.

23    BY MS. DAVIES:

24         Q.    My question is which is more

25    consistent?

389

1           MR. STAFFORD:  Still speculation.

2           THE COURT:  I still sustain the

3      objection.

4      BY MS. DAVIES:

5           Q.   Sergeant Kennedy, let's go back to the

6      scene.

7           THE COURT:  Ladies and gentlemen, we

8      are going to take a recess.  Please go to the

9      jury room.

10          (Recess; after which, the following

11     proceedings were had:)

12          THE COURT:  Proceed, please.

13          MS. DAVIES:  Thank you, Your Honor.

14          Q.   Sergeant Kennedy, I want you to help

15     us understand what it was you saw out there at

16     the scene on September 13 of 1991.  Actually I

17     think it's going to be a little easier if you

18     would come around here by this diagram.  Move so

19     the jury can see.  Now, let's first look at

20     State's Exhibit 57.  Actually we have several

21     photographs here, 57, 58, 59, 60, 61 and 62.

22     All appear to be scenes around the driveway.

23     Now, the driveway is not drawn on this

24     diagram.  Can you show us what portion, where

25     it would be in relation to the front of the

                                                  390

1   house?

2       A.   Coming straight off the side of the

3   house.

4       Q.   I know the court reporter can't hear.

5       A.   It's on the west side of the house

6   here, straight to Keith Street.

7       Q.   Now, first you have got State's

8   Exhibit 57.  What portion of the driveway does

9   that show, or what does that show?

10       A.   This actually is not the driveway.

11   This is a sidewalk from the front door, comes

12   around to the west to the driveway.  The front

13   door would have been right here.

14       Q.   You're showing on the photograph

15   State's Exhibit 57?

16       A.   Yes.

17       Q.   Actually you were turning it.  It

18   would probably be very helpful.  So, if one was

19   looking at this photograph, State's Exhibit 57,

20   it would be where?

21       A.   You would be standing here on the

22   driveway looking back to the east.  The front

23   door would be right here.

24       Q.   Let's put State's Exhibit 57 there

25   with an arrow back that direction.   Is there

1    anything obvious on that photograph or anything

2    that caught your attention when you were

3    investigating the scene?

4         A.    It's hard to see.  Footprints coming

5    out the front door, down the sidewalk and out on

6    the driveway.   Bloody footprints.

7         Q.    Now, did you look at those just with

8    your naked eye?

9         A.    Yes.

10        Q.    Were you able to tell just by a visual

11   examination did those appear to be made by

12   somebody wearing a shoe or barefooted or someone

13   wearing socks?

14        A.    They appeared to be made by someone

15   wearing socks.  You could see the fabric in the

16   bloodstain.

17        Q.    State's Exhibit 58.   Can you tell us

18   what scene that shows?

19        A.    This is the driveway that runs along

20   the west side of the house.  This would be the

21   sidewalk that goes to the front door.  This is

22   Keith Street out here.  And kind of hard to see

23   again.  You can see the bloody footprints coming

24   down the sidewalk on out the driveway to the

25   street.

1          Q.    So, if one was looking at State's
2    Exhibit 58, you pointed in this area, would you
3    be looking toward Keith Street?
4          A.    Yes.
5          Q.    With an arrow in the direction you
6    would be looking.  Does this photograph also
7    show footprints?
8          A.    Yes, it does.
9          Q.    Or, again, sock prints?
10         A.    Yes.
11         Q.    In fact, is that the way all the
12   prints at the house appeared to be that morning?
13         A.    Yes.
14         Q.    Anywhere in the entire scene, inside
15   or out, did you observe any bloody prints that
16   appeared to be made by somebody wearing shoes?
17         A.    No.
18         Q.    Or by anybody who was barefooted?
19         A.    No.
20         Q.    You indicated there were bloody
21   footprints on this driveway.  What direction
22   were those prints leading?
23         A.    North.
24         Q.    Was that toward the house or away from
25   the house?

393

1        A.    Away.

2        Q.    State's Exhibit 59, what does that

3   show?

4        A.    This is the close-up of the bloody

5   prints.   This is the driveway.   Prints head

6   north to the street.    I am not sure of what

7   portion of the street.

8        Q.    Is that a closer up of State's Exhibit

9   58?

10       A.    Yes.   I am not sure which area it is.

11  It appears to start right here.

12       Q.    Are those footprints leading away from

13  the house?

14       A.    Yes, they are.

15       Q.    This is also you are saying would be

16  on the driveway heading the same direction?

17       A.    Yes.

18       Q.    Look at State's Exhibit 60.   Can you

19  tell us where that picture is taken?

20       A.    This picture has been taken from north

21  to south like you are standing on the street out

22  here, taking the picture down the driveway.

23       Q.    Still a picture of the driveway, though?

24       A.    Yes.

25       Q.    Just the opposite direction.   Are the

                                                  394

1    footprints visible in that photograph?

2         A.   Yes, they are.

3         Q.   I noticed there appears some trash and

4    debris here.  Do you recall where that was

5    located at the house?

6         A.   Down here on the west side of the

7    driveway on the far west side of the property

8    line over here like utility toward the house was

9    recently built, and this was construction trash.

10        Q.   Was this nearer the street, the

11   construction trash?

12        A.   Yes.

13        Q.   State's Exhibit 61, can you tell us

14   where that was taken?

15        A.   It's another portion of the driveway.

16   It would be heading away from the house.  I am

17   not sure exactly where it is.

18        Q.   61 looking, is it still toward the

19   street?

20        A.   Yes.

21        Q.   Just another portion of the driveway.

22   And can you tell us what State's Exhibit 62 is?

23        A.   That is a close-up of the bloody

24   footprint.  You can see the fabric detail in it.

25        Q.   I notice there is a ruler in that

1   photograph, State's Exhibit 62.  Did this appear
2   to be taken on the driveway also?
3       A.   Yes.
4       Q.   What is this, just the ruler here, is
5   that something somebody laid out next to that
6   print?
7       A.   Assume Officer Jordan or somebody at
8   the crime lab did that to get the size of the
9   footprint.
10      Q.   At some point in your investigation
11  out there, did you actually measure the distance
12  between the prints on that driveway?
13      A.   My partner, Sergeant Maxey, did.
14      Q.   And what was the purpose in doing
15  that, do you know?
16      A.   We had hoped we could determine the
17  size of the person by his stride.
18      Q.   His stride, the distance between the
19  foot steps?
20      A.   Yes.  We didn't have much luck with
21  that.
22          MS. DAVIES:  Your Honor, at this time
23  may we pass State's Exhibits 57 through 62 to
24  the jury?
25          THE COURT:  You may.

396

1            MS. DAVIES:  Your Honor, at this time

2     -- I think we failed to pass these yesterday

3     when they were identified.  If I can, I would

4     like to also at the same time pass the tiles and

5     the impressions of the defendant's foot that

6     were offered into evidence.

7            THE COURT:  The tiles are State's

8     Exhibit 42.

9            MS. DAVIES:  And the two impressions

10    of the defendant's left foot, 53 and 54.

11        Q.    Sergeant Kennedy, let me show you

12    State's Exhibit 63.  Can you tell us what room

13    that shows?

14        A.    This is a shot of the room where the

15    piano is like standing in the living room.  Side

16    of the porch looking back to the area here.

17        Q.    Looking through this doorway here?

18        A.    Correct.

19        Q.    63 looking into the piano room?

20        A.    Yes.

21        Q.    And there is, looks like there is

22    carpet area and a hard floor area.  Where would

23    the hard floor area be?

24        A.    Right here.

25        Q.    The entry hall?

1    A.    Yes.

2    Q.    And then look at State's Exhibit 64.

3    Tell us what room that shows.

4    A.    That is the living room.

5    Q.    What direction would that be looking,

6    would you show us?

7    A.    Basically looking from southwest to

8    northeast.  Here is the room that leads, hallway

9    to the two bedrooms.  This door right here.  If

10   you were standing in this corner of the room

11   looking in this direction.

12   Q.    Let me be sure I understand.  State's

13   Exhibit 64 would be taken from this direction;

14   am I right?

15   A.    Correct.

16   Q.    Looking across the room?

17   A.    Correct.

18   Q.    And there is a door right here.  Is

19   this the doorway leading where?

20   A.    To the hallway which leads to the

21   bedroom.

22   Q.    State's Exhibit 65.  What portion of

23   what room does that show?

24   A.    This is also a shot in the living room

25   of the sofa area.  Where the tennis shoes are is

398

1    right to the entrance to the kitchen.

2        Q.    Looking toward the kitchen, breakfast

3    room area?

4        A.    Yes, ma'am.

5        Q.    This living room area had carpet on

6    it; is that correct?

7        A.    Yes.

8        Q.    So when we see a change in flooring on

9    these pictures, the carpeted area is going to be

10   the living room?

11       A.    Yes.

12            MS. DAVIES:    Your Honor, with the

13   court's permission, I will just show these

14   photographs to the jury.

15       Q.    The areas that are shown in these

16   photographs, Sergeant Maxey, was there

17   significant bloodstains that you noticed on the

18   carpet on the floor?

19       A.    Yes.

20       Q.    Back up then.    Show us where.    Where

21   did you see on the floors in these photographs

22   bloodstains?

23       A.    Looking leading from this door over to

24   the foyer area.

25       Q.    I'm sorry, I couldn't hear you.

1    A.    They led from the door that leads to

2  the hallway, around the sofa into this area

3  where the foyer and the piano is.

4    Q.    Now, as I look at that photograph,

5  it's not easy for me to see that.   Do you see

6  it on the photograph?

7    A.    No, I cannot.

8    Q.    Are you telling us that out at the

9  scene, though, you could see, what, just like

10  bloody footprints?

11    A.    Yes.

12    Q.    Was the blood as easily visible in

13  those prints as it was in the other, say, for

14  instance, the ones that you have showed us on

15  the driveway?

16    A.    No.

17    Q.    Let's look at State's Exhibit 66.   Can

18  you tell us what room that is taken in?

19    A.    This is in the weight room.

20    Q.    Hold that up for me.

21    A.    This is a picture of the weight bench

22  right here and window behind it.

23    Q.    So, State's Exhibit 66, what direction

24  would one be looking in that photograph?

25    A.    North.

400

1          Q.    And what is State's Exhibit 67 a

2     picture of?

3          A.    I think that is a picture of the

4     bathroom.

5          Q.    This hall bathroom?

6          A.    Yes.

7          Q.    State's Exhibit 67?

8          A.    Yes.

9          Q.    Would that be looking from the hall

10     toward the wall or toward the side of the house?

11          A.    Yes, it would.

12          Q.    Look at 68 and 69.  Tell us what rooms

13     those are.

14          A.    This was the back bathroom back here.

15          Q.    The master bath?

16          A.    Yes, it is.  This is the tub right

17     here.

18          Q.    That is 69?

19          A.    Right.

20          Q.    What is 68?

21          A.    This is the lavatory.

22          Q.    Lavatory.

23          A.    Sink.

24          Q.    Was there a mirror over that lavatory?

25          A.    Yes, there is.

401

1    Q.    Part of the room is reflected in the

2    mirror; is that correct?

3    A.    Yes, it is.

4    Q.    Again, with the court's permission and

5    your assistance, if you will hold these two of

6    the master bath, 68 and 69, I will hold the

7    pictures of the weight room and the hall bath,

8    and we will show those to the jury.

9    When you looked in the weight room,

10   did you see any blood or any significant

11   evidence in that room?

12   A.    No.

13   Q.    Were the weight bars and weight

14   equipment in that room?

15   A.    Yes, there were.

16   Q.    When you looked in the master

17   bathroom, did you see any signs of blood or

18   struggle or any evidence of significance in

19   there?

20   A.    No.

21   Q.    What about this hall bathroom?  Did

22   you see anything of significance in there?

23   A.    There were a few specks of what

24   appeared to be dried blood on the carpet right

25   in front of the sink.

1      Q.    Just a few specks?

2      A.    Right here on the floor.

3      Q.    Stand back, be sure the jurors over

4    here can see.  I know we have too many people in

5    too small a space.

6      A.    Right here on the carpet right in

7    front of the sink.

8      Q.    Compared to the quantity of blood in

9    the other portions of the house, was this

10   considerably less, or how would you characterize

11   it?

12     A.    Just a couple of little flecks.

13   Almost insignificant, but I did find them there

14   on carpet.

15     Q.    And they were dried?

16     A.    Yes, they were.

17     Q.    Now, I think you had indicated, that

18   when you first went into the house, the door to

19   Brad's room you could not open?

20     A.    No.

21     Q.    Is that correct?  Let me show you --

22   what does State's Exhibit 70 show?

23     A.    That is a picture of the door right

24   here.

25     Q.    From what location?

403

1      A.   From the hallway.

2      Q.   Is that before anybody actually opened

3   that door?

4      A.   Yes.

5      Q.   State's Exhibit 70.   Would you

6   describe for the jury what it was you saw on

7   that closed door?

8      A.   Blood.

9      Q.   Was there blood on the wall?

10     A.   Yes, there was.

11     Q.   What about on the floor?

12     A.   Yes, there was.

13     Q.   Which window was it that you went in

14   to get into Brad's room?

15     A.   There were three windows on the north

16   wall of the room.   I don't remember exactly

17   which one I broke.   I broke one to get in.

18     Q.   Once you were inside, can you tell us,

19   looking at State's Exhibit 71, what area of the

20   room that shows?

21     A.   This is chest-of-drawers right here.

22     Q.   What direction is that looking?

23     A.   Taken from like this wall looking back

24   to the north.

25     Q.   That is 71.   State's Exhibit 72, can

1    you tell us where that shot was taken?

2         A.    Taken right here.

3         Q.    And 73?

4         A.    Same area, different direction.

5         Q.    State's Exhibit 73, does that show the

6    inside of the door that was closed to Brad's room?

7         A.    Yes, it does.

8         Q.    Does that also show some glasses?

9         A.    Shows two pair of glasses.

10        Q.    Keep your voice up for all the jurors

11   and the court reporter.

12        A.    Shows a pair of prescription glasses

13   up here on top of a chest-of-drawers and pair of

14   sunglasses on the floor.

15        Q.    The sunglasses that are on the floor,

16   are those the broken sunglasses that you

17   identified for us earlier?

18        A.    Yes, they are.

19        Q.    State's Exhibits 74 and 75 and 76.

20   Can you tell us what areas those are?

21        A.    These are the pictures of the body of

22   Bradley Allen in the same room.

23        Q.    From different angles?

24        A.    Yes.

25        Q.    State's Exhibit 75, does it also show

405

1    a weapon?

2         A.    Shows a knife laying on top of the bed

3    here.

4         Q.    Is this it right here?

5         A.    Yes, it is.

6         Q.    I am going to circle it.    Let me show

7    you this knife.    Is this the knife that is shown

8    in those photographs that you found there on the

9    bed by Brad?

10        A.    Yes, it is.

11        Q.    Can you tell us, based on your

12   experience, whether a knife such as this State's

13   Exhibit 29, if it's used to stab someone such as

14   Bradley Allen was stabbed, is this in your

15   opinion a deadly weapon?

16        A.    Yes, it is.

17        Q.    Is a knife such as this capable of

18   causing serious bodily injury and death?

19        A.    Yes.

20        Q.    Is this knife bent?

21        A.    Yes, the blade is bent.

22             MS. DAVIES:    Your Honor, I would ask

23   that State's Exhibits 70 through 76 be passed to

24   the jury.

25             THE COURT:    They may be.


                                                    406

BY MS. DAVIES:

Q.   Sergeant Kennedy, Brad Allen was still crouched there by, kneeling there by the door when you went into the bedroom; is that right?

A.   Yes, he was.

Q.   According to the pictures, there appears to be a pillow that he was clutching?

A.   Yes.

Q.   Did you see his injury in terms of near the pillow that he was clutching?

A.   Yes.

Q.   What is your observation?

A.   He had a large wound to his mid section or side.

Q.   Was there anything protruding from that wound?

A.   His intestines.

Q.   In the hallway outside of Bradley Allen's room, can you tell the jury what you observed?

A.   Well, the carpet, there was blood on the carpet.   The walls were just covered with blood and pieces of human tissue.   I don't know whether they were skin, intestines, whatever, just meat basically were on the walls here.

1      Q.    In a minute we will look at this
2   video.   Are there some scenes on the video that
3   depict accurately what you saw on the walls in
4   the hallway?
5      A.    Yes.
6      Q.    When you went into Charles Allen's
7   room, looking at State's Exhibit 77, without
8   showing it yet, 78, can you tell us first what
9   portion of the room does State's 77 show?
10      A.    This is a shot of here.   This is a
11   shot of the bed and the body of Charles Allen
12   taken from west to east, this direction.
13      Q.    That would be State's Exhibit 77
14   looking toward the foot of the bed; is that
15   correct?
16      A.    That is correct.
17      Q.    Now, there is in the photograph here,
18   in the picture there is something drawn here.   I
19   think it says tripod, sound system.   Is this
20   tripod shown in the photograph, State's Exhibit 77?
21      A.    Yes, it is.
22      Q.    Was that near Charles' head?
23      A.    Yes.
24      Q.    Do you know what that is?
25      A.    I don't know what -- this is like a

1    rack of keyboard and stuff.   Musical

2    instrument.

3         Q.   The apparatus near Charles' head for

4    musical instruments, is that also shown in

5    State's Exhibit 78?

6         A.   Yes, it is.

7         Q.   And now tell us what direction State's

8    Exhibit 78 is taken from.

9         A.   It's another shot of the bed and body

10   taken from this direction.   Northwest and

11   southeast.

12        Q.   This direction?

13        A.   Yes.

14        Q.   Let's write 78 there.   Here in the

15   lower right-hand corner of 78, there is

16   something sticking up.   Can you tell me what

17   that is?

18        A.   Neck of a guitar.

19        Q.   Where in the room would that guitar be?

20        A.   Sitting on a stand right next to the

21   north wall of the bedroom.

22        Q.   If I write guitar right here, would

23   this be the area where the guitar is?

24        A.   Yes.

25        Q.   It was upright in a stand?

1      A.    Yes.

2      Q.    Was there more than one guitar in the

3    room?

4      A.    There was another guitar and another

5    stand right here by this one, but this second

6    guitar was lying on the side like it had been

7    knocked out of the stand.

8      Q.    One upright and one laying on the side?

9      A.    Yes.

10     Q.    Is the second one lying on the side

11   shown in these photographs of the bedroom?

12     A.    No.

13     Q.    When we look at the video, will you be

14   able to point it out for us?

15     A.    Yes.

16     Q.    There were two guitars right over

17   here; is that right?

18     A.    Yes.

19     Q.    Tell us what portion of the room

20   State's Exhibit 79 shows.

21     A.    Another shot of the bed and body taken

22   from behind the keyboard rack in this direction.

23     Q.    This direction?

24     A.    Yes.

25     Q.    And are there some weapons shown on

1    the floor?

2        A.   Yes, two knives, a dumbbell bar or

3    weight set laying here at the foot of the bed.

4        Q.   And are those items, this weight bar

5    State's Exhibit 31?

6        A.   Yes.

7        Q.   And these two knives that are in

8    evidence as State's Exhibit 33?

9        A.   Yes, they are.

10       Q.   Was there another weapon found in

11    Charles' room?

12       A.   Yes, there was.

13       Q.   What was that?

14       A.   The second what appeared to be weight

15    bar found underneath his body on top of the bed.

16       Q.   In this location?

17       A.   Yes.

18       Q.   But under the body?

19       A.   Yes.

20       Q.   Do you see that weight bar in the

21    photograph, State's Exhibit 80?

22       A.   Yes.

23       Q.   Let me give you -- take this little

24    red arrow, if you would, and try to place it

25    where you don't cover up anything.

1      A.   It's a little difficult to see, but
2   it's right under the right forearm.
3      Q.   So you have placed a red arrow on the
4   photograph State's Exhibit 80 to denote where
5   that weight bar is?
6      A.   Yes.
7      Q.   I believe that was State's Exhibit
8   30.  Tell us what the last photograph is,
9   State's Exhibit 81 is?
10     A.   This is a picture of this corner of
11  the bed taken from this direction.  Shows the
12  wallet, the barbell and the two knives.
13     Q.   Taken this direction pointing up this
14  way?
15     A.   Well, here.
16     Q.   Okay.  That is 80; is that correct?
17     A.   81.
18     Q.   81.  Thank you.  I believe the one
19  that you pointed out the barbell was State's
20  Exhibit 80.
21          Now, you mentioned a wallet on the
22  floor.  In this photograph it shows the wallet.
23  And where on the diagram, State's Exhibit 10, is
24  that wallet?
25     A.   This is the wallet, the brown wallet.

412

1 Blue checkbook laying relatively close to each

2 other.

3   Q. Was there any money at all in the

4 wallet?

5   A. No, there was not.

6   Q. Was there any identification or credit

7 cards?

8   A. Charles Allen's wallet had credit

9 cards and driver's license in it.

10   MS. DAVIES:  Your Honor, I would ask

11 that State's Exhibits 77 through 81 be passed to

12 the jury.

13   MR. STAFFORD:  I would like to suggest

14 to the court to instruct the jury for those

15 members who wish not to view these pictures at

16 this time can elect not to.

17   THE COURT:  There is nothing to

18 prevent the jury from passing them on if they

19 wish to do so.

20   MR. STAFFORD:  I ask if they do not

21 want to view them.

22   THE COURT:  They are being passed to

23 the jury.  Please pass them to the jury.

24   That includes 77 through 81, Ms.

25 Davies?

413

1    MS. DAVIES:  Yes.

2    THE JUROR:  Could you move the diagram

3  up a little closer, please?

4  BY MS. DAVIES:

5    Q.    Sergeant, I want to call your

6  attention to these two weight bars, State's

7  Exhibits 30 that you pointed out was found under

8  Charles' body and State's Exhibit 31 that was on

9  the floor.  If either one of these bars were

10  used to hit someone in the head the way Charles

11  Allen was struck in the head, would either one

12  of these bars be capable of causing serious

13  bodily injury or death?

14    A.    Yes.

15    Q.    Would they be deadly weapons?

16    A.    Without a doubt.

17    Q.    These two knives, State's 33, that

18  were found on the floor in Charles Allen's room,

19  would either of these knives be capable of

20  causing serious bodily injury or death?

21    A.    Yes, they would.

22    Q.    Would they also be deadly weapons?

23    A.    Yes, they would.

24    Q.    Let me show you what I have marked for

25  identification purposes as State's Exhibit 88.

414

1    Would you look at that?  Tell us whether you

2    recognize that.

3         A.   Yes, it's the wallet of Charles Allen.

4         Q.   Is that the wallet that you described

5    as being on the floor in his room?

6         A.   Yes, it is.

7         MS. DAVIES:  Your Honor, I am

8    tendering State's Exhibit 88 to defense

9    counsel.   I would offer it into evidence.   I

10   would ask for the record to be permitted to

11   substitute a photograph.

12        THE COURT:  Any objection?

13        MR. STAFFORD:  No, Your Honor.  Well,

14   just a minute.  Yes, Your Honor.

15        (Off-the-record bench conference).

16        MS. DAVIES:  At this time I would like

17   assistance in moving the TV over closer.

18        THE COURT:  Is there going to be any

19   narration?

20        MS. DAVIES:  I will have some

21   questions for Sergeant Kennedy while it's going

22   on.

23        Q.   Sergeant Kennedy, do you want to use

24   this control so that I can -- is there any sound

25   to this?

415

1      A.    No.

2            (Video being shown)

3  BY MS. DAVIES:

4      Q.    What street is that?

5      A.    Keith Street.  That is the driveway

6  leading to the house, Allen brothers' house.

7            I think this is attempting to show you

8  the bloody footprints, but they are not coming

9  out very well on this video.

10     Q.    Do they show up better in the still

11 photographs?

12     A.    Yes, they do.

13     Q.    Who was taking this video?

14     A.    Officer Jordan.

15     Q.    Do you know what those boxes are

16 sitting out there?

17     A.    That is part of the construction trash

18 that was on the west side of the driveway.

19            That is the front door of the house.

20            That is the sidewalk that leads to the

21 driveway.

22     Q.    What is that?

23     A.    Ever now and then I can pick up one of

24 the bloody prints in the video, but they are

25 really kind of hard to see.  That is a good

416

1       one.

2               Q.    Leading toward the street?

3               A.    They are a little bit better defined.

4       They are leading north toward the street.

5               Q.    Are those police cameras out in the

6       street?

7               A.    No, those are news media.

8                     Close-up of the same footprints.

9                     That is the front door of the house

10      here.

11                    This is the back of the house.    That

12      is the back door that leads into the kitchen.

13                    That right there is the sound studio

14      located in the rear of the house on a vacant lot

15      behind the house.

16                    This is Charles' truck, and Brad had a

17      motorcycle parked back there.

18                    This is the rear of the house near

19      Brad's motorcycle.

20                    This is Jordan running with the

21      camera.

22                    This is the sidewalk that leads to the

23      front door again.

24                    Some more shots of the footprints

25      going out to the driveway.

                                                          417

1    Q.   What room of the house are we in now?

2    A.   This is Charles Allen's bedroom.   This

3    is his bed and this is his body.

4    Q.   Is all that sound equipment there?

5    A.   Yes.

6    Q.   What is that against the wall?

7    A.   That is all his musical equipment.

8         This is the door that leads into the

9    bathroom.

10   Q.   What is that?

11   A.   That is a bunch of his personal papers

12   and belongings that hadn't been unpacked.

13   Q.   Where does that door lead?

14   A.   From Charles' bedroom to the backyard.

15   Q.   Stop.

16   A.   Okay.   This is the doorway that leads

17   to the hall to Brad's room.

18   Q.   Now, what is -- the picture is kind of

19   shimmying as you stop.   Can you tell us what

20   that is?   What are we seeing right there?

21   A.   Blood spatters.

22   Q.   On the diagram, can you show us where

23   those blood spatters are?   Using this red

24   marker.   Just the section of the wall, if you

25   can.

418

1        A.    Right here.

2        Q.    Okay.   Now, start it up again.   Do you

3   get to see that second guitar you were telling

4   us about?   Point it out to us.

5        A.    This is the guitar stand that it was

6   on.   I think this is the neck of the guitar

7   here.   Now you can see it a little better.

8        Q.    That music rack right there, were

9   there blood spatters there?

10       A.    Yes.

11       Q.    What, on the wall in Charles' room?

12       A.    Yes, there were splatters on the wall

13   behind the headboard.

14       Q.    Is this the way the covers were on the

15   bed?

16       A.    Yes.   This is the guitar.   This is the

17   guitar laying on the floor.

18       Q.    Is there blood on both of those

19   pillows?

20       A.    Yes, there is blood all over the bed.

21       Q.    Blood on the carpet.   Is that the

22   doorway of Charles' room leading to the hall?

23       A.    This is the doorway that leads to the

24   hall down to Brad's room.

25       Q.    Now, in comparison to the amount of

419

1    blood that was in the doorway, is there any

2    significant amount of blood on the carpet

3    otherwise in Charles' room?

4           A.    No, not like there was in the

5    doorway.

6           Q.    Who is that?

7           A.    I don't know.   This is the weight bar.

8           Q.    What is that near Charles' foot?

9           A.    Looks like a clock radio.

10          Q.    Stop.

11          A.    This is the hallway.   This is the

12   hallway wall.   This is the entrance to the

13   bathroom.

14          Q.    I want you to show us on the diagram

15   where this blood is.

16          A.    Located right here in this area.

17   Closer to the door but in this area here.

18          Q.    Close to the hall bathroom door?

19          A.    Right.   In this direction.

20          Q.    Okay.   That is on the same wall?

21          A.    Yes.

22          Q.    Is there anything in that little box

23   there on that vanity?

24          A.    No.

25          Q.    Was it empty?

1      A.    I don't know.   I do not know whether

2  anything was in there.

3      Q.    Are we getting to the area where there

4  are little specks of blood?

5      A.    Yes, this is the inside of the hallway

6  bathroom.   Really nothing of importance there

7  except for couple of specks of blood on the

8  floor.

9            This is back into the hallway.

10     Q.    Stop.   What portion of the hallway is

11  that?

12     A.    This is going to be back in here.

13     Q.    On the opposite side of the wall?

14     A.    Yes.

15     Q.    It looks like there is a doorway

16  opening shown?

17     A.    That is going to be this doorway right

18  here.

19     Q.    Into the living room?

20     A.    Yes.   This is the door to Bradley

21  Allen's room.

22     Q.    Stop it.   Back up.   Right there.

23  Where is that blood that is shown on the wall?

24     A.    Be right here.

25     Q.    You are using the red marker.   Okay.

                                              421

1   This is before you had gone in through the

2   window?

3         A.   Correct.   You can see the body through

4   the doorway there, but you can't open the door

5   completely.

6              This is the bed.   I don't know what

7   he is trying to pick up.

8         Q.   Still looking through the crack in the

9   door?

10        A.   Right.

11        Q.   Are those other detectives?

12        A.   Other homicide detectives.

13             This is the weight room.

14        Q.   Who is that?  Is that Sergeant Massey?

15        A.   One of those is my partner.

16        Q.   Stop.   Where is that?

17        A.   I am not sure.

18        Q.   Is that all inside Brad's room?   Back

19   out in the hall?

20        A.   That is in the hallway.

21        Q.   Can you show us on the diagram where

22   that was?

23        A.   It would be back in this area

24   somewhere here.   I am not sure which side it was

25   on.   Blood on the hallway.

422

1      Q.    On this hallway wall?

2      A.    Yes.

3      Q.    So there was blood, the blood spatters

4  are on both sides of the wall in that hallway?

5      A.    Yes.

6            This is inside Bradley's room.

7  Chest-of-drawers.   These are his eyeglasses.

8  These are the sunglasses we were talking about

9  earlier.   This is the front door.   The door to

10 his bedroom, rather.

11     Q.    Was there blood on Bradley's glasses?

12     A.    These are sunglasses.   This is a knife

13 laying on top of Brad's bed.

14           (End of video).

15           MS. DAVIES:   Pass the witness.

16           MR. STAFFORD:   I respectfully reserve

17 my right to cross at a later time, judge.

18           THE COURT:   You may stand down.

19           MS. DAVIES:   State's next witness will

20 be Officer Hilleman.

21

22

23

24

25

423

                         KEN HILLEMAN

1    was called as a witness by the State and, having

2    been duly sworn, testified as follows:

3                        DIRECT EXAMINATION

4    BY MS. CONNORS:

5         Q.    Sir, could you state your name?

6         A.    Ken Hilleman.

7         Q.    Where do you work?

8         A.    I am an officer with the Houston

9    Police Department.

10        Q.    How long have you worked for the

11   Houston Police Department?

12        A.    Eleven years.

13        Q.    What particular division of the

14   Houston Police Department were you assigned to

15   back in September of 1991?

16        A.    I was assigned to the homicide

17   division crime scene section.

18        Q.    How long had you been in the crime

19   scene section?

20        A.    Nine years.

21        Q.    Have you since left the crime scene

22   section?

23        A.    Yes, ma'am, I have.

24        Q.    When was that?

1          A.    Last week.

2          Q.    Where do you work now?

3          A.    I am assigned to the homicide division

4     major assault squad.

5          Q.    Officer Hilleman, directing your

6     attention back to October 12 of 1991, were you

7     involved in the investigation of the capital

8     murder of Ricky Rhoades?

9          A.    Yes, ma'am, I was.

10         Q.    Were you asked to go to 4343 South

11    Shaver, the Park Hollow Apartments?

12         A.    Yes, ma'am, I was.

13         Q.    Approximately what time was it that

14    you were dispatched there?

15         A.    It was 8:24 a.m.

16         Q.    Who were you to meet?

17         A.    Sergeant Rick Maxey.

18         Q.    When you got there, was Sergeant

19    Kennedy also there?

20         A.    No, he was not.

21         Q.    Just Sergeant Maxey?

22         A.    That is correct.

23         Q.    Before you got to the Park Hollow

24    Apartments, did you go anywhere else?

25         A.    Yes, ma'am, we went to a strip

1    shopping center in the 4200 block of South

2    Shaver.

3        Q.    Did you take any photos?

4        A.    Yes, I did.

5        Q.    What did you take photos of?

6        A.    There was a convenient store and a

7    little Dragon Express Chinese food restaurant

8    there.

9        Q.    Was the convenient store named

10   Pak and Go?

11       A.    Yes, it was.

12       Q.    Was that located at 4204 South Shaver?

13       A.    Yes, ma'am, it was.

14       Q.    And next door was the Chinese

15   restaurant, the Dragon Express?

16       A.    That is correct.

17       Q.    After you took photographs of the

18   convenient store and the Chinese restaurant,

19   what did you do next?

20       A.    We left the convenient store and went

21   to the apartment complex.

22       Q.    What did you do when you got to the

23   apartment complex?

24       A.    We proceeded to apartment 1102.

25       Q.    How did you get in the apartment?

426

1        A.   There was a gentleman that we met

2   there that had a key, and also the windows to

3   the apartment were open.

4        Q.   Officer Hilleman, let me show you what

5   has been marked for identification purposes only

6   as State's Exhibits A-10, 11, 12, 13, 14, A-15,

7   A-16, A-17, A-18.  Do you recognize State's

8   Exhibits A-10 through A-18?

9        A.   Yes, ma'am, I do.

10       Q.   Did you take these photographs of

11  apartment 1102 at the Park Hollow Apartments?

12       A.   Yes, ma'am, I did.

13            MS. CONNORS:  Your Honor, at this time

14  I tender to defense counsel for his inspection

15  A-10 through A-18 and ask that they be admitted

16  into evidence.

17            MR. STAFFORD:  I have no objection.

18            THE COURT:  State's Exhibits A-10

19  through A-18 are admitted.

20  BY MS. CONNORS:

21       Q.   When you were at apartment 1102, did

22  you also gather evidence?

23       A.   Yes, ma'am, I did.

24       Q.   Let me show you State's Exhibit A-1.

25  That is evidence envelope with your name, case

427

1  number assigned this case, the date of October

2  12, capital murder at 624 Keith.  All the

3  information that pertained to this case; is that

4  correct?

5       A.   Yes, ma'am.

6       Q.   And you took the evidence that you

7  found, which is labeled A-2 through A-6, and you

8  placed it in the evidence envelope A-1; is that

9  correct?

10      A.   That is correct.

11      Q.   What did you do with all the evidence

12  that you placed in this evidence envelope?

13      A.   Went to the property room.

14      Q.   Let me show you what has been

15  introduced into evidence as A-2.  What is that?

16      A.    It's a piece of kleenex or tissue

17  paper that I collected from the living room

18  floor of apartment 1102.

19      Q.   Does it appear to have blood on it?

20      A.   Yes, it does.

21      Q.   State's Exhibit A-3, what is that?

22      A.    It's a piece of pipe insulation that

23  was recovered from the bedroom floor at

24  apartment 1102.

25      Q.   Does it appear to have blood on it?

428

1          A.    Yes, it does.

2          Q.    And State's Exhibit A-4, what is that?

3          A.    It's a sock that was recovered from

4     the area where the furnace used to be in 1102.

5     It's a closet, the furnace had been removed, and

6     the sock was laying inside the closet.

7          Q.    And the contents of State's A-5?

8          A.    It's a blood sample from the shower

9     wall that was scraped by the shower wall by

10    myself and placed in that glossy envelope.

11         Q.    State's Exhibit A-6, what are the

12    contents of A-6?

13         A.    It's another blood sample from the

14    windowsill from the bedroom that was scraped

15    into the glossy envelope by myself in apartment

16    1102.

17         Q.    And A-7, did you also gather A-7?

18         A.    That's the venetian blind from the

19    bedroom window from apartment 1102.

20         Q.    State's Exhibit A-11, you seem to be

21    pointing.  Is that you?

22         A.    No, ma'am, I believe that was the

23    other person that was present at the time.

24         Q.    They are pointing to something on the

25    mini blind; is that correct?

1       A.    Pointing to the blood that is on the

2   mini blind.

3       Q.    Can you put an arrow where what

4   appeared to be blood was on the mini blind that

5   you saw?  State's Exhibit A-12 is a picture of

6   the windowsill where the mini blind was; is that

7   correct?

8       A.    That is correct.

9       Q.    Is that from the outside looking in?

10      A.    Yes.

11      Q.    Can you show us where the blood would

12  have been on State's Exhibit A-12 marked by the

13  red arrow?

14          (Witness complied).

15      Q.    A-13 and A-14.  What does A-13 show?

16      A.    A-13 shows the blood on the shower

17  wall and standing a little bit back away from

18  the wall.  A-14 is a close-up of the blood on

19  the shower wall.

20      Q.    Would you put an arrow where the blood

21  appears to be on A-13?

22          And A-15 and A-16, what does A-15

23  show?

24      A.    A-15 is the blood on the shower wall.

25  Again I am standing back away from the wall so

1    you can see the area where the blood is.  And

2    A-16 is a close-up of the blood on the shower

3    wall.

4         Q.   Would you put an arrow on A-15

5    pointing towards the blood.

6              And A-18, what is that a picture of?

7         A.   It's some blood on the wall, on the

8    outside wall going into the bathroom.

9         Q.   Does it appear to be blood in more

10   than more than one place, or is it just one

11   place?

12        A.   There looks to be two drops on the

13   wall, two areas where there is blood on the

14   wall.

15        Q.   Can you mark those areas, please?

16             And A-3 is the styrofoam pipe

17   insulation that is shown in State's Exhibits

18   A-18?

19        A.   Yes, it is.

20        Q.   Can you mark that with a red arrow

21   that says A-3, please?

22             Could you step down so we can show the

23   jury, please?

24             What does A-10 show?

25        A.   It's the front door to apartment 1102.

                                                  431

1          Q.    A-11 is what, sir?

2          A.    A-11 is the photograph of the venetian

3     blinds with the blood on the blinds, photograph

4     taken from the outside looking in.

5          Q.    A-12, what does that show?

6          A.    That is the blood on the windowsill.

7     Again the photograph is taken from the outside

8     of the apartment looking in.   The window is open.

9          Q.    Going back to A-11.   Does it show on

10    the photo how the window is open or where it's

11    open?

12         A.    Yes, ma'am.   You can see the edge of

13    the sliding window that is slid open.    This is

14    the edge.   You would slide this window in this

15    direction, it would close the window.

16         Q.    So, looking at the photograph, it

17    would be on the right side that the window is

18    open; is that correct?

19         A.    Yes, ma'am.

20         Q.    What does A-13 show?

21         A.    A-13 is some blood on the shower wall.

22         Q.    And A-14, is that just a close-up of A-13?

23         A.    That is correct.

24         Q.    What does A-15 show?

25         A.    Again that's another area of the

                                                        432

1    shower above the faucets.  Blood on the shower

2    wall.

3         Q.    Is A-16 just a closer up version of

4    that blood?

5         A.    Yes, it is.

6         Q.    What does A-17 show?

7         A.    Photograph of the sock in the closet

8    where the furnace was.  The furnace had been

9    removed from the apartment.

10        Q.    When you picked up the sock, how did

11   it feel?

12        A.    It was stiff.

13        Q.    A-18, what does that show?

14        A.    A-18 is the blood on the wall and also

15   the piece of pipe insulation on the floor.

16        Q.    Officer Hilleman, when you got to the

17   apartment in the early morning hours of October

18   12, was the electricity working?

19        A.    No, ma'am, it was not.

20        Q.    Were you able to see in the apartment

21   without electricity?

22        A.    The windows were open, we had the

23   natural light.  It was not the best light in the

24   world, but we could see.

25        Q.    Was the water working?

433

1      A.    Yes, it was.

2      Q.    Can you tell us was this a ground

3  floor apartment?

4      A.    Yes, ma'am, it was.

5          MS. CONNORS:   I have no further

6  questions.   I ask that A-10 through A-18 be

7  passed to the jury.

8          THE COURT:   All right.

9

10              CROSS EXAMINATION

11  BY MR. STAFFORD:

12      Q.    Mr. Rhoades was not with you during

13  this collection; was he?

14      A.    No, sir.

15      Q.    Just you and Sergeant Maxey?

16      A.    That is correct.

17          MR. STAFFORD:   I have no questions.

18          THE COURT:   Anything else?

19          MS. CONNORS:   No, Your Honor.

20          THE COURT:   You may stand down.

21          Call your next.

22          MS. DAVIES:   State calls Monica

23  Thompson.

24

25

                                              434

MONICA THOMPSON

1
2    was called as a witness by the State and, having
3    been duly sworn, testified as follows:
4                    DIRECT EXAMINATION
5    BY MS. DAVIES:
6         Q.    Would you, please, tell us your name?
7         A.    Monica Thompson.
8         Q.    Where are you employed?
9         A.    By the City of Houston police
10   department crime lab.
11        Q.    What is your position there?
12        A.    I am a criminalist.
13        Q.    What does that mean to be a
14   criminalist?
15        A.    I analyze evidence from rapes and
16   homicides for DNA analysis.
17        Q.    Tell us a little bit about your
18   educational background and your professional
19   background that qualifies you for your position.
20        A.    I have a bachelor's and master's
21   degree in biology from Sam Houston State
22   University.  I have had two and a half years
23   training at the HPD crime lab.  I have trained
24   for six months at Baylor College of Medicine.  I
25   have had very intensive, month-long training at

                                                   435

1    the FBI Academy.

2         Q.    Who is your supervisor?

3         A.    James Bolding.

4         Q.    Do you work specifically in the area

5    of DNA analysis?

6         A.    Yes, I do.

7         Q.    At this time does the Houston Police

8    Department laboratory have the capacity to do

9    DNA analysis?

10        A.    Yes, we do.

11        Q.    Back in September of 1991, did they

12   have that capacity?

13        A.    In September of 1991, we were not

14   fully equipped.  We were not taking cases.  We

15   were analyzing cases to see if they did have DNA

16   in them to go to the next step, but we were not

17   completing that analysis.  We were then sending

18   them to another laboratory to complete the

19   analysis.

20        Q.    So, has your training -- have you been

21   trained to do that analysis?

22        A.    Yes, I have.

23        Q.    What is the first step, if you get a

24   blood sample in the laboratory, what is the

25   first step in order to start that process of DNA?

436

1      A.    After receiving a sample of evidence,
2   we extract the sample to see if DNA is present.
3   We will take that evidence and take it through
4   procedures to remove the cells from the item.
5   After we remove the cells from the item we then
6   burst open the cells to release the DNA.  After
7   the DNA is released and it's cleaned up to
8   remove it from any other particles that may be
9   in the solution, we then run a test to check the
10  quality and the quantity of the DNA present.
11      Q.    What do the initials DNA stand for?
12      A.    DNA stands for Deoxyribonucleic Acid.
13      Q.    When you are through testifying, will
14  you wait for a minute and spell that for the
15  court reporter?
16      A.    Yes, I will.
17      Q.    Hopefully she won't have a nervous
18  breakdown before the day is over.
19          Ms. Thompson, what you have described
20  as far as extracting DNA, when you make that
21  extraction, in laymen's terms can you describe
22  for us what form, how it appears?
23      A.    When we extract the DNA and we do the
24  test for the quality and quantity to see if we
25  can move on to the next step, we are looking for

437

1      the DNA to be in a long stranded form and not to

2      be broken into pieces.  And if it's in this long

3      stranded form, we can go on to the next step.

4            Q.    All right now, back in September of

5      1991, did Jim Bolding ask you to do an

6      extraction of DNA on some evidence in this case?

7            A.    Yes, he did.

8            Q.    And did you follow through and do that?

9            A.    Yes, I did.

10           Q.    Other than extracting DNA from the

11     sample that you were given by Mr. Bolding, did

12     you go on to the next step of DNA analysis?

13           A.    No.  After extraction and looking at

14     the quantity and quality of the DNA, that was

15     where I ended.  I then gave the evidence back to

16     Jim Bolding, who had it sent to another lab for

17     testing.

18           Q.    He had it sent to another laboratory?

19           A.    Yes.

20           Q.    At that point, your laboratory was not

21     fully operational; is that correct?

22           A.    That is correct.

23           Q.    How long does it take to get your

24     laboratory on line?

25           A.    We started taking cases the latter

                                                        438

1  part of February.  It took us about almost two

2  years to come up to line.

3      Q.    Let me show you some -- first let me

4  show you these two in the containers marked

5  State's Exhibits 36 and 37.  Are there any

6  markings on those vials of blood, State's

7  Exhibits 36 and 37, that enable you to recognize

8  them?

9      A.    Yes, there are.

10     Q.    What markings are those?

11     A.    The lab number, L91-9937 and my

12  initials.

13     Q.    All right.  The lab number is what?

14     A.    L91-9937.

15     Q.    Now, can you explain to the jury how

16  you keep track of your evidence in the laboratory?

17  Do you have identifiers that you use for all the

18  evidence?

19     A.    Yes.   When a piece of evidence is

20  brought into the crime lab, it is logged into a

21  case book that is in an area called centralized

22  evidence receiving, and all evidence goes

23  through the area.  We log it into the case book

24  along with the HPD incident number and

25  description of the evidence.

439

1    Q.   Now, who submitted this evidence to

2  your laboratory?  Do you know from your records?

3    A.   The item marked State's Exhibit No. 36

4  was submitted by Sergeant Kennedy.

5    Q.   And State's Exhibit 37?

6    A.   It was -- I received it from James

7  Bolding.   It was originally submitted by

8  Kennedy.

9    Q.   All right.   And when Mr. Bolding gave

10  you that sample, what were your instructions?

11    A.   My instructions were to extract the

12  DNA to determine the quality and quantity present.

13    Q.   Did you make a determination of the

14  quality and the quantity?

15    A.   Yes, I did.

16    Q.   What was your determination?

17    A.   That high molecular weight DNA was

18  present, which means that it was in a long

19  stranded form and could go on to the next step.

20    Q.   Were you given any other samples by

21  Mr. Bolding to extract DNA?

22    A.   Yes, I was.

23    Q.   What was that?

24    A.   I was given a sample from the kitchen

25  floor and a sample from a kitchen drawer.

1      Q.    Were you also given another blood sample?

2      A.    I was given a blood sample from

3   medical-legal 91-6153.

4      Q.    When you say medical-legal, what

5   number is that?

6      A.    That is the number that the Harris

7   County Medical Examiner's Office gives to their

8   case.

9      Q.    The autopsy number?

10      A.    Right, that is the autopsy.

11      Q.    The other blood sample that you had

12   was from what autopsy number?

13      A.    Medical-legal number 91-6153.

14      Q.    Basically, when you do these things in

15   the lab, you don't know the person, you just

16   know a number to identify the sample?

17      A.    In this case, I was only given a

18   number.  Sometimes I am given a name and a

19   number.  In this case, I was only given a

20   number.

21      Q.    So, the sample from the medical

22   examiner's office from autopsy 916153, were you

23   able to extract DNA from that sample?

24      A.    Yes, I was.

25      Q.    And, likewise, the sample that Mr.

441

1  Bolding gave you from you said the kitchen floor
2  and the kitchen drawer?
3      A.   Yes.
4      Q.   All of those items, were they given
5  the same lab number, your 91-9937?
6      A.   Yes, they were.
7      Q.   Were they identified by that number
8  when they came to you?
9      A.   Yes, they were.
10     Q.   Were you able to extract DNA from the
11 blood samples from the kitchen floor and the
12 kitchen drawer?
13     A.   Yes, I was.
14     Q.   Did you make an assessment of the
15 quality and quantity in each of those
16 instances?  Did you form an opinion as to
17 whether they were sufficient to pass on for DNA
18 testing and comparison?
19     A.   Yes, I did.  I determined that high
20 molecular weight DNA was present and that these
21 samples could go on to the next step.
22     Q.   You carried some evidence into the
23 courtroom with you today.  Let me show you what
24 we have marked for identification purposes.
25 First there is this large, plastic envelope

                                              442

1    marked 105.   Inside that, there were four

2    smaller plastic envelopes.  And I have marked

3    those 101, 102, 103 and 104 for identification

4    purposes.  Can you tell us where you got these

5    items to bring to court today?

6         A.   I took control of those items from

7    Kristy Kim.

8         Q.   Who is Kristy Kim?

9         A.   Kristy Kim is a criminalist at the HPD

10   crime lab.

11        Q.   She works with you?

12        A.   Yes, she does.

13        Q.   Is she also supervised by Mr. Bolding?

14        A.   Yes, she is.

15        Q.   Okay.  Have you had a chance to look

16   at these smaller envelopes 101 through 104 and

17   their contents?

18        A.   Yes, I have.

19        Q.   Do you recognize those envelopes and

20   their contents?

21        A.   Yes, I do.

22        Q.   Are there any identifying marks -- in

23   fact, what is contained in each of the envelopes

24   it appears to be two items in each of these

25   envelopes 101 through 104.   Can you tell us

443

1   just physically what those two items are in each

2   envelope?

3        A.   They are vials containing DNA

4   extracted samples in this case.

5        Q.   And who actually prepared these vials

6   in each instance, these vials of DNA?

7        A.   I did.

8        Q.   How were you able to recognize that

9   and tell us that?

10       A.   By the lab number and my initials.

11       Q.   Can you point out for me where your

12   initials and the lab number appear?

13       A.   Lab number, and then my initials are

14   at the end.

15       Q.   Your initials MT and the lab number

16   what?

17       A.   L91-9937.

18       Q.   And do your initials and the lab

19   number appear on each and every one of the

20   vials, namely, two vials in each of the four

21   envelopes?  Would you check and be sure for us?

22       A.   Yes, they do.

23       Q.   After you extracted DNA from the

24   samples you were given and placed them in these

25   vials that are contained in the envelopes as you

444

1    have described them, what did you do with the vials?

2        A.    I returned the vials to James Bolding.

3        Q.    At that point, were they in a

4    condition to be passed on for DNA analysis?

5        A.    Yes, they were.

6        Q.    Did you actually carry them to the DNA

7    lab yourself?

8        A.    No, I did not.

9        Q.    Did you do any other part of the

10    testing or DNA comparisons on these samples?

11        A.    No, I did not.

12        MS. DAVIES:  I pass the witness.

13        MR. STAFFORD:  We have no questions.

14        THE COURT:  You may stand down.  Any

15    objection to her being excused subject to being

16    on call?

17        MS. DAVIES:  No objection from the

18    State.

19        MR. STAFFORD:  No objection.

20        THE COURT:  Call your next, please.

21        MS. DAVIES:  Kristy Kim.

22

23

24

25

                          KRISTY KIM

1  was called as a witness by the State and, having

2  been duly sworn, testified as follows:

3                    DIRECT EXAMINATION

4  BY MS. DAVIES:

5       Q.    Please state your name.

6       A.    Kristy Kim.

7       Q.    How are you employed, Ms. Kim?

8       A.    I am employed by the Houston Police

9  Department crime laboratory as a chemist.

10      Q.    What is your particular area of

11 responsibility at the laboratory?

12      A.    I am assigned in the serology section

13 of the crime laboratory, where my duties include

14 analyzing any body fluids from a crime scene or

15 in the form of a rape kit, identify the body

16 fluid and compare them with a known complainant

17 and defendant, and I also make crime scenes.

18      Q.    Who is your supervisor?

19      A.    James R. Bolding.

20      Q.    Did you actually do any of the testing

21 or analysis related to DNA yourself in this case?

22      A.    No, ma'am.

23      Q.    Did you handle some of the evidence

24 when it was in the laboratory?

                                              446

1     A.   Yes, I did.

2     Q.   Specifically I want to call your

3 attention to -- well, first let's look at the

4 blood vials that are contained in State's

5 Exhibits 36 and 37.  Did you do any of the

6 testing or DNA extractions on those?

7     A.   No, ma'am.

8     Q.   Did you receive them in the

9 laboratory?

10    A.   Yes, I did.

11    Q.   Once they were received in the

12 laboratory, did you process either one of these

13 items at all, specifically I am talking about

14 the blood contained in the vials in State's

15 Exhibits 36 and 37.

16    A.   No, ma'am.

17    Q.   Let me call your attention to the

18 envelope, the large envelope, State's Exhibit

19 105, and inside it are four smaller ones marked

20 State's Exhibits 101, 102, 103, 104.  Have you

21 seen those items before?

22    A.   Yes, I have.

23    Q.   Did you bring them to court today?

24    A.   Yes, I did.

25    Q.   In fact, did you turn those over to

447

1    your co-worker Ms. Thompson just before she came

2    in to testify?

3        A.    Yes, I did.

4        Q.    Where had you gotten them prior to

5    giving them to Ms. Thompson?

6        A.    I had received them from Holly Hammond

7    from Kleberg DNA Laboratory and Medical Center.

8        Q.    Kleberg DNA Laboratory?

9        A.    Yes, ma'am.

10       Q.    That was from Holly Hammond?

11       A.    Yes, ma'am.

12       Q.    Did you get those at my request before

13   coming to court?

14       A.    That is correct.

15       Q.    Now, prior to getting them from Ms.

16   Hammond at the Kleberg Laboratory today, had you

17   at some point delivered these items to Ms.

18   Hammond at the Kleberg Laboratory?

19       A.    That is correct.

20       Q.    Do you recall when that was?

21       A.    November 8, 1991.

22       Q.    Can you look at these envelopes, the

23   smaller ones, State's Exhibits 101, 102, 103 and

24   104, and tell me whether you delivered

25   personally the eight vials contained in those

                                              448

1    four envelopes to the Kleberg Laboratory, Holly
2    Hammond for testing?
3         A.    Yes, I did deliver these personally to
4    Holly Hammond of the Kleberg Laboratory.
5         Q.    And where had you received them for
6    delivering to Ms. Hammond?
7         A.    Received them from my supervisor,
8    James R. Bolding.
9         Q.    During the time that they were in your
10   care, custody and control to transport to the
11   laboratory, did you take care to see that
12   nothing happened to these to change the
13   contents?
14        A.    That is correct.
15             MS. DAVIES:   Pass the witness.
16                  CROSS EXAMINATION
17   BY MR. STAFFORD:
18        Q.    Ma'am, you stated that you also make
19   crime scenes?
20        A.    Yes, I do.
21        Q.    Is one of your areas of specialty as
22   Mr. Bolding's area of specialty is blood
23   splatter, is it not?
24        A.    Yes, sir.
25        Q.    And do you know of your own personal

449

1   knowledge how many samples that were submitted

2   to your department for analysis in this case?

3       A.   How many samples?

4       Q.   Yes.

5       A.   I have no idea.  This is not my case.

6       Q.   Okay.  But that is an area in your

7   department that y'all are specialized in, to go

8   out to the scene and collect that kind of

9   evidence; is it not?

10      A.   Not all the scenes we go to, but some

11  scenes we do go out and collect the samples.

12      Q.   Could you tell the jury, taking an

13  actual sample of blood splatter, wouldn't that

14  give you a more accurate reading than trying to

15  view a photograph and come up with an opinion?

16      A.   Yes, sir.

17      MR. STAFFORD:  I have no other

18  questions.

19

20

21

22

23

24

25

450

REDIRECT EXAMINATION

BY MS. DAVIES:

Q.   Is that true if your purpose is to
identify the source of the blood?  Let me reword
my question.  I am not sure what I am asking.
If the objective is to identify the source of
the blood, would you take a blood sample or
would you look at the spatter?

A.   --.

Q.   That wasn't artfully put.

A.   You have to rephrase the question.  I
don't understand where you are coming from.

Q.   If you are attempting to type the
blood, would you have to take a sample?

A.   Of course.

Q.   If you wanted to do DNA testing to
identify the source of the blood, would that
require a sample from the scene?

A.   Yes, ma'am.

Q.   A photograph wouldn't do that; would it?

A.   No.

MS. DAVIES:  Pass the witness.

451

RECROSS EXAMINATION

BY MR. STAFFORD:

Q.   Ma'am, my point is:  If you have a
speck of blood here or a speck of blood on the
wall and you are trying to figure out the angle
of projection and where a body was situated from
the projection, being able to be there to
physically look at it and take a scraping so you
can take it back and analyze or take a ruler and
measure, you being on the scene is much better
and more accurate than taking a picture from
somebody that you have no control over because
you do not know what position he was in, you
don't know, and then trying to take that picture
and make a determination of angles and direction
and things of that nature?

A.   Right.  It will be hard to see the
angle of the blood spatters or things of that
nature, it will be hard to determine that by
just looking at the picture.

MR. STAFFORD:  I have no other
questions.

MS. DAVIES:  Pass the witness.
I will offer.

THE COURT:  May she be excused?

452

1      MS. DAVIES:  She may be excused.

2  Actually, before she's excused, I want to offer

3  the contents of the envelope, State's Exhibits

4  36, 37, and 101 through 104.

5      THE COURT:  Everything except 105?

6      MS. DAVIES:  That is correct.  I won't

7  offer that into evidence.

8      THE COURT:  Do you understand what is

9  being offered?  State's Exhibits 36, 37, 101

10  through 104.

11      MS. DAVIES:  The contents of 36 and

12  37.  The small envelopes, each containing two

13  plastic vials, 101 through 104.

14      MR. STAFFORD:  No objection.

15      THE COURT:  State's Exhibits 36, 37,

16  101, 102, 103 and 104 are admitted.

17      You may stand down.

18      Call your next.

19      MS. DAVIES:  Harold Jordan.

20      THE COURT:  Approach the bench,

21  please.

22

23

24

25

HAROLD JORDON

1
2   was called as a witness by the State and, having
3   been duly sworn, testified as follows:

DIRECT EXAMINATION

4
5   BY MS. DAVIES:
6       Q.   Would you state your name to the jury,
7   please?
8       A.   Harold C. Jordan.
9       Q.   How are you employed?
10      A.   As a police officer for the City of
11  Houston.
12      Q.   What is your assignment?
13      A.   Currently I am assigned to the
14  homicide division as a crime scene investigator.
15      Q.   Can you tell us just very briefly what
16  your responsibility is as a crime scene
17  investigator?
18      A.   Yes, ma'am.  Primarily my duties are
19  to go out to major scenes and take photographs,
20  collect items pertinent to the case, draw scene
21  sketches when needed, do morgue follow-ups,
22  fingerprints.
23      Q.   Are you the first person who took the
24  photographs and the video tape pictures in
25  connection with the scene at 624 Keith?

454

1       A.   Yes.

2       Q.   On September 13, 1991?

3       A.   Yes, ma'am.

4       Q.   Did you have some assistance from the

5  crime lab and latent print laboratory at that

6  scene?

7       A.   Yes, ma'am, I did.

8       Q.   You mentioned doing the morgue

9  follow-up.  What do you mean by doing that?

10  What is the follow-up?

11       A.   After we clear the scenes on cases

12  when people have been killed, one of our duties

13  is to go out to the Harris County morgue and

14  obtain fingerprints, palm prints, close-up

15  photographs of wounds, collect other items

16  pertinent to the case while the body is being

17  posted.

18       Q.   While it's being posted?

19       A.   Yes, ma'am, post-mortem.

20       Q.   When you go to the laboratory to do

21  follow-up, do you determine whether the morgue

22  has assigned a number to each body that an

23  autopsy is going to be performed on?

24       A.   Yes, ma'am.

25       Q.   And you had been at the scene, so you

455

1    had seen the bodies of Charles and Brad Allen

2    there at the house; did you not?

3        A.   Yes, ma'am.

4        Q.   When you went to the morgue, can you

5    tell us whether an autopsy number had been

6    assigned to each of them?

7        A.   Yes, ma'am, they had.

8        Q.   Do you recall what those numbers were?

9        A.   I would have to look at my notes in

10    order to.

11        Q.   Do you have your report?

12        A.   I have a copy of my supplement here.

13        Q.   Would that refresh your memory?

14        A.   According to my notes, Charles Allen

15    was assigned case 91-6153.  And Bradley was

16    assigned 91-6154.

17        Q.   Now, before the autopsy was performed,

18    did you take some additional photographs there

19    at the morgue?

20        A.   Yes, ma'am, I did.

21        Q.   I have marked some photographs for

22    identification purposes as State's Exhibits 89

23    through 94.  Can you tell me whether 89 through

24    94, without displaying those to the jury,

25    please, are those accurate depictions of Charles

1    Allen's body prior to any autopsy being

2    performed as you viewed it at the morgue?

3         A.    Yes, ma'am, they are.

4         Q.    Did you go there immediately after

5    leaving the scene at 624 Keith on the 13th of

6    September?

7         A.    I think that the homicide sergeant,

8    Sergeant Kennedy and I stopped for a glass of

9    iced tea and went to the M. E.'s office from

10   there.

11        Q.    So, did much time elapse before you

12   went?

13        A.    No, ma'am.

14        Q.    All right.  Let me show you some

15   photographs that I have marked as State's

16   Exhibits 95 through one hundred.  I want you to

17   tell me whether those fairly and accurately

18   depict the body of Brad Allen as you saw it

19   there at the morgue prior to any autopsy being

20   performed.

21        A.    Yes, ma'am, they do.

22             MS. DAVIES:  Pass the witness.

23

24

25

                                             457

```
 1                        CROSS EXAMINATION
 2    BY MS. KAISER:
 3         Q.    Were you the only officer, the only
 4    agency that took photographs out at the crime
 5    scene on Keith Street?
 6         A.    Yes.   The medical examiner's office
 7    sent out an investigator who also took
 8    photographs.
 9         Q.    They took photos at the scene?
10         A.    Yes, ma'am.
11         Q.    Did you write an offense report in
12    relation to this scene that you made?
13         A.    Yes, ma'am, I did.
14              MS. DAVIES:   May the record reflect I
15    have a copy of Officer Jordan's supplement I am
16    tendering to defense counsel.
17              THE COURT:   All right.
18    BY MS. KAISER:
19         Q.    Were you the only CSU officer on the
20    scene?
21         A.    Yes, ma'am, I was.
22         Q.    So from the Houston Police Department
23    you were the only one taking photographs or
24    doing video?
25         A.    Yes, ma'am, that is correct.
```

1       Q.   When you take photographs and make

2    videos, do you leave everything on the scene as

3    it is?

4       A.   --.

5       Q.   You leave it as is.  You don't change

6    anything to make for a better picture?

7       A.   No, ma'am.

8       Q.   Does that include the lighting?

9       A.   That is correct, ma'am.  I used a

10   flash.

11      Q.   So, in areas that are dark in the

12   house, you might have used a flash attachment to

13   light that area for the photograph.   You

14   wouldn't have turned on a light in the room to

15   light up that room for the picture, you would

16   have used your flash attachment?

17      A.   That is correct.

18      Q.   So if any of your pictures project a

19   lighted room or an unlighted room, that is

20   exactly the way you found those rooms?

21      A.   Yes, ma'am, I take photographs of the

22   scene intact.

23      Q.   That applies to the video as well?

24      A.   I also used a video light on the video

25   camera.  But everything else was as it was when

459

1    I arrived on the scene.

2         Q.   How soon did you arrive on the scene?

3         A.   I would say within thirty minutes of

4    the time that the victims were found.

5         Q.   So approximately 8:30 to 9:00?

6         A.   Yes, ma'am, roughly I would say that.

7         Q.   Did it appear to you that the crime

8    scene had been kept intact?

9         A.   Yes, ma'am.  There were several

10   officers inside the house, and from the time

11   that I got there the scene did remain intact.  I

12   saw that nothing else was moved or lighting

13   turned on or whatever.

14        Q.   How did you enter the house to take

15   the photographs?

16        A.   Front door.

17        Q.   That door was open and unlocked when

18   you got there?

19        A.   Yes, ma'am.  There were officers

20   inside the house when I arrived on the scene.

21             MS. KAISER:  Pass the witness.

22             MS. DAVIES:  May Officer Jordan be

23   excused subject to recall?

24             MR. STAFFORD:  No objection.

25             THE COURT:  You are to remain on

460

1    call.

2            THE COURT:   Ladies and gentlemen, we

3    are going to recess for the day.   All the

4    previous admonitions are still in effect.

5    Again, don't watch any of the media casts.   Turn

6    the station, turn it down.   Don't read it if

7    it's in the newspaper.   I noticed that the press

8    hasn't been here.   I noticed one of the TV

9    stations did make it yesterday, did filter in

10   sometime this morning, I don't know what may be

11   reported.   You haven't missed anything today.

12   I know you were out of the courtroom a couple of

13   times yesterday, but you haven't missed anything

14   today.   You don't need to watch any of that.

15   Don't allow anybody to talk to you about the

16   case. If anybody does attempt to talk to you

17   about it, bring it to our attention immediately.

18   Don't make any drive-bys, don't make any kind of

19   independent investigation.   We haven't started

20   before 10:30 yet, so 10:30 tomorrow morning in

21   the hallway outside.   Continue to wear your

22   badges at all times.   You haven't asked yet,

23   but, yes, you may bring your own coffee makers

24   and cookies because I am not sure what the

25   schedule is going to be.   If you want to put

1    something in the refrigerator, we can do that

2    for you, too.   You may bring reading material

3    except for the newspapers if you want to bring

4    it with you tomorrow.    Do you have any

5    questions at this time?

6              If there is nothing else, please go in

7    a group to the jury room.

8              (End of day)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25