APPELLATE COURT NO. _71595_

IN THE COURT OF CRIMINAL APPEALS

OF THE STATE OF TEXAS

AT AUSTIN

_____

RICK ALLAN RHOADES,

                          Appellant

VS.

THE STATE OF TEXAS,

                          Appellee.

_____

APPEAL FROM 179TH DISTRICT COURT OF HARRIS COUNTY,

TEXAS

Judge J. Michael Wilkinson  Presiding

_____

STATEMENT OF FACTS

VOLUME _XXIX_   OF _40_   VOLUMES

Marlene Swope
Official Court Reporter
301 San Jacinto
Houston, Texas  77002

FILED IN
COURT OF CRIMINAL APPEALS

MAR 5  1993                    463

Thomas Lowe, Clerk

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

INDEX

VOLUME XXIX

|  |  | Page |
| --- | --- | --- |
| HOLLY HAMMOND |  |  |
| Direct | | 467 |
| Cross | | 515 |
| Redirect | | 518 |
| DON ALLEN |  |  |
| Direct | | 520 |
| AURELIO ESPINOLA |  |  |
| Direct | | 545 |
| Cross | | 621 |
| Redirect | | 635 |
| GARY ANDREWS |  |  |
| Direct | | 637 |

i.

1

ALPHABETICAL INDEX

2

VOLUME XXIX

3                                                                    <u>Page</u>

4     ALLEN, DON
            Direct                                              520
5
      ANDREWS, GARY
6           Direct                                              637

7     ESPINOLA, AURELIO
            Direct                                              545
8           Cross                                               621
            Redirect                                            635
9
      HAMMOND, HOLLY
10          Direct                                              467
            Cross                                               515
11          Redirect                                            518

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CAUSE NO. 612408

2    STATE OF TEXAS        IN THE 179TH DISTRICT COURT

3    VS.                            OF

4    RICK ALLAN RHOADES      HARRIS COUNTY, T E X A S

5

6    A P P E A R A N C E S:

7    For the State:        Ms. Carol Davies
                           Ms. Claire Connors
8                          Assistant District Attorneys
                           Harris County, Texas
9
     For the Defendant:    Mr. James Stafford
10                         Ms. Deborah Kaiser
                           Attorneys at Law
11                         Houston, Texas

12

13           BE IT REMEMBERED that upon this the

14   30th day of September A.D. 1992, the above

15   entitled and numbered cause came on for

16   continued trial before the Honorable J. Michael

17   Wilkinson, Judge of the 179th District Court of

18   Harris County, Texas, and a jury; and the State

19   appearing by counsel and the Defendant appearing

20   in person and by counsel, the following

21   proceedings were had, viz:

22

23

24

25

                                              464

1
2          (Out of the presence of the jury).
3          THE COURT:  You have no objection to
4    the witness Monica Thompson sitting in on the
5    rest of this trial; correct?
6          MR. STAFFORD:  Correct.
7          Judge, the State had certain marked
8    photos identified yesterday for identification
9    purposes only.  I have not seen those pictures.
10   I am assuming they are going to use them for
11   identification purposes by the deceased's
12   father.
13         THE COURT:  Are you talking about the
14   photographs that the CSU man referred to?
15         MR. STAFFORD:  Yes, sir.  I have not
16   seen those photographs.
17         THE COURT:  They haven't been
18   tendered.
19         MR. STAFFORD:  They are getting ready
20   to.
21         THE COURT:  I don't know.
22         MS. DAVIES:  Your Honor, if I may, Mr.
23   Stafford has seen the photographs because they
24   are a part of all the photographs that were
25   shown to him prior to trial during discovery.

1    So the photographs from the morgue that were

2    identified by Officer Jordan yesterday are

3    photographs they have seen in the past.

4              THE COURT:  What you are trying to do

5    is make objections to them outside the presence

6    of the jury before they are even tendered?

7              MR. STAFFORD:  True.

8              MS. DAVIES:  I did not tender those

9    yesterday.  I brought Officer Jordan in to

10   identify the photographs to lay the groundwork

11   so that, when the time comes, if it does, that I

12   need to offer some or all of those, he has

13   already testified, he identified them as

14   accurate photographs.  I do not intend to offer

15   any of those photographs with this next witness.

16             MR. STAFFORD:  My point is I think

17   they are going to be attempted to be introduced

18   through the father.

19             THE COURT:  I don't know.

20             MR. STAFFORD:  I don't know, either.

21   But what I am saying I am trying not to have to

22   make needless -- not needless, very proper

23   objections -- not to have to bore the jury.   I

24   would just as soon get it done outside the jury.

25             THE COURT:  I am afraid we are going

466

1     to have to wait and see what it is she is going

2     to tender.

3                    (Jury enters the courtroom)

4                    THE COURT:   Call your next witness.

5                    MS. DAVIES:   The State calls Holly

6     Hammond.

7                    THE COURT:   This witness was

8     previously sworn, ladies and gentlemen.

9                         HOLLY HAMMOND

10    was called as a witness by the State and, having

11    been duly sworn, testified as follows:

12                    DIRECT EXAMINATION

13    BY MS. DAVIES:

14         Q.   Would you, please, tell us your name?

15         A.   My name is Holly A. Hammond.

16         Q.   How are you employed?

17         A.   I am the clinical laboratory

18    supervisor in position of manager of the

19    forensic and paternity laboratory at Baylor

20    College of Medicine.

21         Q.   Is that a part of the Baylor College

22    of Medicine?

23         A.   Yes, it is.

24         Q.   And is there another name connected

25    with that?  Is that Kleberg?

467

1    A.    It falls under the Kleberg Center for
2    Human Genetics, yes.
3         Q.    How long have you been associated with
4    that particular laboratory?
5         A.    I've worked with Baylor College of
6    Medicine for approximately three and a half
7    years.
8         Q.    Prior to that, where were you
9    employed?
10        A.    I was employed by the Houston Police
11   Department crime laboratory as a serologist and
12   trace evidence examiner for approximately three
13   and a half years.
14        Q.    What are your main responsibilities
15   and duties there at the Kleberg Center at Baylor
16   College of Medicine?
17        A.    We receive blood and evidentiary
18   samples into our laboratory for the purpose of
19   doing forensic identification and for doing
20   paternity testing.
21        Q.    When you say forensic identification,
22   in laymen's terms can you tell us what that
23   means?
24        A.    We make an attempt to associate an
25   evidentiary stain or body fluid of some sort

468

1    with a known and match that to a known sample

2    using DNA typing.

3         Q.   The term DNA, those initials, what

4    does that stand for?

5         A.   DNA is an acronym for Deoxyribonucleic

6    Acid.

7         Q.   I am sure most of us have heard that

8    term.  Is DNA a part of an individual's body?

9         A.   Yes, it is.  DNA is the material that

10   is found in the nucleus of all the cells except

11   the red blood cells which do not have nucleus,

12   and it's a material that codes for and provides

13   information for your body to make everything

14   that it contains and for it to provide all the

15   characteristics of each person.

16        Q.   You said that it is not contained in

17   red blood cells.  Can you obtain DNA for your

18   identification purposes from blood, however?

19        A.   Yes.  Blood also contains white blood

20   cells which do have a nucleus and, therefore,

21   contain DNA.

22        Q.   So other than blood, can we extract

23   DNA from say bone or other body tissues?

24        A.   Yes, you can extract it from almost

25   any other body tissue or most body fluids.

469

1      Q.    What about hair?

2      A.    You can extract DNA from hair.  The

3  quantity that you obtain is very small.

4      Q.    So are there some fluids or tissues

5  that are more conducive in terms of ease of

6  treatment in the laboratory, more conducive to

7  extracting the DNA?

8      A.    Any sample that you have, the larger

9  the quantity of that sample you have the more

10  likely you are to obtain DNA and to obtain an

11  amount of DNA that is usable for testing.

12      Q.    When you say an amount that is usable

13  for testing, are there some minimum requirements

14  in terms of quantity or quality?

15      A.    We require, in order to do the DNA

16  testing that we typically use, you need to have

17  DNA that is what we call high molecular weight.

18  That is it's in long strands.  DNA is in very

19  long strands in its whole form, but it can be

20  broken up just by from the atmosphere or from

21  light, or just by being manipulated it can be

22  broken into smaller pieces.  We need to have

23  fairly lengthy pieces to begin with in order for

24  the testing to work.

25      Q.    You say lengthy pieces; and, yet, I

470

1    understand you are talking about from scientific

2    standpoint. Are you talking about a strand or

3    something that would be visible to the naked eye?

4        A.    Well, if you could stretch the DNA

5    from one cell out into one long strand, it would

6    be approximately three feet. But you can't see

7    that because it's essentially so small in its

8    width, it's essentially one molecule or several

9    molecules of the DNA. When we talk about the

10   length of the DNA, the DNA is composed of two,

11   it's like a ladder type structure, composed of

12   the size of the ladder or backbone of the

13   sugar. And then we have what we call the bases

14   or nucleotides that form the differences in each

15   portion of the DNA molecule. And there is four

16   of those nucleotides, adenine, cytosine, guanine

17   and thymine. And those nucleotides are called

18   bases. And they form sort of like the rungs of

19   a ladder, and they are abbreviated by their

20   initials, A, C, G and T. To form a rung, the A

21   and T nucleotides always pair together for this

22   what we call double strand of DNA, that is, the

23   ladder type form. And then C and G always pair

24   together for another rung. And these can be in

25   any order with a long piece. We talk about the

1    size of DNA, the length of DNA in terms of how

2    those base pairs or how many rungs there are in

3    the ladder.

4         Q.    Okay.   This pairing, is that something

5    that assists you in identifying an individual

6    through this process?

7         A.    Yes, it does.   The double strand or

8    ladder like structure of the DNA has the

9    property that if subjected to heat or alkali you

10   can separate the two strands, that is, break the

11   base pairs apart, sort of cutting the ladder

12   down through the middle of the rungs.   If you

13   do this by heat, it has the property that as you

14   cool that back down, if you cool it slowly and

15   give the molecules time to react together, they

16   will come back and allele back together exactly

17   the way they were, that is, reform the ladder in

18   just the same patteern that they were formed

19   before.

20        Q.    When you say allele.   I am trying to

21   understand the word you are using there, is that

22   like to return?

23        A.    Yes.   It's the two base pairs coming

24   back together and forming the bond back

25   together.   Like bringing the two, if you split

                                                    472

1    the rungs of a ladder, then bringing them back

2    together and connecting them again.

3        Q.    Before we get any further into the

4    process of how you go about doing this, I want

5    to be sure I understand.  Is there potential for

6    identifying an individual by DNA analysis?

7        A.    Yes, there is.

8        Q.    In other words, if you are given a

9    sample, say, from a crime scene, you don't know

10   whose blood that is, and then you are given a

11   known sample from an individual, is there a way

12   that you can, through your scientific process,

13   compare those and determine the probability of

14   it being the same person?

15       A.    We can make a comparison and decide

16   whether or not that sample could have come from

17   the known sample.

18       Q.    And let's back up a little bit because

19   I didn't give you a chance to tell us about what

20   your educational background is.  You mentioned

21   you worked for the HPD lab.  Now, when you were

22   working with the Houston Police Department

23   laboratory, were you doing DNA analysis and

24   comparison there?

25       A.    No, we did not do DNA analysis there

473

1    at that time.

2        Q.   What were you doing in that

3    laboratory?

4        A.   I was doing serology and trace

5    evidence analysis.  Serology is the

6    identification and typing of blood and body

7    fluids, which DNA typing falls into, but we

8    weren't using that methodology.  Trace evidence

9    is the examination of hairs, fibers, various

10   other evidence, excluding serology and drugs.

11       Q.   Give the jury the benefit of your

12   educational background in the entire field of

13   serology and DNA.

14       A.   I have a bachelor of science degree in

15   forensic science and a bachelor of science

16   degree in chemistry from the University of New

17   Haven in West Haven, Connecticut.   I have

18   additional graduate credits in molecular biology

19   and genetics from the University of Texas Health

20   Science Center here in Houston.  I have attended

21   numerous seminars on forensic science, serology

22   and DNA typing.  And I worked for the Houston

23   Police Department as a serologist and trace

24   evidence examiner for three and a half years.  I

25   underwent training both in our laboratory, in

1  the research laboratory at Baylor and with some
2  period of time at the FBI Academy to learn to do
3  the DNA typing and analysis.  And then have
4  worked to set up the laboratory at Baylor to do
5  both paternity testing and forensic DNA typing
6  and have worked there for the past three and a
7  half years.
8      Q.   You said you were involved in setting
9  up the laboratory.  You're talking about the
10  Kleberg Laboratory at Baylor College?
11      A.   As far as the forensic and paternity
12  laboratory, I was hired to establish that
13  laboratory at Baylor.
14      Q.   So you have been working there since
15  its inception?
16      A.   Yes.
17      Q.   Were you involved in setting up the
18  laboratory and coming on line with the process
19  there?
20      A.   Yes, I was.
21      Q.   How long a process is that, to be able
22  to actually get your laboratory under way for
23  this type of testing?
24      A.   Well, it can take different lengths of
25  time, depending on the laboratory and where you

1    start.  Because the laboratories, the research

2    laboratories and the other diagnostic

3    laboratories at Baylor do this same type of work

4    for medical genetics research and medical

5    genetics diagnostic, all the equipment and

6    materials were in place to set it up.  It was

7    just a matter of simply establishing the

8    particular application and more getting me up

9    and running than the laboratory itself.

10   Everything was in place.  It took us, it was

11   approximately ten months after I started working

12   that we accepted our first case.

13        Q.   Now, do you have a supervisor?

14        A.   Yes, I do.

15        Q.   Who is that?

16        A.   My supervisor is Doctor Thomas Caskey,

17   who is the director of the Institute of

18   Molecular Genetics and the medical director of

19   the diagnostic laboratory at Baylor.

20        Q.   Now, in fact, did you do some testing

21   for us in connection with this case?

22        A.   Yes, I have.

23        Q.   In setting up your laboratory, does

24   each laboratory have to have some kind of

25   database or base information in order to process

476

1  and do your comparisons?

2      A.  Well, to actually just do a comparison

3  between two samples you would not have to have a

4  database.  You could make a comparison between

5  the results and say this sample could not have

6  come from this person or it could have come from

7  this person.  If you declare that it has been a

8  match, that is, that the sample could have come

9  from a known individual, in order to give any

10  statistics, that is, how often could this DNA

11  pattern be seen in the general population, then

12  you do have to have a database.  We ran a number

13  of samples in our laboratory and collected data

14  to form a database for ourselves.

15      Q.  Is that part of what you were doing

16  during that ten month period?

17      A.  Yes.  And even sometime after that.

18      Q.  You mentioned that you did some

19  training or studying at the FBI laboratory.

20  Does your laboratory use basically the same

21  techniques and methodology that the FBI

22  laboratory does?

23      A.  Yes, we do.

24      Q.  Let me show you some -- I have marked,

25  contained in this envelope that is marked

1    State's Exhibit 105 there are four smaller
2    envelopes.  First look at the large envelope,
3    State's 105, that has been marked just for
4    identification purposes.  Do you recognize that
5    container?
6         A.    Yes, I do.
7         Q.    How is it that you are able to
8    recognize that container?
9         A.    It has my laboratory number and my
10   initials on it.
11        Q.    When material comes to your laboratory
12   for testing, do you assign your own laboratory
13   number?
14        A.    Yes, I do.
15        Q.    You are not satisfied with the other
16   laboratory's number, is that right, you want to
17   put your own on it?
18        A.    We use our own tracking system.
19        Q.    Okay.  At the DNA lab, when you
20   receive evidence, you put on your lab number; is
21   that right?
22        A.    Yes.
23        Q.    What lab number did you assign?
24        A.    I gave it the number F for forensic,
25   911108, which is the date the evidence was

1    initially received, and 035, which is the

2    special number, means it was thirty-fifth case

3    that we received that year.

4         Q.    F91108035?

5         A.    You missed it one.  F911108035.

6         Q.    Okay.  You said the date you received

7    the evidence is reflected where?

8         A.    F911108.   Eleventh month, eighth day

9    of '91.

10        Q.    So he received it on November eighth

11   of '91.

12        A.    Yes, that is correct.

13        Q.    Now, who did you receive evidence from

14   in this case?

15        A.    We received the evidence from Kristy

16   Kim of the Houston Police Department crime

17   laboratory.

18        Q.    Now, you had told us that you

19   recognize this envelope because of the lab

20   number.  And are there initials on here to help

21   you recognize it?

22        A.    Yes, I indicated that as well.

23        Q.    These are your initials?

24        A.    Yes, they are.

25        Q.    Inside that envelope are four smaller

1    envelopes.  In fact, did you see these as
2    recently as yesterday?
3         A.   Yes.
4         Q.   And when was it that you last saw
5    these four envelopes, State's Exhibits 101
6    through 104?
7         A.   I turned them back over to Kristy Kim
8    of the Houston Police Department laboratory
9    yesterday afternoon.
10        Q.   Were they in the same condition, other
11   than the fact that these exhibit stickers have
12   been added, do they appear to be in the same
13   sealed condition as when you gave them to her?
14        A.   Yes.
15        Q.   Are there any identifying marks on
16   each of those four packets 101 through 104 that
17   enable you to ascertain that they are the same,
18   that this is the evidence you received from
19   Kristy Kim and turned back over to her?
20        A.   Yes, they have my laboratory number
21   and my initials on them.
22        Q.   Are there any other identifying
23   numbers on there?
24        A.   Lots.
25        Q.   A lot?

1       A.      Yes.

2       Q.      Does it have the Houston Police

3   Department identifying laboratory number on the

4   container, the envelope as well as the vials

5   contained in those envelopes?

6       A.      Yes, it does.

7       Q.      What is that number?

8       A.      L91-9937.

9       Q.      So when you start the process, when

10  the evidence comes into your laboratory, was

11  there also a submission form?  Other than the

12  actual physical evidence, did they give you some

13  paperwork for you to track your work?

14      A.      We have a submission form for our

15  laboratory that we fill out with the evidence

16  that we receive from them.   We receive from

17  them an evidence receipt.   And it's the Houston

18  Police laboratory evidence receipt which

19  reflects when they turned it over to us as well.

20      Q.      So, does your receipt also reflect the

21  Houston Police Department laboratory number that

22  this case was in connection with?

23      A.      Yes, it does.

24      Q.      That is what?

25      A.      L91-9937.

1    Q.   Now, did you bring with you today your

2    file in connection with this case?

3    A.   Yes, I have.

4    Q.   Let me show you what has been marked

5    for identification purposes as State's Exhibit

6    -- marked incorrectly.  It has to be

7    re-marked.  State's Exhibit 106.  Let me ask you

8    whether you recognize that, is it a three or

9    four page document?

10   A.   Four page document.

11   Q.   Four page docket marked State's

12   Exhibit 106?

13   A.   Yes.  It's a copy of laboratory report

14   that I wrote on this case.

15   Q.   Now, is this your original document

16   from your file?

17   A.   No.  It's a copy of the report that I

18   have in my file.

19   Q.   Have you had a chance to look at

20   this?  Is it an exact copy of your original

21   report?

22   A.   Yes.

23   Q.   And is this report a part of your

24   records that you keep in the regular course of

25   business there at your laboratory?

1      A.   Yes, it is.

2      Q.   Was it prepared by an employee who has

3  personal knowledge of the information that is

4  being put in this report?

5      A.   Yes, it was.

6      Q.   In fact, who prepared it?

7      A.   I prepared the report.

8      Q.   Is this report, State's Exhibit 106,

9  prepared at or near the time of the events that

10 are being recorded?

11     A.   Yes.

12          MS. DAVIES:  Your Honor, at this time

13 I tender to defense counsel for his inspection

14 State's Exhibit 106, and I will offer it into

15 evidence.

16          MR. STAFFORD:  We have no objection.

17          THE COURT:  State's 106 is admitted.

18 BY MS. DAVIES:

19     Q.   Now, can you explain to us, when you

20 received these little vials in the envelopes 102

21 through 105 -- wait a minute -- 101 through 104,

22 how did you make use of those vials or the

23 contents of the vials?

24     A.   The vials contained DNA that was

25 extracted from the evidence in the case at the

483

1    Houston Police Department crime laboratory.

2         Q.   So, is that the first step in the

3    process of DNA comparison?

4         A.   Yes, it is.

5         Q.   I want you to help me.  As a part of

6    your comparison, did you rely on the information

7    on those vials as to where the DNA extraction

8    had come from?

9         A.   Yes, I did.

10        Q.   All right.  Would you look at each of

11   those little envelopes and tell me first --

12   which one do you have in your hand now, State's

13   Exhibit number?

14        A.   102.

15        Q.   102.  That is DNA extraction from what

16   source?

17        A.   DNA isolated as a known from Charles

18   Allen.

19        Q.   What is the next envelope?

20        A.   103.  This is DNA isolated as a known

21   from -- and it's labeled Robert Rhodes.

22        Q.   Robert Rhodes.  What laboratory number

23   is on there from the HPD lab?

24        A.   L91-9937.

25        Q.   Is that the same lab number that is on

1    all these samples?

2         A.    Yes, it is.

3         Q.    All right.  And let's look at the next

4    sample, please.

5         A.    State's Exhibit 104 is DNA isolated

6    from blood on the kitchen floor.

7         Q.    Kitchen floor.

8               Do you have another small envelope

9    there?

10        A.    It's State's Exhibit No. 101.

11        Q.    101.  What is the source of the DNA

12   extraction?

13        A.    DNA isolated from blood on the kitchen

14   drawer.

15        Q.    Kitchen drawer?

16        A.    Right.

17        Q.    Once you received those DNA

18   extractions in your laboratory, what is the

19   first thing you do?

20        A.    The first step of the process after

21   the DNA is extracted is to do what we call a

22   restriction digest.

23        Q.    Do you have some visual aids to help

24   you in explaining this process?

25        A.    Yes, I do.

1      Q.   Let me call your attention to what I

2  have marked for identification purposes as

3  State's Exhibit 107.   Does this poster reflect

4  some of the visual aids that you commonly use in

5  explaining your process?

6      A.   Yes, it does.

7           MS. DAVIES:  Your Honor, at this time

8  I am tendering State's Exhibit 107 to defense

9  counsel.   I would like to offer this into

10 evidence with the court's permission to

11 substitute a photograph at the conclusion of

12 trial.

13          MR. STAFFORD:  No objection.

14          THE COURT:  State's 107 will be

15 admitted and a photograph will be allowed to be

16 substituted for the record.

17 BY MS. DAVIES:

18     Q.   I am trying to position this where you

19 can see it so you can still use the

20 microphone.   Can you see this well enough?

21     A.   Yes, I can.

22     Q.   I notice at the top it says Southern

23 Blotting.   What does that term mean?

24     A.   Southern Blotting is a phrase that is

25 commonly used in the laboratory to mean DNA

1    typing.   Southern Blotting is actually only one
2    very small portion of the DNA typing, but it's
3    generally referred for the whole system.
4         Q.   Is that because we do this testing in
5    the South?
6         A.   No.  Southern actually comes from the
7    person's name who originated the type of test,
8    name was Edward Southern.
9         Q.   Thank you.   To understand this, do we
10   start at the top left?
11        A.   Yes.
12        Q.   I notice it says bloodstain.   Are we
13   starting before you actually begin in your lab
14   in this process?
15        A.   Well, in this case that is where I
16   start in the lab.  In lots of cases, we do get
17   in the actual evidentiary stain, whether they be
18   blood or some other stain, to do the DNA
19   extraction from.
20        Q.   So, when it says bloodstain, what does
21   that indicate?
22        A.   It just means that the evidentiary
23   sample, whether we had a bloodstain, a liquid
24   blood sample, the type of evidence that we might
25   get.

1       Q.   Once you have a sample from a

2   bloodstain, the next step is what?

3       A.   It's to extract the DNA from the

4   sample, either the blood or other tissue sample

5   in that stain.

6       Q.   In this instance, that was done in the

7   HPD lab and sent over to you in the form of

8   these vials; is that correct?

9       A.   Yes.

10      Q.   Okay.  In the four exhibits that you

11   have identified as 101 through 104; right?

12      A.   Yes.

13      Q.   All right.  Now, once you receive

14   that, do you go to the next step?

15      A.   Yes.

16      Q.   That is what?

17      A.   That is restricting the DNA.

18      Q.   Now, please try to keep it in very

19   simple laymen's terms.  Some of us don't

20   understand the laboratory like you do.  Okay?

21      A.   A restriction enzyme is an enzyme that

22   comes from various bacterial sources, and it is

23   also contained within the cells of humans.  But

24   restriction enzymes have the capability of

25   cutting through long strands of DNA.  One of

1    those recognized is a certain base pair sequence

2    in the numerous base pairs of the strands of

3    DNA.  When it finds the sequence that it

4    recognizes, it cuts the DNA there.  In any

5    particular person's DNA, a restriction enzyme, a

6    particular restriction enzyme same will always

7    cut that DNA in the same places.  We use the

8    restriction enzyme Hae III, h-a-e, Roman numeral

9    three.  It's just a designation of the enzyme

10   itself.  And if we take my DNA and cut it with

11   that enzyme, it will cut it into a number of

12   fragments.  If I cut it today, it will cut it

13   into those fragments.  If I cut it tomorrow, it

14   will cut it always into the same fragments.  And

15   that allows us to produce a pattern of DNA

16   fragments which can be compared from individual

17   to individual.

18        Q.   In laymen's terms, if it cuts the same

19   place every time, constant, is that so that you

20   have got a constant standard to compare by?

21        A.   Well, in any particular person, for

22   instance, your DNA, anytime I cut your DNA with

23   this same enzyme, it will give the same pattern

24   of smaller fragment sizes.  That allows us to

25   take two samples that come from the same person,

489

1   cut them, and then compare them and see whether
2   we get the same pattern in our end result.
3        Q.   When you say a fragment, you are
4   talking about a fragment or piece of this long
5   strand of DNA that is in every cell?
6        A.   Yes.
7        Q.   So, then you use this enzyme to cut a
8   strand of DNA into a smaller piece.  What?  Just
9   because that is more manageable in the
10  laboratory?
11       A.   No, that allows us to make comparison
12  of the sizes that we get.   Different people
13  will get a different pattern of the size
14  fragments.
15       Q.   After you do that, then what do you do?
16       A.   Then we just have these fragments now
17  in a tube.  What we need to do is spread them
18  out so that we can look at them.  So we do what
19  we call electrophoretic separation, which is the
20  next picture on the diagram.
21       Q.   What happened to the transfer?
22       A.   If you will follow the arrows, it goes
23  down to.
24       Q.   See why I wanted you to keep it
25  simple?

490

1       A.    What we do here is we put the
2   restricted or cut up DNA sample into a well of
3   an agarose gel.  Agarose gel is simply a slab of
4   material that is a jello like material.    This
5   acts as a molecular seal.    We put an electrical
6   current through this gel, and the DNA moves
7   through the gel.  Smaller fragments will move
8   more quickly and move down through the gel
9   quickly.  And larger fragments will move slower
10  through the gel so that they will be -- they
11  won't move as far in the same length of time.
12  This allows us to run this for a set length of
13  time.  We run our gels for eighteen hours.    And
14  spread the fragments of DNA out across the gel.
15      Q.    You spread them out so that you can
16  examine them at a later time?
17      A.    Right.    They are now sorted by size.
18  So the largest fragments or the longest
19  fragments with the larger number of the base
20  pairs are still near the top of the gel.  And as
21  you go down toward the bottom of the gel the
22  fragments are smaller and smaller.
23      Q.    In this case you had four different
24  samples of DNA, the kitchen drawer, the kitchen
25  floor, Charles Allen and R.R.  From that other

491

1    vial.  Do you spread all of those out on the

2    same gel, or do you do separate ones for each?

3        A.    They are all on the same gel.    Run in

4    different lanes of the gel along with some other

5    controlled samples.  When the DNA moves through

6    the gel, it's loaded in a very particular area

7    of the gel.  As it moves down through it, it

8    moves in a straight line right down the gel.  So

9    if you could look at the DNA in the gel

10   afterwards you just see this long line of the

11   DNA down through the gel.  That is the DNA

12   spread out from high molecular weight to low

13   molecular weight.

14       Q.    So your samples stay distinct and

15   separate?

16       A.    Yes, they do.

17       Q.    Then what do you do next?

18       A.    The agarose gel is like a slab of

19   jello, it will break.  So we want to move the

20   DNA out of that gel onto something that will

21   hold it so that we can do other testing.    We

22   use a piece of nylon paper, we call it a nylon

23   membrane.    Sometimes called a filter.  We do

24   that by capillary action.    We put the filter on

25   top of the gel and allow the liquid to soak up

1    through the gel into the filter.  When the

2    liquid passes through the DNA, it will carry the

3    DNA up out of the agarose where it's trapped by

4    the filter, and it will be then trapped on the

5    filter in the exact same pattern that it was in

6    the gel.

7        Q.    So now you have got the same pattern

8    that was on this jelly substance, something that

9    is easier for you to handle?

10       A.    That's right.

11       Q.    Then what do you do?

12       A.    The next step starts the actual

13    analysis, actual looking at a particular DNA

14    locus, that is, particular place on one of your

15    chromosomes or particular place in your DNA that

16    has differences between individuals.  And we go

17    through that process.  The first step in that is

18    called hybridization.  For hybridization, we

19    take a short section of DNA that is known to

20    come from a specific place.  We denature it,

21    that is, separate the two strands so it's now

22    single stranded.  It's one-half of the DNA

23    ladder.  That piece is then labeled with a

24    radioactive molecule.  By chemical reaction, we

25    can just attach a radioactive molecule to that

1  single strand of DNA probe.  We then put it in a
2  solution with this filter and let that solution
3  hybridize or just sit with the solution washing
4  over the filter.  And we allow that to go
5  overnight.  What this allows us to do is to
6  have that single strand of DNA come in contact
7  with the DNA that is on the filter.  In the
8  process of the transfer of the DNA to the
9  filter, we also separated the two strands of DNA
10 on the filter.  So now this radioactive probe
11 can come along and find its exact match and
12 re-allele, as we talked before, that is, find
13 its match and attach back together with the DNA
14 at the particular place in all of your DNA that
15 it belongs.  And it marks that spot on the DNA
16 that is spread out across the filter.  Then
17 from there we go on, wash off any excess of this
18 radioactive probe, that is, wash off any probe
19 that hasn't bound to its exact match in the
20 sample, and then take the filter and put it
21 against x-ray film because this probe has a
22 radioactive molecule attached to it.  Anywhere
23 that it has attached to the DNA in the sample it
24 will make a black mark on the x-ray film.  And
25 we then get a pattern which, or we develop the

494

1   film, we get what we call an autorad which shows

2   a pattern which is depicted on the diagram that

3   could be different between different samples on

4   the gel and then will reflect the size of the

5   DNA fragments that contain the specific DNA

6   probe.

7        Q.   Now, did you go through that entire

8   process with the samples that were given to you

9   in this case?

10       A.   Yes, we did.

11       Q.   Do you end up with something similar

12   or like an x-ray film?

13       A.   Yes, we do.  We end up with several of

14   them.

15       Q.   Now, you used the term -- you talked

16   about doing a probe.  Can you, in laymen's

17   terms, tell us what a probe is?

18       A.   The probe is a short piece of DNA that

19   we can then mark with a radioactive molecule

20   that is specific for a particular place in your

21   DNA.  And those probes have names or locations

22   on the chromosomes.

23       Q.   This is what assists you in making an

24   identification?

25       A.   Right.  These are what we make the

1   identification with by examining these

2   particular probes and areas on the DNA, and

3   these areas are genetic markers like A-B-O

4   typing would be.

5        Q.   Is it more exact?  When you say A-B-O

6   typing, are you talking about blood typing?

7        A.   Yes.

8        Q.   Do y'all have type A, type B, type O?

9        A.   Type A, B and type O, yes.

10       Q.   If I am understanding you correctly,

11  it could be much more precise in identifying

12  somebody by DNA than by A-B-O typing?

13       A.   The genetic markers that we look at,

14  the particular places on the chromosomes we look

15  at are more polymorphic than A-B-O type, that

16  is, A-B-O can have three possible alleles, A, B

17  and O, and they can be combined to give you

18  blood types of A-B, A-B and O.  The number of

19  alleles that any particular--.

20       Q.   You just used a word that I am not

21  familiar with, allele?

22       A.   Allele is the genetic variance.

23  A, B and O are the alleles in the A, B, O blood

24  typing system.  Any particular allele or

25  genetic variance in the DNA typing, there is

496

1    just more of them.   Instead of it just being

2    three alleles and four possible types, there is

3    really an unknown number of alleles but greater

4    than twenty, and these can be combined in

5    combinations of two to provide almost an

6    infinite number of types in any one genetic

7    locus.

8         Q.    Is it combination, then, that makes

9    each individual DNA distinctive?

10        A.    Yes.   When we look at several genetic

11   markers by DNA typing, then the probability that

12   one person will have the same type at several

13   different loci becomes quite small.

14        Q.    Now, when you say you do a probe, do

15   you just do one probe, one test for comparison

16   in order to reach your conclusion?

17        A.    No.   We have five different genetic

18   loci that we look at using DNA probes.

19        Q.    So, when you use five different

20   probes, does that mean that you go through this

21   process you have described five times?

22        A.    We go through the process from the

23   hybridization on, incubating it with the probe,

24   washing it and putting it in the x-ray film five

25   times.

1    Q.    I am interested in knowing the process

2    of whether you exclude someone, in other words,

3    can you look at -- do you have to go through

4    that process five times to determine that, well,

5    this just can't be the same person exclusively?

6    A.    No.   If you have excluded someone,

7    you would probably exclude them with just one

8    probe.    You would be able to see that the two

9    samples did not match, and you could stop

10   there.   We generally continue through and do all

11   of our probes on a particular case just for

12   completeness.   But even after one probe, if the

13   two samples don't match, then you have excluded

14   those samples as having come from the same source.

15   Q.    If you do your first probe and

16   comparison and the person is not excluded, in

17   other words, they are included, some portion of

18   the DNA matches up, why is it you go on and do

19   additional probes?

20   A.    If it does match?

21   Q.    You have a match on probe one, why

22   don't you stop there?

23   A.    Well, those allels or the bands of

24   pattern we see occurs in a certain percent of

25   the population.   We could stop and say:  Okay,

498

1    well, this matches and this pattern occurs in

2    this whatever percentage of the population.

3    That is what you do with A, B, O typing, if you

4    match A, B, O types, you say okay, you know, we

5    get type A, this sample could have come from

6    this person because this person also has type A

7    and that occurs in forty percent of the

8    population.  With one DNA probe, that percentage

9    is going to be much smaller but it still might

10   be even as much as two or three percent of the

11   population, depending on exactly what type the

12   person has.  If we go on and do two, three,

13   four, five probes, all those percentages can

14   then be combined together.  These probes all

15   lie on different chromosomes.  They are

16   unrelated.  So you can say that you can then

17   essentially multiple the numbers together and

18   you get a frequency in which the combined

19   pattern could occur in the population.  And

20   that can become very, very small.

21       Q.   So, is your combination, your pattern

22   -- as you get more information about your

23   pattern, you can be more precise in calculating

24   how often that would occur?

25       A.   Well, the percent of people that that

1    combined pattern could occur in will get smaller.

2         Q.    Now, you brought your report with you

3    today and we have got it in evidence as State's

4    Exhibit 106.  In doing your probes and in doing

5    your comparisons, did you use some numbers in

6    identifying what you were -- as you lined up

7    your samples for comparison?

8         A.    I am not sure what you are asking.

9         Q.    Let me call your attention to the

10   first page of State's Exhibit 106.

11        A.    Yes.

12        Q.    I notice you have got some numbers 101

13   through 104.

14        A.    Yes.

15        Q.    Okay.  Now, those are not my exhibit

16   numbers; are they?

17        A.    No, they are not.

18        Q.    Strikingly familiar, unfortunate

19   coincidence, but I need to know what you use --

20   instead of talking about the numbers, let's do

21   it this way.  Did you keep track of your samples

22   so that you could know what you were matching up

23   by a numbering system?

24        A.    Yes, I did.

25        Q.    May I see the x-rays, the prints which

500

1    you ended up with?  Is there one for each of the

2    five probes?

3         A.    Yes, there is.

4         Q.    Are those a part of your records also?

5         A.    Yes, they are.

6         Q.    Can you describe for the jury -- did

7    you identify for your purposes as you were

8    laying out these samples which sample you were

9    comparing, whether it was the sample from

10   Charles Allen or the drawer or the floor, and do

11   that consistently in each of your probes?

12        A.    Yes.

13        Q.    Now, when you did the first probe, can

14   you tell us what results, what you learned in

15   terms of whether or not any of these matched up?

16        A.    Okay.  For all of the probes that we

17   ran, we found that the pattern that was

18   developed for the DNA from the known blood of

19   Robert Rhodes or Robert Rhodea gave the same

20   pattern as the DNA from the blood found on the

21   kitchen floor and gave the same pattern as the

22   blood that was on the kitchen drawer.

23        Q.    All right, let me be sure I

24   understand.   You are saying that the sample

25   that was brought to you that was the DNA

501

1    extraction that was labeled Robert Rhoades or

2    Rhodea with the HPD lab number did match, line

3    up with what sample?

4         A.    The samples from the kitchen floor and

5    the kitchen drawer.

6         Q.    Now, that was true on each of the five

7    probes?

8         A.    Yes, it was.

9         Q.    Is that something that you can see

10   visually when you are doing your comparisons?

11        A.    Yes, it is.

12        Q.    As you ran, as you compared the DNA

13   sample from Charles Allen, did it match up on

14   any of the probes with any of the other samples

15   that you had?

16        A.    The DNA sample that we received from

17   Charles Allen was what we call partially

18   degraded, that is, the DNA wasn't all high

19   molecular weight.   It was already broken up

20   into some pieces.   In a sample like that,

21   sometimes it will not give results at all.   In

22   this case, we got no pattern for any of the

23   probes for Charles Allen due to this degradation

24   of the sample of the DNA.

25        Q.    Is that to say that you were not able

1    to, I mean, you just wouldn't be able to reach

2    any conclusion at all as to Charles Allen?

3         A.    That is correct.

4         Q.    Presence or lack.  Okay.

5               Now, when you talk about the bands of

6    DNA--.

7               Your Honor, may I ask for some

8    assistance?  I would like to set up the light

9    box.

10              If you would, would you walk around

11   here.  It's a challenge in this courtroom to

12   situate things where everybody can see.   Can

13   you display for us the film that you have from

14   your first probe?  Let's try to show the jury

15   what it is.

16        A.    I will simply do these in the order of

17   the probe zones.

18        Q.    In the order of the probe zones?

19              Let me give you a pointer.  Maybe that

20   will help you.

21        A.    This is the autorad that we developed

22   for the probe called MS1 or D1S7.  Meaning it's

23   on chromosome 1.  It's the location that was

24   assigned on the chromosome.

25        Q.    You need to keep your voice up.

503

1      A.    Across the autorad we see that there
2   are several lanes with different numbers of
3   bands, dark lanes on the autorad.   The lanes
4   that have a large number of bands are our
5   controls, and these are molecular weight
6   markers.   Each of these bands corresponds to a
7   particular size fragment of DNA that is known.
8   We just know what sizes those are.   Those
9   control to allow us to assign a size to any
10  other band that appears on the autorad.
11          The next lane here has two bands, is
12  our control that we call what we call human
13  standard or sizing control.   And this is the
14  DNA sample that we run on every gel, and after
15  we get the pattern on every autorad, and it
16  allows us to make sure that the gel ran
17  correctly and we are getting the correct sizing,
18  correct pattern with any particular probe.
19  This DNA is actually my DNA, and we use it as a
20  control throughout the process.   In cases where
21  we actually do the extraction, we start with a
22  blood sample and take that sample through the
23  entire process as a control for the whole
24  procedure.
25          The next lane is labeled 101.   That

504

1     is our sample number that was assigned to the

2     sample from Charles Allen.

3         Q.    Not the exhibit number?

4         A.    Not the exhibit number.

5         Q.    That is Charles Allen?

6         A.    Yes.

7         Q.    All right.

8         A.    As we look down that lane we see that

9     it's blank, there are no bands in that lane.

10    That is the sample that was degraded, and we

11    didn't get a pattern for any of the probes in

12    that sample.

13            The next lane is sample 102.  And we

14    see two.

15        Q.    Instead of a number, tell us where

16    that sample is from.

17        A.    That sample.

18        Q.    Because that's your designation?

19        A.    That is the DNA from the known blood

20    of Robert Rhoades.  And it contains two bands,

21    two marks on the autorad in a particular

22    location as compared to the molecular weight

23    marker.  We then have another molecular weight

24    marker.  And then we have sample of DNA that

25    was from the blood from the kitchen floor.  And

                                                505

1    that sample still has particular patterns that
2    is developed in this probe.
3                The next pattern, the next sample is
4    the DNA from the blood from the kitchen drawer.
5    And that also has a particular pattern that is
6    developed in this probe.
7                The next lane what we call the
8    sensitivity standard.  It's the same human
9    standard run at a very low level.  And that
10   gives us like a cut off point in terms of how
11   much DNA we have.  In this case, we don't see
12   any pattern from that.  We found that throughout
13   all the probes.  So we know that we are not
14   testing an amount of DNA actually down to that
15   level in a particular case.  If we had an, for
16   instance, a sample from Charles Allen, if that
17   was the sample that we knew had not been
18   degraded, it would indicate that maybe we didn't
19   get a pattern simply because there wasn't enough
20   DNA present.  That can be a problem on an
21   unknown sample, that is, a sample from an
22   evidentiary source as opposed to a known
23   sample.  For this sample, we know that that was
24   extracted from a known blood sample.  We know
25   that we had enough DNA but it was degraded.

506

1    If we look at the pattern and compare
2  the pattern from the two unknown samples as the
3  DNA from the blood on the floor and the drawer,
4  we see that the bands in those patterns follow
5  in the relative position as the bands in the
6  known sample from Robert Rhoades; therefore, we
7  declare this to be a match.   We do this
8  visually to begin with -- do the bands fall in
9  the same general position.   If they do, then
10 the samples match and they could have come from
11 the same source.
12      Q.   Now, I think for most of us we expect
13 it  to look far more intricate than that series
14 of dots that we are seeing.   If I am
15 understanding you -- correct me if I am wrong --
16 these vertical rows are pictures, if you will,
17 of just that DNA strand that you process?
18      A.   Portions of the DNA that are
19 identified by this particular.
20      Q.   That is each lane, the vertical series
21 of dots.   It's when we have this horizontal
22 match or lineup is where the radioactive one has
23 matched, has found a mate, so to speak?
24      A.   The two samples have patterns that are
25 in the same relative position.   It can't be

507

1    excluded from coming from the same source.

2        Q.    You're looking for the lineup, anytime

3    you have got a horizontal alignment or match; is

4    that right?

5        A.    Yes.

6        Q.    Too simple I know, but.    If you

7    would, just put up -- did you get a match with

8    your known sample from Rhoades on each of your

9    probes?

10       A.    Yes.

11       Q.    Can you just show us where the match

12   is in each instance?

13       A.    This is probe that is for DNA locus

14   chromosome two.   Again, see the known sample.

15   The standard sample gave the expected pattern.

16   The known sample and the two unknown samples all

17   have bands at the same relative position;

18   therefore, match the known sample.

19       Q.    Were those matches -- the match comes

20   with Rhoades' sample matching up to the sample

21   both from the drawer and the floor in the

22   kitchen; is that correct?

23       A.    Yes, that is correct.

24            This is the pattern obtained from

25   probe that is on chromosome four.    Again, our

1    human standard came up and gave us a pattern

2    that, the expected pattern.  The known sample

3    from Rhoades and our two unknown samples again

4    gave the same pattern, have bands in the same

5    relative position and, therefore, a match for

6    this probe.

7        Q.   A match between Rhoades?

8        A.   And both unknown samples.

9        Q.   Being what?

10       A.   DNA from the blood on the kitchen

11   floor and the DNA from the blood on the kitchen

12   drawer.

13        This is the autorad of the probe

14   location on chromosome 14.  Again we get a

15   pattern with the human standard.  Gives

16   expected band size.  And we see a pattern for

17   Rhoades and for the unknown sample from the

18   floor and the kitchen drawer that have bands in

19   the same relative position and are a match to

20   Robert Rhodes.

21       Q.   Did you get yet another match?

22       A.   This probe is from a location on

23   chromosome fifteen.  Again, with doing standard

24   control, we got our expected size pattern, and

25   with the DNA from Rhoades we got a pattern that

1    has bands in the same relative position and,

2    therefore, matches to the pattern that was

3    obtained from the DNA from the kitchen floor and

4    the DNA from the blood from the kitchen floor.

5         Q.    You used that known, that control each

6    time just to check your test to make sure it's

7    working properly?

8         A.    Right.  And it lets us know that the

9    probe we used was the correct one and is giving

10   us the correct pattern and lets us know that the

11   gel ran correctly, that is, the DNA spread out

12   correctly so it's giving us correct size and

13   pattern.

14        Q.    Thank you.   Now, after you examined

15   your results visually, then what did you do?

16        A.    If we do a visual examination and we

17   exclude, that is, the patterns aren't the same,

18   then we are essentially finished and we can

19   write a report and say that the samples have not

20   come from the same source.   In a case like this,

21   where we have found the same pattern in the

22   unknown samples and the known sample, we then go

23   to computer and do a computer imaging of the

24   autorad, and using the molecular weight markers

25   now assign a number that is a size, a length of

510

1    the DNA to each of the bands that we see.  This

2    allows us another matching source.  If the

3    numbers that are generated by the computer for

4    each of the bands that visually match have to

5    fall within a certain percentage of each other

6    that takes into account the differences in how

7    the gel runs from low molecular weight to high

8    molecular weight, the problems in the imaging as

9    far as, you know, not placing things in the same

10   place.  But if they fall within a certain

11   tolerance which is essentially our error rate

12   for the measurement, then it's declared to be a

13   computer match or the match is confirmed by the

14   computer, and then we can go to our database and

15   generate statistics as to how often that pattern

16   occurs in the population.

17        Q.   Now, did you go to that final stage of

18   calculation based on the database that your

19   laboratory has to calculate frequency of the

20   existence of the pattern that you saw in this

21   case?

22        A.   Yes, I did.

23        Q.   Did you form an opinion, Ms. Hammond,

24   as to the frequently with which the DNA pattern

25   that you saw matching, in other words, Rhoades'

1    pattern as it matched with the sample on the

2    kitchen floor and drawer, how frequently would

3    that occur in the population?

4         A.    The pattern that we found for Rhoades'

5    over all five probes occurs in approximately

6    seven ten-millionths of one percent of the

7    Caucasian population.   That is a frequency of

8    approximately one in 135 billion people.

9         Q.    One in 135 billion people?

10        A.    Yes.

11        Q.    Let me be sure I understand that.   Did

12   you expect to have to take blood samples from

13   135 billion people before you would ever come

14   across this same pattern again?

15        A.    Yes.

16        Q.    Now, is there an even more

17   conservative way to calculate this?   Was that

18   your conclusion based on your work in your

19   laboratory and the database available?

20        A.    Yes.

21        Q.    Is that the opinion that is reflected

22   in your report that is in evidence as State's

23   Exhibit 106?

24        A.    Yes, it is.

25        Q.    Would some experts calculate it

1    differently?

2         A.   Yes.

3         Q.   How would they calculate it and why?

4         A.   Well, there has been some disagreement

5    among the experts that have been sort of

6    fighting in DNA typing over how these

7    calculations have been made.   Another way to do

8    the calculations, this year, it was in April,

9    sometime after this report was written, this

10   year, the National Academy of Science put out a

11   document that reflected their research into DNA

12   typing and also into the methods of calculations

13   of the statistics.   And what they advocated,

14   which it doesn't make it law or anything but

15   it's just what they suggested as perhaps would

16   be a more conservative way to do the

17   calculations, is what they call a ceiling

18   principal.   And what that does is you go

19   through your database and you look at not just

20   the ethnic group or racial group that you

21   assigned or the suspect, your known sample has

22   been assigned to in this case just by visual

23   identification but look at all your ethnic

24   groups and look at how often each particular

25   allele occurs across those groups and take that

513

1    highest number.  Then go even further and say
2    that if that highest frequency for a particular
3    allele is not more than ten percent, to use ten
4    percent as the frequency of that allele.  And
5    that fairly well assures that your estimate of
6    how often a particular pattern will occur in a
7    population will be including a much larger -- or
8    rather, or make it a much smaller population
9    that that sample has to have come from.  So if
10   we go back and go through our database and do
11   this ceiling principle calculation using ten
12   percent with the numbers or less than that, we
13   come up with a different calculation.
14        Q.    What is that?
15        A.    It comes down to a frequency of
16   approximately one in 66 million people.   One in
17   66 million people.
18        Q.    So, if I am understanding you -- I
19   probably erroneously used the word people in
20   your first estimate.  The way you calculated it
21   in what your actual data available in your lab,
22   it would be one in 135 billion Caucasians?
23        A.    Yes.
24        Q.    If you recalculate in terms of more
25   conservative ceiling principle that includes all

1   races, it would be one in 66 million people; is

2   that correct?

3        A.   That's correct, yes.

4        Q.   So even under the more conservative

5   method you would expect to have to test and

6   compare 66 million people before you would have

7   that same pattern show up again; is that correct?

8        A.   Yes.

9             MS. DAVIES:   Pass the witness.

                    CROSS EXAMINATION

11  BY MR. STAFFORD:

12       Q.   Very briefly, ma'am.   I am gathering

13  what you are telling our jury is that you can

14  take known blood sources from unknown blood

15  sources and pretty well -- this is basically

16  like fingerprinting in a way except it's a

17  little more scientific and a little bit more

18  complex, but it pretty well accurately tells you

19  or matches up whether or not a person was there

20  or was not there?

21       A.   Well, it gives us a certain pattern

22  that we can say excludes or includes and then we

23  can put a probability on that.

24       Q.   You have already pretty well told the

25  jury that there are some disagreements among the

                                                    515

1    scientific community as to DNA, especially from

2    the defense side?

3         A.    Actually the disagreement among the

4    scientific community is only in how the numbers

5    should be calculated.

6         Q.    That is basically what it is.   For

7    example -- this has been previously introduced

8    into evidence -- for example, if the State had

9    brought you known blood samples of sufficient

10   amount say from this wall in this bedroom and

11   presented it to you, that would have been an

12   unknown source; right?

13        A.    Yes.

14        Q.    Other than it came from a wall?

15        A.    Yes, sir.

16        Q.    And presented a known source to you,

17   you could have done a comparison and maybe

18   determined whose blood that was on that wall;

19   could you not?

20        A.    I could have determined whether it

21   could have come from that known sample or

22   whether it did not come from that known sample.

23        Q.    And evidently you could come up with

24   basically a percentage one way or the other,

25   depending on what kind of data you get, and make

1    a projection; could you not?

2         A.   If we match to a known sample, then we

3    could give a statistical number.

4         Q.   And that would be true from any source

5    at the crime scene.   They could have submitted

6    various, as they did, in the kitchen?

7         A.   Yes.

8         Q.   They could have gone to the bedrooms

9    or bathrooms and presented it to you as well?

10        A.   Certainly.

11        Q.   You could have made a determination.

12             So, in essence, what you are telling

13   this jury is that if Mr. Rhoades has admitted

14   being in the kitchen  and leaving those drops,

15   basically what you are telling the jury he told

16   you the truth, he admitted being there.

17             MS. DAVIES:   I object to speculation

18   as to whether this defendant told the truth.

19             THE COURT:   Sustained.

20   BY MR. STAFFORD:

21        Q.   If he stated that he was in the

22   kitchen where these known blood sources came

23   from, there is no way -- your evidence doesn't

24   disprove that he wasn't there; does it?

25        A.   No, it doesn't.

1          MR. STAFFORD:   Pass the witness.

2               REDIRECT EXAMINATION

3    BY MS. DAVIES:

4          Q.   As to locations of Charles Allen's

5    blood, you had a sample there from Charles

6    Allen.   I believe that is the one that you said

7    was degraded and you did not get any results?

8          A.   Yes, that was a known sample, yes.

9          Q.   So if we had brought you samples from

10   the house from other locations where Charles

11   Allen's blood happened to be, would you ever be

12   able to establish that for us by DNA testing?

13         A.   With this particular known sample, we

14   would not have known whether it came from

15   Charles Allen or not.

16         Q.   You say it was degraded.   When

17   someone dies, does the quality of the blood

18   deteriorate?

19         A.   The DNA in the blood or in any sample

20   begins to deteriorate with time.   But it's also

21   affected by the condition of the sample.   So if

22   it's wet blood it will degrade more quickly.

23   There is bacteria and things that can go in and

24   work on the cells and the DNA, break it down.

25   And a dry sample, it becomes more preserved.

1    The bacteria, mold and things won't grow as well

2    in a dry sample as they might in the wet.  It's

3    not uncommon for us to find degraded DNA from

4    the sample from a deceased individual.

5         Q.   The ideal situation is when you have a

6    live human being who under laboratory conditions

7    gives you a clean blood sample to test?

8         A.   That is always nice.

9              MS. DAVIES:  Pass the witness.

10             MR. STAFFORD:  No other questions.

11             THE COURT:  You may stand down.

12             Any objection to this witness being

13   excused?

14             MS. DAVIES:  No objection.

15             THE COURT:  Ladies and gentlemen, take

16   a short break.   If you would, go back to the

17   jury room.

18             (Recess; after which, the following

19   proceedings were had:)

20             THE COURT:  Ms. Davies, call your next

21   witness.

22             MS. DAVIES:  The State calls Don

23   Allen.

24

25

519

1                         DON ALLEN

2    was called as a witness by the State and, having

3    been duly sworn, testified as follows:

4                    DIRECT EXAMINATION

5    BY MS. DAVIES:

6         Q.    Would you, please, tell us your name?

7         A.    Don J. Allen.

8         Q.    Mr. Allen, how are you related to

9    Charles and Brad Allen?

10        A.    I am their father.

11        Q.    Is your wife here in the courtroom?

12        A.    Yes, she is.

13        Q.    What is her name?

14        A.    Emma Allen.

15        Q.    And what about, do you have other

16   children?

17        A.    Yes, four other children that are here

18   today.

19        Q.    What are their names?

20        A.    James, Janis, Kevin and Donny.

21        Q.    Are they all sitting here in the

22   courtroom?

23        A.    Yes.

24        Q.    Are there other family members with

25   them?

                                              520

1       A.    Yes.

2       Q.    Are your other sons, your surviving

3   sons, are they married?

4       A.    Yes.

5       Q.    Mr. Allen, I want to ask you several

6   questions about your sons and the events leading

7   up to September 13 of 1991.  How long had you

8   and your family lived on Keith Street?

9       A.    A little over thirty years.

10      Q.    With the family, the wife and sons and

11  daughter that you have just described?

12      A.    Yes, the whole family.

13      Q.    I take it that you are certainly

14  familiar with the area around Keith Street?

15      A.    Oh, yeah.

16      Q.    Having lived there that long.  I would

17  like for you to clarify a couple of things for

18  us.  I am showing you a diagram that we have

19  marked State's Exhibit 12.  I will put it up

20  here where you can see it.  Is there a trailer

21  park near Keith Street, near 624 Keith Street

22  where your sons lived?

23      A.    Yeah, one right directly across the

24  street.  A driveway.

25      Q.    Right directly across the street?

1          A.    Yes.

2          Q.    Let me take my pen, if you would, and

3     just put a big T.  If this dot is where your

4     sons lived and 609 is your house, can you just

5     put a T approximately where that trailer park

6     is?

7          A.    (Complies).

8          Q.    Now, in back of the trailer park, is

9     there an open field area?

10         A.    Yes, there was about two acres of an

11    old trailer place abandoned, and they had all

12    these trailer houses, and weeds had grown up.

13    About two or three acres.

14         Q.    Of just open field back in here?

15         A.    Backing up to the next street, Smith

16    Street.

17         Q.    There on Smith Street, is there

18    another trailer park?

19         A.    Yes.  If you go all the way to the

20    left and go all the way down to the end of the

21    street, there is a trailer place on the right.

22         Q.    You say the end of Smith Street?

23         A.    That is correct.

24         Q.    Where would the trailer park be, about

25    in here?

1      A.   Yes.

2      Q.   Put another T.

3           And what about the area around that

4      trailer park, is there any open field area

5      there?

6      A.   Yeah, there is two or three vacant

7      acres in between the houses down to Smith.

8      Q.   Thank you.  Now, your sons, Charles

9      and Bradley, about how long had they been living

10     in the house at 624 Keith Street?

11     A.   Oh, I would say -- they hadn't closed

12     on that house yet, and I would say a couple of

13     weeks, maybe longer, maybe a little shorter.

14     Q.   As an adult, had your son Charles, had

15     he ever lived in the house with you during his

16     adult years?

17     A.   Oh, yes.

18     Q.   Were you in and out of his home there

19     at 624 Keith on many occasions?

20     A.   Yes.  Me and my wife, the day it

21     started, we was there every day.

22     Q.   When you say the day it started?

23     A.   The day they started building the

24     home.

25     Q.   Throughout construction?

1      A.    Yes, through the construction.   And at

2    the time he moved in.

3      Q.    And after they moved in, would you and

4    your wife go over there very often?

5      A.    Oh, yes, every day.

6      Q.    Coming and going from Charles and

7    Brad's house there, did you have occasion to

8    notice whether they had gotten in the habit of

9    being real careful of locking the doors?

10     A.    Bradley Dean would.   He was very

11   careful.   But I went over one day with my

12   sister-in-law, and the house was locked in the

13   middle of the day, but they had left a door open

14   around the back.

15     Q.    So one door?

16     A.    One door might be open, yes.

17     Q.    You made a point of saying Bradley

18   Dean is careful?

19     A.    Yes.    More so than Charles.

20     Q.    Would it be unusual for you to go over

21   to their house and for the door to be unlocked,

22   one of the exterior doors would be unlocked?

23   Would that be unusual or common?

24     A.    That would be common for it to be

25   unlocked.    At night, of course, I didn't go

524

1    over there at night.  During the day, most of

2    the time, it was open.

3         Q.   About how far was it from your house

4    to theirs?

5         A.   Half a block.  Maybe not that far.

6    Half a football field.

7         Q.   Had you noticed, through the years,

8    both when they lived with you and then, I guess,

9    more importantly, when they were living down the

10   street at 624 Keith, had you noticed what your

11   sons' habits were in connection with leaving

12   lights on around the house?

13        A.   They would leave the outside lights on

14   and sometimes the lights in the house.

15        Q.   Even at night?

16        A.   Even at night sometime.

17        Q.   Certainly I am not asking you whether

18   -- I assume that you do not know what lights

19   were on inside the house after you left?

20        A.   No, I don't have any idea.

21        Q.   But as a general thing, I mean, had

22   you had occasion to go over there -- let me ask

23   it this way.  Would you frequently go over in

24   the morning?

25        A.   Oh, yes.

                                                    525

1       Q.    Why was that?

2       A.    To watch the construction and

3    overseeing the builder and things I wanted

4    done.   I had built a couple of houses.

5       Q.    What about after the boys moved in?

6       A.    Oh, yes, I was over there at least

7    once a day.

8       Q.    And were there times that like would

9    you, say, just let yourself in, or how would you

10   get into the house?

11      A.    Up to the time he installed an alarm

12   system, and he gave me the code, but he left it

13   off most of the time, anyway, because David, his

14   friend David was coming and going, and his

15   brother was coming and going, and me and my wife

16   would come and go.  So, I can never remember

17   that alarm going off at any time.

18      Q.    Do you ever remember seeing it

19   actually in use?

20      A.    One day they was playing with it and

21   showing each other, and I didn't pay too much

22   attention to it.

23      Q.    As you would come and go from the

24   house after they were living there, did your see

25   it actually in use?

526

```
1        A.    No.
2        Q.    Let's go back, talking about the
3   lights.  Would you ever go over in the morning
4   to drink coffee with your sons?
5        A.    Oh, yes.
6        Q.    Now, if you would go over in the
7   morning, in fact, I didn't ask you do you work
8   during the day?
9        A.    No.  I am retired.
10        Q.    You are retired from what job?
11        A.    Anheuser Busch.
12        Q.    How long did you work there?
13        A.    Twenty-five years.
14        Q.    Are you enjoying your retirement?
15        A.    Oh, yes.
16        Q.    That allows you to go drink coffee?
17        A.    That was my major project every day.
18        Q.    So you would go over there in the
19   morning.  Would you just go right on in the
20   house, or how, would you knock first, what?
21        A.    Well, I usually knew if Charles was
22   working on not.   If he was home, sometimes if
23   he worked midnights he would come by our house,
24   but I knew he would go home and go to sleep.  I
25   wouldn't go over until that afternoon about four
```

527

1    o'clock.

2         Q.   On occasion, if he was home and you

3    would go in the morning, would you have an

4    opportunity to see whether the lights were left

5    on?

6         A.   Oh, yes.  I got on him a couple of

7    times about leaving the lights on.

8         Q.   Why was that?

9         A.   The electric bill.

10        Q.   Was that exterior lights?

11        A.   Yes.  He had a couple of lights

12   outside, exterior lights.

13        Q.   Would that be in the back of the house

14   as well as the front?

15        A.   He had some lights in the back of the

16   house, and they was left on sometime.

17        Q.   Did your sons have a dog or cat?

18        A.   No.

19        Q.   Tell me a little bit, if you know,

20   about Brad's eyesight.  Did Brad wear glasses?

21        A.   Yes.  He was nearsighted.

22        Q.   Did he wear contact lenses or

23   prescription glasses or both?

24        A.   He wore both.

25        Q.   Is that something that he did, always

528

1      when he was up and about?

2          A.    Yes, he had to have his glasses.    At

3      this particular time, I think he had skinned one

4      of his contacts, and he was wearing glasses.

5          Q.    So when he would get up in the morning

6      -- you did your hand up -- first thing, put on

7      the glasses?

8          A.    Yes.

9          Q.    What about Charles?

10         A.    No, Charles didn't wear no glasses.

11         Q.    Was Charles in the habit of, if you

12     know, when he was at home and comfortable,

13     walking around the house in his underwear?

14         A.    No, never.

15         Q.    Probably wouldn't be unusual for a

16     young man to do that?

17         A.    Not Charles.

18         Q.    How is it that you know that?    You

19     seem to be speaking pretty firmly there, Mr. Allen.

20         A.    He had an old robe that he wore.    You

21     have to understand.    He worked twelve hour

22     shifts, and that required him to shower after

23     work and shower before work.    So he would come

24     home, sleep, get up and put the robe on.    He

25     wouldn't change to his work clothes until it was

1    time to go to work, no matter what, who was

2    there or whatever.  He always wore that old

3    robe.   I threatened to burn it one time.

4         Q.   And now, to your knowledge, as his

5    father, he might sleep in his underwear; is that

6    right?

7         A.   Oh, yeah.

8         Q.   But if he is up around the house,

9    would you expect him to be going into the

10    kitchen or doing anything around the house?

11         A.   Not without that robe on.

12         Q.   Have you known your son Charles to

13    step outside the house say to get the newspaper

14    in the mornings or anything like that in his

15    underwear?

16         A.   Well, he wasn't taking a paper.   He

17    wasn't taking a paper, but he wouldn't step out

18    of the house without that robe on or clothes on.

19         Q.   Not even for an instant?

20         A.   No reason.

21         Q.   Let me call your attention to State's

22    Exhibit 68.  That robe that Charles always wore,

23    do you see it in State's Exhibit 68?

24         A.   Yes, it's hanging right there by the

25    door.

530

1    Q.   Is this the plaid robe right there?

2    A.   Yes.

3    Q.   Shown reflected in the mirror.

4         Do you know what schedule Charles

5   worked at his job with Lubrizol?

6    A.   They call it the schedule A and B.  At

7   this particular time, he was on the midnight

8   shift.  That is six o'clock in the evening to

9   six o'clock in the morning.

10    Q.   Would his shift vary from time to

11  time?

12    A.   Well, it would be like twelve hour

13  shifts.  He would work like three midnights, be

14  off two days and work two or three days six to

15  six again.  Then he would be off two days or

16  one day.

17    Q.   You said he was working from six p.m.

18  to six a.m.?

19    A.   At this time.

20    Q.   The week before his death; is that

21  right?

22    A.   No, he was working midnights.  He was

23  suppose to go to work that night from six to

24  six.  Midnights.  And he took off that night.

25    Q.   On Friday, the twelfth?

531

1      A.   On Friday, the thirteenth.

2      Q.   I am saying.  Okay.  I'm getting the

3  dates mixed up.

4      A.   He worked the twelfth.

5      Q.   He worked on the twelfth.

6      A.   Got off work at six o'clock that

7  morning.

8      Q.   So he had done a twelve hour shift?

9      A.   Yes.

10      Q.   From six p.m. on Wednesay, ending at

11  six a.m. on Thursday, the twelfth?

12      A.   That is correct.

13      Q.   And then did you see your son, did you

14  see Brad during the day on Thursday, the twelfth?

15      A.   Brad went to work that day.  And then

16  I seen him later on that night.

17      Q.   During the day on Thursday, the

18  twelfth, after Charles got off work at six a.m.,

19  did you see him during the day?

20      A.   Yes.

21      Q.   Do you recall what time of day that

22  was?

23      A.   It was around noonish, twelve, 1:00.

24      Q.   How was it that you happened to see

25  Charles?

1      A.   My sister-in-law and her daughter came

2    over and they wanted to see the house.   And I

3    said, "Well, he is probably up."   And, so, we

4    walked over, and he was there in his robe, and

5    we went in.   We wanted him to play the piano and

6    show the house.

7      Q.   Who was with you on that visit?

8      A.   My wife and sister-in-law and her

9    daughter.

10      Q.   Did Charles play the piano?

11      A.   Yes, he did.

12      Q.   What was the name of the CD that

13    Charles made?

14      A.   A Brand New Day.

15           MR. STAFFORD:   I object to the

16    relevancy.

17           THE COURT:   Sustained.

18    BY MS. DAVIES:

19      Q.   Is that what he played for you on the

20    twelfth?

21           MR. STAFFORD:   Again I object to the

22    relevancy of this matter.

23           THE COURT:   Sustained.

24    BY MS. DAVIES:

25      Q.   How long was your visit with your son

533

1  Charles at that time?

2      A.   I would say thirty to forty-five

3  minutes.

4      Q.   Did you leave or did he?

5      A.   No, we left.  We went back.  My

6  sister-in-law had to be home by 3:00, I believe

7  it was.

8      Q.   So, do you know whether Charles slept

9  during that day, since he had worked all night?

10      A.   No.  I asked him about that.  Because

11  I said, "Don't you have to go to work tonight?"

12  He said, "No, I am taking off."

13      Q.   Why was that?

14      A.   He was going to work on his studio

15  that night.

16      Q.   In fact, did you have any conversation

17  with your son about that, whether he was going

18  to work on the studio?

19      A.   He was going to work on the studio

20  that night, but he stayed up all that day.

21           MR. STAFFORD:  This would be all

22  hearsay, not relevant, and I object.

23           THE COURT:  I don't know that it's

24  hearsay.

25           Could you be a little more specific?

1          MR. STAFFORD:  I object to the

2    relevancy.

3          THE COURT:  Overruled.

4    BY MS. DAVIES:

5      Q.   If I understood you, Mr. Allen, you

6    said that your son Charles stayed up all day?

7      A.   Yes.

8      Q.   You were living right across the

9    street.  How do you know he stayed up all day?

10     A.   Well, he was with David earlier that

11   day, I believe, and when we went over I

12   questioned him, I said, "Don't you have to work

13   tonight?"  He said, "No, I am taking off.  I

14   have got to get this studio ready."  He was

15   having an opening house that Saturday, and

16   things changed during the day because he went

17   water skiing with his brother about three or

18   four o'clock that evening.

19     Q.   Which brother?

20     A.   That is Kevin Wayne.  And we was over

21   watching a football game, and they came back in

22   about eight o'clock.

23          MR. STAFFORD:  I request question and

24   answer.

25          THE COURT:  All right.

                                              535

1   BY MS. DAVIES:

2       Q.   Were you at Charles and Brad's home on

3   Thursday evening?

4       A.   Yes.

5       Q.   Was that with the group watching the

6   football game?

7       A.   Yes.

8       Q.   So, did Charles sleep during that part

9   of the evening while you were over there?

10      A.   No.  He came in from water skiing

11  while we were watching the football game about

12  eight o'clock.

13      Q.   And then did he stay up during the

14  evening while you were there?

15      A.   He stayed up as long as I was there.  I

16  questioned him.   I said, "When are you going to

17  sleep?"

18      Q.   Why were you concerned about your son?

19      A.   Well, I had worked graveyards and

20  midnights for twenty-five years, and I know how

21  your system works.  And he told me, says, "No, I

22  am going to take a nap and get up early in the

23  morning and start on it."

24      Q.   What was it that y'all were going to

25  work on in the morning?

536

1        A.    On the studio.

2        Q.    Mr. Allen, when was the last time that

3    you saw your son Charles and your son Brad?

4        A.    I would say at the half of the

5    football game between Miami and University of

6    Houston.

7        Q.    You didn't stay for the whole game?

8        A.    No, I went home.  The university was

9    getting beat real bad, so I got up and left.

10       Q.    Your son Brad's whole name is what?

11       A.    Bradley Dean Allen.

12       Q.    Let me show you what I have marked for

13   identification as State's Exhibit 108.  Is that

14   a fair and accurate depiction of your children,

15   including Bradley Dean and Charles?

16       A.    Yes, that is them.

17             MS. DAVIES:  Your Honor, I am

18   tendering 108 to defense counsel and offer it

19   into evidence.

20       Q.    Other than the clothing which may have

21   been different, does that accurately depict the

22   way your sons Charles and Brad looked the last

23   time you saw them alive?

24       A.    They usually wore bluejeans and a

25   little sport shirt of some kind.

537

1      (The following proceedings were had at
2   the bench:)
3           MR. STAFFORD:  First of all, the
4   purpose of the objection is that the family
5   portrait is not relevant in this matter.
6   There's other pictures the State has available
7   of them singly and individually.  It's offered
8   for no other purpose than to upset the emotional
9   strings of this jury.  And I object to the
10  overall relevancy at this time of this
11  particular family portrait picture.
12          MS. DAVIES:  Your Honor, they all know
13  it's a family.  It's not particularly
14  prejudicial.  As far as the type of photograph
15  it is, it certainly does more to show the size
16  and physiques of Charles and Brad than just an
17  individual snapshot would.
18          THE COURT:  It's admitted.
19          (Before the jury)
20  BY MS. DAVIES:
21      Q.   Mr. Allen, I want you to help us be
22  sure we can tell which of your children.    I
23  have a little red dot.   I want you to point out
24  which one is Charles.
25      A.   (Indicates).

538

1      Q.   You pointed to the left?

2      A.   Yes.

3      Q.   I am going to put a little red dot

4 above Charles.   And point out Brad for us.

5      A.   Brad.

6      Q.   Put a green dot above Brad's head.

7 Charles and Brad.   Okay.   Now, in between,

8 standing in between Charles and Brad is who?

9      A.   That is Donny, the youngest.

10      Q.   And your other sons?

11      A.   Kevin is standing beside Bradley

12 Dean.   This is my daughter Janis, and this is

13 the oldest Jamie.

14      Q.   On the far right?

15      A.   Yes.

16           MS. DAVIES:   Your Honor, may I ask

17 that State's 108 be passed to the jury?

18           THE COURT:   It may be.

19 BY MS. DAVIES:

20      Q.   When was that photograph taken?

21      A.   That was taken on our thirty-fifth

22 anniversary I believe it was.   The kids took

23 these photographs and gave it to us.   We

24 actually got some of the whole family that they

25 had taken over at the church.

1      Q.    When was that?   How long ago was that?

2      A.    Three years ago approximately.

3      Q.    When Charles and Bradley Dean died,

4  were they about the same size as they are shown

5  in that photograph?

6      A.    Yes.

7      Q.    Mr. Allen, I also want to show you a

8  ring that is in evidence, broken ring, marked

9  State's Exhibit 35.  Ask you to look at that and

10 tell us whether you recognize it.  Can you see

11 it well enough inside the envelope?

12     A.    Yes.   That is Charles' ring.

13     Q.    Did he wear that often?

14     A.    Yes.

15     Q.    Mr. Allen, do you feel -- did you have

16 a close relationship with your sons?

17     A.    Yes.

18          MR. STAFFORD:  Again, my motion in

19 limine, victim impact has no relevancy.

20          THE COURT:  I don't know where she's

21 going with this.  Overruled at the moment.

22 BY MS. DAVIES:

23     Q.    Do you feel like you knew your son

24 Charles' character for whether he was a peaceful

25 type of person?

540

1          MR. STAFFORD:  Again, Your Honor, I

2    object.  That is an improper question at this

3    time; has no relevancy; has not been raised in

4    the evidence in any way.

5          MS. DAVIES:  This defendant's

6    statement--

7          THE COURT:  It's raised in the

8    confession which was admitted.

9    BY MS. DAVIES:

10        Q.   Do you feel like you know your son

11   Charles' character as to whether he was a

12   peaceful type person?

13        A.   Yes, he was a peaceful kind of person.

14        Q.   Do you know your son's character,

15   Charles' character as to whether he was an

16   aggressive or combative type individual?

17        A.   No, not Charles.

18        MS. DAVIES:  Pass the witness.

19        MR. STAFFORD:  No questions.

20        THE COURT:  You may stand down, sir.

21        Call your next witness or approach the

22   bench.

23        THE COURT:  Ladies and gentlemen, if

24   you would, please go with the bailiff back to

25   the jury room.

1           (Recess; after which, the following

2    proceedings were had outside the presence of the

3    jury:)

4           THE COURT:   Before we get started, Ms.

5    Davies, have you had a chance to look at this

6    motion?

7           MS. DAVIES:   No.

8           THE COURT:   The motion for appointment

9    of blood spatter analysis expert.   He is already

10   here.   Floyd is in the back.   And second part,

11   however, is to have Mr. McDonald remain in the

12   courtroom during your direct examination of your

13   expert.   I don't know who the expert is.   Who is

14   your expert?

15          MS. DAVIES:   Larry Hoffmaster.

16          THE COURT:   Do you oppose this?

17          MS. CONNORS:   Your Honor, what is the

18   authority for his request?

19          THE COURT:   It's not cited in his

20   motion.

21          All right, it's my understanding that

22   the State is opposing that portion of your

23   motion asking Mr. McDonald to remain in the

24   courtroom during the State's direct examination

25   of their expert.   I am granting the motion for

1    appointment of Mr. McDonald as an expert. I am

2    denying that portion of it that he remain in the

3    courtroom.

4            MR. STAFFORD: I would ask for a short

5    continuance after the expert testifies so I can

6    confer with my expert so I can effectively cross

7    examine him.

8            THE COURT: I don't know when that is

9    going to occur. We will probably take a

10    bathroom break somewhere in there, and you will

11    be able to talk to him.

12            MS. DAVIES: Your Honor, just for the

13    record, I would like for the record to be clear

14    that during the lunch break all of the exhibits

15    and in fact all the photographs in the State's

16    possession that have not been offered into

17    evidence were all made available to defense

18    counsel, and I know I saw him and his expert

19    back in the back going over all of that. We did

20    make that available for his inspection.

21            MR. STAFFORD: That's a gratuitous

22    statement on behalf of the State, but may the

23    record also go forward, we have no basis or

24    reports or understanding as to what her expert

25    is going to testify to. We are definitely

1    shooting from the hip, playing in the dark.  We

2    have no earthly idea what he is going to testify

3    to other than I know she has submitted certain

4    photographs and he is going to render an opinion

5    thereon.  As to what his opinion is, I have no

6    earthly idea other than he is going to say they

7    are blood splatters, and I am sure he is going

8    to form an opinion.  That is why it's so

9    important for our expert to be present to see

10   whether or not he can agree or disagree from a

11   scientific standpoint.

12          THE COURT:  The rule has been invoked

13   as to all witnesses.  Mr. McDonald has to

14   remain outside the courtroom.

15          (Witness Floyd McDonald sworn).

16          THE COURT:  The rule has been

17   invoked.  You are to remain outside the

18   courtroom while other witnesses are testifying.

19   Don't discuss this case with anyone except the

20   attorney who has you in charge.

21          (The jury enters the courtroom).

22

23

24

25

```
 1                    AURELIO A. ESPINOLA

 2      was called as a witness by the State and, having

 3      been duly sworn, testified as follows:

 4                      DIRECT EXAMINATION

 5      BY MS. DAVIES:

 6           Q.    Would you, please, state your name for

 7      the record?

 8           A.    My name is Doctor Aurelio Espinola.

 9           Q.    Could you spell the last name for us?

10           A.    E-s-p-i-n-o-l-a.

11           Q.    Would you tell the jury how you are

12      employed?

13           A.    I am a deputy chief medical examiner

14      of Harris County.

15           Q.    Who is the chief medical examiner?

16           A.    Doctor Joseph Jachimczyk.

17           Q.    Do you work under his supervision?

18           A.    Yes.

19           Q.    When you say you are deputy chief, are

20      there other medical examiners who assist Doctor

21      Jachimczyk other than you?

22           A.    Yes.

23           Q.    Approximately how many?

24           A.    Originally we are five, but we are

25      reduced to three.
```

1       Q.    Just recently?

2       A.    Yes.

3       Q.    Workload heavy, doctor?

4       A.    Yes, ma'am.

5       Q.    Can you tell the jury what your area

6    of specialization is?

7       A.    My area of specialization is forensic

8    pathology.

9       Q.    What is forensic pathology?

10      A.    Pathology is the branch of medicine

11   that deals with the study of human diseases, and

12   forensic pathology is a subspeciality of

13   pathology that deals with the study of unnatural

14   death, such as unexpected death, violent death,

15   and application of medical knowledge.

16      Q.    So, are you able to examine a body and

17   determine what was the cause of death?

18      A.    Yes, ma'am.

19      Q.    How long have you been working in that

20   field?

21      A.    Fourteen years in Houston.

22      Q.    Just in Houston?

23      A.    Yes.

24      Q.    Tell us about your educational

25   background and professional background.

1        A.    I am a doctor of medicine, and I did a

2   one year pathology internship at Detroit

3   Memorial Hospital and four years pathology

4   residency at Wayne State University in Detroit

5   and another year of forensic pathology training

6   at Wayne County Medical Examiner's Office, also

7   in Detroit, Michigan.   I am board certified in

8   anatomic, clinical and forensic pathology by the

9   American Board of Pathology, and I am a licensed

10  physician in the State of Texas.

11       Q.    As the deputy chief medical examiner,

12  do you actually perform autopsies yourself?

13       A.    Yes, ma'am.

14       Q.    Can you give the jury the benefit of

15  knowing approximately how many autopsies you

16  have performed in your career?

17       A.    Well, I have performed thousands of

18  autopsies.

19       Q.    That is over the fourteen year period?

20       A.    Yes, ma'am.

21       Q.    In many instances, are the autopsies

22  that you perform in connection with a violent

23  death?

24       A.    Yes, ma'am.

25       Q.    As a result, you have occasion to come

1    to court and testify about those?

2        A.   That's correct.

3        Q.   Did you bring some records with you to

4    court today at my request?

5        A.   Yes, ma'am.

6        Q.   Let me show you what I have marked for

7    identification purposes as State's Exhibit 10 as

8    well as photographs marked State's Exhibit -- I

9    said ten, that is one hundred ten, as well as

10   photographs marked State's Exhibits 111, 112,

11   113, 114, and 115.

12       A.   Yes, ma'am.

13       Q.   Are those all a part of the file and

14   records that you keep in the medical examiner's

15   office in the regular course of business?

16       A.   Yes, ma'am.

17       Q.   Can you tell us, first of all, whether

18   there is any identifying number in connection

19   with the report number one hundred ten that is

20   your means in the medical examiner's office of

21   keeping track of the individual on whom the

22   autopsy was done?

23       A.   Yes, ma'am.  I assign a case number

24   91-6153.

25       Q.   91-6153.  Now, at what point is a

1    number assigned to a case in the medical

2    examiner's office?

3         A.    This number 6153 means that at that

4    particular time that is the six thousand one

5    hundred and fifty-three bodies that they examine

6    in the autopsy, or in the medical examiner's

7    office.

8         Q.    All right.  That is not six thousand

9    one hundred fifty-three in the year of 1991 I

10   hope.

11        A.    The year is 1991, and that is the six

12   thousand one hundred fifty-three bodies.

13        Q.    Okay.  Now, what is the name of the

14   individual to whom that autopsy number 6153 was

15   assigned?

16        A.    Charles Ray Allen.

17        Q.    Did you also bring some records in

18   connection with your autopsy number 91-6154?

19        A.    Yes, ma'am.

20        Q.    What individual was that number

21   assigned to?

22        A.    To Bradley Dean Allen.

23        Q.    Now, let me show you a report marked

24   120 as well as photographs connected to that

25   report marked 121 through 126.

1      A.   Okay.

2      Q.   Are those items also a part of your

3  file that is kept during the regular course of

4  business at the medical examiner's office?

5      A.   Yes, ma'am.

6      Q.   As to all of those numbered items that

7  you have just identified, are these records that

8  are kept routinely at the M. E.'s office?

9      A.   Yes, ma'am.

10      Q.   Are they prepared by an individual who

11  has personal knowledge of the information that

12  is going into those reports?

13      A.   Yes, ma'am.

14      Q.   Are they done at or near the time that

15  the information is being recorded or transpires?

16      A.   Yes.

17      Q.   The report that you have identified

18  marked 110 consists of six pages.  No, seven

19  pages.  Is this your original report?

20      A.   No, ma'am.

21      Q.   The report marked 120 consists of

22  eight pages?

23      A.   Yes, ma'am.

24      Q.   Is that the original report?

25      A.   No, ma'am.

1      Q.    Have you had a chance to compare

2   report exhibit number 110 and 120 with your

3   original document so that you can tell us

4   whether these are accurate copies?

5      A.    Yes, ma'am.

6      Q.    Are they accurate copies?

7      A.    They are.

8      Q.    Are you permitted to leave your

9   original documents with us here in the

10  courtroom?

11     A.    No, ma'am.

12     Q.    Why not?

13     A.    Because that is a permanent record in

14  the medical examiner's office.

15         MS. DAVIES:   Your Honor, at this point

16  I am tendering State's Exhibit 120 with the

17  accompanying photographs numbered 121 through

18  126 to defense counsel as well as the report

19  marked 110 with photographs numbered through 115

20  to defense counsel for their inspection, and I

21  offer them into evidence.

22     Q.    If I may, about the photographs, are

23  the photographs also taken at the time that the

24  actual autopsy is done?

25     A.    Yes, ma'am.

1    Q.   Are they also kept as part of your

2    record there?

3    A.   That is correct.

4    Q.   In each instance, in addition do they

5    adequately depict the body of the person upon

6    whom you were doing the autopsy?

7    A.   Yes, ma'am.

8    MS. KAISER:   No objection.

9    THE COURT:   State's Exhibits 110

10   through 115 are admitted.   State's Exhibits 120

11   through 126 are admitted.

12   BY MS. DAVIES:

13   Q.   Now, doctor, I also want to show you

14   some photographs that have been identified

15   previously.   They are marked State's Exhibits 89

16   through one hundred.   Would you look through

17   those for me, if you will, and see if there are

18   any of those photographs that would assist you

19   in explaining your autopsy and your resulting

20   conclusions that would assist you more than the

21   photographs that you had made as part of your

22   regular report?

23   A.   Yeah, that is the photograph that can

24   assist me.

25   Q.   You have handed me one.   Out of that

1    group is there only one of those that would be

2    of additional assistance to you?

3          A.    Yes, ma'am.

4          Q.    It shows something other than what

5    your results and report?

6          A.    Yes.

7          Q.    And that is State's Exhibit what?

8          A.    91.

9          MS. DAVIES:  Your Honor, I tender

10   State's Exhibit 91 to defense counsel and offer

11   it into evidence at this time.

12         MR. STAFFORD:  Your Honor, could we

13   take this witness on voir dire outside the

14   jury's presence?

15         THE COURT:  As to 91?

16         MR. STAFFORD:  Yes.

17         THE COURT:  Let me see 91.

18         Let me see all of them.  The

19   previously admitted photographs.

20         Ladies and gentlemen, please go down

21   the hallway for just a moment.

22         (The jury is removed from the

23   courtroom)

24         THE COURT:  All right.  You wish to

25   take the witness on voir dire without the jury's

1    presence.  Go ahead.

2

3              VOIR DIRE EXAMINATION

4    BY MS. KAISER:

5         Q.   Doctor Espinola, can you describe to

6    me how this photograph that was marked State's

7    Exhibit No. 91 would assist you in a way that

8    you cannot make intelligent testimony from these

9    other exhibits, State's Nos. 113, 115, 111?

10        A.   The reason is that this photograph

11   would assist me explaining to the court that

12   that trauma per se in the head would cause death

13   in the absence of the other injuries.

14        Q.   I didn't understand what you said,

15   that the what?

16        A.   As you notice, in the opinion that I

17   made, blunt trauma to the head was included as a

18   cause of death.  And the autopsy report did not

19   show any evidence of fracture of the skull.  And

20   you might be wondering why I included that as a

21   cause of death.  And this photograph will assist

22   me in explaining how vascular or how bloody the

23   scalp is.  The bleeding from those lacerations,

24   from the blunt trauma to the head can cause

25   death with the absence of the other injuries.

1            THE COURT:   All right.    May I jump in

2     here just a moment?

3            MS. KAISER:   Yes.

4            THE COURT:   That is the distinction

5     you are making specifically between State's

6     Exhibit No. 113, which is a full front-on head

7     shot, as opposed to State's Exhibit No. 91?

8        A.   Yes, Your Honor.

9            MS. DAVIES:   Just for purpose of the

10    record, Doctor Espinola, is State's Exhibit 91 a

11    photograph of Charles Allen, the same individual

12    that you did the autopsy on as shown in

13    photograph 113?

14       A.   Yes, ma'am.

15    BY MS. KAISER:

16       Q.   Doctor Espinola, I would like to show

17    you a photograph that has already been admitted

18    into evidence as State's Exhibit No. 80.

19    Looking at State's Exhibit No. 80, we see the

20    body of Charles Allen, his face and head totally

21    bloody, a giant pool of blood directly beneath

22    his head.   Would this photograph in a like

23    manner assist you in describing to the jury how

24    blunt trauma to the head could result in death?

25       A.   Yes.

555

1    Q.    Would it do it just as sufficiently as
2    the other one?
3    A.    Yes; but, in addition, the photograph
4    or Exhibit 91 will assist me to explain that
5    with this type of trauma there will be no
6    spurting of blood.
7         MR. STAFFORD:   What do you mean by
8    that?
9    A.    Because the trauma to the head is, the
10   bleeding is free flowing.   It's not pumping.
11   The blood is not pumping out.
12   BY MS. KAISER:
13   Q.    I fail to see how that photograph
14   shows that the blood isn't pumping any more so
15   than this photo shows.   Can you show me that?
16        MS. DAVIES:   I object to irrelevance.
17        MS. KAISER:   That is his reason for
18   wanting this photograph as opposed to the other
19   one.
20        THE COURT:   It's overruled.   I will
21   let him explain it.
22   A.    In this photograph, you can see the
23   blood flowing downward.
24   Q.    Downward.   Can you not see the blood
25   flowing downward here in State's Exhibit No. 80?

556

1      A.    Here it also shows the downward flow
2  of the blood.
3      Q.    That is the only way that you can
4  distinguish how State's Exhibit 91 is preferable
5  to you, that is, more preferable than State's
6  Exhibit 80, just because it shows the downward
7  flow of blood a little bit better?
8      A.    Both photographs will assist me
9  because this photograph will also show the court
10  how bloody the head injuries are.
11      Q.    So, actually, in that particular
12  instance, State's Exhibit No. 80 is preferable
13  over this one because it shows this large pool
14  of blood down here at the bottom?
15      A.    Partly, because some areas can not be
16  explained by this.  And that one will not be
17  able to explain the other one.
18          THE COURT:  You didn't mention the
19  numbers.
20      A.    What I am saying is that photograph 91
21  -- I'm sorry -- the photograph 80 or exhibit
22  number 80 will assist me to show how bloody the
23  injuries in the head are that was not present in
24  exhibit 91.
25          THE COURT:  The question is does 91

                                              557

1    show you anything that is not in 80?

2        A.   Yes, sir.  The flowing or the flow of

3    the blood shows in this photograph better than

4    the other photograph.

5        THE COURT:  91 better than 80?

6        A.   Yes, sir.

7        THE COURT:  All right.  Do you have

8    anything else?

9        MS. KAISER:  Nothing of him.

10        THE COURT:  Do you want anything

11    further from him while we are outside the

12    presence of the jury?

13        MS. KAISER:  I would like to make my

14    objection outside the presence of the jury.

15        I believe that the witness has

16    exhibited that State's No. 80 in some ways is

17    preferable, it has already been admitted into

18    evidence, shows the pooling of the blood on the

19    floor and even shows, perhaps not in as great

20    detail, but shows the same thing that State's

21    Exhibit No. 91 shows and the downward flow of

22    the blood from the head area.  I believe State's

23    Exhibit No. 91 is extremely prejudicial and

24    serves absolutely no purpose other than to

25    inflame the jury, and whatever minimal

1    assistance it might provide Doctor Espinola in

2    addition to a photograph that has already been

3    admitted into evidence is far outweighed by its

4    prejudicial value.

5              THE COURT:   It's overruled.   State's

6    Exhibit 91 is going to be admitted in the

7    presence of jury.

8              (The jury returns to the courtroom)

9                   DIRECT EXAMINATION

10                    (CONTINUED)

11   BY MS. DAVIES:

12       Q.   Doctor Espinola, I believe you had

13   identified one photograph, State's Exhibit 91,

14   as one that would assist you in describing your

15   opinions and conclusions?

16       A.   Yes.

17            MS. DAVIES:   Your Honor, I offer

18   State's Exhibit 91.

19            THE COURT:   State's Exhibit 91 is

20   admitted.

21   BY MS. DAVIES:

22       Q.   Doctor, would you describe for the

23   jury how it is that you go about, just in

24   general, how it is you do an autopsy?   What is

25   the first thing you do?

                                              559

1      A.    There are two parts of the autopsy.

2   One is the external examination, checking all

3   the injuries, and the second part is the

4   internal examination which also includes the

5   microscopic examination of the organs and

6   laboratory testing of the body fluids.

7      Q.    In addition, then, you also do an

8   internal examination?

9      A.    Yes.

10     Q.    Did you do a complete autopsy in

11  connection with both of these cases, 6153 and

12  6154?

13     A.    Yes, ma'am.

14     Q.    Doctor, I would like for you to first

15  address 916153, the autopsy of Charles Ray

16  Allen.

17     A.    Yes, ma'am.

18     Q.    Did you do both an internal and

19  external examination?

20     A.    Yes.

21     Q.    On Mr. Allen?

22     A.    Yes, ma'am.

23     Q.    Just in summary, would you tell us --

24  we will go back and get you to give us more

25  detailed information -- but, in summary, can you

560

1  tell us what wounds you saw on Mr. Allen's body?

2    A.    There were seven lacerations in the

3  head.   There were five in the back and right

4  side of the head.   And there was a laceration on

5  the forehead and also in the left eyebrow.   And,

6  in addition to that, there were bruising of the

7  face, and there was a fracture of the nasal bone

8  and also the left cheek bone.

9    Q.    Both the nasal and the left cheek bone

10 were fractured?

11   A.    Yes, ma'am.   And also the left side of

12 the lower jaw was fractured.    And there were

13 two stab wounds to the chest on each side, and

14 there were two stab wounds of the back and also

15 stab wounds to the right arm.

16   Q.    At the completion of your autopsy, did

17 you form an opinion as to the cause of death of

18 Charles Allen?

19   A.    Yes, ma'am.

20   Q.    What was your opinion?

21   A.    In my opinion, the cause of death were

22 the two stab wounds of the chest, one stab wound

23 of the back, and blunt trauma to the head with a

24 fracture of the nasal bone, maxillary and lower

25 jaw with contusion of the brain.

1      Q.   If I am understanding you correctly,
2   Doctor Espinola, are you saying that the stab
3   wounds alone could have caused Charles Allen's
4   death?
5      A.   Yes, ma'am.
6      Q.   And are you also saying that the head
7   trauma, the blows to the head alone would have
8   or could have killed Charles Allen?
9      A.   Yes, ma'am.
10      Q.   If you would, let's go over your
11   report, doctor, so we can understand in more
12   detail just what it is you found.
13            Did you note the height and weight of
14   Charles Allen?
15      A.   Yes, ma'am.  The height was 5' 10".
16   And the weight was 144 pounds.
17      Q.   And other than the injuries that you
18   have described -- and I will ask about in more
19   detail -- did he appear to be a healthy young
20   man?
21      A.   Yes, ma'am.
22      Q.   Doctor, I have got--?
23            MS. DAVIES:  Your Honor, I have marked
24   as State's Exhibit 109 a mannequin here I would
25   like to use to assist Doctor Espinola in

1    describing, would like to use this for
2    demonstrative purposes and be permitted to
3    substitute a photograph for the record at the
4    conclusion of the trial.
5                THE COURT:   Very well.
6    BY MS. DAVIES:
7        Q.    Doctor Espinola, if you would, can you
8    step down here.   Now, you will notice we have
9    not only twelve but fourteen jurors and the
10   court reporter.    So we will need to get you to
11   really keep your voice up.
12               If you would, I am going to get you to
13   help me understand -- let's start with the face,
14   Charles Allen's face.   And explain to us exactly
15   what injuries you observed in your autopsy.
16       A.    In the face, there was a laceration on
17   the forehead, and there was a laceration of the
18   left eyebrow.   And there was another superficial
19   laceration here that I did not mark.
20       Q.    Let me interrupt you for a minute.
21   On State's Exhibit 109, there is some red tape
22   on there.   Did you place this tape on the
23   mannequin prior to the beginning of trial?
24       A.    Yes, ma'am.
25       Q.    All right.   Now, when you say a

1  laceration, in your terminology what does a

2  laceration mean?  Is that a cut, a scrape?

3       A.   Yes.

4       Q.   Give us your definition.

5       A.   Laceration means that it is a break in

6  the skin that was inflicted by blunt instrument.

7       Q.   Okay.

8       A.   Whereas, a cut is caused by a sharp

9  instrument.

10       Q.   A laceration, a cut caused by blunt

11  instrument.  The ones you said of the eyebrow,

12  is this where you put this red tape?

13       A.   Yes, ma'am.

14       Q.   And here's another piece in the

15  forehead.

16       A.   Yes.

17       Q.   Now, this is actually a breaking of

18  the skin?

19       A.   Yes, ma'am.

20       Q.   Now, were there other visible injuries

21  to the face of Charles Allen?

22       A.   Yes, ma'am, there was another

23  laceration in the upper lip on the left side.

24  And another laceration on the left side of the

25  face just anterior in front of the ear.

564

1    Q.   Now, you have got some chalk there in

2    your hand.  If you would, use that chalk to put

3    the locations and the size as closely as you can

4    to show those lacerations.

5    A.    This is about three inches.

6    Q.    Over the lip?

7    A.    Yes.  And on the left side of the face

8    was one-fourth inch.

9    Q.    Those are actually lacerations where

10   the skin is broken; is that correct?

11   A.    Yes, ma'am.

12   Q.    You have put a mark over here on this

13   left cheek.

14   A.    Yes, ma'am.

15   Q.    Were there any other lacerations on

16   the face, the front of the face?

17   A.    That's all.

18   Q.    Were there any other marks or injuries

19   on the front of the face?

20   A.    Yes, ma'am, there were bruising in the

21   left side of the face.

22   Q.    All right.  Now, let me show you

23   State's Exhibit 113.   Does that show the

24   bruising that you are referring to?

25   A.    Yes, ma'am.

565

1    Q.    What is a contusion?

2    A.    A contusion is bleeding under the skin.

3    Q.    All right.  So, are there any

4  contusions, or is that the same thing as a bruise?

5    A.    Yes.

6    Q.    Was Charles Allen's face swollen?

7    A.    There was a slight swelling of the

8  left side of the face.

9    Q.    Did you notice, when you looked at,

10  examined his face, were there any broken bones

11  in his face?

12    A.    Yes, ma'am, the nasal bone was

13  fractured as well as the maxillary bone or the

14  cheek bone was fractured.

15    Q.    Can you use that chalk to show us?

16  You are putting an x where the broken bones

17  were?

18    A.    Yes, ma'am.

19    Q.    Now, the jaw, the cheekbone and the

20  nasal bone; is that correct?

21    A.    Yes, ma'am.

22    Q.    Does State's Exhibit 113 show the

23  injuries as you observed them as you have

24  detailed here?

25    A.    Yes, ma'am.

1      Q.   Were there any other injuries on the

2  face?

3      A.   That is all.

4      Q.   Okay.  Doctor, can you describe for

5  us, any one of these injuries, would they bleed

6  readily?

7      A.   Yes, ma'am.

8      Q.   Would you expect profuse bleeding?

9      A.   Profuse bleeding.

10      Q.   What is the difference between an

11  artery and a vein?

12      A.   The artery is pulsating because the

13  blood in the artery is directly coming from the

14  heart; whereas, the vein is the blood vessel

15  that goes to the heart.  So there would be no

16  pulse.

17      Q.   The vein goes to the heart?

18      A.   Yes, ma'am.

19      Q.   So, is there a difference in the kind

20  of bleeding that is the result of severing a

21  vein as opposed to severing an artery?

22      A.   Yes.

23      Q.   What is that difference?

24      A.   In injury to the veins, the bleeding

25  will be free-flowing, just flow; whereas,

567

1    arterial bleeding or laceration of the artery,

2    the blood will be spurting just like a garden

3    hose.

4         Q.   Squirting or spurting out?

5         A.   Yes.

6         Q.   With more force?

7         A.   Yes, because there is the -- everytime

8    the heart beats, it pulsates, the blood

9    pulsates.

10        Q.   Was there anything about any of the

11   injuries on Charles' face that you would have

12   expected to get a spurting type bleeding from?

13        A.   No, ma'am.

14        Q.   You said it would bleed readily,

15   though, these injuries to the face?

16        A.   That is correct.

17        Q.   So, would it be just a flee-flowing as

18   opposed to spraying outward?

19        A.   That is correct.  The bleeding here

20   would be  -- if he was standing, the bleeding

21   would be just dropping to the ground.

22        Q.   And what if he was not standing, what

23   if he was lying down?

24        A.   It would flow to the more dependent

25   portion of the body.

1    Q.    Again, gravity would control that?

2    A.    Yes.

3    Q.    There is no force projecting the

4    blood?

5    A.    There was none.

6    Q.    Now, I think it will be easier to turn

7    this model. Let's do the entire front, and then

8    we will come back to the back. That might be a

9    little more difficult for you, but I think it

10   will easier to handle.

11         On the front part of the body, were

12   there other injuries that you saw?

13   A.    Yes. There was a stab wound to the

14   left side of the chest and another stab wound to

15   the right side and another stab wound to the

16   right arm.

17   Q.    All right, now, do you have the wound

18   marked on the right arm?

19   A.    Yes, ma'am.

20   Q.    Now, let's take this stab wound here,

21   the left chest.

22   A.    Yes, ma'am.

23   Q.    I assume you have put this red tape as

24   close as you can to the position where that

25   wound was?

1       A.    That is correct.

2       Q.    Are these the wounds, the wounds on

3 the chest the same ones that are shown in

4 State's Exhibit 11?

5       A.    Yes, ma'am.

6       Q.    I mean one hundred eleven.

7       A.    Yes, ma'am.

8       Q.    Can you tell us, as to this one in the

9 left upper chest, how deep was that wound?

10      A.    The depth was approximately four

11 inches.

12      Q.    Four inches deep?

13      A.    Yes.

14      Q.    Was this wound, what organs, what?

15      A.    The organ involved was the left lung,

16 the upper lobe of the left lung, the pericardial

17 sac, which is the covering of the heart.  And

18 also the left ventrical, which is the left side

19 of the heart.

20      Q.    So this wound penetrated for four

21 inches into the lung and into the heart?

22      A.    Yes, ma'am.

23      Q.    This would be a stabbing type wound;

24 is that correct?

25      A.    Yes, ma'am, that is correct.

1        Q.    What about the other wounds here on
2    the front of the chest to the right?
3        A.    To the right.   The depth of
4    penetration was approximately three and one-half
5    inches.
6        Q.    What organs did that stab wound
7    penetrate?
8        A.    And it injured or lacerated the hilum
9    of the right lung.
10       Q.    The hilum?
11       A.    The hilum.
12       Q.    Explain to me what that is, doctor.
13       A.    Hilum is the -- you see, the windpipe
14    branches to the right.   To the right lung.   So
15    the hilum means that the windpipe, as it entered
16    the right lung, that is the hilum.
17       Q.    Could you tell from your examination
18    by looking at those wounds what the direction
19    was of the stab wounds that were inflicted on
20    Charles?
21       A.    Yes, ma'am.
22       Q.    What could you tell us about that?
23       A.    This one on the right side was--
24       Q.    This one that penetrated the heart and
25    lung?

571

1      A.    Yes.   The left was front to back.

2      Q.    Front to back?

3      A.    Yes.

4      Q.    Can you tell which direction in terms

5  of which side?

6      A.    The instrument was coming from the

7  left side of the deceased and going like that.

8      Q.    All right.   Now, does that necessarily

9  indicate that the person who stabbed Charles was

10  to Charles' left, or would it also be consistent

11  with somebody being in front of them and

12  stabbing with the right hand?

13      A.    Yes, ma'am.   Either.   The assailant

14  could be facing the victim using the right hand

15  or the assailant was coming from the left side

16  of the deceased using the left hand.

17      Q.    You say the wound was front to back?

18      A.    Yes.

19      Q.    From that, and from your examination

20  of these wounds, is there anything about the

21  track of the wound that would tell you whether

22  Charles was standing up or lying down when those

23  wounds were inflicted?

24      A.    No, I cannot answer that question.

25      Q.    Doctor, I want to show you this

1    knife.  The size and shape of the two wounds in

2    Charles' chest, are those consistent with being

3    caused by a knife such as State's Exhibit 29?

4         A.   Yes, ma'am.

5         Q.   Would either one of these wounds alone

6    have killed Charles?

7         A.   Yes.

8         Q.   Let's look at -- I believe you

9    mentioned an injury on the arm.  Can you show us

10   where there was an injury on Charles' arm?

11        A.   Yes, ma'am.  Here.

12        Q.   On the right arm up toward the top of

13   the shoulder?

14        A.   Yes, ma'am.

15        Q.   What type of wound is that?  Is that a

16   stab wound?  Do you differentiate between a stab

17   and a cut?

18        A.   Yes.

19        Q.   What is the difference?

20        A.   A cut means that the length of the

21   wound is longer than the depth.  But a stab

22   wound, the depth is deeper than the length.

23        Q.   So what type of wound was this on his

24   arm?

25        A.   It's a stab wound.

1        Q.   Also a stab wound.

2        A.   Yes, ma'am.

3        Q.   So, in other words, a stab wound would

4  be when someone is driving the knife in as

5  opposed to slashing?

6        A.   That is correct.

7        Q.   Cutting motion?

8        A.   That is correct.

9        Q.   How deep is the wound on Charles' arm?

10       A.   Was only one inch.

11       Q.   One inch?

12       A.   Yes.

13       Q.   Did that hit any vital organs?

14       A.   No, ma'am.

15       Q.   One inch in that part of the arm, what

16  are you penetrating there?

17       A.   In this part of the arm, it only

18  involves the muscle.

19       Q.   Before we turn this mannequin around,

20  did you notice whether there were any injuries

21  on Charles' hand?

22       A.   Yes, ma'am.

23       Q.   What were those?

24       A.   There was a bruising or contusion on

25  the back of the right hand.

1        Q.   Do you have that chalk over there?

2             Now, when you see bruising or

3    contusion like that, can you tell how recent

4    that is?

5        A.   Yes.

6        Q.   Like was this something that maybe he

7    had bruised his hand a week earlier, or did this

8    appear to be a part of the same time that all

9    these other injuries were sustained?

10       A.   This is the same age.

11       Q.   How would you characterize that

12   injury, the bruising of the back of his hand?

13   Or was it all on the back?  Was some of it on

14   the inside?

15       A.   That was on the back of the hand.

16   Yes, ma'am, that is on the back of the hand.

17       Q.   Would that be consistent with someone

18   being struck with something or grasping

19   something very hard?  What would that be

20   consistent with?

21       A.   There are two possibilities -- one, he

22   was struck and then he covered himself, or he

23   could be the one who hit somebody.

24       Q.   Was all this on the back of the hand

25   or the palm -- not the palm, this back part, or

1      was it on the fist part?

2           A.    On the fist part.

3           Q.    On the fist part.  Okay.  And then

4      tell me this.  Before we turn the model around,

5      I forgot to ask you about this on the face.

6      These injuries, the fractures that you

7      designated on the jaw and the cheek and the

8      nasal passages, are those consistent with --

9      just talking about these, the fractures and

10     contusions -- are those consistent with Charles

11     having been struck in the face with a bar such

12     as State's Exhibit 30?

13          A.    Yes, ma'am.

14          Q.    These injuries are?

15          A.    Yes.

16          Q.    What about the lacerations on the

17     forehead and over the eyebrow?

18          A.    It is also consistent with that

19     instrument.

20          Q.    Now, I am talking specifically about

21     State's Exhibit 30, this metal bar.

22          A.    Yes, ma'am.

23          Q.    Would any of those injuries be

24     consistent with being hit with a bare fist?

25          A.    No.

1       Q.    Why not?

2       A.    Because just a fist, if you are a

3  boxer, probably, yes; but if you are just an

4  ordinary person, it could be very difficult to

5  fracture those areas by just fist.

6       Q.    Were these blows on Charles' face, are

7  they consistent with being struck just once?

8       A.    More than once.

9       Q.    Can you tell how many times?

10      A.    In the face, there was one blow here,

11  and this is another blow.  This is another

12  blow.  So three.  Another blow.  And at least

13  five blows to the face.

14      Q.    Are you telling me, that based on your

15  examination and specifically looking at the

16  picture of the face, State's Exhibit 113, there

17  is no way that all of this damage could have

18  been done in a single blow?

19      A.    That is correct.

20      Q.    Or even two or three?

21      A.    That is correct.

22      Q.    All consistent with being struck with

23  a bar such as State's Exhibit 30?

24      A.    Yes, ma'am.

25      Q.    In fact, are your photographs, State's

577

1      Exhibit 113, does that show the size and shape

2      of the laceration here on the forehead?

3          A.   Yes, ma'am.

4          Q.   By your examination -- can you look at

5      State's Exhibit 31 -- are any of these

6      lacerations on the face consistent with having

7      been caused by this particular bar?

8          A.   No, ma'am.

9          Q.   Why not?

10         A.   Because if this was used, it would

11     leave an imprint that would match these marks.

12         Q.   You don't have the imprint that shows

13     the marks?

14         A.   There was none.

15         Q.   The size and shape, would it fit being

16     struck by State's Exhibit 30, this metal bar?

17         A.   Yes, ma'am.

18         Q.   Okay.   Let's see if we can't turn this

19     mannequin around here.

20              Doctor, let's talk about the injuries

21     to the back of the head.   What did you show in

22     your report during your autopsy?

23         A.   In the back of the head, there were

24     five lacerations.   And these are all imposed by

25     blunt objects.

578

1      Q.   Have you used the red tape to

2  approximate the size of the actual lacerations?

3      A.   Yes, ma'am.

4      Q.   Now, Charles had hair?

5      A.   Yes.

6      Q.   Do you actually shave some of the hair

7  away so that you can see the lacerations more

8  clearly?

9      A.   Yes, ma'am.

10      Q.   Let me show you State's Exhibit 115.

11  Did you do that?

12      A.   Yes.

13      Q.   Again, the lacerations as shown in

14  115, does that -- talking about a pattern that

15  you would get.  For instance, if these

16  lacerations had been caused by 31, would you be

17  able to tell?

18      A.   Yes, ma'am.

19      Q.   Were they?

20      A.   No.

21      Q.   Were they consistent with being caused

22  by a bar such as State's Exhibit 30?

23      A.   Yes, ma'am.

24      Q.   The size and shape would fit?

25      A.   Yes, ma'am.

1          MS. DAVIES:   Your Honor, may I show
2    State's 115 to the jury?
3          THE COURT:   You may.
4    BY MS. DAVIES:
5          Q.   Would these injuries to the head, the
6    back of the head, would you have expected those
7    to bleed?
8          A.   Yes, ma'am.
9          Q.   How quickly would the bleeding start?
10   If somebody was hit in the head in a fashion
11   such as you saw in this autopsy, how quickly
12   would you expect the bleeding to start?
13         A.   After the knife was withdrawn.
14         Q.   Would there be profuse bleeding from
15   each and every one of these lacerations?
16         A.   Yes, ma'am, there would be profuse
17   bleeding.
18         Q.   Could you tell how many blows were
19   struck to the back of Charles Allen's head?
20         A.   There were five blows to the back of
21   the head.
22         Q.   How can you tell that there were five
23   separate blows?
24         A.   Because the lacerations were all
25   separated.

                                                    580

1          Q.    Separated in space?

2          A.    For every laceration, it was one blow.

3          Q.    So, in other words, one blow with this

4     bar couldn't have caused two?

5          A.    No.

6          Q.    It would take separate blows?

7          A.    That is correct.

8          Q.    What other injuries did you see on

9     Charles Allen?

10         A.    There were two stab wounds to the back.

11         Q.    And have you put red tape to

12    approximate those?

13         A.    Yes, ma'am.

14         Q.    To his right back, can you tell us the

15    size and depth of that?

16         A.    The size of these was three-fourth of

17    an inch.  And it was superficial.   It did not

18    enter the chest.

19         Q.    What about the stab wound on the left

20    back?

21         A.    On the left side, the instrument

22    entered the chest and it penetrated the lower

23    lobe of the left lung, and the depth of

24    penetration was approximately three and one-half

25    inches.

1       Q.    So this stab wound was much deeper?

2       A.    Yes, ma'am.

3       Q.    Would this have been a fatal wound

4  also?

5       A.    Yes, this was a fatal stab wound.

6       Q.    As well as the ones to the front of

7  the chest?

8       A.    That is correct.

9       Q.    Now, what can you tell us about the

10  direction of the stab wounds to the back?

11       A.    The direction was from back to front.

12       Q.    Back to front.  Could you tell any

13  directionality, in other words, whether it came

14  from the right or the left, or were they just

15  straight on, back to front?

16       A.    May I see the picture?  This stab

17  wound was very superficial.  It only involves

18  the skin.  So I cannot tell you if it was

19  downward or upward.  But this one, it was a

20  downward direction.

21       Q.    Downward direction.  Okay.  You asked

22  to look at the photograph, State's Exhibit

23  112.  What is it about the appearance, the

24  outer appearance that helps you tell the

25  direction, doctor?

1        A.    Because in this photograph it shows an

2    abrasion or abraided markings on the upper part

3    of the stab wound.   That means that the knife

4    entered the body downward.   And the knife

5    scratches the upper margin of the stab wound.

6        Q.    Were both of these wounds on the back

7    consistent with being inflicted with a knife

8    such as this State's Exhibit No. 29?

9        A.    Yes.

10        Q.    When you say downward, again, can you

11    tell whether Charles was upright or reclining

12    when those wounds were inflicted?

13        A.    I cannot answer that.

14        Q.    Point out for me which is the abraided

15    area that tells you.

16        A.    The upper margin.

17        Q.    Doctor, why don't you have a seat for

18    just a minute, and I will ask you a few more

19    questions about Charles' autopsy.

20              Can you tell from your examination of

21    the body such as Charles', can you tell us the

22    sequence in which the stab wounds were

23    inflicted?   In other words, can you look at that

24    body and look at your laboratory and tell us:

25    Well, he was stabbed in the chest first or the

1    back first?

2         A.   No, I cannot answer that.

3         Q.   Based on your observations, can you

4    tell us whether it appears that the head

5    injuries were received first or the stab wounds

6    were received first?

7         A.   Well, in my opinion the head injuries

8    were inflicted first.

9         Q.   Why is that?

10        A.   Because when I performed or did the

11   internal examination, I only recovered

12   approximately one thousand or one liter of blood

13   in the left chest cavity and five hundred cc's

14   in the right chest cavity.

15        Q.   What is the significance of the

16   difference in the quantity of blood in the chest

17   cavity?

18        A.   Well, in the left chest cavity, the

19   left ventrical or the left side of the heart was

20   involved.  And on the right side it only

21   involves the hilum of the right lung.  But the

22   fact that there were only about one thousand or

23   one liter in the left chest cavity in spite of

24   the fact that the left ventrical was involved,

25   it is very clear that stabbing occurred later

584

1    than the head injuries.

2        Q.   Am I understanding correctly that if

3    the stabbing had come first there would have

4    been more blood in the chest cavity?

5        A.   Yes, because every time the heart

6    pumps it will pump out the blood in the left

7    chest cavity.  And if that was the first stab, I

8    would expect the left chest cavity to be full of

9    blood.

10       Q.   So, that is the basis for your

11   concluding that the head injury came first?

12       A.   Yes, ma'am.

13       Q.   The location of the blood in the chest

14   cavity or the amount of blood?

15       A.   That is correct.

16       Q.   If a man the size of Charles sustained

17   the head injuries that you have described, front

18   and back -- total blows, how many do we have

19   here?

20       A.   At least ten.

21       Q.   Would there be, say, the blows to the

22   face, in fact, you can't tell us front or back

23   first?

24       A.   No, ma'am.

25       Q.   Okay.  Would you expect any of those,

1   that type blow to the head and that number to --
2   expect him to lose consciousness, or what
3   physical reaction would you expect to occur?
4        A.   Well, it depends upon the capacity of
5   the individual to receive the blow.  But with
6   that kind of blow, that person will be drousy,
7   if not unconscious.
8        Q.   Drousy?
9        A.   Yes, ma'am.
10       Q.   Perhaps unconscious?
11       A.   Yes.
12       Q.   Would it not affect their equilibrium,
13  their ability to react quickly?
14       A.   Yes, ma'am.
15       Q.   But not necessarily unconscious; is
16  that what you are saying?
17       A.   That is correct.
18       Q.   Would it be, those type of injuries,
19  would it be consistent with perhaps someone
20  being stunned momentarily, might they be
21  stunned, slow down, be dizzy, but still be able
22  to move or react?
23       A.   That is correct.
24       Q.   What about swelling?  You mentioned
25  breaking the nasal bone here, cheek, jaw.  Would

1    you expect there to be any swelling to occur?

2        A.    Yes, ma'am.

3        Q.    How quickly would that happen?

4        A.    Well, after the infliction of the

5    blunt trauma, it will break the blood vessel

6    underneath the skin so it will bleed.  But it

7    will be noticeable later.  It will not be

8    noticable right away.

9        Q.    Would you expect the bleeding and

10   whatever swelling might occur at that point to

11   interfere with a person's vision at all?

12       A.    Well, the bleeding in the left eye

13   will interfere with his vision.

14       Q.    Without showing this to the jury,

15   please.  I want to call your attention to

16   State's Exhibit 91.   Does that photograph give

17   you any indication -- by the way, let me back up

18   and ask you this.  You have mentioned several

19   photographs, State's Exhibits 111 through 115.

20   They are part of your autopsy.  Do you clean the

21   body up before you actually perform your autopsy?

22       A.    Yes, ma'am.

23       Q.    Is that just so you can see what you

24   are looking at a little better?

25       A.    That is correct.

1        Q.   Now, State's Exhibit 91, was that

2   taken of Charles Allen prior to your cleaning

3   him up for the autopsy?

4        A.   Yes, ma'am.

5        Q.   Does that photograph give you any

6   indication of the amount of swelling and type of

7   bleeding that was going on, on his face?

8        A.   Yes.

9        Q.   Can you describe for us, with the aid

10  of that photograph, what the result was?   Here

11  again, don't show it to the jury, please.

12       A.   Well, this photograph shows the amount

13  of bleeding that he had and also the swelling in

14  the left side of the face, especially the

15  eyelids.

16       Q.   Does it appear that the amount of

17  swelling and bleeding might have interfered with

18  Charles Allen's ability to see after he had

19  sustained the blows to the face?

20       A.   Yes, ma'am.

21       Q.   Can you tell us from this, does this

22  clarify at all what type of bleeding would have

23  been going on?  Would there have been any

24  spurting type bleeding from those wounds to the

25  head?

1     A.   No, ma'am.  This shows that the

2  bleeding was mainly coming from the veins so

3  that the blood was free flowing.

4     Q.   Now, let's talk about those stab

5  wounds again.  Did any of the stab wounds that

6  you have described, did any of those sever an

7  artery?

8     A.   No.

9     Q.   What type of bleeding would have come

10  from the stab wounds that Charles sustained?

11     A.   In the left side of the chest, the

12  bleeding would be arterial because it was

13  oxygenated blood from the left side of the

14  heart, but the bleeding would be inside the

15  body, not outside.

16     Q.   All right.  Did Charles sustain any

17  wounds that would have been spurting blood on

18  any part of his body?

19     A.   No, ma'am.

20     Q.   Free flowing in terms of bleeding

21  internally or just flowing with gravity?

22     A.   Well, the one in the left chest cavity

23  will be spurting but inside the chest.  It's not

24  outside.

25     Q.   All right.  And how can you tell that,

589

1   doctor, from your examination?

2       A.   Yeah, because the blood, before it

3   goes out, should fill up the chest cavity first.

4       Q.   That is true on a chest wound?

5       A.   Yes.

6       Q.   Okay.  Now, you said that I believe at

7   least one, perhaps two of those wounds were,

8   what, four inches deep?

9       A.   Yes, ma'am.

10      Q.   I want to show you the knife, State's

11  Exhibit 29.  I have a ruler here for you.  Can

12  you mark for us the depth of that wound on that

13  knife?

14      A.   (Complies).

15      Q.   Let's use this red sticker.  If you

16  would put that on at the depth.  That shows how

17  deep the wound was?

18      A.   Yes.

19      Q.   Doctor, as a part of your autopsy

20  examination, do you do any screening for drugs

21  or alcohol on a routine basis?

22      A.   Yes, ma'am.

23      Q.   Is that just a part of the autopsy

24  procedure?

25      A.   Yes.

590

1    Q.    In this instance, did you find the
2  presence of any alcohol in Charles Allen's body?
3    A.    There was no alcohol.
4    Q.    Any drugs at all?
5    A.    No drugs.
6    Q.    Do you do a test for blood type when
7  you do an autopsy?
8    A.    Yes.
9    Q.    Can you tell us what Charles Allen's
10 blood type is?
11   A.    Type O positive.
12   Q.    I notice there are also, the last page
13 of your report is a laboratory report.  Is this
14 also a routine part of your autopsy examination?
15   A.    Not routine, but it depends upon the
16 case.
17   Q.    What is this laboratory report?
18   A.    This is a swab taken from the oral
19 cavity, anal and the penis.
20   Q.    Did you obtain any -- what were you
21 checking for?
22   A.    I was checking for possible sodomy or
23 any sexual activity prior to death.
24   Q.    So, were you checking for semen or
25 sperm?

591

1      A.    Semen or sperm.

2      Q.    Did you find any in the oral cavities?

3      A.    There was none.

4      Q.    In the anus?

5      A.    No.

6      Q.    What about the penis?

7      A.    There was none.  No, I'm sorry.

8  There was spermatozoa in the penis.

9      Q.    Is that a normal finding in a normal,

10 adult male?

11     A.    Yes.

12     Q.    Is that any indication of any specific

13 sexual activity?

14     A.    No, ma'am.

15     Q.    Doctor, if you would, turn to your

16 report on Bradley Dean Allen, autopsy 6154.

17          Did you perform both an external and

18 internal examination on Bradley Dean Allen also?

19     A.    Yes, ma'am.

20     Q.    Just in summary tell us what injuries

21 you saw on Brad.

22     A.    There were three stab wounds of the

23 chest and there was a stab wound of the abdomen

24 and there were five stab wounds of the back and

25 one stab wound on the left thigh and stab wounds

592

1    on the upper extremities.

2         Q.   In addition to the first, what, ten,

3    there were other more superficial?

4         A.   Yes, there were more cutting wounds.

5         Q.   At the conclusion of your autopsy, did

6    you form an opinion as to the cause of death of

7    Bradley Dean Allen?

8         A.   Yes, ma'am.

9         Q.   What caused his death?

10        A.   The cause of death was one stab wound

11   of the chest and one stab wound of the abdomen.

12       Q.   Did you see any signs of blunt trauma

13   to the head on Brad like you had seen on Charles?

14       A.   No, ma'am.

15       Q.   You said there was a stab wound to the

16   chest and a stab wound to the abdomen.  Would

17   either one of those wounds individually, could

18   either one of those wounds have killed Brad?

19       A.   Yes.

20       Q.   Let's go to the end, and I will ask

21   you about the -- I want you to help me with

22   detailing those, but did you do the laboratory

23   analysis, checking for oral, anal and penile

24   swabs on Brad also?

25       A.   Yes, ma'am.

1     Q.   What was the result of that?

2     A.   The swab from the mouth and the anus

3 were negative for spermatozoa, but it was

4 positive in the penis.

5     Q.   And, again, is that any sign of sexual

6 activity?

7     A.   No, ma'am.

8     Q.   If you examine an adult male, you

9 expect to see that; is that correct?

10    A.   That's right.

11    Q.   Did you also do your toxicology screen

12 to determine whether there were any drugs or

13 alcohol in Brad Allen's body?

14    A.   That's right.

15    Q.   What did you find?

16    A.   There was no alcohol and there was no

17 drug.

18    Q.   Now, were you able to type Brad

19 Allen's blood?

20    A.   No, ma'am.

21    Q.   Why not?

22    A.   Because the blood was hemolyzed.

23    Q.   What does that mean?

24    A.   The membrane of the red cell was

25 ruptured, so we can not type the blood.

594

1    Q.   So you just -- that is simply a matter
2    that you didn't have that available?
3    A.   At that time.
4    Q.   Let me ask you to come down again,
5    doctor, and help us to understand exactly what
6    wounds.  Let me give you a piece of blue chalk
7    this time.   I want you to use the same dummy
8    but use a different color so we can distinguish
9    between the injuries on the two men.
10   A.   Let me see the photographs.
11   Q.   Would the photographs help you?
12   A.   Yes, ma'am.
13   Q.   Let's start with the back.
14   A.   Can I remove this?
15   Q.   I would prefer that you not.  We will
16   be able to distinguish with the different
17   colors.
18   A.   On the mid back at the base of the
19   neck, there was a vertical stab wound.  This
20   measured seven-eighths inch in length and gaped
21   up to three-eighths inch.
22   Q.   You are using the blue chalk.  Now,
23   this appears to be going a vertical direction,
24   different direction than the stab wounds on
25   Charles.

595

1      A.    That's right.

2      Q.    Can you tell us anything about the

3 direction of that wound?

4      A.    The direction proceeded towards

5 right.    And it did not enter the chest cavity,

6 and the depth was only one inch.

7      Q.    One inch?

8      A.    Yes.

9      Q.    Okay.  So what portion of the body did

10 this penetrate to?

11      A.    Just the back of the neck.

12      Q.    All right.  What other wounds did you

13 see on the back?

14      A.    On the left upper back, eight inches

15 to the left of the mid line and six and

16 one-fourth inches below the top of the shoulder

17 there was another gaping wound.

18      Q.    Can you use the blue chalk?  Can I

19 help you hold something there?

20           Again, from what you have drawn here,

21 about what is the size of that?

22      A.    It measures one inch in length.

23      Q.    One inch in length.

24      A.    And it gaped up to one-half inch.

25      Q.    It was gaping open?

596

1        A.    Yes, it gaped open.

2        Q.    Now, is there some significance to the

3   fact that it was gaping?  Is that gaping more

4   than some of these other wounds that you have

5   described for us?

6        A.    No, ma'am, because the muscles are

7   arranged in such a way that if the muscle fibers

8   is like that, when you cut it, it pulls, so it

9   will cut open.  But if the knife would be

10  parallel to the muscle fiber, it will not gape.

11       Q.    I see.

12       A.    That is why the plastic surgeon cuts

13  along the muscle fibers so the wound will not

14  open.

15       Q.    Instead of across the fibers?

16       A.    That is correct.

17       Q.    This wound was across muscle fiber?

18       A.    Yes, ma'am.

19       Q.    How deep was this?

20       A.    The depth was one and a half inches.

21       Q.    So did this one-and-a-half-inch gaping

22  wound, it went through muscle, did it go into

23  any vital organs?

24       A.    No, ma'am, it just go toward right

25  without entering the chest.

1       Q.   All right.   Now you say this one was

2    straight on?

3       A.   No, it went to the right also.

4       Q.   Both of these are to the right?

5       A.   Yes, ma'am.   And on the same side,

6    seven inches below the top of the head, there

7    was another gaping stab wound measuring one inch

8    in length.

9       Q.   About the same size as this one?

10      A.   Yes.   And gaped up to one-eighth inch.

11      Q.   Is that because it was cutting across

12   the muscle, across this left shoulder?

13      A.   That is correct.

14      Q.   Now, if somebody has gotten two wounds

15   across this muscle, would this affect their

16   ability to move and utilize the muscles in that

17   arm?

18      A.   Not much.

19      Q.   All right.

20      A.   And this went to the right also.   And

21   the depth of penetration was two inches.   Again,

22   it did not enter the chest cavity.

23      Q.   So if I am understanding you

24   correctly, none of these three wounds to the

25   back were fatal wounds?

                                                   598

1        A.    None.

2        Q.    Is there another stab wound to the

3   back?

4        A.    Yes.   On the left lumbar, that is in

5   the lower back, six and one-half inches to the

6   left of mid line and fifteen inches below the

7   top of the shoulder there was another wound

8   measuring one and a half inches and gaped up to

9   one inch.

10       Q.    That, too, then, is cutting across

11  muscle?

12       A.    Yes.

13       Q.    How deep was that wound?

14       A.    The depth was five inches.

15       Q.    Five inches?

16       A.    Yes.  But it was slanting, just

17  underneath the skin to the muscle without

18  entering the body cavity.

19       Q.    All right now, slanting from what

20  direction?

21       A.    To the right.

22       Q.    Draw an arrow on there.  So, each of

23  these wounds, can you show us what it would be

24  consistent with, when you've got five inches,

25  but how deep?

599

1        A.    Five inches.   (Indicates).

2        Q.    Okay.  So it plunges into the body but

3   to the side?

4        A.    That is correct.

5        Q.    Is that consistent with the person who

6   is stabbing -- these are upright.   These are

7   different direction?

8        A.    Yes, ma'am.

9        Q.    As opposed to -- I mean it looks like

10  the knife is going in sideways here.   Can you

11  show us what these wounds with the direction and

12  the vertical play, what is that consistent with?

13       A.    It means that the knife was held like

14  this when the stabbing occurred.

15       Q.    Were there any other stab wounds on

16  Brad's back?

17       A.    Yes, ma'am.

18       Q.    Where else?

19       A.    One inch below this there was another

20  stab wound.   This measured three-fourth of an

21  inch in length; and, again, it did not enter the

22  body cavity.   And the depth of penetration was

23  three inches.

24       Q.    Three inches?

25       A.    Yes, ma'am.

1    Q.    So, this one is going to be five
2    inches deep.   What direction?
3         A.    This is from back to front.
4         Q.    Back to front.   So this is a
5    different direction?
6         A.    That is correct.
7         Q.    This is not from the side?
8         A.    That is correct.
9         Q.    Three inches deep?
10        A.    Yes.
11        Q.    Now, what organs, if any, did that
12   wound penetrate?
13        A.    Again, this only goes to muscle.   It
14   did not enter the abdominal cavity.
15        Q.    Any other wounds to Brad's back?
16        A.    On the back of the left thigh,  eleven
17   inches above the knee, there was an oblique stab
18   wound.   The stab wound measured one inch in
19   length and gaped up to one-half inch.   And the
20   wound track proceeded upward.
21        Q.    Upward?
22        A.    Yes.   Without injury to the vital
23   organ.
24        Q.    Now, any of these wounds, would any of
25   these wounds have severed an artery or have

601

1    caused any kind of spurting type bleeding?

2         A.    No, there would be none.

3         Q.    Can you tell, is it possible that

4    these wounds were inflicted as Brad is maybe

5    rolling around on the bed, struggling, or as he

6    is upright?  Could it be consistent either way?

7         A.    No, I cannot answer that question.

8         Q.    Because you cannot tell or because I

9    worded it poorly?

10        A.    No, I cannot because, remember, there

11   are two actors.  One is the victim and one is

12   the assailant.   It depends upon their position.

13        Q.    Okay.   So, in other words, if the

14   victim is upright, the assailant would be to

15   that side?

16        A.    That is correct.

17        Q.    If the victim is lying in a prone

18   position moving, it's going to affect?

19        A.    The position of the assailant.

20        Q.    For example, you said that this wound

21   is upright.   Does that mean -- or going up --

22   that somebody came down here and stabbed like

23   this, or is it possible somebody is kicking,

24   raising their legs, and if their leg is going up

25   the knife could nick them?

                                                    602

1    A.    No, again I cannot answer.  The victim
2    could be lying prone or he could be standing
3    because I don't know where the assailant was
4    coming from.
5    Q.    Any other stab wounds on Brad's back?
6    A.    No, ma'am, that is all.
7    Q.    Let's turn.  On Brad's chest, what
8    wounds did you see?
9    A.    On the upper chest, two inches to the
10   right of mid line and three and one-half inches
11   below the base of the neck, there was an oblique
12   stab wound.
13   Q.    Oblique refers to the angle of the wound?
14   A.    Yes, ma'am.  And this wound measured
15   five-eighth inch in length and gaped up to
16   one-fourth inch.
17   Q.    We don't have as wide a gape on that
18   wound?
19   A.    That's right.
20   Q.    What does that tell you, if anything?
21   A.    The muscle here is not as strong as
22   the muscle in the back, so the pull is not
23   much.  And the autopsy show that the knife
24   entered the chest, the chest cavity and nicked
25   the upper lobe of the right lung.

603

1      Q.   How deep was the wound?

2      A.   I did not measure it because it only

3 nicked the lung because if the lung was expanded

4 at the time of the stab wound, the depth would

5 be only one or one and a half inches.  But

6 during the exhalation the lung collapse, and

7 with the nick it could have been five inches.

8 So I did not measure it.

9      Q.   What is the effect when the lung is

10 nicked from a wound like this?

11      A.   It will leak the air and also produce

12 bleeding.

13      Q.   I'm sorry, it will do what?

14      A.   It will leak the air.

15      Q.   Leak air?

16      A.   Yes.

17      Q.   And the bleeding is going to be where?

18      A.   Inside the chest.

19      Q.   Would any of the stab wounds for Brad

20 that you have described so far, would any of

21 those alone have killed him?

22      A.   This one alone can kill.

23      Q.   Because of the damage to the lung?

24      A.   That's right.

25      Q.   Were there any other stab wounds on

604

1    Brad?

2         A.   On the right side of the chest, three

3    and one-fourth inches to the right of mid line

4    and medial to the nipple there was oblique stab

5    wound.  This stab wound measures two inches in

6    length.

7         Q.   Two inches long?

8         A.   Yes, ma'am.  And gaped up to

9    three-fourth inch.

10        Q.   All right.  Now, the fact that this

11   wound is I think longer than any of the others

12   you have described, what does that tell us about

13   that wound, if anything?

14        A.   It tells us that there was a movement,

15   either the victim moves or the assailant moved.

16        Q.   How deep was that wound?

17        A.   The depth was three and a half inches,

18   but it did not enter the chest cavity.

19        Q.   Three and a half inches and it didn't

20   enter the chest cavity?

21        A.   No, ma'am, because it goes sideways

22   like that.

23        Q.   Again what direction?  Show us.  So

24   that would be left to right?

25        A.   Yes.

605

1    Q.    Three inches, or did you say three and
2    a half?
3    A.    Three and a half.
4    Q.    Again, to the side?
5    A.    That is correct.
6    Q.    Would that be consistent if someone is
7    fighting and moving back and forth as they are
8    being stabbed?
9    A.    That's right.
10   Q.    To get these sideway wounds?
11   A.    That's right.
12   Q.    What other wounds did you see on Brad?
13   A.    On the left upper abdomen four inches
14   to the left of mid line just below the rib
15   cage.  This stab wound was oblique and also
16   measured two inches in length.  And it gaped up
17   to one inch.  And the autopsy showed that it
18   entered the chest initially and then it went
19   into the abdomen, perforating the diaphragm,
20   which is the partition between the chest and the
21   abdomen, and then inside and cut the spleen and
22   the left kidney.
23   Q.    It went into the spleen and the left
24   kidney?
25   A.    Yes, ma'am.

606

1      Q.    And go on.

2      A.    The depth of penetration was three and

3  a half inches.

4      Q.    Three and a half inches.  What is the

5  direction?

6      A.    The direction was towards right.

7      Q.    So, in other words, same direction as

8  this three and a half inch wound?

9      A.    That's right.

10      Q.    From this direction?

11      A.    Yes, ma'am.

12      Q.    Would this wound have been fatal alone?

13      A.    Yes, ma'am.

14      Q.    You stated going into the abdomen.

15  Intestine.   I mean, what portion -- there was a

16  gaping wound apparent on some of the

17  photographs.  Is this the one that -- in fact,

18  is that shown on State's Exhibit 123?

19      A.    Yes, ma'am.

20      Q.    And what are we seeing there in that

21  wound?

22      A.    We are seeing the omentum or the fat

23  in the abdomen.

24      Q.    Now, is that wound also shown in

25  State's Exhibit 125?

1        A.    Yes, ma'am.

2        Q.    Now, are there any other stab wounds?

3        A.    That is all.

4        Q.    Were there other cutting type wounds

5    on Brad?

6        A.    Yes.

7        Q.    Can you describe those for us?

8        A.    Yes, ma'am.   In the left axilla.

9        Q.    The dummy doesn't raise his arm.   Try

10   me.

11       A.    In the axilla, there was a horizontal

12   wound that measures two inches in length, and

13   the depth of penetration was three and a half

14   inches without entering the chest cavity.

15       Q.    Now, okay.   Show me -- the under

16   arm.   Is that what we would call the under arm?

17       A.    The armpit.

18       Q.    How deep in the armpit?

19       A.    Three and a half inches.

20       Q.    When you are examining that area, can

21   you tell what direction or anything from that?

22       A.    No, this is more of a cutting than a

23   stabbing.

24       Q.    Cutting.   But it actually went three

25   and a half inches deep into the body?

608

1      A.    That's right.    This is the exception

2  to the rule.

3      Q.    Now, would this injury have severed an

4  artery or caused any spurting type bleeding?

5      A.    No, ma'am.   There was no cutting of

6  the artery.

7      Q.    Would this affect a person's ability

8  to move or fight?

9      A.    No, when a person is angry or mad, it

10  will not interfere.

11      Q.    From the injuries you saw, did it look

12  like Brad Allen fought?  Were they consistent

13  with him having fought for his life?

14      A.    Yes, ma'am.

15      Q.    Were there any injuries that you would

16  characterize as defensive wounds?

17      A.    Yes, ma'am.

18      Q.    Starting with this injury under the

19  arm, would you characterize that as a defensive

20  wound?

21      A.    No.

22      Q.    Why not?

23      A.    Because the defensive wound means that

24  the wounds were sustained by covering the vital

25  parts of the body, and this is not that.   The

609

1    arms and the hands are used to cover the body.

2        Q.   For the depth and location of that,

3    did you say three or three and a half inch wound

4    in the armpit, wouldn't a person's arm have to

5    be up?

6        A.   Yes.

7        Q.   Would that be consistent with someone

8    trying to shield themselves and getting stabbed

9    in the arm?

10       A.   It can be, but I think this was more

11   of a fighting because he had also some injuries

12   to the arm.  So probably when he was covering

13   his vital part of the body he was raising his

14   arm, and he was sliced in the armpit.

15       Q.   Okay.  So to get this slice,

16   apparently you wouldn't have to have your arm

17   raised as high as I have raised mine for this

18   demonstration?

19       A.   No.

20       Q.   It could be down more shoulder height?

21       A.   Yeah, just shoulder height.

22       Q.   That cut under the armpit as well as

23   this wound are shown in State's Exhibit 125?

24       A.   Yes.

25       Q.   Now, it appears there are other cuts

610

1    on 125.

2         A.    Yes.

3         Q.    In fact, what is this one right here?

4         A.    That is already described.

5         Q.    That is on the back?

6         A.    Yes.

7         Q.    What are these other marks?

8         A.    Those are cutting wounds.

9         Q.    Cutting wounds?

10        A.    Yes.

11        Q.    Can you show us on the model?

12        A.    (Demonstrates).

13        Q.    When you are looking at a cutting

14   wound such as these in 125, can you tell what

15   direction they came from?

16        A.    No, because this is very superficial,

17   but it is just slicing, it can come from below

18   or it can come from above.

19        Q.    Somebody who is slashing with a knife?

20        A.    Yes, ma'am.

21        Q.    Were there some other wounds on Brad's

22   body that you haven't showed us?

23        A.    Yes, ma'am.

24        Q.    Where are they?

25        A.    In the inner aspect of the left arm,

1   there was another cutting wound.

2        Q.    Where are you putting that?

3        A.    (Demonstrates).

4        Q.    On the arm itself, just inside?

5        A.    Yes.

6        Q.    Now, what photograph is that shown in?

7        A.    It shows on exhibit 125.

8        Q.    The one we were just pointing to.   In

9   other words, it's right under here, right below

10  the armpit?

11       A.    That's right.

12       Q.    How deep was that?

13       A.    That was superficial.

14       Q.    What other cuts or stab wounds?

15       A.    Here.   There was a stab wound here

16  that entered the back of the arm, and then it

17  exited on the left side in front.

18       Q.    Are you saying that the knife actually

19  entered -- you had an entrance and exit wound on

20  this arm?

21       A.    Yes, ma'am.

22       Q.    How long a wound was that?

23       A.    Three and a half inches.

24       Q.    Can you describe, because of the

25  location of that, I mean, its depth, it goes in

                                                        612

1    and out, how long that overall wound was?

2         A.    No, I did not measure the one on the

3    back of the arm.

4         Q.    Can you select the photograph that

5    best depicts that particular injury?

6         A.    That exhibit 126.

7         Q.    That shows at the back the entrance

8    and then toward the front the exit wound?

9         A.    Yes, ma'am.

10        Q.    Is that a part of the same cut on the

11   arm, the upper arm that is shown on 123 also?

12        A.    Yes, ma'am.

13        Q.    Is 126 the one that shows the entrance

14   as well as the exit?

15        A.    Yes.

16        Q.    Is that muscle that is going to be cut

17   across there?

18        A.    Yes, ma'am.

19        Q.    Is this injury going to sever an

20   artery or a vein of any kind?

21        A.    No.

22        Q.    What type of bleeding?

23        A.    It's a veinous or from the vein.

24        Q.    Were there other injuries?

25        A.    Yes.    There was another cut here and

613

1    four cuts in the left forearm.  I'm sorry.

2    Four in the back of the left forearm.  And

3    another cut in the inner part of the left

4    forearm.

5         Q.    Do you have a photograph that

6    demonstrates those cuts?

7         A.    Yes.

8         Q.    Which ones?  123 and 124?

9         A.    Yes, ma'am.

10        Q.    All right.  First can you tell me the

11   -- you say four cuts on the forearm here that

12   are shown in State's Exhibit 123?

13        A.    Yes.

14        Q.    All right.  Now, are those deep, or

15   how deep into the body?

16        A.    Those are superficial; it only

17   involves the skin and underneath the skin.

18        Q.    What about the one on the front part

19   of the arm that is shown in 124, how deep does

20   that penetrate?

21        A.    This is deep, involves the artery and

22   vein.

23        Q.    This one is a deep wound?

24        A.    Yes, ma'am.

25        Q.    When you say it involves the artery,

614

1    would this wound, when that artery is cut, would

2    there be a spurting of blood?

3        A.    Yes.

4        Q.    Different type of bleeding from the

5    other wounds we have seen?

6        A.    Yes, ma'am.

7        Q.    How would you characterize, I mean,

8    are any of these wounds what would ordinarily be

9    characterized as defensive wounds?

10        A.    These wounds in the extremities are

11    all defensive wounds.

12        Q.    All of these that you have described

13    on the arm?

14        A.    Yes.

15        Q.    Including this one that is shown in

16    124 that caused arterial spurting?

17        A.    Yes, ma'am.

18        Q.    Why do you characterize those as

19    defensive wounds?

20        A.    Because it was sustained when he was

21    trying to protect himself.

22        Q.    Arms raised up to cover?

23        A.    Yes.

24        Q.    Face, chest, whatever?

25        A.    Yes.

615

1      Q.    Point out for me so I can show which
2   one severed an artery.  On 124?
3           Are there any more injuries that we
4   have not designated?
5      A.    That is all, ma'am.
6      Q.    You have the slashing wounds, too?
7      A.    Yes, ma'am.
8      Q.    You may have a seat.  Thank you.
9           Doctor, I want to show you two metal
10  bars, State's Exhibits 30 and 31.  Based on your
11  experience as a medical examiner, are both of
12  those, State's 30 and 31, are either one or both
13  of those capable of causing serious bodily
14  injury or death if they are used to strike an
15  individual such as Charles Allen in the head?
16     A.    Yes, ma'am.
17     Q.    In your opinion, would either one of
18  those bars be deadly weapons?
19     A.    Yes, ma'am.
20     Q.    Both of them would be?
21     A.    Yes.
22     Q.    In this particular case, is State's
23  Exhibit 30 consistent with being the weapon that
24  was actually used to beat Charles Allen in the
25  head?

                                                    616

1        A.    Yes, ma'am.

2        Q.    Doctor, let me show you again the

3   knife that is in evidence as State's Exhibit

4   29.   And I have two other knives here that are

5   in evidence as State's Exhibit 33.   If you would

6   look at all three of those, please.   Based on

7   your experience, is any one of those or each of

8   those three weapons, three knives, capable of

9   causing serious bodily injury or death?

10       A.    All of those knives can cause serious

11  bodily injury.

12       Q.    In your opinion, is each and every one

13  of those knives, State's Exhibit 29 as well as

14  the two that are exhibit 33, in your opinion are

15  those deadly weapons?

16       A.    Yes, ma'am.

17       Q.    Specifically is State's Exhibit 29

18  consistent with being the actual weapon that

19  inflicted the stab wounds on both Charles and

20  Brad Allen?

21       A.    Yes, ma'am.

22            MS. DAVIES:   I pass the witness.

23            THE COURT:   Anybody need a short

24  break?   Yes.   Go down the hallway to the jury

25  room for a couple of minutes, ladies and

1    gentlemen.

2           (Recess; after which, the following

3    proceedings were had:)

4           MS. DAVIES:  Your Honor, defense has

5    not begun their cross.  May I ask a couple more

6    questions?

7           THE COURT:  Yes, ma'am.

8                  DIRECT EXAMINATION

9                    (CONTINUED)

10   BY MS. DAVIES:

11         Q.   The timing of the break let me think

12   of a couple more questions.  Doctor Espinola, I

13   want to direct your attention back to your

14   autopsy of Brad Allen.   That is your report

15   6154.  You had mentioned, in examining Charles,

16   that because of the amount of blood in the chest

17   cavity or in that area of the body, that gave

18   you some indication of the order in which the

19   injuries were received.  He got the head injury

20   first and then the stab wounds to the chest.  As

21   to Brad, can you tell us whether, once he

22   received those fatal wounds, the deeper stab

23   wounds, even though they were fatal, would he

24   still have been able to move his body?

25         A.   One second.   Yes, ma'am.

                                                    618

1      Q.    So, is there anything about the wounds

2    or the amount of blood in the cavity in his

3    chest that would indicate whether the slashing

4    wounds, the defensive wounds, did they come

5    first or did the fatal wounds come first, if you

6    can tell?

7      A.    The stab wound in the chest did not

8    produce so much injury.  It only nicked the

9    lungs.   But the stab wound to the abdomen, it

10   lacerated the spleen, which is very vascular, is

11   very bloody.  And in the abdomen I recovered

12   approximately one thousand cc's of blood.  And

13   as far as the sequence of events is concerned,

14   this is a more difficult case because in the

15   chest there are two causes of death.  One is the

16   suffocation because, as I said earlier, the air

17   will leak, so it will -- and there is an opening

18   to the chest.  The chest normally has a negative

19   pressure so it will suck in air.  So, in

20   addition to bleeding, he was suffocated.  And in

21   the abdomen the cause of death is the loss of

22   blood.  But the blood is only one thousand

23   cc's.  And as I said before, his cutting wound

24   to the forearm cut the (unintelligible) of the

25   arteries so there would be bleeding.  In this

1    cutting wound, the bleeding is not as much as

2    the bleeding of the head.  It will be less even

3    though it involves the artery.

4         Q.   It will be less blood but it will

5    produce a spurting pattern of blood; is that

6    correct?

7         A.   That is correct.

8         Q.   All right.  Given the quantity of

9    blood that you have described, is it more

10   likely, more consistent that the fatal wounds

11   were the later wounds?  In other words, the

12   defensive wounds came first and then the fatal

13   wounds?

14        A.   Yeah, it seems like that.

15        Q.   That is more consistent?

16        A.   That is more consistent.

17        MS. DAVIES:  Thank you.  Pass the

18   witness.

19

20

21

22

23

24

25

                                                    620

CROSS EXAMINATION

BY MS. KAISER:

Q.   Good afternoon.

A.   Good afternoon.

Q.   Why don't we begin our discussion with Brad's autopsy.  We just finished that, and that is fresher on our mind, and then we will work our way back.

A.   Yes, ma'am.

Q.   Basically, it appears to me, that although there are numerous wounds, they seem to kind of come in groups and in territories. Wouldn't you agree that we have got several wounds here on the back, on the left upper back that all appear to be kind of centralized here and all going in the same direction with the wounds, the cut in the same direction, the stab in the same direction.  This whole group here from one, two, three, four, right together. Would you agree?

A.   Yes, ma'am.

Q.   Would all of these wounds be consistent with someone standing in front of them and holding a knife and reaching around like in a bear hug struggle type fashion?

1   A. That's right.

2   Q. And that type of a movement would

3 result in wounds in this configuration, in that

4 direction?

5   A. Yes, ma'am.

6   Q. And, likewise, we have a lot of

7 defensive wounds.  All of them appear to be here

8 on the left arm.  I don't see anything here

9 other than probably some superficial things.

10 Nothing of any consequence that is noted at all

11 here on his right arm; is that true?

12   A. That is true.

13   Q. Would that be consistent with him

14 using his left arm primarily in defense, raising

15 it.  That would account for the stab wounds in

16 the axilla.  It would account for the through

17 and through stab wound from back to front, would

18 it not, of this upper forearm?  It would account

19 for all of these wounds, the defensive wounds on

20 the left arm?

21   A. That's right.

22   Q. If he was reacting in that particular

23 fashion.

24   Do you find, for instance, if you have

25 a right-handed party, do you notice that

622

1    generally on their stronger arm, their right

2    hand, what they are most comfortable using, that

3    they will usually have less defensive wounds on

4    that particular arm because that is the hand

5    that they are mounting their offense with?

6         A.    That is correct.

7         Q.    So in this particular situation, while

8    he was defending himself with his left arm, he

9    could have been mounting his offense with his

10   right arm, and that would account for the lack

11   of defensive wounds on that right arm?

12        A.    That's right.

13        Q.    Likewise, of course, there is no way

14   to know because bodies are all moving around,

15   but the cut, stab in the back of the thigh also

16   might be consistent with some type of a kick,

17   would it not, because if he kicks forward and I

18   was in front of him that would account for the

19   direction that that particular stab wound took;

20   would it not?

21        A.    Could be.

22        Q.    Likewise, here in the front, again, we

23   seem to have a general consensus of direction.

24   In this particular case, again the wounds are

25   going in this fashion.  Would that be consistent

623

1    with an assailant standing in front of him and

2    stabbing in this direction?  Would that account

3    for the wounds being in the -- if he's going

4    like this, in the direction and the -- what word

5    am I looking for?  Being in this oblique kind of

6    fashion?

7         A.    That's right.

8         Q.    Okay.  And all of these superficial

9    wounds would also be consistent in a struggle

10   with somebody just kind of slashing and a bunch

11   of movement going around where perhaps just the

12   tip of the blade was making contact with the

13   skin?

14        A.    Yes, ma'am.

15        Q.    The bleeding, I believe you had

16   mentioned earlier that if a stab wound enters

17   into a cavity of some type, whether it's

18   abdominal cavity perhaps or into the chest

19   cavity, then the bleeding, although it may be

20   massive, is internal in those cases.  But in

21   instances where a stab wound doesn't penetrate

22   that far into any cavity, does the blood come

23   out?

24        A.    Yes, ma'am.

25        Q.    So it doesn't have an internal place

1    to go; it comes out?

2          A.    That is correct.

3          Q.    That would be the same with the

4    defensive wounds and the cutting wounds and

5    things of that nature.    The only wounds where

6    the blood is inside are those wounds that go all

7    the way into a cavity; is that true?

8          A.    That is true.

9          Q.    Isn't it true, that in neither of the

10   autopsies, you saw any indication that the knife

11   ever hit a bone of any type?

12         A.    No, there was none.

13         Q.    I believe Ms. Davies has showed you

14   what has been marked as State's Exhibit 29.   I

15   believe you have indicated is a weapon that

16   would be consistent with the stab wounds on both

17   Bradley and Charles; is it not?

18         A.    Yes.

19         Q.    You will notice that the blade of this

20   knife is bent; is it?

21         A.    That's right.

22         Q.    Would hitting soft tissue alone

23   account for the bend in this knife blade?

24         A.    No.

25         Q.    So, it never hit bone in neither

                                                   625

1    Bradley or Charles; is that true?

2        A.    No, ma'am.

3        Q.    So however this knife got bent is

4    something other than what we know about in this

5    autopsy and these wounds; is that correct?

6        A.    That is correct.

7        Q.    And you say that it is likely or

8    consistent that most of the I guess probably

9    some of the later wounds that Bradley received

10   were the wounds to the abdomen that actually hit

11   the spleen and caused all the massive internal

12   bleeding, that wouldn't have been the first

13   wound that he received because he wouldn't have

14   had enough energy or blood to mount the defense

15   that he did during that period; is that true?

16       A.    You are saying the stab wounds of the

17   abdomen would be later?

18       Q.    Later, yes.

19       A.    Yes, that's right.

20       Q.    Moving on to the autopsy that you

21   performed on Charles.  Normally, not just on

22   Charles but in any instance, isn't it true that

23   when -- that a person is more likely to suffer a

24   cut or a break in the skin if they are hit in an

25   area where the bone is close to the surface of

626

1   the skin?

2       A.   That is true.

3       Q.   If they have a lot of muscle or fatty

4   tissue or whatever underneath, that kind of

5   absorbs the blow, and generally the skin isn't

6   as likely to break; isn't that true?

7       A.   That is true.

8       Q.   And isn't it also true that a hit with

9   a blunt object such as the pipe bar that you

10   were shown earlier, the black one here on

11   counsel table, if you were hit with an object

12   such as that on an area of your body that the

13   bone was buried close to the surface of the

14   skin, you would be more likely to have a break

15   in the skin than, say, for instance, if you were

16   hit by a fist in that same area?

17       A.   Well, it depends upon the type of

18   wound.

19       Q.   But generally speaking, a metal object

20   like this bar would have a more concentrated

21   force than something like a fist that is a

22   little bit (unintelligible) and spreads the

23   force out over the whole area of it; does it

24   not?

25       A.   That is true.

627

1    Q.    When people are in fear or if their

2    adrenlin is really pumping and they are in high

3    anxiety, lots of times they are stronger than

4    what they might appear to be otherwise; isn't

5    that true?

6    A.    That's true.

7    Q.    And they can accomplish things that

8    you wouldn't have otherwise thought possible?

9    A.    That is true.

10   Q.    Keeping these factors in mind, don't

11   you think that the break in the nasal bone, the

12   break of the maxilla and possibly the break of

13   the jaw bone are consistent with receiving a

14   heavy blow by a fist?  Because the skin is not

15   broken in those areas, although this maxilla is

16   very close to the surface here.  Same with the

17   nasal bone.  And a fist would disperse that

18   energy more.   Isn't it just as equally

19   consistent with being hit by a fist?

20   A.    That is true because, as I said, if a

21   person is a boxer it can break those bones very

22   easily.  And another thing, underneath this bone

23   is a hollow because it's the sinus.   And also

24   the bone here is also hollow.  So it is

25   possible that it could be broken by a fist, but

628

1    that is the cheekbone.  But in the nasal bone it
2    is very unlikely that it was caused by a fist
3    because this is a very small area that if you
4    use a fist you wouldn't concentrate the force on
5    the nasal bone.  And in addition to that, there
6    was an abrasion of the bridge of the nose that
7    can not be sustained from the fist.
8         Q.   Okay.  But the maxilla would be
9    consistent, it would be possible to have broken
10   the maxilla from a blow from the fist?
11        A.   Yeah, it's possible.  It depends upon
12   the force.
13        Q.   The force used.  And somebody that is
14   high adrenaline, high anxity, certainly could
15   mount a force of that nature even if they were
16   not a boxer?
17        A.   That's right.
18        Q.   And equally the same with the jaw.  I
19   mean, we hear about glass jaws.  I am not sure
20   what that means.  I have always heard about
21   it.   Could the jaw bone have been broken in the
22   same fashion, with a strong blow from the fist?
23        A.   In that bone, I think it was a
24   transfer type of injury because, as you
25   described, there was a laceration here of three

629

1      inches in length, and this is consistent with

2      the blow by a pipe.  And it will transfer the

3      force from there to the jaw.  So it could be

4      either way.  It could be direct blow to the jaw,

5      or it could be force from the upper lips to the

6      jaw.

7           Q.   So it could be either way, either the

8      object was hit here and the force was

9      transferred to the jaw and it broke, or they

10     could be two independent injuries, two totally

11     separate things, where the jaw had been broken

12     by a fist or was broken later by a fist?

13          A.   That is correct.

14          Q.   And those injuries, the broken maxilla

15     and nasal bone, you said there was a lot of

16     bruising?

17          A.   Yes, ma'am.

18          Q.   Accompanying that.  Not immediate

19     bruising, but bruising that shows up a little

20     bit later?

21          A.   That's right.

22          Q.   And bruising is, in effect, bleeding

23     underneath skin, just blood that is not coming

24     out?

25          A.   That is correct.

630

1        Q.   Neither of those injuries bled

2   externally, they bled inside?

3        A.   That is correct.

4        Q.   You had mentioned on all of these

5   lacerations on the head, both the one here in

6   the middle of the forehead, eyebrow and the ones

7   around back, that they would have bled quite a

8   bit immediately?

9        A.   Yes, ma'am.

10       Q.   Isn't that true?

11       A.   That is true.

12       Q.   I notice in the autopsy that Charles

13  had brown hair that was fairly long in length;

14  wasn't it?

15       A.   Yes.

16       Q.   And he had a full head of hair, he

17  wasn't balding like some people?

18       A.   Yes.

19       Q.   Don't take it personally.   So he had

20  a nice full head of hair and it was fairly long?

21       A.   Yes, ma'am.

22       Q.   Isn't it true that the hair

23  surrounding these lacerations would initially

24  absorb quite a bit of the blood coming from the

25  laceration.   It would collect it and soak it to

631

1    a certain extent.  Before the blood actually

2    started running or dripping, it would be

3    collected by all the hair?

4         A.   That is true.

5         Q.   And, so, you wouldn't, although the

6    wound might start bleeding immediately, you

7    wouldn't necessarily have to see dripping on the

8    floor immediately because we have a lot of

9    things in between that wound and the floor

10   before it gets there, like a full head of hair;

11   isn't that true?

12        A.   That is true.

13        Q.   And although none of those wounds hit

14   an artery so there weren't any type of spurting

15   blood, if you have a head and the hair is

16   saturated with blood and an instrument, once it

17   hits that area, wouldn't blood spray off of that

18   just because of the collection of blood that had

19   pooled there?

20        A.   It could.

21        Q.   I believe you had mentioned that there

22   were contusions on the outside of Charles' right

23   fist area; is that not right?

24        A.   Yes, ma'am.

25        Q.   I believe you mentioned to Ms. Davies,

                                                    632

1    that although that might be a place that

2    received a blow, it was equally consistent -- it

3    wouldn't be unusual for you to see that in

4    somebody who had actually hit somebody with

5    their fist and they hit so hard that it bruised?

6         A.    That is true.

7         Q.    And I believe she had -- we used

8    different color for him?

9         A.    I used the red.

10        Q.    Okay.   He didn't have any stab wounds

11   in the back of him; did he?   He just had--

12             MR. STAFFORD:   Yes.

13   BY MS. KAISER:

14        Q.    Where am I missing?   Oh.   Both of

15   these stab wounds.   Would the configuration and

16   the direction of these wounds also be consistent

17   with an assailant being in front of him and

18   reaching around in this manner with a knife?   I

19   believe you have an arrow going inward.

20        A.    No, it's not consistent.   The reason

21   is that stab wound to the left side penetrated

22   the lower lobe of the left lung, so it should be

23   downward.

24        Q.    This one is downward?

25        A.    Yes.

633

1     Q.   But it would still be like this?  It

2    could be over and down this way?

3     A.   That is correct.

4     Q.   In that particular instance, the blade

5    of the knife would be in the same horizontal

6    fashion that you see the wound appearing on

7    this; is that not true?

8     A.   That is true.

9     Q.   And the same over here?

10     A.   That is true.

11     Q.   I am showing you what has been marked

12    as State's 77 and 78, both pictures of Charles

13    Allen lying in a supine position on the bed with

14    his head partially off the side of the bed.  It

15    would appear that his hair at this particular

16    stage is extremely saturated with blood; would

17    it not?

18     A.   That is true.

19     Q.   If his hair was saturated with blood

20    and he fell back and the force of the fall was

21    stopped by the bed, would that cause some of

22    that blood to splatter around?

23     A.   It might on the vicinity of the--.

24     Q.   Right here in back.  Obviously not for

25    feet, but just right here in back of where the

1    head?

2         A.    That is true.

3              MS. KAISER:   Pass the witness.

4

5              REDIRECT EXAMINATION

6    BY MS. DAVIES:

7         Q.    Doctor, I want to clarify a couple of

8    things, if I can.  Ms. Kaiser was asking you

9    about adrenaline flow giving one the capacity to

10   do more than they would ordinarily than if they

11   are in a relaxed state.   I think she asked you

12   about might fear cause the adrenaline to flow,

13   give someone that extra boost of strength.   Are

14   there other things, doctor, that also could give

15   somebody that extra strength from adrenaline

16   other than fear?

17        A.    Other substance?

18        Q.    Well--

19        A.    Anger.

20        Q.    Anger?

21        A.    Yes.

22        Q.    Not necessarily fear that gives

23   someone that extra strength; is it?

24        A.    That's right.

25        Q.    If somebody is on drugs, they might,

635

1    in some instances, act differently or perhaps in

2    a frenzy or have more strength?

3         A.   Well, depends on what kind of drug

4    because there are two types, one is stimulant,

5    and the other one is depressant.  So if the

6    person had taken a simulant drug, that would

7    produce effect like adrenaline.  But if it's a

8    depressant, then a person will be weak.

9         Q.   I guess my point is, in your opinion

10   are there things other than fear that could give

11   someone that extra capacity, whether it's drugs

12   or anger, or can you think of anything else?

13        A.   Yes.

14        Q.   Let me ask you -- the wounds here,

15   there were several demonstrations Ms. Kaiser was

16   asking you about.  For instance, these wounds on

17   the back, and asked you was it consistent with

18   this bear hug approach.  Now, given the position

19   and the depth and angle of those wounds, I mean,

20   is that the only thing that is consistent, or

21   would it also be consistent with somebody who is

22   over to the side and stabbing?

23        A.   Both are consistent.   Either is

24   consistent.

25        Q.   Or somebody is over on this side and

                                            636

1      stabbing?

2          A.    That's true.

3          Q.    What if somebody is on top?  Somebody

4      who is over, maybe crouched on the bed over

5      somebody and stabbing, is that consistent, too?

6          A.    Yes, ma'am.

7                MS. DAVIES:  I have nothing further.

8                MS. KAISER:  I have nothing further.

9                THE COURT:  You may stand down.

10               Any objection to Doctor Espinola being

11     excused?

12               You may be excused.

13               Call your next.

14                     GARY ANDREWS

15     was called as a witness by the State and, having

16     been duly sworn, testified as follows:

17                   DIRECT EXAMINATION

18     BY MS. CONNORS:

19         Q.    Would you state your name, please?

20         A.    Gary Andrews.

21         Q.    Mr. Andrews, how old are you?

22         A.    Thirty-six.

23         Q.    Are you married?

24         A.    Yes.

25         Q.    What is your wife's name?

1        A.    Janis.

2        Q.    Is that your wife in the second row

3   here?

4              MR. STAFFORD:   I object to the

5   relevancy as to who his wife is.

6              THE COURT:   Sustained.

7   BY MS. CONNORS:

8        Q.    Can you tell us what your relationship

9   with Charles Allen and Bradley Dean Allen was?

10       A.    They were my brothers-in-law.

11       Q.    How long had you been married to their

12   sister Janis?

13       A.    Eight years.

14       Q.    How long had you known Charles and

15   Bradley Allen?

16       A.    Same amount of time.

17       Q.    Have you seen Charles Allen interact

18   with both friends, people that he worked with

19   and his family?

20       A.    Absolutely.

21       Q.    Are you familiar with the reputation,

22   the character of Charles Allen in the community?

23       A.    Yes, I am.

24       Q.    In your opinion, was Charles Allen an

25   aggressive person?

1          A.   Not at all.  Just to the contrary.

2          Q.   Was he a combative person?

3          A.   No.

4          Q.   In your opinion, was he peaceful?

5          A.   Very peaceful.

6          Q.   Was his character one of a law-abiding

7  character?

8          MR. STAFFORD:  I object to that.  That

9  has never been approached as to that.

10         THE COURT:  Sustained.

11         MR. STAFFORD:  Ask the jury be

12  admonished that is an improper question.

13         THE COURT:  You are instructed to

14  disregard the last question by the prosecutor,

15  ladies and gentlemen.

16         MR. STAFFORD:  I ask the court to

17  grant my motion in limine on victim impact

18  information.  This is improper testimony.

19         THE COURT:  Denied.

20         MR. STAFFORD:  Ask for a mistrial.

21         THE COURT:  Denied.

22  BY MS. CONNORS:

23         Q.   Have you ever seen Charles Allen get

24  angry with any person?

25         MR. STAFFORD:  Improper question.  The

1    form of character has been asked and answered.

2              THE COURT:  Approach the bench.

3              (Off the record bench conference)

4    BY MS. CONNORS:

5         Q.   Mr. Andrews, where do you live

6    presently?

7         A.    Dallas, Texas.

8              MS. CONNORS:  I have no further

9    questions.

10             MR. STAFFORD:  I have no questions,

11   judge.

12             THE COURT:  You may stand down.

13             Any objection to this witness being

14   excused?

15             Ladies and gentlemen, we are going to

16   recess for the evening.  I can't tell you how

17   much more we have to go.  I am sometimes

18   surprised by who is next.  I anticipate there

19   will be at least one more State's witness before

20   the State rests.  You have been waiting quite

21   awhile some mornings.  Ask that you be here at

22   10:00 a.m. tomorrow morning.  All the previous

23   admonitions are still in effect.  Again, don't

24   discuss this case among yourselves or with

25   anybody else.  Wait until the case has been

640

1    argued to you and you are back there
2    deliberating the case.  Just a few minutes ago I
3    saw another camera, I think, its lens inside the
4    door, which we thought we had taken care of.  I
5    don't know who is covering this.  Don't pay any
6    attention to the media.  Don't read anything in
7    the newspaper.  Again, don't allow anybody to
8    talk to you about this case.  If anybody does,
9    bring it to our attention immediately. I
10   anticipate we are going to complete all the
11   testimony in the case in chief sometime
12   tomorrow.  I don't know what time that is going
13   to be.  I don't know exactly what time we are
14   going to have a charge read, but it's possible
15   that we may charge the jury tomorrow.  In that
16   event, I am going to want you to bring with you
17   in your vehicle when you come in tomorrow a
18   change of clothes and a toothbrush, whatever it
19   might take, in case you are spending the night
20   with us.  Do not bring it to the courtroom,
21   leave it in your vehicle.  In the event you are
22   sequestered tomorrow, we will be giving you the
23   opportunity to retrieve those items from your
24   vehicle.  It would probably be better for all of
25   us if tomorrow you would park in one of the

1   parking garages, either the covered parking
2   where the jury assembly parking garage is or the
3   parking garage directly behind this building
4   bounded by Congress, Preston and Caroline and
5   Austin Street.
6           Do you have any questions?
7           THE JUROR:  Ten o'clock tomorrow
8   morning; is that correct?
9           THE COURT:  Yes, you heard it
10  correctly.
11          THE JUROR:  Should we get sequestered,
12  will we have a chance to call?
13          THE COURT:  You will always have the
14  opportunity to call home in that event.  I am
15  not certain that is going to happen tomorrow,
16  but just be prepared for it, particularly if you
17  have small children that may be needed to be
18  picked up.  If you live alone and you have a
19  pet, you might want to leave the key with
20  somebody else, that kind of thing.  Any other
21  questions?
22          THE JUROR:  Will the alternates have
23  to be here?
24          THE COURT:  After the charge, no.
25          Any other questions?