APPELLATE COURT NO. *71595*

IN THE COURT OF CRIMINAL APPEALS

OF THE STATE OF TEXAS

AT AUSTIN

---

RICK ALLAN RHOADES,

                         Appellant

VS.

THE STATE OF TEXAS,

                         Appellee.

---

APPEAL FROM 179TH DISTRICT COURT OF HARRIS COUNTY,

TEXAS

Judge J. Michael Wilkinson  Presiding

---

STATEMENT OF FACTS

VOLUME _XXX_  OF _40_  VOLUMES

Marlene Swope
Official Court Reporter
301 San Jacinto
Houston, Texas  77002

FILED IN
COURT OF CRIMINAL APPEALS

MAR 5  1993

Thomas Lowe, Clerk

644

1        If there is nothing else, please go in

2   a group back to the jury room and we will take

3   you down.

4        MS. DAVIES:   Our last witness, now

5   that he has been testified, can he stay in the

6   courtroom?

7        MR. STAFFORD:   No objection.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           INDEX

2                       VOLUME XXX

3                                                      <u>Page</u>

4    LARRY HOFFMASTER
          Direct                                        648
5         Cross                                          684
          Redirect                                       695
6         Recross                                        697

7    STATE RESTS                                         701

8    STEWART H. KENNEDY
          Cross                                          702
9         Redirect                                       748
          Recross                                        756
10
     FLOYD McDONALD
11        Direct                                         761
          Cross                                          776
12
     DEFENSE RESTS                                       789
13
     DAVID SANDERS
14        Redirect                                       791
          Cross                                          800
15
     Objections to Court's Charge                        803
16
     Opening argument of the State                       808
17
     Opening argument of the Defense                     825
18
     Closing argument of the  Defense                    839
19
     Closing argument of the State                       848
20

21

22

23

24

25

                                                          i.

1                  ALPHABETICAL INDEX

2                    VOLUME XXX

|                        |      | Page |
|------------------------|------|------|
| HOFFMASTER, LARRY       |      |      |
|     Direct   |      | 648  |
|     Cross    |      | 684  |
|     Redirect |      | 695  |
|     Recross  |      | 697  |
| KENNEDY, STEWART H.     |      |      |
|     Cross    |      | 702  |
|     Redirect |      | 748  |
|     Recross  |      | 756  |
| McDONALD, FLOYD         |      |      |
|     Direct   |      | 761  |
|     Cross    |      | 776  |
| SANDERS, DAVID          |      |      |
|     Redirect |      | 791  |
|     Cross    |      | 800  |

1                  CAUSE NO. 612408

2    STATE OF TEXAS        IN THE 179TH DISTRICT COURT

3    VS.                        OF

4    RICK ALLAN RHOADES     HARRIS COUNTY, T E X A S

5

6    A P P E A R A N C E S:

7    For the State:        Ms. Carol Davies
                           Ms. Claire Connors
8                          Assistant District Attorneys
                           Harris County, Texas
9
     For the Defendant:    Mr. James Stafford
10                         Ms. Deborah Kaiser
                           Attorneys at Law
11                         Houston, Texas

12

13              BE IT REMEMBERED that upon this the

14    1st day of October A.D. 1992, The above entitled

15    and numbered cause came on for continued trial

16    before the Honorable J. Michael Wilkinson, Judge

17    of the 179th District Court of Harris County,

18    Texas, and a jury; and the State appearing by

19    counsel and the Defendant appearing in person

20    and by counsel, the following proceedings were

21    had, viz:

22

23

24

25

1          THE COURT:  Mr. Stafford.

2          MR. STAFFORD:  For purposes of the

3    record, it's my understanding that the State's

4    next witness is going to be Sergeant Hoffmaster,

5    who is a purported expert in blood spatter.  I

6    am contending under Frye vs. United States and

7    under the rules of criminal evidence that blood

8    spatter testimony is not readily acceptable by

9    the scientific community.  It's susceptible to

10   various and many interpretations.  Since it's my

11   understanding, this fine sergeant did not make

12   the scene, his calculations are strictly from

13   pictures that have been blown up to make

14   predictions on hypothets presented to him.

15   Based upon the fact that this type testimony is

16   not accepted by the scientific community, I

17   would ask the court to prevent this witness from

18   testifying.

19          MS. DAVIES:  Your Honor, it's not

20   scientific expertise.  It does not fall into the

21   arena of scientific testing at all.  It's a type

22   of information and opinion based on a

23   specialized training and interpretation and

24   opinion.  But certainly it's not the kind of

25   thing that would be a scientific test.

646

```
1            THE COURT:  Your objection is overruled.
2            MS. CONNORS:  Monday counsel from the
3    parole board turned over to the court some
4    parole records.  The court reviewed the
5    records.  On Tuesday evening at approximately
6    seven o'clock, the judge gave the parole
7    records--
8            THE COURT:  Actually I reviewed them
9    Monday and Tuesday.  On Tuesday afternoon, at
10   the time we broke, I turned them over.
11           MS. CONNORS:  Which is close to six
12   o'clock in the evening.  This court ordered the
13   State to make a copy for defense counsel and
14   give them to defense counsel.  We have done
15   that.  At approximately ten o'clock this
16   morning, which is October 1st, I gave Mr.
17   Stafford the parole records.
18           THE COURT:  All right.
19           MR. STAFFORD:  I still object to the
20   court giving that to the State.
21           THE COURT:  Get the jury.
22           (Jury enters the courtroom)
23           THE COURT:  This witness has
24   previously been sworn.  Please be seated.
25           Proceed, please.
```

```
 1                      LARRY HOFFMASTER
 2    was called as a witness by the State and, having
 3    been duly sworn, testified as follows:
 4                      DIRECT EXAMINATION
 5    BY MS. DAVIES:
 6         Q.    Would you, please, tell us your name?
 7         A.    Larry Hoffmaster.
 8         Q.    How are you employed?
 9         A.    Houston Police Department homicide
10    division.
11         Q.    How long have you been in law
12    enforcement?
13         A.    Twenty-one years.
14         Q.    You say you are in the homicide
15    division.  How long have you been there?
16         A.    Fifteen years.
17         Q.    During your years of experience as a
18    police officer, have you had few or many
19    occasions to be at and investigate homicide
20    scenes?
21         A.    Many occasions.
22         Q.    On those occasions, many instances,
23    was there bloodstain evidence at the scene in
24    the form of blood that had been left behind?
25         A.    Yes, there was.
```

1          Q.   Have you had any specialized training
2     to enhance your ability in law enforcement?
3          A.   Yes, I have.
4          Q.   Tell the jury about some of the
5     special training you have had.
6          A.   I have had training in bloodstain
7     interpretation, crime scene reconstruction.   Did
8     you want me to list those?
9          Q.   Any special training you have had and
10    give us an idea where you received that
11    training.
12         A.   In 1985, I received a course in
13    bloodstain interpretation in Dallas, Texas; in
14    1987, an advanced bloodstain interpretation
15    course in Corning, New York; 1988, bloodstain
16    interpretation at the Houston Police Academy;
17    1992, I went to an advanced bloodstain seminar
18    in Colorado Springs.
19         Q.   So, those special schools just related
20    to bloodstain interpretation?
21         A.   Yes.
22         Q.   I assume, through the years, you have
23    gone to other training sessions in other areas?
24         A.   Yes, unrelated to this.
25         Q.   Did you develop any special interest

1    in the interpretation of bloodstain?

2        A.   Yes, I did.

3        Q.   Is that why you happened to have gone

4    to a number of these seminars?

5        A.   Yes.

6        Q.   Have you been involved in teaching at all?

7        A.   Yes.

8        Q.   Tell us about that, if you would.

9        A.   I teach some bloodstain interpretation

10    for Houston Community College.  I have taught

11    for Brazoria County Regional Law Enforcement,

12    Pasadena Police Department, Houston Police

13    Academy.  I am a member of the International

14    Association of Bloodstain Pattern Analysts, and

15    I am sometimes called as an expert witness by

16    the Harris County District Attorney's Office.

17        Q.   Were you involved initially in the

18    investigation of the Allen brothers' murder at

19    624 Keith on September 13 of 1991?

20        A.   No, I was not.

21        Q.   Did you actually go out to the scene

22    there while the evidence at the scene was still

23    intact?

24        A.   No, I did not.

25        Q.   At some later point, did you look over

1    the evidence in this case at my request?

2         A.   Yes, I did.

3         Q.   Can you tell the jury, since you were

4    not at the scene, what efforts did you make to

5    familiarize yourself with the evidence in the case?

6         A.   I read the scene description and the

7    defendant's statement from the offense report.

8    I viewed the 35 millimeter photographs and the

9    video tape and talked with the medical examiner.

10        Q.   Did you talk to any of the individuals

11   who were at the scene?

12        A.   Yes, I did.

13        Q.   For example, Jim Bolding?

14        A.   I talked with Jim Bolding, and I also

15   talked to the two scene detectives.

16        Q.   When you are asked to look at evidence

17   and see if you might have some opinions as to

18   interpretation of bloodstain patterns, ideally

19   would you want to have gone to the scene?

20        A.   Yes, that would be the ideal situation.

21        Q.   The fact that you were not at the

22   scene, after reviewing all of the pictures, the

23   video and the reports, did you feel that you

24   were able to reach some conclusion even though

25   you were not there in person?

1     A.   Yes, I can definitely tell a lot from

2  those things.  I may have told a little more if

3  I had been able to go to the crime scene, but I

4  was able to make some determinationss from the

5  evidence I was shown.

6     Q.   Now, we have a number of photographs

7  and video tape in evidence.  Did you take steps

8  to have some other visual aids made to assist you?

9     A.   Yes, I had made some slides of still

10  photographs and a couple from the video that

11  made specific points that I wanted to show the jury.

12     Q.   So you had slides made from 35

13  millimeter film and from the video film?

14     A.   Yes.

15     Q.   Any particular reason that you prefer

16  to have some slides available, sergeant?

17     A.   They are easier for the jury to see.

18  If you and I are talking about that picture and

19  I am pointing to things, they can't see what I

20  am talking about.

21     Q.   Let me show you a group of photographs

22  here that have been previously identified in

23  court, State's Exhibits 89 through one hundred,

24  all of which are photographs that were taken at

25  the morgue of Charles and Brad Allen prior to

1   the autopsy.  Would you look through those and
2   see if there are any particular ones that you
3   felt were of significance and assistance to you
4   in your analysis?
5       A.   Yes, 89 and 90.
6       Q.   89 and 90.  Did you assist me in
7   setting up a projector and carousel here earlier
8   for the slides that you had made?
9       A.   Yes, I did.
10      Q.   Did you review the slides at that time
11  that are contained in the carousel that was
12  marked State's Exhibit 141?
13      A.   Yes.
14      Q.   And the slides contained in that
15  carousel, did you review them?  They are marked
16  141-A through P.
17      A.   Yes.
18      Q.   Are each of these slides accurate
19  reproductions of film, either 35 millimeter or
20  scenes from the video, that you reviewed?
21      A.   Yes.
22      Q.   In fact, did you show the slides 141-A
23  through P to defense counsel for me also?
24      A.   Yes, I did.
25           MS. DAVIES:  Your Honor, at this time

                                                    653

1    I am tendering the slides 141-A through P as

2    well as State's Exhibits 89 and 90.

3              THE COURT:   Tell me the slide

4    identifying marks again.

5              MS. DAVIES:   141-A through P, sixteen

6    slides.

7              MR. STAFFORD:   As far as 141 is

8    concerned, I renew my previous objection I made

9    outside the presence of the jury as to the

10   slides in reference to his testimony.   Other

11   than that, I have no objection.

12             THE COURT:   Were 89 and 90 previously

13   admitted?

14             MS. DAVIES:   They have not been

15   offered.   They were previously identified, and

16   this is the first offer.

17             THE COURT:   State's Exhibits 89 and 90

18   are admitted, as are State's Exhibits 141-A

19   through P.

20   BY MS. DAVIES:

21       Q.   Sergeant Hoffmaster, before we start

22   explaining from the pictures, would you give us

23   a little information to assist us in

24   understanding, a little information about the

25   field of blood spatter interpretation.

654

1    Basically what is it?

2        A.    Bloodstain interpretation is simply

3    learning how blood reacts when certain things

4    happen to it, learning the various patterns it

5    produces and then being able to compare those to

6    the spatters at the crime scene, and it tells

7    you what took place at that location.

8        Q.    Are there any terms that you use,

9    vocabulary in bloodstain interpretation?

10       A.    Yes, there are several.   There are

11   three basic types, low, medium and high

12   velocity.

13       Q.    Stop just a minute.   Velocity.   Low

14   medium and high velocity?

15       A.    Yes.    That describes the impact, the

16   speed of the impact on the blood.   In a high

17   velocity, that would be consistent with a

18   gunshot, where the velocity of the bullet

19   hitting the blood would break it up into a fine

20   mist.

21       Q.    You expect to see a pattern that looks

22   like a fine mist?

23       A.    Yes.

24       Q.    On a surface that is adjacent?

25       A.    Yes, it could be on a wall or on

655

1    clothing or something of that nature.

2        Q.    And what is medium velocity?

3        A.    Medium velocity is a little larger,

4    and it's caused by beating.  And when I say

5    beating I include stabbing in that.  Either a

6    beating with an object or a stabbing.  In both

7    cases, it breaks up the blood into medium

8    velocity spatters.  That is a little larger.  To

9    give you an example that you could picture in

10   your mind, say between the size of the head of a

11   pin and maybe a pencil eraser.

12       Q.    Now, if I am understanding you

13   correctly, you would expect to see the same type

14   and size spatter, medium velocity, whether it

15   was the result of someone being beat?

16       A.    Yes.

17       Q.    With a blunt object?

18       A.    Yes.

19       Q.    Or the same type pattern would be the

20   result of a stabbing; is that correct?

21       A.    That is correct.  In the beating, the

22   blunt object is breaking up the blood.   In a

23   stabbing, the hand and the hilt of the knife are

24   doing the same thing that the blunt object does.

25       Q.    You also mentioned low velocity.  What

656

1    is that?

2         A.   Low velocity is just blood that drips

3    as a result of gravity.  When the blood drop

4    becomes large enough that gravity overcomes the

5    surface tension, then it drops to the floor.

6    That is usually about the size of a dime or

7    slightly smaller.

8         Q.   Now, would the size be a result in

9    some cases of the amount of bleeding that is

10   going on, or do you expect it to be of that size

11    -- I mean, does it make a difference if

12   somebody is bleeding profusely or just a little

13   bit?

14        A.   Well, yes, it would because you would

15   be having a lot of drops coming off if they are

16   bleeding profusely, it would be all together, or

17   maybe you just couldn't tell, it would be so

18   much.

19        Q.   In laymen's terms, it would be like a

20   pool of blood?

21        A.   Yes.

22        Q.   There are so many drops that they are

23   going to combine and make a larger area?

24        A.   Yes.

25        Q.   Is there anything significant about

657

1    the shape of the drops that you see when you are

2    looking at your low velocity?

3        A.   The shapes?  Well, the shape is

4    generally determined by the surface that it

5    strikes.  Unless, if you are talking about

6    directionality, sometimes if a person is moving

7    you can tell directionality, the direction they

8    are going by the -- there is a spined edge on

9    the side that they are traveling in.

10       Q.   You say the surface that it strikes

11   would be significant.  Are you going to get a

12   more precise pattern if it's a smooth surface?

13       A.   Well, on a slick surface you get a

14   perfectly round drop.  If it hits a rough

15   surface then it breaks up with spines and uneven

16   circles.

17       Q.   The term transfer, what significance

18   does that have?

19       A.   A transfer is simply just having blood

20   on one object, touching it to another object and

21   transferring the blood.

22       Q.   Again, in laymen's terms, might it be

23   the kind of thing that one would refer to as a

24   smear?  In other words, if I had blood on my

25   hand and touched it on the table as opposed to a

1    cut hand and let the blood just drip?  If I am

2    cut and the blood drips, you are going to see

3    what kind of pattern?

4         A.    Low velocity.

5         Q.    Just your round?

6         A.    Basically round drops.

7         Q.    As opposed to if I had cut myself and

8    I touched the table?

9         A.    If your hand was covered with blood

10   either from cutting yourself or touching

11   somebody else that was covered with blood and

12   you touched the table, then that would be a

13   transfer.

14        Q.    When you go to a crime scene and it is

15   a situation where it's a stabbing, is there

16   anything that you commonly look for?

17        A.    Yes, there is.

18        Q.    What is that?

19        A.    I look for the low velocity drops that

20   we discussed just now, the round drops.  A trail

21   of them through the house.

22        Q.    Why is that?

23        A.    It's very, very common for, in a

24   stabbing, the knife slips in someone's hand or

25   they are fighting over the knife, the defendant

659

1    often gets cut during the struggle.  It's

2    common.   I look for it at every crime scene I

3    go to because if that occurs and I recognize

4    that then I can take or get the lab people to

5    take samples of that blood, and then I have that

6    for DNA comparison.

7         Q.   Is there any other term that you think

8    would be of assistance to us in understanding

9    your analysis?

10         A.   Yes, there is one I can think of right

11    off, and that is arterial spurting.

12         Q.   What is that?

13         A.   Arterial spurting occurs when an

14    artery is breached through a stabbing or some

15    type of wound and the blood spurts out with the

16    beating of the heart and it causes a specific

17    pattern on the wall that we will see in just a

18    minute.

19         Q.   Is it a distinctive pattern?

20         A.   Yes.

21         Q.   Would you expect to see a different

22    evidence of bleeding at the scene as a result of

23    the situation where an artery had been cut as

24    opposed to, say, if somebody had been hit in the

25    face and maybe their nose was bleeding?

660

1    A.   Yes, that would be different.

2    Q.   Why is that?

3    A.   Arterial spurting produces a different

4    pattern than if someone's nose was bleeding.

5    You might have some medium velocity spatter if

6    they are struck again after the nose started

7    bleeding, or you may just have some low velocity

8    dripped blood on the floor.

9    Q.   You said if they were struck again.

10   Did I understand you to say if someone was

11   struck in the face and they were bleeding you

12   might expect to see medium velocity spatter if

13   they were struck again?

14   A.   Yes.   Normally it takes at least two

15   blows before you get spatter.   The first blow

16   draws the blood, and the second blow would, once

17   that blood has pooled and you strike in that

18   blood again in the same area, it breaks it up

19   into the medium velocity spatter that we talked

20   about.

21   Q.   Is that true of both stab wounds and

22   beating type injuries?

23   A.   Yes.

24   Q.   Ordinarily it would take two blows

25   before you would begin to see spatter?

661

1    A.   At least two, yes.

2    Q.   Is that to say you would never get any

3 spatter of any kind from just a single blow?

4    A.   No, occasionally with a heavy

5 instrument you can get spatter on the first blow.

6    Q.   When you talk about this medium

7 velocity spatter as a result of beating, am I

8 understanding is that blood that is spraying --

9 if I am using the wrong term, tell me -- but is

10 that like blood that is spraying from the victim

11 as blood has been drawn, or might it be from the

12 weapon that is being used?

13    A.   If I understand that correctly.

14         MR. STAFFORD:  I didn't, judge.  Could

15 she restate it?

16         THE COURT:  I didn't hear it.  What

17 was the question?

18 BY MS. DAVIES:

19    Q.   When you talk about blood spatter, the

20 medium velocity blood spatter pattern, the kind

21 of thing that is the result of beating or

22 stabbing, are you telling us that that is blood

23 that is spraying from the body of the victim, or

24 might blood come from the weapon as it's in use?

25    A.   Medium velocity spatter is, once you

662

1    have opened a wound and you have blood, it

2    starts bleeding, and you strike back in that

3    place again, it breaks the blood up and it

4    spatters on surrounding things, whatever.

5         Q.   Is there any -- I heard the term

6    cast-off.  What is that?

7         A.   Cast-off is the second thing you were

8    describing.  If you have a weapon and you are

9    striking back in a pool of blood, the blood gets

10   on the weapon.  When you raise it back and bring

11   it forward, sometimes it produces a cast-off

12   pattern on the wall or the ceiling behind you,

13   or in front of you, too.

14        Q.   In other words, that is actually blood

15   that has gotten onto the weapon and then is

16   going from the weapon when it's brought back to

17   the surface where you see the stain?

18        A.   That is correct.

19        Q.   Is there anything distinctive about

20   the pattern or shape of that type of stain?

21        A.   Yes, it looks differently than other

22   stains.

23        Q.   Is that something that is based on

24   your experience and training you have that you

25   can attempt to distinguish?

663

1      A.    Yes.

2      Q.    Sergeant Hoffmaster, would it assist

3   you -- what would be the best way to explain to

4   the jury your conclusions?  Would it assist you

5   to show these slides first and point out what

6   you consider significant?

7      A.    Yes.

8            MS. DAVIES:   Your Honor, may I ask

9   that we be allowed to show these slides?

10           THE COURT:   All right.

11  BY MS. DAVIES:

12     Q.    I didn't ask you.  You did not go to

13  the crime scene while the evidence was intact.

14  At some point did you go to 624 Keith to

15  personally see the layout and familiarize

16  yourself with the location where these

17  photographs were taken?

18     A.    Yes, I did.  I went there so I could

19  compare the photographs to the scene and see the

20  layout of the house in my mind.

21     Q.    Are you ready?

22     A.    Yes.

23     Q.    Can you tell us what you were able to

24  see in this slide that was helpful or

25  significant to you?

1     A.    Well, there were several things that
2   were significant in this slide.   Many times in
3   bloodstain interpretation or crime scene
4   reconstruction what is not present is as
5   important as what is.    In this slide you can
6   see that there is a lack of the dripped blood,
7   the low velocity dripped blood in this area next
8   to the bed.   It's important to note that this
9   foot is out.    The other half of the body is
10  covered with this cover.   And then we have
11  something we forgot to discuss here, hair
12  transfers on this pillow.    That is just simply
13  having blood on your hair and transferring that
14  to some object.
15     Q.    Is that similar, you described
16  transfer, we talked in terms of the hand.    Is
17  it basically a transfer but you are just talking
18  about hair that is soaked with blood?
19     A.    Yes.   You see it here on the first
20  pillow, then it moves across to the second
21  one.    Has some on the third and then.   Those
22  are I think the three basic things that are
23  important in those slides.   The lack of blood
24  here, the foot being out from under the cover.
25  Actually the full leg is out from under the

1    cover.  And the stains going across the pillow.

2        Q.    All right.

3        A.    In this photograph we can see what we

4    talked about awhile ago, the medium velocity

5    spatter.   It's a little hard to see, but you

6    can see it here in this area.   Here.   Here.

7    There are several drops up in this area and on

8    this music stand next to the bed.   Those are

9    consistent with the beating that occurred

10   there.   It tells us that the beating did occur

11   there.

12       Q.    All right.   Now, you have pointed out

13   some spots that are difficult to see there on

14   the wall.   And what about, is there an

15   electrical outlet there?

16       A.    Yes, right here.   There is a spatter

17   on that also.

18       Q.    As well as on the music stand?

19       A.    There is some on the phone, here on

20   the music stand, the wall here, here, here and

21   up in this area.   I suspect there is a great

22   deal more; we just can't see it in these

23   photographs.

24       Q.    What about there is a white portion of

25   the pillow sticking out.   How would you describe

1    that?

2         A.    There is some type of transfer stain

3    there, and I wasn't able to make a determination

4    of what caused that.

5         Q.    Can you tell anything, from the

6    spatter that you pointed out to us, can you tell

7    anything about direction, given the quality of

8    the pictures that you have?

9         A.    --.

10             MR. STAFFORD:  I didn't hear the

11   answer, Judge.

12             THE COURT:  It hasn't been given yet.

13        A.    No.  I couldn't really make any

14   determination on that.

15        Q.    Try to keep your voice up.

16        A.    This is a morgue photograph of the

17   complainant that we just saw, Charles; and we

18   talked about the fact that the one leg was out

19   from under the covers and the other leg was

20   still under the cover.  You notice the lack of

21   blood on this leg and the blood present on the

22   right leg.  And also see it on his right foot.

23   This is some of the medium velocity spatter that

24   we talked about present on his right foot.  All

25   those things together, the lack of blood beside

1    the bed, the hair transfers on the pillow going

2    across the bed, the medium velocity spatter on

3    the wall and the headboard and the music stand

4    around the bed all points to the attack

5    occurring in that bed.

6         Q.   Now, Sergeant Hoffmaster, the drop,

7    the medium velocity spatter drops on Charles'

8    foot there, can you tell us, I mean, is that an

9    indication that he was standing upright at some

10   point and that blood was dripping from him, or

11   could it have been dripping from another, from

12   his attacker?  Can you tell anything about how

13   that spatter?

14        A.   This spatter would be from the

15   beating.  It appears that it occurred there in

16   the bed because of the lack of spatter on the

17   left leg.  Very high probability that if he were

18   standing and was being beaten he would have

19   spatter on both feet.  Also there may have been

20   spatter present somewhere in the house if that

21   had occurred.

22        Q.   So, if he was in an upright position

23   when he was bleeding from the injury that you

24   saw on his head, you would expect to see

25   evidence of that in terms of blood on both of

668

1   his legs, not just the one that was sticking out
2   from under the cover?
3        A.   If he were standing up being beaten,
4   yes.
5        Q.   Did it appear to you that that left
6   leg had ever been out from under the bed
7   covering that we saw?
8        A.   No.  There was no blood present
9   anywhere on that leg or that foot that I could
10  observe.
11       Q.   What is this?
12       A.   This is the wall just inside Charles'
13  room, the bedroom, the door leading into his
14  bedroom.
15       Q.   Is this one of the slides you had made
16  from the video?
17       A.   Yes.  That is why it appears
18  differently.  This type of pattern is the
19  arterial spurting that we talked about where an
20  artery is breached, and there is also some
21  medium velocity spatter in this area.
22       Q.   So you have a combination of two
23  patterns there; is that right?
24       A.   Yes.
25       Q.   Medium velocity as well as the

669

1   arterial spurting?

2       A.   Yes.

3       Q.   When you said arterial spurting, is

4   that the larger spots with the trail going

5   down?

6       A.   These patterns, these and these.

7   What happens, this part of it is just what

8   gravity has overcome and is just running down

9   the body, was large enough that it's running

10   down.  As I said, this is consistent with an

11   artery being breached, is consistent with the

12   wounds that Bradley had.  And it appears that he

13   may have entered the room and was attacked at

14   this point and received wounds that would cause

15   arterial spurting.

16       Q.   Did there, based on your experience

17   and training, did there appear to be any wounds

18   on Charles that would have caused that pattern

19   of bloodstain?

20       A.   Yes.  I talked with Doctor Espinola,

21   and he did have wounds on his left arm that

22   would be consistent with this type stain.

23       Q.   That is Brad?

24       A.   Brad, yes.

25       Q.   Now, Charles, the other brother, the

1   one you just showed us the slide of.

2       A.   Did Charles have those?  According to

3   Doctor Espinola, he did not.

4           MR. STAFFORD:  I object to what the

5   doctor told him, judge.  That would be hearsay.

6           THE COURT:  Sustained.

7           MR. STAFFORD:  They had an opportunity

8   to ask the doctor that when they had him here

9   and failed to do it.   Ask the jury be

10  instructed to disregard the last statement.

11          THE COURT:  I sustained your original

12  objection.

13          MR. STAFFORD:  I ask the jury to

14  disregard the last statement.

15          THE COURT:  Disregard the last

16  response of the witness, ladies and gentlemen.

17          MS. DAVIES:  I object to the sidebar.

18          THE COURT:  Sustained.

19          MR. STAFFORD:  I ask for a mistrial at

20  this time.

21          THE COURT:  Denied.

22  BY MS. DAVIES:

23      Q.   Is that the main significance of that

24  slide, sergeant?

25      A.   Yes.


671

1      Q.    All right.

2      A.    This area is the wall in the hallway

3  on the -- it would be the west side going from

4  Charles' room down this area, back down the hall

5  to Bradley's room.  We have the same type of

6  pattern, arterial spurting going down the wall

7  back to that room.

8      Q.    Now, can you tell anything about the

9  direction when you look at that type?

10     A.    Yes, it's traveling back in this

11  direction.   It's usually angled in the

12  direction that it's traveling in.

13     Q.    So does that tell you anything about

14  the direction that the person who was bleeding

15  was going?

16     A.    Yes.   The person was going from

17  Charles' room toward Bradley's room.

18     Q.    This would be a person who had had an

19  artery severed?

20     A.    Right.

21     Q.    What do we have here?

22     A.    This is the doorway outside of

23  Bradley's room.   You see a great deal of the

24  arterial spurting in this area.   He apparently

25  paused in this area for sometime.

1     Q.   Why do you say that?

2     A.   Because of the concentration in this area.

3     Q.   All right.

4     A.   And there is some what appears to be

5 medium velocity spatter mixed in with that as if

6 the attack may have continued here.

7     Q.   So, the arterial spurting, if I am

8 understanding you correctly, would come from a

9 wound where an artery had been severed, the

10 additional medium velocity spatter might

11 conceivably come from other stab wounds or

12 beating type wounds being inflicted; is that

13 correct?

14     A.   Yes, that is correct.

15     Q.   Is there any transfer type blood here?

16     A.   Yes, there is one here.

17     This just depicts the location that

18 Bradley came to rest in his room.

19     Q.   There on the doorfacing, what is that

20 pattern?  Is that where the arterial spurting is?

21     A.   Yes, that is part of what we just saw

22 going into the room.

23     Q.   What about on the spread there, there

24 is a white, looks like the spread has white lining?

25     A.   Which area?  Here?

673

1      Q.    Right.

2      A.    I can't really make a determination on

3    that.

4      Q.    As to?

5      A.    There is so much going on in this

6    room, I can't separate that out.

7      Q.    In terms of direction -- what do you

8    mean there is so much going on in the room?

9      A.    Well, there are, let's see, I think

10   three or four locations where things are

11   occurring in this room.

12     Q.    How would you characterize the stains

13   that you see on the sheet?

14     A.    They are transfer stains from some

15   part of their body touching this sheet with

16   blood on it.

17           This is another view of it from inside

18   the room.  The locations I was talking about are

19   here, here, here and here.   At some point,

20   Bradley appeared to be over here.

21     Q.    Why do you say that?

22     A.    There are two right hand transfers in

23   this area here.  And we have the arterial

24   spurting appearing in here on this wall.

25     Q.    So, at some point, it appears he is up

674

1       against the wall.  That stain you are saying is
2       the right hand kind of smeared on the wall?
3            A.   Yes.
4            Q.   As well as arterial spurting?
5            A.   Yes.  I can't say whose right hand,
6       but there is a right hand impression on the
7       wall, and then there is arterial spurting next
8       to it.
9            Q.   Apparently it was a right hand that
10      was covered with blood?
11           A.   Yes.
12           Q.   What about on the door?
13           A.   This is a transfer pattern from his
14      body being against the door.  This lower half is
15      just where the volume of blood was great enough
16      that it ran down.
17           Q.   That is not arterial spurting pattern?
18           A.   No.
19           Q.   What you see there, is that
20      consistent, given the size and location of the
21      wounds and the blood, consistent with Brad
22      leaning up against that door with his shoulder
23      as if to hold it closed?
24           A.   Yes, it is.
25           Q.   Anything else significant?

675

1      A.    Here on the bed we have a large area

2   of soaked blood where Bradley was apparently on

3   the bed at some point.   And then this last one,

4   there is a transfer pattern right here and more

5   arterial spurting here next to where he came to

6   rest.

7      Q.    What does this show you?

8      A.    This is the area across the room next

9   to that black piece of furniture where we saw

10  the hand impression on the wall and the arterial

11  spurting.   That is just a close-up of it.

12     Q.    So we are seeing arterial spurting on

13  that wall and then.

14     A.    That right hand impression was up in

15  this area.

16     Q.    All right.   There is clothing and

17  carpet there.   How would you characterize -- on

18  the socks and jeans, you can see blood

19  spatters.   How would you characterize that?

20     A.    I can't really make a determination.

21  It could be from arterial spurting; it could be

22  from medium velocity.   The way it is there -- I

23  can't recognize everything there.   I can only

24  tell you of the things I do recognize.

25     Q.    Okay.   The fact that it's fabric and

676

1    obviously is ruffled up, is not a smooth

2    surface, does that have an effect on what you

3    are able to determine?

4       A.    Yes.

5       Q.    Is the same true of the carpet area?

6       A.    Yes.    You can see some transfer

7    patterns in this area, but they are not clear as

8    to what they are.

9            And this is just a close-up of the

10    bedspread, the soaked areas where he was

11    obviously on the bed for sometime.   And the

12    knife.

13       Q.    I notice way up in the right-hand

14    corner practically over to the other side of the

15    bed there appears to be -- is that a transfer

16    stain, or can you tell?

17       A.    It looks just like a soaked area.

18    Some more of this, only it looks a little

19    different on the bed.

20       Q.    What does this show?

21       A.    That is just a close-up of that

22    bedspread, soaked areas.

23            These are the footprints that lead

24    into the kitchen.   And here is the low velocity

25    drops that we talked about, the drops that

1    dropped from a wound.

2            This is a better shot of those.  You

3    can see how round they are.

4        Q.   When you look at the -- looks like I

5    see there is some that appear to have little --

6    they aren't quite perfectly round, while others

7    are more round, is that of any significance?

8        A.   Are you talking about like for

9    directionality?

10       Q.   Yeah, I mean, can you tell whether the

11   person is moving or standing still or, I mean,

12   obviously, from the footprints, somebody is

13   moving, but whether they are running?  Is there

14   anything about the shape of those drops that is

15   significant?

16       A.   The person dropping this would have

17   been either standing or moving slowly.  If they

18   were moving fast, it would have a spined edge on

19   one side in the direction they were moving.

20       Q.   Thank you.

21       A.   Here you can see in front of the sink

22   the same low velocity blood drops.   This is

23   also common when someone has a wound at a crime

24   scene, they go to the sink and try to wash up.

25           This is the knife drawer.   Bloody

678

1    finger impressions around the edge of it.

2         Q.   Is that transfer?  In other words,

3    somebody, would appear a bloody hand opened that

4    drawer?

5         A.   Yes.   Here you can see a low velocity

6    drop of blood also.

7              Now, this one does have scalloped

8    edges.   It doesn't necessarily mean it was

9    moving in this case.   It may be the surface

10   here that broke that up.

11             That is all of them.

12        Q.   Sergeant, did you look at the complete

13   set of photographs -- I know you had sixteen

14   slides made up.  Did you look at all the

15   photographs?

16        A.   Yes, I did.

17        Q.   Based on your observations, can you

18   tell us whether you formed an opinion as to

19   where the attack or assault on Charles Allen,

20   the young man in the back bedroom, occurred?

21        A.   All the evidence--.

22             MR. STAFFORD:  Your Honor, I object to

23   that.  One is that he only had photographs.  He

24   was never at the scene, never got to see the

25   whole scene to make an accurate prediction of

679

1    this.  I think this invades the province of the

2    jury.  This is totally speculation on his

3    behalf, and I object to this type of testimony

4    and predictions.

5              THE COURT:  It's overruled.

6    BY MS. DAVIES:

7         Q.   Sergeant, did you form an opinion

8    where -- I am talking about Charles, the young

9    man in the back bedroom -- in fact, have you had

10   a chance to see this diagram?  You said you

11   walked through the house?

12        A.   Yes.

13        Q.   I am talking about Charles in the back

14   bedroom.  Did you form an opinion, based on your

15   training and your observation of the photographs

16   in evidence, did you form an opinion as to where

17   the attack on Charles most likely began?

18        A.   Yes.

19        Q.   What is your opinion?

20        A.   It appears from the evidence that it

21   occurred there in the bed, began there in the

22   bed.

23        Q.   Did you see any evidence to indicate

24   -- did it appear that Charles ever actually got

25   out of that bed?

                                              680

1    A.  No, I did not.  I didn't see anything
2  that was consistent with that.
3    Q.  Based on your analysis and
4  interpretation of the evidence, did you form an
5  opinion as to where the attack on Bradley, the
6  young man who was crouched at the door of the
7  front bedroom, where the attack on him began?
8    A.  Yes.  I believe it began just inside
9  the door to Charles' room where we saw the
10  arterial spurting on the wall.
11    Q.  Based on the arterial spurting pattern
12  that you saw in the pictures on both sides of
13  the wall in that hallway, did it appear that
14  that was consistent with Bradley running, moving
15  and fighting after he had first been cut, had an
16  artery cut?
17    A.  --.
18    Q.  Did I put too much in the question?
19    A.  I think so.  I can say that it's
20  consistent with Bradley receiving wounds in that
21  location that would cause arterial spurting and
22  then moving back down the hall to his room,
23  pausing there in front of the door and then
24  moving inside.
25    Q.  Did it appear that there was -- you

1   said paused by the door.   Given the additional

2   blood spattering at that location and inside his

3   room, did it appear to you, based on the

4   evidence, that there was additional stabs or

5   wounds inflicted on Bradley after he got to his

6   room?

7           A.   Are you saying inside the room?

8           Q.   Yes.

9           A.   Yes, it appears that the attack

10  continued inside the room.

11          MS. DAVIES:   Pass the witness.

12          MR. STAFFORD:   I ask for a continuance

13  at this time for a short moment.

14          THE COURT:   Approach the bench.

15          (Off the record bench conference)

16          THE COURT:   Ladies and gentlemen, if

17  you would, please, go to the jury room for a

18  moment.

19          (The jury is removed from the

20  courtroom).

21          MS. DAVIES:   Your Honor, I understand

22   -- I don't know if this even needs to be on the

23  record -- but I am curious as to how we avoid a

24  violation of the rule.

25          THE COURT:   That is what I want him to

682

1    tell me.

2                MR. STAFFORD:  A violation of the rule

3    means I can't go talk to my client.  I mean,

4    talk to my witness.

5                THE COURT:  About what this witness

6    said?

7                MR. STAFFORD:  For purpose of

8    cross-examination, it would be expert to expert.

9    I am not an expert in this.  Never proclaimed to

10   be an expert.  This witness was again I am

11   contending called on me in surprise.

12               THE COURT:  I will give you five

13   minutes to talk to your witness in preparation.

14               MR. STAFFORD:  Can we put a phone call

15   in now for Doctor Espinola and ask him to come

16   back?  I want him to see these slides.  I may

17   want to put him back on.  I want him here to see

18   these slides.

19               THE COURT:  If you can locate him more

20   easily, Ms. Davies.

21               MS. DAVIES:  I have a phone number.  I

22   will make it available.

23               THE COURT:  I would assume you are

24   wanting him sometime after the State rests.  And

25   you do have one witness that you are recalling,

683

1   at any rate.

2          MR. STAFFORD:  Yes, I will get him out

3   of the way.

4          THE COURT:  We don't know what time to

5   have him here.  I am talking about Espinola.

6          You go back to your expert for a

7   couple of minutes.  And y'all are in charge of

8   beeping Kennedy to get back over here.

9          (Recess; after which, the following

10  proceedings were had in the presence of the

11  jury:)

12         THE COURT:  Proceed, please.

13              LARRY HOFFMASTER,

14  called as a witness by the State and on the

15  stand at the time of the recess, resumed the

16  stand and testified further as follows:

17              CROSS EXAMINATION

18  BY MS. KAISER:

19      Q.   Do you recall approximately when it

20  was that you actually became involved in this

21  case?

22      A.   I think the first time I talked with

23  the district attorney about it was probably four

24  months ago, four or five months ago.

25      Q.   What is your educational background,

684

1    please?

2         A.    High school education.

3         Q.    Here in Houston?

4         A.    Yes.

5         Q.    Where did you go to school?

6         A.    Reagan.

7         Q.    I have a few questions, and then we

8    will be done.

9         A.    Okay.

10        Q.    The blood dripping, let's go, first of

11   all, to the kitchen area where there was a

12   bloody footprint and then there was the drops of

13   low velocity spatter on the floor.

14        A.    Yes.

15        Q.    There was one shot that had a low

16   velocity spatter that was kind of next to the

17   kitchen sink at the baseboard, kind of dribbled

18   down a little bit on to the floor.  Do you

19   recall which picture I am talking about?

20        A.    Yes.

21        Q.    I believe, during your direct

22   examination, you made a comment that that wasn't

23   unusual to see blood dripping around the sink

24   area like that because many times the assailant

25   would go to the kitchen sink in an attempt to

685

1   clean themselves up a little bit.

2       A.   That is correct.

3       Q.   You didn't find any blood in the sink;

4   did you?

5       A.   The report indicated there was.

6       Q.   Did we see that in any of the

7   photographs?

8       A.   No.

9       Q.   There were photographs of the kitchen

10  sink; were there not?

11      A.   I did not see any other than the one I

12  showed you.

13      Q.   Was there any indication of blood

14  found on the kitchen faucet handle, to your

15  knowledge?

16      A.   I don't know.

17      Q.   The drawer, the knife drawer in the

18  kitchen that had the blood drops, a few blood

19  drops inside it and also the transfer on the

20  edge, you have no way of knowing whether or not

21  the transfer that was on the edge of that drawer

22  was made by somebody that opened the drawer or

23  was just standing there and touched the drawer.

24  You can't really tell that one way or another;

25  can you?

686

1       A.    Make sure I understand.

2       Q.    How can you tell the difference

3  between the -- if the fingers are placed in the

4  same place, if they just rest their hand and

5  they transfer blood one way or another, how do

6  you know if they opened the drawer?

7       A.    It appears from the location, it was

8  on the inside pulling outward.   Also, the low

9  velocity drop of blood was inside the drawer,

10 which would indicate their hand was over, or

11 wherever the wound was, was over that location.

12      Q.    But, at the same time, they could have

13 just rested their hand in that manner and the

14 blood dropped; could it not?

15      A.    That is possible.

16      Q.    We don't have any great shots of the

17 kitchen sink here, unfortunately.   I am showing

18 you what has been marked State's Exhibit 9.

19 It's a pretty far-off view.   Do you see any

20 blood drops apparent in the kitchen sink from

21 that photo?

22      A.    No.

23      Q.    One of the things that you testified

24 to Ms. Davies that you frequently look for in a

25 crime scene were low velocity drops of blood

687

1    because frequently the defendant would get cut
2    in some way by the knife; is that correct?
3         A.   That is correct.
4         Q.   But I believe it was your testimony
5    that he could either get cut by the knife
6    slipping in his hand or by fighting over the
7    knife and grabbing the knife.  Would that also
8    be consistent with him being cut?
9         A.   Yes.
10        Q.   If a person received blows that don't
11   cause blood, there is no spatter, so you know
12   nothing about those in your analysis of blood
13   spatter testimony; is that true?
14        A.   That would be correct.
15        Q.   So it's only the blows that produce
16   the blood and the blows following the production
17   of the blood that causes spatter that you talked
18   about when you look at the pattern?
19        A.   Yes, that is true as far as the blood
20   spatter goes.
21        Q.   And I believe also it was your
22   testimony that generally, except in extreme
23   circumstances and an extremely heavy instrument
24   was used, generally a first blow doesn't create
25   a spatter.  Wasn't that your testimony?

1      A.    That is correct.

2      Q.    And it would be the second or

3  subsequent blows that might create a spatter.

4  And I would assume that subsequent blows would

5  create more splatter than the very first initial

6  one?

7      A.    Yes, that is correct.

8      Q.    If a person is standing upright and

9  they receive an initial blow with not the heavy

10  type of an instrument that you were saying would

11  be the exception to the rule, then there would

12  generally be no spattering there for you to base

13  an opinion on; is that correct?

14      A.    That would be correct.

15      Q.    And the second blow that may create a

16  bit of a spatter -- let me back up a little

17  bit.   If a person is standing upright and there

18  is a spatter, an initial splatter from the top

19  of their head area, isn't it true that the upper

20  body of the individual would be the more likely

21   -- and walls or whatever goes up horizontally

22   -- would be the more likely place for that

23  spatter to end up?  You wouldn't necessarily

24  think that the first blow that produces a

25  spatter would spatter a leg?

689

1    A.    Yes, I would agree with your

2    statement, that probably the walls or upper area

3    would receive most of that, yes.

4    Q.    And, so, it might just be subsequent

5    blows that create a greater amount of spatter,

6    or perhaps thereafter, if that person is no

7    longer in an upright position, that their leg

8    may receive some spatter on it; would that not

9    be true?

10   A.    Yes.

11   Q.    It's difficult at times, when you are

12   coming in after the fact and just have

13   photographs to look at, you can just imagine all

14   the movement that has taken place in a situation

15   like this because nobody just sits around and

16   gets beat up?

17   A.    Right.

18   Q.    And, so, it's really difficult to sit

19   and think about who was where and when and how

20   everything interacted; isn't that true?  It's

21   almost impossible to put it all together with

22   any kind of certainty; isn't it?

23   A.    I am not sure how to answer that.  As

24   far as the things that I told you awhile ago, I

25   feel certain about those movements.  As far as

690

1    detailed movements, no, I couldn't say.

2        Q.   It wouldn't be unusual if someone had

3    received a couple of blows while they were

4    upright, fell against the bed and a struggle

5    ensued and continued in the bed, for one leg as

6    opposed to both legs to get wrapped up in a

7    cover or in a sheet or something of that nature;

8    would it?

9            MS. DAVIES:  Your Honor, I object to

10   speculation.

11           THE COURT:  I am going to allow him to

12   answer if he can.

13           If you can answer that, sir, you

14   may.

15       A.   I don't think it would be unusual; but

16   then again we weren't basing the whole analysis

17   on that one point.  There were several things

18   put together there.

19       Q.   I understand.  But it is possible,

20   that if one leg became covered up or underneath

21   a sheet or cover early on in the struggle, that

22   you would not see blood on that leg or foot

23   because it was covered up?

24       A.   That is possible, if it occurred

25   before the blood was spattering.

691

1     Q.   Or if it occurred -- even if there was

2  some initial blood spatter like we talked about

3  just a few moments ago where they were standing

4  up but it was not a great amount and it was

5  absorbed either by the upper body or by the

6  walls or whatever was surrounding it and didn't

7  ever make it down to the leg?

8     MS. DAVIES:   I object.

9     Q.   Isn't that true?

10     A.   Could you repeat the question?

11  BY MS. KAISER:

12     Q.   That would also be true in the

13  situation that we were speaking of just a few

14  moments earlier where one or two blows had been

15  received while the victim was in an upright

16  position and the blood -- and although there was

17  blood spatter, it was either caught by the upper

18  body or the wall surrounding it; isn't that

19  true?

20     A.   Yes.

21     Q.   And I believe it was your testimony

22  that a good part of the blood on Charles' right

23  leg, the one that was not covered up by the

24  cover, was transfer blood; was it not?   There

25  was some spatters on the foot and there was a

692

1    lot of transfer blood on the thigh?

2        A.   I testified to spatter on the foot.

3    I don't think I mentioned what type of blood was

4    on the leg.  There was blood there, but I didn't

5    make a determination on what caused that.

6        Q.   Showing you what has been marked as

7    State's Exhibit 90.  Does this appear to be

8    transfer type blood in this area here?

9        A.   I can't make a determination on that.

10       Q.   It's not blood droplets, though; is it?

11       A.   At this point, it's not.  Yes, I guess

12   that would be the best way to describe it now is

13   smeared blood now.

14       Q.   And that could have gotten there

15   several ways, but one of the ways that it might

16   have gotten there, would be consistent with two

17   people struggling and one person that had some

18   blood on them rubbing up against this leg?

19       A.   That is possible.

20       Q.   I believe it was also your testimony

21   that the one slide that you had -- actually you

22   had two made.  The slide that you had made from

23   the video of the inside wall of Charles' bedroom

24   next to the doorway -- are you familiar with the

25   slide that I am talking about?

693

1      A.    Yes.

2      Q.    Had a series of what you called

3  arterial spurting and some little run lines from

4  that spurting.   I believe it was further your

5  testimony that also on that wall there was

6  medium velocity blood spatter?

7      A.    Yes.

8      Q.    You have no way of knowing who that

9  medium velocity spatter came from; do you?

10  Wouldn't it be just as consistent that Charles

11  was standing there, received an initial blow

12  that caused no spatter there, the second blow

13  that went out horizontal, did not end up on his

14  leg, fell upon the bed, and that is where the

15  remainder, the balance of the attack occurred,

16  would that not also cause that medium velocity

17  blood spatter on that wall?

18      A.    It would cause medium velocity

19  spatter; however, I would think if we were

20  receiving those kind of blows we would have some

21  low velocity drip blood on the way up to the bed.

22      Q.    Well, but if he had on a T-shirt, had

23  a lot of long, thick hair that would absorb

24  blood, and keeping in mind that this happened

25  extremely quickly, it doesn't take much time in

694

1      an attack to cover four feet?

2          A.   No.

3          Q.   It wouldn't be that unusual for you

4      not to have a lot of drips of blood in that four

5      feet?

6          A.   It would be possible to do that.

7               MS. KAISER:   Pass the witness.

8

9                    REDIRECT EXAMINATION

10     BY MS. DAVIES:

11         Q.   Sergeant, if a person first such as

12     Charles -- I am not sure if you have seen a

13     picture of Charles and the type of hair he had.

14     Let me show you what is in evidence as State's

15     Exhibit 108.  The young man on the left marked

16     as Charles.  You can see he does have a fair

17     amount of hair?

18         A.   Yes.

19         Q.   If the first blow Charles received was

20     a blow to the face, maybe fractured his nose,

21     caused bleeding to the face, would you expect,

22     if he was in an upright position, for his hair

23     to catch and collect that blood to keep it from

24     dripping to the floor?

25         A.   From having been hit in the nose?

                                                    695

1      Q.   From being hit, whether it's the jaw,

2   the nose or the eye area, if he received blows

3   to the face front on initially, would you expect

4   his hair to collect the blood and keep it from

5   dripping down?

6      A.   If he was in a standing position, no.

7      Q.   If he was lying on the bed, would that

8   hair perhaps then collect that blood and absorb?

9      A.   From being hit in the face?

10     Q.   Yes, sir.  If he is lying down?

11     A.   Yes, it could run to his hair from gravity.

12     Q.   So the gravity would control the

13  direction of the blood, in other words, from

14  that type of wound?

15     A.   Yes.

16     Q.   And if he was in an upright position,

17  if I am understanding you, the hair is not what

18  would be collecting at that point; would it?

19     A.   Not from being hit in the face, no.

20     Q.   Ms. Kaiser suggested a number of

21  possible scenarios.  Do any of those

22  possibilities that have been suggested change

23  your opinion of the evidence that you analyzed,

24  change your opinion in regard to that opinion

25  that you said in your opinion Charles was most

696

1    likely attacked in his bed?

2        A.   No.

3          MS. DAVIES:  Pass the witness.

4

5               RECROSS EXAMINATION

6   BY MS. KAISER:

7        Q.   Sergeant, there was a fair amount of

8    blood collected on the carpeted area right there

9    inside the entrance to Charles' bedroom; was

10   there not?

11       A.   Yes.

12       Q.   I suppose, if somebody had a bloody

13   nose or something like that, it could also have

14   fallen down on the carpet; could it not?

15       A.   Yes.

16       Q.   And the fact that they are being hit

17   on the face would eventually be absorbed by

18   their hair only if they were lying down -- let

19   me back up a little bit.  If a person received a

20   blow initially and they are upright, they are

21   standing up, and the blood starts running down,

22   but then at a very short time thereafter then

23   they are lying down, then the blood changes

24   direction, it doesn't just immediately, I mean,

25   this happens over a period of time, and the

1   blood continues to flow, so just because the end

2   result is that a person is lying down and the

3   blood is collected in back of them as if  they

4   had been face up for a period of time, that

5   really isn't indicative of how everything

6   started; is it?

7        A.   --.

8        Q.   They could have started in an upright

9   position.

10       A.   I'm sorry, you lost me on that.

11       Q.   Is it not possible that the

12  altercation could have started when they were in

13  an upright position, at a very short point

14  thereafter ended up in a lying position, and you

15  would expect to see the same scene?

16       A.   I don't know how to answer that.

17  What I based my decision on was the lack of

18  disorder at the scene other than in that room,

19  the fact that the hair transfers were on the

20  pillow that started in the position where you

21  would normally lay, the medium velocity transfer

22  around the bed from the beating, the lack of

23  blood trail going up to it.   Those type of

24  things is what I based that on.   I am sorry, I

25  couldn't make a determination on what you just

698

1   said to me.

2           MS. KAISER:  Pass the witness.

3           MS. DAVIES:  No further questions.

4   May Sergeant Hoffmaster be excused?

5           MR. STAFFORD:  We may want to call him

6   back.

7           THE COURT:  Remain on call.

8           Call your next.

9           MS. DAVIES:  Your Honor, at this time

10  the State will offer into evidence the diagrams

11  State's Exhibits 10 and 12.  With the Court's

12  permission, I will provide -- actually I have

13  provided a Polaroid photograph to substitute for

14  the DNA poster that was marked State's Exhibit

15  107.   And I would mark the photograph in the

16  same way.   The mannequin, which has been used

17  and marked as State's Exhibit 109, I offer, with

18  the Court's permission, to substitute multiple

19  Polaroid photographs showing the mannequin from

20  each view for the record after the conclusion of

21  the trial.

22          THE COURT:  All right, you are

23  offering State's Exhibit 10, State's Exhibit No.

24  12, State's Exhibit 107 to be a photograph of

25  the DNA poster that was originally marked

699

1   State's Exhibit No. 7.  And as to State's 109,

2   are these going to be 109 A through something?

3   Let's get the number of photographs you are

4   going to have.

5           MS. DAVIES:  I believe five

6   photographs will suffice, 109-A through E.

7           THE COURT:  You understand the tender,

8   Mr. Stafford?

9           MR. STAFFORD:  Yes, Your Honor.

10          THE COURT:  Any objection?

11          MR. STAFFORD:  No objection.

12          THE COURT:  State's Exhibits ten and

13  twelve are admitted.  State's Exhibit 107, a

14  photograph of the DNA poster, is admitted.

15  State's Exhibits 109-A through E are admitted.

16  Those being five photographs of the mannequin

17  which was originally marked as State's 109.

18          MS. DAVIES:  Your Honor, my proffer of

19  the photographs 109-A through E are for purposes

20  of the record only.  I am offering 109 just for

21  trial purposes, and will ask to substitute A

22  through E for the mannequin at the conclusion of

23  trial.

24          THE COURT:  How about the poster?

25  Same thing?

                                          .700

1              MS. DAVIES:  Yes.  I just want to

2        substitute photographs for the record.

3              THE COURT:  If these are items that

4        are later requested or reviewed by the jury, the

5        actual mannequin will be available, as the

6        original poster.

7              MS. DAVIES:  Correct.

8              THE COURT:  All right.

9              Anything else?

10             MS. DAVIES:  Are all those items

11       accepted in evidence?

12             THE COURT:  Those are all admitted.

13             MS. DAVIES:  That concludes the

14       evidence from the State on the issue of guilt.

15       The State rests.

16             THE COURT:  Mr. Stafford.

17             MS. KAISER:  Mr. Sanders approached me

18       in the hallway and asked if we were planning on

19       calling him, and I believe we are not.  He asked

20       that he be excluded from the rule and allowed to

21       be in the courtroom.

22             THE COURT:  Well, I don't think that

23       is a proper matter to take up at this moment

24       without having first conferred with the

25       prosecutor.   I don't know.

1              MS. DAVIES:  We will discuss it during

2      the break.

3              THE COURT:  I'm sorry, you were

4      attempting to call?

5              MR. STAFFORD:  Kennedy.

6                       STEWART H. KENNEDY,

7      called as a witness by the State, having been

8      previously sworn, resumed the stand and

9      testified further as follows:

10                     CROSS EXAMINATION

11     BY MR. STAFFORD:

12         Q.    Sergeant, will you restate your name?

13         A.    Stewart H. Kennedy.

14         Q.    You are the same Sergeant Kennedy that

15     previously testified before; are you not?

16         A.    Correct.

17         Q.    And very briefly, directing your

18     attention back to the day that you made the

19     scene, could you tell the jury -- I think it was

20     your testimony, other than the scene officer,

21     when you arrived, had the ambulance personnel

22     arrived yet?

23         A.    Are you talking about the Houston Fire

24     Department ambulance personnel?

25         Q.    Yes.

702

1    A.    I never saw them.    I assumed they had
2    already arrived and gone.
3    Q.    But the scene was secure?
4    A.    Yes, it was.
5    Q.    And basically at that particular time,
6    when you arrived, was there anybody in the house
7    at all?
8    A.    Only police personnel.
9    Q.    How many police personnel?
10    A.    Two or three uniformed patrolmen and
11    Officer Jordan with CSU.
12    Q.    Can you tell the jury, that based upon
13    the policy of the Houston Police Department, do
14    the scene officers get certain training as to
15    what they should do or not do?
16    A.    Yes.
17    Q.    One of the things that they are
18    trained to do is not to touch any of the
19    evidence or unlock any doors or windows, et
20    cetera until you arrive and give whatever
21    instructions you want to give; is that correct?
22    A.    That is correct.
23    Q.    So, the photographs which have been
24    taken in this case pretty well accurately depict
25    the way you found the scene when you arrived?

703

1    A.   That is correct.

2    Q.   If I may, could you tell the jury, if

3  you recall, the night before or that morning,

4  had it been raining out there at all?

5    A.   I don't recall.  I think there was

6  some mud around the house.  My recollection is

7  it had been raining, but I don't recall how

8  much.

9    Q.   It was fairly muddy, consistent with

10  maybe a rain that night or the day before?

11    A.   Something like that.

12    Q.   It would be safe to tell the jury,

13  that when you drove up there, looking down the

14  driveway, that it was very obvious that you

15  could see a car parked there; could you not?

16    A.   I'm sorry, could you repeat your

17  question?

18    Q.   You could see a car.   I believe he

19  had a Blazer; was it not?

20    A.   Talking about the vehicle at the rear

21  of the house?

22    Q.   Yes?

23    A.   Yes.

24    Q.   Standing at the head of the driveway

25  looking down, you could see a Blazer?

1      A.    Yes.

2      Q.    Also, on State's Exhibit No. 6, it's

3 readily apparent that the porch light, both

4 porch lights are on; is it not?

5      A.    That is correct.

6      Q.    So, basically, at 2:30 at night, if

7 this was the time this attack occurred, the

8 front porch light would have been on?  That is

9 assuming that this picture actually depicts what

10 was going on at 2:30 at night?

11     A.    Assuming that, yes.

12     Q.    And there is nothing in your

13 investigation that would indicate to you that

14 the lights were not on at 2:30 at night; is there?

15     A.    No.

16     Q.    And, also, if I may show you what has

17 been marked as State's Exhibit No. 63.  That is

18 a picture of the dining room with the Grand

19 Piano, and there is a light on in there; is

20 there not?

21     A.    Yes.

22     Q.    And that room is facing, or the light

23 would reflect into the driveway; would it not?

24     A.    It's on the north side of the house.

25 I don't know whether it would reflect on the

1    driveway or not.

2         Q.   I may have my semantics wrong.   If I

3    was walking up the driveway, assume the driveway

4    is here and the back of the house was there,

5    would the dining room be on my left?

6         A.   Yes, sir.

7         Q.   And the only thing on the windows was

8    blinds?

9         A.   Correct.

10        Q.   Mini blinds.  So there would be some

11   light reflecting through, you could tell the

12   light could be on in that room?

13        A.   Yes.

14        Q.   So at 2:30 at night, if someone walked

15   by that house, they could see a light on in the

16   dining room and a light on in the front porch;

17   is that correct?

18        A.   If they are on, yes.

19        Q.   And, also, if you were in the middle

20   of the road there on Keith Street and I was

21   standing underneath the porch light looking out

22   at the street at you, I would be very well

23   illuminated; would I not?

24        A.   I would assume so, yes.

25        Q.   Thus, being able to see the length of

706

1    my hair and the color of my hair?

2        A.   I would assume so.   I am not

3    positive.  I would assume you could.

4        Q.   Can you tell the jury -- the pictures

5    that have been introduced, it's difficult to

6    tell -- were there any lights on in the back of

7    the house?  Outside lighting?

8        A.   I do not know.

9        Q.   Did you make any determination whether

10   there were any kind of lighting that came on

11   automatically at night like some sort of vapor

12   light?

13       A.   I do not know.

14       Q.   And if I may -- I am losing all my

15   exhibits here.  I think you previously

16   testified, that as far as Charles' room is

17   concerned, there was a door that went out to the

18   back area?

19       A.   Backyard?

20       Q.   Yes, sir?

21       A.   Yes.

22       Q.   That had a curtain on it; did it not?

23       A.   Yes.

24       Q.   And also the windows, as reflected in

25   State's 79, also had blinds on them?

707

1    A.    Yes.

2    Q.    And also there was no light on in that

3    room when you made the scene; is that correct?

4    A.    That is correct.

5    Q.    And if all the blinds were closed and

6    there was covering on the back door at 2:30 at

7    night, there would be no known light source

8    coming into that room; would there?

9    A.    Not to my knowledge.

10   Q.    Thus, that room would be dark, it

11   would be safe to assume?

12          MS. DAVIES:   Object to speculation

13   about how much light would have been in that

14   room under those circumstances.

15          THE COURT:   Sustained.

16   BY MR. STAFFORD:

17   Q.    You have already testified you didn't

18   see any lights on in the back on the back patio;

19   is that correct?

20   A.    That is correct.  I am not aware of

21   any, no.

22   Q.    And as far as Charles' room is

23   concerned, on this side of the house, which

24   would be the -- this is the driveway side; is it

25   not?

1      A.    Yes.

2      Q.    There are no lights on this side?

3      A.    To my knowledge.   I don't know

4   whether there is or there isn't.

5      Q.    There is three windows there; correct?

6      A.    Correct.

7      Q.    And they all had blinds on them; correct?

8      A.    Yes.

9      Q.    And all these windows -- well, that is

10   in the bathroom.  Was any lights on in the tub

11   in the master bedroom that you recall?

12      A.    Not that I recall.

13      Q.    And after making your initial

14   investigation, was it at that particular time

15   you went around to check to see if all the

16   windows were locked?

17      A.    Yes.

18      Q.    Tell the jury what you found.

19      A.    All the windows were locked.  Closed

20   and locked.

21      Q.    And from your investigation, all the

22   back doors were locked?

23      A.    When I arrived at the scene, the back

24   door was open.

25      Q.    You received information somebody got

1    the key and let them in the back?

2         A.   Yes, sir.

3         Q.   Was the front door closed or open when

4    you arrived?

5         A.   It was closed.

6         Q.   Do you know who initially first tried

7    the front door?

8         A.   I do not know.

9              MS. DAVIES:  Object to hearsay.

10             THE COURT:  It's overruled.  He has

11   already answered it, anyway.

12   BY MR. STAFFORD:

13        Q.   Can you tell the jury or describe to

14   the jury, as far as the front door is concerned,

15   assuming this is the front door -- if I recall

16   from the pictures, that had a door knob not

17   quite this color, but it had a doorknob; did it

18   not?

19        A.   Yes, sir.

20        Q.   Was this the type of doorknob that

21   would lock or had a key in it, or was it just a

22   regular?

23        A.   I don't recall if the doorknob itself

24   actually had a key lock in it.

25        Q.   There was a dead bolt?

710

1      A.    There was a single throw dead bolt.

2      Q.    That dead bolt was the type that you

3  could lock it from inside; it didn't need a key?

4      A.    Correct.

5      Q.    So I could lock it.   And taking my

6  client's confession where he states that he saw

7  Mr. Allen in the doorway, can you tell the jury,

8  from your conversation with Mr. Rhoades during

9  the taking of the confession, your present sense

10  impression, was the door open like this, or was

11  the door closed after Mr. Allen went in?

12      A.    Can you repeat that?  I am not sure I

13  followed.

14      Q.    The statement, if I may, I furnish you

15  a copy of it.  I may be kind of jumping ahead of

16  myself.  He said, "I ran around to the front of

17  the house.   The front door was open, and I went

18  inside."

19      A.    Where are you at?

20      Q.    On page two of five.

21      A.    Okay.

22      Q.    Let me withdraw that question.  I will

23  come back to it in just a minute.  I think it

24  will make more sense.

25            Can I have your offense report?

711

1      A.    I don't have it with me.

2            MS. DAVIES:  I have it here.

3            MR. STAFFORD:  Will you tender it?

4            MS. DAVIES:  There is a request for

5      Sergeant Kennedy's report?

6            MR. STAFFORD:  And anything he read to

7      refresh his memory.

8            MS. DAVIES:  Assuming Sergeant Kennedy

9      also read his partner's supplement, I am going

10     to tender Sergeant Kennedy's and Maxey's

11     supplement to defense counsel at this time.

12     BY MR. STAFFORD:

13     Q.    So, after making your initial window

14     survey, determining that the windows were

15     locked, you also checked the doors; did you not?

16     A.    Correct.

17     Q.    To see if there were any pry marks or

18     anything of that nature was present?

19     A.    Yes, sir.

20     Q.    And you didn't find any; did you?

21     A.    No, I did not.

22     Q.    And, also, I think, from your direct

23     examination testimony, you went throughout the

24     house.  Other than the blood splattering and the

25     various bloody scenes, the house really wasn't

1    that torn up; was it?

2         A.    No, it was not.

3         Q.    And you fairly quickly determined that

4    it didn't appear that burglary was the motive

5    because of what items were undisturbed, drawers

6    not being gone through, clothes in the closet

7    not strewn around, things of that nature; correct?

8         A.    Correct.

9         Q.    After further investigation and

10   talking to the family and other members, when

11   they surveyed what was there as far as the major

12   items was concerned, it was pretty well apparent

13   that burglary wasn't a motive at that particular

14   time; correct?

15        A.    Regarding major items, yes.

16        Q.    You can tell the jury -- were the car

17   keys to the automobile there in the house?

18        A.    No.

19        Q.    They had disappeared?

20        A.    That is correct.

21        Q.    And could you, after the

22   investigation, as far as the musical equipment

23   and Charles' bedroom, did you place any dollar

24   value on those?

25        A.    I don't know the exact dollar amount,

713

1    but it's worth quite a lot of money.

2          Q.    It could be something a fence or a

3    pawnbroker would take pretty quickly and pretty

4    rapidly on a hock; wouldn't he?

5          A.    Yes.

6          Q.    There was televisions there; correct?

7          A.    Yes.

8          Q.    They weren't taken?

9          A.    No.

10         Q.    And I think you had already said there

11   were some credit cards that were there that were

12   not taken?

13         A.    Yes.

14         Q.    So a lot of things that thieves

15   normally take were not taken and not disturbed;

16   is that correct?

17         A.    That is correct.

18         Q.    You told the prosecutor in her direct

19   examination of you that you and your partner

20   were working endlessly looking for leads, trying

21   to figure out what happened, and still basically

22   butting your head up against the wall and not

23   making any headway?

24         A.    That is correct.

25         Q.    Until you got that call on October

                                                  714

1    11th about someone wanting to see you in
2    Pasadena about this case?
3         A.    That is basically right, yes, sir.
4         Q.    And as we discussed before, you had no
5    leads, and to this day you wouldn't know who had
6    committed this offense if you had not got that
7    call on October 11th unless someone called and
8    tipped you off?
9         A.    There are several scenarios where we
10   could have found out who did it.
11        Q.    At that particular time, none of the
12   scenarios were working?
13        A.    That is correct.
14        Q.    And you told the prosecutor basically
15   about his demeanor, et cetera, when he first
16   came in to talk to you.  I think she asked you
17   the question because, or just because, or asked
18   you the question was he crying or sobbing.   Do
19   you remember that question?
20        A.    Yes, I do.
21             MS. DAVIES:   I object to misstatement
22   of the question.   I don't believe I ever asked
23   if he was sobbing.
24             THE COURT:   If he remembers some kind
25   of question, he can clarify it.

715

BY MR. STAFFORD:

1    Q.   Something, whether he was shedding

2    tears.   You are not suggesting that if I, for

3    example, give a confession to you about a crime

4    that I committed a month after the fact, that if

5    I am not sobbing or crying, this does not mean

6    that I am not telling you the truth or not

7    remorseful about what happened because I am not

8    in an emotional state of being?

9         MS. DAVIES:   Object to speculation on

10   Mr. Stafford's emotional reaction.

11        THE COURT:   It's overruled.

12   BY MR. STAFFORD:

13        Q.   The bottom line is just because

14   someone is not crying when he is giving you a

15   confession doesn't mean that he is not telling

16   you the truth or does not mean that he is not

17   remorseful about what he did?

18        A.   No, it does not.

19        Q.   And you told the prosecutor that he

20   was rather forthcoming in his deliverance or

21   what he was telling you about what happened; is

22   that correct?

23        A.   That is correct.

24        Q.   Would you describe him cocky at all?

1    Or how was his attitude?

2        A.    Not when I talked to him.

3        Q.    Wasn't cocky to you at all.    Was he

4    talking fast, talking slow?   How would you

5    describe the way he was talking when you first

6    got him in the interview room?

7        A.    As I stated previously, he was calm

8    and collected and talked in a normal way.

9        Q.    And I think you told the prosecutor

10   basically that y'all talked for about twenty

11   minutes before you actually started typing

12   everything down?

13       A.    Approximately.

14       Q.    And you talked about various things,

15   about his background, things of that nature; is

16   that correct?

17       A.    Are you talking about his personal

18   life?

19       Q.    Yeah.

20       A.    Afterwards.

21       Q.    But before he started giving the

22   confession, though, he told you that he was

23   thinking about committing suicide, though;

24   didn't he?

25       A.    Yes, he did.

717

1      Q.    And that this had been really
2  bothering him and he was tired of running?
3      A.    Is that a question?
4      Q.    Yes.  I mean, he told you that; is
5  that correct?
6      A.    Yes.
7      Q.    And would you describe his demeanor as
8  being somewhat relieved to tell you about what
9  had happened?  Wanting to tell you what he did,
10  how it happened?
11      A.    I didn't perceive it as being such.
12  He was pretty calm and collected through the
13  whole thing.
14      Q.    And gave his statement?
15      A.    Yes.
16      Q.    And I think we had also -- you told
17  Ms. Davies that when you first went out there
18  you had thought it was co-defendant or somebody
19  in trouble who was going to do some trading with
20  you for some information?
21      A.    That is what I assumed, yes.
22      Q.    For the purpose of the jury who
23  haven't been around criminal law, often people
24  get in trouble and try to--
25                MS. DAVIES:  Object to the relevancy

                                                    718

1      of what might have happened in other cases.

2                 THE COURT:   It's overruled.

3      BY MR. STAFFORD:

4           Q.    People try to exchange information for

5      a lighter sentence or lighter charge if they

6      give you this information?

7           A.    Correct.

8           Q.    But the point I am leading up to,

9      before Mr. Rhoades gave his confession he did

10     not negotiate with you about I will tell you

11     something if you charge me with voluntary

12     manslaughter or aggravated assault; did he?

13          A.    No, he did not.

14          Q.    Did not attempt to barter with you at

15     all?

16          A.    Not at all.

17          Q.    And when the confession started off,

18     from beginning to the end of the confession, he

19     was fairly consistent about one thing or two

20     things, that he did not enter that house with

21     intent to commit a burglary or theft; is that

22     correct?

23          A.    That is what he told us.

24          Q.    And that he also entered that house

25     with no intent to kill anybody, hurt anybody or

1    do any bodily harm?  That was not his intent of
2    going into the house?
3            MS. DAVIES:  I object.   There is
4    nothing in evidence that I am aware of that
5    illustrates that intent or that being indicated
6    by this defendant to Sergeant Kennedy.
7            THE COURT:  Well, he can so respond.
8            MS. DAVIES:  I object to assuming
9    facts that are not in evidence.
10           THE COURT:  Sustained.
11   BY MR. STAFFORD:
12       Q.   During your interview of him -- and
13   you have already told the jury through questions
14   by the prosecutor that there's a lot of things
15   that were said and talked about between you and
16   Mr. Rhoades that did not make it in the
17   confession; is that correct?
18       A.   Yes.
19       Q.   One of the things that was apparent to
20   you throughout your conversation with Mr.
21   Rhoades is that he did not go in there with the
22   intent to kill anybody or hurt anybody?
23       A.   Well, as far as killing anybody, I
24   don't know.   I think he told me several times
25   he went in there because him and whoever was

1    standing in the doorway were mad at each other

2    and were going to fight.

3         Q.   If we may, when you take the

4    confession -- I would like to go over it with

5    you and point out some things and see if they

6    are corroborated by the evidence or by the

7    things we know in this particular case.   Once

8    you took the confession, I think one of the

9    first things that Mr. Rhoades told you that he

10   had gone by several assumed names; is that

11   correct?

12        A.   Yes, sir.

13        Q.   You verified that?

14        A.   Yes.

15        Q.   That was true?

16        A.   Yes, it was.

17        Q.   Also he told you that he had been to

18   the joint four times, twice in Indiana and twice

19   here in Texas, and you verified all of that;

20   didn't you?

21        A.   Correct.

22        Q.   And you also determined that he

23   processed out of the Walls, in other words, he

24   just got out of prison; you verified that;

25   didn't you?

1        A.    Yes, sir.

2        Q.    He told you the truth about that.

3              Now, also, in the first or second

4    paragraph he said I have been to the joint twice

5    in Indiana and twice in Texas, always been for

6    burglary or auto theft, never for anything

7    violent.   That was his statement?

8        A.    Yes.

9        Q.    And when you checked his record, that

10   is what you determined, he had never been to

11   prison for anything violent?

12       A.    That is correct.

13       Q.    And as far as his path that he took or

14   that he suggested that he took as far as walking

15   down Mize Street, going down Keith Street, it

16   was fairly consistent of the diagram that the

17   State introduced here.   Very consistent with the

18   layout that she has introduced under State's

19   Exhibit No. 12, as far as the route that he

20   took, in his statement?

21       A.    Yes.

22       Q.    Very consistent with what we already

23   know from the State's Exhibit.

24             And he stated that he had over a

25   hundred dollars in his pocket from getting out

722

1    of prison.  Do you know from your past

2    experience as a police officer that TDC does

3    give their releasees a couple of hundred dollars

4    when they are released?

5         A.    Yes, I do.

6         Q.    From your calculations, how long had

7    he been out of prison approximately when this

8    happened?

9         A.    Approximately a day.

10        Q.    Somewhere in twenty-four hour

11   period.   Or maybe less than twenty-four hours.

12        A.    Less than twenty-four hours.

13        Q.    So he would have had two hundred

14   dollars, or whatever was left over from playing

15   video and buying beer.

16             MS. DAVIES:  I object to what was it,

17   a sidebar remark?

18             THE COURT:  Sustained.

19             MS. DAVIES:  Ask for the jury to

20   disregard.

21             THE COURT:  Disregard the last

22   statement by the defense attorney, ladies and

23   gentlemen.

24   BY MR. STAFFORD:

25        Q.    According to the confession, Sergeant

723

1    Kennedy, he said he bought some beer and played

2    video and ate a sandwich; right?

3         A.    Correct.

4         Q.    If he had two hundred dollars when he

5    got out of prison, it would be minus beer,

6    sandwich and video gammes?

7         A.    I don't know exactly what they give

8    them when they get out of the joint.

9         Q.    They give them some money.  And he

10   tells you he had over a hundred dollars in his

11   pocket.  That is what he confessed to; correct?

12        A.    Yes.

13        Q.    In the same paragraph on page two, he

14   said he didn't have any weapons of any kind.

15   Correct?  When he went into the house?

16        A.    That is what he said.

17        Q.    The State has introduced three knives

18   in this case.  And I am sure you have already

19   examined them before testifying.  All three

20   knives are of the same brand and the same make;

21   are they not?

22        A.    They appear to be.

23        Q.    They are all Wilkerson Sword stainless

24   steel knives?

25        A.    Yes, sir.

1    Q.    There is nothing in your offense

2  report that would indicate that any other

3  weapons were found in the house nobody knew who

4  they belonged to; is that correct?

5    A.    Other than the bars.

6    Q.    Other than the bars.

7    A.    Yes, sir.

8    Q.    And when he was describing to you

9  about the confrontation that he had with the

10  gentleman that was in the doorway because he

11  didn't know who the person was, in his

12  statement; correct?

13    A.    Correct.

14    Q.    And from your talking to him, you knew

15  or had the presence sense impression that Mr.

16  Rhoades did not know these gentlemen previously?

17    A.    That is what he told me.

18    Q.    That is what I am saying, based on

19  what he told you, he did not know them

20  previously?

21    A.    Yes, sir.

22    Q.    Based upon what he told you, he had

23  not been stalking out the house; is that correct?

24    A.    That is what he told me, yes.

25    Q.    And he basically was saying that when

725

1   the gentleman went inside the house he thought

2   he was going after a gun.  And you have already

3   told the jury that if I was standing here in the

4   doorway with the light, I could be seen

5   sufficiently and there is sufficient light for

6   someone to be in the middle of the street and be

7   able to view me; is that correct?

8          MS. DAVIES:  Your Honor, I object to

9   speculation about what some one generic person

10  could see from that distance.

11         THE COURT:  This is also repetitious

12  of what we have heard.  The jury has heard this

13  testimony.

14  BY MR. STAFFORD:

15     Q.   I was asking questions previously and

16  I didn't go back to it about Mr. Rhoades'

17  statement the front door was open and I went

18  inside.  Could you tell the jury, at the time

19  you were taking this statement, because "the

20  front door was open and I went inside" is kind

21  of an ambiguous statement; it could be two

22  things -- (1) the door was unlocked; or (1) the

23  door was open.  From reading that statement, you

24  really can't tell about what it means by the

25  door being open.  Was it open like this, or was

1   the door unlocked?  When you wrote this down,
2   what was your impression at the time you wrote
3   this down?
4               MS. DAVIES:  I object to speculation.
5               THE COURT:  Sustained.
6               MS. DAVIES:  If he wants to ask
7   exactly what Rick Rhoades said--
8               THE COURT:  Sustained.  You can go
9   into what he said or maybe what demonstration he
10  made as far as this witness is concerned.
11  BY MR. STAFFORD:
12      Q.   The front door was open and I went
13  inside.  When he made that statement, you had a
14  present sense impression what he meant.
15              MS. DAVIES:  I object.  He had a
16  present sense impression of what was said.
17              THE COURT:  You haven't asked the
18  question yet, but I am supposing it's along the
19  same lines, so it will be sustained.
20  BY MR. STAFFORD:
21      Q.   Did he tell you whether the door was
22  unlocked or whether the door was open?
23      A.   He said the door was open.
24      Q.   You don't know what that means?
25              MR. STAFFORD:  Can I ask him his

727

1   opinion what he thought it meant?

2          MS. DAVIES:  I object to speculation.

3          THE COURT:  You can ask him.   I think

4   the questions along this line are all going to

5   be sustained as to her objections.

6   BY MR. STAFFORD:

7      Q.   I direct your attention to your

8   offense report.  See if this refreshes your

9   memory as to what was said.  I even marked it

10  for you.   Would you read that paragraph?

11        THE COURT:  Just a moment.  You are

12  asking him to read it to himself?

13        MR. STAFFORD:  Yes.

14     Q.   For informational purposes of the

15  jury, offense report--

16        MS. DAVIES:  Your Honor, I object to

17  defense counsel making speeches for

18  informational purposes.

19        THE COURT:  Sustained.  Just ask the

20  question.

21  BY MR. STAFFORD:

22     Q.   What is an offense report?

23     A.   Offense report is a police report,

24  police recollection of what happened, what

25  occurred.

1      Q.    Does it contain summaries of

2   conversations that you have with individuals?

3      A.    Yes.

4      Q.    Is what I just had you read, is it a

5   summary of what people or i.e. Rick Rhoades told

6   you when you were talking to him in the

7   interview room at Pasadena, Texas?

8      A.    Yes.

9      Q.    Okay.   And in that, doesn't it say

10  that -- you have the statement -- that he stated

11  that--

12          MS. DAVIES:   I object to reading from

13  a document that is not in evidence.

14          THE COURT:   Sustained.

15  BY MR. STAFFORD:

16     Q.    Let me ask you this.   Can you tell

17  the jury, after reading that document, after

18  reading that document, isn't it true that Mr.

19  Rhoades told you that after exchanging words the

20  gentleman entered the house leaving the door

21  open?

22     A.    Yes.

23     Q.    Leaving the door open means the door

24  was open like this; was it not?

25          MS. DAVIES:   I object to asking this

1    witness to speculate or interpolate the meaning

2    of the word.

3           THE COURT:   Sustained.

4    BY MR. STAFFORD:

5        Q.    Further on down in his statement, the

6    same paragraph about the front door being open,

7    he said, "I went into the front door, and there

8    was a large family room.   The kitchen was back

9    to the right."

10       A.    Where are you at, Mr. Stafford?

11       Q.    Right in this area.

12       A.    Okay.

13       Q.    If I can show you what has been marked

14   as State's Exhibit No. 13 and No. 19.  He also

15   stated that he went into the weight room and

16   basically picked up a bar, which would be

17   consistent with what has been marked as State's

18   Exhibit No. 30; is that correct?

19       A.    I would assume so.

20       Q.    It has been introduced into evidence

21   as a bar.

22       A.    Correct.

23       Q.    This would be a bar that you would

24   expect to find in a weight room?

25       A.    Yes.

730

1      Q.    Is that correct?  And where in the

2   weight room, from your conversations with him,

3   whether it was right inside the door, up against

4   the wall, or where in the room you really don't

5   know?

6      A.    No, I don't.

7      Q.    He didn't tell you other than he got

8   it out of that room.

9           And Mr. Rhoades further told you that

10  he was going back or he walked back into the

11  family room, which has already been introduced,

12  the chart here, the weight room being in this

13  area here.  This would be the entrance going

14  back into the living room; is that correct?

15     A.    Yes, sir.

16     Q.    And the two exhibits being what?  Of

17  the kitchen?

18     A.    Thirteen and nineteen.

19     Q.    They reflect that right in this area

20  the kitchen has an area that is broken out that

21  you can see into the kitchen from this area?

22  This area I am pointing from?

23     A.    Yes.

24     Q.    You can see into the kitchen from that

25  particular area, according to those exhibits?

731

1      A.    That is correct.

2      Q.    Because of the cutout in between the

3  living room and the kitchen, had a little bar

4  there, you can stand in that doorway and

5  actually see into the kitchen from the hallway

6  because of the cutout.  I guess the point I am

7  making, or want to make, is that, if I am

8  standing here looking toward the kitchen, Mr.

9  Rhoades said he saw the gentleman who he didn't

10  know was in this area because, basically, this

11  is the area where the knives were supposedly

12  found, is that correct, that is pulled out here?

13      A.    That is correct.

14      Q.    And standing there, one could observe

15  someone in that position, according to the

16  State's exhibit; is that not true?

17          MS. DAVIES:  Object to the speculation

18  about what an individual could observe.

19          THE COURT:  You can ask this officer,

20  since he was inside the house, if he could see

21  that.

22  BY MR. STAFFORD:

23      Q.    Did you ever stand in that location

24  and look back toward the kitchen?

25      A.    Yes.

732

1      Q.   And if I had been standing right

2   there, you could have seen me; could you not?

3      A.   It's possible, yes.

4      Q.   And, also, Mr. Rhoades told you, and

5   it has been read to the jury, that when he was

6   in this area, right in this area is where he got

7   confronted, according to his statement; is that

8   correct?  That the man came into the -- the guy

9   then started coming towards me with a knife.

10          MS. DAVIES:  Your Honor, I object

11   again to asking this witness to speculate or

12   interpret the words.  The statement speaks for

13   itself.

14          THE COURT:  I don't understand this

15   last question as asking him to interpret.   It's

16   just exactly what the words were.

17   BY MR. STAFFORD:

18      Q.   According to the statement, he is here

19   in the living room; correct?  And according to

20   Mr. Rhoades' statement, that the unknown

21   gentleman was in the kitchen getting a knife; is

22   that correct?

23      A.   Correct.

24      Q.   And according to Mr. Rhoades'

25   statement, the gentleman came back into the room

1   and confronted him and asked him what in the

2   fuck he was doing; is that correct?  Isn't that

3   what the statement says?

4          MS. DAVIES:  Your Honor, I object.

5   Mr. Stafford is using a diagram to attempt to

6   get Sergeant Kennedy to pinpoint a specific

7   location on a diagram, interpreting the words

8   that were given on a typed statement.    I object

9   to that.

10         THE COURT:  Okay, first of all, there

11   is not any interpretation of the words Sergeant

12   Kennedy can tell what is in the statement or is

13   in evidence.  He can read from it.   And I don't

14   know what Mr. Stafford is doing over there, but

15   that is not testimony, whatever it is he is

16   doing.

17         MS. DAVIES:  My point is, by combining

18   the two, he is in fact trying to elicit an

19   interpretation of the defendant's statement.

20         THE COURT:  All he can achieve right

21   now is what the defendant said or did regarding

22   inside the house, how it relates to the alleged

23   confession.

24   BY MR. STAFFORD:

25       Q.   Let me ask you this.   Mr. Rhoades'

1    statement, after Mr. Allen asked him what he was

2    doing in his house, he made the statement, "I

3    thought about running out the door, but he had

4    me cut off"; is that correct?  Is that the

5    statement he made?

6    A.   Yes.

7    Q.   And in his statement he had already

8    told the jury that he was right in this area

9    because he went into the weight room coming back

10    into the living room.

11    MS. DAVIES:  I object, Your Honor.

12    The statement does not say I was right in this

13    area.  The statement speaks for itself.

14    THE COURT:  If y'all would like to

15    read the statement to the jury again, that's

16    fine, too; but it seems like we are wasting a

17    lot of time doing it in this fashion.

18    BY MR. STAFFORD:

19    Q.   He stated in his confession that he

20    went back into the living room area, did he not,

21    after getting the bar?

22    A.   Yes, sir.

23    Q.   And hypothetically speaking, if one

24    was in this area and he was confronted in that

25    area, hypothetically speaking, his route to get

1   out the front door that he came in would be cut

2   off; would it not?

3          MS. DAVIES:  I object to assuming

4   facts not in evidence.    There is nothing in

5   evidence to suggest which area of the living

6   room the defendant was in.

7          THE COURT:  Sustained.

8   BY MR. STAFFORD:

9      Q.    But he did say his route was cut off?

10  Correct?

11     A.    Yes.

12     Q.    Did you actually examine the person of

13  Mr. Charles Allen at the scene?

14     A.    Yes, I did.

15     Q.    Was there anything there inconsistent

16  with what you saw to indicate that he was not

17  hit in the nose by Mr. Rhoades' fist?

18     A.    I'm sorry, can you repeat that?

19     Q.     Mr. Rhoades said that during the

20  scuffle he hit the person in the nose with his

21  right hand.  From what you observed, was there

22  anything inconsistent with that statement?

23          MS. DAVIES:  I object as to Sergeant

24  Kennedy's qualification.

25          THE COURT:  Sergeant, do you

736

1    understand the question?

2             MS. DAVIES:   Interpretation of  the

3    physical, the medical expertise.

4        A.    I think I understand the question.   I

5    don't think I am qualified to answer it.

6             THE COURT:   Then that's your answer.

7    BY MR. STAFFORD:

8        Q.    And during your interview and taking

9    of the statement, Mr. Rhoades told you that he

10   cut his thumb during the process of this; is

11   that correct?

12       A.    Yes.

13       Q.    And it was due to him grabbing the

14   knife that the individual had in his hand?

15       A.    That is what he stated, yes.

16       Q.    And this knife has a ridge up here on

17   the top of it; does it not?   It's not like the

18   top where it's smooth all the way across?

19       A.    That is correct.

20       Q.    And hypothetically speaking, this

21   notch there kind of acts as a stopper; doesn't

22   it?   Kind of keeps the hand from sliding back

23   and forth a little bit, does it not, or could

24   act that way, could it not?

25       A.    Yes.

1    Q.   And if I can show you, as I'm holding

2    the knife, if I hit a hard object, assuming it

3    was being held this way, and it slipped in my

4    hand, the route that it would take, assuming it

5    was held like that, would be basically right in

6    that area there; would it not be?  If my hand

7    slipped?

8    A.   I assume so.

9    Q.   Depending on how you were holding it?

10   A.   Yes.

11   Q.   His statement was he grabbed the knife?

12   A.   Yes.

13   Q.   And you observed the scar, or he

14   showed you the scar that was healing at the time

15   he was making the confession; did he not?

16   A.   Yes.

17   Q.   I previously have showed you what has

18   been marked as Defendant's Exhibits one through

19   four; have I not?

20   A.   Yes, sir.

21   Q.   And looking at those, do those

22   accurately depict and reveal the scar as it

23   appeared to you back at the time that you made

24   this statement, or Mr. Rhoades gave the

25   statement?

1     A.    Basically, yes.

2         MR. STAFFORD:  Your Honor, I would

3  offer one, two and three into evidence after

4  tendering the same to State's counsel.

5         MS. DAVIES:  May I see all four

6  photographs that have been identified, please?

7         THE COURT:  You are tendering four,

8  you are offering Defense one through three?

9         THE COURT:  Yes.

10        MS. DAVIES:  I have no objection.

11        THE COURT:  Defense Exhibits 1, 2 and

12  3 are admitted.

13  BY MR. STAFFORD:

14     Q.    We notice that this exhibit somewhat

15  has a curve bent to it; correct?

16     A.    Yes, sir.

17     Q.    How heavy would you think that bar

18  would be?

19     A.    One pound.

20     Q.    A pound.  If I was holding this knife

21  in an offensive manner or coming toward you and

22  you took a swing at me and hit my knife, the bow

23  in that blade would be consistent with this rod

24  hitting it; would it not?

25     A.    Yes, it's possible, yes.

1   Q. That also would be sufficient to knock

2 it out of Mr. Allen's hand as reflected in the

3 defendant's statement that his knife was knocked

4 out of his hand; is that correct?  Is that what

5 he said?

6   A. That is what he said, yes, sir.

7   Q. And you have observed the video that

8 has been introduced here.  Have you seen the

9 video?

10   A. Yes.

11   Q. And right inside Charles' room on the

12 wall at his door there -- is this plugged in?

13     THE COURT:  I don't know.

14     MR. STAFFORD:  May I plug it in?

15   Q. While we are trying to figure out how

16 to operate this machine, on top of page three,

17 bottom of page two, he describes grabbing the

18 knife and cutting his thumb.  He states on the

19 top of page three, "We were scuffling around, we

20 ended up in the open doorway to a large

21 bedroom.  I then hit the guy in the head with a

22 pipe that I had.  I hit the guy a couple of

23 times, and he fell back on the bed."  Is that

24 correct?  Is that what he said in his statement?

25   A. Said he fell on the bed, yes, sir.

1          MR. STAFFORD:   Does anybody know how
2     to operate the machine?
3          THE COURT:   Is that witness still
4     here?
5          THE JUROR:   Push that thing over here.
6          MR. STAFFORD:   Brilliant.   I only
7     have a law degree.
8          Q.    Detective, this has been introduced.
9     I assume you recognize that as being Charles'
10    bedroom, right by the door of his bedroom; is
11    that correct?
12         A.    Yes.
13         Q.    And that is basically the same area
14    that is described in Mr. Rhoades' confession; is
15    it not?
16         A.    Yes.
17         Q.    And that is where Mr. Rhoades in his
18    statement said he struck the gentleman twice.
19    If I remember his confession.   Correct?
20         A.    Yes.
21         Q.    And striking someone twice with a bar
22    of this nature, the blood splattering that you
23    see here is consistent with someone being hit
24    twice or three times with a bar; is it not?
25         MS. DAVIES:   I object.   This witness

                                                    741

1    is not qualified as to blood spatter
2    interpretation.
3              THE COURT:   Sustained.
4    BY MR. STAFFORD:
5         Q.   Do you have any blood spattering
6    expertise?
7         A.   None at all.
8         Q.   But from looking at that while you
9    were on the scene, you made a determination
10   there was an attack made there; did you not?
11        A.   That was my opinion, yes.
12        Q.   Still is your opinion; isn't it?
13        A.   Yes, sir.
14        Q.   Did anybody take any blood samples
15   from there and send them off to the lab for any
16   DNA expert testimony?
17        A.   Lab personnel handled all the blood
18   work; I don't know.
19        Q.   To your knowledge, was any blood
20   samples taken from there to aid this jury in
21   determining whose blood is on that wall?
22        A.   To my knowledge, no.
23        Q.   But from reading his statement about
24   the attack being there, that blood supports his
25   statement; does it not?

742

1          MS. DAVIES:  I object to interpreting

2     the statement.    The statement is in evidence.

3          THE COURT:  Sustained.   You may ask

4     him what he saw in an individual room; you may

5     ask him what the statement says about a room;

6     but you can't ask him if it's the same room,

7     among other things that you have implied.

8     BY MR. STAFFORD:

9          Q.   And let me show you what has been

10    introduced as number 90, being the lower torso

11    of Charles.  And number 77.  Number 77 shows a

12    large amount of blood on the second pillow; does

13    it not?  In this area.  Do you remember that

14    from your investigation?

15         A.   Yes.

16         Q.   And from your investigation, if one

17    was -- there was a lot of equipment on this

18    side; correct?

19         A.   Yes, sir.

20         Q.   And would be naturally assumed would

21    be the logical place where one would be sleeping

22    if he slept on the right side of the bed.  That

23    would be the side he would be getting in?

24         A.    If you are looking at the picture, it

25    would be the left side.

743

1      Q.    Because this is all blocked over here;

2    is that correct?

3      A.    Correct.

4      Q.    But very little blood is on the pillow

5    where one would be sleeping if he slept on the

6    right side of the bed.    All the blood is on the

7    left pillow; is it not?

8      A.    It appears to be more blood than on

9    the other pillow, yes.

10      Q.    If one was standing here and fell at a

11    45 degree angle onto the bed, his head would

12    have landed on that second pillow; would it

13    not?

14              MS. DAVIES:   Object to speculation.

15              THE COURT:   Sustained.

16    BY MR. STAFFORD:

17      Q.    Using this as a diagram, if one was

18    standing here at this bed, fell at a .45 degree

19    angle, where would his head land?

20              MS. DAVIES:   I object to speculation.

21              THE COURT:   This all sounds like

22    argument to me.

23              MR. STAFFORD:   Judge, I don't mean to

24    argue with the court.   I am asking him what he

25    saw.

744

1          THE COURT:   No, that is not what you

2     are asking.   You are asking him to speculate,

3     not what he saw.

4     BY MR. STAFFORD:

5          Q.    Did the bed appear, from what has been

6     introduced, it would be consistent with a

7     struggle going on in the bed; would it not?

8          A.    Can you repeat the question?

9          Q.    The way the bed Mr. Allen was in, the

10    way he was wrapped up in it, the way it was

11    arranged, it would be consistent with someone

12    having a struggle in the bed; would it not?

13         A.    It would be more consistent with

14    somebody being covered up with the bedding.

15         Q.    But either way; it could be either

16    way?

17         A.    It could be either way, yes.

18         Q.    And going back into the kitchen after

19    the struggle was over -- can you tell the jury

20    did you ever observe the burglar alarm system

21    that was in the kitchen area?

22         A.    Yes, I did.

23         Q.    Can you describe it very briefly?   Did

24    it have multiple lights on it?

25         A.    Had one red flashing light.

1       Q.   That stayed on continuously?

2       A.   While I was there, yes.

3       Q.   And if you had no working knowledge of

4  a burglar alarm, you wouldn't know whether it

5  was on or not; could you?

6       A.   No.

7       Q.   Mr. Rhoades stated in his statement,

8  at the conclusion, or close to the conclusion,

9  that he had taken his boots off; is that

10  correct?  I believe page three.  He said in his

11  statement that he took his boots off.

12       A.   Yes, sir.

13       Q.   After the fight was over.

14       A.   Yes, sir.

15       Q.   And if I can direct your attention to

16  your supplement or your offense report on page

17  104.  Ask you to read that.  Is it not true

18  that he also told you he wasn't sure when he

19  took his boots off?  According to the offense

20  report?

21       A.   Correct.

22       Q.   And I think from your conversations

23  with the prosecutor this statement started at

24  eight o'clock, you started talking to him around

25  7:30, and approximately can you tell the jury

1    when the statement came to a conclusion?

2        A.    If I recall correctly, it was

3    approximately 10:00 p.m.

4        Q.    And for those two and a half hours --

5    and I have already asked you, that based upon

6    what you wrote in the offense report and based

7    upon what is in the confession, that Mr. Rhoades

8    did not enter into that house to commit a

9    burglary; is that correct?

10            MS. DAVIES:  I object to speculation

11   again.

12            THE COURT:  Well, I am not sure what

13   the question is.

14   BY MR. STAFFORD:

15       Q.    Based upon what he told you.

16            THE COURT:  For the two and a half

17   hours he was with the defendant's if in that

18   time the defendant maintained he had not entered

19   for the purpose of burglary and theft.

20            MS. DAVIES:  I object to the form of

21   the question.  Again it's asking for an

22   interpretation as opposed to a clear question or

23   revelation of what this defendant actually said.

24            THE COURT:  Can you rephrase your

25   question, Mr. Stafford?

747

BY MR. STAFFORD:

Q.   What Mr. Rhoades said, he did not
commit this offense for money, if I remember his
statement; is that correct?

A.   I don't remember exact words.  It was
something to that effect.

Q.   And he also told you that he couldn't
understand why he did it because he was not a
violent person when he started off; is that
correct?

A.   That is correct.

MR. STAFFORD:  I pass the witness.

REDIRECT EXAMINATION

BY MS. DAVIES:

Q.   Sergeant Kennedy, despite this
defendant's disclaimers, he did tell you that he
took money from Charles Allen's billfold; didn't
he?

A.   Yes, he did.

Q.   And he also admitted to you that he
took the keys, the car keys with him when he
left the Allen brothers' home; didn't he?

A.   Yes, he did.

Q.   And certainly, based on your
experience, is money something that is commonly

748

1   stolen when a home is burglarized?

2       A.   Yes, it is.

3       Q.   What about an automobile, is that

4   something that is commonly stolen when a house

5   is burglarized?

6       A.   Very common.

7       Q.   In fact -- I think I forgot to ask you

8   this earlier -- when this defendant went with

9   you and showed you the location at the Park

10  Hollow Apartments where he had cleaned up after

11  the killing, did he tell you where he had thrown

12  the car keys after he left?

13      A.   He pointed out an area where he

14  thought he had, yes.

15      Q.   Do you recall where that was?  I am

16  showing you State's Exhibit 12.   Can you point

17  out for us where he stated he had disposed of

18  the car keys?

19      A.   There is an abandoned mobile home park

20  back in here.  It was all grown up in weeds.

21      Q.   Keep your voice up.

22      A.   There is an abandoned mobile home park

23  back here off Smith Street that he said he had

24  thrown them in the weeds somewhere around there.

25      Q.   Open field area or weeded area?

1      A.    Yes.

2      Q.    Did you actually conduct a search to

3   try to locate those keys?

4      A.    Yes.

5      Q.    Were you successful?

6      A.    No.

7      Q.    This was a month later?

8      A.    That is correct.

9      Q.    After the statement was taken.

10          You pointed out on the diagram, I

11   think the other day you pointed out for us where

12   the Park Hollow Apartments are.  The fact is,

13   Sergeant Kennedy, just a couple of days before

14   this defendant gave you a statement, you and

15   your partner had been at the Park Hollow

16   Apartments as part of your investigation; hadn't

17   you?

18      A.    Correct.

19      Q.    Did you talk to a number of people

20   there?

21      A.    Yes, we did.

22      Q.    As you were talking to people at those

23   apartments, did you put out the word what case

24   you were investigating?

25      A.    Yes.

1   Q. Is that the very location where this
2 defendant told you he had been hanging out and
3 hiding out?
4   A. Yes, it is.
5   Q. When you were interviewing this
6 defendant and you described for us the other day
7 -- I won't go into that in detail again -- but
8 he was telling you things and you were typing
9 them; is that correct?
10   A. That is correct.
11   Q. Now, when you were talking to him, did
12 you have with you, even smaller, did you have
13 with you a diagram of the house to consult and
14 ask him to clarify the information that he was
15 giving you?
16   A. No, I did not.
17   Q. Did you have anything of this type --
18 and I am pointing to State's Exhibit 10, the
19 diagram of the interior of the house -- did you
20 have anything there that he was using to explain
21 exactly where he was as he would mention a
22 location in the house?
23   A. No.
24   Q. So, in other words, when he said to
25 you he was in the living room, did you have any

1    way to pinpoint what area within this entire
2    room he was in?
3         A.    No.
4         Q.    In fact, I believe when you read, I
5    think it was on the third page when Mr. Stafford
6    was questioning you, there is something in that
7    statement about that he and Charles, although he
8    didn't use the name Charles, of course, were
9    near an open doorway to the bedroom.  Was there
10   anything about what he said that would clarify
11   for you whether he was suggesting that he was on
12   one or the other side of that open doorway?
13        A.    No.
14        Q.    In other words, it could have been in
15   the hallway by the open doorway; is that right?
16        A.    Correct.
17        Q.    Could have been inside the bedroom by
18   the open doorway; correct?
19        A.    Correct.
20        Q.    Could have been by the master
21   bathroom, if that was an open doorway at the
22   time?
23        A.    Correct.
24        Q.    Or inside the master bath; is that
25   right?

1      A.   Yes.

2      Q.   No way for you to know what he meant

3  when he said he was by an open door in that

4  house; is there?

5      A.   No.

6      Q.   Sergeant, when you take a statement

7  from this defendant or any defendant, do you

8  edit the statement, depending on what aspect you

9  believe to be true?

10     A.   No.

11     Q.   How do you decide what words go into

12 the statement?

13     A.   The subject I am taking the statement

14 from tells me.

15     Q.   Have you ever had a situation where

16 somebody tells you part truth and part

17 self-serving information?

18     A.   Very frequently.

19     Q.   Of course, you also have situations

20 where somebody lies totally?

21     A.   Yes.

22     Q.   The defendant, apparently, I think

23 from the statement indicated that -- in fact,

24 it's right at the very first line -- "My name is

25 Rick Rhoades.  I also go by Steven Ray Leland

753

1    and David Marcas."  Are those the two alias

2    names that he gave you?

3         A.   Yes, they are.

4         Q.   Did he mention any other alias names?

5         A.   Not to my recollection, no.

6         Q.   So if he has used any other names

7    other than those, he certainly didn't tell you

8    about those at that time; did he?

9         A.   No.

10         Q.   Are you familiar with the street

11   lights there on Keith Street?  Do you recall

12   whether there is any street lights?

13         A.   I do not, off the top of my head.

14         Q.   When you searched the house, went

15   through the Allen brothers' home, did you find

16   any guns?

17         A.   No.

18         Q.   Other than ordinary kitchen knives,

19   did you find any weapons in Brad and Charles

20   Allen's home?

21         A.   No.

22         Q.   I want to call your attention again to

23   this photograph that you were shown earlier,

24   State's Exhibit 77.   It shows it looks like

25   actually three pillows on Charles' bed.   And I

1    want to be sure that I understand.    From one of

2    the questions that Mr. Stafford asked you, I

3    wasn't quite sure.   Can you tell me whether you

4    personally observed blood on each of the three

5    pillows?

6         A.   I did.

7         Q.   The pillow here on the left as I'm

8    looking at the photograph, in other words, the

9    one on the side of the bed opposite from the

10   music stand, was there blood on that pillow as

11   well as the other two?

12        A.   Yes, there was.

13        Q.   Sergeant, I want to show you -- if you

14   want me to open it out, I will.

15        A.   No.

16        Q.    I have marked for identification

17   purposes a bag marked 143.   Do you recognize

18   that as containing the bedding from Brad Allen's

19   bed?

20        A.   I do.

21        Q.   The bag marked State's Exhibit 142,

22   are you able to recognize as the bedding taken

23   from Charles' bed?

24        A.   I do.

25             MS. DAVIES:   Tender 142 and 143 to

1    defense counsel and offer it into evidence.

2              MR. STAFFORD:  I have no objection.

3              THE COURT:  State's Exhibits 142 and

4    143 are admitted.

5              MS. DAVIES:  Pass the witness.

6              MR. STAFFORD:  Very briefly.

7                   RECROSS EXAMINATION

8    BY MR. STAFFORD:

9         Q.   The fact that Mr. Rhoades' statement

10   and even to the State's evidence there in

11   Charles' room where all the splattering was,

12   assuming using this as the doorway to Charles'

13   room and blood spattering would be here, the

14   length from the doorway to his bed would be

15   about as far as counsel table, maybe a little

16   closer, approximately the same distance, the bed?

17        A.   Give or take a couple of feet,

18   approximately the same.

19        Q.   Hypothetically speaking, a struggle

20   was here, according to the physical evidence

21   because the physical evidence shows there was

22   blood in the rug area here; correct?

23        A.   Yes.

24        Q.   Blood here?

25        A.   Yes.

1    Q.    If the struggle initially started

2  there, the time it would take to get to this

3  section right here would be a matter of seconds,

4  would it not, as I have demonstrated?

5    A.    Correct.

6         MR. STAFFORD:  No other questions.

7         MS. DAVIES:  No further questions.

8         THE COURT:  You may stand down.

9         Ladies and gentlemen.  I want you to

10  file out and go with the bailiff straight to the

11  elevator at this time.   Just go out this

12  doorway.  Everybody else remain seated in the

13  courtroom.

14         (The jury is removed from the

15  courtroom).

16         MR. STAFFORD:  He can be excused,

17  judge.

18         THE COURT:  Who is your next witness?

19         MR. STAFFORD:  I assume I am going to

20  call Floyd, but he hasn't seen the slides.  Mr.

21  Mc Donald has not seen the slides.

22         THE COURT:  He will have the

23  opportunity now.

24         THE COURT:  2:15.

25         MR. STAFFORD:  I am excusing him.

757

1      THE COURT:  It's my understanding the

2  defense is excusing this witness.  Do you wish

3  to have him on call?

4      MS. DAVIES:  Yes.

5      THE COURT:  Is Mr. McDonald, if you

6  call him, he is your last witness?

7      MR. STAFFORD:  Yes.  Unless I put

8  Espinola on.

9      MS. DAVIES:  I was asked earlier by

10  the Court to see if Dr. Espinola was available.

11  I know that he is at the M. E.'s office and

12  available, but someone will have to notify him

13  to be here.

14      MR. STAFFORD:  I want him to see these

15  slides.

16      THE COURT:  Make the phone call.  He

17  is on call.

18      MS. DAVIES:  I called to verify that

19  he was there, but he could leave if someone

20  doesn't make arrangements.

21      THE COURT:  Tell him he needs to be

22  here by two o'clock.  I anticipate the jury

23  will be back in the jury room at 2:15.

24      MR. STAFFORD:  I would ask, for

25  purposes of the record, some minimal leeway.

1    Again, it's my position that we were surprised

2    by their expert.  We had no idea what he was

3    going to testify to.  We had not seen any

4    previous.

5              THE COURT:  We have been talking about

6    this expert all this week.

7              MR. STAFFORD:  Since yesterday.  That

8    is when I filed the motion, unless you consider

9    twenty-four hours.  That is when I received

10   notice of it.

11             THE COURT:  We have been talking about

12   blood spatter testimony for quite sometime.

13             MS. DAVIES:  Your Honor, I want to be

14   sure that the record is clear that Sergeant

15   Hoffmaster has been on my subpoena list from day

16   one.

17             MR. STAFFORD:  Judge, there has been

18   two hundred people on the subpoena list.  That

19   doesn't mean I know what they are going to say.

20             THE COURT:  At any rate, if you want

21   the doctor to see the slides you better do it

22   before the jury comes back because we are not

23   going to take a break between Mc Donald and

24   Espinola if you call him.

25             MR. STAFFORD:  Again, for purposes of

1      the record, since I have not been aware until

2      today, had no idea what their witness was going

3      to testify to, as to what splatters, et cetera,

4      et cetera, this is being unfair to me.

5              THE COURT:   All right.   Espinola has

6      been on call all this time.   He could have been

7      down here all day long as far as I can tell. You

8      need to leave the room and make the phone call.

9              MR. STAFFORD:   I'm going to, but I'm

10     trying to get something on the record.   Their

11     cross examination did not complete until

12     11:30.   And I have been in direct evidence --

13     anyway, we will get into that.

14              (Jury in)

15

16

17

18

19

20

21

22

23

24

25

```
                        FLOYD McDONALD
 1
 2   was called as a witness by the Defense and,
 3   having been duly sworn, testified as follows:
 4                       DIRECT EXAMINATION
 5   BY MR. STAFFORD:
 6        Q.   Would you state your name for the
 7   record, please?
 8        A.   Floyd E. McDonald.
 9        Q.   Mr. McDonald, for the benefit of the
10   jury, where are you presently employed?
11        A.   I am not employed right now.  I am
12   retired.
13        Q.   You have such an extensive resume, I
14   don't know where to start.
15             MS. DAVIES:  I object to the sidebar
16   remark, Your Honor.
17             THE COURT:  Sustained.
18             MS. DAVIES:  Ask we proceed in
19   question and answer.
20   BY MR. STAFFORD:
21        Q.   Can you give the jury the benefit of
22   your educational background?
23        A.   I have a bachelor's and master's
24   degree in organic and biochemistry.  I have done
25   some further postgraduate work in the same field
```

761

1    toward a Ph.D.  Over the years, I have taken a

2    number of specialized courses in different areas

3    of forensic chemistry in different academies and

4    universities around the country.

5        Q.    Can you tell the jury where you got

6    your master's degree from?

7        A.    I got my master's and my bachelor's

8    both at Sam Houston State University at

9    Huntsville.  And did graduate work at the

10   University of Texas in Austin.

11       Q.    Did you ever enter Rice University?

12       A.    I did during the war.  The Navy sent

13   me to Rice for about a year.

14       Q.    And starting in 1950, can you tell the

15   jury what your primary occupation was?

16       A.    It has been in forensic chemistry.  I

17   have been employed by law enforcement agencies,

18   primarily the Houston Police Department.

19       Q.    How long were you with the Houston

20   Police Department?

21       A.    I was there thirty years.

22       Q.    Beginning when?

23       A.    1953 until 1983.

24       Q.    From 1983 to present, can you tell the

25   jury basically what kind of -- I know you are

1    retired -- but do you stay active in the field?

2        A.   Well, yes, sir.   When I retired from

3    Houston -- I live in Pasadena -- and they

4    insisted I come to work for them and set up a

5    crime lab for them, and I did that, equipped it,

6    staffed it and trained the people to take it

7    over and then turned it over to them.   But right

8    now, I have been helping them out a little bit

9    because they are shorthanded.

10        MS. DAVIES:   Excuse me.   Your Honor, I

11    object to the narrative.

12        THE COURT:   Sustained.

13   BY MR. STAFFORD:

14        Q.   Okay.   Can you tell the jury, when you

15    testify, do you normally testify for the State

16    or you normally testify for the defense?

17        A.   Well, I don't know about normally.

18    Probably 99 percent of the time that I have

19    testified it has been for the State.

20        Q.   And can you tell the jury

21    approximately when it was when I first contacted

22    you to give me assistance in this case?

23        A.   Yes, sir.   It was day before.   I am

24    not sure.   A couple of days before.

25        Q.   Can you tell the jury, directing your

763

1   attention to blood splatter, can you tell the

2   jury how long you have been dealing with the

3   field of blood splatter, starting back when?

4        A.   Well, it is a field, we have been

5   utilizing blood splattering in criminal cases

6   investigations since 1950.

7        Q.   Since 1950, have you been involved

8   with blood splattering techniques and blood

9   splattering investigations?

10        A.   Yes, sir, I have.

11        Q.   Can you give the benefit to the jury

12   what kind of seminars or courses and things of

13   that nature that qualify you as a blood splatter

14   expert?

15        A.   Oh, I guess the first blood spatter

16   seminar I attended was at the FBI Academy back

17   in '63 or '64, something like that.  I made a

18   bunch of them since.  The last one I attended

19   was last spring in Shreveport, Louisiana.

20        Q.   And would you say you have attended

21   numerous or few blood splattering classes and

22   seminars?

23        A.   Well, at least a few.

24        Q.   Do you consider yourself an expert,

25   blood splatter expert?

764

1      A.    Well, I have certainly utilized it a

2  lot.  I am not sure what an expert is, but I

3  have certainly utilized it a lot and come to a

4  lot of final conclusions.

5      Q.    Have you testified before a jury about

6  blood splattering before?

7      A.    Yes, sir.

8      Q.    For the State?

9      A.    As far as I can remember, that is the

10  only one, yes, sir.  Always for the State.

11      Q.    Let me, before I proceed.  Have you

12  had an opportunity to read the statement that

13  Mr. Rhoades gave in this particular cause?

14      A.    Yes, sir, I did.

15      Q.    Did you happen to read the autopsy of

16  Charles Allen in this particular cause?

17      A.    I did, yes, sir.

18      Q.    Can you tell the jury were the scene

19  photographs supplied to you for you to view of

20  Charles Allen's bedroom?

21      A.    I saw them, yes, sir.

22      Q.    And did you have an opportunity to

23  review and see the video that was taken in this

24  case?

25      A.    Yes, I did.

1      Q.   And also the slides that, some of the

2  slides on this projector?

3      A.   I saw one or two of them.   I am not

4  sure I saw all the slides.   I saw all the video.

5      Q.   Okay.   Now, you haven't had an

6  opportunity to make the scene; have you?

7      A.   No, I did not, no, sir.

8      Q.   Can you describe, from a blood

9  spattering standpoint, can you describe whether

10  it's better to view a photograph and make a

11  prediction of positioning of bodies or hitting

12  someone in the head, or would it be better to be

13  at the scene to actually see what was left by

14  the act?

15      A.   There is no comparison.   Obviously

16  it's a lot better to be at the scene.   We always

17  insisted that they call us to the scene for

18  things like that.

19      Q.   What does being at the scene often

20  show you that a photograph won't show?

21      A.   Well, to calculate the angles, for

22  example, at which a drop of blood struck the

23  wall, the floor or whatever you are looking at,

24  you need to measure.   You need to take

25  measurements of the stain, the length and width

1    of the stain so that allows you to calculate the

2    angle.  You can be much more precise  if you can

3    see and actually take the measurements.

4         Q.   If you had the measurements, by doing

5    the width and the length, can you basically

6    place where people, or what does it tell you?

7         A.   You can tell exactly, by tracing back

8    to the source of a drop, where it came from,

9    take several of them, see where they came from,

10   and when they all came from a single spot that

11   tells you where the person that bled was at the

12   time the blood was spattered.

13        Q.   That gives you a good estimation of

14   distance then?

15        A.   Exactly.  Yes, sir.

16        Q.   And in a photograph, you can't make

17   those measurements; can you?  It's difficult?

18        A.   Unfortunately, no, you can't.

19        Q.   If I can direct your attention to Mr.

20   Rhoades' statement where he said the struggle

21   with Mr. Charles Allen began in the doorway.

22             MR. STAFFORD:  May I have the lights

23   turned off, judge?

24        Q.   And he stated that he struck the

25   gentleman or the guy a couple of times in the

1 head while there.  You have had a chance to view
2 this photograph before or this slide before
3 testifying for this jury; have you not?
4     A.   Yes, I did.
5     Q.   Do you have an opinion, or can you
6 tell the jury what you find in that particular
7 photograph?  Or would you like to approach the
8 picture, or however you feel comfortable.
9     A.   There is more than one thing.   I
10 guess I need to get over there to the picture
11 and show you.
12         MR. STAFFORD:  Is that all right with
13 the court?
14         THE COURT:  Yes.
15 BY MR. STAFFORD:
16     Q.   You have to keep your voice up.
17     A.   I kind of got laryngitis as you can
18 tell.  I will talk as loud as I can.
19         These spots here are very apparently
20 from an arterial spurt, a small artery that was
21 probably cut.   And this across here seems to be
22 the same sort of thing.  When an artery is cut,
23 the blood runs out kind of like a kid shooting a
24 water pistol.  You get a line of stain.   These
25 random spots down here, that seems to be medium

1   velocity spattering.  It's as if a blood pool

2   were hit with something and made it splash.

3          Q.   The statement said he was hit a couple

4   of times there in the entrance of the doorway.

5   Can you tell the jury, when you hit someone for

6   the first time, do you expect to see a

7   splattering of that nature, or does it take a

8   second hit for a medium velocity splattering as

9   we see on this particular slide?

10         A.   No, it takes two.  The first time a

11   person gets hit, in this case it was about the

12   head, the first time he gets hit, it doesn't

13   bleed for a second or two, and then there is a

14   lot of blood from the scalp, and it will start

15   bleeding pretty profusely.  The second blow will

16   hit the pool of blood and make it splash, and

17   that is what produces the spatters.

18         Q.   Okay.  And you told the jury that the

19   head area bleeds fairly profusely?

20         A.   Oh, yeah.  Anybody that has ever cut

21   their head knows you get a lot of blood.

22         Q.   Based upon your various thirty or so

23   years of this type of work and study, could you

24   tell the jury, based upon the medium velocity

25   splatters that you see on the wall, are those

769

1    medium velocity splatters more consistent with a

2    strike coming from a bar similar to the State's

3    exhibit here, or would it be more consistent

4    with a knife in your opinion?

5         A.    These down here, these medium velocity

6    spatters, that is more of the sort of thing you

7    see from a blunt object like a bar.   A knife

8    stabs; it doesn't cause a splash.   You don't

9    get spattering from that.   The only way you get

10   spattering from a knife is if you stab hard

11   enough for your hand to hit the body and there

12   is blood on the surface.

13        Q.    Can you tell the jury, as far as being

14   more profusely bleeding, would the head area

15   bleed more for splattering effect or would the

16   blows here in the stomach be -- which would

17   splatter the most?

18        A.    The bar is not likely to draw much

19   blood to the body.   It would be the blows to the

20   head that would cause the splatter.

21        Q.    Let me advance this real quick.   I

22   have showed you, have I not, sir, the State's

23   exhibits that has been introduced of blood spots

24   that the State recovered of -- how would you

25   describe that, blood splatter or drop or what on

                                                  770

1    the foot?

2    A.    It looks like a really, especially

3    this one, looks like a low velocity drop.    Like

4    blood dropped onto it.    It could be, from back

5    in this area could be a spatter, especially the

6    smaller ones.

7    Q.    I previously showed you what has been

8    marked as defendant's exhibit seventeen.

9    Pardon me.    State's Exhibit seventeen and

10   sixteen.    That being the splattering in the

11   kitchen on the kitchen floor would what you see

12   in sixteen and seventeen be consistent with what

13   is shown in that slide as far as blood drops are

14   concerned?

15   A.    Those are pretty obviously low

16   velocity spatters.    Low velocity blood just

17   falls.    That is pretty obvious low velocity on

18   the floor.    And this spot here could also be.

19   Q.    And let me show you also another

20   object, I mean another slide.    Hypothetically,

21   if I was bloody and there was a struggle, could

22   blood be transferred from my clothing onto a

23   bare leg if there was a struggle?

24   A.    If you came in contact with it,

25   obviously.

771

1    Q.    Would that be consistent or

2    inconsistent with blood being transferred from

3    my clothing on to a bare leg?

4    A.    Sure.

5    Q.    It would be consistent?

6    A.    Obviously it is, sure.

7    Q.    Also the fact -- if I may point out.

8    Directing your attention to this area.  The

9    defendant's statement said he hit him a couple

10   of times and then he fell back on the bed.  If

11   that proposition is true, could you tell the

12   jury would you expect to find blood in this

13   area, or would you not expect to find blood in

14   that area?

15   A.    Well, assuming from the angle --

16   medium velocity spatters were on this wall back

17   over here by the door -- the man had to be

18   standing just inside the door at that point.

19        MS. DAVIES:  I object to the

20   nonresponsive answer.

21        THE COURT:  Sustained.

22   A.    For him--

23        MS. DAVIES:  I object.

24   BY MR. STAFFORD:

25   Q.    Okay.  Let me suggest this.    Let me

772

1  ask you this.  In your opinion, where was the
2  person who got hit standing inside the bedroom
3  according to the blood that you saw?
4       A.   The first--
5            MS. DAVIES:  Your Honor, I object to
6  the form of the question.
7            THE COURT:  In his opinion, where was
8  the person standing?
9  BY MR. STAFFORD:
10      Q.   Let me do this.  If the person fell
11 onto the bed, taking the route that was
12 described in the statement and based upon the
13 physical evidence, would you expect to find
14 blood in this area?
15      A.   If that is all he did from this point,
16 just went back and fell on the bed, not
17 necessarily, no.  I wouldn't expect any at
18 all.
19      Q.   If he did not receive any blows in
20 that area, would you expect to find any blood?
21      A.   Well, that is the point.   If.
22           MS. DAVIES:  Object to nonresponsive
23 answer.
24           THE COURT:  Sustained.
25           MS. DAVIES:  Ask the court to instruct

1  Mr. McDonald.

2       THE COURT:  Mr. McDonald, please

3  answer only the question being asked.

4  BY MR. STAFFORD:

5       Q.   Basically, though, the question is

6  based upon my client's statement, what you see

7  there is consistent with his statement; is it

8  not?

9       A.   Yes, it is.

10      Q.   Also you read in the confession, did

11  you not, sir, that some of the stabbing and some

12  of the beating occurred in the bedroom, I mean,

13  in the bed itself; is that correct?

14      A.   Oh, yes, right.

15      Q.   And is the fact that the bedspread is

16  covered around the leg be consistent with a

17  struggle in the bed?

18      A.   I would say so, yes, sir.

19      Q.   And while the tussling is going on,

20  would it be difficult, in your training and

21  experience, for somebody's leg to get wrapped up

22  in the bedspread?

23       MS. DAVIES:  Your Honor, I object to

24  the speculation.  This has nothing to do with

25  blood spatter expertise.

774

1            THE COURT:  Sustained.

2            MR. STAFFORD:  They brought it out on

3    direct examination.

4            THE COURT:  In his training and

5    experience?

6            MR. STAFFORD:  Through their expert.

7            THE COURT:  Sustain the objection.

8    BY MR. STAFFORD:

9        Q.    Based upon the evidence that you have

10    seen doing the video and the State's still

11    photos and the slides, do you have an opinion

12    whether or not all of the attack from start to

13    finish of Charles Allen occurred only in the bed?

14        A.    --.

15        Q.    Or is that too difficult a question?

16        A.    I think in my opinion the physical

17    evidence bears out the statement that it started

18    over near the door and then transferred to the

19    bed.  Most of it took place in the bed, no

20    doubt.  That is where all the stabbing took

21    place.    There is a lot of blood in the bed, all

22    over the bed.  That is where the struggle was,

23    and that is where it finished.    But the

24    physical evidence indicates to me that it

25    started by the door.

1          MR. STAFFORD:   Pass the witness.

2                    CROSS EXAMINATION

3    BY MS. DAVIES:

4          Q.   Mr. McDonald, you are well aware that

5    Charles Allen is not the only person who was

6    attacked in that bedroom?

7          A.   That is true.   I know that.

8          Q.   And the fact is the physical evidence,

9    the blood spatter, one of the slides certainly

10   indicates that arterial spurting would have come

11   from Brad Allen?

12         A.   I have no doubt that is true, right.

13         Q.   And certainly there was no, as far as

14   you could see, there was no reason to think that

15   those blood patterns came from Charles Allen; am

16   I correct?

17         A.   Not those arterial patterns, no.

18         Q.   And certainly Brad Allen suffered

19   numerous stab wounds; is that correct?   Based on

20   the autopsy report?

21         A.   During the course of the whole affair,

22   he sure did, yeah.

23         Q.   In fact, given the arterial spurting

24   and spatters -- in fact, did you look at the

25   slides inside Brad Allen's room?

                                                    776

1        A.   No, I didn't see any slides.   I saw
2    some photographs from inside Brad's room.
3        Q.   Well, let's see.   Instead of turning
4    the lights off.   Did you and Mr. Stafford have
5    all the photographs out here?
6        A.   I don't know.
7        Q.   Let me draw your attention -- instead
8    of turning off the lights, I think some of the
9    slides actually are duplicates of these
10   photographs.   Perhaps we can use those.   Looking
11   at State's Exhibit 70, the door, the hallway
12   door leading into Brad Allen's room.   Do you see
13   arterial spurting there?
14       A.   I see a lot of just bleeding.   It
15   could have been veinous in origin; it could have
16   been from small arteries that would have
17   contributed to it.   I don't see any arterial
18   spurting.   I see a lot of blood that's being
19   deposited there.   I don't really see.   You
20   understand I didn't study these.   I mostly
21   studied the ones of the other victim.
22       Q.   Well, perhaps you can help us by
23   looking at these right now.   Would it be fair
24   to say there is some medium velocity spatter
25   there by Brad's door?   Here's another one,

1    State's Exhibit 72 shows another view of that

2    doorfacing.   Do you see any medium velocity

3    spattering?

4         A.   Oh, yeah, surely.

5         Q.   Okay.

6         A.   I don't necessarily see an arterial

7    pattern.   But it doesn't mean some of it

8    couldn't have come from a small artery.

9         Q.   But, certainly, even if you do not

10   recognize any arterial spurting, would you agree

11   with me that there is certainly indication, both

12   outside and in the doorframe of Brad's room,

13   some medium velocity spatter?

14        A.   Sure.

15        Q.   Let me call your attention to these

16   photographs.   Look at these for me, please.

17   State's Exhibit 73 in front of you there.   And

18   32-A.   You weren't shown those before?

19        A.   I probably saw them, but I didn't

20   study these.

21        Q.   Do you see any indication of any

22   medium velocity spatter there inside Brad's

23   room?

24        A.   Oh, yeah, sure.   You understand, the

25   guy is covered with blood by now.   Almost any

778

1    time he moves he's going to cause spattering

2    himself.   There is so much blood all over him.

3         Q.   Now, and you certainly are aware that

4    Brad's wounds were stab wounds?

5         A.   Oh, yeah.

6         Q.   And they result in this medium

7    velocity spatter?

8         A.   I don't think the wounds resulted in

9    that as much as him moving himself.   He's so

10   covered with blood, as he moves his arms he is

11   going to cause some spattering.

12        Q.   Blood is just squirting out

13   everywhere?

14        A.   Yeah, right.

15        Q.   There is arterial spurting, of course?

16        A.   Some of that undoubtedly is.   This on

17   the back of the door looks like it might be.

18   This is smeared by his body.

19        Q.   You think that is arterial spurting,

20   or is that just blood that ran down when he is

21   bleeding so heavily?

22        A.   I think this is a smear.   I think you

23   can't tell what was up here before.

24        Q.   What about on the wall?

25        A.   Well, this is medium velocity

1  spattering.  From what, I do not know.

2      Q.  Okay.  You have seen no indication in

3  the autopsy reports that Brad was struck with a

4  blunt instrument; did you?

5      A.  That is correct.

6      Q.  His wounds were all stab wounds?

7      A.  Right.

8      Q.  And, yet, they did result in medium

9  velocity spattering on these walls?

10     A.  We are talking about two different

11 things now.  I don't think the wound itself

12 caused the spattering.  I think just the

13 movement and the striking against his body, his

14 hands and the assailant's hands and arms.  That

15 is what caused the spattering.

16     Q.  In your opinion the man is being

17 stabbed, he is bleeding, and as a result you are

18 seeing in Brad's room medium velocity spatter?

19     A.  Sure.

20     Q.  So, by the same token, Mr. McDonald,

21 certainly Brad's injuries could be causing the

22 medium velocity spattering that you saw inside

23 Charles' room, too, couldn't they, just like it

24 did here?

25     A.  It depends on--

1       Q.    Would you answer me yes or no?

2       A.    I can't answer yes or no.    It's not

3    definite.

4       Q.    I asked if that is possible.

5       A.    Oh, of course.    Obviously, anything is

6    possible.    Sure, it is.

7       Q.    His wounds were capable of causing

8    medium velocity spattering in his room, isn't it

9    also true that it could have been Brad's

10   injuries that resulted in the medium velocity

11   spattering in Charles' room by the door?    Is

12   that true?

13      A.    That doesn't follow.    You have two

14   different situations.    By the time he got to his

15   room, he is covered with blood.    Almost any

16   move is going to result in spattering.    Back

17   where it started, it depends on how many stab

18   wounds he got there in the door.

19      Q.    You really don't know that?

20      A.    We don't know.    It's possible it

21   could have been.    But the blunt instrument the

22   second time always produce spattering.    It

23   could have been either one.

24      Q.    Mr. McDonald, because neither one of

25   us know exactly what happened in that house,

1    just based on the fact that you see arterial

2    spurting and spattering, medium velocity

3    spattering in one room caused obviously by

4    Brad's injuries, isn't it true that that same

5    pattern could appear as a result of Brad's

6    injuries in another room?

7         A.   I think you lost me somewhere.  We saw

8    arterial -- which room are you starting in?

9         Q.   In Brad's room.  You just looked at

10   these pictures.

11        A.   Yeah, right.

12        Q.   As I understood, both the arterial

13   spurting and the spattering?

14        A.   We saw both of them in Brad's room.

15        Q.   I believe these are the two we were

16   looking at.  The doorframe inside and out.  Do

17   you see both arterial spurting and medium

18   velocity spattering in Brad's room?

19        A.   Apparently so, yes.

20        Q.   And the same is true from these two

21   photographs I showed you that are also shots

22   taken inside Brad's room?

23        A.   Right.

24        Q.   Let's keep these out.  Let me find the

25   slide.   While we are here, let me ask you about

1    this.    Just to jump ahead.    Am I blocking your

2    view?

3         A.    No, I can see it.

4         Q.    You mentioned, in response to Mr.

5    Stafford, that the blood smears on Charles' legs

6    would be consistent with maybe transferring from

7    the blood on his attacker's clothing; is that

8    what I understood you to say?

9         A.    That or the blood on the quilt or the

10   bed or anything.

11        Q.    Could have been from the sheets and

12   all the blood on the quilt?

13        A.    Obviously.

14        Q.    Or the sheets?

15        A.    Right.

16        Q.    Here's what I am looking for.    Now, if

17   I understood correctly, when you were answering

18   Mr. Stafford's question, you indicated that the

19   arterial spurting that you see on this slide

20   certainly is consistent with the injuries that

21   you saw on Brad; right?

22        A.    Right.

23        Q.    And at the same time you are telling

24   us you see some indication of medium velocity

25   spatter?

1    A.   Right.

2    Q.   Same kind of spattering, that medium

3  velocity spattering -- I don't mean identical

4  spots, but the same type of thing that is

5  apparent on the photographs in Brad's room?  Is

6  that correct?

7    A.   Sure.  Medium velocity spattering are

8  all the same in that respect, sure.

9    Q.   So, without blood typing, you really

10  can't distinguish who the medium velocity

11  spattering came from; is that correct?

12    A.   Obviously that is correct.

13    Q.   In this instance.  You can tell who

14  the arterial spurting came from because of the

15  injury?

16    A.   Right.

17    Q.   There was distinctive injury to Brad

18  that would have caused arterial spurting?

19    A.   That is correct, apparently, yeah.

20    Q.   But both young men were stabbed, and

21  Charles, in addition, beaten to the point where

22  both of them would have -- you would expect to

23  see medium velocity spattering as a result?

24    A.   Well, you would expect to see it

25  sooner or later, of course.

1    Q.    And, in fact, you did in these
2    pictures?
3    A.    You did see it later on Brad, sure.
4    Q.    Obviously, it is more ideal to go to
5    the scene and do your initial investigation
6    there; am I correct?
7    A.    Of course, that is correct.
8    Q.    But, certainly, obviously, from your
9    testimony today, that doesn't mean it's
10   impossible to reach a conclusion after the
11   fact?
12   A.    No, you can reach some conclusions
13   based on the photographs, but there are some
14   things you can't tell.  For example, you can't
15   make the measurements that I mentioned.  You
16   can't calculate the exact angles.  Obviously
17   you can tell some things from the photographs.
18   Q.    Right.  Now, Mr. McDonald, is it fair
19   to say that the field of blood spatter analysis
20   basically is just common sense refined?
21   A.    It's a little more than that.  Herb
22   McDonald, when he published his book back in the
23   early '70's, I think he kind of got everybody's
24   attention because he devised a way to actually
25   use the geometric measurements to calculate the

1    exact angle in which blood spatter hits a

2    surface.  Before, we were estimating.  We would

3    use things we had done in the laboratory.   We

4    used standard angles and from the shape of the

5    spot and the length, we would estimate the

6    angle.   Now we can actually calculate it to

7    exactly.   That is when it kind of got popular.

8         Q.   And certainly if you refine it to the

9    extent of being there to do calculations, very

10   precise one, a specialist in that field could

11   tell us even more, but in terms of the -- I

12   don't want to oversimplify -- but in terms of

13   basic pattern, is it the kind of thing, I mean,

14   people track animals, it's the kind of thing

15   that people have known for years, different

16   situations create a different pattern and

17   result, and you just assemble that information,

18   and based on experience and the repetition of

19   the time you see things, you get to the point

20   that you can make pretty good judgments on it.

21   Anybody can look at these pictures and see a

22   pool of blood and say there must have been a

23   fight here.

24         MR. STAFFORD:  I don't think that was

25   a question.  Testimonial statement from the

786

1    prosecutor.

2            THE COURT:   There was a question.   Can

3    you answer it, sir?

4        A.    I think a lot of things that are

5    scientific in nature are based on common sense.

6    And if you go back to the route, certainly,

7    obviously, as you see a pool of blood, you think

8    somebody bled.   There are things that are based

9    on obvious commonsense things.

10       Q.    And most anybody can come in and look

11   at those pictures and just can't be quite as

12   precise or understand the significance of some

13   of the different patterns like somebody who has

14   studied them can?

15       A.    I didn't quite understand all of that.

16       Q.    Well, I can understand why you

17   didn't.   It wasn't a very well-worded

18   question.   And I apologize.   Basically I guess

19   what I am saying is anybody with good common

20   sense can look at a scene or pictures like this

21   and get a sense of where different aspects of a

22   confrontation took place; is that correct?

23       A.    I wouldn't say that is totally

24   incorrect, but it helps also if you have a

25   little training so you understand more about

787

1    what these things mean.

2         Q.   Somebody with more training and more

3    experience who has seen them repeatedly is

4    obviously going to be able to give us additional

5    helpful information about that?

6         A.   I would say so, right.

7         Q.   So, we will be able to recognize the

8    difference between what is just blood that

9    drips, why one looks different than your

10   arterial spurting, for example, pretty

11   distinctive kind of a pattern?

12        A.   I guess that is the sort of thing.

13        Q.   And easily recognizable; is that

14   correct?

15        A.   And what?

16        Q.   Is that easily recognizable, that kind

17   of thing, the arterial spurting?

18        A.   Distinguish between those two

19   patterns?

20        Q.   Yes?

21        A.   Sure, it is.

22        Q.   Mr. McDonald, are you enjoying your

23   retirement, or are you still working?

24        A.   Pretty much, yeah.

25        Q.   I think we met before probably ten

1    years ago right before you left the office.
2    Before you left HPD, I should say.  At that
3    time, what was your main area that you were
4    working in?  Were you in the serology lab?
5         A.    Before I left, I was director of the
6    whole laboratory, so all the areas were under my
7    supervision.  I guess I had some training in
8    everything.
9         Q.    Okay.  Were you still making the
10   scenes at that time?
11        A.    Oh, not very often.   I usually would
12   send somebody else.  I have made -- I guess I
13   have made enough thousands of scenes that I was
14   having other people make most of them.
15        Q.    And at this time are you totally
16   retired, or are you just in private practice?
17        A.    Well, I still sort of work with the
18   Pasadena Police Department.
19             MS. DAVIES:  I pass the witness.
20             MR. STAFFORD:  I have no other
21   questions.
22             THE COURT:  You may stand down.   Any
23   objection to this witness being excused?
24             Mr. Stafford, call your next.
25             MR. STAFFORD:  We respectfully rest.

1      THE COURT:  What says the State?

2      MS. DAVIES:  The State calls David

3  Sanders.

4      MR. STAFFORD:  May we approach on

5  that, judge?

6      (The following proceedings were had at

7  the bench:)

8      MR. STAFFORD:  I ask for the State to

9  state on the record why she is calling David

10  Sanders back.  She has already passed him.  I

11  didn't ask him any questions.  And this witness

12  definitely didn't raise a fact question that

13  would warrant, under the rules of evidence or

14  the Code of Criminal Procedure, to rebut.

15      MS. DAVIES:  Cross of Sergeant Kennedy

16  certainly did.

17      MR. STAFFORD:  That was the State's

18  witness, Judge.  She had the right to clarify

19  whatever she wanted to with redirect.  Under the

20  rules of evidence and rules of procedure, it's

21  improper.

22      THE COURT:  She is allowed to call him

23  to rebut.

24      MR. STAFFORD:  I object to the next

25  witness being called as being a violation of the

790

1      rules.    It's improper rebuttal.

2                    THE COURT:    The objection is

3      overruled.

4                    (Before the jury)

5

6                         DAVID SANDERS

7      was recalled as a witness by the State and,

8      having been duly sworn, testified as follows:

9                    REDIRECT EXAMINATION

10     BY MS. DAVIES:

11          Q.    For the record, are you the same David

12     Sanders who testified on Monday?

13          A.    Yes, ma'am, I am.

14                    MR. STAFFORD:    May we approach one

15     more time?    No, never mind.

16     BY MS. DAVIES:

17          Q.    Mr. Sanders, I want to ask you a few

18     questions about the lighting on the house that

19     you constructed at 624 Keith Street for Charles

20     Allen.    Can you tell us what kind of exterior

21     lighting was installed there?

22          A.    On the front of the house -- do you

23     have the pictures?

24          Q.    Yes.    Do you remember the number?

25          A.    Eight, seven.

1       Q.   I assure you they are not in order,
2   but I will try to find them.
3       A.   On State's Exhibit 5 -- the elevation
4   of this house was a French elevation, and
5   Charles wanted to really accent --
6           MR. STAFFORD:  This is not being
7   responsive.
8           THE COURT:  Sustained.
9       A.   So he put two lights on the front.
10          THE COURT:  Let her ask another
11  question.
12      Q.   Tell me about the exterior lighting.
13  What exterior lighting did you put on the house?
14      A.   There's two outside French fixtures on
15  the columns to the entrance.  There is a soffit
16  fixture or a hanging fixture on the soffit right
17  above the front door.  They are on in these
18  pictures, and they were on that night.
19      Q.   Is there any street light on Keith
20  Street anywhere near 624 Keith?
21      A.   Yes, ma'am, I believe within
22  approximately fifty feet of Mr. Allen's
23  residence there is an overhead street light.
24      Q.   Is it on the same side of the street
25  as 624 Keith or across the street?

792

1      A.    It's across the street on the other
2  side.
3      Q.    Is the street lighting bright out
4  there in your neighborhood?
5      A.    No, ma'am, it is not.
6      Q.    So, you have got the exterior lights
7  that you have just described on the front of the
8  house on State's Exhibit 5.  And then what kind
9  of lighting did you install in the back of the house?
10     A.    On the house itself, there is an
11  outside light at the back door to the utility
12  room.  There's two soffit lights at the entry to
13  the master bedroom.  And that would be right up
14  under here.
15     Q.    You are pointing to the back of the
16  house underneath the chimney as we see it?
17     A.    Yes.
18     Q.    When you say soffit light, what does
19  that mean?
20     A.    The eaves, overhang, the area
21  underneath.
22     Q.    So they are not visible from this
23  picture, but the lights are installed outside
24  under that eave?
25     A.    Yes, ma'am.

793

1    Q.   And we are referring to State's

2    Exhibit 7; is that correct?

3    A.   Correct.

4    Q.   Okay.  What other lighting is in the

5    back?

6    A.   There is a light that Charles had

7    specifically installed at the corner of the

8    studio to light the whole area, the whole back

9    yard.  This wasn't something that was on the

10   plans, but the lights that were out there didn't

11   put out enough, and he wanted, for security

12   purposes, he wanted a hallogen spotlight.  And

13   it's right here.  It's a twelve-foot building

14   there, so that light sits up and shows down on

15   the whole backyard.

16   Q.   On the top of the recording studio?

17   A.   Yes, ma'am.

18   Q.   Is that shown in State's Exhibit 7?

19   A.   Yes.

20   Q.   I notice there is another light next

21   to the door on the recording studio.  Was that

22   also?

23   A.   That's more cosmetic.  It put out

24   light, but it's like the wattage of a house

25   light.  The hallogen up above put out I think

1    three hundred watts is what it's rated at.

2        Q.    Now, it looks like there is also a

3    light over here by the what I would call the

4    utility room door?

5        A.    Yes, ma'am.

6        Q.    On State's 7?

7        A.    So there is five lights visible there.

8        Q.    Now, well, I see three visible.  Where

9    do you see the other two?

10        A.    The other two I guess aren't visible.

11    They are underneath the soffit area next to the

12    chimney.

13        Q.    The three that are the visible, the

14    hallogen light and the carriage lamps, one by

15    the recording study and one by the utility door,

16    they don't appear to be on on in this picture.

17        A.    No, ma'am.

18        Q.    What about the soffit lights?  From

19    this photograph, can you tell whether they are

20    on or not?

21        A.    I can't tell, and I don't think they

22    are.

23        Q.    Do you live right next door?

24        A.    Yes, ma'am.

25        Q.    And I think you had told us on Monday

1    you were having to cut across the backyard

2    rather than go to the street?

3         A.    Correct.   This is what.

4              MR. STAFFORD:   Excuse me.   That would

5    call for free narrative.   Ask for question and

6    answer.

7              THE COURT:   Sustained.

8    BY MS. DAVIES:

9         Q.    Do you recall, when you left Charles

10   and Brad's home on Thursday, the twelfth, after

11   the football game, do you recall what route you

12   took to get back to your house?

13        A.    Out the utility room door, there is a

14   fence in between our two properties with a place

15   cut out and a board across it that we would go

16   between the two properties with.

17        Q.    And what lighting did you rely on to

18   see from Charles' house to your house?

19        A.    Once we installed this halogen light

20   at the twelve foot -- elevation of twelve foot,

21   you really didn't need any other lighting.   That

22   one light lit up the whole area.   It lit up my

23   house as well.

24        Q.    Do you recall, when you left Charles'

25   that Thursday night after the football game,

1    whether that light was on at that time?

2         A.   Yes, ma'am, it was.   It was

3    approximately eleven o'clock.

4         Q.   From your house -- you said it lights

5    up your house -- where is your bedroom in your

6    home in relation to the Charles Allen home?

7         A.   You can look out my window and see

8    this view right here.   I mean, it's on the side

9    of the house that faces Mr. Allen's house.

10        Q.   During the couple of weeks that

11   Charles and Brad had lived in that house, were

12   you aware of whether or not that hallogen light

13   ordinarily stayed on during the night hours?

14        A.   Yes, ma'am, ordinarily it did.   And it

15   lit up my house.

16        Q.   Wouldn't that interfere -- would that

17   make your bedroom light?

18        A.   Yeah, we had to close the blinds in

19   the downstairs kitchen area.   You know, it lit

20   up the kitchen at night, so we would keep those

21   drapes closed also.

22        Q.   Would that hallogen light ordinarily

23   stay on all night, if you know?

24        A.   It was his practice to leave it on all

25   night.   After I went to bed, I don't know, he

1   might have cut if off, but I doubt it.

2      Q.   When you went to bed on the night of

3   Thursday, the twelfth, 1991, as far as you

4   remember, was that light on?

5      A.   When I went to bed, I am not sure if

6   it was on or not.   When I left his residence at

7   eleven o'clock, it was on.

8      Q.   Based on your years of association and

9   certainly in the period of time that you were

10   living close to Charles and Brad Allen, did you

11   know them to have any guns in their house?

12      A.   No, ma'am.

13      Q.   Were they hunters and keep guns

14   around?

15      A.   No.

16      MR. STAFFORD:   Your Honor, this is

17   improper rebuttal.

18      THE COURT:   Overruled.

19   BY MS. DAVIES:

20      Q.   During the years of your friendship

21   with Charles, did you ever know him to step

22   outside the house in his underwear for any

23   reason?

24      MR. STAFFORD:   Same objection.   It's

25   irrelevant.

1          THE COURT:  Sustained.    Repetitious,

2    I believe.

3          MS. DAVIES:  I don't believe.

4          THE COURT:  Do you want to approach

5    the bench?

6          THE WITNESS:  I have never been asked

7    that.

8          MR. STAFFORD:  Objection under 403.

9    It's cumulative evidence, already been

10   introduced.   Improper rebuttal testimony.

11         THE COURT:  Objection is overruled.

12   BY MS. DAVIES:

13     Q.   Mr. Sanders, during the years you knew

14   Charles Allen, in and out of his house, living

15   next door to him, did you ever see him on any

16   occasion step outside his house in his underwear?

17     A.   No, ma'am.  I didn't see him inside

18   his house in his underwear.

19     Q.   Was Charles a person who would walk

20   around in his underwear?

21         MR. STAFFORD:  Objection to relevancy.

22         THE COURT:  I haven't heard it yet.

23   BY MS. DAVIES:

24     Q.   Based on your years of association, is

25   he an individual who would walk around the house

                                                   799

1    in his underwear?

2         A.    Absolutely not.

3               MS. DAVIES:   Pass the witness

4                    CROSS EXAMINATION

5    BY MR. STAFFORD:

6         Q.    How many years have you known him to

7    live by himself?  All the time you have known

8    him, he either lived with his mother and father

9    or his wife?

10        A.    That is not correct.

11        Q.    How many years did he actually live by

12   himself?

13        A.    Probably five.

14        Q.    Did he live by himself totally alone

15   for five years, no roommate, no female, not

16   living with his parents?

17        A.    Never any females.  He lived by

18   himself off Bay Area Boulevard I would say for

19   two years by himself.  He lived--

20        Q.    Let me stop you there.  You were not

21   down there with him every day on the two year

22   period?

23        A.    No.

24        Q.    You don't know how he walked around in

25   his house while he was there by himself; do you?

1          A.    No, sir, I don't.

2          Q.    Could you tell the jury approximately

3    how many feet there is between your house and

4    Charles' house?

5          A.    Approximately a hundred feet.

6                MR. STAFFORD:   No further questions.

7                THE COURT:   Anything else?

8                MS. DAVIES:   No.

9                THE COURT:   You may stand down.

10               MS. DAVIES:   The State rests.

11               THE COURT:   Mr. Stafford, do you close

12   also?

13               MR. STAFFORD:   Yes, sir.

14               THE COURT:   Both sides close.   Ladies

15   and gentlemen, if you would, go to the jury

16   room, we have some matters to take up outside

17   your presence.

18               (Recess; after which, the jury enters

19   the courtroom)

20               THE COURT:   We are going to take a

21   recess right now for those of you to go to your

22   vehicles who have vehicles here, those first

23   twelve, and retrieve whatever you might have

24   brought in with you in the way of change of

25   clothes or a toothbrush or whatever that was.

                                                      801

1    I am going to send the bailiff down to the first

2    floor to ride the elevator with you.  Go

3    directly to your vehicle, and he will wait out

4    front.   You will meet out front and come back

5    in in one elevator and deposit those belongings

6    in a room we have designated in the back.   Any

7    questions?

8              For Mr. Sheehan and Mr. Whitten, I am

9    not releasing you yet, but you do not need to

10   retrieve anything from your vehicles.

11             (The jury is removed from the

12   courtroom)

13             THE COURT:   All right.   In cause

14   number 612408, State of Texas vs.  Rick Allan

15   Rhoades.  Y'all have a proposed charge in front

16   of you.  The only differences in what you have

17    -- and I have spoken to all parties about this

18    -- is the words "if any" added following the

19   word relationship in line three of the first

20   full paragraph on page four, and line nine on

21   page five the word "at" should be an "as".  I'm

22   correcting that on the original to be given to

23   the jury in pen.

24             Any objection to my doing that, Mr.

25   Stafford?

802

1          MR. STAFFORD:  No.

2          THE COURT:  Ms. Davies?

3          MS. DAVIES:  No.

4          THE COURT:  Additionally, do you have

5    any objections to the charge, Mr. Stafford?

6          MR. STAFFORD:  Yes, Your Honor.  My

7    first objection is due to the fact that in my

8    opinion the court allowed in certain background

9    and victim impact information on the deceased.

10   I felt like was introduced in violation of the

11   Rules of Criminal Procedure, Code of Criminal

12   Procedure and the state constitution.  As a

13   result thereof, I would ask the court to give

14   this jury a limited instruction that that

15   evidence can not be used by them for any purpose

16   in determining guilt and innocence of my

17   client.  I am not suggesting at this particular

18   time what kind of wording the court should use.

19   I will resort and rely on the court's own

20   wisdom, but I would request the court, and more

21   specifically object to the Court's Charge for

22   failure to include a victim impact or background

23   charge.

24          My second objection to the jury charge

25   is for the charge's failure to include threats

1   made to Mr. Rhoades by Mr. Allen, Charles

2   Allen.  I think the statement, the only evidence

3   that is before the court, before this jury is

4   that Mr. Allen and my client were having

5   difficulties in the middle of the road and based

6   upon the conversations that they had led my

7   client to believe that Mr. Allen was going in

8   after a gun.  According to Detective Kennedy's

9   statement is the way I interpret it, and I think

10  the way the jury interprets it is the door was

11  left open, and the only logical deduction is

12  that the defendant went inside to seek an

13  explanation or an amicable adjustment of the

14  problems that he and Mr. Allen were having.  And

15  I think the court should charge -- or I object

16  to the charge for failure to charge the jury on

17  threats made to the defendant.  And I think that

18  charge would be given even -- and that charge

19  would be independent of the fact that the court

20  has already charged on self-defense.  Would also

21  ask for a charge on the right to seek an

22  explanation and the right to seek an amicable

23  adjustment between the two parties.  We object

24  to the Court's Charge for failure to include

25  these requested items.

804

1          THE COURT:   Objection is overruled.

2          MR. STAFFORD:   We also ask the court

3     to include a charge, or we object to the charge

4     for failure to identify a criminal transaction

5     because, without a definition of that, the jury

6     will not have -- criminal transaction is not a

7     common, everyday usage term.   The jury does not

8     know what a criminal transaction is because they

9     are lay people and not skilled in the law.   We

10    would ask the court to identify the term

11    criminal transaction that it uses throughout the

12    charging portions of the jury charge.

13          MS. DAVIES:   There is no statutory

14    definiton of criminal transaction.   It would be

15    improper for the court to give one.

16          THE COURT:   I am not going to define

17    criminal transaction in the charge.

18          MR. STAFFORD:   That request is

19    overruled?

20          THE COURT:   It's overruled.

21          MR. STAFFORD:   We also object to page

22    number ten, judge, on the issue of voluntary

23    intoxication.

24          THE COURT:   You are objecting to

25    inclusion of what is on page ten of this

805

1  proposed charge?

2          MR. STAFFORD:  Yes, as not being

3  supported by the evidence.   It's only there to

4  inflame the minds of the jury.   That would lead

5  them to believe that the reason our client

6  committed the offense, if he did commit the

7  offense, was because he was drunk.   Unnecessary

8  comment on the weight of the evidence.

9          THE COURT:  I don't see page ten as

10  being a comment on the weight of the evidence.

11          MS. DAVIES:  I certainly don't

12  either.  The evidence in the defendant's

13  statement he says he had had ten beers.  And one

14  of the issues is certainly intent.  I think it's

15  an appropriate instruction and one that the

16  statute provides for.

17          MR. STAFFORD:  He also says, Your

18  Honor, I wasn't drunk.

19          THE COURT:  Also, on page four, there

20  is another insertion of the words "if any" three

21  lines from the bottom of the page after the word

22   "force."  Any objection?

23          MR. STAFFORD:  No, Your Honor.

24          MS. DAVIES:  No objection.

25          MR. STAFFORD:  I assume the court

806

1     overrules my objection to page ten?

2                 THE COURT:  Yes.

3                 MR. STAFFORD:  Other than that, I

4     think it's peachy.

5                 (Jury in)

6                 THE COURT:  Ladies and gentlemen, both

7     sides having rested and closed, I am now going

8     to charge you in the case of the State of Texas

9     vs. Rick Allen Rhoades.

10                (Charge read)

11                THE COURT:  At this time, under

12    article 36.29 (d) of the Code of Criminal

13    Procedure, the charge of the court having been

14    read to the jury, Mr. Joseph E. Sheehan and Mr.

15    Larry W. Whitten are discharged.

16                Y'all may wait in the courtroom.  You

17    may listen to this.  You may go home.  You are

18    totally discharged.  If you would like to sit

19    there, that is all right, too.  What's your

20    pleasure?

21                THE JURORS:  Sit here.

22                THE COURT:  Ms. Davies.

23                MS. DAVIES:  Thank you.

24

25

807

1          OPENING ARGUMENT OF THE STATE

2  BY MS. DAVIES:

3          I know you all already knew the wheels

4  of justice turn slowly, but I doubt if you

5  realized how long they could grind on some

6  days.  This is one of them.  Hang in here with

7  us.  It's important.

8          I am going to use a little bit of my

9  time right now to talk about the charge that the

10  judge just read to you.  I want to walk through

11  it with you and talk about some of the legal

12  issues, then I am going to sit down, and Mr.

13  Stafford and Ms. Kaiser will get to present

14  their argument.  I am going to save most of my

15  time, especially in terms of talking about the

16  evidence, for the conclusion.  But this is a

17  lengthy charge, and what I want to do is try to

18  cut through some of it.  I know certainly all of

19  you and all of you collectively could struggle

20  with it, get back there and spend an lawful lot

21  of time reading through it, but I think, if we

22  walk through it and kind of put it in

23  perspective, it will make it simplier for you.

24  Basically, as you go through that charge, the

25  judge is telling you there are some lesser

1    includeds in there.  Remember the first day --

2    some of you, it has been months ago -- when you

3    came down for jury duty that first day, we

4    talked about the possibility of lesser included

5    offenses.  That is the kind of charge we have

6    got.  And if you follow the instructions the

7    judge has given you in the sequence they are

8    given, it tells you where to start.  I will go

9    over it page by page.  There are a lot of

10   definitions; but in terms of deliberating on

11   your actual verdict, it tells you, you start

12   with capital murder.  You first consider whether

13   or not this defendant is guilty of the

14   intentional killing of both Brad and Charles.

15   You also will consider whether he was justified

16   in killing either one of them under the concept

17   of self-defense.  Okay?  Now, if you reject

18   self-defense at that point and if you reach the

19   unanimous verdict that, yes, he is guilty of the

20   capital murder of those two young men, it's

21   guilty of capital murder and you are through,

22   you do not go through the other steps of

23   considering all those lesser included

24   offenses.  It is only if, after you consider

25   capital murder, you are not convinced that it is

1    capital murder or if for some reason you decide
2    self-defense applies to either or both of the
3    young men, then the next step -- I have got them
4    numbered -- the next step in the sequence is you
5    consider:  Okay, you have decided it's not
6    capital murder, look at the next crime.   The
7    next one you look at is was this just murder of
8    Brad, intentionally or knowingly killing Brad by
9    stabbing him.   And then it says:  All right, if
10   you are convinced it's murder, now consider
11   again was it self-defense, was it a justified
12   murder under the concept of self-defense.  And
13   if you conclude that it was, I mean, you could
14   decide either way.  You could decide it's
15   murder, guilty of murder, or it was self-defense,
16   not guilty.  Regardless of your decision, if you
17   get that far, then you would go to the third.
18   Now you are going to look at Charles, killing of
19   Charles, and consider was it an intentional
20   murder of Charles and then was it self-defense,
21   was it justified.   It's only if you have
22   rejected murder because of self-defense or
23   whatever, only then would you get down to the
24   last choice, number four, of voluntary
25   manslaughter.   And remember voluntary

810

1   manslaughter is the offense -- and I am going to

2   read from these definition a little more -- that

3   is where you are acting under sudden passion

4   from an adequate cause.   Second degree

5   murder.   Actually I wrote self-defense here.

6   Self-defense doesn't even apply because if you

7   get down to voluntary manslaughter you have

8   rejected self-defense at the murder level.

9           I don't think your deliberations are

10   going to be as difficult in terms of going

11   through each of the steps.   The evidence is

12   overwhelming in this case, ladies and gentlemen,

13   that this defendant is guilty of capital

14   murder.   Capital murder alone.   And that is

15   where your verdict will be.   That is where you

16   will stop in going through this process.   In

17   fact, the evidence is so overwhelming, I have to

18   say some of you probably wondered, you know,

19   hey, we got this confession, we know he did it,

20   it's there.   I mean, why did we have to sit

21   here for another whole day and we listened to

22   DNA evidence.   You know, I am a little

23   compulsive, I guess, about trying to dot every I

24   and cross every T, but I can't be too careful.

25   If there was any chance that any one person had

811

1    ever read or heard of a story of some screwball
2    confessing to a crime that he didn't commit
3    because he read about it in the newspaper --
4    this is capital murder -- I don't want anybody
5    back there worrying about that.   You don't have
6    any concern in this case over whether you have
7    got the right man.   You know who killed Charles
8    and Brad Allen.   It's this defendant.   So now
9    what you do is look at the law and apply the
10   evidence that you have to the legal concepts
11   that the judge has given you.

12          The first page of this charge is all
13   definitions.   It defines capital murder, murder,
14   voluntary manslaughter.   Let's talk about
15   voluntary manslaughter for a minute.   I will
16   tell you it's very tempting to just disregard
17   those.   It seems so absurd that anyone would
18   seriously argue that this would be voluntary
19   manslaughter as to Charles, but I can't take a
20   chance, I am too cautious, I am not a risk
21   taker, I have to talk about it.   This charge
22   from the judge tells you what voluntary
23   manslaughter means.   It means that you
24   intentionally or knowingly killed Charles is
25   what it applies to.   And you do it, or this

1  defendant did it, is how you would have to

2  decide under the immediate influence of sudden

3  passion arising from an adequate cause.

4  Adequate cause is defined.  Adequate cause is a

5  cause that would commonly produce a degree of

6  anger, rage, resentment or terror in a person of

7  ordinary temper, not a hothead ex-con, a person

8  of ordinary temper, sufficient to render the

9  mind incapable of cool reflection.

10      Now, the reason that lesser included

11  charge is included by the judge is simply

12  because of the things that this defendant says

13  in his statement.   It doesn't make any

14  difference whether they are true or not.  You

15  are going to see, as these arguments progress,

16  you already know, I know, from the questioning,

17  Mr. Stafford and I are going to disagree

18  strenuously over whether everything that is in

19  that statement is true, and especially about

20  that original confrontation in the street, or in

21  front of the house.   But the fact that the

22  defendant said that in his statement is the

23  reason this is in the charge.  You do not, I

24  mean, first off, let's assume, let's give him

25  every benefit of the doubt.  Worst case scenario

from my point of view you believe every word he
says in that statement.  And if you believe
every word he says, if you believe that Charles
Allen stood with crossed arms and stared at this
defendant -- and, please, folks, ask for the
statement -- if you believe that that is what
Charles Allen did, and that in Houston, Texas,
in 1991 or 1992, that is an adequate cause, that
is the kind of thing that a person of ordinary
temper would commonly become so enraged over
that it would justify or downgrade their actions
as being an adequate cause to respond by
following the man into his home and butchering
him, we are in big trouble, if that is the way
you believe.  And I don't believe any of us here
would accept that concept even if you believe
his statement word for word.  Voluntary
manslaughter is not there.   You are not going
to even get there.

Let's keep on going through this
statement.  I mean, this charge.  There are more
definitions.   Describes intentionally,
knowingly.   And at the bottom of the second
page begins the paragraph that we call the
charging paragraph.   Very important

814

1    paragraph.   This is the charging paragraph on
2    capital murder.   Tells you that if you find, if
3    you are convinced by the evidence -- and I
4    believe you will be, that is what the evidence
5    shows, that this defendant intentionally killed
6    Charles by stabbing him with a knife or, either
7    one, or by hitting him in the head with a bar,
8    doesn't make any difference which one, and you
9    also believe that in the same criminal
10   transaction he killed Bradley by stabbing him
11   with a knife, he is guilty of capital murder.
12          Then the charge tells you, okay, and
13   if you think that it's capital murder, now
14   consider self-defense.   And it defines for about
15   six paragraphs here what is self-defense.
16   Ladies and gentlemen, keep this in mind, please,
17   first off, the use of force against another is
18   not justified in response to verbal provocation
19   alone.   Now, where this whole thing -- and,
20   again, for the moment, I am going to assume for
21   the worst case scenario you believe every word
22   of that statement that this defendant gave --
23   this whole thing is just verbal provocation.
24   There is not any suggestion in any of this that
25   Charles Allen did anything more than fold his

1    arms and maybe tell him to get his ass on down
2    the road when he is loitering around at 2:30 in
3    the morning.  Verbal provocation alone certainly
4    does not justify using deadly force.  Beyond
5    that, though, for a person to be justified in
6    using deadly force against another, this
7    defendant would have to be able to show, or the
8    evidence would have to show, I should say, that
9    this defendant first used the degree of force
10   necessary.  I mean, talk about degree of force
11   necessary, when you remember that blood bath
12   that was there.   He has to show that he was
13   responding to unlawful force.  Now, again, worst
14   case scenario -- believe his story.  Even if
15   Charles Allen reached for a knife to protect
16   himself or Brad used his fist or anything, my
17   God, if they had a gun and reached for it they
18   still would have be acting lawfully.  They
19   would have been within their rights.   And it's
20   only if he is responding first to unlawful
21   force.  It's not there.  Charles and Brad Allen
22   are in their home acting lawfully, no matter
23   what force they used to protect themselves from
24   this intruder.  Not only would he have to show
25   that they were using unlawful force, the

816

1    evidence would have to show that he used only

2    the degree of force that was immediately

3    necessary and that a reasonable person in his

4    circumstances wouldn't have retreated.  Wouldn't

5    have retreated?  We are talking about somebody

6    who, if you are to believe his version, somebody

7    gives him the bad eye from their home at 2:30 in

8    the morning, he is in the street, all he has to

9    do is keep on walking.  A reasonable person

10   would retreat.  Even if by impulse they went to

11   the door and they see somebody in there, a

12   reasonable person would and could retreat

13   through that open door.  Self-defense -- he

14   cannot show you that any aspect of this evidence

15   shows self-defense, that this killing is

16   justified under the concept of self-defense.  It

17   is not there.  So you can eliminate self-defense.

18          So, as you go through those, that is

19   one step.  It's gone, folks.  You know, if we

20   can not protect ourselves in our own home from

21   somebody like Rick Rhoades, we are in big

22   trouble, we are in worse trouble than any of us

23   ever dreamed.

24          And when you read that definition of

25   self-defense, I hope you will notice.   I meant

817

1   to count how many times it reads, uses the word

2   reasonable, because every definition, every

3   aspect of it talks about reasonableness.  And

4   it's true, it's repetitious, and it says

5   repeatedly you look at the circumstances from

6   the position of the defendant; however, when you

7   read those definitions, it doesn't mean, again,

8   that you embrace the view of a hot-headed

9   convict, ex-con.  There is a definition on page

10  three about in the middle of the page that is

11  very important in that regard.  It defines

12  reasonable belief.  It's meant a belief that

13  would be held by an ordinary and prudent person

14  in the same circumstances as the defendant.

15  It's true, you evaluate all of this from the

16  point of view, from the position the defendant

17  is in, but you view it as an ordinary and

18  prudent person would.  Reasonableness is the key.

19  I think you will all agree that as we went

20  through that evidence we didn't see any

21  reasonable conduct on the part of this defendant

22  from the minute this thing got started until the

23  end.  We saw nothing but savagery.

24          It goes through, as I said, all the

25  permutations, starting with capital murder and

818

1    was it self-defense and then the lesser

2    includeds.  When you get to the end and the

3    verdict page, there is every variation.  The

4    second one is the one you want.  The second one

5    is where:  We, the jury, find the defendant,

6    Rick Allan Rhoades, guilty of capital murder as

7    charged in the indictment.  That is the one

8    that applies here, and that is the one I believe

9    you will use.

10            You know, the evidence is so clear, as

11   I have already said.  You know not only from his

12   statement but from the DNA testing we have got

13   the right man.  By the way, DNA testing makes

14   me think, as far as the possibility of

15   pinpointing where Charles' blood is and where

16   Brad's blood is in the house, I want you to

17   remember you heard from Holly Hammond from the

18   DNA lab, remember we had a blood sample from

19   Charles, and it was so degraded because of the

20   circumstances of his death that they couldn't do

21   DNA testing on Charles.  And you will also

22   remember when Doctor Espinola testified he told

23   you Brad's blood had hemolyzed, and, so, they

24   couldn't do a blood sample and even typing.

25   That is why we had to use those medical

1    records.  Both young men had type O blood.  So

2    blood typing and DNA testing won't separate it

3    out.  That is why the blood spatter is the only

4    way, by differentiating from the type of wound,

5    that we can try to sort out the scene and shed

6    some light on what really happened in that house

7    that night.  We will talk some more about that

8    later.  But as far as the things I have to

9    prove to prove capital murder to you, identity

10   is no issue.  You know who did it.  It's Rick

11   Rhoades.  You know it was in Harris County,

12   Texas.  It was on September 13, 1991.  You

13   know, my God, it's the same criminal

14   transaction.  It was all, I mean, the two young

15   men were seen alive at the same time, at eleven

16   o'clock.  They are found together the next

17   morning.  It's a blood trail that doesn't stop

18   from one young man to the other.  And his

19   statement tells you he did it all at the same

20   time.  You know how it was done.  He does tell

21   you, admits he stabbed and beat Charles, he

22   stabbed Brad, the weapons are there, the wounds

23   are there.  There is no question about who got

24   killed and how.  Basically there is no real

25   issue here.  If there is one at all, it's

820

1   intent.   You know, I guess Mr. Stafford will

2   get up here and say he didn't mean to kill

3   them.   Well, remember we talked about this, too,

4   intent can be formed very quickly.   When you

5   talk about whether one intentionally killed, it

6   doesn't mean he had to enter that house with the

7   intent to kill.   In fact, I mean, why he went

8   into the house?   Why he killed those two young

9   men?   I know we would all love to know.   Ask

10   Mr. Stafford to tell you why he would do a thing

11   like that.   Why.   An answer that makes some

12   sense because the one he gave in that statement

13   certainly doesn't.   But as far as intent goes,

14   at some point, for whatever reason, he went in,

15   and I think -- and I am going to go into it in

16   more detail -- I think the evidence supports the

17   conclusion he went into that house to burglarize

18   is what he did.

19         MR. STAFFORD:   I object, Your Honor.

20   That is not supported by the record, not

21   supported by anything that has been introduced

22   in the case other than the fantasy of the

23   prosecutor.   I object to that.

24         MS. DAVIES:   It is a reasonable

25   deduction from the evidence.

821

1           MR. STAFFORD:  I ask the court to

2   rule.

3           THE COURT:  Overruled.  And could be

4   a reasonable deduction from the evidence.

5           MR. STAFFORD:  Thank you.

6           MS. DAVIES:  You don't have to decide

7   what he intended to do when he went into the

8   house.  The only thing you have to decide is

9   that at some point, whether he decided before he

10   went in or after he got in there, he intended to

11   kill.  And when you look at the circumstances

12   of the slaughter, he uses multiple weapons,

13   multiple blows -- and we are going to go into

14   that in more detail on the evidence, too --

15   there is no question he intended to kill.  And

16   that is why it's capital murder because he

17   killed both Brad and Charles.  A reasonable

18   deduction that he went into that house to steal,

19   to burglarize.  You have an ex-con who had been

20   on the street less than twenty-four hours.  And

21   whatever happened that at some point he decided

22   it was necessary to kill, ladies and gentlemen,

23   this is not a man who was looking to go back to

24   the pen that soon.  He was going to do whatever

25   it took to get out of that house without getting

1    caught.   And if it meant butchering Charles and

2    then Brad in turn, that is what he would do.

3    He did it.

4             Please remember that the truthfulness

5    of anybody, any witness, any evidence is your

6    decision.   That statement, we will both be

7    talking a lot about it, we are going to disagree

8    about it, you are the ones who will decide.

9    Remember you can believe all or part of that

10   statement just like you can believe all or part

11   of anything any witness tells you when they come

12   in here.   That statement I want you to keep in

13   mind, please, as you listen to Mr. Stafford's

14   argument and to mine, that statement came from

15   an ex-con multiple times, he tells you in there

16   been to the pen four times, twice in Indiana,

17   twice in Texas.   An accomplished liar who has

18   managed to go to the pen under different names

19   and pull that off.   The statement came from a

20   man who, even when he is admitting that he

21   committed a capital murder, a double homicide,

22   he is going to rationalize just like anybody

23   else. It's human nature.   We all know that.

24   Even when you admit something bad that you have

25   done or something that you don't want to have to

823

1    admit, most folks try to put themselves in the
2    best light they possibly can.   He had a full
3    month to think about that statement before he
4    gave it, from September 13th to October 11th.
5    This isn't that he got caught running out of the
6    house and immediately had to come up with a
7    statement; he had been thinking for a month
8    about how, I mean, he knew what he had done,
9    what kind of justification can he come up with?
10   He didn't do a very good job, frankly.   I don't
11   know who could.   That is why we would like to
12   know why.   I hope we will find out.
13               THE COURT:  Mr. Stafford.   Ms.
14   Kaiser.
15
16
17
18
19
20
21
22
23
24
25

824

OPENING ARGUMENT OF THE DEFENSE

BY MS. KAISER:

May it please the court.

Ladies and gentlemen of the jury.

Mr. and Mrs. Rhoades.

The Allen family.

Ms. Davies.

On October 11th, 1991, Rick Rhoades made a big decision, a decision that would alter the course of his life.   That decision came at a time about two in the morning when he came face to face through the window of a door of an elementary school out in Pasadena, Texas, with Sergeant Lopez from the Pasadena Police Department.   There is Rick inside with his little blue bag with a VCR.   Sergeant Lopez catches him in the act.   I don't think either one of them expected to see each other.   And he immediately hooks it around the building and orders him to come out.   Rick could have taken the course that he had taken in the past in his life on several different occasions, set down that little bag, turned 180 degrees, taken it on down the hall and out another exit.   Y'all saw Sergeant Lopez.   He didn't look in the best of

1    physical conditions.   He was a little bit
2    rotund.   I don't think we have any difficulty
3    thinking that Rick might be able to outrun him
4    and get away from the situation.   But, instead,
5    Rick sat there for a moment, walked outside that
6    door, laid face down on the ground and thought I
7    can't live like this anymore.   I can't run
8    anymore.
9              MS. DAVIES:   Your Honor, I object to
10   arguing outside the record.
11             THE COURT:   Stay in the record, please.
12             MS. KAISER:   My recollection of Rick's
13   statement to Sergeant Kennedy later is that that
14   was the reason that he turned himself in.   He
15   was taken into custody, and within ten hours is
16   asking the Pasadena police to get in touch with
17   the Houston Police that are in charge of the
18   murder of some brothers in Houston.   He wants to
19   talk to them, has some information.   According
20   to their own admission, the Houston detectives
21   had absolutely no leads on the case.   One month
22   after, and they did a lot of investigation.
23   They put a lot of foot work into the case, as
24   Sergeant Kennedy testified.   They were
25   nowhere.   They go out and talk to Rick.   He is

826

1   talking so fast they have to stop him so they
2   can read him his rights.  He says I can't live
3   like this anymore.   I got to get something off
4   my chest.   I thought about killing myself.    I
5   just can't do it anymore.  Here it is.    And he
6   proceeds to talk with them for about half an
7   hour and then reduced that statement to
8   writing.  Didn't ask for a lawyer, although he
9   certainly knew he was entitled to one.    He had
10  been through this situation before.   There was
11  absolutely no reason for Rick Rhoades to lie in
12  this statement.  He wasn't caught running out of
13  the door of the Allen house.  That, of course,
14  would be some type of situation where you are
15  caught and one might think that a person might
16  have to be more justified or that might be an
17  indicator that they are trying to make some
18  excuses or paint themselves in the best light
19  possible.  Ms. Davies would like you to think
20  that Rick gave this statement but then he puts
21  in all this self-serving stuff, all this
22  self-defense stuff just to kind of cover his own
23  butt.  He could have done that real easily.
24  All he had to do to cover his butt was just to
25  keep his mouth shut.  Nobody was looking for

827

1  him.   There was no word on the street that,

2  hey, the word is out, Rick Rhoades, we are

3  investigating this murder.   All he had to do

4  was keep quiet just like he had done for the

5  last month.   Absolutely no reason in the world

6  for him to be less than truthful in this

7  statement.   Although, certainly, Sergeant

8  Kennedy told you defendants give statements all

9  the time that contain some truth and some lies.

10  But you have to look at the circumstances that

11  that statement was given, where they already

12  kind of suspect, did they already know that,

13  were they caught in the act?   And I agree with

14  Ms. Davies I would like for y'all to ask for

15  this statement because I want you to see how

16  every single sentence in this statement is

17  supported by the evidence.   And why in the world

18  we should just believe 99 percent of it and just

19  choose to disbelieve one or two little parts of

20  it is beyond me.   There are a lot of indicators,

21  although small, that would indicate the

22  truthfulness of the statement.   Ms. Davies is

23  right, there is going to be a lot of conflict on

24  how the altercation first began, whether or not

25  Charles was ever in that open doorway at the

828

1    front door.  Well, according to all the
2    testimony that we have heard from this stand,
3    the master bedroom was totally unlit, mini
4    blinds drawn, no lights on, curtains on the
5    window.  If you will look at the photographs,
6    you will see the hallogen light that Mr. Sanders
7    referred to that points in different directions
8    and the bedroom window.    Nothing to think that
9    that room wasn't totally dark.  And, so, how --
10   and the State would have you believe that Rick
11   Rhoades slipped into this house and butchered --
12   her word -- Charles Allen in his bed.  Never
13   left that room, never got out of that bed.    I
14   want you to ask yourself how on October 11th of
15   1991 did Rick Rhoades know that Charles Allen
16   had brown hair.   In the dark, all hair colors
17   look identical.  How in the world would he have
18   ever known that?  I submit to you it's a small
19   point, but it's those little points, that is
20   what you are going to have to look at.  They are
21   telling.  They are very telling.
22            Rick says that he goes into the house,
23   that he rushes in, the door was left open, he
24   rushes in to confront.  He thinks that Charles
25   has gone in for a gun.  Well now, there is a

1  reason to believe that someone might be fearful
2  if they had some kind of angry words and the
3  person at the door says, well, I will tell you
4  what I am going to do and then runs into the
5  door and leaves the door open.  That certainly
6  isn't indicative that this person is
7  frightened.  They didn't close the door and
8  turn that little latch in back of them.  They
9  didn't go and dial 911.  You leave the door open
10 if you are planning on coming back.  So, Rick
11 is a confrontational guy, he is going to go in
12 and set this situation straight, and goes in,
13 and what does he see?  He sees Charles Allen
14 with the open drawer and pulling out a knife.
15 And Charles Allen confronts him.  Rick has
16 picked up a weight bar right inside the doorway
17 inside the weight room.  Has the weight bar in
18 his left hand.  Now, the State wants you to
19 believe, of course, that this never happened,
20 that Rick Rhoades went in there, found a knife
21 in the kitchen drawer, went through and
22 butchered Charles and Bradley Dean Allen, did a
23 reconnaissance again on the kitchen and got some
24 more knives, that he pointed at this one drawer
25 that has the blood drop.  How did Rick Rhoades

830

1   know where the knife drawer was in the kitchen?

2   There was one drawer that had drops of blood on

3   it.   That was the knife drawer.  Was that just

4   a lucky guess or was that drawer already open?

5   Rick also points, says in his statement that

6   Charles came out with this knife, that he had

7   this weight bar in his left hand, he tried to

8   grab the knife with his right hand.  Of course,

9   the State the offered a theory that the way that

10   Rick got the cut on his right thumb, just above

11   the joint of his thumb here -- and y'all can

12   look at the pictures of that -- that that was

13   during the stabbing, that somehow the knife

14   slipped and he cut himself during that.  When

15   you go back to the jury room, you have a right

16   to take the evidence with you.   I would like

17   for y'all to hold that knife and see what

18   fits.   You hold the knife in this direction and

19   it slips, it doesn't cut you down here.   It

20   cuts you way up here.  If you happen to be

21   holding the knife like this and it slips, it's

22   cutting the bottom of your finger here.

23   However, if somebody is coming at you and you

24   are trying to disarm them, this is exactly where

25   you are cut, in exactly that position.

831

1        Ms. Davies is right, the State's

2   evidence is overwhelming.  For three days -- and

3   she does, she crosses her T's and dots her I's

4   -- and we have heard an abundance of

5   testimony.  The only problem was that all of

6   those facts were admitted to, they were conceded

7   a year ago.  What she doesn't have is evidence

8   to dispute what Mr. Rhoades has said in these

9   few little areas that she chooses not to believe

10  this confession.  Brings you a little bit of

11  evidence that says he was going to sleep that

12  night because he hadn't been to sleep yet.  He

13  had gotten off his shift, hadn't gotten his

14  sleep, he was going to go to bed and then get up

15  and work the next day.  I think you can look at

16  the evidence and see, that on the toxicology

17  report Doctor Jachimcyzk and Doctor Espinola in

18  the laboratory findings on Charles Allen on the

19  drug screen, they show the presence of caffeine

20  in this body.  He had been there, everybody had

21  been over there, they had a little football

22  party that night.  He had been up for, gosh,

23  twenty-four hours at that point.  Worried about

24  the sticky floor in the recording studio, keeps

25  getting up to go out and check on the drying

832

1    pattern of the floor, had been drinking coffee
2    all through the game, got a caffeine buzz and
3    just couldn't get to sleep.  Just could have
4    been one of those when you are almost too
5    tired to go to sleep.  We will never know why
6    Charles Allen got back out of bed that night.
7    Perhaps he went out to check on the floor in the
8    studio.  Perhaps at that point he saw Rick
9    Rhoades walking down the street, decided to go
10   back through his house and open the door and
11   just see what happened.  There is no question, I
12   think, that the evidence that the State
13   presented that aggressive behavior was unlike
14   Charles Allen; but then again, he perhaps acted
15   a little bit out of character this particular
16   night.  He had been up for a long time, he
17   hadn't had any sleep, and sometimes people's
18   reactions are a little bit different than they
19   would be normally.  They also offered this
20   evidence that he doesn't walk around the house
21   in his underwear.  Never has.  And they bring in
22   friends and family members to set that up.  Even
23   if he has the habit of not walking around in his
24   underwear, always wearing his favorite robe, I
25   believe we can all imagine how somebody getting

1    up in their own home in the middle of the night

2    and either going to the bathroom or going to

3    check on a floor wouldn't necessarily put on

4    your robe like you might if you were walking

5    around in the daytime with people coming and

6    going in your house.   You feel a little bit

7    more comfortable walking in your underwear to do

8    something in your own home like that.

9            And then they point, they rely on this

10   blood spatter testimony.   What happened where.

11   And I think that all we got from both of the

12   blood spatter experts is that, gee, you really

13   can't tell.   You can almost concoct whatever

14   story you want and it can be supported.   The

15   mere fact that Charles Allen had no blood on one

16   leg and one foot could mean that he was in bed

17   and had it covered up.   Could equally mean that

18   he was standing up and the first couple of blows

19   didn't create much splatter.   When he fell back

20   on the bed in an unmade condition the leg got

21   under cover.   Equally consistent.

22           There are other indicators of

23   truthfulness in the confession.   They bring all

24   this evidence.   A couple of people say they were

25   kind of lax about locking their front door.

834

1    This is the reason that Rick was able to gain

2    access to the front door.   They pretty much

3    acknowledge there was absolutely no forced

4    entry.    Entry must have been through the front

5    door.  So, okay, we will concede it was unlocked

6    unintentionally.   However, when David Sanders

7    came over that next morning right before he

8    found the bodies and found the back door locked,

9    he didn't even try the front door.  He went a

10   hundred feet through a fence, over a board, back

11   to his house to get a key and come back without

12   even trying the front door.  Perhaps that is

13   because David Sanders knew that normally that

14   front door was locked because perhaps Charles

15   and Brad, like a lot of people, kept their front

16   door locked.   It's not a door that a lot of

17   people use very often.   Many people come and go

18   through the back door.   They pull their cars

19   up, that is where the kitchen is, that is the

20   heart of the house, and that is where everybody

21   enters and exits.   The front door could almost

22   be painted on in a lot of houses.  Perhaps that

23   is why he didn't even try the front door because

24   he knew he shouldn't even bother.  That front

25   door didn't need a key to lock from the inside.

1    Just had a little latch.  Could have easily been

2    turned by Charles that morning when he closed

3    that door, if he closed the door and locked it

4    behind him, but he didn't.   He ran back and

5    left the door open.

6             Now, about the confrontation itself.

7    Granted, it started as a staredown, but it

8    progressed to a little bit more than that.  I am

9    not going to sit here and try to tell you that

10   anyone of you in the same situation would do the

11   same thing if somebody confronted you or even

12   acted like they were threatening you, made some

13   kind of a threatening comment and you were

14   outside and they were in their home, chances are

15   good that most of you would do just exactly like

16   Ms. Davies suggested, keep on trucking right

17   down the road.   But that is not the test.  You

18   have to look at this whole situation through the

19   eyes of the defendant, through the eyes of a

20   twenty-eight-year-old man that had spent most of

21   his adult life in prison.   And imagine and

22   think, if you will, detach yourself from your

23   own personal responses and try and imagine and

24   put yourself in the feet of somebody who has

25   lived in a prison atmosphere who can't ignore

1    conflicts, who isn't given the luxury of just

2    ignoring and going on down the road.  Problems

3    need to be addressed when you are in prison.

4    They are addressed quickly.   If you look at it

5    from that perspective, it makes a little bit

6    more sense.

7                I want you to, when you get back

8    there, to spend a lot of time on this statement

9    and go through here and see how just about each

10   and every statement in there was supported by

11   the evidence, the State's evidence.  We get to a

12   part that talks about after the death and how at

13   some point Rick took off his shoes and then ran

14   back down the hallway and went to the kitchen

15   and got some more knives out of the drawer

16   because he didn't know if he was still in a

17   fearful situation and ran back down the hallway

18   again.  Sergeant Kennedy testified that the

19   actual sequence of when he took off his shoes

20   was in question.  Rick didn't remember exactly

21   when he took off his shoes, but somewhere around

22   that time, but he couldn't put it in exact

23   sequence of going in the hallway and coming back

24   and everything.  So there might be a few

25   discrepancies on that part.   You can't expect

1    somebody to remember every single detail in
2    something that happens this quickly, over a
3    month ago.  But go through it and see how it
4    matches up.  Remember that this self-defense
5    issue, since it has been raised, the burden is
6    on the State to disprove it, not just a little
7    bit but to disprove it beyond a reasonable
8    doubt.  And I don't think the little nebulous
9    reasons that they have tried to set out, well,
10   he doesn't normally walk around in his
11   underwear, and normally they have a hard time
12   keeping the doors locked comes anywhere close to
13   the kind of evidence that it is going to take
14   for the State to meet their burden.  And I
15   submit to you that they have not proved capital
16   murder in the indictment as charged.
17             THE COURT:  Mr. Stafford.
18             MR. STAFFORD:  How much time do I
19   have?
20             THE COURT:  It's going to take a
21   second.  Twenty-nine minutes.
22             MR. STAFFORD:  Thank you, Judge.
23
24
25

838

CLOSING ARGUMENT OF THE DEFENSE

BY MR. STAFFORD:

I am not going to take very long.  I
think Ms. Kaiser covered a lot of the things.  I
was thinking if I was the prosecutor what would
I argue in this case.  I wouldn't argue
motive.  I wouldn't argue anything.  I think I
would just show you the pictures.  There is one
picture that has been introduced, and it's
exhibit number 91.  Right here.  You haven't
seen it.  Out of 150 exhibits, you haven't seen
this one.  I objected to it.  Supposedly had
some evidentiary value to let y'all see how the
blood was flowing.  And my heart goes out to the
Allen family because it's never nice, never
pleasant to lose two of your sons.  And you had
a chance to look at this lovely family.  That's
tragic.  I mean it pulls every heartstring that
you have.  It almost brings tears to your
eyes.  And if we are gauging guilt and innocence
about the number of loved ones and friends that
have been here daily in support of the State, in
support of the Allen family, then there would be
no reason for you to leave the jury box.  There
would be no reason.  Death is never pretty.  We

839

1   talked about this on voir dire.   Regardless of
2   whether it's the most justified act in the
3   world, the end result is still horrible.   And I
4   will stipulate -- I saw this gentleman's face
5   when we started passing the pictures of the
6   crime and y'all's reaction.   Y'all went into
7   immediate shock.   It is a horrible thing.   It's
8   a horrible deed.   I could spend thirty minutes
9   and slowly take each one of these photographs
10  and let you look at them one more time.   Your
11  objectivity is totally gone out the window.
12  Totally gone.   Do you really care why he did
13  it?  Do you really care where he came from?  Do
14  you really care what his motive is because you
15  are looking at the dastardly deed that was done.
16  How can you be objective?  How can you be?   I
17  mean, we spent some awful quality, bonding time
18  with y'all, she did, showing you, going through
19  each detail, rightfully so, because you should
20  be able to see what went on there.   But then,
21  we, under the constitution and the laws of the
22  State of Texas, at least have a chance for you
23  to sit without emotion, without passion and
24  review our evidence.   Don't I have at least that
25  fair shake?  She told you why she didn't object

840

1   to certain things.   I tell you why I let in the
2   the fact that he is an ex-con.   I didn't have
3   to let y'all know that he just got out of
4   prison.   I didn't have to let you know that he
5   had been to prison.  Y'all would be sitting here
6   today thinking this is possibly a one-time
7   offender who did it.   Never would have known
8   that.   I tell you why.
9          MS. DAVIES:   I object to arguing
10  outside the record.
11         THE COURT:   Stay within the record,
12  please.
13         MR. STAFFORD:   Y'all were confronted
14  with what?  A statement that said I was out in
15  the middle of the street and a guy gave me
16  eyes.   That still doesn't make much sense.
17  Still makes no sense at all.   But there are
18  certain things that do make sense because I
19  think Ms. Kaiser hit it very heavily and very
20  strongly, there was only one way that my client
21  knew he had long hair, brown hair because poor
22  Charles was standing, unfortunately, on this
23  bloody Friday, the thirteenth, out under the
24  porch light.   And maybe the fact you wouldn't go
25  in there, maybe none of us would go in there and

841

maybe nobody else in the world would have gone
in there, but again I think, based upon the
evidence, there is nothing that would make you
believe he went in there to kill anybody, with
the intent to cause harm to anybody, with the
intent to commit burglary.   There is no
evidence that this was a stake-out.   There is no
evidence that this was premeditated.   So he was
stupid enough to go in and say:   Hey, I want to
confront him.   Hey, I want to know why he was
giving me the evil eye.   So he did that.   Based
upon the pictures, that you know, that you see,
the lights were on, if you believe the State's
theory, why in the world would a person commit a
burglary with all the lights on?   Cars in the
driveway.   Motorcycle in the back.   If that was
your intent.   We know he was chicken enough,
when he got caught, to go into a closed school
with nobody there.   It takes a lot of nerve,
takes a lot of brave to go into a house that you
think someone is there.   Nothing in there that
would indicate he is that type of person.   But
what I want you to think about is, based upon
the State's evidence, undisputed, that standing
in that entryway looking back in the kitchen you

1  could see in there.  Take the State's
2  photographs.  They are there.  You can see it.
3  Straight shot through there.  You can see.  He
4  says my path was cut off.  I couldn't get out.
5  I am not going to try to pinpoint him other than
6  he made the statement I couldn't get out.  He
7  had my path cut off and he was coming toward me
8  with a knife.  And you can take the sorriest,
9  meanest, yellow dog, tick-ridden dog in the
10  world and he has one basic instinct, and that is
11  to survive.  Whether you want to follow her
12  thought that he had no right to be in there.
13  Say he didn't have any right to be in there. All
14  of a sudden, it's either me or him.  What do
15  you do?  I suggest that there was nothing
16  unlawful -- maybe you wouldn't have been there
17  where Mr. Rhoades was, but there wasn't anything
18  unlawful.  Our Honor didn't charge you that him
19  going into the house was unlawful.  There is
20  nothing in the charge that says that Mr. Rhoades
21  being in the house is unlawful.  There is
22  nothing there.
23          And another interesting thing which I
24  think is supported by the evidence and even the
25  police officer, how else could that dent get in

there other than by this being hit there, which
is consistent, undisputed, that Mr. Allen had
this knife in his hand.  Rightfully so.  I think
as Ms. Kaiser brought out on the
cross-examination of the doctor that you take
with Brad the patterns that are in the back is
consistent with a struggle.  Consistent, totally
in opposition of State's theory that both of
these or both of these attacks occurred in the
bed.  Or if you don't believe that, that one
started in Charles' bedroom and went down, which
I think the blood spatters support that.  You
heard Floyd McDonald come in today, which I
called.  He was my expert.  He looked at the
same things that their expert looked at, and
each of them admit to you that the best type of
evidence is there at the scene, collected at the
scene.  Don't base a verdict, don't base your
decision upon some photographs that the DA had
someone come in four months ago to try to
support her theory of the case because I think
it's basically, if you look at the confession,
it's undisputed that the attack on Charles
started there in the doorway and makes logical
sense, as I have demonstrated over here, that

844

1    getting from that doorway to the bedroom is a

2    matter of seconds.   That explains why there is

3    no blood on the floor.   That explains why most

4    of the blood is on that right pillow where the

5    head hit.   Totally consistent with it.   Again,

6    you may not have walked into that house.   But

7    the jury charge doesn't say he didn't have the

8    right to be in there, either.

9         And another thing I want you to

10   remember -- the thing that bothers me the most

11   is that because we have taken so much time, by

12   drawing each hit, each stab, it makes it seems

13   like this whole thing acted as an eternity, that

14   just went on and on and on.   But I think, once

15   you put everything in perspective, I think

16   logically, based on the evidence, that probably

17   this whole thing happened in less than two

18   minutes.   Everything happened quickly.   It

19   wasn't a long, drawn-out affair.   The end

20   result, I agree with you, is totally

21   devastating.  Devastating.  Devastating.  But I

22   ask you, as Ms. Kaiser asked you, when you

23   listen to the State's argument of going over

24   each of these blows, the blows are bad.   I agree

25   with you.   And I think any person who feels

845

threatened and struggling for their life and
feels like they are going to die, they don't
stop and think about what kind of havoc they are
creating.   They are fighting to survive as
showed by this trauma that happened to this
knife and by the consistent patterns on the back
of Brad.   What I am asking you to do is to find
my client not guilty of capital murder.   And I
think you should find him guilty of something.
I am not suggesting that you shouldn't.    I
think you should.   I think he deserves to be
found guilty of something.   I just don't think
you should find him guilty of capital murder.
I have no objection if you slip down to the
third and fourth charge and find him guilty of
murdering both of them.   There is a provision
right there that says you can find.   Or
involuntary manslaughter.   I just don't think,
based upon the evidence, that this was a
continuous murder during a criminal
transaction.   Something happened that he was
defending his life. Something happened to make
him do that because we know, based upon the
testimony of Kennedy, that he verified that this
man did not have a violent background.   All of a

846

1  sudden something happened to make him do that.

2  I want you to find him guilty of something.  He

3  deserves to be found guilty of something.  But

4  don't find him guilty of the ultimate, horrible

5  crime of capital murder.  Find him guilty of

6  murder.  Find him guilty of anything but

7  capital murder because I think, based upon the

8  evidence, based upon the law Our Honor has given

9  you, you would have to do that because you have

10  taken an oath to uphold the law and the

11  evidence.  I know the State has a lot of

12  fantacies about what happened, but none of them

13  are supported by the evidence.  Not one iota is

14  supported by the evidence.  And if you follow

15  your oath, you are going to have to find him

16  guilty of either involuntary manslaughter or

17  murder, not capital murder.  I thank you.

18         THE COURT:  Ms. Davies.

19

20

21

22

23

24

25

CLOSING ARGUMENT OF THE STATE

BY MS. DAVIES:

I guess that is what makes the world go 'round.   Different people see things differently.   For a minute there, I thought Mr. Stafford was going to suggest this man isn't even guilty of trespass.   Whether he was lawfully in the house isn't the issue.   I mean, that is absurd, that it was permissible for him to go in the house.   That is not an issue here.   In terms of the self-defense concept, there is no self-defense.   He would have had to be reacting to unlawful force.   And anything Brad and Charles did to protect themselves was lawful, not unlawful.

I have to answer a couple of things. How did he know, how did he know that Charles had long, blonde hair.   Well, several possibilities.   I mean, for one thing, if he was hanging around that neighborhood all evening -- and we know that Charles is going out all evening.   He comes in from water skiing, he goes in and out checking on the floor, there are friends and family in and out.   To say nothing of the fact that there is a month in between the

848

1    murder and the statement.  What?  This guy
2    doesn't have access?  He tells you how he
3    watched on TV at the Chinaman's store about the
4    murders.  What?  He doesn't see things on TV
5    like the rest of us?  That is in his
6    statement.   There are a lot of ways he could
7    know about the long, blonde hair.   But,
8    obviously, because he was on top of the man
9    stabbing and beating him to death.   You know,
10   whether the lights are on or off, we will never
11   know which room had lights on.   But, you know,
12   it's not like total blackout eclipse just
13   because you don't have a light on in a
14   particular bedroom or particular room in the
15   house.
16           You know, if you take every word in
17   his statement as gospel truth, he is still
18   guilty of capital murder.  He admits every one
19   of the elements of capital murder.  Now, I have
20   to disagree with Mr. Stafford.   We did put in
21   evidence to refute some of the things in this
22   statement.  And whether there is something that
23   specifically refutes every little detail, again,
24   you are the finders of fact.   You decide every
25   word in there, which is believable.   And you

849

1    look through the physical evidence, like I tried
2    to do in some of the questioning, and we are
3    going to do now, you look to that and you decide
4    does this fit.  Does this make sense.  Does it
5    sound believable.
6             Let's look at some of the problems,
7    some of the refuting evidence.   For example,
8    how he gets into the house.  His entry into the
9    house.  Now, in his statement he says the door
10   was open.  Now, when Sergeant Kennedy is typing
11   and when this defendant is talking, they are not
12   drafting a legal document.   That is an
13   ambiguous word.  Is it open?  Well, technically
14   it probably means the door is standing wide
15   open, but people don't talk in that precise
16   terms.  It could mean the door was standing wide
17   open, or it could mean the door wasn't locked.
18   And we will not know for sure.   Well, of
19   course, either way, it's not locked.  But I want
20   you to think about what makes sense.   If, I
21   mean, this is why this business of confrontation
22   on the porch, the staredown where Charles runs
23   back into the house.   If that happened, if
24   Charles saw this guy out in the street and was
25   concerned enough to size him up -- we have all

1    had that experience.  And I know some of us who
2    live alone, you see somebody who doesn't look
3    like they belong around your neighborhood, maybe
4    you are driving off or you are coming in alone
5    at night, you check them out pretty good.  If
6    that happened, if Charles gives him a look, now
7    you go back to this statement, he doesn't say
8    Charles threatened him.  He says that he,
9    Rhoades tells Charles, according to him, come on
10   out here and we will settle it.  He invites
11   Charles out into the street to fight.  And he
12   says the guy turned around and ran back in.
13   Where is it?  "When I told him to come outside,
14   the guy ran back in the house."  Now, if
15   somebody is alarmed and runs back in the house
16   because some stranger lurking around the house
17   has challenged them to come out and fight, you
18   think they are going to leave the door standing
19   open?  They are not only going to close the
20   door, they are going to turn that bolt lock to
21   secure the door.  And the fact that the door
22   wasn't locked -- and we know it wasn't because
23   there is no forced entry -- is a very strong
24   indication that if Charles at any point went in
25   through that door, I mean, he didn't lock the

851

1  door behind him because he wasn't aware of any
2  threat.  It just doesn't fit.  Very unlikely.
3              This business about the boots.  You
4  know, he tells you in the statement he knew this
5  is a problem.  When he is leaving, he notices
6  his bloody footprints going down the driveway.
7  He knows this is a problem.  He is aware of that
8  is one piece of evidence they have.  And, so,
9  when he tells them about these boots -- here
10  again, this is his rationalization.  Now, when
11  did he take off the boots?  He describes it
12  somewhere after this attack, this battle that he
13  is engaged in, he is not sure exactly why,
14  Sergeant Kennedy, or exactly when, but at some
15  point he says he took off those boots.  And
16  after the struggle.  After the attack.  Folks,
17  think about that.  Doesn't fit.  First off,
18  those feet, those socks, the bottom had to be
19  saturated, soaked with blood.  There are
20  footprints into the kitchen, out of the kitchen,
21  back through the house because you know -- and
22  we will check it out with all the other physical
23  evidence -- he goes all the way back in the back
24  master bedroom again, back through the house,
25  out, still leaving bloody footprints all the way

down the sidewalk and out to the street.    Now,
how did his feet get saturated with blood?   I am
not going to show these bloody pictures in your
face.    I know they are awful to look at.    But
please ask for them and look and verify for
yourself what I am telling you on most of these
things.    Where could he have gotten his feet --
if he had his boots on throughout that attack,
there would have been blood on the boots.    And
maybe, with such a blood bath, maybe a little
would have run down, I mean, he wasn't walking,
his boots weren't this full of blood in the
bottom to sock the sole of his socks and that is
what left the prints.    He got the blood on his
socks after he took the boots off.    Now, think
about where the concentrations of blood are in
that house.    And David told you he pulled the
carpet out.    There were two areas where the
blood was saturated through the carpet.    One of
that was in Brad's room.    I know you will
remember for a long time how bad it looked in
Brad's room.    But you know what?    Remember he
lost his knife.    That is why he ran from Brad's
room.    Brad managed to slam that door.    And this
is the point where somewhere in here he took off

1  the boots. Because it darn sure wasn't in the
2  middle of that struggle. I mean, you know,
3  when Brad came running in to help his brother
4  Charles: Excuse me just a minute, I believe I
5  am going to take my boots off now. No. This
6  thing that has been described as happening so
7  fast -- and I am sure it did once it got going
8  -- no, the boots were already off before the
9  attack began because once Brad slammed that door
10 he couldn't get back in there to walk around in
11 enough blood to pick up that much blood. And
12 where is the other place that there is this big
13 concentrated pool of blood where you could soak
14 it up with your socks like that? Would have
15 been at Charles' head. Well, you know that
16 isn't where he did that. That music rack is in
17 the way. It would be obvious from the pictures
18 if he had gone in there -- why would he do
19 that? He would have to climb over that stuff
20 and stand in it to get that much blood on his
21 feet. He got his feet soaked on the bed and
22 maybe partly when he was attacking Charles and
23 mostly in Brad's room. You can see the blood
24 is wet and thick on that bed. That is where a
25 lot of the fight was going on. So what does

854

that mean?  What is the significance?  It means
he took his boots off before any confrontation
started.  Now, why would you do that?  If
someone has just, as he wants you to believe,
had a confrontation with somebody, challenged
them to a fight, is so afraid that they are
running into their home to protect themselves,
does he stop and take off his boots?  No.  I
mean, this alarmed person.  Now, if somebody
goes into somebody's home at 2:30 in the
morning, why would they take off their shoes?
Do you think it's because he noticed that, oh,
this is a new house, wouldn't it be a shame to
get mud on the carpet?  I think not.  This man,
the only logical, reasonable deduction from the
evidence is that when he tried that front door
-- remember, remember, I mean, they are making
a big deal that he has a hundred dollars in his
pocket.  Hey, he gets out of the pen less than
twenty-four hours before, and I believe Sergeant
Kennedy says they give them something like two
hundred dollars, in less than twenty-four hours
he has blown half of his money on beer, video
games and taxi fare.  He doesn't have a place
to live.  Not planning real well.  He needs a

1    little more cash.  He needs to replenish his
2    supply.   He tries a door as he is walking that
3    neighborhood, and you take off your boots
4    because you are going to tippy-toe around,
5    sneaking through that house trying to find
6    something to steal.  Money.  Nothing big.  He
7    doesn't have a car.  What is he going to carry
8    out?  Cash.  Small things.  Hey, it's brazen
9    all right, I will agree.  Brazen because, if he
10   did walk to the back or look like he says he did
11   -- in fact, in his statement he says he ran to
12   the back of the house, so he knows there are
13   people there.  But isn't it strange they want
14   you to think that this brash, confront every
15   slight, this brazen ex-con who stands up to any
16   imagined insult is too timid to burglarize a
17   house?  Won't be the first time you ever heard
18   of somebody's house getting burglarized when
19   they were in it.   He took off his boots because
20   he was sneaking around in that house.   And what
21   is the first thing he does?  Now, he tells you
22   even in his statement -- and I certainly
23   wouldn't say that the sequence or every word of
24   it is accurate, but isn't it interesting that
25   this person who wants you to think he is going

856

1   in, he says first thing he does -- and you read
2   it.  Remember he says he walks in here and he
3   doesn't see anybody.   Hey.  Safe now.  No
4   danger.  If his story is true.  Hey, oh good,
5   he doesn't have a gun, I can leave now.   That
6   isn't what he does.  He tells you that he
7   doesn't see anybody and he goes through this way
8   to the hallway and sees the weight room.  And
9   what does he do? He picks up a bar.  Now, why
10   does someone do that? The first thing he has
11   done is pick up a weight bar.  Now, he tells you
12   he goes back to the living room.  Now, he could
13   have had this sequence as confused as he was
14   confused over when the boots came off.   It
15   could just as easily have been that he goes to
16   the kitchen first and picks up a knife, then
17   goes through the bedroom and picks up a bar.  I
18   mean, why?  Who knows?  Regardless, he is
19   armed.  He is armed, and he is looking for
20   trouble.   Now, maybe he is looking for things
21   to steal, but he has seen the cars.   In case
22   anybody wakes up, he is armed.
23          Now, those pictures -- I want you to
24   remember Charles had been up for thirty-six
25   hours.  He had worked that late shift,

857

1    remember.   He had gone water skiing.   He knew

2    he had to get up early the next morning to work

3    on the studio.   This was a man who, when he went

4    to bed, he would be sleeping.   He has a buzz

5    because he had a trace of caffeine in his

6    blood.   Defendant says I had ten beers but I

7    wasn't drunk.   I mean, that shows you just how

8    meticulously honest and precise he is in his

9    statement.   Now, he tells you one way or

10   another, whichever room he has gone to first, he

11   tells you he has armed himself, and he claims

12   that he is in this living room when the

13   confrontation begins with Charles.   Wants you to

14   ignore the fact that you can see blood on the

15   pillow where Charles' head would have been as he

16   is lying sleeping.   He says the confrontation

17   starts in that living room.   Ladies and

18   gentlemen, I want you to think about this.   In

19   this picture, you can barely see some of that

20   blood spatter that is on the doorframe right by

21    -- this is Brad's bedroom door, the closed

22   bedroom door, and here's some of that spatter.

23   And you think about the layout of that house.

24   Brad Allen is sleeping in this room.   If the

25   fight that the defendant described, he says --

858

how does he do it?  Wait a minute.  I want to be
sure I get this right.  The guy starts -- he
says that Charles starts coming towards me, he
cut me off at the door.  Poor guy, he couldn't
get out now because Charles cuts him off.  So I
guess that means he is suggesting they are
somewhere in here in the living room.  And then
he wants you to believe -- let's see, where is
it?  He says, "We started scuffling in the
hallway."  And then later on he says they end up
in the bedroom.  With that scenario, their
confrontation begins in the living room, goes
right here by Brad's door, down the hall to the
bedroom.  Consider, will you, for that to be
true, Charles Allen, who has just confronted a
stranger in his house at 2:30 in the morning,
who is alarmed and supposedly has armed himself,
Charles Allen, who knows his brother is right
here in this bed, you think there wouldn't have
been enough noise and commotion and screaming
and hollering on Charles' part that Brad
wouldn't have been alerted to get up and help
his brother?  There is no way these two men
fought from the living room, down the hall, to
the bedroom, and then to have him tell you from

1 his statement the real fight only gets under way

2 when Charles falls on the bed.  Brad would have

3 been in there much sooner.  With the two of

4 them, maybe they would both still be alive

5 today.

6     THE COURT:  Ten minutes.

7     MS. DAVIES:  The reason there wasn't

8 enough noise to awaken Brad is because Charles

9 was sound asleep.  Charles is taken by

10 surprise.  Now, it's reasonable to conclude if

11 Charles woke up, maybe with Mr. Tippy-toes there

12 looking through the house and Charles awakens

13 and he is not going to get caught.  He starts

14 beating Charles first -- I mean, if Charles

15 awakened at all, he never got a chance, based on

16 this physical evidence, the blood on that bed,

17 to do anything more than try to sit up.  You do

18 not need a blood spatter expert.  I think

19 anybody can look at the way Charles is -- he is

20 under the covers.  This is a person who was in

21 bed.  If he had fallen on the bed after the

22 attack had started, he would be on top of the

23 covers.  You can compare that to the way the

24 spread looked in Brad's room.  It's covered

25 with blood on top where he was on top, fell out,

1    got out, whatever.  Charles and that leg.

2    Ladies and gentlemen, that leg speaks.  Those

3    two young men, you know from those horrible

4    pictures, they were covered with blood head to

5    toe, arms, legs, both of them covered with

6    blood.   Except that leg and foot never got out

7    from under the cover that Charles was sleeping

8    under.  Now, it's obvious he thrashed and rolled

9    and fought on that bed after the initial

10   surprise of the attack.  But he never had a

11   chance.  And when it finally got loud enough and

12   went on long enough Brad comes running in.   And

13   I never suggested Brad was attacked in his bed.

14   And none of the evidence did.  You have got that

15   arterial spurting.   You know he is the only one

16   who has that type of injury.  And he comes into

17   that room to see what is happening, what is

18   wrong with his brother.   And this guy, he says

19   from his statement, he says the other guy came

20   in and yelled, I jumped up.   I got off him.

21   He was on top of the bed stabbing Charles.   Oh,

22   another thing.   How do we know Charles was in

23   the bed?  I nearly forgot this.   You know, he

24   never explains this.  He explains that the

25   reason he left his attack on Brad is because in

the fight, the knife, he lost the knife.  He had
to run.   That gave Brad a chance to close the
door.   This bar that he beat Charles in the
head with time after time.   Remember it was
under Charles' body.  How did he lose it?  Now,
in the struggle as they are rolling back and
forth on the bed he lost this, too.  He doesn't
explain that.  He uses the bar, he uses the pipe
to beat Charles until he loses it.   And then he
turns to the knife.   Whether Charles was so
stunned from the blows to the head that it gave
him a chance to run for the knife or whether he
initially walked into that room armed with both,
he uses them both.   The fact that he uses the
weapons repeatedly on both men, stabs, slash,
beat, more than one weapon, all those
circumstances we know what his intent was.   And
you know what?  If we couldn't be sure then, I
want you to think about it.   This man who has
just slaughtered Charles, who is lying there on
the bed in the condition that you see him,
gurgling, to use his words, Charles is no
threat.   And then Brad -- some of these stabs
wounds are in the back and the chest, which you
know they are both rolling back and forth and

1    fighting.  Brad, you suppose he was trying to
2    get to that phone that was in his room?  You can
3    see it in the picture.   I was just trying to
4    get away.   I was just trying to defend
5    himself.  Regardless, he cuts on Brad until he
6    loses the knife.   Backs out of the room,
7    according to his statement, Brad slams the
8    door.  Hey, is he out of there now?  He has just
9    slaughtered two men, one is gurgling, one is
10   whining, dying behind the door, to use his
11   words, is he out of that house now?  No.   He
12   goes in this kitchen -- and the pictures show
13   you his prints going in and out of the
14   kitchen.   By the way, this drawer, if it was
15   already open I don't know why he had to touch it
16   here when he left the blood drops.   That is not
17   the knife drawer.  That is the wrong drawer.
18   If you look at the pictures, the knives are in
19   the butcher block that is on the counter in the
20   kitchen.  And what does he do?  He gets not one
21   but two knives.  Now, why would one do that?
22   Except for the fact that there are two men that
23   he is hearing death rattles.   Is he out the
24   door?  No.   He goes back with a knife in each
25   hand, one for each of them.  Just one problem.

1    He can't get in Brad's room because Brad is
2    dying holding the door shut.   He did all he
3    could.  Does he leave then?  No.   Goes back to
4    Charles' room.   And you know, you know that
5    Charles is dead, and he knows it then.   He goes
6    back there to Charles' room.   He has two
7    knives.   And, you know, at some point we know
8    that one of the Allens type O blood is on this
9    bar.   Why do you suppose he used it?
10            MR. STAFFORD:   There is no evidence he
11   used it.   I object to her suggesting that.
12            THE COURT:   The jury has heard the
13   evidence.
14            MR. STAFFORD:   Ask the court to rule
15   on my objection.
16            THE COURT:   It's overruled.
17            MS. DAVIES:   There is blood on this
18   bar.   How did the blood get there?  Did he heft
19   it up?  Well, no, the knife is better.   I want
20   you to look at the pictures.   It's so
21   interesting.   You know, we know, because this
22   other knife, we know this is the one that he
23   actually killed them with.   But these other two
24   knives he went back to the kitchen for.   This
25   little bit of blood on the tip.   Now, how did

1    that get there?  How did that get there?  He

2    goes back to check whether Charles is dead yet

3    or not.  And for some reason we end up with just

4    a little bit of blood on the end of the knife.

5          MR. STAFFORD:  That is totally

6    unsupported by the autopsy.  I object to that

7    statement by the prosecutor.

8          THE COURT:  Overruled.

9          MS. DAVIES:  Picture is right here.

10    Blood on the knife.  You heard it from Jim

11    Bolding.

12          THE COURT:  Two minutes, please.

13          MS. DAVIES:  Intent?  When he went in

14    that kitchen and got these last two knives.

15    Bolding, maybe McDonald, I know Bolding and

16    Hoffmaster both told you, because of the pattern

17    of the blood spatters and the footprints, you

18    know this was a person who was not rushing,

19    moving slow still.  He has time to think.  What

20    is he going to do?  That is when he decides to

21    go back with these two knives and be sure they

22    are dead.

23          He takes the keys to the car.  He was

24    smart enough to leave the credit cards and leave

25    the I. D. in the wallet.  That is how you get

1    caught when you take things like that.   The cash

2    you can take out of the wallet and walk out

3    with.   He takes the keys because the temptation

4    is really, hey, it would be good to have wheels;

5    wouldn't it? He doesn't have wheels.   You know

6    that.   And he needs them.   But, you know, he

7    changes his mind.   He goes down that drive and

8    he realizes he is leaving footprints.   And being

9    caught in the car that you stole from a house

10   where you just killed two people is another darn

11   good way to get caught.   He is smart enough to

12   know that.   So he throws away the keys.   He goes

13   in the house, he kills two good men and walks

14   away into the night tracking their blood down

15   the street.   He is guilty of capital murder,

16   ladies and gentlemen.   There is just no other

17   verdict.   It's the second one on the verdict

18   page, and I trust you to do the right thing.

19   Thank you.

20           THE COURT:   Ladies and gentlemen, in a

21   moment you will retire to consider your

22   verdict.

23           First of all, as to Mr. Whitten and

24   Mr. Sheehan, do either of you have anything in

25   the jury room?

1          THE JUROR:  Yes.

2          THE COURT:  I want you two to go down

3     the hall at this time and retrieve that,

4     please.

5          For the remainder of you, when you

6     return to the jury room, I am going to suggest

7     that your first order of business be to elect a

8     foreman as we used to call them or as we now

9     call it presiding juror.

10         Regarding the evidence, there are many

11    items of evidence, most are in consecutive

12    order, not all items numbered were admitted into

13    evidence.  If you wish to have all the evidence,

14    you may get it.  I want the foreman or

15    foreperson or presiding juror to write a note

16    telling me what you want if you want any of the

17    evidence.  Or if it's easier, since there are so

18    many items and some are large items, tell me

19    what it is you don't want.  Either way you want

20    it.  At this time, would you, please, go with

21    the bailiff back to the jury room.

22         (Jury retires to deliberate at 9:50

23    p.m.).

24         (Verdict at 12:15)

25         THE COURT:  Ladies and gentlemen, have

867

1    you reached a verdict?

2              THE FOREMAN:  We have, Your Honor.

3              THE COURT:  Mr. Harvill, are you the

4    foreman?

5              THE FOREMAN:  Yes, sir.

6              THE COURT:  Pass it to the bailiff,

7    please, sir.

8              Please stand up, Mr. Rhoades.

9              Case styled State of Texas vs. Rick

10   Allan Rhoades.  Cause number 612408.  We, the

11   jury, find the defendant, Rick Allen Rhoades,

12   guilty of capital murder as charged in the

13   indictment.  Signed by Dale Harvill, presiding

14   juror.

15             So say you all, ladies and gentlemen?

16             THE JURORS:  Yes.

17             THE COURT:  Do you wish them polled?

18             MR. STAFFORD:  No, Your Honor.

19             THE COURT:  Please be seated.

20             I will give you a couple of options

21   for tomorrow.  We are pretty much agreed it's

22   okay with us if you come in about 12:30 tomorrow

23   afternoon.  Does anybody have a particular

24   problem with that?  No.

25             I anticipate you are going to hear

                                                  868

1    from several witnesses tomorrow for the State.
2    And then we will break until Monday morning.
3    You will not be held over.  And allow the State
4    to continue their case beginning Monday morning
5    and continuing straight through at that time.
6             Anybody have any special problems you
7    want to bring to my attention at this point?
8             All the previous admonitions are still
9    in effect.  You do not have to stay with us
10   overnight.  We will see that a bailiff goes with
11   you to your cars.  I understand they are all
12   grouped in one location.
13            Mr. Garcia, you don't have
14   transportation?
15            THE JUROR:  I will find a ride.
16            THE COURT:  Is there somebody
17   available to come get you at this hour?
18            THE JUROR:  I will get a cab.
19            THE COURT:  Why don't you stay and
20   talk with the bailiff when I release you in just
21   a moment before everybody goes down.
22            As I said before, all the previous
23   admonitions are in effect.  Don't discuss this
24   case among yourselves or with anybody else.  We
25   are going to ask that you be back tomorrow

                                                    869

1    afternoon at 12:30.   Again assemble in the

2    hallway just like you have been doing.   Don't

3    make any kind of independent investigation.   I

4    know that some members of the media have been in

5    and out throughout the evening and have been

6    calling in, so there may be something in the

7    papers or on the radio or television.   Again,

8    don't pay any attention to it, change the

9    channel, turn it down, change the station, set

10   the newspaper aside.

11           Any requested admonitions from the

12   defense?

13           MR. STAFFORD:   No.

14           THE COURT:   The State?

15           MS. DAVIES:   Nothing more.

16           THE COURT:   If you would, please, all

17   in a group go back to the jury room.   Mr.

18   Garcia, please talk to the bailiff on your way

19   back.   We will take you down in a group.   12:30

20   tomorrow afternoon.

21

22

23

24

25

                                                    870