71595

TRIAL COURT NO. 612408

APPELLATE COURT NO._____

IN THE COURT OF CRIMINAL APPEALS

OF THE STATE OF TEXAS

AT AUSTIN

---

RICK ALLAN RHOADES,

                    Appellant

VS.

THE STATE OF TEXAS,

                    Appellee.

---

APPEAL FROM 179TH DISTRICT COURT OF HARRIS COUNTY,

TEXAS

Judge J. Michael Wilkinson   Presiding

---

STATEMENT OF FACTS

EXHIBITS ONLY

VOLUME____38___ OF _40_  VOLUMES

Marlene Swope
Official Court Reporter
301 San Jacinto
Houston, Texas  77002

FILED IN
COURT OF CRIMINAL APPEALS

MAR 5  1993                          170

Thomas Lowe, Clerk

1

2                            STATE'S EXHIBIT A-1

3

4

5

6

7

8

9

10

11

12

13                            Evidence Bag

14

15

16

17

18

19

20

21

22

23

24

25

1                           STATE'S EXHIBIT A-2

2

3

4

5

6

7

8

9

10

11

12

13                          TISSUE PAPER

14

15

16

17

18

19

20

21

22

23

24

25

172

1                          STATE'S EXHIBIT A-3

2

3

4

5

6

7

8

9

10

11

12

13                          PIPE INSULATION

14

15

16

17

18

19

20

21

22

23

24

25

1        STATE'S EXHIBIT A-4

2

3

4

5

6

7

8

9

10

11

12

13                SOCK

14

15

16

17

18

19

20

21

22

23

24

25

1              STATE'S EXHIBIT A-5A

2

3

4

5

6

7

8

9

10

11

12

13              BLOOD SAMPLE

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

STATE'S EXHIBIT A-6A

BLOOD SAMPLE

1                    STATE'S EXHIBIT A-10

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                  STATE'S EXHIBIT A-11

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



STATE'S
EXHIBIT
ENCAD-Bayonne, N. J.

1                    STATE'S EXHIBIT A-12

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                    STATE'S EXHIBIT A-13

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                        STATE'S EXHIBIT A-14

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



STATE'S
EXHIBIT

PENGAD-Bayonne, N. J.

1                    STATE'S EXHIBIT A-15

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE'S
EXHIBIT
4-15
PENGAD-Bayonne, N. J.



1                    STATE'S EXHIBIT A-16

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



STATE'S EXHIBIT
A-16

PENGAD-Bayonne, N. J.

1                          STATE'S EXHIBIT A-17

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



PENGAD-Bayonne, N. J.

STATE'S
EXHIBIT
A-17

1          STATE'S EXHIBIT A-18

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1              DEFENDANT'S EXHIBIT 1 PRE-TRIAL

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 4:14-cv-03152   Document 38-58   Filed on 09/01/16 in TXSD   Page 27 of 265

# METROPOLITAN

## Local & State

Editorials, 30A
Outlook, 31A
Weather, 33A

DEFENDANT'S EXHIBIT

# McDuff case moved to city

## Former death row inmate to be tried Jan. 11

By JOHN MAKEIG
Houston Chronicle

One of Texas' most notorious murder defendants, former death row inmate Kenneth McDuff, will be tried in Houston on capital murder charges in the deaths of a Waco convenience store clerk and a prostitute.

State District Judge George Allen in Waco agreed to move the trial to the court of state District Judge Bob Burdette in Houston because of extensive publicity.

One example is the August issue of Texas Monthly, which has McDuff's face on the cover with the word "Monster" across his forehead.

The larger pool of potential jurors in Houston makes it more likely to find jurors unfamiliar with the case, Burdette, a former prosecutor in

McLennan County, said the trial will begin Jan. 11.

McDuff, 46, is a suspect in several Central Texas killings since he was paroled from prison in 1989, but he is only under indictment in the two 1992 McLennan County deaths.

The case coming to trial accuses McDuff of kidnapping, robbing and murdering clerk Melissa Northrup, and also killing prostitute Valencia Kay Joshua.

Crawford Long, McLennan County first assistant district attorney, wouldn't provide details on either case, citing a gag order issued by Allen.

According to McDuff had worked at the same Quik-Pak convenience store as Northrup, 22, who was pregnant with her third child when she disappeared March 1. Her body was found about two

months later, floating in a gravel pit in Dallas County.

Joshua lived on the Texas State Technical College campus in Waco, where McDuff also lived after enrolling there in early 1991.

She disappeared Feb. 24, and her body was found in a shallow grave on the campus not long after Northrup disappeared.

Another case where authorities suspect McDuff is the Dec. 29, 1991, disappearance of an Austin accountant, Colleen Reed, 28, who may have been slain in Bell County. No trace of her body has been found.

Last April one of McDuff's friends, Alva Hank Worley, 34, told Bell County officers that he was with the ex-convict during the abduction of

See McDUFF on Page 33A.

See McDUFF on Page 33A.

Accused killer Kenneth Allen McDuff went before a Waco state district judge on Thursday.

Associated Press

# McDuff

Continued from Page 27A.

Reed in Travis County.

McDuff was arrested May 4 in Kansas City, just three days after his story was featured on the television program *America's Most Wanted.*

The son of a cement finisher in Temple, McDuff was sentenced to death for the 1966 killings of 16-year-old girl and two boys, ages 15 and 17, in the Fort Worth suburb of Everman.

All three were robbed and then abducted at gunpoint to a remote area. The two boys were shot to death in the trunk of a car before the

girl was raped and strangled.

McDuff spent six years on death row before the U.S. Supreme Court in 1972 ruled the death penalty unconstitutional.

His sentence was commuted to life, and he remained in prison until 1989, when he was freed by the Texas Board of Pardons and Paroles.

The decision provoked a huge outcry after he was linked to the McLennan County cases.

When the board decided to release him, it only took the approval of a three-member panel of parole board members.

Now, for cases of capital killers like McDuff whose death penalties were commuted to life, it takes the approval of the entire 18-member board.

1                           DEFENSE EXHIBIT A
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Case 2:11-cv-02722 Document 86-38 Filed 09/30/16 ENTERED Page 30 of 265

DEFENDANT'S
EXHIBIT

PENGAD-Bayonne, N. J.

# THE PREDICTION OF DANGEROUS BEHAVIOR

EDWIN I. MEGARGEE
*Florida State University*

Error is inevitable whenever psychologists attempt to predict future behavior. This paper examines the steps involved and the factors to be considered in the prediction of behavior in general and dangerous behavior in particular. Errors can occur in identifying the relevant personality and situational variables to sample, assessing these variables, and determining their interaction. The effects of these errors are multiplied by the fact that violence is a low base-rate phenomenon. The consequences of errors in violence prediction are examined and the ethical problems and social policy implications discussed.

A t no time has the prediction of dangerous behavior been of greater concern to mental health professionals and society at large. In addition to the natural concern over preventing violence directed at public figures and ordinary citizens, the problem of predicting dangerous behavior is a common bridge

Author's Note: *This paper is based on papers delivered at the Second Annual Florida Symposium on Dangerousness, Gainesville, Florida, March 14, 1975 and the Fourth International Seminar on Comparative Clinical Criminology, Santa Margherita Ligure, Italy, April 29, 1975. Preparation was supported in part by USPHS Grant No. MH 13202; NIMH: Center for Studies of Crime and Delinquency. All statements and opinions expressed are those of the author and should not be construed as representing official policies, opinions, or attitudes of the Public Health Service. The author would like to thank Wally Kennedy and Jean Kling for their comments on an earlier draft as well as the suggestions for improvement by the anonymous reviewers, particularly Saleem Shah.*

CRIMINAL JUSTICE AND BEHAVIOR, Vol. 3 No. 1, March 1976
©1976 American Association of Correctional Psychologists

CRIMINAL JUSTICE AND BEHAVIOR seeks to examine the behavioral, psychological, and interactional foundations of clientele and employees in the criminal justice system. The journal will strive to present information on processes of law violation, deterrence, behavior change and functioning of systems, groups and individuals. Articles are desired which describe original research in these areas, theoretical aspects, and development of innovative programs and practices.

MANUSCRIPTS should be submitted in triplicate to the attention of Stanley L. Brodsky, Editor, CRIMINAL JUSTICE AND BEHAVIOR, Department of Psychology, University of Alabama, Box 2968, University, Alabama 35486. Articles should be typewritten double-spaced with footnotes, references, tables, and charts on separate pages. Footnotes and bibliography should follow the current journal style; copies of the style sheet may be obtained upon request. An abstract of no more than 100 words, as well as a brief biographical paragraph describing each author's current affiliation, research interests, and recent publications, should accompany the manuscript. Authors' names should appear only on a detachable cover sheet. Simultaneous submission(s) to other journals should be clearly acknowledged.

BOOKS FOR REVIEW should be sent to Asher Pacht, Book Review Editor, CRIMINAL JUSTICE AND BEHAVIOR, Bureau of Clinical Services, Wisconsin Division of Corrections, Box 669, Madison, Wisconsin 53706. Potential contributors to the book review section are invited to correspond with the Book Review Editor prior to submission of manuscripts.

CRIMINAL JUSTICE AND BEHAVIOR is published four times annually—in March, June, September, and December. Copyright © 1976 by the American Association of Correctional Psychologists. All rights reserved. No portion of the contents may be reproduced in any form without written permission of the publisher.

Subscriptions: Regular institutional rate $20.00 per year. Professionals and teachers may subscribe at a one-year rate of $12.00; full-time college and university students, at a one-year rate of $10.00. Add $1.00 for subscriptions outside the U.S. and Canada. No student discounts outside the U.S. and Canada. Orders from U.K., Europe, the Middle East, and Africa should be sent to the London office (address below). Non-institutional orders must be paid by personal check.

Inquiries: Address all correspondence, permissions requests, and books for review to SAGE PUBLICATIONS, INC., 275 South Beverly Drive, Beverly Hills, California 90212. Inquiries and subscriptions from U.K., Europe, the Middle East, and Africa should be sent to SAGE PUBLICATIONS LTD, St George's House, 44 Hatton Garden, London EC1N 8ER. Other orders should be sent to the Beverly Hills office.

Exclusive Advertising Representatives: R. K. Armstrong & Associates, Inc., 2311 Cotner Avenue, Los Angeles, California 90064.

Back Issues: Information about availability and prices of back issues may be obtained from the publisher's Order Department (address above). Single-issue orders for 10 copies or more of any particular issue receive a special 50 percent adoption discount. Write to London office for sterling prices.

Second-class postage paid at Beverly Hills, California.

This journal is abstracted in Psychological Abstracts, Sociological Abstracts, Crime & Delinquency Literature, Human Resources Abstracts, Sage Urban Studies Abstracts, and Abstracts in Criminology. It is indexed in Public Affairs Information Service, Psychological Reader's Guide, Current Contents, Social Sciences Citation Index, and Criminal Justice Periodical Index.

Claims for undelivered copies must be made no later than three months following month of publication. The publisher will supply missing copies when losses have been sustained in transit and where the reserve stock will permit.

Change of Address: Six weeks' advance notice must be given when notifying of change of address. Please send old address label as well as new address to insure proper identification. Please specify name of journal.

linking the civil and criminal law. As Dershowitz has pointed out, our society has always maintained a system of preventive confinement of potentially dangerous individuals by means of a number of legal strategies including involuntary commitment of the "dangerous" mentally ill individual, denial of bail, probation, or parole to the "dangerous" criminal offender, and confinement of juveniles, "vagrants," and "sexual psychopaths" who appear likely to engage in acts of violence (cited by Stone, 1975: 4). Indeed, one libertarian view is that such preventive confinement is the only justification for involuntary civil commitment. According to Stone (1975: 25),

this progressive approach rejects the medical model, rejects the treatment rationale, and puts forward the narrow John Stuart Mill libertarian point of view, which suggests that in principle civil commitment can be continued if the State can justify the loss of liberty in light of its traditional police function. The emphasis on dangerousness as the salient variable is compatible with the modern jurisprudence of criminal law and is central to the sentencing premises of the American Law Institute Model Penal Code and the Model Sentencing Act. It is also a critical theme in the President's Commission on Law Enforcement and Administration of Justice.

It is easy to understand why Stone (1975: 25) concludes, "the generic concept of dangerousness has emerged as the paramount consideration in the law-mental health system."

How well do professionals predict dangerous behavior? The public at large, and law enforcement personnel and legislators in particular, apparently feel mental health personnel advise the release of too many potentially violent individuals to prey upon society. On the other hand, empirical data indicate that clinicians are more inclined to overpredict violence and classify an excessive number of people as dangerous (Monahan, 1975; Stone, 1975).

In either case, it is clear the prediction of dangerous behavior involves making errors. The purpose of this paper is to present a conceptual framework for examining the process of predicting dangerous behavior, indicating the points at which mistakes can

occur, and explaining why such errors are inevitable. Secondly, it will address itself to the implications for social policy and decision making.

### "DANGEROUSNESS" VS. DANGEROUS BEHAVIOR

In recent years it has become popular to refer to this problem as the assessment of "dangerousness." "Dangerousness" is an unfortunate term, for it implies there is a trait of "dangerousness" which, like intelligence, is a relatively constant characteristic of the person being assessed. However, the degree of danger an individual represents to himself or others varies markedly as a function of a number of variables. It is better to eschew the term "dangerousness" in favor of discussing the problems involved in "predicting dangerous behavior," to avoid the trap of affixing permanent labels on changeable people.

The term "dangerous behavior," which will be used interchangeably with "violence," will be applied to a relatively narrow range of acts characterized by the application or overt threat of force which is likely to result in injury to people. Although not all dangerous behavior is criminal (since the perpetrator may be lacking criminal intent) this use of the term includes, but is not restricted to, such criminal acts as homicide, mayhem, aggravated assault, forcible rape, battery, robbery, arson, and extortion. Criminal behavior not likely to result in injury to people, such as noncoercive thefts or vandalism, are excluded, as are business practices which, although injurious to people, do not involve the application of force.

### BASIC PROBLEMS IN PREDICTING BEHAVIOR

When discussing the accuracy of public opinion polling, laymen intuitively understand that polling a small sample of people to estimate the future voting behavior of the electorate as a whole inevitably involves error. However, it is less often understood that the same problem plagues psychological assess-

Before discussing motivation, or to use a more technical term, *instigation to aggression*, we should distinguish between what Buss (1961) termed "angry aggression" and "instrumental aggression." According to Buss, angry aggression is motivated by a conscious or unconscious desire to harm the victim and is reinforced by the victim's pain, whereas instrumental aggression is a means to some other end and is reinforced by the satisfaction of some other drive. Shooting someone you hate is an example of angry aggression; shooting someone in self-defense, in the line of duty, or to fulfill a "contract" would be examples of instrumental aggression. Of course, both types of motivation may be mixed, as in the case of an angry parent who spanks a child partly to help socialize that child and partly to ventilate his or her own feelings.

Instigation to aggression is the sum of both types of motivation and it is necessary to assess not only the degree of anger or hostility but also the extent to which dangerous behavior would be used by the client as a means to some other end. This is particularly true in such violent offenses as armed robbery and forcible rape, which may satisfy acquisitive or sexual drives, and gang fights, which usually satisfy needs for status, affiliation, and territory as well as hostility.

The assessment process is further complicated by the fact that *hostility* and *anger* must be evaluated. Hostility is a relatively enduring characteristic or trait, whereas anger or rage are transitory emotional states which are highly individualized and situation-specific. A client who manifests no anger during the assessment, even when deliberately provoked, may still act out on the street. Although some state-trait scales of anger and hostility have been devised (Vanderbeck, 1972), most are quite obvious and easily dissimulated. The vast majority of the psychometric devices available simply attempt to measure aggressive motivation (or worse yet, "aggressiveness") as though they were enduring traits (Megargee, 1970; Megargee and Menzies, 1971). The case history and interviews with family and friends are more useful in gauging the incidence of transitory

ment. Whenever a sample of behavior is used to estimate a larger behavior domain, whether we use high-school grades and CEEB scores to predict college achievement or case history data and personality tests to estimate the likelihood of dangerous behavior, some errors inevitably occur. Despite our best efforts we will recommend confining some people who, if left free, would not have injured anyone, and we will suggest releasing others who will subsequently engage in violence. (If our batting average is perfect for one type of decision, i.e., if none of our released clients ever harms anyone, then the odds are that we are making errors of the other type and confining too many who could have been set free.)

The basic question is how much error can be tolerated and whether more harm is done by predicting inaccurately or by not predicting at all. These value judgments will be considered when we discuss social policy implications. But first the processes involved in predicting dangerous behavior will be discussed to demonstrate why error is inescapable.

## THE PROCESS OF
## PREDICTING DANGEROUS BEHAVIOR

### IDENTIFYING THE RELEVANT VARIABLES

Although it is axiomatic that behavior is a function of both personality factors and situational variables [B = (P · S)], psychologists typically focus on the former at the expense of the latter. But a recent series of experiments on the prediction of leadership showed that knowledge of both personality and situational variables was essential for accurate prediction (Fenclon and Megargee, 1971; Megargee, 1969; Megargee, Bogart and Anderson, 1966).

*Personality factors.* To predict dangerous behavior, the clinician must consider three broad classes of personality variables: *motivation, internal inhibitions, and habit strength.*

states of rage and anger as well as in determining the likelihood that the client will encounter situations or conditions likely to elicit instigation to aggression.

*Internal inhibitions* or taboos against engaging in dangerous behavior have received less attention than instigation to aggression. However, they are equally important, because whenever the inhibitions against a response exceed the instigation the response will be suppressed or repressed. Unfortunately for predictors, inhibitions are probably even more specific than instigation. They differ from target to target. Mike LeFevre, a steel worker interviewed by Studs Terkel in *Working*, said, "all day I wanted to tell my foreman to go fuck himself, but I can't. So I find a guy in a tavern. To tell him that. And he tells me too.... He's punching me and I'm punching him, because we actually want to punch somebody else" (Terkel, 1974, p. xxxiii). Inhibitions also vary as a function of the act; although Mike LeFevre had few compunctions about hitting the other man, he refrained from using a knife. Distance from the target is yet another factor; a man who would be too inhibited to strangle one individual might well be able to bomb thousands. It is these differences in levels of inhibition as a function of victims and acts that account in part for the phenomena of displacement and response substitution.

Like instigation, inhibitions can vary over time. Moreover, they can be influenced chemically. The association between drinking and violence stems primarily from the fact that alcohol acts to anesthetize the brain areas that mediate inhibitions; chronic as well as acute brain syndromes can also lower inhibitions.

As if these variations in inhibitions did not pose enough problems for the would-be prognosticator, the situation has been further complicated by studies which have demonstrated that some extremely violent people are characterized by excessive inhibitions. In such individuals, suppressed instigation to aggression apparently summated to the point where the

massive inhibitions were overwhelmed. (For reviews of these studies and the MMPI Overcontrolled-Hostility scale that helps identify such individuals, see Megargee, 1971, 1973.)

Perhaps because of this preoccupation with the chronically overcontrolled assaultive individual, who rarely if ever engages in even mildly aggressive behavior, the author in his previous theoretical writings has neglected a third personality variable which is probably just as important as instigation and inhibitions. This is *habit strength*, the extent to which aggressive responses have been reinforced in the past. An appraisal of habit strength is particularly important when attempting to determine whether an individual will attempt to satisfy his or her needs for sex, power, mastery, wealth, and the like by means of instrumental aggression and in the analysis of socially approved dangerous behavior by people such as policemen and military personnel.

*Situational factors.* The importance of situational factors has already been emphasized. These include immediate specific factors such as the availability of a weapon, the presence of onlookers, and the behavior of a potential victim, but more pervasive situational variables such as the level of frustration in the environment, or the social approval of violence in a particular subculture should also be considered.

Situational factors can either facilitate or impede dangerous behavior. A gun in the hand of an angry man can facilitate his committing an act of violence, but if, instead, the gun is in the hand of his potential victim, it is more likely to inhibit his dangerous behavior. One reason behavioral scientists can predict college achievement more accurately than dangerous behavior is that academia presents each student with standard situations and similar stimuli, whereas the situations and milieus to be confronted by mental patients and parolees in the community seem infinitely more variable.

[10] CRIMINAL JUSTICE AND BEHAVIOR

## ASSESSING THE RELEVANT VARIABLES

Once the relevant variables have been identified, ways must be found to assess them. The discussion of instigation, inhibitions, habit strength, and situational factors indicated some of the problems involved in their measurement such as the transitory nature of emotional states such as anger, the specificity of both instigation and inhibitions, and the difficulty of obtaining adequate data pertaining to situational variables.

Most of the literature on the prediction of dangerous behavior focuses on the reliability and validity of personality assessment devices. Although many of these instruments can discriminate people who have engaged in dangerous behavior in the past from "normal" nonclinical groups, few, if any, can adequately differentiate violent from nonviolent criminals or patients (Megargee, 1970; Megargee and Cook, 1967; Megargee and Mendelsohn, 1962; Megargee and Menzies, 1971). Unfortunately, these are precisely the differentiations that practitioners who work in a correctional or mental health setting are usually called upon to make.

Moreover, even if the validity literature showed that our tests could accurately identify people who have been violent in the past, it would not necessarily mean these tests could predict who will behave dangerously in the future. The violent act itself may have created feelings of guilt or relieved pent-up hostility. Also, people who have been identified as having illegally engaged in such acts are inevitably exposed to a variety of judicial and correctional procedures expressly designed to change their personality structure and dynamics. And change they probably do, although the nature of these alterations may be quite different from what was intended.

Psychological tests are neat, efficient, and quantifiable, but they are not always the best samples of behavior for the prediction of violence. Telling a story about a scene depicted in a TAT card or answering a series of true-false questionnaire items are many steps removed from the dynamic interactions

Megargee / PREDICTION OF DANGEROUS BEHAVIOR [11]

that actually result in violence. Case histories are better indicators, but, as already noted, people do change. Institutional behavior may provide some useful data, but it is not infallible. An individual may refrain from violence for years in a facility with strong external controls, particularly if he is receiving chemotherapy and counseling, only to resume violent behavior in a less structured or supportive community setting. By the same token, a person who responded with violence to the peculiar stresses and demands of the institutional subculture might not behave dangerously on the street. Diagnostic role playing sessions in the institution coupled with furloughs might provide useful data. However, such informal assessment techniques are not standardized or quantifiable so it is difficult to determine their reliability or validity.

Whatever the behavior sample the clinician selects, it is no secret that the validity of our assessment techniques is less than perfect, and too often less than satisfactory (Megargee, 1966, 1970; Megargee and Menzies, 1971). The clinician can make errors in selecting the variables to assess, but even if he does this perfectly, he is likely to make errors in measuring these variables with the instruments currently available.

### DETERMINING THE INTERACTION OF THE RELEVANT VARIABLES

It is not enough to select the correct variables and measure them accurately. Before making a prediction, one must determine how these variables interact. In effect, one must forecast the effects of a rapid internal algebra which determines the response potential for a given dangerous act relative to all other possible behaviors.

Based on the discussion thus far, it would appear, in theory at least, that we could add up the factors facilitating and impeding the expression of dangerous behavior and balance them against one another. One would take the sum of instigation to aggression against victim "x" ($M_x$), plus the past history of reinforcement (H), and the situational factors

facilitate violence ($S_f$) and weigh them against the sum of the internal inhibitions against a particular dangerous act "a" against victim "x" ($I_{a \cdot x}$) and the inhibitory situational factors ($S_i$).

If one did go through such a procedure and found that the inhibitions were stronger (i.e., $M_x + H + S_f < I_{a \cdot x} + S_i$), then one could safely predict that dangerous behavior against that victim would not occur. (Of course, if the instigation was increased by one more provocation or the inhibitions decreased by one more beer, this balance could be shifted.)

On the other hand, finding that the factors favoring the completion of the dangerous act exceed those inhibiting it (i.e., $M_x + H + S_f > I_{a \cdot x} + S_i$) does not mean that poor victim "x" will soon be on the receiving end of dangerous act "a." A predominance of factors favoring the particular response only means that it is *possible*, not that it will inevitably occur. At any given time a number of possible responses are competing for expression and the one actually selected depends upon their *relative response strength*. It may be that the response potential is stronger for some other dangerous act "b" or act "a" directed at another victim "y." Or, some completely non-aggressive act satisfying competing drives such as hunger, sex, or status might be prepotent.

SOURCES OF ERROR IN PREDICTING DANGEROUS BEHAVIOR

This essay began with the assertion that error is inevitable in the prediction of behavior. It should be clear to any readers who have persevered this far that this is particularly true in the case of dangerous behavior because of the numerous pitfalls along the way. It is easy to make an error in identifying the relevant variables, especially the situational factors, and even easier to encounter difficulties in assessing them reliably or validly. Even if this is done correctly, one can make mistakes as he attempts to determine the interaction of these variables or

estimate the relative response potential of dangerous and nondangerous acts.

Unfortunately, once such errors are made, they are greatly magnified by another factor peculiar to dangerous and other infrequent forms of behavior. This is the base-rate problem identified by Meehl and Rosen (1955). Applying Bayes' Theorem, Meehl and Rosen (1955) demonstrated that whenever we attempt to predict infrequent events, even a moderate false positive rate will result in large numbers of people being erroneously diagnosed.

In predicting dangerous behavior, we can make two types of errors: "false positives" are those individuals that we erroneously predict will engage in dangerous behavior, whereas "false negatives" are those whom we erroneously predict will not engage in dangerous behavior. Although the public is more concerned about the false negatives who are released and later attack someone, it is the false positives who, by sheer weight of numbers, call into question the possibility of accurately predicting dangerous behavior (Stone, 1975).

Let us suppose that someone devises a method of predicting dangerous behavior that far exceeds any technique currently available and that a validation study shows this new technique correctly identifies 85% of the people who later engage in dangerous behavior (i.e., has a false negative rate of 15%) and 90% of those who do not behave dangerously (i.e., has a false positive rate of 10%). Although the false negative rate exceeds the false positive rate, application of this technique to a random sample of 100,000 U.S. citizens would demonstrate the pernicious effect of false positives. Recently reported data indicates that the base rate for violent crime in the United States is 187 per 100,000 (Hindeling, Dunn, Aumick, and Sutton, 1975). The new test would accurately identify 85% or 159 of the 187 violent individuals. So far so good. But what of the 99,813 citizens who will not behave dangerously? Because of the 10% false positive rate, the test will erroneously predict that 9,981 of these individuals will commit acts of violence.

Combining the 9,981 false positives and the 28 false negatives, we see that by using the test we would make 10,009 mistakes. On the other hand, if we had not used the test and had simply predicted no one would be violent, we would have made only 187 errors.

Unfortunately, none of our techniques has a false positive rate as low as our hypothetical example (Monahan, 1975). Follow-up studies of people classified as dangerous who have subsequently been released or transferred show false positive rates of 65% (Kozol, Boucher and Garofalo, 1972), 76% (women) and 80% (men; Steadman and Halatyn, 1971), and 86-95% (Wenk, Robison, and Smith, 1972). To be sure, Kozol (1975) now estimates that with improved techniques his team has been able to lower the false positive rate among previously violent patients to about 50%, but applied to our random sample of 100,000, a 50% false positive rate would result in erroneous predictions of violence for 49,906 people. As Stone (1975: 28) has stated, "if dangerousness is the sole criterion for civil commitment or other preventive detention, and if an empirical study demonstrates violence is a rare event (low base rate), then even if we had a very good predictive technique or device, we would end up confining many more false than true positives."

## SOCIAL POLICY IMPLICATIONS

Most mental health professionals will at some time find themselves in a position in which they must decide whether an individual is likely to engage in behavior that is dangerous to him or herself or to others. Although this question most often confronts clinicians working in criminal justice and inpatient psychiatric settings, others in private practice, in school settings or community mental health centers will also have occasion to make such predictions. Given the current state of the art, what stance should they adopt?

Some may simply refuse to make such predictions on the grounds that the problems discussed thus far make errors inevitable. Although each person must be guided by his individual professional values, the present writer disagrees with this Pilate-like position. It is facile, but correct, to point out that someone has to make these predictions. If there are data that show that better predictions are made without his professional input, then by all means a clinician should decline to participate. Otherwise, as long as predictions regarding dangerous behavior are going to be made, the author feels mental health professionals should contribute to the best of their ability.

More cogent is the fact that in predicting dangerous behavior, the assessor must balance the often-conflicting needs of at least three parties—the person regarding whom the prediction is made (the "predictee" if you will), that person's potential victim, and society at large.[1] In the author's opinion, those who refuse to

**TABLE 1**
Use of a Hypothetical Test with a False Positive Rate of 10 Percent and a False Negative Rate of 15 Percent to Predict Dangerous Behavior in a Random Sample of 100,000 United States Citizens

| Predicted Behavior | Actual Behavior | | Total |
|---|---|---|---|
| | Dangerous | Not Dangerous | |
| Dangerous | 159 (true positive) | 9,981 (false positive) | 10,140 |
| Not dangerous | 28 (false negative) | 89,832 (true negative) | 89,860 |
| Total | 187 | 99,813 | 100,000 |

predict dangerous behavior are letting their concern for the rights and welfare of the "predictee" blind them to their obligations to the potential victim and to society.

One way of crystallizing the issues is to imagine, despite all the evidence to the contrary, that it was possible to identify with complete accuracy those individuals who were going to engage in dangerous behavior. If so, would society have the right to intervene?

The author finds it impossible to cope with such questions without considering the nature of the intervention. Counselors and therapists in some settings are required to warn potential victims if a client appears likely to attack them. Law enforcement agencies can warn individuals likely to engage in dangerous behavior, confiscate their weapons, and, on various legal or psychiatric grounds, usually arrange for a brief period of preventive detention. The present author would have no great reservations about any of these relatively benign interventions if dangerous behavior could be predicted this accurately.

But what if the intervention took the form of confinement for an indefinite period? Such preventive detention would clearly be in the interest of the potential victim but not the potential attacker, except insofar as it might be better in the long run for the latter not to commit a crime of violence. Although the public at large undoubtedly favors the safety of the potential victim over the civil rights of the potential attacker, consideration of the best interest of the third party, society, leads the present writer to adopt a middle course. If the predictee has already engaged in behavior that warrants confinement in its own right, then he would favor preventive detention. For example, if the predictee is hospitalized for mental illness or imprisoned for some crime, then the certainty that the predictee will engage in violence would, in my opinion, warrant continued confinement even though he or she might otherwise be eligible for release or parole. If the predictee is not confined but has engaged in overt behavior that would warrant confinement such as uttering threats, acquiring an illegal weapon, or

entering into criminal conspiracy, then the writer would advocate prosecution for that behavior, with all appropriate legal safeguards, and confinement if the predictee were convicted. Similarly, if the individual is committable as mentally ill, this could be undertaken.

However, if the individual is not currently confined and has engaged in no overt behavior or exhibited no other symptoms that would warrant confinement, then the writer would be reluctant to advocate indefinite detention. In my opinion, the harm done to society as a whole for any of its members to be confined indefinitely on the basis of expert opinion rather than overt behavior outweighs the threat to one member of society, namely the victim.

Of course, as we have established, predictions of dangerous behavior are hardly infallible. Examining the problem of predicting dangerous behavior from a purely theoretical standpoint, we saw that errors are inevitable and, when we are working with populations in which dangerous behavior is infrequent, the base rate problem will magnify these errors and result in an excessive number of false positives.

To be right most of the time, a person should go along with the base rates and predict no dangerous behavior will occur. However, rather than be right most of the time, the author prefers a decision model that minimizes the possible adverse consequences for all concerned, the predictee, the potential victim, and society.

A rough screening procedure with literally thousands of false positives is justifiable if the adverse consequences to the predictees are relatively benign. Who can calculate the false positive rate of the psychological screening profiles used by airlines to identify potential hijackers or by the Secret Service to spot potential assassins? But if the only consequences of being classified as a potential air pirate or presidential assassin are being denied access to an aircraft, or proximity to the President, then the writer feels it is better to have a thousand false positives than a single false negative.

But what if the consequences are less benign? What if the prediction that someone will engage in dangerous behavior means that he or she will be denied parole from a correctional institution or involuntarily committed to a mental institution?

The first requirement in such cases is that the prediction should be based on the most complete and valid procedures currently available to minimize errors in general and false positives in particular. Mental health professionals should limit themselves to predicting dangerous behavior in high base-rate populations such as those who have already engaged in repeated violence. Kozol et al. (1972) have flatly stated, "No one can predict dangerous behavior in an individual with no history of dangerous acting out." Moreover, predictors should refuse to allow themselves to be trapped into a dichotomous decision model. Instead, they should set cutting scores on both ends, predicting dangerous behavior for those at one extreme, no dangerous behavior for those at the other, and admitting they cannot predict for those in the middle.[3] Thirdly, prediction should be confined to cases for which there is a good understanding of the situation or milieu. One would expect better prediction of violence inside institutions, where the environment is similar for all, than in community settings, which are more variable.

Despite these measures, it is clear we cannot predict dangerous behavior with absolute certainty. Kozol et al. (1972) obtained follow-up data on a sample of patients who were released despite the fact that Kozol's psychiatric team had classified them as dangerous; only 35% actually engaged in violence. On the basis of these data, then, we can believe Harry Kozol and his team if they point to three individuals and say, "If these three people are released, one of them will attack someone, but we do not know which one of the three will do so." Does society have the right to confine two people unnecessarily to prevent violence by a third? Or, on the other hand, does society have the right to release any of the three and thereby knowingly endanger someone else's very life?

Some who would endorse preventive detention if dangerous behavior could be predicted with 100% accuracy will balk at the notion of confining [two to prevent violence by a third. The present writer's response would be similar to the guidelines he suggested for the perfectly accurate prediction, i.e., confine only those whose overt behavior would justify confinement even if no prediction had been made. With others take less drastic steps to deter violence such as providing close parole supervision, warning potential victims, or perhaps requiring the posting of peace bonds.

Thus far we have been grappling with these problems on a moralistic basis, balancing the rights of predictees against the safety of potential victims and the preservation of social structure. A "hard-headed" pragmatist might attempt to resolve the dilemma through a cost-benefit analysis. What is the total cost to society of confining 100 of Kozol's patients? This could be calculated by figuring the cost of institutionalizing them (food, buildings, staff, lost earning power, family deprivation, and so on). The same approach could be used to calculate the social cost of the violent behavior—rapes, murdering, child molesting—engaged in by the 35 who became violent, using insurance company estimates of the dollar cost of these crimes to society. The analyst could then determine if society shows a profit or a loss from confining 100 "dangerous" individuals to prevent violence by 35. Although the assigning dollar values to human suffering is morally repugnant, it is one way to resolve the dilemma. However, there is no way to calculate how much it cost society as a whole to curtail the civil liberties of a few.

The public at large is probably not overly concerned about the loss of civil liberties or the unnecessary confinement of people erroneously labeled "dangerous." Clearly most people identify with the victim and place a premium on personal safety, and the professional will experience much more criticism for false negatives than for false positives. Nevertheless, in addition to modifying and improving the prediction process to minimize the number of errors, it is time for mental health

professionals to accept the responsibility to consider in each case the ethical and social implications of their predictions. After all, if the predictors do not worry about the consequences of predicting dangerous behavior, who will?

## NOTES

1. The writer prefers the rather artificial term "predictee" to the more commonly used noun "client," because the latter term implies the clinician is working for the "predictee" when in fact he or she may be working for an institution or agency.

2. Technically, only a mentally ill person can be committed; however, being dangerous to oneself or others is often inextricably interwoven with the definition of mental illness. For example the state of the Washington code stipulates, "'Mentally ill person' shall mean any person found to be suffering from psychosis or other disease impairing his mental health, and the symptoms of such disease are of a suicidal, homicidal, or incendiary nature, or of such nature which would render such person dangerous to his own life or to the lives or property of others" (Brakel and Rock, 1971: 71).

3. Any psychologist who plans to adopt this procedure should carry several vials of ammonia with him since lawyers, judges, parole officers and the like are apt to faint from the shock of hearing a psychologist appearing as an expert witness admit his ignorance.

## REFERENCES

BRAKEL, S.J. and R.S. ROCK (1971) The Mentally Disabled and the Law, Rev. ed. Chicago: Univ. of Chicago Press.
BUSS, A.H. (1961) Psychology of Aggression. New York: Wiley.
FENELON, J.R. and E.I. MEGARGEE (1971) "Influence of race on the manifestation of leadership." J. of Applied Psychology 55: 353-358.
HINDELANG, M.J., C.S. DUNN, A.L. AUMICK, and L.P. SUTTON (1975) Sourcebook of Criminal Justice Statistics–1974. Washington, D.C.: Government Printing Office.
KOZOL, H. (1975) Personal communication, received March 14.
–––, R. BOUCHER, and R. GAROFALO (1972) "The diagnosis and treatment of dangerousness." Crime and Delinquency 18: 371-392.
MEEHL, P.E. and A. ROSEN (1955) "Antecedent probability and the efficiency of psychometric signs, patterns, or cutting scores." Psych. Bull. 52: 194-216.
MEGARGEE, E.I. (1973) "Recent research on overcontrolled and undercontrolled personality patterns among violent offenders." Soc. Symposium 9: 37-50.

––– (1972) The Psychology of Violence and Aggression. New York: General Learning Press.
––– (1971) "The role of inhibition in the assessment and understanding of violence," in J.E. Singer (ed.) The Control of Aggression and Violence: Cognitive and Physiological Factors. New York: Academic Press.
––– (1970) "The prediction of violence with psychological tests," in C.D. Spielberger (ed.) Current Topics in Clinical and Community Psychology (Vol. 2). New York: Academic Press.
––– (1969a) "The influence of sex roles on the manifestation of leadership." J. of Applied Psychology 53: 377-382.
––– (1969b) "The psychology of violence: a critical review of theories of violence," pp. 1037-1115 in D.J. Mulvihill and M.M. Tumin (eds.) Crimes of Violence: A Staff Report to the National Commission on the Causes and Prevention of Violence. NCCPV Staff Report Series, Vol. 13, Washington, D.C.: Government Printing Office.
––– and P.E. COOK (1967) "The relation of TAT and inkblot aggressive content scales with each other and with criteria of overt aggressiveness in juvenile delinquents." J. of Projective Techniques and Personality Assessment 31, 1: 48-60.
MEGARGEE, E.I. and G.A. MENDELSOHN (1962) "A cross-validation of 12 MMPI indices of hostility and control." J. of Abnormal and Social Psychology 65: 431-438.
MEGARGEE, E.I. and E. MENZIES (1971) "The assessment and dynamics of aggression," in P. McReynolds (ed.) Advances in Psychological Assessment (Vol. 2). Palo Alto: Science and Behavior Books.
MEGARGEE, E.I., P. BOGART, and B.J. ANDERSON (1966) "The prediction of leadership in a simulated industrial task." J. of Applied Psychology 50: 292-295.
MONAHAN, J. (1975) "The prevention of violence," in J. Monahan (ed.) Community Mental Health and the Criminal Justice System. New York: Pergamon.
STONE, A.A. (1975) Mental Health and Law: A System in Transition. Washington, D.C.: Government Printing Office.
STEADMAN, H. and A. HALATYN (1971) "The Baxstrom patients: backgrounds and outcomes." Seminars in Psychiatry 3: 376-386.
TERKEL, S. (1974) Working. New York: Pantheon.
VANDERBECK, D.J. (1972) "An examination of the use of adjective checklists in measuring anger states and hostile traits." FCI Technical and Treatment Notes 3, 3: 1-53. Federal Correctional Institution, Tallahassee, Florida 32304.
WENK, E., J. ROBISON, and G. SMITH (1972) "Can violence be predicted?" Crime and Delinquency 18: 393-402.

EDWIN I. MEGARGEE was born in 1937 in Plainfield, New Jersey. He received his B.A. magna cum laude from Amherst College in 1958 and his Ph.D. in clinical psychology from the University of California at Berkeley in 1964. An assistant professor of psychology at the University of Texas at Austin from 1964 to 1967, he joined the Psychology Department of the Florida State

[23]

# FAMILY COURT PLACEMENT
# OF MENTALLY RETARDED
# JUVENILE OFFENDERS AND THE USE
# OF INTELLIGENCE TESTING
## A Reply to Sussman

PAUL V. OLCZAK
MICHAEL W.R. STOTT
*Family Court Psychiatric Clinic*
*Erie County, Buffalo, New York*

The occurrence of mental retardation among delinquent offenders, the use of the intelligence test in court dispositions, and placement issues were examined in response to Sussman's polemic on the use of psychological testing in the juvenile justice system. Data presented failed to support several of Sussman's important contentions.

I n a recent article on the use of psychological testing in the juvenile justice process, Sussman (1974) argued that intelligence tests are discriminatory, and, in fact, cause serious dispositional and classification errors in the judicial process. Sussman further stated, "If a child has an I.Q. score below 70, for example, he may be sent to a state school for the mentally retarded, where he might remain for years to come." He later added, "Private institutions (usually better staffed and less punitive than training schools) *will almost never* [italics ours] accept a child from Family Court whose I.Q. is less than 90, or even 100." The major thrust of his article and his conclusion was, "the administration of I.Q. tests to children, and their

CRIMINAL JUSTICE AND BEHAVIOR, Vol. 3 No. 1, March 1976
©1976 American Association of Correctional Psychologists

---

University in 1967 as an associate professor and was promoted to professor in 1970. A consultant to the Bureau of Prisons since 1967, Megargee is the director of FSU's graduate training program in the applications of psychology to criminal justice. His principal research interests are the psychology of violence, correctional psychology, and psychological assessment. A past president of the American Association of Correctional Psychologists and member of the Board of Directors of the American Correctional Association, Megargee serves on the editorial boards of a number of professional journals in the areas of psychology and criminology and is the founding editor of FCI Research Reports and FCI Treatment Notes. He has published four books, ten monographs and chapters, and has contributed approximately 40 articles to professional journals.

1                    DEFENSE EXHIBIT B
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*1978*





DEFENDANT'S EXHIBIT

PENGAD-Bayonne, N. J.

# The Prediction of Violent Criminal Behavior: A Methodological Critique and Prospectus

JOHN MONAHAN

## I. OVERVIEW

The identification of persons who reliably can be predicted to engage in dangerous behavior has been called "the greatest unresolved problem the criminal justice system faces" (Rector 1973) and "the paramount consideration in the law-mental health system" (Stone 1975). It is the purpose of this paper to suggest how the problem of predicting dangerous behavior might be clarified by improved methods of empirical research. Current public policies that rely upon the prediction of violence will be briefly reviewed, the empirical data to date will be summarized, and hypotheses will be offered to account for the obtained findings. Following this, five general recommendations for future research in violence prediction will be presented, each with a specific proposal for implementation.

John Monahan is Assistant Professor, Program in Social Ecology, University of California, Irvine.
NOTE: I would like to thank Alfred Blumstein, Gilbert Geis, Raymond Novaco, Paul Meehl, Andrew von Hirsch, James Q. Wilson, Henry Steadman, Carol Warren, and Thomas Halatyn for their insightful discussion of this paper.

244

*The Prediction of Violent Criminal Behavior*                    245

## II.  CURRENT POLICY USES OF VIOLENCE PREDICTION

The task of identifying violence-prone individuals has been allocated to the criminal justice and mental health systems. In both systems, predictions of violence[1] are variables in decision-rules relating to who should be institutionalized and who should be released from an institution—the institution being a jail, prison, civil mental hospital, or hospital for the criminally insane.

In the criminal justice system, predictions of violence may be introduced in at least five stages of the judicial process (compare Shah 1976): (a) decisions whether or not to grant bail, and, if bail is to be granted, decisions on the level at which bail is set; (b) decisions whether certain offenders should be transferred from juvenile to adult court for trail; (c) sentencing decisions imposing probation or imprisonment or death[2], and, if imprisonment is imposed, decisions on the length of imprisonment; (d) parole decisions; and (e) decisions whether to invoke special statutes dealing with "dangerous sex offenders," "dangerous mentally ill offenders," or "habitual" criminals (Monahan and Hood 1976).

In the mental health system, predictions of violence are employed primarily in terms of decisions regarding civil commitment to a mental hospital and release from such commitment.

Two recent and contradictory trends in public policies involving the prediction of violence are clearly discernible. One is the increased reliance upon the "dangerousness standard" as the primary or sole justification for civil commitment in the mental health system; many states now follow California's 1969 lead in rewriting commitment laws to emphasize the role of violence prediction (*Harvard Law Review* 1974). The second trend is the decreased reliance upon predictions of violence in determining release from prison in the criminal justice system. Several state legislatures (e.g., California, Maine) have recently passed or are now considering bills to abolish indeterminate sentences

*Handwritten annotations in right margin:*
1) bail
2) juvenile → adult
3) sentencing
4) parole
5) ? to invoke special statutes dealing ē 'dangerous sex offender, etc'.

---

[1] A distinction between "violence," "violent behavior," "dangerousness," and "dangerous behavior" will not be attempted in this report, although arguments can be made in favor of using one term rather than another (Sarbin 1967, Megargee 1976).

[2] The United States Supreme Court recently held that it was not unconstitutional for a state to make the imposition of the death penalty on an offender convicted of certain categories of murder contingent upon a prediction that he or she would be violent in the future. "It is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made" (Jurek v. Texas. 96 S.Ct. 2950 [1976]).

in which the prisoner's release date is determined by a parole board
and based in part upon a prediction of his potential for future violence,
in favor of sentences of a more definite length set by the judge (cf.
Morris 1974; Twentieth Century Fund 1976; von Hirsch 1976).

## III.  SUMMARY OF VIOLENCE PREDICTION RESEARCH

The eight major research efforts attempting to validate predictions of
violence are summarized in Table 1.[3]

Wenk et al. (1972) report three massive studies on the prediction of
violence undertaken in the California Department of Corrections. In
the first study, a violence prediction scale that included variables such
as commitment offense, number of prior commitments, opiate use, and
length of imprisonment was able to isolate a small group of offenders
who were three times more likely to commit a violent act than parolees
in general. However, 86 percent of those identified as violent did not,
in fact, commit a violent act while on parole.

In the second study, over 7,000 parolees were assigned to various
categories keyed to their potential aggressiveness on the basis of their
case histories and psychiatric reports. One in five parolees was as-

TABLE 1[a]   Research Studies on the Prediction of Violence

| Study | % True Positives | % False Positives | N Predicted Violent | Follow-up Years |
|---|---|---|---|---|
| Wenk et al. (1972) Study 1 | 14.0 | 86.0 | ? | ? |
| Wenk et al. (1972) Study 2 | 0.3 | 99.7 | 1630 | 1 |
| Wenk et al. (1972) Study 3 | 6.2 | 93.8 | 104 | 1 |
| Kozol et al. (1972) | 34.7 | 65.3 | 49 | 5 |
| State of Maryland (1973) | 46.0 | 54.0 | 221 | 3 |
| Steadman (1973) | 20.0 | 80.0 | 967 | 4 |
| Thornberry and Jacoby (1974) | 14.0 | 86.0 | 438 | 4 |
| Cocozza and Steadman (1976) | 14.0 | 86.0 | 96 | 3 |

[a]Updated from Monahan (1976).

[3]This section draws heavily from Monahan (1975, 1976) and Monahan and Cummings
(1976).

signed to a "potentially aggressive" category, and the rest to a "less aggressive" category. During a 1-year follow-up, however, the rate of crimes involving actual violence for the potentially aggressive group was only 3.1 per 1,000, compared with 2.8 per 1,000 among the less aggressive group. Thus, for every correct identification of a potentially aggressive individual, there were 326 incorrect ones.

The final study reported by Wenk *et al.* (1972) sampled over 4,000 California Youth Authority wards. Attention was directed to the record of violence in the youth's past and an extensive background investigation was conducted, including psychiatric diagnoses and a psychological test battery. Subjects were followed for 15 months after release, and data on 100 variables were analyzed retrospectively to see which items predicted a violent act of recidivism. The authors concluded that the parole decision maker who used a history of actual violence as his sole predictor of future violence would have 19 false positives in every 20 predictions, yet "there is no other form of simple classification available thus far that would enable him to improve on this level of efficiency" (p. 399). Several multivariate regression equations were developed from the data, but none was even hypothetically capable of doing better than attaining an 8-to-1 false-to-true positive ratio.

Kozol *et al.* (1972) have reported a 10-year study involving almost 600 offenders. Each offender was examined independently by at least two psychiatrists, two psychologists, and a social worker. A full psychological test battery was administered and a complete case history compiled. During a 5-year follow-up period in the community, 8 percent of those predicted not to be dangerous became recidivists by committing a serious assaultive act, and 34.7 percent of those predicted to be dangerous committed such an act. While the assessment of dangerousness by Kozol and his colleagues appears to have some validity, the problem of false positives stands out. Sixty-five percent of the individuals identified as dangerous did not, in fact, commit a dangerous act. Despite the extensive examining, testing, and data gathering they undertook, Kozol *et al.* were wrong in two out of every three predictions of dangerousness. (For an analysis of the methodological flaws of this study, see Monahan 1973b, and the rejoinder by Kozol *et al.* 1973.)

Data from an institution very similar to that used by Kozol *et al.* have recently been released by the Patuxent Institution (State of Maryland 1973). Four hundred and twenty-one patients, each of whom received at least three years of treatment at Patuxent, were considered. Of the 421 patients released by the court, the psychiatric staff opposed the release of 286 on the grounds that they were still dangerous and

248                                    COMMISSIONED PAPERS

recommended the release of 135 as safe. The criterion measure was any
new offense (not necessarily violent) appearing on FBI reports during
the first 3 years after release. Of those patients released by the court
against staff advice, the recidivism rate was 46 percent if the patients
had been released directly from the hospital, and 39 percent if a "con-
ditional release experience" had been imposed. Of those patients re-
leased on the staff's recommendation and continued for outpatient
treatment on parole, 7 percent recidivated. Thus, after 3 years of ob-
servation and treatment, between 54 and 61 percent of the patients
predicted by the psychiatric staff to be dangerous were not discovered
to have committed a criminal act.

In 1966, the U.S. Supreme Court held that Johnnie Baxstrom had
been denied equal protection of the law by being detained beyond his
maximum sentence in an institution for the criminally insane without
the benefit of a new hearing to determine his current dangerousness
(*Baxstrom v. Herold*, 1966). The ruling resulted in the transfer of nearly
1,000 persons "reputed to be some of the most dangerous mental pa-
tients in the state [of New York]" (Steadman 1972) from hospitals for
the criminally insane to civil mental hospitals. It also provided an ex-
cellent opportunity for naturalistic research on the validity of the psy-
chiatric predictions of dangerousness upon which the extended deten-
tion was based.

There has been an extensive follow-up program on the Baxstrom
patients (Steadman and Cocozza 1974). Researchers find that the level
of violence experienced in the civil mental hospitals was much less
than had been feared, that the civil hospitals adapted well to the mas-
sive transfer of patients, and that the Baxstrom patients were being
treated the same as the civil patients. The precautions that the civil
hospitals had undertaken in anticipation of the supposedly dangerous
patients—the setting up of secure wards and provision of judo training
to the staff—were largely for naught (Rappaport 1973). Only 20 per-
cent of the Baxstrom patients were assaultive to persons in the civil
hospital or the community at any time during the four years following
their transfer. Furthermore, only 3 percent of Baxstrom patients were
sufficiently dangerous to be returned to a hospital for the criminally
insane during 4 years after the decision (Steadman and Halfon 1971).
Steadman and Keveles (1972) followed 121 Baxstrom patients who had
been released into the community (i.e., discharged from both the crim-
inal and civil mental hospitals). During an average of 2½ years of
freedom, only nine of the 121 patients (8 percent) were convicted of a
crime and only one of those convictions was for a violent act. The
researchers found that a Legal Dangerousness Scale (LDS) was most

*The Prediction of Violent Criminal Behavior*                              **249**

predictive of violent behavior. The scale was composed of four items: presence of juvenile record, number of previous arrests, presence of convictions for violent crimes, and severity of the original Baxstrom offense. In subsequent analyses, Cocozza and Steadman (1974) found that the only other variable highly related to subsequent criminal activity was age (under 50 years old). In one study, 17 of 20 Baxstrom patients who were arrested for a violent crime when released into the community were under 50 and had a score of 5 or above on the 15-point Legal Dangerousness Scale. Yet the authors conclude (pp. 1013-1014)

For every one patient who was under 50 years old and who had an LDS score of 5 or more and who was dangerous. there were at least 2 who were not. Thus, using these variables we get a false positive ratio of 2 to 1. . . . Despite the significant relationship between the two variables of age and LDS score and dangerous behavior if we were to attempt to use this information for statistically predicting dangerous behavior our best strategy would still be to predict that none of the patients would be dangerous.

The Supreme Court's Baxstrom decision prompted a similar group of "mentally disordered offenders" in Pennsylvania to petition successfully for release in *Dixon v. Pennsylvania*, 1971. The results of the release of 438 patients have been reported by Thornberry and Jacoby (1974) and are remarkably similar to those reported by Steadman. Only 14 percent of the former patients were discovered to have engaged in behavior injurious to another person within 4 years after their release.

Finally, Cocozza and Steadman (1976) followed 257 indicted felony defendants found incompetent to stand trial in New York state in 1971 and 1972. All defendants were examined for a determination of dangerousness by two psychiatrists, with 60 percent being predicted to be dangerous and 40 percent not so. Subjects were followed in the hospital and in the community (if they were eventually released) during a three year follow-up. While those predicted to be dangerous were slightly but insignificantly more likely to be assaultive during their initial incompetency hospitalization than those predicted not to be dangerous (42 percent compared with 36 percent). this relationship was reversed for those rearrested for a crime after their release, with 49 percent of the dangerous group and 54 percent of the not-dangerous group rearrested. Predictive accuracy was poorest in the case of a rearrest for a violent crime. "perhaps the single most important indicator of the success of the psychiatric predictions." Only 14 percent of the dangerous group, compared with 16 percent of the not-dangerous group, were rearrested for violent offenses. While these data are susceptible to alternative interpretations (Monahan, in press[a]), the authors believe that they

constitute "the most definitive evidence available on the lack of exper-
tise and accuracy of psychiatric predictions of dangerousness" and
indeed represent "*clear and convincing evidence* of the inability of
psychiatrists or of anyone else to accurately predict dangerousness."

The conclusion to emerge most strikingly from these studies is the
great degree to which violence is overpredicted. Of those predicted to
be dangerous, between 54 and 99 percent are false positives—people
who will not, in fact, be found to have committed a dangerous act.
Violence, it would appear, is vastly overpredicted, whether simple
behavioral indicators or sophisticated multivariate analyses are em-
ployed and whether psychological tests or thorough psychiatric exami-
nations are performed.

Several factors have been suggested that might account for the great
degree of overprediction found in the research (Monahan 1976).

1. *Lack of corrective feedback to the predictor.* The individual is
usually incarcerated on the basis of the prediction and so it is impossi-
ble to know whether or not he actually would have been violent (Der-
showitz 1970).

2. *Differential consequences to the predictor of overpredicting and
underpredicting violence.* False negatives lead to much adverse public-
ity, while false positives have little effect on the predictor (Steadman
1972).

3. *Differential consequences to the individual whose behavior is
being predicted.* A prediction of violence may be necessary to ensure
involuntary treatment (Monahan and Cummings 1975).

4. *Illusory correlations between predictor variables and violent be-
havior.* The often cited correlation between violent behavior and men-
tal illness, for example, appears to be illusory (Gulevich and Bourne
1970, Sweetland 1972).

5. *Unreliability of violence as a criterion event.* There is little con-
sensus as to the definition of violence, and great unreliability in verify-
ing its occurrence (Monahan and Geis 1976).

6. *Low base rates of violence.* The prediction of any low-base-rate
event is extremely difficult (Rosen 1954).

7. *Low social status of those subjected to prediction efforts.* Over-
prediction may be tolerated in part because of class biases in the crimi-
nal justice and mental health systems (Geis and Monahan 1976, Mona-
han *et al.* in press).

## IV.  FUTURE RESEARCH DIRECTIONS IN THE PREDICTION OF VIOLENCE

The conclusion of Wenk and his colleagues (1972) that "there has been no successful attempt to identify, within . . . offender groups, a sub-class whose members have a greater than even chance of engaging again in an assaultive act" is widely shared by researchers in the field (e.g., Stone 1975, Megargee 1976). There is no consensus, however, on the implications of this conclusion for future research. Some agree with Wilkins's (1972) assessment of a major California prediction study that "research along these lines does not seem worthwhile to press. Perhaps this study should be 'the last word' for some time in attempts to 'predict' violence potential for individuals." Others side with Hala-tyn (1975) that the empirical studies to date "reflect data and design limitations which should stimulate rather than stifle further research."

While the future may bear out Wilkins's pessimistic judgment, we shall proceed here in the spirit of Halatyn's remarks and assume that the last word on violence prediction has yet to be uttered. A series of research priorities shall be articulated that, if successfully implemented, might improve the ability to predict violence to a point at which it could provide useful information to policy decision makers. The ensuing discussion will consider the criterion variables that define violent or dangerous criminal behavior and the predictor variables that attempt to forecast it. In each of these categories, several recommendations will be made to improve the quality of research in the prediction of violence, and specific proposals for research projects will be offered.

*Recommendation One: Research on violence prediction must employ multiple definitions of violence.*

*Proposal One: Violence should be defined in a hierarchy including (a) the four FBI violent index crimes of murder, forcible rape, robbery, and aggravated assault, and (b) all assaultive acts against persons.*

The choice of a definition of violence for research purposes would be made more simple if there were a consensus among either the public or professional groups as to what behaviors should be counted as danger-ous. Unfortunately, no such consensus exists (Monahan and Hood, in press). Given this fact, the appropriate research strategy would seem to lie in the direction of multiple definitions of violence. Research on violence prediction should use several hierarchical definitions of the criterion, each succeeding one being more inclusive than that before it.

This would have two substantial advantages over the current prolifera-
tion of studies employing a single arbitrary definition of violent or
dangerous behavior:

1. It would allow a greater degree of comparability across studies.
As things stand now, it is very difficult to compare the results of predic-
tion research projects that use different criteria. Even projects as simi-
lar as Kozol et al. (1972) and state of Maryland (1973) did not use
similar criteria. Kozol et al. defined their criterion as "serious assaul-
tive acts," while at Patuxent, the definition was "any new offense, not
necessarily violent."

2. It would facilitate policy implications being drawn from the re-
search. Violence, as Skolnick (1969, p. 4) notes "is an ambiguous term
whose meaning is established through political processes." If re-
searchers could present policy makers with a series of plausible defini-
tions of violence, each with attendant empirical data with regard to
predictability, the final choice of definition could be left in the political
arena (Heller and Monahan 1977).

In establishing multiple definitions of violence, it should be noted
that the more inclusive the definition, the greater the predictive accu-
racy: Large targets are easier to hit than small ones. The data bear out
this axiom. One attempt to predict "assaultive behavior" had 16 per-
cent true positives when the criterion was defined as "homicide, all
assaults, attempted murder, battery, forcible rape and attempt to
rape"; 22.6 percent true positives when the criterion was expanded to
include "other sex offenses and kidnapping"; and 53 percent true posi-
tives when assaultive behavior was construed still more loosely to
encompass "all of the above plus robbery, all sex offenses, weapon
offenses and disturbing the peace" (cited in Halatyn 1975). While pre-
dictive accuracy is indeed increased as definitions of violence expand,
there comes a point at which it is arguable whether one is studying
violence or simply any kind of lawbreaking. Including "disturbing the
peace" as violent, for example, would seem to stretch the concept to
its breaking point.

It would be reasonable to specify initially that at least two levels of
the criterion must be identified in future research. One level should be
violence in its most strict construction, and the other should be some-
what more inclusive in nature. The narrowest definition of violent
crime in common use is that employed by the Federal Bureau of Inves-
tigation (e.g., Kelley 1976). Violent crime, according to the FBI, is
restricted to (a) murder, (b) forcible rape, (c) robbery, and (d) aggra-

vated assault. There would seem to be little disagreement that these four acts are indeed violent ones.

At the more inclusive level, the kinds of acts referred to by Cocozza and Steadman (1974) and Rubin (1972) as "assaultive behavior against persons," or more formally by Megargee (1976) as "acts characterized by the application or overt threat of force which is likely to result in injury to people" appear reasonably to be definable as violent. According to Megargee (p. 5):

> this use of the term [violent] includes, but is not restricted to, such criminal acts as homicide, mayhem, aggravated assault, forcible rape, battery, robbery, arson, and extortion. Criminal behavior not likely to result in injury to people, such as noncoercive thefts or vandalism, are excluded, as are business practices which, although injurious to people, do not involve the application of force.

It is not possible to list precisely all the crimes to be included in this second-level definition of violence, since the categorization of crimes differs from state to state and since many violent acts will result in civil commitment rather than arrest (Cocozza and Steadman 1974). Yet the thrust of defining violence in terms of "assaultive acts against persons" could be captured in future research studies and could add substantially to our ability to compare various prediction efforts and draw policy-relevant information from them.

In research on clinical predictions[4] of violence, it would also appear necessary to achieve a consistency between the "working definitions" of violent behavior employed by the individuals making the predictions and the definitions used in the follow-up research. If a psychiatrist considers "writing a bad check" to be a sufficiently dangerous behavior to justify institutionalization to prevent its occurrence (*Overholser v. Russell*, 1960), and if the validation researcher is limiting his or her definitions of dangerousness to the FBI violent index crimes and assaultive behavior against persons, it is not surprising that overprediction would be reported. Rather than overprediction, however, this would more properly be a case of unsynchronized definitions. Even if the predictions were perfectly accurate—if those predicted to write bad checks actually wrote them—the follow-up researcher using less inclusive definitions of violence would report them as false positives. The two ways in which this inconsistency could be resolved are to match the follow-up criteria to the working definitions used by the clinicians

[4]See the discussion of Recommendation 4 in Section IV for a discussion of clinical and actuarial prediction.

254                          COMMISSIONED PAPERS

predicting violence, or to provide the clinicians with the definitions to be used in the follow-up and have them predict according to those definitions. Given the need for consistency across different prediction studies, as well as within each prediction study, the latter alternative would appear to be preferable.

*Recommendation Two: Research on violence prediction must employ multiple time-periods for follow-up validation.*
*Proposal Two: Studies should report follow-up results at (a) 1 year, (b) 3 years, and (c) 5 years after release.*

The empirical attempts to validate predictions of violence have used a follow-up period of from 1 to 5 years (Table 1). It is self-evident that the longer the follow-up period, the more likely one is to find high rates of true positives, due to the fact that each individual has more opportunity to commit a violent act. Given the difficulty of predicting low-base-rate events, lengthening the follow-up period will have the effect of increasing the base rate, and hence lowering the probability of false positives. The data bear this out. The two studies employing a 1-year follow-up had false positive rates of 99.7 and 93.8 percent, while the six studies using a 3- to 5-year follow-up had false positive rates of 86.0, 86.0, 86.0, 80.0, 65.3, and 54.0 percent.

As with the definition of the criterion, the specification of the follow-up period is not a case of choosing the "best" way to do research. Multiple follow-up periods would serve the same function as multiple definitions: They would increase comparability between studies and facilitate the generation of policy-oriented knowledge. As an attempt at this needed "standardization" of research studies, the reporting of follow-up results at 1-year, 3-year, and 5-year intervals would appear to be both reasonable and feasible.

In the case of predictions by mental health professionals, it would seem that a specification of the duration of the follow-up periods should be made at the time of the original predictions. It would then be possible for different predictions to be made for each of the follow-up periods. For example, a psychiatrist could predict that a given offender or patient had a 30-percent probability of committing a violent act within 1 year after release, a 60-percent probability within 3 years, and an 80-percent probability within 5 years.

*Recommendation Three: Research on violence prediction must employ multiple methods of verifying the occurrence of violent behavior.*
*Proposal Three: Verification methods should be employed in a*

*hierarchy including (a) conviction rates; (b) conviction rates and arrest rates; (c) conviction rates, arrest rates, and rates of civil commitment to mental hospitals; and (d) all of the above plus self-report.*

In the prediction studies to date, police arrest rates have been the primary means of verifying whether or not a violent act has occurred during the follow-up period. For at least two reasons, however, arrest rates are inadequate methods of verification: Most violent behavior is never reported to the police, and the violent behavior that is reported often does not lead to the recording of an arrest.

On the first point, a recent victimization study in eight major American cities found that only 40 to 50 percent of all violent crime was reported to the police. The reporting rate for simple assault ranged from 27 to 39 percent (U.S. Department of Justice 1974). While the reasons for not reporting a crime are varied (e.g., embarrassment, fear of retaliation, low opinion of police effectiveness), the result of underreporting is surely to reduce the usefulness of arrest records as a means of verifying the occurrence of violent behavior (Halatyn 1975).

Added to this is the fact that the "clearance rate" of reported crime (i.e., the percentage of reported crime that results in an alleged offender being charged and taken into custody) is far from perfect. While the clearance rate for murder is reasonably high (79 percent), the clearance rates for forcible rape (51 percent), aggravated assault (63 percent), and robbery (27 percent) are such that a large portion of the violent crime that is reported never finds its way into police statistics (Kelley 1976).

In addition to the standard reasons given to account for the low clearance rates for violent crime (e.g., unidentified offenders, lack of evidence, unwillingness of the victim to press charges, etc.), one factor especially relevant to validation studies of the prediction of violence is that mental hospitalization is often used by the police as an alternative to arrest. As Cocozza and Steadman (1974, p. 1013) noted in their follow-up of the "criminally insane" Baxstrom patients, "some of the patients were rehospitalized for behavior very similar to that displayed by other patients who were arrested for violent crimes." One Los Angeles study found that 33 percent of police referrals to a medical center psychiatric unit had as their primary precipitating incident "some degree of aggressive behavior." In none of these cases was an arrest made (Jacobson *et al.* 1973).

When these limitations on the use of official crime statistics are taken in concert, they suggest that many persons classified as false positives in prediction research actually may be leading active careers in violent

crime but simply have not yet been apprehended and charged or, if they have been apprehended, they have been diagnosed as "dangerous to others" and processed through the mental health rather than the criminal justice system.

If it is violent behavior, rather than arrests for reported violent crime, that prediction researchers are really interested in, they would do well to broaden their procedures for verifying its occurrence. Criminal justice statistics are estimates of the amount of violent behavior occurring in a given group predicted to be violent. As such, they should be used along with other indicators of violent behavior to arrive at the most reliable estimate possible.

Each estimate of violent behavior will have its own error costs. Reliance solely upon conviction rates for violent crime to verify the occurrence of violent behavior would tend to avoid the erroneous recording of events as violent, but at an enormous cost in the nonrecording of violent events that do occur.[5] Arrest records likewise will underestimate crime to the extent that it is unreported or uncleared, but against this underestimation there must be a consideration of those innocent persons who are arrested and later acquitted or have the charges dropped. This is even more true with data on civil commitments to mental hospitals, in which discretion as to the definition of violence and the procedures for certifying its occurrence is great (Monahan 1973a, 1973b, 1977a, 1977b).

Additional validation procedures are needed that do not rely upon the official statistics that so underrecord violent behavior. One such procedure is self-report. Self-report methodologies have been used extensively in the study of delinquency (Hirschi 1969) and might be applied fruitfully to the study of adult violence. In this regard, Toch (1969) has developed a "peer interview" technique whereby parolee research assistants interview other parolees regarding instances of violent behavior. With appropriate guarantees of confidentiality, such methods may provide an extremely valuable addition to the use of official statistics to validate predictive judgments. A representative sample of a cohort of ex-prisoners or ex-patients whose potential for violence is being assessed could be interviewed by other ex-prisoners or ex-patients at 1-, 3-, and 5-year intervals to obtain data on actually committed, but not recorded, violent behavior.

As with the definition of violence and the duration of the validation period, multiple methods for verifying the occurrence of violent behav-

[5]It should be clear that the use of estimates of criminality other than conviction is for research purposes only, since due process considerations preclude their use in the disposition of individual cases.

*The Prediction of Violent Criminal Behavior*                    257

ior would appear appropriate in future research. A hierarchy of valida-
tion procedures beginning with convictions then sequentially adding
arrests, mental hospital commitments,[6] and self-reports might be a
viable approach. Such a tack, as earlier, should increase comparability
across prediction studies and facilitate the derivation of policy implica-
tions from the data.

*Recommendation Four: Research on violence prediction should
stress actuarial rather than clinical methods.*
*Proposal Four: Actuarial models of the clinical decision-making
process should be constructed.*

The two generic methods by which violent behavior (or any other
kind of event) may be anticipated are known as clinical and actuarial
prediction. In clinical prediction, a psychologist, psychiatrist, parole
board member, or other person acting as a "clinician" considers what
he or she believes to be the relevant factors predictive of violence and
renders an opinion accordingly. This was the method used in the
Kozol, Steadman, Thornberry and Jacoby, and Patuxent studies re-
viewed earlier. The clinician may rely in part upon actuarial data in
forming the prediction, but the final product is the result of an intuitive
weighting of the data in the form of a professional judgment. Actuarial
(or statistical) prediction refers to the establishment of statistical rela-
tionships between given predictor variables (e.g., age, number of prior
offenses) and the criterion of violent behavior. This method was used
in the Wenk *et al.* series of studies. The prediction variables may
include clinical diagnoses or scores on psychological tests, but these
are statistically weighted in a prediction formula.

One of the "great debates" in the field of psychology has revolved
around the relative superiority of clinical versus actuarial methods. It is
one of the few such debates to emerge with a clear-cut victor. With the
publication of Paul Meehl's classic work in 1954 and its many sub-
sequent confirmations (Sawyer 1966), actuarial methods have come to
be recognized as the generally superior way of predicting behavior.

At first glance, the research reviewed above on the prediction of
violence would appear to constitute an exception to this rule. The five
clinical studies have reported substantially better predictions than the
three actuarial ones. While several confounding factors make this

[6]By commitment here is meant commitment to a mental hospital through the police
power rather than the *parens patriae* power of the state (Kittrie 1971, Shah 1977). Thus,
in California, a civil commitment as "dangerous to others" should be counted in valida-
tion studies, while commitment as "gravely disabled" (which is defined as an inability to
feed, clothe, or house oneself) should not.

258                                COMMISSIONED PAPERS

comparison problematic (e.g., the base-rate for violent behavior was higher, and the follow-up period longer for the clinical than for the actuarial studies), it would at least be fair to conclude that the actuarial method has not shown the same superiority over the clinical method in the case of violence as it has with the prediction of other behaviors.

Two conflicting interpretations might be drawn from a comparison of the clinical and actuarial studies. One is that clinical prediction methods really do constitute the best way to predict violent behavior, and that future research should focus on improving the predictive accuracy of clinicians. The other is that actuarial methods have not yet lived up to their potential, judging from their performance in other areas, and that a priority for future research should be the development of more sophisticated actuarial models. We shall argue for the latter interpretation.

While it is undoubtedly true that much can be done to improve the accuracy of clinical predictions of violence—including the multiple definitions, validation periods, and methods of verification mentioned earlier and the inclusion of situational variables, to be discussed below—the impression persists that clinicians have taken their best shot at predicting violence and that future improvements will not drastically alter the two-to-one false positive ratio reported so consistently. The Kozol and Patuxent studies, for example, both involved extensive multidisciplinary examinations over a lengthy period of observation in nationally recognized institutions. The base rates for violence in their populations were high, the follow-up periods long, and the criteria generous. Still, a majority of the predictions were erroneous in both cases.

Actuarial studies, on the other hand, have often been based on "general purpose variables" (Wenk and Emrich 1972) rather than on theoretically derived predictors and have been employed with short follow-up periods on populations with very low base-rates of violent behavior. There have been few actuarial studies of any sort, and all have relied on data from a single source (the California Department of Corrections). It would seem that actuarial methods need to be pursued with more vigor before an exception is declared to the general superiority of actuarial over clinical prediction.

But perhaps too much has been made in the past of distinguishing actuarial and clinical methods, and not enough of how each might contribute to the other. Clinical predictions, as was noted, may take into account actuarial tables, and actuarial prediction may incorporate clinical judgments. Two possible strategies for cross-fertilization, therefore, suggest themselves. One is to provide clinicians with as

much actuarial information as possible, to see if this affects their predictions. The other is to construct actuarial models based upon the variables used in the clinical decision-making process.

On the first point, Hoffman *et al.* (1974) presented actuarial prediction tables to parole board members reviewing the files of adult male inmates for parole consideration. The board members were then asked for their own clinical predictions and for a decision on whether the inmates should be paroled or kept in prison. They found that the correlation between statistical risk estimates based on the actuarial tables and the board's clinical risk estimates was 0.74 when the actuarial tables were presented to board members before they made their clinical judgments, and 0.53 when the tables were not provided. The correlation between risk estimates and the outcome of the parole decision was 0.30 when the actuarial tables were provided and 0.18 when they were not. The provision of actuarial data, therefore, affected both the clinical judgments of the parole board and its parole decisions in the predicted direction.

The difficulty with this strategy is that it is, in effect, matching clinical judgments to actuarial ones. This will result in improved predictive accuracy only to the extent that the actuarial predictions are, in fact, better than clinical ones would be. In the prediction of violence, however, actuarial predictors have not yet shown their superiority. Based on the results reviewed earlier, influencing clinical predictions to look more like actuarial ones could result in lowered predictive accuracy in the case of violent behavior. This is especially true in light of the fact that Hoffman *et al.* (1974) found that actuarial data were more likely to result in increasing clinical predictions of unfavorable parole outcome (when the actuarial data suggested such an unfavorable outcome) than they were to result in decreased predictions of unfavorable outcome (when the actuarial data were in the favorable direction). This would mean even more false positives if such a strategy were applied to the prediction of violence.

The other possible rapprochement between clinical and actuarial prediction lies in the construction of actuarial models of clinical decision making. Along these lines, Gottfredson *et al.* (1975), relying upon a study that found that the primary variables influencing parole decision making were severity of offense, "parole prognosis," and institutional behavior, developed systematic decision-making guidelines to be fed back to the parole board members from whom the factors were originally derived. They operationalized severity of offense on a 6-point scale and parole prognosis on an 11-point "salient factor" actuarial table, and they developed guidelines concerning the mean sen-

260                                        COMMISSIONED PAPERS

tence served for each severity/risk level. These guidelines were pre-
sented to the parole decision makers, as they were reviewing cases,
who were asked to record their reasons if their recommended sentence
in a given case was outside the range provided (poor performance in
the institution, for example, could be one reason for exceeding the
guidelines). While no comparison groups were used in this study, the
researchers found that 63 percent of the parole recommendations were
within the guidelines presented.

Creating actuarial models of the clinical decision-making process in
the prediction of violent behavior could have two advantageous ef-
fects. First, it would make explicit the variables used in clinical deci-
sion making. These variables could then be incorporated on their own
account into actuarial models so that their predictive accuracy could be
independently assessed. Second, it could increase consistency both
between and within individual decision makers, and this increased con-
sistency or reliability could itself lead to improved predictions. As
Goldberg (1970) has stated, "linear regression models of clinical judges
can be more accurate diagnostic predictors than the humans who are
modeled." He goes on to note that a clinician can incorporate and
evaluate a great deal of information but that he or she lacks the reliabil-
ity of a computer always to respond to similar information in similar
ways (p. 423):

[The clinician] "has his days": Boredom, fatigue, illness, situational and inter-
personal distractions all plague him, with the result that his repeated judgments
of the exact same stimulus configuration are not identical. He is subject to all
those human frailties which lower the reliability of his judgments below unity.
And, if the judge's reliability is less than unity, there must be error in his
judgments—error which can serve no other purpose than to attenuate his
accuracy.

Goldberg took a subsample of psychologists' judgments on predict-
ing psychosis from psychological tests and derived a statistical model
of their decision-rules. He then had the clinicians and the statistical
model of the clinicians compete in predicting psychosis (defined inde-
pendently) for the rest of the sample. The model won, since it was not
subject to the same random errors as were the clinicians from whom it
was derived.

It is important to separate the reliability of predictions from their
accuracy or validity. Creating statistical models of the clinical predic-
tion process may increase the reliability of the process substantially,
but it will increase predictive accuracy or validity only to the extent
that some random error is eliminated. Deriving an actuarial model of a
clinical prediction process that has low reliability and low validity will

*The Prediction of Violent Criminal Behavior*                               **261**

result only in a model with high reliability and almost-as-low validity. The model, in other words, will not be much better than the clinical judgments on which it is based. It may, however, be much quicker and cheaper than human predictions.

Since clinicians do appear to have some (albeit meager) ability to predict violent behavior, a priority for future research should be to create statistical models of the clinical prediction process. The factors obtained could themselves be used in a prediction model (as in Goldberg 1970), or they could be fed back to the clinical decision makers in a systematic fashion to see if they would make more consistent judgments when presented with, in effect, their own preferred data base (as in Gottfredson *et al.* 1975).

*Recommendation Five: Research on violence prediction should include situational as well as dispositional predictor variables.*

*Proposal Five: Situational variables should be derived from conceptions of human environments in terms of (a) personal characteristics of the environment's inhabitants, (b) reinforcement properties of the environment, and (c) the psychosocial climate of the environment.*

After one has defined the criteria, specified the validation periods, selected the methods of verification, and decided upon a clinical or an actuarial prediction format, it remains to choose the variables upon which one will base the prediction effort. Ideally, these predictor variables should be related to the criterion variables by virtue of their causal implication in some theory of violent behavior. Yet unlike theories of aggression (e.g., Bandura 1973), theories of human violence have not generated a great deal of scholarly interest (Megargee 1969). This has left the person who would predict violence with only his or her own implicit theory of violence to guide in the selection of predictor variables.

As it happens, since many of the individuals involved in violence prediction efforts have been mental health professionals or others who have adopted a ''mental health ideology,'' almost all of the variables that have been investigated as predictors of violence have been dispositional variables. That is, they have referred to fixed or relatively enduring attributes or traits of the person under study, such as age, sex, race, prior criminal record, or psychiatric history and diagnosis. This reliance upon dispositional variables or personal traits has characterized not only the prediction of violence but the prediction of all types of behavior. The result has been the same in each case: low correlations between predictor and criterion variables (Mischel 1968; *cf.* Bem and Allen 1974). In this regard, Arthur (1971), reviewing studies of the

prediction of military performance, has stated that a prediction "sound barrier" exists, since "no matter how much information about the individual one adds to the predictive equation, one cannot bring the correlation coefficient between individual characteristics and prediction criteria much above about .40" (p. 544). This "sound barrier" remains unbroken by research on the prediction of violence.

An alternative to the dispositional or trait perspective in the mental health fields has arisen that offers a possible source of previously overlooked variables to include in prediction research. While the roots of the ecological perspective on human behavior have been planted for some time (e.g., Park 1925), it is only recently that this approach has been taken seriously in psychology (Kelly 1966, Moos and Insel 1974, Stokols 1977).

The ecological or environmental perspective on human behavior derives in part from a new appreciation of Kurt Lewin's (Lewin *et al.* 1939) dictum that behavior is a joint function of characteristics of the person and characteristics of the environment with which he or she interacts. Until recently, psychological and psychiatric research had focused almost solely on dispositional or person variables. The ecological approach attempts to right this imbalance by an emphasis upon situational or environmental variables, as they interact with personal characteristics. While environmental research of relevance to the topic of violent behavior has been initiated (Newman 1972, Monahan and Catalano 1976), there has as yet been no empirical attempt to apply the ecological or environmental perspective to the problem of prediction. This is despite the fact that there is coming to be widespread agreement with Moos's statement (1975a) that "to adequately predict individual aggressive behavior, one must know something about the environment in which the individual is functioning" (p. 13).

The use of environmental or situational variables in prediction differs from the use of personal or dispositional variables in at least one major way. In the case of dispositional variables, one has only to establish a relationship between the predictors and the criterion. Since the dispositional variables refer to fixed or relatively enduring characteristics of the person, one knows immediately whether any obtained relationship can be applied to a given case: An individual subject will not change from white to black, from male to female, or from 45 to 25 years old over the duration of the follow-up. In the case of situational predictors, however, one must establish both a statistical relationship between a given situation and violent behavior and the probability that the individual will in fact encounter that situation. One might, for example, predict with a high degree of accuracy that a given class of offenders

will resort to violent behavior when confronted with a situation they interpret as a challenge to their masculinity. To predict the actual occurrence of violent behavior, however, one would then have to perform a separate prediction concerning whether they will encounter such situations during the period under investigation.

It can be argued that the inclusion of situational variables is the most pressing current need in the field of violence prediction research. The principal factor inhibiting the development of situational predictors of violence is the lack of comprehensive ecological theories relating to the occurrence of violent behavior.

Moos (1973) has identified six different ways of conceptualizing human environments that have been used in previous research:

1. *Ecological dimensions*, including meteorological, geographic, and architectural variables;

2. *Dimensions of organization structure*, including staffing ratios and organization size;

3. *Personal characteristics of milieu inhabitants*, implying that the character of an environment depends upon the characteristics (e.g., age, sex, abilities) of those who inhabit it;

4. *Behavior settings*, defined by Barker (1968) as units with both behavioral and environmental components (e.g., a basketball game);

5. *Functional or reinforcement properties of environments*, suggesting that people vary their behavior from one setting to another principally as a function of the reinforcement consequences in the different environments; and

6. *Psychosocial characteristics and organizational climate*, in which the characteristics of an environment, as perceived by its members, are measured on various psychosocial scales.

Of these six extant conceptualizations of human environments, two (ecological dimensions and dimensions of organizational structure) appear not to be relevant to the prediction of individual violence, and another (behavior settings) is in an insufficient state of development to allow for its current application to the topic of prediction. The remaining three all provide guidance for the formation of environmental predictors of violence.

Conceptualizing environments in terms of the personal characteristics of milieu inhabitants might lead a researcher to inquire of the about-to-be-released prisoner or mental patient who he or she would be living, working, and recreating with in the post-release environment. The pooled base-rate probabilities of violence for these individuals

264                          COMMISSIONED PAPERS

(given their age, sex, and prior history of violence, for example)
should, according to this approach, relate significantly to the probabil-
ity of violent behavior being committed by the ex-prisoner or ex-
patient who enters the environment.

Emphasizing the functional or reinforcement properties of environ-
ments would lead the researcher to a behavioral analysis of the reward
contingencies operating in the environments in which the predicted
individual would be functioning. If, in a given environment, desired
rewards (e.g., material goods, peer approval, self-esteem) can be ob-
tained only by committing violent behavior, then the probability of
violence in this environment would be high, according to reinforcement
theory.

Finally, environments may be conceptualized for the purpose of pre-
diction according to their psychosocial characteristics and organiza-
tional climate. According to Moos, this "social climate" perspective
"assumes that environments have unique 'personalities' just like
people. Personality tests assess personality traits or needs and provide
information about the characteristic ways in which people behave.
Social environments can be similarly portrayed with a great deal of
accuracy and detail" (1975a, p. 4). He has devised a series of scales to
measure the perceived social climates of prisons, hospital wards,
community-based treatment programs, classrooms, military units, and
families (1975a, 1975b). Common to all these scales are three basic
dimensions of the environment: (a) relationship dimensions, such as
the degree to which the environment is supportive and involving; (b)
personal development dimensions, such as the degree of autonomy the
environment provides; and (c) system maintenance and system change
dimensions, including the degree to which the environment emphasizes
order, organization, and control.

Drawing from Moos's extensive body of research, scales might be
derived to describe the psychosocial environment in which a prisoner
or mental patient is likely to return when released from an institution.
For example, the relationship dimension could be operationalized in
terms of items such as, "Is the individual likely to be returning to a
parent or spouse, or will he or she be living alone? If the individual will
be living with someone else, how likely is that other person to be
supportive of a nonviolent lifestyle?" The personal development di-
mension might involve items concerning how likely the individual will
be to attain a satisfying life-style (e.g., as the leader of a peer group)
without resort to violence. System maintenance and dimensions of
system change might be operationalized by estimates that the indi-

*The Prediction of Violent Criminal Behavior*                    265

vidual will be employed in a satisfying job (Cook 1975, Witte 1976, Monahan and Monahan 1977).

It should be clear that these three methods of describing environments overlap greatly and that some situational predictor items would fit equally well under any of the three rubrics. It should also be clear that situational variables are being proposed for use in addition to, rather than instead of, dispositional variables in actuarial or clinical prediction schemes. It is the interaction of dispositional and situational variables that holds the greatest promise for improved predictive accuracy. Ideally, it eventually might be possible to make differential predictions of the sort that an individual with dispositional characteristics of type $N$ would have $X$ probability of violent behavior if he resided in environment type $A$, and $Y$ probability if he resided in environment type $B$. But in order to reach this nirvana of prediction, it will be necessary for researchers to begin the arduous task of compiling and verifying a catalog of situations that relate to the future occurrence of violent behavior. The three nonexclusive approaches to conceptualizing human environments reviewed above could provide a framework for deriving specific predictor items that could then be applied to a cohort of prisoners or mental patients about to be released from institutions and validated during follow-up periods by the multiple methods specified previously.


## V. CONCLUSION

We have examined the research to date on the prediction of violent criminal behavior and suggested several ways in which research in the future might improve upon it. The prediction of violence is an area of intrinsic scientific interest and policy importance as well.[7] In the latter regard, it is well to keep in mind that improvements in prediction technology can inform but not determine public policy. The risks must be borne by the false positives who languish in institutions and the victims of false negatives who lie in the streets. It is a rare prisoner who will accept with equanimity the explanation that he must be denied parole because the odds are one-in-three that he will be violent upon release. It is an even rarer victim of violent crime who will care to listen

[7]The policy implications of prediction research have been addressed in von Hirsch (1972), Dershowitz (1973, 1974), Wilkins (1975), Shah (1976, 1977), Wexler (1976), Fagin (1976), Dix (1976), and Monahan (in press [b]) in addition to the references cited previously.

266                                              COMMISSIONED PAPERS

to a treatise on the difficulty of predicting low-base-rate events. The task of research is to provide the most accurate estimates possible of the relative risks to the individual and to society of various procedures for predicting violence. Their weighting remains, as it must, in the political process.

## REFERENCES

Arthur, R. (1971) Success is predictable. *Military Medicine* 136:539-45.

Bandura, A. (1973) *Aggression: A Social Learning Analysis.* Englewood Cliffs, N.J.: Prentice-Hall.

Baker, R. (1968) *Ecological Psychology: Concepts and Methods for Studying the Environment of Human Behavior.* Palo Alto: Stanford University Press.

Bem, D., and Allen, A. (1974) On predicting some of the people some of the time: the search for cross-situational consistencies in behavior. *Psychological Review* 81:506-20.

Cocozza, J., and Steadman, H. (1974) Some refinements in the measurement and prediction of dangerous behavior. *American Journal of Psychiatry* 131:1012, 1020.

Cocozza, J., and Steadman, H. (1976) The failure of psychiatric predictions of dangerousness: clear and convincting evidence. *Rutgers Law Review* 29:1084-1101.

Cook, P. (1975) The correctional carrot: better jobs for parolees. *Policy Analysis* 1:11-54.

Dershowitz, A. (1970) Imprisonment by judicial hunch: the case against pretrial preventive detention. *The Prison Journal* 50:12-22.

Dershowitz, A. (1973) Preventive confinement: a suggested framework for constitutional analysis. *Texas Law Review* 51:1277-1324.

Dershowitz, A. (1974) Indeterminate confinement: letting the therapy fit the harm. *University of Pennsylvania Law Review* 123:297-339.

Dix, G. (1976) "Civil" commitment of the mentally ill and the need for data on the prediction of dangerousness. *Americal Behavioral Scientist* 19:318-34.

Fagin, A. (1976) The policy implications of predictive decision-making: "likelihood" and "dangerousness" in civil commitment proceedings. *Public Policy* 24:491-528.

Geis, G., and Monahan, J. (1976) The social ecology of violence. Pages 342-56 in T. Lickona, ed., *Morality: Theory, Research and Social Issues.* New York: Holt, Rinehart, & Winston.

Goldberg, L. (1970) Man versus model of man: a rationale, plus some evidence, for a method of improving on clinical inferences. *Psychological Bulletin* 73:422-32.

Gottfredson, D., Hoffman, P., Sigler, M., and Wilkins, L. (1975) Making paroling policy explicit. *Crime and Delinquency* 21:34-44.

Gulevich, G., and Bourne, P. (1970) Mental illness and violence. Pages 309-26 in D. Daniels, M. Gilula, and F. Ochberg, eds., *Violence and the Struggle for Existence.* Boston: Little, Brown.

Halatyn, T. (1975) Violence Prediction Using Actuarial Methods: A Review and Prospectus. Unpublished manuscript. National Council on Crime and Delinquency, Research Center, Davis, California.

*Harvard Law Review* (1974) Developments in the law: civil commitment of the mentally ill. note. 87:1190-1406.

Heller, K., and Monahan, J. (1977) *Psychology and Community Change.* Homewood, Ill.: Dorsey Press.

Hirschi, T. (1969) *Causes of Delinquency*. Berkeley: University of California Press.

Hoffman, P., Gottfredson, D., Wilkins, L., and Pasela, G. (1974) The operational use of an experience table. *Criminology* 12:214-28.

Jacobson, D., Craven, W., and Kushner, S. (1973) A study of police referral of allegedly mentally-ill persons to a psychiatric unit. Pages 533-51 in J. Snibbe, and H. Snibbe, eds., *The Urban Policeman in Transition*. Springfield, Ill. Charles Thomas, 1973, 533-51.

Kelley, C. (1976) *Crime in the United States*. Washington, D.C.: U.S. Government Printing Office.

Kelly, J. (1966) Ecological constraints on mental health services. *American Psychologist* 21:535-39.

Kittrie, N. (1971) *The Right to Be Different*. Baltimore: Johns Hopkins University Press.

Kozol, H., Boucher, R., and Garolfalo, R. (1972) The diagnosis and treatment of dangerousness. *Crime and Delinquency* 18:371-92.

Kozol, H., Boucher, R., and Garofalo, R. (1973) Dangerousness. *Crime and Delinquency* 19:554-55.

Lewin, K., Lippett, R., and White, R. (1939) Patterns of aggressive behavior in experimentally created 'social climates.' *Journal of Social Psychology* 10:271-99.

Meehl, P. (1954) *Clinical versus Statistical Prediction*. Minneapolis: University of Minnesota Press.

Megargee, E. (1969) A critical review of theories of violence. Pages 1037-1115 in D. Mulvihill and M. Tumin, eds., *Crimes of Violence*. Vol. 13. Washington, D.C.: U.S. Government Printing Office.

Megargee, E. (1976) The prediction of dangerous behavior. *Criminal Justice and Behavior* 3:3-22.

Mischel, W. (1968) *Personality and Assessment*. New York: Wiley.

Monahan, J. (1973a) The psychiatrization of criminal behavior. *Hospital and Community Psychiatry* 24:105-107.

Monahan, J. (1973b) Abolish the insanity defense? Not yet. *Rutgers Law Review* 26:719-40.

Monahan, J. (1975) The prediction of violence. Pages 15-35 in D. Chappell and J. Monahan, eds., *Violence and Criminal Justice*. Lexington, Mass: Lexington Books.

Monahan, J. (1976) The prevention of violence. Pages 13-35 in J. Monahan, ed., *Community Mental Health and the Criminal Justice System*. New York: Pergamon Press.

Monahan, J. (1977a) Social accountability: preface to an integrated theory of criminal and mental health sanctions. Pages 241-55 in B. Sales, ed., *Perspectives in Law and Psychology: The Criminal Justice System*. New York: Plenum Press.

Monahan, J. (1977b) Empirical analyses of civil commitment: critique and context. *Law and Society Review* 11:619-28.

Monahan, J. (in press [a]) Prediction research and the emergency commitment of dangerous mentally ill persons: a reconsideration. *American Journal of Psychiatry*.

Monahan, J. (in press [b]) Strategies for an empirical analysis of the prediction of violence in emergency civil commitment. *Law and Human Behavior*.

Monahan, J., and Catalano, R. (1976) Toward the safe society: police agencies and environmental planning. *Journal of Criminal Justice* 4:1-7.

Monahan, J., and Cummings, L. (1975) The prediction of dangerousness as a function of its perceived consequences. *Journal of Criminal Justice* 2:239-42.

Monahan, J., and Cummings, L. (1976) Social policy implications of the inability to predict violence. *Journal of Social Issues* 31:153-64.

Monahan, J., and Geis, G. (1976) Controlling "dangerous" people" *Annals of the American Academy of Political and Social Science* 423:142-51.

Monahan, J., and Hood, G. (1976) Psychologically disordered and criminal offenders: perceptions of their volition and responsibility. *Criminal Justice and Behavior* 3:123-34.

Monahan, J., and Hood, G. (in press) Ascriptions of dangerousness: The eye (and age, sex, education, location, and politics) of the beholder. In R. Simon, ed., *Research in Law and Sociology*. Greenwich, Conn.: Johnson.

Monahan, J., and Monahan, L. (1977) Prediction research and the role of psychologists in correctional institutions. *San Diego Law Review* 14:1028-38.

Monahan, J., Novaco, R., and Geis, G. (in press) Corporate violence: research strategies for community psychology. In T. Sarbin, ed., *Community Psychology and Criminal Justice*. New York: Human Sciences Press.

Moos, R. (1973) Conceptualizations of human environments. *American Psychologist* 28:652-65.

Moos, R. (1975a) *Evaluating Correctional and Community Settings*. New York: Wiley.

Moos, R. (1975b) *Evaluating Treatment Settings*. New York: Wiley.

Moos, R., and Insel, P., eds. (1974) *Issues in Social Ecology*. Palo Alto: National Press.

Morris, N. (1974) *The Future of Imprisonment*. Chicago: University of Chicago Press.

Newman, O. (1972) *Defensible Space*. New York: Macmillan.

Park, R. (1925) *The City*. Chicago: University of Chicago Press.

Rappaport, J. (1973) A response to "Implications from the Baxstrom Experience." *Bulletin of the American Academy of Psychiatry and the Law* 1:197-98.

Rector, M. (1973) Who are the dangerous? *Bulletin of the American Academy of Psychiatry and the Law* 1:186-88.

Rosen, A. (1954) Detection of suicidal patients: an example of some limitations of the prediction of infrequent events. *Journal of Consulting Psychology* 18:397-403.

Rubin, B. (1972) Prediction of dangerousness in mentally ill criminals. *Archives of General Psychiatry* 27:397-407.

Sarbin, T. (1967) The dangerous individual: an outcome of social identity transformations. *British Journal of Criminology* 7:285-95.

Sawyer, J. (1966) Measurement and prediction, clinical and statistical. *Psychological Bulletin* 66:178-200.

Shah, S. (1976) Dangerousness: A Paradigm for Exploring Some Issues in Law and Psychology. Presented as the David Levine Invited Address at the meeting of the American Psychological Association, Washington, D.C.

Shah, S. (1977) Dangerousness: Some definitional, conceptual, and public policy issues. Pages 91-119 in B. Sales, ed., *Perspectives in Law and Psychology*. New York: Plenum Press.

Skolnick, J. (1969) *The Politics of Protest*. New York: Simon and Schuster.

State of Maryland (1973) Maryland's Defective Delinquency Statute—A Progress Report. Department of Public Safety and Correctional Services. Unpublished manuscript.

Steadman, H. (1972) The psychiatrist as a conservative agent of social control. *Social Problems* 20:263-71.

Steadman, H., and Cocozza, J. (1974) *Careers of the Criminally Insane*. Lexington, Mass: Lexington Books.

Steadman, H., and Halfon, A. (1971) The Baxstrom patients: backgrounds and outcome. *Seminars in Psychiatry* 3:376-86.

Steadman, H., and Keveles, G. (1972) The community adjustment and criminal activity of the Baxstrom patients: 1966-1970. *American Journal of Psychiatry* 129:304-10.

Stokols, D., ed. (1977) *Psychological Perspectives on Environment and Behavior: Conceptual and Empirical Trends.* New York: Plenum Press.

Stone, A. (1975) *Mental Health and Law: A System in Transition.* Washington, D.C.: U.S. Government Printing Office.

Sweetland, J. (1972) "Illustory Correlation" and the Estimation of "Dangerous" Behavior. Doctoral dissertation, Indiana University.

Thornberry, T., and Jacoby, J. (1974) The Uses of Discretion in a Maximum Security Mental Hospital: The Dixon Case. Paper presented at the annual meeting of the American Society of Criminology, Chicago, Illinois.

Toch, H. (1969) *Violent Men.* Chicago: Aldine.

Twentieth Century Fund (1976) *Fair and Certain Punishment.* New York: McGraw-Hill.

U.S. Department of Justice (1974) *Crime in Eight American Cities.* Washington D.C.: U.S. Government Printing Office.

von Hirsch, A. (1972) Prediction of criminal conduct and preventive confinement of convicted persons. *Buffalo Law Review* 21(3):717-58.

von Hirsch, A. (1976) *Doing Justice: The Choice of Punishments.* New York: Hill & Wang.

Wenk, E., and Emrich, R. (1972) Assaultive youth: an exploratory study of the assaultive experience and assaultive potential of California Youth Authority wards. *Journal of Research in Crime and Delinquency* 9:171-96.

Wenk, E., Robinson, J., and Smith, G. (1972) Can violence be predicted? *Crime and Delinquency* 18:393-402.

Wexler, D. (1976) *Criminal Commitments and Dangerous Mental Patients: Legal Issues of Confinement, Treatment and Release.* Washington, D.C.: U.S. Government Printing Office.

Wilkins, L. (1975) Cited in E. Wenk and R. Emrich, Assaultive youth: An exploratory study of the assaultive experience and assaultive potential of California Youth Authority wards. *Journal of Research in Crime and Delinquency* 9:171-96.

Wilkins, L. (1975) Putting "treatment" on trial. *The Hastings Center Report* 5:35-48.

Witte, A. (1976) Testing the Economic Model of Crime on Individual Data. Unpublished manuscript, Department of Economics, University of North Carolina.

1               DEFENSE EXHIBIT C
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# Violent Crime: Prediction and Control

Beverly Koerin

③

DEFENDANT'S EXHIBIT

PENGAD-Bayonne, N. J.

*Violent crime has become a major public concern, threatening many citizens' sense of well-being and involving tremendous national social and economic costs. The various professions involved in the study, rehabilitation, and control of violent offenders feel increasing public pressure to protect society from crimes of violence, primarily by incapacitating the offender.*

*Decisions to incarcerate or release offenders are often based on individual predictions of future violent behavior. Recent public policy concerning career offenders represents an attempt to protect society by evaluating collective probabilities of future violent behavior.*

*This paper examines the growing concern over violent crime, the prediction techniques that have been used to determine the disposition of an offender, the tendency toward overprediction documented by various research studies, and recent public policies enacted to curb crimes of violence. Finally, balancing individual rights and the rights of society in light of public attitude and public policy involves several moral and ethical questions.*

Public outrage at the incidence of violent crime has caused professionals to intensify their efforts to discover causes of crime, develop techniques for predicting individual violent behavior, and enact public policy to control violent offenses. However, correlates or causes of crime are difficult to translate into public policy—prediction techniques are not entirely reliable and public policy is as much influenced by public mood and political considerations as it is by empirical evidence of crime causation and control. Moreover, moral and ethical issues are inherent in attempts to predict and control violence. Research by sociologists, psychiatrists, and lawyers tends to support this evaluation.

## INCIDENCE OF VIOLENT CRIME

The President's Commission on Law Enforcement and Administration of Justice reported in 1967 that Americans are extremely concerned about crimes that threaten them personally: "The crimes that concern Americans the most are those that affect their personal safety—at home, at work, or in the

BEVERLY KOERIN is Assistant Professor of Sociology, Randolph-Macon College, Ashland, Virginia.

streets."[1] That crime continues to be a major national concern is evident in current political speech making and news reports.[2]

Between 1960 and 1968, the national rate of criminal homicide per 100,000 population increased 36.7 percent; for rape the rate increased 65 percent; and in the case of aggravated assault, 67 percent.[3] James Q. Wilson notes that by 1972 the murder rate in this country had risen higher than at any time since 1936.[4] However, a second glance at the statistics reveals that willful homicide, aggravated assault, forcible rape, and robbery "represent only 13% of the FBI Index of Reported Serious Crime."[5] The odds are 1 in 20,000 that a person will die from willful homicide, and 1 in 3,000 that a person will require hospitalization because of injuries suffered during an assault.[6] Despite the low odds, many people continue to live in fear, because "generally held perceptions of reality can be at least as important as reality itself in the way they influence a person assessing his own well-being."[7] A survey revealed that 50 percent of the women and 20 percent of the men in the United States are afraid to walk outside at night, even in the vicinity of their homes; one-third of American households contain firearms for protection against intruders.[8]

The threat of violent crime affects society as well as individual citizens—the costs of maintaining adequate police protection, courts, and jails are increasing each year. Because of their fear of violent crime, many people alter their lifestyle. For example, they may avoid certain areas of town, thus increasing the likelihood of victimization in those areas,[9] or remain home after dark, thus disrupting formal and informal neighborhood and community ties and contributing to greater "atomization" of society.[10]

## PREDICTION: USES, METHODS, AND FINDINGS

With the objective of reducing violent crime, professionals have tried to develop valid and reliable techniques for predicting potential dangerousness.

1. President's Commission on Law Enforcement and Administration of Justice, *The Challenge of Crime in a Free Society* (Washington, D.C.: U.S. Govt. Printing Office, 1967), p. 18.

2. "Losing Battle against Crime," *U.S. News and World Report*, Dec. 15, 1974; "Crime in America: One Nation's Journey into Fright," *PTA Magazine*, April 1974; "Crime Wave," *Time*, June 30, 1975.

3. Robert Winslow, ed., *Crime in a Free Society*, 2d. ed. (Encino, Calif.: Dickenson, 1973), p. 157.

4. James Q. Wilson, *Thinking about Crime* (New York: Basic Books, 1975), p. 7.

5. Winslow, *Crime in a Free Society*, p. 156.

6. Ibid., p. 48.

7. James Brooks, "The Fear of Crime in the United States," *Crime and Delinquency*, July 1974, pp. 242-43.

8. Winslow, *Crime in a Free Society*, p. 157.

9. Ernst A. Wenk, James O. Robison, and Gerald W. Smith, "Can Violence Be Predicted?," *Crime and Delinquency*, October 1972, pp. 393-402.

10. Wilson, *Thinking about Crime*, p. 21.

They have also tried to control dangerous behavior collectively. Within the criminal justice and mental health fields, judgments about dangerousness are constantly being made. In setting bail or ordering pretrial detention, judges base their decisions, in part, on an assessment of the danger the individual presents to the community. The length of an offender's sentence and his eligibility for parole are contingent on the offender's history of violence and on predictions of future violent behavior. Criminal or civil commitments to mental institutions rest on psychiatrists' diagnoses and prognoses of future dangerousness.

Two methods of prediction have been used: the clinical, case study method and the statistical, actuarial method. Don Gottfredson describes clinical assessment as a wide band procedure in which a broad range of information about the individual is gathered from sources such as interviews, social history, and projective testing. The statistical method, or narrow band procedure, considers a narrower range of factors evaluated as specifically related to criminal behaviors.[11]

Clinical methods have been used by psychiatrists, social workers, and parole staffs in evaluating the potential for violent behavior among patient or inmate populations. But violent crimes by former prison inmates or mental patients have undermined the reliability of clinical prediction. Dr. Michael Peszke contends that "prediction of danger is not within medical competence" and shouldn't be, and "physicians should not be expected to act as agents of society."[12] Edwin Sutherland and Donald Cressey, reviewing the research literature, assert that no single personality trait has "been found to be very closely associated with criminal behavior."[13] Confirming this observation, Manfred Guttmacher, a psychiatrist who studied the clinical histories of people who had committed homicide after having received treatment for mental disorder, states that he was

> unable to decipher . . . any symptoms which they presented in common that might act as warning signs of impending catastrophe. In large measure this is due to the fact that one cannot anticipate with accuracy social situations which the released . . . patient will have to meet.[14]

Nevertheless, the public continues to rely heavily upon clinical judgment.

Statistical prediction techniques evolved with the desire to improve predictive accuracy. A delinquency prediction scale developed by Sheldon and Eleanor Glueck has been the subject of considerable controversy. Holding age,

11. Don Gottfredson, "Assessment of Methods," in Crime and Justice, Vol. 3, Leon Radzinowicz and Marvin Wolfgang, eds. (New York: Basic Books, 1971), pp. 362–63.
12. Michael A. Peszke, "Is Dangerousness an Issue for Physicians in Emergency Commitment?" American Journal of Psychiatry, August 1975, p. 828.
13. Edwin H. Sutherland and Donald R. Cressey, Principles of Criminology (Philadelphia: Lippincott, 1960), p. 135.
14. Jonas R. Rappeport, ed., The Clinical Evaluation of Dangerousness of the Mentally Ill (Springfield, Ill.: Charles C Thomas, 1967), p. 27.

52                                                                    Beverly Koerin

I.Q., and neighborhood constant, the Gluecks noted relationships between delinquency and several other variables: patterns of family stability, affection, and discipline. They then devised statistical or actuarial tables based on those factors to determine the probability of a juvenile's becoming delinquent. Their findings have been questioned because the sampling methods and prior knowledge of the subjects' status may have influenced their rating of the quality of family relationships.[15] Moreover, critics maintain that the Gluecks'—and others'—prediction tables do not truly individualize: They fail to account for many factors which may affect the individual indirectly. Prediction tables appear static; they seem to assume that no changes will occur in the personal or social conditions that might alter the prediction.[16] In countering these objections, the Gluecks assert that while prediction tables should be flexible enough to permit change, they cannot account for all factors having only an indirect relationship to criminal behavior. Statistical tools are meant to provide probabilities, not certainties. Used in conjunction with clinical methods, statistical tables provide a background for more competent individual treatment.

Numerous attempts have been made to devise statistical tables to predict parole success or failure or the probability that an individual will commit a violent offense. Most follow a similar procedure. First, criterion categories of behavior are established—what behavior is to be predicted and what procedure is to be used for classifying persons on the basis of behavior. Second, the characteristics which are expected to be closely related to the predicted behavior are selected and defined. The procedure is then tested on a representative sample of the target population to determine the relationships between the criterion categories of behavior and the predictor factors. Before applying the prediction procedure in the setting for which it was developed, these relationships are retested on a sample population to cross-validate the results.[17]

As noted above, statistical prediction studies have generally focused on parole success or failure and failure due to violent or nonviolent offense. Several factors have been found to be associated with these various behavioral outcomes. Recidivists are likely to have been young at the time of first arrest and conviction, to have left home at an early age, to have committed nonviolent, economic crimes such as larceny, burglary, theft, or forgery.[18] A Virginia study noted that the risk of parole violation was highest among younger male offenders who had been sentenced to five or more years and had served at least three, who lacked an occupation or previous regular employ-

15. Alfred J. Kahn, "Public Policy and Delinquency Prevention," in *Crime and Justice,* Vol. 3, Radzinowicz and Wolfgang, eds., p. 417.

16. Sheldon Glueck and Eleanor Glueck, *Predicting Delinquency and Crime* (Cambridge, Mass.: Harvard University Press, 1960), pp. 144-49.

17. Gottfredson, "Assessment of Methods," p. 347.

18. Daniel Glaser, *The Effectiveness of a Prison and Parole System* (Indianapolis, Ind.: Bobbs-Merrill, 1969).

ment, had more than three children, and who had prior records of recidivism.[19] Offenders who committed crimes against persons appeared to be better parole risks than those who committed crimes against property.[20] This is due, in part, to the fact that crimes of violence are frequently situational crimes of passion committed by otherwise law-abiding citizens. Yet "the greatest proportion of all serious violence is committed by repeaters who have committed less serious offenses in the past."[21]

Given these factors associated with recidivism and with violent behavior, how accurate have prediction techniques been? Hermann Mannheim and Leslie Wilkins reported that their use of statistical prediction based on statistical classifications of failure-likely and success-likely groupings proved to be twice as accurate as clinicians' "intuitive" judgment.[22] This may be because the primary variable in the case study method is the clinician or prognosticator himself.[23] The researcher is less likely to be a variable when the factors related to the behavior in question are discrete: prior offenses, age of first offense, and type of offense, rather than "quality" of family relationship. Lloyd Ohlin suggested that the "greatest increase in predictive accuracy will undoubtedly depend on securing better factors rather than on refining the techniques and methods of predictive work."[24]

*RELIABILITY OF PREDICTION:*
*FOLLOW-UP STUDIES*

Various studies have been done which indicate the reliability of techniques for predicting violent offenses. The Parole and Community Service Division in the California Department of Corrections sponsored research to evaluate techniques of violence prediction. The division obtained violence histories on parolee subjects, placed them in six distinct categories based on past aggressive behavior, and assigned those in the two most aggressive categories to special supervision units with relatively small caseloads. One in five of the parolees studied was classified as aggressive; the subsequent rate of crime involving violence was 3.1 per 1,000 cases, compared with 2.8 per 1,000 cases for those classified as less aggressive. The difference is of little statistical significance.[25]

19. Elmer H. Johnson, *Crime, Correction and Society* (Homewood, Ill.: Dorsey Press, 1966).
20. Gottfredson, "Assessment of Methods," p. 360.
21. Winslow, *Crime in a Free Society,* p. 161.
22. John P. Conrad, *Crime and Its Prevention* (Berkeley, Calif.: University of California Press, 1970).
23. Daniel Glaser, "The Efficacy of Alternative Approaches to Parole Prediction," *American Sociological Review,* June 1955, p. 284.
24. Daniel Glaser, "A Reconsideration of Some Parole Prediction Factors," *American Sociological Review,* June 1955, p. 335.
25. Wenk et al., "Can Violence Be Predicted?" pp. 395-98.

54                                                                          Beverly Koerin

After evaluating dangerousness in convicted offenders, Harry Kozol, Richard Boucher, and Ralph Garofalo followed up their research to assess predictive accuracy. Dangerousness was defined as "the potential for inflicting serious bodily harm on another."[26] Over a ten-year period, the researchers studied 592 convicted male offenders, a majority of whom had committed sex offenses, some involving extreme violence. The criteria for evaluating dangerousness included previous attempts to inflict serious injury on another, anger, hostility, displayed or suppressed resentment, enjoyment of others' suffering, little or no compassion for others, irritation with or rejection of authority, sense of being a victim, inability to tolerate frustration, inability to delay satisfaction or control impulses.

The subjects were evaluated by at least two psychiatrists, two psychologists, and one social worker; a detailed life history was completed in each case; and all subjects underwent psychological testing. The clinicians obtained detailed descriptions of the actual assault—as perceived by the victim and as perceived by the offender. After evaluating all data, the clinicians recommended that some of the subjects be released; others were determined to need further psychiatric treatment. The predictions were reasonably accurate. The recidivism rate for serious assault was 34.7 percent for those released against the research team's advice, compared with only 8 percent serious assault recidivism by those released with the team's consent. However, as should be apparent from the above statistics, 65 percent of those not recommended for release did *not* commit a serious offense.

Herein lies the difficulty in most prediction techniques: Violence appears to be vastly overpredicted by both statistical and clinical methods.[27] Findings from several studies support this observation. The California Department of Corrections devised a violence predictor scale, using as variables the number of previous offenses, length of imprisonment, drug use, and present commitment offense. On the basis of these factors, the researchers isolated a group of offenders who were three times more likely to commit a violent act than the general parolee population. Yet 86 percent of those in the high risk group did *not* commit a violent offense while on parole.[28]

In another California study, the records of violence for 400 wards of the California Youth Authority were examined. The subjects were diagnosed by psychiatrists, tested by psychologists, and followed up by the research team for fifteen months after release. The team collected information on 100 variables and attempted to analyze the data retrospectively to determine which factors might be predictors of violent recidivism. Using statistical

26. Harry L. Kozol, Richard Boucher, and Ralph Garofalo, "The Diagnosis and Treatment of Dangerousness," *Crime and Delinquency,* October 1972, pp. 371-92.

27. John Monahan and Lesley Cummings, "Social Implications of the Inability to Predict Violence," *Journal of Social Issues,* March 1975, p. 153.

28. Ibid., p. 155.

lyses of the variables, the researchers predicted eight to one false to true positives. The parole officers, using history of violent behavior as the only factor, predicted nineteen false positives in every twenty.[29]

## CURRENT PUBLIC POLICY AND IMPLICATIONS

Obviously, the ability to predict violent behavior statistically or by clinical evaluation is grossly imperfect. Nevertheless, "much of current policy in the area of mental health and criminal justice is based on the supposition that psychologists and psychiatrists can actually predict those who will be physically violent to another."[30] Dangerous offender statutes and recommendations of the American Law Institute maintain legal reliance on the illusion of predictive accuracy. Washington, D.C., enacted into law in 1970 a provision for pretrial detention of a person "charged with a dangerous crime if the government . . . certifies there is no condition or combination of conditions which will reasonably assure the safety of the community.[31] Over half the jurisdictions in the United States have adopted dangerous offender laws, often including or restricted to sex offenders. Such legislation follows the recommendation of the Model Sentencing Act and requires that legal identification of the offender as dangerous must be based on a psychiatric diagnosis of the offender as mentally abnormal.[32]

Norval Morris asserts that "prediction of future criminality is an unjust basis for determining that the convicted criminal should be imprisoned."[33] Yet he recognizes that this is a politically astute tactic in light of public demands for safety and security.[34]

The American Law Institute Model Penal Code recommends the sentencing professional, disturbed, *dangerous*, and multiple offenders to extended _rms of imprisonment. In 1973, the Task Force on Corrections of the National Advisory Commission on Criminal Justice Standards and Goals likewise recommended terms of from five to twenty-five years for professional criminals, habitual felony offenders, and *dangerous offenders*. The commission admitted that lengthy sentences for the dangerous and habitual offender might provide political leverage in obtaining legislative approval for shorter sentences, fines, and community-based care for the majority of less serious offenders.[35]

---

29. Ibid.

30. Ibid., p. 153.

31. Kozol et al., "Diagnosis and Treatment of Dangerousness," p. 373.

32. Monahan and Cummings, "Social Implications of the Inability to Predict Violence," p. 374.

33. Norval Morris, "The Future of Imprisonment: Toward a Punitive Philosophy," *Michigan Law Review*, May 1974, p. 1162.

34. Ibid., p. 1169.

35. Ibid., pp. 1165-66.

56                                                                    Beverly Koerin

But a disturbing question remains unanswered: If violence prediction is not accurate, how many persons are suffering the loss of their civil rights because of invalid overpredictions? In *Baxstrom* v. *Herold,* the United States Supreme Court ruled that persons committed to institutions for the criminally insane had been denied their right to due process if they were hospitalized beyond the length of the sentence for their offense. As a result, New York State released or transferred to ordinary mental hospitals many "dangerous" offenders. Follow-up studies after release revealed that only 3 percent of these offenders returned to correctional institutions or hospitals for the criminally insane, and 55 percent of the men and 43 percent of the women had no readmissions to mental hospitals.[36]

Ironically, while uncertain prediction techniques jeopardize the rights of some people, the very uncertainty may be deterring greater invasion of human rights. "Confidence in the ability to predict violence serves to legitimate intrusive types of social control."[37] If prediction techniques were accurate and reliable, early intervention—before the occurrence of a violent act—might be justified. A psychiatrist serving as consultant to the National Commission on the Causes and Prevention of Violence recommended a nationwide psychiatric testing program of all six year olds, followed by widespread treatment of those judged to be criminally inclined. The issues raised by this suggestion involve the constitutionality of enforced treatment and the potential stigmatizing and labeling effect of such a predictive testing program.[38]

The difficult facts confronting the criminal justice system are as follows:

1. Violent crime represents a threat to individuals and to society.
2. Prediction techniques are not completely accurate.
3. Public demands for crime control are intense.

In view of this, what can be done to reduce the amount of violent crime? Sutherland and Cressey recommended that we protect society and prevent crime and delinquency by—

1. Providing relatively permanent segregation of those individuals who have shown themselves to represent the greatest menace to society.
2. Providing "nonalienating" treatment of offenders whose values are basically anticriminal.
3. Defining the types of social and personal factors associated with crime to allow for preventive intervention.[39]

In view of the fact that defining "anticriminal values" and "social and personal factors" is extremely difficult, many recent programs have focused on

36. Ibid., pp. 1169-70.
37. Wenk et al., "Can Violence Be Predicted?" p. 402.
38. Monahan and Cummings, "Social Implications of the Inability to Predict Violence," pp. 160—61.
39. Sutherland and Cressey, *Principles of Criminology,* pp. 590-91.

:therland and Cressey's first recommendation: permanent segregation of recidivists. Research has suggested that most serious criminal offenses are committed by repeat offenders. Marvin Wolfgang's studies of crime by Philadelphia youth indicate that the 6 percent who had committed five or more offenses before the age of eighteen were responsible for two-thirds of all violent crime committed by the study population.[40]

While dangerous offender legislation relates primarily to segregation of violent or sexual offenders and requires psychiatric diagnosis of dangerousness, career offender programs attempt to segregate for as long as possible habitual offenders whose past offenses may not necessarily have been violent. The federal government initiated an experimental program in eighteen major cities in 1975 to boost the conviction rates of habitual or "career" offenders by augmenting the salaries of prosecuting attorneys who carry smaller-than-average caseloads of career offenders and who remain on the case from the outset to the final disposition. Under this program, those prosecuting the career criminal are able to obtain a speedier trial by going directly to the grand jury, bypassing the preliminary hearing; and they seek indictments for the most serious felony charge rather than plea bargaining in exchange for a guilty plea. Critics of the program express concern about the "career offender" label and its impact on the judges, suggesting that the label may tend to contradict the presumption of innocence. Moreover, critics assert that providing funds to the prosecuting attorney's office may jeopardize the legal rights of impoverished offenders unless comparable funds are granted to public defender programs.[41]

## CONCLUSIONS

An enormous volume of information has been compiled in causal and predictive studies of violent behavior. Much of what we now know may be of great potential value. But there appears to be a dilemma inherent in determining how the knowledge is to be used in light of ethical and legal considerations. Our predictive variables must be refined; yet, even so, prediction techniques are designed to predict *probabilities*. Will decisions based on clinical or statistical predictions ever be foolproof? I remain skeptical of that possibility.

Our treatment of dangerous crime reflects the "persistent punitive attitude of the general public toward criminals."[42] This is a disturbing notion because it may portend an erosion of civil rights and legal protections in criminal

40. John Irwin and Lewis Yablonsky, "The New Criminal: A View of the Contemporary Offender," in *Crime in America: Perspectives on Criminal and Delinquent Behavior*, Bruce J. Cohen, ed. (Hasco, Ill.: F. E. Peacock, 1970), pp. 199-200.

41. Timothy D. Schellhardt, "Experimental Program Musters Legal Forces against Repeat Offenders to Boost Convictions," *Wall Street Journal*, Aug. 19, 1976, p. 28.

42. Gresham M. Sykes, *Crime & Society* (New York: Random House, 1967), p. 194.



58                                                                        Beverly Koerin

justice and other aspects of public life. We must follow up recent dangerous offender and career criminal laws and programs to assess their deterrent value and their effect on the rate of violent crime. Current data related to crime causation are applicable to public policy in only a small way; future reliance on prediction appears inevitable yet should be approached carefully. Do we fully understand the chilling effect dangerous offender and career criminal laws may have on attitudes toward and protection of individual rights?

Referring to the federal program on career criminals discussed above, one proponent commented: "Our aim is to put a Bandaid on the spot that's hurting."[43] If we seek to treat crime effectively, we must attack social problems such as poverty and unequal access to opportunities—conditions which may contribute to violent behavior. Elimination of poverty and racial discrimination should be national goals grounded in moral and humanitarian values; however, if humanitarian ideals are not a strategically "sound" political platform, policy makers should attempt to win public support for such goals on the basis of the economic and social costs of these conditions. I believe that policy makers must, at the very least, apply iodine to the wound before the Bandaid.

43. Schellhardt, "Experimental Program," p. 28.

1            DEFENSE EXHIBIT D
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25





# INSTITUTIONAL AND POST-RELEASE BEHAVIOR OF THE TEXAS FURMAN-COMMUTED INMATES

BY

James W. Marquart
Sam Houston State University

and

Jonathan R. Sorensen
Sam Houston State University

The authors are greatly indebted to George J. Beto for his encouragement in undertaking this project, S.O. Woods of the Texas Department of Corrections for making the files available and room to work, Melba Harris for advice, John Byrd of the Texas Board of Pardons and Paroles for granting access to the release data, and to Sheldon Ekland-Olson, Michael Radelet, Richard O. Lempert, Brad Anderson and Carl Harris for their critical comments and suggestions on an earlier draft. This study was funded by a Faculty Research Support Grant from Sam Houston State University.

# ABSTRACT

In 1972, the United Supreme Court ruled that the death penalty as administered constituted cruel and unusual punishment.  This ruling also invalidated the death sentences of over 600 inmates in the United States.  These inmates had their death sentences commuted to life imprisonment.  This paper examines the institutional and post release behavior of the 47 Furman commutees in Texas from 1973-1986.  Prior to the release of these 47 inmates into the general prisoner population, prison officials and clinicians predicted that the commutees were dangerous and constituted a substantial threat to other inmates and security staff.  The institutional and release behavior of these ex-capital offenders is compared to a cohort of like violent offenders.  Subsequent data analysis revealed that the commutees committed few serious prison rule violations.  They did not kill other inmates or staff.  A minority of the commutees and cohort members committed the majority of prison rule violations.  Of the thirty-one commutees released on parole, one committed a new homicide.  No cohort inmate killed again.  The paper concludes that execution of these 47 inmates would not have greatly protected society.

In 1972, the United States Supreme Court decided in
Furman v. Georgia, 408 U.S. 238 (1972) that the death penalty
as then imposed constituted cruel and unusual punishment in
violation of the Eighth and Fourteenth Amendments.  This
landmark decision invalidated the death sentences of more
than 600 death row prisoners scattered across 30 states and
the District of Columbia (1).  The former death row prisoners
had their sentences commuted to life imprisonment and, after
subsequent processing, were released into the general
prisoner population.

Critics of the ruling feared that the public would be
endangered by the former death row prisoners if they were
ever released.  Prison administrators and mental health
professionals warned that the Furman-commuted inmates posed a
significant threat to the general prison population, and if
paroled, to the community at large.  Some reasoned that these
inmates had "over time become progressively less suitable for
reentry into a general prison population or the general
public" (see Gallemore and Panton, 1971:171).  The underlying
logic for their argument centered on the complex (and
controversial) issue of "dangerousness" (e.g. Floud and
Young, 1982).  Advocates of capital punishment often cite
long-term violence and "dangerousness" as justification for

the death penalty.   Sellin summarizes this position:

> Supporters of the death penalty claim this
> punishment is a superior means of saving lives,
> because if a capital murderer were sentenced to life
> imprisonment, he may some day kill a fellow prisoner
> or member of the prison staff, the assumption being
> that he is, more than a prisoner sentenced for some
> other crime, prone to homicidal violence; and, if at
> some future time he were pardoned, paroled, or
> otherwise released from confinement, this presumed
> compensity might lead him to kill again. (1980: 103)

The Furman decision represents an opportunity, a natural
experiment, to test this latter position.  However, social
scientists have almost totally ignored the institutional and
post-release behavior of the Furman inmates (see Vito and
Wilson, 1986).  The fate of these inmates may tell us
something crucial about recidivism, predictions of
dangerousness and future violence, and the appropriateness of
long-term confinement (incapacitation) of violent offenders
in maximum security institutions.  Most importantly, the
natural experiment created by Furman offers a unique chance
to examine the validity of specific deterrence arguments so
often used by capital punishment advocates.

The present study examines the Texas Furman-commuted
population (N= 47) over the fourteen year period, 1973-1986,
following their release from death row.  We are especially
interested in whether or not the Furman inmates presented a
threat to the lives of others, including the prison staff,
other inmates, and members of the community.  To test the
issue of dangerousness, we compare the Furman group to a
control group (N= 156) of violent offenders who were

convicted of murder, and rape, and received life sentences. The point of the comparison group is to assess whether the people we decide to execute constitute a more violent threat than those sent to prison for life for convictions of similar offenses.

Data on institutional and parole behavior are examined to determine if the Furman-releasees, as compared to the control group, did in fact inflict injury upon others after their reprieve. First, we review the relevant literature on commutation studies. Then, we present and analyze the institutional and release data. Finally, we compare the release data reported in this paper to the findings of other recidivism research on murderers. The available literature is used as a bench mark for comparative purposes.

## THEORETICAL BACKGROUND

Many offenders who receive the death penalty have their sentences commuted before being executed. Radelet and Pierce (1985) found that only a fraction of convicted murderers are ever executed. Studies have shown that commutations, or "reductions in the severity of sentence(s) imposed by court(s)" (Martin, 1983: 594), occur in a substantial proportion of capital cases. Johnson (1957), for example, found that in North Carolina between 1909 and 1953 only 24% of first-degree burglars, and 56 percent of both murderers and rapists sentenced to death were actually executed. In

Texas between 1924 and 1952, five of eight robbery cases were commuted, 21 percent of the murder cases, and 7 percent of the rape cases; of the total 350 persons sentenced to death during this time period, 19 percent were commuted (Giardini and Farrow, 1952). In updating this Texas data, we found that between 1924-1964 (the pre-Furman execution era) 453 offenders were sentenced to death, of which 366 were executed, and 87 (19%) received commutations.

COMMUTATION STUDIES

Not all offenders sentenced to death are actually executed. A minority receive, for whatever reasons, commutations of their death sentences, to a less severe sentence-- usually life imprisonment. However, very little empirical research has been conducted on commuted ex-capital offenders. Of the few commutation studies completed, focus tends to be on the demographic differences between condemned and commuted populations (Johnson, 1957; Wolfgang, Kelly, and Nolde, 1962).

Research on the institutional behavior of commuted capital offenders is nonexistent; however, some studies have been conducted on the behavior of murderers in prison. Flanagan (1980) found that murderers generally had lower disciplinary infraction rates; but, when committing rule violations, these long-term inmates were more likely to commit serious rule violations. Overall, these inmates, when compared to other prisoners, tended to

be "settled" and the most manageable of prisoners (Wardlaw and Biles, 1980). Though some studies have examined first-degree murderers and prison homicides (Bedau, 1967; Sellin, 1980), these studies did not differentiate between those who were sentenced to death and later commuted and those who committed capital crimes but were not sentenced to death.

The critical question that remains unanswered is how commuted ex-capital offenders behave in prison and on parole. This question was partially addressed by two commutation studies that considered whether or not commuted offenders had recidivated. Stanton (1969) studied 63 convicted first-degree murderers between 1930 and 1961 in New York, 61 of which had been sentenced to death and later had their sentences commuted. His major finding indicated that only three of the 63 returned to prison by the end of 1962, two for technical violations of parole and one for a new felony, burglary. Giardini and Farrow (1952) gathered data on commuted and paroled capital offenders in 22 states over periods ranging from 1 to 38 years. Of the 197 ex-capital cases paroled, 129 were still on parole, 34 had completed parole, 11 died, 5 absconded, 7 violated parole by breach of rules, and 11 (6%) committed new offenses. Giardini and Farrow warn of the incompleteness of their data and of drawing conclusions from it.

Only one study in recent years has tracked Furman-commuted inmates (Vito and Wilson, 1986). They

addressed the issue of whether or not 17 paroled Kentucky
inmates, out of 23 commuted as a result of Furman,
recidivated.  They found that 5 of the 17 (29%)
returned to prison, 2 for technical violations, 1
for burglary, and 2 for robbery.  None committed another
homicide in prison or while on parole.  However, these
researchers failed to examine institutional behavior.  It is
our opinion that in-prison violence is the critical factor
that most directly affects release behavior.  With limited
exceptions and incomplete data, the question of how commuted
offenders behave in prison and on parole has been left
unanswered.  Considering the numerous issues that surround
the death penalty, this gap in the literature on capital
punishment seems startling.


### FURMAN v. GEORGIA: A NATURAL EXPERIMENT


The Furman v. Georgia decision presents an opportunity to
observe the effects of a natural or after-the-fact
experiment-- a court decision which resulted in the release
of capital offenders to the general prison population and
some, eventually, to the free society. . This study is in the
tradition of such legal impact studies as Eichman's (1966)
research on the consequences of the historic Gideon v.
Wainwright, 372 U.S. 335 (1963) decision which demonstrated
that the release of hundreds of prisoners in Florida did not
trigger, as predicted, a major crime wave.  The present study

is also similar to an assessment of the effects of the court
order issued in Ruiz v. Estelle, 503 F. Supp. 1265 (S.D.
Texas, 1980) on levels of violence and disorder in Texas
prisons, which found that the court order initially led to a
breakdown in the traditional mechanisms of social control and
precipitated an unprecedented wave of inmate violence (see,
Crouch and Marquart, 1989; Ekland-Olson, 1986).

Especially relevant to this research is the work
conducted by Terence Thornberry and Joseph Jacoby (1979), who
examined the outcome of Dixon v. Attorney General of the
Commonwealth of Pennsylvania, 325 F. Supp. 966 (M.D. PA,
1971) which led to the release of 586 patients from a maximum
security hospital for the criminally insane.  They
hypothesized that these inmates would not be assaultive.  In
testing such variables as pre-release violence, postrelease
recidivism and rehospitalization, support was found for their
hypothesis.  Though clinically predicted to be dangerous to
themselves and others, these patients were not seriously
assaultive during confinement and did not pose a threat to
the community upon release.  This study and its findings
parallel an earlier study by Steadman and Cocozza (1974),
which examined the effects of Baxstrom v. Herold, 328 U.S.
107 (1966), litigation that resulted in the transfer of
nearly 1,000 reputedly dangerous patients from hospitals for
the criminally insane to civil mental hospitals.

The guiding hypothesis of the present research, based on
the previously mentioned literature on the institutional

behavior and recidivism of murderers and the findings of
Thornberry and Jacoby, is that the Furman inmates did not
present a disproportionate serious threat to other inmates
and prison staff while incarcerated and, if released, did not
commit a disproportionate number of "dangerous" acts while in
the free society.  For the purposes of this paper
"dangerousness" is defined as "serious assaultive conduct,
defined as conduct which does, or is reasonably likely to,
cause significant injury to the victim" (Dix, 1980: 530-531).


## DATA SOURCES


The first task of this research was to identify the
Texas Furman inmates.  The Classification Office in the Texas
Department of Corrections (TDC) maintains a death row file
which contains the personal histories, classification
workups, appeals documents, photographs, commitment papers,
and death certificates (of those executed) of all inmates
sentenced to death in Texas.  These files began in 1924 and
continue to the present.(2)  We reviewed these records and
identified the Furman inmates by a special commutation
document in their files signed by the Governor.

Furman inmates received their commutations between June
1972 and January 1973.  The  NAACP-Legal Defense Fund
identified 52 Furman inmates in Texas.  However, this
research deals with 47 Furman-commuted inmates, of which
there were 37 murderers, 7 rapists, and 3 armed robbers. (3)

These inmates, verified by TDC's records, were physically present on death row at the time of the ruling. We did not consider those inmates with death sentences in county jails awaiting transfer to death row. Once commuted, they were processed, like all new inmates, through the TDC's Diagnostic Unit, and the majority sent to the Ellis, Eastham, Darrington, Retrieve, and Ramsey I Units. These units were similar in that they housed older multiple recidivists with long histories of violence. According to Classification personnel present in 1973, TDC regarded the Furman inmates as highly dangerous due to their previous death sentence and in need of tight disciplinary control. It was this "prediction" of and "propensity" for violence that determined unit of assignment.

The comparison group consists of all 156 male inmates convicted of murder (n=128) and rape (n=28) sentenced to TDC for life imprisonment (based on 60 plus years) in 1973. These were the same offenses for which the Furman inmates were sentenced to death.(4) All 156 entered the general prisoner population in 1973 and were housed in the same penitentiaries as the Furman commutees. The researchers believe that the life sentence cohort represents the best possible comparison group for the following reasons: (1) both groups were convicted of murder and rape; (2) both were sentenced to life imprisonment; (3) they entered the general prisoner population in 1973; and (4) both had a percentage released to the free society between 1973-1986. (5)

Data on institutional behavior were gathered from the inmates' prison records.  We were specifically interested in the inmates' institutional disciplinary histories.  TDC has three types of rule violations: Level 1, Level 2, and Level 3.  Level 1 offenses are such serious violations as fomenting riots or work strikes, escape, possession of a weapon, fighting with a weapon, attacking a guard, and aggressive sexual attacks.  Level 2 offenses consist of such offenses as fighting, refusing to work, and possession of drugs or contraband, while Level 3 violations are very minor infractions (e.g., gambling, tattooing).  A code sheet was developed to obtain each inmate's disciplinary history which noted the year of the offense and subsequent official punishment (e.g., loss of good time, solitary confinement, demotion in time-earning class).  This research, however, focuses on Level 1 offensivity.

Post-institutional (recidivism) data for those inmates paroled were obtained from the Texas Board of Pardons and Paroles (BPP).  The BPP maintains exhaustive records on parolees, much of which is computerized.  From the BPP, we obtained data on whether or not the inmate had violated his conditions of parole.  These records also delineated the type of violation-- a new felony and subsequent conviction, or simply a technical violation and when.

## RESULTS

In the following sections, results of the analysis are presented: (1) current status; (2) demographic characteristics; (3) institutional behavior; (4) conduct on parole, including those returned to prison and why; and (5) a comparative analysis of recidivism data.

## CURRENT STATUS

Over the course of 14 years, thirty-one Furman commutees were eventually released to the community, 28 being paroled, one discharged, one pardoned, and one case dismissed.  Of those released, six were eventually revoked, three died, and 23 are still living in the community (includes one of the revoked offenders who has since been re-paroled).  Sixteen inmates have never been released from prison; three died, and 13 are still incarcerated.  As for the life sentence cohort, 109 have been released (47 have never been released) of which 18 returned to prison, 9 died, and 94 of these inmates are still in the free community.

## DEMOGRAPHIC CHARACTERISTICS

Table 1 presents a frequency distribution of the general demographic characteristics of the Furman and life sentence cohort.

(Table 1 about here)

In many respects, the two groups are comparable in terms of these general characteristics.  For both groups, the mean age in 1973 was similar, however, cohort offenders appear to be slightly younger than the commutees.  In terms of race/ethnicity, over half of the life sentence and Furman inmates were black and Hispanic.  The majority in both groups did not have a violent offense in their prior criminal history.  Most important, none of the Furman inmates committed a previous homicide-- this includes second and third degree murder.  They did, however, commit 4 prior robberies, 2 rapes, and 6 aggravated assaults.  Though not statistically significant, the life sentence cohort did commit more violent previous offenses than the Furman commutees.  These prisoners committed 7 prior murders, 7 rapes, 23 robberies, and 25 aggravated assaults.  The prior rates of adult incarceration for both groups were similar.

The only significant finding was time spent in prison. The former capital offenders spent nearly 10 years in the general population while the life sentence group averaged over 11 years.  This difference was statistically significant.  The reason for this finding centers on the amount of time Furman inmates spent on death row, an average of 4.5 years.  One spent almost 11 years in the death house. Once they entered the general prisoner population, the Furman inmates were given credit for their time spent on the "row" as well as good time which for most hastened their release.

INSTITUTIONAL BEHAVIOR

The TDC regarded the Furman inmates as a dangerous and potentially disruptive group. The rate of disciplinary infractions among these prisoners offers an insight into how "dangerous" they were in reality over the past fourteen years, and are today. The following section examines Level 1 rule-breaking activity during the course of confinement.

Serious Rule Violations

Level 1 offenses are the most serious institutional rule violations and represent the best determinants of the extent of dangerousness to other inmates in the prison setting, as opposed to other infractions (e.g., gambling, disobeying orders, possessing of contraband, tattooing) considered by the staff to be merely annoying problems. Table 2 lists the eleven Level 1 offenses committed by the Furman group and cohort, and the frequency of their occurrence from 1973 through 1986.

(Table 2 about here)

Overall we found that 73% of the Furman and 70% of the cohort inmates committed no Level 1 infractions during their confinement. This is remarkable considering the average time spent in prison for both groups was roughly a decade. In addition, 93% of the commutees and 90% of the comparison group committed no assaultive weapons (aggravated assault and

fighting with a weapon) offenses while incarcerated in TDC. These data, besides contravening predictions of future dangerousness in the prison setting, certainly suggest a non-violent and non-predatory (physical ansd sexual) type of prisoner. Who then were the serious rule violators? Several studies have found that within a penitentiary (as in the outside community) a small group of prisoners accounts for a disproportionate amount of offenses (Fox, 1958; Ramirez, 1983; Wolf, Freinek, and Schaffer, 1966). This theory was tested to see if it held true for the Texas Furman and cohort inmates.

High Rate Offenders

Of the Furman-commuted prisoners, 12 (9 murderers and 3 rapists) were responsible for the 21 Level 1 offenses. In fact, 1 inmate, a murderer, committed 6 of these serious infractions. Among the cohort, 47 committed the 116 offenses, with 1 committing 14, and another 17. Over the 14 year period, the 12 Furman Level 1 rule violators committed an average of 14.3 disciplinary infractions (Levels 2 and 3) per inmate compared to the non-Level 1 violators who committed an average of just 4.1 disciplinary infractions per inmate. The offending rate of Level 1 offenders was 3.5 times that of the other Furman inmates. Similarly, the 47 life sentence Level 1 violators committed an average of 14.3 infractions per offender compared to the non-Level 1 offenders, who committed an average of 4.3 offenses. These

data show how alike the two groups were in terms of serious
rule breaking activity in prison.  Furthermore, the
contention of previous researchers that the group of inmates
who violate the most serious institutional rules are also
over-represented in lesser misconduct categories held true in
this research as well. (see, Flanagan, 1980)

The high-rate offenders in both groups were slightly
younger (25 for the Furman and 28 for the cohort) than the
other inmates.  They also consisted overwhelmingly of
minorities.  Among the 12 Furman high rate offenders, nine
were black, two were Hispanic, and only one was white,
compared to their representation within the group-- 43
percent white, 46 percent black, and 11 percent Hispanic.
Among the life sentence cohort, the 47 high rate offenders
were primarily minority inmates (68% black, 11% Hispanic, 21%
white).  The majority of high rate offenders in both groups
(compared to the non-Level 1 violators) had not been
incarcerated in TDC or other prisons prior to this term.
Thus, it seems that this small group of inmates, accounting
for the bulk of serious disciplinary infractions, had
difficulty adjusting to the general prison environment.

In summary, the data indicate that a small percentage of
inmates were involved in Level 1 offenses over the 14 year
period.  Perhaps most significant is the fact that no inmates
from either group committed or were implicated in a prison
homicide.  The Furman inmates, as compared to the life
sentence cohort, were not unusually disruptive or rebellious,

nor did they pose an disproportionate threat to other inmates and staff, as had been previously predicted by clinicians and administrators. These findings on the institutional behavior are consistent with the research of Thornberry and Jacoby (1979).

## Conduct in the Free Community

In an earlier section it was noted that at some point prisoners from both groups had been released from prison. Table 3 reports the frequency distribution of those released and returned to prison.

(Table 3 about here)

Considering the small number of inmates who recidivated, the groups appear to be somewhat similar. Though the Furman inmates had a higher return rate than the cohort, this can be attributed to a longer release or risk period. Excluding the the technical violations, the data indicate that 94% of the life sentence cohort and 86% of the Furman releasees did not commit a new felony while in the free community.(6) As found in most recidivism studies, the period immediately following release is the most critical time for committing new offenses or violating parole rules. Seventy-five percent of the Furman recidivists recidivated within the first two years of their initial release. Sixty-one percent of the cohort recidivists returned to prison within two years.

Since Furman, states have only executed offenders convicted of capital murder. The current Texas capital sentencing scheme includes a "future dangerousness" provision. That is, jurors must unanimously conclude that the offender will commit future acts of violence (specifically homicide) to hand down a sentence of death. Table 4 is a more restricted comparison which lists recidivism data for murderers only from both groups.

(Table 4 about here)

Although recidivism rates for the murderers were low, one inmate in the Furman group committed another homicide while on parole. This act, committed in 1985, occurred within twelve months of his release from prison. He murdered his girlfriend and then committed suicide. An interesting finding of this research was that none of the released life sentence murderers committed an additional homicide. In short, of a total of 109 released murderers (both groups combined), one committed another homicide in the course of 14 years-- both inside prison and in the free community.

Comparison to Other Studies

In the following analysis, we compare our recidivism results for the murderers only to four other first-degree murderer-recidivism studies. These studies serve as a baseline for comparison to illustrate that the Furman inmates

did not have an extraordinarily high recidivism rate.  The small sample of Texas inmates makes statistical comparison difficult; however, some broad generalizations can be made about the Furman inmates when compared to existing research. It is apparent that the rates of recidivism we observed among these inmates are quite similar to the research conducted by Donnelly and Bala (1984), Wallerstedt (1984), Bedau (1982), and Vito and Wilson (1986).

(Table 5 about here)

Based on these prior research findings and compared to the cohort data, the Furman-commuted murderers did not present a proportionately greater threat to the community; only four of the 21 inmates released (19%) were returned, or in one case would have been returned, to prison in fourteen years.  Of these four, only 1 committed a second homicide. If speaking of recidivism in the sense of recommission of the crime for which the person was initially imprisoned, only 1 of the 21 released Furman murderers recidivated; that is one true positive (predicted to be dangerous and was dangerous) and 20 false positives.  The predictions by administrators and clinicians that these individuals would wreak havoc if released to the community did not occur.  Only a very small percentage of those predicted to be dangerous actually carried out additional serious felonies.  It is worth noting that in a sample of 239 male British lifers, that 2, less

than 1%, committed a second homicide while on "license" in the free society (see Coker and Martin, 1985).


## CONCLUSIONS


This article analyzed the institutional and post-release conduct of a group of capital offenders "freed" by a historic Supreme Court decision in 1972.  These inmates were labeled as "dangerous" and predicted to be a continuing threat to society.  The evidence reviewed in this article found that whether in prison or in the free society, the vast majority of these ex-capital offenders (as compared to a like group of violent criminals) did not engage in numerous serious assaultive or predatory acts over a prolonged period.  Those commuted proved to be no more dangerous in the prison setting than the life sentence prisoners.  Few prisoners in both groups committed assaultive weapons offenses against other prisoners.  The majority rarely sought to escape, fomented rebellion, or attacked correctional personnel.  They did not commit a prison homicide.  The predictions of future dangerousness among the ex-capital offenders in the prison environment did not materialize.  Most were model inmates during their confinement.  These findings closely parallel those of Thornberry and Jacoby's (1979) research on ex-criminally insane mental patients eventually released to the free society.

Thirty-one of the commutees (including the 3 armed robbers) were eventually released into the free community. The data indicate that the majority of released commutees did not recidivate.  Four releasees committed new felonies-- 1 murder, 1 rape, and 2 burglaries.  To some, this second killing may be "too many" and beyond any "acceptable" level or rate of violence.   However, twenty-three Texas Furman inmates are, as of this writing, still on parole.  Several have been on parole for more than a decade, without incident. Further, there was little difference in the institutional and release behavior between those offenders we once decided to execute versus a group of like offenders sentenced to prison for life.  These so-called "successes" or false positives demonstrate the futility in trying to predict future dangerousness.  Current capital sentencing schemes that include a future dangerousness or continuing threat provision are especially suspect (see Dix, 1977).

In summary, the findings from this research have strong implications for those who advocate specific deterrence to justify capital punishment.  Our data suggest that executing the offender to protect society is not a valid response to violent crime or a legitimate sentencing policy.  Indeed, nearly all the released Furman inmates proved to be good "risks" in the free community.  Furthermore, life without parole statutes, specifically designed to protect society, are also seriously called into question.  All ex-capital offenders, or violent offenders in general, certainly do not

make good release risks.  Yet, executing 47 inmates to prevent 1 additional homicide seems to be an extraordinary measure, and based on overpredictions of secondary violence. The ex-capital offenders in Texas were not, as a group, a significant or disproportionate threat to society when compared to similar offenders.  To continue to treat them as such will only preserve the myth that they are a distinct and unique menace to the free community.  Execution in this instance would not have greatly protected society.  We are left with one conclusion: execution would have served only one goal-- retribution.  Research on capital punishment is voluminous but certainly not exhaustive.  More systematic research on the Furman and those commutees under current capital sentencing schemes is sorely needed.

**NOTES**

1.  The exact number of inmates that were on death row
    at the time of the Furman ruling is not clear.   Doug
    Lyons' list compiled for the NAACP-Legal Defense
    Fund contains 613 inmates, while Greenberg (1982) states
    that there were 629 inmates on death row at the time
    of the ruling.

2.  For an historical overview of capital punishment in Texas
    (1924-1968), see Rupert C. Koeninger (1969).

3.  In (1), different estimates of the number of death
    row inmates commuted by the Furman decision nationwide
    were mentioned.   In individual states, the number of
    inmates released by the decision have also differed from
    Lyons' list.   While Lyons' list contains 102 inmates
    supposedly on Florida's death row at the time of the
    Furman decision, Radelet, in a preliminary analysis
    found 96.   Similarly, in Texas, 47 inmates were verified
    by institutional records as being present on death row at
    the time of the ruling.   The overestimate by Lyons may
    have been caused by including some persons who were still
    awaiting transfer to death row in county jails.

4.  The results in the following sections are based only on
    murderers and rapists.   We collected data on 80 armed
    robbers in the life sentence cohort.   However we have
    excluded the armed robbers from this analysis.   To
    introduce the armed robbers into the analysis (both
    Furman and those sentenced to life) would have confounded
    the results due to the sheer size of the cohort robbers.
    Moreover, the armed robbers in the cohort represent a
    different type of criminal-- a career criminal who most
    likely would not have been sentenced to death under the
    pre-Furman Texas death statute.   In addition, all 3
    Furman-robbers have been released, have not returned, and
    did not commit any Level 1 rule violations.

5.  We did not engage in sophisticated matching techniques or
    multivariate analysis because the populations sizes
    were dangerously small, which also tends to diminish the
    ability to make simple comparisons of percentages
    (Farrington, 1979).

6.  There is, however, a limitation to this release data.
    That is, our findings on recidivism pertain only to known
    or official encounters with law officers.  We do not know
    the extent to which the Furman-releasees and cohort
    members committed offenses or violated parole conditions
    and were not detected.  It is possible these
    ex-prisoners committed "hidden" felonies.

## REFERENCES

Bedau, Hugo A.
   1982     Recidivism, Parole, and Deterrence.  In Hugo
            Bedau's (ed.), The Death Penalty in America. New
            York: Oxford University Press.

   1967     Parole of Capital Offenders, Recidivism
            and Life Imprisonment. in H. Bedau (ed.) The
            Death Penalty in America. Garden City, NY:
            Doubleday.

Coker, J.B. and J.P. Martin
   1985     Licensed to Live. NY: Basil Blackwell.

Crouch, Ben M. and James W. Marquart
   In Press An Appeal To Justice: Litigated Reform of Texas
            Prisons.  Austin: University of Texas Press.

Dix, George
   1980     Clinical evaluation of the "Dangerousness" of
            Normal" criminal defendants.  Virginia Law
            Review 66 (3): 523-581.

   1977     Administration of the Texas death penalty
            statutes: Constitutional infirmities related to
            the prediction of dangerousness.  Texas Law
            Review 55: 1343-1414.

Donnelly, Henry C. and Gerald Bala
   1984     1977 Releasees: Five Year Post Release
            Follow-up. Albany, NY: Department of
            Correctional Services.

Eichman, Charles J.
   1967     The Impact of the Gideon Decision Upon Crime
            and Sentencing in Florida: A Study of
            Recidivism and Sociocultural Change.
            Unpublished Thesis. Tallahassee, FL: Florida
            State University.

Ekland-Olson, Sheldon
   1986     Crowding, social control, and prison violence:
            Evidence from the post-Ruiz years in Texas.
            Law and Society Review 20 (3): 389-421.

Farrington, David P.
   1979     Longitudinal research on crime and
            delinquency. Crime and Justice: An Annual
            Review of Research 1: 289-347.

Flanagan, Timothy J.
   1980      Time served and institutional misconduct:
             patterns of involvement in Disciplinary
             infractions among long-term and short-term
             Inmates." Journal of Criminal Justice 8 (6):
             357-367.

Floud, Jean and Warren Young
   1982      Dangerousness and Criminal Justice. Totowa, NJ:
             Barnes and Noble.

Fox, Vernon
   1958      Analysis of prison disciplinary problems.
             Journal of Criminal Law, Criminology, and
             Police Science 49 (4): 321-326.

Gallemore, Johnnie L. and James Panton
   1972      Inmate responses to lengthy death row
             confinement.  American Journal of Psychiatry
             129 (2): 167-172.

Giardini, Giovanni I. and R.G. Farrow
   1952      The paroling of capital offenders.  The Annals
             284: 85-94.

Johnson, Elmer H.
   1957      Selective factors in capital punishment."
             Social Forces 36 (2): 165-169.

Koeninger, Rupert
   1969      Capital punishment in Texas, 1924-1968." Crime
             and Delinquency 15 (1): 132-141.

Martin, Susan E.
   1983      Commutation of prison sentences: Practice,
             promise, and limitations. Crime and
             Delinquency 29 (4): 593-612.

Radelet, Michael and Glenn Pierce
   1985      Race and prosecutorial discretion in homicide
             cases.  Law and Society Review 19 (4): 587-621.

Ramirez, John
   1983      Race and apprehension of inmate
             misconduct.  Journal of Criminal Justice 11
             (5): 413-427.

Sellin, Thorsten
   1980      The Penalty of Death. Beverly Hills, CA: Sage.

Stanton, John M.
   1969      Murderers on Parole." Crime and Delinquency 15
             (1):  149-155.

Steadman Henry J. and Joseph J. Cocozza
  1974      Careers of the Criminally Insane: Excessive
  —         Social Control of Deviance.  Lexington MA: D.C.
           Heath.

Thornberry, Terence P. and Joseph E. Jacoby
  1979      The Criminally Insane: A Community Follow-up of
           Mentally Ill Offenders. Chicago Press.

Vito, Gennaro F. and Deborah G. Wilson
  1986      Back From The Dead: Tracking the Progress of
           Kentucky's Furman-Commuted Death Row
           Population.  Kentucky Criminal Justice
           Statistical Analysis  Center.  Research Report
           Series #10.

Wallerstedt, John
  1984      Bureau of Justice Statistics Special Report:
           Returning to Prison. Washington, DC: U.S.
           Department of Justice.

Wardlaw, Grant and David Biles
  1980      The Management of Long-Term Prisoners in
           Australia.  Canberra: Australian Institute of
           Criminology.

Wolf, Sidney, Wilfred R. Freinek, and John W. Schaffer
  1966      Frequency and Severity of Rule Infractions as a
           Criteria of Prison Maladjustment."  Journal of
           Clinical Psychology  22 (2): 244-247.

Wolfgang, Marvin E., Arlene Kelly, and Hans C. Nolde
  1962      Comparison of the executed and the commuted
           among admissions to death row.  Journal of
           Criminal Law, Criminology, and Police Science
           52 (3): 301-311.

# CASES CITED

Baxstrom v. Herold, 328 U.S. 107 (1966).

Dixon v. Commonwealth Pa., 325 F. Supp. 966 (1971).

Furman v. Georgia, 408 U.S. 238 (1972).

Gideon v. Wainwright, 372 U.S. 335 (1963).

Ruiz v. Estelle, 503 F. Supp. 1265 (1980).

Table 1.  DESCRIPTION of the GROUPS

| Characteristics | Furman (N=44) | Life Sentence Cohort (N=156) | Test of Significance |
|---|---|---|---|
| Offense | | | $\chi^2=$ .01 |
| Murder | 84.1% | 82.1% | |
| Rape | 15.9 | 17.9 | |
| Race/Ethnicity | | | $\chi^2=$ .22 |
| Black | 45.5 | 49.4 | |
| White | 43.2 | 39.7 | |
| Hispanic | 11.4 | 10.9 | |
| Mean Age in 1973 | 32.2 | 29.9 | T= 1.51 |
| Mean Years in Prison | 9.9 | 11.3 | T= 2.08* |
| Prior UCR Violent Offenses | | | T= 1.14 |
| 0 | 79.1 | 69.3 | |
| 1-2 | 20.9 | 28.7 | |
| 3 or more | 0 | 2.0 | |
| Prior Adult Incarcerations | | | T=  .57 |
| 0 | 65.9 | 63.4 | |
| 1-2 | 27.3 | 26.1 | |
| 3 or more | 6.8 | 10.5 | |

*Significance levels were determined as appropriate by chi-squares or T-tests and *p < .05.

Table 2.   NUMBER of SERIOUS INSTITUTIONAL RULE INFRACTIONS

| Offense | Furman (n=47) | Life Sentence Cohort (n=156) |
|---|---|---|
| **Inmate-Inmate Offenses** | | |
| Fighting with weapon | 1 | 19 |
| Aggravated assault on an inmate with a weapon | 2 | 11 |
| Aggravated assault on an inmate | 0 | 6 |
| Sex by force | 0 | 2 |
| **Inmate-Guard Offenses** | | |
| Striking a guard | 2 | 8 |
| Attempting to strike a guard | 0 | 3 |
| Threatening a guard | 5 | 19 |
| **Offenses Against Prison Order** | | |
| Escape/Attempts to escape | 0 | 6 |
| Mutiny | 1 | 5 |
| Possession of weapon | 7 | 16 |
| Sex misconduct | 3 | 21 |
| Total offenses | 21 | 116 |
| Number of inmates involved | 12 (25%) | 47 (30%) |

30

TABLE 3.   TOTAL RECIDIVISM BY GROUP

| Release Outcome | Furman | Life Sentence Cohort |
|---|---|---|
| Total Released | 28 (64%) | 109 (70%) |
| Mean Time in community | 4.1 yrs | 3.0 yrs |
| Recidivated* | 7 (25%) | 18 (17%) |
| Technical Violations | 3 (11%) | 12 (11%) |
| New Felony Offenses | 4 (14%) | 6 (6%) |
|     Murder | 1 | 0 |
|     Rape | 1 | 1 |
|     Robbery | 0 | 1 |
|     Burglary | 2 | 4 |

*Recidivism is based on return to prison.

TABLE 4.   RECIDIVISM OF MURDERERS

| Release Outcome | Furman (n=37) | Life Sentence Cohort (n=128) |
|---|---|---|
| Total Released | 21 | 88 |
| Mean Time in Community | 4.3 yrs. | 2.9 yrs. |
| *Recidivated | 4 (19%) | 14 (16%) |
| Technical Violation | 2 | 10 |
| New Offense | 2 | 4 |
| Burglary | 1 | 3 |
| Rape | 0 | 0 |
| Murder | 1 | 0 |
| Robbery | 0 | 1 |

* Recidivism is based on return to prison.

TABLE 5. RECIDIVISM RATES of THE TEXAS FURMAN-COMMUTED
MURDERERS COMPARED WITH PREVIOUS RESEARCH

| Study | Outcome Definitions | Failure Rate |
|---|---|---|
| **Texas Furman** | Reincarcerated: | 19.0% |
| | New offense | 9.5 |
| | Violation | 9.5 |
| Texas 1973 Cohort | Reincarcerated: | 15.9 |
| | New Offense | 4.5 |
| | Violation | 11.4 |
| Vito and Wilson (1986) | Reincarcerated | 29.0 |
| | New offense | 18.0 |
| | Violation | 11.0 |
| Wallerstedt (1984) | Reincarcerated for new offense or violation | 29.0 |
| Donnelly and Bala (1984) | Reincarcerated for new offense or violation | 27.3 |
| Bedau (1982) | Reincarcerated: New Offense Violation | 6.3 1.2 5.1 |

*The Bedau study was based on a one year follow-up of
nationwide sample of male convicted murderers released during
1971-74 (see Table 4-5-3).  The "at risk" period was the
first year after release.  The Donnelly and Bala (1984) study
consisted of a five-year follow-up of 66 murderers released
from New York State prisons in 1977.  The Wallerstedt (1984)
study reports the median reincarceration rate for homicide
repeaters in Michigan (1978), Nebraska (1980), New York
(1976), Oregon (1978), and Rhode Island (1978).  Vito and
Wilson's (1986) study is based on 17 Furman-Commuted Kentucky
inmates who have been paroled.  Donnelly and Bala, and
Wallerstedt were reported in Vito and Wilson, 1986.  Our
Texas data represents a fourteen year followup.

1                    DEFENSE EXHIBIT E
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Case 4:14-cv-03253 Document 20-56 Filed on 08/04/16 in TXSD Page 115 of 265

# LIFESTYLE
## Ideas & Trends

# DECIDING WHO IS DANGEROUS

DEFENDANT'S EXHIBIT
D

PENGAD-Bayonne, N.J.

### Mental health professionals cannot predict violence — there are no tests, just guidelines

By VIVIENNE HEINES
Houston Chronicle



John Yunek / Chronicle

THE MAN was in his mid-20s, wearing an Army fatigue jacket and sporting a freshly cut Mohawk hairdo. He said he had guns in his house and he was going to shoot his neighbor.

"If you talked to him, he was rational about the whole thing — which scares me a lot — and he told me that he was going to do it," said Barbara Levinson, director of nursing at Belle Park Hospital, a private psychiatric facility in southwest Houston.

In the case above, it was not hard for Levinson to decide that her patient was potentially dangerous. Other cases, though, are not as clear-cut. They present mental health and medical professionals with a dilemma that is as complicated as it is challenging: how to predict if a patient is dangerous to himself or others.

"No one can predict dangerousness, and there is no absolute rule about how to predict if a person is dangerous. You can't even find two psychiatrists who will agree on a certain person," said Betsy Schwartz, executive director of the Mental Health Association of Houston and Harris County Inc.

"If we could predict dangerousness, we wouldn't have any crime."

Random, unprovoked violence is frightening and fickle. The good news is that it's rare; the bad news is that there is very little way of foretelling when and where it will occur.

The problem is compounded by several factors — lack of knowledge about violence, myths about who is potentially dangerous and fears people have about seeking help for emotional or mental disturbances. Often people are ashamed of seeking help for mental problems, either their own or for others.

"I think no matter how hard we've tried to say that mental illness or disorder is like going to the emergency room to get your finger fixed, there will always be a stigma," Levinson said.

Although homicide gets more publicity, suicide is the most common form of violent behavior, says Dr. Pedro Ruiz, chief of psychiatry at Ben Taub Hospital and vice chairman of the department of psychiatry at Baylor College of Medicine. Therefore, much of the research on violence focuses on suicide, and psychiatrists use similar markers in determining potential danger to others.

"A lot of it has to do with the planning, the means to carry out the plan, evidence of that kind of behavior in their past and good motivation to do it now," Cox said.

"You take those things and you can build a pretty scary individual but can you predict with certainty? It's like predicting suicide — most people don't do it — so if you say nobody does it, you're going to be right 97 percent of the time."

Judgment is further hampered because patients who want to conceal violent tendencies can easily do so by lying to an evaluating psychiatrist. Frequently, hospitals don't see potentially dangerous patients until it's too late.

"Our biggest dilemma is when we feel like a patient would certainly benefit from treatment but won't commit himself to care," said Litrelle Levy, emergency room social worker at Ben Taub Hospital.

There are also legal problems. If a hospital holds a patient against his will without a valid medical reason, it can be accused of violating his civil rights. On the other hand, if it releases someone who is disturbed and dangerous, society is at risk.

"In order to be committed, to be treated against one's will, a person must be mentally ill and dangerous and there must be a causal connection between the two," said Dr. Betsy Comstock, medical director at the Bay Hospital Program at the Houston Veterans Administration Medical Center.

Mental illness and dangerousness do not go hand in hand, people are more often driven to homicidal or violent acts by external reasons, Comstock says.

"Some people are motivated to dangerous behavior by personal gain; some people murder other people for money. Revenge can be a motivation or an assault associated with a robbery," she said.

Indeed, mental health professionals agree that one of the most pervasive myths about violence is that it is committed by the mentally ill:

"We can't blame the majority of this on crazy people. Most crazy people don't do this," said clinical psychologist Michael Cox, director of training in psychology at Baylor College of Medicine.

"A lot of these people, it's hard to pick out unless you interview them. They just go their own way until they blow."

Once admitted to a hospital, a potentially violent patient is first evaluated for medical causes and treatment. Among possible medical causes for violence are temporary epilepsy, brain tumors, hormonal difficulties or extreme anxiety caused by hypothyroidism, says Ruiz. If a patient is on drugs or drunk, he or she is stabilized in the intensive care unit.

Next, an evaluation is made by a team of psychiatric personnel. The patient's history is sought — maybe he's been in another facility or under care of an agency or doctor. This is especially important if the decision is made not to admit a patient because they may instead be sent to an agency or doctor.

"We cannot admit everybody that we see. We see 6,000 to 8,000 people a year. Generally speaking, we give first priority to patients we consider seriously suicidal or seriously dangerous to other people," Ruiz said.

On an emergency basis, the hospital has 24 hours to make a decision about treatment, says Dr. Robert Bacon, chief of psychiatry in the emergency room at Ben Taub Hospital. If they decide a patient needs a longer stay, they can file for an order of protective custody. If granted, the patient must see a judge in court within three days. In another 10 days, the patient is seen by a judge again. Throughout the entire process, discharge plans including family members, social services, financial assistance, medical care and follow-up treatment are in progress.

Levy says doctors prefer to release patients in the care of a friend, relative or neighbor. Another option is alternative-care facilities that provide less attention than a hospital but more than independent living. There is a great need in the Houston area for such facilities, Levy says.

"We start working with the discharge plans as soon as a patient sets foot in here, with what will happen to a patient when he leaves the hospital," Ruiz said. "So that when we discharge the patient, we feel comfortable that he will not go back to the same system he came from."

Although violence may be more visible today, most psychiatrists say that doesn't mean there's more of it.

"It's always been with us; there's always been civil violence," Cox said. "People have always run amok in the past. In some ways the world is more safe than in the past; in other ways, there is a greater risk of danger.

"I don't think I necessarily see more violent patients but the fact that certain kinds of drugs are being used would mean there is more violence or different kinds of violence, more purposeless violence," Bacon said.

Still, economic problems may forecast an increase in violence.

"It has been proven that there is a relationship with unemployment and suicidal or violent behavior. Houston is facing a major economic crisis with oil and all that, particularly for the Hispanic and black populations. I would expect the rate of suicidal and violent behavior to go up," Ruiz said.

The deinstitutionalization of mental patients is also putting people who need attention on the streets, experts say.

"What we refer to as 'from back wards to back streets' is really true. We took them out of hospitals and put them on the streets," Schwartz said.

"We have fewer beds in the state facilities . . . and we are beginning to see more and more mental patients join the criminal justice system," Ruiz said. "Those who are lucky come here and we are able to work with the court. Others go to jail. I think it's unfair because they don't belong in prisons, they belong in psychiatric programs."

Comstock believes most people ignore the fact that violent behavior related to mental illness will worsen if left untreated. She says that not spending the necessary money on mental illness can contribute to an increase in such violence.

Prevention, agrees Levinson, is the key in treating dangerousness.

"Awareness, education and the use of support systems in identifying problems is our best solution. Taking an active stance instead of a reactive stance is the answer," she said.

## Doctors look for signs to define patient's problems

Trying to decide if a patient is violent is like traveling a twisting road with many ins and is in the act of committing a crime, or because the drug has affected them and they can signal danger.

"The family tends to think that the patient

Case 4:14-cv-03253 Document 28-58 Filed on 09/01/16 in TXSD Page 116 of 265

...to go up," Ruiz said.

"If we could predict dangerousness, we wouldn't have any crimes... [illegible] doctors, psychologists, psychiatrists... ing and fickle. The good news is that if there, the bad news is that there is very little way of foretelling when and where it will occur."

The problem is compounded by several factors — lack of knowledge about violence, myths about who is potentially dangerous and tears people have about seeking help for emotional or mental disturbances. Often people are ashamed of seeking help for mental problems, either their own or for others.

"I think no matter how hard we've tried to say that mental illness or disorder is like going to the emergency room to get your finger fixed, there will always be a stigma," Levinson said.

Although homicide gets more publicity, suicide is the most common form of violent behavior, says Dr. Pedro Ruiz, chief of psychiatry at Ben Taub Hospital and vice chairman of the department of psychiatry at Baylor College of Medicine. Therefore, much of the research on violence focuses on suicide, and psychiatrists use similar markers in determining potential danger to others.

"A lot of it has to do with the planning, the means to carry out the plan, evidence of that kind of behavior in their past and good motivation to do it now," Cox said.

... hands in hand: people are more often ... ... ... ... victims when acts in progress and remain, Comstock says.

"Some people are motivated to dangerous behavior by personal gain; some people murder other people for money. Revenge can be a motivation or an assault associated with a robbery," she said.

Indeed, mental health professionals agree that one of the most pervasive myths about violence is that it is committed by the mentally ill.

"We can't blame the majority of this on crazy people. Most crazy people don't do this," said clinical psychologist Michael Cox, director of training in psychology at Baylor College of Medicine.

"A lot of those people, it's hard to pick out unless you interview them. They just go their own way until they blow.

Once admitted to a hospital, a potentially violent or violent patient is first evaluated for medical causes and treatment. Among possible medical causes for violence are temporary epilepsy, brain tumors, hormonal difficulties or extreme anxiety caused by hypothyroidism, says Ruiz. If a patient is on drugs or drunk, he or she is stabilized in the intensive care unit.

Next, an evaluation is made by a team of psychiatric personnel. The patient's history is sought — maybe he's been in another fa-

... entire custody. If granted, the patient must ... a judge himself within three days. In another 14 days, the patient again... judge again. Throughout the entire process, discharge plans including family members, social services, financial assistance, medical care and follow-up treatment are in progress.

Levy says doctors prefer to release patients in the care of a friend, relative or neighbor. Another option is alternative-care facilities that provide less attention than a hospital but more than independent living. There is a great need in the Houston area for such facilities, Levy says.

"We start working with the discharge plans as soon as a patient sets foot in here, with what will happen to a patient when he leaves the hospital," Ruiz said. "So that when we discharge the patient, we feel comfortable that he will not go back to the same system he came from."

Although violence may be more visible today, most psychiatrists say that doesn't mean there's more of it.

"It's always been with us; there's always been civil violence," Cox said. "People have always run amok in the past. In some ways the world is more safe than in the past; in other ways, there is a greater risk of dan-

The deinstitutionalization of mental patients is also putting people who need attention on the streets, experts say.

"What we refer to as 'from back wards to back streets' is really true. We took them out of hospitals and put them on the streets," Schwartz said.

"We have fewer beds in the state facilities... and we are beginning to see more and more mental patients join the criminal justice system," Ruiz said. "Those who are lucky come here and we are able to work with the court. Others go to jail. I think it's unfair because they don't belong in prison, they belong in psychiatric programs."

Comstock believes most people ignore the fact that violent behavior related to mental illness will worsen if left untreated. She says that not spending the necessary money on mental illness can contribute to an increase in such violence.

Prevention, agrees Levinson, is the key in treating dangerousness.

"Awareness, education and the use of support systems in identifying problems is our best solution. Taking an active stance instead of a reactive stance is the answer," she said.

# Doctors look for signs to define patient's problems

Trying to decide if a patient is violent is like traveling a twisting road with many intersections and without a map. The road signs may be hidden or misleading and, sometimes, they can only be interpreted with the help of others.

Doctors say that when making an assessment of dangerousness, they look for certain markers that might indicate a potential for violence.

Does the patient have a history of violence? Has he or she expressed an intention to harm anyone? Does the patient have a clear-cut plan or access to weapons to carry out that violence? Are they under the influence of drugs or alcohol? Are they emotionally stable?

"A lot of our violent crimes are drug-related, either because the person is high

and is in the act of committing a crime, or because the drug has affected them and they are in minimal control of their aggressive tendencies," said Barbara Levinson, director of nursing at Belle Park Hospital.

Even the season can contribute. Holidays are harbingers of violence as well.

"Sometimes patients plan to commit violent acts during holidays," said Dr. Pedro Ruiz, chief of psychiatry at Ben Taub Hospital and vice chairman of the department of psychiatry at Baylor College of Medicine.

Doctors also look for signals, like a surge of energy. When a patient rouses from lethargy enough to carry out a self-destructive act or when anti-depressant medicine begins to take effect, it might appear that a patient has improved whereas the reverse is true.

Similarly, if a patient is suddenly calm, it

can signal danger.

"The family tends to think that the patient is better but sometimes it means that the patient has made a decision," Ruiz said.

Stress can constitute, says Levinson, who worked with New York's Tremont Crisis Center in the South Bronx for 10 years. She says she looks for a recent precipitating event that can drive a person over the edge.

"When you hear about mass murderers, those kinds of violent outbursts of homicidal acts could be done by a variety of people either who have long-standing anxieties or they move up to that," she said. "Anything can precipitate a crisis state ... it could be anything from the death of a loved one to your electricity going off."

Experts often talk to a patient's support system when trying to determine danger-

ousness, Levinson says. Since friends, family, neighbors and co-workers might provide information not available from the patient, they need to be educated to watch for behavioral changes.

"If families see changes in a person's behavior over a period of time, do they know who to go to?" she asked. She recalls the case of a mother who stabbed her 3-year-old child. Later, it was discovered she had gone through some noticeable behavior changes before the incident, including hearing voices.

"Whenever you have someone that says I hear voices and the voices are telling me to do something, you have got to intervene. Because if they hear voices, they have given up control," Levinson said.

— VIVIENNE HEINES

# Use your common sense to avoid harmful situations

There are certain steps you can take for protection if you find yourself in a situation with someone you think may be dangerous to himself or others.

First, don't panic. "Show that you're in control of the situation and act as calm and firm as possible," said Betsy Schwartz, executive director of the Mental Health Association of Houston and Harris County Inc.

Try not to show fear. You may want to remain seated if the person is standing up so

as not to appear aggressive. A show of aggression could set off a confrontation.

"Behave in a confident manner. Be non-threatening, calming," said Barbara Levinson, director of nursing at Belle Park Hospital.

If you suspect that someone may be dangerous, don't see them alone. If they come into your office or a room where you are, leave the door open.

It may not be useful to reason with someone who's out of control, Schwartz says.

"Someone who you think is acting violent is not rational at that moment, especially if he is under the influence of drugs or alcohol. To try and talk to him rationally is not very productive," she said.

Try to avoid potentially dangerous situations — working alone at night, walking by yourself on deserted streets after dark. But don't let yourself become incapacitated by

fears over violence, Schwartz adds.

"When you live in a big metropolitan city like New York or Houston, where there are a lot of crimes, common sense tells you that you are at higher risk," she said.

"But you have to keep that in perspective. You can't live your life overreacting and being afraid but you can use your common sense and avoid certain situations."

— VIVIENNE HEINES

1          DEFENSE EXHIBIT F

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CRIME AND DELINQUENCY

October 1972

# Can Violence Be Predicted?*

DEFENDANT'S EXHIBIT
F

Ernst A. Wenk
Associate Director, NCCD Research Center
Clinical Psychologist, California Department of Corrections, 1959-67
Diploma, 1953, Lehrerseminar and University of Basel, Switzerland; M. Crim., 1969,
University of California (Berkeley)

James O. Robison
Consulting Criminologist; Research Director, Parole-Corrections Project,
American Correctional Association
Supervisor, Bay Area Research Unit, California Department of Corrections, 1965-68
D.D., 1969, Universal Life Church (Modesto, Calif.); D. Crim., 1970,
University of California (Berkeley)

Gerald W. Smith
Assistant Professor, Department of Sociology, University of Utah
B.A., 1965, M.A. (Sociology), 1966, University of Louisville; D. Crim., 1969,
University of California (Berkeley)

*The prediction of violence in offender populations has long been a dream of correctional decision-makers. The possibility of identifying those individuals who will engage in violent behavior in the future offers the prospect of treatment interventions to reduce such violence. Using elaborate case histories, current measures of mental and emotional functioning, and professional prognoses for a sample of 4,146 California Youth Authority wards, the present study sought to develop a classification device for estimating assaultive potential with sufficient accuracy to be useful in correctional program decisions. Simple classification procedures and multivariate approaches failed to yield an operationally practical prediction instrument that would warrant implementation in actual preventive or correctional practice. Much of the violent behavior we would wish to predict will probably never come to our attention and the part that does will be far from a representative sample. The prediction equations themselves contain the seed of self-fulfilling prophecy.*

*This study was supported by ACORN grant NI-095 from the National Institute of Law Enforcement and Criminal Justice, LEAA, to the NCCD Research Center. Part of this work was supported by General Research Support Grant 1 SOL RR-05693-01 from the National Institute of Health to the NCCD Research Center. A more detailed presentation of the study will be issued through LEAA as a monograph entitled "Assaultive Youth: An Exploratory Study of the Assaultive Experience and Assaultive Potential."

394                    E. A. WENK, J. O. ROBISON, G. W. SMITH

A LARGE PROPORTION OF THE PUBLIC is alarmed about criminal violence. This alarm is commonly expressed as fear for one's own physical safety. Many are particularly apprehensive about danger in the streets and see the stranger as a menace.[1] They usually stay out of "dangerous areas" and sometimes purchase weapons with which to defend their homes and families. What many do not realize is that both of these responses are likely to elevate the overall level of public danger: as public traffic in an area diminishes, opportunities for victimizing those who remain may increase; and the chance of accidental injury, posed by the presence of a weapon in the home, may surpass the likelihood of deliberate injury by an intruder.

But citizens do not seem as concerned about the *probability* of personal injury as they are about the *possibility* of injury from a specific source: the stranger. General statistics showing the low probability of becoming a victim of homicide or physical assault do not appear to alleviate their concern, and comparative statistics showing that violence is most likely to be unleashed by a relative or personal acquaintance of the victim appear unlikely to alter their defense tactics. While some of the threat is perceived as coming from minority group members—political (e.g., "militant") and cultural (e.g., "hippie") as well as ethnic minorities—a great deal of suspicion is aimed toward those already adjudicated as criminal. Consequently, in recent years correctional agencies have been exposed to increasing pressure to "do something" about violent offenders.

In order to "do something" through treatment and intervention measures, it is first necessary to know to whom these measures are to be applied. Assuming that an effective and appropriate measure were available (a most unwarranted assumption[2]), the first move would be to identify a population of violent individuals—that is, individuals who will engage in violent behavior in the future.

## Prediction: The Violent Offender

There is little doubt that the known offender in general and the known violent offender in particular are more likely than members of the public at large to commit an assaultive act. Still, there has been no successful attempt to identify, within either of the offender groups, a subclass whose members have a greater-than-even chance of engaging again in an assaultive act. The best prediction available today, for even the most refined set of offenders, is that any particular member of that set *will not* become violent. Even so, since crimes of personal violence have such grave consequences for their victims, justification is often made for identifying—and extending special attention or treatment to—all members of a class with higher-than-average violence potential (for example, a class 10 per cent of whose members are likely to engage in serious violent acts during the period of official commitment or opportunity for intervention). Let us illustrate with two existing examples:

1. "Public Attitudes toward Crime and Law Enforcement," in President's Commission on Law Enforcement and Administration of Justice, *Task Force Report: Crime and Its Impact—An Assessment* (Washington, D.C.: U.S. Government Printing Office, 1967), ch. 6.

2. James O. Robison and Gerald Smith, "The Effectiveness of Correctional Programs," *Crime and Delinquency*, January 1971, pp. 67-80.

In 1965 the California Department of Corrections' Research Division developed a violence prediction scale for its population which employed, as predictor items, commitment offense, number of prior commitments, opiate use, age, length of imprisonment, and institution of release.[3] The result was the identification of a class of offenders (the most violent class isolated), 14 per cent of whom could be expected to violate parole by a violent or potentially violent discovered act. This likelihood was nearly three times as great as that for parolees in general, whose violence probability, by the same criterion, was only 5 per cent.

If a perfect corrective intervention method were developed and applied to the members of the violence-prone class, all acts of violence by this class could be prevented. However, since the violence potential for the class is already low (14 per cent), 86 per cent of its members could be expected to refrain from violence without the special treatment, although the entire group must be exposed to it at a considerable treatment cost. Further, since this class is such a small part of the parolee population (less than 3 per cent in this example), only 8 per cent of total violence on parole would be prevented by its isolation and special treatment—leaving 92 per cent of violent parolee acts occurring as usual. If the treatment were less than entirely successful the violence reduction would be even less.

Our second example deals with the application of violence history classification to screening decisions by the California Department of Correc-

tions' Parole and Community Services Division. All parolees released to supervision are classified into one of six categories according to past aggressive behavior. The categories range from the most serious, Aggressive Category No. 1, whose members have committed one or more acts of major violence (murder, assault with a deadly weapon, etc.), to the lowest level, Aggressive Category No. 6, consisting of parolees with no recorded history of aggression. The classification procedure involved both actual offender histories and psychiatric reports assessing violence potential.

The usefulness of this classification procedure can be examined by analyzing the effectiveness of decisions based on it, in a correctional setting. Since the inception in 1965 of the parole division's Work Unit Program (a reduced-caseload, intensive-supervision operation), parolees in the two most aggressive categories were placed in Work Unit supervision instead of large-caseload or "conventional" supervision. For some period after their release from prison to parole, the men were required to receive "special" supervision—the highest of three intensity levels (or contact frequencies) in Work Unit parole. A modification was made late in 1967 which permitted the assignment of some of these cases to the conventional program. It then became possible to compare the two methods (see Table I) and to assess the efficiency of the costly Work Unit intervention with violent offenders.

The findings presented in Table I indicate that the special precautions taken for identifying and handling the violent offender are unwarranted, given the actual level of danger. They can be justified only as token steps to alleviate fears about the possible oc-

3. "Predicting Violence Proneness on Parole," Crime Studies Section, California Department of Corrections Research Division, November 1965 (unpublished paper).

396      E. A. WENK, J. O. ROBISON, G. W. SMITH

TABLE 1

ONE-YEAR FOLLOW-UP OF RETURNS TO PRISON FOR VIOLENT OFFENSES COMMITTED BY
PAROLEES RELEASED BETWEEN JANUARY 1968 AND JUNE 1969

| Outcome | Type of Parole Supervision | | | |
| | Work Unit | | Conventional | |
| Convicted and returned to prison for: | Aggressive (AC 1-2) | Less aggressive (AC 3-6) | Aggressive (AC 1-2) | Less aggressive (AC 3-6) |
|---|---|---|---|---|
| New crime involving actual violence* | 0.3% | 0.4% | 0.4% | 0.2% |
| New crime involving possible violence** | 0.8% | 0.4% | 1.8% | 1.6% |
| Number released | 1,174 | 2,682 | 456 | 3,400 |

*Actual violence includes murder, manslaughter, assaults, rape, and kidnapping.
**Possible violence includes robbery, lewd and lascivious conduct, and escape.

currence of violence. One in every five parolees (1,630 out of 7,712) was assigned to the Potentially Aggressive categories (AC 1-2), and yet the rate of crimes involving actual violence for this group was 3.1 per thousand cases (5/1,630), compared to 2.8 per thousand (17/6,082) among the Less Aggressive categories.

Our familiarity with the findings on past efforts at violence prediction left us little enthusiasm for developing a device that could have practical utility for correctional decision-makers. Nevertheless, many things convinced us of the importance of a contemporary study that could link its findings to their immediate—and even political—implications. Public concern about the issue, the evident interest of officials and administrators in problems of offender classification (e.g., preventive detention), and the apparent belief of many that such practices are helpful or necessary and that instruments for effective prediction can eventually be perfected were all indications of the need for the study. A further incentive was the availability of a data pool[4] particularly suited

to such an exercise by size of sample, character of population, and comprehensiveness of stored case information.

### The Present Study— Youth and Violence

In California, the most serious juvenile offenders are committed to the Department of the Youth Authority. The majority of this department's wards are maintained in the community under parole supervision (about 15,000 wards are on parole during any given year) and are therefore exposed to opportunities for violent crime. Youth Authority wards have both a proportionately higher recidivism rate and more violence recidivism than the Department of Corrections' adult parolees. The contribution of Youth Authority wards to total new crimes of violence in California is relatively small; however, with only a slightly larger population than adult parolees, Youth Authority wards account for twice as many new violent crimes on which Superior Court convictions are obtained in the state. Felony defendants who already had criminal status and were convicted and sentenced in Superior Court for willful homicide in 1967 num-

4. The authors are grateful to the Division of Research, California Youth Authority, for assistance in assembling the data base.

bered sixteen Department of Corrections parolees and thirty-three Youth Authority parolees; for robbery, 143 CDC parolees and 234 CYA parolees. Thus, while the vast majority of Youth Authority wards will not be convicted for a new crime of actual or threatened personal violence, the likelihood of such acts is still sufficiently high to make this population a prime target for the development and application of assault-proneness scales.

The study sample consisted of 4,146 California Youth Authority wards admitted to the Reception Guidance Center at Deuel Vocational Institution during 1964-65. The focus of the study was actual violence—primarily assault. Attention was given to the record of violence in each subject's career, including the offense for which he was incarcerated, past violent behavior not necessarily connected with the immediate offense, and violence during a fifteen-month exposure period on parole following his release from the institution. Extensive background information available on each subject included the following: (1) elaborate case histories containing possible predictor items of violence proneness, such as past behavior (alcohol, drugs, suicide attempts, homosexuality, escape, weapons-carrying) and past or present diagnosed clinical conditions (psychosis, neurosis, brain damage, personality trait disturbance, personality pattern disturbance); (2) current measures of mental and emotional functioning (intelligence, maturity level, grade achievement, MMPI, CPI); and (3) prognostic judgments (counselors' ratings of academic and vocational potential, plus their recommendations for type of training).

Using this information we hoped to determine whether it was possible to construct a device for assessing potential assaultiveness with sufficient accuracy for program decisions.

In the sample of 4,146 wards, 250 or 6 per cent had a violent commitment offense and 104 or 2.5 per cent were involved in a violent violation during the fifteen-month period after their release. Our task was to identify as many of the 104 violators as possible while misclassifying as "violent" a minimum of the remaining cases. We began by developing subgroup classifications of offenders. To control for sampling variability and to insure that findings would have some utility for correctional decisions, subgroups were disregarded unless they contained at least one hundred subjects (about 2.5 per cent of the population) or unless they could reasonably be merged with an adjacent category to exceed one hundred in total. A search was then conducted to determine which groups had a favorable outcome rate notably different from the entire study sample rate of 61.1 per cent. The thresholds applied were "at or below 50 per cent favorable

TABLE 2
SIZABLE AND DEVIATING OUTCOME SUBGROUPS*

| Subgroup | No. of Cases | Favorable Outcome |
|---|---|---|
| Violent commitment offense | 250 | 70.4% |
| Fourth or higher admission to CYA | 351 | 46.5% |
| Moderate to serious opiate involvement | 132 | 42.4% |

*Subgroups numbering greater than one hundred, with favorable outcome 50 per cent or less, 70 per cent or more.



398                   E. A. WENK, J. O. ROBISON, G. W. SMITH

outcome" and "at or above 70 per cent favorable outcome." Only three sizable subgroups out of sixty (see Table 2) fell outside these boundaries.

Thus, the recidivism rate for offenders who have already been admitted to CYA institutions on several occasions and for those with more than a mild history of opiate usage was substantially higher than for the offender population in general. Neither of these groups contained a higher-than-average proportion of members with violent commitment offenses—4.8 per cent for the multiple admission group and 3.8 per cent for the opiate group, compared to 6.0 per cent overall. Violent recidivism was low for these groups—4.8 per cent and 2.3 per cent, respectively; however, rate of violent recidivism for the multiple offender group was still twice as high as that for the overall population (2.4 per cent).

We found that while recidivism among cases with a violent admission offense was lower than average, this recidivism was more likely to be violent when it occurred, and it accounted for 17.4 per cent of the viola-tions for this group, compared to 7.4 per cent overall. The rate of violent recidivism, however, was 4.8 per cent—the same as the rate for the multiple recidivist group. Further, since the total sample of offenders with violent commitment offenses numbered only 250, this group contributed a relatively small share to the total violence on parole (twelve incidents out of 104). Thus, the odds were about eight to one against a violent recidivist having had a violent admission offense and about nineteen to one against a parolee with a violent admission offense breaking parole by committing another violent offense.

VIOLENT RECIDIVISM

A second search was conducted within the sixty subgroups to determine which groups displayed a high proportion of violent offenses in their recidivism. For the full population, 7.4 per cent of recidivism was violent, and all sizable subgroups in which the corresponding figure exceeded 10 per cent were selected (see Table 3). Again, the convention of groups exceeding one hundred was applied.

TABLE 3
SIZABLE SUBGROUPS FOR WHICH VIOLENCE EXCEEDED 10 PER CENT OF SUBGROUP RECIDIVISM

| Subgroup | Favorable Outcome | Violent Recidivism | | Violent Commitment Offense | Total in Group |
|---|---|---|---|---|---|
| | | % of Cases in Group | % of Total Violations | | |
| Psychiatric referral for evaluation of violence potential | 62.3% | 6.2% | 17.6% | 31.1% | 257 |
| History of actual violence | 61.2% | 5.2% | 14.9% | 20.3% | 1,006 |
| Fourth or higher admission to CYA | 46.5% | 4.8% | 10.2% | 4.8% | 351 |
| Violent commitment offense | 70.4% | 4.8% | 17.4% | 100.0% | 250 |
| Mexican-American | 61.1% | 4.3% | 12.1% | 9.5% | 772 |
| Severe alcohol problem | 55.5% | 4.0% | 11.2% | 11.7% | 624 |
| Entire sample | 61.1% | 2.4% | 7.4% | 6.0% | 4,146 |

TABLE 4
VIOLENCE HISTORY AND TYPE OF RECIDIVISM

|  | Simple Recidivism | Violent Recidivism | Violent Recidivists | Total Cases |
|---|---|---|---|---|
| No history of violence | 40.2% | 1.8% | 42 | 2,386 |
| Aggressive crime, but no actual violence | 34.7% | 1.3% | 10 | 754 |
| History of actual violence | 38.8% | 5.2% | 52 | 1,006 |
| Total | 38.9% | 2.4% | 104 | 4,146 |

The multiple-recidivist and violent commitment subgroups have been discussed earlier. The four remaining groups all have general recidivism rates quite close to the average but, for each, a greater than usual proportion of recidivism is through violence. More than 10 per cent of the recidivism of Chicano offenders and offenders diagnosed as having a severe alcohol problem is violent, but for each of these groups the rate of violence on parole remains below 5 per cent.

The class of offenders with the highest level of violent recidivism is composed of subjects who had been referred to psychiatrists for evaluation of their violence potential upon or during their CYA incarceration. This group does not have a higher-than-usual rate of general recidivism, but nearly one in five (17.6 per cent) of the violations that do occur are violent. Nevertheless, the rate of violent recidivism remains relatively low (6.2 per cent) and the group contains only 257 subjects—just over 5 per cent of the study population.

The "History of actual violence" category is of particular interest for several reasons. First, it is at least as capable of discriminating violence on parole as "Violent admission offense" and is applicable to a relatively high proportion of the total admission population.[5] Second, relatively few (20.3 per cent) of the subjects in this category were admitted on an offense of labeled violence. Since this classification is based on actual behavior rather than on legal definitions, it should not be surprising that discrimination is improved with regard to future violence. But is a history of actual violence a useful indicator of potential violence on parole? Examine Table 4.

Since the first two categories have similar and low levels of violent recidivism, it appears reasonable to combine them into a single category containing 3,140 cases with fifty-two violent recidivists—a rate of 1.6 per cent. The category of offenders with a history of actual violence contains one-fourth of the total population and half the subjects who later became violent. This one category has a violent recidivism rate three times greater than that of the remainder. However, if the interest is in using this information for programing decisions to reduce the danger of violence, the practical consequences of this information are trivial. If a decision-maker were to consider all of the cases in the "History of actual violence" category as potentially violent and submit

5. Because the temporal dimension is sacrificed in this classification, it is not possible to tell whether recency or distance in history is a relevant variable. However, considering the age of our subjects (mean age for total study population is 19.45 years, with a range of 16 to 25 years), this factor does not appear to be critical.

400                    E. A. WENK, J. O. ROBISON, G. W. SMITH

them to special programing, he would
be sounding a false alarm nineteen
times in twenty and wasting 95 per
cent of the resources expended in
that endeavor. Further, there is no
other form of simple classification
available thus far that would enable
him to improve on this level of effi-
ciency.

The decision-maker might, never-
theless, apply the information in an-
other fashion and determine that he
will expend no energy on violence-
preventive measures with regard to
members of the two categories with
no violent history, in which case he
could ignore three-quarters of the
population and miss only sixteen
cases per thousand. He will notice,
however, that this informed decision
is hardly more effective than an un-
informed decision, owing to the general
rarity of violence on parole. He could
deal with the entire population in
this way and miss 50 per cent more
but still make only twenty-four errors
per thousand cases. The quest for an
operationally practical predictor of
violence from simple classification ap-
pears to be futile.

### Multivariate Approaches to Violence Prediction

Several procedures were employed
on the present study sample in the
attempt to develop regression equa-
tions for application to violence pre-
diction. William Meredith, Depart-
ment of Psychology, University of
California at Berkeley and Peter
Griffin, Department of Mathematics,
Sacramento State College, conducted
the statistical analyses.[6] The results of

these analyses were similar to our pre-
vious efforts, although their interpre-
tations were quite different. Griffin
concluded:

Considering the rarity of the pheno-
menon [only one in forty exhibited subse-
quent violence], it is difficult to imagine
that, even with the most refined tech-
niques, one could do much better than, say,
to double the best rates obtained here.
The utility of such an optimal rate would
seem highly limited for selection for re-
medial programs, etc. Of a group of 2,073
with fifty-two expected to be "violent," if
those with the fifty-two highest violence
potentials, according to our predictive
instrument, were separated for special
treatment, we could expect to have cor-
rectly identified only eight of them while
wasting treatment on forty-four false posi-
tives. In addition, more than 80 per cent
of the actually violent would escape the
sieve. This weakness is inherent in the
limitations of the quantifiable variables
we have available.

Using analytic procedures that
were basically similar to those used by
Griffin although varying in many de-
tails, Meredith arrived at markedly
different conclusions:

It is apparent that this set of data offers
numerous encouraging leads on the
make-up and identification of potentially
violent parolees. These results strongly
suggest that a useful violence index could
be constructed—although a great deal
more research is obviously necessary.

He suggested that more accurate re-
sults might be yielded if different pre-
dictive equations were developed for
each ethnic group and if multiple an-
alyses of variance were applied, using
the following four classes: violent his-
tory—violent parole offense; violent
history—no violent parole offense;
nonviolent history—violent parole
offense; and nonviolent history—no
violent parole offense. By such means,
Meredith said, "it appears to be feasi-

---

6. The statistical data and technical de-
scriptions of the multivariate approaches
have been omitted from the text of this
article. This information is available in the
LEAA monograph, "Assaultive Youth."

ble to develop, in this sample at least, an index of violence-proneness that would correctly identify over 50 per cent of those individuals violating parole by violent offenses at the cost of misclassifying no more than 10 per cent of those not returned for violent offense."

But let us examine, for a moment, what the situation would be if this promise could be fulfilled:

50% of 104 violent offenders=52

10% of 4,042 nonviolent offenders=404

The ratio of false positives to true positives, although lower than any actually attained, remains a discouraging eight to one, and meanwhile, half of the true positives would continue to be ignored.

Griffin's rejection and Meredith's endorsement contain no reference to program applications other than "useful" (Meredith) and "special treatment" (Griffin). The policy question, if we may oversimplify it, is this: What represents an acceptable trade-off between the values of public safety and individual liberty? Answers to this question presuppose the existence of a concrete proposal that can be examined to determine whether and to what extent, if the plan is accepted, the realization of one value will entail the sacrifice of the other.

### Discussion

The present state of the art holds little promise for the development of a prediction instrument that would warrant implementation in actual preventive or correctional programs. The problem is fundamentally related to the nature of the phenomenon we studied: *reported violence*. A detailed examination of the 104 incidents of violence indicated that violence typically erupts out of a crisis. In these circumstances the labeled assailant may have been blamed for not avoiding the situation altogether, for contributing to the provocation within it, or for either losing control or asserting the control that became the violent act. Some of these incidents resulted in no injury or minimal injury to the labeled victim, and are recorded only because something transpired to bring official notice to the event, requiring its classification and acknowledgement.

Behavioral events of this type are not rare; they are probably quite common. Instead, it is the *certification* of the events that is rare, and this perhaps provides us with a major clue to the problems of prediction, as well as an alternate explanation of why we are capable at all of predicting better than "chance." The reason may lie in what the police choose to do about the event and how they choose to characterize it when it is brought to their attention. If the event is not clearly classifiable as violent, some part of their determination (as well as that of other relevant parties) is likely to be based on the prior record and reputation of the offender. Such processes will affect decisions about whether the subject is released, whether charges brought are subsequently dismissed, whether the violation will be noted and processed by the Youth Authority, whether parole revocation will result, and consequently whether the event will become available as a datum for research on violence prediction.

*The problem, then, is this:* Most of the violent behavior we would wish to predict probably never comes to our attention, and the part that does is far from a representative sample. The prediction equations contain the seed of self-fulfilling prophecy: those who have been noticed before will be no-



ticed again. If this is so, the question of why "prediction" hasn't succeeded remains unanswered. It is relevant to raise questions about the *reliability* as well as the validity of the criteria, since the decisions involved vary by characteristics of persons other than the offender. The same kinds of influences also reduce the reliability of many of the predictor variables we employed, compounding the general problem.

As we approach incidents of greater gravity, such as those resulting in major injury or death, the reliability of the criteria changes. There is likely to be less variance in the handling of such events, and we can be more confident that they will be reliably brought to our attention.[7] These are the events to which everyone feels obligated to respond, and it is these events that we are most concerned with being able to predict and prevent. Twenty-six of our 104 cases involved in violence on parole inflicted major injury or death.

However, these twenty-six "violents" represent *only six-tenths of one per cent of the 4,146-member study sample*. The classification of events on the basis of the magnitude of their consequences may not be a true indicator of an individual's violence-proneness. The severity of injury resulting from a given interaction is only partly determined by the assailant's intent or factors within his control, and innumerable factors may make the difference between no injury and death, or between minor and major injury.

A still deeper question must also be asked: Once the potentially violent cases have been identified successfully, what then? Currently, violence

prevention and treatment of known violent persons remain rather primitive, consisting largely of more secure confinement and the administration of calming drugs or counseling. Do such means accomplish anything besides a temporary reduction in the offender's social nuisance level? The adjustment centers within the California adult prisons were instituted, among other reasons, to control and reduce violence among prisoners, but today it is not certain whether they alleviate or exacerbate the problem. What are the available cures for "violence-proneness"?

Finally, we need to examine the important ethical problems that are a direct result of the present level of knowledge in identification of violence-prone individuals. Concern about violence will inevitably lead to the development of special treatment programs, but the majority of persons placed in such programs must be false positives—persons who would not commit the act which the program is designed to prevent. It must be acknowledged that involvement in a corrective program is a constraint on an individual as well as a possible help and that unnecessary constraints on human freedom should be avoided. Those who argue that treatment cannot harm the person who does not need it and those who would warp the definition of "need" are obviously ignorant of the effects of social stigma and of the difficulty of administering corrective interventions without social stigma as a result.

Confidence in the ability to predict violence serves to legitimate intrusive types of social control. Our demonstration of the *futility* of such prediction should have consequences as great for the protection of individual liberty as a demonstration of the *utility* of violence prediction would have for the protection of society.

---

7. The same probably holds true for one type of event that is ordinarily less violent—resisting arrest or battery on a police officer.

1               DEFENSE EXHIBIT G
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

JOURNAL OF EXPERIMENTAL RESEARCH IN PERSONALITY 1, 17–26 (1965)

for____al: The EEG Journal,

ie ____ of observing responses
____arning. Part I. *Psychological*
____:31–442.





Seer ve____

GARDNE____

*University of Texas*

Thematic Apperception Test (TAT) protocols from homosexual and normal college *Ss* and homosexual and normal prisoners were employed in two consecutive studies concerned with clinical and actuarial prediction. In the first study a clinician blindly predicted the criterion from TAT protocols with 95% accuracy. Twenty objective TAT indices, when combined after-the-fact using actuarial methods, functioned nearly as well as the clinician. When applied to the prison population, the actuarial methods were totally ineffective, while two clinicians were more successful in predicting the criterion. The findings are discussed in terms of their implications for the clinical-actuarial prediction controversy as well as the probable utility of objective "signs" derived from projective technique protocols.

The task of the investigator is inextricably linked to the individual observer, and nowhere is this more frustratingly evident than in the study of personality. Although the efforts of psychologists to dehumanize—more positively, to "objectify" —the process of data collection have been many and ingenious, it remains true that behind every validity coefficient or network of justifying concepts and operations there lurks, at some point, an observer, hopefully a sensitive and unbiased observer. Few psychologists have accepted this fact more gracefully than Henry A. Murray and none has labored more diligently and imaginatively to maximize the contribution of the observer and to provide him with a respected position within the field of psychology.

[1] This research was supported by a grant from the Ford Foundation and research grant M-1949 from the National Institute of Mental Health. The paper was written while the author was in residence at the Center for Advanced Study in the Behavioral Sciences. Final preparation of the manuscript was facilitated by sage comments from Lee J. Cronbach, Anthony Davids, Edward E. Jones, and David T. Lykken. I received valuable assistance in the collection and analysis of data from Jean Bradford, James Kincannon, and Harvey D. Winston. The late Ephraim Rosen generously served as one of the judges in the second study.

The present investigations may be viewed as minor attempts to assess the relative merits of the trained human observer in a particular setting. More specifically, they compare the judgment of one or more unaided clinicians with objective and actuarial methods of prediction under conditions where the special strengths of the clinician are given a reasonable opportunity to manifest themselves. As such they belong to a growing body of investigations concerned with the relative merits of mechanical, objective, and (typically) quantitative methods of prediction as opposed to the relatively subjective and qualitative predictions of the clinician. Such studies have been summarized ably by Meehl (1954), Cronbach (1956), and Gough (1962) among others, and the area of investigation owes much to the earlier writing of Allport (1937, 1942), Sarbin (1941, 1942), and Murray (1938, 1948).

It is worth noting that this issue possesses certain significant links to the idiographic-nomothetic question, and like the latter controversy it has proved sturdily resistant to the frequent suggestion (for example, Holt, 1958; Zubin, 1956) that sophisticated examination of the problem reveals little or no real basis for maintaining such a distinction or issue. Just as species survival may ꞁe considered the ultimate test of "fitness," so too the persistence

17

of a conceptual distinction or empirical issue over many years in the face of repeated efforts to obliterate or dissolve it may be considered evidence of theoretical-empirical fitness or significance.

## Study I

In this study, which already has been reported in part (Lindzey, Tejessy, and Zamansky, 1958), it was possible to compare the predictive (literally, postdictive) effectiveness of a number of objective TAT indices of homosexuality (individually and in combination) with the comparable effectiveness of clinical predictions by an experienced interpreter of the TAT.

### Method

*Subjects.* The Ss consisted of 20 undergraduate male students who had acknowledged overt homosexual acts and a group of 20 undergraduates comparable in sex, age, and educational level but with no known history of homosexuality. They were volunteers and received no pay for their participation.

*Procedure.* Five TAT cards (4, 6BM, 7BM, 10, 18BM) were administered individually by an experienced male administrator. The resultant protocols with all identification of individual Ss removed were then scored for 20 different variables or indices that were believed on the basis of prior research or formulation to be indicative of homosexual tendencies (Lindzey, Bradford, Tejessy, and Davids, 1959). The variables, scoring procedures, and reliabilities are described in greater detail in an earlier publication (Lindzey et al., 1958), and they are briefly identified in Table 1.

The TAT protocols were also sorted blindly by an experienced interpreter of the TAT who was generally familiar with all the objective indices used in the study but was permitted to make his classification without justification or specification of the basis for his decision. He also divided the predictions into those of which he was confident and those of which he was uncertain.

### Results

The results summarized in Table 1 indicate clearly that the objective indices functioned very well in comparison with similar indices derived from TAT protocols that have been examined in previous studies (Lindzey and Newburg, 1954; Lindzey and

Tejessy, 1956). However, it is equally clear that none of the indices serves by itself as a powerful basis for discrimination between the homosexual and normal groups. Indeed, when compared with the judgments of an experienced clinician they fare very poorly. The judge was able to sort the protocols with 95% accuracy–classifying incorrectly one S from each group. Moreover, of the 29 judgments which he considered "confident," there were no mistaken classifications.

The question remains whether it is possible to combine after the fact the information contained in the 20 objective indices and produce findings that parallel, or closely resemble, those produced by qualitative, clinical judgments. The first step in answering this question was simply to arrange all indices (no matter what the prediction or expectation had been) so that a high score was typical of the homosexual group and a low score of the normal group. This involved reversing two variables (15 and 19). We then cumulated raw scores across all variables for each S, ignoring the different ranges of scores permitted by the various scoring procedures. The resultant distribution of scores for the two groups are reported in Fig. 1. Next we divided the scores for each variable as close to the median as possible so that we had a high and low group. Then for each S we simply counted the number of variables in which his score placed him in the high group, and the results for the two groups are summarized in Fig. 2. Both of these procedures functioned effectively; indeed, if we permit ourselves the luxury of maximizing diagnostic accuracy by identifying a cutting point after-the-fact, we are able to identify such a score for each distribution that will correctly classify 34 of the 40 Ss.

A third objective approach used in the attempt to extract the diagnostic information potentially available in these indices emphasized pattern or configural analysis. We employed an ingenious technique devised by Lykken (1956; Lykken and Rosen, (1963) that utilizes dichotomous predictor variables to make up actuarial tables for the various patterns of scores. Each table represents the observed frequency from



|   | Varia |
|---|---|
| 1 | Misrecognition of sex |
| 2 | 18BM: Attack from t |
| 3 | Feminine identificatio |
| 4 | Attitude toward marr |
| 5 | Man-killing woman |
| 6 | Sexual references |
| 7 | Unstable identification |
| 8 | Feminine feelings, emo |
| 9 | Shallow heterosexual r |
| 10 | Male embrace |
| 11 | Attitude toward oppos |
| 12 | Tragic heterosexual re |
| 13 | Attachment to mother |
| 14 | 18BM: Symbolism or |
| 15 | Attachment to father |
| 16 | Derogatory sexual term |
| 17 | Homosexual content |
| 18 | Incest |
| 19 | 10BM: No elderly cou |
| 20 | 18BM: Positive introd |

* Values of p for differen $x^2$, and the remainder, on predicted direction (8, 15,

Fig. 1. Comparis

each criterion group pattern; for exampl low,high,high for vari there were 5 homosex Ss, thus leading to the sexu lity from this p

lowever, it is equally clear
... es serves by itself as
f... .scrimination between
ind normal groups. Indeed,
with the judgments of an
cian they fare very poorly.
able to sort the protocols
acy–classifying incorrectly
group. Moreover, of the 29
he considered "confident,"
correct classifications.
emains whether it is possi–
ifter the fact the informa–
n the 20 objective indices
indings that parallel, or
, those produced by quali–
udgments. The first step in
question was simply to
ices (no matter what the
ectation had been) so that
s typical of the homosexual
score of the normal group.
eversing two variables (15
hen cumulated raw scores
iles for each S, ignoring the
of scores permitted by the
procedures. The resultant
cores for the two groups are
... ' Next we divided the
... ible as close to the
ible so that we had a high
Then for each S we simply
mber of variables in which
him in the high group, and
the two groups are sum–
2. Both of these procedures
tively; indeed, if we permit
uxury of maximizing diag–
by identifying a cutting
fact, we are able to identify
r each distribution that will
y 34 of the 40 Ss.
ctive approach used in the
act the diagnostic informa–
r available in these indices
ttern or configural analysis.
an ingenious technique de–
en (1956; Lykken and Rose,
ilizes dichotomous predictor
ake up actuarial tables for
tterns of scores. Each table
... observed frequency from

TABLE 1
DIMENSIONAL TAT COMPARISON OF COLLEGE STUDENTS

| | Normal (N = 20) | | Homosexual (N = 20) | | |
|---|---|---|---|---|---|
| Variable | M | Freq. | M | Freq. | p* |
| 1 Misrecognition of sex | | 3 | | 3 | — |
| 2 18BM: Attack from the rear | | 4 | | 9 | < .10 |
| 3 Feminine identification | 1.05 | | 1.55 | | < .005 |
| 4 Attitude toward marriage | − .32 | | .48 | | < .005 |
| 5 Man killing woman | | 0 | | 5 | < .02 |
| 6 Sexual references | .55 | | 1.25 | | NS |
| 7 Unstable identification | 1.65 | | 2.25 | | < .005 |
| 8 Feminine feelings, emotions | 2.10 | | 2.05 | | NS |
| 9 Shallow heterosexual relations | .90 | | 1.75 | | < .005 |
| 10 Male embrace | | 0 | | 1 | — |
| 11 Attitude toward opposite sex | − .32 | | .18 | | NS |
| 12 Tragic heterosexual relations | | 2 | | 7 | .06 |
| 13 Attachment to mother | | 2 | | 4 | NS |
| 14 18BM: Symbolism or allegory | | 0 | | 6 | .01 |
| 15 Attachment to father | | 5 | | 1 | .18 |
| 16 Derogatory sexual terms applied to women | | 0 | | 7 | .004 |
| 17 Homosexual content | | 0 | | 6 | .01 |
| 18 Incest | | 0 | | 1 | — |
| 19 10BM: No elderly couple | | 16 | | 11 | NS |
| 20 18BM: Positive introduction of female | | 5 | | 0 | .02 |

* Values of p for differences between means are based on t tests. Those for variables 2 and 19 are based on $x^2$, and the remainder, on Fisher's Exact Test. Only the variables on which the difference was not in the predicted direction (8, 15, 19) were assigned to a two-tailed test of significance.



FIG. 1. Comparison of normal and homosexual college students on total TAT scores.

each criterion group for one particular pattern; for example, for the pattern low,high,high for variables 14, 16, and 17 there were 5 homosexual Ss and 0 normal Ss, thus leading to the prediction of homosexuality from this pattern, while for the

pattern low,low,low for variables 14, 16, and 17 there were 7 homosexual Ss and 20 normal Ss, leading to the prediction of normality. It is also possible to provide a "validity coefficient" for each pattern which is based upon the number of cases in the



Fig. 2. Comparison of normal and homosexual college subjects on total TAT "high" scores.

original group displaying the pattern and the amount of difference between criterion groups in frequency for this pattern.

In the present study we used five actuarial tables, consisting of three variables each, which included most of the individual indices that seemed to function effectively. The variable groups employed were 14-16-17, 12-19-20, 2-12-16, 6-2-11, and 3-4-15. With this method it proved possible to predict correctly (after the fact) 34 out of the 40 cases when the prediction for each case was that indicated by three or more of the five tables. This performance could be increased slightly (36 correct identifications) if the prediction was based upon the difference for each $S$ between the homosexual validity coefficients for the homosexual predictions as opposed to the normal predictions.

In summary, we find that the informed but unfettered and nonquantified clinician functioned slightly better than any of the actuarial combinations of objective scores. The relative similarity in performance of the two approaches must be evaluated against the background of a deliberate maximizing after-the-fact of the information contained in the objective indices, even when this meant reversing the intended direction of scoring. Thus, the clinician made his predictions before the fact while the objective procedure was adjusted to maximize its sensitivity after the fact. Under these circumstances one may naturally expect a great deal of shrinkage when the actuarial procedure is applied to an independent sample of observations. Study

II was intended to permit an estimate of just how effectively the two systems would function when applied to a new source of data.

## Study II

In this study we compared clinical judgment with our actuarial procedures when applied to two groups of $Ss$ that were distinguished from each other in terms of overt homosexual acts but otherwise were quite different from the $Ss$ of the previous study. We were interested in further evaluating the two different methods of prediction and also in examining the situational generality of findings concerned with the relation between a particular TAT sign or index and an underlying disposition or personal attribute.

### Method

*Subjects.* The $Ss$ consisted of 30 male prisoners in a state maximum security prison. The group was divided into 14 who were known to have been overtly homosexual prior to imprisonment (11 were convicted of sodomy charges) and 16 who provided no evidence of homosexuality prior to imprisonment or during incarceration. The groups were matched in terms of age, education, intelligence, period of imprisonment, and place of residence. The normal group was selected in such a manner as to exclude persons convicted of crimes of violence, and consequently it included predominately persons convicted of charges related to crimes against property. The $Ss$ were paid for their participation in the study and all knew that they were participating in a study that involved, among other things, an interest in homosexuality.

*Procedure.* The TAT was administered individually (Cards 2, 3BM, 6BM, 9BM, 10, 12, 13 MF, 18 BM) by two male administrators who were unaware of the group to which any $S$ belonged. Each examiner tested an equal number of normal and homosexual $Ss$.

The stories were scored for 20 variables according to the procedures developed in the earlier studies by two raters who were unaware of the group to which any $S$ belonged. Discrepancies between the two sets of scores were eliminated by discussion between the two raters so that the final score represented a composite rating. The scoring was the same as in the previous study except that the larger number of cards increased the range of scores for a number of variables, and for two variables (4, 11) the numerical score as-

signed for the fi[...]
($-2$ to $+2$) to ([...]

The $Ss$ were [...] pendently as bein[...] on the basis of [...] of the true distri[...] gories. One judg[...] objective indices [...] studies, but the [...] familiar with the [...] make any system[...] tion. Judge B wa[...] the comparable [...] judge divided his [...] he was confiden[...] uncertain.

Dimensional T[...]

| Variable | $M$ | | |
|---|---|---|---|
| 1 | 2.3[...] | | |
| 2 | | | |
| 3 | 3.5[...] | | |
| 4 | 15.7[...] | | |
| 5 | | | |
| 6 | 1.7[...] | | |
| 7 | 1.4[...] | | |
| 8 | 1.9[...] | | |
| 9 | .5[...] | | |
| 10 | | | |
| 11 | 15.9[...] | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |

### Results

Examination [...] in Table 2 ind[...] the objective [...] tween normal a[...] ner comparabl[...] study. Of 20 co[...] conventional s[...] direction; ther[...] expected direc[...]

Case 4:14-cv-03152    Document 38-58    Filed on 09/01/16 in TXSD    Page 133 of 265

... permit an estimate of ... le two systems would ...pplied to a new source of

### STUDY II

we compared clinical judg-actuarial procedures when ... groups of Ss that were ...om each other in terms of ...al acts but otherwise were ...rom the Ss of the previous ... interested in further evalu-...ifferent methods of predic-...n examining the situational ...ndings concerned with the ...n a particular TAT sign or ...nderlying disposition or per-

...s consisted of 30 male prisoners ...um security prison. The group ...4 who were known to have been ...al prior to imprisonment (11 ... sodomy charges) and 16 who ...ence of homosexuality prior to ...during incarceration. The groups ...terms of age, education, intel-...i   onment, and place of resi-...al   up was selected in such a ...lude persons convicted of crimes ...onsequently it included predomi-...onvicted of charges related to ...roperty. The Ss were paid for ...n in the study and all knew that ...pating in a study that involved, ...gs, an interest in homosexuality. ...e TAT was administered in-... 2, 3BM, 6BM, 9BM, 10, 12, ...by two male administrators who ...f the group to which any S ...xaminer tested an equal number ...mosexual Ss. ...re scored for 20 variables accord-...edures developed in the earlier ...raters who were unaware of the ...any S belonged. Discrepancies ... sets of scores were eliminated ...ween the two raters so that the ...sented a composite rating. The ...same as in the previous study ...larger number of cards increased ...es for a number of variables, and ...s (4, 11) the numerical score as-

signed for the five categories was changed from (−2 to +2) to (0 to +4).

The Ss were classified by two judges inde-pendently as being homosexual or nonhomosexual on the basis of the TAT stories and knowledge of the true distribution of cases in the two cate-gories. One judge (A) was unfamiliar with the objective indices and the findings of the previous studies, but the other judge (B) was intimately familiar with these findings although he did not make any systematic effort to use this informa-tion. Judge B was the same judge who had made the comparable ratings in the first study. Each judge divided his predictions into those of which he was confident and those of which he was uncertain.

TABLE 2
DIMENSIONAL TAT COMPARISON OF PRISONERS

| Variable | Normal (N = 16) | | Homosexual (N = 14) | |
|---|---|---|---|---|
| | M | Freq. | M | Freq. |
| 1 | 2.31 | | 1.86 | |
| 2 | | 2 | | 4 |
| 3 | 3.50 | | 3.79 | |
| 4 | 15.75 | | 15.00 | |
| 5 | | 4 | | 4 |
| 6 | 1.75 | | 1.93 | |
| 7 | 1.44 | | 1.43 | |
| 8 | 1.94 | | 1.79 | |
| 9 | .56 | | .64 | |
| 10 | | 0 | | 0 |
| 11 | 15.94 | | 15.86 | |
| 12 | | 5 | | 5 |
| 13 | | 3 | | 8 |
| 14 | | 1 | | 1 |
| 15 | | 0 | | 0 |
| 16 | | 4 | | 4 |
| 17 | | 0 | | 0 |
| 18 | | 0 | | 2 |
| 19 | | 6 | | 6 |
| 20 | | 14 | | 12 |

### Results

Examination of the findings summarized in Table 2 indicates a consistent failure of the objective indices to differentiate be-tween normal and homosexual Ss in a man-ner comparable to that revealed in the first study. Of 20 comparisons only one achieved conventional significance in the predicted direction; there were four reversals in the expected direction of the difference, and

most of the 10 group differences in the predicted direction were minute. It seems clear that these indices, even though "vali-dated" in several previous studies (Davids, Joelson, and McArthur, 1956; Lindzey et al., 1958), have little merit when applied under the conditions of the present study.

Not surprisingly, in view of the results for the individual variables, the application of the actuarial procedures used in the previous study to combine these indices were highly ineffective. Whether we use raw scores cumulated (Fig. 3), number of high scores (Fig. 4), or the configural scor-



FIG. 3. Comparison of normal and homosexual prisoners on total TAT scores.



FIG. 4. Comparison of normal and homosexual prisoners on total TAT "high" scores.

ing method, we arrive at the same "hit rate" of 17 out of 30, or 57%. Even an additional, and more complicated applica-tion of Lykken's technique failed to im-prove upon the 57% figure. In this method each S was compared with all 40 of Ss in the previous study, and for each pair-comparison a deviation score was computed that represented the number of times the two Ss were discrepant on a variable (one high and the other low). Then those Ss in

the comparison group who had deviation scores of six or less were identified, and a prediction was made based upon whether the majority of these similar patterns had been drawn from homosexual or normal $Ss$.

TABLE 3

ACCURACY OF JUDGES' PREDICTIONS FOR NORMAL AND HOMOSEXUAL PRISONERS

| Predictions | $N$ | Per cent correct | |
|---|---|---|---|
| | | Judge A | Judge B |
| Over-all | 30 | 80 | 60 |
| Confident | 14 | 71 | 86 |
| Uncertain | 16 | 88 | 38 |

In contrast, the judges' performance (Table 3), although variable, appears distinctly better. The most efficient of the judges was able to identify group membership with 80% success. While the less successful judge was able to identify correctly only 60% of the cases, of those 14 judgments in which he indicated confidence he was correct in 86% or 12 of the cases. Thus Judge A was able to predict significantly better than chance for all $Ss$, and Judge B functioned well above chance for those predictions of which he was confident; none of the actuarial methods proved able to function above the level of chance.

DISCUSSION

*Clinical versus Actuarial Prediction.* The studies we have just discussed may be viewed as a direct, although modest, response to a challenge issued by Paul Meehl following a comprehensive review of the clinical-statistical research literature. His survey failed to reveal any clear evidence for the superiority of the clinical method, and he concluded, "I have reservations about some of these studies; I do not believe they are optimally designed to exhibit the clinician at his best; but I submit that it is high time that those who are so sure that the 'right kind of study' will exhibit the clinician's prowess, should *do* this right kind of study and back up their claim with evidence" (Meehl, 1957, p. 272). Our find-

ings, although far from definitive, do provide evidence that, at least under some circumstances, clinical judgment may function somewhat more efficiently than objective and actuarial prediction.

For such findings to be of more than glancing importance, however, it must be possible to state something about the conditions that may have played a role in producing these discrepant results. In the present study it seems to us the events predisposing in favor of the sensitive and informed clinician relate to the psychometric intractability of the TAT. In brief, we have here an instrument that elicits a large amount of complex response data and which is accompanied by very little in the way of rules for effectively transforming or encapsulating these responses within a finite number of scores, variables, or indicants. Thus, although there have been many attempts to establish dimensions or categories for analyzing TAT responses (cf. Lindzey et al., 1959), none of them has met with spectacular success. It appears that the massive and unwieldy qualitative data of the TAT continue to provide predictive cues for the skilled clinician that are not represented adequately in the objective indices upon which actuarial prediction must rest. To generalize, it seems reasonable to expect that, under circumstances where there is little available in the way of sensitive and objective guidelines, the experienced clinician is likely to function relatively better than in a psychometrically highly developed terrain.

It may appear that I am suggesting that clinical predictions function better only in very primitive areas of psychological measurement. Indeed, overlooking the role of the clinician as a source of ideas or hypotheses that may lead to further objectivity and specification, this is precisely what is implied. Insofar as the objective basis for clinical prediction's operating better than chance can be made explicit and verbalized, it will usually prove possible to devise substitutive methods that are freer of error than the human mind. On the other hand, there is little doubt that much of psychological measurement, defined broadly, is

still in a very prim quently, it may be ment to function conditions such as this study.

It is clear, in add the present study studies in this area that the criterion to as familiar to the chometrician. Comp ods of prediction i demic achievement outcome variable, method both becaus is more often studie clinician and also indices for predicti relatively efficient to quantitative anal Meehl (1956), and pointed to in the clinical predictions and all have sugges formance of the clin more encouraging, to be.

It is worth emph frequent misunderst ways believed in th of the clinician ov certain circumstanc paper (Meehl, 1959 factors that should first is *open-endedn* be predicted canno means of a single number of categorie tor himself is dete content of the predi *lyzed stimulus-equiv* for analyzing or cl data are not objecti is the existence of *e* ticular events or co have not been obse consequently have r in the actuarial tabl ble role of *theory-me* an active process of and hypothesis form tween the observatio

r from definitive, do pro-
.. : least under some
n... judgment may func-
ore efficiently than objec-
l prediction.

ngs to be of more than
nce, however, it must be
omething about the condi-
have played a role in
discrepant results. In the
seems to us the events
avor of the sensitive and
a relate to the psychomet-
of the TAT. In brief, we
rument that elicits a large
plex response data and
anied by very little in the
r effectively transforming
these responses within a
scores, variables, or indi-
though there have been
to establish dimensions or
alyzing TAT responses (cf.
959), none of them has met
· success. It appears that
unwieldy qualitative data
:inue to provide predictive
lled clinician that are not
qr ·ly in the objective
·l actuarial prediction
eneralize, it seems reason-
that, under circumstances
:tle available in the way of
bjective guidelines, the ex-
ian is likely to function
than in a psychometrically
i terrain.

r that I am suggesting that
ons function better only in
.reas of psychological meas-
:, overlooking the role of the
ource of ideas or hypotheses
to further objectivity and
:is precisely what is im-
as the objective basis for
ion's operating better than
nade explicit and verbalized,
prove possible to devise sub-
ods that are freer of error
n mind. On the other hand,
loubt that much of psycho-
ement, defined broadly, is

still in a very primitive state and, conse-
quently, it may be no trivial accomplish-
ment to function relatively well under
conditions such as those that prevailed in
this study.

It is clear, in addition, that conditions in
the present study come closer than most
studies in this area to meeting the demands
that the criterion to be predicted is at least
as familiar to the clinician as to the psy-
chometrician. Comparison of the two meth-
ods of prediction in connection with aca-
demic achievement, or some comparable
outcome variable, favors the actuarial
method both because this area of behavior
is more often studied by psychometrist than
clinician and also because the objective
indices for predicting such behavior are
relatively efficient and readily susceptible
to quantitative analysis. McArthur (1956),
Meehl (1956), and Cronbach (1960) have
pointed to the importance of studying
clinical predictions on their home terrain,
and all have suggested that here the per-
formance of the clinician may be relatively
more encouraging, as indeed it appears
to be.

It is worth emphasis that, contrary to a
frequent misunderstanding, Meehl has al-
ways believed in the probable superiority
of the clinician over the actuary under
certain circumstances. Indeed, in a recent
paper (Meehl, 1959) he has identified six
factors that should favor the clinician. The
first is *open-endedness*, where the event to
be predicted cannot be represented by
means of a single dimension or a small
number of categories but where the predic-
tor himself is determining the terms or
content of the prediction. Second is *unana-
lyzed stimulus-equivalences*, where the rules
for analyzing or classifying the relevant
data are not objectively specifiable. Third
is the existence of *empty cells*, where par-
ticular events or combinations of events
have not been observed in the past and
consequently have not yet gained a place.
in the actuarial tables. Fourth is the possi-
ble role of *theory-mediation*, where there is
an active process of theoretical reasoning
and hypothesis formation intervening be-
tween the observational data and t' e par-

ticular prediction to be made. Fifth is the
situation which offers *insufficient time* for
the application of actuarial methods simply
because an immediate decision must be
made. Sixth is the case where there is a
*nonlinear* and particularly a *configural* or
pattern association between the predictor
variables and the criterion. The perform-
ance of the clinicians in the present studies
is presumably consistent with the implica-
tions of Meehl's statements in regard to
"unanalyzed stimulus equivalences" and
"empty cells" as factors favoring the ef-
fectiveness of clinical prediction. That is,
the clinicians responded to stimuli that had
not yet been objectively identified and .
classified, and among these cues there may
even have been some that had not been
encountered in previous studies and conse-
quently could not have been used by the
actuarial methods. It is impossible to com-
pletely rule out the role of theory-mediated
hypotheses, but the subjective report of the
judges and the state of theory in this area
make such a contingency most unlikely.

Our findings are only obliquely related
to Holt's (1958) distinctions between pure
actuarial, naive clinical, and sophisticated
clinical prediction. However, insofar as the
distinction between naive clinical and
sophisticated clinical can be mapped into
this study, we would have to place Judge A
in the naive category and Judge B in the
sophisticated class, on the basis of the fact
that Judge B had made comparable predic-
tions from a similar data base before and
was intimately familiar with objective find-
ings in this area. Our evidence suggests that
the naive clinical judge did at least as well
as the sophisticated clinical judge, contrary
to Holt's expectation, although one would
not like to generalize far from only two
judges.

If we recklessly accept the difference be-
tween Judge A and Judge B as a real and
stable difference, we are faced with the
mild embarrassment of increased experience
and sophistication appearing to diminish
accuracy or sensitivity. Obviously this is
not necessarily the case. Judge A may
simply have been a better diagnostician,
and with increased experience his advan-

tage might have been even greater than it was. However, it is at least possible that experience with predicting this variable under conditions of the first study, and a thorough knowledge of the TAT literature on homosexuality, might make a negative contribution to prediction in the second study. Remembering how poorly the objective indices functioned in the second study, it seems altogether conceivable that if Judge B was deriving many of his diagnostic cues from these indices he might have operated at a disadvantage.

*Utility of Projective Technique "Signs", or Objective Indices.* In view of the fact that the indices and related variables studied in the present investigations comprise one of the most successful sets of "signs" in the history of TAT research, their almost total collapse upon further cross-validation might be considered a serious indictment of this entire approach to measurement. On the other hand, such a finding should scarcely come as a surprise in view of the many investigations (for example, Kenny, 1954, 1961; Lindzey and Silverman, 1959; Masling, 1960) and formulations (Lindzey, 1952, 1961; Gleser, 1963) that have made clear the extent to which these instruments are responsive to a wide array of diverse determinants. Given this multiplicity of conditions that determine projective technique response, only a small proportion of which are related to personality variables or dispositions, it is inevitable that strictly empirical findings secured in one situation will not be likely to generalize effectively if we change a great many of the situational factors as well as nonpersonality attributes of the Ss.

Let us consider some of the respects in which the Ss and conditions of test administration differed between our first and second studies. The Ss of the second study were much more heterogeneous than Ss of the first study in age, socioeconomic status, education, intelligence, employment history, indeed on almost any other variable one might care to mention other than criminality. Not only was the second group more variable on these attributes but also there were sizeable differences in the group average for most variables, including verbal facility, intelligence, and socioeconomic status. The differences in situational determinants of test performance were at least as striking as the differences in demographic and personal attributes. To mention only the most salient of these differences, one group of tests was given in a maximum security prison and another in an institution of higher learning; one group of Ss was paid for participation and the other was not; one group of homosexual Ss knew the examiner was aware of their homosexual behavior while the other group did not; one group of homosexual Ss included a large number who had been harshly punished by society for homosexual acts while the comparable group in the other study included no such Ss. A large number of studies have been conducted that demonstrate projective technique responses to vary with conditions such as those just described. Many of these investigations are described or referred to in recent publications by Masling (1960) and Lindzey (1961).

Generalizations of the sort dealt with in this study must be accompanied by a statement of the parametric limits within which they operate, and among the group differences mentioned above there are undoubtedly many such parameters that must be attended to in order to permit effective generalization of findings. To cite only a single illustration, a great deal of the research and clinical literature on projective techniques has tended to ignore the difference between the situation in which the S sees the examiner as sympathetically involved in a cooperative and supportive enterprise and the situation in which the S, accurately or not, perceives the examiner as hostile, as a barrier to some desired goal, or as the potential revealer of some deeply defended aspect of the S's inner world. There seems little doubt that one of the reasons for the failure of the second study to even approach a replication of the findings of the first study concerns just this difference. Indeed, when reporting the initial results of the first study we indicated that " . . . mo . , of the indices of

homosexuality that i tended to be relative homosexuality and t to be readily subject tion" (Lindzey *et al* this observation it is that, with less coo indices would fare mo

What has just bee parametric limits w expect a given relati technique sign and to be attended mig if it were not for the of studies concerned relationships fail eve portance of such pa of the existing inter based upon controll derived from clinical to be misleading bec attempt to state t within which the int ship is likely to be su

The sensitivity of variation is obviously the person interested sonological traits, a equally perplexing and other techniques ality. Until and u identify objective c linked with personali ant manner over ma the clinician or inv ceedingly cautious i personality inference ents who are examin

REFE

ALLPORT, G. W. Persona
    pretation. New York:
ALLPORT, G. W. *The us*
    *psychological science.*
    Council Bull. No. 42,
CRONBACH, L. J. Assess
    ences. In P. R. Far
    (Eds.), *Annual revie*
    Stanford, Calif.: An
    173–196.
CRONBACH, L. J. *Essent*
    *ing.* New York: Harp

st variables, including ver-
e      ce, and socioeconomic
erec es in situational deter-
performance were at least
the differences in demo-
rsonal attributes. To men-
nost salient of these differ-
up of tests was given in a
ity prison and another in an
igher learning; one group of
participation and the other
roup of homosexual Ss knew
was aware of their homo-
r while the other group did
of homosexual Ss included
er who had been harshly
ociety for homosexual acts
parable group in the other
no such Ss. A large number
e been conducted that dem-
tive technique responses to
ditions such as those just
y of these investigations are
ferred to in recent publica-
sling (1960) and Lindzey

ns of the sort dealt with in
ust be accompanied by a
h    rametric limits within
e      and among the group
ntioned above there are un-
y such parameters that must
in order to permit effective
of findings. To cite only a
ion, a great deal of the re-
nical literature on projective
tended to ignore the differ-
the situation in which the S
iner as sympathetically in-
cooperative and supportive
the situation in which the
or not, perceives the examiner
barrier to some desired goal,
ntial revealer of some deeply
ct of the S's inner world
little doubt that one of the
e failure of the second study
ach a replication of the find-
irst study concerns just this
leed, when reporting the ini-
i the first study we indi-
. . . most of the indices of

homosexuality that functioned successfully
tended to be relatively directly related to
homosexuality and thus might be expected
to be readily subject to censoring or inhibi-
tion" (Lindzey et al., 1958, p. 74). Given
this observation it is altogether predictable
that, with less cooperative Ss, the TAT
indices would fare more poorly.

What has just been said concerning the
parametric limits within which one may
expect a given relation between projective
technique sign and personality disposition
to be maintained might be considered banal
if it were not for the fact that the majority
of studies concerned with such diagnostic
relationships fail even to mention the im-
portance of such parameters. Thus, much
of the existing interpretive lore, both that
based upon controlled research and that
derived from clinical observation, is certain
to be misleading because there has been no
attempt to state the reasonable bounds
within which the interpretation or relation-
ship is likely to be sustained.

The sensitivity of the TAT to situational
variation is obviously a serious problem for
the person interested in enduring and per-
sonological traits, albeit the problem is
equally perplexing with structured tests
and other techniques for assessing person-
ality. Until and unless we are able to
identify objective cues that prove to be
linked with personality traits in an invari-
ant manner over many different situations,
the clinician or investigator must be ex-
ceedingly cautious in attempting to make
personality inferences concerning respond-
ents who are examined in a novel setting.

REFERENCES

ALLPORT, G. W. Personality: a psychological inter-
pretation. New York: Holt, 1937.
ALLPORT, G. W. The use of personal documents in
psychological science. Social Science Research
Council Bull. No. 42, 1942.
CRONBACH, L. J. Assessment of individual differ-
ences. In P. R. Farnsworth and Q. McNemar
(Eds.), Annual review of psychology. Vol. 7.
Stanford, Calif.: Annual Reviews, 1956. Pp.
173-196.
CRONBACH, L. J. Essentials of psychological test-
ing. New York: Harper, 1960.

DAVIDS, A., JOELSON, M., AND MCARTHUR, C.
Rorschach and TAT indices of homosexuality
in overt homosexuals, neurotics, and normal
males. Journal of Abnormal and Social Psychol-
ogy, 1956, 53, 161-172.
GLESER, GOLDINE C. Projective methodologies. In
P. B. Farnsworth (Ed.), Annual review of psy-
chology. Vol. 14. Palo Alto, Calif.: Annual
Reviews, 1963. Pp. 391-422.
GOUGH, H. G. Clinical versus statistical prediction
in psychology. In L. Postman (Ed.), Psychology
in the making. New York: Knopf, 1962. Pp.
526-584.
HOLT, R. R. Clinical and statistical prediction: A
reformulation and some new data. Journal of
Abnormal and Social Psychology, 1958, 56, 1-12.
KENNY, D. T. Transcendence indices, extent of
personality factors in fantasy responses, and the
ambiguity of TAT cards. Journal of Consulting
Psychology, 1954, 18, 345-348.
KENNY, D. T. A theoretical and research reap-
praisal of stimulus factors in the TAT. In
J. Kagan and G. Lesser (Eds.), Contemporary
issues in thematic apperceptive methods.
Springfield, Ill.: Thomas, 1961. Pp. 288-310.
LINDZEY, G. Thematic Apperception Test: Inter-
pretive assumptions and related empirical evi-
dence. Psychological Bulletin, 1952, 49, 1-25.
LINDZEY, G. Projective techniques and cross-
cultural research, New York: Appleton-Century-
Crofts, 1961.
LINDZEY, G., AND NEWBURG, A. S. Thematic Ap-
perception Test: A tentative appraisal of some
"signs" of anxiety. Journal of Consulting Psy-
chology, 1954, 18, 389-395.
LINDZEY, G., AND SILVERMAN, M. Thematic Ap-
perception Test: Techniques of group adminis-
tration, sex differences and the role of verbal
productivity. Journal of Personality, 1959, 27,
311-323.
LINDZEY, G., AND TEJESSY, CHARLOTTE. Thematic
Apperception Test: Indices of aggression in re-
lation to measures of overt and covert behavior.
American Journal of Orthopsychiatry, 1956, 26,
567-576.
LINDZEY, G., TEJESSY, C., AND ZEMANSKY, H.
Thematic Apperception Test: An empirical
examination of some indices of homosexuality.
Journal of Abnormal and Social Psychology,
1958, 57, 67-75.
LINDZEY, G., BRADFORD, JEAN, TEJESSY, CHARLOTTE,
AND DAVIDS, A. Thematic Apperception Test:
An interpretive lexicon for clinician and investi-
gator. Journal of Clinical Psychology, Mono-
graph Supplement, 1959, No. 12.
LYKKEN, D. T. A method of actuari  pattern

26            GARDNER LINDZEY

analysis. *Psychological Bulletin*, 1956, 53, 102–107.

LYKKEN, D. T., AND ROSE, R. Psychological prediction from actuarial tables. *Journal of Clinical Psychology*, 1963, 19, 139–151.

McARTHUR, C. Clinical versus actuarial prediction. In *Proceedings of the 1955 invitational conference on testing problems.* Princeton, N.J.: Educational Testing Service, 1956. Pp. 99–106.

MASLING, J. The influence of situational and interpersonal variables in projective testing. *Psychological Bulletin*, 1960, 57, 65–85.

MEEHL, P. E. *Clinical versus statistical prediction.* Minneapolis: Univer. of Minnesota Press, 1954.

MEEHL, P. E. Clinical versus actuarial prediction. In *Proceedings of the 1955 invitational conference on testing problems.* Princeton, N.J.: Educational Testing Service, 1956. Pp. 136–141.

MEEHL, P. E. When shall we use our heads instead of the formula? *Journal of Counseling Psychology*, 1957, 4, 268–273.

MEEHL, P. E. A comparison of clinicians with five statistical methods of identifying psychotic MMPI profiles. *Journal of Counseling Psychology*, 1959, 6, 102–109.

MURRAY, H. A. *Explorations in personality.* New York: Oxford Univer. Press, 1938.

MURRAY, H. A., *et al. Assessment of man.* New York: Rinehart, 1948.

SARBIN, T. Clinical psychology—art or science? *Psychometrika*, 1941, 6, 391–400.

SARBIN, T. A contribution to the study of actuarial and individual methods of prediction. *American Journal of Sociology*, 1942, 48, 593–602.

ZUBIN, V. Clinical versus actuarial prediction. In *Proceedings of the 1955 invitational conference on testing problems.* Princeton, N.J.: Educational Testing Service, 1956. Pp. 107–128.

JOURNAL OF EXPERIMENTA

Se

Professor Li a clear superior combination. T objectified "sign singly and coll inmates. The d reported in the subtle stylistic Because of their population, the data, or an unse

Ten years ago I ma ful attempt to arous from their dogmati 1954). I call the because, while it mob tions and made some as yet been able to impact upon clinical decision-making the function, usually qui no such book had eve ever, I can perhaps focused attention on both theoretical inter portance, thereby gen search studies. Monit in the decade since yields a current bibli empirical investigatio ciency of a human information is compa formalized ("mechan procedure. The desig these investigations confident generalizati the basis of the eight to me in 1954. They r substantive domains or schooling, criminal violation, psychother outcome), recovery

! Jo~~nal of Counseling Psychol-
:8
:on., _rison of clinicians with five
hods of identifying psychotic
. Journal of Counseling Psychol-
i2–109.
Explorations in personality. New
:niver. Press, 1938.
et al. Assessment of man. New
. 1948.
cal psychology-art or science?
1941, 6, 391–400.
ribution to the study of actuarial
methods of prediction. American
ology, 1942, 48, 593–602.
.l versus actuarial prediction. In
the 1955 invitational conference
blems. Princeton, N.J.: Educa-
Service, 1956. Pp. 107–128.

JOURNAL OF EXPERIMENTAL RESEARCH IN PERSONALITY 1, 27–32 (1965)

# Seer over Sign: The First Good Example

## Paul E. Meehl

### University of Minnesota

Professor Lindzey's study is the first (in some fifty published) which demonstrates a clear superiority of the clinical judge over formalized (actuarial) methods of data combination. These clinicians' superiority lay in validity generalization, the semi-objectified "signs" derived from research on college students having negligible validity singly and collectively when applied to a population of maximum-security prison inmates. The data indicate that the clinical experts were not employing the "signs" reported in the research literature. It is suggested that TAT-skilled judges rely on subtle stylistic features of the protocol, which are refractory to scoring categories. Because of their atypicality and the crucial role played by moving to a very different population, the findings should not be generalized to other prediction tasks, kinds of data, or an unselected population of clinicians.

Ten years ago I made a rather unsuccessful attempt to arouse clinical practioners from their dogmatic slumbers (Meehl, 1954). I call the attempt unsuccessful because, while it mobilized emergency emotions and made some sparks fly, I have not as yet been able to detect any significant impact upon clinical practice. In his daily decision-making the clinician continues to function, usually quite unabashedly, as if no such book had ever been written. However, I can perhaps lay claim to having focused attention on a research problem of both theoretical interest and practical importance, thereby generating numerous research studies. Monitoring of the literature in the decade since the book appeared yields a current bibliography of some fifty empirical investigations in which the efficiency of a human judge in combining information is compared with that of a formalized ("mechanical," "statistical") procedure. The design and the range of these investigations permits much more confident generalization than was true on the basis of the eighteen studies available to me in 1954. They range over such diverse substantive domains as success in training or schooling, criminal recidivism and parole violation, psychotherapy (stayability and outcome), recovery from psychosis, re-sponse to shock treatment, formal psychiatric nosology, job success or satisfaction, medical (nonpsychiatric) diagnosis, and general trait ascription or personality description. The current "box score" shows a significantly superior predictive efficiency for the statistical method in about two-thirds of the investigations, and substantially equal efficiency in the rest. (In 1954 I mistakenly classified one paper as favoring nonformalized judgment, because I failed to detect its use of a spuriously inflated chi-square.)

It would be difficult to mention any other domain of psychological controversy in which such uniformity of research outcome as this would be evident in the literature. Since Professor Lindzey's paper is the first and *only* empirical comparison of the relative efficiency of the two methods showing clear superiority for the clinical judge, it is deserving of special attention.

Since, as Lindzey points out, commentators have tended to polarize and oversimplify my own views, in reacting to his paper I should like first to say clearly that I incline strongly to accept his results and interpretation. It would be my judgment that we have here the first clear instance of somebody's accepting the statistical challenge and exhibiting a signifi-

27

cantly superior predictive performance by the human judge. What I have to say by way of further comment or questions should not, therefore, be construed as meaning that I disagree with the author's essential conclusions.

I take it as not in controversy that the clinical judge (proceeding informally or impressionistically) and the "sign" list (employed mechanically) do not differ significantly in the hit-rate achieved on a college population. While the statistical method is given an advantage through the lack of cross-validation, I would be inclined not to assign this factor as much weight as the author does. Cross-validation shrinkage (in the narrow sense) is a very important influence for prediction systems such as regression equations where the actual magnitude of a rather unstable statistic like a beta-weight is used with the idea of maximizing predictive power. But this effect is very considerably reduced when a simple count of signs, based on a median cut or similar dichotomous procedure such as the author employed, is involved. I have seen some striking examples where such an unweighted sign-counting procedure results in negligible cross-validating shrinkage. Presumably the reason for this is that the discriminating *power* of a dichotomous sign is not being weighted, so as long as the signs are at least scored "in the right direction," an unweighted sign-count is not a statistic greatly biased by capitalizing on random error in the criterion sample. (This is especially true, of course, when the selected signs do not represent a small minority of a large potential set such as the MMPI item pool.)

On the clinician's side, we have no accurate means within the data of estimating how much of the fluctuation in hit-rate between the two samples (a drop from 95% hits in Sample I to 80% hits in Sample II) is attributable to random sampling error and how much to the (presumably much more important) factor of validity generalization to a different population. That is, we have no good means, either from theoretical considerations or estimators cal-

culable from the data, of deciding whether there is a difference between the efficiency of the statistical method and the judges in the first study. If we were dealing with the first study taken by itself, we would have to record it in the box score as "no substantial difference." I shall therefore confine my discussion to the striking superiority of the clinical judges in Study II.

In explaining the clinical judges' marked superiority over the statistical sign-combination in Study II, the fascinating question is, of course, "What were the clinical judges *doing*?" I put it this way because the data make it quite clear that the difference in results between Studies I and II lies in the failure of the sign-statistical method to hold up, while the clinical judges did almost as well as in Study I. It is important to realize that we deal here not with shrinkage on *cross-validation* in the strict sense, i.e., that attributable to random sampling fluctuation within the same population, but the very different situation of *validity generalization*, i.e., the extent to which predictor variables function in the same way in a different population. Granted that in theory it will never be the case that any two clinical populations are mathematically identical in their parameters, in practice one can usually assume that shrinkage in passing from one VA Mental Hygiene Clinic sample, say, in Minnesota in 1956 to one in Michigan in 1958 will be largely attributable to sampling fluctuations; whereas moving from a population of college students to a population of prisoners involves a rather marked change in a number of presumably critical variables (demographic, intellectual, psychiatric, test-attitudinal, stylistic). A hard-line protagonist of the statistical method might be tempted to view this fact as a defect of the experimental design, saying that it is "not fair to the statistician" to expect him to make estimates of parameters in a prediction function for a population which he has not yet sampled. I am sure that Lindzey would accept the substance of that observation as a statistical truism. However, as regards the "fairness" aspect, I think that this line of rebuttal would be improper, for the same

reason that I think it [...]
cians dismiss the adve[...]
it is "unfair" to exp[...]
know in advance whet[...]
tor variable is releva[...]
terion. If the clinicia[...]
under the erroneous [...]
current state of psycho[...]
generalizability of his [...]
experience is such as to[...]
powerful predictions [...]
this error is part of the [...]
as a predictive instr[...]
would insist that given [...]
text in which the who[...]
—and it is only, I b[...]
matic context that it ca[...]
lated as a competition[...]
—then it seems obviou[...]
a clinician to move suc[...]
population, when the [...]
collapses upon attempt[...]
must be viewed as a [...]
clinician's pragmatic s[...]
particular circumstance[...]

The data indicate th[...]
cal judges suffered son[...]
power in moving to the [...]
their attrition was not[...]
the attrition suffered b[...]
which collapsed to a cl[...]
nitude. That the latter [...]
a matter of validity g[...]
than pure sampling-[...]
shown by the data in [...]
see that the componen[...]
statistic had individual[...]
power, with a couple of [...]
deal here not with a [...]
purportedly "optimal v[...]
they capitalize excess[...]
error in the initial san[...]
with a situation in wh[...]
*sions* being utilized fo[...]
the most part predictiv[...]
the new population.

On first reading the [...]
to criticize the empha[...]
paragraphs upon the cl[...]
server," but I think I u[...]
thought why the auth[...]
"observer" aspect as h[...]

data, of deciding whether
between the efficiency
method and the judges in
if we were dealing with the
n by itself, we would have
e box score as "no substan-
I shall therefore confine
the striking superiority of
es in Study II.

the clinical judges' marked
the statistical sign-combi-
II, the fascinating question
hat were the clinical judges
this way because the data
lear that the difference in
Studies I and II lies in
e sign-statistical method to
he clinical judges did almost
tudy I. It is important to
eal here not with shrinkage
ion in the strict sense, i.e.,
e to random sampling fluc-
the same population, but
nt situation of *validity gen-*
the extent to which predic-
action in the same way in a
tion. Granted that in theory
e the case that any two
ti        are mathematically
en     .rameters, in practice
r assume that. shrinkage in
e VA Mental Hygiene Clinic
Minnesota in 1956 to one
1958 will be largely attribut-
iing fluctuations; whereas
population of college stu-
ilation of prisoners involves
ed change in a number of
ical variables (demographic,
sychiatric, test-attitudinal,
ard-line protagonist of the
hod might be tempted to
as a defect of the experi-
saying that it is "not fair to
i" to expect him to make
parameters in a prediction
population which he has not
am sure that Lindzey would
tance of that observation as
ruism. However, as regards
aspect, I think that this line
iid be improper, for the same

reason that I think it improper when clini-
cians dismiss the adverse studies by saying
it is "unfair" to expect the clinician to
know in advance whether a certain predic-
tor variable is relevant to a certain cri-
terion. If the clinician makes judgments
under the erroneous impression that the
current state of psychological theory or the
generalizability of his accumulated clinical
experience is such as to permit him to make
powerful predictions of a given criterion,
this error is part of the clinician's weakness
as a predictive instrument. Similarly, I
would insist that given the pragmatic con-
text in which the whole issue makes sense
—and it is only, I believe, in the prag-
matic context that it can be properly formu-
lated as a competition between techniques
—then it seems obvious that the ability of
a clinician to move successfully into a new
population, when the statistical method
collapses upon attempting such movement,
must be viewed as a manifestation of the
clinician's pragmatic superiority under the
particular circumstances.

The data indicate that, whereas the clini-
cal judges suffered some loss of predictive
power in moving to the prisoner population,
their attrition was not nearly as great as
the attrition suffered by the sign-statistics,
which collapsed to a clinically useless mag-
nitude. That the latters' collapse is mainly
a matter of validity generalization rather
than pure sampling-error shrinkage is
shown by the data in Table 2, where we
see that the component signs in the sign-
statistic had individually no discrimination
power, with a couple of exceptions. Thus we
deal here not with a situation in which
purportedly "optimal weights" fail because
they capitalize excessively upon random
error in the initial sample; rather we deal
with a situation in which the very *dimen-
sions* being utilized for prediction are for
the most part predictively irrelevant within
the new population.

On first reading the paper I was impelled
to criticize the emphasis in its first two
paragraphs upon the clinical judge as "ob-
server," but I think I understand on further
thought why the author emphasizes the
"observer" aspect as he does. It seems the

most parsimonious interpretation of the
data to say that the clinical judges were
able to do almost as good a job on the
prisoner sample as on the college sample, in
spite of the fact that the samples differ so
greatly in respect to the variables used as
statistical signs, because the clinical judges
were relying largely, perhaps almost wholly,
upon other aspects of the protocol than
those aspects represented in the signs.
Hence I would myself look upon the
author's comments on the "psychometric
refractoriness" of the TAT protocol as
getting closest to the heart of the matter.
Of the (practically) unlimited number of
facets or aspects of the verbal behavior
recorded in a TAT protocol, it seems that
those which the research, and even the
articulated clinical tradition, have fixed
upon as TAT "signs" of homosexuality are
just not the best ones, i.e., "best" in the
sense of possessing high validity general-
izability.

If we inquire into what these superior
aspects might be, we leave the realm of the
data for speculation. But if it is permissible
to record a hunch, I would hazard a guess
that we deal here with some subtle aspects
—subtle because highly configural—of a
stylistic-expressive nature. I do not, of
course, mean something crude like sentence
length or verb-adjective quotient or what
not, but I do mean some features of the
patient's discourse which are relatively
closer to the *formal* than to the *contentual*
aspects of the stream of speech. It is a pity
that the article does not report any intro-
spective account by the judges of what they
at least *thought* they were attending to in
making the discrimination. But this general
line is what has made me more comfortable
with the author's "observer" emphasis, be-
cause pending further investigation of the
inferential process in this situation, I would
opt for the working hypothesis that the
judges were scanning the material with
responsiveness to features of it that have
as yet eluded anything like an adequate
reduction to scoring categories.

This latter point perhaps renders the
investigation somewhat less central in re-
gard to the clinical-statistical issue than it

30                                   PAUL E. MEEHL

would otherwise be. As I formulated the distinction (Meehl, 1954, pp. 15–18) the question of relative efficiency is most appropriately asked having first settled upon a defined class of data, whether these data are rockbottom epistemologically or are themselves, strictly speaking, inferences, constructions, or behavior summaries. Thus, for example, in predicting academic success one would normally treat the student's Stanford-Binet IQ as part of the "data." But a little reflection upon the process of administering an individual intelligence test makes it obvious that "clinical judgments" already occur close to the behavior level, as when the examiner must decide how a patient's definition of a word is to be scored when precisely that definition cannot be found among the scored samples in the manual. There is, admittedly, an arbitrary element here because of the ambiguity of the verb "observed" in ordinary language and even in conventional scientific usage. In moving from the patient's stream of behavior to the scored signs, two reductions of data occur: First, only the words are recorded and such behavioral features as rate, tone, expressive movements, and the like are ignored, a factor not relevant in the present study. Second, only certain features of the word sequence as found in the protocol are selected for attention and classified with respect to specified properties, i.e., "scored." Here again, I can understand a temptation on the part of the actuarial protagonist to say that the study does not quite fulfill the criteria for a meaningful test because the two predictive methods do not "start with the same body of data." While this is true in one sense, a sense of which Lindzey is fully cognizant, it is not true in that sense which is pragmatically important. The fact is that the skilled judge reading the protocol impressionistically and the statistical system putting together scores obtained by attending selectively to prespecified features of the record, *do* have access to the "same data," namely a transcript of verbal behavior. At the risk of overstressing a methodological abstraction, one could say

as a matter of strict logic or epistemology that, when the statistical method does not begin by scoring the aspects of verbal behavior which the judge responds to impressionistically, from the mathematical point of view this amounts in effect to the actuarial method's assigning a zero weight to those aspects and meanwhile assigning nonzero weights to other aspects which are less predictive, or at least less generalizably so.

I think it is less important to argue the semantic merits of a broad versus narrow use of the verb "observe" than it is to get as conceptually clear as we can about what is actually going on in the situation. There is an interesting symmetry here between the special disadvantages of the two predictive methods, in that Holt's distinction (1958) between the "naive" and the "sophisticated" clinical judge finds its counterpart in the "naive" versus "sophisticated" actuary. Holt wants to make sure, before he will be happy with a comparison of the two methods' efficiencies, that the clinical judge has had an adequate opportunity to consult actuarial experience (including actuarial experience with his own previous judging behavior) so that he can adjust and hopefully improve his subjective weights by whatever psychological means clinical judges do this. Similarly, it will not do much good for the statistician to employ formally powerful mathematical methods of combining scored dimensions if those dimensions are not the right ones to start with. Noting this symmetry, we must nevertheless give due recognition within the pragmatic context of predictive efficiency to a finding that the efforts of clinically knowledgeable investigators to identify the predictively relevant and *population-generalizable* aspects of the stream of TAT speech, and to subject them to a semiobjective response classification procedure ("scoring"), has thus far apparently failed. I should think that the observational and classificatory problem involved here would partake to a considerable degree of the same elements that enter into skillful functioning as a psychotherapist and, therefore, that many of the theoretical consider-

ations I raised in relevant in under the present study and 7). I am also author's identifica posed six "pro-cl 1957) as being mo predictive situatio

As must be evi of my comments, paper with which entirely happy adopted to describ especially since th "naive" paradoxica both samples and, better in the prisc the late Ephraim Psychology Depar Nevitt Sanford and clinician. As the other judge's "soph his own research ex with the statistical have worked to hit the further conside explicit identificat can never systema of an actuarial me reduce power when actuarially but an thinking process o possibility arises be that is likely to o ceeds in making ex the cues to which I sive is that his sub these cues will incre of the residual subs not yet brought to t Sarbin, in his classi that the well-recog tors HSR and CAT assigned a *larger* variance by counsel ables actually acco instance of this effe fascinating article which an intuitivel who had been doing nosing certain occup

ic ...gic or epistemology ...al method does not ...he aspects of verbal be-...udge responds to impres-... the mathematical point ...nts in effect to the actu-...signing a zero weight to ...meanwhile assigning non-...er aspects which are less ...ast less generalizably so. ...s important to argue the f a broad versus narrow ...observe" than it is to get ...ear as we can about what ...n in the situation. There ...symmetry here between ...antages of the two pre-...n that Holt's distinction the "naive" and the ...linical judge finds its ..."naive" versus "sophis-...Holt wants to make sure, ...happy with a comparison ...ods' efficiencies, that the ...had an adequate oppor-...actuarial experience (in-...experience with his own ...behavior) so that he can ...il ...prove his subjective ...vel psychological means ...this. Similarly, it will ...d for the statistician to powerful mathematical ...ining scored dimensions ...ns are not the right ones ...oting this symmetry, we ...s give due recognition ...atic context of predictive ...nding that the efforts of ...dgeable investigators to ...tively relevant and *popu-*...*le* aspects of the stream ...nd to subject them to a ...onse classification proce-...has thus far apparently ...ink that the observational ...problem involved here ...a considerable degree of ...s that enter into skillful ...sychotherapist and, there-...i the theoretical consider-

ations I raised in that respect would be relevant in understanding the findings of the present study (Meehl, 1954, Chapters 6 and 7). I am also inclined to agree with the author's identification of two of my proposed six "pro-clinical" factors (Meehl, 1957) as being most likely operative in this predictive situation.

As must be evident from the character of my comments, I find very little in the paper with which to disagree. I am not entirely happy about the terminology adopted to describe the two clinical judges, especially since the judge characterized as "naive" paradoxically did the better job in both samples and, I take it, significantly better in the prisoner sample. This judge, the late Ephraim Rosen of the Minnesota Psychology Department, was trained by Nevitt Sanford and was an unusually gifted clinician. As the author points out, the other judge's "sophistication," consisting in his own research experience and familiarity with the statistical sign list, may actually have worked to his disadvantage. There is, the further consideration that, whereas the explicit identification of predictive signs can never systematically reduce the power of an actuarial method, it may sometimes reduce power when the signs are not treated actuarially but are filtered through the thinking process of a clinical judge. This possibility arises because one of the changes that is likely to occur when a judge succeeds in making explicit a proper subset of the cues to which he is potentially responsive is that his subjective beta-weights on these cues will increase, to the disadvantage of the residual subset of cues which he has not yet brought to the reporting level. Thus Sarbin, in his classical study (1942), found that the well-recognized scholastic predictors HSR and CAT were being subjectively assigned a *larger* proportion of criterion variance by counselors than these two variables actually accounted for. A beautiful instance of this effect can be found in the fascinating article by Berne (1949) in which an intuitively gifted psychoanalyst who had been doing remarkably well diagnosing certain occupations of inductees "at

sight" suffered a marked decline in his efficiency as a result of identifying only a *portion* of the cue-family to which he had been originally responding unconsciously.

The only other partial disagreement I would have with the author is based upon literature not extensively known to him, in that he lays some stress upon the relative lack of studies in which the clinician is operating on his own terrain and attempting to predict a criterion with which he has some meaningful clinical familiarity. This criticism has been considerably reduced by the studies appearing since 1954, and I am not convinced that on the basis of the total body of presently available evidence one can plausible attribute the highly consistent and sometimes marked superiority of the statistical method to the use of an inappropriate setting and criterion for assessing the clinician's predictive skills.

Finally, I believe it is needful to enter a *caveat* with regard to the general application of these findings in the pragmatic context of daily clinical decision-making. I have little doubt, on the basis of my long personal acquaintance with them, that both of these clinical judges would be superior to the modal practitioner in a number of dimensions that I can hardly think irrelevant in this task, particularly abstract intelligence, good common-sense judgment, flexibility, and responsiveness to subtle nuances. [While revising the draft of this paper, I received a research report on counselor predictions in which 12 accurately predicting counselors differed from 12 inaccurately predicting ones by 27 raw score points on the Miller Analogies Test, a mean difference of approximately two sigma. No other counselor variable showed any such large differentiation as this measure of "Ph.D.-type brains"; see Watley and Vance (1964).] Investigations involving several clinicians characteristically show significant differences in predictive skill. The average judge does no better than the statistical method and usually somewhat worse; a minority of judges will sometimes succeed in bettering the actuarial procedure. While the functioning of a consist-

32                                      PAUL E. MEEHL

JOURNAL OF EXPERIMENTAL

ently superior judge is of great theoretical interest, and also could presumably provide one basis for refurbishing the less adequate average judge who performs below the actuarial method, unless individual judges are empirically calibrated with respect to their predictive efficiency over the range of recurring clinical tasks, the present empirical demonstration that these two judges were doing something validly that the scoreable signs were not doing does not help us much in adopting an over-all administrative policy with regard to the optimal method of clinical decision-making. As I have earlier pointed out, a pretty strong case can be made for an overarching decision-policy *to predict by actuarial methods, except when empirical information is available as to the predictive efficiency of the clinicians functioning in an installation;* and the specificity of abilities surely makes it dangerous to assume that these can be assessed by an indirect general method (except perhaps general intelligence) instead of carrying out a major predictive study on each clinic's personnel (Meehl, 1954, pp. 114–116).

With these minor reservations and qualifications, let me conclude by saying that, so far as I am concerned, Professor Lindzey

has successfully responded to my "challenge" to do the right kind of study enabling the clinical judge to emerge victorious.

REFERENCES

BERNE, E. The nature of intuition. *Psychiatric Quarterly*, 1949, 23, 203–226.

GOUGH, H. G. Clinical versus statistical prediction in psychology. In L. Postman (Ed.), *Psychology in the making.* New York: Alfred A. Knopf, 1962. Pp. 526–584.

HOLT, R. R. Clinical and statistical prediction: A reformulation and some new data. *Journal of Abnormal and Social Psychology*, 1958, 56, 1–12.

MEEHL, P. E. *Clinical versus statistical prediction: A theoretical analysis and a review of the evidence.* Minneapolis: Univer. of Minnesota Press, 1954.

MEEHL, P. E. When shall we use our heads instead of the formula? *Journal of Counseling Psychology*, 1957, 4, 268–273.

SARBIN, T. R. A contribution to the study of actuarial and individual methods of prediction. *American Journal of Sociology*, 1942, 48, 593–602.

WATLEY, D. J., AND VANCE, F. L. Clinical versus actuarial prediction of college achievement and leadership activity. *U. S. Office of Education Cooperative Research Project No. 2202.* Minneapolis: Univer. of Minnesota, 1964.

## Effects of "Subl:

Ir

A test for pos
Three groups of
The correct respo:
syllable for 4 of
incorrect cue, was
of the cues was v
recognizable level
required for chan
as to the accurac
cue was found to
any effect in the r
tors used and the o

One of the more end
research into personalit
herited from psychoan
that behavior may be
about which the indivi
The most typical proce
idea has been investig
stimuli that were either
stimuli or at too weak a
adequate reception. Thi
"subliminal" stimulation
been summarized by B
points out many of the s
studies in this area and
the use of the term "sub
clusion that these stimuli
independently of the ma
sentially in accord with
cal position. On the o
would agree with the sta
(1960), "there is no co
that the human organism
or differentially respond
uli that are at an intensi
elicit a discriminative ve
Recent work on "sublir
has focused upon the i

[1] This research was supporte
g. nt M-1206 and National
grant G-22139.

1                        DEFENSE EXHIBIT H

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 4:14-cv-03152 Document 38-58 Filed on 09/01/16 in TXSD Page 146 of 265



# The Prediction of Dangerousness in Juveniles: A Replication



DEFENDANT'S
EXHIBIT
H

## Stephen E. Schlesinger

*This study investigates the application of predictor variables identified by nine previous studies and by staff members of a family court and its psychiatric clinic to clinical predictions of dangerousness. The records of 122 juveniles evaluated by the clinic during a six-month period were studied for the presence or absence of the variables. No significant relationships were found in comparisons among predictor variables, clinic recommendations to the court, and subsequent dangerous behaviors. The author discusses the difficulties inherent in field research of this type and the significance of the findings for clinical practice.*

A person's potential for dangerous behavior may be evaluated at several points in the criminal justice system. Bail, type and length of sentence, level of institutional custody, and parole may be contingent on psychological or psychiatric review. Dangerous behaviors are commonly defined as those behaviors which result in harm to self or others,[1] and they occur infrequently in the general population.[2]

Much has been written about the relationships between violent behavior and factors in offenders' psychological histories. The conclusion of several authors, reviewing the complexities of violence prediction, is that such prediction is futile.[3] Yet, in spite of this, clinical predictions of dangerousness are frequently ordered by criminal justice authorities throughout the country.[4]

STEPHEN E. SCHLESINGER is a doctoral candidate in the Department of Psychology, State University of New York at Buffalo.

This research was supported by Grant 5-T01-MH-13817 from the National Institute of Mental Health.

Grateful acknowledgment is made to Frank Cammarata, Charles Hutchinson, Frank Bocci and their staffs; and to Dr. Donald Bartlett, Dr. Neil Murray, and Norman Rosenberg. This research could not have been conducted without the assistance of these persons.

1. J. Cocozza and H. Steadman, "Some Refinements in the Measurement and Prediction of Dangerous Behavior," *American Journal of Psychiatry*, vol. 131 (1974), pp. 1012–14.

2. C. Kelley, *Crime in the United States—1972, Uniform Crime Reports* (Washington, D.C.: U.S. Govt. Printing Office, 1973).

3. See G. E. Murphy, "Clinical Identification of Suicidal Risk," *Archives of General Psychiatry*, vol. 27 (1972), pp. 356–59; E. Wenk, J. Robison, and G. Smith, "Can Violence be Predicted?" *Crime and Delinquency*, October 1972, pp. 393–402; and J. Monahan, "The Prevention of Violence," in *Community Mental Health and the Criminal Justice System*, J. Monahan ed. (New York: Pergamon Press, 1976), pp. 13–34.

4. B. Rubin, "Prediction of Dangerousness in Mentally Ill Criminals," *Archives of General Psychiatry*, vol. 27 (1972), pp. 397–407.

Table 1.   *Predictors Identified by Previous Research*

| Investigator | Predictors |
|---|---|
| Bender | Abnormal EEG |
| | Epilepsy |
| | Extremely unfavorable home conditions and life experiences |
| | Personal experiences with violent death |
| Cowden | Poor personality prognosis |
| | Poor institutional adjustment |
| Hellman and Blackman | Enuresis |
| | Firesetting |
| | Cruelty to animals |
| Glueck and Glueck | Overstrict or lax discipline by either parent |
| | School retardation |
| | Truancy |
| | School misconduct |
| Guze, Goodwin, and Crane | Sociopathy |
| | Alcoholism |
| | Drug dependence |
| von Hirsch | Known history of violence |
| | Original commitment for a violent offense |
| | Commitment for fourth or more time |
| | History of moderate or serious opiate involvement |
| | Referred to a psychiatrist on commitment |
| Wenk and Emrich | Violent admission offense |
| Justice, Justice, and Kraft | Fighting |
| | Temper tantrums |
| | Inability to get along with others |
| Sendi and Blomgren | Parental brutality |
| | Exposure to violence or murder |
| | Sexual inhibition |
| | Seduction by or perversion in parent |
| | Unfavorable home environment |

Where repetition of predictors occurred among authors, such overlap was eliminated from this table.

Predictions of children's future behavior are often requested as aids in disposing of cases in the juvenile and family courts.[5] These predictions have been of special interest to researchers. Nine studies identified thirty different factors as statistically related to violent behavior in children; the correspondence

5. A. Sussman, "Psychological Testing and Juvenile Justice: An Invalid Judicial Function," *Criminal Law Bulletin*, March 1974, pp. 117−46.

Stephen E. Schlesinger

was judged sufficient to justify their use as predictors.[6] Table 1 contains a summary of these factors.

The purpose of this study was to investigate the obvious discrepancy between these conclusions and evidence that prediction is futile. The predictor variables listed in Table 1, as well as a number of variables believed by the staffs of a family court and its psychiatric clinic to be reliably related to violent behavior, were applied to juvenile cases. Table 2 contains a summary of the number of cases in which each of the predictor variables was found.

The study had three specific objectives. First, it examined the relationship of the predictor variables in Table 2 to the clinic staff's recommendations to the court. These recommendations presumably reflected the staff's estimate of the probability of future violent behavior by the juveniles assessed. Second, it examined the relationship of the predictor variables to the juveniles' subsequent behavior. Finally, the clinic's recommendations were compared with the subsequent behavior of the juveniles.

Decisions regarding custody and parole are often based on clinicians' predictions,[7] which assume a relationship between the predictor variables and the anticipated violent behaviors. If the relationships do not in fact reliably exist, use of present prediction paradigms may be unfair.

## METHOD

### Subjects

Subjects for this investigation were 122 juveniles evaluated by the clinic between January 1 and June 30, 1973. The clinic evaluated 275 juveniles during this time; however, the sample included only those juveniles who reached

6. L. Bender, "Children and Adolescents Who Have Killed," American Journal of Psychiatry, vol. 116 (1959), pp. 510–13; J. E. Cowden, "Predicting Institutional Adjustment and Recidivism in Delinquent Boys," Journal of Criminal Law, Criminology and Police Science, March 1966, pp. 39–44; D. Hellman and N. Blackman, "Enuresis, Firesetting and Cruelty to Animals: A Triad Predictive of Adult Crime," American Journal of Psychiatry, vol. 122, no. 6 (1966), pp. 1431–35; S. Glueck and E. Glueck, Predicting Delinquency and Crime (Cambridge, Mass.: Harvard University Press, 1967); S. Guze, D. Goodwin, and B. Crane, "Criminal Recidivism and Psychiatric Illness," American Journal of Psychiatry, vol. 127, no. 6 (1970), pp. 832–35; A. von Hirsch, "Prediction of Criminal Conduct and Preventive Confinement of Convicted Persons," Buffalo Law Review, vol. 21 (1972), pp. 717–58; E. Wenk and R. Emrich, "Assaultive Youth: An Exploratory Study of the Assaultive Experience and Assaultive Potential of California Youth Authority Wards," Journal of Research in Crime and Delinquency, July 1972, pp. 171–96; B. Justice, R. Justice, and J. Kraft, "Early Warning Signs of Violence: Is a Triad Enough?" American Journal of Psychiatry, vol. 131, no. 4 (1974), pp. 457–59; and I. Sendi and P. Blomgren, "A Comparative Study of Predictive Criteria in the Predisposition of Homicidal Adolescents," American Journal of Psychiatry, April 1975, pp. 423–27.

7. S. E. Schlesinger, The Prediction of Dangerousness in the Criminal Justice System: A Review of the Literature (Unpub. paper, State University of New York at Buffalo, 1976).

Table 2.  Number of Cases in Which
Predictor Variables Were Found

| Variables Identified by Previous Research | Number of Cases |
| --- | --- |
| Abnormal EEG | 3 |
| Epilepsy | 3 |
| Extremely unfavorable home conditions and life experiences | 5 |
| Poor personality prognosis | 1 |
| Poor institutional adjustment | 17 |
| Enuresis | 10 |
| Firesetting | 4 |
| Cruelty to animals | 1 |
| Overstrict or lax discipline by either parent | 12 |
| School retardation | 1 |
| Truancy | 66 |
| School misconduct | 40 |
| Sociopathy | 1 |
| Alcoholism | 10 |
| Drug dependence | 2 |
| Known history of violence | 1 |
| Original commitment for a violent offense | 2 |
| Fighting | 20 |
| Temper tantrums | 14 |
| Inability to get along with others | 5 |
| Parental brutality | 14 |
| Exposure to violence or murder | 4 |
| ...tion by or perversion in parent | 4 |

|  Variables Identified by  Court and Clinic Staff | |
| --- | --- |
| Sex of juvenile | — |
| Religion | — |
| Race | — |
| Amount of education | — |
| Reading below grade level | 56 |
| Judge | — |
| Child is adopted | 3 |
| Child has a physical defect | 10 |
| Parent is absent from the home or deceased | 50 |
| Father is/was an alcoholic | 34 |
| Mother is/was an alcoholic | 12 |
| Parents are separated/divorced | 40 |
| Number of children in the family | — |
| Marital discord between parents | 5 |
| Family is disorganized/dysfunctional | 32 |
| Child is a loner | 10 |

Stephen E. Schlesinger

their sixteenth birthday after the one-year follow-up period (on or after July 1, 1974). Table 3 contains the demographic characteristics of the sample.

## Procedure

The study examined the records of juveniles referred by the family court to the court's psychiatric clinic for evaluation before disposition of the case. Collected from each file was all information about the juvenile available to the clinic staff and the judges. Criteria used in formulating the recommendations were contained in the records of the clinic's social worker, psychologist, and psychiatrist. Two sources yielded data on offenses committed by each juvenile during the one-year follow-up period: The family court's files provided information on offenses leading to reopened files, and the probation department's records provided information on probationary contacts with the juveniles.

Chi-square analyses were performed for 124 comparisons among predictor variables, clinic recommendations, and criterion behaviors. If the clinic recommended to the court that the juvenile be detained either in a closed facility or in a medium-security facility with supervision, a prediction of dangerousness was presumed. A recommendation of detention in a supervised facility might be based on other factors, such as general emotional

*Table 3. Demographic Characteristics of the Sample*

| Sex | | Education | |
|---|---|---|---|
| Male | 67% | Still in school | 80% |
| Female | 33% | Source of referral to court | |
| Average age | | Police | 29% |
| Overall sample | 13.0 | Mother | 25% |
| Males | 13.0 | School | 22% |
| Females | 13.0 | Father's age | |
| Whites | 13.0 | Average | 45.0 |
| Nonwhites | 12.9 | Mother's age | |
| White males | 13.1 | Average | 40.0 |
| Nonwhite males | 12.8 | Marital history | |
| White females | 12.9 | Parents married | 42% |
| Nonwhite females | 13.1 | Parents separated/divorced | 33% |
| Race | | Number of children in the family | |
| White | 66% | Average | 5.3 |
| Nonwhite | 30% | Intellectual level of the juveniles | |
| Unlisted | 4% | Average I.Q. | 92.5 |
| Residence | | Reading below grade level | 33% |
| Urban | 70% | Average number of levels below | 3.8 |
| Suburban | 17% | Reading at grade level | 13% |
| Rural | 13% | Reading above grade level | 12% |

Table 4. Recommendations to the Court

| Placement Recommendations | Number of Cases |
|---|---|
| Placement in an open facility with structure | 18 |
| Placement in a closed facility | 8 |
| Placement in a foster home | 11 |
| Placement with other relative | 5 |
| Removal from the home—unspecified placement | 7 |
| Remain in present living situation | 2 |
| Other placement recommendation | 4 |

| Other Recommendations | |
|---|---|
| Probation | 32 |
| Suspended sentence | 2 |
| Academic or training programs | 8 |
| Counseling/psychotherapy for juvenile and/or family | 41 |
| Other recommendations | 3 |
| No recommendation made to the court | 30 |

Some files contained more than one recommendation to the court.

problems needing institutional care; however, these juveniles' records revealed that clinicians believed the youngsters to be potentially violent. The two hypothesized groups of predictors—one from previous research efforts and the other from court and clinic staff—were compared to the clinic's final recommendation to the court, then to the future acting-out behaviors of the subjects. Table 4 lists the types of clinic recommendations to the court, and Table 5 lists the criterion (or follow-up) behaviors found in juveniles' files. The sample was divided into two groups for each comparison: The histories of the first group contained the predictor variable; the histories of the second, or control, group did not include the variable being tested.

## RESULTS

Two striking patterns are evident in the data. First, the incidence of violent acting-out behaviors among the juveniles referred to the clinic is low: 19 of

Table 5. Criterion Behaviors

| Type of Behavior | Number of Cases |
|---|---|
| Violent offenses | 7 |
| Burglary or larceny | 5 |
| Person in need of supervision (PINS) | 15 |
| Runaway | 7 |
| Other | 6 |

the 122 juveniles, 15.6 percent, had been referred to the court for violent offenses. Only 7 of the 122 juveniles, or 5.7 percent, committed violent or dangerous offenses during the follow-up period. Second, none of the chi-square analyses indicated a systematic relationship among predictor variables, clinic recommendations, and criterion behaviors. Moreover, the relationship between predictions of dangerousness and subsequent violent behaviors was not significant: $X^2(1) = .8990$; $p = .3458$.

## DISCUSSION

Clearly, these results do not support the conclusions of the researchers cited above. Nor do they substantiate the assumptions of court and clinic staff that other variables are systematically related to subsequent dangerous behaviors. Two explanations may help to account for the discrepancies.

The first concerns methodological issues related to prediction research. Inherent in field research of this type are several important limitations. First, identification of variables in juveniles' histories has necessarily been by sources recalling developmental details of each offender's past. The accuracy of the recall and, hence, the reliability of the variables cannot be firmly established.

Second, the reasons why judges order presentence evaluations are unknown. Judges refer approximately 15 to 20 percent of their cases to the clinic each year, but the bases for selecting this potentially biased sample are unclear. By focusing on a sample composed solely of offenders, researchers may introduce additional bias into their evaluations. A higher relative incidence of antisocial acts is to be expected in a population of offenders than in the general population. The possibility of finding significant relationships in this type of sample is enhanced by the elimination of cases which would dilute the strength of those relationships.

Third, the listing of offenses in offenders' records may not be accurate—the actual offenses may have been obscured by plea bargaining. Thus, the offenses listed may be of less legal consequence than those actually committed. Since the effects of plea bargaining on the records of juveniles in the sample are unknown, this must remain a potential source of bias.

Fourth, the predictors identified by previous researchers may be difficult to evaluate in specific cases. Categories such as "extremely unfavorable home conditions," "inability to get along with others," and "fighting" are very broad; they are not defined sufficiently to be reliable in evaluating individual records.

Fifth, the follow-up data may be influenced by two factors. Prediction of dangerousness may result in the detention of the (allegedly) violent juvenile. If detained, the juvenile is removed from those circumstances in which he might exhibit dangerous behavior. Thus, he is prevented from generating additional follow-up data for studies evaluating the reliability of predictors of

langerousness and the accuracy of the predictions themselves. Further, it may be that an intervention during detention reduces the juvenile's potential for violent behavior. Given any of these circumstances, researchers cannot fully evaluate the accuracy of predictions.

A second explanation for the discrepancy in findings concerns the manner in which the results of prediction studies are interpreted and the nature of the concept of dangerousness itself. Other authors have discussed the difficulty of predicting low base rate behaviors;[8] the conclusion from a review of the literature and from many empirical studies is that low base rate behaviors cannot be predicted sufficiently to warrant their use in clinical practice. In his review of the empirical literature, Monahan discovered reports of rates of false positive predictions ranging from 54 percent to 99.7 percent. He concluded that

> violence is vastly overpredicted whether simple behavioral indicators are used or sophisticated multivariate analyses are employed, and whether psychological tests are administered or thorough psychiatric examinations are performed.[9]

Where relationships between predictor variables and criterion behaviors have been shown to be statistically significant, such relationships have been based on evaluation of large samples. Further, a large number of statistical tests have been performed on the samples. Seldom considered in the reporting of results is the statistical problem of random generation of significant results. That is, if the significance level of .05 is chosen by investigators, and if many tests are done for relationships among a large number of variables, then the investigators must expect that 5 percent of the significant relationships may be generated by chance alone. Reports of research do not generally specify whether statistical tests have included procedures for correcting this statistical relationship among the many tests performed, or whether the number of reported significant relationships exceeds that which can be expected on the basis of chance alone. I suspect that in most cases it does not exceed the level of chance.

Significant relationships among variables found by previous researchers

8. A. Rosen, "Detection of Suicidal Patients: An Example of Some Limitations in the Prediction of Infrequent Events," *Journal of Consulting Psychology*, vol. 18, no. 6 (1954), pp. 397–403; P. Meehl and A. Rosen, "Antecedent Probability and the Efficiency of Psychometric Signs, Patterns, or Cutting Scores," *Psychological Bulletin*, vol. 52 (1955), pp. 194–216; J. Livermore, C. Malmquist, and P. Meehl, "On the Justifications for Civil Commitment," *University of Pennsylvania Law Review*, vol. 117 (1968), pp. 75–96; E. Megargee, "The Prediction of Violence with Psychological Tests," in *Current Topics in Clinical and Community Psychology*, C. Spielberger, ed. (New York: Academic Press, 1970), pp. 98–156; Murphy, "Clinical Identification of Suicidal Risk"; Rubin, "Prediction of Dangerousness in Mentally Ill Criminals"; Wenk et al., "Can Violence Be Predicted?" and B. J. Ennis and T. R. Litwack, "Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom," *California Law Review*, May 1974, pp. 693–752.

9. Monahan, "The Prevention of Violence."

may be a result primarily of the large sample size. If we compare the large number of cases upon which the research investigations were based with the small number in clinical practice, the clinicians' difficulty in applying research results becomes clearer. It may be that the *statistical relationships* between predictor variables and criterion behaviors which research has identified do not lend themselves to reliable *clinical* applications.[10]

Researchers and clinicians have both tended to view "dangerousness" as a phenomenon unto itself and, as such, have sought to predict its occurrence. But what do we really know about this construct? We are, in fact, largely ignorant of its parameters. We know violent acts occur relatively infrequently in the general population, and we define the incidence of such acts as unacceptable. But that is really all we know. We have not established that such a thing as "dangerousness" exists separately from the acts by which we have identified it or is an entity unto itself at all. That is, might it be more appropriate to view the occurrence of these abhorrent acts as situationally determined, transitory, and therefore less amenable to identification in terms of a psychological construct? If so, then we must develop procedures for systematically recording the social context of violent acts. Such records would permit investigation of the acts as situational or socioecological occurrences.

## CONCLUSIONS AND IMPLICATIONS

Predictors of violent behavior identified by previous researchers were not substantiated by this study. Future efforts to predict dangerousness will probably meet similar success. We may be wrong in our definition and study of dangerousness as an isolated factor, and the very state of the art of predicting such behaviors may well be moribund. Perhaps we should reconsider our conduct as professionals in light of this rather dismal state of affairs.

If we cannot reliably predict violent behavior, how can we justify our continued detention of juveniles evaluated as violent? Can the use of unsubstantiated and demonstrably unreliable techniques be professionally and ethically justified? And how shall we balance the right of individuals to remain free from the control of others and society's need to protect itself from those few who will become violent? The fairness of the present policies is dubious.

10. See, for discussions of the problems of clinical versus statistical predictions: H. Gough, "Clinical versus Statistical Prediction in Psychology," in *Psychology in the Making*, L. Postman, ed. (New York: Knopf, 1962), pp. 526–84; J. Sawyer, "Measurement *and* Prediction, Clinical *and* Statistical," *Psychological Bulletin*, vol. 66, no. 3 (1966), pp. 178–200; and J. Lick, "Statistical vs. Clinical Significance in Research on the Outcome of Psychotherapy," *International Journal of Mental Health*, vol. 2 (1973), pp. 26–37.

1                    DEFENSE EXHIBIT I

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1, 13 + C05,



…rge B. Palermo,[1] M.D.; Frank J. Liska,[2] J.D.;
…k T. Palermo,[3] M.D.; and Gloria Dal Forno,[4] M.D.

DEFENDANT'S EXHIBIT

# …the Predictability of Violent Behavior:
## …nsiderations and Guidelines

…FERENCE: Palermo, G. B., Liska. F. J., Palermo. M. T.. and Dal Forno. G.. "On the
…dictability of Violent Behavior: Considerations and Guidelines," *Journal of Forensic Sci-*
…er, JFSCA. Vol. 36, No. 5, Sept. 1991, pp. 1435–1444.

…STRACT: Following a semantic discussion of dangerousness, and having established its
…namic concept. the authors define the prediction of dangerous behavior as the anticipation
…an antisocial act towards others. The present-day dilemma of predicting dangerous behavior
…discussed. An extensive review of sociological and psychiatric studies is presented. Further,
…authors stress the vital importance of predicting violent behavior in view of statistical
…concerning rampant violent crime in the United States. They encourage more cooperation
…ween psychiatric experts and the judicial system in view of the common social problem
…are faced with. Better diagnostic procedures and more logically deductive factual expert
…ports are hoped for. The authors postulate that prediction is strictly connected with the
…ssible prevention of dangerous behavior and the continuation of a civilized, secure society.

…EYWORDS: psychiatry, mental illness. dangerousness. violent behavior, predictability,
…curity

…agnosis, prognosis, and treatment are the essence of the medical profession. The
…ological root of the word *prognosis* derives from the ancient Greek *pro-*, meaning
…re," and *gignoskein*, meaning "to know" [1]. While he may not actually have
…red more than a half dozen of the 70 works of the so-called Hippocratic collection,
…ocrates, in the fifth century. B.C., in works entitled *Prognostic, Coan Prognosis,*
…phorism, is credited with the then-revolutionary idea that, by observing enough
…a physician could predict the course of the disease. Many feel that these works
…been the most important ones in freeing ancient medicine from superstition. Sur-
…ngly, some 25 centuries later, in the field of psychiatry, there is controversy about
…bility of practitioners and the extent to which they are able to predict behavior,
…cularly violent behavior, in their patients.

…appeport [2], already in 1967, thought that psychotic people are not particularly
…e to be assaultive or to commit suicide. The *Arizona Law Review* [3] questioned,
…971, the accuracy of psychiatric predictions regarding dangerousness. Following the
…nedy assassination, an American Psychiatric Association study (reported by Rappe-

…ceived for publication 13 Sept. 1990; revised manuscript received 4 Feb. 1991; accepted for
…cation 12 March 1991.
…inical professor of psychiatry, Medical College of Wisconsin, Milwaukee, WI. and professor,
…artment of Social and Cultural Sciences, Section of Criminology and Law Studies. Marquette
…ersity, Milwaukee, WI.
…Court commissioner for Milwaukee County, Milwaukee, WI.
…esident in psychiatry, Medical College of Wisconsin, Milwaukee, WI.
…sident in neurology, Medical College of Wisconsin, Milwaukee, WI.

port [2]) showed that the incidence of criminal behavior among former patients of mental institutions was not significantly higher than that among the general population.

Obviously, dangerous behavior is not necessarily a manifestation of mental illness, even though some crimes, because of their heinousness, are thought to be the outcome of a psychotic state. Society, appalled by such crimes and in self-defense, in an attempt to maintain the security of its social development, usually alienates the perpetrator. "Dangerous" as an adjective is attributed to something or someone that may bring about a harmful event. Accordingly, dangerousness, which does not take place in a vacuum but during an interrelationship among people in an evolving world, assumes a dynamic concept. A distinction should be made between prognosis as used in medicine, which relates to an intrapersonal body dysfunction, and prediction of dangerousness, which implies a behavioral manifestation that takes place on an interpersonal level. Prediction of dangerousness is the prediction of abnormal dangerous behavior and does not always correspond to a prognostic evaluation. Therefore, prediction of dangerousness is here intended as the anticipation of a dangerous act, usually directed towards others. Regardless of the semantics used, there has never been a greater need for the prediction of violent behavior in our society.

## Sociological and Psychiatric Studies

In 1980, the number of homicides in the United States was 23 040, higher than at any previous time in this century [4]. As the years have gone by, the problem of violent crime has assumed frightening proportions. Statistics [5] reveal that 20 675 Americans were murdered in 1988, an increase of 2.9% over the previous year. The slayings occurred primarily in the nation's cities, which experienced a 4% increase in the number of murders. The number of murders increased 10% in the Northeast, 4% in the South, and 1% in the West, while the Midwest had a 3% decline in the number of slayings. The nation's overall murder rate was 8.4 per 100 000, but the major city with the highest rate, Washington, DC, reported a rate more than 7 times as high, 59.5 per 100 000. A recent report [6] states that, "although the federal government has not compiled nationwide statistics on killings in the first half of 1990, police departments in more than a dozen major cities report increases ranging from 10% to more than 50% over the figures for the first six months of 1989. It seems that the nation's murder rate, after dipping in the mid-1980s, has resumed a strong upsurge and . . . may even surpass the record year of 1980, when 23 040 people were slain." The above statistics clearly show that the prediction of dangerous behavior in our society is of vital importance.

The authors are aware of the many studies that take issue with the appropriateness and accuracy of clinical predictions of violence. Halleck [7] and Diamond [8] stated that objective data could not be offered in support of predictions of violence to justify the restriction of a person's freedom. Negative statements regarding the reliability of predicting future violence have been made by the American Psychiatric Association [9] and the American Psychological Association [10]. In 1978 the American Civil Liberties Union [11] categorically stated that mental health professionals have no expertise in predicting future dangerous behavior. A sizeable group of psychiatrists, psychologists, and lawyers surveyed by Kahle and Sales [12] gave a 40 to 46% mean predictive accuracy for violent behavior. In 1963, Szaz [13] had already stated that prediction of violence destroys the helping role of the mental health disciplines.

The difficulty in predicting dangerous behavior is well known and well accepted by all. "Science, particularly in its applied form, can never achieve the perfection and certainty of the law," says Tanay [14]. That should not be a deterrent in searching for guidelines that would make our diagnostic judgment more accurate, even though a recent legal decision relative to reasonable forseeability (reported by Tanay [14]) does not facilitate the task at hand. In the midst of diverse, frustrating opinions that may be

produced a confusing forensic-psychiatric climate, the statements by Monahan [15] loom large as a stimulating, illuminating beacon: "There is nothing alien about using predictions of the future behavior of others to guide our conduct: it is hard to imagine life without such assumptions, both of the continuities and discontinuities of the behavior of others and without reliance on such assumptions. It would certainly be difficult to cross a city street; driving a car would be unthinkable." He further states, "Predictions of dangerousness are a necessary factor in regulating the relationship between individual and state. We are more concerned with the moral problem raised by the use of long-term predictions of violent behavior, predictions concerned with months and years, not hours and days." Violent behavior has become so rampant in our society during the past decade, because of the widespread use of drugs and an ever-increasing impulsive unleashing of hostile feelings in families and society at large, that a better effort should be made to anticipate, and so prevent, "acts characterized by the application of overt threat of force which is likely to result in injury to people" [16].

One should be aware that, at times, violent behavior is not reported to the police. According to the 1978 National Victimization Panel [17] only 47% of those persons who stated that they had been the victim of a violent crime reported the act to the police.

In the field of psychology Freud, himself, dealt with the problem of human aggressiveness (reported by Becker [19]). He stated that human aggressiveness comes about through a fusion of the life instinct with the death instinct. The death instinct, representing the organism's desire to die, would be changed into redirecting these negative impulses outwardly. Dying, or the desire to die, would be replaced by the desire to kill, and the basic death instinct would then be defeated. Contrary to Freud's idea, Otto Rank, one of his pupils, stated beautifully (as reported by Becker [19]), "The death fear of the ego is lessened by the killing, the sacrifice, of the other; through the death of the other, one buys oneself free from the penalty of dying, of being killed." Rank had a profound and existential approach to the problem at hand.

Much closer to us, Karl Menninger [20] attempted to explain human aggression with his theory of dysfunction/dyscontrol. He claimed that an explosive, destructive act, or a series of acts, is the outcome of internal disorganization, ego weakness, and its incapacity to control basic, dangerous impulses. He thought that chronic, repetitive, aggressive behavior, or episodic, impulsive violence, such as homicidal assaultiveness, could be explained in this manner. A recent study [21] confirms this, "A decompensating patient with poor impulse control may be at risk for violence in the community regardless of the diagnosis." In that study, the diagnoses of both schizophrenia and mania were associated with dangerous behavior, and many patients were more unpredictable and emotionally explosive during the first period of their hospitalization.

The psychological predicting factors of a childhood history of maternal deprivation, poor father identification, nocturnal enuresis, fire-setting, violence towards animals, and abuse by one or both parents cited by Goldstein [22] do not necessarily hold true. Indeed, Diamond [8] stated, "Yet I have repeatedly found some, and sometimes all of these predictive factors, in individuals who have never committed even the slightest harmful act, let alone assault or murder. I have examined offenders who have committed the extraordinarily brutal acts of great violence and lethality who possessed none of these factors." It must also be pointed out that the original pioneer studies of the use of the Minnesota Multiphasic Personality Inventory (MMPI) in order to predict delinquency [23], especially those using the psychopathic deviate (Pd) scale, were recently found to be inconclusive by several surveys. The most recent of these is that of Tannenbaum in 1970 [24].

Without getting involved in the dispute between the nature and nurture theories of the origins of criminal behavior, we must recognize that the majority of the inmates in jails in the United States have a low-normal intelligence quotient (IQ), as has been established by psychometric testing. The contention that IQ scores are strongly related

to crime has been supported by Hirschi and Hindelang [25], who concluded that "the weight of evidence is that IQ is more important than race and social class for predicting criminal behavior." The above view has also been supported by more recent research by Moffit, Gabrielli, Mednick, and Schulsinger [26]. In their Danish studies, they concluded that children with low IQs may be more prone to engage in delinquent behavior. Those children also failed in school because of their poor verbal ability. "Such initial experiences may contribute to later delinquency in many ways: by creating a negative attitude towards authority . . . seek[ing] awards in a less socially desirable setting . . . [being] more sensitive to delinquent peer pressure."

The study by Wolfgang, Figlio, and Sellin [27] and that by Wolfgang [28] stress the importance of a juvenile record in the past life of an adult offender and point out that variables of race and socioeconomic status were most strongly associated with reported delinquency. These findings confirmed the classical study by Wolfgang and Ferracuti [29].

An article by Yesavage, Werner, Becker, and Mills [30] points out that the psychiatrists they reported on in their study used patients' hostility as a predictor of future violence. They also stressed the importance of suspiciousness, tension, excitement, and a prior assaultive act as predictors of dangerous behavior. Monahan's model [31], in assessing dangerousness, blends three types of prediction: anamnestic, actuarial, and clinical. His suggestions are for a short-term and specific prediction of dangerousness. Among the various traits described by Ostrov et al. [32] in assessing dangerousness, we find poor reality testing, thought disorder, paranoid thinking, excited rage, impulsivity, and superego deficit. He emphasizes the lack of coping skills, of empathy, of introspection, of the ability to reach out for people, and of a sense of humor. Bidinotto [33] lists the following dangerous traits of the serial killer: he or she shows less regard for the rights and feelings of peers, irresponsibility, disregard for authority, failure to abide by rules and regulations, and lack of moral conscience. In addition, a correlation has been made between the MMPI scales and hostile, explosive, psychopathic, violent behavior, and between the Rorschach test color responses and impulsivity and manifest hostility (reported by Starke, Monachesi, and Young [23]).

The study by Tancredi and Volkow [34] brings to the debate some neurophysiological factual understanding of violent behavior. Indeed, positron emission tomography (PET) studies reveal that defects in brain functioning are related to particular behavior and that specific defects may be at the basis of an individual's dyscontrolled acting out. The recent study on schizophrenics by Adams, Reid, and Moritz [35] supports the thesis that certain patient histories of violence, especially severe histories, are associated with neurophysiological dysfunction. In addition, when diffuse neurophysiological brain dysfunction leads to violent behavior, "such behavior tends to be recurrent or perseverative—an ongoing trait . . . . This would tend to explain the presence in the IMP group—neurophysiologically impaired schizophrenic (Luria Nebraska Neuropsychological Battery) tested by Golden, Hammecke, and Purish [36] of the very highest 'career violence' individuals." The study by Jarvie [37] that showed the frontal lobe region lesions acting as a disinhibitor of social control was further corroborated by a study by Blumer and Benson [38]. The study of Grafman et al. [39] stresses the tenet that psychiatric sequelae and personality changes are common following frontal lobe damage. A pseudopsychopathic personality characterized by a lack of impulse control, irritability, anger, and hostility usually ensues from orbitofrontal lesions. Results of these studies suggest that chronic, recidivistic, violent behavior, even though a minimal part of the larger bulk of criminal offenses, may have a biological and neurophysiological predisposition. That predisposition also derives from a rather complex interaction between multiple genetic factors and their reaction to the environment [40]. One can hope that in the near future higher technology, including single photon emission computed tomography (SPECT), will also help in the prediction of dangerous behavior.

:25], who concluded that "the ... and social class for predicting ... rted by more recent research ... heir Danish studies, they c... ngage in delinquent behavior ... r verbal ability. "Such initial ... ways: by creating a negative ... socially desirable setting . . .

it by Wolfgang [28] stress the ... lt offender and point out that ... ngly associated with reported ... y by Wolfgang and Ferracuti ...

points out that the psychiatrist ... a predictor of future violence ... sion, excitement, and a prior ... han's model [31], in assessing ... tic, actuarial, and clinical. His ... of dangerousness. Among the ... dangerousness, we find poor ... ted rage, impulsivity, and su... empathy, of introspection, of ... umor. Bidinotto [33] lists the ... ... s regard for the rights ... ... ailure to abide by rules ... a correlation has been made ... pathic, violent behavior ... ity and manifest hostility ...

bate some neurophysiologic ... n emission tomography (PET) ... o particular behavior and th... trolled acting out. The rec... l supports the thesis that ... re associated with neuro... logical brain dysfunction ... or perseverative—an ong... MP group–neurophysiolo... al Battery) tested by Gol... lence' individuals." The ... ting as a disinhibitor of ... d Benson [38]. The stu... elae and personality ch... chopathic personality ... l hostility usually ensue ... : chronic, recidivistic ... f criminal offenses, ma... edisposition also deriv... tors and their reaction ... higher technology, inc... rill also help in the pre...

The most important variable in the prediction of violence, says Stone [41], is the actual ... st criminal conduct. This tenet accords with a major dictum of Freudian psychoanalysis, ... at history is the best prediction of future behavior. Even though one fully agrees with ... Stone's statement, its limitations must be recognized when confronted with individuals ... hose past does not show overt criminal behavior.

The American Psychiatric Association (APA) task force members [9] who investigated ... he problem of predicting future dangerousness have come up with opposite, controver- ... sial, and confusing statements, such as, "Judgements are fundamentally of very low ... reliability . . . . Past behavior must be clearly repetitive . . . . Recidivism is specific to ... he previous crime . . . . Immediacy of harm, likelihood of harm, cannot be stressed ... rongly enough . . . . Some persons are at a comparatively higher risk for future violence ... han are others." Karl Menninger [20] warned us. "It is the possibility of unusual behavior ... at we have to anticipate and predict." Hans Toch [42] includes among types of unusual ... havior "the unstable, who may shoot because of a propensity to be clumsy, boisterous, ... rful, touchy or sadistic."

False-positive predictions of dangerousness also raise a problem. Wettstein [43] in 1988 ... ated, "Predictive reliability and accuracy remain poor, and significant numbers of false ... ositive predictions continue to be made." In a study by Kozol, Boucher, and Garofalo ... 1972 [44], it is reported that staff incorrectly predicted violence two times out of three. ... e study by Cohen, Groth, and Siegel in 1978 [45] showed, on the contrary, that 86% ... staff predictions were correct.

In addition, moral and political issues have been raised by the questionable prediction ... dangerous behavior. Von Hirsch aptly stated [46]. "Predictive restraint poses special ... ical problems. The fact that the person's liberty is at stake reduces the moral ac- ... ptability of mistakes of overprediction. Moreover, one may question whether it is ever ... t to punish someone more severely for what he is expected to do even if the prediction ... s accurate."

In the midst of such diversity of opinion, the California Supreme Court with *Tarasoff* ... in 1976, created a legal duty for mental health professionals to diagnose and predict ... gerousness [47]. Many experts have concluded that the prediction of dangerousness ... ore a sociolegal judgement and that dangerousness itself is neither a psychiatric nor ... edical diagnosis. The previously mentioned APA task force report [9] also stated, ... ome persons are at a comparatively higher risk for future violence than others." It is ... ly those "some persons" that one would like to detect and predict. Many authors ... e stated that it should be up to the judiciary to assume the responsibility for making ... a sociolegal determination. However, psychiatric or psychologic expert testimony ... ld certainly help the judiciary in reaching such a difficult responsible decision as the ... diction of dangerousness.

**...lections**

ne should not deduce the possibility for future dangerousness from an isolated, ... vidual trait, even though it may have the connotation of dangerousness. It should be ... embered that violent and dangerous acts are relatively infrequent, occur in rather ... cific interpersonal and situational contexts, may be state dependent (under the influ- ... e of alcohol or other drugs), and may not be representative of the individual's more ... al behavior. In favor of intuitive clinical judgement over actuarial predictions of ... nce is the statement by Meehl [48] that "clinical judgement may be the only feasible ... t-term prediction strategy especially in emergency situations."

he authors fully agree with the statement by Cohen, Groth and Siegel [45], "It is a ... lous, narrow path . . . to balance order and liberty properly . . . a socio-political and ... a clinical issue and this must be done by society's courts and legislature. The experts ... ld not attempt to usurp society's rights in resolving the conflict between safety and

liberty." However, the views of Morris and Miller [49] should not be disregarded
when they aptly state. "A merciful and just system of punishment presupposes le...
towards those who least threaten social injury; and this. in turn. inexorably inv...
predictions of dangerousness." Peszke's [50] concern with the welfare of the indi...
should also be kept in mind.

The psychiatry/psychology experts have psychiatric/psychological knowledge regard...
the individual assessed by them. Their participation as professionals in the forensic f...
and the very fact that they. themselves. are members of society should make the...
welcome and appreciated in such important and complex decisions. Even though ...
prediction of dangerousness is a difficult task. one can assume that the forensic ps...
artist's knowledge and experience can provide better expertise than those of Szaz...
common man.

The study by Cocozza, Melick, and Steadman [52] revealed that the higher rat...
violent crime committed by released mental patients can be accounted for primar...
those patients with a record. particularly an extensive record, of criminal activi...
predated their hospitalization. Nonetheless, the deinstitutionalization of the late...
accounts for a large group of misdemeanants who occasionally. under stress, may be...
violent offenders. Most of the violent offenders. however. are young, unmarried...
skilled, and prone to the use of drugs and alcohol [53].

The studies by Wolfgang [54] and by Petersilia, Greenwood. and Lavin [55]. p...
reasonable, accurate estimates further supporting the validity of clinical prediction...
violence. Petersilia. Greenwood. and Lavin [55] also state the following, "One thir...
the individuals predicted to be violent who were arrested for a violent crime are, in f...
the same people who are committing most of the unreported and unsolved violent a...
And even though there is no consensus regarding the relationship between mental diso...
and violent behavior. the recent study by Collins and Baily [56] reports that How...
1982. after reviewing relevant studies. concluded that "the link between depress...
serious violence. such as homicide. is the most widely accepted in clinical practic...
study by Bland and Orn [57] "found recurrent depression . . . an important fac...
family violence." On the other hand. Monahan's [16] statement, "Mental patien...
do not have a record of violent arrests are, if anything, less violent than the ...
population," should always be taken into consideration. The evaluation of futur...
gerous behavior. therefore, should be an integration of clinical psychiatric judg...
and legal assessment.

The following factors should be taken into consideration by the expert when as...
the probability of an individual's future violence: *Sociological and environment...
bles*—the age, sex, race. and employment status of both possible offenders and p...
victims; relationship between offender and victim; base rate for violent behavior; pr...
history of physical force to resolve conflicts; previous arrest records, in particul...
offenses against the person. including aggravated assault; exposure to violence...
family; lack of social competence; purchase of a gun; problems with authority fig...
distortion of relationships with men or women; availability of victims, availabili...
weapons, availability of drugs; drug and alcohol use; city dwelling; cultural and subc...
group; and climatic conditions. *Psychological variables*—unstable disposition, imp...
ity, and proneness to act out against others in a disruptive, destructive way; ...
emotional concern for others; aggressive fantasies and planning of vengeance...
inhibitions; deeply repressed hostile feelings; depression or dysthymia; delusion...
secution; previous institutionalization. either in a mental hospital or a prison; p...
threats to kill; loss of consensual view of reality; inability to cope with anger an...
impulses; acceptance or nonacceptance of guilt and personal responsibility fo...
acts committed or fantasized. *Biological and neurophysiological factors*—47-XY...
XXY chromosome; low IQ; head injury; electroencephalogram (EEG) abnor...
temporal lobe epilepsy; limbic ictus; tumors and neurophysiological dysfunction...
frontal lobe.

It is legitimate to presume that an individual whose psychiatric-legal history reveals several of the above personality traits or historical, genetic, or neurophysiological factors might, in all probability, and to a reasonable degree of medical certainty, have a higher propensity to act out in a violent way against others.

Perusal of the literature reveals that most of the factors listed above have already been described in the past by many authors [15,18,30,32,33,42,58–63]. Nonconsideration or downright dismissal of past observations and reflections deprives one of the benefits derived from history. Therefore, it would be advisable to search for the presence of the above factors in assessing the probability of dangerousness. We firmly agree with Thompson [64] that "race, in the absence of any other qualifying or confounding variable, may not be a predictive factor for future violence."

It is also legitimate to presume the possibility of future dangerousness in a person who committed a crime in circumstances that were not in all probability conducive to a criminal act. Monahan [15] recently stated, "We are talking of murder, rape, robbery, assault, and other forms of violent behavior. There is a widespread social consensus, which transcends political, racial, and economic groupings, that such activities tear at the already frayed social bonds holding society together. It seems to me that when we lend professional assistance, however marginal, to improve society's control of those who will murder, rape, rob, and assault—provided that we do not let the nature of that assistance be overstated or distorted—we have nothing for which to apologize."

As to expert testimony, the statement by Gerin [63] still holds true: "The psychiatrist does not have to make a legal evaluation of a defendant. That pertains to the magistrate. He or she, the forensic expert, must evaluate the psychopathology of the offender and, from his [or her] report must be complete, objective, and logically deductive, and, from symptoms to diagnosis, must be persued above and beyond theoretical, sociological, philosophical, or psychiatric views." Gerin's approach and the previously reported statement by Monahan [15] find, fortunately, a great deal of support in a large stratum of unknown, but reliable, forensic psychiatrists/psychologists and jurists. Obviously, objectivity and equanimity should be maintained.

## Conclusions and Suggestions

Such statements as "to predict that one is dangerous is safer . . . ," or "a person released as not dangerous can cause great harm" [41] summarize the quandary in which the most profound thinkers in these matters find themselves. In this regard, the psychiatrist/psychologist should be cautious not to overpredict dangerousness and should not confuse an increased risk of dangerousness with reasonable medical certainty that an individual will be dangerous. It is possible that the difficulty one encounters in assessing dangerousness is due not only to the many variables that must be assessed in order to reach an accurate prediction, but also to a climate of limited responsibility and relativism in present-day society. It is also possible that this societal trend has, at times, unconsciously influenced some experts—they, themselves, members of society—in generating reports which, although sufficiently supported by factual data, fail to express a clear opinion regarding the potential dangerousness of an individual they have examined. This may result in further doubts, in the eyes of the courts, regarding the credibility of the forensic expert's testimony, to the point of questioning the mental health professional's ability to contribute adequately in the prediction of violence. These doubts can be largely assuaged if psychiatrists and psychologists take care to substantiate their prognostications of dangerousness on the basis of the preponderance of credible scientific and clinical data available. Actually, the judicial system may tend, at times, to believe that psychiatrists/psychologists, often at variance among themselves, agree no more frequently than other health and criminal justice personnel in their assessment of dangerousness. To this effect, the institution of an appointed panel of experts—comprising an attorney, a psychiatrist or psychologist, a sociologist, and a violent crimes expert—who, together, would

**1442** JOURNAL OF FORENSIC SCIENCES

examine the supposedly dangerous individual, could probably bring about, through the sharing of responsibility, greater objectivity, better acceptance of their reports, and fewer recriminations.

The present-day social climate is disorderly and confusing and, at times, frightening. What has been thought of as the abdication by the judiciary of its responsibility in making legal decisions as to the future possible dangerousness of defendants should not alone create a reluctance in the forensic psychiatrist or psychologist to participate fully in an important multidisciplinary decision. They, even though limiting their role to providing an estimate of the probability of future violent behavior, would make, in so doing, their expertise not only a source of valid professional communication but also of humane interest. The attempt to predict dangerousness is necessary in order to keep our civilized world together and our daily living as secure as possible. The possibility of identifying individuals with some increased risk of dangerousness could be enhanced if the examiners, during the joint psychiatric, psychological, and legal assessment, would take into consideration the sociological, environmental, biological, and neurophysiological factors suggested above. The examiners should be cognizant of the fact that short-term prediction of dangerous behavior, although a difficult task, can probably be made with better accuracy than long-term prediction. Indeed, as far as long-term prediction of dangerousness is concerned, we are lacking, because of obvious ethical considerations, supportive scientific studies. Furthermore, it is to be assumed that no professionally competent and ethically bound forensic psychiatrist or psychologist would ever claim a level of absolute certainty and confidence in the determination of either short- or long-term future violent behavior. However, an attempt should always be made to better our expertise and to base it on a maximum of factual data and, if available, scientific evidence. In addition, proposals should be made in the case of seriously dangerous individuals for brief periods of detention in order to further observe their behavior. Such provisions clearly would have to be made within narrowly drawn guidelines to survive constitutional scrutiny. The law in some states already provides mechanisms for short-term detention of individuals where there is merely probable cause to believe that the offender is dangerous, provided, however, that within a short, limited period of time he or she is given a full evidentiary hearing as to the need for further detention. In some states, such as Wisconsin, these mechanisms are available in both civil and criminal law. Section (5) 969.035 of the Wisconsin Statutes [65] provides a procedure for preventative detention in cases of murder, sexual assault, or sexual assault of a child, or if there is a history of previous violent behavior. Preventative detention of allegedly violent persons also exists in the Federal Court system [66]. At the same time, a negligent and indifferent attitude towards this basic social issue should be condemned and avoided. Good professional expertise, coupled with awareness of the present-day social climate and common sense, should be at the basis of simple, clear, and logical forensic reports. And, without any doubt, experts' opinions, based on and supported by factual evidence, would establish a better and more realistic communication and cooperation with the courts, supporting Franco Ferracuti's statement [67], "The mental health system and the criminal justice system in any given country are interlocking and complementary parts of the same deviance control apparatus within a society that is trying to cope with and care for the various and changing groups of defendants."

## References

[1] Funk and Wagnall's Standard Desk Dictionary, Harper and Row, New York, 1985.
[2] Rappeport, J. R., Ed., The Clinical Evolution of the Dangerousness of the Mentally Ill, Charles C Thomas, Springfield, IL, 1967.
[3] Arizona Law Review, Vol. 13, 1971, p. 96.
[4] Crime in the United States: 1980 Uniform Crime Reports for the United States, Superintendent of Documents, U.S. Government Printing Office, Washington, DC, 1981.

[5] *Crime in the United States: 1988 Uniform Crime Reports for the United States*. Superintendent of Documents. U.S. Government Printing Office. Washington, DC, 1988.

[6] "Murder Rate Soars Higher Across U.S.," *The Milwaukee Journal*, 18 July 1990.

[7] Halleck, S., *Psychiatry and the Dilemma of Crime*, Harper and Row, New York, 1977.

[8] Diamond, B., "The Psychiatric Prediction of Dangerousness," *University of Pennsylvania Law Review*, Vol. 123, 1974, pp. 439–452.

[9] *APA Task Force Report 8: Clinical Aspects of the Violent Individual*, American Psychiatric Association, Washington, DC, 1974.

[10] "American Psychological Association Report of the Task Force on the Role of Psychology in the Criminal Justice System," *American Psychologist*, Vol. 33, 1978, pp. 1099–1113.

[11] Ennis, B. and Emery, R., *The Rights of the Mental Patients—An American Civil Liberties Union Handbook*, Avon, New York, 1978.

[12] Kahle, L. and Sales, B., "Due Process of Law and the Attitudes of Professionals Toward Involuntary Civil Commitment," *New Directions in Psycholegal Research*, P. Lipsitt and B. Sales, Eds., Von Nostrand Reinhold, New York, 1980.

[13] Szaz, T., *Law, Liberty and Psychiatry*, MacMillan, New York, 1963.

[14] Tanay, E., "Dangerousness and Psychiatry," *Current Concepts in Psychiatry*, Vol. 1, No. 1, Oct. 1975, pp. 17–26.

[15] Monahan, J., "The Prediction of Violent Behavior: Toward a Second Generation of Theory and Policy," *American Journal of Psychiatry*, Vol. 141, No. 1, Jan. 1984, pp. 10–15.

[16] Monahan, J., "The Clinical Prediction of Violent Behavior," *DHHS Publication*, No. [ADM] 81-921, U.S. Government Printing Office, Washington, DC, 1981.

[17] *Criminal Victimization in the United States*, Superintendent of Documents, U.S. Printing Office, Washington, DC, 1978.

[18] Bromberg, W., *Crime and the Mind*, MacMillan, New York, 1965.

[19] Becker, E., *The Denial of Death*, Free Press, New York, 1973.

[20] Menninger, K., *The Vital Balance*, Viking Press, New York, 1973.

[21] Binder, R. L. and McNiel, D. E., "Effects of Diagnosis and Context on Dangerousness," *American Journal of Psychiatry*, Vol. 145, No. 6, June 1988, pp. 728–732.

[22] Goldstein, R., "Brain Research and Violent Behavior," *Archives of Neurology*, Vol. 30, 1974, pp. 1–18.

[23] Starke, H. S., Monachesi, E., and Young, L., "Delinquency Rates and Personality," *Journal of Criminal Law, Criminology and Police Science*, Vol. 51, 1960, pp. 443–460.

[24] Tannenbaum, D., "Research Studies of Personality and Criminality," *Journal of Criminal Justice*, Vol. 5, 1977, pp 1–19.

[25] Hirschi, T. and Hindelang, M., "Intelligence and Delinquency: A Revisionist Review," *American Sociological Review*, Vol. 42, 1977, pp. 471–586.

[26] Moffit, T., Gabrielli, W., Mednick, S., and Schulsinger, F., "Socioeconomic Status, I.Q. and Delinquency," *Journal of Abnormal Psychology*, Vol. 90, 1981, pp. 152–156.

[27] Wolfgang, M., Figlio, R., and Sellin, T., *Delinquency in a Birth Cohort*, University of Chicago Press, Chicago, 1972.

[28] Wolfgang, M., "From Boy to Man—From Delinquency to Crime," *National Symposium on the Serious Juvenile Offender*, Minneapolis, MN, 1977.

[29] Wolfgang, M. and Ferracuti, F., *The Subculture of Violence*, Tavistock, London, 1967.

[30] Yesavage, J. A., Werner, P. D., Becker, J. M. T., and Mills, M. J., "Short Term Civil Commitment and the Violent Patient," *American Journal of Psychiatry*, Vol. 139, No. 9, Sept. 1982, pp. 1145–1149.

[31] Monahan, J., "Clinical Predictions of Violent Behavior," *Psychiatric Annals*, Vol. 12, No. 11, Nov. 1982, pp. 509–512.

[32] Ostrov, E., Offer, D., Marohn, R. C., and Rosenbein, T., "The Impulsivity Index: Its Application to Juvenile Delinquency," *Journal of Youth and Adolescence*, Vol. 1, No. 2, June 1982, pp. 179–196.

[33] Bidinotto, R. J., "Crime and Consequence: Part I. Criminal Responsibility," *Freeman*, Vol. 39, No. 7, July 1989, pp. 340–352.

[34] Tancredi, L. R. and Volkow, N., "Neural Substrates of Violent Behavior: Implications for Law and Public Policy," *International Journal of Law and Psychiatry*, Vol. 11, No. 1, Spring 1988, pp. 13–49.

[35] Adams, J. J., Reid, M., and Moritz, M. S., "Neuropsychological Deficits and Violent Behavior in Incarcerated Schizophrenics," *Journal of Nervous and Mental Disease*, Vol. 178, No. 4, 1990, pp. 253–256.

[36] Golden, C. J., Hammeck, T., and Purish, A., *A Manual for the Luria-Nebraska Neuropsychological Battery (Revised)*, Western Psychological Services, Los Angeles, 1980.

[37] Jarvie, H. F., "Frontal Lobe Wound Causing Disinhibition: A Study of Six Cases," *Journal of Neurologic Neurosurgical Psychiatry*, Vol. 17, 1954, pp. 14–32.

[38] Blumer, D. and Benson, D. F., "Personality Changes with Frontal and Temporal Lesions," *Psychiatric Aspects of Neurologic Disease*, in press.

[39] Grafman, J., Vance, S. C., Weingartner, H., et al. "The Effects of Lateralized Frontal Lesions on Mood Regulation," *Brain*, Vol. 109, 1986, pp. 1127–1148.

[40] Mattson, A. J. and Levin, H. S., "Frontal Lobe Dysfunction Following Closed Head Injury," *Journal of Nervous and Mental Disease*, Vol. 178, No. 5, 1990, pp. 282–291.

[41] Stone, A., *Mental Health and the Law: A System in Transition*, Superintendent of Documents, U.S. Government Printing Office, Washington, DC, 1975.

[42] Toch, H. H., *The Violent Man*, Aldine, Chicago, 1969.

[43] Wettstein, R. M., "The Prediction of Violent Behavior and the Duty to Protect Third Parties," *Behavioral Sciences and the Law*, Vol. 2, No. 3, Summer 1984, pp. 291–312.

[44] Kozol, H., Boucher, R., and Garofalo, R., "The Diagnosis and Treatment of Dangerousness," *Crime and Delinquency*, Vol. 18, No. 4, Oct. 1972, pp. 371–392.

[45] Cohen, M., Groth, A., and Siegel, R., "The Clinical Prediction of Dangerousness," *Crime and Delinquency*, Vol. 24, No. 1, Jan. 1978, pp. 28–39.

[46] von Hirsch, A., *Doing Justice: The Choice of Punishments*, Hill and Wang, New York, 1976.

[47] Applebaum, P. S., "*Tarasoff* and the Clinician: Problems in Fulfilling the Duty to Protect," *American Journal of Psychiatry*, Vol. 142, No. 4, April 1985, pp. 425–429.

[48] Meehl, P., *Psychodiagnosis: Selected Papers*, University of Minnesota Press, Minneapolis, MN, 1973.

[49] Morris, N. and Miller, M., "Crime and Justice," *Annual Review of Research*, M. Tonry and N. Morris, Eds., University of Chicago Press, Chicago, 1985, pp. 1–49.

[50] Peszke, M., "Is Dangerousness an Issue for Physicians in Emergency Commitment?" *American Journal of Psychiatry*, Vol. 132, 1975, pp. 825–828.

[51] Szaz, T., *Law, Liberty and Psychiatry*, MacMillan, New York, 1963.

[52] Cocozza, J., Melick, M., and Steadman, H., "Trends in Violent Crime Among Ex-Mental Patients," *Criminology*, Vol. 16, 1978, pp. 317–334.

[53] Palermo, G. B., Smith, M., and Liska, F., "Jails Versus Mental Hospitals—A Social Dilemma," *International Journal of Offender Therapy and Comparative Criminology*, Vol. 35, No. 2, Summer 1991.

[54] Wolfgang, M., "An Overview of Research into Violent Behavior," Testimony before the U.S. House of Representatives Committee on Science and Technology, 1978.

[55] Petersilia, J., Greenwood, P., and Lavin, M., *Criminal Careers of Habitual Felons*, Rand, Santa Monica, CA, 1977.

[56] Collins, J. J. and Bailey, S. L., "Relationship of Mood Disorder to Violence," *Journal of Nervous and Mental Disease*, Vol. 178, No. 1, 1990, pp. 44–47.

[57] Bland, R. and Orn, H., "Family Violence and Psychiatric Disorder," *Canadian Journal of Psychiatry*, Vol. 31, 1986, pp. 129–137.

[58] Siegel, L. J., "L.A.J. Quetelet," *Criminology*, West Publishing Co., St. Paul, MN, 1986, pp. 187–188.

[59] Wolfgang, M. E., *Patterns in Criminal Homicide*, University of Pennsylvania Press, Philadelphia, PA, 1958.

[60] Macdonald, J. M., *The Murderer and His Victim*, Charles C Thomas, Springfield, IL, 1961.

[61] Shah, S. and Roth, L., "Biological and Psychophysiological Factors in Criminality," *Handbook of Criminology*, D. Glaser, Ed., Rand-McNally College Publishing Co., Chicago, 1974, pp. 125–144.

[62] Guttmacher, M. S., *The Mind of the Murderer*, Farrar, Straus, and Cudahy, New York, 1960.

[63] Gerin, C., *Medicina Legale e delle Assicurazioni III*, Schirri, Rome, 1950.

[64] Thompson, P. M., "Predicting Violence," Letters to the Editor, *Psychiatric News*, Vol. 25, No. 16, 1990.

[65] Sec. 969.035 Wis. Stats.

[66] TITLE 18 U.S.C. §3141 et seq.

[67] Ferracuti, F., "Secretariat Memorandum," *Seventh Criminological Colloquium*, Strasbourg, France, 1986.

Address requests for reprints or additional information to
George B. Palermo, M.D.
925 East Wells
Milwaukee, WI 53202

1           DEFENSE EXHIBIT J
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# The Clinical Prediction
# of Dangerousness

DEFENDANT'S
EXHIBIT
PENCAD-Bayonne, N. J.



Murray L. Cohen

A. Nicholas Groth

Richard Siegel



Laws committing dangerous sexual offenders indefinitely are
only insofar as "dangerousness" can be predicted and treated.
has relied on the clinician to identify and measure the crucial ve
violent behavior and assign a probability of occurrence. Yet mc
studies have concluded that not only has predictive accuracy
demonstrated but also that such accuracy cannot be achieved.
that any conclusion at this time is premature. There are data indi
soundness of clinical as opposed to statistical prediction of d
ness. Both approaches show high false positive error rates, bu
provement in accuracy of clinical studies over statistical studies
denied.
    In examining the success of treatment, the authors present .
cating that a program of psychological rehabilitation can have a
effect on the majority of dangerous sexual offenders.
    The authors conclude that the indefinite commitment of c
offenders is legitimate and appropriate, but the policy carries wit
responsibilities. Enforcing such an approach means that the clini
play an important role in his relationship to the court.

## INDETERMINATE CIVIL COMMITMENT STATUTES

In 1958, the Massachusetts legislature enacted a statute which led to t
lishment of the Center for the Diagnosis and Treatment of Sexually
ous Persons. This statute provides for the indefinite civil commitmer
sons who have been convicted of any one of a number of sexual offer
civil commitment is in lieu of or in addition to a criminal sentence a
posed on those offenders found by the court to be persons ".
misconduct in sexual matters indicates a general lack of powers
trol . . . sexual impulses . . . and who as a result [are] likely to attack or
inflict injury on the objects of [their] uncontrolled or uncontrollable d

MURRAY L. COHEN is Professor, Department of Psychology, Chairman o
Community Psychology Program, Boston University. A. NICHOLAS GROTH i
Forensic Mental Health Department, Harrington Memorial Hospital, Southbrid
chusetts. RICHARD SIEGEL is Assistant Professor, Department of Psychology, Ur
Lowell, Lowell, Massachusetts.

This article is based on papers presented to the American Psychological Association
the American Correctional Association (1975).

1. Mass. Ann. Laws Ch. 123A § 1 (Supp. 1965).

The judicial reasoning for such a statute, which exists not only in Massachusetts but in more than twenty other states as well, is that there are offenders whose dangerous potential would not be substantially diminished by imprisonment through criminal law. The purpose of indefinite commitment to a mental health facility is to make available psychological services within the confines of a maximum security setting.

As Paul Tappan pointed out over twenty years ago, indefinite commitment laws are morally and legally legitimate only if we can accurately determine those persons to whom such laws should apply, and only if we can treat effectively the condition for which the commitment is imposed.[1]

Our experience in implementing the Massachusetts law involved the evaluation of over 1,000 sexual offenders and the treatment of approximately 300 of those offenders. We attempted to evaluate the accuracy of our predictions and the effectiveness of our treatment. This paper reports some of our experiences and describes various issues pertaining to the clinical prediction of dangerousness: the role of the clinician in the judicial process, the problems of treatment of sexual offenders, and society's alternatives in the disposition and treatment of dangerous offenders.

## DANGEROUSNESS: A MEDICO-LEGAL DIAGNOSIS

A dangerous person may be defined as having a high probability of inflicting serious bodily injury on another. Clearly, this is not a diagnosis of the person's past behavior or current state but a predictive statement of future behavior. In recent years, a series of federal court decisions have emphasized the importance of the factors involved in this predictive statement, specifically in regard to the sexual offender classified as dangerous. The courts maintain that past misconduct alone is not a sufficient basis for the label "dangerous" and does not justify indefinite incarceration. They argue that if past misconduct were the only issue, then punishment through the sanctions of criminal law would be the proper response.[2]

The courts have also held that a psychological disorder alone is not sufficient for commitment, even though the psychologically disordered individual might be in need of treatment. Only if the sexual offender is judged likely to repeat his crime, with a substantial risk of harm to the victim, is indefinite commitment as a form of preventive detention permissible. The court's determination has depended, in such cases, largely on the professional opinion of the clinician, most often a psychiatrist.

If we assume that the clinical process has something to contribute to determining dangerousness, we must ask what the clinician or behavioral scientist

2 Paul W. Tappan, "Some Myths about the Sex Offender," *Federal Probation*, June 1955, pp.
7-12.

3 See, for example, Millard v. Harris, 406 F. 2d 964 (1968).

knows about certain factors related to the violent act: the nature of the aggressive impulse; the stimuli which elicit aggressive behavior; the release or discharge factors in such behavior; the management of appropriate, as opposed to violent, aggression; and the interrelation of other motivational factors with aggression. To determine precisely the probability of a violent act, one must understand these and still other factors. However, the knowledge required to make such a prediction simply does not exist at present.

## SYSTEMATIC STUDY OF CLINICAL PREDICTION

During the past decade, the ability of the clinician to predict dangerousness has been seriously questioned by social scientists, judges, lawyers, and the clinicians themselves.[4] Their inquiry has been systematic, vehement, at times even irrational. Critical studies generally conclude that neither statistical nor clinical prediction of dangerousness has been demonstrated. Further, some have decided that not only has predictive accuracy not been demonstrated but also that such accuracy cannot possibly be achieved.

We argue, however, that any conclusion is premature at this point. There are, in fact, some data to indicate the soundness of the clinical prediction of dangerousness, and we see no comparable alternative to clinical evaluation.

## CLINICAL EVALUATION PROCEDURE

In evaluating an offender, the clinician bases his or her prediction on an extended period of study, makes use of a variety of professional personnel, and

4. See, for example, the following American studies: G. H. Morris, "Criminality and the Right to Treatment," *University of Chicago Law Review*, vol. 36 (1969), pp. 784ff.; D. L. Bazelon, "Introduction," in *The Right to Treatment: A Symposium*, Donald S. Burris, ed. (New York: Springer, 1969); A. M. Dershowitz, "The Law of Dangerousness: Some Fictions about Predictions," *Journal of Legal Education*, vol. 23, no. 1 (1971), pp. 24–47; Seymour L. Halleck, *Psychiatry and the Dilemmas of Crime—A Study of Causes, Punishment and Treatment* (New York: Harper and Row, 1967); Thomas S. Szasz, *Law, Liberty, and Psychiatry* (New York: Macmillan, 1963); H. J. Steadman, "Some Evidence on the Inadequacy of the Concept and Determination of Dangerousness in Law and Psychiatry," *Journal of Psychiatry and Law*, Winter 1973, pp. 409–61; J. Monahan, "The Prevention of Viole·ce," in *Community Mental Health and the Criminal Justice System*, J. Monahan, ed. (New York: Pergamon, 1976); E. Megargee, "The Prediction of Violence with Psychological Tests," in *The Control of Aggression and Violence: Cognitive and Physiological Factors*, Jerome L. Singer, ed. (New York: Academic Press, 1971); Ernst A. Wenk, James O. Robison, and Gerald W. Smith, "Can Violence Be Predicted?" *Crime and Delinquency*, October 1972, pp. 393–402; B. J. Ennis, "Civil Liberties and Mental Illness," *Criminal Law Bulletin*, March 1971, pp. 101–27; Nicholas N. Kittrie, *The Right to Be Different: Deviance and Enforced Therapy* (Baltimore, Md.: Johns Hopkins Press, 1971); and B. Rubin, "The Prediction of Dangerousness in Mentally Ill Criminals," *Archives of General Psychiatry*, September 1972, pp. 397–407. Reports from abroad include: (The Netherlands) H. Roosenburg, "Discussant"; (Denmark) Georg K. Sturup, "Will This Man Be Dangerous?" and (England) P. G. McGrath, "Custody and Release of Dangerous Offenders," in *The Mentally Abnormal Offender*, A. V. S. deReuck and R. Portes, eds. (Boston: Little, Brown, 1968).

consults diverse clinical, behavioral, and social sources of data. Typically, this involves a minimum of a sixty-day study period. The clinician examines the offender's emotional, behavioral, and psychological development through a detailed study of his social, sexual, educational, and vocational history; his medical and psychological records; and his history of criminality. Sources for these data are clinical interviews, psychological tests, official records and transcripts, family interviews, behavioral reports of the offender's adjustment during the observation period, field investigations, and, when relevant, interviews with the victim. Only after completing this process is a predictive decision made.

It is important to note that we refer only to a *convicted* offender, someone who has already committed at least one dangerous act. The clinician must view this act in terms of the offender's developmental history, the social-environmental context of this development, the environmental context of the offense, the current psychological and emotional life of the offender, and the social-environmental features of the world the offender would reenter if not committed. The clinician must then ask himself several questions. How probable is it that this person will exhibit behaviors physically harmful to another? Under what environmental conditions are these behaviors most likely to occur? What is the likelihood that these environmental conditions will prevail? Internal factors—motivation, attitudes, values—and external factors—early family experiences and social development, current life stresses—become crucial.

History has shown that persons who have lived moral and ethical lives may, under certain circumstances such as war, exhibit violent and primitive behavior; in countries where there is political, social, and economic turmoil, acts of violence increase; in certain parts of society where life stresses are high and personal gratifications low, there is a relatively high incidence of violence. Marvin Wolfgang and Franco Ferracuti have demonstrated the existence of subcultures of violence which may be attributed, at least in part, to the breakdown of the family, to widespread social and economic decay, and to pervasive asocial or antisocial values and attitudes.[5]

However, there are also persons involved in a life-long history of violent behavior whose environment has been benign and who have suffered no apparent stresses on survival nor any special precipitating events. Here, the factors relating to the violence appear to be internal. Here, the motivational life of the offender—regardless of social, political, and economic factors—is crucial.

## CLINICAL CASE STUDY

The authors studied a young man who had been convicted of a very brutal sexual assault on a teenage girl. It was apparent to us and to him that the

5. Marvin E. Wolfgang and Franco Ferracuti, *The Subculture of Violence—Towards an Integrated Theory in Criminology,* tr. from the Italian (London: Tavistock Publications, 1967).

32                                                M. L. Cohen, A. N. Groth, R. Siegel

degree of aggression and violence were far beyond what had been necessary to force her to submit sexually; in fact, the rape itself was not essentially a sexual act but an act of violence. This offender came from a stable, middle-class family. Although he had never been convicted previously for a criminal act, he did have a history of difficulty with women marked frequently by physical assault. He viewed women as either saints or sinners and could become involved only with the sinners—those who were promiscuous and felt no commitment to a relationship. When left by these women, as he was each time, his reactions varied: Sometimes he would simply seek out someone else; at other times, however, he would become irritated by other women and would quarrel with them at work, while driving, or in bars.

The pattern in this man's character was clear: He saw the majority of women as whores; he established relationships that were doomed to fail; and he displaced his felt anger onto other women. On the day of his vicious assault, he saw a girl, whom he had worshipped from a distance as a "saint," necking with a boy on her front porch. A short time later, he followed another young girl as she walked home, then he kidnapped, assaulted, and raped her.

It seemed apparent that unless something intervened in this destructive pattern of life, an even more serious assault or a murder might occur. The young man met one set of our criteria of sexual dangerousness: basic feelings of anger toward women, a relative lack of control over the acting out of such feelings, and a tendency to place himself in situations where such feelings were activated. Rather than imposing the standard five-to-ten-year criminal sentence, the court committed the offender, upon our recommendation, to the Treatment Center for an indeterminate sentence of one day to life. After two and one-half years of in-patient treatment he was released and continued in out-patient treatment. Although he experienced some difficulties following release, he has now made a successful adjustment and has lived for over ten years in the community. Two clinical evaluations were made regarding this offender: He was judged "dangerous" at the time of commitment, and "nondangerous" at the time of release.

## PREDICTION STUDIES: A CRITIQUE

These preliminary considerations are essential to understand the focus of the following observations and comments on the predictive studies.

1. The first major criticism concerns the sample of persons for whom the prediction is made. In Henry Steadman's preliminary study for the "Baxstrom" research, he notes that 42 percent of the men evaluated as "dangerous" had never committed a known violent act.[6] Ernst Wenk, James Robison, and Gerald Smith studied subgroups of men who had committed

6. H. J. Steadman. "Follow-up on Baxstrom Patients' Return to Hospitals for the Criminally Insane," *American Journal of Psychiatry*, March 1973, pp. 317–19.

Case 4:14-cv-03152 Document 38-58 Filed on 09/01/16 in TXSD Page 172 of 265

violent acts, but it is not clear whether these were the same subgroups for whom someone would have predicted future violence.[7]

Our own experience in prediction, which we will report later in this paper, is based on a sample of persons who already have a conviction for *at least* one sexual assault. In fact, 73 percent of those committed to the Massachusetts Treatment Center had two or more convictions for sexual offenses before our predictions were made. Past conduct alone is not a sufficient predictor of future behavior: 60 percent of those whom we predicted to be *not* dangerous also had two or more convictions. However, to predict an act that has never occurred in an individual's history is an unwarranted test of clinical prediction. Yet many of the negative statistical studies in the literature are based on just such a test.

The Massachusetts statute regarding dangerous sexual offenders requires at least one conviction before commitment. Other comparable state statutes have no such requirement. The position that dangerousness cannot and should not be predicted when there has been no prior dangerous act has our complete support.

2. The second issue in question is the interval between the time of prediction and the time when the individual may be released in the community. Two problems must be considered: First, where does the offender reside during the interval—in a hospital, in a prison, or in some other controlled and structured setting? And second, if he is returned to the community, have significant internal changes or changes within the community environment occurred so that a prediction may well be revised? Our data from the Treatment Center demonstrate that recidivism rates for released patients are significantly related to the amount of postrelease support and control maintained for each released patient.

Wenk, Robison, and Smith reported a fifteen-month follow-up of offenders. This is a considerable period, but it is unclear whether the follow-up brought the releasees to the end of their parole supervision period. An earlier study by Leon Shapiro, Murray Cohen, and William Budgen found that many parolees did not participate in crime while under parole supervision, but they began to get into difficulty when their parole period ended.[8]

3. Clearly, the accuracy of predictive equations is contingent on the predictors' relevancy to the criterion. Predictor variables in the clinical studies have shown a woeful lack of specification, and relevancy in the statistical studies has too often been open to serious question. How many statistical studies include the environmental variable contained in the reentry situation? Clinical data show clearly that a person evaluated as high risk based on prerelease data may well be a false positive error if environmental factors are not included in

7. Wenk et al., "Can Violence Be Predicted?"

8. Leon N. Shapiro, Murray Cohen, and William Bugden, "Parole Violation and the Early Development of Internal Controls," *Archives of Criminal Psychodynamics*, Spring 1959, pp. 354–59.

34                                          M. L. Cohen, A. N. Groth, R. Siegel

the prediction. If the released offender enters a stable, supportive home in a concerned community, and undertakes a self-selected job that provides financial support and personal gratification, his high risk evaluation may be inaccurate.

4. In the study by Wenk, Robison, and Smith, it appears that the research personnel extracted various clinical data from each offender's history and inserted them into a statistical equation to generate a prediction. Clinical data are no different from other kinds of data. Their meaning is lost when taken out of context.

5. Both Steadman's "Baxstrom" report and a study by McGarry[9] presented data on criminal arrests for persons released by court order who had previously been confined in mental hospitals. Two flaws are readily apparent. First, release decisions were not clinical predictions at all but were based purely on technical legal considerations. Second, these patients had been committed on grounds of incompetence or criminal insanity, commitments which are only indirectly and implicitly based on a prediction of dangerousness.

That clinicians have not yet developed expertise in regard to behavioral prediction is, in our opinion, true. That dangerousness cannot be predicted by professionals trained only in diagnosis and treatment—not in prediction—is a conclusion that simply confuses a difficult enough problem. Clinical prediction of dangerousness is possible. Two important studies show findings significantly different from those in the statistical reports. Both generate their predictions from extensive clinical material, and in both cases the predictions themselves are made by clinicians. These studies have received widespread attention; we will discuss their findings briefly.

## CLINICAL PREDICTION STUDIES

In 1972, Kozol, Boucher, and Garofalo reported on a study conducted by (but not credited to) Cohen, Petrelli, and Boucher on 335 sexual offenders, a sample of the total group sent for diagnostic evaluation under the Massachusetts law.[10] Of this sample, 304 were found not to be sexually dangerous and were so recommended to the court. They were given either probation or a criminal sentence. The remaining 31 men were found by the clinical staff to be sexually dangerous, but the court did not accept the recommendation; instead of incarcerating the offenders under a civil commitment, the court disposed of the cases by criminal law procedures. All these offenders were then followed up for a five-year period, beginning with their release to the community. Of the former group, those found to be nondangerous, 8.6 percent committed a new

9. A. Louis McGarry, "The Fate of Psychotic Offenders Returned for Trial," *American Journal of Psychiatry*, March 1971, pp. 1181–84.

10. H. L. Kozol, R. J. Boucher, and R. F. Garofalo, "The Diagnosis and Treatment of Dangerousness," *Crime and Delinquency*, October 1972, pp. 371–92.

sexual offense. Of the latter group, those diagnosed as dangerous, 38.7 percent committed a new sexual offense.

A similar study by Hodges, based on the Patuxent Center in Maryland, followed up 447 "defective delinquent" (dangerous) offenders for three years.[11] Hodges found that 81 percent of those recommended by the clinical staff for incarceration who were not incarcerated by the court (the "untreated" group) committed another offense, although this was not necessarily a violent crime. Of those committed to the Patuxent Center but later released against staff recommendation (the "partially treated" group), 71 percent committed a new crime. Only 37 percent of those committed and later released on the staff's recommendation (the "fully treated" group) were arrested for a new crime.

These studies predicted not only dangerousness but also nondangerousness; the total accuracy of prediction was 88 percent in the Massachusetts Treatment Center study and 60 percent in the Patuxent study.

What is most important about these findings, however, is not the specific values of the error rate. Rather, these are the only two studies which could truly be called clinical-predictive, and they show considerable improvement over the statistical studies in both false positive and false negative error rates. The two studies demonstrate, we believe, that a conclusion about our capability of predicting dangerousness is premature.

Prediction is but one question raised in discussions of preventive detention. A second question pertains to the psychological treatment program, such as that at the Massachusetts Treatment Center. Is treatment ineffective, since the violent offender is untreatable, or is it unnecessary, since the rehabilitative services of a progressive prison system are more than adequate?

## TREATABILITY OF DANGEROUS SEX OFFENDERS

The authors conclude, after nearly twenty years of experience, that about 15 percent of dangerous sexual offenders do not appear responsive to any treatment procedures currently available. Treatment for another, somewhat larger, group—about 20 to 25 percent—has a modest effect; it reduces dangerousness but does not alter significantly a maladaptive lifestyle. For the remainder of offenders—over 60 percent—a total treatment effort of individual and group psychotherapy, socialization experiences, occupational and recreational therapy, prerelease planning and postrelease treatment and supportive care has a profound effect on their lives and on successful societal adaptation.

Petrelli collected data which show partial support of these conclusions.[12]

11. Emory F. Hodges, "Crime Prevention by the Indeterminate Sentence Law," *American Journal of Psychiatry*, September 1971, pp. 291–95.

12. Personal communication, 1975.

From 1958 to 1974, 160 offenders were treated and released from the Massachusetts Treatment Center. Of this group, 131 were released on the recommendation of the clinical staff and 29 were released by judicial process, before the staff felt that treatment was completed. The follow-up periods were, of course, different, ranging from seven months to fourteen years. Of the group that completed treatment, 14 percent committed a new violent offense; 31 percent of the incompleted-treatment group committed a new violent offense. If we compare these figures with the study in which 38.7 percent of those not incarcerated but evaluated as dangerous committed a new offense, we see that dangerousness may be reduced by treatment. Dangerousness has been reduced by over 24 percent for the recommended group and by over 7 percent for the nonrecommended group.

These data test not only the effectiveness of treatment but also the reevaluation of men previously considered dangerous.

## CLINICAL CRITERIA FOR DIAGNOSING DANGEROUSNESS

Admittedly, there is no scientifically confirmed set of predictor variables, nor do we have precise techniques for evaluating change. However, certain important factors enter into our consideration of commitment and subsequent release. The offender described earlier showed the following characteristics:

1. He was convicted for an explosive, violent sexual assault.
2. He had a history of difficulties with women.
3. He overidealized some women and experienced a fear of, and contempt for, others. The psychological pain produced by an experience with an idealized woman resulted in feelings of anger being displaced onto other women.
4. He displayed a supernormal posture of self-confidence, thinly veiling a sense of worthlessness, inadequacy, and helplessness. Aggression served as a means of reestablishing a sense of well-being; thus, aggressive behavior was high on the response hierarchy and there was little ability to control its expression.
5. He did not perceive his active role in putting himself in situations with women which could have no consequence other than his feeling used and hurt. His experience was that he was a helpless victim.
6. He had no real, intimate attachments to either men or women; as part of this isolation, the emotional qualities of compassion, love, warmth, empathy, and trust were noticeably absent.
7. His general mood was dysphoric, characterized by a dull depression; at times, the depression would become acute and lead to a sense of panic and overwhelming feelings of hopelessness. Once again, aggression was his characteristic way of fending off the distress of depression.

8. He was a steady and good worker, but he refused to accept a promotion with its attendant increase in responsibility. Although errors or mistakes at work caused him great discomfort, he received no particular pleasure from good work or accomplishments.

9. In general, his perception, attention, reasoning, and judgment were relatively intact, but serious impairment in these basic perceptual-cognitive functions would occur under stress.

With the exception of this offender's difficulties with women, he exhibited no other criminal or antisocial behavior. Sexual offenders may share many characteristics of other social offenders, but the differences between these offenders are significant. The man who sexually molests a child and the man who sexually assaults or sadistically murders a woman are psychologically disordered persons; their acts are best understood as equivalent to symptoms. Social, cultural, economic, and political factors are far less important than in the case of the nonsexual social offender.

Indefinite commitment of sexual offenders, based on an evaluation of dangerousness and requiring treatment, is legitimate and appropriate, yet such a policy imposes a heavy responsibility on clinicians, judges, lawyers, correctional personnel, and legislators. Individuals committed under these statutes are faced with the possibility of lifetime confinement.

## THE ROLE OF THE CLINICIAN IN THE CRIMINAL JUSTICE SYSTEM

Under the sexual psychopath statutes, the clinician functions as an expert whose role is to advise the court about a person's potential for sexual violence. In fulfilling this responsibility, the clinician is bound by certain requirements of law.

The first requirement is that any prediction of dangerousness must be based on a substantial and demonstrable likelihood of future sexual misconduct. The clinician must clearly articulate the predictive factors.

Second, the courts have interpreted the sexual psychopath statutes as applying only to those whose future sexual misconduct entails a significant risk of truly dangerous behavior, posing a threat of serious injury to the victim. It is not the court's or the clinician's function to eliminate from society all sexual deviants. Only the potential for sexual violence justifies extreme action.

Third, in defining the task of the clinician as expert witness, the courts have held that the clinician must submit not only his informed opinion but the basis for that opinion as well.

Fourth, the ultimate determination of dangerousness is made by the court, not the clinician, and to make this determination the court must have access to all pertinent information. Monahan, in testimony before the California

Assembly, called attention to the fact that courts too often simply rubber stamp the opinion of the psychiatrist or the psychologist.[13] Such rubber-stamping occurs when the clinician assumes too much responsibility and the court too little. But it is with the judiciary and the legislature that responsibility must rest.

Fifth, in discharging this responsibility, the psychiatrist is not the only expert consulted; the courts must be open to a wide range of data presented by other behavioral scientists as well.

Sixth, there must be a constant and intensive effort devoted to the treatment of patients committed under sexual psychopath statutes. In recent years the courts have begun to rule that treatment is the *quid pro quo* of involuntary commitment, and that the absence of treatment would render commitment punitive to an excessive degree and therefore unconstitutional. Furthermore, the Supreme Court has recently argued that where adequacy of treatment is involved, the issue becomes subject to court review and thus is no longer the private domain of the clinicians.[14] The courts have already acted in several cases to establish and enforce standards for psychiatric treatment.[15]

Seventh, every procedural safeguard must be included to ensure that the individual's rights are respected. As clinicians, we aim to heal the pain and suffering of our patients. However, we must also realize that these patients may view their commitment as punishment, differing from imprisonment only in that the patients are denied certain knowledge of when—or even if—they will be released.

A number of our patients sought commitment because they felt themselves to be in need of treatment. Others accepted commitment because of their fear of prison and the sex offenders' status in the social hierarchy. Nevertheless, most patients were committed involuntarily; the number of legal challenges brought by these individuals indicates that many may feel less than grateful for our efforts to help them. All too often in the past, commitment laws have been abused by the wholesale confinement of large numbers of social undesirables. To avoid such abuse, certain safeguards must be guaranteed the individual: He must be given a full and impartial hearing to decide on his commitment; he should be presumed not dangerous unless proved otherwise; his status and the adequacy of his treatment should be periodically reviewed by outside agents of the court; and he must be confined only in a facility that meets reasonable standards of decency and human dignity.

Eighth, psychotherapy is obviously only one procedure for change. Clinical, social, and rehabilitative services must be available. Institution-

13. Monahan, "The Prevention of Violence."
14. O'Connor v. Donaldson, 95 S.Ct.2486 (1975).
15. See, for example, Wyatt v. Stickney, 344 F. Supp. 373 (1972).

Case 4:14-cv-03152  Document 38-58  Filed on 09/01/16 in TXSD  Page 178 of 265

alization typically brings experiences and attitudes that are counter-productive to healthy change, such as loss of dignity, dependency, forced compliance, apathy, and cynicism. Mental health and correctional personnel must work as a treatment team to overcome these negative factors.

It is a perilous, narrow path between the requirements of social order and the expression of individual freedom. To balance order and liberty properly is a sociopolitical, not a clinical, issue, and this must be done by society's courts and legislatures. The clinician should neither be given nor attempt to usurp society's right to determine the risks it is willing to take in resolving the conflict between safety and liberty.

1                    DEFENSE EXHIBIT 1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



DEFENDANT'S
EXHIBIT

1

DEFENSE EXHIBIT 2

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



DEFENDANT'S
EXHIBIT
2

1               DEFENSE EXHIBIT 3

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



DEFENDANT'S
EXHIBIT
3

PENGAD-Bayonne, N. J.

1                        DEFENSE EXHIBIT 6

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                          DEFENSE EXHIBIT 7

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                          DEFENSE EXHIBIT 8
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



1                        DEFENSE EXHIBIT 9
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



1               DEFENSE EXHIBIT 10
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



D-10

DEFENSE EXHIBIT 11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25





1                    DEFENSE EXHIBIT 12
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



P-12

1                    DEFENSE EXHIBIT 13
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



P-13

1          DEFENSE EXHIBIT 14

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



C-14

1                   DEFENSE EXHIBIT 15

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                    DEFENSE EXHIBIT 16

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                 DEFENSE EXHIBIT 29

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



PATIENT'S NAME:  **RHOADES, RICK ALLAN**  DATE:  09-15-92

AGE:  28 YEARS                    DOCTOR:  DR. ALAN C. TAYLOR

QUANTITATIVE EEG:

SUMMARY OF RESULTS:

   I.  CONVENTIONAL EEG:  is within the range of normal variation.

   II.  QEEG:  The quantitative (computerized) EEG showed a total power asymmetry between temporal leads, activity appearing higher in voltage on the right side.  This is particularly marked in anterior temporal leads.

The patient's EEG data were subjected to neurometric analysis with discriminant functions.

Discriminant functions provide a quantitative estimate of the similarity between a patient's profile and characteristic patterns found during extensive research on groups of patients with various disorders.

This classification is a multivariate statistical summary of a neurometric evaluation and serves only as an adjunct to other clinical evaluations.

The patient's discriminant scores suggested the presence of a major affective disorder (P < 0.10) of the bipolar subtype (P < 0.10).

RICK ALLAN RHOADES

Evoked responses were also obtained on this patient. These included:

I.  Pattern Visual Evoked Responses: borderline normal on right side, abnormal on left side because of delay in P100 response.

II.  Upper Somatosensory Evoked Potentials: normal.

III.  Lower Somatosensory Evoked Potentials: normal.

IV.  Auditory Brainstem Responses: normal.

V.  Long Latency Cognitive Evoked Auditory Responses (P300): normal.

A complete technical summary underlying these results with samples of neurophysiologic data is included within this portfolio.

TECHNICAL DESCRIPTION AND FINDINGS:

I.  CONVENTIONAL EEG

TECHNICAL SUMMARY: This 21-channel recording is of satisfactory technical quality. There is EKG and electrical artifact which arises intermittently during the recording. Posterior dominant 9-10Hz alpha activity, of persistent quantity, rhythmic character, of 40-60uv amplitude when recorded with reference to the ipsilateral ear. This is slightly higher in voltage on the right side, particularly in anterior leads. Generalized 6-7Hz activity of 10-20uv amplitude when recorded with reference to the ipsilateral ear in anterior leads.

Hyperventilation was not performed.

RESULTS: Findings are within the range of normal variation.

II.  QUANTITATIVE EEG (QEEG)

A 20-minute recording was performed on a Cadwell Spectrum 32 Quantitative Electroencephalogram. All electrodes of the International 10-20 System were used and in addition electrodes FPZ, OZ and one eye lead which was placed laterally and inferiorly to the right eye. All electrodes were referred to linked ears (A1 + A2). The sensitivity setting as 7uv per millimeter. The high frequency filter was set at 70Hz and the low frequency at 0.53Hz. 60Hz notch filters were also employed. A 50uv square wave calibration signal was generated and recorded. Furthermore, biocalibration employing an FZ-PZ derivation in all channels was recorded prior to and after the test. The patient was recorded with eyes closed, awake and alert but relaxed. Data was recorded on an optical laser disk. Automatic artifact rejection algorithms were employed as well as visual inspection by a board certified EEG

RICK ALLAN RHOADES

technologist and physician.  The tracing was also written on paper
for more thorough visual inspection.  Following data collection
epoch selection was performed offline.  A minimum of 24 epochs of
2.5 seconds each and a maximum of 48 epochs of similar duration
were obtained for analysis.  Both monopolar and bipolar derivations
were selected for analysis.

RESULTS:  shows a total power asymmetry between temporal leads,
particularly anteriorly (Z total power asymmetry F7T3 vs
F8T4 = -3.10).  This gives rise to a total power asymmetry in
anterior leads in multivariate Z scores measures (Z total power
asymmetry anterior = 2.08) and an overall anterior abnormality Z
score = 2.31.

The patient's EEG data were subjected to neurometric analysis with
discriminant functions and his discriminant scores suggested the
presence of a major affective disorder (P < 0.10) of the bipolar
subtype (P < 0.10).

The features making the highest contribution to the discriminant
decisions were:

Major Affective Disorder Statement:
   - Bipolar Coherence Combined Anterior
   - Bipolar Asymmetry Combined Anterior

Bipolar Statement:
   - Bipolar Relative Alpha T4/T6
   - Bipolar Asymmetry Total T3F7/T4F8
   - Monopolar Relative Beta Fz.

Preliminary studies by Dr. Stephen Suffin in collaboration with
Cadwell Laboratories suggest that patients showing this neurometric
profile respond best to a medication regimen of Amitriptyline and
Lithium.

III.  PATTERN EVOKED VISUAL POTENTIAL (PRVEP)

Recordings were obtained on a 21-channel montage with linked ear
references.  Sensitivity was 10uv per division.  The high frequency
filter was set at 70Hz and the low frequency filter was at 1.0Hz.
Visual stimuli were presented by a light emitting diode (LED)
checkerboard with red and black alternating at a repetition rate of
2.11 pattern reversals per second.  The LED was held approximately
18 inches from the patient's eyes.  It consisted of 36 1/2 inch
squares;  both monocular and binocular stimulations were performed.
Approximately 150 flashes were averaged.

RESULTS:  P100 OS = 102.1 ms;  P100 OD = 113.5 ms.  Responses from
the right eye is abnormal because of delay in the P100 response.
This could be due to diminished visual acuity in the right eye or
to other types of retinal or optic nerve pathology.

**RICK ALLAN RHOADES**

### IV.  UPPER SOMATOSENSORY EVOKED POTENTIALS (SSEP)

Recordings were obtained on a 21-channel montage with linked ear references.  The amplitude setting was at 10uv per division.  The high frequency cutoff was at 1000Hz; the low frequency cutoff was at 10Hz. The median nerve was stimulated bilaterally at intensities adjusted for the patient to maximum toleration approaching the discomfort level (approximately 6 to 12mA).  These stimuli were repeated at a rate of 2.11 per second and their duration was approximately 100 microseconds.   The sweep speed of the oscilloscope was approximately 5 ms per division giving a 50 ms window.

RESULTS:  Left Erb's = 10.3 ms; 14.7 ms; N19 = 20.6 ms; P22 = 22.6 ms; right Erb's = 10.4 ms; N13 = 14.8 ms; N19 = 20.3 ms; P22 = 22.5 ms.

### V.  LOWER SOMATOSENSORY EVOKED POTENTIALS (LSSEP):

Recordings were obtained on a 21-channel montage with linked ear references.  The amplitude setting as at 20uv per division.  The high frequency cutoff was at 500Hz.  The low frequency cutoff was at 10Hz.  The posterior tibial nerve was stimulated bilaterally at intensities adjusted for the patient to maximum toleration approaching and at times exceeding the discomfort level (approximately 30-40 mA).  These stimuli were repeated at a rate of 2.11 per second and the duration was approximately 100 ms.  The sweep speed of the oscilloscope was approximately 5 ms per division, giving a 100 ms window.

RESULTS:  NP37 left = 38.9 ms; right = 40.7 ms.  The patient is approximately 5'7" tall.

### VI.  AUDITORY BRAINSTEM RESPONSE (ABR)

Recordings were obtained using a 2-channel display consisting of CZ-A1 and CZ-A2.   Sensitivity was 10uv per division.   The high frequency filter was at 3000Hz.   The low frequency filter was at 100Hz.  Stimuli were applied in the condensation phase at a rate of approximately 11.1 per second and 100 microsecond duration.  The intensity was 70 decibels above auditory threshold.  This was applied either to the left or right ear.  White noise was applied simultaneously to the contralateral ear at an intensity of 30 decibels.   The sweep speed was approximately 1 ms per division, giving a 10 ms time window.  Automatic artifact rejection was used. Two trials were performed for each ear.

RESULTS: within the range of normal variation (see sample).

**RICK ALLAN RHOADES**

VII.   LONG LATENCY COGNITIVE EVOKED AUDITORY RESPONSES (P300).

A 21-channel recording was obtained using linked ear montage. The sensitivity was set at 2uv per division. The high frequency filter was 70Hz; the low frequency filter was at 1.0Hz. Both common and rare auditory stimuli were applied. The common stimulus was at 500Hz frequency. The pseudorandom (oddball) stimulus was at approximately 800Hz.  Stimuli were presented binaurally. The stimuli had an intensity of 70 decibels, a rise time of 5 ms, a plateau of 10 ms and a fall time of 5 ms. The repetition rate was 0.97 per second.

RESULTS:  within the range of normal variation (see sample).


                        Meyer L. Proler, M. D.



UNIVERSITY NEURO-DIAGNOSTICS
5615 KIRBY # 650
HOUSTON, TX 77005

Name: Rhoades, Rick                    Test Date: 09/16/92
ID:                                    Test #: 1
Date of Birth: 05/10/64                Sex: m

Physician: Bromberg                    Technician: JSZ

## Neurometric Discriminants

Discriminant functions provide a quantitative estimate of the similarity
between a patient's profile and characteristic patterns found during
extensive research on groups of patients with various disorders.

This classification is a multivariate statistical summary of a neurometric
evaluation and serves only as an adjunct to other clinical evaluations.

This patient's discriminant scores suggest the presence of a Major
Affective Disorder (p ≤ 0.10 ) of the BIPOLAR subtype. (p ≤ 0.10 )

The features making the highest contribution to the discriminant
decisions are:

Major Affective Disorder Statement:
  - Bipolar Coherence Combined Anterior
  - Bipolar Asymmetry Combined Anterior

Bipolar Statement:
  - Bipolar Relative Alpha T4/T6
  - Bipolar Asymmetry Total T3F7/T4F8
  - Monopolar Relative Beta Fz

### UNIVERSITY NEURO-DIAGNOSTICS
### 5615 KIRBY # 650
### HOUSTON, TX 77005

## Patient Clinical Record

Name: Rhoades, Rick
ID:
Test #: 1

Test Date: 09/15/92
Today's Date: 09/16/92
Date of Birth: 05/10/64    Sex: m

Physician: Bromberg
Montage: ae

Technician: JSZ

Medications:    none

Reason for test: organic brain disorder

Impressions:

UNIVERSITY NEURO-DIAGNOSTICS
5615 KIRBY # 650
HOUSTON, TX 77005

Name: Rhoades, Rick                    Test Date: 09/16/92
ID:                                    Test #: 1
Date of Birth: 05/10/64                Sex: m

Physician: Bromberg                    Technician: JSZ

## Neurometric Discriminants

Discriminant functions provide a quantitative estimate of the similarity
between a patient's profile and characteristic patterns found during
extensive research on groups of patients with various disorders.

This classification is a multivariate statistical summary of a neurometric
evaluation and serves only as an adjunct to other clinical evaluations.

This patient's discriminant scores suggest the presence of a Major
Affective Disorder (p ≤ 0.10 ) of the BIPOLAR subtype. (p ≤ 0.10 )


The features making the highest contribution to the discriminant
decisions are:

Iajor Affective Disorder Statement:
    - Bipolar Coherence Combined Anterior
    - Bipolar Asymmetry Combined Anterior

Bipolar Statement:
    - Bipolar Relative Alpha T4/T6
    - Bipolar Asymmetry Total T3F7/T4F8
    - Monopolar Relative Beta Fz

Case 4:14-cv-02152   Document 38-58   Filed on 09/01/16 in TXSD   Page 217 of 265



Name: hoades, Rick
Test: i-P300

Test Date: 09/15/92

10.7 uU    0    -10.7 uU

Lat: 263ms    Lat: 271ms    Lat: 278ms
Lat: 286ms    Lat: 293ms    Lat: 301ms
Lat: 308ms    Lat: 316ms    Lat: 323ms
Lat: 331ms    Lat: 338ms    Lat: 346ms

25.00uU* *uU

0    375    750ms

Fp1 Fpz Fp2 F7 F8 F3 Fz F4 T3 T4 C3 Cz C4 T5 T6 P3 Pz P4 O1 Oz O2

```
Name: Rhoades, Rick          Analyzed: 09/16/92   Recorded: 09/15/92
Age:  28.3 yrs               # Epochs: 37
```

Multivariate Z score Measures

| BIPOLAR | | Left Hem | Right Hem | Posterior | Anterior | All |
|---|---|---|---|---|---|---|
| Total Absolute Power | | 0.03 | 1.16 | -0.35 | 1.29 | 0.79 |
| Total Power Asymmetry | | | | -0.28 | 2.08 | 1.90 |
| Relative | Δ | 1.07 | 1.40 | 0.25 | 1.52 | 0.93 |
| Power | θ | 0.66 | 0.95 | -0.73 | 0.41 | 0.66 |
| | α | 0.36 | 1.21 | -0.68 | 1.09 | 0.84 |
| | ß | -0.06 | 0.49 | 0.13 | 0.07 | -0.02 |
| | Δ+θ | 0.23 | 0.70 | -0.68 | 1.01 | 0.48 |
| | Combination | 0.62 | 0.79 | -0.03 | 1.20 | -1.00 |
| Interhem. | Δ | | | -0.45 | 0.67 | 0.08 |
| Power | θ | | | -1.09 | 1.55 | 1.10 |
| Asymmetry | α | | | 0.03 | 1.93 | 1.76 |
| | ß | | | -1.66 | 1.23 | 0.73 |
| | Combination | | | -0.85 | 1.25 | 0.57 |
| Interhem. | Δ | | | -1.03 | 0.82 | 0.19 |
| Coherence | θ | | | -1.20 | 0.97 | 0.31 |
| | α | | | 0.75 | 1.49 | 1.42 |
| | ß | | | 0.65 | 1.12 | 1.03 |
| | Combination | | | -0.11 | 1.61 | 1.27 |
| Overall | | | | -0.49 | 2.31 | -2.05 |

SELECTED MONOPOLAR

```
Absolute Combined Left Lateral      0.43
Absolute Combined Right Lateral     0.44
Absolute Delta Posterior            0.77
Absolute Combined Anterior         -0.00

Relative Alpha Left Lateral         0.68
Relative Alpha Right Lateral        1.07
Relative Delta Left Anterior        0.63
Relative Delta Right Anterior       0.28
Relative Delta Median               1.36
Relative Alpha Posterior            1.65
Relative Beta Anterior              0.07

Coherence Combined Central          1.00
Coherence Alpha All                 1.23
```

Name: Rhoades, Rick  Analyzed: 09/16/92  Recorded: 09/15/92
Age: 28.3 yrs  # Epochs: 37

## Monopolar Z Score Measures

|  |  | Fp1 | Fp2 | F7 | F8 | F3 | F4 | C3 | C4 | Fpz | Fz | Cz |
|---|---|----|----|----|----|----|----|----|----|----|----|----|
| Absolute Power | Δ | -0.47 | -0.09 | 0.50 | 1.04 | -1.08 | -0.12 | -1.66 | -1.13 | -0.48 | -0.64 | -1.09 |
|  | θ | 0.71 | 0.98 | 0.71 | 1.29 | 0.62 | 1.51 | -0.15 | 0.21 | 1.17 | 1.26 | 0.24 |
|  | α | 0.93 | 0.88 | 0.59 | 1.03 | 0.41 | 0.55 | -0.03 | 0.35 | 0.97 | 0.42 | 0.27 |
|  | β | 1.45 | 1.63 | -0.10 | 0.59 | -0.30 | -0.00 | -0.45 | -0.11 | 0.87 | -0.00 | 0.07 |
|  | T | 0.66 | 0.80 | 0.49 | 1.09 | 0.03 | 0.56 | -0.55 | -0.08 | 0.70 | 0.36 | -0.10 |
| Relative Power | Δ | -1.48 | -1.19 | -0.04 | -0.25 | -1.14 | -0.85 | -1.00 | -1.11 | -1.53 | -1.13 | -1.00 |
|  | θ | 0.04 | 0.29 | 0.35 | 0.34 | 0.93 | 1.58 | 0.67 | 0.41 | 0.86 | 1.54 | 0.52 |
|  | α | 0.84 | 0.58 | 0.47 | 0.58 | 0.65 | 0.27 | 0.52 | 0.75 | 0.88 | 0.26 | 0.55 |
|  | β | 0.95 | 0.99 | -0.78 | -0.77 | -0.50 | -0.79 | 0.02 | -0.10 | 0.15 | -0.45 | 0.17 |

| Interhem. Power Asymmetry | Δ | -1.39 | -0.76 | -2.47 | -1.24 |
|---|---|----|----|----|----|
|  | θ | -1.04 | -1.01 | -2.83 | -1.01 |
|  | α | 0.33 | -1.25 | -0.80 | -1.62 |
|  | β | -0.33 | -1.08 | -1.00 | -1.04 |

| Interhem. Coherence | Δ | -3.50 | 0.25 | -1.90 | -0.79 |
|---|---|----|----|----|----|
|  | θ | -1.13 | -0.40 | -0.65 | -1.36 |
|  | α | 0.22 | 0.50 | -0.11 | -0.13 |
|  | β | -0.52 | -0.31 | -0.05 | 0.78 |

|  |  | T3 | T4 | T5 | T6 | P3 | P4 | O1 | O2 | Pz | Oz |
|---|---|----|----|----|----|----|----|----|----|----|----|
| Absolute Power | Δ | -0.75 | -0.14 | -1.31 | -0.57 | -1.32 | -1.00 | -1.20 | -0.89 | -1.33 | -0.71 |
|  | θ | 0.40 | 0.59 | 0.36 | 0.75 | -0.10 | 0.49 | 0.68 | 0.46 | 0.20 | 0.73 |
|  | α | -0.20 | 0.21 | 1.27 | 1.98 | 1.44 | 1.93 | 1.81 | 1.80 | 1.67 | 2.09 |
|  | β | -0.99 | -0.27 | 0.20 | 1.22 | 0.47 | 0.92 | 1.44 | 1.26 | 0.84 | 1.81 |
|  | T | -0.47 | 0.10 | 0.95 | 1.98 | 1.17 | 1.85 | 1.86 | 1.85 | 1.53 | 2.23 |
| Relative Power | Δ | -0.28 | -0.34 | -2.47 | -3.03 | -2.47 | -2.89 | -3.10 | -2.83 | -2.65 | -3.14 |
|  | θ | 1.60 | 1.10 | -1.15 | -2.22 | -1.86 | -2.17 | -2.02 | -2.15 | -2.02 | -2.44 |
|  | α | 0.15 | 0.30 | 1.86 | 2.28 | 2.09 | 2.36 | 2.04 | 2.10 | 2.13 | 2.18 |
|  | β | -0.83 | -0.54 | -1.16 | -1.33 | -1.04 | -1.42 | -1.04 | -1.21 | -1.09 | -1.12 |

| Interhem. Power Asymmetry | Δ | -0.25 | -0.90 | -0.81 | -0.72 |
|---|---|----|----|----|----|
|  | θ | -0.41 | -0.71 | -1.76 | 0.69 |
|  | α | -0.45 | -1.96 | -1.76 | 0.14 |
|  | β | -0.40 | -2.10 | -1.30 | 0.40 |

| Interhem. Coherence | Δ | -0.30 | -1.09 | -0.39 | -1.55 |
|---|---|----|----|----|----|
|  | θ | -1.00 | -1.03 | -0.63 | -2.74 |
|  | α | 1.18 | 2.28 | 2.48 | 1.58 |
|  | β | -1.58 | 1.09 | 1.65 | -1.45 |

Name: Rhoades, Rick
Age: 28.3 yrs
Analyzed: 09/16/92   Recorded: 09/15/92
# Epochs: 37

## Monopolar Z Score Measures - Page 2

| | Fp1 | Fp2 | F7 | F8 | F3 | F4 | C3 | C4 | Fpz | Fz | Cz |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Mean Frequency Δ | -0.59 | -0.29 | -2.11 | -1.56 | -0.95 | 0.17 | 1.62 | 1.77 | 0.20 | 0.48 | 1.55 |
| θ | 0.72 | 0.83 | 0.19 | 0.97 | 0.94 | 1.28 | 0.70 | 1.42 | 1.01 | 1.22 | 0.84 |
| α | 0.33 | 0.05 | 0.02 | 1.32 | -0.29 | -0.66 | -0.11 | -0.11 | 0.11 | -0.61 | -0.03 |
| β | 1.34 | 1.34 | 0.17 | -0.57 | -0.17 | -0.58 | -0.01 | 0.18 | 0.53 | -0.31 | -0.21 |
| T | 1.61 | 1.51 | -0.07 | 0.19 | 0.23 | -0.06 | 0.48 | 0.76 | 1.10 | 0.76 | 0.12 |

| | F3/T5 | F4/T6 | F7/T5 | F8/T6 |
|---|---|---|---|---|
| Intrahem. Power Asymmetry Δ | 0.65 | 0.74 | 2.24 | 1.85 |
| θ | 0.16 | 0.56 | 0.32 | 0.48 |
| α | -1.95 | -3.05 | -1.66 | -2.27 |
| β | -0.71 | -2.04 | -0.43 | -1.10 |

| | Fp1/F3 | Fp2/F4 | T3/T5 | T4/T6 |
|---|---|---|---|---|
| Intrahem. Coherence Δ | -0.78 | -1.48 | -0.71 | -0.79 |
| θ | 0.49 | -0.27 | -0.41 | -1.85 |
| α | 0.16 | -1.00 | -0.22 | 1.42 |
| β | -0.32 | -1.65 | 0.20 | 0.31 |

| | T3 | T4 | T5 | T6 | P3 | P4 | O1 | O2 | Pz | Oz |
|---|---|---|---|---|---|---|---|---|---|---|
| Mean Frequency Δ | 1.37 | 0.19 | 1.88 | 1.39 | 0.74 | 1.49 | 0.72 | 1.38 | 1.33 | 0.70 |
| θ | 0.24 | 0.49 | 0.78 | 1.89 | 0.18 | 1.43 | 1.69 | 1.01 | 0.81 | 0.23 |
| α | -0.56 | -0.10 | 0.03 | -0.22 | -0.02 | -0.02 | -0.04 | -0.08 | 0.06 | 0.09 |
| β | -0.54 | -0.06 | 0.52 | 0.21 | 1.20 | 0.60 | 1.25 | 0.52 | 0.87 | 1.46 |
| T | -0.65 | -0.20 | 0.93 | 0.93 | 1.17 | 1.15 | 1.16 | 0.92 | 1.33 | 1.10 |

| | F3/O1 | F4/O2 | O1/F7 | O2/F8 |
|---|---|---|---|---|
| Intrahem. Power Asymmetry Δ | 0.47 | 1.10 | -1.96 | -1.97 |
| θ | -0.31 | 0.95 | 0.16 | -0.84 |
| α | -2.67 | -2.36 | 2.44 | 1.70 |
| β | -2.53 | -1.88 | 2.20 | 1.08 |

| | C3/P3 | C4/P4 | F3/O1 | F4/O2 |
|---|---|---|---|---|
| Intrahem. Coherence Δ | -0.61 | -0.37 | -0.62 | -0.78 |
| θ | -0.41 | -0.91 | -1.81 | -0.86 |
| α | -0.73 | 0.83 | 1.45 | 1.31 |
| β | -0.01 | 0.30 | -1.01 | 0.51 |

Name: Rhoades, Rick　　　　　　Analyzed: 09/16/92　　Recorded: 09/15/92
Age: 28.3 yrs　　　　　　　　# Epochs: 37

Bipolar Z Score Measures

| | | Central | | Temporal | | Parietal Occipital | | Frontal Temporal | |
|---|---|---|---|---|---|---|---|---|---|
| | | C3/Cz | C4/Cz | T3/T5 | T4/T6 | P3/O1 | P4/O2 | F7/T3 | F8/T4 |
| Total Absolute Power | | 0.20 | 0.12 | 1.15 | 2.02 | 0.95 | 0.64 | 0.44 | 2.03 |
| Total Power Asymmetry | | 0.24 | | -2.15 | | 0.84 | | -3.10 | |
| Relative Power | Δ | -0.76 | -0.97 | -1.96 | -2.58 | -1.70 | -1.19 | -0.19 | -1.15 |
| | θ | 0.77 | 0.83 | -1.01 | -1.13 | -0.21 | 0.03 | 0.07 | -1.14 |
| | α | 0.81 | 0.66 | 1.73 | 1.84 | 0.98 | 0.59 | 1.21 | 2.05 |
| | ß | -1.05 | -0.70 | -1.37 | -1.37 | -0.51 | -0.02 | -1.43 | -1.65 |
| | Δ+θ | -0.12 | -0.11 | -1.56 | -1.81 | -0.90 | -0.60 | -0.22 | -1.31 |
| | Combination | 0.80 | 1.02 | 0.81 | 1.62 | 1.11 | 0.40 | 0.01 | 0.83 |
| Interhem. Power Asymmetry | Δ | 0.60 | | -0.96 | | -0.29 | | -1.26 | |
| | θ | 0.16 | | -1.88 | | 0.48 | | -1.88 | |
| | α | 0.30 | | -1.68 | | 0.97 | | -3.10 | |
| | ß | -0.37 | | -1.73 | | 0.07 | | -1.45 | |
| | Combination | -0.73 | | 0.76 | | -0.08 | | 1.31 | |
| Interhem. Coherence | Δ | 0.19 | | -0.70 | | -0.53 | | -1.52 | |
| | θ | 0.02 | | 0.86 | | -0.50 | | -1.67 | |
| | α | -1.64 | | 2.16 | | -0.27 | | 1.98 | |
| | ß | 0.53 | | 1.51 | | -1.52 | | 1.55 | |
| | Combination | 0.20 | | 0.95 | | 0.02 | | 1.83 | |
| Overall | | -0.41 | | 1.55 | | -0.19 | | 2.41 | |

1                        DEFENSE EXHIBIT 31

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 4:14-cv-03152   Document 38-58   Filed on 09/01/16 in TXSD   Page 224 of 265



DEFENDANT'S
EXHIBIT
31

| TDC NO | NAME | SOC-SEC-NO | DATE-OF-BIRTH | RECEIVED-GED | CERTIFICATE-ISSUED | UNIT-TESTED | TOT-STND-SCRE | STATUS |
|--------|------|-----------|---------------|--------------|--------------------|-----------|---------------|--------|
| 550587 | MARCAS,DAVID ALAN | 00000000 | 041062 | YES | YES | J3 | 333 | ACTIVE |

| | | TEST-DATE | FORM | TEST-RETEST | RAW-SCORE | STND-SCORE | PERCENTILE | PASS-FAIL |
|---|---|---|---|---|---|---|---|---|
| | TEST 1 | 0491 | AH | | 049 | 60 | 84 % | PASS |
| | TEST 2 | 0491 | AH | | 059 | 77 | 99 % | PASS |
| | TEST 3 | 0491 | AH | | 056 | 63 | 91 % | PASS |
| | TEST 4 | 0491 | AH | | 039 | 75 | 99 % | PASS |
| | TEST 5 | 0491 | AH | | 040 | 58 | 78 % | PASS |
| | TEST 6 | 0000 | | | 000 | 00 | 00 % | |

## VERIFICATION FOR ENROLLMENT

In

Windham ✓      College _____

NAME  MARCAS DAVID      DATE  12-11-90

NUMBER  550577      ALL PRIOR #'s _____

UNIT  33      DATE OF BIRTH 4/10/62   SS# _____

INSTRUCTIONS:   Complete the following sections. Attach a release form
(HD 7120) for each transcript requested.

SECTION I:      Name of High School:

     Lewis High- or Crnode

SECTION II:      Name of GED Testing Center:

SECTION III:      Colleges Attended:

---

Do Not Write Below This Line - Office Use Only

DATE  DEC 11 1990

This student HAS/HAS NOT BEEN verified for WINDHAM/COLLEGE enrollment
based on:

_____ High School Transcript

_____ College Transcript

_____ GED Scores on file

_____ Did not meet requirements for high school diploma

_____ Cannot obtain transcript due to financial block

_____ Need transcript fee $ _____

_____ Failed GED test, parts _____

✓_____ Institute has no record of attendance or GED testing

_____ No reply to request

_____ Request returned to sender

# VERIFICATION FOR COLLEGE ENROLLMENT

USE THIS FORM FOR COLLEGE ENROLLMENT PURPOSES ONLY

NAME _DAVID ALAN MARCHAS_     DATE _7-2-90_

NUMBER _550587_    ALL PRIOR #'s _____

UNIT _Jester 3_    DATE OF BIRTH _4-10-62_    SS# _?_

INSTRUCTIONS:   Complete only ONE of the following sections. *Attach a release form for each transcript requested.*

SECTION I:    Name of High School: (Do not order if you did not graduate)

AUG 1 1990    _Lewis High_

SECTION II:    Name of GED Testing Center: (Do not order if you did not pass)

_____

SECTION III:    Colleges Attended:

_11- 29.30_

_Doti_
_Plese Clear_
_to GED test._
_Lewis N. B._
_ontario, Canada_
_1976-80_

**Do Not Write Below This**

DATE _9-450_

This student **HAS BEEN** verified for enrollment based on:

_____    High School Transcript

_____    College Transcript

_____    GED Scores on file

This student **HAS NOT BEEN** verified for enrollment based on:

_____    Did not meet requirements for high school diploma

_____    Cannot obtain college transcript due to financial block

_____    Need transcript fee $ _____

_____    Failed GED test, parts _____

_____    Institute has no record of attendance or GED testing

_____    No reply to request

_✓_    Request returned to sender _Insufficient Address_

_____    Other: _____

HD-034            Rev. 4/89

SENT BY:XEROX Telecopier 7010 ; 9-18-93 ; 9AM ; Cause No.03152 7DD000re5t 82-5B1 : FAX on 09/01/16 in TXSD Page 227 of 265 JESTER UNIT III;# 5

### TEXAS DEPARTMENT OF CORRECTIONS
### REPORT OF VOCATIONAL TRAINING COMPLETION

Name _Marcas_ _David_ (Last) (First) (M.I.)   Unit _Jester III_

TDC Number _550587_

Date Completed Training _06_ _18_ _91_
Month   Day   Year

Course Title/Trade Area _Business Comp. Oper_

D.O.T. Number _213.362-010_

Check One of the Following:

Windham School System _____✓_____

College:

    Alvin Community College _____

    Blinn College _____

    Central Texas College _____

    Trinity Valley Community College _____

    Lee College _____

Apprenticeship Program _____

Vocational Short Courses
Texas A&M University _____

I certify that the above named inmate has satisfactorily completed vocational training in the program indicated.

_(Authorized Signature)_

JUL 30 1991

Distribution:
    Original — Classification
    Copy — File

Form Revised 5/89

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE

## INSTITUTIONAL DIVISION

### INMATE JOB MANAGEMENT SYSTEM
### VOCATIONAL TRAINING STATUS CHANGE

------------------------------------------------------------

TDC Number: **550587**

Name: **MARCAS, DAVID**

Course Code and Title: **140200 BUSINESS COMP OPER**

Unit: **J3**

School Code: **W**          .100%

Effective Start Date: **04/02/91**

Effective End Date: **06/18/91**

Instructor Name: **RICE, CINDY**

Skill Code:

Status Type: **D**

Certificate:
[Y]es [N]o          X

Performance Rating:
[O]utstanding [G]ood [A]verage
[B]elow Average [U]nsatisfactory

Proficiency Rating:
[S]killed [M]oderately Skilled
[L]imited Skilled [U]nskilled

Reason For Drop: **C — COMPLETED**

Class Hours Accumulated: **562**

Status Code:          *C*
[A]dd [C]hange [D]elete

WSS Final Test Taken:          X
[Y]es [N]o

College V-o-c Selections:

1. _____
2. _____
3. _____
4. _____
5. _____
6. _____
7. _____
8. _____
9. _____
10. _____
11. _____
12. _____
13. _____

------------------------------------------------------------

_____     6-20-91          _____
t  .tor Signature          Date              Principal Signature

JUL 22 1991

trol Clerk1 Signature     Date       Control Clerk2 Signature     Date

SENT BY:Xerox Telecopier 7020 ; 9-15-97 ; 8:58 ; 15270 Documents filed on 09/01/16 in TXSD → Page 229 of 265 JESTER III;# 7

# SEGMENTED

**BUSINESS COMPUTER APPLICATIONS STUDENT PROGRESS RECORD**
WINDHAM VOCATIONAL DEPARTMENT

CO.0007

STUDENT *Marcus, David* 1-10-91

UNIT **J-3**

TDC # **550587**

TEACHER **Rice**

| SEGMENT TEST SCORE | 1 | 100 | 2 | 87 | 3 | 94 | 4 | 97 | Total Skills Completed | 47 |
|---|---|---|---|---|---|---|---|---|---|---|

**( CENTRAL OFFICE USE ONLY)**

Date __/__/__   Final Written Exam Score **95.50**   Final Skill Exam Score **100.0**   Average **94.50**   Final Course Score **96.60**

Type of Certificate Issued (check one):   Achievement_____   Participation_____   **47 SKILLS TOTAL**

---

I have read all Material Safety Data Sheets (MSDS) information related to this program and understand the implied hazards in using these products.

*David Marcus*
Signature

*1-30-91*
Date

| | UNIT / SKILLS | UNIT WRITTEN SCORE | UNIT TEST DATE | TEACHER / STUDENT INITIALS | TAUGHT IN SEGMENTS 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|---|---|---|
| VO 1- | VOCATIONAL ORIENTATION | 100 | 12491 | UR Dam | ● | ● | ● | ● |
| VS 1- | VOCATIONAL SAFETY | 100 | 11891 | UR Dam | ● | ● | ● | ● |
| EE 1- | LOCATING, GETTING AND KEEPING A JOB | 100 | 22691 | CR DAM | ● | | | ● |
| EE 2- | OWNING AND MANAGING YOUR OWN BUSINESS | 100 | 22691 | CR DAM | | | | ● |
| EE 3- | GETTING ALONG WITH YOURSELF & OTHERS | 100 | 12491 | UR Dam | | ● | | ● |
| EE 4- | LEARNING TO LEAD | 100 | 12491 | CR DAM | | | ● | ● |
| CO 7- | OPERATING THE MICROCOMPUTER | 100 | 51491 | CR Dam | ● | | | |
| CO 8- | EVALUATION & SELECTING MICROCOMPUTERS | 98 | 42391 | CR Dam | | | | ● |
| CO 9- | DATA PROCESSING, BACKGROUND AND USES OF | 100 | 22191 | CR Dam | | | | ● |
| CO 10- | DATA ENTRY AND MANUAL ACCOUNTING | 90 | 4191 | CR Dam | | | | ● |
| CO 11- | INPUT/OUTPUT DEVICES AND MEDIA | 100 | 41291 | CR Dam | | | | ● |
| CO 12- | THE CENTRAL PROCESSING UNIT | 100 | 52891 | CR Dam | ● | | | |
| CO 13- | INTRODUCTION TO OPERATING SYSTEMS | 100 | 21891 | CR Dam | | | ● | |
| | CO 13-1  Setting Up Your Computer | | | | | | ● | |
| | CO 13-2  Starting MS-DOS | | | | | | ● | |
| | CO 13-3  Exiting MS-DOS | | | | | | ● | |
| CO 14- | STAND-ALONE COMPUTER OPERATIONS | 93 | 12191 | CR Dam | ● | ● | ● | ● |
| | CO 14-1  Format a Diskette | | | | ● | ● | | |
| | CO 14-2  Backup Diskette | | | | ● | | | |
| | CO 14-3  Change a Current Drive | | | | ● | | | |
| | CO 14-4  Load and Run an Application Program | | | | ● | | | |
| CO 15- | INTRODUCTION TO MULTI-USER APPLICATIONS | 100 | 52491 | UR Dam | ● | | | |
| | CO 15-1  Power-up the System | | | | ● | | | |
| | CO 15-2  Log In and Out | | | | ● | | | |
| | CO 15-3  Change Password | | | | ● | | | |
| | CO 15-4  Power Down a System (Shutdown) | | | | ● | | | |
| CO 16- | COMPUTER LANGUAGE & PROGRAMMING CONCEPTS | 98 | 5309 | UR Dam | ● | | | |
| | CO 16-1  Construct a Simple Program Flowchart | | | | ● | | | |
| | CO 16-2  Write and Execute a BASIC Program | | | | ● | | | |

| | DATE SKILL ACHIEVED | DATE SKILL ASSIGNED |
|---|---|---|
| 1 | 11491 | 11121 |
| 2 | 11491 | 11191 |
| 3 | 11491 | 11191 |
| 5 | 61791 | 61791 |
| 6 | 61791 | 61791 |
| 7 | 11491 | 11191 |
| 8 | 13591 | 11191 |
| 9 | 61791 | 61791 |
| 10 | 12891 | 12591 |
| 11 | 61791 | 61791 |
| 12 | 61791 | 61791 |
| 15 | 32991 | 3191 |
| 16 | 32991 | 3191 |

# SEGMENTED

CO.000

## BUSINESS COMPUTER APPLICATIONS STUDENT PROGRESS RECORD
### WINDHAM VOCATIONAL DEPARTMENT

STUDENT _Marcus_

UNIT _J - 3_

TDC # _550-587_

TEACHER _Rio_

| | DATE SKILL ACHEVED | DATE SKILL ASSIGNED | | UNIT / SKILLS | UNIT WRITTEN SCORE | UNIT TEST DATE | TEACHER / STUDENT INITIALS | TAUGHT IN SEGMENTS 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | CO 20- | **USING A SPREADSHEET** | 85 | 2-27-91 | UR DBM | | | | ● |
| 44. | 4.19.91 | 3.1.91 | CO 20-1 | Create a Report Format using a Spreadsheet Program | | | | | | | ● |
| 45. | 4.19.91 | 3.1.91 | CO 20-2 | Enter Labels into a Spreadsheet | | | | | | | ● |
| 46. | 4.19.91 | 3.1.91 | CO 20-3 | Create and Enter Formulas in a Spreadsheet | | | | | | | ● |
| 47. | 4.19.91 | 3.1.91 | CO 20-4 | Enter Data into a Spreadsheet | | | | | | | ● |
| 48. | 4.19.91 | 3.1.91 | CO 20-5 | Re-Calculate a Spreadsheet | | | | | | | ● |
| 49. | 4.19.91 | 3.1.91 | CO 20-6 | Move Rows and Columns in a Spreadsheet | | | | | | | ● |
| 50. | 4.19.91 | 3.1.91 | CO 20-7 | Add and Delete Rows and Columns in a Spreadsheet | | | | | | | ● |
| 51. | 4.19.91 | 3.1.91 | CO 20-8 | Create and Use Named Ranges in a Spreadsheet | | | | | | | ● |
| 52. | 4.19.91 | 3.1.91 | CO 20-9 | Create and Use Supporting Worksheets in a Spreadsheet | | | | | | | ● |
| 53. | 4.19.91 | 3.1.91 | CO 20-10 | Print a Portion of a Spreadsheet | | | | | | | ● |
| 54. | 4.19.91 | 3.1.91 | CO 20-11 | Print an Entire Spreadsheet | | | | | | | ● |
| | | | CO 21- | **CAREERS IN INFORMATION PROCESSING** | | | DBM | | | | ● |

Rev. 4/83

## TEXAS DEPARTMENT OF CORRECTIONS
## INMATE JOB MANAGEMENT SYSTEM
## VOCATIONAL TRAINING STATUS CHANGE
### (Must submit in triplicate to Vocational Office)

TDC NUMBER ___550587___ (3-6)

NAME ___MARCAS, DAVID___ (9-12)

COURSE TITLE ___BUSINESS COMP OPER___ A.M.

UNIT ___JESTER III___

SCHOOL ___WINDHAM SCHOOL SYSTEM___

EFFECTIVE START DATE ___04/02/91___ (23-28)

EFFECTIVE END DATE ___ (29-34)

INSTRUCTOR'S NAME ___RICE, C.___ (35-49)

ICT SKILL TITLE ___

STATUS CHANGE TYPE: X - ADD (57)
DROP

CERTIFICATE RECOMMENDED: ___ YES (58)
(Apprentice and ___ NO
  College Use Only)

PERFORMANCE RATING: ___ OUTSTANDING
  ___ GOOD (59)
  ___ AVERAGE
  ___ BELOW AVERAGE
  ___ UNSATISFACTORY

PROFICIENCY RATING: ___ SKILLED
  ___ MODERATELY SKILLED
  ___ LIMITED SKILLED (60)
  ___ UNSKILLED

REASON FOR DROP: ___ (U) UNIT TRANSFER
  ___ (D) RELEASED FROM T.D.C.
  ___ (B) BENCH WARRANT
___ ___ (M) MEDICAL
  ___ (O) DISCIPLINARY OFFENSE
  ___ (I) INMATE REQUEST
  ___ (N) CLASS TEMPORARILY SUSPENDED
  ___ (L) CLASS DISCONTINUED (61)
  ___ (C) COMPLETED COURSE/CYCLE
  ___ (H) EDUCATIONAL ADMINISTRATIVE
        REQUEST
  ___ (X) UNSATISFACTORY PROGRESS
  ___ (E) COMPUTER INPUT ERROR
  ___ (G) INELIGIBLE
  ___ (A) T.D.C. ADMINISTRATIVE
        REQUEST
  ___ (F) SCHEDULE CHANGE/CONFLICT

CLASS HOURS ACCUMULATED ___255___ (62-65)

WAS FINAL TEST TAKEN ___ YES ___ NO

---

### TO BE COMPLETED BY CONTROL CLERK

COURSE CODE ___140200___ (13-19)

UNIT CODE ___J3___ (20-21)

SCHOOL CODE ___W___ (22)

SKILL CODE ___ (50-56)

MEETS CRITERIA    Y=YES
                  N=NO

___ TIME LEFT (66)
___ E.A. SCORE (67)
___ PIP SCORE (68)
___ INMATE STATUS (69)
___ MEDICAL CLASS (70)
___ DIPLOMA/GED (71)
___ GATB APTITUDE (72)

RECORD STATUS CHANGE ✓ ADD (73)
___ CHANGE
___ DELETE

APR 08 1991

IJMS CONTROL CLERK SIGNATURE          DATE

Rev.4/83

## TEXAS DEPARTMENT OF CORRECTIONS
### INMATE JOB MANAGEMENT SYSTEM
### VOCATIONAL TRAINING STATUS CHANGE
(USS submit in triplicate to Vocational Office)

TDC NUMBER _____ 550587 _____ (3-6)

NAME _____ MARCAS, DAVID _____ (9-12)

COURSE TITLE _____ BUSINESS COMP OPER _____ A.M.

UNIT _____ JESTER III _____

SCHOOL _____ WINDHAM SCHOOL SYSTEM _____

EFFECTIVE START DATE _____ 04/02/91 _____ (23-28)

EFFECTIVE END DATE _____ (29-34)

INSTRUCTOR'S NAME _____ RICE, C. _____ (35-49)

ICT SKILL TITLE _____

STATUS CHANGE TYPE:    X – ADD           (57)
                          DROP

CERTIFICATE RECOMMENDED:  ___  YES      (58)
(Apprentice and           ___  NO
        College Use Only)

PERFORMANCE RATING:    ___  OUTSTANDING
                       ___  GOOD          (59)
                       ___  AVERAGE

_Inmate Marcas_
_#550587_
_drop and add_
_in error_
_S/B Business Computer_
_Effective Date 1/10/_
_(signature)_

**Men are like computer programs:**
**Smart women always keep a back-up**

___  REQUEST
(X) UNSATISFACTORY PROGRESS
(E) COMPUTER INPUT ERROR
(G) INELIGIBLE
(A) T.D.C. ADMINISTRATIVE
        REQUEST
(F) SCHEDULE CHANGE/CONFLICT

CLASS HOURS ACCUMULATED _____ 255 _____ (62-65)
IS FINAL TEST TAKEN _____ YES _____ NO

---

### TO BE COMPLETED BY CONTROL CLERK

COURSE CODE _____ 140200 _____ (13-19)

UNIT CODE _____ J3 _____ (20-21)

SCHOOL CODE _____ W _____ (22)

SKILL CODE _____ (50-56)

MEETS CRITERIA        Y=YES
                      N=NO

___  TIME LEFT          (66)
___  E.A. SCORE         (67)
___  PIP SCORE          (68)
___  INMATE STATUS      (69)
___  MEDICAL CLASS      (70)
___  DIPLOMA/GED        (71)
___  GATB APTITUDE      (72)

RECORD STATUS CHANGE   ✓  ADD      (73)
                       ___ CHANGE
                       ___ DELETE

APR 10 1991

IJMS CONTROL CLERK SIGNATURE        DATE

TEXAS DEPARTMENT OF CORRECTIONS
INMATE JOB MANAGEMENT SYSTEM
VOCATIONAL TRAINING STATUS CHANGE
(VSS submit in triplicate to Vocational Office)

| | | | TO BE COMPLETED BY CONTROL CLERK |
|---|---|---|---|
| C ' R | 550587 | (3-6) | |
| N. | MARCAS, DAVID | (9-12) | |
| URSE TITLE | BUSINESS COMP OPER   A.M. | | COURSE CODE |
| IT | JESTER III | | |
| HOOL | WINDHAM SCHOOL SYSTEM | | (13-19) |
| ECTIVE START DATE | 01/10/91 | (23-28) | |
| ECTIVE END DATE | 03/15/91 | (29-34) | |
| STRUCTOR'S NAME | RICE, C. | (35-49) | UNIT CODE |
| SKILL TITLE | | | (20-21) |

TUS CHANGE TYPE:          ADD          (57)
                       X = DROP

SCHOOL CODE _____ (22)

TIFICATE RECOMMENDED: ___ YES          (58)
prentice and         ___ NO
   College Use Only)

FORMANCE RATING:     ___ OUTSTANDING
                     ___ GOOD          (59)     SKILL CODE
                     ___ AVERAGE
                     ___ BELOW AVERAGE                 (50-56)
                     ___ UNSATISFACTORY

FICIENCY RATING:     ___ SKILLED
                     ___ MODERATELY SKILLED     MEETS CRITERIA      Y=YES
                     ___ LIMITED SKILLED  (60)                      N=NO
                     ___ UNSKILLED

SON FOR DROP:        ___ (U) UNIT TRANSFER                ___ TIME LEFT      (66)
                     ___ (D) RELEASED FROM T.D.C.         ___ E.A. SCORE     (67)
   G                 ___ (B) BENCH WARRANT                ___ PIP SCORE      (68)
                     ___ (M) MEDICAL                      ___ INMATE STATUS  (69)
                     ___ (O) DISCIPLINARY OFFENSE         ___ MEDICAL CLASS  (70)
                     ___ (I) INMATE REQUEST               ___ DIPLOMA/GED    (71)
                     ___ (N) CLASS TEMPORARILY SUSPENDED  ___ GATB APTITUDE  (72)
                     ___ (L) CLASS DISCONTINUED    (61)
                     ___ (C) COMPLETED COURSE/CYCLE
                     ___ (H) EDUCATIONAL ADMINISTRATIVE
                             REQUEST
                     ___ (X) UNSATISFACTORY PROGRESS
                     ___ (E) COMPUTER INPUT ERROR
                   X ___ (G) INELIGIBLE
                     ___ (A) T.D.C. ADMINISTRATIVE        RECORD STATUS CHANGE   ___ ADD        (73)
                             REQUEST                                             ___ CHANGE
                     ___ (F) SCHEDULE CHANGE/CONFLICT                            ___ DELETE

APR 10 1991

IJMS CONTROL CLERK SIGNATURE        DATE

S HOURS ACCUMULATED    255        (62-65)
FINAL TEST TAKEN    ___ YES    ___ NO

Apr  1, 1991

SENT BY:XEROX Telecopier 7021 ... Document 92381582 Filed on 09/01/16 in TXSD Page 234 of 265 ... GROUP III;#12

IJMS-13
Rev.6/83

TEXAS DEPARTMENT OF CORRECTIONS
INMATE JOB MANAGEMENT SYSTEM
VOCATIONAL TRAINING STATUS CHANGE
(WSS submit in triplicate to Vocational Office)

TDC NUMBER    550587                        (3-6)
NAME    MARCAS, DAVID                        (9-12)
COURSE TITLE    BUSINESS COMP OPER    A.M.
UNIT    JESTER III
SCHOOL    WINDHAM SCHOOL SYSTEM
EFFECTIVE START DATE    01/10/91            (23-28)
EFFECTIVE END DATE                          (29-34)
INSTRUCTOR'S NAME    RICE, C.               (35-49)
ICT SKILL TITLE

STATUS CHANGE TYPE:    X - ADD              (57)
                          DROP

CERTIFICATE RECOMMENDED: ___  YES           (58)
(Apprentice and        ___  NO
       College Use Only)

PERFORMANCE RATING:    ___  OUTSTANDING
                       ___  GOOD            (59)
                       ___  AVERAGE
                       ___  BELOW AVERAGE
                       ___  UNSATISFACTORY

PROFICIENCY RATING:    ___  SKILLED
                       ___  MODERATELY SKILLED
                       ___  LIMITED SKILLED  (60)
                       ___  UNSKILLED

REASON FOR DROP:       ___  (U) UNIT TRANSFER
                       ___  (D) RELEASED FROM T.D.C.
                       ___  (B) BENCH WARRANT
                       ___  (M) MEDICAL
                       ___  (O) DISCIPLINARY OFFENSE
                       ___  (I) INMATE REQUEST
                       ___  (N) CLASS TEMPORARILY SUSPENDED
                       ___  (L) CLASS DISCONTINUED    (61)
                       ___  (C) COMPLETED COURSE/CYCLE
                       ___  (H) EDUCATIONAL ADMINISTRATIVE
                                 REQUEST
                       ___  (X) UNSATISFACTORY PROGRESS
                       ___  (E) COMPUTER INPUT ERROR
                       ___  (G) INELIGIBLE
                       ___  (A) T.D.C. ADMINISTRATIVE
                                 REQUEST
                       ___  (F) SCHEDULE CHANGE/CONFLICT

TO BE COMPLETED BY CONTROL CLERK

COURSE CODE    140200
                                            (13-19)

UNIT CODE    J3
                                            (20-21)

SCHOOL CODE    W
                                            (22)

SKILL CODE
                                            (50-56)

MEETS CRITERIA        Y=YES
                      N=NO

                       ___  TIME LEFT          (66)
                       ___  E.A. SCORE         (67)
                       ___  PIP SCORE          (68)
                       ___  INMATE STATUS      (69)
                       ___  MEDICAL CLASS      (70)
                       ___  DIPLOMA/GED        (71)
                       ___  GATB APTITUDE      (72)

RECORD STATUS CHANGE   ✓  ADD               (73)
                       ___  CHANGE
                       ___  DELETE

IJMS CONTROL CLERK SIGNATURE        DATE

CLASS HOURS ACCUMULATED                      (62-65)

### STUDENT PARTICIPATION RECORD
### WINDHAM SCHOOL SYSTEM

Name: **RHOADES, RICK**                          TDC Number: **427409**

### E.A. SCORES

Highest E.A. Score: **8.2**                      Initial E.A. Score: _____
          Date: _____                                      Date: _____

|   | Read. | Math | Lang. | Total | Type | Date |
|---|-------|------|-------|-------|------|------|
| 1. |      |      |       |       |      |      |
| 2. |      |      |       |       |      |      |
| 3. |      |      |       |       |      |      |
| 4. |      |      |       |       |      |      |

### G.E.D SCORES

| Writing | Soc.Studies | Science | Reading | Math | Total |
|---------|-------------|---------|---------|------|-------|
|         |             |         |         |      |       |

| Program | Unit | Date Enrolled | Date Dropped | Drop Reason |
|---------|------|---------------|--------------|-------------|
| ACADEMIC | B1 | 08/13/86 | 12/03/86 | RECEIVED G.E.D. |
| MUSIC | B1 | 10/17/86 | 10/29/86 | JOB TRANFER |

*HV drop*

NAME:

DISCIPLINE: MATHEMATICS - PERCENTS

| TPO | DATE | MATERIAL(S) | STRATEGIES |
|---|---|---|---|
| NUMERICAL & ALGEBRAIC OPERATIONS<br><br>T.P.O. 4<br><br>PERCENTS | | (1) CAMBRIDGE PROGRAM<br>PERCENTS<br>PAGE 581-597<br><br>(2) CAMBRIDGE MATH TEST<br>PERCENTS<br>PAGE 115-146<br><br>(3) CAMBRIDGE EXERCISES<br>PERCENT EXERICSES<br>PAGE 25-34<br><br>(4) NET/CAMBRIDGE<br>Video TAPE<br><br>MATH V - PERCENTS<br><br>MATH VI - PERCENTS<br>AND INTREST | LECTURE<br>EXAMPLES X<br>MONITORING<br>CLASS DISCUSSION<br>CHALKBOARD<br>INDEPENDANT STUDY<br>SUMMARY<br>TEST |

Case 4:14-cv-03152  Document 38-58  Filed on 09/01/16 in TXSD  Page 236 of 265

# WINDHAM SCHOOL SYSTEM - STUDENT PROGRESS RECORD

Name _____
TDC Number 4?-1465

Enrollment Date 8-16-86  Unit _Math I_
Enrollment Date _____ Unit _____
Enrollment Date _____ Unit _____
Enrollment Date _____ Unit _____

## INSTRUCTIONS

Record identification data and enrollment data requested.

The Instructional Objective (IO) number is shown above each block. In the upper half of the block, enter the number of the month and year in which work on the IO begins. For example, if a student begins work on an objective in September of 1981, write 9-81. In the lower half of the block, enter the number of the month and year in which the IO has been attained.

Use blue or black ball point in making entries on the Student Progress Record (SPR).

## COMMUNICATIONS



Case 4:14-cv-03152 Document 38-58 Filed on 09/01/16 in TXSD Page 238 of 265

| | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 | 48 | 49 | 50 |

SPELLING III

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

LANGUAGE I

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

LANGUAGE II

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 | 48 | 49 | 50 |

LANGUAGE III

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 | 48 | 49 | 50 |

WRITING I

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

WRITING II

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

WRITING III

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Name ______________________

TDC No. ______________________

# MATHEMATICS

| | Phase I | Phase II | Phase II | Phase III | Phase III |
|---|---|---|---|---|---|
| GENERAL | 1 2 3 4 5 | 1 2 3 4 5 | 6 7 8 9 10 | 1 2 3 4 5 | 6 7 8 9 10 |
| NUMBERS AND NUMBER SYSTEMS | 1 2 3 4 5 | 1 2 3 4 5 | 6 7 8 9 10 | 1 2 3 4 5 | 6 7 8 9 10 |
| | 6 7 8 9 10 | 11 12 13 14 15 | 16 17 18 19 20 | 11 12 13 14 15 | 16 17 18 19 20 |
| NUMBERS AND ALGEBRAIC OPERATIONS | 1 2 3 4 5 (1–4: 9-86) | 1 2 3 4 5 (2–3: 9-86) | 6 7 8 9 10 | 1 2 3 4 5 (2–3: 9-86) | 6 7 8 9 10 |
| | 6 7 8 9 10 | 11 12 13 14 15 | 16 17 18 19 20 | 11 12 13 14 15 | 16 17 18 19 20 |
| OPERATIONS USING GRAPHICS | 1 2 3 4 5 | 1 2 3 4 5 | 6 7 8 9 10 | 1 2 3 4 5 | 6 7 8 9 10 |
| GEOMETRY | 1 2 3 4 5 | 1 2 3 4 5 | 6 7 8 9 10 | 1 2 3 4 5 | 6 7 8 9 10 |
| | 6 7 8 9 10 | 11 12 13 14 15 | 16 17 18 19 20 | 11 12 13 14 15 | 16 17 18 19 20 |
| MEASUREMENT AND PROBABILITY | 1 2 3 4 5 | 1 2 3 4 5 | 6 7 8 9 10 | 1 2 3 4 5 | 6 7 8 9 10 |
| SETS AND LOGIC | 1 2 3 4 5 | 1 2 3 4 5 | 6 7 8 9 10 | 1 2 3 4 5 | 6 7 8 9 10 |



1                    DEFENSE EXHIBIT 35

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

THE STATE OF TEXAS

BUSINESS RECORDS AFFIDAVIT

COUNTY OF HARRIS

BEFORE ME, the undersigned authority, personally appeared _Anita Garrett_, who, being by me duly sworn, deposed as follows:

My name is _Anita Garrett_, I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated.

I am the Custodian of the Records of _MHMRA_. Attached hereto are _9_ pages of records kept by _MHMRA_ _____ in the regular course of business. It was the regular course of business of _MHMRA_ for an employee or representative of _MHMRA_, with knowledge of the act, event, condition, opinion or diagnosis, recorded to make the records and the records were made at or near the time or reasonably soon thereafter. The records attached hereto are exact duplicates of originals.

x _Anita N. Garrett_
AFFIANT

SWORN TO AND SUBSCRIBED before me on this the _18_ day of _SEPTEMBER_, 1992.

_A. G. Rodriguez_
NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

A. G. RODRIGUEZ
Notary Public, State of Texas
My Commission Expires
8/03/93.

NOTARY'S PRINTED NAME
Commission Expires: _8-3-93_

# PSYCHIATRIC SCREENING

| Name: Rhondes, Rick | | MHMRA No: | SPN: 1001375 |
|---|---|---|---|
| DOB: 5-10-64 | Sex: (M) F   Race: B (M) H | | Charges: Capital Murder |

| Source Code: DM | N - New (R) Repeat | Date: 12/17/91 | Time: 090 | Place: 762 |
|---|---|---|---|---|
| No. Prev. Hosp: | Prev. OP? Y N | Homeless? Y N | DIV: I E | |
| Milieu: Y N | PD: Y N | React: Y N | Hx Meds: | |

**History and Mental Status:** Referred by medical Division
for ψ consult

having any d— nor but that ψ in
typple of physician

**Impression:** Personality disorder (antisocial)

**NOTE:** The initial impression above is not a diagnosis, but a tentative hypothesis based upon a brief screening interview. It is not to be used for diagnostic purposes.

**Disposition:** nr ψ Rx /D/C Haldol

**Medications Recommended:** None

| Svc Grp: 4 | Disp: RM | Hsg: | Fol: | Out Ref(s): |
|---|---|---|---|---|
| Interview Hrs: | Min: 21 | Liason Hrs: | Min: 18 | Documentation Hrs: | Min: 16 |

| Date: 12-17-91 | Signature/Title: |
|---|---|
| Date: 12-17-91 | Signature/Title: |

Marcas, David Alan

# PSYCHIATRIC SCREENING

204 Briarglen

| Name: Rhoades, Rick Allan | MHMRA No: 113014 | SPN: 100 1375 |
|---|---|---|
| DOB: 5.10.64 | Sex: (M) F | Race: B (W) H | Charges: Capital Murder |

4-10-62 - 4-12-69

| Source Code: D | (N - New)  R - Repeat | Date: 12.13.91 | Time: 1500 | Place: Jail 732 |
|---|---|---|---|---|
| No. Prev. Hosp: 0 2-3 | Prev. OP? Y (N) | Homeless? Y (N) | DIV: (I) E |
| Milieu: Y (N) | PD: Y (N) | React: Y (N) | Hx Meds: Elavil / Xanax / Diltely / Haldol / Anafla Prolixin / Lithium |

History and Mental Status: Pt referred by self 2° problems c̄ impulse control. Feels like he is about to either hurt self or somebody else. Has been on medication in past. Has periods of intense happiness followed by periods of depression. Feels like only whe of tension

MSE  A&O X 3

Affect euthymia  Affect congruent

① SI - no suicide attempt ② HI - relieves tension by attacking others
③ auditory hallucinations - tell him to do himself in
thoughts: goal - directed

Memory 3/3 @ 0'  0/3 @ 5'

Substance Abuse: ① glue-sniffing  ② ETOH
Education: 9th grade

Impression: ① Impulse control disorder

**NOTE:** The initial impression above is not a diagnosis, but a tentative hypothesis based upon a brief screening interview. It is not to be used for diagnostic purposes.

Disposition: Refer to psychiatrist

Medications Recommended:

| Svc Grp: 4 | Disp: RP | Hsg: | Fol: | Out Ref(s): |
|---|---|---|---|---|
| Interview Hrs:  Min: 17 | Liason Hrs:  Min: 14 | Documentation Hrs:  Min: 18 |

| Date: 12.13.91 | Signature/Title: Matthew M. Yarger |
|---|---|
| Date: 13-13-91 | Signature/Title: |

# PSYCHIATRIC SCREENING

| Name: Rhoades, Rick | MHMRA No: | SPN: 1001375 |
|---|---|---|
| DOB: 5.10.64  Sex: (M) F  Race: B (W) H | | Charges: Capital Murder |

JA07

| Source Code: D1 | N - New    R (Repeat) | Date: 12-13-91 | Time: 1530 | Place: 7B-2 |
|---|---|---|---|---|
| No. Prev. Hosp: | Prev. OP? Y N | Homeless? Y N | DIV: I E | |
| Milieu: Y N | PD: Y N | React: Y N | Hx Meds: | |

**History and Mental Status:** 4 consult request

Pt is a 24 y/o white male with + auditory hallucination. Pt states he harms other people in order to relieve tension.

**Impression:** Psychosis NOS

**NOTE:** The initial impression above is not a diagnosis, but a tentative hypothesis based upon a brief screening interview. It is not to be used for diagnostic purposes.

**Disposition:** Start meds

**Medications Recommended:**

Haldol 5 mg po qHS x 1 then 10 mg po qHS if tolerated

| Svc Grp: 4 | Disp: MI | Hsg: | Fol: 4W | Out Ref(s): |
|---|---|---|---|---|
| Interview Hrs: Min: 10 | Liason Hrs: Min: | Documentation Hrs: Min: 4 | | |

| Date: 12/13/91 | Signature/Title: Claude Parler |
|---|---|
| Date: /13/91 | Signature/Title: Martin McYaze— MSW |

FORENSIC PSYCHIATRIC SERVICES

CONSULTATIONS REQUEST AND REPORT



Client's Name: _Rhoades, Rick_____     Case Number: _100137_

Physician: _____

Request Date: _____     Time: _____

To: _____     From: _____

With reference to: _____

_____

_____

REPORT DATE: ___12-17-91___     TIME: _915_

Name of Person Making Report: _____

FINDINGS AND RECOMMENDATIONS:

_____Pt had been started on haldol:_____

_____D/C Haldol please_____

_____

Revised 5/86

7B2

## FORENSIC PSYCHIATRIC SERVICES

### CONSULTATIONS REQUEST AND REPORT

Client's Name: _Rhoades, Rick_     Case Number: _100375_

Physician: _Parker_

Request Date: _____    Time: _____

To: _____    From: _____

With reference to: _____

_____

_____

REPORT DATE: _____ 12.13.91 _____    TIME: _____ 1530 _____

Name of Person Making Report: _____

FINDINGS AND RECOMMENDATIONS:

Pt is 24 yo (W) with auditory hallucinations.

Medication
Haldol 5 mg po q HS x 1
then 10 mg po q HS x 30 days.

_Claude Parker MD_

MHMRA #020

# HARRIS COUNTY SHERIFF'S DEPARTMENT
## DETENTION BUREAU

## REFERRAL FOR PSYCHIATRIC SCREENING

A. Name: _Rhoades, Ricky_____ DOB: _5/10/64_ SPN: _1001375_

Sex:  M  F   Race:  W  B  H   Other: _____  Cellblock: _781C (A&7)_

Charges/Bond: _____

B. **Possible Psychiatric Problems:**   Circle and explain.

(1)  Is thinking of killing self.          (2)   Very frightened.

(3)   Unusual sexual acts.                 (4)   Strange or unusual behavior.

(5)   Very confused.                       (6)   Unable to move.

(7)   Unable to keep still.                (8)   Cannot or will not talk.

(9)   Unable to stop talking.              (10)  Shouting or screaming.

(11)  Distracted or preoccupied.          (12)  Will not keep clothes on.

(13)  Trying to harm self.                 (14)  Destroying property.

(15)  Very depressed.                      (16)  Fighting.

(17)  Other inmates report.                (18)  Will not obey rules.

(19)  Threatening or hostile.              (20)  About to "explode".

(21)  Other behavior which should be checked by the psychiatric screening team:

Explain: _Ref had a psy Ref filled out on 12/6/91_
_no response yet of Wheatley._
_____
_____

C. What caused you to observe the inmate's unusual behavior?

Explain: _____

D. What was the inmate doing when you first observed his/her actions?

Explain: _____

E. What problems have you experienced regarding this inmate in the past?

Explain: _____

Classification Deputy contacted: _____ Date: _12/12/91_

Inmate Transferred to: _____ Date: _____
                        cellblock location

HARRIS COUNTY SHERIFF'S DEPARTMENT
DETENTION BUREAU

REFERRAL FOR PSYCHIATRIC SCREENING

A. Name: RHOADES RICK DOB: 5-10-66 SPN: L001375

Sex: (M) F    Race: (W) B  H  Other: _____  Cellblock: 7 B 2

Charges/Bond: _____

B. **Possible Psychiatric Problems:**    Circle and explain.

(1)    Is thinking of killing self.        (2)  Very frightened.

(3)    Unusual sexual acts.              (4)  Strange or unusual behavior.

(5)    Very confused.                    (6)  Unable to move.

(7)    Unable to keep still.             (8)  Cannot or will not talk.

(9)    Unable to stop talking.          (10)  Shouting or screaming.

(11)   Distracted or preoccupied.       (12)  Will not keep clothes on.

(13)   Trying to harm self.             (14)  Destroying property.

((15))  Very depressed.                  (16)  Fighting.

(17)   Other inmates report problems.   (18)  Will not obey rules.

(19)   Threatening or hostile.          (20)  About to "explode".

(21)   Other behavior which should be checked by the psychiatric screening team:

Explain: Patient says that he had been under
Psychiatric care & was Dx Schizophrenia
was given Elavil & Xanax. He feels he
need to talk to a psychiatrist

C. What caused you to observe the inmate's unusual behavior?

Explain: _____

D. What was the inmate doing when you first observed his/her actions?

Explain: _____

E. What problems have you experienced regarding this inmate in the past?

Explain: _____

Classification Deputy contacted: _____ Date: _____

Inmate Transferred to: _____ Date: _____
                          cellblock location

12-3-91          825 AM
date             time

RRIS COUNTY SHERIFF'S DEPARTMENT
DETENTION BUREAU

RRAL FOR PSYCHIATRIC SCREENING

des , Rick _____ DOB: 5-10-64 SPN: 1001375
    Race: (W) B H Other: _____ Cellblock: 7B2-C
d: _____

chiatric Problems:  Circle and explain.

NIC

| | | |
|---|---|---|
| nking of killing self. | (2) | Very frightened. |
| al sexual acts. | (4) | Strange or unusual behavior. |
| onfused. | (6) | Unable to move. |
| to keep still. | (8) | Cannot or will not talk. |
| to stop talking. | (10) | Shouting or screaming. |
| cted or preoccupied. | (12) | Will not keep clothes on. |
| to harm self. | (14) | Destroying property. |
| depressed. | (16) | Fighting. |
| mates report problems. | (18) | Will not obey rules. |
| ening or hostile. | (20) | About to "explode". |

behavior which should be checked by the psychiatric screening team:

mate is thinking of hurting himself and sometimes
bout hurting others _____

_____

you to observe the inmate's unusual behavior?
disturbance caused by Inmate Rhoads on 12-5-91

inmate doing when you first observed his/her actions?
King his door

s have you experienced regarding this inmate in the past?
lent mood swings

Deputy contacted: Dep. Rodriguez _____ Date: 12-6-91

ed to: _____ Date: _____
        cellblock location

--- 2020 __ David A. Ritchie inmate/jailer

**Mental Health and**
**Mental Retardation**
**Authority of Harris County**

| DG-2-B | Client Diagnostics | Rev. 5/88 |
|---|---|---|

Last Name/ Suffix: Rhoades

Client ID:

First Name: RICK

Local Case Number: 1130154

Middle Name: ALLAN

Component/Location: 280 A206

Action    Add: ☒    Change: ☐    Delete: ☐

Decision Date: 12-17-91 (MM DD YY)

Reason for Action: 1
1 = Admission  2 = Reevaluation
3 = Death

Principal Diag. Axis: ☐

**AXIS I**

| Level 1 | Adjustment Disorder, NOS | 30990 |
| Level 2 | | |
| Level 3 | | |
| Level 4 | | |
| Level 5 | | |
| Level 6 | | |

**AXIS II**

| Level 1 | no Dx | V7109 |
| Level 2 | | |
| Level 3 | | |
| Level 4 | | |

**AXIS III**

| Level 1 | None reported / Known | |
| Level 2 | | |
| Level 3 | | |
| Level 4 | | |
| Level 5 | | |
| Level 6 | | |

AXIS III Date (MM/DD/YY): __/__/__

AXIS IV: 3    AXIS V: Current 39  Past Year 49    ABL: Current ___  Potential ___

Primary AAMD: ___ ___    Secondary AAMD: ___ ___    Tertiary AAMD: ___ ___
Genetic: ___ ___    Cranial Anomaly: ___ ___    Sensory Impairment: ___ ___
Perception: ___ ___    Convulsive Disorder: ___ ___    Psy Impairment: ___ ___
Motor Dysfunction: ___ ___ ___ ___    AAMD Date: __/__/__

IQ Score: ___    IQ Test Date: __/__/__    IQ Test Type: ___
SQ Score: ___    SQ Test Date: __/__/__    SQ Test Type: ___

Completed By: _____ A    Date: 3-18-92

1          EXHIBIT FOR BILL OF EXCEPTION
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

STATEMENT TAKEN FROM JENNIE M. NORTON ON 1/4/83 BY DEPUTY JAN
CLIFTON OF THE HOLT COUNTY SHERIFF'S DEPARTMENT

INFORMATION ON JENNIE M. NORTON
ADDRESS: 1407 ROBIN ROAD          VALPARAISO,INDIANA
MOTHER: MARGARET NORTON
DOB: 1/14/67
HEIGHT: 5'7"
WEIGHT: 160
HAIR COLOR: BROWN
EYE COLOR: BROWN


Rick and Scott picked Eileen and I up at my house 12/30/82. We
asked them if we could go with them. I didn't know Scott(Karpenter)
but I had known Rick(Rhoades) for about one week. I met him
skating at Chesterton. We stopped somewhere in Illinois at
someone's house that Rick knew and stayed all night. We went to
Des Moines,Iowa and slept in the car. We went to a white house
on a back road,I don't know where it was. We got stuck in the snow.
Rick and Scott said they were going to the house to see if anyone
was home. They told us to stay in the car but we went with them
anyway. We went into the house. Rick and Scott were already in
the house. Eileen(Weber) and I took some food and guns. The
boys told us to wait until they got the car out, but they had a
different car. We left again and went to Mound City and slept in
the car again. It was about 7 to 7:30PM when we got the car and
guns. I saw two rings. I think Rick gave them to Eileen. One
of the boys said the rings came from the house.


The original statement was signed by Jennie Norton
Also signed by Deputy Jan Clifton at 12:15PM on 1/4/83
Jennie Norton was read the Miranda Warning at 12 noon on 1/4/83


We tool a gasoline can from a blue, I think, Dodge pickup in
Mound City. Scott took the can.
          **Additional statement was given and signed by Jennie.

COURT'S EXHIBIT 1

*[handwritten annotations: "BM", "2/3 Brother in prison", "Batson Challenge", "COURT EXHIBIT #1 9-9-91", "State Strike"]*

CAUSE NO. 612408

| | | |
|---|---|---|
| THE STATE OF TEXAS | $ | IN THE 179TH DISTRICT COURT |
| VS. | $ | OF |
| RICK ALLAN RHOADES | $ | HARRIS COUNTY, T E X A S |

### JUROR QUESTIONNAIRE

The information which you give in response to this questionnaire will be used only by the Court and the lawyers to select a qualified jury. The attorneys are under orders to maintain the confidentiality of any information they learn in the course of reviewing these questionnaires.

NAME: _Gregory C. Randle_

JUROR NO: _231_

### INSTRUCTIONS

Please answer each question below as completely and as accurately as you reasonably can. Your complete written answer will save a great deal of time for the judge, for the lawyers, for the other jurors, and for you.

You are expected to sign your questionnaire, and your answer will have the effect of a statement given to the Court under oath. What is needed is your very best, honest effort to answer the questions contained in this questionnaire.

The sole purpose of the questionnaire is to encourage your full expression and candor so that both the prosecutor and the defense will have a meaningful opportunity to try to select a fair and impartial jury to try the issues of the case. If this highly important objective of selecting a fair and impartial jury is not achieved, the balance of the proceedings become meaningless. Your full cooperation is of vital importance.

<u>You are instructed not to discuss these questions or your answers with anyone until questioned by Judge Mike Wilkinson.</u>

Mike Wilkinson, Presiding Judge
179th District Court
Harris County, Texas

PLEASE PRINT LEGIBLY                JUROR NO. 23

1. FULL NAME: Gregory Carl Randle

2. IN WHAT PART OF THE CITY OR COUNTY DO YOU LIVE? _____
   North west Harris County

3. HOME ADDRESS: 11959 Medicine Bow Circle Houston, Tex 77067

4. WORK ADDRESS: 44 44 Center Houston, Texas

5. PRESENT MARITAL STATUS:
   SINGLE ___ MARRIED ✓ SEPARATED ___ DIVORCED ___ WIDOWED ___

6. YOUR AGE: 35      DATE OF BIRTH: 2-3-57

7. BIRTHPLACE: Houston, Texas

8. YOUR EMPLOYER: Coffer Corporation

9. LENGTH OF EMPLOYMENT: 12 yrs

10. JOB DUTIES OR TITLE: Machinist
    WHAT DO YOU LIKE MOST ABOUT YOUR JOB? Making things
    from a blue print and being able to see the finished product
    WHAT DO YOU LIKE LEAST ABOUT YOUR JOB? burns & cuts
    from flying metal chips

11. OTHER THAN YOUR PRESENT OCCUPATION, WHAT OTHER TYPES
    OF JOBS HAVE YOU HAD? reasturants, County parks
    during Summer.

12. HOW LONG HAVE YOU LIVED IN HARRIS COUNTY, TEXAS? 35 yrs

13. WHERE HAVE YOU LIVED BESIDES HARRIS COUNTY, TEXAS? (LIST
    PLACE OF RESIDENCE AND WHEN YOU LIVED THERE) _____
    N A

14. SPOUSE'S NAME: Karen Randle
    AGE: 33

15. SPOUSE'S BIRTHPLACE: Kennard Texas

16. SPOUSE'S EMPLOYER: Bank One
    LENGTH OF EMPLOYMENT: 12 yrs

17. OTHER THAN YOUR SPOUSE'S PRESENT OCCUPATION, WHAT OTHER
    TYPES OF JOBS HAS HE OR SHE HAD: None

1

JUROR NO. 23

18.   PLEASE LIST YOUR CHILDREN AND REQUESTED INFORMATION:

| NAME | SEX | AGE | SCHOOL OR EMPLOYMENT |
|------|-----|-----|----------------------|
| Gregory Jr. | M | 12 | Aldine ISD |
| Tiffany | F | 13 | Wells Middle school |
| Renisha | F | 10 | Aldine ISD |
| Shannon | M | 7 | Aldine ISD |
| | | | |
| | | | |

19.   WHAT HOBBIES OR ACTIVITIES DO YOU ENJOY? fishing
Drawing, bowling

20.   WHAT HOBBIES OR ACTIVITIES DO THE OTHER ADULTS IN YOUR HOUSE
ENJOY? fishing, bowling

21.   WHAT IS THE HIGHEST GRADE YOU COMPLETED IN SCHOOL? 12th

COLLEGE? 2 yrs

POST GRADUATE? _____

NAME OF HIGH SCHOOL: M.B. Smiley
            GRADUATE?  YES (_____)    NO (_____)

FAVORITE SUBJECTS: History, Science

LEAST FAVORITE SUBJECTS: Math

IF YOU ATTENDED SCHOOL AFTER HIGH SCHOOL, PLEASE DESCRIBE
THE TYPE OF SCHOOL AND YOUR MAJOR COURSE OF STUDY, INCLUDING
TRADE AND TECHNICAL SCHOOL AND COLLEGE COURSES: _____

San Jacinto Jr College
Electronics - AirConditioning &
Refrigeration

2

JUROR NO. 23

22.  HAVE YOU EVER RECEIVED ANY TRAINING IN THE LAW?

YES    (_____)    NO    (___✓___),

IF YES PLEASE DESCRIBE:_____

_____

23.  HAVE YOU OR ANY MEMBER OF YOUR FAMILY OR CLOSE FRIEND
HAD A BAD EXPERIENCE WITH A WEAPON? ___NO___
IF YES, PLEASE DESCRIBE _____

24.  DO YOU BELIEVE THAT THE CRIMINAL LAWS OF THE UNITED
STATES AND THE STATE OF TEXAS RELATING TO CRIMINAL
DEFENDANTS ARE TOO LENIENT?
YES    (_____)    NO    (___✓___)    NO OPINION (_____)
IF YES, EXPLAIN: _____

_____

_____

25.  DO YOU BELIEVE THAT THE LAWS OF THE UNITED STATES
AND THE STATE OF TEXAS RELATING TO CRIMINAL DEFENDANTS
ARE TOO HARSH?
YES    (_____)    NO    (___✓___)    NO OPINION    (_____)
IF YES, EXPLAIN: _____

_____

_____

26.  DO YOU HAVE ANY DIFFICULTY WITH VISION OR HEARING,
OR ANY OTHER DISABILITY THAT WOULD MAKE JURY DUTY A
HARDSHIP FOR YOU? ___NO_____

27.  HAVE YOU OR YOUR SPOUSE SERVED IN THE MILITARY?
INDICATE BRANCH,LENGTH OR SERVICE, DATE OF SEPARATION,
TYPE OF DISCHARGE, COMBAT DUTY, RANK OR GRADE HELD,
GENERAL DUTIES, PLACES OF SERVICE: ___NO_____

_____

_____

_____

3

JUROR NO. 23

28. HAVE YOU, A FAMILY MEMBER, OR A CLOSE FRIEND EVER BEEN INVOLVED IN A CRIMINAL CASE AS A DEFENDANT, VICTIM, WITNESS, OR COMPLAINANT? YES (✓) NO (_____)
IF YES, PLEASE DESCRIBE: _____

_Brother was A defendant_

_____

29. HAVE YOU, A FAMILY MEMBER, OR A CLOSE FRIEND EVER BEEN ARRESTED FOR OR CHARGED WITH AN OFFENSE ABOVE THE LEVEL OF A TRAFFIC VIOLATION? YES (✓) NO (_____)
IF YES, PLEASE DESCRIBE: _____

_My Brother was arrested_

_____

30. ARE YOU PRESENTLY UNDER INDICTMENT OR LEGAL ACCUSATION FOR ANY MISDEMEANOR OR FELONY? YES (_____) NO (✓)

31. RELIGIOUS PREFERENCE (PLEASE STATE DENOMINATION AND SPECIFIC CHURCH YOU ATTEND) _Church of Christ_

_____

_____

32. CHURCH OFFICES HELD AND ACTIVITIES OTHER THAN ATTENDANCE: _none_

_____

_____

33. DO YOU NOW HAVE OR HAVE YOU EVER HAD A BUMPER STICKER ON YOUR CAR? YES (_____) NO (✓)
IF YES, PLEASE DESCRIBE: _____

_____

_____

4

JUROR NO. 23

34. PRIOR JURY SERVICE:     CIVIL  (___)   CRIMINAL (___)
    BOTH (___)    COURT MARTIAL (___)    NONE (✓)

    IF CRIMINAL:

    |                       | CASE #1           | CASE #2           | CASE #3           |
    |-----------------------|-------------------|-------------------|-------------------|
    | TYPE OF CASE(S):      | _____   | _____   | _____   |
    | HOW LONG AGO?         | _____   | _____   | _____   |
    | REACH VERDICT?        | YES( ) NO( )       | YES( ) NO( )       | YES( ) NO( )       |
    | SET PUNISHMENT?       | YES( ) NO( )       | YES( ) NO( )       | YES( ) NO( )       |
    | WERE YOU THE FOREMAN?  | YES( ) NO( )       | YES( ) NO( )       | YES( ) NO( )       |

    IF OTHER THAN CRIMINAL:  WHEN: _____
                    TYPE OF CASE: _____

    WAS THERE ANYTHING IN YOUR PRIOR JURY EXPERIENCE THAT EITHER
    UPSET OR AGITATED YOU?  YES (___)   NO (___) PLEASE EXPLAIN:

    _____

    _____

35. HAVE YOU OR YOUR SPOUSE EVER BEEN A GRAND JUROR?
    YES (___)   NO (✓)

36. HAVE YOU OR ANYONE IN YOUR IMMEDIATE FAMILY EVER BEEN UNDER A
    DOCTOR'S CARE FOR ANY MENTAL ILLNESS?  YES (___)   NO (✓)

37. HAVE YOU OR ANY MEMBER OF YOUR FAMILY CONSULTED A
    PSYCHIATRIST OR A PSYCHOLOGIST?  YES (___)   NO (✓)

38. WITH WHAT POLITICAL PARTY DO YOU FEEL YOU ARE ASSOCIATED?
    _Democratic_____

39. DO YOU CONSIDER YOURSELF A LIBERAL ___?  CONSERVATIVE___?
    OR MODERATE ✓

40. WHAT POLITICAL GROUPS, FOUNDATIONS, AND ACTION COMMITTEES
    DO YOU BELONG TO OR SUPPORT? _None_____

    _____

5

JUROR NO. 23

41. HAVE YOU OR ANY RELATIVE EVER BEEN A MEMBER OF M.A.D.D., CRIME, OR ANY OTHER LAW ENFORCEMENT ORIENTED GROUP? YES (___)   NO (✓) IF YES, LIST: _____

_____

_____

42. IF YOU DO VOLUNTEER WORK, PLEASE INDICATE THE ORGANIZATION AND YOUR INVOLVEMENT    *none*

43. TO WHAT CIVIC, PROFESSIONAL, FRATERNAL GROUPS, OR LABOR UNIONS DO YOU BELONG?   *none*

_____

44. HAVE YOU EVER HAD ANY INVOLVEMENT WITH THE AMERICAN CIVIL LIBERTIES UNION?  YES (___)   NO (✓) IF YES, DESCRIBE: _____

_____

45. HAVE YOU EVER APPEARED BEFORE CITY COUNCIL, THE LEGISLATURE, ETC.?  YES (___)   NO (✓)

46. HAVE YOU EVER WRITTEN A "LETTER TO THE EDITOR"? YES (___)   NO (✓)

47. WHAT IS THE LAST MOVIE YOU SAW IN A THEATER? _____

*Alien III*

48. WHAT IS THE LAST BOOK YOU READ?  *The Encyclopedia*

_____

49. WHAT TV SHOWS DO YOU WATCH REGULARLY? *Mostly PBS*

50. WHAT CABLE TV STATIONS DO YOU SUBSCRIBE TO?  *NONE*

_____

51. WHAT MAKE AND MODEL CAR/TRUCK DO YOU DRIVE?  *LEXUS ES 250   19.90*

6

JURORNO. _23_

52. WHAT MAGAZINES AND NEWSPAPERS DO YOU READ REGULARLY?
    _Hunting & fishing_

53. HAVE YOU EVER BEEN A MEMBER OF ANY LAW ENFORCEMENT GROUP, SUCH AS THE CRIME COMMISSION, THE TRAFFIC COMMISSION, OR OPERATION GET INVOLVED, POLICE OR SHERIFF'S AUXILIARY?
    _no_

54. ARE YOU NOW OR HAVE YOU BEEN INVOLVED IN LAW ENFORCEMENT?
    _no_

55. WOULD YOU BE WILLING TO TELL A PEACE OFFICER "NO" IF HE GAVE YOU OR A FAMILY MEMBER WHAT YOU BELIEVED TO BE AN IMPROPER ORDER?   YES (_✓_)   NO (____)

56. DO YOU KNOW ANYONE WHO HAS BEEN TO PRISON? YES (____)   NO (_✓_)   IF YES, EXPLAIN: _My_
    _Brother   is   now   in   prison_

57. WHAT DO YOU THINK ABOUT THE TEXAS PRISON SYSTEM? _____
    _needs   Reforms_

58. DO YOU FEEL THAT THE TEXAS DEPARTMENT OF CORRECTIONS SERVES THE PUBLIC IN REHABILITATING INMATES?   YES (____)   NO (_✓_)

59. HAVE YOU OR ANY FAMILY MEMBER BEEN ASSOCIATED OR WORKED WITH ANY PROGRAM DEDICATED TO REHABILITATING PERSONS CONVICTED OF CRIME?   YES (____)   NO (_✓_)

    IF YES, EXPLAIN: _____

60. DO YOU BELIEVE THAT CERTAIN KINDS OF PEOPLE ARE MORE LIKELY TO COMMIT CRIMES THAN OTHERS?   YES (____)   NO (_✓_),
    IF YES, EXPLAIN: _____

7

JUROR NO. 23

61. CHECK THE ONE STATEMENT WHICH BEST SUMMARIZES YOUR
    GENERAL VIEWS ABOUT CAPITAL PUNISHMENT (THE DEATH
    PENALTY).

    _____ 1.   I AM OPPOSED TO CAPITAL PUNISHMENT UNDER
                 ANY CIRCUMSTANCES.

    ___✓___ 2.   I AM OPPOSED TO CAPITAL PUNISHMENT EXCEPT
                 IN A FEW CASES WHERE IT MAY BE APPROPRIATE.

    _____ 3.   I AM NEITHER GENERALLY OPPOSED TO NOR
                 GENERALLY IN FAVOR OF CAPITAL PUNISHMENT.

    _____ 4.   I AM IN FAVOR OF CAPITAL PUNISHMENT EXCEPT
                 IN A FEW CASES WHERE IT MAY NOT BE APPROPRIATE.

    _____ 5.   I AM STRONGLY IN FAVOR OF CAPITAL PUNISHMENT
                 AS AN APPROPRIATE PENALTY.

62. ASSUME YOU ARE ON A JURY TO DETERMINE THE PUNISHMENT FOR
    A DEFENDANT WHO HAS ALREADY BEEN CONVICTED OF A VERY
    SERIOUS CRIME.  IF THE LAW GIVES YOU A CHOICE OF DEATH,
    LIFE IMPRISONMENT, OR SOME OTHER PENALTY:  (CHECK ONLY ONE)

    _____ 1.   I CANNOT VOTE TO ASSESS THE DEATH PENALTY UNDER
                 ANY CIRCUMSTANCES.

    _____ 2.   I AM OPPOSED TO THE DEATH PENALTY BUT COULD VOTE
                 TO ASSESS IT IN A PROPER CASE.

    ___✓___ 3.   MY DECISION ON WHETHER TO ASSESS THE DEATH PENALTY
                 WOULD DEPEND UPON THE FACTS AND CIRCUMSTANCES OF
                 THE CASE.

    _____ 4.   I WOULD USUALLY VOTE FOR THE DEATH PENALTY IN A
                 CASE WHERE THE LAW ALLOWS ME TO DO SO.

    _____ 5.   I WOULD VOTE TO ASSESS THE DEATH PENALTY IN EVERY
                 CASE THAT I COULD.

63. WHAT DO YOU BELIEVE IS THE MOST IMPORTANT OBJECTIVE OF PUNISHMENT
    FOR CRIMINAL OFFENSES?  (FOR EXAMPLE:  DETERRENCE TO OTHERS?
    REHABILITATION?  RETRIBUTION?  PREVENTION OF REPEATED BEHAVIOR?)

    To deter future Crimes

8

JUROR NO. 23

64. YOU WILL FIND A NUMBER OF STATEMENTS BELOW EXPRESSING DIFFERENT ATTITUDES
TOWARD THE DEATH PENALTY (CAPITAL PUNISHMENT). PLACE A CHECK IN ONE OF
THE SPACES NEXT TO EACH STATEMENT INDICATING WHETHER YOU MORE NEARLY
AGREE OR MORE NEARLY DISAGREE WITH THE STATEMENT.

AGREE   DISAGREE

1. I THINK CAPITAL PUNISHMENT IS NECESSARY BUT I WISH IT WERE NOT.

2. ANY PERSON, MAN OR WOMAN, YOUNG OR OLD, WHO COMMITS CAPITAL MURDER SHOULD PAY WITH HIS OWN LIFE.

3. CAPITAL PUNISHMENT IS WRONG, BUT IT IS NECESSARY IN OUR IMPERFECT CIVILIZATION

4. EVERY CRIMINAL SHOULD BE EXECUTED.

5. CAPITAL PUNISHMENT HAS NEVER BEEN EFFECTIVE IN PREVENTING CRIME.

6. I DO NOT BELIEVE IN CAPITAL PUNISHMENT, BUT I BELIEVE IT IS NECESSARY.

7. WE MUST HAVE CAPITAL PUNISHMENT FOR SOME CRIMES.

8. I DO NOT BELIEVE IN CAPITAL PUNISHMENT UNDER ANY CIRCUMSTANCES.

9. CAPITAL PUNISHMENT IS NOT NECESSARY IN MODERN CIVILIZATION.

10. LIFE IMPRISONMENT IS MORE EFFECTIVE THAN CAPITAL PUNISHMENT.

11. EXECUTION OF CRIMINALS IS A DISGRACE TO CIVILIZAED SOCIETY.

12. CAPITAL PUNISHMENT IS JUST AND NECESSARY.

13. I DO NOT BELIEVE IN CAPITAL PUNISHMENT, BUT I DO NOT BELIEVE IT SHOULD BE ABOLISHED.

14. CAPITAL PUNISHMENT GIVES THE CRIMINAL WHAT HE DESERVES.

15. THE STATE CANNOT TEACH THE SACREDNESS OF HUMAN LIFE BY DESTROYING IT.

16. CAPITAL PUNISHMENT IS JUSTIFIED ONLY FOR PREMEDITATED MURDER.

17. CAPITAL PUNISHMENT SHOULD BE AVAILABLE AS PUNISHMENT FOR MORE CRIMES THAN IT IS NOW.

9

JUROR NO. 23

65.  HAVE YOU HAD ANY MEDICAL TRAINING?
     YES (___)   NO (_✓_)  IF YES, EXPLAIN: _____

     _____

66.  HAVE YOU TAKEN A COURSE IN PSYCHOLOGY?
     YES (___)   NO (_✓_)  IF YES, WHEN AND WHERE? _____

     _____

67.  IS THERE ANYTHING ABOUT YOUR JOB, FAMILY, OR HEALTH
     THAT WOULD AFFECT YOUR SERVICE AS A JUROR?
     YES (___)   NO (_✓_)  IF YES, EXPLAIN: _____

     _____

     _____

68.  PLEASE LIST BELOW ANYTHING YOU BELIEVE THE COURT OR
     ATTORNEYS SHOULD KNOW THAT YOU THINK IS IMPORTANT
     WITH REFERENCE TO YOUR ABILITY TO SERVE AS A JUROR
     IN THIS OR ANY OTHER CRIMINAL CASE.




     I HEREBY CERTIFY THAT THE RESPONSES AND INFORMATION PROVIDED HEREIN
     ARE TRUE AND CORRECT.

                                    _Gregory C. Randle_
                                    JUROR SIGNATURE

10