# TAMES Barcode Cover Sheet



541d3c962dd842b5a6768bdace654ee7

| | |
|---|---|
| **Case Number:** | WR-78,124-01 |
| **Style:** | RHOADES, RICK ALLAN AKA MARCAS |
| **Event Date:** | 8/18/2014 |
| **Event Details:** | 11.071 WRIT RECEIVED/This Court/SUPP/CLERK RECORD/11.071/ |
| **Filename:** | WR-78,124-01 SUPP-CLERK RECORD 11.071 8-18-2014 |
| **Document Description:** | RECORD--SUPPLEMENTAL |
| **Document Remarks:** | TWO PAGES LEFT OUT OF RECORD ORIGINALLY SENT TO COURT SO THIS SUPPLEMENTAL REPLACES ORIGINAL RECORD WITH TWO MISSING PAGES INCLUDED |
| **Document(s):** | |
| **Generated By:** | bhooper |
| **Generated On:** | 8/18/2014 3:33:45 PM |

SCANNED
NOV 1 2 2014

3D4

78,124

# S U P P L E M E N T A L

## P O S T   C O N V I C T I O N

FROM:                        179TH CRIMINAL COURT


                                OF


RECEIVED IN
COURT OF CRIMINAL APPEALS

AUG 18 2014

Abel Acosta, Clerk

HARRIS COUNTY,  TEXAS


RICK ALLAN RHOADES
612408-A

APPLICANT


VS.


THE STATE OF TEXAS

RESPONDENT


REV. 01-02-04

# **INDEX**

**PAGE**

CAPTION                                          1

CERTIFICATE OF THE CLERK                          302

REV: 01-02-04

IN  THE  TEXAS  COURT  OF  CRIMINAL  APPEALS

AND

IN  THE  DISTRICT  COURT  OF  HARRIS  COUNTY,  TEXAS
179th  JUDICIAL  DISTRICT

| | |
|---|---|
| Ex Parte RICK ALLAN RHOADES ) ( <br><br> ) ( <br><br> ) ( <br><br> ) ( <br> PETITIONER ) ( | Case No. <u>612408-A</u> |

THIS  IS  A  DEATH  PENALTY  CASE

APPLICATION  FOR  POST-CONVICTION  WRIT  OF  HABEAS  CORPUS

Respectfully submitted,

James M. Leitner
**Attorney for Applicant**
**1314 Texas Ave., Ste. 1206**
**Houston, Texas 77002**
**(713) 237-8707**
**FAX: (713) 237-8757**
**TBN: 12187900**

**F I L E D**
CHARLES BACARISSE
District Clerk

AUG 1 8 1997

Time: _____
Harris County, Texas

By _____
                    Deputy

IN THE TEXAS COURT OF CRIMINAL APPEALS

AND

IN THE DISTRICT COURT OF HARRIS COUNTY, TEXAS
179th JUDICIAL DISTRICT

| | | |
|---|---|---|
| Ex Parte RICK ALLAN RHOADES | ) ( | |
| | ) ( | Case No. 612408-A |
| PETITIONER | ) ( | |

## THIS IS A DEATH PENALTY CASE

### APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS

Applicant, RICK ALLAN RHOADES, pursuant to Article 11.071 V.A.C.C.P., moves this Court to issue a Writ of Habeas Corpus for his release from confinement on grounds that he is being denied his liberty under an illegal and unconstitutional conviction and sentence of death.

Applicant believes that an evidentiary hearing is necessary to adequately prove his allegations herein, and respectfully requests the Court to order the same.

: 00002

## HISTORY OF PRIOR PROCEEDINGS

The District Court of Harris County, Texas, 179th Judicial District, in and for Harris County entered the judgment under attack.

A felony complaint was filed against Mr. Rhoades on October 12, 1991. Mr. Rhoades was indicted by a Harris County, Grand Jury on December 10, 1991, for the offense of capital murder.

Jury selection began on July 27, 1992, and was completed on September 9, 1992. On September 10, 1992, two alternate jurors were chosen. Mr. Rhoades entered a plea of not guilty before the jury on September 28, 1992.  Final arguments began at 8:25 P.M. on October 1, 1992, and were completed at 9:55 P.M. The jury deliberated until 12:20 A.M. on October 2, 1992 at which time they returned a verdict of guilty of capital murder.

The sentencing proceedings were conducted October 2, 1992 through October 7, 1992. On October 8, 1992, the jury returned affirmative answers to the two special issues.

The trial court denied Mr. Rhoades's Motion for a New Trial on December 11, 1992.

As required by the jury's verdict, the trial court sentenced Mr. Rhoades to death.

00003

The Texas Court of Criminal Appeals affirmed the conviction and sentence in **Rhoades v. State**, 934 S.W.2d 113 (Tex. Crim. App. 1996). Motion for Rehearing was denied.

This is Mr. Rhoades' first application for a writ of habeas corpus.

3

## STATEMENT OF FACTS

Rick Allan Rhoades' conviction and sentence was secured through prosecutorial misconduct, lying witnesses, ineffective assistance of counsel, denial of equal protection under the law, and a denial of fundamental principles of due process and due course of law as guaranteed by both the United States Constitution and the Texas Constitution.

This was a prosecution pursuant to V.T.C.A. Penal Code Sec. 7(A), the murder of the Bradley Dean Allen and his brother Charles Allen during the same criminal transaction.

Prior to the trial of this case the State filed a motion in limine to keep the defense from mentioning on voir dire, or any other time: "the length of time a defendant will be imprisoned before becoming eligible for parole if assessed a life sentence for the offense of capital murder." (TR, 146) The Court granted this motion pre-trial and ultimately throughout the trial. (TR, 146)(RIII, 47,48),(RXVII, 21) All other pre-trial motions were ruled upon, and Applicant's confession was determined to be voluntary.

Immediately before trial the State explained that Applicant was arrested initially for a burglary of a school building, but they did not believe that was admissible before this jury on guilt/innocence. This was a burglary committed almost a month after the capital murder, and was not part of any ongoing scheme.

4

Applicant's trial attorney then assured the State that it was OK because he wanted to take the "let it all hang out" approach with this jury. (RXXVII, 8)

The State made an opening statement, and during the statement the prosecutor informed the jury that Applicant made a confession. She informed the jury that factually some of the statement could not have been correct, but she obviously vouched for the credibility of the incriminating portions of the statement. (RXXVII, 34). Applicant's trial attorney responded with an opening statement. (RXXVII, 35-40) In this statement he informed the jury that Applicant did confess because, "he just wanted to get it off of his chest." That he was not a violent person and did not understand why he had committed this offense. Trial counsel informed the jury that he was going to let it all hang out, and they would know everything about what occurred. (RXXVII, 38) This would include the fact that Applicant had just gotten out of prison less than 24 hours before the capital murder. Counsel then set the position of Applicant, for the trial in stone. He stated that they would hear Applicant's confession and the confession correctly stated what occurred in this case.  (RXXVII, 39)

The State's first witness before the jury was David Lee Sanders. He was a lifelong friend of the victims. (RXXVII, 41) He was the first to find the brothers dead in their home. (RXXVII, 70,71) The evidence showed that he then obtained a gun and informed

5

the family of the deceased as to his discovery. Later he testified that he pulled the blood soaked carpet out of the house after the bodies were removed. (RXXVII, 122) Applicant's attorney had no cross examination at this point.

The next witness was Houston Police Officer K.W. Rogers who testified that when he made the scene the front door was locked. (RXXVII, 123) Police chemist Jim Bolding testified as to collecting blood from the scene and typing it as blood type A. (RXXVII, 160) He then testified that the victim brothers were both blood type O, (RXXVII, 160-163) and that he submitted some of the blood to Monica Thompson for DNA testing.

The State then proceeded with Frank Lopez the Pasadena ISD Officer who first arrested Applicant in the commission of a burglary of a school building which occurred approximately one month after the murders. Mr. Lopez testified that Applicant gave himself up peacefully and stated that his name was Seven Ray Leland. (RXXVIII, 250) The State then offered into evidence a Texas Department of Corrections Inmate ID card which was received before the jury without objection. (RXXVIII, 265) This card was not even found by this officer, but still it was received into evidence without objection. On cross examination Applicant's counsel proved that Applicant had falsified names to the police when questioned on 4 or 5 prior occasions. (RXXVIII, 266)

Steve Brown was the next Pasadena Officer who testified. He was a jailer at the Pasadena jail. Applicant, while housed in the

6

Pasadena Jail, informed Mr. Brown that he wanted to talk with someone about a murder. (RXXVIII, 270) Brown then had Detective H.W. Butler speak with Applicant. H.W. Butler testified that Applicant told him that he had been in the penitentiary under the false name of David Marcus but that he wanted to give him information about the killing of a deputy sheriff. (RXXVIII, 287) He then testified that Applicant said it was really about the murders of two brothers, and that his attitude was cocky. (RXXVIII, 288) This was custodial interrogation without **Miranda** or Art. 38.22 V.A.C.C.P. warnings of any kind. (RXXVIII, 293) There were further statements attributed to Applicant about $160.00, missing from the dead brothers' wallets. (RXXVIII, 292-293) The State then called Houston Police Homicide Sergeants Kennedy and Maxey. (RXXVII, 310) These were the officers who obtained Applicant's written confession, State's Exhibit Number 1. (RXXVIII, 360) Additionally these officers made the scene of the murders. They testified to the bloody mess that they found, and then many gruesome pictures depicting the same were introduced, over Applicant's objection. (RXXVIII, 328)

The State then offered, without objection, Applicant's written confession. The confession admits that Applicant had been to the penitentiary some four different times.(RXXVIII, 360ff) It further admits that he had just gotten out of the penitentiary where he had been doing time under an assumed name, and that these murders

occurred within twenty-four hours of his release. The confession made it appear that he was angry because he could not find his parents, that he became intoxicated, and that the murders themselves were just a random act of violence. (RXXVIII, 360ff) The confession admitted physical facts that the officers were able to corroborate through their independent investigation. (RXXVIII, 371) More pictures were admitted which depicted the body of Charles Allen clutching a pillow with his intestines hanging out from his wounds. (RXXVIII, 407) There was no cross examination.

Evidence officers then testified as to the recovery of evidence including blood from the scene. DNA specialists testified to the match up of Applicant's blood and the blood found at the scene. (RXXIX, 512)

The State then called family member Don Allen, who was allowed over objection, to testify that the character of the victim Charles Allen was peaceful. (RXXIX 541) The Court granted Applicant's motion to have the State pay for a defense blood-spatter expert, but the Court disallowed the defense expert the ability to listen to the State expert when he testified. (RXXIX, 544)   The medical examiner then testified and more gruesome pictures were entered into evidence by the State. (RXXIX, 545-637). More testimony was then offered to show that victim Charles Allen was a peaceful person. (RXXIX, 639)

Applicant's counsel objected to the blood spatter expert's testimony on the grounds that such was not scientifically accepted.

8

That objection was overruled. (RXXX, 640-648) The State's blood-spatter expert testified to his opinion that Charles Allen was attacked in his bed and killed on the spot. (RXXX, 681) He further testified that Bradley Allen came into Charles' room, had his artery cut there, and was followed back to his own bedroom where he was then stabbed to death. (RXXX, 682) The cross examination was over at (RXXX, 700).

The State rested and Applicant's counsel offered some evidence to try to bolster the credibility of Applicant's statement. (RXXX, 700-789) Trial counsel was still relying upon the complete accuracy of the statement.

Both sides then rested and closed. (RXXX, 801) Applicant made his objections and requests to the charge known to the Court. These included:(1) a request for a limiting instruction on victim impact evidence as no evidence of guilt; (2) A request that the Court include a charge on the right to seek an amicable adjustment due to the threats made to him by Charles Allen; (3) A request that the Court defining criminal transaction; (4) and he objected to the charge on voluntary intoxication. All objections and requests were overruled. (RXXX, 807)

The State argued, without objection, that the law of self-defense would not apply to the lesser offense of voluntary manslaughter. (RXXX, 811) She further argued that the defensive charges refer to what a reasonable person would do, and not what a HOT HEADED EX-CON would do. (RXXX, 818) She speculated on what

9

intent was really used in this case, and **informed the jury, without objection, that everyone would like to know what Applicant's intent really was.** (RXXX, 821) The State further offered their opinion as to what the intent was. Applicant objected, the Court overruled the objection and made the following comment on the evidence that the State's theory **"COULD BE A REASONABLE DEDUCTION FROM THE EVIDENCE". (RXXX, 822)**

Applicant was convicted of capital murder in less than three hours of deliberation. (RXXX, 868) The jury did not even begin its deliberation until after 9:00 P.M. the evening of final arguments.

On punishment the State offered evidence of the school burglary. (RXXXI, 1-33) The State then offered evidence of prior convictions from Texas and Florida. (RXXXI, 50) They showed that Applicant had been housed in that part of the jail where the MOST VIOLENT OFFENDERS were housed, and that he got mad at jailer Manning one day and threw his tray. (RXXXI, 72,73) Evidence was shown that Applicant had committed theft and burglary in the past. (RXXXI 80-103) Officer John Bertolini testified that on a prior burglary arrest Applicant informed him that "If I would have had a gun I would have killed you". (RXXXI, 163)

Guy Etheride who was a bouncer at a club testified to Applicant being drunk, threatening to kill a patron, and going for a knife when he had to subdue Applicant. (RXXXI, 191-210) Testimony then showed that Applicant stole a car in Indiana in 1982, and then

10

burglarized a home and stole guns in rural Iowa while in the stolen car. (RXXXII, 224-250)

The State then brought Eileen Weber who testified that she was part of the car theft, burglary spree that began in Indiana and proceeded into Iowa. She testified that she was fifteen years old at the time and was having sex with Applicant who was an adult. She further testified that Applicant wanted to pull a gun on the police when he was stopped, but that she kept him from doing that. (RXXXII, 286)

Jay Dickson a correctional officer at the Westville Indiana Correctional Center then testified that he found a homemade shank in Applicant's belongings back in March of 1984. (RXXXII, 360) He was further allowed to testify about what inmates generally do with such shanks. (RXXXII, 347) Terrance James Cornel, a Morgan's Point police officer, testified to an attempted burglary and evading arrest that Applicant was involved in during March of 1990, along with one Chris Fitch. (RXXXII, 372) Bowen Heffner another law enforcement officer then testified to Applicant having another shank in Westville Correctional Facility back in April of 1984. (RXXXII, 394)

The State then showed through a woman namedk Judy Hill and Officer Sherry Peyton that a robbery occurred in April of 1986, by someone Hill could not identify in the courtroom. Hill was then allowed to testify that she was shown a photo spread back then and she picked out who the robber was. Peyton testified that she made

11

up the photo spread and Hill picked Applicant out of the photo spread as being the robber. (RXXXII, 400-425) The State could not produce the photo spread, but over Applicant's objection, the Court ruled that it must not have been suggestive, and forced Applicant to proceed with cross-examination without the aid of ever seeing the photo-spread, or having it available for cross-examination. (RXXXII, 441-442)

David Houston then testified to a car being stolen from his mother in Longview, Texas in 1986. Pictures of the car were entered into evidence. It was shown that Applicant stole the car and evaded the police when they tried to arrest him. (RXXXIII, 450ff) The State then showed that Applicant escaped from juvenile probation custody, (RXXXIII, 475) That Applicant burglarized a Dairy Queen and evaded arrest, (RXXXIII, 479) and that pictures of the damage to this Dairy Queen were entered into evidence. (RXXXIII, 497)

The State then showed that the Cote family took Applicant in off the streets, and that the testimony showed that Applicant responded by making sexual advances toward the Cote children. (RXXXIII, 524) The testimony then showed that Applicant fought Mr. Cote when he was confronted. Further that Applicant cursed and showed his private parts to the entire family during the ensuing argument.

Eduardo Riveria a Harris County Deputy Sheriff testified that Applicant, while in the Harris County Jail, threatened him with the

12

00013

statement, "I guess I am going to have to shank a deputy to get a little respect around here." (RXXXIII, 555)

Chris Fitch was then called to testify by the State. He admitted to being an accomplice of Applicant's in the Morgan's Point incident. (RXXXIII, 564) He testified that Applicant called him the day he was released from prison in September 1991, and they met later that evening. They drank some beer and then split up. The next day he showed Chris that he had cut his hand, and blamed it on jumping over a fence. Later on they heard a news broadcast about the murders of the two brothers. Fitch testified that Applicant jokingly stated that there was a "slasher in the neighborhood". (RXXXIII, 578)

The State then read from records in evidence that Applicant was indicted for felony retaliation against David Cote, and that it was dismissed only because there was a missing witness. There was no objection to the reason for the dismissal. (RXXXIII, 589) The State then showed that Applicant received a bad conduct discharge from the U.S. Navy for being AWOL. Family members of the victims then testified as to the loss they suffered. The State then rested its' case.

The defense called a neuropsychologist to testify about an EEG he ran on Applicant. (RXXXIII, 606ff) He testified that Applicant suffered from a major affective disorder which means he was depressed, and that he had a bipolar depressive disorder. (RXXXIII, 644)

13

: 00014

Patricia Spenny, the biological mother of Applicant, then testified to the events of Applicant's early childhood, and abuse he suffered at the hands of his biological father. (RXXXIV, 700ff) She testified that she was tricked into giving Applicant up for adoption, and that she had not seen him since he was a small child.

Donna Rhoades, the adoptive mother of Applicant then testified. It was at this time that the state was successful in keeping out pictures of Applicant through various stages of his life. (RXXXIV, 735-737) This was an attempt by Applicant to show the jury through pictorial evidence that when living in a caring structured environment Applicant was not a threat to society. She was only allowed to testify about Applicant's childhood, and early adult years. She was precluded from showing what she was testifying about through pictures. She further testified to his criminal problems and stated that she would love him forever.

Novella Pollard, who was in charge of the penitentiary GED class when Applicant was incarcerated before, also testified. She remembered that Applicant was valedictorian of his GED class. In essence she testified that Applicant thrived in the structure of the Windham Unit of the then Texas Department of Corrections. (RXXXIV, 823) Once again, Applicant was attempting to show that when he was in a structured caring environment he was far from a continuing threat to society.

Psychologist Windel Dickerson then testified that Applicant did well within a structured environment, but that outside of

14

structure he was a time bomb. (RXXXIV, 874) Dr. Dickerson testified that Applicant's risk level would decrease with age, and that by the time he was sixty-five years old he would not be much of a risk anymore. (RXXXIV, 886) In summary, Dr. Dickerson testified that Applicant was not a current threat in the structure of the penitentiary, but that he was a continuing threat to free society at the present time. However, with the passage of time he would cease to be a continuing threat to a free society. It was his belief that Applicant's propensity to commit criminal acts of violence would subside with the passage of a great amount of time.

Applicant's adoptive father, Ernest Rhoades, then testified. He testified that Applicant did well in his early years within his structured household even though he was a hyperactive child. (RXXXV, 893ff) He testified that Applicant did well in the structure of boot camp (RXXXV, 923), but that when Applicant was on his own was when he got into the majority of his criminal troubles. Mr. Rhoades testimony would have been illustrated by the pictures that were denied admittance by the Court. These pictures would have made this testimony of Dr. Dickerson more meaningful.

The State then cross examined Dr. Dickerson. He testified on cross that Applicant's story about this being a random act of violence did not make sense. (RXXXV, 959) He further testified that the randomness of the incident as viewed from the confession, makes Applicant a higher risk factor. The State then brought out through

15

cross-examination of Dr. Dickerson, that the risk level of Applicant would decrease significantly with age. (RXXXV, 998)

During rebuttal the State showed evidence of an outburst while Applicant was awaiting trial in the Harris County, Jail. (RXXXV, 1015)

Then the State, via the testimony of witness Roy Smithy, was allowed over objection, to testify about things that go on generally in prison. Witness Smithy testified to all of the gang violence in prison, and to many things that other violent persons do while in prison. All objections to relevancy were overruled. (RXXXV, 1030) Smithy testified that if the jury were to give Applicant a life sentence, he would not be segregated from other prisoners. Smithy was even allowed to testify that Applicant could be given an unescorted emergency furlough in a ridiculously short period of time while serving a life sentence for capital murder. (RXXXV, 1036ff)

The Judge then again disallowed the defense to respond with the fact that Applicant would have to serve a minimum day for day term of 35 years incarceration for a capital life sentence before he would even be eligible for parole. (RXXXV, 1038ff) Smithy was allowed to testify even further about the violent problems with other inmates carrying weapons in prison, and the fact that those weapons are used to inflict injury to others on many occasions. All of this testimony about the bad acts of others was used as

16

aggravating evidence against Applicant herein.   Both sides then rested and closed.

The jury was retired to deliberate, and they returned affirmative answers to the special issues.   In accordance with the verdict, Applicant was sentenced to death.

On motion for new trial the following occurred. On December 4, 1992, the Court began hearing evidence on the motion for new trial which was filed on November 3, 1992. (R, XXXIX, 3) At this hearing trial counsel sought to offer into evidence Defense Exhibit Number 1. This document was eventually received in evidence by the trial Court. (RXXXIX, 17) This included an affidavit of Bill Barry the Director of Management Services with the Texas Department of Criminal Justice Institutional Division concerning the Divisions Departmental Policy and Operational Manual covering temporary furloughs. (RXXXIX, 30) Trial Counsel sought to prove by this document that the testimony of Roy Smithy was contrived, false, and misleading to the jury on the issue of unescorted furloughs. As such, his testimony was perjured, and sponsoring the same by the State amounted to prosecutorial misconduct. Applicant's trial counsel showed, via this document, that an inmate convicted of capital murder could never be eligible for an appropriate reason furlough. Further, defense counsel showed that no person is eligible for an unescorted emergency furlough unless they are certified by the State Classification Committee as not being a security risk. (Pamphlet page 8) It is clear from a reading of the

17

document that the spirit of the guidelines would never allow a convicted capital murderer any type of furlough, certainly not unescorted. Trial counsel argued: "...This trial being conducted during the presidential election where almost every night there were some reference to Willie Horton, the capital murderer who was furloughed out of Massachusetts, who was released on furlough, who committed another offense, that, along with this testimony that my client--that my client was eligible and could be released on a mere pass unsupervised was such a substantial falsehood that misled the jury and caused such prejudicial effect on this jury that they could in no way ever consider granting life imprisonment..." (RXXXIX, 6,7) The Prosecutor could see the problem with this witness, and insisted that she be allowed to testify at this hearing. She testified that she committed no prosecutorial misconduct because she never talked with Smithy about furloughs prior to his testimony. She testified that it was just a topic that she thought of while Smithy was in the hall, so she wrote him a note asking if a capital murder inmate would be eligible for a furlough. His response was yes. Even though she knew that he was not an employee of the Texas Department of Criminal Justice-Institutional Division, she felt that she had shown good faith in proffering any testimony about any topic that he would testify about under oath. She believed that somehow claiming ignorance

18

justified her offer of his testimony. (RXXXIX, 19,20) The Court overruled the motion. (RXXXIX, 27)

This thoroughly unreliable verdict, based upon the constitutional infirmities as set forth above, required the trial court to sentence Rick Allen Rhoades to die.

19

## GROUNDS OF ERROR

GROUND OF ERROR NUMBER ONE........Page 28

THE COURT DENIED APPLICANT FUNDAMENTAL DUE PROCESS WHEN IT DENIED APPLICANT THE RIGHT TO INTRODUCE MITIGATING EVIDENCE IN THE FORM OF PICTURES OF HIMSELF DURING DIFFERING STAGES OF HIS LIFE. (RV XXXIV, 735ff)

GROUND OF ERROR NUMBER TWO........Page 43

APPLICANT'S RIGHTS AS GUARANTEED BY U.S. CONST. AMEND VIII WERE DENIED WHEN HE WAS DENIED THE RIGHT TO INTRODUCE MITIGATING EVIDENCE IN THE FORM OF PICTURES OF HIMSELF DURING DIFFERING STAGES OF HIS LIFE. (RV XXXIV,735ff)

GROUND OF ERROR NUMBER THREE.....Page 56

ARTICLE 37.071(e) & (g)'S PROHIBITION AGAINST INFORMING JURORS THAT A SINGLE HOLDOUT JUROR COULD CAUSE THE IMPOSITION OF A LIFE SENTENCE VIOLATED APPLICANT'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND TEX. CONST. ART. I SEC. 13.

GROUND OF ERROR NUMBER FOUR......Page 63

TEXAS' 12-10 RULE VIOLATED APPLICANT'S RIGHTS UNDER ARTICLE I, SECTION 13 OF THE TEXAS CONSTITUTION AND UNDER THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION, AS CONSTRUED BY THE UNITED STATES SUPREME COURT'S DECISION IN *Mills v. Maryland*[1]

GROUND OF ERROR NUMBER FIVE.....Page 71

ALLOWING THE JURY TO CONSIDER THE POSSIBILITY OF UNESCORTED EMERGENCY FURLOUGH DURING ITS DELIBERATIONS OVER APPLICANT'S SENTENCE VIOLATED APPLICANT'S RIGHTS UNDER THE TEXAS CONSTITUTION.

---

[1]  486 U.S. 367, 383 (1988).

00021

GROUND OF ERROR NUMBER SIX......Page 83

ALLOWING THE JURY TO CONSIDER THE POSSIBILITY OF EMERGENCY FURLOUGH IF APPLICANT WERE GIVEN A LIFE SENTENCE DURING ITS DETERMINATION OF APPLICANT'S SENTENCE VIOLATED U.S. CONST. AMEND. V, VIII, & XIV.

GROUND OF ERROR NUMBER SEVEN.......Page 88

THE JURY'S PROBABLE CONSIDERATION OF EMERGENCY FURLOUGH DURING ITS DELIBERATIONS ON PUNISHMENT VIOLATED APPLICANT'S RIGHT TO DUE PROCESS AND WAS NOT HARMLESS ERROR

GROUND OF ERROR NUMBER EIGHT.......Page 92

THE SPECULATION OVER WHETHER APPLICANT WOULD BE GRANTED AN EMERGENCY FURLOUGH IF GIVEN A LIFE SENTENCE VIOLATED APPLICANT'S FEDERAL CONSTITUTIONAL RIGHT TO A RELIABLE SENTENCING PROCEEDING.

GROUND OF ERROR NUMBER NINE........Page 95

APPLICANT'S SENTENCE OF DEATH WAS BASED UPON MATERIAL INFORMATION THAT WAS FALSE AND MISLEADING IN VIOLATION OF U.S. CONST. AMEND. VIII & XIV.

GROUND OF ERROR NUMBER TEN........Page 98

PETITIONER'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY THE TRIAL COURT'S REFUSAL TO INSTRUCT THE JURY ABOUT THE TRUE PAROLE IMPLICATIONS OF A LIFE SENTENCE.

GROUND OF ERROR NUMBER ELEVEN....Page 104

APPLICANT WAS DENIED DUE PROCESS BECAUSE THE JURY THAT SENTENCED HIM TO DEATH, LIKE MANY TEXAS JURIES, LIKELY HAD FUNDAMENTAL MISUNDERSTANDINGS ABOUT THE MEANING OF A LIFE SENTENCE FOR SOMEONE CONVICTED OF CAPITAL MURDER.

21

GROUND OF ERROR NUMBER TWELVE.......Page 114

THE EIGHTH AMENDMENT REQUIREMENT OF RELIABILITY IN
DETERMINING THAT DEATH IS THE APPROPRIATE PUNISHMENT WAS
VIOLATED WHEN THE JURY WAS NOT TOLD THE TRUE CONSEQUENCES
OF ITS SENTENCING VERDICT.

GROUND OF ERROR NUMBER THIRTEEN.....Page 117

THE TRIAL COURT'S REFUSAL TO ALLOW APPLICANT TO SHOW THE
STATUTORY MINIMUM PERIOD OF INCARCERATION ON A CAPITAL
LIFE SENTENCE VIOLATED APPLICANT'S RIGHT TO PRESENT ALL
RELEVANT MITIGATING EVIDENCE UNDER U.S. CONST. AMEND.
VIII.

GROUND OF ERROR NUMBER FOURTEEN....Page 120

APPLICANT'S U.S. CONST. AMEND. XIV RIGHT TO DUE PROCESS
WAS VIOLATED BECAUSE THE TRIAL COURT FAILED TO INFORM THE
JURY BY WAY OF INSTRUCTION THAT APPLICANT WOULD NOT BE
ELIGIBLE FOR PAROLE UNTIL HE HAD BEEN INCARCERATED FOR 35
YEARS CALENDAR, GIVEN THE SPECIFIC FACTS OF THIS CASE.

GROUND OF ERROR NUMBER FIFTEEN.....Page 124

THE DEATH PENALTY, AT LEAST AS PRESENTLY ADMINISTERED IN
TEXAS, CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT UNDER THE
EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION.

GROUND OF ERROR NUMBER SIXTEEN.....Page 126

THE DEATH PENALTY, AT LEAST AS ADMINISTERED TO APPLICANT
IN HARRIS COUNTY, TEXAS IS ARBITRARY AND CONSTITUTES
CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF U.S. CONST.
AMEND. VIII & XIV

00023

GROUND OF ERROR NUMBER SEVENTEEN....Page 133

THE DEATH PENALTY, AT LEAST AS ADMINISTERED TO APPLICANT
IN HARRIS COUNTY, TEXAS DENIED HIM EQUAL PROTECTION OF
THE LAW.

GROUND OF ERROR NUMBER EIGHTEEN......Page 136

APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL ON
DIRECT APPEAL BY COUNSEL FAILING TO RAISE AN INEFFECTIVE
ASSISTANCE OF COUNSEL CLAIM FOR COUNSEL'S FAILURE TO
OBJECT AT TRIAL TO THE DISPARITY IN TREATMENT BY HARRIS
COUNTY TEXAS DISTRICT COURTS AS SET FORTH ABOVE AS A DUE
PROCESS, EQUAL PROTECTION, AND CRUEL AND UNUSUAL
PUNISHMENT VIOLATION.

GROUND OF ERROR NUMBER NINETEEN......Page 138

THE JURY INSTRUCTION REGARDING MITIGATING EVIDENCE
VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION.

GROUND OF ERROR NUMBER TWENTY....Page 146

APPLICANT'S RIGHTS TO DUE PROCESS WERE VIOLATED WHEN THE
COURT REFUSED TO ALLOW APPLICANT TO PRESENT EVIDENCE OF
PAROLE ELIGIBILITY AFTER THE STATE OPENED THE DOOR TO
SUCH EVIDENCE.

GROUND OF ERROR NUMBER TWENTY-ONE....Page 157

APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL[2] BY
COUNSEL'S FAILURE TO OBJECT, AT TRIAL THAT HIS RIGHTS TO
DUE PROCESS WERE VIOLATED WHEN THE COURT REFUSED TO ALLOW
APPLICANT TO PRESENT EVIDENCE OF PAROLE ELIGIBILITY AFTER
THE STATE OPENED TO THE DOOR TO SUCH EVIDENCE.

---

[2]All effective assistance of counsel claims refer to U.S.
CONST. AMEND. VI.

23

GROUND OF ERROR NUMBER TWENTY-TWO.....Page 167

APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL ON
APPEAL BY COUNSEL'S FAILURE TO RAISE AS AN ISSUE ON
APPEAL THAT APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF
COUNSEL AT TRIAL WHEN COUNSEL FAILED TO OBJECT THAT
APPLICANT'S RIGHTS TO DUE PROCESS WERE VIOLATED WHEN THE
COURT REFUSED TO ALLOW APPLICANT TO PRESENT EVIDENCE OF
PAROLE ELIGIBILITY AFTER THE STATE "OPENED THE DOOR" TO
SUCH EVIDENCE.


GROUND OF ERROR NUMBER TWENTY-THREE....Page 168

APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN
COUNSEL FAILED TO OBJECT TO THE TESTIMONY OF ROY SMITHY
CONCERNING HOW A CAPITAL MURDERER SERVING A LIFE SENTENCE
COULD OBTAIN TRUSTEE STATUS, EARN GOOD CONDUCT TIME, AND
BE GRANTED AN UNESCORTED EMERGENCY FURLOUGH.

GROUND OF ERROR NUMBER TWENTY-FOUR....Page 179

APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY
COUNSEL'S FAILURE TO MOVE TO STRIKE THE TESTIMONY OF ROY
SMITHY CONCERNING THE SPECULATIVE POSSIBILITY OF
EMERGENCY FURLOUGH, OR REQUEST AN INSTRUCTION LIMITING
ITS USE BY THE JURY.


GROUND OF ERROR NUMBER TWENTY-FIVE....Page 180

APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL
WHERE TRIAL COUNSEL DID NOT CONTEMPORANEOUSLY OBJECT TO
THE STATE PRODUCING AGGRAVATING EVIDENCE AT THE
PUNISHMENT STAGE CONCERNING ACTS OF VIOLENCE THAT GO ON
IN PRISON GENERALLY, WHEN SUCH EVIDENCE WAS NOT RELEVANT
TO ANY OF THE SPECIAL ISSUES AS APPLIED SPECIFICALLY TO
APPLICANT. SUCH EVIDENCE ALLOWED THE JURY TO PUNISH
APPLICANT, WITH THE PENALTY OF DEATH, FOR ACTS OF
VIOLENCE BY OTHER PEOPLE.(RXXXV, 1030)

24

GROUND OF ERROR NUMBER TWENTY-SIX....Page 183

APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL BY COUNSEL FAILING TO SUBMIT AS A POINT OF ERROR THE FACT OF INEFFECTIVE ASSISTANCE OF COUNSEL AT THE TRIAL LEVEL.


GROUND OF ERROR NUMBER TWENTY-SEVEN.....Page 185

APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S FAILURE TO OBJECT TO THE STATE'S ARGUMENT ABOUT WISHING TO KNOW WHAT APPLICANT'S INTENT REALLY WAS, AS A COMMENT ON HIS FAILURE TO TAKE THE STAND. (RXXX,821)


GROUND OF ERROR NUMBER TWENTY-EIGHT....Page 190

APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY TRIAL COUNSEL'S FAILURE TO OBJECT TO THE COURT'S COMMENT ON THE EVIDENCE, BY STATING THAT THE STATE'S THEORY OF WHAT APPLICANT'S INTENT REALLY WAS, WAS A REASONABLE DEDUCTION FROM THE EVIDENCE. (RXXX, 822)


GROUND OF ERROR NUMBER TWENTY-NINE....Page 193

APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY TRIAL COUNSEL'S FAILURE TO PROPERLY INVESTIGATE THE CASE PRE-TRIAL.


GROUND OF ERROR NUMBER THIRTY.........Page 202

APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE COUNSEL DID NOT OBJECT AT TRIAL, OR CLAIM INEFFECTIVE ASSISTANCE FOR FAILURE TO OBJECT AT TRIAL, TO THE STATE PUTTING ON EVIDENCE THAT A RETALIATION INDICTMENT WAS RETURNED AGAINST APPLICANT FOR FELONY RETALIATION AGAINST DAVID COTE, AND IT WAS ULTIMATELY DISMISSED ONLY BECAUSE THERE WAS A MISSING WITNESS. SUCH EVIDENCE TOTALLY IGNORED APPLICANT'S PRESUMPTION OF INNOCENCE IN THAT MATTER. (RXXVIII, 589)

GROUND OF ERROR NUMBER THIRTY-ONE....Page 207

APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL BY COUNSEL FAILING TO RAISE AS A POINT OF ERROR THAT THE TESTIMONY OF ROY SMITHY CONCERNING THE POSSIBILITY OF APPLICANT BEING GIVEN AN EMERGENCY FURLOUGH IF GIVEN A LIFE SENTENCE WAS CONTRIVED, FALSE AND INTENTIONALLY MISLEADING AND AS SUCH A VIOLATION OF DUE PROCESS[3]. (RXXXIX, 6,7)

GROUND OF ERROR NUMBER THIRTY-TWO....Page 212

APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL ON PUNISHMENT BY COUNSEL FAILING TO OBJECT TO THE TESTIMONY OF ROY SMITHY FOR THE REASON THAT HIS TESTIMONY WAS NEITHER RELIABLE OR RELEVANT PURSUANT TO TEX. R. CRIM. EVID. 702,705

GROUND OF ERROR NUMBER THIRTY-THREE...Page 216

APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL ON PUNISHMENT BY COUNSEL FAILING TO OBJECT TO THE TESTIMONY OF ROY SMITHY FOR THE REASON THAT HIS TESTIMONY VIOLATED THE DICTATES OF TEX. R. CRIM. EVID.401 & 404

GROUND OF ERROR NUMBER THIRTY-FOUR .....Page 222

APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL WAIVING APPLICANT'S RIGHT NOT TO BE TRIED AS A CRIMINAL GENERALLY ON THE GUILT STAGE OF THE TRIAL, BY ALLOWING INTO EVIDENCE PROOF THAT HE WAS ARRESTED FOR AN EXTRANEOUS BURGLARY, THAT HE HAD PREVIOUSLY BEEN TO THE PENITENTIARY SERVING CRIMINAL SENTENCES ON FOUR OCCASIONS, THAT HE HAD ONLY BEEN RELEASED ON PAROLE FOR

---

[3]Brady v. Maryland, 373 U.S. 83, (1963); Napue v. Illinois, 360 U.S. 264 (1959); Giglio v. United States, 405 U.S. 150 (1972); Means v. State, 429 S.W.2d 490 (Tex. Crim. App. 1968); Crutcher v. State, 481 S.W.2d 113 (Tex. Crim. App. 1972)

00027

LESS THAN TWENTY-FOUR HOURS WHEN THIS OFFENSE OCCURRED, AND THAT HE HAD GIVEN FALSE NAMES WHEN ARRESTED BEFORE.

GROUND OF ERROR NUMBER THIRTY-FIVE.....Page 230

APPLICANT'S RIGHT TO DUE PROCESS AND EQUAL PROTECTION WAS VIOLATED BY THE DISPARITY IN THE APPLICATION OF THE RULES OF EVIDENCE BY THE TEXAS COURTS.

GROUND OF ERROR NUMBER THIRTY-SIX......Page 241

APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AT THE PUNISHMENT STAGE OF THE TRIAL BY THE CUMULATIVE EFFECT OF ALL OF THE PUNISHMENT ERRORS SET FORTH IN THIS WRIT.

GROUND OF ERROR NUMBER THIRTY-SEVEN....Page 246

APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY THE CUMULATIVE EFFECT OF ALL ERRORS DURING THE GUILT/INNOCENCE STAGE OF THE TRIAL.

GROUND OF ERROR NUMBER THIRTY-EIGHT....Page 247

APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY THE CUMULATIVE EFFECT OF ALL ERRORS DURING THE DIRECT APPEAL STAGE OF THE TRIAL.

: 00028

## GROUND OF ERROR NUMBER ONE

**THE COURT DENIED APPLICANT FUNDAMENTAL DUE PROCESS WHEN IT DENIED APPLICANT THE RIGHT TO INTRODUCE MITIGATING EVIDENCE IN THE FORM OF PICTURES OF HIMSELF DURING DIFFERING STAGES OF HIS LIFE. (RV XXXIV, 735ff)**

In the presence of the jury Applicant offered the testimony of his adoptive parents, namely: Donna Rhoades (XXXIV, 735ff) and Ernest Rhoades (RXXXV, 893ff). Prior to Donna Rhoades taking the stand a hearing was held outside the presence of the jury wherein the State sought to limit Applicant's evidence. During this hearing Applicant's trial counsel informed the court that he desired to offer into evidence pictures of Applicant during different stages of his life. These stages began about the age of four years (RXXXIV, 736) and continued until fairly recent times.(RXXXIV, 736) Applicant's counsel informed the court as follows:

By defense counsel: "My point is the State has introduced photographs throughout the dehumanizing stage of their punishment hearing, showing various photographs of him when he was arrested at the time of seventeen, eighteen, throughout, mug shots. To aid the jury to understand the development of the defendant through his various stages of his life, we also have the right to show the human side of the defendant as much as the State has attempted to dehumanize and turn him into some sort of monster. I think, under **Penry**, and under the mitigation portion stage of the trial, the jury should be entitled to see the defendant grown and what various

28

stages. Talking about elementary school and how he appeared, et cetera, et cetera. And let them give whatever weight they think is necessary. It's very material to our lawsuit.

Y'all have publicized very emotional pictures of the deceased and their family, which they had other non-emotional pictures available. Now for the court to deny us the same right I think it's very unfair and very unjust." (RXXIV, 736,737)

The State's response was as follows:

by the State: "Your Honor, there's certainly a lot of pictures in evidence. Some of them are emotional related to the capital murder because the defendant left behind a bloody, gory, emotion-laden scene. Those things are admissible because they are evidence of the crime itself. The other photographs of this defendant, each and every one is related to a time when he was arrested on some other criminal offense. Obviously, all relevant to his background and criminal history that the law permits us to develop. Now, we are all keenly aware of the changes in the capital murder law and what is admissible. And certainly anything mitigating, anything that goes to show a lessening of this defendant's culpability. Now, those things, as far as youth, if youth would be relevant at the time of offense. Everybody was a baby. Everybody was a child. Not to be facetious, but if he was in a little wheelchair or a little iron lung or there was something that showed that he was in some special classroom or low IQ, all of those things, or some rehab

29

program for his drug problem, but as far as just touching, poignant photographs of what he was like as a child, his puppy and his brothers and sisters and fishing and all that has nothing, it does not go to any lessening of his moral blameworthiness. This is not what the law is designed to develop. You know, if we allow baby pictures, I am confident that I can get the Allens to bring in many albums of baby pictures. I don't think that is what this trial is all about. It's not relevant.

By the Court: I don't see the relevance to any of these pictures at this time." (RXXIV, 738,739)

Applicant's's counsel further expressed to the court that he believed that the, "...jury should be able to see his development progress as he grew older and how he was functioning with his family....These pictures may be the piece of evidence that would let them exercise that discretionary act of mercy and vote for life instead of death. That is a tool that you are taking away from me. The State has plenty of tools. I have very few. I think I am being denied due process under the United States Constitution by the Court's failure to let me introduce this material." (RXXIV, 740).

The majority opinion of the Court of Criminal Appeals interpreted this singularly to mean, "Thus, appellant was trying to "humanize" his client by demonstrating that he was once a normal child." (Opinion Paragraph 42) The majority then went further to utilize the U.S. Supreme Court's statement in **Franklin v. Lynaugh,** 487 U.S.

164, 108 S.Ct. 2320, 101 L.Ed. 2d 2320 (1988)(plurality opinion) which stated that the Court had never suggested that sentencers be given-in the context of mitigation-"unbridled discretion in determining the fates of those charged with capital offense."

Lastly, the Court found that, "In our view, photographs of appellant which depict a cheerful early childhood are irrelevant to appellant's moral blameworthiness for the commission of a violent double-murder because such evidence has no relationship to appellant's conduct in those murders. That appellant was once a child does not diminish his moral culpability for the act of murder. Thus, we find no abuse of discretion on the part of the trial court in refusing to admit these photographs." (Opinion paragraph 45).

When treating the request for admission of the pictorial evidence as only serving the purpose of showing that he was a good kid, the Court ignored, special issue number one that the jury had to consider in this case as a basis of the admission.

"Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Rick Allan Rhoades, would commit criminal acts of violence that would constitute a continuing threat to society?" (TRI-A, 294)

There is nothing about this special issue that asks the jury to find one way or the other depending on the degree of Applicant's moral culpability. This question turns solely on whether they

31

believe Applicant will continue to be a continuing threat to society. These pictures, and evidence of his life while in boot camp and while incarcerated, showed the jury that he could adapt and conform in a structured society. Sure there were statements made by Applicant which amounted to threats while in prison. (RXXXIII, 555) There was also the incident where he threw his tray and later apologized. (RXXXI, 78) Lastly, there was an incident where he had a green toothbrush with a razor blade melted into it to ward off punking. (RXXXII, 394) For the most part, the evidence showed that Applicant spent most of his adult life incarcerated, and that nearly all of his past violent conduct occurred while he was living either (A) outside the confines of the structure given to him by his adoptive parents; (B) boot camp; or (C) outside the structure given by the Texas Department of Corrections.

Applicant's adoptive mother testified that he lived a life without violence until a teenager. (RXXXIV, 759) That she thought he did well in the structured environment of the U.S. Navy. (RXXXIV, 761-3) Further, that she believed that Applicant should not be allowed to live in the freedom of society. She testified that she loves him, but he needs to be in jail. (RXXXIV, 764)

Novella Pollard testified as the principal at the Windham School within the penitentiary. She testified that in the structured environment of the penitentiary Applicant was valedictorian for his graduating GED class. This occurred in 1991.

32

(RXXXIV, 823) She also mitigated the shank incident by testifying that it was common for a young man in the penitentiary to carry a shank for protection from being raped. (RXXXIV, 823 ff)

Windell Dickerson who is a psychologist, and used to be the head of psychology within the Texas Prison system, testified that Applicant is the type of person that does well and is not violent in a structured environment, however, when he is removed from the structure, he becomes a time bomb waiting to explode. (RXXXIV, 874) Dr. Dickerson testified that he did not want to see Applicant on the streets now, and that he did not think that it was in the jury's or Applicant's best interest for him to be on the street now, but that he did not believe that Applicant would be a danger in prison society. He further testified, that as long as Applicant was kept within the structure of the penitentiary, by the time he had increased in age to about sixty-five years, his risk level would be greatly diminished. (RXXXIV, 886)

The State, in rebuttal, presented testimony from an officer who investigated offenses within the prison system. Applicant's relevancy objection was overruled, (RXXXV, 1030) and this officer, Roy Smithy, testified to acts of violence that other people had committed in prison. This testimony of others committing acts of violence in prison, was determined by the trial court to be relevant for the jury's determination of how to specifically answer the special issues as they applied specifically to Applicant.

33

Ernest Rhoades, Applicant's adoptive father, testified that Applicant was a loving child. He testified that he worked with Applicant, and that he was involved in mainstream sports as a child. Within the structure of his home Mr. Rhoades had no problem whatsoever with violent behavior from Applicant. (RXXXV, 913) Applicant was never violent with animals, nor was he ever involved in violence in school. (RXXXV, 914) Applicant was able in this structured environment to fish, play sports, and do what most any person within accepted society would do. (RXXXV, 918) He testified that as Applicant got older Mr. Rhoades rules required that Applicant either stay in school or that he join the Navy. Applicant chose the Navy, and he thrived in the structure of boot camp. He loved boot camp and was appointed squad leader. (RXXXV, 923) Earnest Rhoades' testimony showed that as the structure was lessened, the problems increased. After the intense structure of boot camp was released, Applicant could not cope with having freedom. Almost all of his troubles occurred when he was in a time of little or no structure in his life.

The pictures that were offered into evidence as Defense Exhibits 6 through 16, did in fact serve to humanize Petitioner, but that was not their only purpose. Denial of the pictures kept the jury from seeing, not only hearing, that it was a historical fact that Applicant was not a threat to society while living within a structured environment.

34

Applicant was prohibited from demonstrating with pictorial evidence that in a structured environment he was not a threat to society. On the other hand, the State was allowed to rebut this evidence with all of the prior acts of misconduct Applicant had committed, and further to show that it was more probable that Applicant would be a continuing threat to "prison society" because other people had committed violent acts while in prison. The rules for admitting aggravating evidence, were much more flexible than the rules for admitting mitigating evidence in this trial.

## DUE PROCESS RIGHT OF FAIR REBUTTAL

The U.S. Supreme Court has consistently maintained that a capital defendant must be given a fair opportunity to meet, rebut or explain any evidence which the state offers as a reason the defendant should be sentenced to death. **Gardner v. Florida**, 430 U.S. 349 (1977).

Over the years, the Court has reaffirmed this basic due process right in a variety of contexts. In **Simmons v. South Carolina**, 1145 S.Ct. 2187 (1994), the Court held that the trial court's failure to tell the jury the truth regarding a capital defendant's parole ineligibility if sentenced to life imprisonment, transgressed Simmons right of fair rebuttal, especially in light of the fact that the prosecutor stressed the defendant's future dangerousness in his sentencing phase argument. **Skipper v. South Carolina**, 476 U.S. 1 (1986) due process right of fair rebuttal

35

entitles a capital defendant the right to introduce evidence of good conduct in custody to rebut the prosecutor's reliance on future dangerousness in prison as aggravation.

In **Lockett v. Ohio**, 438 U.S. 586 (1978), the Court established the bedrock principle that emanates from the fundamental respect for humanity underlying the Eighth Amendment. This principle mandates consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death. That is exactly what Applicant was attempting to do when offering the pictorial evidence of his adjustment to structure. It became even more important to have this evidence before the jury after the State offered evidence of violence of others while in prison. It was likewise necessary to rebut the State's pictorial evidence with contradictory pictorial evidence of his own.

The State offered evidence of the wrongs of others in prison as a reason to find Applicant a continuing threat to prison society in this case. In **California v. Brown**, 479 U.S. 538 (1987), Justice O'Connor noted in her concurring opinion that evidence about the defendant's background and character is relevant because of the belief, held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants

36

: 00037

who have no such excuse. It must be particularly noted herein that Applicant's adoptive parents explained how Applicant had been abused prior to the adoption. Applicant was almost drowned by one of his mom's boyfriends, and this affected the way he acted after adoption. (RXXXV, 907) Applicant was a hyperactive child, and was treated with Ritalin. (RXXXIV, 754) In spite of all of these problems when Applicant was under the structured wing of Ernest Rhoades he conformed his conduct to the demands of society. Mr. Rhoades testimony, and Defense Exhibits 6 through 16 displayed the fact of normalcy while living within a highly structured environment. By disallowing the introduction of pictures of normalcy during extended periods of a structured environment, it heightened the jury's awareness of the many pictures of abnormalcy or dangerousness displayed against people and property during periods of Applicant living on his own without the structure of his father, Navy boot camp, or the penitentiary. Because of the need for individualized treatment, the states have been required to permit the sentencer to consider, and in appropriate cases, base a decision to impose a life sentence upon any relevant mitigating factor. **Hitchcock v. Dugger**, 481 U.S. 393 (1987).

In **Lockett, supra.** The Court defined a mitigating circumstance as "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. at

37

00038

604. While this explanation seems to allow the defendant the freedom to define what is mitigating, the Court has since given a more objective cast to the explanation. In **Skipper v. South Carolina**, 476 U.S.1 (1986), the Court held that evidence of the defendant's good behavior during his pretrial incarceration was "mitigating" in the sense that it might serve as a basis for a sentence of less than death. (Quoting **Lockett v. Ohio**, 438 U.S. at 604). Thus, any evidence which might serve to reduce the urge to punish harshly must be deemed mitigating. This is especially true when the State is offering evidence of the violent wrongs that other people commit in prison as evidence that Applicant must likewise be more of a continuing threat to society.

When the prosecution relies on the future dangerousness of the defendant to seek the death penalty, elemental due process requires that the defendant be given an opportunity to introduce evidence on this point. **Skipper v. South Carolina**, 476 U.S. 1, 5 n.1, 106 S.Ct. 1669, 1671, 90 L.Ed.2d 1, 7 (1986). In **Skipper** the Court also found an Eighth Amendment requirement. "[E]vidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating." **Skipper**, 476 U.S. at 5, 106 S.Ct. at 1671, 90 L.Ed.2d at 7. "[A] defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination." **Skipper**, 476 U.S. at 7, 106 S.Ct. at

38

1672, 90 L.Ed.2d at 8. The pictorial evidence showed that Applicant can conform his conduct to the requirements of the law when in a structured environment. Disallowing that evidence, under the facts of this case, deprived Applicant the vehicle to prove that he had so conformed his conduct in the past. If a rule has "the effect of precluding the defendant from introducing otherwise admissible evidence for the explicit purpose of convincing the jury that he should be spared the death penalty because he would pose no undue danger to his jailers or fellow prisoners and could lead a useful life behind bars if sentenced to life imprisonment, the rule would not pass muster under **Eddings v. Oklahoma**, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)." **Skipper**, 476 U.S. at 7, 106 S.Ct. at 1672, 90 L.Ed.2d at 8.

The Texas death penalty statute is constitutional, premised on the jury having all possible relevant information about the individual defendant. **Matson**, 819 S.W.2d at 850, citing **Jurek v. Texas**, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). A jury must not be instructed to disregard relevant mitigating evidence. **Matson**, 819 S.W.2d at 850 n.8, citing **Eddings v. Oklahoma**, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). "Clearly then, for the Texas death penalty statutes to meet constitutional muster, the sentencing authority in a capital case must be allowed to consider and give effect to all relevant mitigating evidence." **Matson**, 819 S.W.2d at 851.

39

In **Penry v. Texas,** 492 U.S. at 318, 109 S.Ct. At 2946, 106 L.Ed.2d at 278 (1989), the Court stated that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer, rather there must not be any impediment-through evidentiary rules, jury instructions, or prosecutorial argument -- to the sentencer's full consideration and ability to give effect to mitigating evidence.

Therefore to allow the State to show that Applicant would be a continuing threat to society because of his past violent behavior, because others in prison exhibit violent behavior, and at the same time prohibit him from proving, with pictorial evidence, that he can conform his conduct in a structured society violated Applicant's right to fundamental due process as guaranteed by U.S. CONST. Amend. V & XIV.

## Harm Analysis

One might say that since the evidence was testified to, the pictures are not necessary. That has never been the law when applied to the State. "If a verbal description of the material portrayed is admissible then a photograph reflecting the verbal testimony is also admissible." **Wilkerson v. State,** 726 S.W.2d 542,547 (Tex. Crim. App. 1986). The fact that witnesses may have testified as to a scene or events and are unimpeached does not prevent the introduction of photographs depicting the same scene or events. This does not constitute bolstering. **Marras v. State,** 741

40

S.W.2d 395 (Tex. Crim. App. 1985); and **Cotlar v. State**, 558 S.W.2d 16 (Tex. Crim. App. 1977). It should be obvious that the State relied upon this rule of law throughout this trial. A reading of the text, and a view of the many pictures offered by the State in this case would show that the State relied upon and received the benefit of this area of the law throughout this trial. The effect of pictures is more meaningful and lasting than is momentary testimony. Certainly, that is why the State introduced many pictures that were cumulative of the testimony. The necessity of the pictures is clearly borne out by the affidavit of Jo-Ann Williams.[4]

After consideration of this complaint the Court should find that Applicant was denied due process when the trial court limited his ability to present mitigating evidence to the trier of fact. Defense Exhibits 6 through 16 not only showed Applicant's humanity which may have influenced a juror to a vote of less than death, they displayed vividly that in a structured environment the pictures of life he left behind were not consistent with a finding of future dangerousness. A favorable answer to the pertinent special issue was more probable with the inclusion of defense exhibits 6 through 16. The trial court erred in excluding the same. Petitioner's sentence of death as such is arbitrary and capricious. The sentence of death should be vacated and the cause remanded to

---

[4] See Exhibit "A" attached hereto.

41

the court below for a new hearing on punishment. See Article 44.29(c); **Ransom v. State,** 920 S.W.2d 288 (Tex. Crim. App. 1996).

: 00043

GROUND OF ERROR NUMBER TWO

**APPLICANT'S RIGHTS AS GUARANTEED BY U.S. CONST. AMEND VIII WERE DENIED WHEN HE WAS DENIED THE RIGHT TO INTRODUCE MITIGATING EVIDENCE IN THE FORM OF PICTURES OF HIMSELF DURING DIFFERING STAGES OF HIS LIFE. (RV XXXIV, 735ff)**

Applicant is making substantially the same claim as in ground number one above. All that is different is the claim herein that this was also an Eighth Amendment violation.

In the presence of the jury Applicant offered the testimony of his adoptive parents, namely: Donna Rhoades (XXXIV, 735ff) and Ernest Rhoades (RXXXV, 893ff). Prior to Donna Rhoades taking the stand a hearing was held outside the presence of the jury wherein the State sought to limit Applicant's evidence. During this hearing Applicant's trial counsel informed the court that he desired to offer into evidence pictures of Applicant during different stages of his life. These stages began about the age of four years (RXXXIV, 736) and continued until fairly recent times.(RXXXIV, 736) Applicant's counsel informed the court as follows:

By defense counsel: "My point is the State has introduced photographs throughout the dehumanizing stage of their punishment hearing, showing various photographs of him when he was arrested at the time of seventeen, eighteen, throughout, mug shots. To aid the jury to understand the development of the defendant through his various stages of his life, we also have the right to show the

43

human side of the defendant as much as the State has attempted to dehumanize and turn him into some sort of monster. I think, under **Penry**, and under the mitigation portion stage of the trial, the jury should be entitled to see the defendant grown and what various stages. Talking about elementary school and how he appeared, et cetera, et cetera. And let them give whatever weight they think is necessary. It's very material to our lawsuit.

Y'all have publicized very emotional pictures of the deceased and their family, which they had other non-emotional pictures available. Now for the court to deny us the same right I think it's very unfair and very unjust." (RXXIV, 736,737)

The State's response was as follows:

by the State: "Your Honor, there's certainly a lot of pictures in evidence. Some of them are emotional related to the capital murder because the defendant left behind a bloody, gory, emotion-laden scene. Those things are admissible because they are evidence of the crime itself. The other photographs of this defendant, each and every one is related to a time when he was arrested on some other criminal offense. Obviously, all relevant to his background and criminal history that the law permits us to develop. Now, we are all keenly aware of the changes in the capital murder law and what is admissible. And certainly anything mitigating, anything that goes to show a lessening of this defendant's culpability. Now, those things, as far as youth, if youth would be relevant at the

44

00045

time of offense. Everybody was a baby. Everybody was a child. Not to be facetious, but if he was in a little wheelchair or a little iron lung or there was something that showed that he was in some special classroom or low IQ, all of those things, or some rehab program for his drug problem, but as far as just touching, poignant photographs of what he was like as a child, his puppy and his brothers and sisters and fishing and all that has nothing, it does not go to any lessening of his moral blameworthiness. This is not what the law is designed to develop. You know, if we allow baby pictures, I am confident that I can get the Allens to bring in many albums of baby pictures. I don't think that is what this trial is all about. It's not relevant.

By the Court: I don't see the relevance to any of these pictures at this time." (RXXIV, 738,739)

Applicant's's counsel further expressed to the court that he believed that the, "...jury should be able to see his development progress as he grew older and how he was functioning with his family....These pictures may be the piece of evidence that would let them exercise that discretionary act of mercy and vote for life instead of death. That is a tool that you are taking away from me. The State has plenty of tools. I have very few. I think I am being denied due process under the United States Constitution by the Court's failure to let me introduce this material." (RXXIV, 740).

45

The majority opinion of the Court of Criminal Appeals interpreted this singularly to mean, "Thus, appellant was trying to "humanize" his client by demonstrating that he was once a normal child." (Opinion Paragraph 42) The majority then went further to utilize the U.S. Supreme Court's statement in **Franklin v. Lynaugh**, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed. 2d 2320 (1988)(plurality opinion) which stated that the Court had never suggested that sentencers be given-in the context of mitigation-"unbridled discretion in determining the fates of those charged with capital offense."

Lastly, the Court found that, "In our view, photographs of appellant which depict a cheerful early childhood are irrelevant to appellant's moral blameworthiness for the commission of a violent double-murder because such evidence has no relationship to appellant's conduct in those murders. That appellant was once a child does not diminish his moral culpability for the act of murder. Thus, we find no abuse of discretion on the part of the trial court in refusing to admit these photographs." (Opinion paragraph 45).

### SPECIAL ISSUE NUMBER ONE

When treating the request for admission of the pictorial evidence as only serving the purpose of showing that he was a good kid, the Court ignored, special issue number one that the jury had to consider in this case.

46

"Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Rick Allan Rhoades, would commit criminal acts of violence that would constitute a continuing threat to society?" (TRI-A, 294)

There is nothing about this special issue that asks the jury to find one way or the other depending on the degree of Applicant's moral culpability. This question turns solely on whether they believe Applicant will continue to be a continuing threat to society. These pictures, and evidence of his life while in boot camp and while incarcerated, showed the jury that he could adapt and conform in a structured society. Sure there were statements made by Applicant which amounted to threats while in prison. (RXXXIII, 555) There was also the incident where he threw his tray and later apologized (RXXXI, 78), and lastly where he had a green toothbrush with a razor blade melted into it to ward off punking. (RXXXII, 394) For the most part, the evidence showed that Applicant spent most of his adult life incarcerated, and that nearly all of his past violent conduct occurred while he was living either: (A) outside the confines of the structure given to him by his adoptive parents; (B) boot camp; or (C) outside the structure given by the Texas Department of Corrections.

Applicant's adoptive mother testified that he lived a life without violence until a teenager, (RXXXIV, 759) and that she thought he did well in the structured environment of the U.S. Navy.

47

: 00048

(RXXXIV, 761-3) She testified further that she believed that he should not be allowed to live in the freedom of society. That she loves him, but he needs to be locked up in jail. (RXXXIV, 764)

Novella Pollard testified as the principal at the Windham School within the penitentiary. She testified that in the structured environment of the penitentiary Applicant was valedictorian for his graduating GED class. This occurred in 1991. (RXXXIV, 823) She also mitigated the shank incident by testifying that it was common for a young man in the penitentiary to carry a shank for protection from being raped. (RXXXIV, 823 ff)

Windell Dickerson, a psychologist who used to be the head of psychology within the Texas Prison system, testified that Applicant is the type of person that does well and is not violent in a structured environment, but when he is removed from the structure, he becomes a time bomb waiting to explode. (RXXXIV, 874)

Dr. Dickerson  testified that he did not want to see Applicant free on the street. That he did not think that it was in the jury's or Applicant's best interest for Applicant to be free on the streets, but he did not believe that Applicant would be a danger within the structure of a prison society. He further testified that as long as Applicant was kept within the structure of the penitentiary, by the time he had increased in age to about sixty-five years his risk level would be greatly diminished. (RXXXIV, 886)

48

The State in rebuttal presented testimony from Roy Smithy, an officer who investigated offenses within the prison system. Applicant's relevancy objection was overruled (RXXXV, 1030) and this officer was permitted to testify about acts of violence that other people commit while in prison. This testimony of others committing acts of violence in prison, was determined by the trial court to be relevant for the jury's determination of how to specifically answer the special issues against Applicant herein.

Ernest Rhoades Applicant's adoptive father testified that Applicant was a loving child. He testified that he worked with Applicant, and that Applicant was involved in mainstream sports as a child. He further testified that while Applicant lived within the structure of his home, he experienced no problems whatsoever with violent behavior from Applicant. (RXXXV, 913) Applicant was never violent with animals, nor was he ever involved in violence in school. (RXXXV, 914) Applicant was able in this structured environment to fish, play sports, and do what most any person within accepted society would do. (RXXXV, 918) He testified that as Applicant got older he informed Applicant that he required Applicant to either stay in school or join the Navy. Applicant chose the Navy, and he thrived in the structure of boot camp. He loved boot camp and was appointed squad leader. (RXXXV, 923). Earnest Rhoades' testimony showed that as the structure was lessened, the problems increased. After the intense structure of

49

boot camp was released, Applicant could not cope with having freedom. Almost all of his troubles occurred when he was in a time of little or no structure in his life.

The pictures that were offered into evidence as Defense Exhibits 6 through 16, did in fact serve to humanize Petitioner, but that was not their only purpose. Denial of the pictures kept the jury from seeing, not only hearing, that it was a historical fact that Applicant was not a threat to society while living within a structured environment. The jury was allowed to take back into the jury room many pictures of violence that duplicated aggravating testimony by State's witnesses. Applicant was denied the same use with his mitigating evidence.

Applicant was prohibited from demonstrating with pictorial evidence that in a structured environment he was not a threat to society. The need for rebuttal was made more necessary when the State was allowed to show that it was more probable that Applicant would be a continuing threat to "prison society" because other people commit violent acts while in prison.

In **Lockett v. Ohio**, 438 U.S. 586 (1978), the Court established the bedrock principle that emanates from the fundamental respect for humanity underlying U.S. CONST. AMEND. VIII. This principle mandates consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of

50

inflicting the penalty of death. That is exactly what Applicant was attempting to do when offering the pictorial evidence of his adjustment to structure. It was also specifically what the State was not doing when they offered evidence of the wrongs that other people commit while in prison as a reason to find Applicant a continuing threat to prison society in this case. In **California v. Brown,** 479 U.S. 538 (1987), Justice O'Connor noted in her concurring opinion that evidence about the defendant's background and character is relevant because of the belief, held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse. It must be particularly noted herein that Applicant's adoptive parents explained how Applicant had been abused prior to the adoption. Applicant was almost drowned by one of his mom's boyfriends, and this affected the way he acted after adoption. (RXXXV, 907) Applicant was a hyperactive child, and was treated with Ritalin. (RXXXIV, 754) In spite of all of these problems when Applicant was under the structured wing of Ernest Rhoades he conformed his conduct to the demands of society. Mr. Rhoades testimony, and Defense Exhibits 6 through 16 displayed the fact of normalcy while living within a highly structured environment. By disallowing the introduction of pictures of normalcy during extended periods of a structured environment, it heightened the

51

00052

jury's awareness of the many pictures of abnormalcy or dangerousness displayed against people and property during periods of Applicant living on his own without the structure of his father, Navy boot camp, or the penitentiary.

Because of the need for individualized treatment, the states have been required to permit the sentencer to consider, and in appropriate cases base a decision to impose a life sentence upon any relevant mitigating factor. **Hitchcock v. Dugger**, 481 U.S. 393 (1987). In **Lockett, supra.** The Court defined a mitigating circumstance as "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. at 604. While this explanation seems to allow the defendant the freedom to define what is mitigating, the Court has since given a more objective cast to the explanation. In **Skipper v. South Carolina**, 476 U.S.1 (1986), the Court held that evidence of the defendant's good behavior during his pretrial incarceration was "mitigating" in the sense that it might serve as a basis for a sentence of less than death. (Quoting **Lockett v. Ohio**, 438 U.S. at 604). Thus, any evidence which might serve to reduce the urge to punish harshly must be deemed mitigating. Especially when the State is offering evidence of the wrongs of others in prison as some evidence that Applicant must likewise be more of a threat.

52

: 00053

When the prosecution relies on the future dangerousness of the defendant to seek the death penalty, elemental due process requires that the defendant be given an opportunity to introduce evidence on this point. **Skipper v. South Carolina**, 476 U.S. 1, 5 n.1, 106 S.Ct. 1669, 1671, 90 L.Ed.2d 1, 7 (1986). In **Skipper** the Court also found an Eighth Amendment requirement. "[Evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating." **Skipper**, 476 U.S. at 5, 106 S.Ct. at 1671, 90 L.Ed.2d at 7. "[A] defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination." **Skipper**, 476 U.S. at 7, 106 S.Ct. at 1672, 90 L.Ed.2d at 8. The pictorial evidence showed that Applicant can conform his conduct to the requirements of the law when in a structured environment. Disallowing that evidence, under the facts of this case, deprived Applicant the vehicle to prove that he has so conformed his conduct in the past.  If a rule has "the effect of precluding the defendant from introducing otherwise admissible evidence for the explicit purpose of convincing the jury that he should be spared the death penalty because he would pose no undue danger to his jailers or fellow prisoners and could lead a useful life behind bars if sentenced to life imprisonment, the rule would not pass muster under **Eddings v. Oklahoma**, 455 U.S. 104, 102 S.Ct.

53

869, 71 L.Ed.2d 1 (1982)." **Skipper**, 476 U.S. at 7, 106 S.Ct. at 1672, 90 L.Ed.2d at 8.

### Harm Analysis

One might say that since the evidence was testified to, the pictures are not necessary. That has never been the law when applied to the State. "If a verbal description of the material portrayed is admissible then a photograph reflecting the verbal testimony is also admissible." **Wilkerson v. State**, 726 S.W.2d 542,547 (Tex. Crim. App. 1986). The fact that witnesses may have testified as to a scene or events and are unimpeached does not prevent the introduction of photographs depicting the same scene or events. This does not constitute bolstering. **Marras v. State**, 741 S.W.2d 395 (Tex. Crim. App. 1987); and **Cotlar v. State**, 558 S.W.2d 16 (Tex. Crim. App. 1977). The effect of pictures is more meaningful and lasting than is momentary testimony. Certainly, that is why the State introduced many pictures that were cumulative of the testimony. The necessity of the pictures is clearly borne out by the affidavit of JoAnn Williams attached hereto as Exhibit "A".

After consideration of this complaint the Court should find that Applicant was denied equal protection of the law and fundamental due process as guaranteed by U.S. CONST. AMEND. XIV, when the trial court limited his ability to present mitigating evidence to the trier of fact. Defense Exhibits 6 through 16 not only showed his humanity which may have influenced a juror to a

: 00055

vote of less than death, they displayed vividly that in a structured environment the pictures of life he left behind were not consistent with a finding of future dangerousness. A favorable answer to the pertinent special issue was more probable with the inclusion of defense exhibits 6 through 16. The trial court erred in excluding the same. Petitioner's sentence of death as such is arbitrary and capricious and violated his rights as guaranteed by U.S. CONST. AMEND. VIII. The sentence of death should be vacated and the cause remanded to the court below for a new hearing on punishment. See Article 44.29(c); **Ransom v. State,** 920 S.W.2d 288 (Tex. Crim. App. 1996).

55

: 00056

GROUND OF ERROR NUMBER THREE

ARTICLE 37.071(e) & (g)'S PROHIBITION AGAINST INFORMING JURORS THAT A SINGLE HOLDOUT JUROR COULD CAUSE THE IMPOSITION OF A LIFE SENTENCE VIOLATED APPLICANT'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND TEX. CONST. ART. I SEC. 13.

The version of Art. 37.071 V.A.C.C.P., in operation at the time of Applicant's trial provided that in order for the trial court to impose a death sentence, all twelve jurors had to answer all of the "special issues" affirmatively; to impose a life sentence, at least ten jurors had to answer any of the special issues negatively. A failure of a capital sentencing jury to garner the requisite number of votes either way resulted in the imposition of a life sentence. However, Applicant's jurors were not informed that if they failed to reach a collective decision either way -- if one juror answered "no" to any special issue -- the court would impose a life sentence. Instead, they were instructed by the trial court that the jury must either unanimously agree to answer all of the "special issues" affirmatively (in which case a death sentence would be imposed), or ten or more jurors were to agree to answer one or more of the "special issues" negatively (in which case a life sentence would be imposed).

The collective operation of these provisions of Article 37.071, upon which Texas capital sentencing jury charges are

56

: 00057

modeled, has come to be known as the "12-10 rule."[5]  This feature of 37.071 creates the potential for considerable confusion among reasonable jurors.  The United States Supreme Court has held that, in judging the constitutionality of a capital sentencing statute, a court must ask how a reasonable juror could view his or her role under the statutory scheme.  **See California v. Brown**, 479 U.S. 538, 541 (1985); **Francis v. Franklin, 471 U.S. 307, 315-16** (1985).  The Texas statute implicitly informs a juror that, absent similar votes from nine other jurors, his or her "no" vote to a special issue -- e.g. a vote against the imposition of the death penalty -- is meaningless because it cannot alone be sufficient to result in a life sentence.

Texas' 12-10 rule generates the danger that confused jurors otherwise disposed to hold out on voting for a death sentence will conform to a "majority rules" mentality.  Potential holdout jurors may reasonably believe that their votes in favor of a life sentence are worthless unless nine others join them; if a majority of other jurors are firmly voting "yes," holdouts may feel obliged to vote "yes" since there would appear to be no possibility of a life sentence and the jury has been instructed to return a verdict.  **See Mills v. Maryland,** 486 U.S. 367, 383 (1988) ("[C]ommon sense . . . suggest[s] that juries do not leave blanks and do not report

---

[5] See Robert J. Clary, **"Voting for Death: Lingering Doubts About the Constitutionality of Texas' Capital Sentencing Procedure,"** 19 St. Mary's L. J. 353, 358-59 (1987).

: 00058

themselves as deadlocked over mitigating circumstances after reasonable deliberation . . . unless they are expressly instructed to do so."). Such a belief on the part of a juror is contrary to Texas law, which dictates that if a capital juror is unable to agree on an answer to any of the special issues, the court must sentence the defendant to life.

In **Davis v. State**, 782 S.W.2d 211 (Tex. Crim. App. 1989), the Court acknowledged the possibility that "'a juror who conscientiously believes that the evidence called for a life sentence might nevertheless vote for the death penalty in order to avoid mistakenly assumed consequences of jury deadlock.'" **Id.** at 221, quoting **Barfield v. Harris**, 540 F.Supp. 451, 472 n. 17 (E.D.N.C. 1982), **affirmed**, 719 F.2d 58 (4th Cir. 1983), **cert. denied**, 467 U.S. 1210 (1984). However, the **Barfield** opinion quoted in **Davis** also speculated that it was just as likely that a life prone juror would refuse to consider the evidence and the views of her fellow jurors in favor of a death sentence if she knew her steadfastness would result in a life sentence. **Id.** The **Barfield** opinion, cited with approval by the Texas Court of Criminal appeals concluded that:

> Neither scenario results in a "reliable" or desirable process of deliberation, but the court cannot say that the first scenario is significantly more likely to occur as a result of not giving the instruction than is the second as of giving it.

Id., see also **Sterling v. State**, 830 S.W.2d 114, 121-122 (Tex. Crim. App. 1992) (citing **Davis** with approval and noting Sterling failed "to point to any facts or circumstances which render the statute unconstitutional **as to him** (emphasis added)).

Support for the proposition that a juror in the minority may be subject to coercion, and that such coercion results in a constitutionally unreliable sentence, is found in the United States Supreme Court's cases criticizing the practice by trial courts of inquiring into the numerical division of deadlocked juries prior to requiring further jury deliberations.  **See, e.g., Lowenfield v. Phelps**, 484 U.S. 231, 239-40 (1988); **Brasfield v. United States**, 272 U.S. 448, 450 (1926).  In such cases, this Court has held that "inquiry into the jury's numerical division necessitated reversal because it was generally coercive and almost always brought to bear `in some degree, serious although not measurable, an improper influence upon the jury.'" **Lowenfield**, 484 U.S. at 239 (citing **Brasfield**, 272 U.S. at 450).  Put another way, Texas' "12-10 rule" is a built-in impermissible "dynamite charge," which the Supreme Court has recognized as a possible Eighth Amendment violation in the capital sentencing context. **See Lowenfield**, 484 U.S. at 240-41.

In **Kubat v. Thieret**, 867 F.2d 351, 371 (7th Cir. 1989), the United States Court of Appeals for the Seventh Circuit noted that the instructions to Kubat's jury stated the law as to whether a

59

unanimous verdict was required to find a mitigating circumstance both correctly and incorrectly. However, they reasoned that the fact that the jury had heard a correct explanation of the law did not rescue the law's constitutionality:

> At worst, the jury may have retired for deliberations believing it had to reach a unanimous verdict on sentencing just as it had to do on the merits. At best, it may have entered the jury room confused. Indeed, even if only one juror had been confused, the reliability of the verdict is undermined. For if that one juror thought that the death penalty should not be imposed, he or she might have submitted to the views of the other eleven because of the mistaken belief that unanimity was required.

**Kubat v. Thieret,** 867 F.2d 351, 371 (7th Cir. 1989).   As the reasoning of the Seventh Circuit reveals, there is little Constitutional difference between a jury being instructed that they must find a mitigating circumstance unanimously, and a jury being left in the dark about that issue.

The United States Supreme Court has held that the possibility that a jury may be confused about facts important to their capital-sentencing role has Constitutional implications.   In **Simmons v. South Carolina,** 114 S. Ct. 2187 (1994) the Court, by a 7-2 majority, held that a criminal defendant must be given the opportunity to inform the jury that he would never be eligible for parole if given a life sentence.   **Id.** at 2196 (plurality opinion per Blackmun).   The plurality reasoned that "[t]he jury was left to speculate about petitioner's parole eligibility when evaluating petitioner's future dangerousness, and was denied a straight answer

60

: 000061

about petitioner's parole eligibility even when it was requested." Id. at 2195.  The information about petitioner's parole eligibility was of "obvious relevance . . . to the jury's formidable sentencing task."  Id. at 2197.  The parallel is obvious: the significance of an **individual** vote of "no" to either of the special issues was of "obvious relevance" to any jury, but they were denied information on this point.  Justice Souter's concurring opinion in **Simmons** makes the reliability concerns raised by potential jury confusion even clearer: "Whenever there is a reasonable likelihood that a juror will misunderstand a sentencing term, a defendant may demand instruction on its meaning. . . ."  Id. at 2198 (Souter, J., concurring).  The jurors in Applicant's case were told they could vote "no" to a special issue, but were never told what the result of that single vote would be, as a result, they may have misunderstood the meaning of their vote.  Thus, the Texas capital-sentencing scheme "diminish[ed] the reliability of the sentencing determination."  **Beck v. Alabama**, 447 U.S. 625, 638 (1980).

In this way, Article 37.071's **"12-10 Rule"** injected arbitrariness into the proceedings and created an **unreliable** sentencing determination -- a constitutional violation of the highest order in the capital sentencing context.[6]  **See State v.**

---

[6]  See **Lowenfield v. Phelps**, 484 U.S. 231, 238-39 (1988) (noting that capital sentencing proceedings made unreliable by coercion of jurors violate Eighth Amendment); **Woodson v. North Carolina**, 428 U.S. 280, 305 (1976) (opinion of Stewart, Stevens, & Powell, JJ.) (holding that mandatory death sentences deprive

**Williams**, 392 So.2d 619, 631 (La. 1980) (on rehearing). In

**Williams**, the court stated:

> In the present case the jurors were not fully informed of
> the consequences of their votes and the penalties which
> could result in each eventuality.  They were not told
> that, by their failure to decide unanimously, they would
> in fact decide that the court must impose a sentence of
> life imprisonment. . . .  **Instead, the members of the
> sentencing body were left free to speculate as to what
> outcome would be in the event there was no unanimity.**
> Under these circumstances, individual jurors could
> rationally surmise that in the event of a disagreement a
> new sentencing hearing, and perhaps a new trial, before
> another jury would be required.

**Williams**, 392 So.2d at 631 (emphasis added).  Such a risk of

speculation and confusion was held to be a constitutional violation

by the Louisiana Supreme Court. B.

Applicant's rights as guaranteed by U.S. CONST. AMEND. VII &

XIV, and TEX. CONST. ART.1, Sec. 13 having been violated the

sentence of death should be vacated and the cause remanded.

---

defendants of reliable, individualized sentences in violation of
Eighth Amendment); **Cf. Gardner v. Florida**, 430 U.S. 349 (1977)
(plurality opinion) (holding that capital-sentencing procedures
which restrict defendant's ability to offer mitigating evidence
lead to unreliable capital sentencing proceedings that violate
due process clause of Fourteenth Amendment).

62

: 00063

## GROUND OF ERROR NUMBER FOUR

**TEXAS' 12-10 RULE VIOLATED APPLICANT'S RIGHTS UNDER ARTICLE I, SECTION 13 OF THE TEXAS CONSTITUTION AND UNDER THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION, AS CONSTRUED BY THE UNITED STATES SUPREME COURT'S DECISION IN Mills v. Maryland[7]**

The 12-10 rule also violates the Eighth Amendment principle in **Mills v. Maryland**, 486 U.S. 367 (1988),[8] that it is unconstitutional to instruct capital sentencing jurors in a manner leading reasonable jurors to believe that their individual vote in favor of returning a life sentence based on particular mitigating factors is worthless unless some threshold number of jurors are in agreement that a particular mitigating factor or factors exist. That is, a constitutional violation occurs if a reasonable juror could interpret the jury charge to instruct the jury that there must be a meeting of the minds among some threshold number of jurors[9] as to whether the mitigating evidence offered by the capital defendant warrants a negative answer to at least one special issue, thus resulting in the imposition of a life sentence. See **Mills**, 486 U.S. at 373-75.  Unless jurors are informed of the

---

[7]   486 U.S. 367, 383 (1988).

[8]   See also **McKoy v. North Carolina**, 494 U.S. 433 (1990) (holding that it is a violation of the Eighth Amendment to require a unanimous verdict as to mitigating circumstances in capital sentencing trials).

[9]   In **Mills**, the threshold number was twelve; under the Texas statute, the threshold number is ten.

result of a deadlock in such a situation, the risk that one or more jurors will cave into a "majority rules" mentality is too great under the Eighth Amendment. See **Mills**, 486 U.S. at 383 ("[C]ommon sense . . . suggest[s] that juries do not leave blanks and do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation unless they are expressly instructed to do so.").

Under **Mills,** a constitutional violation would occur under the Texas scheme if reasonable jurors who were instructed pursuant to Article 37.071 were led to believe that their votes in favor of a life sentence based on particular mitigating factors would be worthless unless at least nine other jurors joined them.[10]   **See**

---

[10]  Under the Texas statute at issue here, jurors were not asked to find specific mitigating factors which were to be weighed against specific aggravating factors, as was true in **Mills.**  Rather, as this Court is aware, Texas' unique capital sentencing scheme instead only asks jurors to answer three "special issues" -- whether a capital defendant committed the crime "deliberately" and whether the capital defendant would pose a "future threat" to society if given a life sentence.  See Tex. Code. Crim. Pro. Art. 37.071(b) (Vernon's 1989).
    However, as the United States Supreme Court has repeatedly held, Article 37.071(b)'s "special issue" format permits juries to consider and give proper mitigating effect to almost all types of mitigating evidence.  See **Johnson v. Texas**, 119 S. Ct. 2658, 2670 (1993) ("A Texas capital jury deliberating over the Special Issues . . . is likely to weigh mitigating evidence as it formulates . . . answers in a manner similar to that employed by capital juries in `pure balancing' states."); **Adams v. Texas**, 448 U.S. 38, 46 (1980) (in deliberating special issues, jurors answer "on the basis of all relevant evidence not only why the death sentence should be imposed but also why it should not be imposed").  Thus, for purposes of Applicant's arguments herein, this Court must treat the Texas capital sentencing scheme as one in which jurors weigh mitigating factors against aggravating

: 00065

**Kubat v. Thieret**, 867 F.2d 351, 369-73 (7th Cir.), *cert. denied*, 493 U.S. 874 (1989). In **Kubat**, in finding a **Mills** violation, the Seventh Circuit was faced with a capital sentencing scheme virtually identical[11] to the one at issue in the present case:

> Kubat's jurors were never expressly informed in plain and simple language that even if one juror believed that the death penalty should not be imposed, Robert Kubat would not be sentenced to death. . . . [T]here is a substantial possibility that one or more of Kubat's jurors might have been precluded from granting mercy to Kubat because of a mistaken belief that the sufficiency of mitigating factors had to be found unanimously.

867 F.2d at 373; **cf. Andres v. United States**, 333 U.S. 740, 752 (1948) (reasoning that, in a federal death penalty case, a juror uninformed as to the consequences of a less-than-unanimous verdict "might reasonably conclude that, if they cannot all agree to grant mercy, then the verdict of death must stand unqualified").

The Ninth Circuit has similarly construed the Court's decision in **Mills. Mak v. Blodgett**, 970 F.2d 614, 624-625 (9th Cir. 1992), *cert. denied*, 113 S. Ct. 1363 (1993). The **Mak** court stated:

> The Supreme Court has held that, where the underlying statute does not require unanimity [in assessing a life sentence], due process will not tolerate instructions that could reasonably be interpreted by a jury to

_____

factors, just as jurors do under a "pure" balancing statute.

[11] In **Kubat**, as in **Mills**, the jury was instructed that the threshold number of jurors required for a life sentence was twelve; in Texas, capital sentencing juries are instructed that the threshold number is ten. The difference is irrelevant since the possibility for one or more jurors "caving in" and not voting for a life sentence based on particular mitigating evidence is identical.

65

preclude consideration of any mitigating factor unless a such a factor was unanimously found to exist. . . .  As in Mills, "[u]nless we can rule out the substantial possibility that the jury may have rested its verdict on the `improper' ground, we must remand for resentencing."

Id. at 625 (citations omitted) (quoting **Mills v. Maryland**, 486 U.S. 367, 377 (1988)).

In **Draughon v. State**, 831 S.W.2d 331 (Tex. Crim. App. 1992) the appellant argued the 12-10 rule could mislead the jury to believe that a sentence less than death was not possible unless ten or more jurors answered one of the special issues in the negative. **Id.** at 337.  The **Draughon** opinion recognized that "it is conceivable that. . .[the jury] will surmise later instructions requiring ten votes for a negative answer [to] mean that a life sentence will not be imposed otherwise."  **Id.**  The Court further acknowledged that is was "troubled" by the implication of Draughon's argument "that. . .[the Texas sentencing scheme], by requiring [a] consensus [of ten votes for a "no" answer to a special issue], inhibit[s] the free exercise by each juror of his individual judgment about the propriety of a death sentence."  **Id.** at 338.  However, the Court stated:

> [I]t is the danger that jurors, unaware of the operation of the law, might mistakenly think a sentence other than death to be **impossible** unless ten of them agree that renders the procedure constitutionally suspect.  But, because the jury instructions of which Appellant here complains are not reasonably susceptible of such an interpretation, we are satisfied that no juror would be misled by them into thinking that an affirmative answer should be given unless ten or more jurors agree to give a negative one.

66

: 00067

*Id.* at 338. However, the Court of Criminal Appeals failed to consider the possibility that Texas' 12-10 rule would mislead the jury to believe a mistrial would result from the jury's failure to garner 12 "yes" votes or 10 ten "no" votes, resulting in one or more jurors basing his or her determination on an incorrect understanding of the law.

Even before the United States Supreme Court's decision in **Mills**, at least one other state court has recognized the constitutional infirmity in a sentencing determination made after a jury had "thrown away" their dissenting vote because they could not sway a majority of their fellow jurors. In **People v. Durre**, 690 P.2d 165 (Colo. 1984), the jury was instructed according to Colorado law, which called for them to explicitly note any mitigating or "additional mitigating" factors they found and weigh them against the aggravating factors they found. **Id.** at 175-76. The jury was not told how to find the mitigating factors or whether they had to agree on which factor called for leniency. **Id.** The foreman returned a jury form reflecting that they had found aggravating circumstances and had found no mitigating circumstances, and thus that Durre should be sentenced to death. **Id.** at 170. However, the foreman attached a note to the form saying that though they could neither "claim the mitigating circumstances" nor "deny the aggravating circumstances," nevertheless several jurors had concluded that Durre should not

67

die.  Id.   The trial judge personally interviewed the five dissenting jurors, who told him that even though they felt that Durre should be spared, they agreed with the "verdict."  Id. at 170 & n.10.  The trial judge, however, dismissed their votes against death as the product of mere "conscientious difficulties" and sentenced the defendant to death in accordance with the general verdict.  Id. at 170.

The Colorado Supreme Court reversed the death sentence, dismissing as "faulty" the state's contention that "jury findings on mitigation and aggravation involve no consideration whatever of the issue of punishment."  Id. at 171.  That court intoned:

> Without such an instruction [on the effect of their verdict], the jury will not only be required to labor in the dark about what it is actually deciding by its verdicts but also, of equal importance, will be ill-equipped to fulfill its function of serving as the vital link between contemporary community values and the propriety of the life-and-death decision which its verdicts necessarily resolve.

Id. at 173.   Therefore, the Colorado Supreme Court ruled that jurors must be explicitly informed of the results of their findings of mitigating and aggravating circumstances.  Id. at 174 & n.15. Any one of Mr. Rhoades' jurors may have believed that  by holding out for a life sentence, a mistrial would be declared.[12]    This

---

[12]  The Louisiana Supreme Court explained the consequences of leaving the jury in the dark thus:

> Under these circumstances, individual jurors could rationally surmise that in the event of disagreement a new sentencing hearing, and perhaps a new trial before

68

: 00069

aspect of Texas' 12-10 rule is a **Mills** violation *a fortiori*.  That is, a reasonable juror may have believed, contrary to Texas law, that they had no ability to give mitigating effect to **any and all types of mitigating circumstances** unless at least nine other jurors also voted for life.

Applicant recognizes that "[a] critical assumption underlying [the] system [of trial by jury] is that juries will follow the instructions given them by the trial judge." **Parker v. Randolph**, 442 U.S. 62, 73 (1979) (plurality opinion).  Here, though, the instructions themselves were deficient: they "did not tell the whole truth, because [they] did not tell the jurors what to do in the event of a disagreement." **Gacy v. Welborn**, 994 F.2d 305, 307 (7th Cir. 1993), *cert. denied* 114 S. Ct. 269 (1993).  **Boyde v. California**, 494 U.S. 370, 380 (1990), held the proper inquiry is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevent[ed] the consideration of constitutionally relevant [mitigating] evidence."  Applicant has demonstrated that there is a reasonable likelihood that the jury applied Texas' 12-10 scheme in an unconstitutional

---

another jury would be required.  Such a false impression reasonably may have swayed a juror to join the majority, rather than hold to his honest convictions, in order to avoid forcing the parties, witnesses and court officials to undergo additional proceedings.

**State v. Williams**, 392 So.2d 619, 634-35 (La. 1980).

69

manner resulting in an unreliable sentencing determination. Applicant's sentence of death should therefore be vacated and the cause remanded for a new punishment hearing.

70

: 00071

### GROUND OF ERROR NUMBER FIVE

**THE JURY'S CONSIDERATION OF THE POSSIBILITY OF UNESCORTED FURLOUGH DURING ITS DELIBERATIONS OVER APPLICANT'S SENTENCE VIOLATED THE SEPARATION OF POWERS CLAUSE, AND APPLICANT'S RIGHT TO DUE PROCESS AND DUE COURSE OF LAW UNDER THE TEXAS CONSTITUTION.**

The trial court was legitimately concerned that jurors' knowledge of the workings of the prison system could affect the deliberations of Mr.Rhoades jurors. Accordingly, the judge instructed the jury as follows:

"During your deliberations you are not to consider or discuss any possible action of the Board of Pardons and Paroles Division of the Texas Department of Criminal Justice or of the Governor, or how long the Defendant would be required to serve to satisfy a sentence of life imprisonment."

(TR1-A,291-292)

Despite this clear command, Mr. Rhoades jury was allowed unfettered discretion in considering whether he would be allowed escorted and/or unescorted emergency furlough from the penitentiary if he were given a life sentence.

Allowing the Jury to consider the possibility of Applicant being granted an unescorted furlough if he received only a sentence of life during it's determination of Applicant's sentence violated TEX. CONST. Art. 1 Sec. 19, and Art. III Sec. 1. A capital jury may not consider the existence or operation of the parole laws in Texas in deliberating on the answers to the Special Issues. Likewise, the

71

: 00072

same reasoning would dictate that a capital jury may not consider the existence or operation of internal Texas Department of Criminal Justice Rules concerning release on emergency furlough in deliberating on the answers to the Special Issues.

Texas law has been clear for over two decades: a jury in a capital sentencing proceeding may not be provided with information concerning the possibility of parole if a capital defendant is sentenced to life imprisonment.  Article 37.071 of the Texas Code of Criminal Procedure, governing sentencing in capital cases in Texas, has never contained a provision either requiring or allowing instructions on the parole laws in a capital case.  An unbroken line of authority from the Texas Court of Criminal Appeals holds that "parole is not a proper consideration for the jury when deliberating on punishment in a capital case."  **Jackson v. State**, 822 S.W.2d 18, 27 (Tex. Crim. App. 1990).[13]  This Court has also repeatedly rejected attempts to require that the jury in capital sentencing be instructed on parole.[14]

---

[13]  See also **Boyd v. State**, 811 S.W.2d 105, 121 (Tex. Crim. App. 1991); **Washington v. State**, 771 S.W.2d 537, 547–48 (Tex. Crim. App. 1989); **Felder v. State**, 758 S.W.2d 760, 762 (Tex. Crim. App. 1988); (Walter) **Williams v. State**, 668 S.W.2d 692, 701 (Tex. Crim. App. 1983); **White v. State**, 629 S.W.2d 701, 708 (Tex. Crim. App. 1981); **O'Bryan v. State**, 591 S.W.2d 464, 478 (Tex. Crim. App. 1979); **Freeman v. State**, 556 S.W.2d 287, 304 (Tex. Crim. App. 1977); **Shippy v. State**, 556 S.W.2d 246, 251 (Tex. Crim. App. 1977).

[14] See **Washington v. State**, 771 S.W.2d 537, 547–48 (Tex. Crim. App. 1989); **Knox v. State**, 744 S.W.2d 53, 63 (Tex. Crim. App. 1987); **Andrade v. State**, 700 S.W.2d 585, 587–88 (Tex. Crim.

72

The prohibition on parole information in capital cases is based on the Texas Constitution's separation of powers and due course of law provisions. In **Heredia v. State**, 528 S.W.2d 847, 853 N.4 (Tex. Crim. App. 1975), the court explained the interaction between consideration of parole by sentencers and the separation of powers:

> The decision to parole, if and when made, is beyond the province of the courts . . . and therefore of the jury, and is exclusively a matter within the province of the executive branch of government, under proper regulation by the legislative branch. Article IV, Section 11, Texas Constitution.[15]

**Sanders v. State**, 580 S.W.2d 349, 352 (Tex. Crim. App. 1979), expanded on this discussion, noting that:

> [C]lemency powers embodied in the parole system are beyond the reach of interference by the judicial branch, Art. IV, Sec. 11, Tex. Const,; and any action by the judicial branch to frustrate or delay the exercise of that power by the executive branch is as much of an unconstitutional interference as is an attempted usurpation of that power.

This Court found that discussion of parole during deliberations violates the due course of law guarantees of the

---

App. 1985); **Shippy**, 556 S.W.2d at 251. See also **Williams**, 668 S.W.2d at 701; **Freeman**, 556 S.W.2d at 304.

[15] At the time **Heredia** was decided, Section 11 read in relevant part:

"Section 11. The Legislature shall by law establish a Board of Pardons and Paroles and shall require it to keep records of its actions and the reasons for its actions. The Legislature shall have authority to enact parole laws."

73

Texas Constitution[16] in **Rose v. State**, 752 S.W.2d 529 (Tex. Crim. App. 1987).  In reaching this conclusion, the Court found that:

> It would be improper for punishment to be based on an expectation that clemency powers would be exercised, and it would be unconstitutional to attempt to delay the exercise of the clemency powers or avoid the possible granting of parole by increasing punishment in anticipation thereof.

**Rose**, 752 S.W.2d at 536 (quoting **Sanders v. State**, 580 S.W.2d at 351).

The Court reiterated this point in  the case of **Sneed v. State**, 670 S.W.2d 262 (Tex. Crim. App. 1984).

"It would be improper for punishment to be based on an expectation that clemency powers would be exercised, and it would be unconstitutional to attempt to delay the exercise of the clemency powers or to avoid the possible granting of parole by increasing punishment in anticipation thereof. Article II, Sec. 1 of the Texas Constitution provides for the

---

[16] Article 1, § 13 reads:

**Section 13.**  Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted.  All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.

Article 1, § 19 reads:

**Section 19.**  No citizen of this State shall be deprived of life , liberty, property, privileges or immunities, or in any manner disenfranchised, except by the due course of the law of the land.

74

separation of governmental powers among the three distinct departments, the executive, legislative, and judicial. It is well established under this Article that:

"(A) power which has been granted to one department of government may be exercised only by that branch to the exclusion of the others.... And any attempt by one department of government to interfere with the powers of another is null and void." **Ex parte Giles**, Tex.Cr.App. 502 S.W.2d 774 [1973]; **Smith v. Blackwell**, Tex.Cr.App., 500 S.W.2d 97 [1973]. (Emphasis added).

Clemency powers embodied in the parole system are beyond the reach of interference by the judicial branch, Art. IV, Sec. 11, Texas Const.; and any action by the judicial branch to frustrate or delay the exercise of the power by the executive branch is as much of an unconstitutional interference as is an attempted usurpation of that power. See, **Ex parte Giles** and **Smith v. Blackwell, supra,** for unconstitutional grants of authority to usurp clemency powers.

This is the constitutional basis for the established rule..."

This Court has also held that capital defendants suffer actual harm when a jury is instructed on the operation of parole laws because this skews the operation of the capital sentencing procedures to make a death sentence more likely. This is because of the "risk that punishment will be based on extraneous

75

considerations," such as the documented juror "revulsion against their understanding of how [the parole laws] are being administered." **Rose**, 752 S.W.2d at 536-37. Certainly this would be even more a deterrent for a juror considering a life sentence to believe that a capital murderer might be allowed an unescorted emergency furlough in a relatively short time. Especially in a case where the guilt facts were such that the defendant was released from incarceration for less than twenty-four hours when the capital murder they are punishing actually occurred. This evidence was a direct statement to the jury that only the jury could protect society because the penitentiary system could not be trusted, and then they could only protect society by sentencing Applicant to death. The Texas Department of Criminal Justice had already failed to protect society as shown by the guilt facts, and now it would seem that the Texas Department of Criminal Justice might consider an unescorted emergency furlough in an extremely short period of time which would allow Applicant the same opportunity to kill again. Therefore, this evidence directed the jury to consider the fact that the only way they could ensure the safety of society, outside the walls of the penitentiary, would be to sentence Applicant to death. This was another way of saying that the only way society could be protected would be for the judicial branch of government to eliminate the possibility of the executive branch acting foolishly by usurping its power to make any decision

76

: 00077

regarding the grant of an unescorted furlough. This violated TEX. CONST. Art. III Sec. 1.

In, **Andrade v. State** 700 S.W.2d 585 (Tex. Crim. App. 1985), Justice Teague amplified in a concurrence the court's rationale for rejecting the defendant's requested parole instruction. He explained that "[i]n short, such an instruction disclosing the Governor's power to commute a life sentence might operate to a defendant's severe disadvantage and to his extreme prejudice," and that, "had the trial court granted appellant's requested instruction it would have tended to reduce the jury's sense of responsibility in answering the submitted questions." **Andrade**, 700 S.W.2d at 590 (Teague, J., concurring). He pointed out the grave danger that the instruction "could very well have led the jury into believing that it could have eliminated any possibility of commutation by answering in the affirmative all of the questions submitted to it." **Id.** Instructions of this sort invite the jury to indulge in "sheer speculation" based on "numerous imponderables, in particular, the policies that may be adopted by the present and unnamed future governors and parole officials." They are also objectionable since they "inject into the capital sentencing process a factor that bears no relationship to the offense or the character of the offender." **Id.** See also **Felder v. State**, 758 S.W.2d 760, 762-66 (Tex. Crim. App. 1988) (capital murder conviction reversed where trial court erroneously denied

77

: 00078

defendant's challenge for cause to juror unable to disregard parole eligibility in sentencing). The testimony of Roy Smithy, and the Court's allowing the jury to consider the same without reservation, injected into Applicant's capital sentencing process a factor that beared no relationship to the offense or his character. This new factor was the fact that the Texas Department of Criminal Justice could not be trusted to safely lock Applicant away if he were granted a life sentence.

The U.S. Fifth Circuit Court of Appeals has expressed similar reservations. Judge Jones, speaking for the en banc court in **King v. Lynaugh**, 850 F.2d 1055, 1061 (5th Cir. 1988) in the context of voir dire questioning regarding parole in capital cases, wrote that "a suggestion to prospective jurors that [the defendant] might return to society in twenty years could very easily have predisposed them to impose a death sentence." Certainly then the likelihood that a juror would be predisposed to impose a sentence of death is even more likely when the jurors believe that, if given a life sentence, there is a likelihood that the defendant will be released to society on an unescorted emergency furlough within a relatively short period of time. This is even more likely when all of Applicant's mitigating evidence centered around testimony that Applicant was an extreme risk at the present time, but his propensity for violence would lessen considerably with the passage of a considerable amount of time. (RXXXIV, 874-886)

78

00079

Accordingly, while recognizing that it is common knowledge that inmates are paroled from time to time, **Heredia**, 528 S.W.2d at 852, this Court has repeatedly ruled the discussions of parole during jury deliberations are prohibited.[17] Mere possession of this common knowledge, without more, does not deny due process in Texas. **White**, 629 S.W.2d at 708. To prevent jurors from falling prey to the temptation to inject parole into their deliberations, this Court has given trial courts discretion to admonish the jury not to consider parole in determining sentence.[18] The trial judge in Mr. Rhoades case was using that discretion when he instructed the jury not to consider parole in reaching its sentencing determination. Such an instruction to the jury to prevent them from considering the possibility of a much earlier release on emergency furlough was never given. The jury herein was allowed unfettered discretion in their consideration of emergency furlough. Obviously, from the testimony herein, the safeguards in place when parole is considered

___

[17] See, e.g., **Callins v. State**, 780 S.W.2d 176, 191 (Tex. Crim. App. 1986); **Keady v. State**, 687 S.W.2d 757, 758-60 (Tex. Crim. App. 1985); (Ivery) **Williams v. State**, 675 S.W.2d 754, 757-58 (Tex. Crim. App. 1984); **Sneed v. State**, 670 S.W.2d 262, 266 (Tex. Crim. App. 1984); **Munroe v. State**, 637 S.W.2d 475, 482-84 (Tex. Crim. App. 1982); **Sanders**, 580 S.W.2d at 350-51; **McIlveen v. State**, 559 S.W.2d 815, 819-21 (Tex. Crim. App. 1978); **Ashabranner v. State**, 557 S.W.2d 774, 777-78 (Tex. Crim. App. 1977); **Sweed v. State**, 538 S.W.2d 119, 120-21 (Tex. Crim. App. 1976).

[18] Arnold, 786 S.W.2d at 311; See (Walter) **Williams**, 668 S.W.2d at 701; **Freeman**, 556 S.W.2d at 304. See also P.M. McClung, JURY CHARGES FOR TEXAS CRIMINAL PRACTICE (Rev. ed. 1985).

79

are much more stringent than those used to determine consideration for emergency furlough. According to Smith, any given warden could singlehandedly make the decision to grant an unescorted furlough. (RXXXV, 1042)[19]

It is also clear that in the case at bar, Applicant wanted the opportunity to inform the jury that he could not be paroled until the passage of at least thirty-five years in accordance with Art. 37.071, Sec. 2(b)(1), V.A.C.C.P.. That request was repeatedly denied. The Court of Criminal Appeals on direct appeal stated:

"We have held that parole, and the issues surrounding the minimum prison term necessary for parole eligibility are not matters for jury consideration in a capital murder prosecution. **Smith v. State**, 898 S.W.2d 838, 846 (Tex. Crim. App. 1995)(plurality opinion), cert. denied, 116 S.Ct. 131 (1995); **Broxton v. State**, 909 S.W.2d 912, 919 (Tex. Crim. App. 1995); **Sonnier v. State**, 913 S.W.2d 511, 521 (Tex. Crim. App. 1995). Given that juries are not to consider any aspect of parole, a reasonable trial court could find that parole was not an issue applicable to the case. If parole was not an issue applicable to the case, a reasonable trial court could correctly conclude that parole was not a "proper" area of voir

---

[19] Appellant would assert that such a statement was totally untrue and meant to mislead the jury to Applicant's detriment. See Affidavit "_____" attached hereto.

80

dire inquiry. **Ford v. State**, ___S.W.2d___(No. 71,760)(Tex. Crim. App. 1996)."

Therefore, the same exact reasoning would apply to the jury being allowed to hear testimony of the possibility of unescorted emergency furlough. As pointed out continuously throughout this writ the testimony from Smithy concerning unescorted furlough also encompassed his statements about capital murderers sentenced to life receiving good time. It is common knowledge that "good time" is referring to the grant of early release.

In the case of **Monroe v. State**, 644 S.W.2d 540, 543 (Tex. App. 5th Dist-1982), the Dallas Court of Appeals wrote:

"The statement concerning good time credit, allowing one to serve a year in seven months is consistent with common knowledge....."

In the area of parole there was at least a statutory provision requiring the passage of 35 years before eligibility would arise. As testified to in the trial court, the possibility of emergency furlough had no such passage of time requirement, and was solely up to the whim of certain employees of the prison system. The juror's speculation was allowed to run rampant in this area. The necessary U.S. CONST. Amend. VIII structure to ensure the sentence of death not to be arbitrary and capricious as set forth herein, was not present in this case. The jury may well have answered the special issues to ensure the death penalty so that

81

society would not be subjected to the whims of employees of the
Texas prison system instead of making their answers case and
Applicant specific. Therefore, Applicant's rights as guaranteed by
TEX. CONST. Art. 1 Sec. 10, 13 & 19 were violated.

: 00083

## GROUND OF ERROR NUMBER SIX

**ALLOWING THE JURY TO CONSIDER THE POSSIBILITY OF EMERGENCY FURLOUGH IF APPLICANT WERE GIVEN A LIFE SENTENCE DURING ITS DETERMINATION OF APPLICANT'S SENTENCE VIOLATED U.S. CONST. AMEND. V, VIII, & XIV.**

As noted, at the time of Mr. Rhoades trial, the law in Texas prohibited the jury from considering the possibility of parole while it determined the answers to the special issues under Article 37.071(b) V.A.C.C.P. Please see and consider all previous cites and factual recitation within the totality of the previous section. There was no set regulations or law concerning emergency furlough and Applicant can find no cases where this tactic had been used before. The jury, being allowed to speculate without reservation that the consequences of a life sentence might mean that Mr. Rhoades would be back on the streets enjoying an unescorted furlough within a very short period of time deprived Applicant of due process of law guaranteed to him by U.S. CONST. AMEND. V and XIV.

The basis for this aspect of Mr. Rhoades claim is found in **Hicks v. Oklahoma**, 447 U.S. 343 (1980). Therein the trial court instructed the jury that it was required under a habitual offender statute to sentence the defendant to forty years in prison. Though the state appeals court acknowledged that the statute was unconstitutional, it ruled that Hicks suffered no prejudice because

83

00084

the sentence was permissible under a separate valid portion of the statute allowing for any sentence not less than ten years. **Hicks**, 447 U.S. at 345. The Supreme Court reversed, reasoning that the jury could have returned a sentence of less than forty years and that reliance on the unconstitutional statute in instructing the jury violated Mr. Hicks' right to due process of law. The Court explained:

> "Where, however, the State has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of state procedural law. The defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion, . . . and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State. [. . .]  In this case Oklahoma denied the petitioner the jury sentence to which he was entitled under state law, simply on the frail conjecture that a jury might have imposed a sentence equally as harsh as that mandated by the invalid habitual offender provision. Such an arbitrary disregard of the

84

petitioner's right to liberty is a denial of due process of law."

**Id.** at 346 (emphasis in original); **see also Fetterly v. Paskett,** 997 F.2d 1295, 1299-1301 (9th Cir. 1993) (applying **Hicks** in the capital sentencing context).[20]

In this case, Mr. Rhoades jury was allowed to consider a matter more damaging than the possibility of parole. There was a statutory buffer of 35 years before parole eligibility, not so in the emergency furlough situation as testified to by Roy Smithy. This increased the likelihood of affirmative answers to the special

---

[20] Although **Hicks** involved a state *statute*, it is beyond dispute that a "liberty interest" protected by the Due Process Clause may be created by sources other than a legislative enactment. See **Kentucky Dept. of Corrections v. Thompson,** 490 U.S. 454, 461 (1989) ("Simply stated, `a State creates a protected liberty interest by placing substantive limitations on official discretion.' . . . *A State may do this in a number of ways.*") (emphasis added). For instance, courts have recognized "liberty interests" in administrative regulations and polices, see, e.g., **Washington v. Harper,** 494 U.S. 210, 221 (1990); **Board of Pardons v. Allen,** 482 U.S. 369 (1987); judicial consent decrees, see, e.g., **Smith v. Sumner,** 994 F.2d 1401 (9th Cir. 1991); and judicial decisions, see, e.g., **Purnell v. Lord,** 952 F.2d 679, 684 (2d Cir. 1992) (recognizing that "decisional law" may create liberty interest); **Garcia v. Miera,** 817 F.2d 650, 654 (10th Cir. 1987) ("common law" may create liberty interest); see also **Kozlowski v. Coughlin,** 711 F. Supp. 83, 87 (S.D.N.Y. 1988); **Gugar v. Coughlin,** 613 F. Supp. 849, 859 (S.D.N.Y. 1985); **Conti v. Dyer,** 593 F. Supp. 696 (N.D. Cal. 1984). In **Ford v. Wainwright,** 106 S. Ct. 2595, 2614-15 (1986) (Rehnquist, J., dissenting), Chief Justice Rehnquist recognized the possibility that state court decisional law could create a liberty interest. See Comment, *Ford v. Wainwright: The Executioner's Song,* 72 Iowa L. Rev. 1461, 1469 n.88 (1987).

issues, and was the sole purpose of this evidence. This was not accidental testimony, this was a specific purposeful attempt to scare the jury so as not to grant a life sentence. This fear was meant to be based on the premise that those who grant emergency furlough could not be trusted. This purely speculative evidence of the grant of unescorted emergency furlough effectively denied the jury the reasonable ability to consider and give effect to all of Applicant's relevant mitigating evidence. By refusing to allow Applicant to inform the jury that he would not even be eligible for parole until the passage of 35 years, but then allowing the State to prove that Applicant **might** very well be granted an unescorted emergency furlough in a very short period of time with little safeguards to ensure a safe application of this grant of release effectively negated all of his mitigating evidence. Applicant's mitigating evidence, namely that he was a time bomb in society now, but safe in prison, was effectively turned into damning aggravating evidence when Smithy was allowed to testify to the **possible** grant of emergency furlough in the near future. **See Andrade**, 700 S.W.2d at 590; **King**, 850 F.2d at 1061.

This in effect, deprived Applicant of having a jury that was allowed to consider and give effect to all of his relevant mitigating evidence. This changed the nature of his mitigating evidence. The evidence that Applicant was a threat in regular society, but not a threat in prison, until a great amount of time

had passed, was now transformed into evidence that necessarily would dictate a death sentence to avoid the possibility of furlough. Because a serious error occurred at sentencing, **Hicks** teaches that a conclusion of harmlessness cannot be based on the ground that the jury legally could have returned affirmative answers even if the jury did not consider emergency furlough as a reason for denying Applicant a life sentence. Indeed, there is no way that this error could be considered harmless, as it goes to heart of the reliability of the jury's determination of the answers to special issues, and increased the likelihood that he would be sentenced to death.[21]   Applicant's U.S. CONST. AMEND. V & XIV right to procedural due process having been violated, Mr. Rhoades's sentence of death should be vacated and the case remanded.

---

[21] The fact that the federal constitution does not bar the states from providing jurors in capital sentencing proceedings with information pertaining to the operation of parole laws through jury instructions, see **California v. Ramos**, 463 U.S. 992, 1013-1014 (1983), does not foreclose this claim. The Court in **Ramos** noted that its decision was not intended to override the contrary judgement of states that capital sentencing juries should not be permitted to consider parole matters. ("We sit as judges, not legislators, and the wisdom of the decision to permit juror consideration of possible commutation is best left to the States.") **Id**. **Ramos** also dealt with a court-offered and sanctioned jury instruction, not a jury's refusal to follow a court's instructions and state law regarding the consideration of the operation of a state's parole laws, or consideration of and reliance upon misleading parole information.

## GROUND OF ERROR NUMBER SEVEN

**THE JURY'S PROBABLE CONSIDERATION OF EMERGENCY FURLOUGH DURING ITS DELIBERATIONS ON PUNISHMENT VIOLATED APPLICANT'S RIGHT TO DUE PROCESS AND WAS NOT HARMLESS ERROR**

The test for determining whether it is reversible error for the jury to consider and discuss the application of parole in non-capital cases is set forth in **Sneed v. State**, 670 S.W.2d 262, 266 (Tex. Crim. App. 1984).[22] Applicant contends that **Sneed** is not an appropriate standard in capital cases. Rather, because of the heightened need for reliability in capital cases, **see, e.g., Gardner v. Florida**, 430 U.S. 349 (1977), this Court should adopt a lesser standard. As in this case, when the trial court allowed the jury to consider the incorrect testimony concerning early release by way of unescorted furlough without limitation, and denied Applicant the ability to rebut and respond to such evidence, it necessarily increased the likelihood that Applicant would be given the death penalty. Any procedure that denies a capital defendant the ability to respond to the State's aggravating evidence should be considered harm per se. **Cf. Rose v. State**, 752 S.W.2d 529, 537

---

[22] A defendant must prove:

1) a misstatement of the law;
2) asserted as a fact;
3) by one professing to know the law;
4) which is relied upon by other jurors;
5) who for that reason changed their vote to a harsher punishment.

**Id.**

88

& n.10 (Tex.Crim.App. 1987) (applying traditional harmless-error analysis pursuant to TEX.R.APP.PRO. Rule 81(b)(2)).[23]

If the Court does not accept such a harm per se approach, then a traditional approach to harm would force the Court to reach the same conclusion. The false and irrelevant evidence concerning the possible grant of unescorted emergency furlough was error under the specific facts of this case. A double homicide which occurred within twenty-four hours of Applicant's release on parole; evidence before the jury that Applicant was released early on his last sentence and was on the first day of his parole at the time of the homicides; and the defense evidence in mitigation that he was currently a time bomb that would be a continuing threat to society if outside the penitentiary set the stage for this being harmful error. The false and misleading unescorted emergency furlough testimony allowed the jury to speculate that Applicant might possibly be let out on society within a reasonably short period of time and then would, by all of the evidence, continue to be the threat that he was at the time of this double homicide. To consider

_____

[23] There are other reasons not to apply **Sneed** to capital cases. In non-capital cases, jurors have the option of sentencing criminal defendants to a wide range of punishments. In Texas capital cases, however, jurors have only two choices: "life" imprisonment or a death sentence. This makes the potential for prejudice suffered by a defendant more probable and renders the **Sneed** test inapposite in the capital sentencing context. **Cf. Spriggs v. Collins**, 993 F.2d 85 (5th Cir. 1993) (discussing differences between Texas capital and non-capital sentencing proceedings in evaluating ineffective-assistance-of-counsel claims under Sixth Amendment).

this evidence which was speculative at best, and perjured testimony at worst, certainly enhanced the chance that any reasonable juror would give an affirmative answer to special issue number one. (TR1A, 294) Tex. R. App. Pro. Rule 81(b)(2), and obviously was the reason for placing this testimony before the jury.

In the case of **Sneed, supra.** the Texas Constitutional prohibition against a jury speculatively doing what this evidence suggested that they do is stated:

> "It would be improper for punishment to be based on an expectation that clemency powers would be exercised, and it would be unconstitutional to attempt to delay the exercise of the clemency powers or to avoid the possible granting of parole by increasing punishment in anticipation thereof. Article II, Sec. 1 of the Texas Constitution provides for the separation of governmental powers among the three distinct departments, the executive, legislative, and judicial. It is well established under this Article that:

> "(A) power which has been granted to one department of government may be exercised only by that branch to the exclusion of the others.... And any attempt by one department of government to interfere with the powers of another is null and void." **Ex parte Giles**, Tex.Cr.App. 502 S.W.2d 774 [1973]; **Smith v. Blackwell**, Tex.Cr.App., 500 S.W.2d 97 [1973]. (Emphasis added).

90

: 00091

Clemency powers embodied in the parole system are beyond the reach of interference by the judicial branch, Art. IV, Sec. 11, Texas Const.; and any action by the judicial branch to frustrate or delay the exercise of the power by the executive branch is as much of an unconstitutional interference as is an attempted usurpation of that power. See, **Ex parte Giles** and **Smith v. Blackwell**, **supra**, for unconstitutional grants of authority to usurp clemency powers.

This is the constitutional basis for the established rule..."

As such Applicant's sentence of death which, in part, was the product of the State suggesting to the jury that they violate the above Constitutional provision, fails for want of Due Process[24] and should be vacated and the cause remanded for a new punishment hearing.

---

[24]The procedure employed herein violates both the Due Process clause of both TEX. CONST. ART.1 Sec. 19 and U.S. CONST. Amend. XIV.

91

00092

## GROUND OF ERROR NUMBER EIGHT

**THE SPECULATION OVER WHETHER APPLICANT WOULD BE GRANTED AN EMERGENCY FURLOUGH IF GIVEN A LIFE SENTENCE VIOLATED APPLICANT'S FEDERAL CONSTITUTIONAL RIGHT TO A RELIABLE SENTENCING PROCEEDING.**

In **Johnson v. Mississippi**, 486 U.S. 578, 584 (1988), the Supreme Court underscored the need for reliable capital sentencing determinations:

> The fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special "`need for reliability in the determination that death is the appropriate punishment'" in any capital case. See **Gardner v. Florida**, 430 U.S. 349,363-364 (1977) (WHITE, J., concurring in judgment) (quoting **Woodson v. North Carolina**, 428 U.S. 280, 305 (1976)).

The Court has also made it clear that capital sentencing decisions cannot be predicated on mere "caprice" or on "factors that are constitutionally impermissible or *totally irrelevant to the sentencing process*." **Zant v. Stephens**, 462 U.S. 862, 884-885, 887, n. 24 (emphasis added).

Texas courts have decided repeatedly that the operation of the parole system in Texas is not to be considered by jurors in their capital sentencing determinations. In effect, Texas has declared parole considerations to be "totally irrelevant to the sentencing process" in capital cases in this state. **Rhoades v. State**, 934 S.W.2d 113 (Tex. Crim. App. 1996). If parole considerations are not relevant to the sentencing process, how possibly could emergency

92

: 00093

furlough considerations be relevant to the sentencing process? For capital sentencing purposes, determinations by the states about whether the operation of the parole or commutation system should be an appropriate factor for juries to consider is usually accepted by the Supreme Court. See **California v. Ramos**, 463 U.S. 992, 1013-14 (1983). The Texas Courts have spoken on the issue of parole, and the exact same reasoning applies to evidence concerning the speculative possibility of unescorted furloughs. Please consider previous citations on the unavailability of parole as a matter for jury consideration already set forth herein.

Taking into account the fact that Applicant's jury was allowed unfettered discretion in their speculation about whether prison officials would grant Applicant an escorted and/or and unescorted emergency furlough if given a life sentence, a matter totally irrelevant to the capital sentencing process, Applicant was deprived of his Eighth Amendment right to a reliable sentencing proceeding. The jury's ability to consider, for any purpose, the **possibility** that Applicant would be released to society in short order if they decided that life was the proper verdict undoubtedly reduced Applicant's chances of receiving anything short of the death penalty. This produced an arbitrary and capricious sentencing determination of the type specifically condemned by the Supreme Court since **Furman v. Georgia**, 408 U.S. 238 (1972). This violation of the essence of the Eighth Amendment protection for persons tried

93

for capital offenses cannot not be constitutionally tolerated. The extreme possibility that this jury accepted the State's offer to consider the possible grant of unescorted furlough as a reason for executing Applicant so as to protect society from, not only Mr. Rhoades, but also the discretion of the executive branch of government caused this sentence of death to be unreliable and violative of U.S. CONST. AMEND. VIII & XIV. See, **Woodson v. North Carolina**, 428 U.S. 280, Mr.Rhoades sentence of death should be vacated and remanded for a new hearing.

94

: 00095

## GROUND OF ERROR NUMBER NINE

**APPLICANT'S SENTENCE OF DEATH WAS BASED UPON MATERIAL INFORMATION THAT WAS FALSE AND MISLEADING IN VIOLATION OF U.S. CONST. AMEND. V,VIII, & XIV.**

As demonstrated herein, Mr. Rhoades's sentence of death was based upon material misinformation. During the punishment phase of the trial the jury was intentionally misinformed about a capital defendant who received a life sentence's ability to obtain an emergency furlough. Applicant would show by the affidavits[25] attached hereto that the State intentionally or recklessly brought before the jury information about emergency furlough when they knew or should have known the facts as presented were false and misleading. Roy Smithy knew that he was not giving authoritative testimony on the subject, he was either guessing or committing aggravated perjury.[26] Applicant requests an evidentiary hearing so that he can subpoena Roy Smithy to show that Smithy had no real knowledge of the classification system and how long it would take for a capital murderer to become a State Approved Trustee, or for a capital inmate to ever be released on an unescorted emergency furlough. Applicant would show that such reckless or intentional testimony was admitted solely for the purpose of having the jury

---

[25] See exhibit "C" attached hereto.

[26] See exhibit "C" attached hereto.

95

believe that emergency furlough was a distinct and real possibility if Applicant were given a life sentence. Applicant would request an evidentiary hearing to prove that Roy Smithy either intentionally or recklessly testified falsely. The Prosecutor, during the testimony at the motion for new trial, tried to distance herself from his testimony, but the Prosecution cannot avoid the dictates of **Brady v. Maryland**, 373 U.S. 83 (1963), by keeping themselves ignorant of information known by its witnesses. **Carey v. Duckworth**, 738 F.2d 875 (7th Cir. 1984). In the case of **Brown v. Wainwright**, 785 F.2d 1457 (11th Cir. 1986) the Court granted habeas under **Giglio**, where prosecution allowed its key witness to testify falsely and failed to correct the false testimony. The standard is whether the false testimony could in any reasonable likelihood have affected the judgment of the jury.

Because this false and inaccurate information was material to the jury's determination of an appropriate sentence, and it encouraged the jury to engage in speculation about the likelihood of such a grant of emergency furlough, Mr. Rhoades's Constitutional rights were violated under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution, and Art. I, §10 and §19 of the Constitution of the State of Texas.

"Reliance upon incorrect assumptions from the evidence when passing sentence violates due process and clearly constitutes plain error." **United States v. Tobias**, 662 F.2d 381, 388 (5th Cir.

96

1981), **cert. denied sub nom. Tobias v. U.S.**, 457 U.S. 1108 (1982). **See also United States v. Tucker**, 404 U.S. 443 (1972); **Townsend v. Burke**, 334 U.S. 736 (1948). In **Tobias**, a defendant was sentenced to 15 years for the manufacture of PCP. He had been arrested when buying chemicals to manufacture narcotics from undercover government agents. The sentencing judge relied in part upon the government's argument that the amount of chemicals he bought indicated that he intended to produce an enormous quantity of drugs. However, on appeal, the 5th Circuit held that the defendant did not specify any particular amount of chemicals when he placed his order; instead, the government agents determined what amount to include in the sale. The court noted that although a court has wide discretion in sentencing a defendant, "[s]entences based upon erroneous and material information or assumptions violate due process." **Id.** (citing **Tucker** and **Townsend**).

In this case, the inaccurate information provided to the jury was material and it is reasonably likely that it affected the jury's verdict in this case. Accordingly, the sentence of death should be vacated and remanded to the Court below for a new sentencing hearing.

## GROUND OF ERROR NUMBER TEN

**PETITIONER'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY THE TRIAL COURT'S REFUSAL TO INSTRUCT THE JURY ABOUT THE TRUE PAROLE IMPLICATIONS OF A LIFE SENTENCE.**

The Court refused Applicant's request that the jury be instructed as to the mandatory period of 35 years before a convicted capital murderer serving a life sentence would have to serve before parole eligibility applied. (RXXXIX, 4,5) The Court denied such request. (RXXXIX, 5) Several courts have interpreted **Simmons** as narrowly as possible - holding that **Simmons** only mandates that jurors be informed of the defendant's parole eligibility when (1) the life sentence that may be assessed against him is literally life imprisonment without any opportunity of parole; and (2) the prosecution has put the issue of future dangerousness in issue during the sentencing trial[27].  On the other hand, in **Clark v. Tansy**, 882 P.2d 527 (N.M. 1994),  the New Mexico Supreme Court held that the position of the **Simmons** plurality opinion applied to a situation where a capital defendant sentenced to life would be eligible for parole, as long as the defendant would be significantly advanced in age by the time he becomes eligible for parole if sentenced to "life" imprisonment.

---

[27] Obviously, requirement (2) will always be satisfied in Texas, since capital jurors are required to consider future dangerousness when deliberating on a capital defendant's sentence.

98

Although **Clark** rested on due process grounds, the court noted that, "a majority of this Court now concurs with Justice Souter [who concurred in **Simmons**] that the Eight Amendment requires the jury to be advised of the legal and factual significance of a life sentence in death penalty proceedings." *Id.* at 530-31.  It is important to note that all of the decisions which have refused to apply **Simmons** to parole eligible capital cases have done so only on due process grounds, without considering Justice Souter's important Eighth Amendment concurrence in **Simmons,** which was joined by Justice Stevens.  To date, only the New Mexico Supreme Court has addressed the Eight Amendment issue, and that court has approved Justice Souter's reasoning.

The lower courts require guidance in applying the principles of **Simmons** to parole-eligible capital defendants.  The idea that **Simmons** applies only to defendants who are actually ineligible for parole creates a distinction that cannot be justified on the basis of principle.  No constitutionally significant difference exists between the jury's assessment of the "continuing threat" posed by a prisoner who will never be eligible for parole, and one who will only become eligible after decades of confinement have passed. Both situations keep a capital defendant incarcerated in a maximum security prison during the time when he poses the greatest

99

potential threat of violence against a free society.[28]  Thus, this Court should clarify that **Simmons** does apply to parole-eligible capital defendants in situations where the defendant requests and is denied an instruction informing the jury of when he will be eligible for parole.  In fact whether one is allowed to inform the jury of the mandatory sentence before parole eligibility, and whether such an instruction is given to the jury in Harris County, Texas, depends solely upon which trial court one has the fortune or misfortune of having their case filed. [29]

In **Simmons,** this Court held that when the issue of future dangerousness is raised in a capital trial, failure to give the jury "truthful information" about parole eligibility is a violation

---

[28] Scientific research regarding the effects of aging on persons who commit violent crimes at a relatively youthful age overwhelmingly supports the common-sense conclusion that such persons become considerably less prone to be violent as they age. This concept of "maturational reform" is fully supported by empirical research and widely accepted by criminologists and other social scientists. *See, e.g.,* Jolin & Gibbons, **Patterns in Criminal Involvement,** 31 Internat'l J. of Offender Therapy & Comparative Criminology 237 (1987); Wilbanks, **The Elderly Offender:  Relative Frequency and Pattern of Offenses,** 20 Internat'l J. of Aging and Human Development 269 (1984-85); Kempf, *Criminology:  Crime Severity and Criminal Career Progression*, 79 J. Crim. L. 524, 526 & nn.13-17 (1988) (collecting numerous authorities).  The phenomenon of "maturational reform" has also been widely accepted by courts. *See*, *e.g., People v. Smith*, 574 N.E.2d 784, 794 (Ill. App. 1991) (observing "that ... the tendency to commit crime decreases with age [and] that antisocial personality types usually burn out in their 40s").

[29] See that attached affidavits of practicing Harris County Attorneys whose clients either were allowed or deprived of presenting the truth about parole eligibility to their juries.

of the Due Process Clause of the Fourteenth Amendment.  **Simmons v. South Carolina**, 114 S. Ct. 2187, 2197 (1994).   In that case, the trial judge's instruction to give the term "life in prison" its plain meaning "did nothing to dispel the misunderstanding reasonable jurors may have about the way in which any particular State defines 'life imprisonment.'" *Id.* at 2197.  For the same reasoning, when discretionary release from prison is raised as an issue at trial[30] failure to give a truthful and complete instruction that limits the jury's ability to speculate denies due process.

In this case, Applicant was twenty-seven years old when he was convicted of capital murder.  Under the applicable law, he would have been eligible for parole at the age of sixty-two.[31]  Applicant requested that the jury be informed that if sentenced to "life imprisonment", he would remain in prison for at least thirty-five years.  The trial court refused to inform the jury of what a "life" sentence meant, and it refused to allow Applicant's attorney to explain the same to the jury on voir dire.  So, the jury in this case did not receive any instruction on the definition of a "life"

---

[30]This refers to Roy Smithy's testimony concerning obtaining good time credits, trustee status, and the grant of emergency furlough.

[31] If a prisoner is serving a life sentence imposed under Section 12.42(d)(2), Penal Code, the prisoner is not eligible for release on parole until the actual calendar time the prisoner has served, without consideration of good conduct time, equals 35 calendar years.  Tex. Crim. Pro. Code Art. 42.18 § (8) (b) (2) (Vernon Supp. 1995).

sentence, even though they received inaccurate information about a form of early release which called for them to speculate. In **Simmons**, this Court stated that "[b]ecause truthful information of parole ineligibility allows the defendant to 'deny or explain' the showing of future dangerousness, due process plainly requires that he be allowed to bring it to the jury's attention by way of argument by defense counsel or an instruction from the court." **Id.** at 2196. It is essential that a jury know what a "life" sentence means because "[i]n assessing future dangerousness, the actual duration of the defendant's prison sentence is indisputably relevant." **Id.** at 2194. Therefore, denying the jury such information violated Petitioner's Fourteenth Amendment right to Due Process.

Furthermore, regardless of whether future dangerousness is an issue, a defendant has an Eighth Amendment right to have the jury informed of the minimum period of incarceration before parole eligibility for two reasons. First, "[t]he fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special need for reliability in the determination that death is the appropriate punishment in any capital case." **Johnson v. Mississippi**, 486 U.S. 578, 584 (1988) (citations and internal quotation marks omitted). This principle is violated where a jury is kept "in the dark" about the true consequences of its sentencing verdict. Second, a capital

defendant is entitled to present all relevant mitigating evidence. Thus, the trial court's refusal to allow Petitioner's parole eligibility under a "life" sentence violated the Eighth Amendment's guarantee that a capital defendant will be permitted to present all relevant mitigating evidence, especially in light of the State making early release an issue as they did herein.

Under the specific facts of this case where: (1) the capital murder occurred within 24 hours of Applicant's release from prison on parole, and that fact was made known to the jury; (2) where the jury was informed/misinformed[32] that Applicant **might possibly** be granted an unescorted emergency furlough within a conceivably short period of time if the jury granted him a life sentence: and (3) Applicant's entire mitigation theory was based on the belief that he was an extreme danger outside the prison now, not a danger while incarcerated, and that after a substantial period of years his dangerousness would subside, his U.S. CONST. Amend. VIII rights were violated. Therefore, the sentence of death should be vacated and the cause remanded.

---

[32] Please refer to the preceding claims wherein the falsity of Roy Smithy's testimony was attacked. Applicant still believes that it was untruthful to inform the jury that there was likelihood that Applicant might be granted an emergency furlough especially of the unescorted type if granted a life sentence. Applicant believes this was just death penalty insurance for the state.

103

## GROUND OF ERROR NUMBER ELEVEN

**THE JURY THAT SENTENCED APPLICANT TO DEATH, LIKE MANY TEXAS JURIES, LIKELY HAD FUNDAMENTAL MISUNDERSTANDINGS ABOUT THE MEANING OF A LIFE SENTENCE FOR SOMEONE CONVICTED OF CAPITAL MURDER.**

All available information indicates that a wide gulf exists between the law, and a juror's perception of a "life" sentence. One study of South Carolina jurors concluded that "jurors assessing dangerousness attach great weight to the defendant's expected sentence if a death sentence is not imposed;" most important, "jurors who believe that the alternative to death is a relatively short time in prison [tend to impose death]." Eisenberg & Wells, *Deadly confusion: Juror Instructions in Capital Cases*, 79 Cornell L. REV. 1, 7 (1993). The common-sense insight that capital jurors will be more likely to vote for the death penalty if they view the alternative punishment as inappropriately light has been confirmed in other studies as well. *See* William M. Bowers, *Research Note: Capital Punishment and Contemporary Values: People's Misgivings and the Court's Misperceptions,* 27 Law & Soc'Y Rev. 157, 169-71 (1993).

Furthermore, research demonstrates that jurors often carry distorted perceptions of parole eligibility into the jury room, and that those misperceptions can "shift the balance" and result in

104

: 00105

the imposition of death.[33]     *See* Bowers, *Capital Punishment &
Contemporary Values:     People's Misgivings and the Court's
Misperceptions*, 27 Law and Soc. Rev. 157 (1993) (summarizing survey
data from Florida, Georgia, Nebraska, New York, and South Carolina,
and concluding that "both citizen and juror grossly underestimate
the time that will usually be served by murderers not sentenced to
death"); Paduano & Stafford Smith, *Deadly Errors:    Juror
Misperceptions Concerning Parole in the Imposition of the Death
Penalty*, 18 Col. Human Rights L. Rev. 211, 222 n.22 (1987)
(randomly selected capital jury veniremen in Cobb County, Georgia,
believed, on average, that "life sentence" meant imprisonment for
8.1 years), *Id.* at 223-225 n.35 (summarizing results of county-wide
survey in Georgia and of jury venire survey in Mississippi that
both showed that estimates of anticipated "life sentence" duration
averaged ten years or less); Hood, III, *The Meaning of "Life" for
Virginia Jurors and Its Effect on Reliability in Capital
Sentencing*, 75 Va. L. Rev. 1605, 1624 n.101 (1989)    (median
estimate by jury-eligible residents of Prince Edward County,
Virginia, of time that capital murderer would actually spend in
prison on "life imprisonment" sentence was 10 years); Dayan, *et*

---

[33] The **Simmons** plurality explicitly recognized that juries do
not necessarily understand the meaning of "life imprisonment."
114 S. Ct. at 2197.

: 00106

*al., Searching for an Impartial Sentencer Through Jury Selection in Capital Trials*, 23 Loy. L.A. L. Rev. 151, 171 (1989).

In this case, it is very likely that the jury believed that if Petitioner was sentenced to "life", he might be released much earlier than the law provided. This is even more likely when one considers how cavalier it seemed that prison officials considered the possible grant of emergency furlough per Roy Smithy's testimony.  Parole has played an important role in dealing with the issue of overcrowded prisons in Texas.  The more overcrowding in Texas prisons, the earlier parole was being granted to violent felons.  Of course, the issue of early parole for violent offenders has been highly publicized.  More importantly, the minimum time for parole eligibility for capital life sentences in Texas had been changed  several times before Petitioner's sentencing.[34]  Thus, a juror at Petitioner's trial may have thought a "life" sentence meant something significantly lower.   This is borne out by a look at the juror quotes set forth in the dissenting opinion on direct appeal[35]:

_____

[34]  "The parole law for capital defendants has changed four times in the past ten years, from a minimum of twenty calendar years in 1985, to fifteen years in 1987, to thirty-five years in 1991, to forty years in 1993." **Smith v. State**, 898 S.W.2d 838, 882 (Maloney, J. dissenting)  (footnote omitted).

[35]Cites to the record have been omitted as these quotes are set forth in the opinion on direct appeal.

00107

"In Texas, this Court has observed it is common knowledge that from time to time inmates of the Texas Department of Criminal Justice are released on parole. **Felder**, 758 S.W.2d at 762. Experience demonstrates the best likelihood is that a jury will consider the existence of parole. **Arnold v. State**, 786 S.W.2d 295, 300 (Tex.Cr.App. 1990), **cert. denied**, 498 U.S. 838, 111 S.Ct. 110, 112 L.Ed.2d 80 (1990). Jurors often succumb to the temptation to consider parole. Id. at 311. While jurors conceive of parole, they can, and often do, misperceive its application. "It can hardly be questioned that most juries lack accurate information about the precise meaning of 'life imprisonment.'" **Simmons**, ___ U.S. at ___, 114 S.Ct. at 2197, 129 L.Ed.2d at 146. Portions of the voir dire involving several veniremembers in the present case are illustrative.

VENIREMEMBER: Life is life: correct? It's not what we hear on TV?

The trial court told the panel that it would instruct them not to consider the issue of parole in making their decision.

PROSECUTOR: Does anything pop into your mind that is important, or I mean why that must be, why we need the death penalty, if we do?

VENIREMEMBER: I just-- there is so much about people that are turned loose after serving such a short period of time in a

107

prison for minor crimes and then go out and commit murder, and it's just really scary to hear things like that, that they are put away for not so serious crimes and then turn around and do much worse crimes after being just sentenced for such a short period, or not sentenced but allowed to serve such a short period of time, and if people like that can do-- go to that point, people that have already committed horrendous crimes, it just seems a little scary that they might do the same thing again, or be a hazard to society.

Another veniremember discussed the matter as follows:

DEFENSE COUNSEL: The way the question reads: Do you agree or disagree that life imprisonment is more effective than capital punishment? And you disagreed with that statement. ... Could you share with me why?

VENIREMEMBER: I guess the reason I answered it in that response was that basically we know that even though they get life imprisonment they are up for parole within ten or twenty years and that life imprisonment doesn't mean life imprisonment. Basically the words don't mean anything.

In response to a veniremember's concern about early release, the trial court responded, "Question relating to leniency within the penal institution or criminal laws, and you mentioned early release. Almost everybody does. That is one of the most popular answers."

VENIREMEMBER: What does life mean? Can they get out in three years or four years with life?

The trial court explained to this veniremember that this was not something that could be considered in the punishment phase. The colloquy continued:

VENIREMEMBER: I don't think I really got an answer.

COURT: You didn't get a correct answer because I can't tell you. All I can tell you is you can't consider it.

Another veniremember was asked about the potential for a person being a continuing threat to society.

VENIREMEMBER: Most of them do. Most of them-- I watch the news every night. Early parolees and everything, they get out of jail and they commit another crime the next day.

Another veniremember expressed a problem with a person convicted of a crime who was suddenly released to commit another crime. She asked if that were possible in a capital murder case.

COURT: **Well I think it is obvious if somebody is assessed the death penalty you don't get paroled on a death penalty.** (emphasis added)

VENIREMEMBER: That doesn't seem to be what is happening, though. Or are we not knowing the full story when we hear things?

COURT: You probably don't know the full story, but you aren't paroled on a death penalty. I think that is obvious. I don't think anybody is going to object at this point to my telling you that, which leaves you with the other option, a life sentence.

VENIREMEMBER: And that's the one that you are eligible for parole at some stage perhaps?

COURT: Yes.

This veniremember was told that she would be instructed not to consider parole.

VENIREMEMBER: See I think that is wrong. I think that if-- I think that if the sentence I am going to-- if **the way I vote on this affects whether he is going to be out in two years versus thirty years,** (emphasis added) then I think I should really have the right to know that up front because I think that changes can occur and sometimes changes don't occur, and if they get back out again and they repeat the offense then I am really angry about that.

A veniremember was concerned that a "person is put in prison and he is released within just a few months for a crime that he should be in there for a number of years." Several other veniremembers expressed concerns about parole and early release. Other veniremembers asked when a person sentenced to life could be paroled, but the court declined to answer.

110

I point out that there is indeed a statutory definition of what life means for "a prisoner serving a life sentence for a capital felony" per Art. 42.18, §8(b)(2), V.A.C.C.P. - "life" means the prisoner is not eligible for release on parole until the actual calendar time the prisoner has served, without consideration of good conduct time, equals 35 calendar years. The trial court could have answered the veniremember's question about what life means by relating the statutory language; and could have excised the word "parole" in phrasing the answer, e.g., "Per our statutes, a life sentence for capital murder means that the defendant is not eligible for release until he has served 35 years of actual calendar time without consideration of good conduct time." There is absolutely nothing statutory or constitutional, state or federal, that requires such information to remain a "state secret" hidden from jurors - and as I discuss further, there are indeed constitutional considerations that in some situations require that jurors be informed of such."

The voir dire in this case exemplifies the difficulties and misperceptions potential jurors have with parole, especially in the context of a life sentence for capital murder. Thirty-five years is not an insubstantial length of time. A jury reasonably may believe that a person convicted of capital murder could be released on parole long before he serves

111

thirty-five years if he were not executed. **Cf. Simmons,** \_\_\_ U.S. at \_\_\_, 114 S.Ct. at 2193, 129 L.Ed.2d at 141. To the extent this misperception pervades the jury's deliberation, it would have the effect of creating a false choice between sentencing the defendant to death and sentencing him to a relatively short period of incarceration. **Cf. Simmons,** \_\_\_ U.S. at \_\_\_, 114 S.Ct. at 2193, 129 L.Ed.2d at 141. This misunderstanding would be heightened by the prosecutor's urging the jury that the defendant would be a danger to society on the streets if he were not executed. Simmons, \_\_\_ U.S. at \_\_\_, 114 S.Ct. at 2193, 129 L.Ed.2d at 141.

"[T]here may be no greater assurance of a defendant's future nondangerousness to the public than the fact that he never will be released on parole." **Simmons,** \_\_\_ U.S. at \_\_\_, 114 S.Ct. at 2194, 129 L.Ed.2d at 142. It stands to reason that the fact that a capital murder defendant in Texas would not be considered for release on parole for thirty-five years would provide greater assurance of the defendant's future nondangerousness to society outside of prison than any misunderstanding that he would be eligible for parole considerably earlier. When a defendant presents evidence that he could be rehabilitated in prison and that the risk of violence is substantially reduced when the defendant reaches an advanced age, and the prosecutor argues that the defendant

112

would be a danger to society on the streets, the fact that the defendant could not be released from prison for thirty-five years will often be the only way that a violent criminal can successfully rebut the State's case. Cf. **Simmons**, ___ U.S. at ___, 114 S.Ct. at 2200, 129 L.Ed.2d at 150-51 (O'Connor, J., concurring).

Without being allowed to have the jury informed of the thirty-five year requirement for parole eligibility, a defendant may be prohibited from rebutting information that the jury considers in answering the special issue. **Cf. Simmons**, ___ U.S. at ___, 114 S.Ct. at 2194, 129 L.Ed.2d at 143. The risk that the jury may consider misinformation about parole eligibility is great, and the consequences are vital to the defendant. **Simmons**, ___ U.S. at ___, 114 S.Ct. at 2197, 129 L.Ed.2d at 146-47."

Applicant's trial record further supports the possibility of the jury's misunderstanding of a "life sentence". Because the jury was never informed of what a life sentence would require, this information possibly created an improper assumption by the jury. That misperception could only have served to increase the chance that Applicant would receive the death penalty. Applicant's sentence of death should therefore be vacated.

: 00114

GROUND OF ERROR NUMBER TWELVE

THE EIGHTH AMENDMENT REQUIREMENT OF RELIABILITY IN
DETERMINING THAT DEATH IS THE APPROPRIATE PUNISHMENT IS
VIOLATED WHERE A JURY IS NOT TOLD THE TRUE CONSEQUENCES
OF ITS SENTENCING VERDICT.

In **Simmons**, the plurality explicitly recognized that juries do
not necessarily understand the meaning of "life imprisonment."
**Simmons**, 114 S. Ct. at 2197. Unlike the plurality, Justices Souter
and Stevens applied this practical insight to the Eighth Amendment
requirement of reliability in capital sentencing, and declared that
"whenever there is a reasonable likelihood that a juror will
misunderstand a sentencing term, a defendant may demand instruction
on its meaning, and a death sentence following the refusal of such
a request should be vacated as having been 'arbitrarily and
capriciously' or 'wantonly and ...freakishly imposed.'" **Simmons**,
114 S. Ct. at 2198 (quoting **Furman v. Georgia**, 408 U.S. 238, 249
(1972) (Douglas, J. concurring). Though this Court's opinion in
**Simmons** was based on the Due Process Clause of the Fourteenth
Amendment[36], Justices Souter and Stevens argued that "[the] need for
heightened reliability [in capital sentencing proceedings, as
required by the Eighth Amendment] ... mandates recognition of a

---

[36] See **Simmons**, 114 S.Ct. at 2193 n.4 (plurality) ("We
express no opinion on the question of whether the result we reach
today is also compelled by the Eighth Amendment.")

114

capital defendant's right to require instructions on the meaning of the legal terms used to describe the sentences ... a jury is required to consider, in making reasoned moral choice between sentencing alternatives." **Simmons**, 114 S. Ct. at 2198.

Given the fact that the jury was not instructed on the issue complained of herein the unreliability of the sentence is borne out by the facts that were before the jury. The record at trial showed that Applicant had participated in this double murder within 24 hours of his release on parole.[37] It would be irresponsible and less than honest not to presume that the jury consider this information when answering the "future dangerousness" special issue.   As a matter of common sense, the answer to this question depended in large part on whether Applicant would be securely imprisoned for a definite and lengthy period, or whether he would soon be released on parole.   By withholding the true and honest answer that state law provided, the trial court permitted the jury to sentence Applicant while laboring under an immediate fear resulting from a misperception -- a fear which, though groundless in fact, was surely powerful enough to overcome Applicant's mitigating evidence. Mix the fear a juror would have that life may only mean 10 years or

---

[37]State's Exhibit 208 reflected that Applicant received a 12 year sentence for burglary on July 18, 1986, and that he obviously was released from prison and committed a felony theft on April 22, 1990. He was given a 5 year sentence for that theft on May 21, 1990. This offense occurred on September 13, 1991. Obviously the fact of parole was evident before the jury.

115

less, and the misinformation that unescorted furlough might force a family to relive this "worst nightmare" even sooner, then death was a foregone conclusion. It would defy logic to suppose that a jury entrusted with the determination of Applicant's "future dangerousness" would be unaffected by the possibility of his being released at some point in the near future, when even his evidence in mitigation showed that to release him on society within a short period of time, was a dangerous and possibly deadly mistake.

The withholding of such important information about the severity of the available sentence of life imprisonment also impaired the jury's retributive judgment. Simply put, a capital jury's decision between life and death might well turn on the extent to which the duration of the particular form of "life imprisonment" at issue corresponds to the grievousness of the crime; while seven or eight years' imprisonment might be insufficient, thirty-five might not. A capital sentencing jury must make a retributive judgment, and it will make that judgment whether it is given truthful and accurate information or forced to rely on uninformed speculation and fear. In a matter so emotionally charged, any perception of unwarranted leniency will have its effect; there is a constitutionally unacceptable risk that it did so in Petitioner's case, rendering his death sentence fundamentally unreliable. The sentence of death should therefore be vacated.

116

## GROUND OF ERROR NUMBER THIRTEEN

**THE TRIAL COURT'S REFUSAL TO ALLOW APPLICANT TO SHOW THE STATUTORY MINIMUM PERIOD OF INCARCERATION ON A CAPITAL LIFE SENTENCE VIOLATED HIS RIGHT TO PRESENT ALL RELEVANT MITIGATING EVIDENCE UNDER U.S. CONST. AMEND. VIII.**

The United States Supreme Court has defined mitigating evidence as "any relevant circumstance that could cause [the sentencer] to decline to impose the [death] penalty." **McCleskey v. Kemp**, 481 U.S. 279, 306 (1987).  There is no question that whether Applicant would be imprisoned for the next 35 years if spared from execution is a "relevant circumstance that could cause [the sentencer] to decline to impose the [death] penalty." **Id.**  The fact that Applicant would not be eligible for parole until the age of sixty-two would very likely serve "as a basis for a sentence less than death".  **Lockett v. Ohio**, 438 U.S. at 604.

In addition to constituting mitigating evidence in its own right, evidence of the length of time Applicant would have been required to spend in prison was crucial to provide a means for the jury to respond to the mitigating evidence relating to his ability to conform within a structured environment.  Several examples of the testimony offered at the sentencing phase gain extra resonance when they are added to the fact that Applicant would have to spend at least thirty-five years in prison.  First, of course, is the fact that Applicant would be more than sixty-two years old before even becoming eligible for release.  Second, psychiatric testimony

117

indicated that Applicant would not be an immediate threat in prison.(RXXXIV, 886) The same, uncontroverted psychiatric testimony, displayed the fact that with the passage of thirty-five years in the structure of the penitentiary, Applicant's violent tendencies would have subsided. (RXXXIV, 886)

The testimony established that Applicant was capable of adjusting to institutional life. (see **Skipper v. South Carolina**, 476 U.S. 1 (1986). There is a distinct risk, however, that the jury unduly discounted this testimony because they believed Applicant could be released from prison after only a short time, especially in light of the testimony about the availability of emergency furlough for capital defendant's. Alerting the jury to the true length of his prison term would have given crucial context and meaning to the traditional mitigating evidence offered to the jury, thus allowing them, "in this particular case, . . . [to] fully consider and give effect to the mitigating evidence" he offered. **Penry**, 492 U.S. 1 at 315. In short, the fact that the jury was never informed of Applicant's minimum sentence was "[u]ndoubtedly confusing and frustrating[,] given the arguments by both the prosecution and the defense relating to 'his future dangerousness, and the obvious relevance of [his] parole ineligibility [for thirty-five years] to the jury's formidable sentencing task." **Simmons**, 114 S. Ct. at 2197. This cannot pass the requirements of U.S. CONST. AMEND. VIII as set forth in

118

**Lockett, supra.** and its progency.   The sentence of death should therefore be vacated.

119

GROUND OF ERROR NUMBER FOURTEEN

**APPLICANT'S FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS WAS VIOLATED BECAUSE THE TRIAL COURT FAILED TO INFORM THE JURY BY WAY OF INSTRUCTION THAT APPLICANT WOULD NOT BE ELIGIBLE FOR PAROLE UNTIL HE HAD BEEN INCARCERATED FOR 35 YEARS CALENDAR, GIVEN THE SPECIFIC FACTS OF THIS CASE.**

"The Due Process Clause does not allow the execution of a person 'on the basis of information which he had no opportunity to deny or explain.'" **Simmons v. South Carolina,** 114 S. Ct. at 2192 citing **Gardner v. Florida,** 430 U.S., at 362.   In **Simmons,** this Court reaffirmed the basic due process right to allow the defendant a fair opportunity to meet, rebut or explain any evidence which the state offers as a reason the defendant should be sentenced to death.   The trial court violated the principles of **Simmons** when it instructed the jury to perform the impossible mental gymnastic of deciding whether appellant would pose a "continuing threat to society" without considering "how long the defendant [would] be required to serve any sentence imposed;" the court emphasized that "[s]uch matter come within the exclusive jurisdiction of the Board of Pardons and Paroles" and thus were of "no concern" to the jury. No such limiting instruction was posed to the jury concerning the speculative grant of emergency furlough.

**Simmons,** held that when the issue of future dangerousness is raised in a capital trial, a state must give the jury "truthful information" about parole eligibility or provide "greater

120

:00121

protection than the federal constitution requires" by withholding any information about that subject.[38]   An instruction, not to consider the possibility of parole, is constitutionally unacceptable because jurors are likely to disobey it and speculate -- with inaccurate results -- about the real meaning of a life sentence.   The testimony about emergency furlough invited speculation on the part of the jury.

In **Simmons,** the defendant was not allowed to respond to the prosecutor's closing argument about his future dangerousness by truthfully informing the jury through argument or instructions that under South Carolina law a sentence of life in prison meant life without parole.   Neither was Applicant's trial attorney herein allowed to make such an explanation in his argument. (RIII, 47) The Court in **Simmons,** concluded that this was a violation of due process in spite of the fact that the jury was instructed to give the term life imprisonment its "plain and ordinary meaning" and "not to consider parole or parole eligibility."   This instruction was too "confusing and frustrating" to indulge in the usual presumption that jurors follow the court's charge because it

---

[38]State's Exhibit 208 reflected that Applicant received a 12 year sentence for burglary on July 18, 1986, and that he obviously was released from prison and committed a felony theft on April 22, 1990. He was given a 5 year sentence for that theft on May 21, 1990. This offense occurred on September 13, 1991. Obviously the fact of parole was evident before the jury.

"actually suggested that parole was available" and inexplicably directed them to "be blind" to that crucial fact.

In this case, the court informed the jurors that parole was possible if they chose to vote consistent with a life sentence (the only permissible inference from the instruction not to consider "how long the defendant will be required to serve any sentence imposed"). The judge in **Simmons** at least instructed the jurors to give the term "life in prison" its plain meaning. "[C]ommon sense tells us" that some members of applicant's jury probably would not have known that "a life sentence carries with it the possibility of parole" in Texas if the court had not disclosed this. **See Simmons**, 114 S. Ct. at 2201 (O'Connor and Kennedy, JJ., and Rehnquist, CJ., concurring). The "actual duration of the defendant's prison sentence" was "indisputably relevant" to the prosecutor's comments about the issue of future dangerousness in **Simmons**, 114 S. Ct. at 2194, but it was more relevant here because closing arguments "'generally carry less weight with a jury than do instructions from the court.," **Id.** (Souter and Stevens, JJ., concurring) (quoting **Boyde v. California**, 494 U.S. 370, 384 (1990)).

Because of the trial court's failure to limit the jury's consideration of the possible granting of unescorted furlough, and a failure to instruct the jury about the true facts concerning parole eligibility for a capital life sentence, the jury was left to  speculate about how much protection society would enjoy with

122

: 00123

a life sentence. A procedure that invited such speculation in a capital murder case violates the right to due process. The sentence of death should therefore be vacated.

## GROUND OF ERROR NUMBER FIFTEEN

**THE DEATH PENALTY, AT LEAST AS PRESENTLY ADMINISTERED IN TEXAS, CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

Rather than engage in a lengthy exposition about why capital punishment is *per se* unconstitutional -- at least as it is presently administered -- Applicant herein adopts the cogent arguments of retired Justice Harry Blackmun, dissenting from denial of certiorari in the Texas capital case of **Callins v. Collins**, 114 S. Ct. 1127 (1994). Justice Blackmun, who dissented in **Furman** and who voted in the majority in the 1976 cases affirming various states' post-**Furman** death penalty statutes, **see, e.g., Jurek v. Texas**, 428 U.S. 262 (1976), did not condemn capital punishment in the abstract as a cruel and unusual method of punishment that offends "evolving standard of decency." **Cf. Gregg v. Georgia**, 428 U.S. 153, 227-41 (1976) (Brennan & Marshall, JJ., dissenting). Rather, Justice Blackmun contended, *inter alia*, that capital sentencing procedures employed in the post-**Furman** era are *per se* unconstitutional because they are the product of paradoxical constitutional commands: on the one hand, jurors must be free to consider any and all types of constitutionally relevant mitigating evidence, while, on the other hand, there must be "structured discretion" in sentencing, as required by **Furman**. **See Callins**,

124

: 00125

*supra* ("Experience has taught us that the constitutional goal of eliminating arbitrariness and discrimination from the administration of death ... can never be achieved without compromising an equally essential component of fundamental fairness -- individualized sentencing.").

At least regarding the death penalty as it is presently being administered in Texas, it is *per se* unconstitutional under the Eighth and Fourteenth Amendments.  In particular, the present Texas capital sentencing scheme -- including the statutory **"Penry"** special issue -- is unconstitutional because it permits the very type of open-ended discretion condemned by the Supreme Court in **Furman**.

Accordingly, Applicant's sentence of death should be vacated.

125

## GROUND OF ERROR NUMBER SIXTEEN

**THE DEATH PENALTY, AT LEAST AS ADMINISTERED TO APPLICANT IN HARRIS COUNTY, TEXAS IS ARBITRARY AND CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF U.S. CONST. AMEND. VIII & XIV,**

As set forth in many of the grounds of error herein, it is Applicant's belief that an honest reading of his record of trial would reflect that the only chance or hope he ever had of having his life spared was dependent upon the jury believing that he could be effectively controlled in the penitentiary long enough to render him no longer a threat to society. The uncontested testimony of Dr. Dickerson supported this position. (RXXXIV, 886) All of his mitigating evidence was meant to support this theme. This included the pictures of his "normal" youth while being raised in a structured environment. His "normal" adaptation to boot camp. His "normal" adaptation to the structure of the penitentiary as evidenced by his being valedictorian of his GED class. All of this evidence was meant to support the theme that Applicant was not a danger to society in a structured environment, and that structure could be accomplished with a life sentence in the penitentiary. The vehicle for carrying that theme to the jury was wrongfully eliminated in this case in two ways. (1) The trial judge's unwavering position that the jury would never be informed of the mandatory serving of thirty-five years before Applicant would be

126

00127

eligible for parole; and (2) the admission into evidence of the misleading and irrelevant testimony concerning unescorted furlough.

Whether Rick Allen Rhoades would have had the vehicle available for his use, that is the ability to inform the jury of the true meaning of a capital life sentence, was dependent upon which Harris County District Court his case happened to be assigned. [39] It may not have made much of a difference to another capital defendant whose case was factually different, but to Rick Allen Rhoades the luck of the draw sealed his doom. If a capital defendant's only vehicle for carrying his mitigating evidence to the jury, so that there would exit the opportunity that the jury might respond with a sentence of less than death, is defeated only because that defendant's case fell in a certain court as opposed to another, then certainly such a practice and procedure is arbitrary and capricious.

In **Jurek, supra.**, while upholding the Texas law on capital punishment the Supreme Court stated:

"Texas law essentially requires that one of five aggravating circumstances be found before a defendant can be found guilty of capital murder, and that in considering whether to impose a death sentence the jury may be asked to consider whatever

---

[39]Please see the affidavits of practicing Harris County attorneys, who handle capital offenses which is attached hereto as exhibit "D", and the affidavit of James Leitner which is attached hereto as exhibit "E".

127

evidence of mitigating circumstances the defense can bring before it....

....a sentencing system that allowed the jury to consider only aggravating circumstances would almost certainly fall short of providing the individualized sentencing determination that we today have held in **Woodson v. North Carolina**, post, at 303-305, to be required by the Eighth and Fourteenth Amendments. ....what is rationally necessary is ...the balancing of any aggravations against any mitigations that appear.

...thus in order to meet the requirement of the Eighth and Fourteenth Amendments, a capital-sentencing system must allow the sentencing authority to consider mitigating circumstances. In **Gregg v. Georgia**, we today hold constitutionally valid a capital-sentencing system that directs the jury to consider any mitigating factors, and in **Proffit v. Florida**, we likewise hold constitutional a system that directs the judge and advisory jury to consider certain enumerated mitigating circumstances. The Texas statute does not explicitly speak of mitigating circumstances; it directs only that the jury answer three questions. Thus, the constitutionality of the Texas procedures turns on whether the enumerated questions allow consideration of particularized mitigating factors....

....By authorizing the defense to bring before the jury at the separate sentencing hearing whatever mitigating circumstances

00129

relating to the individual defendant can be adduced, Texas has ensured that the sentencing jury will have adequate guidance to enable it to perform its sentencing function....Because this system serves to assure that sentences of death will not be wantonly or freakishly imposed, it does not violate the Constitution."

Would that ruling have been the same had the Supreme Court also been informed that there was an unequal application of the rules in Harris County, Texas which were dependent solely upon which Court a particular defendant's case was assigned to?

In **Gardner v. Florida**, 430 U.S. 349 (1977), the Court ruled that to allow a person to be sentenced to death when a procedure was employed which allowed for consideration by the Court of some secret material in a pre-sentence report failed to meet the need for reliability in capital sentencing and violated the Eighth Amendment. The defendant therein argued that consideration of the contents of the report in the first instance flouts the procedural regularity mandated for capital sentencing by **Furman v. Georgia**, 408 U.S. 238 and **Profitt v. Florida.**

The Court held that: "...it is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion. Second, it is now clear that the sentencing process, as well as the trial itself, must satisfy the requirements

129

: 00130

of the Due Process Clause. Even though the defendant has no substantive right to a particular sentence within the range authorized by statute, the sentencing is a critical stage of the criminal proceeding at which he is entitled to the effective assistance of counsel. **Mempa v. Rhay**, 389 U.S. 128, **Specht v. Patterson**, 386 U.S. 605. The defendant has a legitimate interest in the character of the procedure which leads to the imposition of sentence even if he may have no right to object to a particular result of the sentencing process. See **Witherspoon v. Illinois**, 391 U.S. 510.

A statement by Justice Marshall's dissent would apply equally to this situation. "...the blatant disregard exhibited by the courts below for the standards devised to regulated imposition of the death penalty calls into question the very basis for this Court's approval of that system...."

Because of the luck of the draw Applicant was forced into a Harris County Court that would, under no circumstances, allow the jury to be informed of the true meaning of a capital life sentence. He was extra unlucky because not only was his entire mitigation meaningful only if the jury would believe that he would be locked up for a sufficient amount of time for his dangerous traits to subside, the district court that he drew allowed the State to present inaccurate evidence of early release while denying him the ability to respond truthfully. In **King v. Lynaugh**, 850 F.2d 1055

130

(5th Cir. 1988) (en banc), **cert. denied**, 106 S.Ct. 1524 (1986), the Court stated,"a suggestion to prospective jurors that the defendant might return to [free world] society in twenty years could very easily have predisposed them to impose a sentence of death." Because of the luck of the draw Applicant was denied a vehicle to carry his mitigation to the jury with any hope of a favorable response. Likewise, he was forced to accept the State's inaccurate evidence of early release via unescorted furlough, without the ability to respond. This evidence most surely predisposed the jury to sentence the defendant to death. It is only reasonable that if twenty years might predispose a jury to death, a couple of months would guarantee such a disposition.

Because of the arbitrary and capricious manner that Harris County District Courts address these important issues, Applicant's chance for receiving a sentence of death was greater solely because of the assignment of his case to the 179th District Court. There is no rational state interest in allowing the effectiveness of a capital defendant's mitigation to depend upon which district court his/her case is assigned to. The reliability in sentencing and the individualized sentencing requirements of the beforementioned cases cannot be Constitutionally met when the difference between having a meaningful punishment hearing is as dependent on which court the case is assigned[40], as it is on the facts.

---

[40]See Exhibit "D"

131

Applicant's sentence of death violated his rights as guaranteed by U.S. CONST. AMEND. V,VIII,& XIV, and TEX. CONST. ART. 1 Sec. 10 & 19.  The sentence of death should be vacated and the cause remanded.

132

## GROUND OF ERROR NUMBER SEVENTEEN

**THE DEATH PENALTY, AT LEAST AS ADMINISTERED TO APPLICANT IN HARRIS COUNTY, TEXAS DENIED HIM EQUAL PROTECTION OF THE LAW.**

Please consider everything set forth in ground of error number sixteen as it applies equally to a claim of deprivation of equal protection. Applicant, solely because he was assigned to the 179th District Court, had his mitigation evidence treated differently than if his case had been assigned to one of the District Courts that allows the jury to be informed of the true meaning of a capital life sentence. In **Furman v. Georgia**, 408 U.S. 238 (1972), the Court stated, "What may be said of the validity of a law on the books and what may be done with the law in its application do, or may, lead to quite different conclusions. It would seem to be incontestable that the death penalty inflicted on one defendant is "unusual" if it discriminates against him by reason of his race, religion, wealth, social position, or class, or if it is imposed under a procedure that gives room for the play of such prejudices. There is evidence that the provisions of the English Bill of Rights of 1689, from which the language of the Eight Amendment was taken, was concerned primarily with selective or irregular application of harsh penalties. Any penalty, a fine, imprisonment or the death penalty

133

could be unfairly or unjustly applied. The vice in this case is not in the penalty but in the process by which it is inflicted."

It cannot be justified that in Harris County, Texas, a process that would allow for the disproportionate treatment of capital defendants, as evidenced here, can endure. If one of the justifications for forbidding jurors from being told of the true meaning of a life sentence is that to do so would likely predispose the juror to vote for death. **King, supra.** How can it be justified that some Harris County Courts allow such an instruction to the jury?[41] The fact of the matter is that, under the specific facts of this case, Applicant's entire case for mitigation was dependent upon the jury truthfully understanding that a life sentence would require Applicant to be incarcerated, without any reduction with good conduct, for thirty-five years. If he had been litigating his case in a different district court, his chances for a life sentence would have been significantly better. There is nothing in such a process that focuses on a particular defendant. It is the duty of judges to see that a general law is applied evenhandedly, nonselectively, and in a non-arbitrary manner. Certainly, this Court must have reviewed many jury charges from Harris County, that contained definitions of a life sentence, and many that did not. No case could be found on this specific point. Possibly, no case needed such a definition more to ensure Constitutional sufficiency than the case at bar. In any

---

[41]See exhibit "D"

134

event, Applicant was denied a chance to fairly respond to the State's aggravating evidence because he was treated differently than other capital defendant's who had the good fortune to have their case assigned to a different district court. Such as procedure, in this situation, denied Applicant equal protection of the law.

Applicant's sentence of death should therefore be vacated and the cause remanded to the trial court.

## GROUND OF ERROR NUMBER EIGHTEEN

**APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL ON DIRECT APPEAL BY COUNSEL FAILING TO RAISE AN INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM FOR COUNSEL'S FAILURE TO OBJECT AT TRIAL TO THE DISPARITY IN TREATMENT BY HARRIS COUNTY TEXAS DISTRICT COURTS AS SET FORTH ABOVE AS A DUE PROCESS, EQUAL PROTECTION, AND CRUEL AND UNUSUAL PUNISHMENT VIOLATION.**

"The test to be applied in determining ineffective assistance of counsel is found in **Strickland v. Washington**, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As the Court of Criminal Appeals has previously noted, no mechanistic formula is provided by **Strickland, supra.**

The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermines the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. **Butler v. State**, 716 S.W.2d 48,54 (Tex. Crim. App. 1986) quoting **Strickland** 104 S.Ct. at 2064." **Ex Parte Welborn**, 785 S.W.2d 391 (Tex. Crim. App. 1990)

"**Strickland**, imposes a two-pronged test for the evaluation of ineffective assistance claims. First, the appellant must show that his counsel rendered ineffective assistance in that counsel made unprofessional errors such that counsel was not functioning effectively on the client's behalf. Secondly, appellant must show that he was prejudiced by his counsel's substandard performance. Prejudice must rise to the level sufficient to undermine the

136

confidence in the outcome of the appellant's trial. Strickland, 466 U.S. at 694, 104 S.Ct. at 2068. The **Strickland,** standard has been adopted by the Court of Criminal Appeals in resolving allegations of ineffective assistance under Article 1, Sec. 10 of the Texas Constitution also. See **Holland v. State**, 761 S.W.2d 307, 314 (Tex. Crim. App. 1988), **cert denied** 489 U.S. 1091, 109 S.Ct. 1560, 103 L.Ed.2d 863 (1989); **Hernandez v. State**, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986). **Montez v. State**, 824 S.W.2d 308 (Tex. App.-San Antonio 1992)."

Applicant would assert that based upon the facts and law set forth in grounds of error numbers sixteen and eighteen it was deficient conduct for counsel not to raise a due process, equal protection, and/or cruel and unusual punishment objection at the trial court. It was therefore deficient conduct not to raise an ineffective assistance claim based on the same on direct appeal. As such the first prong of **Strickland, supra.** has been met.

Likewise, a failure to raise the issue on direct appeal denied Applicant the opportunity to have these Constitutional deprivations considered. Since Applicant believes that such an unequal procedure being employed by the Harris County District Courts renders Applicant's sentence of death invalid, the failure to have these issues addressed is obvious harm.

Ineffective assistance of counsel having been shown, the sentence of death should therefore be vacated.

## GROUND OF ERROR NUMBER NINETEEN

**THE JURY INSTRUCTION REGARDING MITIGATING EVIDENCE VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

Special Issue No. 2, in the charge, reads as follows:

"Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, Rick Allan Rhoades, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?" (TR2-295)

In answering this special issue the Court instructed the jury.

"You are instructed that in answering special issue No. 2, you shall answer the issue "YES" or "NO".
You may not answer Special issue No. 2 "No" unless you agree unanimously, and you may not answer Special Issue No. 2 "YES" unless ten (10) or more of you agree to do so.

You need not agree on what particular evidence supports an affirmative finding on Special Issue No. 2.

In answering Special Issue No. 2 you shall consider mitigating evidence to be evidence that a juror might regard as reducing the Defendant's moral blameworthiness.

You are again instructed that you are not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling in considering all of the evidence before you and in answering the Special Issue No.2

138

: 00139

During your deliberations, you are not to consider or discuss any possible action of the Board of Pardons and Paroles Division of the Texas Department of Criminal Justice or of the Governor, or how long the Defendant would be required to serve to satisfy a sentence of life imprisonment." (TR2, 291,295)

The U.S. Supreme Court stated in **Lockett v. Ohio**, 438 U.S. 586 (1978) that a State may not preclude a jury from considering relevant mitigating evidence.   The Texas Court of Criminal Appeals has consistently misinterpreted this Court's decisions requiring that the jury be given a mechanism to fully consider *and give effect to* all mitigating evidence. *See* **Penry v. Lynaugh**, 492 U.S. 302 (1989).   The limitations placed upon the jury's consideration of mitigating evidence by the Texas statutory requirement that mitigating evidence is limited to that which "a juror might regard as reducing the defendant's moral blameworthiness" is an unconstitutional limitation on the ability of a defendant to present constitutionally relevant evidence which the jury has a mechanism through which it may be considered.

"To meet constitutional requirements, a death penalty statute must not preclude consideration of relevant mitigating factors". **Lockett v. Ohio**, 438 U.S. 586, 608 (1978).   Furthermore, a jury must be able to *fully* consider and *give effect* to all mitigating evidence. **Penry v. Lynaugh**, 492 U.S. 302, 315 (1989).   In this case, the evidence showed that Applicant exhibited remorse about the killings via his confession, he exhibited no actual violent behavior (threats made but never carried out) while in a structured

139

environment, he had strong familial relationships, and a lifelong process of non-violent behavior while in a structured environment. He further exhibited a violent lifestyle while experiencing periods of complete freedom. This evidence included pictures of Applicant during these structured times of his life.   Though this mitigating evidence may not have related to Applicant's "moral blameworthiness" for the offense,  he was entitled to have the jury consider all evidence proffered in mitigation in determining his sentence. **Eddings v. Oklahoma,** 455 U.S. 104 (1982).  Still, pursuant to Tex. Code Crim. Proc. Art. 37.071 § 2 (f) (4), the trial court instructed the jury that they should "consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness."    This definition of "mitigating evidence" was an unconstitutional limitation on Applicant's right to have jury consideration of *all*  relevant mitigating evidence.

Constitutionally relevant mitigating evidence is not limited to evidence that relates to the defendant's moral culpability or blameworthiness for the crime.  The Eighth and Fourteenth Amendments require that a sentencing jury consider as mitigating evidence "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  **Lockett v. Ohio** at 604.  In accordance with this requirement, this Court has recognized that evidence    of    remorse    and    post-arrest    good    behavior    are

140

: 00141

constitutionally relevant mitigating evidence.   **See Skipper v. South Carolina**, 476 U.S. 1, 7 (1986)  ("a defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination"); **see also Franklin v. Lynaugh**, 487 U.S. 164, 177 (plurality)  (defendant's "good disciplinary record during his period of incarceration, both before and after the murder" is relevant mitigating circumstance).

Evidence of strong familial relationships is also constitutionally mitigating.   **See Hitchcock v. Dugger**, 481 U.S. 393, 397, 399 (1987)  (evidence that defendant had been "a fond and affectionate uncle to the children of one of his brothers" was constitutionally mitigating).   Certainly, the family members' love for the Petitioner, and their feelings toward his death is evidence of strong familial relationships. As is his years of growing up non-violently in the family's structured environment. Yet, the Court considers such evidence as not being relevant mitigating evidence. but merely a sympathy plea. In **Rhoades v. State**, 934 S.W.2d 113 (Tex. Crim. App. 1996) the Court stated:

"If evidence has no relation to a defendant's moral culpability for the charged crime, then it is irrelevant to mitigation.

In our view, photographs of appellant which depict a cheerful early childhood are irrelevant to appellant's moral

: 00142

blameworthiness for the commission of a violent double-murder because such evidence has no relationship to appellant's conduct in those murders. That appellant was once a child does not diminish his moral culpability for the act of murder."

The Court erred in placing this type of mitigating evidence within the realm of a mere sympathy plea and therefore out of the jury's reach. The jury could easily have found such evidence that Applicant, being a hyperactive child, needed structure to perform as a normal non-violent human being, and without such structure he became as the State's evidence and pictures depict.  The Court obviously viewed the pictures as meaning nothing more than a picture of a child. One has to view the pictures in a different light to see how they can assume the position of "mitigating evidence" per the Court's definition.  It is therefore, easy to see how a lay juror could interpret the instruction of the trial court to mean that evidence that "reduces the Defendant's moral blameworthiness" must mean something akin to evidence of innocence only.  The very issue of guilt or innocence at this point in the trial is not relevant, as it has already been decided. The type of evidence referred to herein relates to Applicant's  background and it should be considered as relevant to the jury's decision about whether or not he should live or die. Clearly, it is evidence that "mitigates against the imposition of the death penalty [and] (to some jurors may) warrant[s] that a sentence of life imprisonment rather than a

142

death sentence be imposed." Tex. Code Crim Proc. Ann. Art. 37.071 2 (d)(1), (e) (Vernon Supp. 1996).    Pursuant to Art. 37.071 §2(f)(4)[42], the trial court instructed the jury that "mitigating evidence," was limited to "evidence that a juror might regard as reducing the defendant's moral blameworthiness." (TR2, 291). Thus, this jury was not allowed to consider  evidence of Applicant's character, background, and circumstances of the crime *except as it relates to moral culpability*. Applicant objected to this charge as it defined mitigating evidence. The Court responded:

> "As I recall, each of those--of these jurors individually was told that the statutes don't set out what the mitigating factors, the mitigating circumstances, are.
>
> We also told them that **the law limits the aspects of the mitigation** and that the jurors determine what weight to give any mitigating factor.
>
> We told each and every one of those jurors that on voir dire examination." (RXXXIX, 3,4)

The United States Supreme Court  has mandated that *all* relevant mitigating evidence must be considered. The law certainly does not mandate that a trial court inform the jury that the law limits the aspects of mitigation. What did that statement mean? If in fact, as the judge recalled, each juror was told that was the law, how would

---

[42]  Art. 37.071 §2(f)(4) defines mitigating evidence as "evidence that a juror might regard as reducing the defendant's moral blameworthiness."

143

they have interpreted that statement within Constitutional permissible standards? It is clear then that it is not enough that relevant mitigating evidence could have been given "some" effect. A statute may not confine the parameters of constitutionally mitigating evidence. Obviously, the trial court did in fact confine the parameters of the mitigating evidence.

In **Johnson v. Texas,** 509 U.S. 350 (1993), the Court of Criminal Appeals erroneously concluded that it is enough that evidence of Petitioner's post-arrest good behavior and strong familial relationships could have been given "some" effect under §2(b)(1)-- the future dangerousness special issue. The U.S. Supreme Court held that youth as a mitigating factor was well within the scope of the future dangerousness special issue and therefore within the effective reach of the jury.  Therefore, the Court found that the Texas special issues allowed adequate consideration of Johnson's youth and thus complied with the Eighth and Fourteenth Amendments. This court stated that "[a]s long as the mitigating evidence is within 'the effective reach of the sentencer,' the requirements of the Eighth Amendment are satisfied." *Id.* at 368 (citation omitted). In this case, however, photographic evidence of the family members' love for the Petitioner, and their feelings toward his death is not so clearly within the ambit of the future dangerousness special issue.  Thus, this mitigating evidence was beyond the effective reach of the jury in violation of **Johnson.** Applicant's rights as

144

00145

guaranteed by U.S. CONST. AMEND. VIII, being violated the sentence of death should be vacated and the cause remanded.

:00146

## GROUND OF ERROR NUMBER TWENTY

**APPLICANT'S RIGHTS TO DUE PROCESS WERE VIOLATED WHEN THE COURT REFUSED TO ALLOW APPLICANT TO PRESENT EVIDENCE OF PAROLE ELIGIBILITY AFTER THE STATE OPENED THE DOOR TO SUCH EVIDENCE.**

During the punishment phase of the case the State produced the following testimony:

by the State: "Now, if a person receives less than a death sentence, in other words, a life sentence for capital murder, do they go into some special area just for capital murderers, or where are they assigend?

By Roy Smithy: If an inmate, once an inmate comes through diagnostic with anything less than a death sentence, he is classified the same as any other felony offense that has occurred that would come through the diagnostic system. No certain group or no certain felony offense is separated from any of the rest of these except for the death penalty cases.

By the State: And, so, if they are not separated, is this like the general population, they are going to be with other inmates who have committed other types of crimes?

By Roy Smithy: Well, it will be noted during his classification process that he was convicted of a violent offense. During his classification process of entering, that will be noted; but as far as he will come in as a close custody inmate. Once he remains a nondisciplinary problem, if you will, then they are reclassified.

146

: 00147

Each inmate is reclassified. And every thirty days, ever ninety days, depending on what classification that they are. And as they are classified, then they can move up from such as a you have line class one, two, three. These are--in the line class, **it depends on the amount of time that they are pulling good time** (emphasis added) and also the type of work that they may do or where they may be assigned. They you have SAT, which stands for state approved trustee. **And once they obtain the state approved trustee 3 status, then no matter what offense that you have committed on the outside does not matter.** (Emphasis added) **It basically depends on your disciplinary history** while you are in the penitentiary as to where you are assigned, how you are assigned, either to your trustee status or **whether you remain line class and not pull any good time.** (Emphasis added) By the State: So, if an inmate gets to the penitentiary and behaves himself for a period of time, he could be in the population with, what, people who have been convicted of felony D.W.I.?

By Roy Smithy: Yes, ma'am.

By the State: Or auto theft?

By Roy Smithy: Yes, ma'am.

By the State: Any offense?

By Roy Smithy: Yes, ma'am. Just because he is in for capital murder does not isolate him if he has less than a death sentence." (RXXXV, 1033-1035)

147

by the State: "If an inmate is in prison and behaves himself for a certain period of time, even if he has been convicted of capital murder, and, of course, is there on just a life sentence, is there an opportunity for him to get furloughed?

By Roy Smithy: If he obtains SAT status, state approved trustee 3 status, then he is eligible for furloughs.

By the State: Just exactly what does a furlough mean?

By Roy Smithy: You have different types. You have emergency furloughs. You have other.--

By defense counsel: Your Honor, could I have a running objection to all of this?

By the Court: Just a moment. Approach the bench, please.

(Off the record hearing)

by defense counsel: (out of the jury's hearing) Judge, to allow her to go into this stuff and not let me allude to--let the jury know he is going to stay locked up for thirty-five years is a gross miscarriage of justice.

By the Court: I don't know where your objection is in there. I understand what your previous objection was. She has been admonished. (Of course none of the objections or the admonishment are on the record)

by defense counsel: I object to any further questions along this line.

148

00149

By the Court: I am going to allow her to complete her line of questioning. That is all I am going to say. (Then before the jury) by the State: I am not sure I remember what the last question was.

By defense counsel: Talking about furlough.

By the State: Thank you. I think I had asked you what is a furlough?

By Roy Smithy: A furlough is when an inmate is allowed to leave the prison unit **unescorted** (emphasis added) to attend whatever reason it is that he has requested to leave the unit, things such as funeral, family emergency and things of that sort where he, in essence, signs a piece of paper that says that he is going to be released a certain time and that he will go to wherever this emergency is and that he promises that he will be back and turn himself back into the unit.

By the State: Like just for the weekend or something or for a day or so?

By Roy Smithy: Yes, ma'am. It may not be just a weekend. It could very well be for a three day period in the middle of the week.

By the State: Depending on the circumstances?

By Roy Smithy: Yes, ma'am." (RXXXV, 1036-1038)

The Court had already ruled from pre-trial on that evidence of parole eligibility was not relevant to the case. (RIII, 47) The State then sought, on its own, to present evidence of how an inmate achieves trustee status, the benefits of that trustee status, and how good time credits are earned. This witness also misinformed the

149

jury that a person gets to prison and is not a disciplinary problem in prison the type of offense committed no longer matters. All of this would mislead the jury to believe that if the offense does not matter, then all of what I may ever had thought about parole would apply equally to this capital murder case.   One of the benefits, even though untrue,[43] was unescorted release on emergency furlough within a reasonably short period of time. This certainly suggested to the jury that Applicant could gain release from prison based upon his trustee status, and that his release could be shortened by his conduct in prison. The Court on direct appeal did not see the correlation between emergency furlough and parole, but the Court did not focus on the specifics of Smithy's testimony as set forth herein. The jury was mislead to believe that if Applicant would be good in prison, like Dr. Dickerson suggested he would, the character of the offense of capital murder would no longer matter and the benefits he would receive, including benefits of early release, would solely be depended on his prison disciplinary conduct. This was misleading and "opened the door" for Applicant to rebut this false impression given to the jury. The general understanding of the public is that early release is the usual benefit of trustee status and the earning of good time credits. That is evident by the wording of the standard non-death parole charge[44]. The false impression

---

[43]See Exhibit "C", and (RXXXIX, 30)

[44]Art. 37.07 (4) reads in pertinent part:
"Under the law applicable in this case, the defendant, if

150

: 00151

created by Smithy opened the door for Applicant to respond, and due process demanded that he have the ability to respond with the truth about good conduct time application in a capital case. In the case of **Ortiz v. State**, 834 S.W.2d 343 (Tex. Crim. App. 1992) this court stated: "we have held, a party may open the door to evidence of, iner alia, probation "suitability" by proffering evidence that broaches the subject, and the opponent, at his option, may either object, in which case the proffered evidence should be excluded, or present evidence in rebuttal. **Griffin v. State**, 787 S.W.2d 63 (Tex. Crim. App. 1990)."

In the case of **Jenkins v. State, supra.** The Court in justifying the State's offer of evidence of the wrongs of others in prison while on drugs in that Defendant's capital murder punishment hearing stated:

> "Appellant made the structured environment argument that the State claimed he would make. When appellant urged the jury in answering special issue two to look at the fact that Appellant had to be under the influence of crack cocaine when he committed the offense, he would do well in the structured environment of prison due to the unavailability of drugs there. The State was entitled to rebut this inference with the evidence about the availability of drugs in prison. The trial

sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time....."

151

court did not abuse its discretion in admitting Bitter's testimony. See **Montgomery v. State**, 810 S.W.2d 372 (Tex. Crim. App. 1990)(op.on reh'g)"

The same rule should have applied to Applicant herein. The failure to allow Applicant to rebut this false impression denied him due process under U.S. CONST. Amend. V & XIV, TEX. CONST. ART. 1 Sec. 19. Further, this denial destroyed the vehicle by which the jury could have given a mitigating effect to Dr. Dickerson's testimony. See **Penry v. Lynaugh, supra.; Walton v. State**, 497 U.S. 639, 110 S.Ct. 3047, (1990); **Barnes v. State**, 876 S.W.2d 316 (Tex. Crim. App. 19940, cert. Denied, ___U.S.___(1994). Applicant should have not been required to object. All that was necessary was an attempt to offer the evidence, and proof of what the evidence would have shown. That was accomplished. The punishment of death should therefore be reversed.

152

: 00153

## APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL

Please allow the following to serve as Applicant's basic cites of authority for all ineffective assistance of counsel claims (U.S. CONST. AMEND. VI) herein. Namely, ground of error eighteen and numerous grounds that follow.

Appellant was entitled to effective assistance of counsel as a matter of federal constitutional law U.S. CONST. AMEND. VI & XIV; **Strickland v. Washington**, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and state constitutional law TEX. CONST. ART. 1 § 10, **Hernandez v. State**, 726 S.W.2d 53 (Tex. Crim. App. 1986). Appellant received ineffective assistance of counsel at trial where counsel failed in all of the areas set forth in this point of error.

"The test to be applied in determining ineffective assistance of counsel is found in **Strickland v. Washington**, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As the Court of Criminal Appeals has previously noted, no mechanistic formula is provided by **Strickland, supra.**

The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermines the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. **Butler v. State**, 716 S.W.2d 48,54 (Tex. Crim. App. 1986) quoting **Strickland** 104 S.Ct. at 2064." **Ex Parte Welborn**, 785 S.W.2d 391 (Tex. Crim. App. 1990)

"**Strickland**, imposes a two-pronged test for the evaluation of ineffective assistance claims. First, the appellant must show that his counsel rendered ineffective assistance in that counsel made unprofessional errors such that counsel was not functioning effectively on the client's behalf. Secondly, appellant must show that he was prejudiced by his counsel's substandard performance. Prejudice must rise to the level sufficient to undermine the confidence in the outcome of the appellant's trial. **Strickland**, 466 U.S. at 694, 104 S.Ct. at 2068. The **Strickland**, standard has been adopted by the Court of Criminal Appeals in resolving allegations of ineffective assistance under Article 1, Sec. 10 of the Texas Constitution also. See **Holland v. State**, 761 S.W.2d 307, 314 (Tex. Crim. App. 1988), **cert denied** 489 U.S. 1091, 109 S.Ct. 1560, 103 L.Ed.2d 863 (1989); **Hernandez v. State**, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986). **Montez v. State**, 824 S.W.2d 308 (Tex. App.-San Antonio 1992)."

Even though it has been held in some circumstances that a single error of omission or commission by counsel can constitute ineffective assistance, **Jackson v. State**, 766 S.W.2d 504 (Tex. Crim. App. 1985), **modified on other grounds on remand from the U.S. Supreme Court** 766 S.W.2d 518 (Tex. Crim. App. 1988); **Ex Parte Felton**, 815 S.W.2d 733 (Tex. Crim. App. 1991), most of the cases on ineffective assistance are decided on the totality of the

154

representation evidenced during the trial. **Bridge v. State**, 726 S.W.2d 558 (Tex. Crim. App. 1986)

The effectiveness of an attorney's assistance is measured by the totality of the representation of the accused. Therefore, failing to object to every instance of improper evidence, or procedural mistake does not necessarily constitute ineffective assistance of counsel. **Hutchinson v. State**, 663 S.W.2d 610 (Tex. App.-Houston [1st. Dist.] 1983); **Ex Parte Ewing**, 570 S.W.2d 941 (Tex. Crim. App. 1978); **Long v. State**, 502 S.W.2d 139 (Tex. Crim. App. 1973).

In **McMann v. Richardson**, 397 U.S. 759, 90 S.Ct. 1441, 25 L.E.2d 763 (1970), the Supreme Court stated:

"If the right to counsel as guaranteed by the Constitution is to serve its purpose, defendants cannot be left to the mercies of incompetent counsel..."

The Texas Court of Criminal Appeals has adopted the standard promulgated in **McMann**, holding that reasonable effective assistance of counsel is demanded of attorneys in criminal cases. **Ex Parte Gallegos**, 511 S.W.2d 510 (Tex. Crim. App. 1974). If the entire record shows that the accused has not been properly represented by his counsel, the court should accordingly so rule. **Rodriguez v. State**, 340 S.W.2d 61 (Tex. Crim. App. 1960).

As to the first prong of **Strickland**, **supra**. the errors set forth herein should well serve to show that counsel was not

155

functioning as required by either U.S. CONST. AMEND. VI or XIV, or TEX. CONST. ART. 1 Sec. 10.

Each point of error complaining of ineffective assistance of counsel contained herein will utilize the standard set forth above:

: 00157

## GROUND OF ERROR NUMBER TWENTY-ONE

**APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S FAILURE TO OBJECT, AT TRIAL THAT HIS RIGHTS TO DUE PROCESS WERE VIOLATED WHEN THE COURT REFUSED TO ALLOW APPLICANT TO PRESENT EVIDENCE OF PAROLE ELIGIBILITY AFTER THE STATE OPENED THE DOOR TO SUCH EVIDENCE.**

Please accept the law concerning ineffective assistance of counsel claims as previously set forth above, as it applies equally to this claim. During the punishment phase of the case the State produced the following testimony:

by the State: "Now, if a person receives less than a death sentence, in other words, a life sentence for capital murder, do they go into some special area just for capital murderers, or where are they assigned?

By Roy Smithy: If an inmate, once an inmate comes through diagnostic with anything less than a death sentence, he is classified the same as any other felony offense that has occurred that would come through the diagnostic system. No certain group or no certain felony offense is separated from any of the rest of these except for the death penalty cases.

By the State: And, so, if they are not separated, is this like the general population, they are going to be with other inmates who have committed other types of crimes?

By Roy Smithy: Well, it will be noted during his classification process that he was convicted of a violent offense. During his

157

classification process of entering, that will be noted; but as far as he will come in as a close custody inmate. Once he remains a nondisciplinary problem, if you will, then they are reclassified. Each inmate is reclassified. And every thirty days, ever ninety days, depending on what classification that they are. And as they are classified, then they can move up from such as a you have line class one, two, three. These are--in the line class, **it depends on the amount of time that they are pulling good time** (emphasis added) and also the type of work that they may do or where they may be assigned. They you have SAT, which stands for state approved trustee. **And once they obtain the state approved trustee 3 status, then no matter what offense that you have committed on the outside does not matter.** (Emphasis added) It **basically depends on your disciplinary history** while you are in the penitentiary as to where you are assigned, how you are assigned, either to your trustee status or **whether you remain line class and not pull any good time.** (Emphasis added) By the State: So, if an inmate gets to the penitentiary and behaves himself for a period of time, he could be in the population with, what, people who have been convicted of felony D.W.I.?

By Roy Smithy: Yes, ma'am.

By the State: Or auto theft?

By Roy Smithy: Yes, ma'am.

By the State: Any offense?

158

By Roy Smithy: Yes, ma'am. Just because he is in for capital murder does not isolate him if he has less than a death sentence." (RXXXV, 1033-1035)

by the State: "If an inmate is in prison and behaves himself for a certain period of time, even if he has been convicted of capital murder, and, of course, is there on just a life sentence, is there an opportunity for him to get furloughed?

By Roy Smithy: If he obtains SAT status, state approved trustee 3 status, then he is eligible for furloughs.

By the State: Just exactly what does a furlough mean?

By Roy Smithy: You have different types. You have emergency furloughs. You have other.--

By defense counsel: Your Honor, could I have a running objection to all of this?

By the Court: Just a moment. Approach the bench, please.

(Off the record hearing)

by defense counsel: (out of the jury's hearing) Judge, to allow her to go into this stuff and not let me allude to--let the jury know he is going to stay locked up for thirty-five years is a gross miscarriage of justice.

By the Court: I don't know where your objection is in there. I understand what your previous objection was. She has been admonished. (Of course none of the objections or the admonishment are on the record)

159

by defense counsel: I object to any further questions along this line.

By the Court: I am going to allow her to complete her line of questioning. That is all I am going to say. (Then before the jury) by the State: I am not sure I remember what the last question was.

By defense counsel: Talking about furlough.

By the State: Thank you. I think I had asked you what is a furlough?

By Roy Smithy: A furlough is when an inmate is allowed to leave the prison unit **unescorted** (emphasis added) to attend whatever reason it is that he has requested to leave the unit, things such as funeral, family emergency and things of that sort where he, in essence, signs a piece of paper that says that he is going to be released a certain time and that he will go to wherever this emergency is and that he promises that he will be back and turn himself back into the unit.

By the State: Like just for the weekend or something or for a day or so?

By Roy Smithy: Yes, ma'am. It may not be just a weekend. It could very well be for a three day period in the middle of the week.

By the State: Depending on the circumstances?

By Roy Smithy: Yes, ma'am." (RXXXV, 1036-1038)

The Court had already ruled from pre-trial on that evidence of parole eligibility was not relevant to the case. (RIII, 47) The State then sought, on its own, to present evidence of how an inmate

160

achieves trustee status, the benefits of that trustee status, and how good time credits are earned. This witness also misinformed the jury that a person gets to prison and is not a disciplinary problem in prison the type of offense committed no longer matters. All of this would mislead the jury to believe that if the offense does not matter, then all of what I may ever had thought about parole would apply equally to this capital murder case.   One of the benefits, even though untrue,[45] was unescorted release on emergency furlough within a reasonably short period of time. This certainly suggested to the jury that Applicant could gain release from prison based upon his trustee status, and that his release could be shortened by his conduct in prison. The Court on direct appeal did not see the correlation between emergency furlough and parole, but the Court did not focus on the specifics of Smithy's testimony as set forth herein. The jury was mislead to believe that if Applicant would be good in prison, like Dr. Dickerson suggested he would, the character of the offense of capital murder would no longer matter and the benefits he would receive, including benefits of early release, would solely be depended on his prison disciplinary conduct. This was misleading and "opened the door" for Applicant to rebut this false impression given to the jury. The general understanding of the public is that early release is the usual benefit of trustee status and the earning of good time credits.

---

[45]See exhibit "C", and (RXXXIX, 30)

:00162

"The statement concerning good time credit, allowing one to serve a year in seven months is consistent with common knowledge and is generally the practice followed by the administration of the Texas Department of Corrections..." **Monroe v. State**, 644 S.W.2d 540 (Tex. App. 5th Dist. 1982). Such is also evident by the wording of the standard non-death parole charge[46]. The false impression created by Smithy opened the door for Applicant to respond, and due process demanded that he have the ability to respond with the truth about good conduct time application in a capital case. In the case of **Ortiz v. State**, 834 S.W.2d 343 (Tex. Crim. App. 1992) this court stated: "we have held, a party may open the door to evidence of, iner alia, probation "suitability" by proffering evidence that broaches the subject, and the opponent, at his option, may either object, in which case the proffered evidence should be excluded, or present evidence in rebuttal. **Griffin v. State**, 787 S.W.2d 63 (Tex. Crim. App. 1990)."

In the case of **Jenkins v. State, supra.**  The Court in justifying the State's offer of evidence of the wrongs of others in prison while on drugs in that Defendant's capital murder punishment hearing stated:

---

[46]Art. 37.07 (4) reads in pertinent part:
"Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time....."

162

"Appellant made the structured environment argument that the State claimed he would make. When appellant urged the jury in answering special issue two to look at the fact that Appellant had to be under the influence of crack cocaine when he committed the offense, he would do well in the structured environment of prison due to the unavailability of drugs there. The State was entitled to rebut this inference with the evidence about the availability of drugs in prison. The trial court did not abuse its discretion in admitting Bitter's testimony. See **Montgomery v. State**, 810 S.W.2d 372 (Tex. Crim. App. 1990)(op.on reh'g)"

The same rule should have applied to Applicant herein.   The failure to allow Applicant to rebut this false impression denied him due process under U.S. CONST. Amend. V & XIV, TEX. CONST. ART. 1 Sec. 19. Further, this denial destroyed the vehicle by which the jury could have given a mitigating effect to Dr. Dickerson's testimony. See **Penry v. Lynaugh, supra.; Walton v. State**, 497 U.S. 639, 110 S.Ct. 3047, (1990); **Barnes v. State**, 876 S.W.2d 316 (Tex. Crim. App. 19940, cert. Denied, ___U.S.___(1994).

The two major cases on which the **Simmons** Court principally relied had been decided in 1977 and 1986. See **Gardner v. Florida**, 430 U.S. 349, 51 L. Ed. 2d 393, 97 S. Ct. 1197 (1977), and **Skipper v. South Carolina**, 476 U.S. 1, 90 L. Ed. 2d 1, 106 S. Ct. 1669 [*1258]   (1986). n5  - The **Simmons** Court also cited **Crane v.**

163

:00164

**Kentucky,** 476 U.S. 683, 690, 90 L. Ed. 2d 636, 106 S. Ct. 2142 (1986) (noting that due process entitles a defendant to "a meaningful opportunity to present a complete defense"), and **Ake v. Oklahoma,** 470 U.S. 68, 83-87, 84 L. Ed. 2d 53, 105 S. Ct. 1087 (1985) (holding that due process entitles an indigent defendant to the assistance of a psychiatrist for the development of his defense). **Simmons,** 114 S. Ct. at 2194 (plurality opinion).

In **Gardner,** the Supreme Court ruled that the Due Process Clause does not permit the execution of a person "on the basis of information which he had no opportunity to deny or explain," in that case a presentence report kept from the defendant. 430 U.S. at 362. In **Skipper,** the Court elaborated on the principle it had announced in **Gardner** and held that a defendant's rights under the Eighth and Fourteenth Amendments were violated by the trial court's refusal to admit evidence of the defendant's good behavior in the penalty phase of his capital trial. 476 U.S. at 5 n.1, 8-9. According to the **Skipper** Court, "where the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty," elemental due process principles require the admission of the defendant's relevant evidence in rebuttal. Id. at 5 n.1; see also id. at 9 (Powell, J., concurring in the judgment) ("Because petitioner was not allowed to rebut evidence and argument used against him," the defendant was denied due process.).

164

Each of the defendants in **Gardner**, **Skipper**, and **Simmons** were barred from presenting to the jury evidence of critical importance to the fact-finding process. The similarity between the situation that confronted **Skipper, Simmons**, and Applicant herein is especially striking. Surely a Constitution that entitles a defendant to rebut the prosecution's argument of future dangerousness with evidence of his good behavior in prison likewise entitles him to inform the jury that he will remain incarcerated for life.. Cf. id. at 5 n.1. The same would apply to a response to the State's evidence of a capital murderer earning good time, obtaining trustee status, etc. Especially in this situation where the State's evidence was incorrect. The State law would not allow good time credit before the passage of 35 calender years, and Applicant's request was in conformance with then current Texas law. Likewise, Applicant's right to an expert pursuant to **Ake**, **supra**. was effectively denied when Smithy't testimony eliminated the vehicle to give Dr. Dickerson's testimony meaning and the ability to apply it to the mitigating evidence to this jury. Thus, it would be an illogical application of **Skipper**, and **Simmons** not extend their reasoning to the case at bar. See **Butler v. McKellar**, 494 U.S. 407, 415, 108 L. Ed. 2d 347, 110 S. Ct. 1212 (1990).

As such Applicant has shown that counsel's failure to object at trial was error. For the reason that Applicant's right to due process were violated when the court refused to allow Applicant to

:00166

present evidence of parole eligibility to the jury after the State had opened the door to such evidence as set forth above. Applicant has therefore shown deficient conduct which supplies the first prong of **Strickland, supra.,** and prejudice is further shown as set forth herein as this ensured Applicant's denial of due process as guaranteed by U.S. CONST. AMEND. V & XIV and TEX. CONST. ART. I Sec. 19 & 26.

The punishment of death should therefore be vacated.

166

## GROUND OF ERROR NUMBER TWENTY-TWO

APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL ON
APPEAL BY COUNSEL'S FAILURE TO RAISE AS AN ISSUE ON
APPEAL THAT APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF
COUNSEL AT TRIAL WHEN COUNSEL FAILED TO OBJECT THAT
APPLICANT'S RIGHTS TO DUE PROCESS WERE VIOLATED WHEN THE
COURT REFUSED TO ALLOW APPLICANT TO PRESENT EVIDENCE OF
PAROLE ELIGIBILITY AFTER THE STATE "OPENED THE DOOR" TO
SUCH EVIDENCE.

Applicant would ask the Court to consider the entire body of the two preceding claims as they apply equally herein.

A review of all points of error in Applicant's brief on direct appeal will show that Applicant made no ineffective assistance of counsel claim for counsel's failure to object at trial that Applicant's rights to due process were violated when the court refused to allow Applicant to present evidence of parole eligibility to the jury after the State had opened the door to such evidence as set forth above. Applicant has therefore shown deficient conduct which supplies the first prong of **Strickland, supra.**, and prejudice is further shown as set forth herein as this effectively waived any right to so complain on direct appeal and ensured Applicant's denial of due process as guaranteed by U.S. CONST. AMEND. V & XIV and TEX. CONST. ART. I Sec. 19 & 26.

The punishment of death should therefore be vacated.

167

## GROUND OF ERROR NUMBER TWENTY-THREE

**APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO OBJECT TO THE TESTIMONY OF ROY SMITHY CONCERNING HOW A CAPITAL MURDERER SERVING A LIFE SENTENCE COULD OBTAIN TRUSTEE STATUS, EARN GOOD CONDUCT TIME, AND BE GRANTED AN UNESCORTED EMERGENCY FURLOUGH.**

Please consider the law concerning ineffective assistance of counsel claims per **Strickland, supra.** as has been set forth previously.

During the punishment phase of the case the State produced the following testimony:

by the State: "Now, if a person receives less than a death sentence, in other words, a life sentence for capital murder, do they go into some special area just for capital murderers, or where are they assigend?

By Roy Smithy: If an inmate, once an inmate comes through diagnostic with anything less than a death sentence, he is classified the same as any other felony offense that has occurred that would come through the diagnostic system. No certain group or no certain felony offense is separated from any of the rest of these except for the death penalty cases.

By the State: And, so, if they are not separated, is this like the general population, they are going to be with other inmates who have committed other types of crimes?

168

By Roy Smithy: Well, it will be noted during his classification process that he was convicted of a violent offense. During his classification process of entering, that will be noted; but as far as he will come in as a close custody inmate. Once he remains a nondisciplinary problem, if you will, then they are reclassified. Each inmate is reclassified. And every thirty days, ever ninety days, depending on what classification that they are. And as they are classified, then they can move up from such as a you have line class one, two, three. These are--in the line class, it depends on the amount of time that they are pulling good time and also the type of work that they may do or where they may be assigned. They you have SAT, which stands for state approved trustee. And once they obtain the state approved trustee 3 status, then no matter what offense that you have committed on the outside does not matter. It basically depends on your disciplinary history while you are in the penitentiary as to where you are assigned, how you are assigned, either to your trustee status or whether you remain line class and not pull any good time.

By the State: So, if an inmate gets to the penitentiary and behaves himself for a period of time, he could be in the population with, what, people who have been convicted of felony D.W.I.?

By Roy Smithy: Yes, ma'am.

By the State: Or auto theft?

By Roy Smithy: Yes, ma'am.

By the State: Any offense?

169

By Roy Smithy: Yes, ma'am. Just because he is in for capital murder does not isolate him if he has less than a death sentence."(RXXXV, 1033-1035)

by the State: "If an inmate is in prison and behaves himself for a certain period of time, even if he has been convicted of capital murder, and, of course, is there on just a life sentence, is there an opportunity for him to get furloughed?

By Roy Smithy: If he obtains SAT status, state approved trustee 3 status, then he is eligible for furloughs.

By the State: Just exactly what does a furlough mean?

By Roy Smithy: You have different types. You have emergency furloughs. You have other.--

By defense counsel: Your Honor, could I have a running objection to all of this?

By the Court: Just a moment. Approach the bench, please.

(Off the record hearing)

by defense counsel: (out of the jury's hearing) Judge, to allow her to go into this stuff and not let me allude to--let the jury know he is going to stay locked up for thirty-five years is a gross miscarriage of justice.

By the Court: I don't know where your objection is in there. I understand what your previous objection was. She has been admonished. (Of course none of the objections or the admonishment are on the record)

170

by defense counsel: I object to any further questions along this line.

By the Court: I am going to allow her to complete her line of questioning. That is all I am going to say. (Then before the jury) by the State: I am not sure I remember what the last question was.

By defense counsel: Talking about furlough.

By the State: Thank you. I think I had asked you what is a furlough?

By Roy Smithy: A furlough is when an inmate is allowed to leave the prison unit **unescorted** (emphasis added) to attend whatever reason it is that he has requested to leave the unit, things such as funeral, family emergency and things of that sort where he, in essence, signs a piece of paper that says that he is going to be released a certain time and that he will go to wherever this emergency is and that he promises that he will be back and turn himself back into the unit.

By the State: Like just for the weekend or something or for a day or so?

By Roy Smithy: Yes, ma'am. It may not be just a weekend. It could very well be for a three day period in the middle of the week.

By the State: Depending on the circumstances?

By Roy Smithy: Yes, ma'am." (RXXXV, 1036-1038)

Applicant complained on direct appeal of the above testimony of Roy Smithy, the Court ruled in **Rhoades v. State**, 934 S.W.2d 113 (Tex. Crim. App. 1996):

171

"We do not have to address the merits of appellant's contention because he failed to object to the line of questioning with ample specificity to notify the trial court of his contention. See **Zillender v. State**, 557 S.W.2d 515, 517 (Tex.Crim.App. 1977). This Court has identified the prerequisites to an effective objection respecting the admissibility of evidence. As we held in **Lankston v. State**, 827 S.W.2d 907, 909 (Tex.Crim.App. 1992):

As regards specificity, all a party has to do to avoid the forfeiture of a complaint on appeal is to let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it. Of course, when it seems from context that a party failed effectively to communicate his desire, then reviewing courts should not hesitate to hold that appellate complaints arising from the event have been lost.

In the instant case, appellant objected only to the trial court's decision to preclude issues of parole eligibility from the trial; **appellant did not actually object to the State's question regarding emergency furlough.** (emphasis added) Indeed, the **trial court flatly told appellant that it did not comprehend the nature of appellant's objection. Rather than rephrasing the objection in a way that the trial court could**

172

:00173

fathom, appellant lodged another non-specific objection. **Appellant failed to effectively communicate his objection. Appellant then declined to rephrase it when the trial court informed him that it did not understand his objection.** (emphasis added) We therefore hold that appellant's complaint regarding the State's questioning is waived for failure to object with specificity. Point of error five is overruled.

In point six, appellant again contends error resulting from the admission of evidence with respect to unescorted emergency furlough. In this point, however, appellant claims the trial court erred when it overruled appellant's motion for new trial based upon the admission of such evidence. As we held in point five, appellant waived his objection to evidence of unescorted emergency furlough. **Appellant, by failing to object correctly, waived his right to complain of the admission of this evidence.** (emphasis added) Hence, the admission of evidence regarding unescorted emergency furlough could not form the basis of a motion for new trial. Point of error six is overruled.

In point seven, appellant again contends error resulting from the admission of evidence with respect to unescorted emergency furlough. However, in this point, appellant claims the trial court erred when it overruled his requested jury instruction

173

at punishment that the jury not consider the possibility of furlough during deliberations. Appellant is again attempting to avoid the consequence of his procedural default regarding emergency furlough. **Appellant failed to object to, or request the court to limit, the jury's consideration of this evidence. Indeed, appellant also failed to request that the trial court strike the evidence at the time it was offered, waiting until the jury charge was prepared.** (Emphasis added)

The motion to strike is itself subject to a requirement of timeliness. See S. Goode, et al., *Guide to the Texas Rules of Evidence: Civil and Criminal* §103.2 at 18 (2nd ed. 1993). For an objection to be "timely", a party must invoke it as soon as the ground for it becomes manifest. Id. In the case at bar, the basis for a motion to strike became manifest as soon as the State elicited the testimony regarding emergency furlough. Yet, **appellant failed to request that the jury be instructed not to consider the evidence when it was elicited.** (emphasis added) The motion to strike, in the guise of a requested jury instruction, was untimely. The trial court therefore did not err when it overruled appellant's requested instruction. Point of error seven is overruled."

It has long been the law that for an issue to be preserved on appeal, there must be a timely objection which specifically stated the legal basis for that objection. **Rezac v. State**, 782 S.W.2d 869 (Tex. Crim. App. 1990) This Court has found that Applicant's trial

174

00175

attorney waived any complaint concerning the testimony about unescorted emergency furlough.

Applicant believes that the heart of his mitigating evidence was the showing that he did well within a structured environment i.e. his adoptive parents home, boot camp, or the penitentiary, but that he was a continuing threat to society in the free world. Further, that, with the passage of a considerable amount of time his propensity for violence would fade. (RXXXIV, 886) The jury would have been allowed to accept that testimony and possibly use it to Applicant's benefit with only a generic belief that a life sentence would put Applicant away long enough to protect society until Applicant was no longer a threat. Applicant had somewhat of a vehicle to take his mitigating evidence before the jury. **Penry, supra.** That vehicle was eliminated when Smithy was allowed to testify that a life sentence could allow Applicant to be back on the streets, just like it was on the day that he killed the brothers in this case, in a ridiculously short passage of time. The testimony of unescorted emergency furlough eligibility turned the nature of Applicant's mitigating evidence, into aggravating evidence warranting a death penalty.[47] As long as death was the only answer

---

[47] I would draw the Court's attention to the statement of the trial attorney on page ii of the motion for rehearing:
"The admission of fact that the Appellant would be eligible to be released on emergency furlough coupled with the fact that the Appellant committed this offense after just being released from prison prevented the Appellant from receiving a fair trial on the issue of determining whether life or death would be a

175

"The Supreme Court has recognized that there are circumstances that occur during trial that are so likely to prejudice an accused that the cost of litigating their effect is unjustified." **United States v. Cronic,** 466 U.S. 648, 658, 104 S.Ct. 2039, 2046, 80 L.Ed.2d 657, 667 (1984).

In the case of **Nelson, supra.** the Court stated:

"The second prong of **Strickland,** requires the convicted defendant affirmatively prove prejudice. The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome."

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." **Holland v. State,** 761 S.W.2d 307, 320 (Tex. Crim. App. 1988).

Applicant would ask the Court to consider the cumulative effect of each claim of harm set forth in claims number 19,20,21,23,24,25,30,32,& 33 in judging whether Applicant has affirmatively proven prejudice. Applicant would asset that he has displayed individually in each claim and therefore cumulatively the effect of the errors set forth in claims numbers

244

: 00245

19,20,21,23,24,25,30,32,& 33 and would show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Therefore, harm has been shown and the sentence of death should be vacated.

to protect society, death was a foregone conclusion. It did not have to be so in this case. The testimony concerning emergency furlough should not have been before the jury for the analogous reasons that parole should not have been before the jury. See **Smith v. State**, 898 S.W.2d 838 (Tex. Crim. App. 1995), **cert. denied,** ___U.S.___, 116 S.Ct. 131 (1995). **Elliott v. State**, 858 S.W.2d 478 (Tex. Crim. App. 1993), **cert. denied,** ___U.S.___, 114 S.Ct. 563 (1993). The fact, if it really were a fact[48], that unescorted emergency furlough was a speculative possibility was not relevant to any issue at punishment. The prejudicial nature of such speculative evidence greatly outweighed any probative value. Tex. R. Crim. Evid. 403. Its admission violated Applicant's right to due process. This testimony allowed the jury unbridled discretion to speculate on how long Applicant would remain in prison before released without protective custody. Counsel was, by this Court's interpretation on direct appeal, unaware of how to object to this evidence that he obviously understood to be highly prejudicial.

"A criminal defense lawyer must have a firm command of the facts of the case *as well as governing law* before he can render reasonably effective assistance to his client. **Ex parte**

_____

proper punishment. **Written word can never recreate the look the jurors gave the Appellant once they were told that the only thing he had to do was to sign his name and he could be released from prison on emergency furlough.**"

[48] Please see exhibit "C" and (RXXXIX, 30).

176

: 00177

**Lilly**, 656 S.W.2d 490 (Tex. Crim. App. 1983): **Ex parte Ybarra**, 629 S.W.2d 943 (Tex. Crim. App. 1982)." **Jackson v. State**, (Tex. Crim. App. 1985); **Damian v. State**, 881 S.W.2d 102 (Tex. App.-Houston [1st Dist] 1994)."

Therefore, deficient conduct has been clearly shown by counsel's failure to lodge a contemporaneous objection even after being specifically asked to do so by the trial court. The prejudice prong has likewise been shown.

"The Supreme Court has recognized that there are circumstances that occur during trial that are so likely to prejudice an accused that the cost of litigating their effect is unjustified." **United States v. Cronic**, 466 U.S. 648, 658, 104 S.Ct. 2039, 2046, 80 L.Ed.2d 657, 667 (1984).

In the case of **Nelson, supra**. the Court stated:

"The second prong of **Strickland**, requires the convicted defendant affirmatively prove prejudice. The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome."

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot

177

be relied upon as having produced a just result." **Holland v.**

**State**, 761 S.W.2d 307, 320 (Tex. Crim. App. 1988).

Once Applicant's only constitutionally demanded vehicle for carrying forward his mitigation evidence was destroyed by the inaction of his counsel by failing to keep out the prejudicial and inadmissible evidence of unescorted furlough, death was a foregone conclusion. Counsel waived Applicant's constitutional rights to a fair trial by his actions herein. [49] Such action deprived Applicant of his U.S. CONST. Amend. V, VIII, & XIV and TEX. CONST. Art. 1 Sec. 10,13,& 19 rights by his counsel failing to provide him with effective counsel as guaranteed by U.S. CONST. AMEND. VI.

The penalty of death should therefore be vacated.

---

[49] For examples of ineffective assistance for failure to object to clearly inadmissible evidence. See, **Garcia v. State**, 712 S.W.2d 249 (Tex. Crim. App. 1986); **Gravley v. Mills**, 87 F.3d 779 (6th Cir. 1996); **Lyons v. McCotter**, 770 F.2d 529 (5th Cir. 1985) **cert denied**, 474 U.S. 1073 (1986);

178

## GROUND OF ERROR NUMBER TWENTY-FOUR

**APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S FAILURE TO MOVE TO STRIKE THE TESTIMONY OF ROY SMITHY CONCERNING THE SPECULATIVE POSSIBILITY OF EMERGENCY FURLOUGH, OR REQUEST AN INSTRUCTION LIMITING ITS USE BY THE JURY.**

The previous rendition of Roy Smithy's testimony at trial adequately displays what happened before the jury. Likewise, the testimony, and direct appeal opinion show that trial counsel waived any right to complain, strike, or limit the evidence concerning unescorted emergency furlough. Please therefore consider all argument and authorities set forth in the proceeding claim as they apply equally herein. By counsel's failure to have the trial court strike the evidence of unescorted furlough Applicant was harmed by the jury having unfettered discretion to utilize their speculation as to what any given warden (RXXXV, 1042) might due that would cause them to consider Applicant's mitigating evidence as a demand for a death sentence. Applicant was once again deprived of his rights as guaranteed by U.S. CONST. Amend. V,VIII, and XIV, by his counsel failing to provide him with effective counsel as guaranteed by U.S. CONST. AMEND. VI.

Appellant's SENTENCE OF DEATH Should BE VACATED.

179

: 00180

GROUND OF ERROR NUMBER TWENTY-FIVE

APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL
WHERE APPELLANT COUNSEL DID NOT CONTEMPORANEOUSLY OBJECT
TO THE STATE PRODUCING AGGRAVATING EVIDENCE AT THE
PUNISHMENT STAGE CONCERNING ACTS OF VIOLENCE THAT GO ON
IN PRISON GENERALLY, WHEN SUCH EVIDENCE WAS NOT RELEVANT
TO ANY OF THE SPECIAL ISSUES AS APPLIED SPECIFICALLY TO
APPLICANT. SUCH EVIDENCE ALLOWED THE JURY TO PUNISH
APPLICANT, WITH THE PENALTY OF DEATH, FOR ACTS OF
VIOLENCE BY OTHER PEOPLE.(RXXXV, 1030)

Please consider the law concerning ineffective assistance of counsel claims per **Strickland, supra.** as has been set forth previously.

In addition to the testimony about unescorted emergency furlough Roy Smithy was also allowed to testify, without objection, that there were an abundance of violent crimes inside the prison system in 1984, which caused the Governor to fund a special prosecutor assistance program. (RXXXV, 1026) Further, that the **Ruiz,** case created a vacuum in the prison system that has been filled by violent gangs, and the stronger take advantage of the weak. (RXXXV, 1029) During the year 1991 his office had indicted, investigated and/or prosecuted over eighteen hundred cases of violence within the system. (RXXXV, 1029) This figure does not cover drug cases, weapons cases, or unreported cases. Many times one inmate stabs another and they do not want to prosecute. (RXXXV, 1031) Then he testified that if one were convicted of capital murder and given a life sentence he would not be separated from any other prisoner. (RXXXV, 1034)

180

That the capital murderer could quickly move up to a state approved trustee status, and be transferred into areas with people who only committed DWI or auto theft. (RXXXV, 1035) He would only be isolated away from these other people if he were to receive a death sentence. (RXXXV, 1035) He further testified that weapons are a big problem in the prison system, and the inmates "in general" are creative with devising weapons. (RXXXV, 1039) Many times those weapons have inflicted injuries on prison personnel or other inmates. (RXXXV, 1040)

Applicant now must ask, what was the relevance of the above? It obviously was offered into evidence by the State to prove that Applicant was a continuing threat to society because of his propensity for future dangerousness, but how are the sins of many relevant proof of Applicant's future dangerousness? Applicant's mitigation evidence was limited to evidence that would lessen his moral blameworthiness, but the State was certainly not limited in proving its aggravating evidence by only Applicant's personal moral blameworthiness. Because of counsel's failure to object, there was no limitation on the State's ability to produce aggravating factors. Appellant, should have objected that this testimony was not relevant to the issues herein, and the prejudicial effect of the sins of others greatly outweighs any probative value. Tex.R. Crim. Evid. R. 403. There was no attempt to link Applicant to any of these crimes specifically, they were not evidence of Applicant's personal moral

:00182

blameworthiness. Even in the case of **Jenkins v. State**, 912 S.W.2d 793 (Tex. Crim. App. 1995), the evidence was limited to the availability of drugs in prison, because Jenkins would be a greater threat if he had drugs available. Here, there was testimony about the availability of weapons in prison, and that part might follow the **Jenkins, supra.** reasoning. This testimony greatly expanded that theory of admissibility to go on and on about other crimes that other people had committed. Applicant was denied fundamental due process when the jury determining whether he would live or die was allowed to consider, without limitation, whether the crimes of others was evidence to consider in determining Applicant's future dangerousness, or to destroy any effect of Applicant's mitigating evidence.

Applicant was once again deprived of his rights as guaranteed by U.S. CONST. AMEND. V,VIII, and XIV, and TEX. CONST. Art. 1 Sec. 10,13, & 19, by his counsel failing to provide him with effective counsel as guaranteed by U.S. CONST. AMEND. VI.

Applicant's Sentence of Death Should Therefore Be Vacated.

182

: 00183

## GROUND OF ERROR NUMBER TWENTY-SIX

**APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL BY COUNSEL FAILING TO SUBMIT AS A POINT OF ERROR THE FACT OF INEFFECTIVE ASSISTANCE OF COUNSEL AT THE TRIAL LEVEL.**

Please consider the law concerning ineffective assistance of counsel claims per **Strickland, supra.** as has been set forth previously.

Roy Smithy's testimony at trial has been set forth earlier in this Writ and Applicant would ask the Court to consider the same herein. Applicant, in his brief on direct appeal, complained in points of error number 5,6 & 7, of differing reasons that reversible error occurred due to the admission of the testimony concerning unescorted furlough. The Court on direct appeal ruled that all of those complaints were waived due to counsel's failure to contemporaneously and specifically object at the trial court. Counsel did not raise on direct appeal, a denial of his U.S.CONST. AMEND. VI and TEX. CONST. ART. 1 Sec. 10 right to effective assistance of counsel due to the failure to make such a specific objection. Therefore, the Court escaped having to rule on the substance contained within the complaints concerning unescorted furlough. This complaint is Applicant's attempt to make sure this matter is exhausted, in every way possible, at the State court level. For all of the reasons set forth in the preceding points of error which set forth the deficient conduct in failing to object in

183

a timely and specific manner to preserve error in the admission of Roy Smithy's testimony, it was likewise deficient conduct not to raise the issue of ineffective assistance for failure to object on direct appeal. Having met the first prong of **Strickland, supra.** direction is then focused on harm. The deprivation of Applicant's rights to due process, due course of law, and the protection against cruel and unusual punishment as set forth in both the United States and Texas Constitutions, that was lost due to the failure to object as set forth in the preceding complaints, was likewise deprived consideration by this Court due to trial counsel's failure to raise the U.S. CONST. AMEND. VI and TEX. CONST. ART.I Sec. 10 ineffective assistance complaint on direct appeal. Such was harm that deprived Applicant of valuable Constitutional rights, and ultimately deprived him of a fair and impartial punishment hearing. Applicant's sentence of death should therefore be vacated.

184

GROUND OF ERROR NUMBER TWENTY-SEVEN

**APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S FAILURE TO OBJECT TO THE STATE'S ARGUMENT ABOUT WISHING TO KNOW WHAT APPLICANT'S INTENT REALLY WAS, AS A U.S. CONST. AMEND. V & VI VIOLATION. (RXXX,821)**

Please consider the law concerning ineffective assistance of counsel claims per **Strickland, supra.** as has been set forth previously.

Applicant did not testify during the guilt/innocence phase of the trial. At argument the prosecutor argued without an objection from counsel that it violated Applicant's U.S. CONST. AMEND. V right to remain silent, the following: "When we talk about whether one intentionally killed, it doesn't mean he had to enter that house with the intent to kill. In fact, I mean, why he went into the house? Why he killed those two young men? I know we would all love to know. **Ask Mr. Stafford to tell you why he would do a thing like that.**" (Emphasis added) (RXXX, 821)

The permissible areas of jury argument are (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to the argument of opposing counsel; and (4) plea for law enforcement. **Alejandro v. State**, 493 S.W.2d 230 (Tex. Crim. App. 1973). The argument as set forth above did not fall within any of those categories. This opening argument of the State not only does not fall within any of the above categories, it asks the jury to

185

:00185

speculate on what Applicant may have told his attorney in violation of Applicant's rights as guaranteed by U.S. CONST. V & VI.

This was a direct comment on Applicant's failure to take the stand, and explain the reason behind this senseless act of violence. It further asked the jury to speculate that Applicant probably told his attorney, and the Prosecutor was inviting Applicant's trial counsel to tell the jury what Applicant told him. This was a comment on Applicant's failure to testify, an impermissible infringement on his right to counsel by trying to force counsel to be a witness against his own client, and it was an effort to have counsel violate the attorney client privilege. It punished Appellant for exercising his rights as guaranteed by U.S. CONST. AMEND. V, VI, TEX. CONST. Art. 1 Sec. 10, and Art. 38.08 V.A.C.C.P.

In **Myers v. State**, 573 S.W.2d 19 (Tex. Crim. App. 1978) the Court stated:

> "The State may not comment on the accused's failure to testify. Tex.Const., Art. I, Sec. 10; Art. 38.08, V.A.C.C.P., construed in **Pollard v. State**, Tex.Cr.App., 552 S.W.2d 475; **Dubose v. State**, Tex.Cr.App., 531 S.W.2d 330-B; **Bird v. State**, Tex.Cr.App., 527 S.W.2d 891; U.S.Const., Amend. V, construed in **Griffin v. California**, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); **Chapman v. California**, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The comment must be more than an implied or indirect allusion to the defendant's

186

silence, however, **Pollard v. State**, **supra**; and **Bird v. State**, **supra.** the remark, when viewed from the jury's viewpoint, must have necessarily referred to the defendant. **Griffin v. State**, Tex.Cr.App., 554 S.W.2d 688; **Nowlin v. State**, Tex.Cr.App., 507 S.W.2d 534. An indirect comment that labels certain evidence as uncontroverted, unrefuted, or uncontradicted is impermissible if only the defendant could offer the rebutting evidence. **Pollard v. State**, **supra**; **Dubose v. State**, **supra**; **Bird v. State**, **supra.** Thus, if the remark complained of called the jury's attention to the absence of evidence that only the testimony from the appellant could supply, the conviction must be reversed."

The only way trial counsel could have known about some other intent was through learning it via Applicant. A remark that calls attention to the absence of evidence which only the defendant could supply will result in reversal. **Patrick v. State**, 906 S.W.2d 481-B (Tex. Crim. App. 1995).

It was surely deficient conduct for the attorney to allow the State to punish him for invoking his constitutional right to remain silent, be represented by counsel, and utilize the attorney client privilege. The trial court had specifically instructed the jury not to consider the failure of Applicant to take the stand for any purpose whatsoever (TR1, 278), but counsel still failed to object.

: 00188

In **Oliva v. State**, ___S.W.2d___ (Tex. App.-Houston [14th Dist] 1997, no pet.h.) this Court stated:

"A defendant's right not to be subjected to incurable erroneous jury arguments is one of those rights that is forfeited by a failure to insist upon it. A defendant's failure to object to a jury argument or a defendant's failure to pursue to an adverse ruling his objection to a jury argument forfeits his right to complain about the argument on appeal...Before a defendant will be permitted to complain on appeal about an erroneous jury argument or that an instruction to disregard could not have cured an erroneous jury argument, he will have to show he objected and pursued his objection to an adverse ruling."

Counsel's failure to object to the complained of argument and his failure to request that the jury be instructed to disregard was deficient conduct which meets the first prong of **Strickland, supra.** Anytime the State asks the jury to punish a defendant for utilizing his Constitutional rights, and especially when it asks the jury to speculate that his trial attorney knows more damaging evidence but is refusing to inform the jury it is prejudice that meets the second prong of **Strickland, supra..** The prejudicial effect of suggesting to the jury that counsel and Applicant are engaged in some sort of conspiracy to keep the jury from knowing the truth permeates the entire trial. The spillover effect of such an obviously erroneous argument would affect every aspect of Applicant's trial. Harm having

188

been shown, the cause should therefore be reversed and remanded for a new trial.

189

## GROUND OF ERROR NUMBER TWENTY-EIGHT

**APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S FAILURE TO OBJECT TO THE COURT'S COMMENT ON THE EVIDENCE, BY STATING THAT THE STATE'S THEORY OF WHAT APPLICANT'S INTENT REALLY WAS, WAS A REASONABLE DEDUCTION FROM THE EVIDENCE. (RXXX, 822)**

Please consider the law concerning ineffective assistance of counsel claims per **Strickland, supra.** as has been set forth previously.

Immediately after the error complained of previously in ground number twenty-seven occurred, trial counsel objected that the prosecutor's conclusions, were outside the record. (RXXX, 821)

The Court overruled counsel's objection and then gratuitously stated, **"and could be a reasonable deduction from the evidence".** (emphasis added) (RXXX, 822).

This comment on the evidence by the Court is in direct violation of Art. 38.05 V.A.C.C.P. which states that a trial judge may not, "at any stage of the proceeding previous to the return of the verdict, make any remark calculated to convey to the jury his opinion of the case." In the case of **Atkinson v. State,** 923 S.W.2d 21 (Tex. Crim. App. 1996) the court stated:

"We have interpreted the prohibition against judicial comment contained in these statutes to forbid any discussion by the trial judge in the jury's presence of evidence adduced at

190

trial which might suggest to the jury the judge's personal estimation of the strength or credibility of such evidence ro which might tend to emphasize such evidence by repetition or recapitulation. **Hathorn v. State**, 848 S.W.2d 101 (Tex. Crim. App. 1992)....This rule assures the independence of the jury in its role as trier of the facts, a role long regarded by Texans as essential to the preservation of their liberties. **See Walker v. State**, 823 S.W.2d 247 (Tex. Crim. App. 1991)"

The prosecutor's comment that the evidence showed that the intent in entering the house was a burglary came immediately after she challenged defense counsel to tell the real reason for the entry. The Court then immediately informed the jury that what the prosecutor said "could be a reasonable deduction from the evidence", served as the Court informing the jury that he believed the statement could be such a reasonable deduction from the evidence. It also served as the Court showing that it was reasonable to deduct from the evidence that Applicant had told his counsel otherwise, and it was proper to expect counsel to inform the jury during argument.

This error not only violated the before mentioned statute, it served to deny Applicant his right to enjoy the benefits of U.S. CONST. Amend. V & VI. Anytime a defendant is punished for utilizing his Constitutional rights, and especially when it asks the jury to speculate that his trial attorney knows more damaging evidence but is refusing to inform the jury it is prejudice that meets the second

191

prong of **Strickland, supra.**. The harm expressed in the preceding complaint was magnified herein when endorsed by the trial court. The cause should therefore be reversed and remanded for a new trial.

192

00193

## GROUND OF ERROR NUMBER TWENTY-NINE

**APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S FAILURE TO PROPERLY INVESTIGATE THE CASE PRE-TRIAL.**

Please consider the law concerning ineffective assistance of counsel claims per **Strickland, supra.** as has been set forth previously.

At trial the State offered into evidence, without objection, the statement of Applicant which was given to the police. (RXXVIII, 360) This statement was evidence of a random senseless killing of the two brother/victims in this case.

Dr. Dickerson on direct examination was asked if Applicant possessed the personality traits which would cause him to go to a sleeping man in his bed and stab him to death. Paraphrasing, the Doctor responded that it just did not fit, that something happened. He did not know what, but he knew that something had to have happened. It did not make sense to him the way it was being presented. (RXXXIV, 867)

On cross-examination the State asked Dr. Dickerson if he believed the story in the confession. He responded that he did not know whether to believe it or not. He again reiterated that it did not make sense to him, based on what he knew about Applicant. He stated that it would have made more sense if Applicant had gone in to the house to steal, for example, and got caught stealing. (RXXXV,

193

959) Then he admitted that if it were in fact just a random act of violence, Applicant was even more of a risk. (RXXXV, 960ff)

When Chris Fitch testified trial counsel did not ask to review for cross-examination purposes any prior statement he may have made. (RXXXIII, 583). If the State's open file policy (RXXVI, 5) included Fitch's statement counsel should have known that the killings were drug related.[50]

Applicant submits that what really happened should have been discovered pre-trial by counsel.[51]

Counsel owes the accused a duty of competent representation. This is particularly true in a capital case, because "there is a significant difference between the death penalty and lesser punishments." **Beck v. Alabama**, 447 U.S. 625, 637 (1980). Although the effectiveness of counsel must be determined on a case-by-case basis, **Strickland v. Washington, supra** at 688-89 (1984), Courts are entitled to look to objective standards and to the appropriate case law to determine what constitutes "reasonably competent counsel" in a particular death penalty case. Thus, this Court is entitled to refer to guidelines such as the **ABA Standards for Criminal Justice** to determine what level of performance is required by reasonably competent counsel in a capital sentencing trial. As the Supreme Court stated in **Strickland**:

---

[50]See Exhibit "E" which is attached hereto

[51]Please see exhibit "B" which is attached hereto.

:00195

> In any case presenting an ineffectiveness claim, the
> performance inquiry must be whether counsel's assistance
> was reasonable considering all the circumstances.
> Prevailing norms of practice as reflected in American Bar
> Association standards and the like, e. g., ABA Standards
> for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The
> Defense Function"), are guides to determining what is
> reasonable....

466 U.S. at 687.

The need to investigate is an essential part of the duty of competent representation and is set forth in the ABA's Standards:

> It is the duty of the lawyer to conduct a prompt
> investigation of the circumstances of the case and to
> explore all avenues leading to facts relevant to the
> merits of the case and the penalty in the event of
> conviction. The investigation should always include
> efforts to secure information in the possession of the
> prosecution and law enforcement authorities. The duty to
> investigate exists regardless of the accused's admissions
> or statements to the lawyer of facts constituting guilt
> or the accused's stated desire to plead guilty.

American Bar Association, **Standards for Criminal Justice: The Defense Function, Standard 4-4.1**, Duty to Investigate, at 4-53 (2d ed. 1980)(emphasis added).[52]

Counsel's duty to investigate in preparation for sentencing is even more critical:

---

[52]   The Second Edition of the ABA Standards were in effect from 1980 to 1993, when the Third Edition was approved by the ABA House of Delegates.  Thus the Second Edition governed the conduct of counsel in Applicant's case when it was tried in 1992.

195

> The lawyer has a substantial and important role to
> perform in raising mitigating factors both to the
> prosecutor initially and to the Court at sentencing. This
> cannot effectively be done on the basis of broad
> emotional appeals or on the strength of statements made
> to the lawyer by the defendant. Information concerning
> the defendant's background, education, employment record,
> mental and emotional stability, family relationships and
> the like will be relevant, as will mitigating
> circumstances surrounding the commission of the offense.
> **Investigation is essential to the fulfillment of these
> functions.**

American Bar Association, **Standards for Criminal Justice: The
Defense Function, Standard 4-4.1, Commentary,** at 4-55 (2d ed.
1980)(emphasis added).

This standard applies acutely to a capital sentencing trial
because the Constitution requires that the sentencer be provided
with and must consider "any aspects of the defendant's background
and record" that may be "proffer[ed] as a basis for a sentence less
than death." **Lockett v. Ohio,** 438 U.S. 586, 604 (1977)(emphasis
added). The standard of performance in a capital case is, and must
be, higher than in a non-capital case since "death is different."
**See, e.g., Gardner v. Florida,** 430 U.S. 349, 357-358
(1977)(plurality opinion). Courts, therefore, have given particular
attention to capital cases where little or no mitigating evidence
is presented in support of a life sentence. **See, e.g., Harris v.
Dugger,** 874 F.2d 756 (11th Cir. 1989; **Kubat v. Thieret,** 867 F.2d
351 (7th Cir. 1989); **Osborn v, Shillinger,** 861 F.2d 612 (10th Cir.
1988); **Hyman v. Aiken,** 824 F.2d 1405 (4th Cir. 1987); **King v.**

196

**Strickland**, 748 F.2d 1462 (11th Cir.), **cert.** denied 471 U.S. 1016 (1984);   **Bolder v. Armontrout**, 713 F.Supp 1558 (W.D. Mo. 1989); **Mathis v. Zant**, 704 F.Supp. 1062 (N.D. Ga. 1989); **see also Cook v. Lynaugh**, 821 F.2d 1072 (5th Cir. 1987).

In the case at bar, the effect of the mitigation testimony was lessened by the apparent randomness, reasonless murder themselves.

In **Kubat**, for example, the Court reversed a defendant's death sentence based on trial counsel's failure to investigate or present mitigating evidence during the penalty phase.   867 F.2d at 369.[53]

In **Ford v. Lockhart**, 861 F.Supp. 1447 (E.D. Arkansas 1994), the Court held that:

> The failure of Cook to even investigate Ford's background and family falls "outside the range of professionally competent assistance . . . " Strickland, 466 U.S. at 690. Numerous cases have pointed to the duty of the lawyer to investigate all available evidence which might bear on a defendant's guilt and punishment. See e.g. Hill v. Lockhart, 28 F.3d 832, 1994 WL 316460 (8th Cir. July 5, 1994) slip op. at 26 (counsel was ineffective for failure to obtain evidence of psychiatric history); Kenley v. Armontrout, 937 F.2d 1298, 1304-08 (8th Cir.), cert. denied, 112 S.Ct. 431 (1991) (counsel was ineffective for failing to investigate thoroughly defendant's social history, psychiatric disorders, disadvantaged childhood, and drinking problems in preparation for penalty phase); Laws v. Armontrout, 863 F.2d 1377, 1385 (8th Cir. 1988) (en banc), cert. denied, 490 U.S. 1040, 109 S.Ct. 1944, 104 L. Ed. 2d 415 (1989) (failure to discover mitigating

---

[53] The Seventh Circuit reasoned that trial counsel's failure had produced "`a breakdown in the adversarial process that our system counts on to produce just results.'"  **Id.** at 369 (quoting **Strickland v. Washington**, 466 U.S. 688 (1984)).  The Court of Appeals further found that by not presenting mitigating evidence "no effort was made to present Kubat to the jury as a human being." **Id.** at 368.

:00198

evidence because of inadequate trial preparation and investigation is ineffective assistance); Pickens v. Lockhart, 714 F.2d 1455, 1467 (8th Cir. 1983) (failure to investigate and present any mitigating evidence was ineffective assistance). "'Given the severity of the potential sentence and the reality that the life of [the defendant] was at stake,'" Ford's counsel had a duty to collect as much information as possible about Ford for use at the penalty phase. Hill v. Lockhart, slip op. at 26 (cite omitted).

In **Baxter v. Thomas**, 45 F.3d 1501, (11th Cir., 1995), trial counsel was found ineffective where he conducted some limited investigation into the client's background, but failed to discover evidence of mental deficiency. **See also Antwine v. Delo**, __ F.3d __, 1995 WL 276685 (8th Cir., May 12, 1995), **US ex rel Emerson v. Gramley**, __ F.Supp. ___, 1995 WL 151859 (N.D. Ill. April 3, 1995), **Ford v. Lockart**, 861 F.Supp. 1447 (E.D. Ark. 1994), **Spranger v. State**, __ N.E.2d __, 1995 WL 307608 (Ind., May 22, 1995, and **State v. Wright**, 653 A.2d 288 (Del. Superior Court, 1994).

In **Blanco v. Singletary**, 943 F.2d 1477, 1502 (11th Cir. 1991), the court held that because counsel "failed to discover and present any of the available mitigating evidence....the errors committed by Blanco's counsel fell below an objective standard of reasonable representation " **Id**.

"An attorney's trial decisions must be based on a proper exercise of judgment based on adequate knowledge" of the facts and relevant law. **United States v. Cronic**, 839 F.2d 1401, 1404 (10th

198

Cir. 1988); **see also McDougall v. Dixon**, 921 F.2d 518, 537 (4th Cir. 1991) (a "strategic" choice by counsel is one "made with **full knowledge** of the facts and the law, and the options available to him"); **Kimmelman v. Morrison**, 477 U.S. 365, 385 (1986) ("`[C]ounsel has a duty to make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary.'"); **Baxter v. Thomas**, 45 F.3d 1501, (11th Cir., 1995) ("An attorney's decision to limit his [mitigation] investigation must `flow from an informed judgment.'")

Any deference that courts must afford trial counsel under **Strickland** in judging whether such failures were constitutionally deficient, as opposed to "tactical" or "strategic" trial decisions, presupposes that an attorney's trial decisions are fully informed and reasonable exercises of professional judgment. "Judges wisely defer to true tactical choices -- that is to say, to choices between alternatives that each have the potential for both benefit and loss." **Profitt v. Waldren**, 831 F.2d 1245, 1249 (5th Cir. 1987). Moreover, "`[t]his measure of deference ... must not be watered down into a disguised form of acquiescence.'" **Bouchillon v. Collins**, 907 F.2d 589, 595 (5th Cir. 1990)

Thus, the performance of counsel in a capital case requires that counsel undertake an independent investigation to unearth any potential mitigating circumstances or mitigating evidence that may be offered during the sentencing trial. This objective standard may

199

be established by either national performance guidelines such as the **ABA Standards for Criminal Justice** or by reference to relevant case law.  Based upon either standard, trial counsels' performance in this case fell below that of a "reasonably competent attorney" defending a capital case during the penalty phase trial.

Why, Applicant and trial counsel were not on the same wave length pre-trial is not known. Applicant may have had a death wish at the time he made the statement, that he carried with him through the trial. For whatever reason he was not honest with trial counsel initially, it should have become apparent to counsel, with the aid of Dr. Dickerson, that the confession story was incomplete and inaccurate. Further investigation on his part would have disclosed the substance of Exhibit "B" and "E". It was the timing, the randomness and the senselessness of the killings that was the most damning evidence against Applicant. The timing is explained in Exhibit "B".  The randomness is likewise explained, and at least some reason is supplied within Exhibits "B" and "E". Applicant, in no way, is meaning to imply that his statement as set forth in Exhibit "B", justifies his conduct. It does not justify his conduct, but it explains his conduct in a manner that makes the aggravating evidence less aggravating per Dr. Dickerson. (RXXXV, 960ff) A reasonable deduction from the evidence would be that Applicant is more controllable if his conduct is tied to some sort of reason that is understandable. Applicant is uncontrollable if his conduct is

totally without reason. The failure of counsel to discover the true facts and circumstances of the murders through the eyes of Applicant was deficient conduct.

Applicant would submit that the harm is apparent from the State of the evidence at the time the jury deliberated. At that time they were left with the impression that Applicant was presently a dangerous threat to society because of his propensity for random violence as evidenced by his confession and the physical facts of the case. They were further left with the knowledge that Applicant could manipulate the prison system by putting on a good face and obtaining good time. (RXXXV, 1024-145) That he had accomplished this very thing in obtaining parole at the time of the killings. That they were then faced with the situation where it was very reasonable to speculate that Applicant would still be the real danger as set forth in the confession, because he would probably be released on unescorted emergency furlough before the great amount of time necessary to subdue his dangerousness had passed per the testimony of Dr. Dickerson. (RXXXC, 998). Harm is therefore shown.

Applicant's U.S.CONST. AMEND. VI and TEX. CONST. ART. I Sec. 10 right to counsel having been violated Applicant would ask that his cause be reversed and remanded to the court below for a new trial. In the alternative he would ask that his sentence of death be vacated.

000202

GROUND OF ERROR NUMBER THIRTY

**APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE COUNSEL DID NOT OBJECT AT TRIAL, OR CLAIM INEFFECTIVE ASSISTANCE FOR FAILURE TO OBJECT AT TRIAL, TO THE STATE PUTTING ON EVIDENCE THAT A RETALIATION INDICTMENT WAS RETURNED AGAINST APPLICANT FOR FELONY RETALIATION AGAINST DAVID COTE, AND IT WAS ULTIMATELY DISMISSED ONLY BECAUSE THERE WAS A MISSING WITNESS. SUCH EVIDENCE TOTALLY IGNORED APPLICANT'S PRESUMPTION OF INNOCENCE IN THAT MATTER. (RXXXIII, 589)**

Please consider the law concerning ineffective assistance of counsel claims per **Strickland, supra.** as has been set forth previously.

During the punishment hearing the State offered into evidence State's Exhibit Numbers 213 and 214. (RXXXI, 47) Applicant's trial attorney's response was, "May I have a moment, your honor....Your, Honor, **I have no objection to any of them** (emphasis added) with the exception of State's Exhibit 209.

By the Court: State's Exhibits 204,205,206,207,208,210,212,213, and 214 are admitted." (RXXXI, 47)

Exhibit number 213 was a certified copy of an indictment in cause number 547497 in the 262nd District Court of Harris County, Texas charging Applicant with the felony offense of Retaliation. (RXXXVII, 133) Exhibit number 214 was a motion to dismiss the indictment in cause number 547497 out of the 262nd District Court for the reason of a missing witness, and the State expressly

202

reserved the right to re-present the indictment to the grand jury. (RXXXVII, 134).

The State during the trial explained these documents to the jury, without objection.

By the State: "With the Court's permission, there are a number of documents that are in evidence that that I have not published to the jury. I would like to read excerpts from a few of those at this time.

By the Court: You may.

By the State: State's Exhibits 200, 213, and 214 all relate to cause number 547497. These are charges of retaliation in the 262nd District Court of Harris County, Texas. 213 is the indictment in that case **showing that Rick Allen Rhoades** also known as David J. Johnson also known as John Samuel Montgomery on November 9th, 1989, **did intentionally and knowingly harm and threaten to harm David Cote by an unlawful act, namely, striking David Cote in the face with his hand, in retaliation for and on account of the service of David Cote as person reported the occurrence of a crime.** (emphasis added)

That same cause number is reflected in exhibit 214, was dismissed on January 9th of 1990 because of a missing witness with an explanation that the State reserves the right to represent to the Grand Jury." (RXXXIII, 589)

The Court's charge on punishment did in fact state:

: 00204

"You are further instructed that if there is any evidence before you in this case regarding the Defendant having committed offenses other than the offense alleged against him in the indictment, you cannot consider this evidence for any purpose unless you find and believe beyond a reasonable doubt that the Defendant committed such other offense, if any were committed, and even then you may only consider the same in determining the answers to the "Special Issues" (TR1, 292)

The Court's charge on punishment did not contain an instruction that if a person is indicted it is not evidence of guilt, or that he must be presumed innocent of a non-adjudicated charge, as the charge on guilt so instructed. (TR1, 279) No such charge was requested. Normally no such charge would be needed, and it would not be error to fail to request the same. The facts of this case require different actions. Counsel should have objected from the onset to the offer of an indictment that he should have known was dismissed. Counsel should have objected to the prosecutor's statement that the indictment **shows** that he committed the offense of retaliation. This

204

00205

denied Applicant what is required by statute[54], by case law[55] due process as guaranteed by U.S. CONST. AMEND. XIV, and due process and due course of law as required by TEX. CONST. ART. 1 Sec. 19 & 26. Applicant would ask the Court to consider the argument and authorities concerning the before mentioned **Strickland, supra.** two prong test when examining claims of ineffective assistance of counsel. Counsel's actions as set forth above clearly show deficient conduct on the part of counsel. There could have been no trial strategy which would have allowed the jury to disbelieve something that is elemental to our jurisprudence, namely the presumption of innocence. As to the issue of harm, one might ask what did that allegation matter in light of all of the others? Applicant believes that nothing hits closer to home with any juror than evidence that a defendant retaliates against those that perform in the criminal justice system in a manner that he could conceive as harmful to him, namely, witnesses and jurors. Combine that belief with the fact that

---

[54]Art. 38.03 V.A.C.C.P. states:
"All persons are presumed to be innocent and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt. The fact that he has been arrested, confined, or indicted for, or otherwise charged with, the offense gives rise to no inference of guilt at his trial." See V.T.C.A. Penal Code Sec. 2.01

[55] **Crane v. State,** 123 S.W. 422 (Tex. Crim. App. 1909); **Acton v. State,** 656 S.W.2d 453 (Tex. Crim. App. 1993) both, by implication state that when there is made an issue, before the jury, that the indictment is evidence a charge that complies with Art. 38.03 Supra and V.T.C.A. Penal Code Sec. 2.01 is required.

205

: 00206

this jury was also left to believe that this person, who randomly and senselessly kills immediately after release from prison, will be eligible for unescorted emergency furlough in short order if they return anything less than a death verdict. Anything less than death would then be perceived as putting their own lives in jeopardy. Applicant would assert that harm has likewise been shown. See **Strickland** and other cases cited herein.

The sentence of death should therefore be vacated and the cause remanded.

00207

GROUND OF ERROR NUMBER THIRTY-ONE

APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL BY COUNSEL FAILING TO RAISE AS A POINT OF ERROR THAT THE TESTIMONY OF ROY SMITHY CONCERNING THE POSSIBILITY OF APPLICANT BEING GIVEN AN EMERGENCY FURLOUGH IF GIVEN A LIFE SENTENCE WAS CONTRIVED, FALSE AND INTENTIONALLY MISLEADING AND AS SUCH A VIOLATION OF DUE PROCESS[56]. (RXXXIX, 6,7)

Please consider the law concerning ineffective assistance of counsel claims per **Strickland, supra.** as has been set forth previously

As previously demonstrated, Mr. Rhoades's sentence of death was based upon material misinformation. During the punishment phase of the trial the jury was intentionally or recklessly misinformed about a capital defendant who received a life sentence's ability to obtain an unescorted furlough. Applicant would show by the affidavit[57] attached hereto that the State intentionally or recklessly brought before the jury information about unescorted furlough when they knew or should have known such testimony was false and misleading. See **Giglio v. United States,** 405 U.S. 150, 92 S.Ct. 765, 31 L.Ed.2d 104 (1972). Roy Smithy knew that he was not giving authoritative testimony on the subject, he was either guessing or committing

---

[56]**Brady v. Maryland,** 373 U.S. 83, (1963); **Napue v. Illinois,** 360 U.S. 264 (1959); **Giglio v. United States,** 405 U.S. 150 (1972); **Means v. State,** 429 S.W.2d 490 (Tex. Crim. App. 1968); **Crutcher v. State,** 481 S.W.2d 113 (Tex. Crim. App. 1972)

[57] See exhibit "C" attached hereto.

207

: 00208

aggravated perjury.[58] Applicant requests an evidentiary hearing so that he can subpoena Roy Smithy to show that Smithy had no real knowledge of the classification system and how long it would take for a capital murderer to become a State Approved Trustee, or for a capital inmate to ever be released on an unescorted emergency furlough. Applicant would show that such reckless or intentional testimony was admitted solely for the purpose of having the jury believe that an unescorted furlough was a distinct and real possibility if Applicant were given a life sentence. Applicant would request an evidentiary hearing to prove that Roy Smithy either intentionally or recklessly testified falsely. On motion for new trial the then current temporary furlough review procedures were placed in evidence. (RXXXIV, 30) These records show on their face that there are two types of furloughs. One is the appropriate reason furlough of which a capital murderer is never eligible. (See page 2 of the guidelines in RXXXIX, 30) The other is the emergency furlough of which a person must be a State Approved Trusty (SAT) I or II (Minimum-Out Custody), or SAT III or IV (Minimum-In custody); and must be in the custody of TDCJ-ID for a reasonable period of time. (See page 4 of the guidelines in RXXXIX, 30). It further stated that the warden of the unit only makes a recommendation, the grant of any emergency furlough "shall be determined by a majority

---

[56] See exhibit "C" attached hereto.

vote of a three-member voting panel of the State Classification Committee, after a review of all files and records on the inmate. Further, inmates who are considered security risks must be escorted by at least two full-time, certified law enforcement officers. (RXXXIX, 30 page 5). Smithy testified that a warden had the authorization to make this discretionary call to release a capital murderer sentenced to life on unescorted furlough on his own. (RXXXV, 1042)

The Prosecutor, during the testimony at the motion for new trial, tried to distance herself from Smithy's testimony, but the Prosecution cannot avoid the dictates of **Brady v. Maryland**, 373 U.S. 83 (1963), by keeping themselves ignorant of information known by its witnesses. **Carey v. Duckworth**, 738 F.2d 875 (7th Cir. 1984). In the case of **Brown v. Wainwright**, 785 F.2d 1457 (11th Cir. 1986) The Court granted habeas under **Giglio**, where prosecution allowed its key witness to testify falsely and failed to correct the false testimony. The standard is whether the false testimony could in any reasonable likelihood have affected the judgment of the jury. In this case the State's knowledge of the true rules of the Texas Department of Criminal Justice Institutional Division is imputed to them. **United States v. Bryan**, 868 F.2d 1032 (9th Cir. 1989), **cert. denied**, 493 U.S. 858 (1989). In **Kyles v. Whitley**, 115 S.Ct. 1555 (1995), the Court made it clear that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting

209

on the government's behalf in the case, including the police." If Applicant had known the true rules of the TDCJ-ID as they applied to furlough's he would have been able to severely impeach the testimony of Smithy.

Because this false and inaccurate information was material to the jury's determination of an appropriate sentence, and it encouraged the jury to engage in speculation about the likelihood of such a grant of unescorted furlough, Mr. Rhoades's Constitutional rights were violated under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution, and Art. I, §10,13,19 & 26 of the Constitution of the State of Texas.

"Reliance upon incorrect assumptions from the evidence when passing sentence violates due process and clearly constitutes plain error." **United States v. Tobias**, 662 F.2d 381, 388 (5th Cir. 1981), **cert. denied sub nom. Tobias v. U.S.**, 457 U.S. 1108 (1982). **See also United States v. Tucker**, 404 U.S. 443 (1972); **Townsend v. Burke**, 334 U.S. 736 (1948).

In this case, the inaccurate information provided to the jury was material and it is reasonably likely that it affected the jury's verdict in this case. Appellate counsel understood the prejudicial nature of this testimony, and that it was false and misleading, but he failed to precisely raise this issue on its own merits before the Court on direct appeal. Therefore, it was deficient conduct pursuant

210

to the first prong of **Strickland, supra.** not to raise this issue on direct appeal.

The harmful result of this inaccurate and misleading testimony has been shown throughout this trial.  If raised properly , the sentence of death would have been vacated if there was shown any reasonable likelihood that the false testimony could have affected the sentence of death.  Clearly, that has been shown herein. Therefore, the second prong of **Strickland, supra.** has also been shown.  Accordingly, the sentence of death should be vacated and remanded to the Court below.

00212

## GROUND OF ERROR NUMBER THIRTY-TWO

**APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL ON PUNISHMENT BY COUNSEL FAILING TO OBJECT TO THE TESTIMONY OF ROY SMITHY FOR THE REASON THAT HIS TESTIMONY WAS NEITHER RELIABLE OR RELEVANT PURSUANT TO TEX. R. CRIM. EVID. 702,705**

Please consider the law concerning ineffective assistance of counsel claims per **Strickland, supra.** as has been set forth previously

Applicant has set forth herein his complaints concerning the testimony of Roy Smithy on several occasions. That testimony, and the reasons Applicant complains of its admissibility has been previously stated, and Applicant would ask the Court to consider the same herein without requiring that it be restated.

Roy Smithy was called by the State apparently because of his alleged expertise with the workings of the Texas Department of Criminal Justice Institutional Division and violent inmates therein. As an expert he was subject to a Rule 705 (b) examination on a voir dire hearing outside the presence of the jury to test his qualifications to so testify, and to test the admissibility of his opinions. Knowing now, what the rules concerning furlough actually say (RXXXIX, 30) it is easy to see that Roy Smithy was not qualified to testify about the granting of the same. Had Applicant's trial counsel requested such a Rule 705 hearing outside the presence of the jury he would have established that Smithy, who was not even an employee of TDCJ-ID, was either (1) not qualified to expertly

212

00213

testify about how TDCJ-ID administered its internal guidelines because he had no actual knowledge of the internal guidelines; or (2) if he had testified on voir dire that he was an expert in the application of those internal guidelines that he committed aggravated perjury. **Goss v. State**, 826 S.W.2d 162 (Tex. Crim. App. 1992), **cert. denied,**___U.S.___, 113 S.Ct. 3035, 125 L.Ed.2d 722 (1993). Applicant further asserts that it would have become clear that Smithy's testimony concerning what other violent people had done for the last eight years in prison, was not relevant to the issues of Applicant's future dangerousness. Applicant also asserts that it was deficient conduct within the first prong of **Strickland**, **supra**. not to have conducted such an outside the presence of the jury examination pursuant to Tex. R. Crim. Evid. 705.

The harm occasioned by Applicant due to this deficient conduct is that he was ultimately deprived of the one vehicle he had for the jury to utilize his mitigating evidence. By allowing the State to prove that Applicant **might** very well be granted an unescorted furlough. That it could be accomplished in a very short period of time, with little safeguards to ensure a safe application of this grant of release, effectively negated all of his mitigating evidence. Applicant's mitigating evidence, namely that he was a time bomb in society now, but safe in prison was effectively turned into damning aggravating evidence when Smithy was allowed to testify to

: 00214

the **possible** grant of emergency furlough in the near future. **See Andrade**, 700 S.W.2d at 590; **King**, 850 F.2d at 1061.

This in effect, deprived Applicant of having a jury that was allowed to consider and give effect to all of his relevant mitigating evidence. This changed the nature of his mitigating evidence. The evidence that Applicant was a threat in regular society, but not a threat in prison, until a great amount of time had passed, was now transformed into evidence that necessarily would dictate a death sentence to avoid the possibility of furlough. Because a serious error occurred at sentencing, **Hicks** teaches that a conclusion of harmlessness cannot be based on the ground that the jury legally could have returned affirmative answers even if the jury did not consider unescorted furlough as a reason for denying Applicant a life sentence. Indeed, there is no way that this error could be considered harmless, as it goes to heart of the reliability of the jury's determination of the answers to special issues, and increased the likelihood that Applicant would be sentenced to death.[59] His federal constitutional right to procedural due process

---

[59] The fact that the federal constitution does not bar the states from providing jurors in capital sentencing proceedings with information pertaining to the operation of parole laws through jury instructions, see **California v. Ramos**, 463 U.S. 992, 1013-1014 (1983), does not foreclose this claim. The Court in **Ramos** noted that its decision was not intended to override the contrary judgement of states that capital sentencing juries should not be permitted to consider parole matters. ("We sit as judges, not legislators, and the wisdom of the decision to permit juror consideration of possible commutation is best left to the States.") **Id.** **Ramos** also dealt with a court-offered and

00215

having been violated, Mr. Rhoades's sentence of death should be vacated and the cause remanded.

---

sanctioned jury instruction, not a jury's refusal to follow a court's instructions and state law regarding the consideration of the operation of a
state's parole laws, or consideration of and reliance upon misleading parole information.

215

## GROUND OF ERROR NUMBER THIRTY-THREE

**APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL ON PUNISHMENT BY COUNSEL FAILING TO OBJECT TO THE TESTIMONY OF ROY SMITHY FOR THE REASON THAT HIS TESTIMONY VIOLATED THE DICTATES OF TEX. R. CRIM. EVID.401 & 404**

Please consider the law concerning ineffective assistance of counsel claims per **Strickland, supra.** as has been set forth previously.

Applicant has set forth herein his complaints concerning the testimony of Roy Smithy on several occasions. That testimony, and the reasons Applicant complains of its admissibility has been previously stated, and Applicant would ask the Court to consider the same herein without requiring that it be restated. Likewise, the arguments and authorities concerning the **Strickland, supra.** standard for judging ineffective assistance of counsel.

In the case of **Montgomery v. State**, 810 S.W.2d 372 (Tex. Crim. App. 1990)(op.on reh'g), the court stated:

"Evidence is "relevant" that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex.R.Cr.Evid., Rule 401. "All relevant evidence is admissible, except as otherwise provided by ... these rules.... Evidence which is not relevant is inadmissible." Tex.R.Cr.Evid., Rule 402. Tex.R.Cr.Evid.,

216

: 00217

Rule 404, generally prohibits "the circumstantial use of character evidence." **Goode, Wellborn & Sharlot, Texas Practice: Texas Rule of Evidence: Civil and Criminal** § 404.2 (1988), at 106. Thus, although relevant, "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Rule 404(b), supra. 1

If the character of a party is directly in issue, the rule does not bar character evidence, "since then it would not be employed to establish a propensity to act in a certain way." **Goode, Wellborn & Sharlot, supra**, at 106. Such evidence would not be relevant, Rule 401, supra, it would also be admissible under Rule 402, supra, because it is not rendered inadmissible by Rule 404, supra. However, character per se "is almost never an element of a charge or defense in a criminal case."

Id. Evidence of "other crimes, wrongs, or acts" "may, however, be admissible" if it has relevance apart from its tendency "to prove the character of a person in order to show that he acted in conformity therewith." Rule 404(b), supra. Hence, a party may introduce such evidence where it logically serves "to make ... more probable or less probable" an elemental fact; where it serves "to make ... more probable or less probable" an evidentiary fact that inferentially leads

217

:00218

to an elemental fact; or where it serves "to make ... more probable or less probable" defensive evidence that undermines an elemental fact. Rules 404(b) and 401, both supra. Illustrative of the permissible "purposes" to which evidence of "crimes, wrongs, or acts" may be put are "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Rule 404(b), supra. Extraneous offense evidence that logically serves any of these purposes is "relevant" beyond its tendency "to prove the character of a person to show that he acted in conformity therewith." It is therefore admissible, subject only to the trial court's discretion nevertheless to exclude it "if its probative value is substantially outweighed by the danger of unfair prejudice...." Rule 403, supra. On the other hand, if extraneous offense evidence is not "relevant" apart from supporting an inference of "character conformity," it is absolutely inadmissible under Rule 404(b). For if evidence of "other crimes, wrongs, or acts" has only character conformity value, the balancing otherwise required by Rule 403 is obviated, the rulemakers having deemed that the probativeness of such evidence is so slight as to be "substantially outweighed" by the danger of unfair prejudice

218

as a matter of law. **United States v. Beechum**, 582 F.2d 898, at 910 (CA5 1978).

## II. THE TRIAL COURT'S FUNCTION

A. The Trial Court's Decision Whether To Admit Evidence Under Rule 404(b)

When a party attempts to adduce evidence of "other crimes, wrongs or acts," in order to preserve error on appeal, the opponent of that evidence must object in a timely fashion. Optimally, the opponent should object that such evidence is inadmissible under Rule 404(b). An objection that such evidence is not "relevant," or that it constitutes an "extraneous offense" or "extraneous misconduct," although not as precise as it could be, ought ordinarily to be sufficient under the circumstances to apprise the trial court of the nature of the complaint. **Zillender v. State**, 557 S.W.2d 515 (Tex.Cr.App.1977); Tex.R.App.Pro., Rule 52(a). Once that complaint is lodged, it is incumbent upon the proponent of the evidence to satisfy the trial court that the "other crime, wrong, or act" has relevance apart from its tendency "to prove character of a person in order to show that he acted in conformity therewith." Rule 404(b), supra. The trial court should honor any request by the opponent of the evidence for articulation into the record of the purpose for which evidence is either offered by the proponent or ultimately admitted by the trial court.

219

If the trial court determines the evidence has no relevance apart from character conformity, then the evidence is absolutely inadmissible. The trial court has no discretion to admit it. See 22 **Wright & Graham, Federal Practice and Procedure: Evidence** SS §5249 & 5250 (1978), at 540 & 544. On the other hand, the proponent of the evidence may persuade the trial court that the "other crime, wrong, or act" has relevance apart from character conformity; that it tends to establish some elemental fact, such as identity or intent; that it tends to establish some evidently fact, such as motive, opportunity or preparation, leading inferentially to an elemental fact; or that it rebuts a defensive theory by showing, e.g., absence of mistake or accident. Rule 401(b), supra. The proponent may also persuade the court that it is relevant upon a logical inference not anticipated by the rulemakers. This is the reason the "purposes" designated in Rule 404(b) for which "other crimes, wrongs, or acts" are admissible are, as was pointed out on original submission, "neither mutually exclusive nor collectively exhaustive." **Cleary, McCormick on Evidence,** §190 (3d ed. 1984), at 558. Cf. **Morgan v. State,** 692 S.W.2d 877, at 879 (Tex.Cr.App.1985) (list in **Albrecht v. State,** 486 S.W.2d 97 (Tex.Cr.App.1972) "was exemplary rather than exhaustive...."). Should he admit the evidence, then upon timely further request, the trial

220

judge should instruct the jury that the evidence is limited to whatever purpose the proponent has persuaded him it serves. Tex.R.Cr.Evid Rule 105(a)."

Deficient conduct and harm having been shown by Counsel's failure to object or limit this evidence, Applicant's U.S.CONST. AMEND. VI right to effective assistance of counsel having been violated the sentence of death should be vacated and the cause remanded.

221

## GROUND OF ERROR NUMBER THIRTY-FOUR

**APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL WAIVING APPLICANT'S RIGHT NOT TO BE TRIED AS A CRIMINAL GENERALLY ON THE GUILT STAGE OF THE TRIAL, BY ALLOWING INTO EVIDENCE PROOF THAT HE WAS ARRESTED FOR AN EXTRANEOUS BURGLARY, THAT HE HAD PREVIOUSLY BEEN TO THE PENITENTIARY SERVING CRIMINAL SENTENCES ON FOUR OCCASIONS, THAT HE HAD ONLY BEEN RELEASED ON PAROLE FOR LESS THAN TWENTY-FOUR HOURS WHEN THIS OFFENSE OCCURRED, AND THAT HE HAD GIVEN FALSE NAMES WHEN ARRESTED BEFORE.**

Immediately before the State conducted its opening statement the prosecutor made the following remark concerning her opening statement:

by the State: "....I assume that I would not be able to mention that the defendant was arrested while burglarizing a building and was in fact in custody when he gave the statement. Mr. Stafford has indicated to me that he would have no objection to that, that he intends to take a, quote, let it all hang out approach. And I just wanted to be sure we were all on the same track and that was the understanding before I get up in front of this jury and refer to that.....

by defense counsel: ....That is my intent, Your Honor. I have no objection to the State going into that at this time. (RXXVII, 7,8)

The State accepted Counsel's invitation, and on opening statement informed the jury that Applicant was arrested while committing a burglary of Young Elementary School in Pasadena, Texas a month after the murders. (RXXVII, 32) The Prosecutor further

222

stated that upon his arrest Applicant gave the police a false name. (RXXVII, 32)

.Defense counsel then responds with an opening statement of his own. He says that Applicant was arrested committing a burglary, that he admitted committing the crime, that he did not understand why he did this (the murders) because he was not a violent person. (RXXVII, 37) He further stated that Applicant had just gotten out of prison, was supposed to go to a half-way house, but he did not do that. Then he outlines the confession basically as the real story of what occurred. (RXXVII, 39)

At trial Pasadena ISD officer Frank Lopez testified to the arrest of Applicant for the school burglary a month after the murders without objection. (RXXVIII, 246ff) The State was allowed to admit into evidence a Texas Department of Corrections (TDCJ-ID) inmate card, with Applicant's picture on it and the name David Marcus without objection. (RXXVIII, 265) This card was not even found by Officer Lopez. The testimony concerning the finding of this card was hearsay to this officer.

Applicants counsel then asked the following:

by defense counsel: "Well, in fact, Officer, as you have been on this case, it has come to your attention that my client has used several aliases when he has been dealing with the police from time to time, hasn't he?

By Officer Lopez: Yes, he has.

223

By defense counsel: I think a matter of four or five different names?

By Officer Lopez: I believe so.

By defense counsel: **And often the reason this is done is that if I get caught and go to prison I get less time if they don't know about my enhancement paragraphs**? (RXXXVIII, 266)

Later the State offered into evidence Applicant's confession, in its entirety, without objection from the defense. (RXVIII, 360) The confession states "I have been to the joint four times, twice in Indiana and twice in Texas.....I got out of the joint on September 12th of this year. I processed out at the Walls Unit in Huntsville and caught a bus to Houston. I was in the joint this last time under an alias of David Marcas. I was suppose to go to a half-way house in Beaumont, but I came to Houston instead."(RXXXVIII, 361) Later it stated, "I was feeling real good about getting out of prison.... I was feeling real good about being out again." (RXXXVIII, 362,363) It also stated, "I had over a hundred dollars in my pocket from getting out of the joint." (RXXXVIII, 363)

On argument the State was then allowed to argue, without objection, that adequate cause is a cause that would commonly produce a degree of anger, rage, resentment or terror in a person of ordinary temper, not a hothead ex-con. (RXXX, 813) Then again she talked of reasonableness and said "however when you read those definitions, it doesn't mean, again, that you embrace the view of

224

a hot-headed convict, ex-con." (RXXX, 818) She then argued, "You have an ex-con who had been on the street less than twenty-four hours." (RXXX, 822) Again, "...as you listen to Mr. Stafford's argument and to mine, that statement came from an ex-con multiple times, he tells you in there been to the pen four times, twice in Indiana, twice in Texas. An accomplished liar who has managed to go to the pen under different names and pull that off." (RXXX, 823)

Defense counsel argued that the State did not disprove self-defense, and that Applicant was not guilty. (RXXX, 838) Defense counsel told the jury that they would never had known that Applicant was an ex-con if they had not let it in. He then said he would tell them why he did that, but he never did. (RXXX, 841) His second attorney also argued that Applicant was not guilty of capital murder. (RXXX, 846, 847)

The State then responded, "Hey, he gets out of the pen less than twenty-four hours before, and I believe Sergeant Kennedy says they give them something like two hundred dollars, in less than twenty-four hours he has blown half of this money on beer, video games and taxi fare." (RXXX, 855) Later, she refers to Applicant as a "brazen ex-con". (RXXX, 856)

Tex. R. Crim. Evid. 404, would have excluded evidence of the Pasadena ISD burglary which occurred a month after the capital murder. It certainly would have excluded the fact that Applicant had two trips to the Indiana penitentiary and two prior trips to the Texas penitentiary. It likewise, would have excluded the fact that

225

Applicant was only on parole for less than 24 hours when this capital murder was committed. This evidence would likewise not have come in as some form of impeachment pursuant to Tex. R. Crim. Evid. 608 or 609, because Applicant did not take the stand on guilt.

The Court in **Murphy v. State**, 777 S.W.2d 44 (Tex. Crim. App. 1988) stated the following. "Generally, the admissibility of an extraneous offense is determined by using a two-prong test:

First, it must be determined that the extraneous offense is relevant to a material issue in the case other than the defendant's character. Second, the evidence must possess probative value which outweighs its inflammatory or prejudicial effect."
**Plante v. State**, 692 S.W.2d 487, 491 (Tex.Crim.App.1985), citing **Williams v. State**, 662 S.W.2d 344 (Tex.Crim.App.1983). See also **Boutwell v. State**, 719 S.W.2d 164 (Tex.Crim.App.1986) (opinion on State's motion for rehearing), and **Robinson v. State**, 701 S.W.2d 895 (Tex.Crim.App.1985).

See also **Ex Parte Walker**, 777 S.W.2d 427 (Tex. Crim. App. 1989); **Cooper v. State**, 769 S.W.2d 301 (Tex. Crim. App. 1989). Applicant, could have determined pre-trial per Tex. R. Crim. Evid. 104, whether these convictions were admissible. Here, the State conceded that the evidence was inadmissible, but trial counsel allowed and even suggested its admission anyway.

There was no limiting charge on the use the jury could give to these prior convictions, (TR1, 268-280) because they were admitted

226

: 00227

for all purposes. The jury was free to convict Applicant because he was an ex-con, or to use the convictions for any purpose they saw fit.

There could have been no reasonable trial strategy that allowed the jury this highly prejudicial evidence that otherwise would never have been admissible. Especially, if the defense is serious in its plea that self-defense should apply, or that Applicant is not guilty of capital murder. It served no reasonable purpose to allow such testimony into evidence.

Appellant was entitled to effective assistance of counsel as a matter of federal constitutional law U.S. CONST. AMEND. VI & XIV; **Strickland v. Washington**, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and state constitutional law TEX. CONST. ART. 1 § 10, **Hernandez v. State**, 726 S.W.2d 53 (Tex. Crim. App. 1986). Appellant received ineffective assistance of counsel at trial where counsel failed in all of the areas set forth in this point of error.

"The test to be applied in determining ineffective assistance of counsel is found in **Strickland v. Washington**, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As the Court of Criminal Appeals has previously noted, no mechanistic formula is provided by **Strickland, supra**.

The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermines the proper functioning of the adversarial process that the trial cannot be relied on as having

00229

produced a just result. **Butler v. State**, 716 S.W.2d 48,54 (Tex. Crim. App. 1986) quoting **Strickland** 104 S.Ct. at 2064." **Ex Parte Welborn**, 785 S.W.2d 391 (Tex. Crim. App. 1990)

"**Strickland**, imposes a two-pronged test for the evaluation of ineffective assistance claims. First, the appellant must show that his counsel rendered ineffective assistance in that counsel made unprofessional errors such that counsel was not functioning effectively on the client's behalf. Secondly, appellant must show that he was prejudiced by his counsel's substandard performance. Prejudice must rise to the level sufficient to undermine the confidence in the outcome of the appellant's trial. **Strickland**, 466 U.S. at 694, 104 S.Ct. at 2068. The **Strickland**, standard has been adopted by the Court of Criminal Appeals in resolving allegations of ineffective assistance under Article 1, Sec. 10 of the Texas Constitution also. See **Holland v. State**, 761 S.W.2d 307, 314 (Tex. Crim. App. 1988), **cert denied** 489 U.S. 1091, 109 S.Ct. 1560, 103 L.Ed.2d 863 (1989); **Hernandez v. State**, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986). **Montez v. State**, 824 S.W.2d 308 (Tex. App.-San Antonio 1992)."

Even though it has been held in some circumstances that a single error of omission or commission by counsel can constitute ineffective assistance, **Jackson v. State**, 766 S.W.2d 504 (Tex. Crim. App. 1985), **modified on other grounds on remand from the U.S.**

00229

**Supreme Court** 766 S.W.2d 518 (Tex. Crim. App. 1988); **Ex Parte Felton**, 815 S.W.2d 733 (Tex. Crim. App. 1991).

Deficient conduct having been shown, the inquiry then is whether Applicant was harmed by this deficient act. On its face, Applicant was harmed because the jury was now allowed to consider highly prejudicial evidence without restriction. But for, counsel's actions this evidence would never have been before the jury. Likewise, as set forth in many other grounds of error's herein, the fact that Applicant could be so dangerous, so quick after release on parole was damning. Counsel knew, pre-trial, that the Court was disallowing him to inform the jury that life meant incarceration for at least 35 years, so any evidence of a speedy commission of the capital murder while on parole for less than 24 hours was likewise damning to his defense. The State, would have had an impossible task to show the jury that Applicant was on parole for only 24 hours, without opening the door even more than they did in this trial. That fact was especially compelling of a sentence of death, and trial counsel proved it up for the State. Obviously, this evidence would have been self-excluded by the State, but for Applicant's trial counsel. Therefore, deficient conduct and harm has been shown. The cause should therefore be reversed and remanded to the court below for new trial.

229

00230

## GROUND OF ERROR NUMBER THIRTY-FIVE

**APPLICANT'S RIGHT TO DUE PROCESS AND EQUAL PROTECTION WAS VIOLATED BY THE DISPARITY IN THE APPLICATION OF THE RULES OF EVIDENCE BY THE TEXAS COURTS.**

The heart of Applicant's complaint herein is the claim that the rules are applied differently to Applicant, then they are to the State. Applicant believes that a rule is a rule, regardless of who the benefactor is in any given situation. Applicant herein refers to the rule of "opening the door".

The State, during its case in chief, called the victim's father, Don Allen, to the stand. When he was testifying the State asked the following:

by the State: "Do you feel like you knew your son Charles' character for whether he was a peaceful type of person?

By defense counsel: Again, Your Honor, I object. That is an improper question at this time; has no relevancy; has not been raised in the evidence in any way.

By the State: This defendant's statement--

by the Court: **It's raised in the confession which was admitted.** (emphasis added)

by the State: Do you feel like you know your son Charles' character as to whether he was a peaceful person:

by the victim's father: Yes, he was a peaceful kind of person.

230

By the State: Do you know your son's character, Charles' character as to whether he was an aggressive or combative type individual?

By the Victim's father: No, not Charles." (RXXIX540,541)

Relying upon this ruling the State pushed this even further.

By the State: "Can you tell us what your relationship with Charles Allen and Bradley Dean Allen was?

By the witness: They were my brothers-in-law.

By the State: How long had you been married to their sister Janis?

By the witness: Eight years.

By the State: How long had you known Charles and Bradley Allen?

By the witness: Same amount of time.

By the State: Have you seen Charles Allen interact with both friends, people that he worked with and his family?

By the witness: Absolutely.

By the State: Are you familiar with the reputation, the character of Charles Allen in the community?

By the witness: Yes, I am.

By the State: In your opinion, was Charles Allen an aggressive person?

By the witness: not at all. Just to the contrary.

By the State: Was he a combative person?

By the witness: No.

By the State: In your opinion was he peaceful?

By the witness: Very peaceful.

By the State: Was his character one of a law-abiding character?

231

Then Applicant objects and reurges his motion in limine on victim impact testimony. See (TRIb, 190-191)

The trial judge's ruling that the character evidence was admissible because it was raised in the confession which was in evidence, was another way of saying that the door had been opened to this type of evidence. It obviously did not matter to the Court that the door, if opened, was opened by the State. The State offered the confession into evidence, not the defense. (RXXVIII, 360)

This Court stated in **Armstrong v. State**, 718 S.W.2d 686 (Tex. Crim. App. 1985), "It is never competent for the State in the first instance to prove that the person slain was peaceable and inoffensive. Such evidence becomes admissible in rebuttal when the opposite has been testified to in behalf of the defense, or when the defendant seeks to justify the homicide on the ground of threats made by the deceased."

In the case of **Hatley v. State**, 533 S.W.2d 27 (Tex. Crim. App. 1976), the court quoting the rule laid down in **Arthur v. State**, 339 S.W.2d 538-B (Tex. Crim. App. 1960) "The State may not introduce evidence of the deceased's good character unless that character has somehow been placed in issue by the defendant."

The State was allowed to open the door themselves, and then offer, in rebuttal, what otherwise was clearly inadmissible and highly prejudicial evidence. Obviously, a very loose application of the rule of opening the door.

00233

Contrast that to the following testimony elicited by the State: by the State: "Now, if a person receives less than a death sentence, in other words, a life sentence for capital murder, do they go into some special area just for capital murderers, or where are they assigned?

By Roy Smithy: If an inmate, once an inmate comes through diagnostic with anything less than a death sentence, he is classified the same as any other felony offense that has occurred that would come through the diagnostic system. No certain group or no certain felony offense is separated from any of the rest of these except for the death penalty cases.

By the State: And, so, if they are not separated, is this like the general population, they are going to be with other inmates who have committed other types of crimes?

By Roy Smithy: Well, it will be noted during his classification process that he was convicted of a violent offense. During his classification process of entering, that will be noted; but as far as he will come in as a close custody inmate. Once he remains a nondisciplinary problem, if you will, then they are reclassified. Each inmate is reclassified. And every thirty days, ever ninety days, depending on what classification that they are. And as they are classified, then they can move up from such as a you have line class one, two, three. These are--in the line class, **it depends on the amount of time that they are pulling good time** (emphasis

233

added)and also the type of work that they may do or where they may be assigned. They you have SAT, which stands for state approved trustee. **And once they obtain the state approved trustee 3 status, then no matter what offense that you have committed on the outside does not matter.** (Emphasis added) It basically depends on your disciplinary history while you are in the penitentiary as to where you are assigned, how you are assigned, either to your trustee status or whether you remain line class and not pull any good time.

By the State: So, if an inmate gets to the penitentiary and behaves himself for a period of time, he could be in the population with, what, people who have been convicted of felony D.W.I.?

By Roy Smithy: Yes, ma'am.

By the State: Or auto theft?

By Roy Smithy: Yes, ma'am.

By the State: Any offense?

By Roy Smithy: Yes, ma'am. Just because he is in for capital murder does not isolate him if he has less than a death sentence."(RXXXV, 1033-1035)

by the State: "If an inmate is in prison and behaves himself for a certain period of time, even if he has been convicted of capital murder, and, of course, is there on just a life sentence, is there an opportunity for him to get furloughed?

By Roy Smithy: If he obtains SAT status, state approved trustee 3 status, then he is eligible for furloughs.

234

: 00235

By the State: Just exactly what does a furlough mean?

By Roy Smithy: You have different types. You have emergency furloughs. You have other.--

By defense counsel: Your Honor, could I have a running objection to all of this?

By the Court: Just a moment. Approach the bench, please.

(Off the record hearing)

by defense counsel: (out of the jury's hearing) **Judge, to allow her to go into this stuff and not let me allude to--let the jury know he is going to stay locked up for thirty-five years is a gross miscarriage of justice.**

By the Court: I don't know where your objection is in there. I understand what your previous objection was. She has been admonished. (Of course none of the objections or the admonishment are on the record)

by defense counsel: I object to any further questions along this line.

By the Court: I am going to allow her to complete her line of questioning. That is all I am going to say. (Then before the jury)

by the State: I am not sure I remember what the last question was.

By defense counsel: Talking about furlough.

By the State: Thank you. I think I had asked you what is a furlough?

By Roy Smithy: A furlough is when an inmate is allowed to leave the prison unit **unescorted** (emphasis added) to attend whatever reason

235

: 00236

it is that he has requested to leave the unit, things such as funeral, family emergency and things of that sort where he, in essence, signs a piece of paper that says that he is going to be released a certain time and that he will go to wherever this emergency is and that he promises that he will be back and turn himself back into the unit.

By the State: Like just for the weekend or something or for a day or so?

By Roy Smithy: Yes, ma'am. It may not be just a weekend. It could very well be for a three day period in the middle of the week.

By the State: Depending on the circumstances?

By Roy Smithy: Yes, ma'am." (RXXXV, 1036-1038)

True, the trial court said that it did not understand the objection, but what could this have meant? **Judge, to allow her to go into this stuff and not let me allude to--let the jury know he is going to stay locked up for thirty-five years is a gross miscarriage of justice.** Applicant believes that any reasonable person would have to interpret that statement to mean, the State opened the door to the issue of good time, trustee status, furloughs, early release generally, and therefore Applicant should be able to respond? Throwing words in like a gross miscarriage of justice, is another way of saying his right to due process, equal protection, etc. has been violated. This too is obviously a request that the Court lift the pre-trial order not to mention anything

236

about parole. Of course the Court never lifted the pre-trial order not to mention parole.

Applicant likewise responded with the following request:

"Taking into account the wrongful admission of furlough evidence was admitted, and with the fact that my client just got out of prison when he committed this offense, it is imperative that this jury be informed that the defendant would have to serve a mandatory 35 years before becoming eligible for parole and that it would take an 18-man or member vote of the Parole Board before he can even make parole.

The Court: Overruled." (RXXXIX, 5)

When these two situations are contrasted it shows an obvious disparity in the application of this rule. The Court allowed the State, by its own conduct, to force the defendant's door open. The Court then allowed the State to elicit testimony about all of the elements that are considered in assessing parole, namely good time, trusty status, disciplinary record, and that a capital murderer sentenced to life is considered like any other inmate. The trial court implicitly found that this did not open the door for the defense to respond. The Court also openly ruled that a correct instruction on the law concerning parole was unwarranted as rebuttal.

This was all done even though starre decisis would have warranted the following of the rule of **Ortiz v. State**, 834 S.W.2d

237

:00238

343 (Tex. Crim. App. 1992) There the court stated: "we have held, a party may open the door to evidence of, iner alia, probation "suitability" by proffering evidence that broaches the subject, and the opponent, at his option, may either object, in which case the proffered evidence should be excluded, or present evidence in rebuttal.

On direct appeal this Court stated:

"The essence of appellant's argument is that he should be permitted to notify the jury regarding procedures surrounding discretionary prison release if the State is permitted to do so. However, the jury was authorized to consider evidence of unescorted emergency furlough because appellant failed to object properly to its admission. That the jury could consider emergency furlough does not necessitate that it be informed of the factors surrounding parole eligibility. This is because the jury's knowledge of whether appellant was eligible for parole is thirty-five years does not serve to rebut the possibility that appellant could be released on emergency furlough within two days of entering prison. The two issues are unrelated."

On direct appeal this Court ignored precedent that one side may refrain from objecting, either consciously or unconsciously, and rebut the evidence. **Ortiz, supra.** As to Applicant, all the Court stated was that it was his fault that the jury heard about furlough, good time, trustee status, and other incorrect statements about

238

: 00239

prison "early release" procedures. The Court ignored the fact that he should have had the right to respond. Even though this is general Texas trial law, it is also dictated in a capital case by the United States Constitution. "The Due Process Clause does not allow the execution of a person 'on the basis of information which he had no opportunity to deny or explain.'" **Simmons v. South Carolina,** 114 S. Ct. at 2192 citing **Gardner v. Florida,** 430 U.S., at 362. In **Simmons,** this Court reaffirmed the basic due process right to allow the defendant a fair opportunity to meet, rebut or explain any evidence which the state offers as a reason the defendant should be sentenced to death."

This Court then said that early release by furlough, and early release by parole are not even related. The Legislature certainly saw good conduct time and parole as related issues.[60] Likewise many courts have stated the obvious. "The statement concerning good time credit, allowing one to serve a year in seven months is consistent with common knowledge." **Munroe v. State,** 644 S.W.2d 540, 543 (Tex. App. 5th Dist. 1982). A common and reasonable understanding of what the State was eliciting would be. Even though Applicant was sentenced to life for capital murder, once he got to prison, if his disciplinary record was good he would be treated as any other

---

[60] See Art. 37.07 Sec. 4(b) V.A.C.C.P.

239

inmate. The offense would not matter. Obviously, the law sees it differently.[61]

By the trial and appellate courts applying the same rules differently just because Applicant is the party charged or convicted of a criminal offense they have violated the dictates of U.S. CONST. AMEND. XIV, TEX. CONST. Art. 1 Sec. 19 and denied Applicant equal protection of the law.

Applicant's sentence of death should therefore be vacated and the cause remanded. In the alternative, but without waiving the prior request, Applicant should be granted a new trial.

---

[61]See, Art. 42.18 Sec. 8(b)(2) V.A.C.C.P.

: 00241

GROUND OF ERROR NUMBER THIRTY-SIX

**APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AT THE PUNISHMENT STAGE OF THE TRIAL BY THE CUMULATIVE EFFECT OF ALL OF THE PUNISHMENT ERRORS SET FORTH IN THIS WRIT.**

Please consider the law concerning ineffective assistance of counsel claims per **Strickland, supra.** as has been set forth previously.

Applicant would now ask the Court to consider the cumulative effect of each ineffective assistance of counsel at punishment claims set forth herein. In assessing whether confidence is undermined in the punishment trial verdict (and thus whether **Strickland** "prejudice" has been established), this Court must look at trial counsel's deficiencies both individually **and cumulatively** during the course of the penalty trial.[62] **See Mak v. Blodgett,** 970

---

[62] As a constitutional matter, the punishment phase trial in Texas is a full-blown trial in and of itself and thus entitled to the same due process rights, including the right to the effective assistance of counsel, as the guilt-innocence phase trial. **See, e.g., Barclay v. Florida,** 463 U.S. 939, 952-954 (1983); **Bullington v. Missouri,** 451 U.S. 430 (1981). "A capital sentencing proceeding ...is sufficiently like a trial in its adversarial format and in the existence of standards for decision...that counsel's role in the proceeding is comparable to counsel's role at trial -- to ensure that the adversarial testing process works to produce a just result under the standards governing decision. For purposes of describing counsel's duties, therefore...[a]... capital sentencing proceeding need not be distinguished from an ordinary trial." **Strickland,** 466 U.S. at 684. Thus, the proper application of the cumulative assessment of the constitutional ineffectiveness of Petitioner's trial counsel on the issue before this Court is whether counsel was ineffective

241

: 00242

F.2d 614, 622 (9th Cir. 1992); **Kubat v. Thieret**, 867 F.2d 351, 370 (7th Cir. 1987)

Counsel's actions as set forth in claims numbers 19,20,21,23,24,25,30,32,& 33 when viewed cumulatively show a denial of effective assistance of counsel as guaranteed by U.S. CONST. VI and TEX. CONST. ART. I Sec. 10.   A capital defendant has the right to present evidence in mitigation of a death sentence.   Moreover, the jury must be afforded the ability to consider, and give effect to, any relevant mitigating evidence proffered by a defendant as a basis for a sentence less than death.   **Lockett v. Ohio**, 438 U.S. 586 (1978); **Eddings v. Oklahoma**, 455 U.S. 104 (1982); **Skipper v. South Carolina**, 476 U.S. 1 (1986).   The relevant inquiry in determining prejudice is "`whether there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"   **Fretwell**, 113 S.Ct. at 845.

Because a single hold-out juror during the punishment phase would have resulted in a life sentence, **see Tex. Code Crim. Pro. Art. 37.071(e)** (Vernon 1983), this Court's "prejudice" analysis regarding errors in the **sentencing** phase must ask only whether there is a reasonable probability that a single juror's mind could have been changed had counsel performed effectively.   **See Mak v. Blodgett**, 970 F.2d 614, 619-21 (9th Cir. 1992) (considering the

---

considering all of their performance during the penalty trial.

242

00243

Washington death penalty statute's "single holdout juror" provision in analyzing a **Strickland** claim); **Cf. Kirkpatrick v. Whitley**, 992 F.2d 491, 497 (5th Cir. 1993) ("[G]iven the unanimity required at the Louisiana punishment phase, the proper frame of reference, at least with regard to the punishment assessed, is whether the mind of one juror could have been changed with respect to the imposition of the sentence of death.").

Therefore, it should be clear that the first prong of **Strickland, supra.** has been proven by all of the instances of deficient conduct displayed herein, individually and cumulatively.

<u>HARM ANALYSIS</u>

We must now endeavor to decide if there is a reasonable probability that the result of the trial would have been different, but for counsel's deficient performance. **Strickland, supra**. That is, a probability <u>sufficient to undermine confidence in the outcome.</u> **Strickland**, 466 U.S. at 694, 104 S.Ct. At 2068, 80 L.Ed.2d at 698; **Vasquez v. State**, 830 S.W.2d 948 (Tex. Crim. App. 1992).

"A criminal defense lawyer must have a firm command of the facts of the case *as well as governing law* before he can render reasonably effective assistance to his client. **Ex parte Lilly,** 656 S.W.2d 490 (Tex. Crim. App. 1983): **Ex parte Ybarra**, 629 S.W.2d 943 (Tex. Crim. App. 1982)." **Jackson v. State**, (Tex. Crim. App. 1985); **Damian v. State**, 881 S.W.2d 102 (Tex. App.-Houston [1st Dist] 1994).

243

: 00244

## GROUND OF ERROR NUMBER THIRTY-SEVEN

**APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY THE CUMULATIVE EFFECT OF ALL ERRORS DURING THE GUILT/INNOCENCE STAGE OF THE TRIAL.**

Please consider the law concerning ineffective assistance of counsel claims per **Strickland**, **supra.** as has been set forth previously.

Applicant would ask the Court to consider the cumulative effect of all ineffective assistance of counsel errors set forth individually in grounds of error numbers 27,28,29.30 & 34 utilizing the same arguments and authorities cumulatively that were used individually therein.

The cumulative effect having shown deficient conduct and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different the cause should therefore be reversed and remanded to the court below for a new trial.

246

00247

## GROUND OF ERROR NUMBER THIRTY-EIGHT

**APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY THE CUMULATIVE EFFECT OF ALL ERRORS DURING THE DIRECT APPEAL STAGE OF THE TRIAL.**

Please consider the law concerning ineffective assistance of counsel claims per **Strickland, supra.** as has been set forth previously

Applicant would ask the Court to consider the cumulative effect of all error set forth individually in all ineffective assistance claims herein for the additional claim that they were not raised on direct appeal.

Each claim individually and cumulatively having shown deficient conduct the first prong of **Strickland, supra.** has been shown. Each claim individually and cumulatively having shown harm, it is likewise harm for failure to raise the issue on appeal. Deficient conduct and that a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different having been shown, the cause should therefore be reversed and remanded to the court below for a new trial consistent with the Court's ruling.

247

**WHEREFORE**, Applicant, Rick Allan Rhoades, prays that this Court:

A.  Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or be relieved of his unconstitutional sentence of death;

B.  Conduct a hearing at which argument may be offered concerning the allegations of his petition;

C.  Permit him, because of his indigence, to proceed without prepayment of costs and fees;

D.  Allow for the continued appointment of the undersigned counsel to represent him throughout state habeas corpus proceedings, and grant him sufficient funds to secure expert and lay testimony necessary to prove the facts as alleged in his petition;

E.  Grant him the authority to obtain subpoenas in forma pauperis for witnesses and discovery of documents and other information necessary to prove the facts as alleged in his petition;

F.  Grant him an evidentiary hearing at which he may be allowed to present evidence on these claims, and allow him a reasonable period of time subsequent to any hearing this Court determines to conduct, in which to brief the issues of fact of law raised by this petition or such hearing;

G.  Enter Findings of Fact and Conclusions of Law returnable to the Court of Criminal Appeals in Austin, Texas, recommending that

248

his conviction and sentence be vacated and that his case be remanded for a new trial; and

H.     Grant such other relief as may be necessary and appropriate.

Respectfully submitted,

James M. Leitner
Texas Bar No. 12187900
1314 Texas Ave., Ste. 1206
Houston, Texas  77002

Counsel for Applicant

249

: 00250

## Certificate of Service

I hereby certify that I have served the attached pleadings on the attorneys for the opposing party in this case by sending a copy of them U.S. mail to the following addresses:

  Mrs. Roe Wilson
  Harris County District Attorney's Office
  201 Fannin
  Houston, Texas  77002

  Mr. Robert Huttash, Esq.
  Office of the Attorney General
  Supreme Court Building
  Austin, Texas  78711

This ___ day of _____, 1997.

           James Leitner

250

# EXHIBIT "A"

### Affidavit of Jo-Ann Williams

STATE OF TEXAS      )(

COUNTY OF HARRIS )(

## AFFIDAVIT OF JO-ANN WILLIAMS

BEFORE ME, the undersigned authority, personally appeared, Jo-Ann Williams, and after being duly sworn by me, stated the following:

" My name is Jo-Ann Williams. I am over the age of eighteen years and competent to make this affidavit.

I have earned a Bachelor of Fine Arts from the University of Texas, Austin, Texas (1971), completed post-graduate studies in Art Education at the University of Houston, Houston, Texas (1974), as well as a Master of Creative Arts Therapy from the Pratt Institute, Brooklyn, New York (1991).

I have been registered member of the American Art Therapy Association (reg. #92-285) since November 30, 1992.  On January 1, 1995 I became a Board Certified Art Therapist (#92-285) and on December 8, 1995 I was licensed by the Texas State Board of Examiners of Professional Counselors (license #13199).

From 1988 through 1990 I did internship as an Art Therapist at CPC Capital Hospital, Austin, Texas and, from 1989 through 1993 at St. David's Pavilion, Austin, Texas.

My work experience at St. David's Pavilion included but was not limited to providing individual and group art therapy services to children, juvenile offenders within the adolescent unit, adult and geriatric population including substance abuse populations as well as trauma survivors in a crisis intervention short-term care facility.  Traditional verbal therapy was used in conjunction with art therapy and/or movement therapy.  Conducting many therapies to the medical community.

I then entered into private practice in Austin, Texas for approximately one year.

: 00253

From 1993-August 1994 I was Art Therapist at Twelve Oaks Hospital, Houston, Texas, which consisted of working on the Foundations unit with adult psychiatric clients and CD clients as well as Foundations dual diagnosis day treatment clients.

From October 1994 through June 1995 I served as Art Therapist/Counselor for the Harris County Department of Education, Highpoint High School, Houston, Texas.

From 1995 to present I serve as Art Therapist & Director of Adjunctive Therapy at West Oaks Hospital, Houston, Texas.

In my experience and practice I have and have had the opportunity to observe the impact of photographs on individuals. If I show you a photograph of a colleague, it will elicit some sort of reaction from you. People use photographs all the time, they look through magazines and look for specific ones to express their visual means, what their feelings are. As Americans a part of our culture is based on photographs. We are used to seeing them. When you visit at another persons house and eventually during social intercourse, in our society, photographs of family, children, homes, where people once lived or vacations will be passed around.

Having now observed the Defense exhibits 6 through 16 inclusive, which were excluded as evidence in the capital murder trail of Ricky Allen Rhoades, Cause No. 6124608, in the 179th District Court for Harris County, Houston, Texas and, based on my experience and expertise as an Art Therapist it is my opinion that:

At the outset the photographs show he was part of a very common experience. These photographs when given in addition to the adoptive father's (Ernest Rhoades) testimony would have shown Ricky Allen Rhodes was given normal experiences at a young age, and participated in a normal family atmosphere, then in an atmosphere that seemed to figure that his presence in a photograph was

2

important. Right there it was important that he was much of a family member, he is in all the family photographs. He was under and accepted someone as an authority figure within the structured environment.

It follows that as a family member it would be assumed that he would be held responsible for his behavior and his actions. A family is a structured environment, so is a penitentiary.

Taking the adoptive father's testimony along with these photographs would impact on the minds of people the direct connection between early childhood development and behavior in a structured environment in direct relation to the structured environment of the penitentiary.

What has happened in this case, with Ricky Allen Rhoades is when he got out from underneath the family or highly structured environment of prison he is unable to deal with society in broader rules which require self-control, self-discipline, self-guidance.

The photographs show Ricky Allen Rhoades was developing along normal lines in the structured environment.

As a professional and expert in Art Therapy it is my opinion that this jury or any jury in a capital murder case or any other case who saw all the crime scene photos, and the penitentiary packets with mug shots, previous crimes, and then came the testimony of the family, of the adoptive father, with these eleven photographs admitted into evidence and shown to the jury it would mitigate against a penalty of death to me, and if to me, then to others. The photographs would carry tremendous probative weight.

The photographs would have given weight and credibility to the adoptive father's testimony. They also reflect that within a structured environment the development of Ricky Allen Rhoades would be acceptable and not pose a continuing threat to society.

3

It is my professional opinion that had these photographs been admitted to this jury, they would have made a big difference because I and people in our society need to see photographs because they say more. Only an actual event itself has more impact than photographs. The photographs tell a story themselves.

Taking into consideration a capital trial covers several weeks, the jury in this case was only allowed to view photographs presented by the State of Texas, including mug shots, the autopsy, and crime scene photographs. The admission of these photographs provided the jurors something concrete to remember. People will remember pictures, even when they forget the story.

Therefore, the denied photographs would have affected the jury and allowed them to actually "see" and "remember" a reason to exercise a reasoned moral response mitigating against a penalty of death." The denial of Defense exhibits 6 through 16 limited the Defense to just words.

*Jo-Ann Williams MPS, ATRBC, LPC*

Jo-Ann Williams, M.P.S., A.T.R.-B.C., L.P.C.
2122 Persa
Houston, Texas 77019
(713) 526-4767

SUBSCRIBE AND SWORN to before me, the undersigned authority, on this the

26 th day of May, 1997.



NOTARY PUBLIC IN AND FOR TEXAS

Rosie Garcia

Notaries printed name

My commission expires: 06-19-2000

4

# EXHIBIT "B"

## Affidavit of Rick Allan Rhoades

: 00257

STATE OF TEXAS          )(

COUNTY OF WALKER        )(

**Affidavit of Rick Rhoades**

**Before me the undersigned authority personally appeared Rick Alan Rhoades who upon his oath did depose and state:**

Approximately April or May 1990, before I went to Prison, on a Friday or Saturday night Chris Fitch asked me if I could still get a quantity of Marijuana. Fitch told me that it was for one of his acquaintances, which ended up being one of the brothers that I was charged with killing. I told Fitch that I could get the marijuana, and I got the marijuana from a source in Pasadena. His name was Gilbert and it was off Edgebrook where Fairmont turns into Edgebrook. The Painters Mill apts. I do not remember which apt. I went over there, it was a few blocks from where I was staying. I stayed in the Park Hollow Apts. at that time. I got 5 pounds of marijuana and took it to Chris Fitch. Fitch lived with his grandmother who was on one street over from where the murders took place. Her house was the first house  There are pictures in the transcript behind the apartments.  These are the Park Hollow apts and it was the street right behind the apts. It sits behind Hullabaloos.

We go back to the Grandmothers house and smoke some joints. Fitch told me that  the guy would meet them at Krogers or Hullabaloos.  Fitch took me to the guy who was going to purchase the marijuana.  One of the deceased was there and he had long hair.  Chris Fitch told me that he knew these guys well and that their parents were good for a lot of money. The guy was supposed to have $3000.00, to pay me for the marijuana, and he did not have the money with him. He only had $800 at the time. He told me where he lived and that he would have the rest of the money by Monday. He would try to get the money by Saturday, but would have it for sure by Monday. He told me where he lived it was behind the Park Hollow also, but not on the same street as Chris Fitch. There was a trailer park near there. I saw where their parents lived but that was it.

On Saturday Chris Fitch  came over to my house and I told him to check on the dude for the money. Later the dude told Chris that he would have the money by Monday. Then on Sunday I got caught burglarizing  this guy that was a jeweler. There was a police chase and I hid in  a dog house and was caught. I went to jail under the name of David Marcas. I took 5 yrs. from Ted Poe under the name of David Marcas. There was no communication with anyone at this time, it was my fourth trip to prison so I told nobody for fear that I would be habitualized. I did 18 or 19 months on the sentence. Since I was under an alias I did this amount of time and I could not even tell my family where I was for fear that I would be found out.

There was no communication from me while I was in the Jester unit. I was released on Friday 13 of September 1991. I immediately went from the Huntsville bus station to Houston. I was supposed to go to Beaumont but since I now was using my real name again I  went to Houston instead. When I was still in Huntsville, I called Chris Fitch in Houston. Chris had just gotten back from Georgia where he had gotten his leg broke. Chris told me that he would meet me when I got to Houston. I rode the bus to Houston, and went to our old neighborhood. I then went to a Pack an Go across the street from the Park Hollow Apts. I met Chris there and we got a beer and sat around and talked. They went to Chris's  grandmothers house. We talked about things, and then we talked about the prior marijuana sale where I was never fully paid off.  Then Chris told me that the dudes

: 00258

that had bought the marijuana from me had just built a house. I figured that if they could pay for a house, they could surely pay me for the marijuana now.  Chris did not go with me, but he told me where this house was . It was a new house built on  a lot  across the street from where their parents house was. I saw that there was a bunch of people over there when I first looked at the house  around 5:00 or 6:00 P.M. so I waited. I went to Chris's house and then to Park Hollow. There I saw Debbie Party and old girlfriend from the Park Hollow Apts. Then Chris came over to Debbie's apt.. Chris told me that he would leave his house unlocked so I could come back there. It was around 11:00 p.m. or later when I left Debbie's apt. I told Chris that I would be home about 1:00 a.m.  I then, on the spur of the moment, decided to walk back over to where the dudes lived.  It was about  12:00 or later when I walked over to their new house. I got there and I saw the brother that I had made the sale to. I thought the guy was turning off the sprinkler or something. I walked up the driveway, and the guy said it is late what are you doing here? I thought he had someone else  there with him. I did not know at that time that his brother was there. I figured he had some chick there with him. So I asked the dude if he was going to get me the money for the marijuana. I told the dude that I just got out of prison, and that I needed the  money. He recognized me and he knew  that he owed me $2200.00. The dude was hedging around, and he did not produce the money. The guy told me that it was 2 yrs ago and he couldn't help him out. He said he was sorry and that it was too long ago, that he wasn't going to pay me.  I told him, "You got a new house and you really don't want something to happen to it do you". The dude then threatened to call the police. I then smacked him in the face and he ran inside the house. I followed him inside. Once inside I attacked him and we fought.  This guy kept hollering. I really was not drunk or high at the time. The guy kept screaming something. Then the dude grabbed a knife out of a knife rack and started running. I ran around the counter and back towards the hallway. I was chasing after him. I then ran into the wrong room and it was a weight room. I then picked up a weight bar. It was a short curling bar or something like that. Then I looked down the hallway and I saw the door half open down the hallway. I went into that room and the dude was in there. It looked like he was digging for something, so I hit the dude in the arm with the bar. Then I hit his shoulder, and then I started hitting him in the head. I kind of went into a rage and hit him many times. The dude had dropped his knife, so I then picked up the knife and started stabbing him with it. This guy was hollering at the top of his lungs as best as I can remember. Then his brother came in and started yelling. This scared me because I did not know that he was even there. He came at me and I then wheeled on him and attacked the brother with the knife.  We fought all down the hallway. I know that I stabbed him repeatedly, and he fell down somewhere. I threw the knife  and kicked him, and he pushed the door shut as I went out.

I know that I then ran into the kitchen and grabbed another knife, but I don't believe that I ever used that knife. This was all happening so fast I am not sure that I even remember what all was happening. I never went over there with the intent of even getting into a fight, I thought that the dude would just pay me for the marijuana. I know that I was extremely depressed because my parents had moved and I couldn't find them. Even thought I had disappeared without telling them a word for some 19 months or so, I felt that they had somehow deserted me by moving without telling me.  I only had the money that the Pen gives you when you get out, and I really needed the $2200.00, they owed me so that I could find my parents. I took my shirt off and put it in my pocket. I was covered with blood at this time.  I grabbed some pants that were sitting there and a shirt that was sitting there. I didn't think that the second person that I fought was hurt that bad, and I thought that he was calling the police or getting a gun or something so I just wanted to get out of there pretty fast.

When I first sold him the marijuana  I remember him telling me that he was collecting money from somebody else on it.  I took off my boots and I ran out.  I went through some woods and I did have their keys.  I threw their keys away.  I cut through and old abandoned trailer park.  I went to Chris's house and knocked on Chris's window. Chris freaked out when I told him what happened. Chris told me that his grandmother was there so I would have to leave. So I left and went to an abandoned apt. at the Park Hollow Apts.  and got cleaned up. Then I walked around and just hid out.

Then I remember that I  went to a motel . The smiles inn off of I 45.  I took a cab there with some of my remaining TDC money.  I knew that if the guys were alive they would be telling the police and they would be after me. I knew that they would go to Chris's because the dude knew me from Chris.  I  was then  in a hiding mode.  I first found out that they were brothers and they both were dead, by seeing in on a TV at the  Motel.  I did not hear on the news that it was a capital murder.

I called Chris later and he told me not to come back over to his house. He didn't want anything to do with me anymore.  When Chris testified as he did at the trial I knew that he wasn't telling the whole truth, and I felt that because he wasn't telling the truth about the drug deal that I couldn't then take the stand and tell the truth about what happened. That is the only reason that I didn't take the stand and let the jury know the reason that all of this happened.

I swear that the above is the whole truth.

*Rick Rhoades*
Rick Alan Rhoades

Subscribed and sworn to before me that undersigned authority on this the 24th day of April, 1997.

*G. Parker*
Notary Public in and for the State of TEXAS

seal

G. PARKER
NOTARY PUBLIC
STATE OF TEXAS
My Commission Expires 1-5-2000

# EXHIBIT "C"

## Affidavit of Rosie Fronckiewicz

THE STATE OF TEXAS   )(

COUNTY OF HARRIS   )(

### AFFIDAVIT OF FACT

BEFORE ME, the undersigned authority, personally appeared, Rosie A. Fronckiewicz, who being duly sworn upon her oath deposed and said:

"My name is Rosie A. Fronckiewicz. I am above the age of twenty-one years, of sound and competent mind able to recollect and testify to the facts below.

I was employed by the Texas Department of Criminal Justice - Institutional Division for approximately five years. Through the course of my employment I filled many capacities from clerk to security officer.

I have been appointed to escort inmates on emergency furlough. To my knowledge no inmate who has been convicted of capital murder and sentenced to life in prison has ever been granted any furlough, emergency of otherwise, much less one who just arrived in the system.

According to Lon B. Glenn, T.D.C.J.-I.D., Ass't. Warden (Retired), who was employed by the agency for thirty years, he could not recollect any inmate serving a life sentence for capital murder ever being allowed on any type of furlough.

According to Jerry McGinty, T.D.C.J.- I.D., Chief of Classification (Retired), who was employed by the agency for 27 years, no inmate would be considered until they had served at least one year, and no inmate serving a life sentence for capital murder would be considered for any type of unescorted furlough.

According to Leroy Montgomery, T.D.C.J.-I.D., Lieutenant (Retired), who was employed by the agency for thirty years, he could not recollect there ever being an inmate serving a life sentence for capital murder ever being allowed on any type furlough.

00262

According to Robert Herrera, T.D.C.J.-I.D., Ass't. Warden of the Michael Unit, Palestine, Texas, who has been employed by the agency for 17 years.   He would never approve an inmate serving a life sentence for capital murder for any type of furlough much less an unescorted emergency furlough.

According to John Adams, T.D.C.J.-I.D., Ass't. Warden of the Jester Unit, Richmond, Texas it might be possible, but highly unlikely that any inmate serving a life sentence for capital murder would ever achieve State Approved Trusty I status.  Such an inmate will not be considered until he is within one year of minimum parole eligibility.  Warden Adams further stated he had never seen it happen and was not aware of any inmate allowed to attain such a minimum security status.

From my own experience to the years of accumulated experience of T.D.C.J.-I.D. officials no one could recall any case where an inmate sentenced to life for capital murder had been approved for any type furlough, and this would be specifically applicable to unescorted emergency furloughs."

_Rosie A. Fronckiewicz_
Rosie A. Fronckiewicz

SUBSCRIBED AND SWORN to before me, the undersigned authority, on this the _11_ day of _August_ , 1997.

RUTH LEITNER
Notary Public, State of Texas
My Commission Expires 11-06-98

_Ruth Leitner_
NOTARY PUBLIC IN AND FOR TEXAS

_RUTH LEITNER_
Notary's printed name

My commission expires: _11-6-98_

2

: 00263

# EXHIBIT "D"

### Affidavits of Practicing Harris County Criminal Defense Attorneys

: 00264

# AFFIDAVIT

I, _BRIAN D. Coyne_, am a practicing attorney in
Harris County, Texas. My Texas State Bar Number is _04966800_. I
have practiced criminal defense law for _18_ years. I am familiar with the
trial of capital murder cases in Harris County, Texas.  I have personally been involved in
the trial of  capital murder cases, on and off, for at least _8-10_ years.  I am
also familiar with the fact that within the last six years some of the Harris County Judges
that conduct capital voir dire allow for the jury to be informed of the mandatory amount of
time a person must serve on a "capital life sentence" before becoming eligible for parole,
and some do not. Likewise, some Harris County Judges instruct the jury, at punishment, as
to the amount of time a defendant must serve before becoming eligible for parole on a
"capital life sentence", and some do not.  Whether a particular defendant will be allowed to
have his/her jury informed of the mandatory amount of time the defendant would serve
without being eligible for parole on a capital life sentence depends, in Harris County,
Texas, solely on which Court the defendant's case happens to be assigned to.

**Affiant**

Subscribed and sworn to before me the undersigned Clerk of the _____ AUG 13 1997
_____ Court of Harris County, Texas.

**Deputy District Clerk**

seal

## AFFIDAVIT

I, _____, am a practicing attorney in

Harris County, Texas. My Texas State Bar Number is _____. I

have practiced criminal defense law for _____ years. I am familiar with the

trial of capital murder cases in Harris County, Texas.  I have personally been involved in

the trial of  capital murder cases, on and off,  for at least _____ years.  I am

also familiar with the fact that within the last six years some of the Harris County Judges

that conduct capital voir dire allow for the jury to be informed of the mandatory amount of

time a person must serve on a "capital life sentence" before becoming eligible for parole,

and some do not. Likewise, some Harris County Judges instruct the jury, at punishment, as

to the amount of time a defendant must serve before becoming eligible for parole on a

"capital life sentence", and some do not.  Whether a particular defendant will be allowed to

have his/her jury informed of the mandatory amount of time the defendant would serve

without being eligible for parole on a capital life sentence depends, in Harris County,

Texas, solely on which Court the defendant's case happens to be assigned to.

_____
Affiant

Subscribed and sworn to before me the undersigned clerk of the _____
_____ Court of Harris County, Texas.

_____
Deputy District Clerk

seal

# AFFIDAVIT

I, _DENNIS SPURLING_, am a practicing attorney in Harris County, Texas. My Texas State Bar Number is _1897 4400_. I have practiced criminal defense law for _18_ years. I am familiar with the trial of capital murder cases in Harris County, Texas.  I have personally been involved in the trial of  capital murder cases, on and off,  for at least _____ years.  I am also familiar with the fact that within the last six years some of the Harris County Judges that conduct capital voir dire allow for the jury to be informed of the mandatory amount of time a person must serve on a "capital life sentence" before becoming eligible for parole, and some do not. Likewise, some Harris County Judges instruct the jury, at punishment, as to the amount of time a defendant must serve before becoming eligible for parole on a "capital life sentence", and some do not.  Whether a particular defendant will be allowed to have his/her jury informed of the mandatory amount of time the defendant would serve without being eligible for parole on a capital life sentence depends, in Harris County, Texas, solely on which Court the defendant's case happens to be assigned to.

8/13/97

_____
Affiant

Subscribed and sworn to before me the undersigned clerk of the (CCL#13)
_____Court of Harris County, Texas.

_____
Deputy District Clerk

seal

: 00267

# AFFIDAVIT

I, _TERRENCE GAISEC_ , am a practicing attorney in Harris County, Texas. My Texas State Bar Number is _07572506_ . I have practiced criminal defense law for _24_ years. I am familiar with the trial of capital murder cases in Harris County, Texas.  I have personally been involved in the trial of  capital murder cases, on and off,  for at least _20_ years.  I am also familiar with the fact that within the last six years some of the Harris County Judges that conduct capital voir dire allow for the jury to be informed of the mandatory amount of time a person must serve on a "capital life sentence" before becoming eligible for parole, and some do not. Likewise, some Harris County Judges instruct the jury, at punishment, as to the amount of time a defendant must serve before becoming eligible for parole on a "capital life sentence", and some do not.  Whether a particular defendant will be allowed to have his/her jury informed of the mandatory amount of time the defendant would serve without being eligible for parole on a capital life sentence depends, in Harris County, Texas, solely on which Court the defendant's case happens to be assigned to.

_____
Affiant

Subscribed and sworn to before me the undersigned clerk of the _CCCL#13_
_____ Court of Harris County, Texas.

_____
Deputy District Clerk

seal

: 00268

# AFFIDAVIT

I, _John P. Keirnan_, am a practicing attorney in Harris County, Texas. My Texas State Bar Number is _11194700_. I have practiced criminal defense law for _16_ years. I am familiar with the trial of capital murder cases in Harris County, Texas. I have personally been involved in the trial of capital murder cases, on and off, for at least _12_ years. I am also familiar with the fact that within the last six years some of the Harris County Judges that conduct capital voir dire allow for the jury to be informed of the mandatory amount of time a person must serve on a "capital life sentence" before becoming eligible for parole, and some do not. Likewise, some Harris County Judges instruct the jury, at punishment, as to the amount of time a defendant must serve before becoming eligible for parole on a "capital life sentence", and some do not. Whether a particular defendant will be allowed to have his/her jury informed of the mandatory amount of time the defendant would serve without being eligible for parole on a capital life sentence depends, in Harris County, Texas, solely on which Court the defendant's case happens to be assigned to.

_____
Affiant

Subscribed and sworn to before me the undersigned clerk of the _CCCL#13_
_____ Court of Harris County, Texas.

_____
Deputy District Clerk

seal

# AFFIDAVIT

I, _FLOYD W. FREED III_ , am a practicing attorney in Harris County, Texas. My Texas State Bar Number is _07413500_ . I have practiced criminal defense law for ____23____ years. I am familiar with the trial of capital murder cases in Harris County, Texas.  I have personally been involved in the trial of  capital murder cases, on and off,  for at least ____5____ years.  I am also familiar with the fact that within the last six years some of the Harris County Judges that conduct capital voir dire allow for the jury to be informed of the mandatory amount of time a person must serve on a "capital life sentence" before becoming eligible for parole, and some do not. Likewise, some Harris County Judges instruct the jury, at punishment, as to the amount of time a defendant must serve before becoming eligible for parole on a "capital life sentence", and some do not.  Whether a particular defendant will be allowed to have his/her jury informed of the mandatory amount of time the defendant would serve without being eligible for parole on a capital life sentence depends, in Harris County, Texas, solely on which Court the defendant's case happens to be assigned to.

_____
**Affiant**

AUG 18 19__

Subscribed and sworn to before me the undersigned clerk of the _____
_____**Court of Harris County, Texas.**

_____
**Deputy District Clerk**

            seal

# AFFIDAVIT

I, _Gilbert A Villarreal_, am a practicing attorney in Harris County, Texas. My Texas State Bar Number is _20582500_. I have practiced criminal defense law for _15_ years. I am familiar with the trial of capital murder cases in Harris County, Texas.  I have personally been involved in the trial of  capital murder cases, on and off,  for at least _7_ years.  I am also familiar with the fact that within the last six years some of the Harris County Judges that conduct capital voir dire allow for the jury to be informed of the mandatory amount of time a person must serve on a "capital life sentence" before becoming eligible for parole, and some do not. Likewise, some Harris County Judges instruct the jury, at punishment, as to the amount of time a defendant must serve before becoming eligible for parole on a "capital life sentence", and some do not.  Whether a particular defendant will be allowed to have his/her jury informed of the mandatory amount of time the defendant would serve without being eligible for parole on a capital life sentence depends, in Harris County, Texas, solely on which Court the defendant's case happens to be assigned to.

_____
Affiant

Subscribed and sworn to before me the undersigned clerk of the _AUG 1 3 1997_
_____ Court of Harris County, Texas.

_____
Deputy District Clerk

seal

## AFFIDAVIT

I, _DAVID CUNNINGHAM_, am a practicing attorney in Harris County, Texas. My Texas State Bar Number is _05234400_. I have practiced criminal defense law for _14+_ years. I am familiar with the trial of capital murder cases in Harris County, Texas.  I have personally been involved in the trial _+ appeal_ of  capital murder cases, on and off,  for at least _14_ years.  I am also familiar with the fact that within the last six years some of the Harris County Judges that conduct capital voir dire allow for the jury to be informed of the mandatory amount of time a person must serve on a "capital life sentence" before becoming eligible for parole, and some do not. Likewise, some Harris County Judges instruct the jury, at punishment, as to the amount of time a defendant must serve before becoming eligible for parole on a "capital life sentence", and some do not.  Whether a particular defendant will be allowed to have his/her jury informed of the mandatory amount of time the defendant would serve without being eligible for parole on a capital life sentence depends, in Harris County, Texas, solely on which Court the defendant's case happens to be assigned to.

**Affiant**

Subscribed and sworn to before me the undersigned ~~clerk of the~~ _NOTARY_ ~~Court~~ of Harris County, Texas.

~~Deputy District Clerk~~
_NOTARY_

seal

JOHN C. EVERLY
Notary Public, State of Texas
My Commission Expires
OCTOBER 5 1999

# AFFIDAVIT

I, _Ben Durant_ , am a practicing attorney in Harris County, Texas. My Texas State Bar Number is _06273900_ . I have practiced criminal defense law for _Twenty_ years. I am familiar with the trial of capital murder cases in Harris County, Texas.  I have personally been involved in the trial of  capital murder cases, on and off,  for at least _Fifteen_ years.  I am also familiar with the fact that within the last six years some of the Harris County Judges that conduct capital voir dire allow for the jury to be informed of the mandatory amount of time a person must serve on a "capital life sentence" before becoming eligible for parole, and some do not. Likewise, some Harris County Judges instruct the jury, at punishment, as to the amount of time a defendant must serve before becoming eligible for parole on a "capital life sentence", and some do not.  Whether a particular defendant will be allowed to have his/her jury informed of the mandatory amount of time the defendant would serve without being eligible for parole on a capital life sentence depends, in Harris County, Texas, solely on which Court the defendant's case happens to be assigned to.

_Ben Durant_
**Affiant**

Subscribed and sworn to before me the undersigned clerk of the _____
_____Court of Harris County, Texas.

_____
Deputy District Clerk

seal

JOHN C. EVERLY
Notary Public, State of Texas
My Commission Expires
OCTOBER 5 1999

00273

# AFFIDAVIT

I, _Charles A. Brown_____, am a practicing attorney in

Harris County, Texas. My Texas State Bar Number is _03101400_____. I

have practiced criminal defense law for _____17_____ years. I am familiar with the

trial of capital murder cases in Harris County, Texas.  I have personally been involved in

the trial of  capital murder cases, on and off,  for at least _____7_____ years.  I am

also familiar with the fact that within the last six years some of the Harris County Judges

that conduct capital voir dire allow for the jury to be informed of the mandatory amount of

time a person must serve on a "capital life sentence" before becoming eligible for parole,

and some do not. Likewise, some Harris County Judges instruct the jury, at punishment, as

to the amount of time a defendant must serve before becoming eligible for parole on a

"capital life sentence", and some do not.  Whether a particular defendant will be allowed to

have his/her jury informed of the mandatory amount of time the defendant would serve

without being eligible for parole on a capital life sentence depends, in Harris County,

Texas, solely on which Court the defendant's case happens to be assigned to.

**Affiant**

Subscribed and sworn to before me the undersigned ~~clerk of the~~ _____
_____NOTARY_____ ~~Court~~ of Harris County, ~~Texas~~.

~~Deputy District Clerk~~

seal

JOHN C. EVERLY
Notary Public, State of Texas
My Commission Expires
OCTOBER 5 1999

# AFFIDAVIT

I, _JAMES M. LEITNER_, am a practicing attorney in Harris County, Texas. My Texas State Bar Number is _12187900_. I have practiced criminal defense law for _Approx 14_ years. I am familiar with the trial of capital murder cases in Harris County, Texas.  I have personally been involved in the trial of  capital murder cases, on and off,  for at least _12_ years.  I am also familiar with the fact that within the last six years some of the Harris County Judges that conduct capital voir dire allow for the jury to be informed of the mandatory amount of time a person must serve on a "capital life sentence" before becoming eligible for parole, and some do not. Likewise, some Harris County Judges instruct the jury, at punishment, as to the amount of time a defendant must serve before becoming eligible for parole on a "capital life sentence", and some do not.  Whether a particular defendant will be allowed to have his/her jury informed of the mandatory amount of time the defendant would serve without being eligible for parole on a capital life sentence depends, in Harris County, Texas, solely on which Court the defendant's case happens to be assigned to.

_James M. Leitner_
**Affiant**

Subscribed and sworn to before me the undersigned ~~clerk of the~~ _Notary Public of 13 th_ _Day of August, 1997_  ~~Court of Harris County~~, Texas.

_Ruth Leitner_
~~**Deputy District Clerk**~~

RUTH LEITNER
Notary Public, State of Texas
My Commission Expires 11-06-98

: 00275

# AFFIDAVIT

I,   CONNIE B. WIILIAMS   , am a practicing attorney in

Harris County, Texas. My Texas State Bar Number is   21521500   . I

have practiced criminal defense law for   22   years. I am familiar with the

trial of capital murder cases, on and off, for at least   20   years. I am also

familiar with the fact that within the last six years some of the Harris County Judges that

conduct capital voir dire allow for the jury to be informed of the mandatory amount of

time a person must serve on a "capital life sentence" before becoming eligible for parole,

and some do not. Likewise, some Harris County Judges instruct the jury, at punishment,

as to the amount of time a defendant must serve before becoming eligible for parole on a

"capital life sentence", and some do not. Whether a particular defendant will be allowed to

have his/her jury informed of the mandatory amount of time the defendant would serve

without being eligible for parole on a capital life sentence depends, Harris County, Texas,

solely on which Court the defendant's case happens to be assigned to.

_____
Affiant

**SUBSCRIBED AND SWORN BEFORE ME** in the  _13_  day of _Aug._, 1997.

_____
Notary Public in and for the
State of Texas

MARITZA FANINI GUZMAN
MY COMMISSION EXPIRES
APRIL 4, 2001

# AFFIDAVIT

I, _Lott J. Brooks III_ , am a practicing attorney in

Harris County, Texas. My Texas State Bar Number is _03070150_ . I

have practiced criminal defense law for _15_ years. I am familiar with the

trial of capital murder cases in Harris County, Texas.  I have personally been involved in

the trial of  capital murder cases, on and off,  for at least _6_ years.  I am

also familiar with the fact that within the last six years some of the Harris County Judges

that conduct capital voir dire allow for the jury to be informed of the mandatory amount of

time a person must serve on a "capital life sentence" before becoming eligible for parole,

and some do not. Likewise, some Harris County Judges instruct the jury, at punishment, as

to the amount of time a defendant must serve before becoming eligible for parole on a

"capital life sentence", and some do not.  Whether a particular defendant will be allowed to

have his/her jury informed of the mandatory amount of time the defendant would serve

without being eligible for parole on a capital life sentence depends, in Harris County,

Texas, solely on which Court the defendant's case happens to be assigned to.

_____
Affiant

Subscribed and sworn to before me the undersigned clerk of the AUG 1 3 1997

_____ Court of Harris County, Texas.

**Deputy District Clerk**

seal

# AFFIDAVIT

THE STATE OF TEXAS

COUNTY OF HARRIS

Before me, the undersigned authority, on this day did personally appear, Kurt B. Wentz, who, being by me duly sworn, did state under oath as follows:

"My name is Kurt B. Wentz. I am an attorney licensed to practice law in the State of Texas. In Cause No. 713,189 entitled The State of Texas vs. Eric Dewayne Cathey in the 176th District Court of Harris County, Texas, I represented the Defendant. That case involved the prosecution for the offense of capital murder in which the State sought the death penalty.

Prior to voir dire I requested that I be allowed to voir dire the jury on the amount of time a defendant sentenced to life imprisonment for the offense of capital murder would have to serve prior to becoming eligible for parole. The court granted that motion. The State and the Defense were then allowed to discuss this issue with each prospective juror.

The Honorable Woody Denson presided over voir dire.

At the punishment phase of the trial I requested a jury charge instructing the jury that the Defendant would have to serve 40 years on his life sentence before he would become eligible for parole. The presiding judge, The Honorable Brian Raines, granted this request. A copy of the charge is attached, marked Exhibit A, and incorporated herein by reference for all purposes.

I have read the foregoing Affidavit and its contents are true and correct."

_____
Kurt B. Wentz

Subscribed and sworn to before me on this _18th_ day of June, 1997.

_____
Notary Public State of Texas

My commission expires:

> MARIAN C. JOLLY
> Notary Public, State of Texas
> My Commission Expires
> NOV. 30, 2000

: 00279

CAUSE NO. 713189

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 176TH DISTRICT COURT |
| VS. | § | OF HARRIS COUNTY, TEXAS |
| ERIC DEWAYNE CATHEY | § | FEBRUARY TERM, A. D., 1997 |

Members of the Jury:

By your verdict returned in this case you have found the defendant, Eric Dewayne Cathey, guilty of the offense of capital murder, which was alleged to have been committed on or about the 12th day of September, 1995, in Harris County, Texas. In order for the Court to assess the proper punishment, it is necessary now for you to determine, from all the evidence in the case, the answers to certain questions, called "Special Issues," in this charge. The Court instructs you in answering these "Special Issues" as follows:

The mandatory punishment for the offense of capital murder of which you have found the defendant guilty is death or confinement in the Texas Department of Criminal Justice, Institutional Division, for life.

In determining your answers to the questions, or special issues, submitted to you, you shall consider all the evidence submitted to you in this whole trial, which includes that phase of the trial wherein you were called upon to determine the guilt or innocence of the defendant, and this punishment phase of the trial wherein you are now called upon to determine the answers to Special Issues submitted to you by the Court. However, in this punishment phase of the trial you should not consider the instructions given you in the first phase of trial that relate to the law of parties and the responsibility of parties for the acts of others in the commission of offenses. You shall consider only the conduct and state of mind of this defendant in determining what your answers to the Special Issues shall be.

You shall consider all evidence submitted to you during the whole trial as to the defendant's background or character or the

circumstances of the offense that militates for or mitigates against the imposition of the death penalty.

You are instructed that when you deliberate on the questions posed in the special issues, you are to consider all relevant mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the State or the defendant.  A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character, background, the personal moral culpability of the defendant or circumstances of the crime which you believe could make a death sentence inappropriate in this case.  If you find that there is a mitigating circumstance or circumstances in this case, you must decide how much weight it/they deserve, if any, and thereafter, give effect and consideration to it/them in assessing the defendant's personal culpability at the time you answer the special issue.

You are instructed that mitigating evidence, if any, may be considered by you in answering either or both of the special issues under consideration.  If you determine, when giving effect to the mitigating evidence, if any, that a life sentence rather than a death sentence is an appropriate response, let your answers to the special issues reflect that.

You are further instructed that you are not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling in considering all the evidence before you and in answering the special issues.

A-3

Should you return an affirmative finding on Special Issue No. 1 and Special Issue No. 2 and a negative finding on Special Issue No. 3, the Court will sentence the defendant to death. Should you return a negative finding on Special Issue No. 1 or Special Issue No. 2 or an affirmative finding on Special Issue No. 3, the Court will sentence the defendant to confinement in the Institutional Division of the Texas Department of Criminal Justice for life.

A. 4

The State must prove Special Issue No. 1 submitted to you beyond a reasonable doubt, and you shall return a Special Verdict of "YES" or "NO" on Special Issue No. 1.

In deliberating on Special Issue No. 1 you shall consider all the evidence admitted at the guilt or innocence stage and the punishment stage of trial, including evidence of the defendant's background, character, the personal moral culpability of the defendant, or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.

You may not answer Special Issue No. 1 "YES" unless you agree unanimously.

You may not answer Special Issue No. 1 "NO" unless ten (10) or more jurors agree.

Members of the jury need not agree on what particular evidence supports a negative answer to Special Issue No. 1.

You are further instructed that you are not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling in considering all of the evidence before you and in answering the Special Issue No. 1.

It is not required that the State prove Special Issue No. 1 beyond all possible doubt; it is required that the State's proof excludes all "reasonable doubt" concerning the defendant.

A "reasonable doubt" is a doubt based on reason and common sense after a careful and impartial consideration of all the evidence in the case. It is the kind of doubt that would make a reasonable person hesitate to act in the most important of his own affairs.

Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.

The State must prove Special Issue No. 2 submitted to you beyond a reasonable doubt, and you shall return a Special Verdict of "YES" or "NO" on Special Issue No. 2.

In deliberating on Special Issue No. 2 you shall consider all the evidence admitted at the guilt or innocence stage and the

A-5

punishment stage of trial, including evidence of the defendant's background, character, the personal moral culpability of the defendant, or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.

You may not answer Special Issue No. 2 "YES" unless you agree unanimously.

You may not answer Special Issue No. 2 "NO" unless ten (10) or more jurors agree.

Members of the jury need not agree on what particular evidence supports a negative answer to Special Issue No. 2.

You are further instructed that you are not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling in considering all of the evidence before you and in answering the Special Issue No. 2.

It is not required that the State prove Special Issue No. 2 beyond all possible doubt; it is required that the State's proof excludes all "reasonable doubt" concerning the defendant.

A "reasonable doubt" is a doubt based on reason and common sense after a careful and impartial consideration of all the evidence in the case.  It is the kind of doubt that would make a reasonable person hesitate to act in the most important of his own affairs.

Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.

You are instructed that if you return an affirmative finding, that is a "YES" answer, to Special Issue No. 1 and Special Issue No. 2, and only then, are you to answer Special Issue No. 3.

You are instructed that in answering special Issue No. 3, you shall answer the issue "YES" or "NO."

You may not answer Special issue No. 3 "NO" unless you agree unanimously, and you may not answer Special Issue No. 3 "YES" unless ten (10) or more of you agree to do so.

You need not agree on what particular evidence supports an affirmative finding on Special Issue No. 3.

A- 6

: 00284

In answering Special Issue No. 3 you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness, including evidence of the defendant's background, character, the personal moral culpability of the defendant, or the circumstances of the offense that mitigates against the imposition of the death penalty.

You are again instructed that you are not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling in considering all of the evidence before you in answering Special Issue No. 3.

A-7                    : 00285

Under the law applicable in this case, the defendant, if sentenced to a term of life imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

It is also possible that the length of time for which the defendant will be imprisoned on a life sentence might be reduced by the award of parole.

Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life, he will not become eligible for parole until the actual calendar time served equals forty (40) calendar years, without consideration of good conduct time. Eligibility for parole does not guarantee that parole will be granted.

It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment for life, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

A 8

You are instructed that the defendant may testify in his own behalf if he chooses to do so, but if he elects not to do so, that fact cannot be taken by you as a circumstance against him nor prejudice him in any way. The defendant has elected not to testify in this punishment phase of trial, and you are instructed that you cannot and must not refer to or allude to that fact throughout your deliberations or take it into consideration for any purpose whatsoever.

During your deliberations upon the "Special Issues," you must not consider, discuss, nor relate any matters not in evidence before you.  You should not consider nor mention any personal knowledge or information you may have about any fact or person connected with this case which is not shown by the evidence.

In arriving at the answers to the "Special Issues" submitted, it will not be proper for you to fix the same by lot, chance, or any other method than by a full, fair and free exchange of the opinion of each individual juror.

After the reading of this charge, you shall not be permitted to separate from each other, nor shall you talk with anyone not of your jury.  After argument of counsel, you will retire and consider your answers to the "Special Issues" submitted to you. It is the duty of your foreman to preside in the jury room and vote with you on the answers to the "Special Issues" submitted.

You are the exclusive judges of the facts proved and the credibility of the witnesses and the weight to be given to their testimony, but you are bound to receive the law from the Court which has been given you and you are bound thereby.

Brian Rains, Judge
176th District Court
Harris County, TEXAS

SPECIAL ISSUE NO. 1

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Eric Dewayne Cathey, would commit criminal acts of violence that would constitute a continuing threat to society?

ANSWER

We, the jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is "YES."

_____
Foreman of the Jury

OR

We, the jury, because at least ten (10) jurors have a reasonable doubt as to the probability that the defendant, Eric Dewayne Cathey, would commit criminal acts of violence that would constitute a continuing threat to society, determine that the answer to this Special Issue is "NO."

_____
Foreman of the Jury

In the event that the jury has answered Special Issue No. 1 in the affirmative, and only then, shall the jury answer Special Issue No. 2 to be found on the following page.

: 00289

## SPECIAL ISSUE NO. 2

Do you find from the evidence beyond a reasonable doubt that Eric Dewayne Cathey, the defendant himself, actually caused the death of Christina O. Castillo, on the occasion in question, or if he did not actually cause the death of Christina O. Castillo, that he intended to kill Christina O. Castillo, or that he anticipated that a human life would be taken?

### ANSWER

We, the jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is "YES."

_____
Foreman of the Jury

### OR

We, the jury, because at least ten (10) jurors have a reasonable doubt that Eric Dewayne Cathey, the defendant himself, actually caused the death of Christina O. Castillo, on the occasion in question, or that he intended to kill Christina O. Castillo, or that he anticipated that a human life would be taken, determine that the answer to this Special Issue is "NO."

_____
Foreman of the Jury

In the event that the jury has answered Special Issue No. 2 in the affirmative, and only then, shall the jury answer Special Issue No. 3 to be found on the following page.

00290

## SPECIAL ISSUE NO. 3

Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Eric Dewayne Cathey, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

### ANSWER

We, the jury, unanimously find that the answer to this Special Issue is "NO."

_____
Foreman of the Jury

### OR

We, the jury, because at least ten (10) jurors find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed, find that the answer to this Special Issue is "YES."

_____
Foreman of the Jury

After the jury has answered each of the Special Issues under the conditions and instructions outlined above, the Foreman should sign the verdict form to be found on the last page of this charge.

A-17

: 00291

<u>VERDICT</u>

We, the Jury, return in open court the above answers to the "Special Issues" submitted to us, and the same is our verdict in this case.

_____
Foreman of the Jury

:00292

## AFFIDAVIT

I, James M. Leitner, state bar number 12187900, do upon my oath state the following:

"I am the attorney for Applicant in this Writ of Habeas Corpus. During my investigation I interviewed several Harris County, District Judges concerning their practices concerning whether they allowed the jury to be told of the mandatory time before parole eligibility in capital cases. I found the following:

1. There were District Judges that would not allow the jury to be informed of the mandatory amount of time a person would serve before eligible for parole on a capital murder life sentence at any point during a capital trial. They believed that they were just following the law.

2. There was a District Judge who said that he always informs the jury during his voir dire what a life sentence really means. He follows that instruction with an instruction that they should not consider the same in reaching their verdict. This same Judge does not instruct the jury about the mandatory time before parole eligibility in the charge. This Judge believed that this was the only fair thing to do.

3. There were some Judges who both allow for the jury to be informed at voir dire, and they likewise informed them of the true meaning of a life sentence for capital murder in the charge. These

Judges believed that this was the fair thing to do and would be the law soon.

4. One Judge informed the jury of the true meaning of a life sentence for lesser included offenses, but refused to so instruct on capital life. She acknowledged that this probably left the Jury with the impression that life for a lessor offense, and life for capital murder meant the same thing.

5. One Judge told me that he would leave it up to the defense, and that he would make the defense attorney request the way he wanted it handled, on the record, so that it would be requested error if error at all.

It is my understanding, after conducting these interviews, and after speaking to many capital murder defense attorneys, that the facts do not govern whether or not a defendant can have his/her jury informed of the mandatory amount of time he/she must serve before parole eligible on a capital life sentence. The controlling factor is which court your particular case is assigned. It is my belief that if Rick Allan Rhoades' case had been assigned to the 174th, 176th, 262nd, or one of the special courts that only handle capital offenses, or others he would have been allowed to have had his jury know that if sentenced to life, he would have had to have served 35 years before he was eligible for parole. The luck of the draw, namely being assigned to the 179th, kept Mr. Rhoades from having his jury know about the true definition of a capital life sentence. On this issue, he was treated differently than a similar capital

defendant would have been treated who was assigned to a District Court where the Judge had a different philosophy."

An evidentiary hearing is requested. If an evidentiary hearing is allowed **all of the Harris County, District Judges** could either be subpoenaed to testify as to their practices in this matter since 1991, or they could be given written interrogatories to discover this information.

_____
Affiant

SUBSCRIBED AND SWORN to before me the undersigned authority on this the 18th day of August, 1997.

```
RUTH LEITNER
Notary Public, State of Texas
My Commission Expires 11-06-98
```
Seal

_____
Notary Public in and for the State of TEXAS

# EXHIBIT "E"

## Affidavit of James M. Leitner

00296

## AFFIDAVIT

I, James M. Leitner, state bar number 12187900, make the following affidavit.

I was appointed to represent Rick Allan Rhoades for the purpose of preparing and filing a writ of habeas corpus pursuant to Art. 11.071 V.A.C.C.P. In the process of investigating and writing said writ I had the occasion to hire private investigator Jim Jackson to assist me. Mr. Jackson has informed me that on April 16, 1997, he spoke with a witness in this case named Chris Fitch. Chris Fitch told Mr. Jackson that he had given a written statement to the police prior to testifying in the capital murder trial of Rick Rhoades. He stated that, within the body of the statement, it said that Rick Rhoades "killed the people over drugs and that he was high on drugs at the time". He told Mr. Jackson that the statement itself was not true, and that the Prosecutor skipped over that portion of this statement.

I further reviewed the record of trial and found that trial counsel did not ask to see any pre-trial statement of Chris Fitch when he testified.



Affiant

SUBSCRIBED AND SWORN to before me the undersigned authority on this the 18th day of August, 1997.

RUTH LEITNER
Notary Public, State of Texas
My Commission Expires 11-06-98

Seal

Notary Public in and for the State of TEXAS

: 00298



# CHARLES BACARISSE
### HARRIS COUNTY DISTRICT CLERK

NOVEMBER 3, 1997

MR. JAMES M. LEITNER
ATTORNEY AT LAW
1314 TEXAS AVE., SUITE 1206
HOUSTON, TEXAS  77002

RICK ALLAN RHOADES
RE:  Cause No.  612408-A

179th            District Court

Dear Applicant:

Your post-conviction petition for writ of Habeas Corpus was received and filed on
AUGUST 18, 1997   .  Article 11.07 of the Texas Code of Criminal Procedure affords
the State 15 days in which it may answer said petition.  After the 15 days allowed
the State, the Court has 20 days in which it may order a hearing.  If the Court has
not entered an order within 35 days from the date of the filing of the petition, the
petition will be forwarded to the Court of Criminal Appeals for their consideration.

The records of this office reflect the following:

CAUSE NO.        PETITION FOR WRIT OF HABEAS CORPUS FILED        DISPOSITION

All future correspondence should indicate the above listed cause number.

Very truly yours,

RAYMOND POSADO, Manager
Post-Trial Systems
Criminal Division

RP:      lm

cc:   Judge of the above named District Court
      District Attorney's Office
      Appellate Division

: 00299



DON STRICKLIN
FIRST ASSISTANT

DISTRICT ATTORNEY'S BUILDIN
201 FANNIN, SUITE 200
HOUSTON, TEXAS 77002-1901

# JOHN B. HOLMES, JR.
## DISTRICT ATTORNEY
## HARRIS COUNTY, TEXAS

November 3, 1997

Charles Bacarisse, District Clerk
Harris County, Texas
301 San Jacinto Street
Houston, Texas  77002

           RE:  Ex parte_____ Rick Allan Rhoades

           No. 612408-A _____ in the____ 179th

           District Court of Harris County, Texas

           Filing date:__ August 18, 1997

Dear Sir:

I hereby acknowledge receipt of a copy of the above-captioned postconviction petition for writ of habeas corpus, a death penalty case filed pursuant to article 11.071 of the Texas Code of Criminal Procedure.  Therefore, I waive service by certified mail as provided therein.

I understand that I have 30 days in which to file an answer.

           Sincerely,

_____
Date received

_____
Assistant District Attorney
Harris County, Texas

DON STRICKLIN
First Assistant



DISTRICT ATTORNEY'S BUILDING
201 FANNIN, SUITE 200
HOUSTON, TEXAS 77002-1901

# JOHN B. HOLMES, JR.
## DISTRICT ATTORNEY
## HARRIS COUNTY, TEXAS

NOVEMBER 3, 1997

Charles Bacarisse, District Clerk
Harris County, Texas
301 San Jacinto Street
Houston, Texas   77002

RE:   Ex parte_____   RICK ALLAN RHOADES

No. _612408-A____ in the__ 179th

District Court of Harris County, Texas

Filing date:_____ AUGUST 18, 1997

Dear Sir:

I hereby acknowledge receipt of a copy of the above-captioned postconviction petition for writ of habeas corpus, a death penalty case filed pursuant to article 11.071 of the Texas Code of Criminal Procedure.   Therefore, I waive service by certified mail as provided therein.

I understand that I have 30 days in which to file an answer.

Sincerely,

NOV 1 3 1997

_____
Date received

_____
Assistant District Attorney
Harris County, Texas

: 00301

SUPPLEMENTAL
CERTIFICATE OF THE CLERK

APPLICANT IN CUSTODY

THE STATE OF TEXAS                    {   IN THE 179th DISTRICT COURT

COUNTY OF HARRIS                      {   OF HARRIS COUNTY,  TEXAS

I, CHRIS DANIEL, District Clerk of Harris County, Texas, do hereby certify that the

foregoing _302_ pages contain true and correct copies of original records now in my

lawful custody and possession relating to cause number 612408-A  including the petition,

all answers filed by the State, the Order of the Court (entered on the 13TH  day of

AUGUST,A.D., 2014 ) and each document, the inclusion of which was thereby ordered.


I further certify the Applicant RICK ALLAN RHOADES is in the custody of the Texas

Department of Criminal Justice Institutional Division.


Witness my hand and seal of said Court at Houston, Texas, on this the _13th_ day of

AUGUST , 2014.


CHRIS DANIEL, District Clerk
Harris County, Texas


By:_____
Roxana Garcia   Deputy

PAGE 1 OF 1                                                    REV. 01-02-04